## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In Re: | Case No.: 25-30004 |
| | Chapter 11 |
| The Ruins, LLC, | |
| Debtor. | |

### AFFIDAVIT OF JOSHUA W. LUTHER IN SUPPORT OF MOTION FOR RELIEF FROM STAY

STATE OF SOUTH DAKOTA     )
                                    ) SS
COUNTY OF MINNEHAHA      )

I, Joshua W. Luther, hereby state and declare as follows:

1.     I am the Vice President of CBRE Valuation and Advisory Services ("CBRE") located in Sioux Falls, South Dakota.

2.     I graduated with a Bachelor of Science degree in Business Administration from Black Hills State University and a Master of Business Administration with a concentration in Project Management from Colorado Technical University.

3.     I am duly licensed to appraise property in the State of South Dakota. I am an established commercial real estate appraiser and an MAI designated member of the Appraisal Institute with more than twenty (20) years of commercial real estate experience in the Upper Midwest.

4.     I have personal knowledge of the construction of the 63-unit mid/high rise building located at 315 East Kemp Ave., Watertown, South Dakota (the "Ruins Project"). I visited the Ruins Project on May 6, 2025, for a site inspection.

5.    Attached hereto as <u>Exhibit 1</u> is a true and correct copy of CBRE's report following the site inspection on May 6, 2025.

Dated this 14th day of July, 2025.

_____
Joshua W. Luther

Subscribed and sworn to before me this 14th day of July, 2025.

_____
Notary Public, Minnehaha County, SD

REMINGTON COSTER
NOTARY PUBLIC
SOUTH DAKOTA
(SEAL)

2

# EXHIBIT 1

CBRE Valuation & Advisory Services

# Appraisal Report

**THE RUINS APARTMENTS**

315 East Kemp Avenue
Watertown, South Dakota  57201

Prepared for: RED RIVER STATE BANK
Date of Report: July 2, 2025
CBRE File No.: CB25US038368-1

**cbre.com/valuation**

CBRE Valuation & Advisory Services

**CBRE**

7405 S. Bitterroot Pl., #114
Sioux Falls, SD 57108

T  (605) 201-0684

www.cbre.com/valuation

Date of Report: July 2, 2025

Mr. Charles Aarestad
Executive Vice President
RED RIVER STATE BANK
300 2nd Avenue West
Halstad, Minnesota  56548

RE:    Appraisal of: The Ruins Apartments
315 East Kemp Avenue
Watertown, Codington County, South Dakota 57201
CBRE File No.: CB25US038368-1

Dear Mr. Aarestad:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property.  Our analysis is presented in the following Appraisal Report.

The subject is a 63-unit multi-family property situated on a 0.84-acre site located at 315 East Kemp Avenue in Watertown, South Dakota. The property consists of a single, four-story apartment building. The site improvements were originally proposed to be constructed in 2021 and construction is still not complete. Construction was halted mid-construction and the property owner filed for bankruptcy in January 2025. The subject legal description is: The Ruins Addition to the City of Watertown, Codington County, SD.

Construction of the subject property was not complete on the inspection date. Therefore, we have also estimated the subject's market value at completion of construction and upon reaching stabilized operations.

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Fee Simple Estate | May 6, 2025 | $4,520,000 |
| Prospective As Complete | Fee Simple Estate | August 6, 2025 | $6,390,000 |
| Prospective As Stabilized | Fee Simple Estate | August 6, 2027 | $7,070,000 |
| Compiled by CBRE | | | |

This Appraisal Report is subject to Extraordinary Assumptions and/or Hypothetical Conditions; please refer to the Executive Summary section of this report for further discussion and analysis.

CBRE Valuation & Advisory Services

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value. The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute. It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES

_____

Josh Luther, MAI
Title: VAS - Vice President
Phone: (605) 201-0684
Email:   Josh.Luther@cbre.com
License No. & State: 1021CG  SD

# Certification

## We certify to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  Josh Luther, MAI has provided services, as an appraiser, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment. Prior appraisal reports are dated October 24, 2023 and July 20, 2022.

5.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice.

9.  Josh Luther, MAI has made a personal inspection of the property that is the subject of this report.

10.  No one provided significant real property appraisal assistance to the persons signing this certification.

11.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.

12.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

13.  As of the date of this report, Josh Luther, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

14.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the State of South Dakota.

Josh Luther, MAI
Certified General  1021CG  SD

# Subject Photographs



**Aerial View – subject outlined in red**

Subject Photographs



South & west elevations looking northeast



North and east elevations looking southwest

Subject Photographs



North & west elevations looking SE



South & east elevations looking NW



North elevation/rear alley looking NW



East elevation looking south



South & west elevations looking NE



Looking east on Kemp Ave.

Subject Photographs





Parking garage

Parking garage





Main floor commercial space

Elevator






Interior stairwell

Second floor hallway

Subject Photographs



Unit 222 kitchen area



Unit 222 living room



Unit 222 bedroom



Unit 222 bedroom



Unit 222 bathroom



Unit 222 primary closet

# Executive Summary

| | |
|---|---|
| **Property Name** | The Ruins Apartments |
| **Location** | 315 East Kemp Avenue |
| | Watertown, Codington County, SD 57201 |
| **Parcel Number(s)** | 9352 |
| **Client** | RED RIVER STATE BANK |
| **Highest and Best Use** | |
| As If Vacant | Hold for future mixed-use development |
| As Improved | Current use - commercial/parking use on main floor and multifamily use above the main floor |
| **Property Rights Appraised** | Fee Simple Estate |
| **Date of Inspection** | May 6, 2025 |
| **Estimated Exposure Time** | 6 Months |
| **Estimated Marketing Time** | 6 Months |
| **Land Area (Improved)** | 0.84 AC                    36,645 SF |
| **Zoning** | C1 Community Commercial |

| **Improvements** | | **Comments** | |
|---|---|---|---|
| Property Type | Multifamily | (Multifamily Mid/High Rise) | |
| Number of Buildings | 1 | | |
| Number of Stories | 4 | | |
| Gross Building Area | 95,544 SF | | |
| Net Rentable Area | 49,638 SF | | |
| Number of Units | 63 | | |
| Average Unit Size | 788 SF | | |
| Year Built | 2025 | | |
| Effective Age | 0 Years | | |
| Remaining Economic Life | 50 Years | | |
| Condition | New | | |
| **Buyer Profile** | Investor-Regional | | |
| **Financial Indicators** | | | |
| Current Occupancy | 0.0% | | |
| Stabilized Occupancy | 93.5% | | |
| Stabilized Credit Loss | 0.5% | | |
| Estimated Lease-up Period | 24 Months | | |
| Overall Capitalization Rate | 7.00% | | |

| Pro Forma | | Total | Per Unit |
|---|---|---|---|
| Effective Gross Income | | $775,198 | $12,305 |
| Operating Expenses | | $280,138 | $4,447 |
| Expense Ratio | | 36.14% | |
| Net Operating Income | | $495,060 | $7,858 |
| **VALUATION** | | Total | Per Unit |
| **Market Value As Is** | **May 6, 2025** | | |
| Sales Comparison Approach | | $4,945,000 | $78,492 |
| Income Approach | | $4,520,000 | $71,746 |
| **Market Value As Complete** | **August 6, 2025** | | |
| Sales Comparison Approach | | $6,810,000 | $108,095 |
| Income Approach | | $6,390,000 | $101,429 |
| **Market Value As Stabilized** | **August 6, 2027** | | |
| Sales Comparison Approach | | $7,495,000 | $118,968 |
| Income Approach | | $7,070,000 | $112,222 |

| CONCLUDED MARKET VALUE | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value |
| As Is | Fee Simple Estate | May 6, 2025 | $4,520,000 |
| Prospective As Complete | Fee Simple Estate | August 6, 2025 | $6,390,000 |
| Prospective As Stabilized | Fee Simple Estate | August 6, 2027 | $7,070,000 |
| Compiled by CBRE | | | |

## Strengths, Weaknesses, Opportunities and Threats (SWOT)

### Strengths/ Opportunities

- The subject will be in excellent condition at construction completion and has a good location in the community.
- The subject is located in a fully built-up neighborhood, which reduces the risk of future competitors.
- The subject neighborhood is a desirable commercial neighborhood in the community which provides a wide variety of commercial support facilities.
- Given the area demographics, it appears that demand for both comparable surrounding area apartment units and the subject will continue to be favorable.

### Weaknesses/ Threats

- The subject is located in a tertiary market, or a community with a relatively small population, which limits the prospective buyer pool.
- There are two other properties similar to the subject in the central business district that are currently operating below stabilized occupancy. This increases risk associated with the lease-up period.
- The property has been partially finished with no construction activity occurring recently and the developer has been in the local news due to the recent bankruptcy filing and other historic construction delays. This increases the risk of the subject property having a negative stigma with local market participants or potential buyers.

- Commercial real estate market conditions have deteriorated at the macro level due to the significant increase in the cost of capital beginning in 2022 reducing the volume of transaction activity. Over the past few years, this has impacted price discovery and created an increase in uncertainty.
- Recent tariffs implemented by the US have created global economic uncertainty. The outcome of the US tariffs, retaliatory tariffs, and global trade disruption is uncertain as of the date of value. Macro-economic conditions may change and impact the value of commercial real estate.

## Market Volatility

President Trump's announcement of broad-based global tariffs on April 2 sent shock waves through global financial markets. Potential impacts will depend on how long tariffs remain in place and the extent to which retaliatory tariffs by other countries will impact the U.S. economy. The full economic effect of the tariffs is evolving and could result in slower growth as well as potential inflationary pressures.

The reader is cautioned that recent events have created uncertainty for commercial real estate. The impacts on interest rates, the 10-year Treasury yield, leasing activity, real estate demand, construction costs, availability of financing, and values remain unclear. Overall, greater risk and market volatility is likely in the near term.

Experience has shown that consumer and investor behavior can quickly change during periods of such heightened volatility. Lending or investment decisions should reflect this heightened level of volatility and potential for deteriorating market conditions.

It is important to note that the conclusions set out in this report are valid as at the valuation date only. Where appropriate, we recommend that the valuation is closely monitored, as we continue to track how markets respond to evolving events.

## Extraordinary Assumptions

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

The proposed property improvements were not complete as of the inspection date.  Therefore, numerous extraordinary assumptions must be used in developing the as complete and as stabilized opinions of value.

The as complete opinion of value is based on the following extraordinary assumptions:

- Assumes construction is complete as of the as complete effective date and occupancy is at 0%.
- Assumes the development is fully entitled and permitted for the construction of the improvements as specifically described herein and that the project will be completed on time and within budget and in accordance with the plans and assumed good level of specifications commensurate with other new developments in the surrounding area.
- Assumes the budgeted cost to complete the remaining improvements is accurate.
- A certificate of completion/occupancy has been issued by the appropriate regulatory agency.
- The as complete value includes a Prospective opinion of market value at the completion of the property. As such, the prospective values are based on forward-looking projections that are based on current market indications and typical underwriting witnessed by market participants. Any

---

[1] The Appraisal Foundation, *USPAP, 2024 Edition* (Effective January 1, 2024)

Executive Summary

significant change in market conditions that are inconsistent with the assumptions made herein could impact the opinion of market value.

The as stabilized opinion of value is based on the following extraordinary assumptions:

- The property has achieved stabilized occupancy.
- The as stabilized value includes a Prospective opinion of market value at the stabilization of the property. As such, the prospective values are based on forward-looking projections that are based on current market indications and typical underwriting witnessed by market participants. Any significant change in market conditions that are inconsistent with the assumptions made herein could impact the opinion of market value.

The use of these extraordinary assumptions might have affected assignment results. Furthermore, the use of these extraordinary assumptions is reasonable for this appraisal assignment and produce credible appraisal results.

## Hypothetical Conditions

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purposes of analysis." [2]

- None noted

---

[2] The Appraisal Foundation, *USPAP, 2024 Edition* (Effective January 1, 2024)

## Property Ownership and History

| CURRENT OWNERSHIP SUMMARY | |
|---|---|
| Recorded Current Owner | The Ruins LLC |
| True Current Owner | Jesse Craig |
| Listed for Sale/Lease | No |
| Pending Sale | No |
| Change of Ownership - Past 3 Years | No |
| Date Purchased By Current Owner | March 7, 2022 |
| Purchase Price | $0 |
| Purchase Price/SF | $0.00 |
| Recorded Seller | Craig Holdings LLC |
| True Seller | Jesse Craig |
| Property Use At Sale | Multifamily |
| Intended Use | Continue Existing Use |
| Legal Reference | Book 425, Page 7884 |
| County/Locality Name | Codington County |
| Instrument Type | Quit Claim Deed |
| Verification Source | County Records |

| Elements of Comparison | Description | Adjustment |
|---|---|---|
| Property Rights | Fee Simple | $0 |
| Financing | N/A | $0 |
| Conditions of Sale | Not Arm's Length | $0 |
| Buyer Expenditures | None | $0 |
| Non-Realty | None | $0 |
| Other Adjustment | None | $0 |
| Net Adjustment | | $0 |
| Compiled by CBRE | | |

The Ruins LLC has owned the subject property since March 7, 2022, when they purchased the property for $0. The transaction was between related parties and was exempt from transfer tax, resulting in a $0 transfer price. Prior to selling the property in 2022, Craig Holdings LLC is believed to have owned the property since 2019. We are unaware of any additional ownership transfers of the property in the last three years. Further, the property is not reportedly being offered for sale as of the current date and there are no known current offers to purchase or options to purchase.

## Exposure/Marketing Time

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold.  This reasonable time frame can either be examined historically or prospectively.  In a historical analysis, this is referred to as exposure time.  Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value.  On a prospective basis, the term marketing time is most often used.  The exposure/marketing time is a function of price, time, and use.  It is not an isolated estimate of time alone.  In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;
- exposure/marketing time information from the PwC Real Estate Investor Survey;
- CoStar analytics

The following table presents the information derived from these sources.

| EXPOSURE/MARKETING TIME DATA | | | |
|---|---|---|---|
| | Exposure/Mktg. (Months) | | |
| Investment Type | Range | | Average |
| Comparable Sales Data | 2.0 - 3.0 | | 2.5 |
| *PwC Apartment (1st Qtr. 2025)* | | | |
| National Data | 3.0 - 15.0 | | 6.9 |
| CoStar Analytics | 3.0 - 12.0 | | 7.5 |
| **CBRE Exposure Time Estimate** | **6 Months** | | |
| **CBRE Marketing Period Estimate** | **6 Months** | | |
| Various Sources Compiled by CBRE | | | |

# Table of Contents

Certification ...................................................................................................................................... i

Subject Photographs ........................................................................................................................ ii

Executive Summary .........................................................................................................................vii

Table of Contents ...........................................................................................................................xiii

Scope of Work ................................................................................................................................... 1

Area Analysis ..................................................................................................................................... 6

Neighborhood Analysis ................................................................................................................... 11

Site Analysis .................................................................................................................................... 14

Improvements Analysis (As Complete)............................................................................................ 18

Zoning .............................................................................................................................................. 29

Tax Assessment Data ...................................................................................................................... 31

Market Analysis ............................................................................................................................... 32

Highest and Best Use ...................................................................................................................... 41

Sales Comparison Approach ........................................................................................................... 42

Income Capitalization Approach ...................................................................................................... 65

Reconciliation of Value .................................................................................................................... 98

Assumptions and Limiting Conditions ............................................................................................. 99

**ADDENDA**

A     Project Information

B     Client Contract Information

C     Qualifications

Scope of Work

# Scope of Work

This Appraisal Report is intended to comply with the real property appraisal development and reporting requirements set forth under Standards Rule 1 and 2 of USPAP.  The scope of the assignment relates to the extent and manner in which research is conducted, data is gathered, and analysis is applied.

## Intended Use Of Report

This appraisal is to be used for litigation support and no other use is permitted.

## Client

The client is RED RIVER STATE BANK.

## Intended User Of Report

This appraisal is to be used by RED RIVER STATE BANK. No other user(s) may rely on our report unless as specifically indicated in this report.

> Intended users are those who an appraiser intends will use the appraisal or review report. In other words, appraisers acknowledge at the outset of the assignment that they are developing their expert opinions for the use of the intended users they identify. Although the client provides information about the parties who may be intended users, ultimately it is the appraiser who decides who they are. This is an important point to be clear about: The client does not tell the appraiser who the intended users will be. Rather, the client tells the appraiser who the client needs the report to be speaking to, and given that information, the appraiser identifies the intended user or users. It is important to identify intended users because an appraiser's primary responsibility regarding the use of the report's opinions and conclusions is to those users. Intended users are those parties to whom an appraiser is responsible for communicating the findings in a clear and understandable manner. They are the audience. [3]

## Reliance Language

Reliance on any reports produced by CBRE under this Agreement is extended solely to parties and entities expressly acknowledged in a signed writing by CBRE as Intended Users of the respective reports, provided that any conditions to such acknowledgement required by CBRE or hereunder have been satisfied. Parties or entities other than Intended Users who obtain a copy of the report or any portion thereof (including Client if it is not named as an Intended User), whether as a result of its direct dissemination or by any other means, may not rely upon any opinions or conclusions contained in the report or such portions thereof, and CBRE will not be responsible for any unpermitted use of the report, its conclusions or contents or have any liability in connection therewith.

## Purpose of the Appraisal

The purpose of this appraisal is to develop an opinion of the market value of the subject property.

---

[3] Appraisal Institute, *The Appraisal of Real Estate, 15th ed.* (Chicago: Appraisal Institute, 2020), 40.

## Definition of Value

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [4]

## Interest Appraised

The value estimated represents the Fee Simple Estate as defined below:

*Fee Simple Estate* - Absolute property ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat. [5]

*Leased Fee Interest* – The property ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. [6]

The subject has 1,200 SF of main floor commercial space that will be leased to the City of Watertown at a rate of $1 per year. The lease commenced on November 1, 2022 and has a base term of 237 months. The lease automatically renews for four (4) additional identical terms ending on June 30, 2121. This results in a total lease term of approximately 100 years. The space leased by the city essentially serves as a public restroom for the city park that is adjacent to the west of the subject property. This space in the as complete condition is not viable to lease to the general market for any other commercial use without significant renovation cost. Given its small size and poor utility for a market-oriented commercial use, it is not expected to be financially feasible to renovate for any other commercial use. Furthermore, the space is not necessary for the operation of the apartment complex. For these reasons, there is not expected to be a difference between the fee simple and leased fee values of the subject even though the lease to the City of Watertown does not support an adequate market return on the replacement cost of the space. Due to the fact that this lease encumbers such a small area of the subject property and that no leasehold is expected to exist, the property rights appraised are described as the fee simple estate.

---

[4] 12 CFR, Part 34, Subpart C-Appraisals, 34.42(h).

[5] Appraisal Institute, *The Dictionary of Real Estate Appraisal, 7th ed*. (Chicago: Appraisal Institute, 2022), 73.

[6] Appraisal Institute, *The Dictionary of Real Estate Appraisal, 7th ed*. (Chicago: Appraisal Institute, 2022), 105.

## Extent to Which the Property is Identified

The property is identified through the following sources:

- postal address
- assessor's records
- legal description

## Extent to Which the Property is Inspected

Josh Luther, MAI inspected the interior and exterior of the subject, as well as its surrounding environment on the effective date of appraisal. This inspection was considered adequate and is the basis for our findings.

## Type and Extent of the Data Researched

CBRE reviewed the following:

- applicable tax data
- zoning requirements
- flood zone status
- demographics
- income and expense data
- comparable data

## Type and Extent of Analysis Applied

CBRE, Inc. analyzed the data gathered through the use of appropriate and accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value.  The steps required to complete each approach are discussed in the methodology section.

## Statement of Competency

The appraisers have the appropriate knowledge, education and experience to complete this assignment competently.

## Data Resources Utilized in the Analysis

| DATA SOURCES | |
|---|---|
| *Item:* | *Source(s):* |
| **Site Data** | |
| Size | Plat map & county records |
| **Improved Data** | |
| Building Area | Property inspection, county records & architectural drawings |
| No. Bldgs. | Property inspection, county records & architectural drawings |
| Parking Spaces | Property inspection, county records & architectural drawings |
| Year Built/Developed | County records |
| **Economic Data** | |
| Deferred Maintenance: | Assumed none in the as stabilized condition |
| Income Data: | Market extracted information |
| Expense Data: | Market extracted information |
| **Other** | |
| Misc. 1 | Internal database maintained by CBRE and secondary data sources such as CoStar, LoopNet, etc. |
| Misc. 2 | Interviews with knowledgeable market participants and secondary sources such as: PwC Real Estate Survey, RERC Real Estate Report, RealtyRates.com, etc. |
| **Data Not Provided** | |
| Item 1 | Copy of main floor lease with City of Watertown |

Compiled by CBRE

## Appraisal Methodology

In appraisal practice, an approach to value is included or omitted based on its applicability to the property type being valued and the quality and quantity of information available.

### Cost Approach

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility.  This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

### Sales Comparison Approach

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, among others, or economic units of comparison such as gross rent multiplier.  Adjustments are applied to the physical units of comparison derived from the comparable sale.  The unit of comparison chosen for the subject is then used to yield a total value. Economic units of comparison are not adjusted, but rather analyzed as to relevant differences, with the final estimate derived based on the general comparisons.

### Income Capitalization Approach

The income capitalization approach reflects the subject's income-producing capabilities.  This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future.

Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time.  The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

## Methodology Applicable to the Subject

In valuing the subject, only the sales comparison and income capitalization approaches are applicable and have been used.  The cost approach is not applicable in the estimation of market value as market participants are not expected to consider the cost approach given properties in the market segment of the subject are purchased exclusively by investors, who give most consideration to the income characteristics (income approach) and what other similar properties are trading for in the market (sales approach).  The exclusion of said approach is not considered to compromise the credibility of the results rendered herein.

# Area Analysis



The subject is located in the Watertown, SD Micropolitan Statistical Area. Key information about the area is provided in the following tables.

## Population

The area has a population of 28,976. Population has increased by 1,749 since 2010, reflecting an annual increase of 0.4%. Population is projected to increase by 593 between 2024 and 2029, reflecting a 0.4% annual population growth.



Source: ESRI, downloaded on May, 13 2025

## Income

The area features an average household income of $86,113 and a median household income of $68,696. Over the next five years, median household income is expected to increase by 12.4%, or $1,699 per annum.



## Education

A total of 21.1% of individuals over the age of 24 have a college degree, with 14.7% holding a bachelor's degree and 6.4% holding a graduate degree.



## Employment



The area includes a total of 15,941 employees. The top three industries within the area are Manufacturing, Retail Trade and Health Care/Social Assistance, which is a combined total of 45% of the workforce.

Source: ESRI, downloaded on May 13, 2025; BLS.gov dated N/A

Area historic employment information provided by the SD Department of Labor is as follows:

| Area | Time Period | Labor Force | Employed | Unemployed | Unemployment Rate |
|---|---|---|---|---|---|
| Watertown, SD Micropolitan Statistical Area | March 2025 | 16,914 | 16,630 | 284 | 1.7% |
| Watertown, SD Micropolitan Statistical Area | December 2024 | 16,732 | 16,413 | 319 | 1.9% |
| Watertown, SD Micropolitan Statistical Area | December 2023 | 16,363 | 16,108 | 255 | 1.6% |
| Watertown, SD Micropolitan Statistical Area | December 2022 | 16,272 | 15,980 | 292 | 1.8% |
| Watertown, SD Micropolitan Statistical Area | December 2021 | 16,010 | 15,703 | 307 | 1.9% |
| Watertown, SD Micropolitan Statistical Area | December 2020 | 15,724 | 15,213 | 511 | 3.2% |
| Watertown, SD Micropolitan Statistical Area | December 2019 | 15,851 | 15,452 | 399 | 2.5% |
| Watertown, SD Micropolitan Statistical Area | December 2018 | 15,642 | 15,160 | 482 | 3.1% |



## Tax Climate

South Dakota tax system ranks 2nd overall on the 2025 State Tax Competitiveness Index, second only to Wyoming. South Dakota has no corporate or personal income taxes, no inventory tax, no inheritance tax, no personal property tax, and low sales tax. South Dakota ranks #1 in the index's Corporate and Individual Income Tax categories for its lack of corporate and personal income taxes.  However, it ranks 31st in the sales tax category, 10th in the property tax category and 22nd in the unemployment insurance category.



*2025 State Tax Competitiveness Index* Ranks and Component Tax Ranks

Source: www.statetaxindex.org

## Conclusion

In summary, the Watertown MiSA possesses those value-impacting characteristics that should continue to create demand for real estate.  The market area is forecasted to experience an increase in population, an increase in household income, the unemployment rate is low and the job market is expanding. The population and economic statistics suggest that favorable market conditions exist within the local community, and for this reason, the underlying real estate market appears to have the potential for favorable marketability.

# Neighborhood Analysis

## Neighborhood Map



## Location

| NEIGHBORHOOD CHARACTERISTICS | |
| --- | --- |
| Location: | Urban |
| Built-Up: | Over 75% |
| Life Cycle Stage | Stability |
| Change in Present Land Use: | Not Likely |

*Neighborhood boundaries outlined in yellow.

Source:  CBRE

## NEIGHBORHOOD LAND USE

### Present Land Use %

| | | | |
|---|---|---|---|
| Single Unit Residential: | 25% | Industrial: | 15% |
| Multi-Housing: | 10% | Agricultural: | 0% |
| Commercial: | 45% | Other: | 5% |

### Commercial Land Use Patterns

| | |
|---|---|
| Primary Commercial Thoroughfares: | 1st Ave. NW, 5th Street NE (Highway 81), Broadway |

Source: CBRE

## Demographics

Selected neighborhood demographics in 1-, 3- and 5-mile radius from the subject are shown in the following table:

### SELECTED NEIGHBORHOOD DEMOGRAPHICS

| 315 East Kemp Avenue<br>Watertown, SD 57201 | 1 Mile Radius | 3 Mile Radius | 5 Mile Radius | Watertown, SD Micropolitan Statistical Area |
|---|---|---|---|---|
| **Population** | | | | |
| 2029 Total Population | 10,488 | 21,946 | 24,323 | 29,569 |
| 2024 Total Population | 10,372 | 21,389 | 23,706 | 28,976 |
| 2010 Total Population | 10,092 | 20,092 | 22,185 | 27,227 |
| 2000 Total Population | 10,126 | 19,154 | 21,096 | 25,897 |
| *Annual Growth 2024 - 2029* | *0.22%* | *0.52%* | *0.52%* | *0.41%* |
| *Annual Growth 2010 - 2024* | *0.20%* | *0.45%* | *0.47%* | *0.45%* |
| *Annual Growth 2000 - 2010* | *-0.03%* | *0.48%* | *0.50%* | *0.50%* |
| **Households** | | | | |
| 2029 Total Households | 4,885 | 9,591 | 10,515 | 12,557 |
| 2024 Total Households | 4,820 | 9,350 | 10,249 | 12,305 |
| 2010 Total Households | 4,636 | 8,684 | 9,451 | 11,432 |
| 2000 Total Households | 4,495 | 7,905 | 8,567 | 10,357 |
| *Annual Growth 2024 - 2029* | *0.27%* | *0.51%* | *0.51%* | *0.41%* |
| *Annual Growth 2010 - 2024* | *0.28%* | *0.53%* | *0.58%* | *0.53%* |
| *Annual Growth 2000 - 2010* | *0.31%* | *0.94%* | *0.99%* | *0.99%* |
| **Income** | | | | |
| 2024 Median Household Income | $51,681 | $61,800 | $64,112 | $68,696 |
| 2024 Average Household Income | $65,818 | $79,501 | $82,288 | $86,113 |
| 2024 Per Capita Income | $30,307 | $35,015 | $35,931 | $36,599 |
| 2024 Pop 25+ College Graduates | 988 | 2,869 | 3,274 | 4,142 |
| Age 25+ Percent College Graduates - 2024 | 14.0% | 19.7% | 20.3% | 21.1% |

Source: ESRI

Neighborhood Analysis

## Conclusion

The neighborhood is nearly fully built-up, and growth is limited to underutilized properties ready for redevelopment. Most of the properties in the neighborhood are of average to good quality construction and are in fair to good condition. Other than renovation and redevelopment, there is no new development or significant growth occurring in the neighborhood. The central business district (CBD) has a "main street" style of development with older commercial buildings with shared common walls and street parking. Commercial uses generally include local restaurants, shops, offices, banks, multifamily projects, libraries, and other services. Primary access to the subject neighborhood is provided by US Highway 81 which runs north/south through Watertown. Overall, the neighborhood has good market appeal and demographics indicate the neighborhood is poised for favorable market conditions in the near future due to projected growth in households, increasing household income, and an expanding job market.

# Site Analysis

The following chart summarizes the salient characteristics of the subject site.

---

### SITE SUMMARY AND ANALYSIS

**Physical Description**

| | | |
|---|---|---|
| Gross Site Area | 0.84 Acres | 36,645 Sq. Ft. |
| Net Site Area | 0.84 Acres | 36,645 Sq. Ft. |
| Primary Road Frontage | E. Kemp Ave. | 129 Feet |
| Shape | L Shaped | |
| Topography | Generally Level | |
| Parcel Number(s) | 9352 | |
| | | |
| Zoning District | C1 Community Commercial | |
| Flood Map Panel No. & Date | 46029C0338D | 16-Jan-09 |
| Flood Zone | Zone X (Unshaded) | |
| Adjacent Land Uses | Retail, office, multifamily, recreation | |

**Comparative Analysis** — **Rating**

| | |
|---|---|
| Visibility | Good |
| Functional Utility | Good |
| Traffic Volume | N/A |
| Adequacy of Utilities | Assumed Adequate |
| Drainage | Assumed Adequate |

**Utilities** — **Availability** — **Comments**

| | | |
|---|---|---|
| Water | Yes | Municipal |
| Sewer | Yes | Municipal |
| Natural Gas | Yes | Municipal |
| Electricity | Yes | Municipal |
| Telephone/Cable/Internet | Yes | Non-municipal |

**Other** — **Yes** — **No** — **Unknown**

| | Yes | No | Unknown |
|---|---|---|---|
| Detrimental Easements | | | X |
| Encroachments | | | X |
| Deed Restrictions | | | X |
| Reciprocal Parking Rights | | | X |

Various sources compiled by CBRE

---

## Ingress/Egress

Ingress and egress are available to the site via curb cuts from E. Kemp Ave. and an alley located along the northern property line.

At the subject, E. Kemp Ave. is an east/west street that is improved with one lane of traffic in each direction. Street improvements include asphalt paving and concrete curbs, gutters and sidewalks, and street lighting. Street parking is permitted.

## Easements and Encroachments

There are no known easements or encroachments impacting the site that are considered to affect the marketability or highest and best use. It is recommended that the client/reader obtain a current title policy outlining all easements and encroachments on the property, if any, prior to making a business decision.

## Covenants, Conditions and Restrictions

There are no known covenants, conditions or restrictions impacting the site that are considered to affect the marketability or highest and best use.  It is recommended that the client/reader obtain a copy of the current covenants, conditions and restrictions, if any, prior to making a business decision.

## Environmental Issues

Although CBRE was not provided an Environmental Site Assessment (ESA), a tour of the site did not reveal any obvious issues regarding environmental contamination or adverse conditions.

The appraiser is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site.  The existence of hazardous materials or underground storage tanks may affect the value of the property.  For this appraisal, CBRE, Inc. has specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property.

## Conclusion

The site has a good community location for its existing use and has good visibility and good access from the adjoining arterials.  Overall, the site has good functional utility and no limiting site characteristics were identified. There are no characteristics of the site that would prevent it from being developed to its anticipated highest and best use or have a negative impact on value.

## Plat Map

THE RUINS ADDITION
TO THE CITY OF WATERTOWN, CODINGTON COUNTY, SOUTH DAKOTA
FIRST AVE. NE.
(100' R/WAY)
S75° 30' 21"E 350.57'
ORIGINAL
BLOCK 1
THIRD ST. NE.
(80' R/WAY)
FOURTH ST. NE.
(80' R/WAY)
ALLEY
S75° 38' 54"E 350.93'
S75° 38' 54"E 350.97'
THE RUINS ADDITION
(36,614 FT² OR 0.84 ACRES ±)
MONK'S & SHELDON'S SUBDIVISION
VACATED 20' ALLEY
N75° 34' 45"W 107.11'
N75° 30' 47"W 351.43'
E. KEMP AVE.
(80' R/WAY)
WATERTOWN
VACATION NOTE:
THIS RE-PLAT SHALL VACATE "THE EAST 129.69 FEET OF LOTS 15 AND 16, AND THE WEST 85' OF LOTS 19-22, AND THE VACATED 20' ALLEY IN BLOCK 1 OF THE ORIGINAL PLAT OF WATERTOWN, CODINGTON COUNTY, SOUTH DAKOTA", AS RECORDED IN BOOK "AP" OF PLATS ON PAGE 9; AND "LOT 1 OF MONK'S AND SHELDON'S SUBDIVISION OF LOTS 17 AND 18 IN BLOCK 1 OF THE ORIGINAL PLAT OF WATERTOWN, CODINGTON COUNTY, SOUTH DAKOTA", AS RECORDED IN BOOK "AP" OF PLATS ON PAGE 150.
SURVEYOR'S NOTES:
1. BASIS OF BEARING IS UTM 14 NORTH.
2. ALL DISTANCES ARE GROUND DISTANCES.
3. THIS PLAT WAS PREPARED WITHOUT THE BENEFIT OF A TITLE COMMITMENT.
4. THE TOTAL LENGTH OF THE BLOCK LINES ARE LONG PER THE RECORDED ORIGINAL PLAT. BUILDING FOUNDATION LINES & OTHER FIELD EVIDENCE WERE USED TO COMPUTE THE BLOCK & ALLEY LINES AS THERE IS A LACK OF MONUMENTATION WITHIN SAID BLOCK.
LEGEND
PROPOSED PROPERTY LINE
EXISTING PROPERTY LINE
LINE HEREBY VACATED
FOUND MONUMENT
SET NO.5 REBAR W/CAP RLS NO. 12467 OR 'X' IN CONCRETE
Project Location
VICINITY MAP
(NOT TO SCALE)
PREPARED BY:
infrastructure design group, inc.
20 S. MAPLE STREET
WATERTOWN, SD 57201
PHONE: 605-878-2120
WEB: infrastructuredg.com
THE RUINS ADDITION
TO THE CITY OF WATERTOWN, CODINGTON COUNTY, SOUTH DAKOTA
PROJECT NO.: 21016
DATE: 02/10/2022
DRAWN BY: BTC
CHECKED BY: BMK
SHEET NO: 1 OF 2



## Flood Map

National Flood Hazard Layer FIRMette
FEMA
97°6'52"W 44°54'11"N
Subject
46029C0338D
eff. 1/16/2009
97°6'15"W 44°53'45"N
Feet
0 250 500 1,000 1,500 2,000
1:6,000
Basemap Imagery Source: USGS National Map 2023
Legend
SEE FIS REPORT FOR DETAILED LEGEND AND INDEX MAP FOR FIRM PANEL LAYOUT
SPECIAL FLOOD HAZARD AREAS
Without Base Flood Elevation (BFE) Zone A, V, A99
With BFE or Depth Zone AE, AO, AH, VE, AR
Regulatory Floodway
OTHER AREAS OF FLOOD HAZARD
0.2% Annual Chance Flood Hazard, Areas of 1% annual chance flood with average depth less than one foot or with drainage areas of less than one square mile Zone X
Future Conditions 1% Annual Chance Flood Hazard Zone X
Area with Reduced Flood Risk due to Levee. See Notes. Zone X
Area with Flood Risk due to Levee Zone D
OTHER AREAS
NO SCREEN Area of Minimal Flood Hazard Zone X
Effective LOMRs
Area of Undetermined Flood Hazard Zone D
GENERAL STRUCTURES
Channel, Culvert, or Storm Sewer
Levee, Dike, or Floodwall
OTHER FEATURES
20.2 Cross Sections with 1% Annual Chance
17.5 Water Surface Elevation
Coastal Transect
Base Flood Elevation Line (BFE)
Limit of Study
Jurisdiction Boundary
Coastal Transect Baseline
Profile Baseline
Hydrographic Feature
MAP PANELS
Digital Data Available
No Digital Data Available
Unmapped
N
The pin displayed on the map is an approximate point selected by the user and does not represent an authoritative property location.
This map complies with FEMA's standards for the use of digital flood maps if it is not void as described below. The basemap shown complies with FEMA's basemap accuracy standards
The flood hazard information is derived directly from the authoritative NFHL web services provided by FEMA. This map was exported on 5/20/2025 at 3:38 PM and does not reflect changes or amendments subsequent to this date and time. The NFHL and effective information may change or become superseded by new data over time.
This map image is void if the one or more of the following map elements do not appear: basemap imagery, flood zone labels, legend, scale bar, map creation date, community identifiers, FIRM panel number, and FIRM effective date. Map images for unmapped and unmodernized areas cannot be used for regulatory purposes.



# Improvements Analysis (As Complete)

The following chart shows a summary of the improvements.

| IMPROVEMENTS SUMMARY AND ANALYSIS | | |
|---|---|---|
| Property Type | Multifamily | (Multi-Family Garden) |
| Number of Buildings | 1 | |
| Number of Stories | 4 | |
| Gross Building Area | 95,544 SF | |
| Net Rentable Area (NRA) | 49,638 SF | |
| Area Breakdown by Space Use | | |
| Main Floor Commercial NRA | 1,200 SF | (2.42% of NRA) |
| Apartments NRA | 48,438 SF | (97.58% of NRA) |
| Number of Units | 63 | |
| Average Unit Size | 788 SF | |
| Development Density | 74.9 Units/Acre | |
| Parking Improvements | Above Grade | |
| Parking Spaces: | 64 | |
| Parking Ratio (spaces/unit) | 1.02 | |

| Component | Description | GBA (SF) | NRA (SF) |
|---|---|---|---|
| Main Floor | Commercial space and parking garage | 26,349 | 1,200 |
| Second Floor | Apartments | 23,065 | 16,146 |
| Third Floor | Apartments | 23,065 | 16,146 |
| Fourth Floor | Apartments | 23,065 | 16,146 |
| Total | | 95,544 | 49,638 |
| Year Built / Renovated | 2025 | | |
| Actual Age | 0 Years | | |
| Effective Age | 0 Years | | |
| Total Economic Life | 50 Years | | |
| Remaining Economic Life | 50 Years | | |
| Age/Life Depreciation | 0.0% | | |
| Functional Utility | Typical | | |

Source: Various sources compiled by CBRE

| UNIT MIX | | | | | |
|---|---|---|---|---|---|
| Unit Mix/Type | Comments | No. Units | Percent of Total | Unit Size (SF) | NRA (SF) |
| 1BD/1BA - B1 | | 15 | 23.8% | 748 | 11,220 |
| 1BD/1BA - B2 | | 18 | 28.6% | 668 | 12,024 |
| 1BD/1BA - B3 | | 3 | 4.8% | 726 | 2,178 |
| 2BD/2BA - C1 | | 12 | 19.0% | 1,116 | 13,392 |
| 2BD/2BA - C2 | | 3 | 4.8% | 1,077 | 3,231 |
| Studio - A1 | | 9 | 14.3% | 513 | 4,617 |
| Studio - A2 | | 3 | 4.8% | 592 | 1,776 |
| Total/Average: | | 63 | 100.0% | 769 | 48,438 |

Source: Various sources compiled by CBRE

Improvements Analysis (As Complete)

---

**IMPROVEMENT DESCRIPTION & CONDITION RATING**

| Improvement Summary | Description | Comparative Rating |
|---|---|---|
| Foundation | Reinforced concrete foundation | Good |
| Frame | Class D - combination of concrete block, precast concrete, and wood and metal stud framing. | Good |
| Exterior Walls | Combination of brick, brick veneer, and prefinished metal wall panels, & horizontal lap siding. | Good |
| Roof | Rubber membrane over R-30 rigid insulation. | Good |
| Flooring | Carpet and vinyl tile | Good |
| Interior Walls | Textured and painted drywall | Good |
| Ceiling | Textured and painted drywall | Good |
| Interior Lighting | Primarily recessed LED and/or fluorescent fixtures | Good |
| HVAC System | Apartment units are heated with electric baseboard heating units and cooled with electric thru-wall AC units. The commercial space is heated and cooled with a package unit system. | Good |
| Exterior Lighting | Building mounted | Good |
| Plumbing | Assumed adequate | Good |
| Stairwells | Two interior stairwells | Good |
| Elevators | One passenger elevator | Good |
| Smoke Detectors | Yes | Good |
| Sprinkler System | Yes | Good |
| Furnishings | All personal property needed in the operation of an apartment complex is included in the as complete and as stabilized values herein. | Good |
| Parking | Main floor parking garage with 64 parking spaces. | Good |
| Landscaping | Grass, planting beds with shrubbery, concrete sidewalks, fencing, etc. | Good |

Source:  Various sources compiled by CBRE

## Project Amenities

Project amenities include a fitness center, roof deck/patio, storage units, heated structured parking, controlled access, and an elevator.

## Site Improvements

Landscaping of the site is average and includes grass, planting beds with shrubbery, concrete sidewalks, fencing, etc. The project has structured parking on the main floor of the building that has 64 striped stalls, resulting in a parking ratio of 1.02 stalls/unit. Overall, the site improvements are expected to result in acceptable market appeal for the subject property.

## Unit Amenities

Unit kitchens will feature a standard appliance package to include a refrigerator, range/oven, microwave, garbage disposal, and dishwasher. In-unit laundry is provided with one washer and dryer per unit. The kitchens are expected to feature laminate countertops, wood cabinets and vinyl tile flooring. The bathrooms within each unit feature a stand-up shower and/or a tub/shower with a fiberglass surround. Additionally, each bathroom features a commode, with built-in sink, wall-mounted mirror, and vinyl tile flooring. Bedrooms will have carpet flooring. Interior finish generally includes textured, painted drywall walls and ceiling with wood trim. Lighting is primarily provided by recessed LED and/or fluorescent light fixtures.

## Utilities

The tenant will pay for electric service (units are all electric), which is individually metered to each unit and paid directly by the tenant. Water, sewer, garbage service, and common area and exterior lighting (electric) only, is paid by the landlord.

19   © 2025 CBRE, INC

Improvements Analysis (As Complete)

## Condition Analysis

Our tour of the improvements included a cursory inspection of the building, surface parking and other site improvements, and no significant deferred maintenance was identified. The subject property is considered to be in overall good condition.

## Functional Utility

The subject property characteristics have good functional utility for the proposed use and are typical of competitive facilities in its market segment. Hence, no functional obsolescence is expected under the proposed use.

## ADA Compliance

It is assumed the improvements conform to ADA requirements given the new construction status of the subject. Even so, the client/reader's attention is directed to the specific limiting conditions regarding ADA compliance.

## Environmental Issues

The appraiser is not qualified to detect the existence of any potentially hazardous materials such as lead paint, asbestos, urea formaldehyde foam insulation, or other potentially hazardous construction materials on or in the improvements. The existence of such substances may affect the value of the property. The subject involves modern building components and there is no reason to believe hazardous building materials are currently present and/or were used in constructing the subject property. For the purpose of this assignment, we have specifically assumed there are no hazardous materials that would cause a loss in value to the subject.

## FF&E and Non-Realty Components

The apartment units are rented on an unfurnished basis. All apartment units have appliances to include: range/oven, refrigerator, garbage disposal, dishwasher, built-in microwave oven, and washer & dryer. It is assumed the property has miscellaneous maintenance tools which are examples of personal property associated with and typically included in the sale of multifamily apartment complexes. The reconciled as complete and as stabilized values herein include the contributory value of these non-realty components.

| FF&E VALUE ESTIMATE | | | | |
|---|---|---|---|---|
| | As Complete | | As Stabilized | |
| Cost New of FF&E | | $385,000 | | $385,000 |
| Effective Age | 0.0 Years | | 2.0 Years | |
| MVS Expected Life | 10.0 Years | | 10.0 Years | |
| Remaining Economic Life | 10.0 Years | | 8.0 Years | |
| Less: Incurable Physical Deterioration | | 0.0% | | 20.0% |
| Contributory Value of FF&E | | $385,000 | | $308,000 |
| Compiled by CBRE | | | | |

Improvements Analysis (As Complete)

## Cost to Complete

As previously indicated, construction was not complete as of the inspection date. The cost to complete is based on a recent cost estimate developed by Gehrtz Construction Services, which is the best data source available. The detailed cost estimate provided by Gehrtz is located in the addenda. The cost to complete estimate is summarized below.

| COST TO COMPLETE | |
|---|---|
| Cost estimate provided by Gehrtz Construction | $1,695,967 |
| Subtotal (Rd) | $1,695,000 |
| Plus: Entreprenurial Incentive @ 10% (Rd) | $170,000 |
| Total Cost to Complete: | $1,865,000 |
| Source: General Contractor | |

## Conclusion

The improvements at construction completion will be in good condition and have average to good quality characteristics. The subject has similar building components as other properties in its market segment and the site improvements generally conform to the neighborhood. Building placement on the site is appropriate, and the site size, relative to the size of the building, conforms to the market. The site improvements are contributing significantly to the overall property value and are expected to have good market appeal when compared to competitive properties in its market segment.  Overall, there are no known factors that adversely impact the marketability of the improvements.

Improvements Analysis (As Complete)

## Main Floor



*The yellow shaded area is the main floor commercial NRA that is leased by the City of Watertown. The blue shaded area is the apartment leasing office and parcel room. The remaining unshaded areas are the stairwells, elevator, storage/mechanical, and parking garage.

Improvements Analysis (As Complete)

## Second Floor



*Red shaded area does not exist and is excluded from GBA. A current drawing showing the correct layout of the rooftop deck area above the main floor was not available for this assignment.

Improvements Analysis (As Complete)

## Third Floor



Improvements Analysis (As Complete)

## Fourth Floor



Improvements Analysis (As Complete)

## Unit Type Details



Improvements Analysis (As Complete)

## Unit Type Details



Improvements Analysis (As Complete)

## Unit Type Details



# Zoning

The following chart summarizes the subject's zoning requirements.

| ZONING SUMMARY | |
|---|---|
| Current Zoning | C1 Community Commercial |
| Legally Conforming | Yes |
| Uses Permitted | Retail, service, entertainment service, financial institution, uses by a governmental entity, office, parking lot and/or ramp, dwelling units using upper floors of commercial buildings, restaurant, day care, medical cannabis dispensary, etc. |
| Zoning Change | Not likely |

| Category | Zoning Requirement |
|---|---|
| Minimum Lot Size | 625 Sq. Ft. |
| Minimum Lot Width | 25' |
| Maximum Height | 60' |
| Minimum Setbacks | |
| Front Yard | 0 Feet |
| Street Side Yard | 0 Feet |
| Interior Side Yard | 0 Feet |
| Rear Yard | 0 Feet |
| Parking Requirements | 1 per bedroom - 63 |
| Subject's Actual Parking | 64 Spaces |

Source: City of Watertown Planning and Zoning Dept.

## Analysis and Conclusion

The subject site is encumbered by the C1 Community Commercial zoning ordinance.  The zoning and land use authority for the subject property is the City of Watertown. The zoning ordinance allows for a variety of commercial uses, which are summarized in the table above. Based on a review of the major requirements of the current zoning district, the existing site improvements appear to represent a legally conforming use. The current zoning code results in good neighborhood conformity. Thus, a change in zoning in the near future is not expected.

## Zoning Map



# Tax Assessment Data

The subject property is in Codington County, and is subject to the jurisdiction of the Codington County equalization office. The following summarizes the local assessor's estimate of the subject's market value, assessed value, and taxes, and does not include any furniture, fixtures or equipment. The CBRE estimated as complete tax obligation is also shown.

| | AD VALOREM TAX INFORMATION | | | |
|---|---|---|---|---|
| Parcel | Assessor's Parcel No. | 2024 | 2025 | Pro Forma As Complete |
| 1 | 9352 | $4,316,135 | $5,532,392 | $6,216,171 |
| | Percent Completion | 89.0% | 89.0% | 100.0% |
| | Subtotal | $4,316,135 | $5,532,392 | $6,216,171 |
| | Effective Tax Rate % | 1.3275% | n/a | 1.3220% |
| | **Total Taxes** | **$57,297.40** | **n/a** | **$82,180** |
| | Taxes per Unit | $909 | | $1,304 |
| | Source:  Assessor's Office | | | |

The current property assessment (2025) reflects an 89% completion estimate per Codington County. Thus, the implied 100% completion assessment is $6,216,171. The 2025 equalization factor and mil levy rate has not been established yet; hence, the equalization office was contacted. Per Codington County equalization office, the current effective tax rate for commercial property in Watertown is 1.3220%. Applying this effective tax rate to the pro forma as complete assessment indicates as complete/stabilized property taxes of $82,180, or $1,304 per unit.

The current property assessment appears reasonable in its relationship to the reconciled as is market value.

Taxes on the subject property are currently past due. The total amount past due is $92,591.68, which includes past due fees and interest. Our analysis herein assumes that taxes are paid current.

# Market Analysis

The market analysis forms a basis for assessing market area boundaries, supply and demand factors, and indications of financial feasibility. For this report, inferred market analysis is completed to describe the current market conditions of the market segment of the subject. Sources used for completing market conditions analysis include data provided by local commercial real estate brokerage firms, national market data from 3rd party providers, interviews with knowledgeable market participants, observations of market activity, and the experience and opinion of the undersigned.

The subject is in the Watertown market and is considered a Class A a 63-unit apartment project.

## Demographic Analysis

Demand for residential properties is a direct function of demographic characteristics analyzed on the following pages.

### Housing, Population and Household Formation

The following table illustrates the population and household changes for the subject neighborhood with primary focus on the three-mile radius.

| POPULATION AND HOUSEHOLD PROJECTIONS | | | | |
|---|---|---|---|---|
| Population | 1 Mile Radius | 3 Mile Radius | 5 Mile Radius | Watertown, SD Micropolitan Statistical Area |
| 2029 Total Population | 10,488 | 21,946 | 24,323 | 29,569 |
| 2024 Total Population | 10,372 | 21,389 | 23,706 | 28,976 |
| 2010 Total Population | 10,092 | 20,092 | 22,185 | 27,227 |
| 2000 Total Population | 10,126 | 19,154 | 21,096 | 25,897 |
| *Annual Growth 2024 - 2029* | *0.22%* | *0.52%* | *0.52%* | *0.41%* |
| *Annual Growth 2010 - 2024* | *0.20%* | *0.45%* | *0.47%* | *0.45%* |
| *Annual Growth 2000 - 2010* | *-0.03%* | *0.48%* | *0.50%* | *0.50%* |
| Households | | | | |
| 2029 Total Households | 4,885 | 9,591 | 10,515 | 12,557 |
| 2024 Total Households | 4,820 | 9,350 | 10,249 | 12,305 |
| 2010 Total Households | 4,636 | 8,684 | 9,451 | 11,432 |
| 2000 Total Households | 4,495 | 7,905 | 8,567 | 10,357 |
| *Annual Growth 2024 - 2029* | *0.27%* | *0.51%* | *0.51%* | *0.41%* |
| *Annual Growth 2010 - 2024* | *0.28%* | *0.53%* | *0.58%* | *0.53%* |
| *Annual Growth 2000 - 2010* | *0.31%* | *0.94%* | *0.99%* | *0.99%* |
| Source: ESRI | | | | |

As shown, the subject neighborhood is experiencing positive growth in both population and households.

## Income Distributions

Household income available for expenditure on housing and other consumer items is a primary factor in determining the price/rent level of housing demand in a market area.  In the case of this study, projections of household income, particularly for renters, identifies in gross terms the market from which the subject submarket draws. The following table illustrates estimated household income distribution for the subject neighborhood.

| HOUSEHOLD INCOME DISTRIBUTION | | | | |
|---|---|---|---|---|
| Households by Income Distribution (2024) | 1 Mile Radius | 3 Mile Radius | 5 Mile Radius | Watertown, SD Micropolitan Statistical Area |
| <$15,000 | 14.75% | 11.90% | 11.25% | 10.17% |
| $15,000 - $24,999 | 9.00% | 8.32% | 8.13% | 7.87% |
| $25,000 - $34,999 | 6.85% | 5.34% | 5.08% | 4.80% |
| $35,000 - $49,999 | 17.68% | 14.82% | 14.58% | 13.80% |
| $50,000 - $74,999 | 17.57% | 17.04% | 16.84% | 16.51% |
| $75,000 - $99,999 | 15.58% | 16.10% | 16.41% | 17.00% |
| $100,000 - $149,999 | 13.55% | 17.79% | 18.06% | 18.98% |
| $150,000 - $199,999 | 3.30% | 4.35% | 4.75% | 5.42% |
| $200,000+ | 1.72% | 4.34% | 4.90% | 5.44% |
| Source:  ESRI | | | | |

The following table illustrates the median and average household income levels for the subject neighborhood.

| HOUSEHOLD INCOME LEVELS | | | | |
|---|---|---|---|---|
| Income | 1 Mile Radius | 3 Mile Radius | 5 Mile Radius | Watertown, SD Micropolitan Statistical Area |
| 2024 Median Household Income | $51,681 | $61,800 | $64,112 | $68,696 |
| 2024 Average Household Income | $65,818 | $79,501 | $82,288 | $86,113 |
| 2024 Per Capita Income | $30,307 | $35,015 | $35,931 | $36,599 |
| Source:  ESRI | | | | |

An analysis of the income data indicates that the submarket is generally comprised of middle- to upper-middle income economic cohort groups, which include the target groups to which the subject is oriented.

## Employment

An employment breakdown typically indicates the working-class characteristics for a given market area. The specific employment population within the indicated radii of the subject is as follows:

| EMPLOYMENT BY INDUSTRY | | | | |
|---|---|---|---|---|
| Occupation (2024) | 1 Mile Radius | 3 Mile Radius | 5 Mile Radius | Watertown, SD Micropolitan Statistical Area |
| Agric/Forestry/Fishing/Hunting | 3.63% | 3.81% | 4.08% | 5.20% |
| Construction | 4.49% | 5.10% | 5.20% | 6.05% |
| Manufacturing | 18.31% | 19.01% | 19.03% | 18.61% |
| Wholesale Trade | 3.13% | 2.75% | 2.81% | 2.69% |
| Retail Trade | 13.87% | 14.66% | 14.70% | 14.27% |
| Transportation/Warehousing | 3.24% | 2.83% | 2.79% | 2.99% |
| Information | 1.95% | 1.40% | 1.43% | 1.54% |
| Finance/Insurance | 4.42% | 3.62% | 3.59% | 3.60% |
| Prof/Scientific/Tech Services | 1.81% | 1.51% | 1.45% | 1.65% |
| Mgmt of Companies/Enterprises | 0.00% | 0.00% | 0.00% | 0.00% |
| Admin/Support/Waste Mgmt Srvcs | 4.58% | 3.47% | 3.45% | 3.50% |
| Educational Services | 7.07% | 8.49% | 8.61% | 8.78% |
| Health Care/Social Assistance | 12.28% | 13.74% | 13.66% | 12.91% |
| Arts/Entertainment/Recreation | 3.28% | 2.35% | 2.30% | 2.32% |
| Accommodation/Food Services | 8.56% | 7.18% | 7.11% | 6.43% |
| Other Services (excl Publ Adm) | 5.82% | 5.07% | 4.95% | 4.80% |
| Public Administration | 3.54% | 5.01% | 4.83% | 4.66% |
| Source: ESRI | | | | |

The previous table illustrates the employment character of the submarket, with the majority of the population holding manufacturing, retail trade and health care related jobs.

## Barriers to Entry

There are no barriers to entry into the subject market area relative to governmental, topographical, or land availability issues. Barriers to entry are currently relegated to supply and demand levels.

## Outlook

Based on this analysis, the immediate area surrounding the subject is projected to experience growth in households and population in the near future. Given the area demographics, it appears that demand for both comparable surrounding area apartment units and the subject will increase, and the overall outlook is favorable.

## Northeastern South Dakota Multifamily Market



The market area of the subject includes the following South Dakota counties: Brown, Spink, Beadle, Marshall, Roberts, Day, Grant, Clark, Codington, Deuel, Hamlin, Kingsbury, and Brookings. This area includes four major markets, or Aberdeen, Watertown, Brookings and Huron, and numerous smaller communities and rural areas.

## Recent Performance

The following table summarizes historical and projected performance for the overall metropolitan   market, as reported by .



| INVENTORY UNITS | UNDER CONSTRUCTION UNITS | 12 MO ABSORPTION UNITS | VACANCY RATE | MARKET RENT/UNIT | MARKET SALE PRICE/UNIT | MARKET CAP RATE |
|---|---|---|---|---|---|---|
| 7,198 +0.8% | 63 -46.7% | 215 -38.0% | 6.4% -2.3% | $988 +3.4% | $67.4K +2.5% | 9.4% +0% |
| Prior Period 7,143 | Prior Period 118 | Prior Period 347 | Prior Period 8.7% | Prior Period $956 | Prior Period $65.8K | Prior Period 9.4% |

### Key Metrics

| Availability | | Inventory | |
|---|---:|---|---:|
| Vacant Units | 459 | Existing Buildings | 225 |
| Asking Rent/SF | $1.19 | Average Units Per Bldg | 32 |
| Concession Rate | 0.7% | 12 Mo Demolished Units | 0 |
| Studio Asking Rent | $806 | 12 Mo Occupancy % at Delivery | 30.0% |
| 1 Bedroom Asking Rent/Unit | $895 | 12 Mo Construction Starts Units | 0 |
| 2 Bedroom Asking Rent/Unit | $1,029 | 12 Mo Delivered Units | 54 |
| 3 Bedroom Asking Rent/Unit | $1,205 | 12 Mo Avg Delivered Units | 29 |

| Sales Past Year | | Demand | |
|---|---:|---|---:|
| Asking Price Per Unit | $83,750 | 12 Mo Absorp % of Inventory | 3.0% |
| Sale to Asking Price Differential | -11.9% | Median Household Income | 59.1K |
| Sales Volume | $590K | Population Growth 5 Yrs \| 20-29 | -8.6% |
| Properties Sold | 1 | Population Growth 5 Yrs \| 30-39 | 14.0% |
| Months to Sale | 3.9 | Population Growth 5 Yrs \| 40-54 | 12.0% |
| For Sale Listings | 3 | Population Growth 5 Yrs \| 55+ | 1.7% |
| Total For Sale Units | 71 | Population Growth 5 Yrs | 2.5% |

## Historical Occupancy - Market



At the end of the current year, the occupancy rate is projected to be 94.1%, which reflects a small increase from the  occupancy rate at the end of last year.

## Historical Net Absorption - Market



At the end of the current year, the area is projected to experience positive net absorption; however, net absorption is anticipated to decline significantly from the previous year.

## Historical Asking Rent (Per SF) - Market



The area is projected to achieve average asking rent of $1.23/SF at the end of the current year, which indicates an increase from the previous year's asking rent of $1.17/SF. The market asking rent per SF by bedroom is shown below.

Market Analysis



## Market Cap Rates



The area is projected to achieve an average capitalization rate of 9.26% at the end of the current year, which indicates a slight decrease from the previous year's average of 9.37%. The average capitalization rate is projected to continue to slowly decline over then next five years.

## Sale Price Per Unit



The area is projected to achieve an average sale price/unit of $70,022 at the end of the current year, which indicates a slight increase from the previous year's average of $67,064/unit. Also, the average sale price/unit is projected to continue to slowly increase over the next five years.

## Investment Trends

The following is taken directly from the most recent PwC Real Estate Investor Survey.

### NATIONAL APARTMENT MARKET
First Quarter 2025

| | CURRENT | LAST QUARTER | 1 YEAR AGO | 3 YEARS AGO | 5 YEARS AGO |
|---|---|---|---|---|---|
| **DISCOUNT RATE (IRR)ᵃ** | | | | | |
| Range | 6.00% – 9.00% | 6.00% – 8.00% | 6.00% – 9.00% | 5.00% – 10.00% | 5.25% – 10.00% |
| Average | 7.35% | 7.06% | 7.19% | 6.62% | 7.04% |
| Change (Basis Points) | + 29 | | + 16 | + 73 | + 31 |
| **OVERALL CAP RATE (OAR)ᵃ** | | | | | |
| Range | 4.00% – 6.25% | 4.00% – 6.25% | 4.00% – 7.50% | 3.00% – 7.00% | 3.50% – 7.00% |
| Average | 5.25% | 5.16% | 5.42% | 4.40% | 5.14% |
| Change (Basis Points) | + 9 | | – 17 | + 85 | + 11 |
| **RESIDUAL CAP RATE** | | | | | |
| Range | 4.50% – 6.75% | 4.25% – 6.75% | 4.25% – 8.00% | 3.50% – 7.00% | 4.25% – 7.00% |
| Average | 5.55% | 5.47% | 5.77% | 4.81% | 5.51% |
| Change (Basis Points) | + 8 | | – 22 | + 74 | + 4 |
| **MARKET RENT CHANGEᵇ** | | | | | |
| Range | 0.00% – 4.00% | 0.00% – 4.00% | 0.00% – 4.00% | 0.00% – 15.00% | 0.00% – 5.00% |
| Average | 2.40% | 2.38% | 2.46% | 3.84% | 2.41% |
| Change (Basis Points) | + 2 | | – 6 | – 144 | – 1 |
| **EXPENSE CHANGEᵇ** | | | | | |
| Range | 3.00% – 5.00% | 3.00% – 5.00% | 3.00% – 6.00% | 0.00% – 6.00% | 0.00% – 3.00% |
| Average | 3.55% | 3.44% | 3.67% | 3.00% | 2.60% |
| Change (Basis Points) | + 11 | | – 12 | + 55 | + 95 |
| **MARKETING TIMEᶜ** | | | | | |
| Range | 3 – 15 | 3 – 15 | 3 – 15 | 1 – 12 | 1 – 9 |
| Average | 6.9 | 7.5 | 6.3 | 4.3 | 3.9 |
| Change (▼, ▲, =) | | ▼ | ▲ | ▲ | ▲ |
| **FORECAST VALUE CHANGEᵈ** | | | | | |
| Range | (3.0%) – 5.0% | (3.0%) – 3.0% | (10.0%) – 3.0% | (20.0%) – 12.0% | (5.0%) – 10.0% |
| Average | 0.5% | (0.5%) | (1.5%) | 2.7% | 2.2% |
| Change (▼, ▲, =) | | ▲ | ▲ | ▼ | ▼ |

a. Rate on unleveraged, all-cash transactions; assumes stabilized occupancy
b. Year-one rate of change  c. Months  d. Over next 12 months
Source: PwC Investor Survey; survey conducted by PwC during January 2025

## Conclusion

Overall, the Northeastern SD Multifamily market segment has been experiencing favorable market conditions in recent years. The current vacancy rate is at a healthy level, market rent has been increasing, and the average sale price/SF has been stable to slowly increasing since last bottoming out in Q1 2024. Capitalization rates have stabilized in the last year and are projected to slowly decline in the near future, which should have a positive influence on property values. Overall, local market fundamentals indicate healthy market conditions withing the local multifamily market segment. Relative stability to slow growth is expected in the broad multifamily market segment over the next few years.

# Highest and Best Use

In appraisal practice, the concept of highest and best use represents the premise upon which value is based.  The four criteria the highest and best use must meet are:

- legally permissible;
- physically possible;
- financially feasible; and
- maximally productive.

The highest and best use analysis of the subject is discussed below.

## As Vacant

The property is zoned for mixed-use commercial use and is of sufficient size to accommodate various types of development. The immediate area includes a variety of commercial uses on the main floor and multifamily use on floors above the main floor. Considering the surrounding land uses, location attributes, legal restrictions and other factors, it is our opinion that a mixed-use project with commercial uses on the main floor and multifamily use above the main floor would be reasonable and appropriate. However, given current market conditions and high construction costs (evidenced by historic cost estimates of the subject retained in file), immediate development of the site is not financially feasible. Therefore, it is our opinion that the highest and best use would be to hold the property for future mixed-use development, once market conditions improve and demand requires development.

## As Improved

As improved, the subject involves a mixed-use facility, although predominantly a multifamily-oriented use. The existing use is legally permissible and physically possible. The improvements are contributing value to the property and based on our analysis, the existing use is financially feasible and the maximally productive use. The most likely buyer for the subject property is as follows:

- investor-regional

Therefore, it is our opinion that the highest and best use of the subject, as improved, is for continued mixed-use, with a small commercial space and on-site parking uses on the main floor and multifamily use above the main floor.

Sales Comparison Approach

# Sales Comparison Approach

The following map and table summarize the comparable data used in the valuation of the subject.  A detailed description of each transaction is included on the following pages.



Sales Comparison Approach

**SUMMARY OF COMPARABLE MULTIFAMILY SALES**

| No. | Property Name | Transaction Type | Transaction Date | YOC / Reno'd | No. Units | Avg. Unit Size | Actual Sale Price | Adjusted Sale Price [1] | Price Per Unit [1] | Occ. | NOI Per Unit | OAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Axis Apartments<br>10532 South 97th Court<br>Papillion, NE 68046 | Sale | Dec-23 | 2021 | 320 | 927 | $52,525,000 | $52,525,000 | $164,141 | 91.25% | $8,676 | 5.29% |
| 2 | Legacy 23 Apartments<br>3542 23rd Street<br>Columbus, NE 68601 | Sale | Mar-24 | 2019 | 78 | 848 | $11,485,000 | $11,485,000 | $147,244 | 95.00% | $9,123 | 6.20% |
| 3 | Cityville on 9th<br>550 SW 9th Street<br>Des Moines, IA 50309 | Sale | May-24 | 2015 / 2018 | 312 | 844 | $50,000,000 | $47,500,000 | $152,244 | 90.00% | $8,526 | 5.32% |
| 4 | MOD42<br>3115 42nd Street E<br>Minneapolis, MN 55406 | Sale | May-24 | 2020 | 30 | 476 | $3,665,000 | $3,665,000 | $122,167 | 100.00% | $7,574 | 6.20% |
| 5 | Walnut Lake Apartments<br>4454 NW 142nd Street<br>Urbandale, IA 50323 | Sale | May-24 | 2014 | 180 | 896 | $25,000,000 | $25,000,000 | $138,889 | 98.30% | $8,410 | 6.06% |
| 6 | Modi Apartments<br>2015 Lyndale Avenue S.<br>Minneapolis, MN 55405 | Sale | Aug-24 | 2018 | 75 | 549 | $9,750,000 | $9,750,000 | $130,000 | 96.00% | $7,179 | 5.52% |
| 7 | The Villas At Canyon Creek<br>4630 E 54th St<br>Sioux Falls, SD 57110 | Sale | Jul-24 | 2012 | 260 | 866 | $32,000,000 | $32,000,000 | $123,077 | 95.00% | $7,903 | 6.42% |
| 8 | Sunset Ridge Apartments<br>2387 Pioneer Rd<br>Fergus Falls, MN 56537 | Under Contract | Mar-25 | 2015 | 105 | 866 | $10,500,000 | $10,050,000 | $95,714 | 95.20% | $6,968 | 7.28% |
| Subj. Pro Forma | The Ruins Apartments<br>315 East Kemp Avenue<br>Watertown, SD 57201 | --- | --- | 2025 | 63 | 788 | --- | --- | --- | 93.50% | $7,858 | --- |

[1] Adjusted sale price for cash equivalency, lease-up and/or deferred maintenance (where applicable)

Compiled by CBRE

| Sale | Residential - Multi-unit Walk-up | No. 1 |
|------|-----------------------------------|-------|

| Property Name | Axis Apartments |
|---------------|-----------------|
| Address | 10532 South 97th Court |
| | Papillion, NE 68046 |
| | United States |

| Government Tax Agency | Sarpy |
|-----------------------|-------|
| Govt./Tax ID | 011604515 |



**Unit Mix Detail**

| Rate Timeframe | Monthly |
|----------------|---------|

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|-----------|-----|---|-----------|------|-----------|
| Studio | 32 | 10% | 562 | $1,023 | $1.82 |
| Studio | 16 | 5% | 565 | $1,017 | $1.80 |
| 1BR/1BA | 40 | 13% | 769 | $1,232 | $1.60 |
| 1BR/1BA | 1 | 0% | 780 | $1,275 | $1.63 |
| 1BR/1BA | 18 | 6% | 800 | $1,283 | $1.60 |
| 1BR/1BA | 60 | 19% | 802 | $1,292 | $1.61 |
| 1BR/1BA | 2 | 1% | 851 | $1,300 | $1.53 |
| 1BR/1BA | 2 | 1% | 859 | $1,325 | $1.54 |
| 1BR/1BA | 4 | 1% | 884 | $1,475 | $1.67 |
| 1BR/1BA TH | 8 | 3% | 904 | $1,350 | $1.49 |
| 1BR/1BA TH | 4 | 1% | 975 | $1,475 | $1.51 |
| 1BR/1BA TH | 8 | 3% | 1,015 | $1,400 | $1.38 |
| 2BR/2BA | 6 | 2% | 1,052 | $1,567 | $1.49 |
| 1BR/1BA | 2 | 1% | 1,056 | $1,550 | $1.47 |
| 1BR/1BA TH | 6 | 2% | 1,069 | $1,550 | $1.45 |
| 2BR/2BA | 2 | 1% | 1,106 | $1,725 | $1.56 |
| 2BR/2BA | 13 | 4% | 1,142 | $1,613 | $1.41 |
| 2BR/2BA | 22 | 7% | 1,147 | $1,611 | $1.40 |
| 2BR/2BA | 6 | 2% | 1,156 | $1,592 | $1.38 |
| 2BR/2BA | 9 | 3% | 1,159 | $1,616 | $1.39 |
| 2BR/2BA | 3 | 1% | 1,175 | $1,616 | $1.38 |
| 2BR/2BA TH | 8 | 3% | 1,217 | $1,675 | $1.38 |
| 2BR/2BA | 18 | 6% | 1,219 | $1,717 | $1.41 |
| 2BR/2BA TH | 14 | 4% | 1,269 | $1,759 | $1.39 |
| 2BR/2BA | 8 | 3% | 1,338 | $1,738 | $1.30 |
| 2BR/2BA TH | 4 | 1% | 1,379 | $1,700 | $1.23 |
| 2BR/2BA | 4 | 1% | 1,388 | $1,700 | $1.22 |
| Totals/Avg | 320 | | | $1,394 | $1.50 |



## Improvements

| | | | |
|---|---|---|---|
| Land Area | 16.811 ac | Status | Existing |
| Building Area | N/A | Year Built | 2021 |
| Total # of Units | 320 Unit | Year Renovated | N/A |
| Average Unit Size | 927 sf | Condition | New |
| Floor Count | 4 | Exterior Finish | Fiber Cement Board |

| | |
|---|---|
| Property Features | Attached Garages, Detached Garages, Elevators, Fire Sprinklered, Flat Roofs, Gated / Controlled Access, Individual Split Systems, Interior Corridors, Interior Stairwells, On-Site Management, Pitched Roofs, Rooftop A/C Units, Surface Parking, Under-building Parking |
| Project Amenities | Barbeque Area, Clubhouse, Courtyard, Fitness Center, Outdoor Kitchen, Pool |
| Unit Amenities | Carpeted Flooring, Ceiling Fans, Dishwasher, Garbage Disposal, Granite Countertops, Microwave Oven, Plank Flooring, Private Patios / Balconies, Range / Oven, Refrigerator with Icemaker, Stainless Steel Appliances, Washer / Dryer |

## Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | H2 CAPITAL, LLC | Marketing Time | N/A |
| True Buyer | CWG Investments, Inc. - Christoirpher W. Geer, President | Buyer Type | N/A |
| Recorded Seller | Sterling Lincoln Road, LLC | Seller Type | N/A |
| True Seller | Assurity Life Insurance Co. - David Lockwood | Primary Verification | Purchase agreement, Appraisal |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | Apartments | Date | 12/19/2023 |
| Proposed Use | Apartments | Sale Price | $52,525,000 |
| Listing Broker | CBRE | Financing | Market Rate Financing |
| Selling Broker | CBRE | Cash Equivalent | $52,525,000 |
| Doc # | Not publicly recorded | Capital Adjustment | $0 |
| | | Adjusted Price | $52,525,000 |

## Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|---|---|---|---|---|---|
| 12/2023 | Sale | H2 CAPITAL, LLC | Sterling Lincoln Road, LLC | $52,525,000 | $164,141 / $177.13 |



| Sale | Residential - Multi-unit Walk-up | No. 1 |
|---|---|---|

## Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | 12.06 |
| Buyer's Primary Analysis | N/A | Op Exp Ratio (OER) | 36.23% |
| Net Initial Yield/Cap. Rate | 5.29% | Adjusted Price / sf | $177.13 |
| Projected IRR | N/A | Adjusted Price / Unit | $164,141 |
| Actual Occupancy at Sale | 91% | | |

## Financial

| Revenue Type | Pro Forma Stabilized | Trailing Actuals |
|---|---|---|
| Period Ending | N/A | N/A |
| Source | Broker | N/A |
| Price | $52,525,000 | $52,525,000 |
| Potential Gross Income | $6,217,220 | N/A |
| Economic Occupancy | 91% | N/A |
| Economic Loss | $564,269 | N/A |
| Effective Gross Income | $5,652,951 | $4,353,967 |
| Expenses | $2,173,378 | $1,577,587 |
| Net Operating Income | $3,479,573 | $2,776,380 |
| NOI / sf | $11.73 | $9.36 |
| NOI / Unit | $10,874 | $8,676 |
| EGIM | 9.29 | 12.06 |
| OER | 38.45% | 36.23% |
| Net Initial Yield/Cap. Rate | 6.62% | 5.29% |

## Map & Comments



This comparable represents AXIS Apartments, completed in 2022. The property was offered to the market in the third quarter of 2023 and put under contract in December 2023. The broker calculated cap rate noted above is based upon forward-looking market rents, a 5% loss to lease factor, 5.3% vacancy factor, 0.16% credit loss factor, a 0.5% concession factor, a 3.5% management fee, and reserves of $250 per unit. The trailing actuals capitalization rate was derived from the trailing 12 income and expenses ending October 2023 and included a $161 per unit reserve replacement. The property was offered to the market by CBRE in mid-September 2023 unpriced. The property received 12 initial offers with four best and final offers with the highest and most likely to close selected. The property was initially put under contract at $53,000,000, however, was reduced to $52,525,000 during due diligence due to interest rate increases. According to the lender, the sale closed April 30, 2024 with the buyer acquiring the seller's business entity, thus, a deed was not recorded.



| Sale | Residential - Multi-unit Walk-up | No. 2 |
|------|----------------------------------|-------|

**Property Name** Legacy 23 Apartments
**Address** 3542 23rd Street
Columbus, NE 68601
United States

**Government Tax Agency** Platte
**Govt./Tax ID** 710162074



### Unit Mix Detail

Rate Timeframe    Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|-----------|-----|---|-----------|------|-----------|
| Studio | 3 | 4% | 580 | $935 | $1.61 |
| Studio | 3 | 4% | 592 | $975 | $1.65 |
| 1BR/1BA | 21 | 27% | 671 | $995 | $1.48 |
| 1BR/1BA | 23 | 29% | 750 | $1,073 | $1.43 |
| 2BR/2BA | 8 | 10% | 979 | $1,383 | $1.41 |
| 2BR/2BA | 20 | 26% | 1,172 | $1,595 | $1.36 |
| Totals/Avg | 78 | | | $1,208 | $1.43 |

### Improvements

| | | | |
|---|---|---|---|
| Land Area | 2.041 ac | Status | Existing |
| Net Rentable Area (NRA) | 66,129 sf | Year Built | 2019 |
| Total # of Units | 78 Unit | Year Renovated | N/A |
| Average Unit Size | 848 sf | Condition | Good |
| Floor Count | 4 | Exterior Finish | Vinyl Siding |
| Property Features | Detached Garages, Elevators, Individual Split Systems, Interior Corridors, Interior Stairwells, Pitched Roofs | | |
| Project Amenities | Fitness Center, Storage Units | | |
| Unit Amenities | Carpeted Flooring, Dishwasher, Garbage Disposal, Range / Oven, Refrigerator, Vinyl Flooring, Washer / Dryer | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | MRES Acquisitions, LLC | Marketing Time | 3 Month(s) |
| True Buyer | MRES Acquisitions, LLC | Buyer Type | N/A |
| Recorded Seller | Quantum Columbus, LLC | Seller Type | N/A |
| True Seller | Quantum Columbus, LLC | Primary Verification | Purchase Agreement, Buyer, Seller, County Records |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | Apartments | Date | 3/26/2024 |
| Proposed Use | Apartments | Sale Price | $11,485,000 |
| Listing Broker | N/A | Financing | Market Rate Financing |
| Selling Broker | N/A | Cash Equivalent | $11,485,000 |
| Doc # | 256/940 | Capital Adjustment | $0 |
| | | Adjusted Price | $11,485,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|------------------|------------------|-------|--------|-------|-----------------------------------|
| 03/2024 | Sale | MRES Acquisitions, LLC | Quantum Columbus, LLC | $11,485,000 | $147,244 / $173.68 |
| 01/2024 | Under Contract | MRES Acquisitions, LLC | Quantum Columbus, LLC | $11,485,000 | $147,244 / $173.68 |



| Sale | Residential - Multi-unit Walk-up | No. 2 |
|---|---|---|

## Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Pro Forma (Stabilized) | Eff Gross Inc Mult (EGIM) | 10.03 |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | 37.83% |
| Net Initial Yield/Cap. Rate | 6.20% | Adjusted Price / sf | $173.68 |
| Projected IRR | N/A | Adjusted Price / Unit | $147,244 |
| Actual Occupancy at Sale | 95% | | |

## Financial

| Revenue Type | Pro Forma Stabilized |
|---|---|
| Period Ending | N/A |
| Source | Appraiser |
| Price | $11,485,000 |
| Potential Gross Income | $1,227,900 |
| Economic Occupancy | 93% |
| Economic Loss | $83,333 |
| Effective Gross Income | $1,144,567 |
| Expenses | $433,006 |
| Net Operating Income | $711,561 |
| NOI / sf | $10.76 |
| NOI / Unit | $9,123 |
| EGIM | 10.03 |
| OER | 37.83% |
| Net Initial Yield/Cap. Rate | 6.20% |

## Map & Comments



Map data ©2025 Google

This comparable represents the sale of a 78-unit apartment facility located in Columbus, Nebraska. The facility was constructed in 2019 and is considered to be in good condition. The facility has detached garages, a fitness center, and storage units. The unit mix is comprised of studio, one-, and two-bedroom units. On January 9th, 2024 the property sold for $11,485,000, or $147,244/Unit, indicating a 6.2% cap rate based on proforma income.



| Sale | Residential - Multi-unit Mid / High Rise | No. 3 |
|------|-------------------------------------------|-------|

Property Name | Cityville on 9th
Address | 550 SW 9th Street
 | Des Moines, IA 50309
 | United States

Government Tax Agency | Polk
Govt./Tax ID | 020/00190-001-000



**Unit Mix Detail**

Rate Timeframe | Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|-----------|-----|---|-----------|------|-----------|
| Studio/1BA | 42 | 13% | 453-472 | $975-$1,100 | $2.24 |
| 1BR/1BA | 21 | 7% | 595 | $1,225 | $2.06 |
| 1BR/1BA | 81 | 26% | 632-694 | $1,250-$1,300 | $1.92 |
| 1BR/1BA | 60 | 19% | 758-805 | $1,250-$1,375 | $1.68 |
| 2BR/2BA | 6 | 2% | 1,053-1,092 | $1,453-$1,775 | $1.50 |
| 2BR/2BA | 93 | 30% | 1,102-1,300 | $1,675-$1,875 | $1.48 |
| 3BR/3BA | 9 | 3% | 1,425 | $1,995 | $1.40 |
| Totals/Avg | 312 | | | $1,423 | $1.69 |

| Improvements | | | |
|--------------|--|--|--|
| Land Area | 10.550 ac | Status | Existing |
| Net Rentable Area (NRA) | 263,466 sf | Year  Built | 2015 |
| Total # of Units | 312 Unit | Year Renovated | 2018 |
| Average Unit Size | 844 sf | Condition | Good |
| Floor Count | 4 | Exterior Finish | Masonry |
| Property Features | Flat Roofs, Gated / Controlled Access, Ground-level Retail, On-Site Management, Structured Parking, Surface Parking | | |
| Project Amenities | Barbeque Area, Business Center, Clubhouse, Conference Room, Courtyard, Cyber Café, Dog Park / Run, Fitness Center, Game Room, Outdoor Fireplace, Pool, Roof Deck / Terrace, Theater | | |
| Unit Amenities | Ceiling Fans, Dishwasher, Garbage Disposal, Granite Countertops, Microwave Oven, Private Patios / Balconies, Quartz Countertops, Range / Oven, Refrigerator, Stainless Steel Appliances, Tile Backsplash, Vinyl Flooring, Washer / Dryer | | |

| Sale Summary | | | |
|--------------|--|--|--|
| Recorded Buyer | Cityville Iowa Owner, LP, Cityville Iowa Owner Phase III, LP | Marketing Time | N/A |
| True Buyer | Artisan Capital Group | Buyer Type | N/A |
| Recorded Seller | Cityville on 9th LLC, Cityville on 9th III, LLC | Seller Type | N/A |
| True Seller | N/A | Primary Verification | Public Records, Broker |
| Interest Transferred | Leased Fee | Type | Sale |
| Current Use | Multifamily | Date | 5/1/2024 |
| Proposed Use | Continued Use | Sale Price | $50,000,000 |
| Listing Broker | CBRE | Financing | Market Rate Financing |
| Selling Broker | N/A | Cash Equivalent | $50,000,000 |
| Doc # | Book 19793 Page 26, Book 19791 Page 763 | Capital Adjustment | $-2,500,000 |
| | | Adjusted Price | $47,500,000 |

| Transaction Summary plus Five-Year CBRE View History | | | | | |
|------|------|------|------|------|------|
| **Transaction Date** | **Transaction Type** | **Buyer** | **Seller** | **Price** | **Cash Equivalent Price/unit and /sf** |
| 05/2024 | Sale | Cityville Iowa Owner, LP, Cityville Iowa Owner Phase III, LP | Cityville on 9th LLC, Cityville on 9th III, LLC | $50,000,000 | $160,256 / $189.78 |



| Sale | Residential - Multi-unit Mid / High Rise | No. 3 |
|------|-------------------------------------------|-------|

## Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | N/A | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 5.32% | Adjusted Price / sf | $180.29 |
| Projected IRR | N/A | Adjusted Price / Unit | $152,244 |
| Actual Occupancy at Sale | 90% | | |

## Financial

| Revenue Type | Trailing Actuals |
|--------------|------------------|
| Period Ending | N/A |
| Source | Broker |
| Price | $50,000,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | N/A |
| Expenses | N/A |
| Net Operating Income | $2,660,000 |
| NOI / sf | $10.10 |
| NOI / Unit | $8,526 |
| EGIM | N/A |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 5.32% |

## Map & Comments



The property consists of nine four-story apartment buildings. The improvements were constructed in phases between 2015-2018. Amenities include a pool and sundeck, courtyard, business center, conference room, coffee bar, fitness center, game room with pool table, foosball, and shuffle board, dog park, and theater room. The complex was purchased in two transactions, with Phase I and II purchased at $33,330,000 with favorable financing of Fannie Mae. Phase III was purchased for $16,670,000 and with market rate financing, for a total of $50,000,000 or $160,256 per unit. Additionally, the complex features 47,849 square feet of ground floor commercial space. A portion of the property had a remaining tax abatement with a net present value of $2,500,000 as provided by the broker, therefore, we have subtracted this amount from the total purchase price. Cap rate was derived from trailing 12 actuals with the inclusion of full real estate taxes as provided by the broker. The comparable photo is representative of the current condition of the property.



| Sale | Residential - Multi-unit Mid / High Rise | No. 4 |
|---|---|---|

**Property Name** MOD42
**Address** 3115 42nd Street E
Minneapolis, MN 55406
United States



**Government Tax Agency** Hennepin
**Govt./Tax ID** N/A

**Unit Mix Detail**

Rate Timeframe   Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| Studio | 24 | 80% | 467 | $1,165 | $2.49 |
| 1BD/1BA | 4 | 13% | 472 | $1,245 | $2.64 |
| 1BD/1BA | 2 | 7% | 619 | $1,695 | $2.74 |
| Totals/Avg | 30 | | | $1,211 | $2.53 |

## Improvements

| | | | |
|---|---|---|---|
| Land Area | 0.226 ac | Status | Existing |
| Net Rentable Area (NRA) | 14,280 sf | Year Built | 2020 |
| Total # of Units | 30 Unit | Year Renovated | N/A |
| Average Unit Size | 476 sf | Condition | Average |
| Floor Count | 3 | Exterior Finish | Other (See Comments) |
| Property Features | Fire Sprinklered, Flat Roofs, Individual Split Systems | | |
| Project Amenities | Fitness Center | | |
| Unit Amenities | N/A | | |

## Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | MOD42 Apartments, LLC | Marketing Time | 2 Month(s) |
| True Buyer | Landucci Homes | Buyer Type | Private Investor |
| Recorded Seller | 42nd Street Apartments, LLC | Seller Type | Developer |
| True Seller | N/A | Primary Verification | Broker, CRV |
| Interest Transferred | Leased Fee | Type | Sale |
| Current Use | Apartments | Date | 5/1/2024 |
| Proposed Use | Apartments | Sale Price | $3,665,000 |
| Listing Broker | Colliers | Financing | Market Rate Financing |
| Selling Broker | N/A | Cash Equivalent | $3,665,000 |
| Doc # | eCRV 1644004 | Capital Adjustment | $0 |
| | | Adjusted Price | $3,665,000 |

## Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|---|---|---|---|---|---|
| 05/2024 | Sale | MOD42 Apartments, LLC | 42nd Street Apartments, LLC | $3,665,000 | $122,167 / $256.65 |



| Sale | Residential - Multi-unit Mid / High Rise | No. 4 |
|------|-------------------------------------------|-------|

## Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 6.20% | Adjusted Price / sf | $256.65 |
| Projected IRR | N/A | Adjusted Price / Unit | $122,167 |
| Actual Occupancy at Sale | 100% | | |

## Financial

| Revenue Type | Trailing Actuals |
|---|---|
| Period Ending | N/A |
| Source | N/A |
| Price | $3,665,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | N/A |
| Expenses | N/A |
| Net Operating Income | $227,230 |
| NOI / sf | $15.91 |
| NOI / Unit | $7,574 |
| EGIM | N/A |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 6.20% |

## Map & Comments



This comparable represents the sale of a 30-unit apartment property located at 3115 42nd Street E in Minneapolis, Minnesota. The improvements were constructed in 2020 and situated on a 0.23-acre site. The property offers studio, one-, and two-bedroom units. The property is a modular-constructed apartment without any on-site parking. The property has a limited amenity package and tenants pay for all utilities either directly or via RUBS. The property's capitalization rate is based on in-place income and expenses. The property sold in May 2024 for $3,665,000 or $122,167 per unit.



| Sale | Residential - Multi-unit Walk-up | No. 5 |
|------|----------------------------------|-------|

| | |
|---|---|
| Property Name | Walnut Lake Apartments |
| Address | 4454 NW 142nd Street |
| | Urbandale, IA 50323 |
| | United States |
| | |
| Government Tax Agency | Dallas |
| Govt./Tax ID | 1224230000, Multiple |



**Unit Mix Detail**

Rate Timeframe       Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|-----------|-----|---|-----------|------|-----------|
| 1BR/1BA | 22 | 12% | 600 | $970 | $1.62 |
| 1BR/1BA | 26 | 14% | 610 | $992 | $1.63 |
| 2BR/2BA | 48 | 27% | 859 | $1,187 | $1.38 |
| 2BR/2BA | 36 | 20% | 859 | $1,176 | $1.37 |
| 2BR/2BA | 12 | 7% | 1,112 | $1,296 | $1.17 |
| 3BR/2BA | 36 | 20% | 1,299 | $1,303 | $1.00 |
| Totals/Avg | 180 | | | $1,161 | $1.29 |

## Improvements

| | | | |
|---|---|---|---|
| Land Area | 12.144 ac | Status | Existing |
| Net Rentable Area (NRA) | 161,354 sf | Year  Built | 2014 |
| Total # of Units | 180 Unit | Year Renovated | N/A |
| Average Unit Size | 896 sf | Condition | Average |
| Floor Count | 3 | Exterior Finish | Vinyl Siding |
| Property Features | Attached Garages, Interior Corridors, Interior Stairwells, On-Site Management, Pitched Roofs, Surface Parking | | |
| Project Amenities | Billiards, Business Center, Clubhouse, Dog Park / Run, Fitness Center, Game Room, On-Site Security, Pool, Storage Units, Walking Trail | | |
| Unit Amenities | Black Appliances, Ceiling Fans, Dishwasher, Garbage Disposal, Microwave Oven, Private Patios / Balconies, Quartz Countertops, Range / Oven, Refrigerator, Vinyl Flooring, Washer / Dryer | | |

## Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | WALNUT LAKE ACQUISITION LLC | Marketing Time | N/A |
| True Buyer | MLG Capital | Buyer Type | N/A |
| Recorded Seller | WBA WALNUT LAKE LLC | Seller Type | N/A |
| True Seller | WBA WALNUT LAKE LLC | Primary Verification | PSA, Appraisal, Public Records |
| | | | |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | Apartments | Date | 5/23/2024 |
| Proposed Use | Apartments | Sale Price | $25,000,000 |
| Listing Broker | N/A | Financing | Market Rate Financing |
| Selling Broker | N/A | Cash Equivalent | $25,000,000 |
| Doc # | 2024-07448 | Capital Adjustment | $0 |
| | | Adjusted Price | $25,000,000 |

## Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|------------------|------------------|-------|--------|-------|-------------------------------------|
| 05/2024 | Sale | WALNUT LAKE ACQUISITION LLC | WBA WALNUT LAKE LLC | $25,000,000 | $138,889 / $154.94 |
| 04/2024 | Under Contract | MLG Capital | WBA WALNUT LAKE LLC | $25,000,000 | $138,889 / $154.94 |



| Sale | Residential - Multi-unit Walk-up | No. 5 |
|------|-----------------------------------|-------|

## Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Pro Forma (Stabilized) | Eff Gross Inc Mult (EGIM) | 8.79 |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | 46.75% |
| Net Initial Yield/Cap. Rate | 6.06% | Adjusted Price / sf | $154.94 |
| Projected IRR | N/A | Adjusted Price / Unit | $138,889 |
| Actual Occupancy at Sale | 98% | | |

## Financial

| Revenue Type | Pro Forma Stabilized | Trailing Actuals |
|---|---|---|
| Period Ending | N/A | 2/29/2024 |
| Source | Buyer | Seller |
| Price | $25,000,000 | $25,000,000 |
| Potential Gross Income | N/A | N/A |
| Economic Occupancy | N/A | N/A |
| Economic Loss | N/A | N/A |
| Effective Gross Income | $2,843,108 | $2,773,160 |
| Expenses | $1,329,278 | $1,403,752 |
| Net Operating Income | $1,513,830 | $1,369,408 |
| NOI / sf | $9.38 | $8.49 |
| NOI / Unit | $8,410 | $7,608 |
| EGIM | 8.79 | 9.01 |
| OER | 46.75% | 50.62% |
| Net Initial Yield/Cap. Rate | 6.06% | 5.48% |

## Map & Comments



This comparable is a 180-unit multi-family garden property located at 4454 NW 142nd Street in Urbandale, Iowa. The property consists of 15 predominantly three-story apartment buildings. The improvements were constructed in 2014 and are situated on a 12.14-acre site. The improvements were 98.3% leased as of the date of the rent roll (as of March 21, 2024). The project features 90 attached garage stalls and 201 storage units. The property sold in May 2024 for $25,000,000 or $138,889 per unit. The buyers proforma implies a 6.06% cap rate, T-12 financials imply a 5.48% cap rate. The comparable photo is representative of the current condition of the property.



| Sale | Residential - Multi-unit Mid / High Rise | No. 6 |
|---|---|---|

Property Name | Modi Apartments
Address | 2015 Lyndale Avenue S.
Minneapolis, MN 55405
United States

Government Tax Agency | Hennepin
Govt./Tax ID | 34-029-24-22-0278



**Unit Mix Detail**

Rate Timeframe | Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| Studio | 20 | 27% | 413 | $1,100 | $2.66 |
| 1BR/1BA | 55 | 73% | 598 | $1,300 | $2.17 |
| Totals/Avg | 75 | | | $1,247 | $2.27 |

## Improvements

| | | | |
|---|---|---|---|
| Land Area | 0.327 ac | Status | Existing |
| Net Rentable Area (NRA) | 41,150 sf | Year Built | 2018 |
| Total # of Units | 75 Unit | Year Renovated | N/A |
| Average Unit Size | 549 sf | Condition | Good |
| Floor Count | 6 | Exterior Finish | Metal |
| Property Features | Flat Roofs, Gated / Controlled Access, Structured Parking | | |
| Project Amenities | Barbeque Area, Clubhouse, Fitness Center, Storage Units | | |
| Unit Amenities | Dishwasher, Refrigerator, Washer / Dryer | | |

## Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Modi Apartments, LLC | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | Franklyn Mpls Llc | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | Purchase Agreement, Buyer, Appraisal |
| Interest Transferred | Leased Fee | Type | Sale |
| Current Use | N/A | Date | 8/14/2024 |
| Proposed Use | N/A | Sale Price | $9,750,000 |
| Listing Broker | N/A | Financing | Market Rate Financing |
| Selling Broker | N/A | Cash Equivalent | $9,750,000 |
| Doc # | eCRV 1680737 | Capital Adjustment | $0 |
| | | Adjusted Price | $9,750,000 |

## Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|---|---|---|---|---|---|
| 08/2024 | Sale | Modi Apartments, LLC | Franklyn Mpls Llc | $9,750,000 | $130,000 / $236.94 |



| Sale | Residential - Multi-unit Mid / High Rise | No. 6 |
| --- | --- | --- |

### Units of Comparison

| | | | |
| --- | --- | --- | --- |
| Static Analysis Method | Pro Forma (Stabilized) | Eff Gross Inc Mult (EGIM) | 8.47 |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | 53.21% |
| Net Initial Yield/Cap. Rate | 5.52% | Adjusted Price / sf | $236.94 |
| Projected IRR | N/A | Adjusted Price / Unit | $130,000 |
| Actual Occupancy at Sale | 96% | | |

### Financial

| Revenue Type | Pro Forma Stabilized |
| --- | --- |
| Period Ending | N/A |
| Source | Appraiser |
| Price | $9,750,000 |
| Potential Gross Income | $1,122,000 |
| Economic Occupancy | 95% |
| Economic Loss | $56,100 |
| Effective Gross Income | $1,150,792 |
| Expenses | $612,355 |
| Net Operating Income | $538,437 |
| NOI / sf | $13.08 |
| NOI / Unit | $7,179 |
| EGIM | 8.47 |
| OER | 53.21% |
| Net Initial Yield/Cap. Rate | 5.52% |

### Map & Comments



This comparable is a 75-unit multi-family mid/high rise property located at 2015 Lyndale Avenue S. in Minneapolis, Minnesota. The property consists of a single, six-story apartment building. The improvements were constructed in 2018 and are situated on a 0.33-acre site. The property features covered parking, a fitness center and common areas on the ground level, apartment units on floors 2-6 and a rooftop patio.  Additionally, the property is elevator served and features bike storage.   The property is presently 96.0% leased. The property sold for a price of $9,750,000, or $130,000 per unit. Based upon proforma rents with a 5% vacancy and expenses at an OER of 53%, the capitalization rate equates to 5.52%.



| Sale | Residential - Multi-unit Walk-up | No. 7 |
|---|---|---|

| | |
|---|---|
| Property Name | The Villas At Canyon Creek |
| Address | 4630 E 54th St |
| | Sioux Falls, SD 57110 |
| | United States |
| | |
| Government Tax Agency | Minnehaha |
| Govt./Tax ID | Multiple |



**Unit Mix Detail**

Rate Timeframe     Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 1BR/1BA | 141 | 54% | 723 | $962 | $1.33 |
| 1BR/1BA | 9 | 3% | 990 | $1,020 | $1.03 |
| 2BR/2BA | 110 | 42% | 1,040 | $1,256 | $1.21 |
| Totals/Avg | 260 | | | $1,088 | $1.26 |

| Improvements | | | |
|---|---|---|---|
| Land Area | 15.173 ac | Status | Existing |
| Net Rentable Area (NRA) | 225,253 sf | Year Built | 2012 |
| Total # of Units | 260 Units | Year Renovated | N/A |
| Average Unit Size | 866 sf | Condition | Good |
| Floor Count | 3 | Exterior Finish | Fiber Cement Board |
| Property Features | Attached Garages, Detached Garages, Individual Split Systems, Interior Corridors, Interior Stairwells, On-Site Management, Pitched Roofs, Surface Parking | | |
| Project Amenities | Clubhouse, Dog Park / Run, Fitness Center, Pool, Storage Units, Theater | | |
| Unit Amenities | 8-Foot Ceilings, Carpeted Flooring, Dishwasher, Granite Countertops, Microwave Oven, Private Patios / Balconies, Range / Oven, Refrigerator, Silver Appliances, Vinyl Flooring, Washer / Dryer | | |

| Sale Summary | | | |
|---|---|---|---|
| Recorded Buyer | EWR SF Boulder Creek Townhomes | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | Villas at Canyon Creek LLC | Seller Type | Private Investor |
| True Seller | Michael Bender | Primary Verification | Seller's Representative |
| | | | |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | N/A | Date | 7/29/2024 |
| Proposed Use | N/A | Sale Price | $32,000,000 |
| Listing Broker | Michael Bender at Bender Commercial | Financing | Cash to Seller |
| Selling Broker | N/A | Cash Equivalent | $32,000,000 |
| Doc # | Book 627, Page 403 | Capital Adjustment | $0 |
| | | Adjusted Price | $32,000,000 |

| Transaction Summary plus Five-Year CBRE View History | | | | |
|---|---|---|---|---|
| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
| 07/2024 | Sale | EWR SF Boulder Creek Townhomes | Villas at Canyon Creek LLC | $32,000,000 | $123,077 / $142.06 |



| Sale | Residential - Multi-unit Walk-up | No. 7 |
|---|---|---|

## Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | 9.11 |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | 41.52% |
| Net Initial Yield/Cap. Rate | 6.42% | Adjusted Price / sf | $142.06 |
| Projected IRR | N/A | Adjusted Price / Unit | $123,077 |
| Actual Occupancy at Sale | 95% | | |

## Financial

| Revenue Type | Pro Forma Stabilized | Trailing Actuals |
|---|---|---|
| Period Ending | N/A | N/A |
| Source | Broker | Broker |
| Price | $32,000,000 | $32,000,000 |
| Potential Gross Income | $3,889,488 | $3,694,779 |
| Economic Occupancy | 93% | 95% |
| Economic Loss | $257,873 | $181,524 |
| Effective Gross Income | $3,631,615 | $3,513,255 |
| Expenses | $1,415,894 | $1,458,532 |
| Net Operating Income | $2,215,721 | $2,054,723 |
| NOI / sf | $9.84 | $9.12 |
| NOI / Unit | $8,522 | $7,903 |
| EGIM | 8.81 | 9.11 |
| OER | 38.99% | 41.52% |
| Net Initial Yield/Cap. Rate | 6.92% | 6.42% |

## Map & Comments



This comparable represents a 260-unit garden-style project known as The Villas at Canyon Creek in Sioux Falls, SD. The project was built in 2013 and features a clubhouse with fitness center and theater room, outdoor pool, dog park, and a combination of detached garages and open surface parking. This property was sold together with Boulder Creek townhome project (134 units) owned by the seller located at 7601 W. Boulder Creek Pl. in Sioux Falls, SD. The property sold in July 2024 with an allocated sale price of $32,000,000, or $123,077/unit. The cap rate indicated by T-12 is 6.42% and the stabilized FY1 proforma assumes a 5.3% income growth and reduces management fee to 3.5% from the T-12, resulting in a cap rate of 6.92%.



| Under Contract | Residential - Multi-unit Walk-up | No. 8 |
|---|---|---|



| Property Name | Sunset Ridge Apartments |
|---|---|
| Address | 2387 Pioneer Rd |
| | Fergus Falls, MN 56537 |
| | United States |
| Government Tax Agency | N/A |
| Govt./Tax ID | N/A |

**Unit Mix Detail**

Rate Timeframe    Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 1 Bed/1 Bath | 36 | 34% | 702 | $914 | $1.30 |
| 2 Bed/1 Bath | 47 | 45% | 948 | $1,041 | $1.10 |
| 2 Bed/2 Bath | 22 | 21% | 960 | $1,074 | $1.12 |
| Totals/Avg | 105 | | | $1,004 | $1.16 |

## Improvements

| | | | |
|---|---|---|---|
| Land Area | 5.050 ac | Status | Existing |
| Net Rentable Area (NRA) | 90,948 sf | Year Built | 2015 |
| Total # of Units | 105 Unit | Year Renovated | N/A |
| Average Unit Size | 866 sf | Condition | Good |
| Floor Count | 3 | Exterior Finish | Vinyl Siding |
| Property Features | N/A | | |
| Project Amenities | N/A | | |
| Unit Amenities | N/A | | |

## Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Sameul Herzog | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | Sunset Ridge Apartments of Fergus Falls, LLC | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | Broker, PA |
| Interest Transferred | Fee Simple/Freehold | Type | Under Contract |
| Current Use | Multifamily | Date | 3/1/2025 |
| Proposed Use | Multifamily | Sale Price | $10,500,000 |
| Listing Broker | Michael Commercial Real Estate | Financing | Market Rate Financing |
| Selling Broker | N/A | Cash Equivalent | $10,500,000 |
| Doc # | N/A | Capital Adjustment | $-450,000 |
| | | Adjusted Price | $10,050,000 |

## Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|---|---|---|---|---|---|
| 03/2025 | Under Contract | Sameul Herzog | Sunset Ridge Apartments of Fergus Falls, LLC | $10,500,000 | $100,000 / $115.45 |



| Under Contract | Residential - Multi-unit Walk-up | No. 8 |
| --- | --- | --- |

## Units of Comparison

| | | | |
| --- | --- | --- | --- |
| Static Analysis Method | Pro Forma (Stabilized) | Eff Gross Inc Mult (EGIM) | 7.19 |
| Buyer's Primary Analysis | Price and Capitalization Analyses | Op Exp Ratio (OER) | 47.69% |
| Net Initial Yield/Cap. Rate | 7.28% | Adjusted Price / sf | $110.50 |
| Projected IRR | N/A | Adjusted Price / Unit | $95,714 |
| Actual Occupancy at Sale | 95% | | |

## Financial

| Revenue Type | Pro Forma Stabilized |
| --- | --- |
| Period Ending | 12/31/2025 |
| Source | Appraiser |
| Price | $10,050,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | $1,398,579 |
| Expenses | $666,978 |
| Net Operating Income | $731,601 |
| NOI / sf | $8.04 |
| NOI / Unit | $6,968 |
| EGIM | 7.19 |
| OER | 47.69% |
| Net Initial Yield/Cap. Rate | 7.28% |

## Map & Comments



Map data ©2025 Google

The comparable is a 105-unit multi-family (garden) property located at 2387 Pioneer Rd in Fergus Falls, Minnesota. The property consists of three, three story apartment buildings and six, detached garage buildings. The improvements were constructed between 2015 - 2018 and are situated on a 9.47-acre site. The improvements were 95.2% leased. The sale included a TIF note with an allocated value of $450,000 and has been deducted from the purchase price above. The capitalization rate is based upon market rents, 5% vacancy and stabilized expenses including reserves.



## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

| MULTIFAMILY SALES ADJUSTMENT GRID | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Subj. Pro Forma |
| Transaction Type | Sale | Sale | Sale | Sale | Sale | Sale | Sale | Under Contract | --- |
| Transaction Date | Dec-23 | Mar-24 | May-24 | May-24 | May-24 | Aug-24 | Jul-24 | Mar-25 | --- |
| Year Built/Renovated | 2021 | 2019 | 2015 / 2018 | 2020 | 2014 | 2018 | 2012 | 2015 | 2025 / |
| No. Units | 320 | 78 | 312 | 30 | 180 | 75 | 260 | 105 | 63 |
| Avg. Unit Size | 927 | 848 | 844 | 476 | 896 | 549 | 866 | 866 | 788 |
| Actual Sale Price | $52,525,000 | $11,485,000 | $50,000,000 | $3,665,000 | $25,000,000 | $9,750,000 | $32,000,000 | $10,500,000 | --- |
| Adjusted Sale Price [1] | $52,525,000 | $11,485,000 | $47,500,000 | $3,665,000 | $25,000,000 | $9,750,000 | $32,000,000 | $10,050,000 | --- |
| Price Per Unit [1] | $164,141 | $147,244 | $152,244 | $122,167 | $138,889 | $130,000 | $123,077 | $95,714 | --- |
| Occupancy | 91% | 95% | 90% | 100% | 98% | 96% | 95% | 95% | 94% |
| NOI Per Unit | $8,676 | $9,123 | $8,526 | $7,574 | $8,410 | $7,179 | $7,903 | $6,968 | $7,858 |
| OAR | 5.29% | 6.20% | 5.32% | 6.20% | 6.06% | 5.52% | 6.42% | 7.28% | --- |
| Adj. Price Per Unit | $164,141 | $147,244 | $152,244 | $122,167 | $138,889 | $130,000 | $123,077 | $95,714 | |
| Property Rights Conveyed | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | |
| Financing Terms [1] | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | |
| Conditions of Sale | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | |
| Market Conditions (Time) | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | |
| Subtotal - Price Per Unit | $164,141 | $147,244 | $152,244 | $122,167 | $138,889 | $130,000 | $123,077 | $95,714 | |
| Location | -10% | 0% | -15% | -20% | -10% | -20% | -10% | 5% | |
| Project Size | 3% | 0% | 3% | -3% | 2% | 0% | 3% | 2% | |
| Age/Condition | 4% | 6% | 9% | 5% | 11% | 7% | 13% | 10% | |
| Quality of Construction | 0% | 5% | 0% | 0% | 0% | 0% | 0% | 0% | |
| Avg. Unit Size | -9% | -4% | -4% | 20% | -7% | 15% | -5% | -5% | |
| Project Amenities | -1% | 0% | -1% | 0% | -2% | 0% | -2% | 1% | |
| Parking | -3% | 3% | -1% | 3% | -1% | 0% | -1% | 3% | |
| Economic Characteristics | -15% | -17% | -14% | 1% | -10% | 4% | -3% | 14% | |
| Total Other Adjustments | -31% | -7% | -23% | 6% | -17% | 6% | -5% | 30% | |
| Indicated Value Per Unit | $113,257 | $136,937 | $117,228 | $129,497 | $115,278 | $137,800 | $116,923 | $124,429 | |
| Absolute Adjustment | 45% | 35% | 47% | 52% | 43% | 46% | 37% | 40% | |

[1] Adjusted for cash equivalency, lease-up and/or deferred maintenance (where applicable)
Compiled by CBRE

Although we don't have specific numerical data to support an exact adjustment for some of the variables, we use a quantitative adjustment based on the differential for each variable between the comparables and the subject to estimate the influence on value attributable to that variable. These adjustments are more qualitative in nature and are derived from market observations, logical reasoning, and anecdotal evidence.

### Property Rights Conveyed

None of the comparables required adjustments within this category.

### Financing Terms

All of the sales involved cash or were considered equivalent to cash therefore no adjustment was made.

### Conditions of Sale

Adjustments for conditions of sale typically reflect the motivation of the buyer and/or seller that result in a sale price that is not considered market. The comparable sales did not require any adjustments for conditions of sale.

### Market Conditions

Considering market conditions discussed herein, an annual adjustment of 0.0% is considered reasonable.

Sales Comparison Approach

## Location Adjustments

The following supplemental data was collected in order to provide support for our location adjustments:

| IMPROVED SALES LOCATION ADJUSTMENT ANALYSIS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Comparable Number | Subject | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Address | 315 East Kemp Avenue | 10532 South 97th Court | 3542 23rd Street | 550 SW 9th Street | 3115 42nd Street E | 4454 NW 142nd Street | 2015 Lyndale Avenue S. | 4630 E 54th St | 2387 Pioneer Rd |
| Radius for Demographic Analysis | 3 Mile Radius | 3 Mile Radius | 3 Mile Radius | 3 Mile Radius | 3 Mile Radius | 3 Mile Radius | 3 Mile Radius | 3 Mile Radius | 3 Mile Radius |
| 2024 Households | 9,350 | 24,215 | 10,059 | 42,109 | 75,571 | 15,775 | 119,051 | 23,473 | 5,600 |
| 2024 Average Household Income | $79,501 | $136,498 | $88,960 | $83,010 | $119,190 | $190,530 | $108,393 | $115,361 | $74,469 |
| *AHI Relative to Subject* | --- | 71.7% | 11.9% | 4.4% | 49.9% | 139.7% | 36.3% | 45.1% | -6.3% |
| 2024 Median Value of Owner Occupied Housing Units | $221,433 | $318,510 | $214,486 | $200,195 | $390,394 | $419,505 | $434,945 | $323,710 | $192,863 |
| 2024 % Renter Occupied Housing Units | 37.2% | 31.5% | 30.2% | 47.3% | 41.8% | 17.5% | 65.5% | 31.5% | 37.2% |
| 2024 % College/Graduate Degree Age 25+ | 19.7% | 45.5% | 25.3% | 35.3% | 57.9% | 67.7% | 55.9% | 47.2% | 26.3% |
| 2024 Median Age | 38.1 | 37.2 | 38.2 | 33.6 | 36.3 | 38.1 | 32.3 | 37.2 | 42.0 |
| **Indicated Qualitative Adjustment** | --- | Downward | Neutral | Downward | Downward | Downward | Downward | Downward | Upward |
| *Concluded Quantitative Adjustment* | --- | *-10%* | *0%* | *-15%* | *-20%* | *-10%* | *-20%* | *-10%* | *5%* |
| Compiled by CBRE | | | | | | | | | |

## Project Size

The price per unit typically decreases as the project size increases, all other things being equal. The project size adjustment is qualitative in nature and is based on the variance between the total number of units of the comparables and the subject.

### Age/Condition Adjustments

Age/condition adjustments are typically based on the property's age and observed condition, which is summarized below.

| AGE/CONDITION ADJUSTMENT | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Comparable No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Subject |
| Year Built/Renovated | 2021 | 2019 | 2015 /2018 | 2020 | 2014 | 2018 | 2012 | 2015 | 2025 / |
| Age | 4 | 6 | 10 | 5 | 11 | 7 | 13 | 10 | 0 |
| Effective Age | 4 | 6 | 9 | 5 | 11 | 7 | 13 | 10 | 0 |
| Subject Effective Age | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Age Difference | 4 | 6 | 9 | 5 | 11 | 7 | 13 | 10 | |
| Annual Depreciation | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | |
| Total Depreciation (Rd) | 4.0% | 6.0% | 9.0% | 5.0% | 11.0% | 7.0% | 13.0% | 10.0% | |
| Compiled by CBRE | | | | | | | | | |

### Quality of Construction

This adjustment is for differences in construction materials and workmanship. Comparables with differences in quality are adjusted. The quality of construction adjustment is based on the difference in cost between observed quality differences.

### Average Unit Size

An apartment project with a higher average unit size typically can generate more income per unit. The subject's average unit size is 788 SF. The comparable sales are adjusted accordingly for the variance between the average unit size.

### Project Amenities

This adjustment recognizes the typical amenities offered at apartment complexes such as fitness and/or business center, laundry, pool, community room, etc. The comparable sales are adjusted accordingly for project amenities.

## Parking

This adjustment recognizes the different types of parking offered, such as surface parking, detached garages, underground parking, etc. The comparable sales are adjusted accordingly based on their parking characteristics.

## Economic Characteristics

This adjustment recognizes the influence on value attributed to economic characteristics that are not likely reflected in the other elements of comparison previously discussed, such as differences in expense ratios, management, and other characteristics that influence NOI/unit and/or the overall perception of investment risk.

## Sales Comparison Approach Conclusion

Overall, the comparable sales indicate an adjusted probable market value range of $113,257/unit to $137,800/unit with an average of $123,918/unit. When comparing the sales to the subject property, the four sales with the lowest absolute adjustment percentage are expected to be the best indicator of value. These four sales include Sale 2, Sale 5, Sale 7 & Sale 8. Sale 2 appears to be somewhat of an outlier for some unknown reason and has the oldest sale date. Therefore, all consideration is given to Sales 5, 7 & 8 indicating a revised probable value range of $115,278/unit to $124,429/unit. For this assignment, a value near the average of this revised range is reconciled, or $119,000/unit. The following chart presents the valuation conclusion:

| SALES COMPARISON APPROACH | | | | |
|---|---|---|---|---|
| Total Units | X | Value Per Unit | = | Value |
| 63 | X | $119,000 | = | $7,497,000 |

**VALUE CONCLUSION**

| | | |
|---|---|---|
| Current Prospective As Stabilized Value | | $7,497,000 |
| **Rounded** | | **$7,495,000** |
| Market Conditions Adjustment | for 27 Months | 1.00000 |
| Prospective As Stabilized Adjusted Market Value | | $7,497,000 |
| **Rounded** | | **$7,495,000** |
| Lease-Up Discount | | (685,000) |
| Prospective Prospective As Complete Value | | $6,812,000 |
| **Rounded** | | **$6,810,000** |
| Cost to Complete | | (1,865,000) |
| As Is Value | | $4,945,000 |
| **Rounded** | | **$4,945,000** |
| **Value Per Unit** | | **$78,492** |

Compiled by CBRE

Sales Comparison Approach

The as stabilized value indicates an estimated value based on current market conditions. Therefore, changes in market conditions must be considered in order to estimate the as stabilized value as of the prospective effective date. For this assignment, no adjustment is made for market conditions for the prospective as stabilized effective date. The lease-up discount is then deducted from the prospective as stabilized value to develop the prospective as complete value. The estimated cost to complete is deducted from the prospective as complete value to develop the as is value.

# Income Capitalization Approach

The following map and table summarize the primary comparable data used in the valuation of the subject. A detailed description of each transaction is included on the following pages.



Income Capitalization Approach

## SUMMARY OF COMPARABLE MULTIFAMILY RENTALS

| No. | Property Name | Location | YOC / Reno'd | Occ. | No. Units | Avg. Rent Per Unit |
|-----|---------------|----------|--------------|------|-----------|---------------------|
| 1 | Generations on 1st | 26 1st Avenue SW | 2023 | n/a | 72 | $1,180 |
| | | Watertown, SD 57201 | | | | |
| 2 | Parkside Place | 8 2nd St NE | 2021 | 100% | 36 | $1,025 |
| | | Watertown, SD 57201 | | | | |
| 3 | The Marketplace | 15 1st Street NW | 2022 | 83% | 69 | $1,116 |
| | | Watertown, SD 57201 | | | | |
| 4 | The Lofts | 10 North Broadway Street | 2020 | 82% | 39 | $1,041 |
| | | Watertown, SD 57201 | | | | |
| 5 | The Oaks Apartments | 218 19th Street SE | 2020 | 96% | 72 | $1,020 |
| | | Watertown, SD 57201 | | | | |
| 6 | The Plains Apartments Phase I | 1604 4th Street NE | 2021 | 96% | 72 | $1,329 |
| | | Watertown, SD 57201 | | | | |
| Subj. | The Ruins Apartments | 315 East Kemp Avenue | 2025 | 0% | 63 | --- |
| | | Watertown, SD 57201 | | | | |

Compiled by CBRE

| Comparable | Residential - Multi-unit Mid / High Rise | No. 1 |
|---|---|---|

Property Name          Generations on 1st
Address                26 1st Avenue SW
                       Watertown, SD 57201
                       United States

Government Tax Agency  Codington
Govt./Tax ID           9580



**Unit Mix Detail**

Rate Timeframe   Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 1BD/1BA | 48 | 67% | 800 | $1,010 | $1.26 |
| 2BD/2BA | 24 | 33% | 1,150 | $1,520 | $1.32 |
| Totals/Avg | 72 | | | $1,180 | $1.29 |

## Improvements

| | | | |
|---|---|---|---|
| Land Area | 0.764 ac | Status | N/A |
| Net Rentable Area (NRA) | 73,200 sf | Year Built | 2023 |
| Total # of Units | 72 Unit | Year Renovated | N/A |
| Average Unit Size | 1,017 sf | Condition | Good |
| Floor Count | 5 | Exterior Finish | Brick Veneer |

Property Features    Electric Baseboard Units, Elevators, Fire Sprinklered, Gated / Controlled Access, Structured Parking, Thru-The-Wall
                     Systems

Project Amenities    Roof Deck / Terrace, Storage Units

Unit Amenities       Black Appliances, Carpeted Flooring, Dishwasher, Laminate Countertops, Microwave Oven, Plank Flooring, Range /
                     Oven, Refrigerator, Washer / Dryer

## Rental Survey

| | | | |
|---|---|---|---|
| Occupancy | N/A | Utilities Included in Rent | Water, Sewer, Trash |
| Lease Term | 6 - 12 Mo(s). | Rent Premiums | Parking Garage - $80/mo.; Storage - $40-$55/mo. |
| Tenant Profile | Mixed | Concessions | None advertised |
| Survey Date | 05/2025 | Owner | N/A |
| Survey Notes | Current Listing | Management | N/A |



| Comparable | Residential - Multi-unit Mid / High Rise | No. 1 |
| --- | --- | --- |

**Map & Comments**



This comparable represents a 72-unit mid/high rise apartment project located at 26 1st Avenue SW in Watertown, South Dakota. The property opened in September 2023 and consists of a single, five-story apartment building with attached parking and a first-floor senior center. The senior center is leased to the city on a 99-year lease term for $1 annually. Project amenities include a heated parking garage, controlled access, elevator, trash chute, rooftop patio, 1 bedroom guest suite, and on-site storage units. Garage rent is $80/mo. and storage units rent from $40-$55/mo.



| Comparable | Residential - Multi-unit Mid / High Rise | No. 2 |
|---|---|---|

| | | |
|---|---|---|
| Property Name | Parkside Place | |
| Address | 8 2nd St NE | |
| | Watertown, SD 57201 | |
| | United States | |
| | | |
| Government Tax Agency | Codington | |
| Govt./Tax ID | 9358 | |



**Unit Mix Detail**

Rate Timeframe            Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 1BR/1BA | 36 | 100% | 734 | $1,025 | $1.40 |
| Totals/Avg | 36 | | | $1,025 | $1.40 |

| Improvements | | | |
|---|---|---|---|
| Land Area | 0.593 ac | Status | Existing |
| Net Rentable Area (NRA) | N/A | Year  Built | 2021 |
| Total # of Units | 36 Unit | Year Renovated | N/A |
| Average Unit Size | 764 sf | Condition | Good |
| Floor Count | 4 | Exterior Finish | Masonry |
| Property Features | Electric Baseboard Units, Elevators, Fire Sprinklered, Flat Roofs, Gated / Controlled Access, Ground-level Retail, Structured Parking, Thru-The-Wall Systems | | |
| Project Amenities | Roof Deck / Terrace, Storage Units | | |
| Unit Amenities | Black Appliances, Carpeted Flooring, Dishwasher, Garbage Disposal, Laminate Countertops, Microwave Oven, Plank Flooring, Range / Oven, Refrigerator, Washer / Dryer Connections | | |

| Rental Survey | | | |
|---|---|---|---|
| Occupancy | 100% | Utilities Included in Rent | water, sewer, and trash |
| Lease Term | 12 Mo(s). | Rent Premiums | Pets - $300 deposit, Storage - $40/mo. |
| Tenant Profile | Mixed | Concessions | None advertised |
| Survey Date | 05/2025 | Owner | Parkside Place LLC |
| Survey Notes | Current Listing | Management | N/A |



| Comparable | Residential - Multi-unit Mid / High Rise | No. 2 |

**Map & Comments**



This comparable represents a four-story mixed-use apartment/retail building with 36 units and 3,803 square feet of ground-floor commercial space. The development also includes a first-floor 36 stall heated parking garage with one stall included with rent. The property consists of all one-bedroom units. Project amenities include an elevator, rooftop deck, heated parking garage, controlled access, storage lockers for $40 per month, and city park views. Utilities of water, sewer, and garbage are included in the base rent. At the time of survey, the property was leased at 100%. Pets require a $300 deposit (monthly rent not advertised), and garage rent also was not advertised.



| Comparable | Residential - Multi-unit Mid / High Rise | No. 3 |

Property Name          The Marketplace
Address                15 1st Street NW
                       Watertown, SD 57201
                       United States

Government Tax Agency  Codington
Govt./Tax ID           9435



**Unit Mix Detail**

Rate Timeframe    Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 1BR/1BA | 27 | 39% | 614-637 | $995 | $1.59 |
| 1BR/1BA | 26 | 38% | 742-787 | $1,080 | $1.41 |
| 2BR/1BA | 2 | 3% | 811 | $1,060 | $1.31 |
| 2BR/1BA | 4 | 6% | 955 | $1,380 | $1.45 |
| 2BR/2BA | 4 | 6% | 1,027-1,059 | $1,395-$1,450 | $1.36 |
| 2BR/2BA | 6 | 9% | 1,286-1,333 | $1,450 | $1.11 |
| Totals/Avg | 69 | | | $1,116 | $1.42 |

| Improvements | | | |
|---|---|---|---|
| Land Area | 0.671 ac | Status | Existing |
| Net Rentable Area (NRA) | 54,237 sf | Year Built | 2022 |
| Total # of Units | 69 Unit | Year Renovated | N/A |
| Average Unit Size | 786 sf | Condition | New |
| Floor Count | 4 | Exterior Finish | EIFS |
| Property Features | Elevators, Individual Split Systems, Interior Corridors, Surface Parking, Under-building Parking | | |
| Project Amenities | Roof Deck / Terrace | | |
| Unit Amenities | Carpeted Flooring, Dishwasher, Laminate Countertops, Microwave Oven, Plank Flooring, Private Patios / Balconies, Range / Oven, Refrigerator, Stainless Steel Appliances, Washer / Dryer | | |

| Rental Survey | | | |
|---|---|---|---|
| Occupancy | 83% | Utilities Included in Rent | water, sewer, and trash |
| Lease Term | 12 Mo(s). | Rent Premiums | N/A |
| Tenant Profile | Mixed | Concessions | None advertised |
| Survey Date | 05/2025 | Owner | 15DTW LLC |
| Survey Notes | Current Listing | Management | HME Properties |



| Comparable | Residential - Multi-unit Mid / High Rise | No. 3 |

**Map & Comments**



This comparable a four-story, 69-unit apartment project located at 15 1st Street NW in Watertown, South Dakota. The property was built in 2022 and has a combination of one- and two-bedroom apartment units. Water, sewer and trash are included in the monthly rent. Project amenities include heated parking garage, controlled access, elevator, garbage chute, community rooftop patio and pet wash station. At the time of survey, 12 units were available indicating an occupancy rate of 82.6%. Listing does not disclose if garage parking is included in/excluded from base rent.



| Comparable | Residential - Multi-unit Mid / High Rise | No. 4 |
|---|---|---|

| Property Name | The Lofts |
|---|---|
| Address | 10 North Broadway Street |
| | Watertown, SD 57201 |
| | United States |
| | |
| Government Tax Agency | Codington |
| Govt./Tax ID | 9391 |



**Unit Mix Detail**

| Rate Timeframe | Monthly | | | | |
|---|---|---|---|---|---|
| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
| 1BR/1BA | 36 | 92% | 664 | $995-$1,035 | $1.53 |
| 2BR/1BA | 3 | 8% | 964 | $1,349 | $1.40 |
| Totals/Avg | 39 | | | $1,041 | $1.51 |

## Improvements

| | | | |
|---|---|---|---|
| Land Area | 0.160 ac | Status | Existing |
| Net Rentable Area (NRA) | 26,793 sf | Year Built | 2020 |
| Total # of Units | 39 Unit | Year Renovated | N/A |
| Average Unit Size | 687 sf | Condition | Average |
| Floor Count | 4 | Exterior Finish | Masonry |
| Property Features | Electric Baseboard Units, Elevators, Flat Roofs, Gated / Controlled Access, Ground-level Retail, Interior Corridors, Interior Stairwells, Thru-The-Wall Systems, Under-building Parking | | |
| Project Amenities | N/A | | |
| Unit Amenities | Black Appliances, Carpeted Flooring, Ceiling Fans, Dishwasher, Garbage Disposal, Laminate Countertops, Microwave Oven, Plank Flooring, Range / Oven, Refrigerator, Washer / Dryer | | |

## Rental Survey

| | | | |
|---|---|---|---|
| Occupancy | 82% | Utilities Included in Rent | Water, Sewer and Trash |
| Lease Term | 12 Mo(s). | Rent Premiums | N/A |
| Tenant Profile | Mixed | Concessions | None advertised |
| Survey Date | 05/2025 | Owner | The Lofts LLC |
| Survey Notes | Current Listing | Management | HME Properties |



| Comparable | Residential - Multi-unit Mid / High Rise | No. 4 |

**Map & Comments**



The comparable is a mixed-use 39-unit multi-family property with 7,885 square feet of ground-floor retail located at 10 North Broadway Street in Watertown, South Dakota. The property consists of a single, four-story apartment building with below-grade heated parking (46 stalls), 1 stall included in rent. The in-unit amenities include a full appliance package, in-unit washer/dryer, ceiling fans, and through-the-wall air conditioning. The property is pet friendly; however, pet fees at the time of survey were not available. The most recent pet fees advertised were a one-time $200 fee and at $45 monthly fee. The landlord is responsible for water, sewer, and trash expenses with residents paying all other expenses. Property opened in August 2020 and stabilized within eight months. The property is currently 82.1% occupied (residential only). Listing does not disclose if garage parking is included in/excluded from base rent.



| Comparable | Residential - Multi-unit Garden | No. 5 |
|---|---|---|



**Property Name** The Oaks Apartments
**Address** 218 19th Street SE
Watertown, SD 57201
United States

**Government Tax Agency** Codington
**Govt./Tax ID** 721

**Unit Mix Detail**

Rate Timeframe   Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| Studio | 34 | 47% | 500 | $820 | $1.64 |
| 1BR/1BA | 24 | 33% | 620 | $1,095 | $1.77 |
| 2BR/2BA | 14 | 19% | 912 | $1,375 | $1.51 |
| Totals/Avg | 72 | | | $1,020 | $1.64 |

## Improvements

| | | | |
|---|---|---|---|
| Land Area | 5.150 ac | Status | Existing |
| Net Rentable Area (NRA) | N/A | Year Built | 2020 |
| Total # of Units | 72 Unit | Year Renovated | N/A |
| Average Unit Size | 1,000 sf | Condition | Good |
| Floor Count | 3 | Exterior Finish | N/A |

Property Features   Detached Garages, Electric Wall Heaters, Elevators, Gated / Controlled Access, On-Site Management, Surface Parking, Thru-The-Wall Systems

Project Amenities   Barbeque Area, Demonstration Kitchen, Dog Park / Run, Fitness Center, Outdoor Fireplace

Unit Amenities   Carpeted Flooring, Dishwasher, Granite Countertops, Microwave Oven, Plank Flooring, Private Patios / Balconies, Range / Oven, Refrigerator, Stainless Steel Appliances, Washer / Dryer

## Rental Survey

| | | | |
|---|---|---|---|
| Occupancy | 96% | Utilities Included in Rent | Water, Sewer, Trash |
| Lease Term | 12 - 15 Mo(s). | Rent Premiums | Garage $95; pets $35-$60 |
| Tenant Profile | Mixed | Concessions | None advertised |
| Survey Date | 05/2025 | Owner | N/A |
| Survey Notes | Current Listing | Management | N/A |



## Comparable          Residential - Multi-unit Garden          No. 5

### Map & Comments



This comparable is a 72-unit garden-style apartment project located at 218 19th Street SE in Watertown, SD.  The project was built in 2020, is 3-stories and the exterior walls are finished with horizontal lap siding. Project amenities include detached garages, fitness center, multi-use room, outdoor fire pit and grill station, dog park, community-wide WiFi, elevator, on-site management and controlled access. Unit amenities include in-unit laundry, granite countertops, stainless steel appliances, and private patios/balconies. Tenants are responsible for the electric, gas, internet, and cable TV. Garage parking is $95/month and pets are allowed (2 pet limit) with a $350 one-time fee and $35/mo. pet rent for cats and $60/mo. pet rent for dogs. Occupancy was 95.8% at the time of survey.



| Comparable | Residential - Multi-unit Garden | No. 6 |
|---|---|---|

**Property Name** The Plains Apartments Phase I
**Address** 1604 4th Street NE
Watertown, SD 57201
United States

**Government Tax Agency** Codington
**Govt./Tax ID** Portion of 14664



### Unit Mix Detail

Rate Timeframe     Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| Studio | 4 | 5% | 606 | $985 | $1.63 |
| 1BD/1BA | 26 | 32% | 734 | $1,125 | $1.53 |
| 1BD/1BA | 13 | 16% | 762 | $1,150 | $1.51 |
| 1BD/1BA | 3 | 4% | 851 | $1,175 | $1.38 |
| 2BD/2BA | 21 | 26% | 1,125 | $1,545 | $1.37 |
| 2BD/2BA | 8 | 10% | 1,214 | $1,470 | $1.21 |
| 3BD/2BA | 7 | 9% | 1,362 | $1,870 | $1.37 |
| Totals/Avg | 82 | | | $1,329 | $1.42 |

### Improvements

| | | | |
|---|---|---|---|
| Land Area | 3.430 ac | Status | Proposed |
| Gross Building Area (GBA) | 100,732 sf | Year Built | 2021 |
| Total # of Units | 72 Unit | Year Renovated | N/A |
| Average Unit Size | 946 sf | Condition | Good |
| Floor Count | 4 | Exterior Finish | Other (See Comments) |

Property Features     Detached Garages, Fire Sprinklered, Gated / Controlled Access, On-Site Management, Surface Parking, Thru-The-Wall Systems, Under-building Parking

Project Amenities     Barbeque Area, Clubhouse, Dog Grooming Station, Dog Park / Run, Fitness Center

Unit Amenities     9-Foot Ceilings, Carpeted Flooring, Dishwasher, Garbage Disposal, Microwave Oven, Plank Flooring, Private Patios / Balconies, Range / Oven, Refrigerator, Stainless Steel Appliances, Washer / Dryer

### Rental Survey

| | | | |
|---|---|---|---|
| Occupancy | 96% | Utilities Included in Rent | Water, Sewer, Gas (heat), Trash, Internet |
| Lease Term | 12 Mo(s). | Rent Premiums | Pet rent $35/mo.; $300 initial pet fee |
| Tenant Profile | Mixed | Concessions | One month free with 13-month lease |
| Survey Date | 05/2025 | Owner | The Plains Apartments LLC |
| Survey Notes | N/A | Management | Collective |



| Comparable | Residential - Multi-unit Garden | No. 6 |

**Map & Comments**



This comparable represents a 72 unit, 4 story apartment building in Watertown, SD. They offer studio and 1- to 3-bedroom apartments with 1-2 bathrooms, unit size ranges from 610-1,365. Project amenities include on-site parking and available detached garages and underground parking (garages and underground parking included in rent). A clubhouse is provided in Phase 1, which has a fitness center and on-site leasing office, common restrooms, and a pet wash station. A dog park and gazebo with outdoor barbeque area are located in the northeastern corner of the site. Buildings have controlled access and security cameras for tenant safety. Unit amenities include an in-unit washer and dryer, stainless steel appliances, walk-in closets and balcony/patio. Occupancy was 95.8% as of the survey date. One 1,125 SF 2BD/2BA and two 1,362 SF 3BD/2BA units were available and had current asking rents that were higher than the prior survey taken in June 2024. The remaining occupied unit rents are from the prior survey taken in June 2024. Pet rent is $35/mo. with a $300 one-time pet fee and garage parking is $50/mo. Landlord is currently advertising one month free with a 13-month lease.



## Subject Rental Information

The following table shows the subject's unit mix. No recent quoted rental rates are available as the developer has stopped construction and filed for bankruptcy.

| | SUBJECT RENTAL INFORMATION | | |
|---|---|---|---|
| Type | No. of Units | Unit Size (SF) | Unit Occ. |
| 1BD/1BA - B1 | 15 | 748 | 0% |
| 1BD/1BA - B2 | 18 | 668 | 0% |
| 1BD/1BA - B3 | 3 | 726 | 0% |
| 2BD/2BA - C1 | 12 | 1,116 | 0% |
| 2BD/2BA - C2 | 3 | 1,077 | 0% |
| Studio - A1 | 9 | 513 | 0% |
| Studio - A2 | 3 | 592 | 0% |
| Total/Average: | 63 | 769 | 0% |
| Compiled by CBRE | | | |

## Rent Comparables Utility Adjustments

The utility/amenity differences between the subject and the rent comparables is summarized below.

| COMPARABLE RENT UTILITY INCLUSIONS | | | | | | |
|---|---|---|---|---|---|---|
| Comparable | Water | Sewer | Gas | Electric | Trash | Internet |
| Generations on 1st | Y | Y | - | - | Y | - |
| Parkside Place | Y | Y | - | - | Y | - |
| The Marketplace | Y | Y | - | - | Y | - |
| The Lofts | Y | Y | - | - | Y | - |
| The Oaks Apartments | Y | Y | - | - | Y | - |
| The Plains Apartments Phase I | Y | Y | Y | - | Y | Y |
| Subject | Y | Y | - | - | Y | - |
| Y=Included, "-"=Not Included | | | | | | |
| Compiled by CBRE | | | | | | |

Unit rent is adjusted for differences in utilities/amenities based on the following schedule.

| TYPICAL UTILITY COSTS PER UNIT | | | | |
|---|---|---|---|---|
| Utility | Efficiency Unit | 1-Bedroom Unit | 2-Bedroom Unit | 3-Bedroom Unit |
| Water | $20 | $20 | $25 | $30 |
| Sewer | $20 | $20 | $25 | $30 |
| Gas | $25 | $30 | $35 | $40 |
| Electric | $25 | $25 | $30 | $35 |
| Trash | $30 | $30 | $35 | $40 |
| Internet | $50 | $50 | $50 | $50 |
| Source: IREM & Market Extracted | | | | |

Income Capitalization Approach

## Studio & One-Bedroom Units

| SUMMARY OF COMPARABLE RENTALS STUDIO & ONE BEDROOM UNITS | | | | |
|---|---|---|---|---|
| Comparable | Plan Type | Size (SF) | Rental Rates* | |
| | | | $/Mo. | $/SF |
| Generations on 1st | 1BD/1BA | 800 SF | $1,010 | $1.26 |
| The Plains Apartments Phase I | 1BD/1BA | 851 SF | $1,095 | $1.29 |
| *Subject (Concluded)* | *1BD/1BA - B1* | *748 SF* | *$1,025* | *$1.37* |
| Parkside Place | 1BR/1BA | 734 SF | $1,025 | $1.40 |
| *Subject (Concluded)* | *1BD/1BA - B3* | *726 SF* | *$1,015* | *$1.40* |
| The Plains Apartments Phase I | 1BD/1BA | 762 SF | $1,070 | $1.40 |
| The Marketplace | 1BR/1BA | 742-787 SF | $1,080 | $1.41 |
| The Plains Apartments Phase I | 1BD/1BA | 734 SF | $1,045 | $1.42 |
| *Subject (Concluded)* | *1BD/1BA - B2* | *668 SF* | *$995* | *$1.49* |
| The Plains Apartments Phase I | Studio | 606 SF | $905 | $1.49 |
| *Subject (Concluded)* | *Studio - A2* | *592 SF* | *$900* | *$1.52* |
| The Lofts | 1BR/1BA | 664 SF | $995-$1,035 | $1.53 |
| The Marketplace | 1BR/1BA | 614-637 SF | $995 | $1.59 |
| *Subject (Concluded)* | *Studio - A1* | *513 SF* | *$825* | *$1.61* |
| The Oaks Apartments | Studio | 500 SF | $820 | $1.64 |
| The Oaks Apartments | 1BR/1BA | 620 SF | $1,095 | $1.77 |
| *Comparable rental rates have been adjusted for utilities | | | | |
| Compiled by CBRE | | | | |

## Two-Bedroom Units

| SUMMARY OF COMPARABLE RENTALS TWO BEDROOM UNITS | | | | |
|---|---|---|---|---|
| Comparable | Plan Type | Size (SF) | Rental Rates* | |
| | | | $/Mo. | $/SF |
| The Marketplace | 2BR/2BA | 1,286-1,333 SF | $1,450 | $1.11 |
| The Plains Apartments Phase I | 2BD/2BA | 1,214 SF | $1,385 | $1.14 |
| *Subject (Concluded)* | *2BD/2BA - C1* | *1,116 SF* | *$1,425* | *$1.28* |
| The Plains Apartments Phase I | 2BD/2BA | 1,125 SF | $1,460 | $1.30 |
| *Subject (Concluded)* | *2BD/2BA - C2* | *1,077 SF* | *$1,400* | *$1.30* |
| The Marketplace | 2BR/1BA | 811 SF | $1,060 | $1.31 |
| Generations on 1st | 2BD/2BA | 1,150 SF | $1,520 | $1.32 |
| The Marketplace | 2BR/2BA | 1,027-1,059 SF | $1,395-$1,450 | $1.36 |
| The Lofts | 2BR/1BA | 964 SF | $1,349 | $1.40 |
| The Marketplace | 2BR/1BA | 955 SF | $1,380 | $1.45 |
| The Oaks Apartments | 2BR/2BA | 912 SF | $1,375 | $1.51 |
| *Comparable rental rates have been adjusted for utilities | | | | |
| Compiled by CBRE | | | | |

## Market Rent Conclusions

| No. Units | Unit Type | Unit Size (SF) | Total SF | $/Unit | $/SF | PRI | $/Unit | $/SF | Annual Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Monthly Rent** | | | **Annual Rent** | | |
| 15 | 1BD/1BA - B1 | 748 | 11,220 | $1,025 | $1.37 | $15,375 | $12,300 | $16.44 | $184,500 |
| 18 | 1BD/1BA - B2 | 668 | 12,024 | $995 | $1.49 | $17,910 | $11,940 | $17.87 | $214,920 |
| 3 | 1BD/1BA - B3 | 726 | 2,178 | $1,015 | $1.40 | $3,045 | $12,180 | $16.78 | $36,540 |
| 12 | 2BD/2BA - C1 | 1,116 | 13,392 | $1,425 | $1.28 | $17,100 | $17,100 | $15.32 | $205,200 |
| 3 | 2BD/2BA - C2 | 1,077 | 3,231 | $1,400 | $1.30 | $4,200 | $16,800 | $15.60 | $50,400 |
| 9 | Studio - A1 | 513 | 4,617 | $825 | $1.61 | $7,425 | $9,900 | $19.30 | $89,100 |
| 3 | Studio - A2 | 592 | 1,776 | $900 | $1.52 | $2,700 | $10,800 | $18.24 | $32,400 |
| 63 | | 769 | 48,438 | $1,075 | $1.40 | $67,755 | $12,906 | $16.79 | $813,060 |

RENT CONCLUSIONS

Compiled by CBRE

## Potential Rental Income Conclusion

**POTENTIAL RENTAL INCOME**

| | Total | $/Unit/Yr |
|---|---|---|
| **CBRE Estimate** | **$813,060** | **$12,906** |

Compiled by CBRE

## Operating History

There is no operating history data for the subject since construction was never completed. There is also no proforma operating budget given the property owner has filed for bankruptcy.

## Concessions

Rent concessions have not been observed recently with the rent comparables surveyed in the local market. Concessions are most common with properties that are not stabilized or have higher vacancies than what is desired by management. In addition, CoStar analytics indicates a declining concessions rate. Therefore, we have concluded that concessions are not necessary for the subject property to maintain a stabilized occupancy. Therefore, concessions are not necessary in the development of a stabilized profit & loss statement for the application of the direct capitalization method.

However, two direct competitors of the subject are currently below stabilized occupancy (rent comparables 3 & 4). Concessions during the lease-up period are likely to result in a shorter lease-up time, ensuring that the subject has a greater market capture than rent comparables 3 & 4. Thus, concessions are used in the lease-up during stabilization.

## Vacancy

As indicated in the market conditions section, CoStar analytics indicates a current market vacancy rate of 6.4%. A recent survey of rent comparables indicates occupancy rates ranging from 82% to 100%, with an average of 91.4%. For this assignment, a vacancy of 6.5% is reconciled for the subject. The subject's vacancy is detailed as follows:

| VACANCY | | |
|---|---|---|
| | Total | % of ARI |
| **CBRE Estimate** | **($52,849)** | **6.5%** |

Compiled by CBRE

## Credit Loss

The credit loss estimate is an allowance for nonpayment of rent or other income. For this assignment, a credit loss of 0.50% of potential gross income is considered reasonable. The subject's credit loss is detailed as follows:

| CREDIT LOSS | | |
|---|---|---|
| | Total | % of ARI |
| **CBRE Estimate** | **($4,065)** | **0.5%** |

Compiled by CBRE

## Other Income

Other income is supplemental to that derived from leasing of the improvements. This includes categories such as application fees, forfeited deposits, late charges, administrative fees, and other related miscellaneous income.  The subject's Other Income is estimated at 0.50% of net rental income. Other Income is detailed as follows:

| OTHER INCOME | | |
|---|---|---|
| | Total | $/Unit/Yr |
| **CBRE Estimate** | **$3,781** | **$60** |

Compiled by CBRE

## Parking Income

Parking income is supplemental to that derived from apartment units. This includes collections from sources such as reserved parking, covered parking and/or individual garages. The subject has one garage parking space per unit. Apartment facilities with attached structured parking (like the subject) most often include one parking space in the base rent for an apartment unit rather than charge for parking separately. Thus, no parking income is forecasted for the subject. The forecasted rent for the apartment units reflects the inclusion of one parking space in the base unit rent.

## Storage Income

The subject property has a total of 35 on-site storage units that are rented separately from apartment units. Monthly base rent is estimated at $35.00/month and stabilized occupancy is estimated at 50%. Storage income is estimated as follows:

| STORAGE INCOME | | |
|---|---|---|
| Inputs | | |
| Storage Unit Rent/mo. | = | $35.00 |
| Annual Storage Unit Rent Per Storage Unit | = | $420 |
| | | |
| Total Annual Storage Unit Rent | | |
| Total Storage Units | = | 35 |
| Annual Storage Unit Rent Per Storage Unit | x | $420 |
| Potential Storage Unit Income | = | $14,700 |
| Storage Unit Occupancy Rate | x | 50% |
| Total Annual Storage Unit Rent | = | $7,350 |
| Compiled by CBRE | | |

## Commercial Income

The subject has 1,200 SF of main floor commercial space that will be leased to the City of Watertown at a rate of $1 per year. This space essentially serves as a public restroom for the city park that is adjacent to the west of the subject property. This space in the as complete condition is not viable to lease to the general market for any other commercial use without significant renovation cost. Given its small size and poor utility for a market-oriented commercial use, it is not expected to be financially feasible to renovate for any other commercial use. Thus, contract rent is used in developing the stabilized profit and loss statement of the subject.

## Pet Income

Based on local market data, pet income is forecasted at $35/month per pet and a one-time non-refundable pet fee of $300. The pet occupancy rate is estimated at 25%, which is based on typical pet occupancy rates within the multifamily market segment retained in file. The annual turnover rate of pet occupied units is estimated at 25%. Pet Income is detailed as follows:

| PET INCOME | | | |
|---|---|---|---|
| Pet Rent/mo. | | $35 | |
| Annual Pet Rent/unit | | $420 | |
| | | | |
| Annual Pet Rent | | | |
| Total Units | = | 63 | |
| Pet Occupancy Rate | x | 25% | |
| Pet Occupancy Units (Rd) | = | 16 | |
| Annual Pet Rent/unit | x | $420 | |
| Annual Pet Rent | = | | $6,720 |
| | | | |
| Annual Pet Fees | | | |
| Pet Occupancy Units (Rd) | = | 16 | |
| Annual Turnover % | x | 25% | |
| Annual Turnover Units (Rd) | = | 4 | |
| Non-Refundable Pet Fee | x | $300 | |
| Pet Fees | = | | $1,200 |
| Total Pet Income | = | | $7,920 |
| Compiled by CBRE | | | |

| PET INCOME | | |
|---|---|---|
| | Total | $/Unit/Yr |
| **CBRE Estimate** | **$7,920** | **$126** |
| Compiled by CBRE | | |

## Effective Gross Income

The subject's effective gross income is detailed as follows:

| EFFECTIVE GROSS INCOME | | |
|---|---|---|
| | Total | $/Unit/Yr |
| **CBRE Estimate** | **$775,198** | **$12,305** |
| Compiled by CBRE | | |

## Operating Expense Analysis

### Expense Comparables

The following chart summarizes expenses obtained from comparable properties.

| EXPENSE COMPARABLES | | | | | |
|---|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | 4 | Subject |
| Location | Midwest | Midwest | Midwest | Midwest | Watertown, SD |
| Units | 166 | 70 | 175 | 84 | 63 |
| Year Built | 2023 | 2022 | 2024 | 2024 | 2025 |
| Type | Multi-family Garden | Multi-family Mid/High Rise | Multi-family Mid/High Rise | Multi-family Garden | Multi-family Garden |
| *Revenues* | $/Unit | $/Unit | $/Unit | $/Unit | $/Unit |
| **Effective Gross Income** | **$15,643** | **$11,997** | **$22,316** | **$19,647** | **$12,305** |
| *Expenses* | | | | | |
| Real Estate Taxes | $2,160 | $1,019 | $2,266 | $1,857 | $1,304 |
| Property Insurance | 213 | 362 | 299 | 607 | 300 |
| Utilities | 829 | 1,086 | 876 | 662 | 1,000 |
| Administrative & General | 1,110 | 179 | 794 | 276 | 250 |
| Repairs & Maintenance | 500 | 439 | 1,727 | 276 | 500 |
| Management Fee | 277 | 700 | 1,097 | 1,572 | 492 |
| Payroll | 293 | - | 674 | - | 300 |
| Advertising & Promotion | 77 | 353 | 147 | - | 100 |
| Replacement Reserves | - | - | - | - | 200 |
| **Total Operating Expenses** | **$5,458** | **$4,137** | **$7,880** | **$5,250** | **$4,447** |
| Operating Expenses Excluding Taxes | 3,298 | 3,119 | 5,614 | 3,393 | 3,142 |
| Operating Expense Ratio | 34.9% | 34.5% | 35.3% | 26.7% | 36.1% |
| *Management Fee (% of EGI)* | *1.8%* | *5.8%* | *4.9%* | *8.0%* | *4.0%* |
| *Management & Payroll % of EGI* | *3.6%* | *5.8%* | *7.9%* | *8.0%* | *6.4%* |
| Compiled by CBRE | | | | | |

### Real Estate Taxes

The comparable data and projections for the subject are summarized as follows:

| REAL ESTATE TAXES | | |
|---|---|---|
| Year | Total | $/Unit/Yr |
| Expense Comparable 1 | --- | $2,160 |
| Expense Comparable 2 | --- | $1,019 |
| Expense Comparable 3 | --- | $2,266 |
| Expense Comparable 4 | --- | $1,857 |
| **CBRE Estimate** | **$82,180** | **$1,304** |
| Compiled by CBRE | | |

Refer to the Tax Assessment Data section for additional detail on the forecasted real estate taxes for the subject property.

## Property Insurance

Property insurance expenses typically include fire and extended coverage and owner's liability coverage. The comparable data and projections for the subject are summarized as follows:

| PROPERTY INSURANCE | | |
|---|---|---|
| Year | Total | $/Unit/Yr |
| Expense Comparable 1 | --- | $213 |
| Expense Comparable 2 | --- | $362 |
| Expense Comparable 3 | --- | $299 |
| Expense Comparable 4 | --- | $607 |
| **CBRE Estimate** | **$18,900** | **$300** |
| Compiled by CBRE | | |

We have concluded $300 per unit for the subject's property insurance, which is within the range of the expense comparables.

## Utilities

The tenant will pay electric service (units are all electric). Electric service is individually metered to each unit and is paid directly by the tenant. Water, sewer and garbage service is paid by the landlord. The comparable data and projections for the subject are summarized as follows:

| UTILITIES | | |
|---|---|---|
| Year | Total | $/Unit/Yr |
| Expense Comparable 1 | --- | $829 |
| Expense Comparable 2 | --- | $1,086 |
| Expense Comparable 3 | --- | $876 |
| Expense Comparable 4 | --- | $662 |
| **CBRE Estimate** | **$63,000** | **$1,000** |
| Compiled by CBRE | | |

We have concluded at $1,000 per unit for the subject's utilities, which is within the range of the expense comparables and closest to the expense comparables with a similar utility expense structure.

## Administrative & General

Administrative expenses typically include legal costs, accounting, telephone, supplies, furniture, temporary help and items that are not provided by off-site management. The comparable data and projections for the subject are summarized as follows:

| Year | Total | $/Unit/Yr |
|------|-------|-----------|
| **ADMINISTRATIVE & GENERAL** | | |
| Expense Comparable 1 | --- | $1,110 |
| Expense Comparable 2 | --- | $179 |
| Expense Comparable 3 | --- | $794 |
| Expense Comparable 4 | --- | $276 |
| **CBRE Estimate** | **$15,750** | **$250** |
| Compiled by CBRE | | |

We have concluded $250 per unit for the subject's administrative & general, which is within the range of the expense comparables.

## Repairs and Maintenance

Repairs and maintenance expenses typically include all outside maintenance service contracts and the cost of maintenance and repairs supplies. The comparable data and projections for the subject are summarized as follows:

| Year | Total | $/Unit/Yr |
|------|-------|-----------|
| **REPAIRS & MAINTENANCE** | | |
| Expense Comparable 1 | --- | $500 |
| Expense Comparable 2 | --- | $439 |
| Expense Comparable 3 | --- | $1,727 |
| Expense Comparable 4 | --- | $276 |
| **CBRE Estimate** | **$31,500** | **$500** |
| Compiled by CBRE | | |

We have concluded $500 per unit for the subject's repairs & maintenance, which is within the range of the expense comparables.

Income Capitalization Approach

## Management Fee

Management expenses are typically negotiated as a percentage of collected revenues (i.e., effective gross income). Professional management fees in the local market typically range from 3.0% to 6.0%. The comparable data and projections for the subject are summarized as follows:

| MANAGEMENT FEE | | |
|---|---|---|
| Year | Total | % of EGI |
| Expense Comparable 1 | --- | 1.8% |
| Expense Comparable 2 | --- | 5.8% |
| Expense Comparable 3 | --- | 4.9% |
| Expense Comparable 4 | --- | 8.0% |
| **CBRE Estimate** | **$31,008** | **4.0%** |

Compiled by CBRE

We have concluded 4.00% of EGI for the subject's management fee, which is within the range of the expense comparables.

## Payroll

Payroll expenses typically include all payroll and payroll related items for all directly employed administrative personnel. Not included are the salaries or fees for off-site management firm personnel and services.  The comparable data and projections for the subject are summarized as follows:

| PAYROLL | | |
|---|---|---|
| Year | Total | $/Unit/Yr |
| Expense Comparable 1 | --- | $293 |
| Expense Comparable 2 | --- | $0 |
| Expense Comparable 3 | --- | $674 |
| Expense Comparable 4 | --- | $0 |
| **CBRE Estimate** | **$18,900** | **$300** |

Compiled by CBRE

We have concluded $300 per unit for the subject's payroll, which is within the range of the expense comparables. Payroll expense is also frequently included in management expense, and the subject's forecasted payroll and management expense is 6.4%, which is also within the range indicated by the expense comparables.

## Advertising and Promotion

Advertising and promotion expenses typically include all costs associated with the promotion of the subject including advertisements in local publications, trade publications, yellow pages, etc. The comparable data and projections for the subject are summarized as follows:

| ADVERTISING & PROMOTION | | |
|---|---|---|
| Year | Total | $/Unit/Yr |
| Expense Comparable 1 | --- | $77 |
| Expense Comparable 2 | --- | $353 |
| Expense Comparable 3 | --- | $147 |
| Expense Comparable 4 | --- | $0 |
| **CBRE Estimate** | **$6,300** | **$100** |
| Compiled by CBRE | | |

We have concluded $100 per unit for the subject's advertising & promotion, which is within the range of the expense comparables.

## Reserves for Replacement

Reserves for replacement have been estimated based on market parameters. The source used to estimate replacement reserves is RealtyRates.com, which is summarized below.

| RealtyRates.com INVESTOR SURVEY - 1st Quarter 2025* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SURVEYED RESERVE REQUIREMENTS | | | | | | | | |
| Property Type | Per SF | | | Per Unit | | | % of EGI | | |
| | Min. | Max. | Typical | Min. | Max. | Typical | Min. | Max. | Typical |
| Apartments | | | | $170 | $500 | $464 | | | |
| Golf | | | | $1,300 | $8,000 | $3,689 | 2.0% | 4.5% | 3.2% |
| Health Care/Senior Housing | | | | $285 | $775 | $433 | | | |
| Industrial | $0.30 | $1.00 | $0.65 | | | | | | |
| Lodging | | | | | | | 4.0% | 8.5% | 4.6% |
| Mobile Home/RV Park | | | | $40 | $325 | $180 | 2.0% | 5.5% | 4.2% |
| Office | $0.40 | $1.00 | $0.72 | | | | | | |
| Restaurants | | | | | | | 2.0% | 5.5% | 3.2% |
| Retail | $0.40 | $1.25 | $0.82 | | | | | | |
| Self-Storage | $0.35 | $0.90 | $0.75 | $40 | $225 | $141 | | | |
| Special Purpose | $0.35 | $1.25 | $0.85 | | | | | | |

*4th Quarter 2024 Data                        Copyright 2025 RealtyRates.com™

A replacement reserve of $200 per unit is considered reasonable.

## Operating Expense Conclusion

The projections for the subject are summarized as follows:

| TOTAL OPERATING EXPENSES | | |
|---|---|---|
| Year | Total | $/Unit/Yr |
| Expense Comparable 1 | --- | $5,458 |
| Expense Comparable 2 | --- | $4,137 |
| Expense Comparable 3 | --- | $7,880 |
| Expense Comparable 4 | --- | $5,250 |
| **CBRE Estimate** | **$280,138** | **$4,447** |
| Compiled by CBRE | | |

## Net Operating Income Conclusion

The comparable data and projections for the subject are summarized as follows:

| NET OPERATING INCOME | | |
|---|---|---|
| | Total | $/Unit/Yr |
| **CBRE Estimate** | **$495,060** | **$7,858** |
| Compiled by CBRE | | |

## Direct Capitalization

Direct capitalization is a method used to convert a single year's estimated stabilized net operating income into a value indication.

### Comparable Sales

The overall capitalization rates (OARs) confirmed for the comparable sales analyzed in the sales comparison approach are as follows:

| | COMPARABLE CAPITALIZATION RATES | | | | | | |
|---|---|---|---|---|---|---|---|
| Sale | Sale Date | Sale Price $/Unit | Occupancy | Buyer's Primary Analysis | Operating Expense Ratio | Base Term WALE | OAR |
| 1 | Dec-23 | $164,141 | 91% | Trailing Actuals | 36.23 | n/a | 5.29% |
| 2 | Mar-24 | $147,244 | 95% | Pro Forma (Stabilized) | 37.83 | n/a | 6.20% |
| 3 | May-24 | $152,244 | 90% | Trailing Actuals | n/a | n/a | 5.32% |
| 4 | May-24 | $122,167 | 100% | Trailing Actuals | n/a | n/a | 6.20% |
| 5 | May-24 | $138,889 | 98% | Pro Forma (Stabilized) | 46.75 | n/a | 6.06% |
| 6 | Aug-24 | $130,000 | 96% | Pro Forma (Stabilized) | 53.21 | n/a | 5.52% |
| 7 | Jul-24 | $123,077 | 95% | Trailing Actuals | 41.52 | n/a | 6.42% |
| 8 | Mar-25 | $95,714 | 95% | Pro Forma (Stabilized) | 47.69 | n/a | 7.28% |
| **Indicated OAR:** | | | **93%** | | | | **5.29%-7.28%** |
| Compiled by CBRE | | | | | | | |

## Published Investor Surveys

The results of the most recent investor surveys are summarized in the following chart.

| OVERALL CAPITALIZATION RATES | | |
|---|---|---|
| Investment Type | OAR Range | Average |
| *RERC Real Estate Survey - Midwest Apartments* | | |
| First-Tier | 5.30% - 6.50% | 5.90% |
| Second-Tier | 5.50% - 8.90% | 6.90% |
| Third-Tier | 5.60% - 9.30% | 7.50% |
| *RealtyRates.com - Apartments (1st Qtr. 2025)* | | |
| Apartments | 5.24% - 12.03% | 8.36% |
| Garden/Suburban TH | 5.24% - 11.03% | 7.70% |
| Hi-Rise/Urban TH | 5.67% - 12.03% | 8.46% |
| *PwC Apartment (1st Qtr. 2025)* | | |
| National Data | 4.00% - 6.25% | 5.25% |
| **Indicated OAR:** | | **5.25%-8.46%** |
| Compiled by CBRE | | |

## Market Participants

The results of recent interviews with knowledgeable real estate professionals are summarized in the following table.

| OVERALL CAPITALIZATION RATES | | | |
|---|---|---|---|
| Respondent | Comments | OAR | Date of Survey |
| Bender Commercial | None | 6.00%-6.25% | May-25 |
| NAI Commercial | Broker has had a few groups evaluate other properties currently offered for sale by the same developer in Watertown and they weren't willing to go below a 6.50% cap rate. | 6.50%-7.00% | May-25 |
| **Indicated OAR:** | | | **6.00%-7.00%** |
| Compiled by CBRE | | | |

## Band of Investment

The band of investment technique has been utilized as a crosscheck to the foregoing techniques. The Mortgage Interest Rate and the Equity Dividend Rate (EDR) are based upon current market yields for similar investments. The analysis is shown in the following table.

| BAND OF INVESTMENT | | | | | |
|---|---|---|---|---|---|
| Mortgage Interest Rate | 5.75% | | | | |
| Mortgage Term (Amortization Period) | 30 Years | | | | |
| Mortgage Ratio (Loan-to-Value) | 65% | | | | |
| Mortgage Constant (monthly payments) | 0.07003 | | | | |
| Equity Dividend Rate (EDR) | 6.00% | | | | |
| | | | | | |
| Mortgage Requirement | 65% | x | 0.07003 | = | 0.04552 |
| Equity Requirement | 35% | x | 0.06000 | = | 0.02100 |
| | 100% | | | | 0.06652 |
| | | | | | |
| **Indicated OAR:** | | | | | **6.70%** |
| Compiled by CBRE | | | | | |

## Debt Coverage Ratio

The debt coverage ratio (DCR) is the ratio of net operating income to annual debt service and measures the ability of a given property to meet its debt service out of net operating income. Utilizing data obtained from knowledgeable mortgage finance professionals, the subject's projected NOI can be tested for reasonableness against the market's typical loan parameters to determine if the DCR is positive. This analysis is shown in the following table:

| DEBT COVERAGE RATIO ANALYSIS | |
|---|---|
| Estimated As Stabilized Value | $7,070,000 |
| Mortgage Ratio (Loan-to-Value) | 65% |
| Estimated Mortgage Loan Amount | $4,595,500 |
| Mortgage Interest Rate | 5.75% |
| Mortgage Term (Amortization Period) | 30 Years |
| Mortgage Constant (monthly payments) | 0.07003 |
| Annual Debt Service (monthly payments) | $321,817 |
| Estimated NOI | $495,060 |
| Estimated Debt Coverage Ratio (DCR) | 1.54 |
| Market Debt DCR | 1.35 |
| Positive DCR? (Y or N) | Yes |
| Compiled by CBRE | |

The estimated DCR can also be used to derive a capitalization rate by blending the typical market debt coverage requirements of lending institutions with the yield return of the borrowed capital. We have used the same rates and terms from the Band of Investment analysis in the following table:

| DEBT COVERAGE RATIO METHOD | | | | | | |
|---|---|---|---|---|---|---|
| LTV | X | Mortgage Constant | X | DCR | = | OAR |
| 65% | X | 0.07003 | X | 1.35 | = | 6.15% |
| 65% | X | 0.07003 | X | 1.45 | = | 6.60% |
| **Indicated OAR:** | | | | | | **6.15%-6.60%** |
| Compiled by CBRE | | | | | | |

## Capitalization Rate Conclusion

The following chart summarizes the OAR conclusions.

| OVERALL CAPITALIZATION RATE - CONCLUSION | |
|---|---|
| Source | Indicated OAR |
| Comparable Sales | 5.29%-7.28% |
| Published Surveys | 5.25%-8.46% |
| Market Participants | 6.00%-7.00% |
| Band of Investment | 6.70% |
| Debt Coverage Ratio Method | 6.15%-6.60% |
| **CBRE Estimate** | **7.00%** |
| Compiled by CBRE | |

The subject is in good condition, features average to good quality components, and has good functional utility. Given the overall investment characteristics of the subject property, a capitalization rate of 7.00% is reconciled.

We have also considered recent events and prevailing market conditions with respect to capitalization rates. This includes the higher cost of capital that began in 2022 and recent rate cuts from the Federal Reserve. The cap rate conclusion also considers buyers' and sellers' sentiment around slow job growth and the potential for an economic downturn. While the overall long-term outlook for commercial real estate remains positive, the full effect of these factors may not yet be reflected in transactional data or may be lagging recent changes. Overall, the relative uncertainty has been considered with respect to our conclusion herein.

## Cost to Achieve Stabilized Operations

The cost estimates employed for this approach are reflective of a property operating at a stabilized level. A stabilized occupancy for the subject has been estimated to be 93.00% while the subject is expected to be operating at 0.00% at construction completion. Consequently, an adjustment is warranted.

As the subject is currently below a stabilized occupancy position, it requires a deduction for lease-up to stabilization. Variable operating expenses paid by the landlord during stabilization are estimated at 40% of the total stabilized operating expenses. Since cash flow shortages are being discounted during stabilization, the risk associated with cash flow shortages is relatively low. Hence, a discount rate slightly above a "safe rate" is concluded, or 4.50%, which is based upon short-term comparable investment instruments. Developer profit is concluded at 10.00%.

The lease-up period was selected based on market data provided by CoStar Analytics and ESRI. CoStar estimates an annual absorption rate of 53 units in the City of Watertown over the next twelve months. Demand analysis of demographics provided by ESRI indicates demand for 31 units annually (5-mile radius), which is summarized below.

Income Capitalization Approach

---

**NEIGHBORHOOD DEMAND ANALYSIS - ESRI**

| | 1 Mile Radius | 3 Mile Radius | 5 Mile Radius | Watertown, SD Micropolitan Statistical Area |
|---|---|---|---|---|
| 2029 Total Households | 4,885 | 9,591 | 10,515 | 12,557 |
| 2024 Total Households | 4,820 | 9,350 | 10,249 | 12,305 |
| 5-Year Household Growth | 65 | 241 | 266 | 252 |
| Renter Occupied Housing Units* | 56.0% | 56.0% | 56.0% | 56.0% |
| 5-Year Occupied Demand for New Multi-Family Units | 36 | 135 | 149 | 141 |
| Annual Occupied Demand for New Multi-Family Units | 7.3 | 27.0 | 29.8 | 28.2 |
| Plus: Frictional Vacancy @ 5% | 0.4 | 1.3 | 1.5 | 1.4 |
| Annual Total Demand for New Multi-Family Units | 7.6 | 28.3 | 31.3 | 29.6 |

*Based on percentage of household income that can only afford renting vs. buying.

Compiled by CBRE  Sources: ESRI

---

A recent rent survey indicated that two of the direct competitors of the subject are currently below stabilized occupancy (rent comparables 3 & 4). These two properties have a total of 19 units vacant. Once construction of the subject property is complete (63 units), there will be a total of 82 units in the Watertown central business district (CBD) that will be vacant. Using a market vacancy rate of 6.5% leaves 77 units that need to be absorbed to achieve a stabilized level. The CoStar absorption rate of 53 units implies a 1.5-year absorption time, whereas the neighborhood demand analysis indicates a 2.5-year absorption time.

For this assignment, a lease-up period of 24 months is concluded for this assignment.

This analysis utilizes assumptions developed in the market analysis and income capitalization approach and will be deducted as a line item from each approach in order to render an "as is" value estimate.

*Income Capitalization Approach*

## Lease-up Discount Schedule

### LEASE UP DISCOUNT SCHEDULE

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **AS-STABILIZED** | | | | | | | | | | | | |
| Potential Rental Income | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 |
| Vacancy & Credit Loss (%) | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% |
| Vacancy & Credit Loss ($) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) |
| Net Rental Income | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 |
| Other Income | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 |
| Effective Gross Income | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 |
| Total Expenses | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) |
| Net Operating Income | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 |
| **AS-IS** | | | | | | | | | | | | |
| Potential Rental Income | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 |
| Vacancy & Credit Loss (%) | 100.0% | 96.1% | 92.2% | 88.3% | 84.4% | 80.5% | 76.6% | 72.7% | 68.8% | 64.9% | 61.0% | 57.1% |
| Vacancy & Credit Loss ($) | ($67,755) | ($65,115) | ($62,476) | ($59,836) | ($57,197) | ($54,557) | ($51,917) | ($49,278) | ($46,638) | ($43,998) | ($41,359) | ($38,719) |
| Net Rental Income | $0 | $2,640 | $5,279 | $7,919 | $10,558 | $13,198 | $15,838 | $18,477 | $21,117 | $23,757 | $26,396 | $29,036 |
| Other Income | $0 | $67 | $133 | $200 | $266 | $333 | $399 | $466 | $532 | $599 | $665 | $732 |
| Effective Gross Income | $0 | $2,706 | $5,412 | $8,118 | $10,825 | $13,531 | $16,237 | $18,943 | $21,649 | $24,355 | $27,061 | $29,767 |
| Total Expenses (40% Variable) | ($14,007) | ($14,398) | ($14,789) | ($15,180) | ($15,572) | ($15,963) | ($16,354) | ($16,745) | ($17,136) | ($17,527) | ($17,919) | ($18,310) |
| Net Operating Income | ($14,007) | ($11,692) | ($9,377) | ($7,062) | ($4,747) | ($2,432) | ($117) | $2,198 | $4,513 | $6,828 | $9,143 | $11,458 |
| NOI Differential | $55,262 | $52,947 | $50,632 | $48,317 | $46,002 | $43,687 | $41,372 | $39,057 | $36,742 | $34,427 | $32,112 | $29,797 |
| Tenant Improvements | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Leasing Concessions | $0 | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) |
| Sub-Total | $55,262 | $50,999 | $48,684 | $46,369 | $44,054 | $41,739 | $39,424 | $37,109 | $34,794 | $32,479 | $30,164 | $27,849 |
| Plus: Profit @ 10.00% | $5,526 | $5,100 | $4,868 | $4,637 | $4,405 | $4,174 | $3,942 | $3,711 | $3,479 | $3,248 | $3,016 | $2,785 |
| Total Lease-Up Cost | $60,788 | $56,098 | $53,552 | $51,005 | $48,459 | $45,913 | $43,366 | $40,820 | $38,273 | $35,727 | $33,180 | $30,634 |
| Discounted @ 4.50% | $60,561 | $55,680 | $52,954 | $50,247 | $47,561 | $44,893 | $42,245 | $39,615 | $37,005 | $34,414 | $31,842 | $29,288 |

### LEASE UP DISCOUNT SCHEDULE, Cont'd.

| Month | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **AS-STABILIZED** | | | | | | | | | | | | | |
| Potential Rental Income | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 |
| Vacancy & Credit Loss (%) | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% |
| Vacancy & Credit Loss ($) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) | ($4,743) |
| Net Rental Income | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 | $63,012 |
| Other Income | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 | $1,588 |
| Effective Gross Income | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 | $64,600 |
| Total Expenses | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) | ($23,345) |
| Net Operating Income | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 | $41,255 |
| **AS-IS** | | | | | | | | | | | | | |
| Potential Rental Income | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 | $67,755 |
| Vacancy & Credit Loss (%) | 53.3% | 49.4% | 45.5% | 41.6% | 37.7% | 33.8% | 29.9% | 26.0% | 22.1% | 18.2% | 14.3% | 10.4% | 7.0% |
| Vacancy & Credit Loss ($) | ($36,080) | ($33,440) | ($30,800) | ($28,161) | ($25,521) | ($22,881) | ($20,242) | ($17,602) | ($14,963) | ($12,323) | ($9,683) | ($7,044) | ($4,743) |
| Net Rental Income | $31,675 | $34,315 | $36,955 | $39,594 | $42,234 | $44,874 | $47,513 | $50,153 | $52,792 | $55,432 | $58,072 | $60,711 | $63,012 |
| Other Income | $798 | $865 | $931 | $998 | $1,064 | $1,131 | $1,197 | $1,264 | $1,330 | $1,397 | $1,463 | $1,530 | $1,588 |
| Effective Gross Income | $32,474 | $35,180 | $37,886 | $40,592 | $43,298 | $46,004 | $48,710 | $51,416 | $54,123 | $56,829 | $59,535 | $62,241 | $64,600 |
| Total Expenses (40% Variable) | ($18,701) | ($19,092) | ($19,483) | ($19,874) | ($20,266) | ($20,657) | ($21,048) | ($21,439) | ($21,830) | ($22,221) | ($22,613) | ($23,004) | ($23,345) |
| Net Operating Income | $13,773 | $16,088 | $18,403 | $20,717 | $23,032 | $25,347 | $27,662 | $29,977 | $32,292 | $34,607 | $36,922 | $39,237 | $41,255 |
| NOI Differential | $27,482 | $25,167 | $22,852 | $20,538 | $18,223 | $15,908 | $13,593 | $11,278 | $8,963 | $6,648 | $4,333 | $2,018 | $0 |
| Tenant Improvements | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Leasing Concessions | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | ($1,948) | $0 |
| Sub-Total | $25,534 | $23,219 | $20,904 | $18,589 | $16,274 | $13,959 | $11,644 | $9,329 | $7,014 | $4,699 | $2,384 | $69 | $0 |
| Plus: Profit @ 10.00% | $2,553 | $2,322 | $2,090 | $1,859 | $1,627 | $1,396 | $1,164 | $933 | $701 | $470 | $238 | $7 | $0 |
| Total Lease-Up Cost | $28,087 | $25,541 | $22,994 | $20,448 | $17,902 | $15,355 | $12,809 | $10,262 | $7,716 | $5,169 | $2,623 | $76 | $0 |
| Discounted @ 4.50% | $26,753 | $24,237 | $21,739 | $19,259 | $16,798 | $14,355 | $11,929 | $9,522 | $7,132 | $4,761 | $2,406 | $70 | $0 |

| | |
|---|---|
| **Indicated Lease-Up Discount** | **$685,268** |
| **Rounded** | **$685,000** |
| Compiled by CBRE | |

## Direct Capitalization Summary

A summary of the direct capitalization is illustrated in the following chart.

| DIRECT CAPITALIZATION SUMMARY | | | |
|---|---|---|---|
| **Income** | | $/Unit/Yr | Total |
| Potential Rental Income | | $12,906 | $813,060 |
| **Adjusted Rental Income** | | **$12,906** | **$813,060** |
| Vacancy | 6.50% | ($839) | ($52,849) |
| Credit Loss | 0.50% | ($65) | ($4,065) |
| **Net Rental Income** | | **$12,002** | **$756,146** |
| Other Income | 0.50% | $60 | $3,781 |
| Parking Income | | $0 | $0 |
| Storage Income | | $117 | $7,350 |
| Commercial Income | | $0 | $1 |
| Pet Income | | $126 | $7,920 |
| RUBS/Utility Income | | $0 | $0 |
| **Subtotal Other Income (Net)** | | **$302** | **$19,052** |
| **Effective Gross Income** | | **$12,305** | **$775,198** |
| | | | |
| **Expenses** | | | |
| Real Estate Taxes | | $1,304 | $82,180 |
| Property Insurance | | $300 | $18,900 |
| Utilities | | $1,000 | $63,000 |
| Administrative & General | | $250 | $15,750 |
| Repairs & Maintenance | | $500 | $31,500 |
| Management Fee | 4.00% | $492 | $31,008 |
| Payroll | | $300 | $18,900 |
| Advertising & Promotion | | $100 | $6,300 |
| Replacement Reserves | | $200 | $12,600 |
| **Total Operating Expenses** | | **$4,447** | **$280,138** |
| Operating Expenses Excluding Taxes | | $3,142 | $197,958 |
| **Operating Expense Ratio** | | | 36.14% |
| **Net Operating Income** | | **$7,858** | **$495,060** |
| **OAR** | | ÷ | **7.00%** |
| **Current Prospective As Stabilized Value** | | | **$7,072,286** |
| **Rounded** | | | **$7,070,000** |
| Market Conditions Adjustment | | 0.00% for 27 Months | 1.00000 |
| **Prospective As Stabilized Value** | **August 6, 2027** | | **$7,072,286** |
| **Rounded** | | | **$7,070,000** |
| Lease-Up Discount | | | (685,000) |
| **Prospective Prospective As Complete Value** | **August 6, 2025** | | **$6,387,286** |
| **Rounded** | | | **$6,390,000** |
| Cost to Complete | | | (1,865,000) |
| **As Is Value** | **May 6, 2025** | | **$4,522,286** |
| **Rounded** | | | **$4,520,000** |
| **Value Per Unit** | | | **$71,746** |

Compiled by CBRE

The as stabilized value indicates an estimated value based on current market conditions. Therefore, changes in market conditions must be considered in order to estimate the as stabilized value as of the prospective effective date. For this assignment, no adjustment is made for market conditions for the prospective as stabilized effective date. The lease-up discount is then deducted from the prospective as stabilized value to develop the prospective as complete value. The estimated cost to complete is deducted from the prospective as complete value to develop the as is value.

## Conclusion of Income Capitalization Approach

The conclusions via the valuation methods employed for this approach are as follows:

| INCOME CAPITALIZATION APPROACH VALUES | | | |
|---|---|---|---|
| Appraisal Premise | As of Date | Direct Capitalization Method | Reconciled Value |
| As Is | May 6, 2025 | $4,520,000 | $4,520,000 |
| Prospective As Complete | August 6, 2025 | $6,390,000 | $6,390,000 |
| Prospective As Stabilized | August 6, 2027 | $7,070,000 | $7,070,000 |
| Compiled by CBRE | | | |

# Reconciliation of Value

The value indications from the approaches to value are summarized as follows:

| SUMMARY OF VALUE CONCLUSIONS | | | | |
|---|---|---|---|---|
| Appraisal Premise | Date of Value | Sales Comparison Approach | Income Approach | Reconciled Value |
| As Is | May 6, 2025 | $4,945,000 | $4,520,000 | $4,520,000 |
| Prospective As Complete | August 6, 2025 | $6,810,000 | $6,390,000 | $6,390,000 |
| Prospective As Stabilized | August 6, 2027 | $7,495,000 | $7,070,000 | $7,070,000 |
| Compiled by CBRE | | | | |

When comparing the two valuation techniques to one another, the income approach is expected to be more reliable than the sales approach. The most likely buyer for the subject is expected to be an investor, who typically give significant weight to the income approach when formulating an opinion of value.  Thus, the income approach is given all weight in reconciling the market value for the subject property.

Based on the foregoing, the market value of the subject has been concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Fee Simple Estate | May 6, 2025 | $4,520,000 |
| Prospective As Complete | Fee Simple Estate | August 6, 2025 | $6,390,000 |
| Prospective As Stabilized | Fee Simple Estate | August 6, 2027 | $7,070,000 |
| Compiled by CBRE | | | |

# Assumptions and Limiting Conditions

1.  CBRE, Inc. through its appraiser (collectively, "CBRE") has inspected through reasonable observation the subject property. However, it is not possible or reasonably practicable to personally inspect conditions beneath the soil and the entire interior and exterior of the improvements on the subject property. Therefore, no representation is made as to such matters.

2.  The report, including its conclusions and any portion of such report (the "Report"), is as of the date set forth in the letter of transmittal and based upon the information, market, economic, and property conditions and projected levels of operation existing as of such date. The dollar amount of any conclusion as to value in the Report is based upon the purchasing power of the U.S. Dollar on such date. The Report is subject to change as a result of fluctuations in any of the foregoing. CBRE has no obligation to revise the Report to reflect any such fluctuations or other events or conditions which occur subsequent to such date.

3.  Unless otherwise expressly noted in the Report, CBRE has assumed that:

    (i)    Title to the subject property is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. CBRE has not examined title records (including without limitation liens, encumbrances, easements, deed restrictions, and other conditions that may affect the title or use of the subject property) and makes no representations regarding title or its limitations on the use of the subject property. Insurance against financial loss that may arise out of defects in title should be sought from a qualified title insurance company.

    (ii)   Existing improvements on the subject property conform to applicable local, state, and federal building codes and ordinances, are structurally sound and seismically safe, and have been built and repaired in a workmanlike manner according to standard practices; all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; and the roof and exterior are in good condition and free from intrusion by the elements. CBRE has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of improvements. CBRE appraisers are not engineers and are not qualified to judge matters of an engineering nature, and furthermore structural problems or building system problems may not be visible. It is expressly assumed that any purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems.

    (iii)  Any proposed improvements, on or off-site, as well as any alterations or repairs considered will be completed in a workmanlike manner according to standard practices.

    (iv)   Hazardous materials are not present on the subject property. CBRE is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater, mold, or other potentially hazardous materials may affect the value of the property.

    (v)    No mineral deposit or subsurface rights of value exist with respect to the subject property, whether gas, liquid, or solid, and no air or development rights of value may be transferred. CBRE has not considered any rights associated with extraction or exploration of any resources, unless otherwise expressly noted in the Report.

    (vi)   There are no contemplated public initiatives, governmental development controls, rent controls, or changes in the present zoning ordinances or regulations governing use, density, or shape that would significantly affect the value of the subject property.

    (vii)  All required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be readily obtained or renewed for any use on which the Report is based.

    (viii) The subject property is managed and operated in a prudent and competent manner, neither inefficiently, nor super-efficiently.

    (ix)   The subject property and its use, management, and operation are in full compliance with all applicable federal, state, and local regulations, laws, and restrictions, including without limitation environmental laws, seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, and licenses.

    (x)    The subject property is in full compliance with the Americans with Disabilities Act (ADA). CBRE is not qualified to assess the subject property's compliance with the ADA, notwithstanding any discussion of possible readily achievable barrier removal construction items in the Report.

    (xi)   All information regarding the areas and dimensions of the subject property furnished to CBRE are correct, and no encroachments exist. CBRE has neither undertaken any survey of the boundaries of the subject property, nor reviewed or confirmed the accuracy of any legal description of the subject property.

Assumptions and Limiting Conditions

Unless otherwise expressly noted in the Report, no issues regarding the foregoing were brought to CBRE's attention, and CBRE has no knowledge of any such facts affecting the subject property. If any information inconsistent with any of the foregoing assumptions is discovered, such information could have a substantial negative impact on the Report and any conclusions stated therein. Accordingly, if any such information is subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. CBRE assumes no responsibility for any conditions regarding the foregoing, or for any expertise or knowledge required to discover them. Any user of the Report is urged to retain an expert in the applicable field(s) for information regarding such conditions.

4.  CBRE has assumed that all documents, data and information furnished by or on behalf of the client, property owner or owner's representative are accurate and correct, unless otherwise expressly noted in the Report. Such data and information include, without limitation, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data. Any error in any of the above could have a substantial impact on the Report and any conclusions stated therein. Accordingly, if any such errors are subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. The client and intended user should carefully review all assumptions, data, relevant calculations, and conclusions of the Report and should immediately notify CBRE of any questions or errors within 30 days after the date of delivery of the Report.

5.  CBRE assumes no responsibility (including any obligation to procure the same) for any documents, data or information not provided to CBRE, including, without limitation, any termite inspection, survey or occupancy permit.

6.  All furnishings, equipment and business operations have been disregarded with only real property being considered in the Report, except as otherwise expressly stated and typically considered part of real property.

7.  Any cash flows included in the analysis are forecasts of estimated future operating characteristics based upon the information and assumptions contained within the Report. Any projections of income, expenses and economic conditions utilized in the Report, including such cash flows, should be considered as only estimates of the expectations of future income and expenses as of the date of the Report and not predictions of the future. This Report has been prepared in good faith, based on CBRE's current anecdotal and evidence-based views of the commercial real estate market. Although CBRE believes its views reflect market conditions on the date of this Report, they are subject to significant uncertainties and contingencies, many of which are beyond CBRE's control. In addition, many of CBRE's views are opinion and/or projections based on CBRE's subjective analyses of current market circumstances. Actual results are affected by a number of factors outside the control of CBRE, including without limitation fluctuating economic, market, and property conditions. Actual results may ultimately differ from these projections, and CBRE does not warrant any such projections. Further, other firms may have different opinions, projections and analyses, and actual market conditions in the future may cause CBRE's current views to later change or be incorrect. CBRE has no obligation to update its views herein if its opinions, projections, analyses or market circumstances later change.

8.  The Report contains professional opinions and is expressly not intended to serve as any warranty, assurance or guarantee of any particular value of the subject property. Other appraisers may reach different conclusions as to the value of the subject property. Furthermore, market value is highly related to exposure time, promotion effort, terms, motivation, and conclusions surrounding the offering of the subject property. The Report is for the sole purpose of providing the intended user with CBRE's independent professional opinion of the value of the subject property as of the date of the Report. Accordingly, CBRE shall not be liable for any losses that arise from any investment or lending decisions based upon the Report that the client, intended user, or any buyer, seller, investor, or lending institution may undertake related to the subject property, and CBRE has not been compensated to assume any of these risks. Nothing contained in the Report shall be construed as any direct or indirect recommendation of CBRE to buy, sell, hold, or finance the subject property.

9.  No opinion is expressed on matters which may require legal expertise or specialized investigation or knowledge including, but not limited to, environmental, social, and governance principles ("ESG"), beyond that customarily employed by real estate appraisers. Any user of the Report is advised to retain experts in areas that fall outside the scope of the real estate appraisal profession for such matters.

10. CBRE assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

11. Acceptance or use of the Report constitutes full acceptance of these Assumptions and Limiting Conditions and any special assumptions set forth in the Report. It is the responsibility of the user of the Report to read in full, comprehend and thus become aware of all such assumptions and limiting conditions. CBRE assumes no responsibility for any situation arising out of the user's failure to become familiar with and understand the same.

12. The Report applies to the property as a whole only, and any pro ration or division of the title into fractional interests will invalidate such conclusions, unless the Report expressly assumes such pro ration or division of interests.

Assumptions and Limiting Conditions

13. The allocations of the total value estimate in the Report between land and improvements apply only to the existing use of the subject property. The allocations of values for each of the land and improvements are not intended to be used with any other property or appraisal and are not valid for any such use.

14. The maps, plats, sketches, graphs, photographs, and exhibits included in this Report are for illustration purposes only and shall be utilized only to assist in visualizing matters discussed in the Report. No such items shall be removed, reproduced, or used apart from the Report.

15. The Report shall not be duplicated or provided to any unintended users in whole or in part without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Exempt from this restriction is duplication for the internal use of the intended user and its attorneys, accountants, or advisors for the sole benefit of the intended user. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Finally, the Report shall not be made available to the public or otherwise used in any offering of the property or any security, as defined by applicable law. Any unintended user who may possess the Report is advised that it shall not rely upon the Report or its conclusions and that it should rely on its own appraisers, advisors and other consultants for any decision in connection with the subject property. CBRE shall have no liability or responsibility to any such unintended user.

Addenda

# Addenda

 © 2025 CBRE, INC

Addenda

# Addendum A

## Project Information

**Red River State Bank - The Ruins**

Opinion of Cost to Complete

Watertown, SD

May 13, 2025

Project 24-020


gehrtz
CONSTRUCTION SERVICES

| BID PACKAGE | OPINION OF COST TO COMPLETE | ASSUMED SCOPE OF WORK TO COMPLETE |
|---|---|---|
| General Conditions | $ 50,000.00 | |
| Testing & Inspections | $ 39,555.00 | Triple $5m Watertown permit fee |
| Foundation removal | $ - | |
| Site Survey/Civil | $ - | |
| Soil Borings | $ - | |
| Building Demolition | $ - | |
| Concrete | $ 27,000.00 | Re-work garage entry |
| Asbestos | $ - | |
| Concrete - Waterproofing & Insulation | $ - | |
| Excavation | $ - | |
| Precast Concrete - Materials / Erection | $ - | |
| Gypcrete | $ - | |
| CMU Block | $ 50,000.00 | 1,000sf, assumptions on 1st floor |
| Move Utilities | $ - | |
| Misc. Metals | $ 60,000.00 | 300 lf of railin on 2nd roof |
| General W&L Rough Carpentry Labor | $ 10,000.00 | Allowance of 80 hrs |
| General W&L Rough Carpentry Materials | $ - | |
| General W&L Finish Carpentry Labor | $ 12,500.00 | Install 3 units of cabinets, install frames in commercial spaces |
| General W&L Finish Carpentry Materials | $ - | Assuming all materials on site |
| Millwork - Cabinets | $ 9,000.00 | assuming 3 units of cabinets need to be replaced |
| Countertops - Kitchen & Bathroom | $ 6,000.00 | assuming 3 units worth of ct needs to be replaced |
| Bathroom Vanities | $ - | |
| Wood Components / Trusses | $ - | |
| Moisture Protections | $ 80,000.00 | 2000sf pavers |
| Building Insulation | $ - | |
| Masonry | $ 90,000.00 | 2,500sf and mobilization |
| Metal Siding / Metal Panels | $ 195,000.00 | new tyvek, install panels and new tyvek over existing tyvek (13,00) |
| Sealants | $ 182,712.00 | Complete package |
| Commercial Doors, Frames & Hardware | $ 2,500.00 | Assuming all materials on site |
| Residential Wood Doors & Frames | $ - | |
| Overhead Doors | $ 10,000.00 | New door for alley entrance |
| Vinyl Windows | $ 3,000.00 | 5 window replacement, misc. window removable stop repair |
| Glass & Glazing | $ - | |
| Drywall | $ 5,250.00 | Lobby walls on 1st |
| Carpet (Materials) | $ 120,000.00 | Assuming no material on site, 2/3 LVT and 1/3 broadloom carpet |
| Carpet (Install) | $ 50,000.00 | Install 2/3 LVT and 1/3 broadloom |
| Painting / Staining | $ 51,000.00 | Common area painting with 15k allowance for touch ups |
| Fill Nail Holes | $ - | |
| Postal Specialties/Bike Rack/Door Markers | $ 8,700.00 | supply postal boxes |
| Exterior Signage | $ 30,000.00 | Supply install new large building sign |
| Fire Extinguishers & Cabinets | $ 1,000.00 | Install cabinets throughout, assuming all are on site. |
| Ceiling Fans | $ - | |
| Closet Shelving | $ 25,000.00 | Supply and install 63 units of wire shelving |
| Toilets/Accessories | $ 30,000.00 | Supply/install toilet partitions, accesssories on 1st |
| Appliances & AC Units | $ 160,000.00 | Supply 42 units, install 63 units |
| Kitchen Sinks/Faucets | $ - | |
| Bath Faucets/Shower Heads | $ - | |
| Bathroom Mirrors | $ - | |
| Window Treatments | $ 30,000.00 | Supply 147 blinds |
| Conveying Systems | $ 90,000.00 | complete elevator and testing |
| Building Sprinkler | $ 15,000.00 | fill system, commercial space trim out and minor piping |
| Plumbing | $ 100,000.00 | 63 unit trim out, complete w/v in garage, 2 commerical bathroom trim out |
| HVAC | $ 25,000.00 | Trim out Unit bathrooms, Finish 1st Floor |
| Electrical/Security System | $ 125,000.00 | Per Fusion |
| Accrued Interest | $ - | |
| Paving & Sidewalks | $ 2,750.00 | 1200 lf striping, 1 hc stall |
| Site Fencing / Accessories / Dumpster Enclosure | | No location shown in plans |
| **Total Bid Packages** | **$ 1,695,967.00** | |

Exclusions:
Does not factor any cost associated with water damage mediation and remedies
Does not include current liens on buidling as of May, 2025

Assumptions:
Most materials on site, U.N.O.
extents of 1st floor lobby/bathroom work was assumed based on old plans
all wire pulled, power live into the building
all mechanical and plumbing fixtures for floors 2-4 are on site

# The Ruins, LLC

## Watertown, SD

# LEASE

BETWEEN
THE RUINS, LLC,
AS LANDLORD,

AND

CITY OF WATERTOWN SD,
AS TENANT

DATED _December ~~22~~   22_ , 2021.

## THE RUINS, LLC LEASE

THIS LEASE, made on the *22* day of *December*, 2021 (the "Effective Date") by and between **The Ruins, LLC,** a South Dakota limited liability company, and the **City of Watertown,** a South Dakota municipal corporation.

WITNESSETH:

## ARTICLE 1.  BASIC TERMS

The following are the Basic Terms referenced to in this Lease:

**Section 1.1.**    **Lease:** This Lease agreement.

**Section 1.2.**    **Landlord:** The Ruins, LLC, a South Dakota limited liability company whose address is 1405 1st Ave N, Fargo, ND 58102

**Section 1.3.**    **Tenant:**  City of Watertown SD

**Section 1.4.**    **Facility:** A mixed-use residential and commercial building known as "The Ruins," and located at 315 East Kemp, Watertown, South Dakota

**Section 1.5.**    **Common Areas:** The "Common Areas" as defined herein shall consist of any of the following located on, at, or in the Facility from time to time: the parking areas, streets, fire corridors, driveways, walkways, curbs, gutters, drainage areas, landscaped areas, access roads, retaining walls, fences, Facility identification signs, truck service ways, stairs, elevators, ramps and sidewalks, washrooms, hallways, utility rooms, courtyards, atriums, escalators, elevators, washrooms, utility rooms, auditorium, bus stops, and parcel pick-up stations, and the like, designated by Landlord for common use or benefit of tenants, occupants and other patrons of the Facility and their employees, agents, servants, customers and other invitees. Common Areas may be located either within the Facility or on land adjacent to The Ruins which is made available for the common use or benefit of occupants of The Ruins.

**Section 1.6.**    **Delivery Date:** The date Landlord delivers possession of the Premises for the construction of Tenant's improvements under Section 8.1 currently estimated at November 1, 2022.

**Section 1.7.**    **Premises:**  A space consisting of approximately 1200 square feet of floor area on the first floor of the Facility, the location of which is identified on the Floor Plan of the first floor of the Facility attached as Exhibit 3.

**Section 1.8.**    **Use of Premises:** The permitted use of the Premises referred to in Section 7.1, shall be for the following and for no other purpose: Public gathering space and restroom facilities used as an amenity to the adjacent downtown public park.

**Section 1.9.**    **Term:** The Term of this Lease shall commence on the Commencement Date referred to in Section 1.10 and, unless extended or sooner terminated as provided in this Lease, the Term of this Lease shall continue for two hundred thirty seven (237) months and, unless Tenant is in default of this Lease or Tenant voluntarily non-renews, shall automatically renew for four (4) additional identical terms, ultimately ending on June 30, 2121 (the "Termination Date").

**Section 1.10.**    **Commencement Date:** The earlier of: (a) November 1, 2022; or (b) the date Tenant opens the Premises for use by the public.

2

**Section 1.11.    Base Rent:** $1.00 per year from the Commencement Date through the Termination Date, inclusive.  Any and all renewal periods will have a negotiated and agreed upon base rent increase between the parties.

**Section 1.12. Security Deposit:** The amount deposited by Tenant with Landlord as provided under Article 22, which shall be Zero Dollars ($0).

References contained in this Article I to other provisions of this Lease are for convenience and are not intended to be an exhaustive listing of all of the Articles where the basic terms may be relevant. The listing of any monetary amounts set forth in Article I is not intended to be an exhaustive list of all of Tenant's financial obligations to Landlord under this Lease.

## ARTICLE 2. TENANT ALLOWANCEADDITIONAL PROVISIONS

Landlord shall pay to complete Tenant's Work, excluding trade fixtures, furniture, equipment specific to Tenant's use and personal property (the "Tenant Allowance").

## ARTICLE 3. DEMISED PREMISES

**Section 3.1.    Premises.** In consideration of the mutual covenants, conditions and agreements included in this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises described in Section 1.7 together with those appurtenances specifically granted to Tenant in this Lease, but reserving to Landlord the use of the exterior walls, the roof, and the right to install, maintain, use, repair, and replace, pipes, ducts, conduits, and wires leading through the Premises and which serve the Premises or other parts of the Facility at locations which will not materially interfere with Tenant's use of the Premises. Tenant's rights under this Lease are subject and subordinate to all liens, encumbrances, easements, restrictions, ground leases, and any rights of way and other interests of record, zoning laws and regulations affecting or governing the Premises.

**Section 3.2.    Common Area Use.** The use and occupation by the Tenant of the Premises shall include the non-exclusive use, in common with others entitled thereto, of the Common Areas. Tenant's use of the Common Areas shall be subject to the requirements, limitations and restrictions set forth in this Lease, including without limitation those set forth in Article 8 and this Article 3, and further subject to reasonable rules and regulations for the use of Common Areas as adopted from time to time by Landlord. Landlord shall at all times have full control, management and direction over the Common Areas. Landlord reserves the right, at any time, to reasonably reduce, increase or otherwise change the dimension, location, layout and nature of the Common Areas and facilities to construct additional rental areas through use and enclosure of certain Common Areas; provided, however, that no such action by Landlord shall impair access to the Premises, materially reduce visibility of the Premises, or make the Facility significantly smaller or otherwise materially interfere with Tenant's use of the Premises. Any such reasonable actions by Landlord shall not constitute constructive or actual eviction and Tenant will not be entitled to any compensation or diminution of rent or abatement of rent as a result thereof.

## ARTICLE 4.  TERM

**Section 4.1.    Commencement Date and Term.** This Lease shall begin and be binding on both Landlord and Tenant on the Effective Date. The Term and Tenant's obligation to pay rent hereunder shall commence on the Commencement Date set forth in Section 1.10, and, unless sooner terminated, shall end at midnight

3

on the date specified in Section 1.9.

**Section 4.2.    Lease Year.** The term "Lease Year" means each consecutive period of twelve (12)  full calendar months during the term of this Lease commencing on the Commencement Date, if  that date shall occur on the first day of a calendar month; if not, then the first Lease Year shall commence upon the first day of the first calendar month following the Commencement Date. Each succeeding Lease Year shall commence upon the anniversary date of the first Lease Year's first day. The last Lease Year shall end on the date this Lease terminates and may be less than twelve months.

## ARTICLE 5.  BASE RENT

Tenant agrees to pay Landlord at its address provided in Section 1.2 or at such other place designated by Landlord, without any prior demand therefor and without any deduction or set-off whatsoever, an annual Base Rent for the Premises in the amount set forth in Section 1.11.

## ARTICLE 6.  UTILITIES

**Section 6.1.    Maintenance of Utilities.** Tenant will be responsible for maintaining, at Tenant's expense, all utilities within the Premises or which serve only the Premises, including, without limitation: i) all plumbing fixtures and equipment, including toilet, janitorial and drinking fountain facilities, drainage, vent, hot and cold water piping, water meters and equipment necessary to heat and chill water; ii) electrical power and lighting system; and ·iii) telecommunications system. Landlord shall maintain the utilities serving common areas, together with those portions of the heating, ventilating and air-conditioning systems which serve the Premises and other space in the building in which the Premises is located.

**Section 6.2.    Payment for Utilities.** Tenant shall be solely responsible for and shall promptly pay all charges for utilities serving the Premises, including, without limitation, water, electricity, gas and telephone, and any other utility used or consumed, in or about the Premises during the term of this Lease which are billed to Tenant by any supplier.

Further, Landlord may, at its expense, install and monitor meters for certain utilities provided to the Premises. In that event, Tenant shall, within 10 days after billing therefore, pay to Landlord, as additional rent, for such utilities billed by Landlord rather than the ultimate utility provider. Landlord shall bill any such utilities through to Tenant on a "cost" basis.

**Section 6.3.    Interruption in Utility Service.** Landlord shall not be liable for damages or otherwise if the furnishing by Landlord or by any other supplier of any utility service to the Premises shall be interrupted or impaired by fire, accident, riot, strike, Act of God, the making of necessary repairs or improvements, or by any causes beyond Landlord's control, and no such interruption or impairment shall entitle Tenant to terminate this Lease or stop making any rental or other payment to Landlord.

## ARTICLE 7. USE AND OPERATION

**Section 7.1.    Use of Premises.**  Tenant shall occupy and use the Premises solely for the purpose authorized under Section 1.8. Tenant shall not use, permit, or suffer the use of the Premises for any other purpose. Notwithstanding anything in this Lease to the contrary, in no event during any time during the Term, including any extension periods, shall the Premises or any part thereof be used or occupied in contravention to the lease restrictions set out in Exhibit 4.

4

**Section 7.2.    Operation of Business.** Tenant covenants and agrees that the Premises shall not be abandoned or left vacant. No damage to, vacancy of, or failure to open for business by any other tenant in the Commercial Center, shall excuse the Tenant from opening for business in the manner and during the hours required hereunder or paying any rentals required herein.

**Section 7.3.    Waste or Nuisance.** Tenant shall not commit or allow to be committed any waste upon the Premises or any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenant in the building in which the Premises may be located, or in the Commercial Center or which may disturb the quiet enjoyment of any person within five hundred feet of the boundaries of the Commercial Center. Tenant shall not perform any acts or carry on any practices which may injure the building of which the Premises form a part.

**Section 7.4.    Governmental Regulations.** Tenant shall, at Tenant's sole cost and expense, comply with and faithfully observe all of the rules, regulations, ordinances, laws and requirements of county, municipal, state, federal and other applicable governmental authorities, present or future, which affect the occupancy or use of the Premises, including the making of such modifications to the Premises as may be required thereby.

## ARTICLE 8.
## CONSTRUCTION, IMPROVEMENTS AND ALTERATIONS TO PREMISES

**Section 8.1.    Landlord's Initial Improvements.** Landlord agrees, at its cost and expense to construct a building containing the Premises for Tenant's use and occupancy in accordance with the drawings and specifications prepared by Landlord or its architect. Landlord's work shall be limited to that work described as Landlord's Work on Exhibit 1. Any work on the Premises in addition to the items set forth as Landlord's Work, shall be Tenant's Work and performed by Tenant at its own cost and expense. Any equipment or work other than those items specifically described as Landlord's Work, which Landlord installs or constructs in the Premises on Tenant's behalf, and upon the Tenant's written request by authorized representative, shall be paid for by Tenant within thirty (30) days after receipt of a bill therefore.

Landlord shall use reasonable efforts to complete Landlord's Work by the Delivery Date. If Landlord shall not have, through no fault or delay by Tenant, commenced Landlord's Work within thirty (30) days after Effective Date of this Lease, or if Landlord shall not have completed Landlord's Work within ninety (90) days after the Delivery Date, Tenant shall have the right and option, on thirty (30) days written notice to Landlord, to cancel this Lease. These rights of Tenant are expressly subject to extension as provided in Section 20.2. Landlord shall not be obligated to proceed with the construction of the Premises if causes beyond its reasonable control prevent it from doing so. Landlord shall provide Tenant written notice and statement of explanation in the event of such delay. Landlord shall notify Tenant in writing when Landlord's Work has been completed to the extent that Tenant may begin construction of Tenant's Work (the "Delivery Date").

**Section 8.6.    Alterations and Improvements.** Without first obtaining Landlord's written approval and consent, Tenant shall not make, cause to be made, or contract for any alterations, additions, or improvements to the Premises, or to install therein any trade fixture, exterior sign, floor covering, interior or exterior lighting, plumbing fixtures, heating and air conditioning equipment, shades or awnings, or make any changes to the store front, or other structural changes or additions to the Premises or mechanical systems serving the Premises. At the time Tenant requests Landlord's consent for any such improvement, alteration, or addition, Tenant shall deliver to Landlord Tenant's drawings and specifications for the proposed work.

5

**Section 8.7.**    __Construction Lien.__ Tenant shall do all things reasonably necessary to prevent the filing of any construction or other liens or encumbrances against the Commercial Center, or any part thereof, or upon any interest of Landlord or any mortgagee in any part of the Facility by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone in possession of the Premises or any part thereof through Tenant. Tenant agrees to promptly pay all sums of money in respect of any labor, services, materials, supplies, or equipment furnished or alleged to have been furnished to Tenant in, at or about the Premises or furnished to Tenant's agents, employees, contractors or subcontractors, which may be secured by any construction, materialmen, supplier's, or other type of lien against the Premises, or any interest therein. In the event of the receipt of any notice of intention to claim such a lien, a demand for payment, or a construction lien statement, Tenant shall immediately notify Landlord thereof, and shall either: (a) cause the same to be discharged of record within ten (10) days thereafter; or (b) if in good faith Tenant determines that such lien should be contested, Tenant shall furnish such security as may be necessary and required to (i) prevent any foreclosure proceeding against the Facility or any portion thereof during the pendency of the contest, and (ii) cause the title insurance company or companies insuring Landlord's or Landlord's mortgagees' interest in the Facility to remove such lien as a matter affecting title of the entire Facility. Failure of Tenant to discharge the lien in the manner required hereunder shall constitute a default under this Lease and, in addition to any other remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same of record by paying the amount claimed to be due, and the amount so paid by Landlord and all costs and expenses incurred by Landlord therewith, including reasonable attorney's fees, shall be due and payable by Tenant to Landlord.

**Section 8.8.**    __Ownership of Improvements and Fixtures.__ All alterations, installations, additions and improvements made upon or for the benefit of the Premises by either party are the property of Landlord and unless Landlord otherwise elects (by giving notice thereof to Tenant not less than thirty days prior to the expiration or other termination of this Lease), shall remain upon and be surrendered with the Premises as a part thereof at the expiration or sooner termination of this Lease. Furniture, trade fixtures, equipment and personal property which is acquired by Tenant at its expense shall remain its property and shall be removed prior to the end of the Term and Tenant shall promptly repairs any damage caused by such removal.

**Section 8.9.**    __Signs - Displays.__ Tenant will not place or suffer to be placed or maintained anywhere on the Facility or on any exterior door, wall, or window of the Premises any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place or maintain any decoration, lettering or advertising matter on the glass of any window or door of the Premises without first obtaining Landlord's written approval and consent. Prior to the Commencement Date, Tenant shall, at its expense, install all signs required by and in compliance with Landlord's Sign Criteria that will be established from time to time.

**Section 8.10.**    __Access to Roof.__ Neither Tenant, Tenant's agents, employees, nor independent contractors, shall be permitted to go upon, use, alter, or work in any way upon any part of the roof of the Facility without the express written consent of Landlord. Tenant shall be fully responsible to Landlord for any damages to the roof occasioned by the acts of its agents, employees, or independent contractors resulting from their use of the roof of the Facility.  This does not include access to the rooftop patio which is available to all tenants.


## ARTICLE 9. INSURANCE AND INDEMNITY

**Section 9.1.**    __Construction Insurance.__ Following the Delivery Date and at all times during the making of any improvements or other construction on the Premises by Tenant, or on Tenant's behalf, Tenant or Tenant's contractor(s) shall have and maintain in full force builder's risk insurance (completed value form, if available) and Workers Compensation insurance to the extent required by law. Prior to the commencement of any such work, Tenant shall provide Landlord a certificate of such insurance evidencing

6

compliance with this section.

**Section 9.2.**    **Tenant's Liability Insurance.** Tenant shall, during the entire period of its occupancy of the Premises, including the entire term of this Lease and any occupancy of Tenant prior to the Commencement Date, procure and keep in full force and effect, at its own cost, a policy of public liability insurance and property damage insurance with respect to the Premises and the business operated by Tenant and any of its subtenants, with a combined single limit of no less than $1,000,000.00, including independent contractor's coverage. The insurance policy shall name Landlord, and any person, firms or corporations, if any, designated by Landlord, as a named insured, and shall contain a clause that the insurer will not cancel or change the insurance without first giving the Landlord at least ten days prior written notice. In addition, Tenant shall pay when due to the state worker's compensation fund all amounts required by law to be paid by Tenant, and in the event state law requires the procurement of worker's compensation insurance or similar insurance, Tenant shall keep in full force and effect a policy affording full statutory coverage at the statutory limits. All insurance shall be in a responsible company qualified to do business in South Dakota and approved by Landlord, and a copy of the policy or a certificate of insurance shall be delivered to Landlord. Not more frequently than once each three years if, in the good faith opinion of Landlord's lender or Landlord's insurance agent, the amount of public liability and property damage insurance required hereunder is not adequate, Tenant shall increase its insurance coverage to the amount reasonably requested or required by either Landlord's lender or Landlord's insurance agent.

**Section 9.3.**    **Tenant's Property Insurance.** Tenant agrees that during the entire term of this Lease and the entire period of its occupancy of the Premises, it will procure and keep in full force and effect, at its own cost, fire and extended coverage insurance, including vandalism and malicious mischief and sprinkler leakage, to cover all of Tenant's leasehold improvements, stock in trade, fixtures, furniture, furnishings, equipment, signs, and all other property which Tenant is obligated to repair, rebuild, or replace under Section 10.4 following any damage to or destruction of the Premises, which are located in, on, or about the Premises to the extent of at least equal to their full replacement cost. Tenant shall provide Landlord with certificates of such insurance evidencing such coverage is in full force and effect throughout the term of this Lease.

**Section 9.4.**    **Proof of Insurance.** A certificate of all insurance procured by Tenant in compliance with its obligations under this Lease shall be delivered to Landlord prior to the time such insurance is first required to be carried by Tenant, and thereafter at least ten (10) days prior to the expiration of any such policy. Any insurance required to be provided by Tenant under this Article may be provided by blanket insurance covering both the Premises and other properties or locations of Tenant if (i) such blanket insurance complies with all of the other requirements of this Lease, and (ii) the amounts payable to Landlord and/or Landlord's Designee(s) under such blanket insurance shall at all times be not less than the face amount of such blanket insurance, whether or not Tenant, as an insured, may be otherwise entitled to any proceeds of the policy, and (iii) the insurance protection to be provided hereunder for Landlord and Landlord's Designee(s) is not impaired or diminished by such blanket insurance or inclusion of Tenant as an insured thereunder. If Tenant shall provide blanket insurance in conformity with the foregoing, then the requirements herein for delivery of insurance policies by Tenant shall be deemed satisfied by Tenant's delivery of an underlying certificate(s) of such blanket insurance (in form reasonably satisfactory to Landlord) with respect to the insurance involved.

**Section 9.5.**    **Indemnification.** Tenant covenants and agrees to indemnify, defend and save Landlord harmless from and against any and all injury, loss, claims, actions, damages, liability, costs and expense including reasonable attorney's fees resulting from loss of life, personal or bodily injury, damage to property, or litigation arising from or out of any occurrence in, upon or at the Premises or the occupancy or use by Tenant of the Premises, or occasioned anywhere, wholly or in part, by any act, neglect, or omission of Tenant, its agents, contractors, employees, servants, lessees or

7

concessionaires. All of Tenant's public liability and property insurance policies shall contain a contractual liability endorsement insuring the performance by Tenant of the indemnity agreement set forth in this Section 9.5 as to liability for injury to or death of persons and injury or damage to property.

**Section 9.6.    Waiver of Subrogation.** Landlord and Tenant each hereby release and waive any and all rights of recovery from each other and their respective officers, employees, agents and representatives for loss of or damages to their respective property or the property of others under their respective control, arising from any cause insured under any policy of fire and extended coverage insurance required herein or carried by such party to the extent such loss or damage is recoverable under such policy and without regard to the negligence of the other party that may have contributed to the loss or damage.

**Section 9.7.    Waiver of Claims Against Landlord.** Landlord, its agents and employees shall not be liable for, and Tenant waives all of claims for, loss or damage to Tenant's operations or damage to person or property sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence directly or primarily in or upon the Premises or the building of which it is a part, or any other area of the Facility including but not limited to, claims for damage resulting from fire; any equipment, machinery or appurtenances becoming out of repair; injury done or occasioned by wind; any defect in or failure of plumbing, heating, ventilating or air conditioning equipment, electric wiring or installation thereof, gas, water, and steam pipes, stairs, porches, railings or walks; broken glass; the backing up, overflowing or leaking of any sewer pipe or downspout; the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about such building or the Premises; the escape of steam or hot water; water, snow or ice being upon or coming through the roof, skylight, trapdoor, stairs, doorways, show windows, walks or any other place upon or near such building or the Premises or otherwise; the falling of any fixture, plaster, tile or stucco; and any act, omission or negligence of other tenants, licensees or of any other persons in or occupants of said building or of adjoining or contiguous buildings or of owners or occupants of adjacent or contiguous property of the Commercial Center. To the extent Tenant desires to be compensated for such claims, Tenant shall obtain insurance to cover losses to its property and business. This waiver shall not apply to any such loss resulting from Landlord's failure to make a reasonable effort to repair a defect Landlord is obligated to repair under this Lease, within a reasonable time after Landlord receives written notice from Tenant specifying the existence of the defect. Tenant shall give immediate notice to Landlord or its agent in case of fire, accident, casualty, or other untoward incident in the Premises or in the building of which the Premises are a part, and of any defects therein or in any fixtures or equipment.

## ARTICLE 10. DAMAGE AND DESTRUCTION

**Section 10.1.    Landlord's Obligation.** If the Premises is partially or totally destroyed or damaged by fire or other insured casualty so as to become partially or totally untenantable, Landlord shall repair and rebuild the same as required by Section 10.3, except that Landlord shall have no obligation to repair and rebuild if: i) Landlord is unable to obtain all necessary permits and approvals therefor, including, without limitation, permits and approvals required from any agency or body administering environmental laws, rules or regulations; ii) Landlord terminates this Lease as authorized by Section 10.2; or iii) Tenant is in default under this Lease.

**Section 10.2.    Option to Terminate.** If (a) the Facility or the Premises, or the building in which the Premises are located, shall be destroyed or damaged by fire or other insured casualty to the extent of 25% or more of the cost of replacement thereof under the coverage of Landlord's insurance (notwithstanding that the Premises may be unaffected by such fire or other occurrence), or (b) if the

8

Premises shall be partially or totally destroyed during the last three years of the term of this Lease, or (c) if the Facility, the Premises or the building of which it is a part shall be partially or totally destroyed by a cause or casualty other than one covered by Landlord's insurance, or (d) if Landlord's mortgagee shall require that the insurance proceeds be applied against the principal balance of Landlord's mortgage, then in such event, Landlord, may, if it so elects, rebuild the Premises, or it may give notice terminating this Lease as of a date not later than sixty (60) days after such damage or destruction. If Landlord elects to restore, repair or rebuild the Premises, Landlord shall, within sixty days after such damage or destruction, give Tenant notice of its intention to restore, repair or rebuild the Premises and then shall proceed with reasonable speed to make the repairs to or to rebuild the Premises. Unless Landlord elects to terminate this Lease, this Lease shall remain in full force and effect, provided, however, that Tenant shall have the right to terminate this Lease, upon not less than sixty days written notice to Landlord, if Landlord shall not have restored, repaired or rebuilt the Premises suitable for Tenant's use and occupancy within two years after the fire or other casualty (excluding time lost because of strikes, material shortages, Acts of God, or other causes beyond Landlord's control.)

**Section 10.3.    Landlord's Reconstruction.** If Landlord shall elect or be obligated to repair or rebuild the Premises because of any damage or destruction, Landlord shall reconstruct the Premises to substantially the condition as it existed prior to the damage or destruction, provided that Landlord's obligation shall be limited to rebuilding or restoring the all structural framing materials, roof, windows, unfinished concrete floor slab, walls, partitions, doors, painting and decorating, plumbing and electrical systems and fixtures, telephone systems, heating, ventilating and cooling facilities required of Landlord as Landlord's Work to be completed prior to the Delivery Date, exclusive of any items of Tenant's Work. All work to be performed by Landlord shall be done in such manner that upon completion thereof, that portion of the Premises repaired or rebuilt shall contain substantially the same amount of floor area as immediately prior to the damage or destruction. Tenant agrees to cooperate and assist Landlord in the restoration and reconstruction of the Premises.

**Section 10.4.    Tenant's Reconstruction.** If Landlord does not elect to terminate this Lease as provided in Section 10.2, Tenant shall, at its own cost and expense promptly and diligently commence to fully repair, replace and restore those portions of the Premises Landlord is not required to repair under Section 10.3, including, but without limitation, all floor coverings, painting and decorating, cabinets, trade fixtures, furnishings, equipment, merchandise, signs and other personal property to a condition equal to, or better than, that existing prior to its damage or destruction. All construction shall be in accordance with plans and specifications approved by Landlord.

**Section 10.5.    Insurance Proceeds,** All proceeds payable from Landlord's insurance policies with respect to the Premises shall be payable to Landlord. If Landlord does not elect to terminate this Lease, as provided in Section 10.2, Landlord shall, subject to the rights of Landlord's mortgagee, disburse and apply so much of any insurance recovery as shall be necessary to pay and reimburse Landlord for the costs incurred by Landlord with respect to Landlord's restoration work referred to in Section 10.3. If Landlord elects to terminate this Lease under this Article, Landlord shall be entitled to retain all insurance proceeds.

**Section 10.6.    Tenant's Obligations - Rent Adjustment,** Should the Premises be rendered totally or partially untenantable as a result of any fire or other insured casualty, neither Base Rent nor any additional rents payable hereunder shall abate. In no event shall Landlord be liable for interruption to the operations of Tenant or for damage to or repair, reconstruction or restoration of any items belonging to Tenant or within the Premises.

9

## ARTICLE 11. REPAIRS AND MAINTENANCE

**Section 11.1.    Landlord's Obligation.** Landlord shall, within a reasonable period after receipt of written notice from Tenant, make or cause to be made necessary structural repairs to the exterior foundations and exterior walls of the Premises (but excluding the exterior of, and the frames surrounding all windows, doors, plate glass, and signs) and shall keep or cause to be kept in good order, condition and repair the exterior walls, foundations and roofs of the buildings constituting the Facility, except for reasonable wear and tear.

**Section 11.2.    Tenant's Obligation.** Tenant shall, at its expense, keep, replace and maintain the Premises (including maintenance of exterior entrances and signs, all glass) and all partitions, doors, store fronts, fixtures, equipment and appurtenances thereof (including lighting, heating and plumbing fixtures, interior walls, interior surfaces of exterior walls, and any air handling  equipment or air conditioning system) in clean, neat and good order, condition and repair (including reasonably periodic painting and decorating), damage by insurable casualty excepted. If Landlord is required to make repairs to said structural portions by reason of Tenant's, its agents' or employees' acts or omission to act, or if Tenant refuses or neglects to repair, maintain, or replace property as required hereunder to the reasonable satisfaction of Landlord after ten days written notice, then Landlord may make such repairs or modifications without liability to Tenant for any loss or damage that may accrue to Tenant's equipment, fixtures, or other property or to Tenant's operations by reason thereof, and upon completion thereof and presentation of bill therefor, Tenant shall pay Landlord, as additional rent, at the time the next Base Rent payment is due,  the Landlord's cost and expense for making such repairs, plus 15% for overhead and supervision.

## ARTICLE 12. CONDEMNATION

**Section 12.1.    Continuation of Lease.** If title to the whole or part of the Premises shall be conveyed or condemned by right of eminent domain then this Lease shall cease and terminate as of the date that possession is taken by the condemning authority.  If more than 25% of the floor area of the building in which the Premises are located shall be so condemned or conveyed, whether or not any portion of the Premises shall be taken or conveyed, or if so much of the parking areas and Common Area facilities shall be so taken or conveyed that a reasonable number of parking spaces and sufficient other common area facilities, necessary, in Landlord's judgment, for the continued effective operation of the Facility shall not be available for use by tenants or if required by Landlord's mortgagee, or if Landlord's mortgage requires the condemnation award to be applied to Landlord's loan, then, in any such event, Landlord may, by notice in writing to Tenant delivered on or before the day of surrendering possession to the condemning authority, terminate this Lease, and rent shall be paid or refunded as of the date of termination.

**Section 12.2.    Rental Obligation after Taking.** In the event this Lease should terminate by reason of any taking or conveyance as aforesaid of the Premises, the building of which it is a part, the Facility, the parking areas and Common Area facilities, or any portion thereof, Tenant shall pay rent to the day when possession shall be taken by such authority, with an appropriate refund by Landlord of such rent as may have been paid in advance for a period subsequent to such date. If this Lease shall continue in effect as to any portion of the Premises not so taken or conveyed, the Base Rent shall be reduced to a fair and equitable amount based on the floor area of the Premises remaining after such taking (or conveyance) as compared to the floor area in the Premises prior to such taking, and all additional rents shall thereafter be computed on the basis of such remaining floor area.

**Section 12.3.    Restoration.** If this Lease shall continue, Landlord shall, subject to the limitations set

10

forth below, make all necessary repairs or alterations so as to constitute the portion of the remaining building a complete architectural unit, and the remaining Premises a complete merchandising unit. Landlord shall also restore or replace the parking areas and other common facilities as nearly as practicable to the area and condition they were in prior to any such taking.

**Section 12.4.    Right to Award.** All compensation awarded or paid for any taking or conveyance, whether for the whole or a part of the Premises, shall be the property of Landlord, provided however, that Landlord shall not be entitled to any award separately made by the condemning authority for the loss of value of leasehold improvements made or paid by Tenant, or for Tenant's fixtures, personal property, damages for interruption and discontinuance of Tenant's operations, the cost of relocating to other premises and damages for discontinuance of the lease term. Tenant shall have the right to claim and recover from the condemning authority, but not from Landlord, such compensation as may be separately awarded or recoverable by Tenant in Tenant's own right on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in repairing, restoring or removing Tenant's merchandise, furniture, and trade fixtures, as well as for the unamortized cost (amortized on a straight line basis over the term of this Lease) of Tenant's leasehold improvements to the extent Landlord has not contributed to the cost thereof.

## ARTICLE 13. HAZARDOUS MATERIALS

**Section 13.1.    Hazardous Materials.** Tenant covenants and agrees that Tenant shall at all times from and after delivery of possession of the Premises to Tenant, be responsible and liable for, and be in complete and strict compliance with, all laws, ordinances, rules and regulations relating arising, directly or indirectly, out of the storage, transportation, disposal, treatment or use of "Hazardous Materials" in, on, under or about the Premises or the Facility by Tenant, its agents, servants, employees, licensees, contractors, subtenants and concessionaires. The term "Hazardous Materials" as used herein shall include, without limitation, whether now or subsequently listed in any Governmental listing or publication defining hazardous materials, substances defined as: 'hazardous substances', 'hazardous materials', or 'toxic substances' in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq.; and any subsequent amendments thereto, or replacement statutes thereof and ordinances, rules and regulations adopted and publications promulgated pursuant to said laws.

**Section 13.2.    Landlord's Approval.** Tenant shall not take any remedial action in response to the presence of Hazardous Materials in, on, under or about the Premises, nor enter into any settlement agreement, consent decree or other compromise in respect to any Claims as such there is hereinafter defined in Section 13.3 relating to Hazardous Materials in any way connected with the Premises, without first notifying Landlord of Tenant's intention to do so and affording Landlord ample opportunity to appear, intervene or otherwise appropriately assert Landlord's interest with respect thereto.

**Section 13.3.    Indemnity.** Without limiting anything contained in this Article 16, Tenant shall indemnify and hold Landlord harmless from and against any and all claims, demands, losses, liabilities, penalties, damages, costs and expenses, including without limitation, attorneys' fees and costs (collectively "Claims"), arising out of or in any way connected with the use, manufacture, storage, sale, release or disposal of Hazardous Materials or products containing Hazardous Materials by Tenant, its agents, servants, employees, licensees, contractors, subtenants or concessionaires in, on, under or about the Premises during the period of its occupancy of the Premises including, without limitation; (i) any Claim by a federal, state

11

or local Governmental agency or a private citizen arising out of or in any way connected with the environmental condition of the Premises; (ii) any Claim by any successor tenant, its agents, servants, employees, licensees, contractors, subtenants or concessionaires, arising out of or in any way connected with the environmental condition of the Premises; and (iii) the cost of any required or necessary repair, cleanup or detoxification and the preparation of any closure or other required plans in connection therewith. The indemnity obligations of Tenant under this Section shall survive the expiration or earlier termination of the term of this Lease.

## ARTICLE 14. DEFAULT AND REMEDIES

**Section 14.1.** **Events of Default.** Any one or more of the following occurrences shall constitute an event of default under this Lease by Tenant:

(a)     The failure of the Tenant to pay any Base Rent, operating expense charge, or additional rental or monetary obligation of any kind or nature due to Landlord hereunder within five (5) days after the same shall be due;

(b)     The bankruptcy or insolvency of the Tenant or any guarantor of this Lease, or the filing of any debtor proceedings, including petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or any portion of Tenant's or any such guarantor's property, or the making or assignment for the benefit of creditors, or the petitioning or entering into an arrangement by the Tenant or any guarantor of this Lease;

(c)     The falsification by the Tenant or an agent of the Tenant of any report required to be furnished to the Landlord pursuant to the terms of this Lease, or the repeated or intentional failure to document or record sales made on or from the Premises;

(d)     The vacation or abandonment by the Tenant of the Premises for a period of five consecutive (5) days;

(e)     The taking by any party of this Lease by writ of execution or similar process;

(t)     The failure of the Tenant to keep or perform any of the terms, conditions, covenants or agreements of this Lease covenanted and agreed to be observed or performed by Tenant, not otherwise specified as a default or event of default, for more than thirty (30) days after written notice of such default or violation shall have been given to Tenant, provided that if the default be of such a nature that it cannot be reasonably cured within said thirty day period, and Tenant shall in good faith have promptly commenced the curing of such default within such period, then Tenant shall be deemed not in default hereunder if it shall diligently proceed to cure such default within the grace period expressly allowed by Landlord in writing.

**Section 14.2.** **Remedies for Default.** In the event of the occurrence of an event of default, as defined in Section 14.1, in addition to all other rights and remedies available to Landlord under this Lease or under law, Landlord shall have the following remedies:

14.2.1.     At any time following an event of default, Landlord may, at Landlord's option, elect to terminate this Lease by written notice to Tenant specifying Landlord's intention to terminate this Lease, which notice may, but need not be, included in a notice of intention to evict or pleading in an eviction action. Notice of termination shall be served in writing, by facsimile, or any manner authorized for service of any pleading in a civil action.

12

Following service of the notice of termination, Tenant shall have the right to reinstate this Lease by paying to Landlord all fixed minimum rent, Percentage Rent, additional rentals, late charges and all other fees and charges payable under this Lease and curing all other events of default under this Lease, by no later than 11:59 pm of the third day following notice of termination. Landlord shall be under no obligation to reinstate this Lease if Tenant fails to cure all events of default within the time and in the manner required herein.

Unless Tenant reinstates this Lease in the time and in the manner provided above, termination of this Lease will be effective, without further notice and without the necessity of any legal suit or action, upon the expiration of the period Tenant is allowed to reinstate this Lease. Delivery of Landlord's notice of termination under this provision is intended to satisfy any common law requirements relating to service of notice of default or demand for payment of rents prior to terminating a lease, and no further notice to quit, vacate, demand or legal process shall be necessary to terminate this Lease, whether or not any additional notice may be required by law as a condition to obtaining a judicial order evicting Tenant from the Premises. Following the effective time of termination, Tenant shall have no further interest in the Premises or in this Lease, or any right to rents or profits generated by Landlord from the Premises and, subject to Landlord's right to recover damages under Section 14.3, Tenant shall not be liable to Landlord for fixed rent or additional rents which first accrue after the effective date of termination. Rents and other charges paid to Landlord for the post-termination use or occupancy of all or any portion of the Premises shall not reduce Tenant's obligations to pay all rents and other charges which accrued prior to the effective date of termination. No attempt by Tenant to cure defaults under this Lease following expiration of the time to cure defaults shall be valid.

**14.2.2.**     At any time following an event of default, Landlord, shall, at its option, have the immediate right to re-enter the Premises, without terminating the Lease. Should Landlord elect to re-enter, it may take such steps as it deems necessary to secure the Premises and to exclude Tenant and its agents and employees therefrom; make such alterations and repairs as may be necessary in order to relet the Premises; and relet the Premises or any part thereof, on behalf of Tenant, for such term or terms (which may be for a term extending beyond the term of this Lease) and at such rental and upon such other terms and conditions as Landlord, in its sole discretion, may deem advisable. Notwithstanding re-entry by Landlord, and until termination of this Lease, Tenant's obligations under this Lease shall remain in full force and effect and, unless Landlord has agreed to lease or otherwise convey all or any portion of the Premises, Tenant shall have the right to reinstate this Lease and retake possession of the Premises by curing all events of default and paying all late charges and legal fees due under this Lease. Any rents collected by Landlord following re-entry shall be applied as provided in Section 14.3.3. To the extent that for any month after re-entry, but prior to termination, Landlord receives net rents, as defined below, in excess of Tenant's rental obligation for such month, the excess shall be held by Landlord as security for Tenant's future obligations to Landlord under this Lease, and upon satisfaction of those obligations, shall be applied to the reduction of Tenant's past due obligations to Landlord.

Following re-entry, Landlord shall have no obligation to relet the Premises or otherwise mitigate Tenant's damages. In the event, notwithstanding this provision,  any court were to impose on Landlord the obligation to mitigate Tenant's damages subsequent to re-entry, Landlord may condition the reletting of the Premises on, among other reasonable conditions, any one or more of the following: i) the payment of a fair market  rate of rent for the Premises, whether or not that rate is in excess of the amounts reserved to Landlord under this Lease; ii) the compliance by the prospective tenant with the use clause and all other material covenants

and agreements in this Lease (except those which cannot legally be performed by anyone other than Tenant); iii) the making of repairs and improvements to the Premises necessary to place it in first-class condition; or iv) the provision of a security deposit or guaranty; or v) the satisfaction of all requirements Landlord could impose as a condition to approving Tenant's assignment of the Lease to any other party. Re-entry by Landlord solely for the purpose of securing the Premises and without any effort by Landlord to relet the Premises after Tenant's abandonment or vacation of the Premises, shall not impose any obligation on Landlord to mitigate damages.

**Section 14.3.    Recovery of Rent and Damages.** In addition to all other rights and remedies of Landlord provided by law and under this Lease, following an event of default, Landlord shall have the right to recover from Tenant, Tenant's successors and assigns, and any co-obligor, surety or guarantor, or other party legally responsible for Tenant's obligations under this Lease, jointly and severally, all or any portion of Tenant's obligations under this Lease in the following amounts:

> 14.3.1    All rent, late charges, legal fees, and all other charges owing by Tenant to Landlord under this Lease prior to the effective date of termination or re-entry; plus,

> 14.3.2    Damages subsequent to termination of the Lease equal the excess of all rent including any additional rents reserved under this Lease reduced to present value to the date of the termination, over the rental value of the Premises for the remaining term of this Lease; plus,

> 14.3.3    For any period subsequent to re-entry but prior to termination of this Lease all rent and any additional rents, late charges, legal fees and other charges reserved under this Lease, as defined below, accrued as of the date of judgment, less the net rentals received by Landlord from the reletting of all or any portion of the Premises, after deducting Landlord's costs of reletting the Premises, including without limitation, leasing commissions, brokerage fees, costs of repairs, improvements or modifications made to the Premises, legal fees, and other costs incurred by Landlord in reletting the Premises; plus,

> 14.3.4    All direct and consequential damages, cost, expense, or loss suffered by Landlord as a proximate result of the breach by Tenant of any provision of this Lease for which Landlord is not fully compensated under Sections 14.3.1 through 14.3.3, including, without limitation, portions of brokerage commissions, build-out expenses and construction allowances paid to Tenant relating to the remainder of the Term; plus,

> 14.3.5    Interest on all rents and damages at the rate provided in Section 14.4.

**Section 14.4.    Interest on Amount Overdue.** If any installment of Base Rent or additional rents, or any other amounts due hereunder from Tenant to Landlord shall not be received by Landlord within ten (10) days after the amount is due, Tenant shall pay the Landlord interest on the unpaid balance overdue at a rate equal to the maximum amount permitted to be charged by the Landlord to the Tenant under South Dakota law, or one and one-half percent per month on the overdue balance, whichever is less, plus any attorney's fees and other costs of collection as provided in this Lease. The charging or acceptance of such interest by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of its other rights and remedies granted hereunder.

**Section 14.5.    Legal Expense.** If any case, suit or proceeding shall be brought by Landlord for recovery of possession of the Premises, or recovery of any rents or any other amount due under this Lease, or otherwise as the result of the breach by Tenant of any other obligation under this Lease, and if such a breach shall be established, Tenant shall be required to pay to Landlord all expenses incurred as a result thereof,

14

including reasonable attorney's fees.

**Section 14.6.     Waiver of Default.** The waiver by Landlord of any breach of any term, covenant or condition herein contained or the doing of any matter or payment of any sum by Landlord not required of Landlord by the terms hereof shall not be deemed to be a waiver or amendment of that term, covenant or condition or of any subsequent breach of the same or any other term, covenant or condition herein. The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any existing or preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord's knowledge of such preceding or existing breach at the time of acceptance of such rent. No covenant, term or condition of this Lease shall be deemed to have been waived by Landlord, unless such waiver be in writing signed by Landlord.

**Section 14.7.     Option to Cure Default.** Landlord may, at its option, elect to cure at any time, without notice, (except as otherwise provided), any default by Tenant under this Lease; and whenever Landlord so selects, and if not otherwise expressly provided for in this Lease, all costs and expenses incurred by Landlord in curing a default, including, without limitation, reasonable attorney's fees, together with interest on the amount of costs and expenses so incurred at the rate of eighteen per cent (18%) per annum or the highest legal rate provided by law to be charged to Tenant, whichever is lower, shall be paid by Tenant to Landlord on demand, and shall be recoverable as additional rent.

**Section 14.8.     Accord and Satisfaction.** No payment by Tenant  or receipt  by Landlord  of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

**Section 14.9.     Remedies Cumulative.** All remedies provided by Landlord under this Lease are intended to be cumulative, and any one or more may be exercised by Landlord, at its option. The exercise by Landlord of any remedy reserved to Landlord under this Lease or provided by law is not intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be in addition to every other remedy now or hereafter existing at law, in equity or by statute.

## ARTICLE 15. SURRENDER OF PREMISES

**Section 15.1.     Tenant's Obligations.** At the expiration of Tenant's right to possession of the Premises, whether by expiration of the term of this Lease, surrender of the Premises by Tenant, or as a consequence of the occurrence of an event of default, Tenant shall surrender the Premises in as good condition and order as they were when Tenant took possession, ordinary wear and tear and damage by insurable casualty excepted, and shall return all keys for the Premises to Landlord and shall inform Landlord of all combinations on locks, safes and vaults, if any, in the Premises.  Tenant shall, at its expense, remove all its trade fixtures, furniture, equipment, signs, any alterations or improvements made by Tenant as to which Landlord shall have made the election as provided in Section 8.8, and all personal property before surrendering the Premises and shall repair any damage to the Premises caused thereby. After termination of this Lease, Tenant shall not use for any purposes the name or any trademark or service mark, if any, associated with the Facility.

**Section 15.2.     Landlord's Election.** In the event that Tenant fails to comply with the requirements of Section 15.1, Landlord shall be entitled to remove Tenant's property and remove and restore the Premises to the condition required by Section 15.1. Any fixtures and personal property remaining on the Premises

15

may be disposed of by Landlord in accordance with Section 15.4. Tenant shall be required to pay Landlord, as additional rent, the reasonable costs and expenses incurred by Landlord in removing Tenant's items and/or repairing and restoring the Premises and in any event caused by Tenant's failure to comply with Section 15.1, plus an administrative fee of fifteen percent (15%).

**Section 15.3.**    **Holding Over.** Any holding over after the expiration of the term of this Lease, with or without the consent of the Landlord shall, unless otherwise agreed by the parties in writing, be construed to be a tenancy from month to month at one and one-half times the rents herein specified (prorated on a monthly basis) and shall otherwise be on the terms and conditions herein specified, so far as applicable. If such holding over is without the consent of Landlord, Tenant shall be liable for all consequential damages resulting therefrom.

**Section 15.4.**    **Removal and Storage of Tenant's Property.** Following re-entry or termination of this Lease, Landlord may remove all persons and property from the Premises, and any property removed by Landlord may, in Landlord's sole discretion, be stored in a public warehouse or other location determined by Landlord at Tenant's expense. Upon seventy-two hours written notice to Tenant, all such property may be sold, leased, or otherwise transferred at Tenant's cost and for the account of the Tenant, all without service of notice or resort to legal process and without being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned thereby, and without such re-entry working a forfeiture of the rents due and to be paid or of the covenants, agreements, and conditions to be kept and performed by Tenant for the full term of this Lease. If Landlord, in its discretion, determines that the sale of any item or items of Tenant's property is not commercially viable, such property may be disposed of by Landlord in any manner it sees fit, including disposing of the property as waste. All costs and expenses incurred by Landlord with respect to Tenant's property left on the Premises shall be reimbursed and paid by Tenant. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the term of this Lease. The proceeds received by Landlord from the sale of any such property shall be applied by Landlord first to the costs of sale, storage, repair, improvement transportation and removal of all of Tenant's property left on the Premises, and then past due obligations of Tenant to Landlord under this Lease.

## ARTICLE 16. TRANSFER AND ASSIGNMENT

**Section 16.1.**    **Assignment by Tenant.** Tenant shall not voluntarily or by operation of law, assign, sublet, license, franchise, transfer, mortgage, or otherwise encumber all or any part of the Premises or Tenant's interest in this Lease (collectively for the purpose of this Article a "Transfer"), without the prior written consent of the Landlord, which consent shall not be unreasonably withheld. Any attempted or purported Transfer without Landlord's written consent shall be null and void, have no force or effect, and confer no rights upon any third party. Notwithstanding any assignment or subletting, the Tenant shall remain fully liable to Landlord under this Lease and shall not be released from the performance of any of its terms, covenants and conditions.

Notwithstanding anything to the contrary herein, Tenant may assign this Lease or any interest therein or sublet the Premises or any portion thereof, without Landlord's consent but with simultaneous notice to Landlord to a Related Party (as defined below); (herein called "Permitted Transactions"):

"Related Party" shall mean the Watertown Chamber of Commerce, Watertown Development Company, the Watertown Convention and Visitor's Bureau, the Watertown Community Foundation, or an entity whose purpose includes operation of the adjacent park.

**Section 16.2.**    **Landlord's Consent to Assignment.** Should Tenant desire to enter into a Transfer of this

16

Lease, Tenant shall give Landlord at least thirty (30) days prior written notice, which notice shall include: i) the full particulars of the proposed Transfer; and ii) a description of the identity, net worth and previous business experience of the proposed transferee, including, without limitation, copies of the proposed transferee's latest income, balance sheet and cash flow statements in audited form, if available; and iii) any further information relevant to the proposed Transfer which Landlord shall have requested within fifteen (15) business days after receipt of Tenant's notice. With respect to any such proposed Transfer, it shall not be unreasonable for Landlord to withhold its consent to a proposed Transfer of this Lease if, in Landlord's business judgment, any one or more of the following conditions or situations exist or may exist: i) if the financial strength of the proposed assignee or sublessee (sometimes a "Transferee"), including the adequacy of its working capital, is insufficient to pay all expenses anticipated in connection with the operation of the Premises; ii) if the proposed Transferee has not had successful experience in operating the business to be operated on the Premises; (iii) if the current net worth of the proposed Transferee is less than the greater of Tenant's net worth as of the date of this Lease or Tenant's net worth at the date of Tenant's request for Landlord's consent to such Transfer. In addition, Landlord shall be entitled to reasonable satisfaction that each and every covenant, condition or obligation imposed upon Tenant by this Lease and each and every right, remedy or benefit afforded Landlord by this Lease would not be impaired or diminished by such transfer.

**Section 16.3.    Further Transfers/Effect.** Notwithstanding any Transfer, the provisions of this Article shall apply to all further Transfers. No Transfer shall release or relieve the transferor from any tenant obligations under this Lease, but the successor/assign shall become jointly and severally liable therefore.

**Section 16.4.    Assignment or Transfer by Landlord,** In the event of the bona fide sale or other transfer of Landlord's interest in the Commercial Center, the Landlord herein named (and in case of any subsequent transfers, the then granter or transferor) shall have no further liability and obligations of Landlord hereunder, except any that may have accrued prior to the sale and transfer, provided any prepaid rent and the Security Deposit, if any, is transferred or credited to such purchaser, assignee or transferee. Notwithstanding anything to the contrary contained in this Lease, it is specifically understood and agreed that there shall be absolutely no personal liability on the part any partner, stockholder, officer, director or trustee of Landlord or any successor in interest of Landlord, with respect to any of the terms, covenants and conditions of this Lease, and that Tenant shall look solely to the estate and interest of Landlord (or such successor in interest of Landlord) on the Facility for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord or by such successor in interest of any of the terms, covenants and conditions of this Lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever. No judgment against Landlord may be satisfied other than from Landlord's interest in the Facility.

## ARTICLE 17. OTHER TENANT OBLIGATIONS

**Section 17.1.    Rules and Regulations,** Landlord reserves the right to promulgate such reasonable rules and regulations relating to the Premises, Common Areas and facilities and the Facility and any part or parts thereof, including hours of operation and employee parking, as Landlord may deem appropriate and for the best interests of the tenants. Tenant agrees to abide by such rules, which shall be uniformly applied, and to cooperate in their observance. Landlord shall also have the authority to establish in the rules and regulations reasonable fines and penalties for violations of the rules and regulations applicable to tenants of the Facility. The rules and regulations, and any amendments or additions that may be made from time to time, shall be effective and become binding upon Tenant upon delivery of a copy of them to Tenant. Tenant shall be responsible for compliance by its employees, agents and contractors with all rules and regulations adopted by Landlord.

17

## ARTICLE 18. PROTECTION OF LENDERS

**Section 18.1.    Estoppel Certificate.** Landlord and Tenant each agree that they will, at any time and from time to time, within ten (10) business days following written notice by the other party hereto specifying that it is given pursuant to this provision, execute, acknowledge and deliver to the party who gave such notice a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified, and stating the modifications), and the dates to which the rent and any other payments due hereunder from Tenant have been paid in advance, if any, and stating whether or not, to the best of knowledge of the signer of such certificate, the other party is in default in performance of any covenant, agreement or condition contained in this Lease, and, if so, specifying each such default of which the signer may have knowledge.

The failure of either party to execute, acknowledge and deliver to the other a statement in accordance with the foregoing provisions within the ten (10) day period shall constitute an acknowledgement by the party given such notice, which may be relied on by any person holding or proposing to acquire an interest on the Facility or the Premises or this Lease from or through the other party, that this Lease is unmodified and in full force and effect and that the rent has been duly and fully paid to and including the respective due dates immediately preceding the date of such notice and shall constitute, as to any person entitled as aforesaid to rely upon such statements, a waiver of any default which may exist prior to the date of such notice.

**Section 18.2.    Attornment.** Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of power of sale under, any mortgage or deed of trust made by Landlord covering the Premises, attorn in writing to the mortgagee or purchaser at such foreclosure sale and recognize such purchaser as Landlord under this Lease.

## ARTICLE 19. SECURITY DEPOSIT

In conjunction with the execution of this Lease, Tenant will deposit with the Landlord the sum specified in Section 1.12 as security for payment of Base Rent, and all additional rents owing under this Lease, and the faithful performance by Tenant of all the terms, covenants, and conditions of this Lease to be kept and performed by said Tenant during the term hereof. Said deposit shall be held by the Landlord in an interest-bearing account at the rate allowed for passbook savings established for security deposits. If at any time during the term of this Lease any of the rent herein reserved shall be overdue and unpaid, or any other sum payable by Tenant to Landlord hereunder shall be overdue and unpaid, then Landlord may, at its option, appropriate and apply any portion of said deposit to the payment of any such overdue rent or other sum. Also, Landlord, at its option, may appropriate and apply all or part of said deposit, as necessary, to compensate Landlord for loss or damage sustained or suffered by it due to any breach, default, or neglect of Tenant to keep or perform any of the terms, covenants and conditions of this Lease. Should the entire deposit, or any portion, be appropriated and applied by Landlord as provided herein, then Tenant shall, upon written demand, forthwith remit to Landlord a sufficient amount in cash to restore the security to the original sum deposited and Tenant's failure to do so within five (5) days after receipt of such demand shall constitute a breach of this Lease. Should Tenant comply with all of said terms, covenants and conditions and promptly pay all of the rental as it falls due, and all other sums payable by Tenant to Landlord under this Lease, the said deposit shall be returned in full to Tenant at the end of the term of this Lease, or upon its earlier termination as provided herein.

## ARTICLE 20. OTHER PROVISIONS

**Section 20.1.    Additional Rents.**  In addition to Base Rent, Percentage Rent and additional rents, if any, Tenant agrees that all other sums of money or charges required to be paid by Tenant under the provisions of this Lease, shall be deemed to be and shall become additional rent, whether or not the same be designated as such, and shall be included in the term "rent" wherever used in this Lease. If such amounts are not paid by Tenant at the time provided in this Lease, they shall nevertheless be collectible from Tenant as additional rent with the next installment of rent thereafter falling due hereunder, but nothing herein contained shall be deemed to suspend or delay the payment of any sum at the time it becomes due and payable hereunder, or limit any other remedy of the Landlord.

**Section 20.2.    Excuse for Non-Performance.**  Anything in this Lease to the contrary notwithstanding, if performance of any act or obligation is prevented or delayed by Act of God, war, labor disputes, fire, windstorm, explosion, collapse of structure, riot, government regulation, delays by government bodies or any other cause or causes beyond the reasonable control of Landlord or Tenant (except those unlisted causes relating to the financial status of Landlord or Tenant or general economic conditions), the time for the performance of the act or obligation will be extended for the period that such act or performance is delayed or prevented by any such cause. This provision shall not operate to excuse Tenant from prompt payment of Base Rent, additional rent or any other payments required by the terms of this Lease.

**Section 20.3.    Successors.**  All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the respective heirs, executors, administrators, successors, and assigns of the said parties; and if there shall be more than one tenant, they shall all be bound jointly and severally by the terms, covenants, conditions and agreements herein. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing or does not require approval hereinbefore provided.

**Section 20.4.    Entire Agreement.**  This Lease and the exhibits now or hereafter attached (as provided herein) and forming a part hereof, set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises or matters related thereto, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

**Section 20.5.    Net Lease.**  Except as expressly otherwise provided  herein, it is intended that the  rent provided for herein shall be an absolute net return to Landlord for the term of this Lease without any abatement or offset whatsoever and Tenant's use and occupancy of the Premises shall be free of any expenses or charges whatsoever to Landlord with respect to the Premises, including, but not limited to, all insurance premiums, all utility charges, all truces and other similar assessments, all restoration, repairs and maintenance, and all other costs of, and with respect to, the Premises.

**Section 20.6.    No Partnership Relation.**  Landlord is not intended to be in any way or for any purpose a partner of Tenant in the conduct of its business, or otherwise, or joint adventurer, or a member of a joint enterprise with Tenant.

**Section 20.7.    Notices.**  Any notice, demand, request or other instrument  required  to be given under this Lease shall be delivered in person to a director, partner, officer, or local manager or assistant manager, or sent by United States certified mail, postage prepaid, return receipt requested, and addressed: (a) if to Landlord, at Landlord's address specified in Article 1 or at such other address as it may designate by written notice, and (b) if to Tenant, at the address specified  in Article I, or such other address as Tenant shall

designate by written notice. Unless otherwise specifically provided in this Lease, all notices will be effective on: i) the date they are personally delivered to the other party; ii) two days after the date they are deposited in the mails.

**Section 20.8.**    **Captions.**  The captions used as headings for the various subject matters appearing in this Lease are used only as a matter of convenience to help find subject matters and are not to be construed as part of the Lease provisions nor in determining the intent of the parties to this Lease.

**Section 20.9.**    **Submission of Lease Form.** The submission of this Lease or any part hereof to Tenant or Tenant's attorneys or agents for examination does not constitute a reservation of, or an option for the lease of the Premises. This Lease shall become effective only upon: i) execution hereof by both Landlord and Tenant; ii) the receipt of fully executed counterparts hereby by both Landlord and Tenant; iii) the satisfaction of any other conditions precedent to this Lease which may be specified herein; and iv) the execution of any guaranty of Tenant's obligations required in connection with this Lease and the delivery of the same to Landlord. If Tenant is or will be a corporation, the persons or person executing this Lease on behalf of Tenant hereby represent(s) and warrant(s) that Tenant is a corporation duly incorporated in South Dakota or, if Tenant is a foreign corporation, Tenant is a corporation in good standing under the laws of the state of its  incorporation and is duly authorized to do business in South Dakota, and that the person(s) executing and delivering this Lease on behalf of Tenant is or are an officer or are officers of the Tenant, fully authorized by all required corporate action to execute this Lease and deliver the same to Landlord. Upon request of Landlord, Tenant shall deliver to Landlord instruments reasonably satisfactory to Landlord evidencing compliance with the foregoing provisions of this Section 20.9. In the event Tenant is a partnership, the persons executing this Lease on behalf of Tenant hereby represent and warrant that Tenant is duly organized and validly existing and is qualified to do business in South Dakota and such persons are duly authorized to execute and deliver this Lease on behalf of the partnership.

**Section 20.10.** **Brokerage.** Each of the parties represents and warrants that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, and each of the parties agrees to indemnify the other against, and hold it harmless from, all liabilities arising from any such claim (including, without limitation, the cost of attorney's fees in connection therewith).

**Section 20.11.** **Severability.** If any term, covenant or condition of this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to person or circumstances other than those in respect to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**Section 20.12.** **Survival of Obligations.** Tenant expressly agrees that all provisions of this Lease which contemplate performance by Tenant after the expiration of the term or the earlier termination of this Lease, shall survive the expiration or earlier termination of this Lease.

**Section 20.13.** **No Option.** The submission of this Lease for examination does not constitute a reservation of or option for the Premises and this Lease becomes effective as a Lease only upon execution and delivery thereof by Landlord and Tenant.

**Section 20.14.** **Recording.** Tenant shall not record this Lease without the written consent of Landlord.

IN WITNESS WHEREOF, Landlord and Tenant have signed this Lease as of the day and year first above written.

LANDLORD
The Ruins LLC

Jesse Craig
Managing Member

TENANT
City of Watertown, SD

Amanda Mack
City Manager

ATTEST

Kristen Bobzien
Finance Officer

21

**LIST OF EXHIBITS**

Exhibit 1: Landlord's Work

Exhibit 2: Verification of Term, Floor Area

Exhibit 3: Commercial Center Site Plan

Exhibit 4: Lease Restrictions

Exhibit 5: Sign Criteria

Exhibit 6: Rules and Regulations

## EXHIBIT 1

### LANDLORD'S WORK

Landlord will complete construction of the Premises. Interior improvements for which landlord is responsible include epoxy floor cover, electric baseboard heat, base, trim, doors, toilets, urinals, sinks, interior partition walls, painting, wall cover, casework, miscellaneous ductwork for all areas, and electrical work from the electric service panels.

**Building Exterior Description**

- Clear anodized aluminum store front with 3'x7' wide stile doors w/ panic bars at each lease space.
- Painted hollow metal rear service doors with panic bar hardware.
- Exterior finish of brick and EIFS.
- Powder coat steel awnings on front and sides of building. Sidewalks along the front, side and rear of buildings.
- Landscaping as generally depicted in the drawings.

**Building Interior Description**

- 4" interior slab on compacted granular fill.
- Water and sewer stubbed into space.
- Exterior walls insulated with vapor barrier.
- General fire suppression system.
- Alterations needed for fit-up of lease space is by tenant.

**Electrical Description**

- Landlord to provide tenant with a 200 amp single phase panel in each lease space. Exit signs and general exterior building lighting.
- All additional electrical work and distribution by tenant.
- Distribution by tenant.

All other work not described above is Tenant responsibility. Tenant responsibilities include, but are not limited to, bathroom stalls, lighting, toilet paper holders, and paper towel dispensers.

# EXHIBIT 2

### VERIFICATION OF TERM - FLOOR AREA



**EXHIBIT 3**

MECH/ELEC.

WARMING AREA

FAMILY REST.

WOMEN'S

MEN'S

RENTAL OFFICE

PARCEL ROOM

1200 SF

2
PLAN

②  ENLARGED WARMING AREA
    1/8" = 1'-0"

①  FIRST FLOOR PLAN - WARMING AREA
    3/64" = 1'-0"



STROH
ARCHITECTS + INTERIORS

09/30/21

THE RUINS
CRAIG PROPERTIES

PLAN

## EXHIBIT 4

## LEASE RESTRICTIONS

**A.    Use Restrictions.** Even if otherwise a permitted use under the Lease, Tenant's use and occupancy of the Premises shall be further restricted by the following, provided the following shall not be deemed to grant permitted uses beyond those set forth in Section 1.8 of the Lease.

1.    Tenant shall use the Premises only for those "permitted uses" under the City of Watertown in General Commercial zoning classifications, as such classifications exist as of the date of this Declaration, without regard to conditional uses (the "Zoning Standard"). Only such uses, structures, signs and other improvements that are permitted under the Zoning Standard, without regard to variances and otherwise permitted herein or in the Lease, shall be permitted.

2.    No portion of the Premises may be used or occupied for: any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, or objectionable noise or sound (other than that resulting from temporary construction or repairs undertaken in the manner authorized by this Lease), which is a public or private nuisance.

3.    No oil drilling, oil development operations, oil refining, quarrying or mining operations of any kind shall be permitted upon or in any lot nor shall oil wells, tanks, tunnels, mineral excavations or shafts be permitted upon or in the Premises. No derrick or other structure designed for use in boring for oil or natural gas shall be erected, maintained or located upon the Premises.

4.    The Premises shall not be used or occupied as an adult bookstore displaying or a store selling or exhibiting pornographic materials. As used herein, "an adult book store or a store selling or exhibiting pornographic materials" shall include, without limitation, a for sale or exhibition books, magazines or other publications containing any combination or photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing independently or in conjunction with another device, machine or equipment, an image or series or images, the content of which has been rated "X" by the Motion Picture Rating Association, or any successor thereto.

5.    No portion of the Premises shall be used or occupied as: a so-called "head shop"; a bowling alley; a billiard or bingo parlor or any establishment conducting games of chance or permitting gambling of any kind; a sales office, showroom, dealership, or storage facility for boats, automobiles or other vehicles, except there shall be no prohibition against the keeping of occupant-owned vehicles, incident to an otherwise permitted use; a business primarily involved in the repair or maintenance of vehicles, boats or recreational vehicles; a movie theater of any kind (this shall not prohibit playing of movies or videos incidental to an authorized use); a pawn shop; a dry cleaning or laundry plant (except for an establishment which receives and dispenses items for laundry and/or dry cleaning but the processing of such items is done elsewhere); a funeral parlor; training or educational businesses, except that training and education incidental to an otherwise permitted use is allowed; an on-site, customer participatory exercise or sports facility (including, without limitation, karate or other martial arts facilities, gymnasiums and health/fitness clubs), other than as incidental to a business for the retail sales of exercise equipment; a massage parlor; a discotheque; manufacturing or warehouse (excluding assembly or warehousing incidental to the operation of a permitted retail use); a bar, tavern, nightclub, or similar establishment; a recycling facility or stockyard; any medical or other facility in which human abortions are performed; a firearms shooting gallery; a hotel/motel; an off-track betting establishment; a house of worship; an amusement arcade or game room; a thrift or good will shop; a junkyard or salvage facility for motor

vehicles, boats or recreational vehicles; a so-called "flea market"; dumping, disposing or reduction of garbage (exclusive of garbage compactors and/or dumpsters placed and used pursuant to the Lease); any animal raising or boarding facilities; mobile home park, trailer court, labor camp or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction or maintenance). Notwithstanding anything in this Paragraph to the contrary, if the permitted uses in the Lease for the Premises allow an establishment that sells food or food and alcoholic beverages, no prohibitions against gambling of any sort, dancing or the presence of amusement arcades or game rooms shall apply to any such establishment.

**B.**    **Signage.** Even if otherwise permitted under the Lease, the following restrictions shall apply to all of Tenant's signage in or about the Premises and the Facility, provided the following shall not be deemed to grant signage rights beyond those set forth elsewhere in the Lease.

1.    Signs located on the exterior wall of the Premises shall extend no more than 18 inches horizontally from the building and shall not extend above the façade.

2.    Signs shall be identity-only signs that permanently identify only the name of the Tenant, the firm, the major enterprise or the products/services offered for sale, or a combination of these, on the Premises on which the sign is located.

3.    No Portable Sign shall be allowed on the Facility.  A "Portable Sign" is a sign that is constructed so as to be movable, either by skids, wheels, truck or other conveyance and any sign which does not have a permanent foundation or is otherwise permanently affixed to the ground and/or a structure permanently affixed to the ground. A sign that has been on a trailer does not cease to meet the definition of a Portable Sign solely because the wheels or undercarriage are removed. Neither does a sign that is movable fail to meet the definition of a Portable Sign solely because the sign is anchored by means of concrete blocks, sandbags, or other types of temporary anchors.

4.    If lighted by an external light source, signs shall have a concealed light source.

## EXHIBIT 5

### SIGN CRITERIA

Each Tenant is required to design, fabricate, install and maintain a sign on the storefront. We encourage the Tenant to develop their individual store signs in an imaginative and varied manner. A variety of signs contributes to the vitality of the shopping environment.

    a.  TENANT SIGNS-FASCIA MOUNTING.

        1.  Fascia mounted Signage can be either:

            a.  Individual illuminated letters, on exposed raceway, between 12" and 18".
            b.  Individual letter, non-illuminated, 'Minnesota Letters' injection molded by Gemini Sign Co., between 12" and 18".
            c.  A maximum width of 8' or 75% of the sign band width, whichever is greater.

        2.  Signage shall be limited to the Tenant's trade name, logo and decorative treatment.

        3.  Sign shall be operated by a 24-hour clock, with operating times determined by the Landlord.

### TENANT REQUIREMENTS

1.  Electrical service to Tenant's sign shall be installed by the Tenant and not be part of Landlord's operating costs.

2.  The Tenant shall be fully responsible for the operation of the Tenant's sign contractor.

3.  The Tenant shall obtain the required sign permit from the City of Watertown.

4.  The Tenant shall maintain all signs and ensure they are fully lighted at all times, and if the signs are not properly maintained after notice is provided by Landlord, Landlord may repair the signs and charge Tenant for such expenses. Tenant shall pay Landlord for any invoices received from Landlord for sign repairs within ten (10) days after receiving the invoice from Landlord.

### SIGN CONSTRUCTION REQUIREMENTS

1.  Shop Drawings: The Tenant's sign drawings shall include the following items:
    a.  Exterior elevation of storefront.
    b.  Size specifications.
    c.  Color and materials.
    d.  Location of all openings for conduits and sleeves in building wall.
    e.  Method of illumination, color and wattage.
    f.  Placement on the storefront elevations.
2.  Landlord's written approval of Tenant prepared sign drawings and a specification is mandatory. The Landlord reserves the right to reject any sign design which, in his sole opinion, is not compatible with the aesthetics of the Facility.

3. No signmaker's label or other identifications shall be permitted on the exposed surface of the sign.

4. The sign contractor shall repair all damage to any area caused by his work.

5. No exposed crossovers, conduit conductors, ballast boxes or transformers, etc. will be permitted.

6. All signs, bolts, fastenings and clips shall be of hot-dipped galvanized iron, stainless steel, aluminum, brass, or bronze.

7. If exposed raceways are used, they shall be painted to match the sign banner.

**EXHIBIT 6**

**RULES AND REGULATIONS**

1.      All loading and unloading of goods shall be done only at such times, in the areas, and through the entrances, designated for such purposes by Landlord.

2.      The delivery or shipping of merchandise, supplies and fixtures to and from the Premises shall be subject to such rules and regulations as in the judgment of Landlord are necessary for the proper operation of the Premises or Facility.

3.      All garbage and refuse shall be kept in the kind of container specified by Landlord, and shall be placed outside of the Premises, prepared for collection in the manner and at the times and places specified by Landlord. If Landlord shall provide or designate a service for picking up or recycling refuse and garbage, Tenant shall use same. Tenant shall pay Landlord a reasonable charge to reimburse Landlord for all additional costs incurred as a consequence of Tenant's failure to properly sort and deposit its refuse in designated containers.

4.      No radio or television or other similar device shall be installed without first obtaining in each instance Landlord's consent in writing. No aerial shall be erected on the roof or exterior walls of the Premises or on the grounds, without in each instance, the written consent of Landlord. Any aerial so installed without such written consent shall be subject to removal at any time without notice and at Tenant's expense.

5.      No loud speakers, televisions, phonographs, radios or other devices shall be used in a manner so as to be heard or seen outside of the premises without the prior written consent of Landlord.

6.      If the Premises is equipped with heating facilities separate from those in the remainder of the Facility, Tenant shall keep the Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

7.      The outside areas immediately adjoining the Premises shall be kept clean and free from snow, ice, dirt and rubbish by Tenant to the satisfaction of Landlord, and Tenant shall not place or permit any obstructions or merchandise in such areas. This requirement does not include any City of Watertown ordinance requirement to keep clear the sidewalks as such obligation is the obligation of the Landlord.

8.      Tenant and its employees shall park their cars only in areas specifically designated for that purpose from time to time by Landlord. In no event shall Tenant's employees park in any space immediately adjacent to the Facility. Tenant's employees shall park only in parking spaces on the perimeter of the Facility and Landlord may, from time to time, further restrict and designate which perimeter parking spaces shall be used for Tenant employee parking. Tenant shall furnish Landlord with automobile license numbers assigned to Tenant's car and the cars of its employees, within five days after taking possession of the premises and shall thereafter notify Landlord of any changes within five days after they occur. Tenant  agrees to cause its employees to park only in the areas designated for employee parking, and if, after a prior notice of violation, Tenant or its employees fail to park their cars in the designated areas, then at Landlord's election: i) such cars may be removed therefrom by Landlord or its agents and stored elsewhere at Tenant's expense and without liability of Landlord for such removal; ii) Landlord may place a device which temporarily disables the offending vehicle and charge Tenant; and iii) Landlord may assess Tenant a fine of up to $25, which amount shall be paid as additional rent.

9.      The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by Tenant, who shall, or whose employees, agents or invitees shall have caused it.

10.      Tenant shall use at Tenant's cost such pest extermination contractor as Landlord may direct and at such intervals as Landlord may require.

11.      Tenant shall not burn any trash or garbage of any kind in or about the leased premises, the Facility, or within one mile of the outside property lines of the Facility.

12.      Tenant and its employees and agents shall not solicit business in the parking or other Common Areas, nor shall Tenant distribute any handbills or other advertising matter on automobiles parked in the parking area or in other Common Areas.

13.      No flammable or combustible material shall be kept in, on or about the leased premises except as may be permitted to be kept in such locations and containers as specified by Landlord from time to time in accordance with the recommendations or regulations of Landlord's insurance carrier, underwriter or appropriate governmental authority.

14.      These rules and regulations are adopted to set forth in writing the present rules and regulations of Landlord relating to the Facility. Landlord reserves the right to amend, add to or delete any policy, or repeal these rules and regulations and to adopt new policies at any time

# Addendum B

## Client Contract Information

VALUATION & ADVISORY SERVICES

# Proposal and Contract for Services



CBRE, Inc.
7405 S. Bitterroot Pl, #114
Sioux Falls, SD 57108
www.cbre.us/valuation

**Josh Luther, MAI**
VAS - Vice President

April 16, 2025

Charles Aarestad
Executive Vice President
**RED RIVER STATE BANK**
300 2nd Avenue West
Halstad, MN 56548
Phone: 218-456-2187
Email: charles.aarestad@redriverbank.com

RE: Assignment Agreement | CB25US038368
Residential
The Ruins,
E 315 E Kemp
Watertown, SD 57201

Dear Mr. Aarestad:

CBRE, Inc. ("CBRE") is pleased to submit this proposal and our Terms and Conditions for this assignment.

PROPOSAL SPECIFICATIONS

| | |
|---|---|
| Purpose: | To estimate the Market Value of the referenced real estate |
| Premise: | As Is, As Complete, and As Stabilized |
| Rights Appraised: | Fee Simple |
| Intended Use: | Litigation Support |
| Intended User: | The intended user is RED RIVER STATE BANK ("Client"), and such other parties and entities (if any) expressly recognized by CBRE as intended users (each an "Intended Users" and collectively the "Intended Users") provided that any Intended User's use of, and reliance upon, any report produced by CBRE under this Agreement shall be subject to the Terms and Conditions attached hereto and incorporated herein (including, without limitation, any limitations of liability set forth in the attached Terms and Conditions). |
| Reliance: | Reliance on any reports produced by CBRE under this Agreement is extended solely to parties and entities expressly acknowledged in a signed writing by CBRE as Intended Users of the respective reports, provided that any conditions to such acknowledgement required by CBRE or hereunder have been satisfied. Parties or entities other than Intended Users who obtain a copy of the report |

VALUATION & ADVISORY SERVICES
## Proposal and Contract for Services



or any portion thereof, whether as a result of its direct dissemination or by any other means, may not use or rely upon any opinions or conclusions contained in the report or such portions thereof, and CBRE will not be responsible for any unpermitted use of the report, its conclusions or contents or have any liability in connection therewith.

Unless otherwise expressly identified in this Agreement, there are no third-party beneficiaries of this Agreement pertaining to this appraisal assignment or any reports produced by CBRE under this Agreement, and no other person or entity shall have any right, benefit or interest under this Agreement or with respect to any reports produced by CBRE under this Agreement.

| | |
|---|---|
| Scope of Inspection: | A full interior and exterior inspection of the property will be conducted and arranged with the property contact and performed by CBRE Valuations. |
| | If this expected property inspection is not possible due to unforeseen issues (such as lack of on-site personnel cooperation, physical obstructions, or appraiser/property contact health and safety concerns), the client will be promptly advised. The client may continue this assignment based on other inspection options agreed upon by CBRE and client or provide CBRE with a written notice to cancel. If CBRE determines that a credible appraisal result cannot be achieved due to inspection limitations, it will promptly provide the client with a written cancellation of this assignment. |
| Valuation Approaches: | All three traditional approaches to value will be considered. |
| Report Type: | Appraisal Report |
| Appraisal Standards: | USPAP/FIRREA |
| Appraisal Fee: | $6,750.00. If cancelled by either party before a completion, the fee will be based on CBRE's hourly rates for the time expended; plus actual expenses. |
| Expenses: | Fee includes all associated expenses except to the extent otherwise provided in the attached Terms and Conditions. |
| Retainer: | A retainer is not required for this assignment. |
| Payment Terms: | Final payment is due upon delivery of the final report or within thirty (30) days of your receipt of the draft report, whichever is sooner. The full appraisal fee is considered earned upon delivery of the draft report. We will invoice you for the assignment in its entirety at the completion of the assignment. |
| Delivery Instructions: | CBRE encourages our clients to join in our environmental sustainability efforts by accepting an electronic copy of the report. |
| | An Adobe PDF file via email will be delivered to **charles.aarestad@redriverbank.com.**The client has requested 0 bound final copy (ies). |
| Delivery Schedule: | |
| Final Report: | On or before 05/30/2025 |

VALUATION & ADVISORY SERVICES
## Proposal and Contract for Services



| | |
|---|---|
| Start Date: | The appraisal process will start upon receipt of your signed agreement and the property specific data. |
| Acceptance Date: | These specifications are subject to modification or withdrawal if this proposal is not accepted within 5 business days from the date of this letter. |
| | When executed and delivered by all parties, this letter, together with the Terms and Conditions and the Specific Property Data Request attached hereto and incorporated herein, will serve as the Agreement for appraisal services by and between CBRE and Client. Each person signing below represents that it is authorized to enter into this Agreement and to bind the respective parties, including all intended users, hereto. |

VALUATION & ADVISORY SERVICES
## Proposal and Contract for Services



We appreciate this opportunity to be of service to you on this assignment. If you have additional questions, please contact us.

Sincerely,
**CBRE, Inc.**
**Valuation & Advisory Services**

Josh Luther, MAI
VAS - Vice President
As Agent for CBRE, Inc.
T +1 605-201-0684
Josh.Luther@cbre.com

Enclosures:

| PROPERTY LIST | | | |
|---|---|---|---|
| **Property Name** | **Property Location** | **Report Type** | **Appraisal Fees** |
| The Ruins | E 315 E Kemp, Watertown, SD 57201 | Appraisal Report | $6,750.00 |
| **Assignment Total:** | | | **$6,750.00** |

VALUATION & ADVISORY SERVICES
**Proposal and Contract for Services**



## AGREED AND ACCEPTED

**FOR RED RIVER STATE BANK ("CLIENT"):**

_____     **4. 16. 2025**_____
Signature                                                         Date

Charles Aarestad_____     Executive Vice President_____
Name                                                            Title

218-456-2187_____     charles.aarestad@redriverbank.com___
Phone Number                                              E-Mail Address

## ADDITIONAL OPTIONAL SERVICES

Assessment & Consulting Services: CBRE's Assessment & Consulting Services group has the capability of providing a wide array of solution-oriented due diligence services in the form of property condition and environmental site assessment reports, ALTA Surveys, and other necessary due diligence service (seismic risk analysis, zoning compliance service, construction risk management, annual inspections, etc.).Initial below if you desire CBRE to contact you to discuss a proposal for any part or the full complement of consulting services, or you may reach out to us at ACSProposals@cbre.com. We will route your request to the appropriate manager. For more information, please visit www.cbre.com/assessment.

VALUATION & ADVISORY SERVICES
## Proposal and Contract for Services



# TERMS AND CONDITIONS

1.  The Terms and Conditions herein are part of an assignment agreement (the "Agreement") for appraisal services ("Services") between CBRE, Inc. ("CBRE") and the client signing this Agreement and for whom the Services will be performed (the "Client") for the property identified herein (the "Property") and shall be deemed a part of such Agreement as though fully set forth therein. In addition, with respect to any appraisal report prepared by CBRE pursuant to the Agreement (the "Report"), any use of, or reliance on, the Report by any Intended User constitutes acceptance of these Terms and Conditions as well as acceptance of all qualifying statements, limiting conditions, and assumptions stated in the Report. The Agreement shall be governed and construed by the laws of the state where the CBRE office executing this Agreement is located without regard to conflicts of laws principles.

2.  Client shall be responsible for the payment of all fees stipulated in this Agreement. Payment of the fees and preparation of the Report are not contingent upon any predetermined value or on any action or event resulting from the analyses, opinions, conclusions, or use of the Report. Final payment is due as provided in the Proposal Specifications Section of this Agreement. If a draft Report is requested, the fee is considered earned upon delivery of the draft Report. It is understood that the Client may cancel this assignment in writing at any time prior to delivery of the completed Report. In such event, the Client is obligated to pay CBRE for the time and expenses incurred (including, but not limited to, travel expenses to and from the job site) prior to the effective date of cancellation, with a minimum charge of $500. Hard copies of the Reports are available at a cost of $250 per original color copy and $100 per photocopy (black and white), plus shipping fees of $30 per Report.

3.  If CBRE is subpoenaed or ordered to give testimony, produce documents or information, or otherwise required or requested by Client or a third party to participate in meetings, phone calls and conferences (except routine meetings, phone calls and conferences with the Client for the sole purpose of preparing the Report), litigation, or other legal proceedings (including preparation for such proceedings) because of, connected with or in any way pertaining to this assignment, the Report, CBRE's expertise, or the Property, Client shall pay CBRE's additional out-of-pocket costs and expenses, including but not limited to CBRE's reasonable attorneys' fees, and additional time incurred by CBRE based on CBRE's then-prevailing hourly rates and related fees. Such charges include and pertain to, but are not limited to, time spent in preparing for and providing court room testimony, depositions, travel time, mileage and related travel expenses, waiting time, document review and production, and preparation time (excluding preparation of the Report), meeting participation, and CBRE's other related commitment of time and expertise. Hourly charges and other fees for such participation will be provided upon request. In the event Client requests additional Services beyond the scope and purpose stated in the Agreement, Client agrees to pay additional fees for such services and to reimburse related expenses, whether or not the completed Report has been delivered to Client at the time of such request.

4.  CBRE shall have the right to terminate this Agreement at any time for cause effective immediately upon written notice to Client on the occurrence of fraud or the willful misconduct of Client, its employees or agents, or without cause upon 5 days written notice.

5.  In the event Client fails to make payments when due then, from the date due until paid, the amount due and payable shall bear interest at the maximum rate permitted in the state where the CBRE office executing this Agreement is located. **EACH PARTY, AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE, KNOWINGLY AND VOLUNTARILY, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION IN ANY WAY RELATED TO THIS AGREEMENT.**

6.  CBRE assumes there are no major or significant items or issues affecting the Property that would require the expertise of a professional building contractor, engineer, or environmental consultant for CBRE to prepare a valid Report hereunder. Client acknowledges that such additional expertise is not covered in the fee and agrees that, if such additional expertise is required, it shall be provided by others at the discretion and direction of the Client, and solely at Client's additional cost and expense.

VALUATION & ADVISORY SERVICES
**Proposal and Contract for Services**



7.   Client acknowledges that CBRE is being retained hereunder as an independent contractor to perform the Services described herein and nothing in this Agreement shall be deemed to create any other relationship between Client and CBRE.  Unless otherwise stated in this Agreement, Client shall not designate or disclose CBRE or any of its agents or employees as an expert or opinion witness in any court, arbitration, or other legal proceedings without the prior written consent of CBRE.

8.   This assignment shall be deemed concluded and the Services hereunder completed upon delivery to Client of the Report discussed herein.

9.   All statements of fact in the Report which are used as the basis of CBRE's analyses, opinions, and conclusions will be true and correct to CBRE's actual knowledge and belief.  CBRE does not make any representation or warranty, express or implied, as to the accuracy or completeness of the information or the condition of the Property furnished to CBRE by Client or others. TO THE FULLEST EXTENT PERMITTED BY LAW, CBRE DISCLAIMS ANY GUARANTEE OR WARRANTY AS TO THE OPINIONS AND CONCLUSIONS PRESENTED ORALLY OR IN ANY REPORT, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE EVEN IF KNOWN TO CBRE.  Furthermore, the conclusions and any permitted reliance on and use of the Report shall be subject to the assumptions, limitations, and qualifying statements contained in the Report.

10.  CBRE shall have no responsibility for legal matters, including zoning, or questions of survey or title, soil or subsoil conditions, engineering, or other similar technical matters.   The Report will not constitute a survey of the Property analyzed.

11.  Client shall provide CBRE with such materials with respect to the assignment as are requested by CBRE and in the possession or under the control of Client.  Client shall provide CBRE with sufficient access to the Property to be analyzed, and hereby grants permission for entry unless discussed in advance to the contrary.

12.  The data gathered in the course of the assignment (except data furnished by Client, "Client Information") and the Report prepared pursuant to the Agreement are, and will remain, the property of CBRE.  With respect to Client Information provided by Client, CBRE shall not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential and proprietary Client Information furnished to CBRE.  Notwithstanding the foregoing to the contrary, CBRE is authorized by Client to disclose all or any portion of the Report and related data as may be required by applicable law, statute, government regulation, legal process, or judicial decree, including to appropriate representatives of the Appraisal Institute if such disclosure is required to enable CBRE or its employees and agents to comply with the Bylaws and Regulations of the Appraisal Institute as now or hereafter in effect.

13.  Unless specifically noted, in preparing the Report CBRE will not be considering the possible existence of asbestos, PCB transformers, or other toxic, hazardous, or contaminated substances and/or underground storage tanks (collectively, "Hazardous Materials") on or affecting the Property, or the cost of encapsulation or removal thereof.  Further, Client represents that there are no major or significant repairs, improvements or deferred maintenance of the Property that would require the expertise of a professional cost estimator, engineer, architect or contractor.  If any such repairs, improvements or maintenance are needed, the estimates for such repairs, improvements or maintenance are to be prepared by other parties pursuant to a separate written agreement in Client's sole discretion and direction, and are not deemed part of the Services or otherwise covered as part of the fee hereunder.

14.  In the event Client intends to use the Report in connection with a tax matter, Client acknowledges that CBRE provides no warranty, representation or prediction as to the outcome of such tax matter. Client understands and acknowledges that any relevant taxing authority (whether the Internal Revenue Service or any other federal, state or local taxing authority) may disagree with or reject the Report or otherwise disagree with Client's tax position, and further understands and acknowledges that the taxing authority may seek to collect additional taxes, interest, penalties or fees from Client beyond what may be suggested by the Report. Client agrees that CBRE shall have no responsibility or liability to Client or any other party for any such taxes, interest, penalties or fees and that Client will not seek damages or other

VALUATION & ADVISORY SERVICES
**Proposal and Contract for Services**



compensation from CBRE relating to any such taxes, interest, penalties or fees imposed on Client, or for any attorneys' fees, costs or other expenses relating to Client's tax matters.

15.    **LIMITATION OF LIABILITY**. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY:

(A) EXCEPT TO THE EXTENT ARISING FROM SECTION 16, OR SECTION 17 IF APPLICABLE, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR CONTRACTORS BE LIABLE TO THE OTHER PARTY, FOR ANY LOST OR PROSPECTIVE PROFITS OR ANY OTHER INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT OR OTHER EXEMPLARY LOSSES OR DAMAGES, WHETHER BASED IN CONTRACT, WARRANTY, INDEMNITY, NEGLIGENCE, STRICT LIABILITY OR OTHER TORT OR OTHERWISE, REGARDLESS OF THE FORESEEABILITY OR THE CAUSE THEREOF.

(B) EXCEPT TO THE EXTENT ARISING FROM SECTION 16, OR SECTION 17 IF APPLICABLE, AGGREGATE DAMAGES IN CONNECTION WITH THIS AGREEMENT FOR EITHER PARTY (EXCLUDING THE OBLIGATION TO PAY THE FEES AND COSTS REQUIRED HEREUNDER) SHALL NOT EXCEED THE GREATER OF THE TOTAL FEES PAYABLE TO CBRE UNDER THIS AGREEMENT OR TEN THOUSAND DOLLARS ($10,000).

(C) CBRE SHALL HAVE NO LIABILITY WITH RESPECT TO ANY LOSS, DAMAGE, CLAIM OR EXPENSE INCURRED BY OR ASSERTED AGAINST CLIENT ARISING OUT OF, BASED UPON OR RESULTING FROM CLIENT'S OR ANY INTENDED USER'S FAILURE TO PROVIDE ACCURATE OR COMPLETE INFORMATION OR DOCUMENTATION PERTAINING TO ANY SERVICES OR REPORT ORDERED UNDER OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING CLIENT'S OR ANY INTENDED USER'S FAILURE, OR THE FAILURE OF ANY OF CLIENT'S OR ANY INTENDER USER'S RESPECTIVE OFFICERS, DIRECTORS, MEMBERS, PRINCIPALS, AGENTS OR EMPLOYEES, TO PROVIDE A COMPLETE AND ACCURATE COPY OF THE REPORT TO ANY THIRD PARTY.  CBRE SHALL HAVE NO LIABILITY WHATSOEVER FOR REPORTS OR DELIVERABLES THAT ARE SUBMITTED IN DRAFT FORM.

(D) THE LIMITATIONS OF LIABILITY IN SUBSECTIONS 15(A) AND 15(B) ABOVE SHALL NOT APPLY IN THE EVENT OF A FINAL FINDING BY A COURT OF COMPETENT JURISDICTION THAT SUCH LIABILITY IS THE RESULT OF A PARTY'S FRAUD OR WILLFUL MISCONDUCT.

16.    (a) Client shall not disseminate, distribute, make available or otherwise provide any Report prepared hereunder to any third party (including without limitation, incorporating or referencing the Report, in whole or in part, in any offering, including, but not limited to any offering of the Property or any securities offering as defined by applicable law, or other material intended for review by other third parties) except (i) to any third party (a) identified in the Agreement as an Intended User subject to the terms and conditions of this Agreement or (b) otherwise expressly acknowledged in a separate writing executed by CBRE, such third party and Client, setting forth that such third party is an "Intended User" of the Report and providing CBRE with an acceptable release from such third party with respect to such Report or wherein Client provides acceptable indemnity protections to CBRE against any claims resulting directly from the distribution of the Report to such third party; (ii) to any third party service provider (including accountants, attorneys, rating agencies and auditors) using the Report in the course of providing Services for the sole benefit of an Intended User and limited to the Intended Use of the Report as defined in this Agreement, or (iii) to the extent required by applicable law, statute, government regulation, legal process, or judicial decree.

(b)  In the event CBRE consents, in writing, to Client incorporating or referencing the Report in any offering or other materials intended for review by other parties, Client shall not distribute, file, or otherwise make such other materials available to any such parties unless and until Client has provided CBRE with complete copies of such offering or other materials and CBRE has approved the inclusion of the Report, or reference to the Report and/or CBRE, in such offering and other materials in writing.  Further, CBRE's consent to such inclusion of the Report, or reference to the Report and/or CBRE, in any securities offering is subject to (i) CBRE's and CBRE's securities counsel's review and approval, in writing, of any inclusion of the Report, or reference to the Report and/or CBRE, in such securities offering; (ii) Client shall not modify the Report, any such inclusion of or reference to the Report and/or CBRE in such securities offering once approved

VALUATION & ADVISORY SERVICES
## Proposal and Contract for Services



by CBRE and its securities counsel in writing; and (iii) Client shall reimburse CBRE for its out-of-pocket costs and expenses, including attorneys' fees, arising from legal review of such securities offering and related materials on CBRE's behalf.

(c)  In the absence of satisfying the conditions of this <u>Section 16</u> with respect to any party who is not designated as an Intended User, in no event shall the receipt of a Report by such party extend any right to the party to use and rely on such Report, and CBRE shall have no liability for such unauthorized use and reliance on any Report.

(d)  In the event Client breaches the provisions of this <u>Section 16</u>, Client shall indemnify, defend and hold CBRE and its affiliates and their officers, directors, employees, contractors, agents and other representatives (CBRE and each of the foregoing an "Indemnified Party" and collectively the "Indemnified Parties"), fully harmless from and against all losses, liabilities, damages and expenses (collectively, "Damages") claimed against, sustained or incurred by any Indemnified Party arising out of or in connection with such breach, regardless of any negligence on the part of any Indemnified Party in preparing the Report.

17.    In the event Client incorporates or references the Report, in whole or in part, in any offering, including, but not limited to any offering of the Property or any securities offering as defined by applicable law, or other material intended for review by other parties, Client shall indemnify, defend and hold each of the Indemnified Parties harmless from and against any Damages in connection with (i) any transaction contemplated by this Agreement or in connection with the Report or the engagement of or performance of Services by any Indemnified Party hereunder, (ii) any Damages claimed by any user or recipient of the Report, whether or not an Intended User, (iii) any actual or alleged untrue statement of a material fact, or the actual or alleged failure to state a material fact necessary to make a statement not misleading in light of the circumstances under which it was made with respect to all information furnished to any Indemnified Party or made available to a prospective party to a transaction, or (iv) an actual or alleged violation of applicable law by an Intended User (including, without limitation, securities laws) or the negligent or intentional acts or omissions of an Intended User (including the failure to perform any duty imposed by law); and will reimburse each Indemnified Party for all reasonable fees and expenses (including fees and expenses of counsel) (collectively, "Expenses") as incurred in connection with investigating, preparing, pursuing or defending any threatened or pending claim, action, proceeding or investigation (collectively, "Proceedings") arising therefrom, and regardless of whether such Indemnified Party is a formal party to such Proceeding.  Client agrees not to enter into any waiver, release or settlement of any Proceeding (whether or not any Indemnified Party is a formal party to such Proceeding) without the prior written consent of CBRE (which consent will not be unreasonably withheld or delayed) unless such waiver, release or settlement includes an unconditional release of each Indemnified Party from all liability arising out of such Proceeding.

18.    <u>Time Period for Legal Action</u>.  Unless the time period is shorter under applicable law, except in connection with <u>Section16</u> and <u>Section 17</u>, CBRE and Client agree that any legal action or lawsuit by one party against the other party or its affiliates, officers, directors, employees, contractors, agents, or other representatives, whether based in contract, warranty, indemnity, negligence, strict liability or other tort or otherwise, relating to (a) this Agreement, (b) any Services or Reports under this Agreement or (c) any acts or conduct relating to such Services or Reports, shall be filed within two (2) years from the date of delivery to Client of the Report to which the claims or causes of action in the legal action or lawsuit relate.  The time period stated in this section shall not be extended by any incapacity of a party or any delay in the discovery or accrual of the underlying claims, causes of action or damages.

19.    <u>Miscellaneous.</u>

(a)  This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter hereof.  This Agreement may not be amended, modified or discharged, nor may any of its terms be waived except by written agreement of both parties.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  A signed copy of this Agreement

VALUATION & ADVISORY SERVICES
**Proposal and Contract for Services**



transmitted by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes.

(b) Neither party shall assign this Agreement in whole or in part (other than by operation of law) to any person or entity without the prior written consent of the other party. Subject to the foregoing, this Agreement and all of its provisions shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns.

(c) No consent or waiver, either expressed or implied, by a party to or of any breach or default, shall be construed to be a consent or waiver to or of any other breach or default in the performance of any obligations hereunder. Failure of a party to complain or declare the other party in default shall not constitute a waiver by such party of rights and remedies hereunder.

(d) Except as hereinafter provided, no delay or failure in performance by a party shall constitute a default hereunder to the extent caused by Force Majeure. Unless the Force Majeure substantially frustrates performance of the Services, Force Majeure shall not operate to excuse, but only to delay, performance of the Services. If Services are delayed by reason of Force Majeure, CBRE promptly shall notify Client. Once the Force Majeure event ceases, CBRE shall resume performance of the Services as soon as possible. As used herein, "Force Majeure" means any event beyond the control of the Party claiming inability to perform its obligations and which such Party is unable to prevent by the exercise of reasonable diligence, including, without limitation, the combined action of workers, fire, acts of terrorism, catastrophes, changes in laws, condemnation of property, governmental actions or delays, national emergency, war, civil disturbance, floods, unusually severe weather conditions, endemic or pandemic, or other acts of God. Inability to pay or financial hardship shall not constitute Force Majeure regardless of the cause thereof and whether the reason is outside a party's control.

(e) Any provision of this Agreement that, by its language, contemplates performance or observation subsequent to any termination or expiration of this Agreement shall survive such termination or expiration and shall continue in full force and effect.

(f) If any provision of this Agreement, or application thereof to any person or circumstance, shall to any extent be invalid, then such provision shall be modified, if possible, to fulfill the intent of the parties reflected in the original provision. The remainder of this Agreement, or the application of such provision to person or circumstance other than those as to which it is held invalid, shall not be affected thereby, and each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

VALUATION & ADVISORY SERVICES
**Proposal and Contract for Services**



## SPECIFIC PROPERTY DATA REQUEST

In order to complete this assignment under the terms outlined, CBRE, Inc., Valuation & Advisory Services, will require the following specific information for the property:

1. <u>**PLEASE NOTIFY US IMMEDIATELY IF ANY OTHER CBRE SERVICE LINE (INCLUDING CAPSTONE) IS INVOLVED IN THE BROKERAGE, FINANCING, INVESTMENT OR MANAGEMENT OF THIS ASSET.**</u>

2. Any information reasonably requested during the appraisal process.

If any of the requested data and information is not available, CBRE, Inc., reserves the right to extend the delivery date by the amount of time it takes to receive the requested information or make other arrangements. Please have the requested information delivered to the following:

Josh Luther, MAI
VAS - Vice President
Josh.Luther@cbre.com
CBRE, Inc.
Valuation & Advisory Services
7405 S Bitterroot Pl, #114
Sioux Falls, SD 57108

Addenda

# Addendum C

## Qualifications

© 2025 CBRE, INC

# PROFILES





VALUATION & ADVISORY SERVICES / SIOUX FALLS

# Josh Luther, MAI

**Vice President, Sioux Falls, SD**
**T**  +1 605 201 0684
**M**  +1 605 201 0684
**E**  josh.luther@cbre.com

- South Dakota # 1021CG
- Minnesota # 40473521
- Iowa # CG04106
- Nebraska # CG2022024R

## Clients Represented

- Commercial Banks
- Credit Unions
- Developers
- Owners, Tenants
- Government Agencies
- Law Firms
- Accounting Firms
- Trust Companies

## Pro Affiliations / Accreditations

- MAI Designated Member of the Appraisal Institute Since 2015
- Appraisal Institute Candidate for Designation (2007-2015)
- State Certified General Appraiser Licensed in SD, MN, IA, & NE
- Member of the Professional Appraisers Association of SD

## Education

- Master of Business Administration (MBA) with a concentration in Project Management from Colorado Technical University
- Bachelor of Science in Business Administration from Black Hills State University

## Professional Experience

Josh Luther is an established commercial real estate appraiser and an MAI designated member of the Appraisal Institute with more than 20+ years of commercial real estate experience in the Upper Midwest.  Mr. Luther presently works as a commercial real estate appraiser with CBRE Valuation and Advisory Services in Sioux Falls, SD.  Prior to joining CBRE, Mr. Luther was the principal owner of Insight ValueMetrics, a Sioux Falls-based firm providing commercial real estate appraisal and advisory services.  Since starting Insight ValueMetrics, Mr. Luther grew his business from scratch to a successful appraisal firm serving over two dozen local and regional clients that have provided loyal repeat business.  Mr. Luther is a Sioux Falls native and his strength is his extensive knowledge of appraisal theory and diverse experience with a wide variety of commercial property types, including both real property and going concern assignments.  He combines his in-depth, local knowledge and expertise with CBRE's best-in-class resources to provide superior customer service to clients. In 2020, Mr. Luther was awarded the CBRE VAS Rise award, which is a prestigious award given annually to CBRE professionals who provide world class service to clients and consistently demonstrate RISE values (respect, integrity, service and excellence) in all aspects of their work.

## Assignment Experience

Automotive dealerships, convenience stores, car washes, restaurants, general retail stores, shopping centers, truck stop/travel centers, day care centers, general office buildings, medical office buildings, dental clinics, surgical centers, hospitals, financial institutions, churches, light and heavy industrial facilities, truck terminals, mini-warehouse facilities, warehouses, service garages, manufacturing facilities, lumberyards, apartment complexes, assisted living centers, manufactured parks, townhomes, residential and mixed-use subdivisions; large tracts of development land; individual lots for retail, office, industrial, multifamily, and institutional uses, air rights, etc.

## Awards

- CBRE VAS Rise award winner (2020)

©2025 CBRE, INC.

# South Dakota Department of Labor and Regulation
## Appraiser Certification Program

This is to Certify that Joshua W. Luther of Sioux Falls, SD
is duly licensed to appraise property in the State of South Dakota,
from the date hereof until September 30, 2025, unless terminated by the Department.

Highest Level
### State-Certified General Appraiser
Endorsed Supervisory Appraiser

### Joshua W. Luther
### # 1021CG

State-Certified General Appraiser credential applies to the appraisal of all types of real property. The appraiser is
bound by the Competency Rule of the Uniform Standards of Professional Appraisal Practice.

IN WITNESS WHEREOF,
this document was signed by the official in charge of licensing and certification on August 29, 2024.

*M. Hultman*

Marcia Hultman, Cabinet Secretary,
SOUTH DAKOTA
DEPARTMENT OF LABOR AND REGULATION

## 2025

CBRE Valuation & Advisory Services

**CBRE**

# Delivering more than just a number

At CBRE, we offer more than expert appraisal services, we consult and advise to help you see the full picture of a property or portfolio.

### Valuation & Appraisal
Understand all aspects of value

– Lending & Debt Valuations
– Portfolio Valuations
– Institutional Fund Valuations
– Litigation Support & Testimony
– Right-of-Way & Eminent Domain
– Evaluations/Alternative Valuations

**cbre.com/appraisal**

### Assessment & Consulting
Understand all aspects of value

– Property Condition Assessments
– Environmental Site Assessments
– Land Surveying
– Seismic Risk Analysis
– Radon, Asbestos, Indoor Air Quality
– Zoning Reports & Compliance

**cbre.com/assessment**

### Property & Transaction Tax
Understand all aspects of value

– Assessment Reviews & Appeals
– Real Estate Transaction Tax
– Property Tax Payment Services
– Pre-Acquisition Due Diligence
– Pre-Construction Due Diligence
– Budgeting & Accruals

**cbre.com/propertytax**

## Quality You Can Count On

Reliable valuations depend on accurate insights. Our quality and risk management (QRM) framework ensures the highest-quality reports and analyses, giving you confidence in our calculations.



Upfront conflict and qualification checks



Embedded risk detection and leadership reviews



Landmark training, practice guidelines and governance



Dedicated, global team of QRM experts

Industry-leading people, data and technologies

## Experience You Can Trust

CBRE is the global leader in commercial real estate services, with more than 100 years of industry experience. We provide unmatched market coverage and sector expertise across every dimension of our Valuation & Advisory Services, delivering insights you can't get anywhere else

| 90+ | 80K+ | 600k+ | 200+ |
|---|---|---|---|
| U.S. Valuation Offices | U.S. Yearly Assignments | Global Yearly Assignments | Global Valuation Offices |