Page 1

1           UNITED STATES BANKRUPTCY COURT
                DISTRICT OF NORTH DAKOTA
2
3    In Re:                         )
                                    )
4    Generations on 1st, LLC,       ) Bankruptcy No.:
                                    ) 25-30002
5      Debtor, Jointly Administered )
       (Main Case).                 ) Chapter 11
6                                   )
     ------------------------------ )
7                                   )
     In Re:                         ) Bankruptcy No.
8                                   ) 25-30003
     Parkside Place, LLC,           )
9                                   ) Chapter 11
        Debtor, Jointly Administered. )
10   ------------------------------ )
                                    )
11   In Re:                         ) Bankruptcy No.
                                    ) 25-30004
12   The Ruins, LLC,                )
                                    ) Chapter 11
13      Debtor.                     )
14
15
16              D E P O S I T I O N
17                     OF
18               MULINDA CRAIG
19
20
21
22   DATE:    Wednesday, September 24, 2025
23   PLACE:   Vogel Law Firm
24            Fargo, North Dakota
25   BY:      Charla A. Pawlik, RPR

Page 2

```
 1        A P P E A R A N C E S
 2
 3 FOR THE DEBTORS:
 4    The Dakota Bankruptcy Firm
      Attorneys at Law
 5    1630 First Avenue North - Suite B
      Fargo, North Dakota  58102
 6    By:  Christianna Cathcart
         christianna@dakotabankruptcy.com
 7
 8 FOR JESSE CRAIG AND MULINDA CRAIG:
 9    Schwab, Thompson & Frisk
      Attorneys at Law
10    820 34th Avenue East
      Suite 200
11    West Fargo, North Dakota  58078
      By:  Daniel J. Frisk
12       dan@stf.law
13
14 FOR RED RIVER STATE BANK:
15    Vogel Law Firm
      Attorneys at Law
16    218 NP Avenue
      P.O. Box 1389
17    Fargo, North Dakota  58107
      By:  Caren W. Stanley
18       cstanley@vogellaw.com
19
20 ALSO PRESENT:
21    Jesse Craig, Charles Aarestad and Danielle
      Harless
22
23
24
25
```

Page 3

```
 1        C O N T E N T S
 2        W I T N E S S
 3                      PAGE
 4 MULINDA CRAIG
 5    Examination by Ms. Stanley      4
 6
 7
 8        E X H I B I T S
 9 DEPOSITION
   EXHIBIT NO.              MARKED
10
11 Exhibit 29  SBA Form 1919 Signed by Mulinda   47
12          Sue Craig dated 4-15-21
13 Exhibit 30  SBA Form 1919 Signed by Mulinda   52
14          Sue Craig dated 6-15-21
15 Exhibit 31  SBA Form 1919 Signed by Mulinda   54
16          Sue Craig dated 5-15-21
17 Exhibit 32  Check to Brady Punt dated 6-8-22  58
18          (FCCU Subpoena 669)
19 Exhibit 33  Check to Nichole Mathiason        60
20          (FCCU Subpoena 665)
21 Exhibit 34  Check to Crown Jewels dated       67
22          6-29-22 (RRSB FCCU Subpoena 838)
23
24
25
```

Page 4

```
 1        P R O C E E D I N G S
 2        (Whereupon, the deposition of MULINDA
 3 CRAIG commenced at 8:51 a.m. as follows:)
 4        MULINDA CRAIG,
 5 HAVING BEEN FIRST DULY SWORN TO TESTIFY THE TRUTH,
   THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE
 6 TO THE CAUSE SPECIFIED, TESTIFIED AS FOLLOWS:
 7        EXAMINATION
 8 BY MS. STANLEY:
 9    Q.  Good morning.
10    A.  Morning.
11    Q.  Can you please state your full name for
12 the court reporter?
13    A.  It's Mulinda Craig, also known as Mindy
14 Craig.
15    Q.  And how do you spell your first name
16 just --
17    A.  First name is spelled M-u-l-i-n-d-a.
18    Q.  Okay.  And where -- where are you from
19 originally?
20    A.  Born in Wisconsin.
21    Q.  Wisconsin.  What part of Wisconsin?
22    A.  Tomah.
23    Q.  Okay.  Did you graduate from high
24 school there?
25    A.  Yes.
```

Page 5

```
 1    Q.  And what about -- how did you wind up
 2 in this area of North Dakota, Minnesota?
 3    A.  My husband and I had some mutual
 4 friends so we met through mutual friends back in
 5 Wisconsin.  And he was currently living in Fargo.  I
 6 was in Wisconsin.  We decided to make a relationship
 7 so...
 8    Q.  When --
 9    A.  And --
10    Q.  -- about was that?
11    A.  2010.
12    Q.  Okay.  Did you graduate from college?
13    A.  No.
14    Q.  Okay.  Did you do any -- did you
15 graduate from high school?
16    A.  Yes.
17    Q.  And that's Tomah?
18    A.  Yes.
19    Q.  Okay.  What did you do after high
20 school?
21    A.  I worked for my local family dentist as
22 a dental assistant.  And in the interim I was on the
23 waiting list for a dental hygiene program that had
24 about a four-year-long wait list.
25    Q.  Okay.
```

2 (Pages 2 - 5)

Page 6

1      A.   So I was doing my gen eds, taking some
2   just --
3      Q.   Where was --
4      A.   -- general classes.
5      Q.   Where was that at?
6      A.   In La Crosse, Wisconsin.
7      Q.   How far is La Crosse from Tomah?
8      A.   45 minutes.
9      Q.   Okay.  Were you living in La Crosse
10  then?
11     A.   No.  I was in Tomah.
12     Q.   Okay.  So the -- what's the furthest
13  you have gone in -- in like educational background?
14     A.   Like on the questionnaires and when --
15  I put some college.
16     Q.   Okay.  And that was just like the
17  generals under --
18     A.   Yes.
19     Q.   -- the initial --
20     A.   Yes.
21     Q.   Okay.  As your attorney earlier -- you
22  were here on Monday --
23     A.   Yes.
24     Q.   -- for the depositions of Charles and
25  Danielle; correct?

Page 7

1      A.   Yes.
2      Q.   Okay.  So don't be offended, but I'm
3   going to ask you the same question of --
4      A.   Sure.
5      Q.   -- are you under the influence this
6   morning of any alcohol or drugs?
7      A.   No.
8      Q.   Okay.  And nothing that may impair your
9   ability to answer questions?
10     A.   No.
11     Q.   Okay.  Can you tell me how old you are?
12     A.   I am 38.
13     Q.   Okay.  That's always a sensitive
14  question.
15     A.   Sorry.  I had to think about it for a
16  second.  The years all blur together really.
17     Q.   So when you moved -- did you move up
18  here in 2010 you said?
19     A.   Correct.
20     Q.   Okay.  And did you have -- find a job
21  when you moved up here or what did you -- what did
22  you start to do?
23     A.   So Jesse had the property management
24  company.  And he had a property manager that was
25  not -- or excuse me, an office manager that was not

Page 8

1   doing a great job.  So he knew he needed to replace
2   her and I knew I needed a job anyway so it made sense
3   for me to take over that position.
4      Q.   So the property management company is
5   Craig Properties?
6      A.   Yes.
7      Q.   Okay.  And so that was -- that was open
8   and an existing company in 2010?
9      A.   Yes.
10     Q.   And how many -- at that time in 2010
11  how many employees did Craig Properties have?
12     A.   Three I believe.  Three.
13     Q.   And then when you started working for
14  it did you become the fourth?
15     A.   Nope.  I -- he let the office manager
16  go and I took over her position.
17     Q.   Okay.  So stayed at three?
18     A.   Yes.
19     Q.   How long is it -- has it always been
20  like that number of employees or increased?
21     A.   At Craig Properties?
22     Q.   Yes.
23     A.   It's kind of fluctuated a little bit.
24  I don't have a whole lot to do with Craig Properties
25  any longer so I -- I couldn't say how many true

Page 9

1   employees versus independent contractors there are.
2      Q.   Okay.  When did you -- so explain to me
3   from 2010 till, you know, like now what your
4   involvement with Craig Properties was.
5      A.   In 2014 we had our twins.  And they
6   were micro-preemies born 15 weeks early so we spent
7   four and a half months in the NICU.  And at that time
8   Jesse's oldest daughter knew that she would like to
9   take over the business at some point, kind of get her
10  feet wet a little bit more.  So she took over my
11  position when I was focused on our twins.  So that
12  was a good transition time for me to step away and
13  then she stepped in.
14     Q.   In 2014?
15     A.   2014, yes.
16     Q.   Okay.  And then when did you start or
17  did CP Business Management come into existence?
18     A.   CP Business Management would have been
19  2016 or 2017.  Jesse had purchased a conglomerate of
20  all in one Coldwell Banker real estate, mortgage,
21  title, property management and commercial real estate
22  company.  And then the property management side of
23  things wasn't doing the greatest.  So he came to
24  me -- I was a stay-at-home mom.  Came to me and asked
25  me if I would step in and help kind of turn things

3 (Pages 6 - 9)

Page 10

1 over is what I did.
2      Q.  So this was '16, '17?
3      A.  It would have been 2015.  So we were
4 still under Coldwell Banker's umbrella.  And then --
5      Q.  Okay.
6      A.  -- 20 -- I believe it was 2015 or 2016
7 we split off, renamed the property management company
8 to CP Business Management.
9      Q.  What was it before that?
10      A.  I think it was just Coldwell Banker
11 Property Management I believe.
12      Q.  Oh.  So Craig Properties is separate
13 from Coldwell Banker or CP -- what then became CP
14 Business Management; is that right?
15      A.  Correct.
16      Q.  Okay.  Did you have any involvement
17 with Craig Development?
18      A.  Minor.
19      Q.  So what -- what did you -- when you say
20 minor, what do you mean by that?  Can you expand a
21 little?
22      A.  Well, Jesse and my's office is
23 kitty-corner from each other.  So at the beginning of
24 Craig Development I really had no involvement.  And
25 then I would say probably the last four or five years

Page 11

1 or so little random things pop up that he asks help
2 on, needs help on.
3      Q.  Okay.  So is it fair to say that you
4 would only -- you don't work for Craig Development?
5      A.  Correct.
6      Q.  And is it fair to say you do not work
7 for Craig Properties?
8      A.  Correct.
9      Q.  Okay.  Do you have authority to write
10 checks for Craig Development?
11      A.  I do not believe I do.
12      Q.  What about Craig Properties?  Do you
13 have authority to write checks for that one?
14      A.  Do not.
15      Q.  There was some discussion yesterday
16 about Jesse has a stamp with -- for checks.
17      A.  Yeah.
18      Q.  Do you have access to that?
19      A.  I do.
20      Q.  Do you use it?
21      A.  Yes.
22      Q.  And what do you -- which entity do you
23 use -- use it for?
24      A.  CP Business Management's checking is
25 his signature.

Page 12

1      Q.  Okay.  Do you ever --
2      A.  So I have that stamp.
3      Q.  Are there different stamps or just one?
4      A.  This -- it's the same signature that
5 the Fargo Rubber and Stamp made stamps of so it's the
6 same swoops.
7      Q.  So -- I mean, and when I think of a
8 stamp, right -- I'm old so I think a big hand -- you
9 know, like you --
10      A.  Sure.
11      Q.  -- stamp it on -- on the paper.  Is
12 that -- do I have that right or am I --
13      A.  It's not the big handheld clunk-clunk
14 one.  It's the -- just a little like, yeah,
15 3-inch-by-3-inch.
16      Q.  Okay.
17          MR. FRISK:  Get with the times, Caren.
18      Q.  (Ms. Stanley continuing)  Is there more
19 than one of --
20      A.  More than one stamp?
21      Q.  Yeah.
22      A.  Yes.
23      Q.  Okay.  And are they like allocated for
24 different properties or...?
25      A.  No, it's -- well, since he's the signer

Page 13

1 on the CP Business Management checking account, all
2 the checks get signed by him or that stamp.
3      Q.  Okay.  And who else uses that stamp
4 other than you?
5      A.  I have mine that I keep in my office.
6 I believe he has one.  And then Jordan I believe has
7 one for Craig Properties.
8      Q.  Okay.  Do you have access to online
9 banking for Craig Properties?
10      A.  I do not.
11      Q.  What about do you have online banking
12 access for Craig Development?
13      A.  I do not.
14      Q.  And then I'm guessing you do have it
15 though for CP Business Management?
16      A.  Yes.
17      Q.  Okay.  Are you an owner of CP Business
18 Management?
19      A.  I am.
20      Q.  What is the percentage ownership?
21      A.  50.  50-50.
22      Q.  With you and...?
23      A.  Jesse.
24      Q.  And when did that ownership percentage
25 start?

4 (Pages 10 - 13)

Page 14

1        A.  I believe when we went through the name
2  change.  The ownership changed from the Coldwell
3  Banker umbrella to the name change to me being an
4  owner.
5        Q.  How many employees does CP Business
6  Management have currently?
7        A.  Employees? One.  Myself.
8        Q.  So in the 2016, '17 time frame when it
9  became CP Business Management, how many employees
10  were there?
11        A.  Five I believe.  Five I believe.
12        Q.  And then since that time maybe they
13  left or been terminated from the employment?
14        A.  Correct.
15        Q.  Okay.  Did they voluntarily leave or
16  were they terminated?
17        A.  All left voluntarily.  Different
18  positions, life changes.
19        Q.  How many office locations does CP have?
20        A.  Two.
21        Q.  And where are they?
22        A.  Fargo and Watertown, South Dakota.
23        Q.  How many -- in Fargo how many
24  properties does CP Business Management actually
25  manage?

Page 15

1        A.  There are... I believe there's nine
2  total in Fargo.
3        Q.  Okay.  What is the arrangement with the
4  nine in Fargo?  Do they have to pay overhead for like
5  the CP Business Management office?  Do they get
6  allocated a fee for that?
7        A.  They do not.
8        Q.  And what about in Watertown?  Which
9  properties does CP Business Management manage?
10        A.  Loft -- or sorry.  Generations and
11  Parkside.
12        Q.  Just those two?
13        A.  Yes.
14        Q.  And are Generations and Parkside
15  allocated an overhead for that office?
16        A.  They are currently.
17        Q.  So that's different than how it's --
18  the arrangement for the Fargo properties?
19        A.  Currently.
20        Q.  Is there -- you said currently.  Is
21  there plans to change that?
22        A.  Correct.
23        Q.  And what is -- are you going to get rid
24  of the Watertown office?
25        A.  Yes.  When the lease is up at The

Page 16

1  Lofts, then we have either a space to move into at
2  Generations on 1st or if The Ruins is completed,
3  there's a designated space in The Ruins to move into.
4        Q.  What is -- can you just give me an
5  overview of what the IT, the technology setup is for
6  CP Business Management?
7        A.  Can you be more specific?
8        Q.  That's a fair question.  Do you have
9  like your servers and -- and all of that, is that
10  in -- on site in Fargo or is that all in the cloud or
11  how is -- is there an IT company that manages it?
12        A.  So we have -- majority of everything is
13  on a cloud.  We have Chameleon Technologies who
14  handles the majority of our IT if we need.  And then
15  -- or actually -- they get mad at me.  I'm just
16  spewing.  Our website is -- currently we're trying to
17  figure out how to reconfigure the CP Business
18  Management website.
19        Q.  So --
20        A.  The company switched hands a few times
21  and now we don't have a contact at all.
22        Q.  So -- Chameleon?
23        A.  Yes.
24        Q.  Are they based out of Fargo or are they
25  somewhere --

Page 17

1        A.  Originally it was out of Fargo, and now
2  he's remote and comes to Fargo quite often.
3        Q.  Okay.  Does CP Business Management
4  share its IT setup with Craig Development?
5            MR. FRISK:  What do you mean by setup?
6            THE WITNESS:  Yeah.
7        Q.  (Ms. Stanley continuing)  Like your
8  email system.
9        A.  No.  Those are separate.  We've got two
10  different --
11        Q.  -- email servers?
12        A.  Yes.
13        Q.  So like what is your email?
14        A.  Mcraig@cpbusmgt.com.
15        Q.  And what would Jesse's email be?
16        A.  Jcraig@craigprop.com.
17        Q.  Do you have a craigprop.com email?
18        A.  I do not.
19        Q.  You indicated earlier that your offices
20  are close to each other though.
21        A.  Yes.
22        Q.  Like physically within 10 feet?
23        A.  Give or take, yes.
24        Q.  Okay.  Earlier Jesse had indicated that
25  he was not tech savvy.  Would you agree with that

5 (Pages 14 - 17)

Page 18

1 characterization?
2     A.  Yes.
3     Q.  Okay.  Do you assist him in -- assist
4 him with technology matters?  Let's say that.
5     A.  Some, yes.
6     Q.  So like what would he need assistance
7 with or what do you help him with?
8     A.  Things that come to my mind right now
9 are getting columns to tabulate in Excel.  The
10 printer wasn't feeding paper correctly and printing
11 correctly so changing the settings for that.  And
12 recently our software for the property management
13 accounting software just changed how they do their
14 logins.  And now it's a code that gets sent to your
15 phone every --
16     Q.  Oh.
17     A.  -- so often, and that wasn't working.
18 I guess stuff like that.
19     Q.  Do you ever assist him with -- so you
20 said Excel spreadsheets, you have helped with Excel
21 spreadsheets.
22     A.  Yes.
23     Q.  Do you input data for him into Excel
24 spreadsheets?
25     A.  No.

Page 19

1     Q.  Do you know if Jordan helps him with
2 that?
3     A.  That I could not answer.
4     Q.  What is your understanding of Jordan's
5 role with respect to CP Development?
6     A.  CP Development?
7     Q.  Right.
8     MR. FRISK:  There's no such thing as --
9     THE WITNESS:  Yeah.
10    MR. FRISK:  -- CP Development.
11    Q.  (Ms. Stanley continuing)  Or I'm sorry.
12 Craig Development.  My bad.  Apologies.
13    A.  Well, as Jesse testified yesterday, she
14 wanted to step into the development side of things,
15 and then she wanted to focus on having a family so
16 then she's strictly doing property management things.
17    Q.  For CP -- or sorry, Craig Properties?
18    A.  Yes.
19    Q.  So Jordan only works for Craig
20 Properties at this point?
21    A.  To my knowledge, yes.
22    Q.  Okay.  Does she work for CP Business
23 Management?
24    A.  She does not.
25    Q.  Do you -- so you indicated earlier you

Page 20

1 don't have any banking access for Craig Development;
2 correct?
3     A.  Correct.
4     Q.  And what about -- and you don't have it
5 also for Craig Properties?
6     A.  Correct.
7     Q.  Would there be any reason that Craig
8 Properties would pay you money directly?
9     MR. FRISK:  Objection to form.
10    THE WITNESS:  Yeah.
11    MR. FRISK:  Calls for speculation.  If
12 you want to give her an example of what it was, she
13 probably could answer.
14    Q.  (Ms. Stanley continuing)  If I -- I
15 don't have the bank statements in front of me, but if
16 there are, you know, cash payments or monthly
17 payments to Mindy Craig, what would the reason for
18 that be?
19    A.  From Craig Properties?  What's the time
20 frame you are talking?
21    Q.  Bank statements were provided from
22 2021 -- 20 -- 2021 to current.
23    A.  And there's monthly checks?
24    Q.  Not monthly but fairly regularly.
25    MR. FRISK:  I'm going to object on the

Page 21

1 form again.  You're just asking her ambiguous and
2 vague time periods.  Again if you had a specific
3 dollar amount, she could answer it.  And the other
4 objection's on speculative.  She's going to have to
5 speculate as to what you mean by timing and what
6 payments are.
7     Q.  (Ms. Stanley continuing)  Do you ever
8 get paid money from Craig Properties in the last
9 three years?
10    MR. FRISK:  And again I'll -- same
11 objection as to form.
12    A.  Not that I recall off the top of my
13 head.
14    Q.  (Ms. Stanley continuing)  Does Craig
15 Properties owe you any money in the last three years?
16    A.  No.
17    Q.  Do you know if Craig Properties is
18 used to pay -- Craig Properties funds is used to pay
19 personal expenses for the family?
20    MR. FRISK:  Objection as to form.
21 Again she's already testified that she doesn't
22 know -- she doesn't have a banking relationship with
23 Craig Properties.  She --
24    MS. STANLEY:  She -- she was here
25 yesterday though when he indicated that the mortgage

6 (Pages 18 - 21)

Page 22

1 for the house is paid from that.
2     MR. FRISK: Well, do you want her to
3 testify as to what she knows from yesterday?
4     MS. STANLEY: She was here.
5     MR. FRISK: So to the extent you were
6 here yesterday, Mindy, and heard that, you can answer
7 if you recall. I'm going to object to the form
8 again.
9     MS. STANLEY: That's fine.
10     MR. FRISK: I mean, if we have certain
11 dollar amounts, it's going to go on -- and it's
12 already been asked and answered by Jesse Craig. He's
13 the one who testified that he pays the mortgage
14 sometimes out of this --
15     Q. (Ms. Stanley continuing) And I'm
16 asking, are you aware of any family household
17 expenses paid in the last three years out of the
18 Craig Properties --
19     MR. FRISK: Again I'll --
20     Q. -- bank account?
21     MR. FRISK: -- still object as to form.
22 And, Mindy, if you remember from yesterday's
23 deposition, you can answer to the extent you
24 remember.
25     A. I... Short answer I think to clear up

Page 23

1 any confusion is our finances are kept separate.
2 Personal are kept separate. We don't have any
3 crossover. And that's how it's always been our
4 entire marriage, our entire relationship. So if
5 there are personal expenses paid out of XYZ account,
6 I wouldn't be able to attest either way. As Dan
7 said, Jesse made the comment yesterday, yes, mortgage
8 was paid out.
9     Q. (Ms. Stanley continuing) In the last
10 three years what -- has Craig Properties paid for any
11 of your vehicles?
12     A. That I do not -- I don't know what
13 account car payments come out of.
14     Q. For the car that you drive you don't
15 know?
16     A. The car that I drive comes out of my
17 checking account.
18     Q. Okay. Where's your checking account?
19     A. Altra. Which you have the bank
20 statements for.
21     Q. Is that the one in Wisconsin?
22     A. Yes.
23     Q. And it's a -- is Altra with an A or a
24 U?
25     A. A.

Page 24

1     Q. Okay. What -- what -- how many
2 vehicles do you -- do you have?
3     A. I personally have two.
4     Q. How many does Jesse have?
5     MR. FRISK: Objection as to form. It's
6 calling for speculation. You can answer if you know.
7     A. I -- truly I couldn't tell you off the
8 top of my head. He's got a couple older vehicles.
9 There's vehicles that employees of -- or contractors
10 of Craig Properties drives. I don't know what all is
11 considered personal, what all is considered business
12 or where the cutoffs are. I don't know how those are
13 all situated.
14     Q. So you have your own personal account,
15 checking account?
16     A. Yes.
17     Q. And then your -- you have control of
18 the CP Business Management bank account at Starion;
19 right?
20     A. Correct.
21     Q. Okay. And I did receive the Starion
22 Bank statements from you --
23     A. Uh-huh.
24     Q. -- so thank you. I'm curious about --
25 there were monthly checks for $1,500 that were

Page 25

1 redacted.
2     A. Yes.
3     Q. Can you tell me why they were redacted
4 and what was --
5     A. They are for outside owners that have
6 nothing to do with this case for people that I manage
7 for.
8     Q. So they're owners of properties that
9 you manage for?
10     A. Yes.
11     Q. And they get $1,500 a month?
12     A. Currently.
13     Q. Okay.
14     A. I think it might have changed a little
15 bit over the years.
16     Q. That is Goff?
17     A. Yeah.
18     MR. FRISK: Well, I'm going to -- hang
19 on a second. I'm going to object as to form. That
20 is what?
21     MS. STANLEY: Goff --
22     MR. FRISK: Goff.
23     MS. STANLEY: -- is the last name.
24     MR. FRISK: Right. I think that the
25 design there is she has outside business interests;

7 (Pages 22 - 25)

Page 26

1  right?  She manages apartments and properties for
2  other people.  I don't know that we want to -- unless
3  it relates to Craig let's not throw those names
4  around.  She is taking steps to make sure that
5  they're not disclosed while being -- that would
6  affect her ability to make her outside income.  She
7  doesn't rely solely on Jesse's apartments.  She runs
8  other apartments.
9        Q.  (Ms. Stanley continuing)  Okay.  Do you
10  have an interest in Prevail, LLC?
11        A.  I do not.
12        Q.  Did you ever do any work for Prevail,
13  LLC?
14        A.  Did not.
15        Q.  Had any ownership in it?
16        A.  No.
17        Q.  What about Prevail Realty, LLC?
18        A.  That was set up.  Nothing ever ran
19  through there to my knowledge.
20        Q.  You mean like it never had any business
21  or --
22        A.  I don't believe so.
23        Q.  Do you have a real estate agent
24  license?
25        A.  No.

Page 27

1        Q.  Did you ever take classes or anything
2  towards obtaining one?
3        A.  Yes.
4        Q.  You just didn't -- did you -- you just
5  didn't finish?
6        A.  I did have a license.  I do not
7  currently hold my license.
8        Q.  Okay.  When did you get the license?
9        A.  2016 I believe, maybe '17.
10        Q.  And did you just let it lapse?
11        A.  I did.
12        Q.  When did that happen?
13        A.  This last -- 2020... End of 2024 it
14  would have lapsed.
15        Q.  And were you -- as part of Prevail
16  Realty what did you -- what did you do for that?  I
17  mean, I saw that there was a podcast or something or
18  a -- or a business advertisement for it; is that
19  right?
20        A.  What kind of business advertisement I
21  guess?
22        Q.  I thought you went on the TV or the
23  radio or something talking about Prevail Realty.
24        A.  Not that I recall.
25        Q.  Who did you work with for Prevail?

Page 28

1  Like anybody else involved in that?
2        MR. FRISK:  Objection.  Form and
3  relevancy.
4        A.  Jesse Kiihl has his South Dakota
5  license so he was going to also work under Prevail
6  Realty.  And I believe there was another gal in
7  Watertown that was working on getting her license and
8  her plan was also to work under Prevail Realty, but I
9  was already under a different brokerage.
10        Q.  Which brokerage?
11        A.  Mainstream Realty.
12        Q.  Okay.  You ever have to take any ethics
13  classes as -- to get your real estate license?
14        A.  Yes.
15        Q.  Ever take any classes on mortgage
16  fraud?
17        A.  I don't believe on mortgage fraud.
18        Q.  Okay.  Jesse Kiihl was the property --
19  I'm sorry, project manager for Parkside, Generations
20  and The Ruins; correct?
21        A.  Yes.
22        Q.  Did you work with him on those projects
23  at all?
24        MR. FRISK:  Objection as to form.
25  Which projects are you talking about?

Page 29

1        MS. STANLEY:  Parkside, Generations and
2  Ruins.
3        A.  As far as Jesse Kiihl and his
4  project --
5        MR. FRISK:  Hang on a second.  She's
6  pretty -- she testified she works for CP Business
7  Management.  To the extent she worked for these
8  entities or what are you --
9        MS. STANLEY:  I mean, they have
10  disclosed emails where she's emailing with Jesse
11  Kiihl.
12        MR. FRISK:  On the real -- on this
13  real estate agency thing or on -- as a --
14        MS. STANLEY:  On the -- on The Ruins --
15        MR. FRISK:  Projects?
16        MS. STANLEY:  -- the three Watertown
17  projects, yes.
18        MR. FRISK:  During construction or
19  after -- after they've been opened?
20        MS. STANLEY:  I -- I think --
21        MR. FRISK:  She managed them after they
22  were opened.
23        MS. STANLEY:  I believe that they were
24  during the construction phase --
25        MR. FRISK:  Okay.

8 (Pages 26 - 29)

Page 30

1      MS. STANLEY: -- so I would like to ask
2  her that question.
3      MR. FRISK: Perfect. But just identify
4  whether it's construction or ownership 'cause she --
5  or construction or operations.
6      Q.  (Ms. Stanley continuing) So do you
7  recall having communications by email with Jesse
8  Kiihl?
9      A.  Yes.
10     Q.  And was it -- what do you recall about
11 those email communications?
12     A.  We -- majority was regarding the Knox
13 Boxes for the properties.
14     Q.  The what boxes?
15     A.  Knox Boxes.
16     Q.  What's a Knox Box?
17     A.  They are the fire department -- you
18 have to have them -- you have to have a form
19 submitted to you by the fire department giving
20 them -- giving you the authority to order the Knox
21 Box which is keyed to their municipal key or their
22 fire department key if there's ever an emergency --
23     Q.  Uh-huh.
24     A.  -- so the fire department is the only
25 one that ever has access to that box.

Page 31

1      Q.  Is that the only thing you ever really
2  recall talking to him about on the three Watertown
3  projects?
4      A.  There may have been a -- I don't know
5  if there's an email about it -- a phone call about --
6  we had a roof leak at Generations he looked at.
7      Q.  So this would have been after it was
8  constructed --
9      A.  Yes.
10     Q.  -- and there's tenants?
11     A.  Yes.
12     Q.  Okay. Did you pay any -- take
13 responsibility for paying during the construction
14 phase excise taxes for the three Watertown projects?
15     A.  No.
16     Q.  So you don't know if -- if -- have any
17 knowledge about paying taxes on Parkside, Generations
18 or The Ruins?
19     A.  I submitted the pay -- or the -- not
20 the pay request. The amount that was owed. But that
21 is the extent of -- I didn't make any payments to --
22     Q.  So like --
23     A.  -- for excise tax.
24     Q.  -- a reporting thing?
25     A.  Yes.

Page 32

1      Q.  To the state of South Dakota?
2      A.  Yes.
3      Q.  Is this something you did monthly?
4      A.  Yes.
5      Q.  For all three of the projects?
6      A.  Yes.
7      Q.  So any other -- but you didn't actually
8  pay it; is that what you're saying?
9      A.  Correct.
10     Q.  Or pay it through Craig Development or
11 through Craig Properties?
12     A.  No. Yes, correct, I did not pay that.
13     Q.  So did you just have to tell Jesse he
14 needs to pay this?
15     A.  He would tell me the amount that needed
16 to be reported and that's what I would do.
17     Q.  So you would just do the reporting of
18 the amounts?
19     A.  Correct.
20     Q.  And had nothing to do with any payments
21 remitted to the state?
22     A.  Correct.
23     MR. FRISK: Well, I'm going to object
24 because it mischaracterizes the -- the answer. I
25 think what she's getting at is that she would get a

Page 33

1  number from Jesse and put it on a form. I don't want
2  there to be a misconstrue that -- misconstrued that
3  she's doing the calculation.
4      MS. STANLEY: No. No. Just -- I
5  believe he said she made the payments but...
6      MR. FRISK: He would give her a number
7  and she would make the payment?
8      MS. STANLEY: I think that's what he
9  testified to yesterday, but we'll have to look at the
10 transcript when it comes out. So I just wanted to
11 clarify that though.
12     Q.  (Ms. Stanley continuing) Is there any
13 other clerical work like that -- I don't know.
14 That's probably a bad term for that, clerical work.
15 But that you can think of that you would do on behalf
16 of those three projects?
17     A.  Yes, I think that's a fair statement.
18     Q.  That there is or there isn't?
19     A.  There is not.
20     Q.  Okay. None that you can think of
21 anyway?
22     A.  Correct.
23     Q.  Okay. Did you ever deal with in
24 respect to The Ruins any of the subcontractors such
25 as if they're sending in paperwork or invoices?

9 (Pages 30 - 33)

Page 34

1        MR. FRISK: I'm going to object as to
2 form just 'cause that's really broad.
3        Q. (Ms. Stanley continuing) Did you ever
4 receive and look at paperwork from subcontractors on
5 The Ruins when it was being constructed?
6        A. In terms of like what was submitted for
7 draw requests or what?
8        Q. Sure.
9        A. No.
10       Q. Had no involvement with the draw
11 requests at all?
12       A. No.
13       Q. No --
14       A. I take that back. I did have to send
15 Charles -- Jesse was out of town one time, and I had
16 to scan something in and send it to Charles. It was
17 the first time I had ever done that. And I think
18 there's even an email saying: I hope I did this
19 right 'cause I don't know what I'm doing.
20       Q. So how would the invoices come into the
21 office? Would they like just have his name on and
22 they go on his desk or...?
23       A. I could not -- I didn't see any
24 invoices. I don't receive the mail. So if they came
25 in by mail, I wouldn't have any idea. If they came

Page 35

1 in by email, I wouldn't have any idea.
2        Q. Okay.
3        A. If they came in person, I wouldn't have
4 any idea.
5        Q. And so when there would be unpaid
6 contractors, did you ever take any calls from unpaid
7 contractors regarding these three projects?
8        A. Did not.
9        Q. So you never -- are you testifying you
10 never reviewed any of the draw requests before they
11 were submitted other than that one you just
12 referenced with Charles?
13       A. Every now and again Jesse would need
14 help tabulating the tabs at the bottom, but that is
15 about the extent of it.
16       Q. What do you mean, the tabs at the
17 bottom?
18       A. He -- well, he testified yesterday he
19 kept a -- the big sheet of paper.
20       MR. FRISK: And I want to make an
21 objection. Again it mischaracterizes her testimony.
22 She didn't -- she said she did not review the draw
23 requests. Caren, you said -- suggested she did
24 review the draw requests. Her conduct was limited to
25 faxing a piece of paper or something to Charles one

Page 36

1 time so I don't want you to misconstrue that as she
2 reviewed a draw request and sent it to -- to Charles.
3 She didn't review it. She merely -- I meant scanned
4 it. Nobody faxes anymore.
5        Q. (Ms. Stanley continuing) So tell me
6 about this spreadsheet. I know -- I know what you're
7 referencing and I can't --
8        A. Yeah, it was like the -- similar to
9 what the big -- the one that had all the yellow --
10       Q. Okay.
11       A. -- things on it.
12       Q. I think that was 24 -- Exhibit 24 or 25
13 from yesterday.
14       A. Okay. So -- well, in that scope of
15 things there would have been some extra tabs I
16 believe at some point or another that had a
17 running --
18       Q. These ones --
19       A. Yes.
20       Q. -- Exhibits 24 and 25? I think this is
21 the one with the yellow, is 25; right?
22       A. Yeah. So I think like here at some
23 point would have been like the running totals of --
24       Q. Of the --
25       A. -- each line.

Page 37

1        Q. Okay.
2        A. And for whatever reason sometimes those
3 would not calculate across or down so I'd need to do
4 that --
5        Q. So just --
6        A. -- or help him with that.
7        Q. -- help with the Excel skills?
8        A. Yes.
9        Q. Okay. Which that's fair 'cause I need
10 that help all the time as well. Did you ever have
11 any -- assist Jesse with altering invoices?
12       A. No.
13       Q. Did you -- he testified yesterday about
14 financial statements and that there was a financial
15 statement that had a bank account altered. Did you
16 assist with that?
17       MR. FRISK: I object as to form. I
18 think -- the term altered. I think the account
19 number was redacted.
20       MS. STANLEY: No, I believe he said he
21 switched two of the numbers.
22       MR. FRISK: In an effort to redact it,
23 right. You -- you can ask her the question. I'm
24 just going to note my objection on there --
25       MS. STANLEY: Sure.

10 (Pages 34 - 37)

Page 38

1         MR. FRISK: -- as to form.
2         MS. STANLEY: I think you have done
3 that.
4     Q.  So --
5         MR. FRISK: And you can answer to the
6 extent you independently recall.
7     A.  I have no knowledge of that.
8     Q.  So no knowledge --
9     A.  Other than what was said yesterday.
10    Q.  Okay.  So you did not assist him in --
11        MR. FRISK: Asked and answered.
12    Q.  -- moving numbers around on financial
13 statements; is that correct?
14    A.  Correct.
15    Q.  And you had no knowledge that he had
16 done this?
17    A.  No.
18    Q.  Did you ever assist with gathering
19 documents for financial statements for...?
20    A.  Other than if he asked for like a
21 balance sheet or something, that most likely would
22 have been the extent of it.
23    Q.  Do you do the bookkeeping for CP
24 Business Management?
25    A.  CP Business Management, yes.

Page 39

1     Q.  Do -- you don't do the -- do you do the
2 bookkeeping though for Craig Properties?
3     A.  No.
4     Q.  Who does; do you know?
5     A.  I wouldn't be able to specifically say.
6 I think --
7         MR. FRISK: Objection as to form.
8 Answer only if you know.  Don't speculate.
9     A.  No.
10        MR. FRISK: And then slow it down
11 because I'm slow.  I can't think of objections fast.
12 I'm like the slowest guy in the world now.
13        THE WITNESS: Okay.
14        MR. FRISK: So before you answer give
15 me a chance to at least think about it for a second.
16        THE WITNESS: Okay.
17        MR. FRISK: Thank you.
18    Q.  (Ms. Stanley continuing) Have you
19 reviewed what's Exhibit 17 from yesterday which --
20 what's that one?
21    A.  18.
22    Q.  Oh, it must be this one.  This is the
23 declaration of Charles Aarestad.  Re: The Mulinda
24 Notes.
25    A.  No, I have not reviewed them.

Page 40

1     Q.  Okay.
2         MR. FRISK: Wait.  This is Exhibit 17.
3         MS. STANLEY: 18.  I'm -- this is 16.
4         MR. FRISK: Oh, 16.
5         THE WITNESS: 16.
6         MR. FRISK: Which one did you want?
7         MS. STANLEY: Oh.
8         MR. FRISK: 17 or 16?
9         MS. STANLEY: That says Parkside.  I
10 want the one that says Mulinda Notes.  17.  My
11 apologies.  Sorry.
12        MR. FRISK: I don't mean to lord over
13 you but...
14        THE WITNESS: No, that's fine.
15        MS. STANLEY: Now we got them all
16 messed up too.
17        (Off the record.)
18    A.  Okay.
19    Q.  Is this the first time you have seen
20 Exhibit 17?
21    A.  In its entirety, yes.
22    Q.  So you just saw parts of it?
23    A.  I had seen that it was attached to an
24 email.  I have not specifically gone through it.
25    Q.  Okay.  If you look at Exhibit 1-A which

Page 41

1 is page 1 of -- there you go -- 1 of 56, are you
2 familiar with this promissory note in the sum of
3 1,477,500?
4     A.  I am to the extent that it's been
5 supplied to attorneys over the last two years.
6     Q.  Is that your signature on page 3 of the
7 promissory note?  Oh, you went one page too far.
8     A.  Appears to be.
9     Q.  Do you recall signing this note?
10    A.  I do not.
11    Q.  You don't recall signing this?
12    A.  This one I do not.
13    Q.  Do you recall signing any others?
14    A.  Yes.  I remember signing a
15 approximately 400-and-some-change-thousand-dollar
16 note and a $600,000-and-some-change note prior to all
17 these that are in this exhibit.
18    Q.  So these -- this Exhibit 1-A is dated
19 2021.
20    A.  Correct.
21    Q.  You're saying you signed a 400 and a
22 $600,000 one prior to this?
23    A.  Yes.  And not $400,000 even and
24 $600,000 even.  It was odd numbers.
25    Q.  Sure.  Sure.  Are you saying this note

11 (Pages 38 - 41)

Page 42

1  was fraudulently obtained in your name?
2          MR. FRISK:  Object.  Objection as to
3  form.  That calls for a legal conclusion.  You can
4  answer as a layperson to the extent you know
5  anything.
6      A.  I very vividly and very specifically
7  for whatever reason remember the 400 and $600,000
8  note.  And when the notice of default I believe came
9  out in 2024 --
10     Q.  The one from me do you mean?
11     A.  Yes.  I was extremely shocked at the
12 amounts for me.  I do not recall signing these.  I
13 have racked my brain trying to think of what in the
14 world, where was I, when did this happen.
15         MR. FRISK:  We'll just note that when
16 she said "these," she's pointing --
17         THE WITNESS:  The -- the --
18         MR. FRISK:  -- to --
19         THE WITNESS:  -- three in front of me
20 in Exhibit --
21         MR. FRISK:  Which are Exhibits...?
22         THE WITNESS:  1-A, 2-A, 3-A.
23     Q.  (Ms. Stanley continuing)  So do you have
24 any -- would you have ever had conversations with
25 Martin Peterson?

Page 43

1      A.  I did, yes.
2      Q.  And was it during this time frame?
3      A.  Yes.
4      Q.  And what do you recall of those
5  communications?
6      A.  We were working on a SBA loan.  He had
7  brought that to our attention.  When I say "our," I
8  mean mine and Jesse's.  Was working on -- so the SBA
9  was the EIDL and the PPP.  Those were two different
10 loans that he brought to our attention.
11     Q.  So that was right during COVID --
12     A.  Yeah --
13     Q.  -- is that right?
14     A.  -- it was at the end or mid 2020 if I
15 remember correctly.  Maybe the end.  And then the 400
16 and the $600,000 notes were -- I don't recall the
17 dates on those exactly, but I just remember he came
18 into the office and said:  I need your signatures.
19 This is super short term.  It will be wrapped up into
20 permanent financing.  And --
21     Q.  For the 400 and the 600?
22     A.  Yes.
23     Q.  Okay.
24     A.  And I -- like I said, I don't recall
25 these ones.  Any other communications with Martin and

Page 44

1  I were from real estate matters.  He was helping a
2  person get a loan for buying some multi-family,
3  single-family homes.
4      Q.  Do you recall -- what was the PPP loan
5  for, what entity?
6      A.  Mindy Craig Photography, and CP
7  Business Management I believe also applied for that.
8      Q.  Do you -- at the time you had a
9  photography business?
10     A.  Yes.  Still do.
11     Q.  You still do?
12     A.  Uh-huh.
13     Q.  Okay.  Is it just you as an employee?
14     A.  Correct.
15     Q.  If you look at Exhibit 1-B, this is for
16 the $1.477 million loan, and that's the one that we
17 referred to as the First Mulinda Note.
18     A.  Uh-huh.
19     Q.  Do you see the disbursements in the
20 middle there?  It indicates that there's a lot of --
21 several cashier's checks --
22     A.  I do see that.
23     Q.  -- to Craig Development.  Do you have
24 any recollection of these?
25     A.  I do not.

Page 45

1      Q.  Any reason to dispute that these checks
2  were issued to Craig Development?
3      A.  I -- I would not be able to answer that
4  'cause I don't -- these don't look familiar to me.
5      Q.  Okay.  Do you have any reason to think
6  anyone forged your signature on that document?
7      A.  It looks like my signature.  I -- like
8  I said, I have racked my brain trying to remember
9  meeting with Martin, seeing Martin.  With these large
10 dollar amounts I certainly would believe that
11 something that large would stick out, but as far as
12 forging I -- I don't know.
13     Q.  Have you asked Jesse if he forged your
14 signature on these documents?
15     A.  Specifically, no.
16     Q.  Have you asked Jesse how these -- if he
17 recalls how these loans came about?
18     A.  There was roundtable discussion I
19 guess, and it was that more or less it was supposed
20 to have been rolled into permanent financing.  And
21 that's about the extent of anything, the conversation
22 went.
23     Q.  And when you say roundtable discussion,
24 what do you mean by that?
25     A.  It was:  Where did these amounts come

12 (Pages 42 - 45)

Page 46

1 from? I don't remember signing these. I thought I
2 had a 400 and a 600? And he just said: I thought
3 those were taken care of in permanent financing.
4      Q. So did he acknowledge to you though
5 that the note -- or that those loans had been issued?
6      A. Yes.
7      MR. FRISK: Well, I'm going to --
8 mischaracterizes the testimony. When you say --
9      MS. STANLEY: She said "yes" so...
10     MR. FRISK: Okay. Well, but she also
11 testified that -- that she didn't know anything about
12 that and she thought that they had gone into
13 permanent financing so...
14     MS. STANLEY: Okay. Let's -- what time
15 is it?
16     THE WITNESS: 9:42.
17     MS. STANLEY: Okay.
18     MR. FRISK: I have 10:30. And I can
19 run over to court and be back. So if we can go to
20 10:30 -- 10:25, take my break, I'll run over to court
21 and I will run up to the clerk and tell her to get me
22 in right away. It's just a pretrial, setting it for
23 trial.
24     MS. STANLEY: Yeah. Okay. Let me --
25 let me take like a five-minute --

Page 47

1      MR. FRISK: Sure.
2      MS. STANLEY: -- ten-minute one. 9:42
3 so 9:50?
4      MR. FRISK: Yeah, I'm good.
5      MS. STANLEY: Okay.
6      (Off the record from 9:42 a.m. to
7 10:03 a.m.)
8      Q. (Ms. Stanley continuing) You had
9 mentioned something about SBA loans and talking to
10 Martin about SBA loans; correct?
11     A. Yes.
12     Q. And you thought that was -- what did
13 you think that was for again?
14     A. The EIDL I believe it was.
15     Q. The EIDL loans --
16     A. Yes.
17     Q. -- the emergency ones?
18     A. Yes.
19     Q. I'm going to give you -- let's mark
20 this as... Well, hang on. Let me make sure I got
21 the right one. Exhibit 29.
22          (Whereupon, Deposition Exhibit
                29 was marked for identification
23              by the court reporter.)
24     MS. STANLEY: I just wrote 29 on that
25 for you. Do you want one too, Dan?

Page 48

1      MR. FRISK: I'll just share.
2      Q. (Ms. Stanley continuing) Okay. If you
3 look -- let me find the page for you, if that's okay.
4      A. Yeah. Oh, I'm sorry.
5      Q. Yeah. No, no.
6      MS. CATHCART: What page is that?
7      MS. STANLEY: It's kind of in the
8 middle and it says page 1. These forms are always
9 interesting. Wait a minute. Do you start out
10 page -- at the beginning page 2 and then it's a
11 $1.477 million loan or are the pages all mixed up?
12 Look at the second -- no, no, you're only front.
13 Second page.
14     MR. FRISK: She's looking.
15     MS. STANLEY: Is that a 1.477...?
16     MS. CATHCART: Yeah.
17     MS. STANLEY: Okay. So let's look at
18 that.
19     MS. CATHCART: So page 2?
20     MS. STANLEY: Yes.
21     Q. (Ms. Stanley continuing) Are you
22 familiar with having made an SBA loan application for
23 this sum of money with Martin -- the assistance of
24 Martin Peterson?
25     A. I believe that this was not approved.

Page 49

1 The SBA kicked it back.
2      Q. The SBA what?
3      A. Kicked it back or --
4      Q. Okay.
5      A. -- said it wasn't --
6      Q. But did you apply for this?
7      A. -- eligible or something like that.
8 Yes --
9      Q. Okay.
10     A. -- I do recognize this under direction
11 of Martin.
12     Q. And it indicates this was for working
13 capital; is that right? In the middle there,
14 "Purpose of the loan."
15     A. That's what Martin put in, yes.
16     Q. Okay. And was that working capital for
17 your Mindy Photography business or was this for
18 construction of the Watertown projects?
19     A. Is there another page that goes with
20 this? Because I believe it had -- there was one for
21 Mindy Craig Photography.
22     MR. FRISK: And I'll just object to the
23 form. It calls for speculation. She can't find
24 the first page.
25     A. Truly I don't recall what the purpose

13 (Pages 46 - 49)

Page 50

1  was.  You'd have to ask Martin.
2       Q.   (Ms. Stanley continuing)  So you signed
3  it, but you don't recall what the purpose was for?
4       A.   Not off the top of my head.
5       Q.   And that's your signature though on
6  page -- I believe it's page 5.
7       A.   Yes.
8       Q.   And do you see on page 5 that...
9       A.   Yep, you can go ahead.
10      Q.   You're on page 5?
11      A.   Yep, page 5.
12      Q.   Okay.
13      A.   The signature page?
14      Q.   Yep.
15      A.   Yep.
16      Q.   Do you see where it has the
17 Representations section at the top?
18      A.   Yes.
19      Q.   And does it say, "All SBA loan proceeds
20 will be used only for business related purposes as
21 specified in the loan application"?
22      A.   Yes.
23           MR. FRISK:  You're asking her if she
24 sees that on page 5?
25           MS. STANLEY:  Yes.

Page 51

1       Q.   (Ms. Stanley continuing)  And you're
2  not looking at page 5.  This is page 5.
3       A.   Yes, I do see that.
4       Q.   Okay.  And can you read the Accuracy
5  Certification section on page 5, please?
6       A.   I certify -- certify that the
7  information provided in this application and the
8  information I have provided in all supporting
9  documents and forms is true and accurate.  I realize
10 that the penalty for knowingly making a false
11 statement to obtain a guaranteed loan from the SBA is
12 that I may be fined up to $250,000 and/or be put in
13 jail for up to 5 years under 18 USC 1001; under 15
14 USC 645 by imprisonment of not more than two years
15 and/or a fine of not more than 5,000; and, if false
16 statements are submitted to a Federally insured
17 institution, I may be fined up to 1 million and/or be
18 put in jail for up to 30 days under 18 USC 1014.
19      Q.   So you -- I just want to confirm.  You
20 made this application --
21      A.   Uh-huh.
22      Q.   -- but you don't know the reason for
23 it?
24           MR. FRISK:  Objection as to form.
25 Mischaracterizes her testimony.  She already said she

Page 52

1  wasn't sure if this was for the photography business
2  or not, and it clearly doesn't have the page on it.
3  You can answer to the extent you remember.
4       A.   The extent of what I recall was that
5  Martin put together the application, and what it was
6  for -- to be used for says working capital.  That's
7  the extent of what I recall.
8       Q.   And you -- you recall signing it?
9       A.   Yes, I believe so.
10           MS. STANLEY:  Let's mark this one as
11 30.
12           (Whereupon, Deposition Exhibit
             30 was marked for identification
13           by the court reporter.)
14      Q.   (Ms. Stanley continuing)  I'll give it
15 to you.  Make sure you put that one --
16      A.   Yes.
17      Q.   -- back together.  Okay.  You are
18 looking at Exhibit 30; correct?
19      A.   Yes.
20      Q.   And if you look at page 2, is this for
21 a -- the amount of loan request on this one indicates
22 1,652,500?
23      A.   Yes.
24      Q.   Okay.  And does that again indicate the
25 purpose of the loan was for working capital?

Page 53

1       A.   Yes.
2       Q.   And did you -- is this your signature
3  on page 5?
4       A.   Appears to be.
5       Q.   Okay.  Do you know on this one what the
6  purpose of the loan was for?
7       A.   Just by the page 2 stating working
8  capital.
9       Q.   And you submitted this application for
10 SBA funds; correct?  Or gave permission for Martin
11 Peterson to submit it?
12      A.   I don't recall this one.
13      Q.   You recall the one that we just looked
14 at?
15      A.   I recall filling out an application for
16 an SBA, but I don't recall multiples.
17      Q.   You only recall one?
18      A.   One.
19      Q.   And you don't -- do you remember the
20 amount of the one that was submitted?
21      A.   I think it was this first one.
22      Q.   The 1.6?
23      A.   Point 4.
24      Q.   Oh, the first one was Exhibit 29,
25 1.477?

14 (Pages 50 - 53)

Page 54

1    A.  Yep, I don't remember -- I believe that
2  was -- well, judging by the dates that was the first
3  one.  The amounts, I -- I couldn't attest to you.  I
4  just remember filling out one application.
5      Q.  Okay.  If we look on page 6, does that
6  look like your handwriting?
7      A.  Appears to.
8      Q.  And then page 8, again the
9  representations, acknowledgments and authorizations?
10     A.  Appears to.
11         MR. FRISK:  On 8?  You mean 8?
12         MS. STANLEY:  Yes, there's a signature
13  page on page 8.
14         MR. FRISK:  Oh, I thought you said 6.
15         MS. STANLEY:  There's one on 6 as well.
16  Or not -- there's writing on page 6.
17         MR. FRISK:  Oh.
18         MS. STANLEY:  Not signature but
19  initials.  All right.  And let's do one more.  This
20  is 31?
21         THE REPORTER:  Correct.
22             (Whereupon, Deposition Exhibit
                31 was marked for identification
23              by the court reporter.)
24     Q.  (Ms. Stanley continuing)  And I notice
25  you're looking at the exhibits --

Page 55

1      A.  Yeah --
2      Q.  -- for --
3      A.  -- I'm looking at my signature and I'm
4  also looking at the dates to see if they coordinate,
5  are the same, if it would have been all in one time
6  when the signing.  And even just jogging my memory as
7  to what the world...
8      Q.  Here's Exhibit 31.  Just make sure I
9  got the right numbers.  Here's 31.  And if you look
10  on page 2 of 31, does this appear to be a loan
11  request -- SBA loan request from Mulinda Sue Craig in
12  the sum of $1,321,100?
13     A.  Yes.
14     Q.  And if you look on page 5, does that
15  appear to be your signature?
16     A.  It does appear, but it looks like it
17  was either transferred -- it doesn't look like a wet
18  signature so I'm not sure.  It's not as clear as the
19  other ones so I don't know.
20     Q.  Okay.  Let's look at page 6.  Does that
21  appear to be your writing on page 6?
22     A.  Yeah, again it almost looks like it was
23  transferred.  Not as clear as the other ones.
24     Q.  So --
25     A.  It appears to be my initialing, but the

Page 56

1  other ones were very specifically clear.  These ones
2  are very -- not.
3         MR. FRISK:  Well, just let the record
4  reflect that Exhibit 29 and 30 and 31 were
5  photocopies.  We don't have the originals.
6         MS. STANLEY:  That's true.  They're not
7  here today.
8      Q.  (Ms. Stanley continuing)  Please look at
9  page 8.  Does that appear to be your signature?
10     A.  Appears to, but again it looks odd.
11     Q.  It looks like it's been photocopied
12  multiple times --
13     A.  Yeah.
14     Q.  -- is that correct?
15     A.  Yeah.
16     Q.  Okay.  Do you have any recollection of
17  making this request for an SBA loan in that sum of
18  $1.321 million?
19     A.  That does not ring a bell to me.
20     Q.  And this one indicates the purpose of
21  the loan was for working capital again; is that
22  correct?
23     A.  That is what the paperwork states.
24     Q.  Would there be any reason that Mindy
25  Photography would need loans in these amounts?

Page 57

1      A.  No.  Is there a business tax ID on any
2  of them --
3      Q.  Not that I have seen.
4      A.  -- that the bank has?
5      Q.  No.
6      A.  'Cause the bank would have the
7  originals of these; correct?
8      Q.  (Indicating.)
9      A.  And in the loan file is there any
10  documentation --
11     Q.  If there was --
12     A.  -- as to what it's for?
13     Q.  My understanding of the forms is -- if
14  you look at page 9, that is where if it was on behalf
15  of an entity that would be filled out.  But that's
16  just my understanding of the forms.  So would --
17  would you have submitted loan applications for these
18  amounts on behalf of Mindy Photography?
19     A.  Not for these amounts, no.
20     Q.  Was there any other business you would
21  have submitted these on behalf of?
22     A.  No.  The PPP was for Mindy Craig
23  Photography, and I believe CP Business Management
24  also got one.
25

15 (Pages 54 - 57)

Page 58

1          (Whereupon, Deposition Exhibit
          32 was marked for identification by
2          the court reporter.)
3      Q.  (Ms. Stanley continuing)  Handing you
4  what's been marked as Exhibit 32, and can you
5  identify what this document is?  Oh, sorry.
6      A.  It is a check from Craig Development
7  for $600.
8      Q.  Made out to who?  I can't...
9      A.  Brady Punt.
10     Q.  P-u-n-t?
11     A.  Yes.
12     Q.  Is this your handwriting?
13     A.  Yes.
14     Q.  What is -- who's Brady Punt?
15     A.  Was a horse trainer, owner.
16     Q.  Who -- is this somebody that you used
17  as a horse trainer, owner?
18     A.  No.
19     Q.  Who -- why would Craig Development make
20  a payment for $600 to Brady Punt?
21     A.  Good question.  As Jesse stated
22  yesterday, he uses the 824 out of the Craig
23  Development checking in the Yardi system --
24     Q.  Uh-huh.
25     A.  -- for personal expenses.  This would

Page 59

1  have been one of those instances.
2      Q.  And you wrote the check out though?
3      A.  It looks like I did.
4      Q.  Can you recall other instances where --
5  or did you not indicate you were not authorized or
6  are you authorized to write on the Craig Development
7  account?
8      A.  I may have been back then.  I'm not
9  currently now to my knowledge.  And if they didn't
10  kick it back, I must be or must have been.
11     Q.  Well, is that your -- I mean, is that
12  how you sign?  The authorized signature, is that you
13  signing in your name or is that you signing Jesse's
14  name?
15     A.  That's me signing mine.
16     Q.  That's your --
17     A.  -- signature.  But it's shortened over
18  the years.
19     Q.  Okay.  Do you recall making other
20  payments out of the Craig Development account?
21  Writing other checks I should say.
22     A.  If I did, it would have been Jesse
23  handing me a check for whatever the case may have
24  been.
25     Q.  So are the -- the horse interaction, is

Page 60

1  that Jesse doing that or, I mean, who -- who rides
2  the horses?
3      A.  Our daughters.
4      Q.  The younger twins?
5      A.  Yes.
6      Q.  Okay.  Both of them?
7      A.  Yes.
8      Q.  Do you ride horses?
9      A.  No.
10     Q.  Does Jesse ride horses?
11     A.  He does not.
12          (Whereupon, Deposition Exhibit
          33 was marked for identification
13          by the court reporter.)
14          MR. FRISK:  Do you want to take -- you
15  guys want to take your midmorning right now and let
16  me run over?
17          MS. STANLEY:  You need to run?  Okay.
18          (Off the record from 10:23 a.m. to
19  10:57 a.m.)
20          MS. STANLEY:  It is 10:57.  We're back
21  on the record.  Mr. Frisk hurried back from a
22  scheduling conference so thank you for hurrying back.
23     Q.  (Ms. Stanley continuing)  I'm handing
24  you what's been marked as Exhibit 33.  Is that your
25  handwriting on Exhibit 33?

Page 61

1      A.  Yes.
2      Q.  And can you identify the document?
3      A.  It's a check from Craig Development for
4  $9,000.
5      Q.  And made out to...?
6      A.  I think it's Nichole Mathison.
7  Mathiason.
8      Q.  And it looks like it says "3 saddles"
9  to me.  Is that right?
10     A.  Yes.
11     Q.  Okay.  Does this ring any bells?
12     A.  Vaguely.
13     Q.  And was that -- so the authorized
14  signature, is that you signing your name or are you
15  signing Jesse's name?
16     A.  My name.
17     Q.  Okay.  So you were authorized to write
18  this check?
19     A.  I believe this is the same time frame
20  as Exhibit 32.  And at the time I may have had
21  signature authority.  I can't recall.  The bank
22  didn't kick it back so I must have.
23     Q.  Did you remove yourself from having
24  signatory authority?
25     A.  No.  No, not that I recall.  I just

16 (Pages 58 - 61)

Page 62

1 can't recall how the checking account was set up
2 initially. I don't recall.
3      Q.  Do you have recollection of any other
4 checks that you may have written for Craig
5 Development or Craig Properties?
6      A.  In what time frame?
7      Q.  In 2020 to 2024.
8      A.  Yes.  I don't know about Craig
9 Properties though.  Craig Development, yes.  Craig
10 Properties, I don't believe there should have been
11 any on Craig Properties.  I wouldn't have access to
12 that check -- or a check blank at all.
13      Q.  And I think earlier -- just remind me.
14 Earlier I think you testified that you don't recall
15 ever getting payments to you from either Craig
16 Development or Craig Properties.  To you in your
17 individual capacity.
18      A.  You asked for Craig Properties --
19      Q.  Okay.
20      A.  -- not Craig Development.
21      Q.  Did you -- in that time frame of 2020
22 to '24 did you receive funds from Craig Development?
23      A.  Yes.
24      Q.  What was the purpose?
25      A.  Multitude of reasons.  To pay down the

Page 63

1 car loans.  To -- or -- yes, pay down car loans, but
2 like they're monthly payments.  Reimbursement for
3 random expenses.  I mean, it all -- like I said, if
4 anything, it went through the 824 account.  So it was
5 in our Yardi system.  Or Jesse's part of the Yardi
6 system.  'Cause we have two different ones.  It would
7 all be tracked in there as to what it was for, how
8 much or whatnot.
9      Q.  Is the Yardi system -- you have this
10 for both Craig Development and Craig Properties?
11      A.  We have two separate systems,
12 completely separate systems.  It's -- yes, it's Yardi
13 software, but there are two logins, there two -- they
14 don't cross over at all.  I don't have it on my
15 computer.  I don't have access to it.  And likewise
16 for CP Business Management, Craig Development doesn't
17 have a login or access to it.
18      Q.  So the Yardi software is used for
19 Craig -- CP Business --
20      A.  Yes.
21      Q.  -- correct?
22      A.  Yes.
23      Q.  Okay.  And it's also used for Craig
24 Properties?
25      A.  Craig Properties, I don't know how

Page 64

1 their account is set up, but there's different
2 subcategories.  I don't know if it's a Craig
3 Properties heading or if it's a Craig Development
4 heading or if it's just a Craig heading.  I don't
5 know.
6      Q.  Uh-huh.  Okay.
7      A.  And then all the different
8 subcategories for the different checking accounts,
9 entities, buildings, bank account, all of it.  And
10 same thing for CP Business Management.
11      Q.  So is there like two -- two licenses?
12      A.  Uh-huh.
13      Q.  One for --
14      A.  Yes.
15      Q.  Okay.  And is Jesse the only one who
16 has access to the Craig one, Craig Properties, Craig
17 Development one?
18      A.  Jordan would also have access.  And I
19 believe anyone that she's had working under her over
20 numerous years may have had access.  Just -- you can
21 limit certain aspects and scopes to just seeing
22 maintenance, just seeing tenants, just seeing bank
23 account information, just seeing financials, all
24 that.
25      Q.  Okay.  Interesting.  So I -- you said I

Page 65

1 had asked you about Craig Properties --
2      A.  Correct.
3      Q.  -- and that you had not received any
4 funds from Craig Properties to your recollection.
5      A.  Not that I can recall.
6      Q.  Okay.  And then just to clarify.  You
7 have received funds though from Craig Development?
8      A.  Yes.
9      Q.  And they were during that time period
10 of 2020 to 2024?
11      A.  Would have been vehicle payments that
12 get written out to me, and then they come out of my
13 bank account as auto payments.  And then just like I
14 said random personal expenses.  I don't even -- I
15 couldn't even tell you what else.
16      Q.  But you weren't --
17      A.  Is there something specific that you're
18 asking --
19      Q.  Well, you --
20      A.  -- that I can help?
21      Q.  -- you weren't doing any work for Craig
22 Development; right?
23      A.  No.
24      Q.  So these were gifts?
25           MR. FRISK:  Objection to form.  She's

17 (Pages 62 - 65)

Page 66

1 previously testified that the nature of these were
2 just personal expense reimbursements, not gifts, and
3 that's -- that would have legal connotations if they
4 were not -- if they were gifts. We know what they
5 were. They were just reimbursements for stuff.
6      Q. (Ms. Stanley continuing) Well, when
7 you say reimbursements for stuff, were they things
8 that you had paid on behalf of Craig Development that
9 you are asking for it to reimburse you?
10      A. No. It would have been Jesse paying
11 for whatever the item was that maybe I personally
12 paid for. It went on my credit card or my debit card
13 or whatever the case may have been.
14      Q. So were these things to benefit Craig
15 Development or to benefit Jesse in his individual
16 capacity?
17      MR. FRISK: Objection as to form.
18 She's previously testified that there's a subcategory
19 of personal expenses that Jesse uses his account for.
20 Go ahead and answer to the extent you can. And I
21 don't remember what the question was so...
22      A. A little bit of both. I can't recall
23 anything specifically off the top of my head to give
24 as an example for Craig Development specifically
25 paying for versus Jesse Craig and the 824 out of the

Page 67

1 Craig Development account paying for. Even some
2 random things in Watertown, the lake home. I can't
3 recall specifically.
4      Q. (Ms. Stanley continuing) So is 824
5 the -- like the accounting number for Craig
6 Development?
7      A. 824 is a...
8      Q. Like the Yardi number or something?
9      A. Yeah. Yes --
10      Q. Okay.
11      A. -- would be the best I guess, the
12 terminology for that.
13      Q. What's the one for Craig Properties?
14      A. That one I don't -- I don't know. I
15 don't know how Craig Properties subcategorizes
16 anything.
17      Q. Do you...
18      MS. STANLEY: Well, let's mark this
19 one. This is...?
20      THE REPORTER: 34.
21      (Whereupon, Deposition Exhibit
           34 was marked for identification by
22      the court reporter.)
23      Q. (Ms. Stanley continuing) I'm giving
24 you Exhibit 34. Can you identify this document?
25      A. It's a Craig Development check.

Page 68

1      Q. Made out to...?
2      A. Crown Jewels.
3      Q. And it's dated it looks like June 29th
4 of 2022.
5      A. Yes.
6      Q. Did you receive any jewelry on this
7 date, on or about this time from Jesse?
8      A. I don't believe so.
9      Q. Are you aware of any jewelry purchases
10 by Jesse around this time for anything else?
11      A. You would have to ask him specifically.
12 I know that he helped his now son-in-law with some
13 jewelry, but I don't know --
14      Q. Like buying --
15      A. -- a date.
16      Q. -- buying jewelry for --
17      A. Yes.
18      Q. -- other people?
19      A. Yes.
20      Q. Is this Jesse's signature?
21      A. Yes.
22      Q. Are you aware of other personal
23 expenses similar to this coming out of the Craig
24 Development, LLC account?
25      A. I would not be aware. I couldn't tell

Page 69

1 you.
2      MS. STANLEY: I have no further
3 questions.
4      MR. FRISK: We'll read and sign. And
5 then I think Mac's office gets a -- wants a copy.
6      MS. CATHCART: Yeah.
7      MR. FRISK: I don't necessarily. I
8 don't need a copy.
9      (Whereupon, the deposition of MULINDA
10 CRAIG was concluded at 11:07 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

18 (Pages 66 - 69)

Page 70

```
 1          REPORTER'S CERTIFICATE
 2
    STATE OF NORTH DAKOTA )
 3                        )
    COUNTY OF CASS        )
 4
 5        I hereby certify that I reported the
    deposition of MULINDA CRAIG on September 24, 2025, at
 6  the Vogel Law Firm, Fargo, North Dakota, and that the
    witness was by me first duly sworn to tell the whole
 7  truth;
 8        That the testimony was transcribed by me
    and is a true record of the testimony of the witness;
 9
          That the cost of the original has been
10  charged to the party who noticed the deposition, and
    that all parties who ordered copies have been charged
11  at the same rate for such copies;
12        That I am not a relative or employee or
    attorney or counsel of any of the parties, or a
13  relative or employee of such attorney or counsel;
14        That I am not financially interested in the
    action and have no contract with the parties,
15  attorneys or persons with an interest in the action
    that affects or has a substantial tendency to affect
16  my impartiality;
17        That the right to read and sign the
    deposition transcript by the witness was reserved.
18
          WITNESS MY HAND AND SEAL THIS 26th day of
19  September, 2025.
20
21
22  [signature]
23  Charla R. Pavlik, RPR
    Notary Public
24  Cass County, North Dakota
    My commission expires September 4, 2026.
25
```

Page 71

```
 1          Veritext Legal Solutions
              1100 Superior Ave
 2               Suite 1820
             Cleveland, Ohio 44114
 3           Phone: 216-523-1313
 4
    September 26, 2025
 5
    To: Maurice VerStandig
 6
    Case Name: Generations On 1St LLC, Et Al v.
 7
    Veritext Reference Number: 7619968
 8
    Witness: Mulinda Craig     Deposition Date:  9/24/2025
 9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA
```

Page 72

```
 1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 7619968
 3  CASE NAME: Generations On 1St LLC, Et Al v.
    DATE OF DEPOSITION: 9/24/2025
 4  WITNESS' NAME: Mulinda Craig
 5  In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7  I have made no changes to the testimony
    as transcribed by the court reporter.
 8  _____
 9  Date            Mulinda Craig
10    Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
         Statement; and
14    Their execution of this Statement is of
         their free act and deed.
15
      I have affixed my name and official seal
16  this _____ day of _____, 20____.
17
    _____
18    Notary Public
19
    _____
    Commission Expiration Date
20
21
22
23
24
25
```

Page 73

```
 1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 7619968
 3  CASE NAME: Generations On 1St LLC, Et Al v.
    DATE OF DEPOSITION: 9/24/2025
 4  WITNESS' NAME: Mulinda Craig
 5  In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7  I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9  I request that these changes be entered
    as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date            Mulinda Craig
14
      Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18      in the appended Errata Sheet;
      They signed the foregoing Sworn
19      Statement; and
      Their execution of this Statement is of
20      their free act and deed.
21    I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
      Notary Public
24
    _____
25    Commission Expiration Date
```

19 (Pages 70 - 73)

```
                                            Page 74
 1          ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
 2          ASSIGNMENT NO: 7619968
 3  PAGE/LINE(S) /      CHANGE      /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

20  Date       Mulinda Craig
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
          Notary Public
24
          _____
25          Commission Expiration Date
```

**[& - 58]**                                                                Page 1

**&**

**&**   2:9

**1**

**1**   40:25 41:1,1
41:18 42:22
44:15 48:8
51:17
**1,321,100**   55:12
**1,477,500**   41:3
**1,500**   24:25
25:11
**1,652,500**   52:22
**1.321**   56:18
**1.477**   44:16
48:11 53:25
**1.477...**   48:15
**1.6**   53:22
**10**   17:22
**1001**   51:13
**1014**   51:18
**10:03**   47:7
**10:23**   60:18
**10:25**   46:20
**10:30**   46:18,20
**10:57**   60:19,20
**11**   1:5,9,12
**1100**   71:1
**11:07**   69:10
**1389**   2:16
**15**   9:6 51:13
**16**   10:2 40:3,4
40:5,8

**1630**   2:5
**17**   10:2 14:8
27:9 39:19
40:2,8,10,20
**17952**   70:22
**18**   39:21 40:3
51:13,18
**1820**   71:2
**1919**   3:11,13,15
**1st**   1:4 16:2
71:6 72:3 73:3

**2**

**2**   42:22 48:10
48:19 52:20
53:7 55:10
**20**   10:6 20:22
72:16 73:22
74:22
**200**   2:10
**2010**   5:11 7:18
8:8,10 9:3
**2014**   9:5,14,15
**2015**   10:3,6
**2016**   9:19 10:6
14:8 27:9
**2017**   9:19
**2020**   27:13
43:14 62:7,21
65:10
**2021**   20:22,22
41:19
**2022**   68:4

**2024**   27:13
42:9 62:7
65:10
**2025**   1:22 70:5
70:19 71:4
**2026**   70:24
**216-523-1313**
71:3
**218**   2:16
**24**   1:22 36:12
36:12,20 62:22
70:5
**25**   36:12,20,21
**25-30002**   1:4
**25-30003**   1:8
**25-30004**   1:11
**250,000**   51:12
**26**   71:4
**26th**   70:18
**29**   3:11 47:21
47:22,24 53:24
56:4
**29th**   68:3

**3**

**3**   12:15,15 41:6
42:22 61:8
**30**   3:13 51:18
52:11,12,18
56:4
**31**   3:15 54:20
54:22 55:8,9
55:10 56:4

**32**   3:17 58:1,4
61:20
**33**   3:19 60:12
60:24,25
**34**   3:21 67:20
67:21,24
**34th**   2:10
**38**   7:12

**4**

**4**   3:5 53:23
70:24
**4-15-21**   3:12
**400**   41:15,21
42:7 43:15,21
46:2
**400,000**   41:23
**44114**   71:2
**45**   6:8
**47**   3:11

**5**

**5**   50:6,8,10,11
50:24 51:2,2,5
51:13 53:3
55:14
**5,000**   51:15
**5-15-21**   3:16
**50**   13:21
**50-50**   13:21
**52**   3:13
**54**   3:15
**56**   41:1
**58**   3:17

**[58078 - appear]**                                      Page 2

| | | | |
|---|---|---|---|
| **58078**  2:11 | **9** | **accounts**  64:8 | **altering**  37:11 |
| **58102**  2:5 | **9**  57:14 | **accuracy**  51:4 | **altra**  23:19,23 |
| **58107**  2:17 | **9,000**  61:4 | **accurate**  51:9 | **ambiguous** |
| **6** | **9/24/2025**  71:8 | **acknowledge** | 21:1 |
| **6**  54:5,14,15,16 | 72:3 73:3 | 46:4 72:11 | **amount**  21:3 |
| 55:20,21 | **9:50**  47:3 | 73:16 | 31:20 32:15 |

**[appears - brain]**                                                    Page 3

| | | | |
|---|---|---|---|
| **appears** 41:8 | **assistance** 18:6 | 52:17 59:8,10 | 33:5 36:16 |
| 53:4 54:7,10 | 48:23 | 60:20,21,22 | 37:20 42:8 |
| 55:25 56:10 | **assistant** 5:22 | 61:22 71:15 | 44:7 45:10 |
| **appended** | **attached** 40:23 | **background** | 47:14 48:25 |
| 73:11,18 | 73:7 | 6:13 | 49:20 50:6 |
| **application** | **attention** 43:7 | **bad** 19:12 | 52:9 54:1 |
| 48:22 50:21 | 43:10 | 33:14 | 57:23 61:19 |
| 51:7,20 52:5 | **attest** 23:6 54:3 | **balance** 38:21 | 62:10 64:19 |
| 53:9,15 54:4 | **attorney** 6:21 | **bank** 2:14 | 68:8 |
| **applications** | 70:12,13 | 20:15,21 22:20 | **bell** 56:19 |
| 57:17 | **attorneys** 2:4,9 | 23:19 24:18,22 | **bells** 61:11 |
| **applied** 44:7 | 2:15 41:5 | 37:15 57:4,6 | **benefit** 66:14 |
| **apply** 49:6 | 70:15 | 61:21 64:9,22 | 66:15 |
| **approved** | **authority** 11:9 | 65:13 | **best** 67:11 |
| 48:25 | 11:13 30:20 | **banker** 9:20 | **big** 12:8,13 |
| **approximately** | 61:21,24 | 10:10,13 14:3 | 35:19 36:9 |
| 41:15 | **authorizations** | **banker's** 10:4 | **bit** 8:23 9:10 |
| **area** 5:2 | 54:9 | **banking** 13:9 | 25:15 66:22 |
| **arrangement** | **authorize** | 13:11 20:1 | **blank** 62:12 |
| 15:3,18 | 73:11 | 21:22 | **blur** 7:16 |
| **asked** 9:24 | **authorized** | **bankruptcy** 1:1 | **bookkeeping** |
| 22:12 38:11,20 | 59:5,6,12 | 1:4,7,11 2:4 | 38:23 39:2 |
| 45:13,16 62:18 | 61:13,17 | **based** 16:24 | **born** 4:20 9:6 |
| 65:1 | **auto** 65:13 | **beginning** | **bottom** 35:14 |
| **asking** 21:1 | **ave** 71:1 | 10:23 48:10 | 35:17 |
| 22:16 50:23 | **avenue** 2:5,10 | **behalf** 33:15 | **box** 2:16 30:16 |
| 65:18 66:9 | 2:16 | 57:14,18,21 | 30:21,25 |
| **asks** 11:1 | **aware** 22:16 | 66:8 | **boxes** 30:13,14 |
| **aspects** 64:21 | 68:9,22,25 | **believe** 8:12 | 30:15 |
| **assignment** | **b** | 10:6,11 11:11 | **brady** 3:17 |
| 72:2 73:2 74:2 | **b** 2:5 3:8 44:15 | 13:6,6 14:1,11 | 58:9,14,20 |
| **assist** 18:3,3,19 | **back** 5:4 34:14 | 14:11 15:1 | **brain** 42:13 |
| 37:11,16 38:10 | 46:19 49:1,3 | 26:22 27:9 | 45:8 |
| 38:18 | | 28:6,17 29:23 | |

**[break - commenced]**                                                                 Page 4

| | | | |
|---|---|---|---|
| **break**  46:20 | **capacity**  62:17 | **chance**  39:15 | 44:21 45:1 |
| **broad**  34:2 | 66:16 | **change**  14:2,3 | 59:21 62:4 |
| **brokerage**  28:9 | **capital**  49:13 | 15:21 41:15,16 | **christianna**  2:6 |
| 28:10 | 49:16 52:6,25 | 71:13,14 73:8 | 2:6 |
| **brought**  43:7 | 53:8 56:21 | 74:3 | **civil**  72:5 73:5 |
| 43:10 | **car**  23:13,14,16 | **changed**  14:2 | **clarify**  33:11 |
| **buildings**  64:9 | 63:1,1 | 18:13 25:14 | 65:6 |
| **business**  9:9,17 | **card**  66:12,12 | **changes**  14:18 | **classes**  6:4 27:1 |
| 9:18 10:8,14 | **care**  46:3 | 71:12 72:7 | 28:13,15 |
| 11:24 13:1,15 | **caren**  2:17 | 73:7,9 | **clear**  22:25 |
| 13:17 14:5,9 | 12:17 35:23 | **changing**  18:11 | 55:18,23 56:1 |
| 14:24 15:5,9 | **case**  1:5 25:6 | **chapter**  1:5,9 | **clearly**  52:2 |
| 16:6,17 17:3 | 59:23 66:13 | 1:12 | **clerical**  33:13 |
| 19:22 24:11,18 | 71:6 72:3 73:3 | **characterizati...** | 33:14 |
| 25:25 26:20 | **cash**  20:16 | 18:1 | **clerk**  46:21 |
| 27:18,20 29:6 | **cashier's**  44:21 | **charged**  70:10 | **cleveland**  71:2 |
| 38:24,25 44:7 | **cass**  70:3,24 | 70:10 | **close**  17:20 |
| 44:9 49:17 | **cathcart**  2:6 | **charla**  1:25 | **cloud**  16:10,13 |
| 50:20 52:1 | 48:6,16,19 | 70:23 | **clunk**  12:13,13 |
| 57:1,20,23 | 69:6 | **charles**  2:21 | **code**  18:14 |
| 63:16,19 64:10 | **cause**  4:6 30:4 | 6:24 34:15,16 | **coldwell**  9:20 |
| **buying**  44:2 | 34:2,19 37:9 | 35:12,25 36:2 | 10:4,10,13 |
| 68:14,16 | 45:4 57:6 63:6 | 39:23 | 14:2 |
| **c** | **certain**  22:10 | **check**  3:17,19 | **college**  5:12 |
| **c**  2:1 3:1 4:1 | 64:21 | 3:21 58:6 59:2 | 6:15 |
| **ca**  71:25 | **certainly**  45:10 | 59:23 61:3,18 | **columns**  18:9 |
| **calculate**  37:3 | **certificate**  70:1 | 62:12,12 67:25 | **come**  9:17 18:8 |
| **calculation** | 73:11 | **checking**  11:24 | 23:13 34:20 |
| 33:3 | **certification** | 13:1 23:17,18 | 45:25 65:12 |
| **call**  31:5 | 51:5 72:1 73:1 | 24:15 58:23 | **comes**  17:2 |
| **calling**  24:6 | **certify**  51:6,6 | 62:1 64:8 | 23:16 33:10 |
| **calls**  20:11 35:6 | 70:5 | **checks**  11:10 | **coming**  68:23 |
| 42:3 49:23 | **chameleon** | 11:13,16 13:2 | **commenced**  4:3 |
| | 16:13,22 | 20:23 24:25 | |

**[comment - craig]**                                        Page 5

| | | | |
|---|---|---|---|
| **comment**  23:7 | **construction** | 15:22 20:2,3,6 | 63:16,19 64:10 |
| **commercial** | 29:18,24 30:4 | 24:20 28:20 | **cpbusmgt.com.** |
| 9:21 | 30:5 31:13 | 32:9,12,19,22 | 17:14 |
| **commission** | 49:18 | 33:22 38:13,14 | **craig**   1:18 2:8,8 |
| 70:24 72:19 | **contact**  16:21 | 41:20 44:14 | 2:21 3:4,12,14 |
| 73:25 74:25 | **continuing** | 47:10 52:18 | 3:16 4:3,4,13 |
| **communicati...** | 12:18 17:7 | 53:10 54:21 | 4:14 8:5,11,21 |
| 30:7,11 43:5 | 19:11 20:14 | 56:14,22 57:7 | 8:24 9:4 10:12 |
| 43:25 | 21:7,14 22:15 | 63:21 65:2 | 10:17,24 11:4 |
| **company**  7:24 | 23:9 26:9 30:6 | **corrections** | 11:7,10,12 |
| 8:4,8 9:22 10:7 | 33:12 34:3 | 71:12 73:17 | 13:7,9,12 17:4 |
| 16:11,20 | 36:5 39:18 | **correctly**  18:10 | 19:12,17,19 |
| **completed**  16:2 | 42:23 47:8 | 18:11 43:15 | 20:1,5,7,17,19 |
| 71:15 | 48:2,21 50:2 | **cost**  70:9 | 21:8,14,17,18 |
| **completely** | 51:1 52:14 | **counsel**  70:12 | 21:23 22:12,18 |
| 63:12 | 54:24 56:8 | 70:13 | 23:10 24:10 |
| **computer** | 58:3 60:23 | **county**  70:3,24 | 26:3 32:10,11 |
| 63:15 | 66:6 67:4,23 | 72:10 73:15 | 39:2 44:6,23 |
| **concluded** | **contract**  70:14 | **couple**  24:8 | 45:2 49:21 |
| 69:10 | **contractors**  9:1 | **court**  1:1 4:12 | 55:11 57:22 |
| **conclusion**  42:3 | 24:9 35:6,7 | 46:19,20 47:23 | 58:6,19,22 |
| **conduct**  35:24 | **control**  24:17 | 52:13 54:23 | 59:6,20 61:3 |
| **conference** | **conversation** | 58:2 60:13 | 62:4,5,8,9,9,11 |
| 60:22 | 45:21 | 67:22 72:7 | 62:15,16,18,20 |
| **confirm**  51:19 | **conversations** | **covid**  43:11 | 62:22 63:10,10 |
| **confusion**  23:1 | 42:24 | **cp**  9:17,18 10:8 | 63:16,19,23,25 |
| **conglomerate** | **coordinate** | 10:13,13 11:24 | 64:2,3,4,16,16 |
| 9:19 | 55:4 | 13:1,15,17 | 64:16 65:1,4,7 |
| **connotations** | **copies**  70:10,11 | 14:5,9,19,24 | 65:21 66:8,14 |
| 66:3 | **copy**  69:5,8 | 15:5,9 16:6,17 | 66:24,25 67:1 |
| **considered** | **corner**  10:23 | 17:3 19:5,6,10 | 67:5,13,15,25 |
| 24:11,11 | **correct**  6:25 | 19:17,22 24:18 | 68:23 69:10 |
| **constructed** | 7:19 10:15 | 29:6 38:23,25 | 70:5 71:8 72:4 |
| 31:8 34:5 | 11:5,8 14:14 | 44:6 57:23 | 72:9 73:4,13 |

**[craig - duly]**                                                                    Page 6

| | | | |
|---|---|---|---|
| 74:20 | data 18:23 | 71:22 | direction 49:10 |
| craigprop.com | date 1:22 68:7 | deposition 3:9 | directly 20:8 |
| 17:17 | 68:15 71:8 | 4:2 22:23 | disbursements |
| craigprop.com. | 72:3,9,19 73:3 | 47:22 52:12 | 44:19 |
| 17:16 | 73:13,25 74:20 | 54:22 58:1 | disclosed 26:5 |
| credit 66:12 | 74:25 | 60:12 67:21 | 29:10 |
| cross 63:14 | dated 3:12,14 | 69:9 70:5,10 | discussion |
| crosse 6:6,7,9 | 3:16,17,21 | 70:17 71:8,11 | 11:15 45:18,23 |
| crossover 23:3 | 41:18 68:3 | 72:1,3 73:1,3 | dispute 45:1 |
| crown 3:21 | dates 43:17 | depositions | district 1:1 |
| 68:2 | 54:2 55:4 | 6:24 | document 45:6 |
| cstanley 2:18 | daughter 9:8 | design 25:25 | 58:5 61:2 |
| curious 24:24 | daughters 60:3 | designated | 67:24 |
| current 20:22 | day 70:18 | 16:3 | documentation |
| currently 5:5 | 72:16 73:22 | desk 34:22 | 57:10 |
| 14:6 15:16,19 | 74:22 | development | documents |
| 15:20 16:16 | days 51:18 | 10:17,24 11:4 | 38:19 45:14 |
| 25:12 27:7 | 71:18 | 11:10 13:12 | 51:9 |
| 59:9 | deal 33:23 | 17:4 19:5,6,10 | doing 6:1 8:1 |
| cutoffs 24:12 | dear 71:10 | 19:12,14 20:1 | 9:23 19:16 |
| **d** | debit 66:12 | 32:10 44:23 | 33:3 34:19 |
| d 1:16 4:1,17 | debtor 1:5,9,13 | 45:2 58:6,19 | 60:1 65:21 |
| dakota 1:1,24 | debtors 2:3 | 58:23 59:6,20 | dollar 21:3 |
| 2:4,5,11,17 5:2 | decided 5:6 | 61:3 62:5,9,16 | 22:11 41:15 |
| 14:22 28:4 | declaration | 62:20,22 63:10 | 45:10 |
| 32:1 70:2,6,24 | 39:23 | 63:16 64:3,17 | draw 34:7,10 |
| dakotabankru... | deed 72:14 | 65:7,22 66:8 | 35:10,22,24 |
| 2:6 | 73:20 | 66:15,24 67:1 | 36:2 |
| dan 2:12 23:6 | deemed 71:19 | 67:6,25 68:24 | drive 23:14,16 |
| 47:25 | default 42:8 | different 12:3 | drives 24:10 |
| daniel 2:11 | dental 5:22,23 | 12:24 14:17 | drugs 7:6 |
| danielle 2:21 | dentist 5:21 | 15:17 17:10 | duly 4:5 70:6 |
| 6:25 | department | 28:9 43:9 63:6 | |
| | 30:17,19,22,24 | 64:1,7,8 | |

**[e - finances]**

| e |
|---|

e  1:16 2:1,1 3:1
  3:2,8 4:1,1
earlier  6:21
  17:19,24 19:25
  62:13,14
early  9:6
east  2:10
eds  6:1
educational
  6:13
effort  37:22
eidl  43:9 47:14
  47:15
either  16:1 23:6
  55:17 62:15
eligible  49:7
email  17:8,11
  17:13,15,17
  30:7,11 31:5
  34:18 35:1
  40:24 71:17
emailing  29:10
emails  29:10
emergency
  30:22 47:17
employee  44:13
  70:12,13
employees  8:11
  8:20 9:1 14:5,7
  14:9 24:9
employment
  14:13

enclosed  71:11
entered  73:9
entire  23:4,4
  72:5 73:5
entirety  40:21
entities  29:8
  64:9
entity  11:22
  44:5 57:15
errata  71:13,18
  73:7,10,18
  74:1
estate  9:20,21
  26:23 28:13
  29:13 44:1
et  71:6 72:3
  73:3
ethics  28:12
exactly  43:17
examination
  3:5 4:7
example  20:12
  66:24
excel  18:9,20
  18:20,23 37:7
excise  31:14,23
excuse  7:25
executed  73:10
execution
  72:14 73:19
exhibit  3:9,11
  3:13,15,17,19
  3:21 36:12
  39:19 40:2,20

40:25 41:17,18
  42:20 44:15
  47:21,22 52:12
  52:18 53:24
  54:22 55:8
  56:4 58:1,4
  60:12,24,25
  61:20 67:21,24
exhibits  36:20
  42:21 54:25
existence  9:17
existing  8:8
expand  10:20
expense  66:2
expenses  21:19
  22:17 23:5
  58:25 63:3
  65:14 66:19
  68:23
expiration
  72:19 73:25
  74:25
expires  70:24
explain  9:2
extent  22:5,23
  29:7 31:21
  35:15 38:6,22
  41:4 42:4
  45:21 52:3,4,7
  66:20
extra  36:15
extremely
  42:11

| f |
|---|

fair  11:3,6 16:8
  33:17 37:9
fairly  20:24
false  51:10,15
familiar  41:2
  45:4 48:22
family  5:21
  19:15 21:19
  22:16 44:2,3
far  6:7 29:3
  41:7 45:11
fargo  1:24 2:5
  2:11,17 5:5
  12:5 14:22,23
  15:2,4,18
  16:10,24 17:1
  17:2 70:6
fast  39:11
faxes  36:4
faxing  35:25
fccu  3:18,20,22
federally  51:16
fee  15:6
feeding  18:10
feet  9:10 17:22
figure  16:17
file  57:9
filled  57:15
filling  53:15
  54:4
finances  23:1

**[financial - great]** Page 8

| | | | |
|---|---|---|---|
| **financial** 37:14 | **form** 3:11,13 | 29:21,25 30:3 | 28:19 29:1 |
| 37:14 38:12,19 | 3:15 20:9 21:1 | 32:23 33:6 | 31:6,17 71:6 |
| **financially** | 21:11,20 22:7 | 34:1 35:20 | 72:3 73:3 |
| 70:14 | 22:21 24:5 | 37:17,22 38:1 | **getting** 18:9 |
| **financials** | 25:19 28:2,24 | 38:5,11 39:7 | 28:7 32:25 |
| 64:23 | 30:18 33:1 | 39:10,14,17 | 62:15 |
| **financing** 43:20 | 34:2 37:17 | 40:2,4,6,8,12 | **gifts** 65:24 66:2 |
| 45:20 46:3,13 | 38:1 39:7 42:3 | 42:2,15,18,21 | 66:4 |
| **find** 7:20 48:3 | 49:23 51:24 | 46:7,10,18 | **give** 16:4 17:23 |
| 49:23 71:11 | 65:25 66:17 | 47:1,4 48:1,14 | 20:12 33:6 |
| **fine** 22:9 40:14 | **forms** 48:8 51:9 | 49:22 50:23 | 39:14 47:19 |
| 51:15 | 57:13,16 | 51:24 54:11,14 | 52:14 66:23 |
| **fined** 51:12,17 | **forward** 71:15 | 54:17 56:3 | **giving** 30:19,20 |
| **finish** 27:5 | **four** 5:24 9:7 | 60:14,21 65:25 | 67:23 |
| **fire** 30:17,19,22 | 10:25 | 66:17 69:4,7 | **go** 8:16 22:11 |
| 30:24 | **fourth** 8:14 | **front** 20:15 | 34:22 41:1 |
| **firm** 1:23 2:4 | **frame** 14:8 | 42:19 48:12 | 46:19 50:9 |
| 2:15 70:6 | 20:20 43:2 | **full** 4:11 | 66:20 |
| **first** 2:5 4:5,15 | 61:19 62:6,21 | **funds** 21:18 | **goes** 49:19 |
| 4:17 34:17 | **fraud** 28:16,17 | 53:10 62:22 | **goff** 25:16,21 |
| 40:19 44:17 | **fraudulently** | 65:4,7 | 25:22 |
| 49:24 53:21,24 | 42:1 | **further** 69:2 | **going** 7:3 15:23 |
| 54:2 70:6 | **free** 72:14 | **furthest** 6:12 | 20:25 21:4 |
| **five** 10:25 | 73:20 | **g** | 22:7,11 25:18 |
| 14:11,11 46:25 | **friends** 5:4,4 | **g** 4:1 | 25:19 28:5 |
| **fluctuated** 8:23 | **frisk** 2:9,11 | **gal** 28:6 | 32:23 34:1 |
| **focus** 19:15 | 12:17 17:5 | **gathering** | 37:24 46:7 |
| **focused** 9:11 | 19:8,10 20:9 | 38:18 | 47:19 |
| **follows** 4:3,6 | 20:11,25 21:10 | **gen** 6:1 | **good** 4:9 9:12 |
| **foregoing** | 21:20 22:2,5 | **general** 6:4 | 47:4 58:21 |
| 72:13 73:18 | 22:10,19,21 | **generals** 6:17 | **graduate** 4:23 |
| **forged** 45:6,13 | 24:5 25:18,22 | **generations** 1:4 | 5:12,15 |
| **forging** 45:12 | 25:24 28:2,24 | 15:10,14 16:2 | **great** 8:1 |
| | 29:5,12,15,18 | | |

**[greatest - item]**                                                                                                Page 9

| | | | |
|---|---|---|---|
| **greatest** 9:23 | **heard** 22:6 | **identification** | **influence** 7:5 |
| **guaranteed** | **help** 9:25 11:1 | 47:22 52:12 | **information** |
| 51:11 | 11:2 18:7 | 54:22 58:1 | 51:7,8 64:23 |
| **guess** 18:18 | 35:14 37:6,7 | 60:12 67:21 | **initial** 6:19 |
| 27:21 45:19 | 37:10 65:20 | **identify** 30:3 | **initialing** 55:25 |
| 67:11 | **helped** 18:20 | 58:5 61:2 | **initially** 62:2 |
| **guessing** 13:14 | 68:12 | 67:24 | **initials** 54:19 |
| **guy** 39:12 | **helping** 44:1 | **impair** 7:8 | **input** 18:23 |
| **guys** 60:15 | **helps** 19:1 | **impartiality** | **instances** 59:1 |

**h**

| | | | |
|---|---|---|---|
| | **high** 4:23 5:15 | 70:16 | 59:4 |
| **h** 3:8 | 5:19 | **imprisonment** | **institution** |
| **half** 9:7 | **hold** 27:7 | 51:14 | 51:17 |
| **hand** 12:8 | **home** 9:24 67:2 | **inch** 12:15,15 | **insured** 51:16 |
| 70:18 | **homes** 44:3 | **included** 71:13 | **interaction** |
| **handheld** 12:13 | **hope** 34:18 | **income** 26:6 | 59:25 |
| **handing** 58:3 | **horse** 58:15,17 | **incorporated** | **interest** 26:10 |
| 59:23 60:23 | 59:25 | 73:12 | 70:15 |
| **handles** 16:14 | **horses** 60:2,8 | **increased** 8:20 | **interested** |
| **hands** 16:20 | 60:10 | **independent** | 70:14 |
| **handwriting** | **house** 22:1 | 9:1 | **interesting** |
| 54:6 58:12 | **household** | **independently** | 48:9 64:25 |
| 60:25 | 22:16 | 38:6 | **interests** 25:25 |
| **hang** 25:18 | **huh** 24:23 | **indicate** 52:24 | **interim** 5:22 |
| 29:5 47:20 | 30:23 44:12,18 | 59:5 | **invoices** 33:25 |
| **happen** 27:12 | 51:21 58:24 | **indicated** 17:19 | 34:20,24 37:11 |
| 42:14 | 64:6,12 | 17:24 19:25 | **involved** 28:1 |
| **harless** 2:21 | **hurried** 60:21 | 21:25 | **involvement** |
| **head** 21:13 | **hurrying** 60:22 | **indicates** 44:20 | 9:4 10:16,24 |
| 24:8 50:4 | **husband** 5:3 | 49:12 52:21 | 34:10 |
| 66:23 | **hygiene** 5:23 | 56:20 | **issued** 45:2 |
| **heading** 64:3,4 | | **indicating** 57:8 | 46:5 |

**i**

| | | | |
|---|---|---|---|
| 64:4 | | 71:13 | **item** 66:11 |
| | **idea** 34:25 35:1 | **individual** | |
| | 35:4 | 62:17 66:15 | |

**[j - locations]**

Page 10

| j | | |
|---|---|---|

**j**  2:11
**jail**  51:13,18
**jcraig**  17:16
**jesse**  2:8,21
  7:23 9:19
  10:22 11:16
  13:23 17:24
  19:13 22:12
  23:7 24:4 28:4
  28:18 29:3,10
  30:7 32:13
  33:1 34:15
  35:13 37:11
  45:13,16 58:21
  59:22 60:1,10
  64:15 66:10,15
  66:19,25 68:7
  68:10
**jesse's**  9:8
  17:15 26:7
  43:8 59:13
  61:15 63:5
  68:20
**jewelry**  68:6,9
  68:13,16
**jewels**  3:21
  68:2
**job**  7:20 8:1,2
**jogging**  55:6
**jointly**  1:5,9
**jordan**  13:6
  19:1,19 64:18

**jordan's**  19:4
**judging**  54:2
**june**  68:3

| k | | |
|---|---|---|

**keep**  13:5
**kept**  23:1,2
  35:19
**key**  30:21,22
**keyed**  30:21
**kick**  59:10
  61:22
**kicked**  49:1,3
**kiihl**  28:4,18
  29:3,11 30:8
**kind**  8:23 9:9
  9:25 27:20
  48:7
**kitty**  10:23
**knew**  8:1,2 9:8
**know**  9:3 12:9
  19:1 20:16
  21:17,22 23:12
  23:15 24:6,10
  24:12 26:2
  31:4,16 33:13
  34:19 36:6,6
  39:4,8 42:4
  45:12 46:11
  51:22 53:5
  55:19 62:8
  63:25 64:2,5
  66:4 67:14,15
  68:12,13

**knowingly**
  51:10
**knowledge**
  19:21 26:19
  31:17 38:7,8
  38:15 59:9
**known**  4:13
**knows**  22:3
**knox**  30:12,15
  30:16,20

| l | | |
|---|---|---|

**l**  4:17
**la**  6:6,7,9
**lake**  67:2
**lapse**  27:10
**lapsed**  27:14
**large**  45:9,11
**law**  1:23 2:4,9
  2:15,15 68:12
  70:6
**layperson**  42:4
**leak**  31:6
**lease**  15:25
**leave**  14:15
**left**  14:13,17
**legal**  42:3 66:3
  71:1 74:1
**letter**  71:19
**license**  26:24
  27:6,7,8 28:5,7
  28:13
**licenses**  64:11

**life**  14:18
**likely**  38:21
**likewise**  63:15
**limit**  64:21
**limited**  35:24
**line**  36:25
  71:13 73:7
  74:3
**list**  5:23,24
**listed**  73:7,17
**listing**  73:7
**little**  8:23 9:10
  10:21 11:1
  12:14 25:14
  66:22
**living**  5:5 6:9
**llc**  1:4,8,12
  26:10,13,17
  68:24 71:6
  72:3 73:3
**loan**  43:6 44:2
  44:4,16 48:11
  48:22 49:14
  50:19,21 51:11
  52:21,25 53:6
  55:10,11 56:17
  56:21 57:9,17
**loans**  43:10
  45:17 46:5
  47:9,10,15
  56:25 63:1,1
**local**  5:21
**locations**  14:19

**[loft - mischaracterizes]**                                         Page 11

| | | | |
|---|---|---|---|
| **loft**  15:10 | 58:8 61:5 68:1 | **manager**  7:24 | **meant**  36:3 |
| **lofts**  16:1 | 72:7 | 7:25 8:15 | **meeting**  45:9 |
| **login**  63:17 | **mail**  34:24,25 | 28:19 | **memory**  55:6 |
| **logins**  18:14 | **main**  1:5 | **manages**  16:11 | **mentioned**  47:9 |
| 63:13 | **mainstream** | 26:1 | **merely**  36:3 |
| **long**  5:24 8:19 | 28:11 | **mark**  47:19 | **messed**  40:16 |
| **longer**  8:25 | **maintenance** | 52:10 67:18 | **met**  5:4 |
| **look**  33:9 34:4 | 64:22 | **marked**  3:9 | **micro**  9:6 |
| 40:25 44:15 | **majority**  16:12 | 47:22 52:12 | **mid**  43:14 |
| 45:4 48:3,12 | 16:14 30:12 | 54:22 58:1,4 | **middle**  44:20 |
| 48:17 52:20 | **make**  5:6 26:4 | 60:12,24 67:21 | 48:8 49:13 |
| 54:5,6 55:9,14 | 26:6 31:21 | **marriage**  23:4 | **midmorning** |
| 55:17,20 56:8 | 33:7 35:20 | **martin**  42:25 | 60:15 |
| 57:14 | 47:20 52:15 | 43:25 45:9,9 | **midwest**  71:17 |
| **looked**  31:6 | 55:8 58:19 | 47:10 48:23,24 | 74:1 |
| 53:13 | **making**  51:10 | 49:11,15 50:1 | **million**  44:16 |
| **looking**  48:14 | 56:17 59:19 | 52:5 53:10 | 48:11 51:17 |
| 51:2 52:18 | **manage**  14:25 | **mathiason**  3:19 | 56:18 |
| 54:25 55:3,4 | 15:9 25:6,9 | 61:7 | **mind**  18:8 |
| **looks**  45:7 | **managed**  29:21 | **mathison**  61:6 | **mindy**  4:13 |
| 55:16,22 56:10 | **management** | **matters**  18:4 | 20:17 22:6,22 |
| 56:11 59:3 | 7:23 8:4 9:17 | 44:1 | 44:6 49:17,21 |
| 61:8 68:3 | 9:18,21,22 | **maurice**  71:5 | 56:24 57:18,22 |
| **lord**  40:12 | 10:7,8,11,14 | **mcraig**  17:14 | **mine**  13:5 43:8 |
| **lot**  8:24 44:20 | 13:1,15,18 | **mean**  10:20 | 59:15 |
| | 14:6,9,24 15:5 | 12:7 17:5 21:5 | **minnesota**  5:2 |
| **m** | 15:9 16:6,18 | 22:10 26:20 | **minor**  10:18,20 |
| **m**  4:17 | 17:3 18:12 | 27:17 29:9 | **minute**  46:25 |
| **mac's**  69:5 | 19:16,23 24:18 | 35:16 40:12 | 47:2 48:9 |
| **mad**  16:15 | 29:7 38:24,25 | 42:10 43:8 | **minutes**  6:8 |
| **madam**  71:10 | 44:7 57:23 | 45:24 54:11 | **mischaracteri...** |
| **made**  8:2 12:5 | 63:16 64:10 | 59:11 60:1 | 32:24 35:21 |
| 23:7 33:5 | **management's** | 63:3 | 46:8 51:25 |
| 48:22 51:20 | 11:24 | | |

**[misconstrue - official]**                                                    Page 12

**misconstrue**
33:2 36:1
**misconstrued**
33:2
**mixed**  48:11
**mom**  9:24
**monday**  6:22
**money**  20:8
21:8,15 48:23
**month**  25:11
**monthly**  20:16
20:23,24 24:25
32:3 63:2
**months**  9:7
**morning**  4:9,10
7:6
**mortgage**  9:20
21:25 22:13
23:7 28:15,17
**move**  7:17 16:1
16:3
**moved**  7:17,21
**moving**  38:12
**mulinda**  1:18
2:8 3:4,11,13
3:15 4:2,4,13
39:23 40:10
44:17 55:11
69:9 70:5 71:8
72:4,9 73:4,13
74:20
**multi**  44:2
**multiple**  56:12

**multiples**  53:16
**multitude**
62:25
**municipal**
30:21
**mutual**  5:3,4
**my's**  10:22

**n**

**n**  1:16 2:1 3:1,1
3:2 4:1,17
58:10
**name**  4:11,15
4:17 14:1,3
25:23 34:21
42:1 59:13,14
61:14,15,16
71:6 72:3,4,15
73:3,4,21
**names**  26:3
**nature**  66:1
**necessarily**
69:7
**need**  16:14 18:6
35:13 37:3,9
43:18 56:25
60:17 69:8
**needed**  8:1,2
32:15
**needs**  11:2
32:14
**never**  26:20
35:9,10

**nichole**  3:19
61:6
**nicu**  9:7
**nine**  15:1,4
**nope**  8:15
**north**  1:1,24
2:5,5,11,17 5:2
70:2,6,24
**notarized**
71:14
**notary**  70:23
71:25 72:10,18
73:15,23 74:23
**note**  37:24 41:2
41:7,9,16,16,25
42:8,15 44:17
46:5 71:12
**notes**  39:24
40:10 43:16
**notice**  42:8
54:24
**noticed**  70:10
**np**  2:16
**number**  8:20
33:1,6 37:19
67:5,8 71:7,13
**numbers**  37:21
38:12 41:24
55:9 73:7
**numerous**
64:20

**o**

**o**  1:16,16 3:1
4:1
**object**  20:25
22:7,21 25:19
32:23 34:1
37:17 42:2
49:22
**objection**  20:9
21:11,20 24:5
28:2,24 35:21
37:24 39:7
42:2 51:24
65:25 66:17
**objection's**
21:4
**objections**
39:11
**obtain**  51:11
**obtained**  42:1
**obtaining**  27:2
**odd**  41:24
56:10
**offended**  7:2
**office**  7:25 8:15
10:22 13:5
14:19 15:5,15
15:24 34:21
43:18 69:5
**offices**  17:19
**official**  72:15
73:21

**[oh - periods]**                                   Page 13

**oh** 10:12 18:16 39:22 40:4,7 41:7 48:4 53:24 54:14,17 58:5
**ohio** 71:2
**okay** 4:18,23 5:12,14,19,25 6:9,12,16,21 7:2,8,11,13,20 8:7,17 9:2,16 10:5,16 11:3,9 12:1,16,23 13:3,8,17 14:15 15:3 17:3,24 18:3 19:22 23:18 24:1,21 25:13 26:9 27:8 28:12,18 29:25 31:12 33:20,23 35:2 36:10,14 37:1,9 38:10 39:13,16 40:1 40:18,25 43:23 44:13 45:5 46:10,14,17,24 47:5 48:2,3,17 49:4,9,16 50:12 51:4 52:17,24 53:5 54:5 55:20 56:16 59:19 60:6,17 61:11

61:17 62:19 63:23 64:6,15 64:25 65:6 67:10
**old** 7:11 12:8
**older** 24:8
**oldest** 9:8
**ones** 36:18 43:25 47:17 55:19,23 56:1 56:1 63:6
**online** 13:8,11
**open** 8:7
**opened** 29:19 29:22
**operations** 30:5
**order** 30:20
**ordered** 70:10
**original** 70:9
**originally** 4:19 17:1
**originals** 56:5 57:7
**outside** 25:5,25 26:6
**overhead** 15:4 15:15
**overview** 16:5
**owe** 21:15
**owed** 31:20
**own** 24:14
**owner** 13:17 14:4 58:15,17

**owners** 25:5,8
**ownership** 13:20,24 14:2 26:15 30:4

**p**

**p** 1:16 2:1,1 4:1 58:10
**p.o.** 2:16
**page** 3:3 41:1,6 41:7 48:3,6,8 48:10,10,13,19 49:19,24 50:6 50:6,8,10,11,13 50:24 51:2,2,5 52:2,20 53:3,7 54:5,8,13,13,16 55:10,14,20,21 56:9 57:14 71:13,15 73:7 74:3
**pages** 48:11
**paid** 21:8 22:1 22:17 23:5,8 23:10 66:8,12
**paper** 12:11 18:10 35:19,25
**paperwork** 33:25 34:4 56:23
**parkside** 1:8 15:11,14 28:19 29:1 31:17 40:9

**part** 4:21 27:15 63:5 73:9
**parties** 70:10 70:12,14
**parts** 40:22
**party** 70:10
**pawlik** 1:25 70:23
**pay** 15:4 20:8 21:18,18 31:12 31:19,20 32:8 32:10,12,14 62:25 63:1
**paying** 31:13 31:17 66:10,25 67:1
**payment** 33:7 58:20
**payments** 20:16,17 21:6 23:13 31:21 32:20 33:5 59:20 62:15 63:2 65:11,13
**pays** 22:13
**penalty** 51:10
**people** 25:6 26:2 68:18
**percentage** 13:20,24
**perfect** 30:3
**period** 65:9
**periods** 21:2

**[permanent - racked]**                                    Page 14

| | | | |
|---|---|---|---|
| **permanent** 43:20 45:20 46:3,13 | **place** 1:8,23 | **proceeds** 50:19 | 28:18 |
| **permission** 53:10 | **plan** 28:8 | **production** 71:15,17,22 | **provided** 20:21 51:7,8 |
| **person** 35:3 44:2 | **plans** 15:21 | **program** 5:23 | **public** 70:23 72:10,18 73:15 73:23 74:23 |
| **personal** 21:19 23:2,5 24:11 24:14 58:25 65:14 66:2,19 68:22 | **please** 4:11 51:5 56:8 71:11,11 | **project** 28:19 29:4 | **punt** 3:17 58:9 58:14,20 |
| **personally** 24:3 66:11 72:11 73:15 | **podcast** 27:17 | **projects** 28:22 28:25 29:15,17 31:3,14 32:5 33:16 35:7 49:18 | **purchased** 9:19 |
| **persons** 70:15 | **point** 9:9 19:20 36:16,23 53:23 | | **purchases** 68:9 |
| **peterson** 42:25 48:24 53:11 | **pointing** 42:16 | **promissory** 41:2,7 | **purpose** 49:14 49:25 50:3 52:25 53:6 56:20 62:24 |
| **phase** 29:24 31:14 | **pop** 11:1 | **properties** 8:5 8:11,21,24 9:4 10:12 11:7,12 12:24 13:7,9 14:24 15:9,18 19:17,20 20:5 20:8,19 21:8 21:15,17,18,23 22:18 23:10 24:10 25:8 26:1 30:13 32:11 39:2 62:5,9,10,11,16 62:18 63:10,24 63:25 64:3,16 65:1,4 67:13 67:15 | **purposes** 50:20 |
| **phone** 18:15 31:5 71:3 | **position** 8:3,16 9:11 | | **put** 6:15 33:1 49:15 51:12,18 52:5,15 |
| **photocopied** 56:11 | **positions** 14:18 | | |
| **photocopies** 56:5 | **ppp** 43:9 44:4 57:22 | | **q** |
| **photography** 44:6,9 49:17 49:21 52:1 56:25 57:18,23 | **preemies** 9:6 | | **question** 7:3,14 16:8 30:2 37:23 58:21 66:21 |
| | **present** 2:20 | | **questionnaires** 6:14 |
| | **pretrial** 46:22 | | **questions** 7:9 69:3 |
| | **pretty** 29:6 | | **quite** 17:2 |
| **physically** 17:22 | **prevail** 26:10 26:12,17 27:15 27:23,25 28:5 28:8 | | **r** |
| **piece** 35:25 | **previously** 66:1 66:18 | **property** 7:23 7:24 8:4 9:21 9:22 10:7,11 18:12 19:16 | **r** 2:1 4:1 |
| | **printer** 18:10 | | **racked** 42:13 45:8 |
| | **printing** 18:10 | | |
| | **prior** 41:16,22 | | |
| | **probably** 10:25 20:13 33:14 | | |
| | **procedure** 72:5 73:5 | | |

**[radio - rides]**                                                                    Page 15

| | | | |
|---|---|---|---|
| **radio** 27:23 | 50:3 52:4,7,8 | **referencing** | **reporter** 4:12 |
| **ran** 26:18 | 53:12,13,15,16 | 36:7 | 47:23 52:13 |
| **random** 11:1 | 53:17 59:4,19 | **referred** 44:17 | 54:21,23 58:2 |
| 63:3 65:14 | 61:21,25 62:1 | **reflect** 56:4 | 60:13 67:20,22 |
| 67:2 | 62:2,14 65:5 | **regarding** | 72:7 |
| **rate** 70:11 | 66:22 67:3 | 30:12 35:7 | **reporter's** 70:1 |
| **read** 51:4 69:4 | **recalls** 45:17 | **regularly** 20:24 | **reporting** |
| 70:17 72:5,6 | **receipt** 71:18 | **reimburse** 66:9 | 31:24 32:17 |
| 72:12 73:5,6 | **receive** 24:21 | **reimbursement** | **representations** |
| 73:17 | 34:4,24 62:22 | 63:2 | 50:17 54:9 |
| **reading** 71:19 | 68:6 | **reimburseme...** | **request** 31:20 |
| **real** 9:20,21 | **received** 65:3,7 | 66:2,5,7 | 36:2 52:21 |
| 26:23 28:13 | **recently** 18:12 | **related** 50:20 | 55:11,11 56:17 |
| 29:12,13 44:1 | **recognize** | **relates** 26:3 | 73:9,11 |
| **realize** 51:9 | 49:10 | **relationship** | **requests** 34:7 |
| **really** 7:16 | **recollection** | 5:6 21:22 23:4 | 34:11 35:10,23 |
| 10:24 31:1 | 44:24 56:16 | **relative** 4:5 | 35:24 |
| 34:2 | 62:3 65:4 | 70:12,13 | **required** 71:25 |
| **realty** 26:17 | **reconfigure** | **relevancy** 28:3 | **reserved** 70:17 |
| 27:16,23 28:6 | 16:17 | **rely** 26:7 | **respect** 19:5 |
| 28:8,11 | **record** 40:17 | **remember** | 33:24 |
| **reason** 20:7,17 | 47:6 56:3 | 22:22,24 41:14 | **responsibility** |
| 37:2 42:7 45:1 | 60:18,21 70:8 | 42:7 43:15,17 | 31:13 |
| 45:5 51:22 | 73:9 | 45:8 46:1 52:3 | **returned** 71:18 |
| 56:24 71:14 | **red** 2:14 | 53:19 54:1,4 | **review** 35:22 |
| 73:8 74:3 | **redact** 37:22 | 66:21 | 35:24 36:3 |
| **reasons** 62:25 | **redacted** 25:1,3 | **remind** 62:13 | 71:12 72:1 |
| **recall** 21:12 | 37:19 | **remitted** 32:21 | 73:1 |
| 22:7 27:24 | **reference** 71:7 | **remote** 17:2 | **reviewed** 35:10 |
| 30:7,10 31:2 | 72:2 73:2 | **remove** 61:23 | 36:2 39:19,25 |
| 38:6 41:9,11 | **referenced** | **renamed** 10:7 | **rid** 15:23 |
| 41:13 42:12 | 35:12 72:11 | **replace** 8:1 | **ride** 60:8,10 |
| 43:4,16,24 | 73:15 | **reported** 32:16 | **rides** 60:1 |
| 44:4 49:25 | | 70:5 | |

**[right - similar]** Page 16

| right | s | section | 74:1 |
|---|---|---|---|

right   10:14
12:8,12 18:8
19:7 24:19
25:24 26:1
27:19 34:19
36:21 37:23
43:11,13 46:22
47:21 49:13
54:19 55:9
60:15 61:9
65:22 70:17
ring   56:19
61:11
river   2:14
role   19:5
rolled   45:20
roof   31:6
roundtable
45:18,23
rpr   1:25 70:23
rrsb   3:22
rubber   12:5
ruins   1:12 16:2
16:3 28:20
29:2,14 31:18
33:24 34:5
rules   72:5 73:5
run   46:19,20
46:21 60:16,17
running   36:17
36:23
runs   26:7

**s**

s   1:16 2:1 3:1,2
3:2,8 4:1 71:15
73:8,8 74:3
saddles   61:8
savvy   17:25
saw   27:17
40:22
saying   32:8
34:18 41:21,25
says   40:9,10
48:8 52:6 61:8
sba   3:11,13,15
43:6,8 47:9,10
48:22 49:1,2
50:19 51:11
53:10,16 55:11
56:17
scan   34:16
scanned   36:3
scheduling
60:22
school   4:24
5:15,20
schwab   2:9
scope   36:14
scopes   64:21
seal   70:18
72:15 73:21
second   7:16
25:19 29:5
39:15 48:12,13

section   50:17
51:5
see   34:23 44:19
44:22 50:8,16
51:3 55:4
seeing   45:9
64:21,22,22,23
seen   40:19,23
57:3
sees   50:24
send   34:14,16
sending   33:25
sense   8:2
sensitive   7:13
sent   18:14 36:2
separate   10:12
17:9 23:1,2
63:11,12
september   1:22
70:5,19,24
71:4
servers   16:9
17:11
set   26:18 62:1
64:1
setting   46:22
settings   18:11
setup   16:5 17:4
17:5
several   44:21
share   17:4 48:1
sheet   35:19
38:21 71:13
73:7,10,18

74:1
shocked   42:11
short   22:25
43:19
shortened
59:17
shown   71:16
side   9:22 19:14
sign   59:12 69:4
70:17
signatory   61:24
signature   11:25
12:4 41:6 45:6
45:7,14 50:5
50:13 53:2
54:12,18 55:3
55:15,18 56:9
59:12,17 61:14
61:21 68:20
70:22 71:14
signatures
43:18
signed   3:11,13
3:15 13:2
41:21 50:2
72:13 73:18
signer   12:25
signing   41:9,11
41:13,14 42:12
46:1 52:8 55:6
59:13,13,15
61:14,15 71:19
similar   36:8
68:23

**[sincerely - sum]**                                          Page 17

| | | | |
|---|---|---|---|
| **sincerely** 71:21 | **speculation** | 48:7,15,17,20 | **stf.law** 2:12 |
| **single** 44:3 | 20:11 24:6 | 48:21 50:2,25 | **stick** 45:11 |
| **sir** 71:10 | 49:23 | 51:1 52:10,14 | **strictly** 19:16 |
| **site** 16:10 | **speculative** | 54:12,15,18,24 | **stuff** 18:18 66:5 |
| **situated** 24:13 | 21:4 | 56:6,8 58:3 | 66:7 |
| **skills** 37:7 | **spell** 4:15 | 60:17,20,23 | **subcategories** |
| **slow** 39:10,11 | **spelled** 4:17 | 66:6 67:4,18 | 64:2,8 |
| **slowest** 39:12 | **spent** 9:6 | 67:23 69:2 | **subcategorizes** |
| **software** 18:12 | **spewing** 16:16 | **starion** 24:18 | 67:15 |
| 18:13 63:13,18 | **split** 10:7 | 24:21 | **subcategory** |
| **solely** 26:7 | **spreadsheet** | **start** 7:22 9:16 | 66:18 |
| **solutions** 71:1 | 36:6 | 13:25 48:9 | **subcontractors** |
| 74:1 | **spreadsheets** | **started** 8:13 | 33:24 34:4 |
| **somebody** | 18:20,21,24 | **state** 2:14 4:11 | **submit** 53:11 |
| 58:16 | **stamp** 11:16 | 32:1,21 70:2 | **submitted** |
| **son** 68:12 | 12:2,5,8,11,20 | 72:10 73:15 | 30:19 31:19 |
| **sorry** 7:15 | 13:2,3 | **stated** 58:21 | 34:6 35:11 |
| 15:10 19:11,17 | **stamps** 12:3,5 | **statement** | 51:16 53:9,20 |
| 28:19 40:11 | **stanley** 2:17 | 33:17 37:15 | 57:17,21 |
| 48:4 58:5 | 3:5 4:8 12:18 | 51:11 72:13,14 | **subpoena** 3:18 |
| **south** 14:22 | 17:7 19:11 | 73:19,19 | 3:20,22 |
| 28:4 32:1 | 20:14 21:7,14 | **statements** | **subscribed** |
| **space** 16:1,3 | 21:24 22:4,9 | 20:15,21 23:20 | 72:10 73:14 |
| **specific** 16:7 | 22:15 23:9 | 24:22 37:14 | 74:21 |
| 21:2 65:17 | 25:21,23 26:9 | 38:13,19 51:16 | **substantial** |
| **specifically** | 29:1,9,14,16,20 | **states** 1:1 56:23 | 70:15 |
| 39:5 40:24 | 29:23 30:1,6 | **stating** 53:7 | **sue** 3:12,14,16 |
| 42:6 45:15 | 33:4,8,12 34:3 | **stay** 9:24 | 55:11 |
| 56:1 66:23,24 | 36:5 37:20,25 | **stayed** 8:17 | **suggested** |
| 67:3 68:11 | 38:2 39:18 | **step** 9:12,25 | 35:23 |
| **specified** 4:6 | 40:3,7,9,15 | 19:14 | **suite** 2:5,10 |
| 50:21 | 42:23 46:9,14 | **stepped** 9:13 | 71:2 |
| **speculate** 21:5 | 46:17,24 47:2 | **steps** 26:4 | **sum** 41:2 48:23 |
| 39:8 | 47:5,8,24 48:2 | | 55:12 56:17 |

**[super - total]**                                                                 Page 18

| | | | |
|---|---|---|---|
| **super**  43:19 | 46:20,25 60:14 | 62:14 66:1,18 | 47:12 54:14 |
| **superior**  71:1 | 60:15 | **testify**  4:5 22:3 | **thousand**  41:15 |
| **supplied**  41:5 | **taken**  46:3 | **testifying**  35:9 | **three**  8:12,12 |
| **supporting** | **talking**  20:20 | **testimony** | 8:17 21:9,15 |
| 51:8 | 27:23 28:25 | 35:21 46:8 | 22:17 23:10 |
| **supposed**  45:19 | 31:2 47:9 | 51:25 70:8,8 | 29:16 31:2,14 |
| **sure**  7:4 12:10 | **tax**  31:23 57:1 | 72:6,7 73:6,9 | 32:5 33:16 |
| 26:4 34:8 | **taxes**  31:14,17 | 73:12 | 35:7 42:19 |
| 37:25 41:25,25 | **tech**  17:25 | **thank**  24:24 | **throw**  26:3 |
| 47:1,20 52:1 | **technologies** | 39:17 60:22 | **till**  9:3 |
| 52:15 55:8,18 | 16:13 | **thing**  19:8 | **time**  8:10 9:7 |
| **switched**  16:20 | **technology** | 29:13 31:1,24 | 9:12 14:8,12 |
| 37:21 | 16:5 18:4 | 64:10 | 20:19 21:2 |
| **swoops**  12:6 | **tell**  7:11 24:7 | **things**  9:23,25 | 34:15,17 36:1 |
| **sworn**  4:5 70:6 | 25:3 32:13,15 | 11:1 18:8 | 37:10 40:19 |
| 72:10,13 73:14 | 36:5 46:21 | 19:14,16 36:11 | 43:2 44:8 |
| 73:18 74:21 | 65:15 68:25 | 36:15 66:7,14 | 46:14 55:5 |
| **system**  17:8 | 70:6 | 67:2 | 61:19,20 62:6 |
| 58:23 63:5,6,9 | **ten**  47:2 | **think**  7:15 | 62:21 65:9 |
| **systems**  63:11 | **tenants**  31:10 | 10:10 12:7,8 | 68:7,10 |
| 63:12 | 64:22 | 22:25 25:14,24 | **times**  12:17 |
| **t** | **tendency**  70:15 | 29:20 32:25 | 16:20 56:12 |
| **t**  1:16 3:1,1,2,8 | **term**  33:14 | 33:8,15,17,20 | **timing**  21:5 |
| 58:10 | 37:18 43:19 | 34:17 36:12,20 | **title**  9:21 |
| **tabs**  35:14,16 | **terminated** | 36:22 37:18,18 | **today**  56:7 |
| 36:15 | 14:13,16 | 38:2 39:6,11 | **together**  7:16 |
| **tabulate**  18:9 | **terminology** | 39:15 42:13 | 52:5,17 |
| **tabulating** | 67:12 | 45:5 47:13 | **tomah**  4:22 |
| 35:14 | **terms**  34:6 | 53:21 61:6 | 5:17 6:7,11 |
| **take**  8:3 9:9 | **testified**  4:6 | 62:13,14 69:5 | **took**  8:16 9:10 |
| 17:23 27:1 | 19:13 21:21 | **thirty**  71:18 | **top**  21:12 24:8 |
| 28:12,15 31:12 | 22:13 29:6 | **thompson**  2:9 | 50:4,17 66:23 |
| 34:14 35:6 | 33:9 35:18 | **thought**  27:22 | **total**  15:2 |
| | 37:13 46:11 | 46:1,2,12 | |

**[totals - work]**                                                        Page 19

| | | | |
|---|---|---|---|
| **totals** 36:23 | 63:13,13 64:11 | **veritext** 71:1,7 | **way** 23:6 |
| **towards** 27:2 | 64:11 | 74:1 | **we've** 17:9 |
| **town** 34:15 | **u** | **veritext.com.** | **website** 16:16 |
| **tracked** 63:7 | | 71:17 | 16:18 |
| **trainer** 58:15 | **u** 4:17 23:24 | **verstandig** 71:5 | **wednesday** |
| 58:17 | 58:10 | **versus** 9:1 | 1:22 |
| **transcribed** | **uh** 24:23 30:23 | 66:25 | **weeks** 9:6 |
| 70:8 72:7 | 44:12,18 51:21 | **vividly** 42:6 | **went** 14:1 |
| **transcript** | 58:24 64:6,12 | **vogel** 1:23 2:15 | 27:22 41:7 |
| 33:10 70:17 | **umbrella** 10:4 | 70:6 | 45:22 63:4 |
| 71:11,12 72:5 | 14:3 | **vogellaw.com** | 66:12 |
| 72:12 73:5,11 | **under** 6:17 7:5 | 2:18 | **west** 2:11 |
| 73:17 | 10:4 28:5,8,9 | **voluntarily** | **wet** 9:10 55:17 |
| **transferred** | 49:10 51:13,13 | 14:15,17 | **whatnot** 63:8 |
| 55:17,23 | 51:18 64:19 | **w** | **wind** 5:1 |
| **transition** 9:12 | **understanding** | | **wisconsin** 4:20 |
| **trial** 46:23 | 19:4 57:13,16 | **w** 2:17 3:2 | 4:21,21 5:5,6 |
| **true** 8:25 51:9 | **united** 1:1 | **wait** 5:24 40:2 | 6:6 23:21 |
| 56:6 70:8 | **unpaid** 35:5,6 | 48:9 | **witness** 17:6 |
| **truly** 24:7 | **usc** 51:13,14,18 | **waiting** 5:23 | 19:9 20:10 |
| 49:25 | **use** 11:20,23,23 | **waived** 71:19 | 39:13,16 40:5 |
| **truth** 4:5,5,5 | 50:20 52:6 | **want** 20:12 | 40:14 42:17,19 |
| 70:7 | 58:16 63:18,23 | 22:2 26:2 33:1 | 42:22 46:16 |
| **trying** 16:16 | **uses** 13:3 58:22 | 35:20 36:1 | 70:6,8,17,18 |
| 42:13 45:8 | 66:19 | 40:6,10 47:25 | 71:8,11 72:1,4 |
| **turn** 9:25 | **v** | 51:19 60:14,15 | 72:11 73:1,4 |
| **tv** 27:22 | | **wanted** 19:14 | 73:15 |
| **twins** 9:5,11 | **v** 71:6 72:3 | 19:15 33:10 | **witness'** 71:14 |
| 60:4 | 73:3 | **wants** 69:5 | **work** 11:4,6 |
| **two** 14:20 | **vague** 21:2 | **watertown** | 19:22 26:12 |
| 15:12 17:9 | **vaguely** 61:12 | 14:22 15:8,24 | 27:25 28:5,8 |
| 24:3 37:21 | **vehicle** 65:11 | 28:7 29:16 | 28:22 33:13,14 |
| 41:5 43:9 | **vehicles** 23:11 | 31:2,14 49:18 | 65:21 |
| 51:14 63:6,11 | 24:2,8,9 | 67:2 | |

**[worked - younger]** Page 20

| | |
|---|---|
| **worked** 5:21 | 47:4 48:4,5,16 |
| 29:7 | 55:1,22 56:13 |
| **working** 8:13 | 56:15 67:9 |
| 18:17 28:7 | 69:6 |
| 43:6,8 49:12 | **year** 5:24 |
| 49:16 52:6,25 | **years** 7:16 |
| 53:7 56:21 | 10:25 21:9,15 |
| 64:19 | 22:17 23:10 |
| **works** 19:19 | 25:15 41:5 |
| 29:6 | 51:13,14 59:18 |
| **world** 39:12 | 64:20 |
| 42:14 55:7 | **yellow** 36:9,21 |
| **wrapped** 43:19 | **yep** 50:9,11,14 |
| **write** 11:9,13 | 50:15 54:1 |
| 59:6 61:17 | **yesterday** |
| **writing** 54:16 | 11:15 19:13 |
| 55:21 59:21 | 21:25 22:3,6 |
| **written** 62:4 | 23:7 33:9 |
| 65:12 | 35:18 36:13 |
| **wrote** 47:24 | 37:13 38:9 |
| 59:2 | 39:19 58:22 |
| **x** | **yesterday's** |
| **x** 3:8 | 22:22 |
| **xyz** 23:5 | **younger** 60:4 |
| **y** | |
| **yardi** 58:23 | |
| 63:5,5,9,12,18 | |
| 67:8 | |
| **yeah** 11:17 | |
| 12:14,21 17:6 | |
| 19:9 20:10 | |
| 25:17 36:8,22 | |
| 43:12 46:24 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS

### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.