IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30004 |
| | ) | (Chapter 11) |
| THE RUINS, LLC | ) | |
| | ) | |
| Debtor | ) | |
| _____ | ) | |

**DISCLOSURE STATEMENT FOR ~~FIRST~~ SECOND AMENDED
CHAPTER 11 PLAN OF REORGANIZATION OF THE RUINS, LLC**

Comes now The Ruins, LLC ("Ruins," the "Debtor," or the "Plan Proponent"), by and through undersigned counsel, pursuant to Section 1125 of Title 11 of the United States Code (the "Bankruptcy Code"), and provides the following disclosure statement (the "Disclosure Statement") correlative to its ~~first~~ second amended plan of reorganization (the "Plan"):

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS ARE HEREBY ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED HERETO AS EXHIBIT "A" AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT BEFORE OR CONCURRENTLY WITH THE FILING OF THIS DISCLOSURE STATEMENT. FURTHERMORE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE; AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

ALL HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT AS A WHOLE PRIOR TO VOTING ON THE PLAN. IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN, EACH CREDITOR MUST RELY ON ITS OWN EXAMINATION OF THE DEBTOR AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.

NO PARTY IS AUTHORIZED BY THE PLAN PROPONENT TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO

1

REPRESENTATIONS OR INFORMATION CONCERNING THE DEBTOR, ITS FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR. ANY INFORMATION OR REPRESENTATIONS GIVEN TO OBTAIN YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE DIFFERENT FROM OR INCONSISTENT WITH THE INFORMATION OR REPRESENTATIONS CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY CREDITOR IN VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES HOLDING OR TRADING IN, OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR SECURITIES OF, THE DEBTOR, IF ANY, SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT AND PLAN AND THE INFORMATION CONTAINED THEREIN SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OR STATUTE OF SIMILAR IMPORT. THIS DISCLOSURE STATEMENT AND PLAN SHALL NEITHER BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE SECURED CREDITORS OR ANY OTHER PARTY NOR BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

This Disclosure Statement and the Plan annexed hereto as Exhibit "A" are being furnished by the Plan Proponent to holders of Claims pursuant to Section 1125 of the Bankruptcy Code, to permit creditors the opportunity to either accept or reject the Plan (and the transactions contemplated thereby, as disclosed herein), as necessary. Capitalized terms in this Disclosure Statement, to the extent not otherwise defined herein, shall have the same definition that is assigned to capitalized terms in the Plan.

    **I.**    **Introduction, History of Debtor, and Discussion of Assets and Liabilities**

Formed on August 12, 2019, Ruins was created for purposes of constructing and operating a residential apartment building at 3154 East Kemp Avenue in Watertown, South Dakota (the "Real Estate"). Wholly owned by Jesse Craig ("Mr. Craig"), the Debtor anticipated being constructed in delayed synchronicity with at least two other regional projects—Generations

on 1st and Parkside Place—in such a manner that a synergy would exist whereby contractors could travel to Watertown, perform work on one project, finish such work, and then seamlessly transition to the next project.

A number of factors went into initial development of the Real Estate, including an assessment of the housing demand in Watertown, the availability of tax increment financing ("TIF") from the local government, and the promised provision of both construction and completion funding from Red River State Bank ("RRSB"). The Debtor commenced operations with detailed projections, and seized upon the industry experience of Mr. Craig. Yet Ruins' development thereafter proceeded in a hardly-typical manner.

Myriad disputes presently exist between RRSB and the Debtor concerning what did—and did not—happen along the way. Where appropriate, this Disclosure Statement addresses the Debtor's position as to those disputes, which are most pertinently being advanced through the pending case of *Generations on 1st, et al. v. Red River State Bank*, Case No. 25-07009 (Bankr. D.N.D. 2025) (the "Adversary Proceeding"). However, more broadly, it may be safely posited that (i) the COVID-19 pandemic occasioned certain construction delays directly attributable to workers becoming sick with the eponymous illness; (ii) the same pandemic occasioned an increase in certain material costs, as prices fluctuated in a historically-volatile manner; (iii) numerous disagreements arose between RRSB and the Debtor; (iv) financing for the development of the Real Estate was ultimately cut off by RRSB (for reasons the Debtor believes to correlate to RRSB encountering issues with applicable lending limits and RRSB's limited access to monies), leading to a cessation of construction; (v) a loan default was called; and (vi) this bankruptcy case was filed in an effort to find a path toward completion of the construction project and ultimate repayment of creditors.

Specifically, Ruins petitioned for chapter 11 protection on January 6, 2025. In subsequently-amended schedules, the Debtor disclosed assets valued at just over $15.7 million and liabilities of just over $15 million. Excepting a *de minimis* utility deposit, the asset base is comprised entirely of the Real Estate and the near-complete (but assuredly still incomplete) improvements thereupon. Most debts are owed to RRSB and trade creditors, including numerous contractors and material providers who performed work on the Real Estate prior to the cessation of construction.

Ruins has remained a debtor-in-possession at all times since, with the Debtor's reorganization being primarily focused on (i) advancement of the Adversary Proceeding; (ii) prosecution of a claim objection, against RRSB, aimed at ascertaining various disbursement and payment histories; (iii) the utilization of time to marshal completion funding for the Real Estate; and, most recently, (iv) the defense of a stay relief motion brought by RRSB; and (v) a motion to convert to chapter 7, also brought by RRSB. The Debtor has timely filed all operating reports and appropriately sought to extend—and received an extension of—the exclusivity period in which to solicit votes on a plan of reorganization.

II.     **The Chapter 11 Confirmation Process**

The chapter 11 confirmation process is governed, in large part, by the Bankruptcy Code. Under the Bankruptcy Code, to be confirmed, the Plan must be accepted by at least one (1) class

of creditors whose claims against the Debtor will be "impaired" under the Plan. Claimants who are scheduled to receive full payment on their claims without modification or changes to their right to payment are deemed to have accepted the Plan and do not vote. Only creditors whose claims are "impaired" or their right to payment terms is modified or changed are entitled to vote in favor of accepting or rejecting the Plan. A class of claims is "impaired" if the amount to be paid to the class provides the claimants in that class with less than full payment of the allowed claims in that class or the terms for repayment are extended beyond the contractual due date or some other contractual terms are changed. Acceptance by such class requires that at least one-half of the creditors in the class who cast accepting votes on the Plan, and hold at least two-thirds of the total dollar amount of the claims in that class casting votes on the Plan. A class of claims that is likely to receive nothing under the Plan is not entitled to vote thereon and, to the contrary, is presumed to have rejected the Plan.

As indicated in the instructions accompanying the ballot (the "Ballot"), which is the form on which you may cast your vote to accept or reject the Plan, the Ballot must be delivered to the Plan Proponent's counsel in time to ensure that your Ballot will be received by the due date. Ballots received after the due date may not be counted.

Pursuant to Federal Rule of Bankruptcy Procedure 3017, a Ballot shall be mailed only to "creditors and equity security holders entitled to vote on the plan." The Plan consists of eight classes of claims entitled to vote on the Plan, and thus those classes will receive ballots. All other classes of claims are presumed to have accepted the Plan.

**III.**     **Litigation**

As noted *passim*, the Adversary Proceeding has proven an outsized part of the Debtor's reorganizational efforts. Alongside two related entities (also debtors in bankruptcy), Ruins has sued RRSB for (i) deceit; (ii) fraud; and (iii) declaratory relief. The litigation was tested by a motion to dismiss, thoroughly briefed by the parties and argued to the United States Bankruptcy Court for the District of North Dakota (the "Bankruptcy Court"). Subsequent briefing on geographic ties ensued, so as to aid in resolution of a choice-of-laws dispute. As of the filing of this Disclosure Statement, several claims of the Debtor have survived early dispositive motions practice and ~~it is reasonably anticipated the litigation will progress through the docketing of~~ an amended complaint ~~and, in turn~~has been docketed with the onus now being on ~~,~~ RRSB to~~'s~~ furnish~~ing~~ of an answer thereto.

The core of Ruins' claims against RRSB is a contention that the bank lacked the authority and resources to honor lending commitments, leading to a premature cessation of construction, an absence of permanent financing, temporal delays, the incursion of excess interest, and a loss of rental income. RRSB clearly disputes any liability and is vigorously contesting the Adversary Proceeding through the services of preeminent counsel.

For purposes of this Disclosure Statement, it is important to emphasize that Ruins has extraordinary confidence in its litigation claims but such pursuits—like all tort-based causes of action—are assuredly not guaranteed to be successful. It is equally meritorious of note that Ruins does not assert—and never has asserted—that the litigation claims, even if successful, will wipe out the debt owed to RRSB. The Debtor posits, rather, that the Adversary Proceeding will

4

hopefully create a judgment that can be used to partially setoff the claim of RRSB in this bankruptcy proceeding.

Critically, the Plan is *not* dependent upon success in the Adversary Proceeding. Rather, in an effort to ensure Ruins may emerge from chapter 11 before the litigation reaches a conclusion (a process that may take some measure of time), the Plan proposes to pay RRSB's claim based on an estimated sum (which is not significantly lower than that asserted by RRSB in an amended proof of claim), with payments to be reamortized once the Adversary Proceeding concludes and a precise sum may be calculated. The Debtor fervently asserts the Plan is feasible even if the Adversary Proceeding is not ultimately successful, with Plan payments being pegged to future rental streams and takeout financing. Success in the Adversary Proceeding will make Plan obligations easier (and, in the biased view of the Debtor, advance the interests of justice); success in the Adversary Proceeding, however, is *not* a condition precedent to the making of payments to creditors under the Plan.

### IV.    Completion Financing

For self-evident reasons, completion of construction on the Real Estate is central to the success of the Plan. The Debtor proposes to make future payments based on rental income, which cannot be realized until the property is leasable. And the Plan also contemplates a take-out loan being procured once the apartment building is near full occupancy—something that also will require completion of construction. The facilitate such, and being mindful that Ruins does not hold any cash or cash equivalents aside from utility deposits, the Plan proposes completion financing to be furnished in the sum of $1,317,352.00, of which $262,094.00 will come in cash from an insider of the Debtor and the rest will come in the form of materials and labor from pre-existing creditors.

The completion financing is inclusive of participant creditors' pre-petition claims, equating to what is colloquially known as a "roll up" of their existing claims. The Plan proposes to pay 10% interest on the ~~cash and~~ in-kind components (but not the cash components) of this financing, while also giving participants a superpriority, "priming" lien on the Real Estate. This means the claims of participants will assume a position senior to that of all pre-petition creditors, including RRSB and a quasi-municipal lienholder. Repayment of these obligations will be made within two years of the Plan's effective date (which is just over two years from when the Plan is confirmed).

Ruins believes these "priming" liens can be safely given to those aiding in the completion of construction because the value added to the Real Estate, by virtue of a building being finished and becoming rentable to the public, will well exceed the amount of credit being obtained. Or, stated otherwise, completion of the Real Estate will benefit *all* creditors—especially existing secured creditors—in a manner that ultimately renders the completion financing a universal aid to the payment of claims.

The Plan specifically identifies the parties participating in the provision of completion financing, alongside the amounts to be contributed by each such party (which include their "roll up" claims), except the Plan does not specifically identify the insider who is contributing cash. That insider will be Mr. Craig; the reason he is not specifically named is because it is yet-to-be-determined if the contribution will come directly from Mr. Craig or through the conduit of one or

5

more companies under his control. Under no circumstances, however, will the cash contribution be made by a separate entity presently seeking to reorganize in bankruptcy.

Since the liens and preferred treatment of completion financing participants will not vest until their contributions commence being made post-confirmation, these creditors are *not* separately classified in the Plan. Rather, these creditors are grouped with similar creditors, in appropriate classes, based on their pre-petition claims against the Debtor. The Plan does, however, make clear how and when these creditors' claims will become entitled to preferred post-petition treatment.

The Debtor has secured commitments from each of the completion financing participants such that the provision of completion financing is not speculative. There assuredly exists some risk one may cease to operate in the applicable business, or completion may be hampered by an unforeseen future occurrence of pestilence (just as was original construction), but the Debtor believes these risks to be minimal in nature.

V. **Summary of the Plan and Treatment of Claims and Interests**

The Plan provides for the following classifications of creditors' claims and the rights of the equity holder:

**Class 1 – Disputed Secured Claim of Red River State Bank.**   Class 1 consists of the secured claim of Red River State Bank ("RRSB"). RRSB asserts this claim to be in the amount of $11,658,331.25. As noted in the pending case of *Generations on 1st, et al. v. Red River State Bank*, Case No. 25-07009 (Bankr. D.N.D. 2025) (the "Adversary Proceeding"), the Debtor holds various civil claims against RRSB that, once adjudicated, are reasonably expected to significantly setoff the total size of the Claim of RRSB in this case. The size of RRSB's claim, subject to any setoff from the Adversary Proceeding, will be determined by the Bankruptcy Court following a hearing currently scheduled to commence on September 29, 2025. And it is thusly impossible, as of present, as fully assess the secured claim of RRSB. However, wWhatever the allowed Secured Claim of RRSB may ultimately be, such will be retired through the making of regular monthly payments, beginning on the Plan Payment Commencement Date, based on (i) a 30-year amortization schedule; (ii) a 4.350% interest rate (being the rate agreed upon by the parties at the time RRSB solicited the Debtor's business); and (iii) a seven-year balloon obligation. RRSB will retain its lien on the Real Estate, in a sum equal to the allowed outstanding debt, until such a time as the debt is retired *en toto*.

It is possible—though less likely than in two related cases—that the Adversary Proceeding will pend until after the first payment hereunder comes due. If so, there will not be any certainty as to the total allowed Secured Claim of RRSB at the time the first such payment is due, but it will nonetheless benefit both the Debtor and RRSB for payments against the yet-to-be-liquidated to be made (as has been done through cash collateral payments post-petition). As such, monthly payments of $55,207.33 will be made until such a time as the total amount of RRSB's allowed Secured Claim is determined through the Adversary Proceeding. This figure is derived by assuming the allowed Secured Claim of RRSB will be $11,090,000.00, net of setoffs. For the avoidance of doubt, however, this estimate should not be construed as an admission of liability in

6

any sum certain; there is a rather distinct possibility the total debt will prove significantly lesser once the Adversary Proceeding is finally adjudicated.[1]

Upon final adjudication of the Adversary Proceeding, the monthly payments due to RRSB will be reamortized to account for (i) the Bankruptcy Court's determination of the actual sum due and owing, net of setoffs; and (ii) payments, if any, made post-petition.

It also must be noted that the Debtor is presently seeking relief, against RRSB, for allegedly violating the "exclusivity" period enshrined in the Bankruptcy Code. This dispute relates to the docketing of a draft plan of reorganization. The dispute is likely to be adjudicated before the Plan is brought on for a hearing on confirmation, but adjudication of this dispute might—but will not certainly—impact the treatment of RRSB's claim. Specifically, the Debtor has asked, amongst other potential remedies, to have the claim of RRSB equitably subordinated to those of all other non-insider creditors.

Before voting on the Plan, parties in interest are advised to examine the docket in this case and ascertain the disposition, *vel non*, of the Debtor's requested relief premised upon RRSB's alleged breach of the exclusivity period. This disposition may ultimately have a material impact upon other claimants.

Class 1 is an impaired class.

**Class 2 – Allowed Secured Claim of Watertown Development Company.** Class 2 shall consist of the allowed Secured Claim of Watertown Development Company ("WDC"). This obligation is derivative of a tax increment financing ("TIF") arrangement pursuant to Section 11-9-1, *et seq*. of the South Dakota Codified Laws (the "TIF Arrangement"). The TIF Arrangement provides that an advance of funding to the Debtor shall be repaid through a combination of (i) payments from the Debtor; and (ii) a grant from the city of Watertown, South Dakota (the "City of Watertown").[2] WDC has filed a proof of claim indicating a total indebtedness of $2,485,641.14.[3] The TIF Arrangement, in turn, provides that WDC shall receive $2,448,400.91 from the City of Watertown. There accordingly exist two components to the manner in which this class shall be

---

[1] In support of the feasibility of this Plan, Ruins will introduce cash flow projections derivative of empirical data. These projections reveal the ability to support a notably larger monthly payment than what is suggested herein. Accordingly, while Ruins is cautiously optimistic the Adversary Proceeding will result in a diminished monthly obligation, the somewhat-capricious use of a $11,090,000.00 figure herein should be understood to be an estimate of the debt due and owing to that bank, and *not* the byproduct of any economic need to minimize the gross debt owed to the bank.

[2] The grant is actually from the City of Watertown to the Debtor, but the Debtor, as part of the TIF process, has agreed to pay the grant proceeds over to WDC.

[3] The Debtor intends to investigate this sum and, if appropriate, may thereafter lodge a partial objection to the Claim of WDC. The subject proof of claim does an excellent job of breaking down the putative debt but does not reflect any payments having been made thereupon, even though the assignment of grant proceeds should have fetched certain payments prior to the Petition Date.

paid: (i) funds to be paid by the City of Watertown, pursuant to the TIF Arrangement; and (ii) funds to be paid by the Debtor, also pursuant to the TIF Arrangement.

The funds to be paid by the City of Watertown will continue to be remitted by the municipal entity. While inherent in any chapter 11 plan, the Debtor does affirmatively covenant to continue paying property taxes, in a timely and proper fashion, so as to ensure the availability of monies to be utilized by the City of Watertown to pay its portion of this claim. Should the Real Estate be sold, the obligation to pay property taxes will, as a matter of law independent of this Plan, necessarily pass to any successor title holder.

The funds to be paid by the Debtor, in turn, equal $37,240.23 (being equal to the gross obligation less the sum to be repaid through property taxes, under the TIF Arrangement). The Debtor shall pay this sum to WDC, beginning on the Plan Payment Commencement Date,[4] over the course of ten (10) years, through equal monthly payments, with the debt accruing interest at 4.00% until retired (being the interest rate utilized in the proof of claim filed by WDC). By way of anecdote only, if payments were to commence on the Petition Date (*i.e.*, before the accrual of any further interest), these monthly payments would equal $275.46. The payment sum will be amortized, however, based on the interest accrued prior to the Plan Payment Commencement Date, and will thusly be in a greater sum.

WDC shall retain its mortgage on the Real Estate in a sum equal to the Debtor's obligation hereunder ($37,240.23) until such a time as that obligation is retired, with the subject lien being reduced in a sum equal to the amount of principal tendered with each monthly payment. For ease of reference, an amortization schedule for this obligation is attached to the Plan as **Exhibit A**.

Notwithstanding any provision to the contrary in the TIF Agreement or any related loan documents, the Class 2 obligation shall *not* become immediately due and owing upon a sale of the Real Estate, though the portion thereof payable by the Debtor under this Plan ($37,240.23) shall be payable, in full, upon a sale of the Real Estate. And, for the avoidance of doubt, the Debtor will continue to honor its grant of funds from the City of Watertown to WDC. (The Debtor does not believe the grant to be an executory contract capable of being assumed or rejected, insofar as such is more akin to the giving of a security interest. However, to whatever extent the grant may be deemed an executory contract, such is assumed in the Plan.)

Class 2 is an impaired class.

**Class 3 – Codington County Treasurer.** Class 3 shall consist of the claim of the Codington County Treasurer. This is a priority tax claim in the amount of $91,263.98. This Class shall be paid in even monthly installments for a period of time equal to the number of months between (i) the Plan Payment Commencement Date; and (ii) the fifth anniversary of the Petition Date. This Claim shall accrue interest, until paid, at the rate of 7.5% per annum, with interest being factored into the straight line amortization of this Claim for purposes of calculating the payment obligation hereunder. By way of anecdote only, if payments were to commence on the Petition

---

[4] This term, and various others used herein, are not defined in this Disclosure Statement. Where such is the case, the term assumes the definition provided for in the Plan.

8

Date (*i.e.*, before the accrual of any further interest), these monthly payments would equal $2,206.66. The payment sum will be amortized, however, based on the interest accrued prior to the Plan Payment Commencement Date, and will thusly be in a greater sum.

Class 3 is an impaired class.

**Class 4 – Mechanics' Lien Holders**. Class 4 consists of the secured mechanics' lien Claims of (i) Diamond Wall System, Inc.; (ii) D&M Industries, Inc.; (iii) Brian's Glass and Door LLC; (iv) Performance Spray Foam, LLC; (v) The Roofing Company; and (vi) Top Finish Carpentry. These Claims total $1,145,801.92. This Class shall be paid in regular monthly payments, beginning on the Plan Payment Commencement Date, based on (i) a 30-year amortization schedule; (ii) a 7.50% interest rate; and (iii) a seven-year balloon obligation. By way of anecdote only, if payments were to commence on the Petition Date (*i.e.*, before the accrual of any further interest), these monthly payments would equal $8,011.61. The payment sum will be amortized, however, based on the interest accrued prior to the Plan Payment Commencement Date, and will thusly be in a greater sum.[5]

Class 4 is an impaired class.

**Class 5 – Watertown Municipal Utilities**. Class 5 consists of the Claim of Watertown Municipal Utilities, for the provision of utility services to the Real Estate. This Class will be paid in full on the Takeout Financing Date.

Class 5 is an impaired class.

**Class 6 – Unsecured Trade Creditor Claims.** Class 6 consists of the unsecured claims of the following trade creditors: (i) Schumacher Elevator Company; (ii) Limoges Construction; (iii) Xtreme Fire Protection, LLC; (iv) Watertight, Inc.; (v) B&W Construction; and (vi) Hamling Building Center. These Claims total $1,302,979.23. This Class will be paid in full on the Takeout Financing Date.

Class 6 is an impaired class.

**Class 7 – Unsecured Claims of Development Cost Creditors**. Class 7 consists of the unsecured Claims of three entities that have contributed to the costs of development of the Real Estate: (i) CP Business Management, Inc.; (ii) Craig Development, LLC; and (iii) the City of Watertown. These Claims total $580,737.18. This Class will be paid in full on the Takeout Financing Date.

---

[5] As noted *infra*, the Debtor intends to obtain financing to complete construction upon the Real Estate. It is reasonably anticipated that, as part of the subject process, certain trade creditors—whether secured or unsecured—will either (i) be denoted as critical vendors, with leave of court being sought to pay their extant Claims early; or (ii) acknowledge their Claims herein to be reflective of work they have already committed to undertake but not yet undertaken, thereby resulting in such Claims being retired through the ordinary course of business. As such, it is reasonably anticipated the size of the Claims in this Class will actually diminish with the passage of time.

9

Class 7 is an impaired class.

**Class 8 – Blacktail Investments, LLC and the Internal Revenue Service.** Class 8 consists of the Claims of Blacktail Investments, LLC and the Internal Revenue Service, both being unsecured wholly pecuniary claims. These Claims total $15,600.00. This Class will be paid in full on the Takeout Financing Date.

Class 8 is an impaired class.

**Class 9 – First National Bank & Trust.** Class 9 consists of the Claim of First National Bank & Trust. It appears this Claim is wholly subsumed within the Claim of Class 1, being advanced by a third party that participated in one or more loans made by RRSB to the Debtor. Insofar as this Claim is wholly derivative of—and incorporated into—that of another Class, the Debtor is candidly uncertain how to classify this putative Claim other than to observe (i) the Claim will assuredly be subject to objection; and (ii) equally assuredly does not resemble the Claim of any other Creditor.

Class 9 is believed to be unimpaired insofar as it does not appear Class 9 actually holds a bona fide Claim and, as such, does not hold any entitlement capable of being impaired.

**Class 10 – Equity.** Class 10 consists of the Debtor's equity interest. The Debtor's equity interest shall remain unchanged insofar as this Plan proposes to pay all Claim Holders in full.

Class 10 is an unimpaired class.

**Full Satisfaction and Release**. The payments, distributions and other treatment afforded to holders of allowed claims and interests under the Plan shall be in full and complete satisfaction, discharge and release of such allowed claims or interests against the Debtor.

VI. **Designation and Treatment of Unclassified Claims**

**Administrative Expense Claims**. On the Effective Date or at such time as otherwise agreed, the holder of an allowed Administrative Claim against the Debtor shall receive, in full and final satisfaction of such Holder's allowed Claim, cash in an amount equal to the unpaid portion of such allowed Claim. Upon information and belief, the only administrative expense claimant herein is counsel for the Debtor, who holds a retainer that should cover a portion—albeit likely not all—of counsel's fees. The Cash on Hand shall be used to satisfy any portion of this Administrative Claim not secured by counsel's retainer. Should the Cash on Hand be inadequate to pay any Administrative Claim over and above the subject retainer, counsel for the Debtor—through the docketing of this Plan—affirmatively agrees to permit such deficiency to be paid over a period of time equal to six months from the Effective Date.

**U.S. Trustee's Fees.** The United States Trustee shall receive payment, on or before the Effective Date, of all fees owed under 28 U.S.C. § 1930(a)(6) on account of disbursements made by the Debtor from the Petition Date through the Effective Date. Any U.S. Trustee's fees owed subsequent to the Effective Date will be paid from the Debtor's operating revenue. The Cash on Hand shall be used to pay these fees.

10

**VII.     Key Dates**

As noted above, *see, supra,* n.4, numerous terms are defined in the Plan and used herein. Readers can cross-reference the Plan to ascertain those definitions. However, certain dates are particularly critical to understanding the Plan and its dynamics, some of which are as follows:

The "Petition Date" is January 6, 2025;

The "Effective Date" is 14 days after entry of an order confirming the Plan; and

The "Takeout Financing Date" is measured as the first to occur of (i) the date on which the Debtor closes on a loan in a sum sufficient to pay all allowed Claim Holders in full; or (ii) June 1, 2029~~32~~.

**VIII.     Estate Representative**

The Plan provides for the appointment of a representative (the "Estate Representative") pursuant to Section 1123 of the Bankruptcy Code. The Estate Representative is designated to be Michael T. Schmitz, unless he declines to serve, resigns, becomes incapable of serving, or is removed for cause. The Plan provides a mechanism for selecting an alternate Estate Representative, should the need so arise, and provides that any Estate Representative may only be removed, against their will, for cause.

The Estate Representative is to take charge of the Debtor and operate the Debtor. This will include reviewing and signing contracts (though the Plan allows for residential lease approval to be delegated). The Estate Representative cannot be related—by blood or marriage—to the equity holder(s) of the Debtor.

The Plan provides for the Debtor's equity holder to contribute $20,000.00 toward payment of the Estate Representative's services, while also providing a mechanism for the payment of services in any sum over and above that amount. The Estate Representative is to be paid in accord with his or her usual and customary hourly rate.

The appointment of the Estate Representative is intended, by the Debtor, to create a paradigm where concerns about the interests of the Debtor's equity holder are addressed by a professional and neutral third party. This is aimed at protecting the best interests of all creditors and stakeholders.

~~VIII.~~**IX.     Bar Date for Filing Claims**

The bar date for filing a proof of claim in this case was March 17, 2025 for all creditors (except a governmental unit, which had a bar date of July 7, 2025). The failure to file or deliver a proof of claim or a proof of interest by the applicable bar date constitutes a bar against the assertion, allowance or distribution on account of any such claim or interest.

11

~~IX.~~X.        **Acceptance and Confirmation of Plan**

Except as discussed below, a prerequisite to the confirmation of the Plan is the acceptance of the Plan by each impaired class. A class is impaired unless, with respect to each claim or interest in such class, the Plan: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default, (a) cures any such default that occurred before or after the Petition Date (other than "ipso facto" defaults as specified in Section 365(b)(2) of the Bankruptcy Code); (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

In order to carry a designated class for purposes of confirmation of the Plan, the affirmative vote of holders of claims in each such class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class who actually vote on the Plan, other than a holder who has been designated by the Court as in bad faith having accepted or rejected the Plan, or whose acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of chapter 11 of the Bankruptcy Code is required. If the requisite acceptances from holders of allowed claims in each class of claims are obtained, and the Plan is confirmed, the Plan will be binding on all holders of claims and interests, including those who did not vote or who voted to reject the Plan (or those who are deemed to reject the Plan).

The Plan Proponent reserves the right to seek to confirm the Plan pursuant to the cramdown provisions of Section 1129(b) of the Bankruptcy Code. As a condition to confirmation, the Bankruptcy Code generally requires that each impaired class of claims or interest accepts a plan of reorganization. In the event that an impaired class does not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if (i) the Plan satisfies all other requirements of Section 1129(a) of the Bankruptcy Code, and (ii) the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class that has not accepted the Plan.

A plan of reorganization does not discriminate unfairly if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are identical with those of the non-accepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Plan Proponent believes that the Plan satisfies these requirements with respect to each class.

The Bankruptcy Code establishes different tests for secured creditors, unsecured creditors and interest holders to determine if the Plan is "fair and equitable." The tests may be summarized as follows:

(a) Secured Creditors: either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value as of the Effective Date equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the

property securing the claim is sold free and clear of liens with such liens to attach to the proceeds, and the liens against such proceeds are treated in accordance with clause (i) or (ii), above.

(b) Unsecured Creditors: either (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed unsecured claim, or (ii) the holders of claims and equity interests that are junior to the claims of the non-accepting Class do not receive any property under the Plan on account of such claims and interests.

(c) Equity Interest Holders: either (i) each interest holder will receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any of its interest or (b) the value of its interest, or (ii) the holders of interests that are junior to the non-accepting class will not receive any property under the Plan.

The Plan Proponent believes that the Plan is "fair and equitable" to interest holders, unsecured creditors, and secured creditors.

The Plan Proponent reserves all rights to modify or withdraw the Plan at any time prior to the Effective Date.

## ~~X.~~XI.      Alternatives to Confirmation and Consummation of the Plan

The alternatives to the confirmation and consummation of the Plan include (1) the preparation and presentation of an alternative plan of reorganization and (2) the liquidation of the Debtor under chapter 7 of the Bankruptcy Code. The Plan Proponent believes that neither alternative provides any greater return to its creditors.

**Alternative Plans of Reorganization.** While it is always possible to tweak a plan of reorganization slightly—or alter such a plan fundamentally—the Debtor does not believe an alternative plan would be in the best interests of creditors. The Plan in this case is a careful and thoughtful byproduct of the weighting of competing interests, moored to fundamental notions of fairness and equity. The Plan provides for all creditors to be paid, in full, over a period of time, while also maximizing the potential for the Debtor to emerge as a healthy business with a robust future.

**Liquidation Under Chapter 7 of the Bankruptcy Code.** If no plan can be confirmed, it is the Plan Proponent's firm belief that liquidation under chapter 7 would result in lesser distribution than proposed by the Plan. Specifically, a fire sale of the Real Property would likely fetch a grossly discounted value. Liquidation would also likely force a compromise of the Adversary Proceeding in unfavorable terms, with the Debtor lacking the cash to pay outside counsel to pursue the litigation and with it being unlikely a trustee could be likely to procure counsel to assume the claims on a contingency basis.

## ~~XI.~~XII.      Risks

It is neither possible nor pragmatic to contemplate all risks occasioned by the Plan in this case or the plan of reorganization in almost any chapter 11 case. The Debtor has, however, endeavored to identify pertinent risks throughout this Disclosure Statement, including furnishing

13

a discussion of the risks of not being successful in the Adversary Proceeding and the risks of something going awry with the completion financing and correlative completion of construction.

Other risks naturally face any builder or operator of an apartment building, but most such risks are mitigated through insurance, which the Debtor holds and always has held. It does merit notation, however, that insofar as Ruins operates in the insular market of Watertown, any long-term impairment of the community, leading to a dissipation of the population, would likely work an adverse impact upon the Debtor and the Debtor's ability to fully perform under the Plan. It is not clear what, if any, indicia of such an impairment are extant, and Ruins firmly believes in the community of Watertown, but the Debtor also recognizes the need to offer a holistic risk assessment in this Disclosure Statement.

There is also always a risk of the Debtor's completed building experiencing other market-based economic difficulties, including a dissipation in the prevailing rate of rents should the national—or local—economy experience a downturn. The Debtor does not believe this is a significant risk insofar as Ruins' insiders already operate two other apartment buildings in Watertown and have extensive knowledge of the local market, local economic factors, housing demand, and the elasticity of rental rates.

## ~~XII.~~XIII.   Distribution

**Delivery of Distributions**. Distributions and deliveries to holders of allowed claims shall be made at the addresses set forth on the proofs of claim filed by such holders (or at the last known addresses of such holders if no proof of claim is filed).

**No Interest Unless Otherwise Provided**. No interest shall be paid on any claim unless, and only to the extent permitted, under the terms of the Plan.

**Undistributed Property**. If any Distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto, such Unclaimed Property shall be forfeited by such Holder. Unclaimed Property shall be donated to The University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond in the manner she deems most charitably fit.

## ~~XIII.~~XIV.   Retention of Jurisdiction

Pursuant to Sections 1334 and 157 of Title 28 of the United States Code, the Bankruptcy Court shall retain jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, for the purposes of Sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a) to hear and determine any and all adversary proceedings, applications, or contested matters, including avoidance actions, and any remands from any appeals;

(b) to hear and to determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

14

(c) to enable the Debtor to prosecute any and all Causes of Action and to recover any transfers, assets, properties or damages to which it may be entitled under applicable provisions of the Plan, the Bankruptcy Code or any federal, state or local laws, including avoidance actions;

(d) to consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(e) to enter, enforce and implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement, consummate or enforce the terms and conditions of the Plan and the transactions contemplated hereunder;

(f) to enter and to implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement or enforce the terms and conditions of the Plan;

(g) to hear and to determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(h) to enter a final decree closing this Chapter 11 case.

**XIV.XV.    Certain Tax Consequences**

The following discussion summarizes certain federal income tax consequences to the Debtor and Debtors' holders of claims and equity interests. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS, as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special categories of taxpayers who are holders of claims (such as taxpayers who are not domestic corporations or citizens or residents of the United States, or are S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers and tax-exempt organizations) and assumes that each creditor holds its claim directly.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Plan Proponent has not requested and will not request a ruling from the IRS with respect to any of the tax aspects of the Plan.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL**

PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.

**Certain Federal Income Tax Consequences to Debtor.** Upon information and belief, the Debtor is a pass-through entity for federal income tax purposes. Thus, the Debtor is not subject to taxes imposed under chapter 1 of the Tax Code. Accordingly, any net operating income or losses generated by the Debtor during a taxable year ("NOLs") will pass through to the equity interest.

Upon a sale of the Debtor' property any recognized gain or loss equal to the difference between the pre-distribution sale proceeds and Debtors' adjusted tax basis in the property that may be subject to capital gains tax will pass through to equity interest. The amount of gain recognized will include the full proceeds from any sale of property, including the amount of any indebtedness assumed by the buyer to which the property is subject. If the sale of the property results in a gain and such property was used in Debtors' trade or business, such gain would generally be treated as a "section 1231 gain." Such gain would be combined with other Tax Code § 1231 gains and losses. Generally, Tax Code § 1231 gains and losses are offset against each other on an annual basis, and net gain is treated as long-term capital gain, while net loss is treated as ordinary loss. Net § 1231 gains must, however, be treated as ordinary income to the extent of net § 1231 losses taken over the five most recent years, to the extent such losses have not been previously "recaptured."

**Certain Federal Income Tax Consequences to Creditors.** The federal income tax consequences of the Plan to a creditor will depend upon several factors, including but not limited to: (i) whether the creditor's claim (or portion thereof) constitutes a claim for principal or interest; (ii) whether the creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); and (iii) whether the creditor has taken a bad debt deduction with respect to its claim. In addition, if a claim is a "security" for tax purposes, different rules may apply.

CREDITORS ARE STRONGLY ADVISED TO CONSULT WITH THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

A creditor receiving solely cash in exchange for its claim will generally recognize taxable gain or loss in an amount equal to the difference between the amount realized and its adjusted tax basis in the allowed claim. The amount realized will equal the amount of cash to the extent that such consideration is not allocable to any portion of the allowed claim representing accrued and unpaid interest, as further discussed below.

The character of any recognized gain or loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the creditor, the nature of the allowed claim in the creditor's hands, the purpose and circumstances of its acquisition, the creditor's holding period

16

of the allowed claim, and the extent to which the creditor previously claimed a deduction for the worthlessness of all or a portion of the allowed claim. A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

A portion of the consideration received by a creditor in satisfaction of an allowed claim may be allocated to the portion of such claim (if any) that represents accrued but unpaid interest. If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the creditor as interest income, except to the extent the creditor has previously reported such interest as income.

In the event that a creditor has not previously reported the interest income, only the balance of the distribution after the allocation of proceeds to accrued interest would be considered received by the creditor in respect of the principal amount of the allowed claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the creditor with respect to the allowed claim. If such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

**Federal Income Tax Consequences to Holders of Equity Interests Receiving Distributions.**
Holders of allowed equity interests receiving distributions will generally recognize loss or gain in the amount of each such holder's adjusted tax basis in the equity interest. The character of any recognized loss or gain (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the equity interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period, and the extent to which the holder had previously claimed a deduction for the worthlessness of all or a portion of the equity interest.

A gain or loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

**Importance of Obtaining Professional Tax Assistance. No holder of a claim or equity interest should rely on the tax discussion in this Disclosure Statement in lieu of consulting with one's own tax professional. The foregoing is intended to be a summary only and not a substitute for consultation with a tax professional. The federal, state, local and foreign tax consequences of the Plan are complex and, in some respects, uncertain. Such consequences may also vary based upon the individual circumstances of each holder of a claim or equity interest. Accordingly, each holder of a claim or equity interest is strongly urged to consult with its own tax advisor regarding the federal, estate, local and foreign tax consequences of the Plan.**

XV. XVI.          **Miscellaneous Provisions**

**Severability.** Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any claim or equity interest or transaction, the Plan Proponent may modify the Plan in accordance with the Plan, as applicable, so that such provision shall not be applicable to the holder of any claim or equity interest.

**Binding Effect.** Upon the entry of the Confirmation Order, all provisions of the Plan shall be binding upon, and shall inure to the benefit of, the Debtor, the holders of claims and equity interests, and such persons' respective successors and assigns.

**Governing Law.** Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the laws of the State of North Dakota shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

**Timing of Distributions.** Any distribution required to be made hereunder on a day other than a business day shall be due and payable on the next succeeding business day.

**Revocation or Withdrawal of Plan.** The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan is withdrawn or revoked, then the result shall be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred. If the Plan is revoked or withdrawn prior to the entry of the Confirmation Order, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or any other person or to prejudice in any manner the rights of the such entity or any person in any further proceedings involving such entity.

**Nonmaterial Modifications.** The Plan Proponent may, with the approval of the Bankruptcy Court and without notice to holders of claims and equity interests, correct any nonmaterial defect, omission, or inconsistency herein in such manner and to such extent as may be necessary or desirable.

**Material Modifications.** Modifications of the Plan may be proposed in writing by the Plan Proponent at any time prior to confirmation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponent shall have complied with Section 1125 of the Bankruptcy Code. The Plan may be modified at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under Section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

**Notices.** Any notice required or permitted to be provided hereunder shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) prepaid overnight delivery service and addressed as follows:

Maurice B. VerStandig, Esq.
THE DAKOTA BANKRUPTCY FIRM
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
*Counsel for the Debtor*

**Successors and Assigns.** The rights, benefits and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person.

~~XVI.~~**XVII.** **Confirmation Request**

The Plan Proponent respectfully urges all parties entitled to vote on the Plan to do so in favor of the Plan, and respectfully pray this Honorable Court confirm the Plan.

Respectfully submitted,

Dated: ~~September 22~~November 24, 2025

By: /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
THE DAKOTA BANKRUPTCY FIRM
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtor*

19