**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In Re:<br><br>The Ruins, LLC,<br><br>                 Debtor. | Case No.: 25-30004<br><br>Chapter 11 |

**RED RIVER STATE BANK'S OBJECTION TO MOTION TO EQUITABLY SUBORDINATE CLAIM OF RED RIVER STATE BANK TO THOSE OF ALL OTHER CREDITORS EXCEPTING INSIDERS OR, IN THE ALTERNATIVE, FOR ENTRY OF AN ORDER DIRECTING RED RIVER STATE BANK TO SHOW CAUSE WHY IT NOT BE HELD IN CONTEMPT OF COURT**

Comes now Creditor Red River State Bank ("RRSB"), by and through undersigned counsel, opposes the Motion to Equitably Subordinate Claim of Red River State Bank to Those of All Other Creditors Excepting Insiders or, in the Alternative, for Entry of an Order Directing Red River State Bank to Show Cause Why It Ought Not be Held in Contempt of Court (the "Motion"), *see* ECF No. 183, and in support of said opposition states as follows:

**I.     Law and Argument**

    A.     <u>Grounds do not exist to equitably subordinate RRSB's claims.</u>

Section 510(c)(1) of the Bankruptcy Code authorizes a bankruptcy court to subordinate a creditor's claim to other claims "under principles of equitable subordination." 11 U.S.C. § 510(c)(1). In the Eighth Circuit, "equitable subordination requires proof of inequitable conduct by the claimant that injured other creditors or conferred an unfair advantage. Fraud, illegality, and breach of fiduciary duty are misconduct that justifies equitable subordination." *Kaler v. Bala (In re Racing Servs., Inc.)*, 571 F.3d 729, 731 (8th Cir. 2009) (citations omitted).

Debtor has not claimed that RRSB committed any fraud. *See generally* ECF no. 183. Nor has Debtor claimed that RRSB breached any fiduciary duty owed to Debtor. *Id.* Accordingly, RRSB presumes that Debtor's request for equitable subordination is premised upon a theory of "illegality." Because RRSB has not engaged in any illegal conduct, Debtor's Motion fails. Moreover, even if RRSB had engaged in illegal conduct, the remedy of equitable subordination would be unwarranted as RRSB's conduct did not injure creditors, or work an unfair advantage for RRSB. Accordingly, this Court should deny the Motion.

    1.    *RRSB did not act illegally in that its conduct did not violate the exclusivity provided by Sections 1121 and 1125 of the Bankruptcy Code.*

Debtor's theory for equitable subordination is that RRSB touched a bankruptcy "third rail," and that a debtor's right to exclusivity includes the right to prevent "creditors from being made privy to the content of any competing or alternative plans of reorganization." *See* ECF No. 183, at 5. Debtor's argument fails in that it is based on a misapplication of the scope of a debtor's right to exclusivity.

The leading case regarding a creditor's alleged violation of a debtor's right to exclusivity is *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94 (3d Cir. 1988), wherein the Third Circuit construed "solicitation" narrowly, and holding that the term referred "only to a specific request for an official vote." *Id.* at 101 (citation omitted). There, the debtor had filed its proposed plan and sought acceptance of the plan from the creditor body during the exclusivity period. *Id.* at 95. During that exclusivity period, a plan opponent transmitted a copy of its plan to one of the debtor's largest creditors. *Id.* The debtor subsequently argued that the plan opponent had improperly solicited and procured the rejection vote of the subject creditor. *Id.* at 96. The Third Circuit rejected the argument, ruling that a

2

party does not solicit acceptances when it presents a draft plan for the consideration of another creditor, so long as the party does not request that creditor's vote. *Id.* at 102. The Third Circuit reasoned that allowing a draft competing plan to be circulated during the debtor's exclusivity period did not offend the language or policy of 11 U.S.C. § 1121(b). *Century Glove*, 860 F.2d at 102. According to the court, Section 1121 provides a debtor with the temporary exclusive right to file a plan, not a right to have its plan considered exclusively. *Century Glove*, 860 F.2d at 102. "The ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals." *Id.* A broad exclusivity provision allowing only the debtor's plan to be "on the table," the court explained, would give a debtor undue bargaining leverage and inhibit creditor negotiations. *Id.* Therefore, the court concluded that Sections 1121(b) and 1125(b) ought to be interpreted narrowly to allow a party to present a draft plan for the consideration of another creditor so long as the plan proponent does not request the creditor's vote. *Id.* A majority of courts—including bankruptcy courts in the Eighth Circuit—have since adopted the holding and reasoning of *Century Glove*. *See, e.g.*, *Duff v. United States Trustee (In re California Fidelity, Inc.)*, 198 B.R. 567, 571–72 (BAP 9th Cir. 1996) (recognizing that solicitation has been interpreted as a "specific request for an official vote" and that "[m]ost courts have reasoned that a broader construction of the term would curtail free and honest negotiations among creditors and, therefore, inhibit creditor participation in the debtor's reorganization."); *In re Dow Corning Corp.*, 227 B.R. 111, 118 (Bankr. E.D. Mich. 1998) ("Solicitation, then, is the process of seeking votes for or against a plan."); *In re Pleasant Hill Partners, L.P.*, 163 B.R. 388, 391 (Bankr. N.D. Ga. 1994) (holding that "section 1125 'solicitation' is usually construed very narrowly."); *In re Kellogg Square Partnership*, 160 B.R. 336, 340 (Bankr. D. Minn. 1993)

3

("[T]here is no . . . reason not to apply *Century Glove's* rationale to the debtor in reorganization, so as to [describe] the concept of 'solicitation' as [equivalent to] the polling process."); *In re Gilbert*, 104 B.R. 206, 214 (Bankr. W.D. Mo. 1989) (agrees with Third Circuit that a broad definition of solicitation would tend to chill creditor negotiations).

Debtor does not allege that RRSB "solicited" any vote for the circulated plan, *see generally* ECF No. 183, and RRSB did not solicit any vote for the draft plan. In fact, the draft plan intentionally contains only placeholders for all of the critical business terms. The purpose of the draft plan was not to solicit, rather it was intended to illustrate that the case desperately needs a mechanism to investigate and prosecute avoidable transfers. The Bank intended to use the draft plan at an evidentiary hearing in conjunction with extensive, detailed evidence of the dates and amounts of potentially avoidable transfers to insiders, to demonstrate that conversion and appointment of a Chapter 7 trustee serves the best interests of unpaid creditors in this case.

By comparison, the draft plan shines a spotlight on the fundamental conflict of interest at the heart of this case. This debtor in possession is not acting as a fiduciary for creditors. The Debtor's plan expressly shields insiders for liability for avoidable transfers with a five-year injunction – notwithstanding the very real possibility that such transfers represent loan proceeds diverted away from the Debtor's creditors by self-dealing insiders. Avoidance actions are not encumbered by any liens and they are the largest potential source of recovery for creditors. If the Debtor's plan is confirmed, regardless of whether the building is finished or the Debtor obtains "Take Out Financing" in 2029, the Debtor's plan will have served the insiders by enjoining creditors long enough that the statute of limitations will lapse, which is functionally equivalent to giving the insiders a third-party release. The insider's equity currently has no value – they literally have nothing to lose if the Ruins plan does not ultimately

4

succeed. From the insider's perspective, the bankruptcy case will have "served its purpose" as long as they succeed in outrunning the two-year statute of limitations for the avoidance actions in this case.

If any party should be equitably subordinated in this case, it is the insiders who have engaged in proven loan fraud and self-dealing. These insiders diverted and commingled loan proceeds for their own benefit, and as a result, the building is incomplete and hundreds of thousands of dollars are owed to local tradesmen. Moreover, to the extent solicitation is the basis of a motion for equitable subordination, the testimony of B&W confirms that it was the Debtor, not the Bank, who actively solicited votes in favor of a plan from at least four creditors in the case, notwithstanding the fact that there was no disclosure statement for such plan on the docket and no court order authorizing solicitation to commence. Lastly, the motion must fail because Debtors do not allege, let alone prove, that RRSB engaged in any illegal conduct, as required by Eighth Circuit precedent.

> 2. *Any violation of the exclusivity provisions encompassed by Sections 1121 and 1125 does not warrant subordinating RRSB's claims.*

And even if, *arguendo*, RRSB's conduct could be construed as "illegal," equitable subordination would still be unwarranted. Debtor concedes that equitable subordination is unwarranted unless the illegal conduct "'result[s] in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.'" ECF No. 183, at 4 (quoting *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1282 (8th Cir. 1988)). Debtor does not claim that RRSB's conduct injured the Debtor's other creditors—and RRSB's conduct did not in fact injure other creditors. Instead, Debtor argues that RRSB was "unfair[ly] advantaged" at the motion to convert hearing because other creditors were "aware of what alternative will lay ahead if the

5

Debtor's proposed plan is rejected and the bank is permitted to proceed with its own chapter 11 plan." *Id.* at 4-5. Debtor's argument is incorrect.

First, as discussed above, the plan was independently relevant because it was intended to be used as an exhibit for the purpose of demonstrating the Debtor's conflict of interest and refusal to even investigate potential fraudulent transfers. At the evidentiary hearing, the insider testified that he had no incentive to do so, and no inclination to do so. The Plan verifies and embodies the insider's intentions and point of view. His primary reason for resisting conversion is that he would lose the ability to control who has standing to investigate and prosecute avoidance actions against himself or his family members. The Debtor's inability to comport itself as a bona fide fiduciary for creditors is an intractable problem in this case, and it is one that is appropriately resolved by conversion and appointment of a Chapter 7 trustee.

And even if the plan were not independently relevant, its identification did not unfairly advantage RRSB. Specifically, Debtor's exclusivity lapsed on November 28, 2025, without any approved disclosure statement, meaning Debtor has been precluded from officially soliciting any votes for the plan. In light of the lapse of exclusivity, RRSB does intend to file a competing plan and disclosure statement. The final version of the RRSB plan will include key terms that were previously omitted from the draft plan. For the avoidance of doubt, RRSB still believes that conversion to Chapter 7 is the most cost-effective solution to the conflict of interest problem, and prosecution of unencumbered avoidance actions is the best way to produce some recovery for unsecured creditors. If the Court chooses not to convert the case, RRSB cannot stand idly by. RRSB will have no choice but to file a plan to be considered in tandem with Debtor's, allowing creditors to consider two potential plans. But the use of a draft plan to illustrate that it is imminently possible to claw back money diverted from the project

6

to pay creditors, without any direct communication that could constitute solicitation of votes in favor or against any plan, does not unfairly advantage RRSB. The purpose of the draft plan is to insure that insiders do not enrich themselves at the expense of unsecured claims. This is a tangible benefit to unsecureds and there is no cause for equitable subordination.

      B.      <u>Grounds do not exist to issue an order to show cause.</u>

Alternatively, Debtor requests that this Court issue an order to show cause for why RRSB should not be held in contempt. *See generally* ECF No. 183, at 5-6. Civil contempt is a remedy which should be used sparingly and should not be employed without more of a direct relationship between a specific order focused on an alleged contemnor and the suggested violation. *See Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992) (civil contempt is designed to force contemnor to comply with direct order of court); *see also In re Bennett*, 41 B.R. 958, 960 (E.D.Wis.1984) (citing *Gompers v. Buck Stove & Range Co.*, 221 U.S. 418, 451 (1911)) ("The power to punish for contempt, being a drastic sanction, is to be used sparingly and with caution."). And "[a] court cannot issue a contempt order unless a party has violated a specific order of which he or she is aware." *Koehler v. Grant*, 213 B.R. 567, 570 (BAP 8th Cir. 1997) (citing *United States v. Di Mauro*, 441 F.2d 428, 439 (8th Cir.1971) ("[I]n order to cite a person for contempt, it must be shown that the alleged contemnor had knowledge of the order which he is said to have violated and that order must be specific and definite."); *United States v. Cutler*, 58 F.3d 825, 834 (2d Cir.1995) ("A defendant cannot be held in contempt absent a 'definite and specific' order of which he had notice.")). Here, Debtor's request that this Court issue an order to show cause lacks proper basis as Debtor fails to identify a specific order that RRSB's conduct violated. *See generally* ECF No. 183. Debtor's only possible legitimate

concern is that the draft plan violated the spirit of a stipulation between the parties. This does not constitute contempt for an order issued by this Court.

## II. Conclusion

For the foregoing reasons, RRSB respectfully requests that this Court deny the Motion.

Dated: December 3, 2025.

**VOGEL LAW FIRM**

BY: */s/ Kesha L. Tanabe*
Caren W. Stanley (#06100)
cstanley@vogellaw.com
Kesha L. Tanabe (#0387250)
ktanabe@vogellaw.com
Drew J. Hushka (#08230)
dhushka@vogellaw.com
218 NP Avenue
PO Box 1389
Fargo, ND 58107-1389
701.237.6983
ATTORNEYS FOR RED RIVER STATE BANK

8

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In Re:<br><br>The Ruins, LLC,<br><br>                Debtor. | Case No.: 25-30004<br><br>Chapter 11 |

**CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2025, a copy of **Red River State Bank's Objection to Motion to Equitably Subordinate Claim of Red River State Bank to Those of All Other Creditors Excepting Insiders or, In the Alternative, For Entry of An Order Directing Red River State Bank To Show Cause Why It Not Be Held In Contempt of Court** was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) all parties who are registered to receive e-notices in this case.

                BY:**Vogel Law Firm**
                      */s/ Kesha L. Tanabe*
                      Kesha L. Tanabe (0387520)
                      ktanabe@vogellaw.com
                      218 NP Avenue
                      PO Box 1389
                      Fargo, ND 58107-1389
                      701.237.6983