UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| **In Re:**<br><br>The Ruins, LLC,<br><br>**Debtor.** | Case No.: 25-30004<br>Chapter 11 |

DISCLOSURE STATEMENT FOR

CREDITOR'S PLAN OF LIQUIDATION FOR THE RUINS, LLC

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT RELATES TO A CHAPTER 11 PLAN OF LIQUIDATION FOR THE RUINS LLC FILED BY RED RIVER STATE BANK, AND IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED OR REFERRED TO IN THE PLAN, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT IN THE FUTURE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(C) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER LAWS GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER

AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY FRE 408. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR. EACH CREDITOR SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED IN THE PLAN.

# 1. INTRODUCTION

### 1.1   *What is the Purpose of this Disclosure Statement?*

Red River State Bank ("RRSB" or the "Plan Proponent") has filed a Plan of Liquidation (the "Plan") for The Ruins, LLC (the "Debtor"). This Disclosure Statement is intended to provide "adequate information" about the Debtor and the Plan, as defined in Section 1125(b) of Bankruptcy Code, to allow creditors to make an informed judgment about the Plan. If this Disclosure Statement is approved by the Bankruptcy Court, it will be used to solicit votes from creditors for or against the Plan. By Order dated _____, this Disclosure Statement was approved by the Bankruptcy Court and it may be used to solicit votes from creditors for or against the Plan.]

The Plan Proponent strongly urges you to read this Disclosure Statement because it contains a summary of the Plan and important information concerning the Debtor's history and finances. The Disclosure Statement also provides information about alternatives to the Plan. A copy of the Plan accompanies this Disclosure Statement as a separate document.

Note, the Plan includes a table of definitions. You should refer to the Plan for the definitions of capitalized terms used in the Disclosure Statement. Cites to "ECF" numbers are references to motions, affidavits, and orders that have been filed on the docket in the Bankruptcy Case.

### 1.2   *Events Leading Up to Bankruptcy Case*

The Debtor is owned by Jesse R. Craig ("Mr. Craig" or the "Insider"). The Debtor's principal asset is a mixed-use facility with 63 units of apartments (the "Ruins Project") located in Watertown, South Dakota (the "City"). However, the Ruins Project is not complete and construction is stalled.

Facing foreclosure on the Ruins Project, the Debtor filed a Chapter 11 bankruptcy case on January 6, 2025.  [ECF 1]  Mr. Craig and the Debtor blame the failure of the Ruins Project on the Covid-19 pandemic and RRSB. First, they make generic claims about the negative impact of the pandemic on workers and supply chains in the United States. Second, they claim the bank did not loan enough money to finish the Ruins Project, "leading to a premature cessation of construction." [ECF 200]  Mr. Craig and the Debtor have repeatedly claimed - without proving – that RRSB did not loan as much money as it originally promised to the Ruins Project, due to the bank's internal lending limits.

2

The site of the Ruins Project was originally owned by Mr. Craig through his wholly-owned company Craig Holdings, LLC. In March 2021, the Watertown Development Corporation ("WDC") loaned $2,750,000 to Mr. Craig to start the Ruins Project. [POC NO. 7-1] In March 2022, RRSB loaned $7,740,000 to the Debtor for construction of the Ruins Project. By August 2022, RRSB made a second loan for an additional $2,750,000. And in February 2023, RRSB made a third and final loan of $600,000. The original term sheet between the parties indicates that RRSB had planned to loan $7.2 million to the Debtor, with a personal guarantee from Mr. Craig. [ECF 214-14, Exhibit 14] In fact, RRSB loaned a total of $11,090,000 to construct the Ruins Project. [POC NO. 1-2]

Funding for the Ruins Project was not abruptly or unexpectedly "cut off" or "cut short." On the contrary, the Debtor received a total of $13,840,000 in loan proceeds from WDC and RRSB, which is $3 million more than the original anticipated cost to complete the Ruins Project. Basic math confirms the Debtor received millions in extra loan proceeds, and yet, the Debtor still failed to pay over $1.7 million to subcontractors and vendors for construction services, goods and materials supplied to the Ruins Project. Equally concerning, a construction expert in the Bankruptcy Case recently testified that the Ruins Project still requires another $1,695,967 in materials and labor to complete. [ECF 60].

RRSB has engaged in extensive discovery to determine what happened to its loan proceeds for the Ruins Project. In recent litigation before the Bankruptcy Court, RRSB submitted detailed evidence of at least three types of loan fraud committed by Mr. Craig. First, Mr. Craig altered documents he provided to RRSB about his personal financial condition, misleading the bank about the amount of cash and liquid assets at his disposal to finish the Ruins Project. Second, Mr. Craig altered documents that were submitted to RRSB with loan disbursement requests, causing loan proceeds that were intended to pay subcontractors and materials for the Ruins Project to be diverted to enrich himself or for the benefit of his other construction projects. [ECF 137] Specifically, RRSB submitted evidence to the Bankruptcy Court confirming that the value of the invoices altered by Mr. Craig exceeds the value of the invoices actually submitted to the Debtor by its subcontractors by $2,169,472.51. Id. RRSB also provided evidence to the Bankruptcy Court to confirm that Mr. Craig directed loan proceeds totaling $1,253,972.84 out of the Ruins Project to Non-Ruins projects, including his personal lake home which has an estimated value of over $3 million. Id. Third, Mr. Craig transferred loan proceeds for the Ruins Project totaling $4,365,805.33 out of the Debtor's bank account and into other bank accounts owned and controlled by Mr. Craig, where they were commingled and/or diverted to himself, his family members, and his other construction projects. [ECF 177]

After reviewing such evidence, it is the Plan Proponent's good faith belief that the Ruins Project is not complete because insiders transferred millions of dollars out of the Debtor. Loan proceeds that were intended by RRSB to pay subcontractors were diverted for Mr. Craig's personal gain, including for the construction of his personal "dream home" on Pelican Lake in Minnesota. To date, Mr. Craig has not been willing or able to provide an accounting of how he spent the loan proceeds for the Ruins Project. In light of the fact that the Ruins Project will still require another $1.695 million to complete, and over $1.7 million is still owed to the original unpaid subcontractors and vendors, it is clear that an investigation is warranted. To that end, RRSB filed a motion to convert this Bankruptcy case to Chapter 7. If RRSB prevails on its motion, a Chapter 7 bankruptcy

trustee will be appointed to investigate and claw back such transfers and to redistribute such funds to pay creditors.

If the bankruptcy case is not converted to Chapter 7, the Debtor should not be allowed to use Chapter 11 for the improper purpose of shielding Mr. Craig and other insiders from investigation and prosecution. Therefore, RRSB filed a competing Plan to provide a mechanism to investigate and prosecute insider claims. This Plan aims to claw back any potentially fraudulent transfers, and to utilize such funds for their original purpose: to pay creditors who provided their money, building materials and construction services to the Ruins Project.

### 1.3   Brief Summary of the Creditor's Plan

As described in more detail in this Disclosure Statement, the Plan provides two sources of recovery for creditors: a sale process and a creditor trust.  First, RRSB, the senior secured creditor, will sell its collateral. Sale Proceeds will be sold to pay down its secured claim. RRSB will also allocate part of its Sale Proceeds, as needed, to pay holders of allowed Claims in the order of priority under section 507 of the Bankruptcy Code, including allowed Administrative Claims (including Professional Fee Claims) and allowed  Priority Tax Claims. And, RRSB will allocate $50,000 worth of its Sale Proceeds to establish a creditor trust and to fund the investigation and prosecution of potentially fraudulent transfers out of the Ruins Project. Litigation or settlement proceeds will be distributed pro rata to all Holders of unsecured Claims.

### 1.4   Confirmation of Plan.

1.4.1  **Requirements.** The requirements for Confirmation of the Plan are set forth in detail in section 1129 of the Bankruptcy Code. The following summarizes some of the pertinent requirements:

(a)   **Acceptance by Impaired Classes.** Except to the extent that the cramdown provisions of section 1129(b) of the Bankruptcy Code may be invoked, each Class of Claims must either vote to accept the Plan or be deemed to accept the Plan because the Claims or Interests of such Class are not Impaired.

(b)   **Feasibility.** The Bankruptcy Court is required to find that the Plan is likely to be implemented and that parties required to perform or pay monies under the Plan will be able to do so.

(c)   **"Best Interest" Test.** The Bankruptcy Court must find that the Plan is in the "best interest" of all Holders of Claims. To satisfy this requirement, the Bankruptcy Court must determine that each Holder of a Claim against the Debtor: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such Holder would receive if the Debtor's property was liquidated under Chapter 7 of the Bankruptcy Code on such date.

(d)   **"Cramdown" Provisions.** Under the circumstances which are set forth in detail in section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan

4

even though a Class of Claims or Equity Interests has not accepted the Plan, so long as one Impaired Class of Claims has accepted the Plan, excluding the votes of Insiders (as defined in the Bankruptcy Code), if the Plan is fair and equitable and does not discriminate unfairly against such non-accepting Classes. The Plan Proponent will invoke the "cramdown" provisions of section 1129(b) of the Bankruptcy Code as to holders of Equity Interests since under the Plan, the Class in which Equity Interests reside are deemed to have rejected the Plan. Should any voting Class fail to accept the Plan, the Plan Proponent will also invoke the "cramdown" provision as to such Class.

       1.4.2   *Procedure.* To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code (the "***Confirmation Hearing***"). The Bankruptcy Court has set _____, at [•] [•].m. Central Standard Time, for the Confirmation Hearing.

       1.4.3   ***Objection to Confirmation.*** Any party-in-interest may object to Confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection. The Bankruptcy Court has set _____, at [•] [•].m. Central Time, as the deadline for filing and serving upon the Plan Proponent's counsel, and the United States Trustee's Office, objections to Confirmation of the Plan. Objections to Confirmation must be filed with the Bankruptcy Court at the following address:

>U.S. Bankruptcy Court for the District of North Dakota
>655 1st Avenue North, #210
>Fargo, ND  58102

with a copy served upon counsel to the Debtor:

>Drew J. Hushka
>Caren W. Stanley
>Kesha L. Tanabe
>Vogel Law Firm
>218 NP Avenue
>PO Box 1389
>Fargo, ND  58107-1389

and a copy served upon the Office of the United States Trustee:

>United States Trustee
>Suite 1015 U.S. Courthouse
>300 South Fourth Street
>Minneapolis, MN 55415

       1.4.4   ***Effect of Confirmation.*** Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective Date, the Debtor and its Estate shall irrevocably vest in the liquidating Debtor for purposes of administration, by the Plan Proponent, of all of its respective rights, title, and interest in and to all assets. The Plan provides for the wind down of the Debtor's affairs, continued liquidation and conversion of all of the Debtor's remaining assets to cash and the distribution of the net proceeds realized therefrom, in addition to cash on hand

on the Effective Date of the Plan, to Holders of allowed Claims in accordance with the relative priorities established in the Bankruptcy Code. The Plan does not provide for a distribution to Holders of Equity Interests, and their votes are not being solicited. The Plan contemplates the creation of a Creditor Trust and the appointment of a Creditor Trustee to pursue any unreleased Causes of Action and to make Distributions to Holders of allowed Claims. Confirmation serves to make the Plan binding upon the Debtor, all Creditors, Holders of Equity Interests, and other parties-in-interest, regardless of whether they cast a ballot ("***Ballot***") to accept or reject the Plan.

### 1.5 *Voting on the Plan.*

1.5.1 ***Impaired Claims or Equity Interest.*** Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by the Plan and receiving distributions or other treatment under the Plan may vote on the Plan. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Equity Interests treated in such Class. Holders of Claims not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan.

1.5.2 ***Eligibility.*** In order to vote on the Plan, a Holder of a Claim must have timely filed or been assigned a timely filed proof of Claim, unless its Claim is scheduled by the Debtor and is not identified as disputed, unliquidated or contingent on the Debtor's Schedules of Assets and Liabilities (the "***Schedules***"). Holders having a Claim in more than one Class may vote in each Class in which they hold a separate Claim by casting a Ballot in each Class.

1.5.3 ***Binding Effect.*** Whether a Holder of a Claim votes on the Plan or not, such Person will be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court. Absent some affirmative act constituting a vote, a Holder of a Claim will not be included in the vote: (i) for purposes of accepting or rejecting the Plan; or (ii) for purposes of determining the number of Persons voting on the Plan.

1.5.4 ***Procedure.*** Members of Classes 1, 2, and 3 may vote to accept or reject the Plan. Class 4 is comprised entirely of Insiders and their votes are disregarded for purposes of plan confirmation. In order for your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to:

> Kesha L. Tanabe
> Vogel Law Firm
> 218 NP Avenue
> PO Box 1389
> Fargo, ND  58107-1389

Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan must be received by mail or overnight delivery at the address set forth above on or before 4:00 p.m. Central Standard Time on _____. Once you have delivered your Ballot, you may not change your vote, except for cause shown to the Bankruptcy Court after notice and hearing.

Any Ballot received that is incomplete in any way shall be deemed to be cast as follows:

(i) Ballots received that do not evidence the amount or evidence an incorrect amount of such Holder's Claim shall be completed or corrected, as the case may be, based upon the Schedules filed by the Debtor if no proof of Claim has been filed by such Holder, or based upon timely filed proofs of Claim, and counted as a vote to accept or reject the Plan upon request to the Court by either the Debtor or such Holder of a Claim;

(ii) Ballots received that do not identify the Holder of the Claim, whether or not signed by the Holder, shall not be counted as a vote to accept or reject the Plan;

(iii) Ballots received that do not reflect in which Class such Ballot is cast or incorrectly classify such Holder's Claim and that are otherwise properly completed may be completed or corrected, as the case may be, and counted as a vote to accept or reject the Plan upon request to the Court by either the Plan Proponent or such Holder of a Claim; and

(iv) Ballots that are completed, except that such Holder of a Claim failed to vote to accept or reject the Plan, shall not be counted as a vote to accept or reject the Plan.

### 1.6 *Acceptance of the Plan.*

1.6.1 **Holder Acceptance.** As a Holder of a Claim, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan, or the Plan must qualify for "cramdown" of any non-accepting Class pursuant to section 1129(b) of the Bankruptcy Code. At least one impaired Class of Creditors, excluding the votes of Insiders, must actually vote to accept the Plan. You are urged to complete, date, sign and promptly mail the enclosed Ballot. Please be sure to complete the Ballot properly and legibly identify the exact amount of your Claim and the name of the Holder of the Claim.

1.6.2 **Cramdown Election.** If all Classes do not accept the Plan, but at least one Impaired Class votes to accept the Plan, excluding the votes of Insiders, the Plan Proponent may attempt to invoke the "cramdown" provisions of the Bankruptcy Code. Cramdown may be an available remedy, because the Plan Proponent believes that, with respect to each Impaired Class, the Plan is fair and equitable within the meaning of section 1129(b)(2) of the Bankruptcy Code and does not discriminate unfairly.

### 1.7 *Sources of Information.* 
The information contained in this Disclosure Statement has been obtained from the Debtor's books and records, from formal discovery in the bankruptcy case, and from motions and other papers filed with the Bankruptcy Court by the Debtor, the Plan Proponent and other parties-in-interest. Every reasonable effort has been made to present accurate information and such information is believed to be correct as of the date hereof. Any value given as to the assets of the Debtor is based upon an estimation of such value. You are strongly urged to consult with your financial and legal advisors to understand fully the Plan and Disclosure Statement.

The financial information contained in this Disclosure Statement is given as of the date hereof, unless otherwise specified. The delivery of this Disclosure Statement does not, under any circumstance, imply that there has been no change in the facts set forth herein since such date. This Disclosure Statement is intended, among other things, to summarize the Plan and must be read in conjunction with the Plan and its exhibits. If any conflicts exist between the Plan and Disclosure Statement, the terms of the Plan shall control.

### 1.8     *Additional Information.*

Should you have any questions regarding the Plan or this Disclosure Statement, or require clarification of any information presented herein, please contact:

Kesha L. Tanabe
Caren W. Stanley
218 NP Avenue
PO Box 1389
Fargo, ND  58107-1389
ktanabe@vogellaw.com
cstanley@vogellaw.com


## 2.     THE DEBTOR

### 2.1     *Description of the Debtor.*

The Debtor's principal asset is a mixed-use facility with 63 units of apartments located in Watertown, South Dakota known as "The Ruins." The Debtor's building is not complete and construction is stalled. The Debtor filed a Chapter 11 bankruptcy case on January 6, 2025.  Prior to filing for bankruptcy, the Debtor had been sued by numerous creditors who were not paid for their work or materials. Several creditors filed mechanics liens against the Debtor.  The secured creditor commenced a foreclosure proceeding in Codington County, South Dakota. The Debtor is authorized to operate its business and manage its properties as a debtor-in-possession pursuant to  sections 1107(a) and 1108 of the Bankruptcy Code.

### 2.2     *The Debtor's Ownership and Other Statutory Insiders.*

The Debtor is wholly owned by Mr. Jesse R. Craig. Other statutory "Insiders" include Mr. Craig's spouse, Mulinda "Mindy" Craig, as well as his two daughters: Jordan Horner and Sydney Craig. Mr. Craig also owns and controls several related entities such as Craig Holdings, LLC, Craig Properties, LLC, Craig Development, LLC, and CP Business Management, Inc.

Ms. Craig performs the majority of the Debtor's administrative and management services.

8

**2.3** *The Debtor's Debt Structure.*

As of the Petition Date, Debtor's senior secured creditor was Red River State Bank. Debtor has stipulated to allowance of RRSB's claim in the aggregate principal amount of approximately $11,658,331.25. The Debtor had granted security interests in, and liens on, all or substantially all of its assets to secure its obligations to RRSB.

Debtor's junior secured creditor was Watertown Development Company. WDC submitted Proof of Claim No. 7-1 for $2,485,641.14.

**2.4** *The Debtor's Employment of Professionals.*

2.4.1 The Debtor requested and obtained the authority to employ the Dakota Bankruptcy Firm as its counsel.

**2.5** *Claims Against the Debtor.*

2.5.1 *Administrative Claims – Professional Fee Claims.* As of the date of the Disclosure Statement, the Plan Proponent (via information provided by Debtor's counsel) estimates Professional Fees owing but unpaid through the Effective Date:

- $45,000 to Dakota Bankruptcy Firm (Debtor's counsel)

- Plan Proponent estimates that Debtor's counsel has a prepetition retainer of approximately $9,950.

2.5.2 *Priority Tax Claims.* As of the date of the Disclosure Statement, the amount of Priority Tax Claims filed against the Debtor is approximately $91,000. The Plan Proponent estimates that $57,060 in Priority Tax Claims will be allowed and unpaid as of the Effective Date of the Plan.

2.5.3 *Other Administrative Claims.* As of the date of the Disclosure Statement, the Plan Proponent estimates that a maximum of approximately $0 in Administrative Claims (other than Professional Fees and Priority Tax Claims, and UST fees) will be allowed and unpaid as of the Effective Date.

2.5.4 *Secured Claims.* The secured claim of RRSB will be determined by a Sale. RRSB will receive Sale Proceeds on account of its Secured Claim, net of the RRSB Plan Contribution. RRSB will have a deficiency based on the most recent appraisal, resulting in a general unsecured claim of approximately $6,208,331.25. WDC's secured claim is junior to RRSB and undersecured. WDC's claim is further subordinated by the RRSB Plan Contribution. As a result, WDC is estimated to have a deficiency and a general unsecured claim of approximately $2,485,641.14. The Plan Proponent does not believe there are any other Secured Claims.

2.5.5 *General Unsecured Claims.* The Debtor's Schedules reflect general unsecured Claims against the Debtor in the approximate aggregate amount of $14,393,923.00. The amount of general unsecured Claims filed against the Debtor is approximately $21,720,848.60. Many Claims

9

filed against the Debtor are duplicative, erroneously classified, unsupportable and/or for contingent/unliquidated amounts and will be the subject of claims objections filed by the Debtor or the Plan Proponent. The Plan Proponent estimates the total amount of general unsecured claims under the Plan is $10,999,331.48.

3.  **SUMMARY OF THE PLAN OF LIQUIDATION**

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTING THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR AND OTHER PARTIES IN INTEREST.

   3.1   *In General.*

The Plan is proposed by RRSB. The Holders of allowed Claims will be paid in accordance with priorities set forth in the Bankruptcy Code, a structure that the Plan Proponent believes will produce a fundamentally equitable outcome for all creditors.

   3.1.1   *Asset Sale.* The Real Property will be sold by the Broker and the Sale Proceeds will be distributed pursuant to the Plan on the Effective Date. The sale process and terms of the Broker's compensation are set forth in <u>Plan Exhibit A</u>.

   3.1.2   *Bidding Procedures.* The Plan Proponent will seek Bankruptcy Court approval of Bid Procedures such as: (a) qualification of bidders; (b) submission of binding bids by the Bid Deadline; (c) a minimum overbid increment of $100,000; (d) deposit requirements of $250,000; (e) authority to designate a Stalking Horse Bidder; and (f) authority to conduct an auction if the Plan Proponent receives more than one Qualified Bid.

   3.1.3   *Sale Hearing and Approval*. The Plan Proponent shall seek entry of an order approving the Sale (the "<u>Sale Order</u>") pursuant to sections 105, 363, and 365. The Sale Order shall, among other things: (a) approve the terms of a purchase agreement with the prevailing bidder; (b)

authorize the Sale free and clear under section 363(f), with Liens attaching to Sale Proceeds; and (c) approve any bid protections for a Stalking Horse Bidder, if any.

       3.1.4  *Free and Clear Sale*. The Real Estate shall be transferred to the prevailing bidder free and clear of all liens, claims, interests, and encumbrances to the maximum extent permitted by section 363(f), with such interests attaching to the Sale Proceeds with the same validity, priority, and extent as existed prepetition, subject to subsequent determination and distributions under the Plan.

       3.1.5  *Good-Faith Purchaser*. The prevailing bidder shall be deemed a good-faith purchaser under section 363(m). The Sale Order shall include findings necessary to afford the protections of section 363(m).

       3.1.6  *Credit Bidding*. Any Holder of an allowed Secured Claim may credit bid at the Auction in accordance with section 363(k), subject to any limitations set forth in the Bid Procedures Order.

       3.1.7  *Creditor Trust.* A trust shall be formed on the Effective Date for the benefit of Class 3 creditors (the "Creditor Trust") pursuant to a trust agreement. Debtor's records confirm the existence of potentially avoidable transfers, including transfers to Insiders in excess of $5.6 million. On the Effective Date, all Causes of Action shall be assigned to the Creditor Trust. The Creditor Trustee shall investigate, litigate and/or settle Causes of Action for the benefit of all Holders of Class 3 Claims. The RRSB Plan Contribution will provide no less than $50,000 to fund the Creditor Trust. If the Insider Settlement Payment is received, the Creditor Trust shall be terminated and the remainder of the RRSB Plan Contribution shall be distributed ratably to Holders of Class 3 Claims.

A table of summarizing the potential value of the possible Causes of Action against the Insiders is set forth below:

| Description of Transfer | Transferee | Amount |
|---|---|---|
| Invoices/amounts paid through Ruins Draw Requests for the benefit of Non-Ruins Construction Projects<br><br>*See* ECF 137 | Non-Ruins Construction Projects | $1,253,972.84 |
| Transfers of Ruins Draw Request Funds from bank accounts of Craig Properties, LLC and/or Craig Development, LLC<br><br>*See* ECF 177 | Jesse Craig | $191,513.05 |
| | Mulinda Craig | $106,597.13 |
| | Jordan Horner | $124,663.56 |
| | Sydney Craig | $78,840.00 |
| | Various Craig Corporate Entities | $928,947.86 |

11

|  | Craig Lake Home | $556,790.91 |
|---|---|---|
|  | Non-Ruins Mortgages/Loans | $912,784.33 |
|  | Luxury Services | $1,465,668.49 |
|  | **Total:** | **$5,619,778.17** |

### 3.2 Classification of Claims and Interests.

3.2.1 *Class 1.* Class 1 consists of the RRSB Secured Claim. Class 1 is impaired by the Plan and entitled to vote.

3.2.2 *Class 2.* Class 2 consists of the WDC Claim. Class 2 is impaired by the Plan and entitled to vote.

3.2.3 *Class 3.* Class 3 consists of general unsecured Claims. Class 3 is impaired by the Plan and entitled to vote, with the exception of Insiders.

3.2.4 *Class 4.* Class 4 consists of all Equity Interests. Class 4 is comprised entirely of Insiders and it is not entitled to vote.

### 3.3 Treatment of Claims and Interests.

3.3.1 *Class 1 (RRSB Secured Claim).* RRSB shall receive Sale Proceeds, net of the RRSB Plan Contribution, up to $10,490,000. The Plan Proponent anticipates RRSB shall have a deficiency of at least $6.2 million.

3.3.2 *Class 2 (WDC Claim).* WDC shall receive Sale Proceeds, net of the RRSB Plan Contribution, in excess of $10,490,000. The Plan Proponent anticipates WDC shall have a deficiency of at least $2.4 million.

3.3.3 *Class 3 (Unsecured Claims).* Each Holder of a Class 3 allowed Claim shall receive its Pro Rata share of all distributions from the Creditor Trust after payment in full of (or reserve for) expenses of the Creditor Trust.

3.3.4 *Class 4 (Equity Interests).* The Holders of Equity Interests in Class 4 shall have their Equity Interests against the Debtor extinguished as of the Effective Date and shall receive no Distributions under this Plan.

### 3.4 Treatment of Unclassified Claims.

3.4.1 *Administrative Expenses - Professional Claims.* The Plan pays Administrative Expenses, including the Debtor's professionals in full on the Effective Date. The

12

Plan Proponent estimates that $45,000 will be paid to Dakota Bankruptcy Firm, net of a prepetition retainer. The Plan Proponent estimates that Debtor's counsel has a prepetition retainer of approximately $9,950 in an attorney's IOLTA account.

       3.4.2  *Priority Tax Claims.* Allowed Priority Tax Claims shall be paid in full on the Effective Date.

       3.4.3  *All Other Administrative Claims and UST Fees.* The Plan provides for full payment of all other Administrative Expenses and US Trustee Fees.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE SUBJECT TO CHANGE.**

| Class | Claim/Equity Interest | Treatment of Claim/Interest | Estimated Amount of Allowed Claims | Projected Recovery Under the Plan |
|---|---|---|---|---|
| N/A | Professional Fee Claims | All Professional Fee Claims shall be paid in full on the Effective Date. Debtor's counsel shall be entitled to apply the balance of a prepetition retainer. | $45,000 | 100% |
| N/A | Priority Tax Claims | All Priority Tax Claims shall be paid in full on the Effective Date. | $91,000 | 100% |
| N/A | All Other Administrative Claims | Allowed Administrative Claims shall be paid in full in Cash by the Plan Administrator as soon as reasonably practicable after the Effective Date | $0 | 100% |
| 1 | RRSB Secured Claim | RRSB shall receive all Sale Proceeds, net of the RRSB Plan Contribution, up to $10,490,000. | $5,400,000 | 49% |
| 2 | WDC Secured Claim | WDC shall receive all Sale Proceeds, net of the RRSB Plan Contribution, in excess of $10,490,000. | $2,485,641.14 | 0% |
| 3 | Unsecured Claims | Pro Rata Share of Distributions from Creditor Trust | $10,999,331.48 | 36.4% |
| 4 | Equity Interests | The holders of Equity Interests in Class 5 shall have their Equity Interests against the Debtor extinguished as of the Effective Date and shall receive no Distributions under this Plan. | N/A | 0% |

    **3.5**  *Claim Objection, Debt Recharacterization, and Equitable Subordination of Insider Claims.* On the Effective Date, any proof(s) of claim filed by Insiders seeking allowance of claims against The Ruins, LLC shall be equitably subordinated to all other holders of Class 3 Claims pursuant to 11 USC § 510, due to the Insiders' prepetition misconduct.

    **3.6**  *RRSB Settlement.* In exchange for the RRSB Plan Contribution, all claims against RRSB related to The Ruins, LLC, or the First, Second or Third Ruins Notes in the Adversary Proceeding and all claims that were raised or could have been raised against RRSB and any of its employees, officers, directors, and representatives in the Foreclosure Proceeding (*RRSB v. The Ruins, LLC et. al.*, Codington County Circuit Court, South Dakota, Case No. CV-24-000068) shall be dismissed with prejudice. In further consideration thereof, RRSB will dismiss the Foreclosure Proceeding with respect to the Debtor on or before the Effective Date.

**3.7** *Insider Settlement*. Mr. Jesse Craig has testified and/or bank records confirm potentially fraudulent transfers were made to him or other Insiders, in excess of $4 million. [ECF 177] Pursuant to Rule 9019, Mr. Craig and other Insiders owned by or related to Mr. Craig (collectively, the "Craig Insiders") may settle their potential liability for such transfers for a one time payment of $500,000 on or before the Effective Date of the Plan (the "Insider Settlement Payment"). As a condition of settlement, the Craig Insiders must also waive their 502(h) claims, if any, against the estate and subordinate their rights to a plan distribution on account of their Class 3 Claims to all other Holders of Class 3 Claims. If the Insider Settlement Payment is not remitted on or before the Effective Date, the Creditor Trust will retain all rights to prosecute all Causes of Action against the Craig Insiders.

**3.8** *Leases and Executory Contracts*. Any executory contracts with Insiders will be deemed rejected as of the Effective Date.

**3.9** *Modification of the Plan.* The Plan Proponent may alter, amend or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation hearing. After the Confirmation Date and prior to the Effective Date, the Plan Proponent may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not materially adversely affect the treatment of Holders of Claims or Equity Interests under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court. From and after the Effective Date and prior to substantial consummation of the Plan (as defined in section 1101(2) of the Bankruptcy Code), the Plan Proponent may seek non-material modification or amendment of the Planas permitted by the Bankruptcy Code.

**3.10** *Plan Controls.* In the event and to the extent that any provision of the Plan is inconsistent with the provisions of this Disclosure Statement, the provisions of the Plan will control.

**3.11** *Binding Effect.* The provisions of the Plan and the Confirmation Order are binding and will inure to the benefit of the Holders of Claims against, and Equity Interests in, the Debtor and its respective successors, assigns, heirs and personal representatives, whether or not such persons voted to accept or reject the Plan.

**3.12** *Tax Consequences.*

3.12.1 **In General.** The Federal income tax consequences of the Plan to a Holder of a Claim or Equity Interest will depend upon a number of factors and can be complex. In general, a Holder of a Claim that receives cash in satisfaction of its allowed Claim will generally receive a gain or loss with respect to the principal amount of the allowed Claim equal to the difference between: (i) the Holder's basis in the Claim (other than any Claim in respect to accrued interest); and (ii) the balance of the cash received after any allocation to the accrued interest. The Plan Proponent has not determined the character of any gain or loss to be recognized by a Holder with respect to any distribution, if any, such Holder may receive under the Plan. FOR THE FOREGOING REASONS, HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC

TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) OF THE PLAN. THE PLAN PROPONENT IS NOT MAKING ANY REPRESENTATION REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST, NOR IS THE PLAN PROPONENT RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TREATMENT OF DISTRIBUTIONS MADE UNDER THE PLAN.

## 4. POST-CONFIRMATION ISSUES

### 4.1 *Exculpation and Limitation of Liability*

4.1.1 *No Liability for Solicitation or Participation.* As specified in section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code are not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale or purchase of securities.

4.1.2 *Exculpation* Pursuant to § 1125(e) of the Bankruptcy Code; the Plan Proponent and the Creditor Trustee, and their Professionals, representatives, successors, and assigns (collectively, the "Plan Participants") will neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the Case, including, but not limited to, the formulation, preparation, dissemination, negotiation, implementation, confirmation or consummation of the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement, pleading or document created or entered into, the pursuit, non-pursuit or settlement of Causes of Action or any other act taken or omitted to be taken in connection with or for the purpose of carrying out the Plan, the Disclosure Statement, the Confirmation Order or related agreement, including solicitation of acceptances of the Plan ("Exculpated Conduct"); provided, however, that no Person shall be relieved of liability for fraud, gross negligence, and intentional misconduct.

All Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against any of the Plan Participants, whether directly, derivatively, on account of or respecting any Claim, debt, right, or cause of action based in whole or in part upon any Exculpated Conduct.

## 5. FEASIBILITY

### 5.1 *Financial Feasibility Analysis.*

5.1.1 *Bankruptcy Code Standard.* The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless contemplated by the Plan.

15

   5.1.2 ***No Need for Further Reorganization of Debtor.*** The Plan provides for the liquidation of all of the Debtor's assets. Accordingly, the Plan Proponent believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor.

## 6. ALTERNATIVES TO PLAN

  *6.1* ***Chapter 7 Liquidation.***

   6.1.1 ***Bankruptcy Code Standard.*** Notwithstanding acceptance of the Plan by the requisite number of Holders of Claims and Equity Interests of any Class, the Bankruptcy Court must still independently determine that the Plan provides each member of each Impaired Class of Claims and Equity Interests a recovery that has a value at least equal to the value of the distribution that each such Person would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

   6.1.2 ***Plan is in Best Interest of Creditors.*** The Plan Proponent believes that the Plan satisfies this standard because the Plan provides for an orderly liquidation of the assets. The RRSB Plan Contribution improves the rate of recovery for Holders of Claims. A Chapter 7 Liquidation Analysis attached hereto as **Exhibit 1**.

  *6.2* ***Risk Factors.***

   6.2.1 The amount of Sale Proceeds to be generated by the Sale can be estimated from the appraised value of the Real Property and the Broker's advice, but there can be no guarantee of success.

   6.2.2 The Plan Proponent has reviewed the actual date and amount of potentially fraudulent transfers in this case to estimate the gross value of the Causes of Action that will be transferred to the Creditor Trust. However, the Plan Proponent cannot predict or guarantee the value of future settlements or litigation proceeds to be collected by the Creditor Trust.

  *6.3* ***Recommendations.*** The Plan Proponent believes the Creditor's Plan provides creditors with the best possible mechanism for selling the Real Estate and ensuring that the Causes of Action are investigated, litigated or settled for the benefit of all creditors in these bankruptcy cases.  By contrast, the Debtor's plan is likely to result in an additional bankruptcy filing, which will result in greater delay and financial losses for all creditors. The Debtor's plan is also designed to enjoin all creditors from seeking to recover loan proceeds that may have been transferred out of the Debtor to Insiders.  By the time the Debtor's plan fails, critical statutes of limitations will have lapsed and it will be impossible to recover such transfers for the benefit of creditors.

**THE PLAN PROPONENT RECOMMENDS THAT YOU VOTE IN FAVOR OF THE CREDITOR'S PLAN.**

**7.     CONCLUSION**

It is important that you exercise your right to vote on the Plan. It is the Plan Proponent's belief and recommendation that the Creditor Plan fairly and equitably provides for the treatment of all Claims against the Debtor and it will not result in a serial bankruptcy filing by the Debtor.

December 8, 2025                                         **VOGEL LAW FIRM**

                                                BY:  /s/ *Kesha L. Tanabe*
                                                     Caren W. Stanley (#06100)
                                                     cstanley@vogellaw.com
                                                     Kesha L. Tanabe
                                                     ktanabe@vogellaw.com
                                                     Drew J. Hushka (#08230)
                                                     dhushka@vogellaw.com
                                                     218 NP Avenue
                                                     PO Box 1389
                                                     Fargo, ND 58107-1389
                                                     Telephone: (701) 237-6983
                                                     Fax: (701) 476-7676

                                                     *COUNSEL TO PLAN PROPONENT*

4922-1459-4943 v.3

17

# **EXHIBIT 1**

**(Liquidation Analysis)**

**The Ruins LLC**
**Liquidation Analysis**
**Estimated Recovery**

| | Recoverable Assets and Expenses | Estimated Value as of | $ Amount | LOW | MID | HIGH |
|---|---|---|---|---|---|---|
| a | Cash | 10/31/2025 | $ 385 | $ 385 | $ 385 | $ 385 |
| | | | *Recovery Rate* | *100%* | *100%* | *100%* |
| b | Accounts Receivable | 12/31/2023 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | *50%* | *65%* | *80%* |
| c | Inventory | 12/31/2023 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | *15%* | *35%* | *50%* |
| d | Utility Deposit | 12/31/2023 | $ 12,860 | $ 6,430 | $ 9,645 | $ 12,860 |
| | | | *Recovery Rate* | *50%* | *75%* | *100%* |
| e | Real Property | 12/31/2023 | $ 4,520,000 | $ 3,616,000 | $ 4,068,000 | $ 4,520,000 |
| | | | *Recovery Rate* | *80%* | *90%* | *100%* |
| f | Prepetition Retainer for CH 11 Professionals | 12/31/2023 | $ 9,949 | $ - | $ - | $ - |
| | | | *Recovery Rate* | *0%* | *0%* | *0%* |
| g | Litigation against RRSB | 12/31/2023 | $ - | $ - | $ - | $ - |
| | | | *Recovery Rate* | *0%* | *20%* | *40%* |
| h | Chapter 5 Claims | 12/31/2023 | $ 4,365,805 | $ - | $ 873,161 | $ 1,440,716 |
| | | | *Recovery Rate* | *0%* | *20%* | *33%* |
| i | Costs of Liquidation (includes Chapter 7 professional fees, trustee fees, and liquidation costs) | | $ | $ 434,738 | $ 594,143 | $ 716,875 |
| | | | *Recovery Rate* | *100%* | *100%* | *100%* |
| | **Chapter 7 Priority Claims:** | | | | | |
| j | Priority Tax Claims (Coddington County RE Tax) | [DATE] | $ 91,264 | $ 91,264 | $ 91,264 | $ 91,264 |
| | | | *Recovery Rate* | *100%* | *100%* | *100%* |
| | **Estimated Liquidation Proceeds Available for Debt** | | | $ 3,096,813 | $ 4,265,784 | $ 5,165,821 |
| | **Senior Secured Lender** | | | | | |
| k | Red River State Bank | [DATE] | $ 11,658,331 | $ 3,096,813 | $ 4,265,784 | $ 5,165,821 |
| | **Total Senior Secured Lender** | | *Recovery Rate* | *27%* | *37%* | *44%* |
| | **Funds Available for Junior Secured Debt and Unsecured Debt** | | | $ - | $ - | $ - |
| | **Junior Secured Debt** | | | | | |
| o | Watertown Development Corporation | [DATE] | $ 2,485,641 | $ - | $ - | $ - |
| | | | *Recovery Rate* | *0%* | *0%* | *0%* |
| | **Net Funds Available for Chapter 11 Claims** | | | $ - | $ - | $ - |
| p | Administrative Claims - Chapter 11 Professionals | [DATE] | $ 44,144 | $ - | $ - | $ - |
| | | | *Recovery Rate* | *0%* | *0%* | *0%* |

Liquidation Analysis Scenarios

|   | | | | | | |
|---|---|---|---|---|---|---|
| | **Net Funds Available for Unsecured Debt** | | | $ - | $ - | $ - |
| | **Unsecured Debt** | | | | | |
| q | General Unsecured Claims | [DATE] | $ 1,911,310.52 | $ - | $ - | $ - |
| | | | *Recovery Rate* | 0% | 0% | 0% |
| | **Funds Available for Equity** | | | $ - | $ - | $ - |

**Assumptions:**

e: Real Estate Value based on CBRE Appraisal Report dated 7/2/2025)

h: Based on gross value of potentially avoidable transfers (ECF 177)

q: GUC includes POC Nos. 2-4, 8-11, 13-17)