UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>The Ruins, LLC,<br><br>                Debtor. | Bankr. No. 25-30004<br><br>Chapter 11 |

**WDC's BRIEF IN SUPPORT OF MOTION TO CONVERT CASE TO CHAPTER 7**

Watertown Development Company ("WDC") submits this brief in support of the pending motion to convert the case to Chapter 7 following an evidentiary hearing held by the Court. WDC is a secured creditor and party in interest and has filed a claim in the amount of $2,485,641.14. (Claim No. 7.) No objection has been filed to WDC's claim.

On September 26, 2025, Red River State Bank ("RRSB") filed a motion to convert this case to Chapter 7. (Doc. 109.) On October 10, 2025, WDC filed a joinder to the motion to convert. (Doc. 131.) The Court held evidentiary hearings on November 3, 4, 20, 24, and 25 related to the motion.

**OVERVIEW**

While WDC does not presume a specific ruling from the Court about whether "cause" has been established pursuant to 11 U.S.C. § 1112(b), WDC does not intend to focus this brief on the issue of "cause." WDC expects Red River State Bank to fully brief that issue, and rather than duplicating those efforts, WDC's focuses its brief on answering the Court's question at the opening of the hearing related to why WDC supports the motion to convert, and why conversion is in the best interest of the creditors.

1

Although WDC holds a mortgage against the sole real estate asset owned by The Ruins, LLC ("Debtor"), WDC's claim is subordinated to that of RRSB up to $10,490,000, plus interest. Accordingly, under most typical circumstances, WDC recognizes that a party in its position may be more likely to oppose a motion to convert a case to Chapter 7, especially when a debtor's only asset is an unfinished apartment complex with no operating income.  Under most typical circumstances, a junior secured creditor would normally want to see the project completed so the value of its collateral increases and the property starts producing income to support debt service. But the circumstances of this case are far from typical, and even if Debtor completes construction of The Ruins, it does not appear the building will have sufficient value to support the claims of most creditors.  In addition, based on testimony provided during the hearings, Debtor cannot operate The Ruins a manner that will produce sufficient cash flow to support debt service.  Debtor's own pending plan relies on obtaining financing from an unknown third-party sometime over the next several years to provide takeout financing to pay creditor claims.  If Debtor could service its debt simply by completing construction and operating the property, the takeout financing provisions of Debtor's plan would be unnecessary.

If WDC could simply vote to confirm the pending plan and the result would be payment in full of WDC's claim, WDC would not be asking the Court to convert the case.  But, at least in WDC's estimation, the pending plan faces far too many hurdles to confirmation, is not feasible, and is far too speculative to rely upon.  Even if the plan were confirmed, it would result in further subordination of WDC's claim through the elevation of pre-petition, unsecured claims of unpaid contractors to superpriority claim status, all while granting post-petition superpriority claim status for in-kind contributions of materials and labor to complete construction.

2

Debtor's pending plan does not provide a viable path for creditors to be paid, and therefore it is not in the best interest of the creditors to keep this case in a Chapter 11 where administrative expenses will continue to accrue.  Moreover, the failure of Debtor to investigate or prosecute Chapter 5 claims is at odds with the interests of all creditors because those claims could be worth millions of dollars.  Conversion of the case will result in the appointment of a Chapter 7 trustee who will be motivated to pursue such claims.  Accordingly, conversion is in the best interest of the creditors, and Debtor has not met its burden of demonstrating unusual circumstances proving otherwise.

## ARGUMENT

1. <u>Legal Standard</u>

Under Section 1112(b)(1), the Court "shall" convert or dismiss a Chapter 11 case, "whichever is in the best interests of the creditors of the estate, for cause, unless the court determinates that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."  "The bankruptcy court has broad discretion in deciding whether to dismiss or convert a Chapter 11 case." *In re Lumber Exchange Bldg. Ltd. P'ship*, 968 F.2d 647, 648 (8th Cir. 1992) (citing *In re Gonic Realty Trust*, 909 F.2d 624, 626-27 (1st Cir. 1990); *In re Koerner*, 800 F.2d 1358, 1368 (5th Cir. 1986)).

Under Section 1112(b)(2), the Court "may not" convert or dismiss a Chapter 11 case "if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of the creditors and the estate . . . ."  Even if the Court finds such unusual circumstances, the Debtor must also establish: (1) "there is a reasonable likelihood" that a plan will be confirmed within a reasonable period of time, and that "the grounds for converting or dismissing the case include an act or omission of the debtor . . . . for

3

which there exists a reasonable justification for the act or omission; and that will be cured within a reasonable period of time fixed by the court." 11 U.S.C. § 1112(b)(2)(A)-(B).

"If cause has been established, the burden shifts to Debtor to prove the case falls within the 'unusual circumstances' exception to § 1112(b)(1)'s mandatory dismissal." *In re Keeley and Grabanski Land Partnership*, 460 B.R. 520, 536 (Bankr. D.N.D. 2011) (citing *In re Miell*, 419 B.R. 357 (Bankr. N.D. Iowa. 2009)). Although "unusual circumstances" is not defined by the Bankruptcy Code, "the import of section 1112(b) is that, if cause exists, the case should be converted or dismissed unless unusual facts or circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding." *Id.* (internal quotations and citations omitted).

    2.    <u>Debtor has not met its burden</u>.

Assuming "cause" has been established here, the burden would shift to Debtor to demonstrate not only unusual circumstances, but also that there is a reasonable likelihood a plan will be confirmed within a reasonable time and there was a reasonable justification for an act or omission establishing cause that will be cured within a reasonable time. However, Debtor did not meet its burden. Debtor did not present evidence of "unusual circumstances" that would avoid the substantial evidence of "cause" presented in this case. The evidence presented by Debtor focused on attempting to demonstrate viable path to plan confirmation. But there was little, if any, evidence explaining what unusual circumstances exist to avoid a finding of cause or explaining how the acts or omissions of Debtor were justified or will be cured within a reasonable time. Accordingly, Debtor has not met its burden of proof.

4

    3.    <u>Conversion of the case is in the best interest of creditors.</u>

Conversion of the case to Chapter 7 is in the best interest of WDC and other creditors. No purposes of Chapter 11 would be better served by maintaining this case as a Chapter 11 proceeding versus converting it to a case under Chapter 7. In fact, the only two creditors to formally take a position on the motion supported conversion. No creditors filed an opposition to the motion. Under Section 1112(b)(1), the Court can convert the case to Chapter 7, dismiss the case, or appoint a Chapter 11 trustee or examiner.

Conversion is in the best interest of the creditors because the pending plan proposed by Debtor is not realistic, and it will not lead to a better result for creditors than conversion. Debtor has no money to pay any of its operating expenses, including utilities, insurance, property managers, maintenance and repairs, and the past-due and currently due real estate taxes. (Doc. 192, at 66:8-67:16; 59:4-10; 70:16-21.) When testifying regarding these matters, Jesse Craig admitted the foregoing are all necessary expenses which Debtor has no ability to pay. (*Id.*)

Under the Second Amended Chapter 11 Plan of Reorganization (doc. 181), Debtor expects to avoid these expenses (and payments to creditors) for an unknown time period while construction of the building is complete, and then to continue avoiding these expenses (and payments to creditors) while the property management company attempts to lease out many dozens of apartment units. Assuming, modestly, that this process takes 12-18 months, real estate taxes will become further past due, and there is no indication of how Debtor will pay its operating expenses. Only when the "Real Property yields adequate cash flows to make such payments" will Debtor even begin paying the Exit Financers under the current proposed plan. (Doc. 181 at ¶ 4.2.1.) And then, sometime between the point of full (or near full) occupancy and

June 1, 2029, Debtor will somehow find a yet unknown third party who will provide final "takeout financing" to pay off all the creditors in full. (*Id.*)

      WDC understands a plan confirmation hearing has not yet been held, but the Court must necessarily consider whether a plan can be confirmed and whether the proposed plan is feasible when deciding what is in the best interest of the creditors. If a plan cannot be confirmed, it cannot be in the best interest of creditors to leave the case in Chapter 11 and to endure a contested plan confirmation hearing, resulting in more delay and expense. And although the proposed plan includes language about paying creditors in full, the U.S. Trustee correctly noted in its objection to the prior disclosure statement, "The Plan is a 100% payment plan in name only." (Doc. 185, p. 3, ¶ 7(b).) Payments to the creditors under the plan depends wholly upon Debtor obtaining exit financing from a third-party sometime within the next four years. (Doc. 181 at ¶¶ 1.2(mm) and 4.4.)

      Importantly, there was no testimony from Debtor or others suggesting that the value of The Ruins upon completion of construction will support enough takeout financing to pay creditors in full. The only testimony on this topic came from witnesses for RRSB and demonstrated that a completed building will not have sufficient value to support takeout financing of all claims. RRSB's expert testified that the as-stabilized value of The Ruins will be $7,070,000. (Doc. 59 at 5.) Noticeably absent from the testimony was an expert for Debtor to support Debtor's scheduled real estate valuation of $15,750,000. (Doc. 35, at 2.)

      Even if the Court assumed without any supporting evidence that Mr. Luther's valuation was off by several million dollars, such a significant valuation difference still would be of no consequence for most creditors. That is because RRSB has an allowed claim $11,658,331.25 (doc. 108), and WDC has an allowed claim of $2,485,641.14 (Claim No. 7; doc. 181 at ¶ 3.2.2.)

6

These claims total $14,143,972.39. When combined with the superpriority priming lien claims of the Exit Financers proposed in the plan of $1,317,352.00 (doc. 181, at ¶¶ 4.2.1 and 4.2.2), the total amount of senior secured debt against Debtor's single real estate asset will be $15,461,324.39. There simply does not exist sufficient value in Debtor's real estate to benefit any creditors by keeping the case in a Chapter 11 or appointing a Chapter 11 trustee. Sufficient value will not exist to secure the mechanic's lienholders' claims, and there is no indication whatsoever that Debtor will be able to pay its secured creditors let alone pay unsecured claims at any point in the future.

While there was some limited testimony from Mulinda Craig about the cashflow potential after construction is complete and the units are rented (doc. 192 at 162:19-22), there was no analysis showing there will be sufficient cash flow to pay expenses and make debt service payments. Without the ability of Debtor to pay its operating expenses and creditors, it is not in the best interest of the creditors for Debtor to incur even more debt and confirm a plan that makes no payments to secured creditors for at least a year (doc. 181, ¶ 1.2(dd)) or to the Exit Financers and unsecured creditors until much later (*id.* ¶ 1.2(mm)). While the Court must consider all creditors in determining what is in the best interest of the creditors, RRSB and WDC are not only the largest creditors, but the only creditors to take a formal position on conversion, and they both support conversion of this case to Chapter 7. No evidence was presented by any other creditor that conversion is not in their best interest. The Court must balance the unfortunate reality that there is little to no chance of payment for many creditors with the harm that will be done to Debtor's secured creditors if The Ruins continues to sit unfinished in its current state while expenses continue to mount.

7

Because RRSB and WDC are creditors, the Court must consider how conversion benefits them.  Conversion benefits both RRSB and WDC because they have an assignment of the TIF revenue from Debtor.  The TIF assignment exists independent of any mortgages or other security WDC and RRSB may have.  The benefit of converting the case the property can be liquidated and sold to a third party who will be motivated by their investment to complete construction and start operating the real estate as soon as possible, without the constraints associated with a Chapter 11 case or plan.  Mr. Craig agreed that the sooner construction is completed, the sooner the property's valuation will increase, which will resulted in increased real estate tax revenue that will come back to WDC through the TIF assignment.  (Doc. 192, p. 59:24-60:22.)  WDC does not have confidence in Debtor's current management to complete construction in a timely and cost-efficient manner, nor is it in the best interest of the creditors to continue having The Ruins sit idle while the parties litigate over the adequacy of disclosure statements and completing Chapter 11 plans.

Perhaps the most significant disadvantage of continuing in Chapter 11 for all creditors is that Debtor's current management will not investigate any Chapter 5 claims that could significantly benefit the bankruptcy estate.  Jesse Craig testified that he is in a "conundrum" as it relates to Chapter 5 claims because "I would in essence be suing myself or going after myself." (Doc. 192, p. 36:1-8.)  Mr. Craig stated that he was not inclined to sue himself.  (*Id.*)  As RRSB laid out in meticulous detail during the evidentiary hearing, there is ample support to justify an investigation of Chapter 5 claims.  Converting a case to Chapter 7 will necessarily involve a Chapter 7 Trustee who would be incentivized to pursue such claims.

Debtor's pending plan proposes the appointment of an "Estate Representative" to serve pursuant to Section 1123(b)(3)(B). (Doc. 181, at ¶ 4.1.)  WDC notes that this concept was added

8

to an amended plan after the testimony of Mr. Craig on November 4th. However, appointing an "Estate Representative" is not one of the options available to the Court under Section 1112(b). While the Court can appoint an Estate Representative for the limited purposes set forth in Section 1123(b)(3)(B), the inclusion of this provision in Debtor's plan does not alleviate the need for the Court to consider whether to convert the case or appoint a Chapter 11 trustee or examiner. And even if the Estate Representative were confirmed, it would not alleviate concerns about the investigation and prosecution of Chapter 5 claims. The proposed role of the Estate Representative will be to act as the CEO of the Debtor and to control Debtor's assets and operate the Debtor's business. (*See* doc. 181 at ¶ 4.2.1.) The Estate Representative would not be empowered by the plan, nor would he have authority under the Bankruptcy Code, to prosecute Chapter 5 claims.

The Court also has the option of appointing a Chapter 11 trustee. That may make some sense if the construction of The Ruins was complete and was the business was operating as a going concern. If that were the case, and the only concerns were regarding the management of Debtor, a Chapter 11 trustee could potentially provide value. But here, reorganization efforts are not realistic regardless of who is in control of Debtor's business. A Chapter 11 trustee, like Debtor, would not have access to financing to complete construction, and a Chapter 11 trustee would have no greater access to funds to pay operating expenses that Debtor has admitted it cannot afford to pay. Appointing a Chapter 11 trustee at this point would lead to further delay and expense because an independent third party would have to become familiar with Debtor's business operating and the significant amount of litigation that has occurred in this case thus far. The most likely result will be additional expense incurred by the bankruptcy estate without any

9

benefit to creditors.  On the contrary, a Chapter 7 trustee would simply need to market and sell Debtor's only asset of any significant value.

Lastly, the pending plan proposes a third-party injunction to prevent creditors from pursuant guarantees and other claims against insiders like Jesse Craig who may be jointly liable on certain of Debtor's debts.  (*See* doc. 181, at ¶ 4.8.)  Provisions like this are not in the best interest of any creditor.  There is significant concern that the injunction ultimately amounts to a release because even if the takeout financing never materializes, the statute of limitations would pass on many potential insider claims before Debtor defaults under the terms of the plan by failing to obtain the takeout financing before June 1, 2029.

## CONLUSION

RRSB presented more than sufficient evidence to support a finding of "cause," and Debtor failed to meet its burden of demonstrating unusual circumstances that would avoid the default remedy of conversion or dismissal.  Debtor also failed to prove it can confirm a plan within a reasonable time, to justify acts or omissions of the Debtor that supported a finding of cause, or to explain when and how such acts or omissions will be cured.  Accordingly, the Court should convert this case to Chapter 7.

Dated this 10th day of December, 2025.

WOODS, FULLER, SHULTZ & SMITH P.C.

By /s/ Jordan J. Feist_____
   Jordan J. Feist (#08592)
   P.O. Box 5027
   300 South Phillips Avenue, Suite 300
   Sioux Falls, SD 57117-5027
   Phone (605) 336-3890
   Fax (605) 339-3357
   Jordan.Feist@woodsfuller.com
   Attorneys for Watertown Development Company

**CERTIFICATE OF SERVICE**

The undersigned states that on the 10th day of December, 2025, I served a copy of the foregoing WDC's Brief in Support of Motion to Convert Case to Chapter 7 electronically upon all CM/ECF participations in this case.

>*/s/ Jordan J. Feist*
>Attorney for Watertown Development Company