Page 1

```
 1    UNITED STATES BANKRUPTCY COURT

 2    DISTRICT OF NORTH DAKOTA

 3    Case No. 25-30002 (Jointly Administered)

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    GENERATIONS ON 1st, LLC,

 8

 9           Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - x

11    Case No. 25-30003 (Jointly Administered)

12    - - - - - - - - - - - - - - - - - - - - - - - - - - x

13    In the Matter of:

14

15    PARKSIDE PLACE, LLC,

16

17           Debtor.

18    - - - - - - - - - - - - - - - - - - - - - - - - - - x

19    Case No. 25-30004

20    - - - - - - - - - - - - - - - - - - - - - - - - - - x

21    In the Matter of:

22

23    The Ruins, LLC,

24

25           Debtor.
```

Page 2

```
 1 - - - - - - - - - - - - - - - - - - - - - - - - - - x
 2
 3
 4            United States Bankruptcy Court
 5            Quentin N. Burdick U.S. Courthouse
 6            655 1st Ave. N.
 7            Fargo, ND 58102
 8
 9            Tuesday, November 4, 2025
10            9:30 AM
11
12
13
14
15
16
17
18
19
20
21  B E F O R E :
22  HON SHON HASTINGS
23  U.S. BANKRUPTCY JUDGE
24
25  ECRO: UNKNOWN
```

Page 3

```
 1  HEARING re Motion by Red River State Bank to Convert Case
 2  from Chapter 11 to 7 filed 09/26/2025 (Doc. 109)
 3
 4  HEARING re Joinder by Watertown Development Company to Red
 5  River State Bank's Motion to Convert Case from Chapter 11 to
 6  7 filed 10/10/2025 (Doc. 131)
 7
 8  HEARING re Objection by Debtor to Red River State Bank's
 9  Motion to Convert Case from Chapter 11 to Chapter 7 filed
10  10/17/2025 (Doc. 143)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by:  Sonya Ledanski Hyde
```

Page 4

```
 1  A P P E A R A N C E S :
 2
 3  THE DAKOTA BANKRUPTCY FIRM
 4       Attorney for Debtors
 5       1630 First Avenue North, Suite B
 6       Fargo, ND 58102-4246
 7
 8  BY:  MAURICE VERSTANDIG
 9       CHRISTIANNA A. CATHCART
10
11  VOGEL LAW FIRM
12       Attorneys for Red River State Bank
13       218 Northern Pacific Avenue
14       Fargo, ND 58102
15
16  BY:  KESHA TANABE
17       CAREN W. STANLEY
18       DREW J. HUSHKA
19
20  DAVENPORT EVANS HURWITZ & SMITH LLP
21       Attorney for Red River State Bank
22       206 West 14th Street
23       Sioux Falls, SD 57101-1030
24
25  BY:  ANTHONY M. HOHN
```

Page 5

```
 1  KD LAW, PLLC
 2       Attorney for D&M Industries, Inc.
 3       3429 Interstate Boulevard
 4       P.O. Box 9231
 5       Fargo, ND 58106-9231
 6
 7  BY:  JOHN M. KRINGS, JR.
 8
 9  WOODS FULLER SHULTZ & SMITH PC
10       Attorney for Watertown Development Company
11       300 South Phillips Avenue, Suite 300
12       Sioux Falls, SD 57104
13
14  BY:  JORDAN J. FEIST
15
16  BASSFORD REMELE
17       Attorney for Diamond Wall Systems
18       Fifth Street Towers
19       100 South 5th Street, Suite 1500
20       Minneapolis, MN 55402
21
22  BY:  JEFFREY D. KLOBUCAR
23
24
25
```

2 (Pages 2 - 5)

Page 6

1  ALSO PRESENT:

2    RUSS KASSIN, President/CEO, First National Bank & Trust

3    JEAN O'DETTE, Sr. VP/CCO, First National Bank & Trust

4    DANIELLE HARLESS, VP, Red River State Bank

Page 8

P R O C E E D I N G S

2    THE COURT:  Good morning.  We are back on the

3  record with Bankruptcy Case Number 25-3004, In re The Ruins.

4  And when we broke last evening, Red River State Bank was

5  prepared to call its second witness.  Would you like to do

6  so now?

7    MR. HUSHKA:  Yes, Your Honor.  We would call Jesse

8  Craig.

9    THE COURT:  Mr. Craig, we'll have you come stand

10 right in front of the clerk and raise your right hand.

11 Please state your name for the record.

12    MR. CRAIG:  Jesse Robert Craig.

13    THE COURT:  Do you solemnly swear that the

14 testimony you are about to give in this case will be the

15 truth, the whole truth, and nothing but the truth, so help

16 you god?

17    MR. CRAIG:  Yes.

18    THE COURT:  Please take the stand.  All right.

19 I'm going to have you skooch up a little bit and turn the

20 microphone on.  Yeah, just tap it lightly.  Is it green now?

21    MR. CRAIG:  Yeah.

22    THE COURT:  Okay.  You'll let me know if you need

23 a break as a result of the recent injury.

24    MR. CRAIG:  Thank you.

25    THE COURT:  You're okay today?

Page 7

I N D E X

PAGE

4  WITNESS(ES):          DX   CX   RDX  RCX

5  JESSIE CRAIG

6    By Mr. Hushka          9      63

7    By Mr. VerStandig       72   43   146

8    By Mr. Feist              70

9    By Ms. Stanley          103     148

11 MULINDA CRIAG

12    By Ms. Cathcart       151

13    By Ms. Tanabe          163

Page 9

1    MR. CRAIG:  I'm sore today.  I should have took

2  more breaks yesterday.

3    THE COURT:  Okay.  Then you make sure and let us

4  know when you need one.

5    MR. CRAIG:  Okay.  Thank you.

6    THE COURT:  All right.  You may proceed.

7    MR. HUSHKA:  Thank you, Your Honor.

8    DIRECT EXAMINATION OF JESSE CRAIG

9  BY MR. HUSHKA:

10 Q   Good morning, Mr. Craig.

11 A   Good morning.

12 Q   Please state your full name, spelling your last name

13 for the record.

14 A   Jesse Robert Craig, C-r-a-i-g.

15 Q   Mr. Craig, I understand that you recently had back

16 surgery?

17 A   Yes, sir.

18 Q   I don't want to get into the details of your procedure.

19 But are you currently under the influence of any

20 medications?

21 A   Yes.

22 Q   Are those medications affecting your mental acuity or

23 accuracy?

24 A   No.

25 Q   So if you answer a question, is it fair to say that you

3 (Pages 6 - 9)

Page 10

1 understood the question?

2 A   Yes, sir.

3 Q   And that you're answering it to the best of your

4 recollection and ability?

5 A   Yes.

6 Q   Those medications don't impair your memory or ability

7 to understand what I'm saying?

8 A   No.

9 Q   Okay.  Sir, what is your profession?

10 A   Developer, property manager.

11 Q   What would you say is your primary occupation?

12 A   Right now developer.

13 Q   What was your role with The Ruins?

14 A   The Ruins, I was both the developer and the general

15 contractor.

16 Q   And what is the difference between a developer and a

17 general contractor if you could indulge me?

18 A   General contractor is just based on the construction of

19 the project where a developer is the one that goes in, finds

20 the land, lines up kind of the project, what would fit on

21 there with the architect and stuff.

22   Apologize for my throat.  That's one of the meds.

23 Q   Take as many sips as you need.  How many years of

24 experience do you have as a general contractor?

25 A   I started in 2015 was my first.  So nine years.

Page 11

1 Q   How many projects over those nine years?

2 A   Eight.

3 Q   Eight.  How many units of apartment buildings over

4 those past nine years?

5 A   Approximately 460.

6 Q   Would it surprise you that on your website says you've

7 developed over 1,500 units?

8 A   No, I think that was probably something where we had

9 managed 1,500 units at one point in time.

10 Q   Approximately how many units worth of property have you

11 developed?  What's the value of all the properties you've

12 developed combined?

13 A   I would guess probably $150 to $180 million.

14 Q   And that's eight or nine buildings over nine years?

15 A   Yes.

16 Q   You were general contractor on all nine of those

17 projects?

18 A   220 West was one that I didn't start as the general

19 contractor, but I finished it.  And then (indiscernible) the

20 first project.  I worked -- worked hand-in-hand with TL

21 Stroh, Terry Stroh.  He helped me on that one.

22 Q   Were you the construction manager for The Ruins

23 project?

24 A   Yes.

25 Q   Is the construction manager different than the general

Page 12

1 contractor?

2 A   How so?

3 Q   Construction management, which again, on that project

4 and none of the projects I wasn't -- I didn't have a

5 contract on it.  I wasn't paid for it.  But that would be

6 the person that would be -- have the staff to go ahead and

7 collect invoices, review them, approve them.  And then after

8 the funding is done by the title company, typically then

9 they would collect all the lien waivers and make sure those

10 were accurate also.

11 Q   And that's the job of a construction manager you said?

12 A   Correct.

13 Q   So when I said you were the construction manager, was

14 it you individually or was it an entity that was operating

15 as construction manager?

16 A   By default it was just myself.  I don't have any

17 employees with any of my companies.

18 Q   I guess -- but you're saying any of your companies.

19 Was it your company that was acting as construction manager

20 or was it Jesse Craig individually?

21 A   With no contract, it was kind of up in the air, I

22 guess.  I wear several hats.  I mean, in that case it

23 probably would have defaulted to Craig Development.

24 Q   So Craig Development was acting as construction

25 manager?

Page 13

1 A   Yes, because that's who would have entered the invoices

2 and the overall job requests.

3 Q   You were present in the courtroom yesterday, correct?

4 A   Yes, sir.

5 Q   So you heard Mr. Aarestad's testimony?

6 A   Yes.

7 Q   And I understand that you and Mr. VerStandig will

8 likely want to address multiple things brought up there and

9 present your own evidence, but I want to briefly discuss a

10 couple of areas that we haven't gotten into yet.  Is that

11 okay?

12 A   Yes.

13 Q   Mr. Aarestad testified yesterday that you submitted the

14 draw request to Red River State Bank.  Is that correct?

15 A   That is.

16 Q   So you were the person that submitted the draw request on

17 behalf of The Ruins?

18 A   Yes.

19 Q   And Mr. Aarestad also testified that attached to those

20 draw requests were invoices.

21 A   Correct.

22 Q   Were you the one that attached those invoices to the

23 emails?

24 A   At the end of it.  But before it was submitted, yes.

25 Q   So you were the one that verified that the invoices

4 (Pages 10 - 13)

Page 14

1  attached to the email were accurate and correct?

2  A   I would have conferred with my project manager to make

3  sure that those are accurate.  Or if there was any questions

4  on it, I would have reached out in some cases to the

5  contractor themselves.

6  Q   The ultimate authority was on you?

7  A   Yes.

8  Q   During his opening statement, your counsel proffered

9  essentially that you had modified certain invoices attached

10 to the draw request.  Is that true?

11 A   Yes.

12 Q   How many of the invoices did you modify?

13 A   Over all three projects or just The Ruins?

14 Q   Just The Ruins.

15 A   Now you're talking about -- and I apologize asking a

16 question with a question, but just to clarify.  There were

17 invoices that came through that were for the lake home and

18 Generations on 1st, both which would have been financed

19 through Red River State Bank.  And for various reasons,

20 those were not able to be done through the appropriate

21 projects.

22     The ones that I actually would have modified, I would

23 say probably 12 to 14.

24 Q   So I guess to clarify, so your testimony is that you

25 modified 12 or 14 of the invoices submitted in support of

Page 15

1  draw requests on The Ruins loans?

2  A   That would have been inaccurate, correct.  That's why

3  they would have been changed or corrected.

4  Q   Okay.  You said the invoices that you originally

5  received were inaccurate.

6  A   Correct.

7  Q   Did you speak to any of the subcontractors regarding

8  these inaccurate invoices?

9  A   I talked to Ron Clausen and I would have talked to Nate

10 Limoges more than likely would have been his manager that

11 was on site, his supervisor.  But a lot of times better

12 results came having Jesse Kiehl or (indiscernible), my

13 project managers on that project reach out.  Because they

14 were there day to day.  They would have saw what was

15 happening or if the work was completed or not.

16 Q   So were these inquiries made orally or in writing?

17 A   By me or by my --

18 Q   By anyone for Craig Development or The Ruins.

19 A   I can't speak for the project managers.  But for

20 myself, it would have been via email.

21 Q   Okay.  Have you produced copies of those emails to

22 anyone?

23 A   Yes.  The ones that I had.  There were other ones that

24 were done through PrevailBild that was run by my project

25 manager.  Those were not found.

Page 16

1  Q   Okay.  So it's your testimony that you turned over

2  emails where you were asking for modifications to the

3  invoices submitted?

4  A   Yes.  Like for instance comes to mind, Baete-Forseth,

5  you know, emailed them, and asked them about why we had

6  extra heater in the garage on Parkside that we could have

7  used on Generations.

8  Q   And so why did you modify the invoices rather than

9  getting corrected invoices from the subcontractors?

10 A   Just timing.  We were dealing with a lot of draw

11 delays.  The funding on the draws through the Red River

12 State Bank were sometimes over 60 days past due.  So we had

13 draw requests on top of draw requests.  And it was very,

14 very confusing.

15 Q   Did you provide copies of these modified invoices to

16 the subcontractors?

17 A   It would have been in the email as an attachment that

18 we provided via discovery.

19 Q   Are you aware that we subpoenaed the various

20 subcontractors on The Ruins project?

21 A   Yes.

22 Q   Would it surprise you to learn that they did not

23 produce any of the modified subpoenas?

24 A   No, because most of them are small contractors.  I mean

25 Limoges is big, but all the rest of them are pretty small.

Page 17

1  Either they do -- the actual owner does the draw request or

2  their wives.  You know, and sometimes like Kloos Electric, I

3  know that his wife does the bookkeeping for that.

4  Q   So it's not surprising to you that they are able to

5  produce the original but not the modified or corrected

6  invoices is what you're saying?

7  A   Correct, yeah.

8  Q   Do you generally keep inaccurate invoices for your

9  businesses?

10 A   If I have something that I changed, I would have

11 stapled them together and kept them.

12 Q   Mr. Aarestad testified yesterday that the submitted

13 invoices that Red River State Bank ultimately received were

14 consistently higher than the original invoices.  Is that a

15 fair summary of his testimony?

16 A   Again, yes, because of the draw requests being delayed.

17 Sometimes they were doubled up.

18 Q   Do you generally find that subcontractors underbill for

19 their work?

20 A   No.

21 Q   So it would be surprising that subcontractors submitted

22 invoices for less than they were actually owed?

23 A   Is there an instance you're speaking of?

24 Q   Well, you just testified that the invoices you

25 ultimately submitted to Red River State Bank were

5 (Pages 14 - 17)

Page 18

1  consistently higher than the invoices that the subcontractor
2  submitted to you, correct?
3  A   If it was a doubled-up invoice.  If we had had an
4  invoice from April and May and those two amounts were
5  $150,000 each and then it was, you know, agreed upon, or
6  modified to have one that was $300,000.
7  Q   So it's your testimony that you would receive two
8  invoices essentially, invoice one and invoice two, and would
9  combine those into one invoice when you submitted them to
10 Red River State Bank?
11 A   Like with Watertight at times, yes.
12 Q   So if the invoice was numbered, why would you not
13 submit both numbers or why would you only modify one number
14 and not submit both?
15 A   I can't answer that.  I guess I'd have to go back and
16 look at what you're actually talking about.
17 Q   When you submitted a draw request with attached
18 invoices -- and use a hypothetical.  Let's say you submitted
19 an invoice with a $100,000 request for D&M Construction.
20 Was it your understanding that the money if paid by Red
21 River State Bank needed to go to D&M Construction?
22 A   Yes.
23 Q   Did you ever submit an invoice and receive a draw from
24 Red River State Bank that you didn't pay the money to that
25 particular subcontractor?

Page 19

1  A   Yes.
2  Q   Mr. Craig, I want to talk about some of your ownership
3  of the various entities that we've talked about yesterday
4  and today.  Okay?
5  A   Okay.
6  Q   What is your relationship with The Ruins?
7  A   I'm the sole member in the LLC.
8  Q   Does The Ruins have any ownership interest in any other
9  entities?
10 A   No, not that I know of.
11 Q   Does anyone else besides you have an ownership interest
12 in The Ruins?
13 A   No.
14 Q   What about Generations?
15 A   Same.  Just me.
16 Q   Does Generations have an ownership interest in anyone?
17 A   In any other properties?  No.
18 Q   Any other entities?
19 A   No.
20 Q   And you said you are the sole owner?
21 A   Correct.
22 Q   Parkside?
23 A   Same.  I'm sole owner.
24 Q   Parkside have any ownership interest in any other
25 entities?

Page 20

1  A   Not that I know of, no.
2  Q   Do Parkside, Generations and The Ruins own their
3  respective real estate development project and only their
4  real estate development project essentially?
5  A   Yes.
6  Q   What's your relationship with Craig Development LLC?
7  A   It's my development company.  Again, I'm a hundred
8  percent owner, sole member.  That might have some ownership
9  in some trucks, work trucks, and a new skid steer.
10 Q   But no ownership interest in any entity?
11 A   Real estate entity?  No.
12 Q   Or other entity.
13 A   No.
14 Q   What does Craig Development do?
15 A   General contractor.
16 Q   What about Craig Properties LLC?
17 A   That's a property management company.  I think right
18 now I own 80 percent and my daughter, Jordan, owns 20
19 percent.
20 Q   Were you initially the complete owner of that?
21 A   Initially I was, yes.  And then as Jordan decided she
22 didn't want to go to college and follow that as a career,
23 then I've been giving her ten percent ownership a year.
24 Q   So that started in '23, '24?
25 A   It started earlier than that, but we stopped doing it

Page 21

1  over the pandemic.
2  Q   Has she been paying for that membership interest?
3  A   No.  She just works hard.
4  Q   You said Craig Properties is a management company?
5  A   Yes.
6  Q   Does Craig Properties own anything?
7  A   I think that again has some ownership in some vehicles,
8  but no real estate that I can recall.
9  Q   Any holdings of any entities?
10 A   No.
11 Q   What about Craig Holdings LLC?
12      MR. VERSTANDIG:  Objection as to relevance.  I
13 understood as to the Debtors, and I wanted to give a little
14 latitude.  But we seem to be just getting into a general
15 inquisition as to what his various assets are and what the
16 subordinate components thereof are, and I'm not sure how
17 that's relevant to the motion.
18      MR. HUSHKA:  Your Honor, he testified during his
19 deposition that Craig Holdings LLC owns the lake property
20 and that monies on draws were spent on the lake property.  I
21 want to establish that they are entirely separate entities
22 with only common ownership through Mr. Craig.
23      THE COURT:  Overruled.
24      MR. VERSTANDIG:  Thank you.
25 BY MR. HUSHKA:

6 (Pages 18 - 21)

Page 22

1  Q   Question again, sir, is what is Craig Properties LLC
2  and your relationship to it?
3  A   Craig Holdings or Craig Properties?
4  Q   Craig Properties.  Sorry, Craig Holdings, yes.
5  A   Craig Holdings is a holding company.  So typically that
6  would go out and procure parcels of land if I'm going to be
7  doing a new project.  Right now I don't believe it owns the
8  lake home any longer, but I'd have to check on that.  My
9  wife and I were actually discussing that prior to coming in.
10  Q   You mentioned a lake home.  Did it previously own a
11  lake home?
12  A   Yes.
13  Q   Where was this lake home?
14  A   22587 Knollwood Lane, Pelican Rapids, Minnesota.
15  Q   Can you describe just generally this lake property?
16  A   Just a brand-new home that we built.  We had lived in a
17  1,200-square-foot cabin there for a better part of 15 years
18  and we made the decision to finally build our dream home.
19  Q   Okay.  1,200 feet.  How much did you go up to?  How big
20  is the new property?
21  A   4,700-square-feet right now in the home on two levels.
22  Q   You said new construction?
23  A   Yes.
24  Q   Rough estimate, what is the value of the lake home
25  property?

Page 23

1  A   I think it appraised for $3.8 million.
2  Q   Does The Ruins have any interest in this lake property?
3  A   It did.
4  Q   How so?
5  A   There was debt, the $400,000 from Charles Aarestad and
6  $600 from Randall Aarestad.
7  Q   I understand debts, but did The Ruins have any
8  ownership interest in the lake property?
9  A   The lake home secured loans for The Ruins.  So I guess
10  had there been a default, then yes, it would have been able
11  to go after that.
12  Q   Did The Ruins own the real property?
13  A   No.
14  Q   Did The Ruins own the building that had been
15  constructed on the real property?
16  A   No.
17  Q   At all relevant times is that owned by Craig Holdings
18  LLC or by some other Craig entity or individual?
19  A   Craig Holdings or myself and my wife.
20  Q   So the various entities we've just gone through, would
21  it be accurate to say that despite your common ownership
22  that these are all independent and distinct legal entities?
23  A   Yes.
24  Q   That I believe beyond you, none of these entities hold
25  an interest in any of the other entities?

Page 24

1  A   Correct.
2  Q   These entities keep separate financial records?
3  A   During construction or once they're up and operating?
4  Q   Both.
5  A   Yes.  I mean, during construction there was overlap.
6  You know, for economy of scale and things like that.  Most
7  of those properties overlapped by two to three months at a
8  time.  So we had, you know, certain contractors and most
9  contractors working on both projects at the same time.  So
10  there was some confusion there and in some invoices that
11  were submitted.
12  Q   Do you employ an accountant to do the financials for
13  these various entities?
14  A   My wife would run -- CP Business Management, they would
15  run the property management on those once they're up and
16  have a certificate of occupancy.  Those financials are done
17  by Haga Kommer at the end of every year.
18  Q   Do the entities keep separate financial accounts?
19  A   Yes.
20  Q   Everyone?
21  A   So I think we've talked about this before in the
22  deposition.  But all our property management software is
23  Yardi, Y-a-r-d-i.  And that has different codes for every
24  property within that bookkeeping system.  So, yes, we are
25  able to identify what goes where.

Page 25

1  Q   Hang on.  I'm sorry if this is belaboring it.  Would it
2  be accurate to say that Generations is the owner of the
3  Generations real property?
4  A   Yes.
5  Q   And Parkside of Parkside's real property?
6  A   Yes.
7  Q   And The Ruins of The Ruins project?
8  A   Correct.
9  Q   Would you agree that if money is spent on the
10  Generations development, that it does not provide a direct
11  financial benefit to The Ruins?
12  A   Yes.
13  Q   Did The Ruins seek draws and submit invoices to Red
14  River State Bank on Ruins loans for construction work
15  performed on the lake property we've discussed?
16  A   One more time.  Sorry.
17  Q   Certainly.  Did The Ruins seek draws and submit
18  invoices to Red River State Bank on The Ruins loans for
19  construction work performed on the lake property?
20  A   Yes.
21  Q   Does The Ruins loan agreement with Red River State Bank
22  allow for Ruins loan funds to be used on anything other than
23  The Ruins development project?
24        MR. VERSTANDIG:  Object to the form of the
25  question.  The document speaks for itself, and it calls for

7 (Pages 22 - 25)

Page 26

1 a legal conclusion analyzing the loan agreement.

2      THE COURT: You're going to have to repeat the

3 question.

4      MR. HUSHKA: The question was does The Ruins loan

5 agreement with Red River State Bank allow The Ruins loan

6 funds to be used on projects other than The Ruins

7 development project.

8      THE COURT: Sustained.

9      THE WITNESS: Honestly, I don't know.

10      THE COURT: No, no, that means you don't have to

11 answer that question.

12      THE WITNESS: Oh, I'm sorry. I apologize.

13 BY MR. HUSHKA:

14 Q   Has The Ruins conducted any internal review to ensure

15 that all Ruins loan proceeds were spent on Ruins?

16 A   I'm the only gentleman that would do that as the owner.

17 So I was very comfortable at what was submitted and what was

18 done.

19 Q   Sir, but that wasn't my question. Has The Ruins

20 conducted any internal review to make sure that The Ruins

21 loan proceeds were only spent on The Ruins development?

22 A   Yes.

23 Q   Sir, you recall that you were deposed earlier this

24 year. Is that correct?

25 A   Yes.

Page 27

1 Q   During that deposition did you testify that you had

2 not conducted any type of internal audit?

3 A   We didn't hire any firm to do it. But in this case

4 going back and having to pretty much review everything, I

5 mean, page by page by page, it's consumed our lives doing it

6 just as, you know, Charles had identified that also. There

7 wasn't probably a piece of paper or an email that I didn't

8 look at.

9      MR. HUSHKA: Sharon, can you please pull up ECF

10 207, page 150?

11 BY MR. HUSHKA:

12 Q   While she gets that ready, Mr. Craig, when you were

13 deposed, you were placed under oath, correct?

14 A   Yes.

15 Q   And you swore that you were going to provide true and

16 honest testimony?

17 A   Yes.

18 Q   And you did provide true and honest testimony, correct?

19 A   I believe so, yes.

20      MR. HUSHKA: 207 --

21      MS. STANLEY: I think it's 114 for Ruins.

22      MR. HUSHKA: Sorry.

23      MS. STANLEY: It's easy to mix them up.

24      THE COURT: What page?

25      MR. HUSHKA: Page 50.

Page 28

1      MR. VERSTANDIG: During the break, and just for

2 the record, Ms. Cathcart is not storming out in protest.

3 She has a 341 and will be back.

4      THE COURT: Pardon me? She has a what?

5      MR. VERSTANDIG: Ms. Cathcart has a 341 and will

6 be back. This is not a walkout in protest.

7      THE COURT: Understood. Thank you.

8      MR. HUSHKA: It should be the Jesse Craig

9 deposition transcript.

10      MS. STANLEY: And we're looking for...

11      MR. HUSHKA: ECF 114, the main transcript, page

12 150 in the little quad box. So probably -- divided by four

13 -- yeah. I think it's in the lower-left corner if I recall.

14      MS. STANLEY: It should be page 39 out. Out of a

15 thousand?

16      MR. HUSHKA: Page 150. On page 39. Yes, okay.

17 BY MR. HUSHKA:

18 Q   Mr. Craig, do you see that on your screen?

19 A   Yes.

20 Q   Does that appear to you to be a true and accurate copy

21 of your deposition testimony?

22 A   Which page?

23 Q   We're looking in the upper-left corner, page 150.

24 A   Okay. Yes.

25 Q   Okay. I'm going to read from that. And let me know if

Page 29

1 I read this accurately. Question, "Have you done an

2 analysis of this?"

3      Answer, "No." Lines one and two. Did I read that

4 accurately?

5 A   Yes.

6 Q   And that was in reference to whether or not you had

7 analyzed whether The Ruins funds had gone to The Ruins

8 project, correct?

9 A   Yes. It's a pretty general question, but yes.

10 Q   Mr. Craig, has The Ruins filed a proposed plan in this

11 case?

12 A   Yes.

13 Q   Does the plan have any mechanism for evaluating whether

14 or not The Ruins loan proceeds were only spent on The Ruins

15 development project?

16 A   That I don't know.

17 Q   Would you want to review the proposed plan?

18 A   If that would help.

19 Q   Okay.

20      MR. HUSHKA: Can we pull up ECF 93?

21      Sir, please let her scroll and take as long as you

22 want to try to find where it says that you'll be evaluating

23 whether or not loans were misappropriated.

24      THE WITNESS: Stop real quick. Just scroll up a

25 little. 2.3 is the one I was reading. Go ahead. Sorry.

8 (Pages 26 - 29)

Page 30

1      MR. VERSTANDIG: I'm going to object. The
2  document speaks for itself. It's in evidence. If the
3  question is whether he's familiar with it, that's certainly
4  a valid and fair question. And if the question is his
5  understanding of any provision thereof, that's a valid and
6  fair question. But...
7      THE COURT: I am looking for the plan of
8  reorganization. I am not spotting it. It is -- it was
9  received yesterday?
10      MR. VERSTANDIG: Yes. It is exhibit -- Court's
11  indulgence?
12      MR. HUSHKA: It's 93, Mack. And it was not
13  offered into evidence yesterday.
14      THE COURT: Yeah. I didn't recall that it was.
15  So it's being offered to refresh recollection right now but
16  not -- it's not an exhibit yet.
17      MR. VERSTANDIG: Court's indulgence?
18      THE COURT: Am I missing something?
19      MR. VERSTANDIG: So the --
20      THE COURT: The disclosure statement.
21      MR. VERSTANDIG: The disclosure statement is
22  there, which attaches to the plan of reorganization.
23      THE COURT: Got it.
24      MR. VERSTANDIG: And then Ruins First Plan of
25  Reorganization, the bottom of page 8 of ECF is marked as an

Page 31

1  exhibit. It's 141-12.
2      THE COURT: There it is. Okay. All right. Then
3  the document speaks for itself and you can move onto a new
4  question.
5  BY MR. HUSHKA:
6  Q    Mr. Craig, do you understand the plan that was proposed
7  to have any mechanism for pursuing claims against insiders?
8  A    In that quick review I couldn't say yes or no.
9  Q    Would you want longer?
10  A    I didn't see it, so no.
11  Q    So no mechanism for investigating or pursuing insider
12  claims?
13      MR. VERSTANDIG: Same objection, Your Honor. I'm
14  not -- I don't want to offer a speaking objection that
15  coaches the witness. That would be poorly received. But as
16  will be touched upon in argument, the plan says certain
17  things and it doesn't say certain things. And as -- this is
18  why the document speaks for itself.
19      MR. HUSHKA: I can move on, Your Honor.
20      THE COURT: Sustained. Thank you.
21  BY MR. HUSHKA:
22  Q    Mr. Craig, I want to talk about the current state of
23  The Ruins. And I'm talking about the entity itself, not the
24  physical property, which we might speak to in a moment.
25  Okay?

Page 32

1  A    Okay.
2  Q    Does The Ruins have any current ongoing business
3  operations?
4  A    No.
5  Q    Does The Ruins have any employees?
6  A    No.
7  Q    Has The Ruins lost money since the petition date on
8  January 6th, 2025?
9  A    Via me? Yes.
10  Q    Approximately $40,000?
11  A    Probably more than that. I mean, insurance and
12  oversight and utilities, it's probably more than that. I
13  would have to think. Insurance is $24,000 a year I believe
14  alone and then utilities in the winter are $6,000 in the
15  cold months when we keep it heated.
16  Q    So six figures potentially?
17  A    Right about, yes.
18  Q    So in less than a year it's lost approximately
19  $100,000?
20  A    Yes.
21  Q    And The Ruins hasn't been doing any debt service during
22  that time, has it?
23  A    No. It hasn't paid its taxes, either. So that would
24  be another bill that would be hanging out there.
25  Q    Mr. Craig, I want to talk briefly regarding the assets

Page 33

1  that The Ruins does hold. Is that okay?
2  A    Yes.
3  Q    Do you recall if The Ruins filed schedules in this
4  case?
5  A    For a tax return?
6  Q    No, schedules with the bankruptcy court.
7  A    That one I -- that's above my pay grade. I apologize.
8  Q    Okay. I'm not trying to trip you up.
9  A    No, I know.
10  Q    But if you could pull up ECF 1. Do you see that
11  document?
12  A    Yes.
13  Q    Are you familiar with that?
14  A    A little bit, yes.
15  Q    Okay. If we scroll down, does it include the schedules
16  for the various assets that The Ruins does hold as well as
17  schedule of debts and other related bankruptcy jargon?
18  A    Yes.
19  Q    Okay. Do you recall if The Ruins filed amended
20  schedules?
21  A    I believe it did.
22  Q    Approximately March 18th, 2025 sound accurate?
23  A    I won't venture to guess.
24  Q    Okay. March of 2025 sounds within the ballpark?
25  A    Couldn't even tell you that. Sorry.

9 (Pages 30 - 33)

Page 34

1  Q   Do you want to look at ECF 35 to refresh your
2  recollection?
3  A   Sure.
4  Q   Do you see that Bates stamp on the top there in blue?
5  A   Yes, sir.
6  Q   Does that indicate that this was filed on or about
7  March 18th, 2025?
8  A   Yes.
9  Q   Has The Ruins amended its schedules to the best of your
10 knowledge since March of this year?
11 A   No.
12 Q   In your schedules and your amended schedules did The
13 Ruins value and schedule two different assets?  Would it
14 refresh your recollection if we went down to page three and
15 four of ECF 35?
16 A   And what was your question, sir?
17 Q   Whether or not there's a valuation, a money valuation
18 of two different assets, specifically utility deposit, and a
19 real property interest.
20 A   Yes.
21 Q   And the value of that utility deposit is $12,860?
22 A   Yes.
23 Q   Okay.  The other asset that was valued as the real
24 property, The Ruins Development Project, fair?
25 A   Yes.

Page 35

1  Q   And the value assigned to that in the amended schedules
2  was $15,750,000?
3  A   Yes.  Yes, sorry.
4  Q   How did you arrive at that value?
5  A   Took the appraisal and then looked at kind of where our
6  rents are scheduled to be now over the past two, three years
7  that we've increased rents.  Put a regular debt service on
8  it and get an NOI and use a cap rate.
9  Q   You said increased rents?
10 A   Yeah.  We've increased rents on Parkside and
11 Generations.  So that will reflect then what we rent the
12 units for on The Ruins.
13 Q   But there's no rents coming in on Ruins, right?
14 A   No.
15 Q   So it's based on a projection of getting the building
16 finished and up and operating?
17 A   Correct.
18 Q   So it's not a present value, it's a projection value.
19 A   That would be a finished value.
20 Q   Sir, I believe Mr. Aarestad might still have his
21 calculator here.  But would it be correct in your mind that
22 if the asset values of the real property are approximately
23 99.91 percent of the value of the property of The Ruins
24 compared to the utilities?
25 A   Yes.

Page 36

1  Q   Circling back around briefly.  We were talking about
2  pursuit of insider claims.  Do you have any plans to pursue
3  insider claims at this point?
4  A   This is kind of the conundrum the person looks at.  I
5  would in essence be suing myself or going after myself.
6  Q   And you're not particularly inclined to sue yourself,
7  are you?
8  A   No.
9  Q   We talked about assets.  Let's briefly touch on debts.
10 Is that all right?
11 A   Sorry about that.  What?
12 Q   I said we've talked about assets.  Can we briefly touch
13 on debts?
14 A   Yes.
15 Q   Do you know if Red River State Bank filed a proof of
16 claim in this case?
17 A   Yes.
18 Q   And The Ruins initially objected to that proof,
19 correct?
20 A   Correct.
21 Q   But the parties eventually worked that out through a
22 stipulation?
23 A   I believe so, yes.
24 Q   Okay.  And is that stipulation that Red River State
25 Bank, subject to potential offsets, will have an allowed

Page 37

1  securable claim in the amount of $11,658,331.25?
2  A   That includes late fees.  Yes.
3  Q   Okay.  Did Watertown Development Company, WDC, also
4  file a proof of claim?
5  A   Yes.
6  Q   Do you know what that claim amount was?
7  A   I can't recall that.  I'm sorry.
8  Q   Okay.  If Mr. VerStandig will let me lead the witness,
9  if I said it was $2,485,641.14, do you have any basis to
10 dispute that number?
11 A   No.
12 Q   Okay.  Has The Ruins objected to that proof of claim?
13 A   That I can't recall.  I don't know that answer.
14 Q   Has there been an objection filed?
15 A   I don't know.
16 Q   Okay.  If we aggregate those two claims from Red River
17 State Bank and WDC, do you believe that the aggregate amount
18 is $14,143,972.39?
19 A   That sounds correct.
20 Q   As part of your amended plan, you scheduled various
21 claims.  Is that true?
22 A   Yes.
23 Q   Okay.  Would the aggregate amounts of the non-Red River
24 State Bank and WDC claims be approximately $3.25 million?
25 A   That sounds close, yes.

10 (Pages 34 - 37)

Page 38

1  Q   Okay.  So the WDC Red River State Bank claims are more

2  than 80 percent of the claims against The Ruins?

3  A   If you're talking in real time, the WDC claim is paid

4  by property taxes over 20 years.

5  Q   But of the scheduled claims, they are more than 80

6  percent?

7  A   Correct.

8  Q   Mr. Craig, there's one last area I want to get into

9  with you a little bit.  Something that doesn't appear on the

10  schedule.  Is that okay?

11  A   Sure.

12  Q   Okay.  Did The Ruins submit draw requests for

13  appliances to Red River State Bank?

14  A   Excuse me.  I'm sorry, one more time?  I apologize.

15  Q   No problem.  Did The Ruins submit draw requests related

16  to appliances to Red River State Bank?

17  A   Yes.

18  Q   Did Red River State Bank fund those draw requests?

19  A   Yes.

20  Q   Using round numbers, was the amount funded

21  approximately $180,000?

22  A   Yeah, 181 and six-hundred-and-some-thousand, yes.

23  Q   Okay.  Did The Ruins purchase $181,000 worth of

24  appliances?

25  A   No.

Page 39

1  Q   How much did it purchase?

2  A   $81,000.

3  Q   What happened to the other $100,000?

4  A   It's been earmarked to finish the project.  It was in

5  our plan.  It's in my schedule that I put together for

6  myself.  So those appliances will -- as the units are

7  finished up, then those appliances would be purchased and

8  put in there.

9  Q   When did you put together that schedule for yourself?

10  A   It was early, early on in this case just so I could

11  track some of the liens.  Because some of the liens that

12  were put on there were not accurate.  They were for the full

13  amount even though a lot of the work had already been done.

14  Q   So around January when you initially filed?

15  A   Of this year?

16  Q   Yeah.

17  A   No, it would have been probably early last year already

18  that I knew the numbers anyways.

19  Q   You knew about it for an extended period of time.

20  A   Yes.  Yeah.

21  Q   Okay.  Do you recall the date that you were deposed in

22  this case?

23  A   No.

24  Q   Does September 23rd, 2025 sound accurate?

25  A   Sure.

Page 40

1  Q   That was 42 days ago?

2  A   Yeah.

3  Q   More than a month?

4  A   Yes.

5  Q   Since September 23rd, The Ruins has filed a stipulation

6  to absolve a claim objection.  True?

7  A   That I don't know.

8  Q   Pull up ECF 103.  That was filed by the parties, fair?

9  A   Yes.

10  Q   And that was after September 23rd?

11  A   Yes.

12  Q   Did The Ruins also file a notice withdrawing objection

13  to stay relief?

14  A   Yes.

15  Q   And did it also file a motion to sell substantially all

16  assets of the debtor, understanding that that was later

17  withdrawn?

18  A   I believe so.

19  Q   Did it also file an opposition to the motion to

20  convert?

21  A   Yes.

22  Q   But at any time during the last 42 days did The Ruins

23  amend its schedules to include this $100,000 that had been

24  earmarked for appliances?

25  A   Not that I know of.

Page 41

1  Q   Does that $100,000 appear anywhere in the schedules?

2  A   I don't believe so.

3        MR. HUSHKA:  No further questions, Your Honor.

4        THE COURT:  Cross-examination.

5        MR. VERSTANDIG:  Thank you.  Your Honor, may I

6  have five minutes?  Not to confer with the witness, but

7  simply to organize my notes so that it's a more efficient

8  cross?

9        THE COURT:  Certainly.  Yeah, yeah.  Absolutely.

10        THE WITNESS:  Can I stand?

11        MS. STANLEY:  Your Honor, one housekeeping matter

12  from yesterday.

13        THE COURT:  Oh, sure.  Let's take care of that.

14        MS. STANLEY:  ECF --

15        THE COURT:  Are you on the microphone?

16        MS. STANLEY:  I'm sorry.

17        THE COURT:  Yes, yes.  I'm sorry, I did not hear

18  that.  Of course you can stand.  Yes.

19        MS. STANLEY:  Sorry.  ECF 114, which was the

20  deposition.  We looked at Exhibit 25, the Contractor

21  Disbursement Summary.  I did not move to admit that one into

22  evidence yesterday.

23        THE COURT:  ECF -- say again?

24        MS. STANLEY:  It was 114 off of his deposition.

25  It was Exhibit 25 to the deposition.

11 (Pages 38 - 41)

Page 42

1    MR. VERSTANDIG:  NO objection to admitting Exhibit

2 25 to the deposition, but we would object to admitting the

3 deposition on the other exhibits that --

4    MS. STANLEY:  No, I'm just asking for Exhibit 25

5 that we looked at yesterday.

6    MR. VERSTANDIG:  No objection.

7    THE COURT:  Okay.  So the court will receive

8 Exhibit 25 to the deposition, which is at 115.  No, it's at

9 114.

10    (Exhibit 25 admitted into evidence)

11    MR. VERSTANDIG:  Your Honor, just for the clarity

12 of the record, not that I'm sure it makes a ton of

13 difference.  At least as to the extent that we're not

14 objecting, it is solely to the exhibit to the deposition,

15 which means you're basically admitting part of a document

16 but not the breadth of the document, meaning not the whole

17 of the deposition or the other exhibits thereto.

18    THE COURT:  Right.  So I said Exhibit 25 to the

19 deposition at 114.

20    MR. VERSTANDIG:  Thank you, Your Honor.

21    THE COURT:  Okay, good.  I think we are on the

22 same page.  Then.

23    MS. STANLEY:  And I think it's just for -- this is

24 a thousand-page document.  It appears to be page 815 of the

25 thousand-page document.

Page 43

1    THE COURT:  That's helpful.  So page 815 of Docket

2 114 only.

3    MS. STANLEY:  Yes.

4    THE COURT:  Okay.  So I'm only receiving page 815

5 of ECF 114.

6    MS. STANLEY:  Yes.  Thank you.  Sorry, I forgot

7 about that.

8    THE COURT:  Okay.  Remind me again what the title

9 of Exhibit 25 is?

10    MS. STANLEY:  Contractor Disbursement -- I can't

11 read it.  Yeah.  It's Contractor Disbursement Summary.

12    THE COURT:  Thank you.  Okay.  Oh yeah.  Okay.

13    MR. VERSTANDIG:  I am good to go if everyone else

14 is.

15    THE COURT:  Okay, one moment.  Okay, you may

16 proceed, Mr. VerStandig.

17    MR. VERSTANDIG:  Thank you, Your Honor.

18    CROSS-EXAMINATION OF JESSE CRAIG

19 BY MR. VERSTANDIG:

20 Q  Mr. Craig, there was some testimony from you a few

21 moments ago concerning the expenses Ruins has incurred since

22 entering bankruptcy.  Do you remember that?

23 A  Yes.

24 Q  You testified that it was north of $100,000 in

25 expenses.

Page 44

1 A  Yes.

2 Q  Who has paid for that?

3 A  I have.

4 Q  When you say you, you mean you, Jesse Craig?

5 A  Yeah.  It would have been.  I mean --

6 Q  I'll rephrase.  It wasn't The Ruins, it wasn't

7 Generations, and it wasn't Parkside?

8 A  No.  It would have came out of my accounts.

9 Q  Okay.  Have you filed a claim against The Ruins seeking

10 reimbursement or have you just been paying the money because

11 you have to pay the money?

12 A  In order to keep the lights on and the insurance on and

13 the utilities, I've -- yeah, I've had to pay it.

14 Q  I don't want to tweak your testimony too badly, but you

15 had said earlier it was a loss on The Ruins' part.  It's not

16 really a loss if The Ruins doesn't have to pay for it,

17 correct?

18 A  Correct.

19 Q  Okay.  What other monetary contributions have you or

20 entities controlled by you not named Generations, Parkside

21 or Ruins made to this project since its inciepieny?

22 A  This project meaning The Ruins?

23 Q  Yes.

24 A  Monetarily or time or both?

25 Q  I know that your time is valuable, but I think it's

Page 45

1 going to be hard to quantify.  Let's go with monetary

2 contributions.

3 A  The reason I said my time is because of the labor

4 that's spent there and sending a skid steer, cleaning up the

5 hallways.  We did a lot of work down there personally also.

6 And then for -- if you could repeat the last part of your

7 question?  Sorry.

8 Q  What other monetary contributions have you or your non-

9 debtor companies made to The Ruins project?

10 A  Insurance, utilities, oversight, which means we've had

11 our property manager that works and lives down in Watertown,

12 she frequents daily if not a couple times daily the

13 hallways, walks through it, makes sure everything is up to

14 par.  We did have some high winds this summer and so we had

15 to repair Tyvek, replace it to make sure that there was no

16 water inundation.  Paid for the mold inspection to go

17 through and identify any spots if there were that needed to

18 be remediated.  There were none.  There was fees to the city

19 inspector to come through with the fire chief to make sure

20 that there was no mold or health safety issues in the

21 project.  I needed to do that before I could get the

22 extension on the building permit.

23 Q  Okay.  Not referring to myself or my law firm, did

24 Ruins engage counsel in connection with litigation in South

25 Dakota?

12 (Pages 42 - 45)

Page 46

1  A   Yes.

2  Q   Who paid for that?

3  A   I did.

4  Q   Without speaking to anything (indiscernible), did there

5  come a time --

6        MR. HUSHKA:  Your Honor, if I may object.  We

7  (indiscernible) this because one of the factors for bad

8  faith that this Court looks into is whether or not the

9  entity is operating or producing sufficient revenues to

10  operate.  Whether or not Mr. Craig and his family have

11  produced money to put into this, I don't know if that's

12  relevant to that issue and I'm not sure the relevance

13  otherwise of what money Mr. Craig is or isn't putting into

14  The Ruins property at this point.

15        THE COURT:  Relevance?

16        MR. VERSTANDIG:  Would respond in two parts.  One,

17  directly refutes the contention that there is a post-

18  petition loss which would give rise to a diminution claim

19  under 1112.  But two more macroscopically, it at least

20  appears the part of the thesis of the bank's case is that

21  Mr. Craig has personally enriched himself or entities under

22  his sole dominion and control from The Ruins project over

23  time, and showing evidence that countervails that would

24  meaningfully refute that contention.

25        THE COURT:  The objection is overruled.

Page 47

1  BY MR. VERSTANDIG:

2  Q   That means you get to answer.

3  A   Can you repeat it?

4  Q   I was afraid you were going to ask me that.

5  A   I know.  Sorry.

6  Q   Did Ruins have counsel in South Dakota?

7  A   Yes.

8  Q   Who paid for counsel?

9  A   I did.

10        MS. STANLEY:  Sorry.  I don't know what my

11  computer is doing.

12        THE WITNESS:  Name that tune.

13        THE COURT:  Everybody's awake now.

14  BY MR. VERSTANDIG:

15  Q   Did there come a time when Ruins engaged an expert

16  witness named Janet Ness in connection with this case?

17  A   Yes.

18  Q   Who paid Ms. Ness's retainer?

19  A   I did.

20  Q   Did there come a time when Ruins engaged another expert

21  witness in connection with this case?

22  A   Yes.

23  Q   Who paid that witness?

24  A   I did.

25  Q   Does Ruins have money in a bank account as the world

Page 48

1  exists today?

2  A   Not anymore, no.

3  Q   Does Ruins have money in a credit union account as the

4  world exists today?

5  A   No.

6  Q   Does The Ruins have cash in a safe?

7  A   No.

8  Q   So The Ruins isn't holding $100,000 as the world exists

9  today, is it?

10  A   Correct.

11  Q   Okay.  All right.  Let's back up.  You had spoken at

12  the beginning about the other projects.  And then I don't

13  want to put words in your mouth, but I believe you had

14  talked about some time lags between them.  Can you explain

15  to the Court what the developmental goals were in putting up

16  four projects in Watertown and how the timeline was going to

17  work?

18  A   Well, that's kind of the hard part of all this, is

19  everyone looks at The Ruins and they look at it as a

20  building.  That's my legacy or what's going to, you know,

21  take care of my wife and my younger two daughters.  That's

22  why those projects were ever built down there and built with

23  the care and, you know, things that we put into it over and

24  above just a standard apartment building.

25        When we started with The Lofts, any time you're

Page 49

1  building downtown, you're going to run into issues.

2  Infrastructure, you find old vaults, old heating -- brick

3  heating ducts.  I mean, you find so much stuff down there.

4  So we started with The Lofts.  And then like we talked about

5  for economy of scale, we overlapped them by two to there

6  months so that when a vendor was coming -- finishing one

7  project, they could jump to the other project.  And the

8  reason that was so important was, number one, could use as

9  many locals as I could.  But we ended up finding out that

10  their bids were almost double what a contractor I could pull

11  from like Sioux Falls or Fargo would be.  But that was the

12  reason for that.

13        MR. HUSHKA:  Your Honor, if I may.  And Mr.

14  VerStandig, sorry, I'm not trying to throw off your timing.

15  But just to clarify for my own purposes, is this cross or is

16  this direct?  Because it goes to my scope objections.  I

17  know the Court likes to allow latitude with the witness, but

18  I just want to clarify for purposes of potential objections

19  if this is cross or if this is direct for Mr. VerStandig as

20  well.

21        MR. VERSTANDIG:  So let me address that.  Because

22  if I hadn't just gotten the answer I did, this was going to

23  come up because I was about to lead him.

24        My hope would be as with yesterday that we can do

25  one examination and not split it into two.  However, I

13 (Pages 46 - 49)

Page 50

1 recognize that if I go beyond scope, I can't lead the
2 witness.
3      If the Court would prefer that we simply do cross
4 and then call him in our case-in-chief, I'm content in doing
5 so. I would caveat that by saying if we were to cut that
6 route, I would ask to speak to the witness between the two
7 exams. And if it's going to go to a scope objection that's
8 currently in front of the Court, I would point out that he
9 had been asked about the various projects that had been
10 built and the eight buildings he had put up, the number of
11 units, et cetera. So it is within the scope of direct as to
12 this question.
13      MR. HUSHKA: And I'm not saying I have a scope
14 objection.
15      THE COURT: Okay.
16      MR. HUSHKA: I just want to clarify whether I
17 should be on the lookout for those or leading objections, or
18 how the Court is considering this testimony.
19      THE COURT: Okay. So there's not an objection
20 pending. And, you know, I am going to defer to how you
21 would prefer to present the case. So this is Red River
22 State Bank's burden. Would you prefer to separate the two?
23      MR. HUSHKA: Your Honor, I am agnostic. So if Mr.
24 VerStandig wants this to be his direct, I am fine with that.
25 If he wants to have delineation and be able to lead Mr.

Page 51

1 Craig at this time, I am fine with that as well. I just
2 want the clarification.
3      MR. VERSTANDIG: I'll actually go back on what I
4 said a moment ago. Because I think I'm not as agnostic as I
5 was. I would like to be able to meet with Mr. Craig before
6 he is done speaking to the Court. The only way I can do
7 that is if I do a cross and then do a direct in our case-in-
8 chief to the extent necessary.
9      THE COURT: Okay.
10      MR. VERSTANDIG: So I'm happy to stay within the
11 scope, but that also means I get to lead, which is going to
12 be fun.
13      THE COURT: Interesting. So we'll just proceed
14 with cross-examination and then I'll invite you at the time
15 when Red River turns over the case to recall Mr. Craig.
16      MR. VERSTANDIG: Thank you, Your Honor.
17 BY MR. VERSTANDIG:
18 Q   Mr. Craig, when you were looking at the schedules,
19 there was a valuation of $15 million and change. Do you
20 remember that?
21 A   $15,750,000. Yeah.
22 Q   That's a lot of change, but yes. Do you still believe
23 that is the as-completed value of this project?
24 A   I believe -- two reasons why, yes, I do believe that.
25 And that's going to be -- of course it's going to be 18 to

Page 52

1 24 months after the CO. That means filled --
2 Q   CO means certificate of occupancy?
3 A   Correct.
4      THE WITNESS: Sorry, Your Honor.
5      THE COURT: Thank you.
6      THE WITNESS: Once it's stabilized and rolling the
7 way it's supposed to. And that's based on, again, we know,
8 you know, what we can do with Parkside and Generations. I
9 shouldn't say we. My wife does that and she does a
10 brilliant job on it. So --
11      MR. HUSHKA: Your Honor, I'm going to object.
12 This is nonresponsive. The question was a yes or no if he
13 understood something.
14      MR. VERSTANDIG: I mean, I'm happy to ask him why
15 that's the as-completed value.
16      THE COURT: So I'm going to sustain the objection
17 and ask you to ask a new question.
18 BY MR. VERSTANDIG:
19 Q   Mr. Craig, since I get to lead you, is that the as-
20 completed value based on knowledge you've obtained through
21 your operation of Parkside and Generations?
22 A   Yes.
23 Q   Are there any other factors that inform your belief
24 that that's the as-completed value, and if so, what are
25 they?

Page 53

1 A   Interest rates, environment, and that they're dropping.
2 Q   Mr. Craig, there's been some testimony about Lofts.
3 A   Yes.
4 Q   Am I correct? That was the first of the four projects.
5 A   Correct.
6 Q   And am I correct that was not financed by Red River
7 State Bank?
8 A   No.
9 Q   Okay. Are you familiar -- are you further familiar
10 with the economics of the Watertown real estate market
11 because of Lofts?
12 A   Because of Lofts. And they have a very comprehensive
13 market study that they have done and updated every two
14 years.
15 Q   And just for clarity, is Lofts an apartment building?
16 A   Yes, a 39-plex.
17 Q   Okay. And you developed it as the first of the four
18 projects?
19 A   Yes.
20 Q   Okay. Mr. Craig, do you have a sense of what the cost
21 of completion would be to get Ruins from the state it exists
22 today to having a certificate of occupancy?
23 A   A little over a million-three.
24 Q   Okay. Without bringing the plan back up, you saw a
25 plan of reorganization that I think you tried to scroll

14 (Pages 50 - 53)

Page 54

1  through during direct.  Do you remember that?

2  A   Yes.

3  Q   Do you know if there is a provision in there that

4  provides for certain subcontractors to perform services to

5  get the project to completion?

6  A   I don't know specifically that.

7  Q   Let's pull up to the plan.  Going to walk right into my

8  document speaks for itself trap.

9       THE COURT:  Yeah, you are.

10      MR. VERSTANDIG:  Sometimes I'll object to myself

11  just to show that I'm being honest.

12      THE WITNESS:  You're talking about our bankruptcy

13  restructure plan to finish The Ruins.

14  BY MR. VERSTANDIG:

15  Q   Yeah.  Let me ask this differently without pulling up

16  the document.  Mr. Craig, has there been a time when you've

17  endeavored to secure the commitments of others to finish

18  construction?

19  A   Yes.  And that was so -- to answer with a little more

20  clarity on the million-three, that's the cost that would be

21  owed to the contractors that's needed to finish The Ruins to

22  get the certificate of occupancy and get it started and it

23  would be rented and cash flowing.  Those -- based on the

24  LOIs that we had signed, those individuals will not be paid

25  until I am able to refinance or sell that property.

Page 55

1  Q   Have you taken steps to secure commitments from those

2  individuals?

3  A   What steps I took to do that?

4  Q   Yes.  What if anything have you done to secure

5  commitments from these people that they'll actually go do

6  the work?

7  A   I just call them.  I mean, these individuals have

8  worked on all four projects some of them.  So we know them

9  very well.  They do follow-up work for us and maintenance

10  and things like that too for plumbing and things of that

11  nature.  But just reached out to him and picked up the phone

12  and called them and talked to them and sent them the

13  document.  Told them if they needed to have anything edited,

14  to make sure that they had their attorney review it.  And

15  they -- it was kind of a testament to how good we ran those

16  projects even through COVID and the pandemic and all of

17  that, that they were willing to come back and believe in the

18  process.

19  Q   And without going to what anyone said to you on the

20  phone, is it your understanding today that these individuals

21  are ready, willing, and able to resume work on those terms?

22  A   Yeah.  The only thing that we've run into now is it's

23  getting late in the year, so the brick on the outside, I

24  probably have to pay some additional monies on that because

25  they'd have to tent it, cover it.  And then the siding would

Page 56

1  be another one that's going to be a little tricky to do.

2  But they'll do whatever they need to do.  They take a lot of

3  pride in what they've done.  And I think that's one of the

4  things with that sitting there.  It's kind of a black eye on

5  everybody.

6  Q   You were asked during your direct examination about the

7  debt to Watertown Development Company.  Do you remember

8  that?

9  A   Yes.

10  Q   Are you familiar with the phrase TIF or the acronym

11  TIF?

12  A   yes.

13  Q   What is a TIF?

14  A   It's tax increment financing.

15  Q   Okay.  Now, Mr. Craig, you are not an attorney, right?

16  A   Thankfully, no.

17  Q   Ouch.  What is your best understanding as a layperson

18  of how the TIF works on this project?

19  A   On these -- actually, on all four projects they're

20  different because they are a front-ended TIF.  So in order

21  to get somebody down there to develop housing, they fronted

22  the TIFs.  I don't know if you want me to explain a little

23  bit more about that.  I can.

24      But on this one, the money was fronted by Watertown

25  Development Company and then it's to be repaid over 20 years

Page 57

1  through the property tax.  So the property taxes are paid to

2  the County.  The County gives the proceeds to the city.  The

3  city gives it to Watertown Development Company to apply to

4  the loan.  There's a four percent note, promissory note tied

5  to that.  So any shortfall not covered by the property taxes

6  would fall upon the property to make up that difference.

7  Q   Has that been your understanding since before ground

8  was broken on Ruins?

9  A   Lofts was completely different.  But Parkside,

10  Generations and Ruins would have been in that category, like

11  I explained.

12  Q   So has it been your understanding since before you

13  broke ground on Ruins that most if not all of the Watertown

14  Development Company debt would be repaid through the

15  ordinary payment of property taxes?

16  A   That and shortfall, yes.

17  Q   I literally didn't hear the last few words you said.

18  A   Between that and any shortfall paid by the property,

19  yes.  That's how they'd be repaid.

20  Q   What is Watertown Development Company to the best of

21  your knowledge?

22  A   It's an organization that's an arm of the city in

23  Watertown, South Dakota.  And their primary goal is to go

24  out and get businesses and developers to come to their town

25  to develop and build.  So just for growth.

15 (Pages 54 - 57)

Page 58

1    MR. VERSTANDIG: With the Court's indulgence, I
2 want to ask counsel something.
3    THE COURT: You're welcome to stretch.
4    THE WITNESS: Thank you.
5    MR. VERSTANDIG: Your Honor, in an effort to stay
6 within the scope, that's going to conclude cross for now,
7 but very candidly acknowledging it's going to be a
8 substantial direct examination in our case.
9    THE COURT: Understood.
10    MR. VERSTANDIG: Thank you.
11    THE COURT: Mr. Feist, would you like to cross?
12    MR. FEIST: Yes, Your Honor. I do have some
13 questions if I may.
14    THE COURT: Yes, you may.
15    MR. FEIST: I am going to apologize. Of course as
16 soon as I start talking it sounds like the F-16s started
17 taking off from our air force base here in Sioux Falls. So
18 if that noise is coming through, I apologize. It should go
19 away pretty soon.
20 BY MR. FEIST:
21 Q    Good morning, Mr. Craig. I just have some questions
22 for you regarding the testimony you just gave about the
23 Watertown Development Company and the TIF.
24 A    Okay.
25 Q    Now, you testified that Watertown Development Company's

Page 59

1 claim is paid by property taxes over 20 years. Is that --
2 do you agree with that?
3 A    Yes.
4 Q    Okay. Are the property taxes for The Ruins past due?
5 A    Yes.
6 Q    And what years property taxes are unpaid?
7 A    I don't know -- excuse me. I don't know an accurate
8 statement to that. I believe it's for sure 2024.
9 Q    But you do agree they are past due.
10 A    Yes, sir.
11 Q    What is your understanding of how property tax amounts
12 are determined in South Dakota?
13 A    I don't know specifically, but I would have to think
14 it's through the assessor's office would do an evaluation.
15 Q    Right. So you understand that the property taxes are
16 based on the assessed value of the property?
17 A    Correct.
18 Q    Do you know the current assessed value of The Ruins?
19 A    I do not.
20 Q    Construction is not complete on that project, is that
21 right?
22 A    Correct. Yes.
23 Q    Do you agree that the assessed value is likely to
24 increase after the construction is complete?
25 A    Not knowing the value now, I can't say that for

Page 60

1 definitely. But I would guess so, yes.
2 Q    Forgetting the assessed value, just the value of the
3 property, the actual value of the property, do you think
4 that's going to increase once construction is complete?
5 A    Absolutely.
6 Q    What is your general understanding of how the property
7 taxes will flow back to pay Watertown Development Company's
8 claim?
9 A    The property taxes are paid by the property to the
10 county. The county then in turn gives them to Watertown
11 Development Company -- or no, they go from Cass County to
12 the city and the city gives them to Watertown Development
13 Company to apply towards the promissory note.
14 Q    Okay, perfect. So you understand the city of Watertown
15 is essentially foregoing its portion of the property tax
16 revenue in order to help The Ruins pay back the loan?
17 A    Not to help it, I guess. There was an agreement. I
18 mean, we provided housing and they provided an incentive.
19 Q    Sure. Yeah. Okay. Would you agree with me then that
20 if there is no property taxes being paid, there's no revenue
21 to fund the payment to Watertown Development Company?
22 A    Correct.
23 Q    And I think you testified to this, but just to make
24 sure, you agree that The Ruins signed a promissory note to
25 Watertown Development Company. Is that right?

Page 61

1 A    Yes.
2 Q    And do you know whether the City of Watertown signed a
3 promissory note?
4 A    I don't believe they did, because they delegated all
5 the responsibilities, all the issues with that to the
6 Watertown Development Company.
7 Q    Do you know what year The Ruins signed its loan
8 documents with the Watertown Development Company?
9 A    A guess would be 2021.
10 Q    And you testified that the loan is repaid over 20 years
11 through property taxes, right?
12 A    Correct.
13 Q    So would you agree we 'are already four years into that
14 20-year period?
15 A    Correct.
16 Q    And the building is still not complete?
17 A    Correct.
18 Q    And if the building isn't complete, that means the
19 assessed value isn't as high as it will be when the building
20 is complete. Isn't that right?
21 A    Correct.
22 Q    And that also means that the property tax value
23 available to repay the loan is not at the level that it
24 would be if construction was complete?
25 A    Correct.

16 (Pages 58 - 61)

Page 62

1 Q   And I think you testified that if there is a shortfall,
2 the property is responsible for repaying the loan. Can you
3 just explain to me what you meant by that?
4 A   Say like on Generations, if the property taxes are
5 $160,000 a year and the property tax statements that we
6 received from the county are only $80,000, the $80,000 would
7 be applied. It would leave a deficit of $80,000. And then
8 Generations on 1st would have to pay that difference.
9 Q   I have no other questions.
10        THE COURT: Okay. So redirect?
11        MR. HUSHKA: I do think I saw Mr. Krings on at one
12 point. I don't know if he's still here or has --
13        THE COURT: He doesn't get to ask questions
14 because he is appearing by telephone. Only those appearing
15 by videoconference is --
16        MR. HUSHKA: He was on video I thought earlier.
17 He was on video.
18        THE COURT: Oh, you are. So sorry. Mr. Krings,
19 would you like to cross-examine?
20        MR. KRINGS: Can you hear me?
21        THE COURT: I can.
22        MR. KRINGS: No questions. I'm just listening.
23        THE COURT: Okay.
24        MR. KRINGS: Thank you.
25        THE COURT: I'm sorry, I didn't mean to ignore

Page 63

1 you. You've -- okay, thank you.
2        MR. KRINGS: I can be ignored, Your Honor. It's
3 okay.
4        THE COURT: Thank you. I didn't know he was
5 appearing by video. I appreciate that.
6        MR. HUSHKA: Briefly if I can, Your Honor.
7        THE COURT: Okay.
8        REDIRECT EXAMINATION OF JESSE CRAIG
9 BY MR. HUSHKA:
10 Q   Mr. Craig, your counsel asked you regarding payments
11 that needed to be made under the proposed plan, the rollup
12 plan to essentially have contractors complete additional
13 work on this project. Is that accurate?
14 A   Yes.
15 Q   And it was your testimony that the -- you received
16 letters of intent regarding that work to be performed?
17 A   From three of the major players, yes.
18 Q   From everyone that's necessary to get the work
19 finished?
20 A   Not an LOI. I just had them done by the three largest
21 amount of work that needed to be done. But I did reach out
22 to flooring, HVAC, security system, Schumacher Elevator. I
23 talked to all of the trades that need to come back.
24 Q   No LOIs from them?
25 A   I did not ask for that, no.

Page 64

1 Q   No formal commitments that have been submitted at this
2 point?
3 A   Not at this point.
4 Q   You also indicated that since the plan has been
5 submitted that the costs have likely gone up?
6 A   For heating and things of that nature, yes. If we want
7 to proceed rather than extending the building permit, it
8 just seems like most of the -- the biggest holdup right now
9 is the plumbing with Watertight. They can do that during
10 the winter. So --
11 Q   But you indicated that the brick and siding needs to be
12 completed as well?
13 A   That could wait until spring if we wanted to, not to
14 incur those costs. But it's only probably 40 percent of the
15 building that's left for both. So it would be probably
16 another $10,000 for each trade. So not very big amounts.
17 Q   So you're either looking at additional costs or further
18 delays on the project. Is that accurate?
19 A   Correct.
20 Q   Mr. VerStandig asked you about the $100,000 that had
21 been -- I believe your term was earmarked for appliances.
22 Is that fair?
23 A   Yes.
24 Q   And he indicated and you'd testified in the affirmative
25 that that money is not sitting in an account for The Ruins

Page 65

1 at this point?
2 A   Not specifically for that, no.
3 Q   Okay. And that was why it wasn't scheduled?
4 A   I think it was honestly, like, missed completely.
5 Q   But you were reminded during your deposition, were you
6 not?
7 A   Yes.
8 Q   And you still didn't amend the schedules?
9 A   That would have been up to my attorney.
10 Q   But there is something on the schedules regarding Craig
11 Development, is there not?
12 A   I believe so.
13 Q   Does Craig Development have a claim of approximately
14 half-a-million dollars against The Ruins?
15 A   Yes.
16 Q   And that you scheduled?
17 A   Yes.
18 Q   But not the $100,000?
19 A   Correct.
20 Q   You also talked about the various expenses that you
21 were funding for The Ruins, fair?
22 A   Yes.
23 Q   Can you go through those expenses again, please?
24 A   Utilities, insurance. We had mold testing. We have
25 our on-site property manager that goes through. We have

17 (Pages 62 - 65)

Page 66

1  done some repair in the hallways where there was some
2  graffiti that was done, just for optics more than anything.
3  We had some profanity in there and things like that. So we
4  wanted to cover that up. That's about it.
5  Q   Post-petition utilities, are those a necessary expense
6  for The Ruins?
7  A   Yes, I believe so.
8  Q   Does The Ruins have money short of your charitable
9  donations to pay those utilities?
10 A   No.
11 Q   Insurance. Is that a necessary expense?
12 A   Absolutely.
13 Q   Does The Ruins have its own funds to be able to pay
14 insurance?
15 A   No.
16 Q   Mold testing. Was that necessary?
17 A   Yes.
18 Q   Does The Ruins have any means to pay for that by
19 itself?
20 A   No.
21 Q   The property manager, is that necessary?
22 A   Oversight on that property, absolutely yes.
23 Q   Necessary expense?
24 A   Yes.
25 Q   Ruins doesn't have an ability to pay that, does it?

Page 67

1  A   No.
2  Q   The repair work, was that necessary?
3  A   Yes.
4  Q   Any means to pay that for The Ruins individually?
5  A   No.
6  Q   You also talked about hiring an expert.
7  A   Yes, a couple of them.
8  Q   Okay. Were those necessary expenses?
9  A   Time will tell on that. But yes, we felt it was money
10 well spent.
11 Q   Okay. And the ruins, again, no means to pay for that
12 by itself?
13 A   No.
14 Q   Fair to say that The Ruins again is not generating
15 sufficient income to pay necessary expenses?
16 A   Correct.
17 Q   You also indicated that you were paying for legal
18 services in the South Dakota foreclosure case.
19 A   Yes.
20 Q   Are you a named party in that case?
21 A   Yes.
22 Q   Are you a defendant in that case?
23 A   I believe so.
24 Q   Are you personally liable in that case?
25 A   Yes.

Page 68

1  Q   Do your interests coincide with The Ruins?
2  A   Yes.
3  Q   So is it fair to say that defense of you is also
4  defense of The Ruins?
5      MR. VERSTANDIG: Object to the form of the
6  question. That goes to all sorts of legal intricacy.
7      THE COURT: Sustained.
8  BY MR. HUSHKA:
9  Q   Do you believe it's necessary to defend yourself in
10 South Dakota?
11 A   Yes.
12 Q   Would you be paying for that even if The Ruins was not
13 in that case?
14     MR. VERSTANDIG: Objection. Trying to figure out
15 how to do this without it being a speaking objection.
16     Assumes a similar cost of defense for one
17 defendant versus two defendants.
18     THE COURT: I'm going to overrule. You can answer
19 if you remember the question.
20 BY MR. HUSHKA:
21 Q   Would you still be defending yourself in that case if
22 The Ruins was not a party?
23 A   yes.
24 Q   Do you have the same counsel as The Ruins in that case?
25 A   No.

Page 69

1  Q   No?
2  A   I don't believe --
3  Q   Who is representing you?
4  A   So we're not talking bankruptcy, we're talking --
5  Q   The Ruins foreclosure action that was recently removed
6  to South Dakota District Court for the time being.
7  A   I believe that The Ruins has different counsel than I
8  do.
9  Q   Mr. Frisk isn't representing you both?
10 A   Yeah, that I don't know.
11 Q   Frisk and Schwab?
12 A   I know Mark and Dan are representing individuals of it.
13 But once it was removed from here, I am not sure if Mr.
14 VerStandig is handling that down there. I would have to
15 think it's probably -- it would have to be Mark Schwab
16 that's handling both because -- yeah, it would be the same
17 counsel.
18 Q   Same counsel?
19 A   I believe so.
20 Q   Okay.
21     MR. HUSHKA: No further questions at this time,
22 Your Honor.
23     THE COURT: Recross?
24     MR. VERSTANDIG: Court's indulgence.
25     THE COURT: Another stretch break? Okay.

18 (Pages 66 - 69)

Page 70

1    THE WITNESS: I can't believe they say that
2  movement actually helps it. It hurts so bad. I don't just
3  lay on my back but -- and it kills. At least if I was
4  having fun when it happened than sitting in a car.
5    MR. VERSTANDIG: I'm thinking, I'm not trying to
6  burn time. I promise.
7    THE COURT: Oh, I'm -- completely understand.
8    MR. VERSTANDIG: Thank you.
9    MR. VERSTANDIG: Nothing further.
10    THE COURT: Mr. Feist, anything further?
11    MR. FEIST: Just very, very briefly, Your Honor,
12  if I may.
13    THE COURT: Sure, yes.
14    RECROSS EXAMINATION OF JESSE CRAIG
15  BY MR. FEIST:
16  Q  Mr. Craig, would you agree with me that the property
17  taxes are a necessary expense of The Ruins?
18  A  Yes.
19  Q  And does The Ruins have money to pay its property
20  taxes?
21  A  No.
22    MR. FEIST: That's all I have.
23    THE COURT: Okay. So Mr. Craig is excused as a
24  witness for Red River State Bank. We're going to take a
25  break shortly. Soo you can stretch and move right now. But

Page 71

1  you might be recalled as a witness. So I'll ask you to stay
2  close.
3    All right. Mr. Hushka, any other witnesses, or
4  team Red River State Bank?
5    MR. HUSHKA: We would rest at this time, Your
6  Honor.
7    THE COURT: Okay. So I think now would be a good
8  time for a morning break. So let's -- ten minutes enough or
9  would you need a little more?
10    MR. VERSTANDIG: Ten minutes is more than enough.
11    THE COURT: Okay. Then let's resume at 10:30.
12    MR. VERSTANDIG: Thank you, Your Honor.
13    CLERK: Please rise.
14    (Recess)
15    CLERK: All rise. Please be seated.
16    THE COURT: All right. We are back on the record
17  with Bankruptcy Case Number 25-3004, In re The Ruins. When
18  we broke, Red River State Bank had completed its case and
19  now we'll turn to Debtors. Mr. VerStandig?
20    MR. VERSTANDIG: Your Honor, just for clarity and
21  out of an abundance of caution, I'm assuming Watertown
22  Development Company does not have any witnesses.
23    THE COURT: Sure. I was -- Mr. Feist?
24    MR. FEIST: No, we don't have any witnesses.
25  Thank you.

Page 72

1    THE COURT: Okay. Thank you. Are there any other
2  parties that wish to offer evidence in support of the motion
3  to dismiss or convert or in opposition? All right.
4  Debtors?
5    MR. VERSTANDIG: Thank you, Your Honor. The
6  Debtor calls Jesse Craig.
7    THE COURT: Okay. Mr. Craig, I'm just going to
8  remind you that you remain under oath. And so you can go
9  directly to the witness stand.
10    MR. HUSHKA: Your Honor, and I would just note I
11  did direct, but Ms. Stanley will be doing the defense or the
12  cross of Mr. Craig.
13    THE COURT: Okay. All right.
14    Okay, Mr. Craig, I'm just going to have you
15  acknowledge on the record that you understand that you
16  remain under oath.
17    THE WITNESS: Yes.
18    THE COURT: Thank you. All right. Mr.
19  VerStandig?
20    DIRECT EXAMINATION OF JESSE CRAIG
21  BY MR. VERSTANDIG:
22  Q  Mr. VerStandig, what is Tyvek wrap?
23  A  Tyvek is a white plastic material that's put on the
24  OSB, on the outside -- or plywood on the outside of a
25  building. It's just a protection layer that's stapled on.

Page 73

1  Then you'd have siding that would go over the top of that.
2  Q  Is there Tyvek on Ruins as the world sits today?
3  A  There's quite a few layers of it because it's updated
4  as it expires.
5  Q  Okay. Did you hear testimony yesterday from Mr.
6  Aarestad about Tyvek wrap?
7  A  Yes.
8  Q  Okay. What was your understanding of his testimony
9  about Tyvek wrap?
10  A  He had said that -- I think there was some testimony
11  that it had blown off and there was issues with product
12  underneath it.
13  Q  Is that accurate, meaning is that an accurate
14  description of the property, not is it accurate that he said
15  that?
16  A  Like I testified earlier, we had a lot of wind events
17  this year. And so yeah, at times we did have Tyvek blow
18  off. We'd have to go rent a $700 to $800 lift, go over
19  there, boom up, either re-secure the original Tyvek or put
20  new Tyvek on.
21  Q  Has that occurred such that Tyvek has remained on?
22  A  It had to be done to get the building permit extended
23  also. But just for the longevity of the building, it was
24  corrected.
25  Q  When it happened, who paid for the lift?

19 (Pages 70 - 73)

Page 74

1  A   I did.

2  Q   Okay.  Did you -- you heard Mr. Aarestad's testimony

3  about graffiti.

4  A   Yes.

5  Q   Okay.  Is there to the best of your knowledge graffiti

6  inside The Ruins property as the world exists today?

7  A   Not anymore.  We covered it up.

8  Q   Okay.  Did you hear Mr. Aarestad's testimony about

9  broken appliances?

10  A   Yes.

11  Q   Are there broken appliances inside The Ruins?

12  A   When I've been through the property, there is only one

13  microwave on the fourth floor in the corridor that looks

14  like it was either dropped or something broke the handle on

15  it.

16  Q   To be clear, a microwave would mean the thing you use

17  to bake a potato without baking it?

18  A   Correct.

19  Q   Okay.  Mr. Craig, are you familiar -- strike that.  Did

20  you hear Mr. Aarestad's testimony about water damage?

21  A   Yes.

22  Q   Are you familiar with whether or not there's water

23  damage on this property?

24  A   Yes.

25  Q   Is there water damage?

Page 75

1  A   Not at the moment.  Again, when we had those rain

2  events, water events, we did have some water come in.  It's

3  pretty standard with construction.  But it's definitely

4  something we take serious to, you know, again boom up, make

5  sure that tape's over the window flashings, things of that

6  nature.  Any water that was inside was cleaned up so we

7  could, you know, monitor if there was another event if there

8  was more water coming in or not.

9      We did the mold testing.  There's a couple sills that

10  we had removed just to make sure there was no mold

11  underneath them.  That was put back in place and taped and

12  textured.

13  Q   Do you anticipate any forward-looking expense to ensure

14  that any remnants of water damage are remedied?

15  A   As of right now we've gone through like we said the

16  mold testing, we've inspected the insulation.  If anything,

17  there will be some windowsills that will have to be redone.

18  We're not sure if that was more stuff that was damaged by

19  the drywall guys when they took the tape off as much as it

20  was from water.  But we're looking probably, you know,

21  $2,000 a floor, $6,000 to fix those items.

22  Q   It's four floors.  So why would it be six instead of

23  $8,000?

24  A   It's three floors.

25  Q   Never mind --

Page 76

1  A   Three over one.

2      MR. VERSTANDIG:  The Court's indulgence?

3      THE WITNESS:  Yeah, there's only three floors.

4  The main level is parking garage.

5  BY MR. VERSTANDIG:

6  Q   Is there a garage or a main level?

7  A   Yeah.

8  Q   Are you counting that as a floor?

9  A   No.

10  Q   Thank you.

11  A   We start at the first floor as apartments.  It just

12  kept it fresh.

13  Q   Understood.  Did there come a time when Ruins was

14  monetarily indebted to Mr. Aarestad individually, meaning --

15  A   Yes.

16  Q   Just to be clear, I'm not asking about a debt to Red

17  River State Bank, I'm asking about a debt to Mr. Aarestad.

18  A   So there were some loans that were done and moved

19  around and things like that.  There was a $400,000 loan that

20  was done from Charles.  And I believe it was to The Ruins or

21  myself personally.  But then it was secured by the lake

22  home.  And now knowing it, I think they were trying to avoid

23  their legal lending limit violation or a Reg O violation

24  that Charles had brought up.

25      So ultimately that $400,000, even though the money was

Page 77

1  used for draw 10A and 10 on The Ruins, when we had -- were

2  forced to refinance our lake home, that note was paid off

3  with interest to Charles.

4  Q   So let's walk through that step by step.  Do you know

5  who originated the loan?  Was it Mr. Aarestad, Red River

6  State Bank, a third party?

7  A   Originally it was Charles.  He had emailed that he was

8  going to put a HELOC on his personal home.

9      MS. STANLEY:  Objection, Your Honor.  Best

10  evidence rule -- oh.

11      THE COURT:  Yeah.  I'm sorry.  You're going to

12  have to start from the beginning.

13      MS. STANLEY:  Objection, Your Honor.  The best

14  evidence rule would indicate that the actual note they're

15  talking about should be put into evidence.

16      MR. VERSTANDIG:  I didn't ask about a promissory

17  note.  I was actually very careful about that.

18      MS. STANLEY:  You were asking about a loa.

19      MR. VERSTANDIG:  I was?

20      THE COURT:  Yeah.  I'm going to overrule.

21  BY MR. VERSTANDIG:

22  Q   You can go ahead and answer.

23  A   Where were we at?  I apologize.

24  Q   We were talking about the lake home paid off the

25  $400,000 with interest to Charles.  And then we talked about

20 (Pages 74 - 77)

Page 78

1 it was originated through his HELOC on his house. He had
2 put in the email --
3 Q   What do you mean by that? What do you mean by
4 originated through a HELOC on his house? I know what those
5 words mean, but...
6 A   Yeah. Charles had reached out with this idea to put a
7 $400,000 note in his name, or him and his wife's name. It
8 was originally the email stated it was going to be on a
9 HELOC on his own personal home. And he noted it would piss
10 his wife off. But then it ultimately -- go ahead. Sorry, I
11 thought you had a question. But then it was assigned to Red
12 River State Bank. And there's a whole lawsuit on this too,
13 so it's confusing as heck. But then it ultimately was
14 secured the lake home. And so when we paid off Charles,
15 even though it was a Red River State Bank Loan, we paid him
16 off personally.
17 Q   Okay. So there's a couple of debts that were
18 referenced in there. And I think this might be more
19 confusing than it needs to be because --
20      MS. STANLEY: Your Honor, I'm going to object to
21 this. I don't understand the relevancy of this.
22      THE COURT: Tell me about the relevance.
23      MR. VERSTANDIG: There's been a lot of testimony
24 on their side about the lake home and about whether or not
25 money properly went to lake home. This is going to show

Page 79

1 that the bank used the lake home as a foundation for loans
2 to Ruins, that the bank used third parties to make loans to
3 Ruins, and that the bank tended to comingle the relationship
4 between the three debtors, the lake home, Mr. Craig, the
5 bank, and the bank's own officers at various points during
6 the relevant lending relationship.
7      THE COURT: Overruled.
8      MR. VERSTANDIG: You can continue. Sorry, you can
9 continue.
10      THE WITNESS: I think I was -- I don't remember
11 where I was even at.
12      THE COURT: We'll start with a new question. How
13 about that?
14 BY MR. VERSTANDIG:
15 Q   Let's start with a new question. Because you had
16 referenced a HELOC and I just want to be very clear about
17 this. Was the HELOC on the lake home, on Mr. Aarestad's
18 home, on some third party's home?
19 A   Charles took a $400,000 HELOC on his personal home.
20 Q   Okay.
21 A   Originally it was going to -- he was going to become a
22 part of Generations on 1st LLC as a tenant-in-common. Then
23 his legal said no, don't do that. And then there's an email
24 on that also. And then he -- that email he was going to do
25 a HELOC on his personal home.

Page 80

1 Q   Okay. Once Mr. Aarestad received the $400,000 from the
2 HELOC, what happened to it?
3 A   It was used to pay draws 10 and 10A.
4 Q   When you say draws 10 and 10A, are those Ruins draws,
5 lake --
6 A   Ruins. The Ruins.
7 Q   And a few moments ago you had mentioned your lake home.
8 Is that the property in Minnesota you referenced earlier
9 today?
10 A   Yes.
11 Q   Okay. How does your lake home play into this?
12 A   When they did those notes, they secured them against
13 the lake home, Craig Properties, myself individually a $3
14 million life insurance policy. I mean, it blanketed
15 everything.
16 Q   On whose life was the $3 million policy?
17 A   Myself.
18 Q   Okay. So you're indicating -- so the $400,000 was
19 loaned to who after it came out of the HELOC?
20 A   It would have been used on The Ruins. I can't recall.
21 We didn't get copies of those promissory notes for quite a
22 while. So I apologize, I can't remember.
23 Q   But it was used on Ruins?
24 A   Correct. Yeah. There's two draws on The Ruins that
25 equaled $400,000. I know 10A is one of them, and I think

Page 81

1 it's 10. But the two of those were what made up the
2 $400,000 for Charles.
3 Q   Were there any other loans from members of the Aarestad
4 family. And I don't mean Red River State Bank, the
5 financial institution.
6 A   Yes. There was $600,000 from his father, Randall
7 Aarestad.
8 Q   Okay. Can you explain to the Court how this $600,000
9 came to be and what that was?
10 A   That one, I didn't have a lot of detail on it other
11 than the fact that Charles was handling it. So they were
12 both kind of done at the same time. I mean, they were
13 apart, but they were in that same time period.
14 Q   Was any collateral offered in security for the $600,000
15 loan?
16 A   Same as the $400,000, blanketed just about everything.
17 Q   Including the lake house?
18 A   Yes.
19 Q   Okay. And the money -- where did the money go? Did it
20 go to Ruins? Did it go to the lake house?
21 A   Went to The Ruins.
22 Q   Okay. And was there another loan from some member or
23 consortium of members of the Aarestad family?
24 A   Yes.
25 Q   Okay. Tell the Court about that.

21 (Pages 78 - 81)

Page 82

1  A   There was another $600,000 loan that encompassed -- and
2  we could only go off of -- again, we never got copies of
3  that note, but we had to go off of like initials on a
4  spreadsheet that Charles had put together.  And originally
5  it was Alexandra, which is his sister, Jake (indiscernible),
6  Danielle Harless, Charles Aarestad.  I believe Randy was on
7  there, and possibly their mother.  But there was a bunch of
8  initials.  We never really knew --
9  Q   You said Randy and a moment ago you referred to someone
10  as Randoff --
11  A   Randall is --  Randall is the father.
12  Q   So it's Randall, not --
13  A   Randall.  And then they call him Randy.  Yeah, sorry.
14  Q   And did you say that was a $600,000 loan?
15  A   Correct.  That was repaid $25,000 a month for eight
16  months, and then it was supposed to go to $87,000 a month.
17  It was like a two-year real quick band aid.  Expensive band
18  aid.
19  Q   All right.  Before you repaid, where did the $600,000
20  go?
21  A   Into The Ruins.
22  Q   Okay.  And what was it secured by?
23  A   That one was secured by The Ruins.  That's the third
24  note.
25  Q   And who repaid it?

Page 83

1  A   I was making the $25,000 a month payments on it myself.
2  Q   Meaning were you using The Ruins money to make those
3  payments?
4  A   Well, no.  I mean, one of the things that we ran into
5  is one of the biggest line items that was repaid was accrued
6  interest to Red River State Bank.  So when money came in
7  like that, then I either needed to get it back to them for
8  family taxes at one point in time or for interest that had
9  accrued on the note.  So either the money was used to pay
10  the monthly interest payment on The Ruins or I would have to
11  pay it.  And that's just the 774 and the 2,750,000.  The
12  $600,000, that was another $25,000 a month that I was
13  paying.
14  Q   Some of those payments you made with your personal
15  money you said?
16  A   All of the $25,000 ones.  And then probably three or
17  four of the $55,000 ones to The Ruins.
18  Q   Did you ever convey to any member of the Aarestad
19  family that you were paying this with personal money?
20  A   The only people I had ever met were Randall, Randy, and
21  Charles and Danielle.  The other ones -- like Jake
22  (indiscernible), I might have met him, but he was a son-in-
23  law.  He worked at the Fertile branch.  And then the sister
24  and mother ran the greenhouse.  So I never got to meet them
25  in-person.

Page 84

1  Q   Just for clarify, the Fertile branch is a reference to
2  Fertile, Minnesota?
3  A   Yeah.  Fertile Minnesota is where their second location
4  bank is.
5  Q   Okay.  So I want to make sure I actually get an answer
6  to that though.  Did you convey to any one or more of them
7  that it was your money being used to repay this loan?
8  A   Charles would have known it.
9  Q   Okay.  How would Charles have known that?
10  A   Because he would have saw if there was any money in The
11  Ruins checking account or where the draw funding went.
12  Q   And just for consistency and clarity -- this gets
13  strange because it's a family -- but Charles is the
14  individual I've been referring to as Mr. Aarestad, correct?
15  A   Correct.
16  Q   Okay.  And that's the individual who testified
17  yesterday?
18  A   Yes.
19  Q   Okay.  Could we please bring up ECF 137?
20       MS. STANLEY:  Could I make a request that we bring
21  it up without the double numbering at the top?
22       MR. VERSTANDIG:  There had been a mouse this
23  morning.  And evidently there was no longer.  Meaning a
24  computer mouse, not a live rodent.
25       THE COURT:  I got it.

Page 85

1       MR. VERSTANDIG:  I hate to ask you to do this.
2  Could you please scroll to the summary page?  There we go.
3  And let's start there.
4       BY MR. VERSTANDIG:
5  Q   Mr. Craig, do you remember seeing this document on the
6  screen yesterday?
7  A   Yes.
8  Q   Okay.  And is it your -- strike that.  Did there come a
9  time when you caused one or more invoices from
10  subcontractors to be altered before they were sent to the
11  bank?
12  A   Yes.
13  Q   Okay.  Was an invoice from Clausen Construction one of
14  those?
15  A   Yes.
16  Q   Can you explain to the Court what caused you to alter
17  that invoice?  And if you need to see it, just say so and --
18  A   No, we had -- Jesse Kiehl, my project manager, and
19  myself had met with Ron and Dave Clausen at the site.  Was
20  originally you had asked about this, Your Honor, but the
21  Palace Apartments used to sit where one arm, the north and
22  south arm of The Ruins sits.  And it was called the Palace,
23  but it was full of sex offenders and bedbugs.  So that's why
24  I named the new project The Ruins, because they wanted to
25  have an outdoor park, which we have developed as part of the

22 (Pages 82 - 85)

Page 86

1  bookends between Parkside Place and The Ruins.  They wanted
2  to put a splash park in there.  And the last thing they
3  wanted was to have a building right next to a splash park
4  with sex offenders in it.
5      So when we took that building down -- and I have video
6  of this.  This building was enormous.  It was built to stay
7  there.  So when we originally met with Ron and Dave on the
8  site, they were concerned about putting a bid on there
9  because they had absolutely no idea how they were going to
10 take this thing down.  And they had to bring in a special
11 excavator with a longer boom to get up to the top.  And then
12 we had an issue with the dump site, the Watertown dump site,
13 that they were only going to take certain items, not all the
14 rubble.  And if they were going to take the rubble, we were
15 going to pay for it monthly.
16     So again, the 1A was originated or funded off the TIF.
17 And there's only a certain amounts or costs that are TIF-
18 eligible costs.  So that one was pretty much getting
19 additional money out of the TIF in order to have those funds
20 sitting in there to pay the dump to help Clausen up front to
21 take care of this building.  And it was quite an
22 undertaking.
23 Q  Okay.
24     MR. VERSTANDIG:  And Ms. (indiscernible), can we
25 scroll -- this is going to be pretty predictable.  I'm going

Page 87

1  to ask him about them one at a time until either the horse
2  is dead of, we've exhausted the...
3  BY MR. VERSTANDIG:
4  Q  Did there come a time when an invoice from Limoges
5  Construction was altered?
6  A  Yeah.
7  Q  Okay.  Can you explain what informed that alteration?
8  A  Same situation there where we were looking at pretty
9  extensive property.  A lot of these contractors were very
10 leery of doing another project for us after the chaos we had
11 with the draw funding delays on Parkside and Generations
12 with Red River.  They were not going to sit and wait 20, 30,
13 60 days to get paid.  So additional --
14     MS. STANLEY:  Objection.  Facts not in evidence
15 here.
16     THE COURT:  It is now.
17     MR. VERSTANDIG:  Testimony is evidence.
18     THE COURT:  Overruled.
19 BY MR. VERSTANDIG:
20 Q  Okay.  Can you elaborate why that -- how did the
21 alteration solve that problem?
22 A  Then we had money available.  It was getting to the
23 point where, you know, on Parkside and Generations I was
24 using all of my own money, including any of the fees that I
25 had gotten off those properties, to help pay these

Page 88

1  contractors so they wouldn't walk off the job, just to keep
2  the projects moving forward.
3  Q  Let's touch on that for a second before we get back to
4  the invoices.  Did you pay subcontractors invoices with your
5  own money?
6  A  Quite often, yes.
7  Q  Okay.  Why did you do that?
8  A  The way the funding draws were delayed, meaning that
9  you usually put a draw request in on the first of the month
10 and it's funded by the tenth.  And again, I'm not a
11 construction manager and no title company would have ever
12 done this, what I had to go through on Parkside and
13 Generations --
14     MS. STANLEY:  Objection.  He's speculating about
15 what a title company would do.
16     THE COURT:  Sustained.
17 BY MR. VERSTANDIG:
18 Q  You can answer other than the no tile company part.
19 A  Even if I've talked to a title company?
20 Q  Correct.
21 A  Okay.  So it had pretty much exhausted all of my
22 available cash after those two projects.  So I wasn't able
23 to keep up on this.  So we funded ahead.
24 Q  Do you know -- this is a yes or no with a follow-up
25 behind it.  Do you know why Red River State Bank was slow

Page 89

1  funding draw requests?
2  A  On Parkside, it was probably the first three or four
3  they were behind the eight ball right away.  We were still
4  trying to figure out if the Ready program was going to be in
5  play.  And we can talk about that.
6  Q  Okay.  Let's focus on Ruins.
7  A  And then it went to -- well, okay.  So you're just
8  talking about Ruins?
9  Q  Yes.
10 A  Honestly, I don't know why they were so delayed.
11 Q  Okay.  Let's go to the next one.  Did there come a time
12 when you altered an invoice from KLJ Engineering?
13 A  Yes.
14 Q  Why did you do that?
15 A  I had already paid money out of my own pocket.  So this
16 was just something that kind of reimbursed me for
17 infrastructure bills and things I had paid.
18 Q  Okay.  We can keep going.  Thank you.  Did there come a
19 time -- could you scroll up a little bit?  I'm sorry.  No,
20 back down.  I'm sorry.  Okay.  Let's keep scrolling.
21     Did there come a time when you altered an invoice from
22 D&M Industries Incorporated?
23 A  Yes.
24 Q  Why?
25 A  Same reason.

23 (Pages 86 - 89)

Page 90

1 Q   Let's be clear about this one, at least according to
2 the summary.  And we can pull them up if need be.
3 Q   Well, like on this one, on 5C, it's for Generations on
4 1st.  Generations on 1st was already closed.  Charles had
5 already done a permanent loan on that, or I believed it was
6 a permanent loan or loans on that.  I still don't know if we
7 have participants on that today or not.  So I'm sitting
8 there with a Generations on 1st bill.  And the people that
9 are supposed to fund it and pay for it are Red River State
10 Bank.  They're not doing that or don't have the ability to
11 do it.  So on D&M, that's why we ran it through here.
12 Q   Okay.  Could we keep scrolling?  What about -- oh god,
13 I'm going to mispronounce this.
14 A   (indiscernible)?
15 Q   Thank you.
16 A   They did asphalt on both sides.  They did it for
17 Generations, but they also did it on The Ruins.
18 Q   Okay.  What about Watertown Cashway Lumber
19 Incorporated?
20 A   They are who we originally -- excuse me -- originally
21 had the bid for the framing on it.  And then they backed out
22 of their contract because of COVID and the price of lumber
23 went up 40 percent.  So that's probably actually an amount
24 that we should get back.  We were set to sue them and they
25 really were just honest about it, saying that you can sue

Page 91

1 us, but then we'll just go in a bankruptcy.  So we didn't
2 pursue it.
3 Q   Now, on this summary sheet, is there a suggestion that
4 some of these are for Generations?
5 A   Correct.
6 Q   Were some of the invoices attached to the draw requests
7 indicative of the work being for Generations?
8 A   Partially, yes.
9 Q   Who did you send those to?
10 A   The Generations ones?  I had a discussion with Charles,
11 but I don't remember the details.
12 Q   Let me rephrase.  Who did you send draw requests to?
13 A   Charles Aarestad or Red River State Bank, but to
14 Charles' email.
15 Q   And did some of those attach invoices that indicated it
16 was for Generations or no?
17 A   Yes.
18 Q   Okay.
19 A   They were right on there.
20 Q   And to be clear, did it indicate it was for Generations
21 because you changed it to say it's for Generations or
22 because it originally said it's for Generations?
23 A   No, it originally said Generations.
24 Q   Okay.  What about United Rentals?
25 A   That one I think was for a lift, but I don't know why

Page 92

1 they have it for the Craig office addition.  Because we
2 didn't rent anything for that.
3 Q   Okay.  Now, Structural Materials Incorporated.  This
4 looks like the words "Jesse's Lake Home" in all caps.
5 A   Yeah.
6 Q   What's going on with that?
7 A   That is probably adhesion glue for the stone that was
8 put on.  And again, we had this thing where we have a
9 million dollars' worth of Ruins debt on the lake home.  And
10 so again this was run through Charles.  He was right printed
11 on there.  But in my mind there had to have been an offset.
12 Otherwise, my lake home would have been almost twice as much
13 as it, you know, was worth.
14 Q   And just to be clear with this one, did you delete the
15 words "Jesse's Lake Home" or did you send the invoice
16 through with those words on it?
17 A   That I can't recall.  I apologize.
18 Q   Okay.
19 A   All caps is odd.
20        MR. VERSTANDIG:  The Court's indulgence for one
21 moment.
22 BY MR. VERSTANDIG:
23 Q   What about Don John Construction?
24 A   They did Gypcrete.
25 Q   I don't know what that means.

Page 93

1 A   That's almost like a subfloor liquid, almost like a
2 real runny concrete.  It's for sound deadening.
3 Q   Okay.
4 A   I guess looking through all of these if I may.
5 Q   Please.
6 A   If you took their $3 million that they're saying didn't
7 go through The Ruins or was put on The Ruins or whatever,
8 just by simple math, you can't build that building for --
9 right now it's $10,490,000 without interest and late fees.
10 If you took $3 million off of that, you're down to
11 $7,490,000.  You've got another $2.2 to finish it.  You just
12 -- in this world you cannot build that type of a building
13 with precast parking garage for those dollars.  It just
14 would not be to this point if that actually happened.
15 Q   What would it cost in your experience as a contractor
16 and a developer to build the building in the condition it's
17 in now?
18 A   I mean, right now we've got -- I mean, the last
19 appraisal was $14,220,000.  Then it goes 12 -- 12,410,000 or
20 something like that without the TIF.  A dollar.  I mean, so
21 with the million-three to finish it, it's going to be right
22 in that, you know, $12 million, twelve-and-a-half million to
23 finish it.
24 Q   Okay.
25 A   That's why you're fighting so hard to keep these

24 (Pages 90 - 93)

Page 94

1  properties.  If they were loaded with debt and they weren't
2  going to cashflow, we wouldn't be spending the time and
3  money we are trying to claw these back.
4  Q    Well, let's talk about that for a second.  I know you
5  don't have the plan in front of you, and we're not going to
6  put it in front of you.  But is one of the commitments under
7  the plan that you're going to put money into completion?
8  A    Correct.
9  Q    Why are you willing to do that?
10  A    I mean, everyone's going to go back to the legal part
11  of it where I have a personal guarantee on it.  But this is
12  something that's a remarkable -- I wish we had the ability
13  to walk Your Honor through the project, or we should have
14  brought our construction experts.  But it's a phenomenal
15  property.  It's built for my children and their children.
16  And it's in a great town with, you know, below two percent
17  vacancy.  They need 300 homes or 300 housing units a year
18  for the next ten years.  I mean, no one's building there
19  since we left.  Yeah, I just -- it's unfinished.  It's hard
20  to sit and watch it be unfinished, and I think it's hard for
21  the citizens or Watertown to see it unfinished.
22  Q    I don't want to be redundant, but just for clarity.
23  You testified earlier that it would take a million dollars
24  and change to complete it, correct?
25  A    A million three.

Page 95

1  Q    A million three.  And you believe a million three
2  between in-kind contributions and cash payments gets to a
3  certificate of occupancy?
4  A    Yeah.  I mean, it will probably be a little bit more if
5  I -- you know, now with my back I'm going to have to hire
6  cleaners versus me going down with my crew.  But I'm going
7  to spend an enormous amount of time down there.  Jesse
8  Kiehl, my original project manager, is willing to come back
9  and help finish it.  Even the subs are stepping up and doing
10  the right thing to get this project finished.
11  Q    Would you make a personal financial contribution to
12  have a third party manage the property between now and the
13  time of plan confirmation?
14  A    Yes.
15  Q    If the Court were to suggest that a restructuring
16  officer or trustee, whoever it may be, had to oversee this,
17  how much money would you be willing to put in to pay for
18  that person?
19  A    And this is that -- so my subs are going to get paid?
20  Everyone is going to be made whole?
21  Q    I'm simply asking if the Court were to say that
22  for this to stay in Chapter 11 you have to pay a fiduciary
23  to come in and oversee things, how much money would you put
24  in?
25  A    $20,000.

Page 96

1  Q    $20,000.  And there are no tenants to oversee it
2  though, am I correct?
3  A    No.  It would just be them overseeing -- myself,
4  hopefully I can stay involved for free labor and my monetary
5  input.  And Jesse Kiehl would be very important.  And it
6  should take four months to finish.
7  Q    Just for clarity, you would still also be willing to
8  put in the money to get it finished?
9  A    Yes, absolutely.
10  Q    And would you continue to pay insurance?
11  A    Yes.
12  Q    And would you continue to pay utilities?
13  A    Yes.
14  Q    And if need be, would you come up with the money to
15  bring the taxes current?
16  A    Yes.
17  Q    Okay.
18        MR. VERSTANDIG:  Your Honor, can I either have 30
19  seconds to whisper with Ms. Craig --
20        THE COURT:  Sure.
21        MR. VERSTANDIG:  Thank you.
22  BY MR. VERSTANDIG:
23  Q    Mr. Carig, during the course of constructing
24  Generations, Parkside, and part of The Ruins, did you come
25  to know Mr. Aarestad on a personal level?

Page 97

1  A    Very much so.
2  Q    How is that?
3  A    We just spent a lot of time.  I mean, when Martin left,
4  Charles stepped in.
5  Q    Who is Martin?
6  A    Martin Peterson was my original loan officer that had
7  went from Midwest bank -- well, there's even a back story --
8  Town and Country to Midwest -- or to Plains Commerce, to
9  Midwest, to Red River State Bank.  And he worked there.  He
10  had reached out to me.  He wanted to continue to service
11  these loans or see these projects happened.  Through emails
12  and things like that, he just got -- he claims he was
13  understaffed, overworked, all those things.  And ultimately,
14  he left.  I think we were -- you know, I think we started
15  Parkside and Generations, Ruins was kind of just starting to
16  get going.  And so Martin left and Charles stepped in.  And
17  it was chaos, so we got to know each other pretty well
18  pretty quickly.  And then per the email that Charles had
19  sent to me, there's Generations one where the participating
20  bank backed out at the last minute really sent everything
21  into a tizzy.  That's where we were kind of trying to figure
22  out a plan to, you know, get this all done.  That's when
23  loans started being placed on Mindy, Mulinda, and lake home
24  and, you know, I was getting emails that he had a Reg O
25  violation on the $2,750,000 loan on Ruins that put them over

25 (Pages 94 - 97)

Page 98

1 their lending limit. And through all of that I guess we
2 just spent a lot of time on the phone, texting.
3 Q  Let's detour for a second. You had said loans placed
4 on Mindy or Mulinda. Is that a reference to Ms. Craig?
5 A  Yes.
6 Q  Okay. What do you mean by loans placed on her?
7 A  There are loans that were -- it was kind of -- I think
8 it was originally Martin's idea, but I also have emails that
9 Charles was behind it also with SPA loans where -- I don't
10 know if, again, trying to avoid their legal lending limit.
11 You know, you're talking a bank that has, you know, $110
12 million in assets. I think their lending limit was $1.1
13 million and they lent me a little over $27 million on my
14 three LLCs. So --
15 Q  Back up. What do you mean by loans placed on Mindy?
16 Did she borrow money? What happened?
17 A  So they put -- in order to fund certain draw requests,
18 they put loans in her name.
19 Q  By loans in her name, do you mean she was the borrower
20 or she was the lender?
21 A  She was the borrower, Red River State Bank was the
22 lender.
23 Q  Okay. And when you say she was a borrower, do you mean
24 she was the borrower or a guarantor or what?
25 A  Both.

Page 99

1 Q  So it would have -- Munlinda Sue Craig would have been
2 the borrower. I was securing it. Either Generations or
3 Parkside were security it.
4 Q  Where did the money go?
5 A  It went to fund draw requests.
6 Q  Did the money ever go to Ms. Craig?
7 A  No.
8 Q  Did the money ever pass through Ms. Craig's bank
9 account?
10 A  No.
11 Q  Was the money ever disbursed to her bank account for a
12 millisecond and then --
13 A  No. It was always to Craig Development.
14 Q  Okay. I detoured you a bit. You had been talking
15 about the fact that you got to know Mr. Aarestad.
16 A  Yes.
17 Q  Did there come a time when you sent Mr. Aarestad
18 personal bank statements of yours that had been altered?
19 A  Yes. I had received a kind of confusing email where he
20 was asking for screenshots of bank statements, but they were
21 -- he wanted them preferably for the end of the month. And
22 this was like on the 27th. So I did alter them. I did not
23 know what they were going to be used for or what they had
24 intended for. Because I had never been asked for anything
25 like that from Red River State Bank before.

Page 100

1 Q  I want to be very clear about this and I want to make
2 sure you have an opportunity. Why did you alter bank
3 statements?
4 A  He had -- in his email he had referenced that he had
5 listed the properties from my personal financial statement
6 in May. And this was the end of July or early August. And
7 he asked that I have screenshots or verification of those
8 dollar amounts that were on my PFS.
9    So I could have easily moved money over to whatever he
10 needed to have done. But like I said, this was something
11 that I had never been asked for before.
12 Q  What was your motivation in complying with a request
13 that couldn't be accomplished without your doing that?
14 A  He reached out so I was trying to help him. He was
15 trying to help me all the time. I mean, we were working on
16 this stuff together for quite some time.
17 Q  Do you have any concerns about what would happen if you
18 didn't help them?
19 A  With that matter?
20 Q  At all.
21 A  I mean, again, that Reg O violation that he had emailed
22 about, you know, same say a felony or there's jailtime or
23 things like that. Yeah, I didn't want -
24    MS. STANLEY: Objection. This is talking about
25 facts not in evidence.

Page 101

1    THE COURT: This is evidence. He is testifying
2 about that. So I'll overrule the objection.
3 BY MR. VERSTANDIG:
4 Q  You can keep going.
5 A  No, I mean, we were just trying to help each other. At
6 my deposition I even made a statement I -- we talked to each
7 other more than we probably talked to our wives for years.
8 I mean, we spent a lot of time. It was very hard on him.
9 It was very hard on myself. To the point where, I mean, I
10 even got a text from him at one point in time about suicide.
11 And immediately called --
12    MS. STANLEY: Objection. This is hearsay and not
13 --
14    MR. VERSTANDIG: It's a statement by a party
15 opponent.
16    MS. STANLEY: Mr. Aarestad is not a party in this.
17    MR. VERSTANDIG: He is. The bank --
18    THE COURT: There is some caselaw suggesting that
19 he is the representative of the bank and therefore party
20 opponent. So I'm going to overrule.
21    MR. VERSTANDIG: Thank you, Your Honor.
22 BY MR. VERSTANDIG:
23 Q  You can keep going.
24 A  So I was worried about him. So I called him and told
25 him, you know, you've got a family, you've got two young

26 (Pages 98 - 101)

Page 102

1 kids. This is nothing to play with. And he didn't reply
2 back for a while. I think he replied back that night. And
3 then I asked for a meeting in the next couple days. And I
4 drove up there. I met with -- in Daniel's office with
5 Randy, Randall, his dad, and Charles. And the first thing I
6 said is I just want to clear the air and make sure he was
7 okay. Because everything else is just money. You know,
8 we'll figure it out. But it was very stressful for
9 everybody involved during that time. It was very chaotic.
10 Q   Do you remember Ruins entering bankruptcy on January
11 6th, 2025?
12 A   Yes.
13 Q   At any time since then have you altered any third-party
14 document in any way related to Ruins?
15 A   I don't believe so, no. Nothing that I can recall.
16 It's nothing that I knew on a, you know, daily or ever. I
17 mean, white-out is used for our children's homework.
18 Q   Thank you.
19       MR. VERSTANDIG: Your Honor, nothing further.
20       THE COURT: Do you want to begin cross or do you
21 need a little break?
22       MS. STANLEY: I need a little break, please.
23       THE COURT: Okay. So how about we resume again at
24 11:30?
25       MR. VERSTANDIG: Thank you. Mr. Craig, I'm not

Page 103

1 allowed to talk to you at the moment.
2       (Recess)
3       CLERK: All rise. Please be seated.
4       THE COURT: We are back on the record with
5 Bankruptcy Case Number 25-3004, The Ruins.
6       Before we proceed with cross-examination, there
7 were a couple of objections to assuming facts not in
8 evidence. And I wanted to make sure that I refresh my
9 memory about what that evidence rule is, and it's basically
10 a foundational thing, was there information that was broadly
11 stated -- a broadly-stated question that somehow left an
12 inference that would be misleading. And I didn't hear that,
13 but I think from now on I don't want to discourage you from
14 making that objection, but rather explain to me why you
15 think there hasn't been sufficient foundation laid. I
16 didn't see it at the time of the last objections, but I want
17 to make sure that I'm not doing anything to discourage you
18 from using the object. You'll just have to explain what it
19 is that's misleading or lacks foundation for the information
20 provided.
21       MS. STANLEY: Thank you, Your Honor.
22       THE COURT: All right. Cross-exam.
23       CROSS-EXAMINATION OF JESSE CRAIG
24 BY MS. STANLEY:
25 Q   Mr. Craig, when does the current building permit for

Page 104

1 The Ruins expire?
2 A   I know right now they're on me to get it paid for and
3 get it moving, but I haven't done that yet because we
4 haven't got the plan confirmed. But I think it's a year
5 from when it was started or when it went through council and
6 approved. So I would have to think like June maybe. May,
7 June of 2026. They gave me a year.
8 Q   So wasn't the meeting with the Watertown Board, wasn't
9 that back in like March or February?
10 A   That was -- it was approved by council. It could have
11 been that early, yes.
12 Q   So how many times have you had to renew the permit on
13 this project?
14 A   Just once. This is the first one.
15 Q   And there's a cost to renew?
16 A   What they decided to do, because the original building
17 permit was paid for. And it was like $25,000. The council
18 decided to cut it in half. It's like twelve-thousand-five-
19 hundred-and-some dollars. And it's going to be put into
20 escrow. And then when it's finished and the CO is
21 delivered, then I get that money back.
22 Q   That was the last time, right?
23 A   That was the only extension that we've had.
24 Q   Right. But there's no guarantee they're going to do
25 that again, right?

Page 105

1 A   No guarantee. But if we had a confirmed plan and I was
2 able to walk into council with my contractors and I was able
3 -- you know, I made the commitment and paid for the deposit
4 for, you know, the building permit, they want to see it
5 done. It's in the middle of downtown and --
6 Q   Okay. So there has been -- since the last time you
7 made the -- got the permit, there's been no significant work
8 done on the property since then, has there?
9 A   When I got the building permit or when we --
10 Q   The second -- the renewed one.
11 A   No. No. The city did the sidewalk in front and the
12 driveway, but they put that on a special assessment. But
13 that was the only thing that was done.
14 Q   Yeah. There was a problem with the sidewalk that it
15 wasn't being upkept, right?
16 A   There was no sidewalk. It was literally tore out. And
17 so they wanted to have that done. So they went ahead and
18 did the work themselves. And then it's --
19 Q   And assessed The Ruins?
20 A   Yeah.
21 Q   Okay. Did you previously -- has the cost to finish up
22 The Ruins -- did you previously tell Mr. Aarestad that it
23 was going to be like $700,000, this was a couple years ago?
24 A   That's had the -- or all the draws been funded. So
25 draw 14 wasn't ever funded. So had those things been

27 (Pages 102 - 105)

Page 106

1 funded, we would have been in good shape.

2 Q   So there was a lot of talk about the term sheet. And

3 that's what the whole adversary proceeding is about, is a

4 commitment made on the term sheet.

5 A   Yeah.

6 Q   Right? Didn't the term sheet indicate that Red River

7 would balloon up to $7 million?

8 A   I think it was around that. And then there was another

9 part of it where it was confusing where they would lend up

10 to 90 percent of the appraised value or something like that.

11 And that was simply because of the Ready program.

12 Q   Which the Ready program never developed, right?

13 A   Ready program was there. We just decided -- Charles

14 and I decided not to take advantage of it.

15 Q   So that was a joint decision by you and Charles?

16 A   Correct.

17 Q   And I think you previously had testified that when it

18 didn't go through, the Ready program, the term sheet wasn't

19 going to work. Right?

20 A   I think it didn't weigh in my favor with the interest

21 rate, but it definitely didn't weigh in favor of Red River

22 State Bank because they were going to take on, you know,

23 instead of 45 percent of the debt, they were going to take

24 on potentially 90 percent of the debt.

25 Q   So hasn't Red River actually loaned $11 million on this

Page 107

1 project?

2 A   They've loaned the $10,490,000.

3 Q   Which is far in excess of $7 million, isn't it?

4 A   Yes.

5 Q   And there was talk about Mr. Aarestad doing his -- you

6 know, taking out money personally to help finish up The

7 Ruins. Is that correct?

8 A   In their eyes, yes.

9 Q   Well, why didn't -- I mean, why would he take out money

10 personally? To give it to you or...

11 A   He gave it to me, but it was at eight-and-a-quarter

12 percent or $25,000 a month payments. I mean, they had a

13 spread that they made on that. So it wasn't where it was

14 4.25 or 4.35 percent. It was eight-and-a-quarter percent

15 with a two-year (indiscernible) on $600,000.

16 Q   But the point was to help you finish up The Ruins,

17 right?

18      MR. VERSTANDIG: Objection.

19      THE WITNESS: It should have been --

20      THE COURT: Hold it. Hold it.

21      MR. VERSTANDIG: Woah, woah.

22      THE COURT: You've got to stop when there's an

23 objection.

24      MR. VERSTANDIG: Because you're paying me a lot to

25 sit here and object. One, I'd appreciate it if he could

Page 108

1 finish his answers before the next question. And two, this

2 calls for a lot of speculation as to what Mr. Aarestad and

3 family members' intent was in making the loan.

4      MS. STANLEY: Your Honor, isn't this why he was

5 soliciting testimony about the family members earlier?

6      THE COURT: So the relevance is not at issue, it's

7 the way the question was framed. And I frankly cannot

8 remember exactly how the question was framed, so I'm going

9 to invite you to ask a new question and the I will be more

10 careful about listening for the objection that counsel had

11 asserted.

12 BY MS. STANLEY:

13 Q   So the money provided from Mr. -- as you testified from

14 Mr. Aarestad personally, that was provided to continue

15 construction on The Ruins, correct?

16 A   It funded two draws, 10 and 10A, I believe.

17 Q   Okay.

18 A   They totaled $400,000.

19 Q   We also talked about what you referred to as the third

20 Ruins notes, correct?

21 A   Yes.

22 Q   And that was the $600,000 note?

23 A   That was the one with the family members.

24 Q   Okay.

25      MS. STANLEY: Can we please pull up ECF 86? Which

Page 109

1 I believe is the Charles Aarestad affidavit regarding the

2 third Ruins note. And go to -- please scroll down until we

3 find the actual attached exhibits. Keep going to the -- I

4 think it's Exhibit B to this. No, promissory note, there we

5 go. Perfect. Thank you. It's Exhibit A to this.

6 BY MS. STANLEY:

7 Q   This is the third Ruins note, correct?

8 A   There is another one with family members involved. So

9 this would have been after they assigned the debt to Red

10 River State Bank.

11 Q   That's your recollection?

12 A   Correct.

13 Q   We don't have any documents in front of us about that

14 though, right?

15 A   If it's in our discovery. But no, I didn't bring

16 anything.

17 Q   Okay. And I think you testified earlier that you

18 personally repaid on this $25,000, is that right?

19 A   Yes.

20 Q   Okay. One other question. How did Craig Development

21 get its money? Was it the source of funds that came to

22 Craig Development only like loan funding?

23 A   It would have been off the draw requests. The first

24 ones through the TIF. So TIF-eligible costs are general

25 contracting fees and then developer fees. Those have been

28 (Pages 106 - 109)

Page 110

1 the amount that Craig Development -- so on Lofts through The
2 Ruins, I made like $2.6 million in fees.
3 Q In fees that came out of draw requests?
4 A And that would have been just for Craig Development.
5 MS. STANLEY: Okay. Can we scroll up to where
6 that chart was? Yeah. Keep going. There.
7 BY MS. STANLEY:
8 Q This is already into evidence, but it indicates that
9 the payments made on the third Ruins note came from Craig
10 Development. Is that correct?
11 A I am Craig Development, yes.
12 Q So when you said you paid these personally, you didn't
13 mean just Craig, you meant Craig Development paid it, is
14 that right?
15 A It's -- yeah, that's kind of convoluted, but I never
16 once took any of my fees to pull them out --
17 Q My question was --
18 THE COURT: Woah, woah, woah. We cannot --
19 MS. STANLEY: Sorry.
20 THE COURT: We cannot talk over each other. Yeah.
21 Okay.
22 THE WITNESS: Yeah. I never took any of my fees
23 and pulled them out and set them in a personal account and
24 used them from there. We left it in this. Because you're
25 always going to have issues with construction projects.

Page 111

1 BY MS. STANLEY:
2 Q So the only money -- I think you earlier testified the
3 only money that really came into the Craig Development
4 account was from draw requests, right?
5 A You're talking just on these projects or other stuff I
6 had going on?
7 Q Right, right. At this time frame, this was the only
8 project you were working on, right?
9 A No. We had started the Plains project down in
10 Watertown, South Dakota. And I was working on 10Bedrock out
11 in Box Elder.
12 Q What time was that?
13 A I'd have to look, but it was in this timeframe.
14 Q In 2023?
15 A The Plains for sure was. 10Bedrock I wasn't as
16 involved.
17 Q So --
18 A And I got a developer fee for doing those. Sorry.
19 Q But the money that paid these $25,000 payments came
20 from Craig Development's bank account, correct? Yes or no?
21 A Yes.
22 Q Thank you. Mr. VerStandig asked you about some
23 invoices that were altered for KLJ earlier, did he not?
24 A Yes.
25 Q KLJ didn't do any work on The Ruins project, did it?

Page 112

1 A No. They did work on the lake home.
2 Q Okay. So any invoice in -- that was paid through The
3 Ruins draws was for your lake home, is that correct?
4 A For the --
5 MR. VERSTANDIG: Hold on. Object to the form.
6 But just because it's going to look terrible in a
7 transcript, you mean any invoice to KLJ, not any invoice
8 period.
9 BY MS. STANLEY:
10 Q Any invoice from KLJ to -- that was paid through the
11 draw requests was for your lake home, correct?
12 A I believe so, yes.
13 Q Okay.
14 MS. STANLEY: Can we go to the 137? And I'm also
15 hoping we can pull up the double thing. Yeah. Side by
16 side. The 137 without the double stamping at the top. And
17 then, yeah, the other screen, let's pull up 89.
18 So 137 on -- oh, that is 137, isn't it? Sorry. I
19 just saw declaration. Can we go to where the chart begins,
20 Exhibit A?
21 BY MS. STANLEY:
22 Q And your attorney was asking you about this Clausen
23 entry earlier, correct?
24 A Yes.
25 Q And if I understood your testimony, it was that -- were

Page 113

1 you saying that -- or I mean why was this one -- I still
2 don't understand why this one was increased from 156 to 716.
3 A Through the TIF we tried to get the money out of their
4 fairly quickly. And we knew this one was going to be way
5 over the price that they had originally thought. It was a
6 substantial undertaking for the demo and the hauling and
7 keeping it watered down in downtown and --
8 Q Isn't it right that you kind of --
9 THE COURT: You really can't interrupt.
10 MS. STANLEY: Sorry.
11 THE COURT: Yeah. So I'm going to allow him to
12 finish and then you can ask a new question.
13 THE WITNESS: Sorry.
14 THE COURT: We'll just try it again.
15 THE WITNESS: Thank you.
16 MS. STANLEY: All right.
17 THE COURT: Try again.
18 BY MS. STANLEY:
19 Q So the $760,000, was that your estimate of what it
20 would take?
21 A When we sat beside Dave CClausen's truck at the site
22 with Ron and Dave, Jesse Keihl and myself and we went
23 through the number of trucks and all of that, yeah, we -- I
24 think we shot a little high, but it was really close to
25 that.

29 (Pages 110 - 113)

Page 114

1  Q    Let's take a look through if we can on the other one,
2  Clausen's declaration, and scroll down to Exhibit A for
3  that, please.
4         MS. STANLEY:  And Mr. VerStandig, if I could --
5  you or Ms. Cathcart, I'm going to go through some numbers.
6  So if you wouldn't mind double-checking my numbers as we go,
7  I would appreciate it.
8         Keep going please, to the first invoice.
9  BY MS. STANLEY:
10 Q    This is invoice 589 I believe.  And that's the one that
11 we've been -- that was in the draw request number one,
12 correct?
13 A    Yes.
14 Q    Okay.  And if we scroll down to the second page of
15 this, the amount of this invoice, would you agree, is
16 $156,964.87?
17 A    Yes.
18 Q    Okay.  So if we can add that one.  Then if we scroll
19 down to the next one.  That was 707.  And then the amount of
20 this invoice, can we agree that it was -- there's a glare
21 here -- $68,945.09, is that right?
22 A    Yes.
23 Q    Okay.  And then if we scroll down to the next one,
24 Invoice 714.  Can we please see how much that one is?
25 $80,134.41.  Is that correct?

Page 115

1  A    Yes.
2  Q    Okay.  And then the next one, Invoice 725, please.  It
3  looks like this one, $112,069.08.  Is that correct?
4  A    Yes.
5  Q    Okay.  And then the next one, 728.  $191,713.94.  Is
6  that correct?
7  A    Yes.
8  Q    And 744, $13,701.56.  Is that correct?
9  A    Yes.
10 Q    And then the last one, Invoice 824, $33,400.61.  Is
11 that correct?
12 A    Yeah.
13 Q    And my -- our calculation for those invoices came to
14 $656,929.56.  Does that sound right?
15 A    I would agree with you, yeah.
16     MS. STANLEY:  Mr. VerStandig, do you agree with
17 that number?
18     MR. VERSTANDIG:  Not objecting.
19     MS. STANLEY:  Not objecting?  Okay.  Everybody can
20 do their own math.
21     So if we can go back now to 114, that Exhibit 25
22 that we put into evidence earlier.  I think it's the next
23 one.  Because it had yellow on it.  Yeah, that one.
24 BY MS. STANLEY:
25 Q    Do you see a line -- and you are familiar with this

Page 116

1  document, correct?
2  A    Yes.
3  Q    And this is -- if we scroll down to the bottom, that's
4  your signature, correct?
5  A    Yes.
6  Q    And does that language in there that's above your
7  signature indicate that this you're certifying these amounts
8  are true and correct?
9  A    As of that date, yes.
10 Q    Okay.  If we go back up towards the top, is there an
11 amount for Clausen that's like the third line down?
12 A    The foundation removal?
13 Q    Yes.
14 A    I would believe it says Clausen there, yes.
15 Q    Okay.  And what's the amount for the foundation
16 removal?
17 A    $193,400.
18 Q    And what is the line for -- if you go down to
19 Excavation.
20 A    $754.396.51.
21 Q    Okay.  So on this document as of this day, are you
22 certifying that you paid Clausen $947,795?
23 A    No.
24 Q    Why not?
25 A    Because this document was kind of put forth -- I think

Page 117

1  -- it looks like in 2020.  And The Ruins was being built
2  well after that.  So a lot of times you approximate.  And
3  what we were having a really hard time with during these
4  projects was the pandemic.  We had availability for
5  materials, costs.  People are out sick for 14 days at a
6  time.  There's no way that you can lock those in with bids
7  that early.
8  Q    Wasn't February before the pandemic?  I think that's a
9  general knowledge.
10     MR. VERSTANDIG:  Object to form.  I'm trying to
11 figure out how to verbalize this one.  Because where?  I
12 think there was a bat in Asia in like November.  And then by
13 February of 2020 we were kind of sort of there.
14     THE COURT:  So you're not objecting to the form of
15 the question, you're objecting to the answer to the
16 question.
17     MR. VERSTANDIG:  No, I -- I'm not sure he's
18 qualified -- objection -- sorry.  I'm not used to
19 (indiscernible) like this.
20     THE COURT:  Let him finish the objection and then
21 you can come back.
22     MR. VERSTANDIG:  Foundation.
23     THE COURT:  Okay.
24     MR. VERSTANDIG:  What is the basis of your
25 knowledge as to when a pandemic began.  And that will --

30 (Pages 114 - 117)

Page 118

1  yeah, that is my issue.

2      THE COURT:  Okay.  So there isn't yet enough

3  foundation for him to answer the question.  So you can ask

4  another question to build the foundation.

5      MR. VERSTANDIG:  Thank you, Your Honor.

6  BY MS. STANLEY:

7  Q   How did the pandemic affect your business as of

8  February 4th, 2020?

9  A   I honestly couldn't identify that specific date.  I can

10  tell you how it affected the projects in general if you

11  wish.

12  Q   Do you recall when North Dakota essentially shut down

13  and made people stay home?

14  A   No, I don't.

15  Q   Don't recall that?  Wasn't the cost to build The Ruins

16  supposed to be $10 million based on that construction loan

17  agreement?

18  A   Yes.

19  Q   Wasn't this document provided to Red River State Bank

20  as part of a request of what it would take to finish the

21  building?

22  A   Yes.  For them, and it's also for the appraiser.  But

23  when you're building something over 12 months, things

24  change.  We had contractors backing out of bids, contracts,

25  because they couldn't honor the price of lumber.  Like I

Page 119

1  said, the delays were the biggest cost.  And the bank

2  benefitted from that with the accrued interest.  But when

3  you have a crew or drywallers that gets sick for -- and

4  remember at that time it was 14 days they had to be out.

5  Q   I just want to go back to -- the bank benefitted -- you

6  said the bank benefitted from that by the accrual of

7  interest.

8  A   Correct.

9  Q   Have you ever paid -- has The Ruins ever paid anything

10  on these loans?

11  A   Yeah.  The Ruins would have had -- there would have

12  been draw requests for every draw from Red River State Bank

13  if they wished to be paid for the interest on the loan.  On

14  Generations, which is -- I've never seen it done, they set

15  interest aside.

16  Q   I was talking about The Ruins.  Thank you.

17      MS. STANLEY:  Your Honor, are we permitted to take

18  judicial notice of the executive order in North Dakota that

19  sort of shut down the government?  Or not necessarily the

20  government, but required people to stay home?

21      MR. VERSTANDIG:  Your Honor, we would counter that

22  it's not on the exhibit list, doesn't appear to be for

23  rebuttal impeachment purposes.  And more importantly, I'm

24  pretty sure this project was in South Dakota.

25      THE COURT:  Oh.

Page 120

1      MS. STANLEY:  We can take judicial notice of the

2  South Dakota mandate.

3      MR. VERSTANDIG:  I think that one, it's still not

4  on the exhibit list.  Two, not clearly rebuttal or

5  impeachment.  Three, without testifying, a global pandemic

6  implies global implications.  Butterfly theory gone wild.

7  And the idea that you could ascertain the start date of the

8  implication of a pandemic by looking at one state's shutdown

9  notice versus what we all very well remember to be shipping

10  issues coming from Asia and the spread of fear that preceded

11  the spread of actual contagion seems like an overt

12  simplification of something that was and is enormously

13  complex.

14      THE COURT:  So that would go to the weight of the

15  evidence.  Are you now offering the South Dakota executive

16  order?  And if so, for what purpose?

17      MR. VERSTANDIG:  Impeachment of the timeframe of

18  this document.  And the pandemic shutdown hadn't happened

19  until after what he says this document was dated.

20      THE COURT:  I will allow it.

21      MS. STANLEY:  South Dakota Executive Order 2020-

22  08.  And I believe it indicated -- I don't have the

23  document.  2020-04 is the first one.

24      THE COURT:  Do you have a document that I can look

25  at?  Is that what you're suggesting?  Okay.  And then as

Page 121

1  soon as I receive it, I can take judicial notice of when

2  South Dakota entered an executive order related to the

3  pandemic.

4      Is there any way we could just move on and as soon

5  as we receive it, I can acknowledge it?  Maybe at the next -

6  - before we take our next break?

7      MR. VERSTANDIG:  Whatever counsel represents as

8  the date of the South Dakota shutdown order, we'll stipulate

9  to that.

10      THE COURT:  Okay.

11      MR. VERSTANDIG:  I don't know if we're going to

12  the contents thereof, in which case I'd have to actually

13  look at it.  but if we're just worried about a date...

14      THE COURT:  Okay.  That could move things a long a

15  little bit.

16      So what are you -- oh, we got it.

17      MS. STANLEY:  I believe we're asking the Court to

18  take judicial notice of the time of the first South Dakota

19  COVID shutdown.  And this is dated I believe March 13th,

20  2020.

21      THE COURT:  Are you printing it for me?  Oh, I can

22  see it.  Never mind.  Move it up so I can see...

23      MS. STANLEY:  The first recognition of COVID.

24      THE COURT:  Okay.  So the date on which the

25  governor of South Dakota declared a state of emergency

31 (Pages 118 - 121)

Page 122

1 exists within the state of North Dakota due to COVID-19 was
2 -- and then you can tell me the date on the bottom. The
3 13th day of March, 2020. That's what I will take judicial
4 notice of.
5      MS. STANLEY: Your Honor, you said North Dakota.
6      THE COURT: South Dakota. Thank you. The
7 governor of South Dakota. So sorry. Thank you for
8 noticing.
9      MR. VERSTANDIG: Your Honor, if the Court has the
10 order, we would be find admitting it as judicial notice
11 since the first sentence acknowledges that it started in
12 late 2019.
13      THE COURT: So you would like me to receive this
14 as an exhibit and take judicial notice of --
15      MR. VERSTANDIG: If they're offering it, we're
16 happy to. Yes.
17      THE COURT: Okay. I will receive the State of
18 South Dakota Office of the Governor Executive Order 2020-4.
19      MS. STANLEY: If we can still be on this one with
20 the yellow highlight, if we can scroll down towards the
21 bottom.
22 BY MS. STANLEY:
23 Q  And yeah, I think yesterday we had looked at the Stroh
24 amount that was on there, $509,775.
25 A  Yes.

Page 123

1 Q  That also included that invoice for $95,000, correct?
2 A  Correct.
3 Q  And I believe you had indicated that you personally
4 made that revision to that invoice, correct?
5 A  Yes. I had talked to Charles about it because Terry
6 had done -- Terry Stroh had done a bunch of work for us
7 because we were trying to get the City of Watertown to buy
8 The Ruins project. And so Charles and I both had
9 involvement in talking to Terry Stroh. And he did a lot of
10 work on that. It didn't come together in the end, but I
11 felt he was owed additional monies for all the work that he
12 did.
13 Q  You never paid Terry Stroh the $95,000 thought, did
14 you?
15 A  That draw for his $95,000 didn't happen for over 40
16 days. And by that time I had other contractors that were
17 owed money. So no, he has not been paid. And he and I know
18 that.
19 Q  You kept that $95,000 or Craig Development did.
20 A  No, I put it back into the project and paid bills.
21 Q  And -- I'm trying to find that invoice.
22      MS. STANLEY: The Court's indulgence for a minute?
23      THE COURT: Oh sure, yeah. I didn't say anything.
24 I didn't mean to.
25      MS. STANLEY: I thought I heard a bad word. So I

Page 124

1 was like, wow. I'm sorry I'm taking so long.
2      THE COURT: No, no.
3      MS. STANLEY: Yeah. Let's pull up Docket 102,
4 please. We're going to have to go back to this one again.
5 BY MS. STANLEY:
6 Q  Or before we leave, this amount here, $509,775, does
7 include that extra $95,000, does it not?
8 A  Yes.
9 Q  Okay. And then let's go to Docket 102. Page 231 of
10 290. This is the $95,000 we were just referring to,
11 correct?
12 A  Yes.
13 Q  And what is the date of that invoice?
14 A  June 15th, 2022.
15 Q  So it includes the amount that you decided in June 15,
16 2022 that Exhibit 25 already includes that amount?
17 A  Correct.
18 Q  So is it your testimony that document, which you seem
19 to indicate was in 2020, included an amount you decided to
20 add in 2022?
21 A  The dates could be wrong. I mean, on that construction
22 statement, I can't recall if that was the correct date or
23 not on it.
24 Q  So it's possible that it was much later than February
25 2020?

Page 125

1 A  As they're updated, yeah, absolutely. That would have
2 been an error on my part.
3 Q  So is it also possible that the amount that we -- we
4 started this with looking at the amount that you had in
5 there for Clausen, which was over $900,000. Is it possible
6 that that was in there back in 2022 when the Stroh amount
7 got added?
8 A  Yes.
9 Q  And Clausen was never paid for The Ruins project,
10 $900,000, was it?
11 A  That I don't know. I know they are still owed $33,400
12 because I've talked to Ron many times.
13 Q  But as we went through the invoices for The Ruins, the
14 amount was $656,929.56, is that correct?
15 A  Yes.
16 Q  I also want to --
17      THE COURT: You're losing me here. I've got --
18 what?
19      MS. STANLEY: Oh. The amount actually invoiced by
20 Clausen for The Ruins was $656,929.56. The amount on
21 Exhibit 25, which indicates how much Clausen was paid,
22 was...
23      THE COURT: Nine hundred and...
24      MS. STANLEY: $947,795.
25      THE COURT: Okay.

32 (Pages 122 - 125)

Page 126

1    MR. VERSTANDIG:  Just to be clear, the testimony
2  was not that that indicates how much he was paid.  The
3  testimony as I understand it was that there was a
4  protectionary element to that.  But the record speaks for
5  itself, whatever it is or isn't.
6    THE COURT:  Right.  Because this is dated 2020.
7  So I get it.
8  BY MS. STANLEY:
9  Q   Was this, the one with the yellow highlights, Exhibit
10  25 that we've been referring to, do you recall if that one
11  was provided to the appraiser for The Ruins?
12  A   I believe so.  It had been provided -- well, it would
13  have been provided straight from me and then he would have
14  worked off construction documents for his initial
15  appraisals.
16  Q   So if amounts -- part of an appraisal includes the cost
17  to build, right?
18  A   That's one part.
19  Q   That's one part.  So if the cost to build something is
20  higher, does that mean generally that the value of the
21  building is higher?
22  A   No, not really.  I mean, during the pandemic, that's
23  one of the struggles that everybody was having, bankers and
24  appraisers alike, is what cap rate do you use.  You know,
25  they had to take into account the price of lumber going up

Page 127

1  40 percent, delays.  Yeah, I wouldn't have wanted to have
2  been an appraiser during that time, or a banker honestly.
3  Q   Do you recall if Clausen Construction is identified in
4  the schedules as being owed any money?
5  A   I don't believe they are.  It's not showing up.
6  Q   Didn't you just testify that Clausen was owed $30,000?
7  A   $33,400.
8  Q   For The Ruins project?
9  A   Correct.
10  Q   Why is that not listed as a debt on the schedules?
11  A   Just oversight.  People like that that are friends of
12  mine, to be honest with you --
13  Q   There's no question.
14  A   Oh.
15    MR. VERSTANDIG:  Hold on.  I think he was
16  continuing to answer the question that had been asked.
17    THE COURT:  This time I'm going to disagree and
18  sustain the objection.
19  BY MS. STANLEY:
20  Q   Did you also earlier testify that you have an agreement
21  to pay Mr. Clausen?
22  A   I don't have an agreement, no.  I have the invoice that
23  he's owed.  And he had called me probably -- I mean, so his
24  brother Dave died.  He was -- which was a shock and
25  everything like that.  So I stayed in touch with a lot of my

Page 128

1  contractors.  That's where we talked about the LOIs and
2  things.  He had called me here or texted me probably three
3  months ago.  He's coming up for a concert and wanted to know
4  where he could stay because all the rooms were booked.
5  Great guy.  Whenever I go down to Watertown, I try to see
6  him and things like that.  And I had brought it up in going
7  through all this, these invoices and stuff like that, I
8  found that.  And he wasn't worried about it.  But I will
9  make him whole, just like I will make Terry Stroh whole.
10  Even if it's out of my own pocket, I will.
11  Q   Is that because they are friends of yours?
12  A   No, because they did the work.  Just like my
13  contractors on this.  I mean, they have to get paid.  These
14  guys did the work.  They busted their tails.  They're young
15  companies, a lot of them.  I just -- and they will get paid
16  one way or another.
17  Q   So if you believe they should get paid, why did you
18  divert money for your lake home?
19  A   Because I had debt on my lake home from Charles and
20  Randy.
21  Q   Can we agree that a lot of the D&M invoices you
22  redacted where it said Lake Home on those invoices when they
23  were submitted in the draw requests?
24  A   It looked like some were and some weren't.  I don't
25  know why that would have been.  I mean, I wasn't trying to

Page 129

1  hide anything.
2  Q   But you redacted some information, is that right?
3  A   I would have to look at the invoices.  I would say that
4  some were altered, yes.
5  Q   Okay.  Let's do that.  Can we pull up -- if we're still
6  in 137.  Without the second set of numbering.  And then also
7  pull up -- what's the D&M one?  Yeah, the D&M one.  Which
8  number was that?
9    MR. VERSTANDIG:  Your Honor, if the purpose is to
10  show what was or wasn't redacted, the documents speak for
11  themselves, right?  Both are in evidence.  There's been no
12  objection to them.  They can be plainly juxtaposed.  Having
13  the witness do it doesn't appear to add anything of
14  evidentiary value.
15    THE COURT:  Response?
16    MS. STANLEY:  He seems to be indicating that he
17  may have redacted some, may have not redacted some.  So I
18  would like to actually look through some of these documents
19  to refresh his recollection.
20    THE COURT:  I'm going to allow it.
21    MS. STANLEY:  Which one is the D&M one?  87 is the
22  other one to please pull up.
23    Okay.  Let's please look at -- let's do 10D
24  (indiscernible).
25    THE COURT:  Was that a direction?

Page 130

1      MS. STANLEY: No, that's me. Sorry. Okay. Page
2  230 of 290, please.
3      THE COURT: Neither of them have 290 pages.
4      MS. STANLEY: I'm sorry. Let's look at ECF --
5  instead of -- let me pull up 137, please.
6      THE COURT: I don't want to spend a whole lot of
7  time doing this.
8      MS. STANLEY: I know. I'm sorry.
9      THE COURT: So...
10     MS. STANLEY: I'm trying to go to Exhibit 11C.
11 137.
12     MR. VERSTANDIG: Just for clarity, the answer
13 that's being refreshed or impeached is that some were and
14 some weren't?
15     MS. STANLEY: Right. And 154 of 209.
16     THE COURT: Ms. Stanley, why don't you ask the
17 question were some -- ask the question again. Just do I
18 know for sure that this process needs to happen. The some
19 were and some weren't question.
20     MS. STANLEY: Right.
21 BY MS. STANLEY:
22 Q   Were some of the -- let's take D&M for example. Some
23 of those invoices were four your lake home, were they not?
24 A   For the lake home, all the projects in Watertown and
25 the office addition.

Page 131

1  Q   Okay. And there were certain of these invoices that
2  had information that refeed to the job address and a ship-
3  to address. Does that sound familiar?
4  A   Yes.
5  Q   And in the ones that were submitted to Red River on the
6  draw requests, it had that information as redated, correct?
7  A   If it was for the wrong project, yes.
8  Q   What do you mean, the wrong project?
9  A   If they would have put an invoice in for baseboard
10 trim, four-and-a-half inches, maple, and they mistakenly put
11 it was for the lake home, I would have redacted that.
12 Sometimes I would put in Jesse's Lake Home or the Lake Home.
13 Sometimes I left it empty.
14 Q   So are you testifying that you think that they got it
15 wrong?
16 A   Yeah. It's human error.
17 Q   Every time?
18 A   What do you mean, every time? No.
19 Q   I think there's like five of them.
20 A   There's probably five requests just for The Ruins, let
21 alone the lake home and the office addition. There's way
22 more than five if you count all of those projects. Not even
23 including Parkside and Generations.
24 Q   So you redacted them because you knew that it wasn't
25 supposed to be on The Ruins draws, correct?

Page 132

1  A   No.
2  Q   When it says lake home?
3  A   No. It could have been on The Ruins draw. That's not
4  a problem at all. That's why you were asking why we were
5  running, you know, costs through The Ruins for these other
6  projects. It's because the lake home is sitting with a
7  million dollars of Ruins debt on it.
8  Q   Didn't you previously testify though that you did run
9  some lake home ones through on The Ruins requests?
10 A   Yeah.
11 Q   And on those ones did you redact that information?
12 A   Not if it was correct.
13 Q   Not if it was correct?
14 A   Yeah. The lake home one is easy because it's stone and
15 --
16 Q   I'm sorry, I didn't hear that.
17 A   I said the lake home one is really easy because it had
18 12-inch walnut baseboard and eight-and-a-half foot doors and
19 things of that nature. It was definitely higher end than
20 the office addition or the apartments.
21 Q   So if we go to page -- let's take a look at one of
22 these. Page 160 of 209. This talks about a master bedroom
23 and a great room. Was this one that was for your lake home?
24 A   Yes.
25     And so this one shouldn't have been on The Ruins,

Page 133

1  correct?
2  A   No, it should have been.
3  Q   Why should it have been on The Ruins if it was for your
4  lake home?
5  A   Because there was a million dollars' worth of Ruins
6  debt on my lake home. I don't know what Charles' plan was
7  long-term to try to get those corrected. But there should
8  have never been Ruins debt on my lake home, ever.
9  Q   Okay. Let's take a look at the next one. Next page
10 down. This one actually indicates job address, 22587
11 Knollwood Lane, Pelican Rapids, correct?
12 A   Yeah.
13 Q   And it says Craig Lake Home, correct?
14 A   Yes.
15 Q   And this is one that -- you redacted this one, did you
16 not?
17 A   It doesn't look like it.
18 Q   Okay. Well, let's go back up to the one before it. It
19 doesn't have that job address, does it?
20 A   This one doesn't? No.
21 Q   And it doesn't have that ship-to address which says
22 Craig Lake Home, does it?
23 A   So this was dated 5/18 of '22. What's the one below it
24 dated? That's the same invoice. So I don't know why they
25 would -- and there would be no reason for me to redact

34 (Pages 130 - 133)

Page 134

1 anything on it. I knowingly put this through on The Ruins.

2 Charles knew about it. He would have reviewed this and

3 approved it and funded it.

4 Q    So you don't -- I mean, can you agree that it looks

5 like it was redacted on the draw request, which was the

6 first one we looked at?

7 A    No. I'm sorry, I can't.

8 Q    You don't agree that this one looks like the ship-to

9 address was redacted and the job address was redacted? It's

10 not there, is it?

11 A    You're asking that I did it or you're saying D&M didn't

12 put it in?

13 Q    I'm saying this is the one that went through on the

14 draw request that was sent to Red River.

15 A    Okay.

16 Q    And it doesn't have a ship-to address on it or a job

17 address, does it?

18 A    No, it's page 5 of 5.

19 Q    Okay. And then if we go to the next one, which this is

20 Docket Number 87. That is the D&M original documents. This

21 one does have a job address on it, does it not?

22 A    You're correct on that, but I don't know why that would

23 have been removed but the ship-to address -- I don't know.

24 Q    But it certainly looks like it was, doesn't it?

25 A    It looks like it was changed, yes.

Page 135

1 Q    And you were the only one that provided the draw

2 requests to Red River, correct?

3 A    Correct.

4 Q    So you were the only one who could have done that,

5 correct?

6 A    Yeah, correct. There would have been no reason for me

7 to do it.

8 Q    Well, isn't it true that if you knew you weren't

9 supposed to put the lake home onto The Ruins, that would be

10 a reason to redact it?

11 A    I didn't know that. All I know is there was a million

12 dollars put on my lake home by Charles and Randy to help

13 their funding, or circumvent, or get around their lending

14 limit. So now I've got a million dollars of debt on my lake

15 home. So in my eyes, The Ruins owes me a million dollars.

16 Q    So when you say a lien, you're talking about a

17 mortgage, right? A mortgage on your lake home?

18 A    Yes.

19 Q    Okay. And you agreed to that, did you not? Executed

20 the mortgage to permit it to be on your lake home?

21 A    Just like we talked about before, everyone was doing

22 what they could to get it figured out, yes.

23 Q    Mr. Craig, you've taken out -- would it be a fair

24 statement to say that you've dealt with a lot of banks over

25 the years?

Page 136

1 A    Yes.

2 Q    And when you take out a large loan in the millions of

3 dollars, is it customary for a bank to ask you for a

4 personal financial statement?

5 A    Yes.

6 Q    so you've given out a personal financial statement on

7 numerous occasions?

8 A    Yes.

9 Q    Okay. And we talked about those two emails in July of

10 2022 and then August of 2023 earlier, correct?

11 A    I don't recall those, sorry.

12 Q    Your attorney asked you about those emails that had the

13 wrong information on the bank statements?

14 A    Oh sure, yes. Yes.

15 Q    Had you not provided personal financial statements

16 previously to Red River Bank prior to July of '22?

17 A    Yeah, just not liquidity.

18 Q    So you don't believe that you provided copies of

19 screenshots of your bank statements?

20 A    I don't recall that, no.

21 Q    You don't recall doing that? Is it customary when you

22 signed loan documents that there's affirmative covenants

23 saying you're going to continue to provide financial

24 information?

25 A    Yes.

Page 137

1        THE COURT: Wait.

2        THE WITNESS: Sorry. My bad.

3        MR. VERSTANDIG: Too late.

4        THE COURT: It's helpful to give it a pause.

5        THE WITNESS: Thank you.

6 BY MS. STANLEY:

7 Q    I think we looked at -- your attorney earlier -- if we

8 can go back to the chart on 137. I think it's like page 10

9 or something. Yes. Please go up to 5C. Yeah.

10    Your attorney asked you about this one earlier, D&M

11 Industries September -- sorry.

12    The invoice -- I don't know if you actually want me to

13 go to the invoice. But the invoice referenced for 5C, the

14 invoice is dated January 18th of '22. And we have -- were

15 you receiving Ruins draws still at that time, January of

16 '22?

17 A    I would think so, but I don't know for certain.

18 Q    Okay. Did you not earlier testify that the reason you

19 put the Generations ones on was because there wasn't funding

20 on Generations?

21 A    All I know is -- I don't know the dates. I just know

22 that we had two months. Once we had a certificate of

23 occupancy, we had two months before it went to P&I.

24 Q    What do you mean by P&I?

25 A    The principal and interest payments. So that means the

35 (Pages 134 - 137)

Page 138

1 construction loan would have been closed down. It would
2 have been permanent financing and it would have went to
3 principal and interest payments rather than an interest-only
4 stabilization period like they had on their term sheet.
5 Q  Okay. So would it surprise you to know that the last
6 funding draw before it went to P&I, which is when the eighth
7 Ruins not was created, right? Is that about right?
8 A  That I couldn't tell you. You're saying --
9 Q  I'm getting it mixed up. On Generations.
10 A  Sorry, yeah, I was wondering.
11 Q  Sorry. That was my mistake.
12     THE COURT: Ms. .Stanley, how much longer do you
13 think you might be questioning?
14     MS. STANLEY: We can break for lunch. It might be
15 another half hour or hour.
16     THE COURT: Concern about that, Mr. VerStandig?
17     MR. VERSTANDIG: I mean, I'm concerned that
18 there's another half hour of it, but I'll take that as it
19 comes.
20     THE COURT: What time is your plane?
21     MR. VERSTANDIG: What?
22     THE COURT: What time is your plane?
23     MR. VERSTANDIG: I have a flight tomorrow, too.
24     THE COURT: Oh, tomorrow.
25     MR. VERSTANDIG: I got greedy and booked a 3:30

Page 139

1 flight today hoping, but it's not going to happen, and I
2 know that. I have a flight tomorrow. I'm fine.
3     THE COURT: Okay. So there's another concern.
4 Tell me what that might be.
5     MR. VERSTANDIG: Scope objections will be
6 forthcoming at some point. But we'll take that as they
7 come. That's it.
8     THE COURT: Okay.
9     MR. VERSTANDIG: Yeah.
10     THE COURT: So do you have any concern about
11 breaking right now for lunch?
12     MR. VERSTANDIG: Your Honor, I'm a red-blooded
13 American. I believe in eating lunch.
14     THE COURT: Okay, all right. So what about 45
15 minutes? Is that something we can do?
16     MS. STANLEY: Yes.
17     THE COURT: So 1:30? Is that too fast or do you
18 need extra time? It's up to you.
19     MS. STANLEY: How about an hour?
20     THE COURT: Okay. All right. So we will break
21 until 1:45.
22     MR. VERSTANDIG: Thank you, Your Honor.
23     CLERK: Please rise.
24     (Recess)
25     CLERK: All rise. Please be seated.

Page 140

1     THE COURT: Back on the record with Bankruptcy
2 with Case Number 25-3004, In re The Ruins.
3     And when we left off, Red River State Bank was
4 cross-examining Mr. Craig. So you can resume the stand,
5 please. And I am going to remind you that you remain under
6 oath. Do you understand? Is that microphone on?
7     THE WITNESS: Yes, ma'am.
8     THE COURT: Okay. Thank you. All right, you may
9 proceed.
10     MS. STANLEY: Can we pull up Docket 137 again?
11 And it was Page 160 again.
12     CONTINUED CROSS-EXAMINATION OF JESSE CRAIG
13 BY MS. STANLEY:
14 Q  Mr. Craig, you earlier testified that this D&M invoice
15 that we're looking at was for your lake home, correct?
16 A  It looks that way, yes.
17 Q  And what exactly did D&M put in your lake home? Do you
18 know what those things are?
19 A  Honestly I don't know what the mark unit is. But they
20 supplied all the doors, all the trim, all the hardware, all
21 the windows, the big patio doors, and stuff like that.
22 Q  Okay. I think -- did you imply earlier that Mr.
23 Aarestad said it was okay that funds from The Ruins draw
24 were used for the benefit of the lake home?
25 A  We had many conversations about how we were packaging

Page 141

1 things. I mean, you know, I had given approval to be able
2 to put Ruins debt on the lake home. And we had loose plans
3 of trying to get financing in place and things of that
4 nature. When that did not happen and there was not
5 financing in place for the bills for the lake home that were
6 coming through, I don't recall a direct conversation, but I
7 know that by sending these through with the Lake Home or
8 Generations right on it and him testifying that he reviewed
9 every draw request, I would have thought if they were in
10 error or he had an issue with it, he would have just kicked
11 it back or had a conversation with me.
12 Q  So if Charles knew about it and was okay with it, why
13 did this one that we are looking at right here, why was this
14 one submitted that had redacted that information off about
15 the lake home?
16 A  I honestly do not know.
17 Q  What is the date of this invoice?
18 A  Order date, 11/4 of '21. Invoices 5/18 of '22.
19 Q  So the invoice date is May 18th of '22, correct?
20 A  Yes.
21 Q  Okay. I think you testified earlier that -- something
22 to the effect of that you put these draw requests through
23 The Ruins draw because The Ruins basically owes me a million
24 dollars?
25 A  The lake home, yeah.

Page 142

1  Q   It owed the lake home a million dollars.  So -- and I
2  think you indicated earlier there were mortgages put on your
3  lake property for that Ruins debt.
4  A   Correct.
5  Q   Okay.  Do you know what the date of those mortgages
6  are, the first mortgage -- I'm sorry, the Charles mortgage.
7  A   That I don't.
8  Q   Can we show you a copy of it to refresh your
9  recollection?
10  A   Sure.
11       MS. STANLEY:  I think, Sharon, that we emailed
12  you.  It should say Lake Home Mortgage.
13  BY MS. STANLEY:
14  Q   What is the date of this mortgage?
15  A   July 14th of '22.
16  Q   And that is subsequent to the D&M Industries invoice
17  that we just looked at, is it not?
18  A   You mean the invoice was put in before the mortgage?
19  Q   The invoice is dated May of '22, correct?
20  A   Yeah.  And this one is July of '22 for the mortgage.
21  So that would have been after the draw request.
22  Q   Yeah.
23  A   Because funds weren't available for...
24  Q   There's no question.
25  A   Oh, sorry.

Page 143

1  Q   So you were modifying invoices or submitting a redacted
2  invoice prior to your lake home becoming collateral for The
3  Ruins, correct?
4  A   I believe there was a small note that was put onto --
5  because this was just a $400,000 loan which, again, is --
6  this money didn't come to the lake home, it went to The
7  Ruins, this $400,000 note or mortgage right here.
8       THE COURT:  There's...
9       MR. VERSTANDIG:  There's something.
10       THE COURT:  Yeah, there's a -- maybe Mr. Feist or
11  -- is there anybody else on the line who is listening who
12  had forgotten to -- Mr. Krings maybe -- to mute your -- oh,
13  or the telephone?  Maybe there are parties on the telephone
14  who hasn't muted their line?
15       MR. KRINGS:  Judge, this is John Krings.  I was
16  muted, so it's not coming from me I don't think, but I do
17  hear it.
18       THE COURT:  Okay.
19       MR. HO:  Your Honor, this is Anthony Ho.  And I am
20  also listening, but I've been muted the whole time.
21       THE COURT:  Okay.  Is there a way for us to mute
22  the telephone or -- okay.  Everyone we see is muted, so I
23  don't know.
24       MS. STANLEY:  Okay.  It's haunted.
25       THE COURT:  I don't have a phone with me, so --

Page 144

1  okay, well, we'll proceed.  Go ahead.  I'm sorry to
2  interrupt.
3       MS. STANLEY:  No, that was...
4  BY MS. STANLEY:
5  Q   So you testified earlier that -- I believe you
6  indicated that Charles and Randy forced you to pay off your
7  lake home.  Did I --
8  A   Well, started foreclosure on it.
9  Q   Okay.  And when was that?
10  A   I should know that because I think it was like June
11  12th of 2024 or 2025.
12  Q   I remember that date as well.  2025.
13  A   Yeah.
14  Q   How much did you have to pay to redeem from the
15  foreclosure on the lake home?
16  A   A little over a million-two.
17  Q   And you were able to raise the funds to make that
18  payoff?
19  A   I refi'd the lake home, yes.
20  Q   Who owns the lake home now?
21  A   I should have looked that up, too.  My wife things it's
22  Craig Holdings.  I believe it's Jesse and Mulinda Craig.
23  Q   Can we show you the quit claim deed to refresh your
24  recollection?
25  A   Sure.

Page 145

1  Q   That would be the other document that was emailed.  No.
2  I believe it says, "Hereby conveys and quit claims to Jesse
3  Craig, grantee."
4  A   Yeah.  So it would be in my name.
5  Q   So it's you own it personally, no?
6  A   Yes.
7  Q   And the date of that is?
8  A   June 12th, 2025.
9  Q   So you were spot-on.
10  A   One for the win column.
11  Q   Yeah.  You also testified in your opinion as an earlier
12  -- or as an experienced general contractor, it's going to
13  cost about $1.3 million to finish The Ruins, correct?
14  A   Yes.
15  Q   And I think you earlier testified that you care about
16  your subs getting paid, it's important for people who busted
17  their tail to get paid, correct?
18  A   Yes.
19  Q   Okay.  So didn't you use $1.2 million to save your
20  cabin instead of completing The Ruins?
21  A   I mean, it wasn't $1.2 million that I had.  I had to go
22  borrow the money.  So lucky the lake home appraised for a
23  higher dollar amount and we were able to refinance it.  But
24  I didn't have to put cash into it.  I didn't have $1.2
25  million that I put in to make the financing happen.

37 (Pages 142 - 145)

Page 146

1  Q   But you had the wherewithal basically to raise that
2  additional money, right?
3  A   No, the --
4  Q   Or refinance it.
5  A   The company -- the cabin appraised for a higher dollar
6  amount.
7  Q   So you were able to get it refinanced?
8  A   Correct.
9  Q   I think earlier there was a little testimony about a
10 South Dakota attorney that was representing you and The
11 Ruins.
12 A   Yes.
13 Q   And do you know if that South Dakota attorney has been
14 -- an application has been filed with the bankruptcy -- in
15 the bankruptcy case to represent The Ruins?
16 A   I don't know that.
17 Q   Thank you.
18     THE COURT:  Mr. Feist, any questions?
19     MR. FEIST:  No, thank you, Your Honor.
20     THE COURT:  Mr. Krings, any questions?
21     MR. KRINGS:  No thank you, Your Honor.
22     THE COURT:  Okay.  Redirect?
23     MR. VERSTANDIG:  Briefly, Your Honor.
24        REDIRECT EXAMINATION OF JESSE CRAIG
25 BY MR. VERSTANDIG:

Page 147

1  Q   Mr. Craig, when was the lake home constructed?
2  A   I should know that because I had both my knees replaced
3  while I was doing it.  It would have been -- oh boy.  June
4  12th.  That was a year.  It would have been in like 2022 to
5  2023.
6  Q   Was any money borrowed from a third-party financial
7  institution to construct the lake home?
8  A   No.
9  Q   And you indicated that a million dollars and change was
10 paid to Red River State Bank when the lake home was
11 refinanced, correct?
12 A   Well, it was actually -- you're talking when the -- the
13 sheriff's sale, the foreclosure?
14 Q   The infamous June 12th, 2025 --
15 A   That's what was kind of odd about it, is the mortgages
16 that we had shown were with Red River State Bank.  But at
17 the sheriff's sale we had to pay off Randall and Charles
18 individually for their amounts.  So I still don't know how
19 that worked.
20     MR. VERSTANDIG:  Your Honor, I'm just looking at
21 something.  I apologize.
22 BY MR. VERSTANDIG:
23 Q   You said that the money went to Randall and Charles?
24 A   Yes.
25 Q   But the lien was in favor of Red River State Bank?

Page 148

1  A   Correct.
2  Q   To the best of your knowledge has Red River State Bank
3  credited that payment against its claim in this case.
4  A   No.  Well, they had a first mortgage on it for $2
5  million.  Red River State Bank did.  And then like I said
6  before, there was a $600,000 note with Randall, a $400,000
7  note with Charles.  But the note assigned those mortgages to
8  Red River State Bank.  But then when it came to the
9  sheriff's sale, we had to pay them off individually as well
10 as Red River State Bank.
11     MR. VERSTANDIG:  Nothing further, Your Honor.
12     THE COURT:  Recross?  Within the scope.
13        RECROSS EXAMINATION OF JESSE CRAIG
14 BY MS. STANLEY:
15 Q   Is it possible that those mortgages had been assigned
16 from Red River State Bank to Charles and Randall?
17 A   Yes.
18 Q   And that's why they got paid out?
19 A   Evidently, yes.
20 Q   Okay.
21     MS. STANLEY:  Nothing further.
22     THE COURT:  Okay.  I think you are -- you have
23 another question?
24     MR. VERSTANDIG:  No, not for this witness.
25     THE COURT:  Okay.  You are excused, Mr. Craig.

Page 149

1      MR. VERSTANDIG:  Debtor calls Charles Aarestad.
2      THE COURT:  Okay.
3      MR. HUSHKA:  Your Honor, I guess we would object
4  to this.  I believe yesterday we allowed them to go beyond
5  the scope in that it was going to be their direct
6  examination of Mr. Aarestad yesterday I believe it was
7  indicated.
8      THE COURT:  Response?
9      MR. VERSTANDIG:  It is solely in response to the
10 testimony just elicited from Mr. Craig in our case and
11 narrowly confined to that last back and forth.  It will
12 concern only the assignment or lack thereof of a mortgage
13 and whether or not funds that should have been remitted to
14 Red River State Bank instead enriched himself or his father.
15     THE COURT:  Response?  Go ahead.
16     MS. STANLEY:  I could show the actual foreclosure
17 documents which indicated laying it out if you want to see
18 it.
19     THE COURT:  Are they in evidence?
20     MS. STANLEY:  No.
21     THE COURT:  Okay.  Then we'll have to allow the
22 witness.
23     MR. VERSTANDIG:  I'm happy to whisper with counsel
24 for a moment and see if there's a way to diffuse this
25 quickly.

38 (Pages 146 - 149)

Page 150

1    THE COURT:  Okay.

2    MR. VERSTANDIG:  Thank you.

3    THE COURT:  I certainly will permit that.

4    MR. VERSTANDIG:  Your Honor, we will not be

5  calling Mr. Aarestad, but we will make some arguments in

6  closing.

7    We do have another witness though.

8    THE COURT:  Okay.

9    MS. CATHCART:  The Debtor calls Mindy Craig.

10    THE COURT:  Okay.

11    MR. VERSTANDIG:  Your Honor, for some clarity of

12  the record -- and counsel discussed this beforehand, Ms.

13  Cathcart is going to handle Ms. Craig's direct.  To the

14  extent there are some objections on cross, my voice may find

15  its way to the microphone.

16    THE COURT:  I have not been fussy about who gets

17  to talk among counsel.  I don't plan on starting now.

18    Please state your name for the record.

19    MS. CRAIG:  Mindy Craig.

20    THE COURT:  Do you solemnly swear that the

21  testimony you are about to give in this case will be the

22  truth, the whole truth, and nothing but the truth, so help

23  you god?  Please take the stand.

24    I'll have you scoot up a little bit.  And is the

25  light green?

Page 151

1    MS. CRAIG:  It is.

2    THE COURT:  Great.  I'm going to have you state

3  your name for the record one more time to make sure that I

4  can hear you.

5    MS. CRAIG:  Mindy Craig.

6    THE COURT:  Okay.  You may proceed.

7    DIRECT EXAMINATION OF MULINDA CRAIG

8  BY MS. CATHCART:

9  Q    Good afternoon.  What is your current professional role

10  and title?

11  A    I am a property manager.

12  Q    Can you briefly describe your responsibilities in that

13  role?

14  A    Manage apartment buildings, condo associations,

15  commercial complexes.  Manage the day-to-day financing,

16  leasing, tenant concerns, emergencies.

17  Q    And is there any projects you specifically work on or

18  are a project manager on?

19  A    Project manager?  Property manager?

20  Q    Property manager.  Sorry.

21    THE COURT:  Ms. Cathcart, I'm going to make sure

22  that there is a microphone in front of you -- right.  So if

23  you could just scoot it a little bit closer to you.  Thanks.

24  Thank you.

25    THE WITNESS:  In Watertown?

Page 152

1  BY MS. CATHCART:

2  Q    In Watertown, yes.

3  A    Yes.  I am currently the property supervisor, property

4  management for Generations on 1st and Parkside Place.

5  Q    And approximately how many units do you oversee in

6  Watertown across those apartments?

7  A    In Watertown there is 103 between apartments and

8  commercial units.

9  Q    Are you familiar with the market and managing aspect of

10  those specific buildings?

11  A    Yes.

12  Q    And based on your experience, how would you describe

13  the demand for housing in Watertown, specifically for

14  apartments?

15  A    In my experience it's been good.  There's been just a

16  few little lulls, typically with the season change in the

17  spring and in the fall.  However, the City of Watertown just

18  published within I believe it was the last six months or so

19  a market study, housing study that shows they need about

20  2,000 units in the next five years.

21    MS. TANABE:  Objection.  I think that's hearsay.

22    THE COURT:  It is.  That was an objection?

23    MS. TANABE:  Yes.  Sorry.  I had a little

24  microphone problem here.

25    THE COURT:  Okay.  I'll sustain.

Page 153

1  BY MS. CATHCART:

2  Q    Over the last 12 months, what occupancy rates have your

3  properties had?

4  A    In the last 12 months, my company has not been the

5  property manager of those two properties.  It was in

6  receivership for a short timeframe.  If you'd like, I can

7  see what their vacancy rate is.

8  Q    That would be good.

9  A    Or I can give ours.  And I apologize, I don't have the

10  exact calculations.  If I recall correctly when we received

11  the properties back in January of 2025, Generations on 1st

12  had nine vacancies and Parkside Place I believe had four --

13    MS. TANABE:  Objection.  What's the relevance of

14  projects other than The Ruins?  We're only here for The

15  Ruins today.  Not for Generations or Parkside.

16    MR. VERSTANDIG:  As completed valuation.

17    THE COURT:  Pardon me?

18    MR. VERSTANDIG:  It's going to be as completed

19  valuation.  It's going to be indicia of the fact that

20  there's market demand and ability to fill the building and

21  that is consistent with the prior testimony that establishes

22  that a completed building, especially one that's fully

23  occupied, is likely to sell for more money than a building

24  in the condition --

25    MS. TANABE:  Then I would object on the grounds

39 (Pages 150 - 153)

Page 154

1  that she is a property manager, she is not an appraiser. I
2  think that -- are you asking this layperson to speculate
3  about or extrapolate from two different buildings what the
4  value of this building is?
5      THE COURT: Not yet he's not.
6      MR. VERSTANDIG: Not yet.
7      MS. TANABE: So reserve the objection then.
8      MR. VERSTANDIG: She's not going to be asked for a
9  value. But Ms. Cathcart is fully prepared to qualify her as
10 an expert on housing demand in Watertown, South Dakota.
11     MS. TANABE: Well, for now we'll object on the
12 original ground. Sorry.
13     THE COURT: Okay. So I'm going to overrule the
14 objection as it relates to the current question before this
15 witness, which is occupancy rate of Generations. So you may
16 complete your answer.
17     THE WITNESS: Okay, sorry.
18     THE COURT: If you remember the question. Either
19 that or I can have it re-asked.
20     THE WITNESS: Yes, I've had stated what the
21 receiver property management company vacancy was when we
22 took it back over in January of 2025. Since then, my
23 property management company, we have been below three
24 percent over the course of the last three months, four
25 months. Parkside place was zero percent vacancy for the

Page 155

1  months of September I believe it was and August. At
2  Generations on 1st we were -- struggled a little bit to fill
3  that back up when we took back over from receivership. I
4  believe it was getting to below five percent in March of
5  2025 and then since then we've had anywhere from two percent
6  -- excuse me, three percent to zero percent vacancy since
7  then.
8      MS. CATHCART: Your Honor, we move to admit Ms.
9  Craig as an expert on residential leasing in the Watertown
10 market based on her direct experience with similar projects
11 and operational oversights and market familiarity.
12     MS. TANABE: I think there's a distinction between
13 leasing as in meeting tenants, doing background checks on
14 tenants, drafting leases with tenants, collecting rents from
15 tenants, and being a licensed, certified appraiser. So I
16 think it depends on what she is being asked to testify
17 about. But to the extent that she is being asked what the
18 average monthly rent in Watertown, South Dakota, I suppose
19 she could be an expert. But for other purposes it's unclear
20 to me what she would be qualified to testify about outside
21 her own personal firsthand knowledge.
22     THE COURT: Okay. So the problem is I don't know
23 what's coming next. So I think what I will do is allow you
24 to question the witness as an expert and recognize that
25 there might be objections.

Page 156

1      So you, Ms. Craig, are under the obligation now to
2  hesitate just a moment before you answer. Because we're
3  walking into territory that might draw objections.
4      MS. TANABE: Your Honor, could I also point out
5  that they didn't designate any expert witnesses for today?
6  I mean, they really called her -- she was on the list of
7  potential witnesses. But in the context of discovery or in
8  the designation prior to today, there was never any
9  indication that there was an expert witness being called by
10 the other side.
11     MR. VERSTANDIG: There wasn't a Rule 26 expert
12 designation deadline for this hearing or the last hearing.
13 I think just by way of anecdote and it's not arguing as to
14 this witness, I believe that there had been an exchange of
15 interrogatories and document requests that inquired in
16 connection with the stay relief hearing as to whether or not
17 experts would be designated. And we had indicated that
18 there were a couple of people likely to be experts there.
19 That ended up not happening. But there hasn't been
20 discovery aimed at this motion, the motion to convert
21 specifically, that would have inquired as to experts. And
22 there hasn't been a scheduling order that set forth a
23 deadline.
24     Now, Ms. Craig is going to be a hybrid fact expert
25 witness for self-evident reasons. She is not someone who

Page 157

1  has been independently hired for purposes of litigation.
2  And to state the obvious, she is not being compensated for
3  her testimony today.
4      MS. TANABE: I think there is a technical way in
5  which that is just entirely counterfactual, and then there's
6  just fair play. So there was an express interrogatory
7  served on their side asking if they had any experts. They
8  indicated that there were not. But if they were going to
9  call any prior to this hearing, that they would do so in
10 accordance with your local rules. And I think your local
11 rules indicate that at least two days before an evidentiary
12 hearing, there should be some indication of which witnesses
13 and exhibits are going to be used at the hearing.
14     So I think there's both a technical problem and
15 just a fairness problem with what's happening right now.
16 This seems like gamesmanship, to be honest. I think there's
17 a continuing obligation to supplement the disclosure, and
18 they had every opportunity to do that.
19     MR. VERSTANDIG: Want to be careful about this.
20 The interrogatories were in connection with the motion for
21 stay relief. This was not the contested matter in which the
22 discovery was issued. Each contested matter is its own
23 prism. Ms. Craig has been on our witness list.
24     I'd also point out that -- and I don't want to
25 proffer on what she is going to testify about. This isn't

Page 158

1 an appraisal.  She is not going to be asked what the value
2 of the building is.  She is testifying as to what the
3 occupancy demand and leasability is in Watertown, South
4 Dakota, which everyone has known from the beginning of this
5 case she would be the (indiscernible) since she is the
6 property manager.
7        MS. TANABE:  There is a misstatement that the
8 interrogatory that was served was for the lift stay or
9 contested matters, which was a defined term.  So I think the
10 entire premise of your position is based on something that's
11 just simply not true.  And I think this is a pivot that was
12 decided on less than five minutes ago.  And again, I think
13 there's just a general fairness issue with it.
14        THE COURT:  So I am going to permit the witness to
15 testify.  And as the questions proceed, you can object if
16 there is a question that really calls for the opinion of an
17 expert witness as opposed to a lay witness, and I'll wing it
18 from there.
19        MS. TANABE:  Okay.
20        THE COURT:  Keeping in mind the fair play as well
21 as the fact that she has background and knowledge as a lay
22 witness.
23        MS. TANABE:  We do not dispute that she has
24 background knowledge as a lay witness, as someone who
25 manages apartments on a day-to-day basis as she stated.

Page 159

1 BY MS. CATHCART:
2 Q    From your experience what is the current average rental
3 rates in Watertown for let's say a one-bedroom, a two-
4 bedroom, or a three-bedroom unit?
5 A    That varies depending on what area of town that you're
6 in.  All of the properties that I manage are in the downtown
7 sector.  There are some near the college, there are some on
8 the outskirts of town that are a little bit on the quote,
9 unquote, newer side.  And I mean within the last five years
10 give or take.
11        The downtown area, without going into too many details
12 or specifics, other management companies that have come into
13 the downtown area have actually decreased the rents in
14 downtown.  We have stood our ground at approximately give or
15 take -- because the buildings are a little bit different and
16 size-wise are a little bit different -- plus a thousand
17 dollars for a one-bedroom.
18 Q    And are you familiar with the proposed Ruins project in
19 Watertown?
20 A    I am familiar with the proposed project, yes.
21 Q    How would you compare the scope and design of the
22 proposed Ruins project to other projects in your area?
23 A    I would say that they are pretty similar all things
24 considered.  We wanted to keep the upscale downtown vibe
25 with the -- and I should say we, I'm sorry.  Jesse as the

Page 160

1 developer and the builder wanted to keep the upscale vibe of
2 the Gypcrete floors and then carpet in the bedroom.  The
3 layouts of the kitchen, the layouts of the apartments are a
4 little bit different and more funky than your standard
5 cookie-cutter styles that I would consider other units in
6 the area to be.
7 Q    And in your professional opinion would The Ruins be
8 competitive within the local market once completed?
9 A    I would say it's probably a step above the others only
10 because it would be brand-new.  The downtown park borders
11 two sides of it versus Parkside Place is just across the
12 park to the west.  And it's the back side of the building.
13 So you don't have any apartments that actually face the
14 park.
15        And then just the newness factor of it will draw
16 people.  We currently have a waiting list at Generations on
17 1st for two-bedrooms.  So I have no concern about a two-
18 bedroom being rented there at all.
19        MS. TANABE:  Your Honor, I think I'm confused
20 about whether she's testifying as a lay witness or as an
21 expert witness right now.  If she's speculating about market
22 conditions in Watertown at some point in the future if
23 circumstances are completely different than right now, then
24 isn't this -- shouldn't there be an objection?  Because this
25 is just pure speculation for a lay witness.  So I'm still

Page 161

1 struggling to understand if we're dealing with a lay witness
2 or an expert witness.  And I apologize if that's just me
3 being dense.
4        THE COURT:  I am going to receive the evidence
5 that the witness testified about as an area of expertise of
6 this lay witness.
7        MS. TANABE:  Thank you.
8        MS. CATHCART:  I can't remember the last question
9 I asked you.
10        THE COURT:  Well, she already answered it.  It was
11 a question of whether it should be struck.  Am I correct?
12        MS. TANABE:  Correct.
13        THE COURT:  So you can ask a new question now.
14        MS. CATHCART:  Ms. Cathcart is better organized
15 than myself.  I think she's trying to figure out where to
16 pick up on her outline.
17        THE COURT:  Got it.
18 BY MS. CATHCART:
19 Q    What is the anticipated profit margin for a stabilized
20 apartment in Watertown?
21        MS. TANABE:  Objection.  What does stabilized
22 mean?  The question is vague.
23        THE COURT:  Sustained.
24        MS. CATHCART:  I'll rephrase.
25 BY MS. CATHCART:

41 (Pages 158 - 161)

Page 162

1  Q   What is the anticipated profit margin for the completed
2  Ruins project?
3  A   For the completed project, that is a loaded question.
4  And I only say that because there is a stabilization period
5  that most new construction projects have.  And that gives or
6  allows time for them to be filled up, the apartments to be
7  filled up and rented out.  And that's anywhere -- and every
8  lender is a little bit different.  I think from what I've
9  seen, my knowledge -- definitely not an expertise in this
10  area by any means.  I'm not a banker by any means.  But it
11  would be roughly 18 months.  Anywhere from a year to 18
12  months.
13      Once it's stabilized and full or has an acceptable
14  occupancy rate of less than five percent -- vacancy rate,
15  I'm sorry, of less than five percent, the market rents that
16  I've anticipated to be able to charge for the units should
17  bring in -- I'm just going to use rounded-off numbers --
18  $80,000 a month plus give or take a little bit.
19      By the time all expenses are accounted for and paid for
20  every month, there should be roughly $60,000 a month in
21  cashflow, net cashflow.  That's not including any debt
22  service.
23      MS. CATHCART:  Nothing further, Your Honor.
24      THE COURT:  Cross-exam?
25      MS. TANABE:  Thank you.

Page 163

1      CROSS-EXAMINATION OF MULINDA CRAIG
2  BY MS. TANABE:
3  Q   Ms. Craig, you said you were a property manager and
4  that your duties consist of day-to-day tasks like finances,
5  leasing, and emergencies.  Is that correct?
6  A   Yes.
7  Q   What kind of training did you undertake for that?
8  A   Good question.  It's been completely all hands-on for
9  the last 15 years.  So all of the knowledge that I have
10  gained has been over the last 15 years of apartment
11  managing.
12  Q   And what's your educational background?
13  A   I have some college.  I have lived in Wisconsin, was on
14  a wait list for a dental hygiene program.  And that was a
15  three-year-long waitlist.  And then life happened and I
16  moved to Fargo.
17  Q   And have you ever worked for a different property
18  manager other than Craig Holdings or Craig Properties?
19  A   Yes.
20  Q   And where did you work?
21  A   Coldwell Banker.
22  Q   Okay.  And what did you do for Coldwell Banker?
23  A   Same thing.  Property management.  I was a step below
24  the vice -- or a step below the president for the property
25  management company there.

Page 164

1  Q   So other than collecting the rents and leasing and
2  dealing with emergencies at properties owned by your
3  husband, you've worked at Coldwell Banker and that's it?
4  A   For...
5  Q   Property --
6  A   Property management, yes.
7  Q   Okay.  And at any point did you take any courses in
8  appraisals or real estate?  Are you a broker or anything
9  like that?
10  A   I did hold a real estate license, yes.
11  Q   Okay.  And have you ever been a commercial real estate
12  broker?
13  A   Not a broker, no.
14  Q   Okay.  So you have no experience with marketing or
15  selling a commercial property?
16  A   Not a commercial property, of selling a commercial
17  property as far as having a commercial license, no.
18  Q   Okay.  Thank you.
19      MS. TANABE:  No further questions.
20      THE COURT:  Mr. Feist, any questions?
21      MR. FEIST:  No thank you.
22      THE COURT:  Let's see.  Mr. Krings for D&M?
23      MR. KRINGS:  No, Your Honor.  Thank you.
24      THE COURT:  All right.  Redirect?  No?
25      MR. VERSTANDIG:  Nothing, Your Honor.

Page 165

1      THE COURT:  All right.  You may be excused.
2      THE WITNESS:  Thank you.
3      THE COURT:  Any other witnesses?
4      MR. VERSTANDIG:  Your Honor, the Debtor rests.
5      THE COURT:  Okay.  And I've received all the
6  exhibits that the parties wanted to offer, correct?
7      MR. VERSTANDIG:  Yes.  And for clarity, the items
8  used to refresh recollection were not offered as evidence,
9  were not marked as evidence, and are not evidence.
10      THE COURT:  Understood.  Okay.  All right.  Do you
11  want to move on to some argument?  Are you planning on
12  briefing the issue?  How would you like to proceed?
13      I'll begin with Red River.
14      MS. TANABE:  Would Your Honor allow us to do
15  closing statements and submit something in writing within a
16  week?
17      THE COURT:  So you'd like to do a little something
18  now as well as put it in writing?
19      MS. TANABE:  Or did I misunderstand --
20      MR. VERSTANDIG:  My preference...
21      MS. TANABE:  I apparently misunderstood.  I stand
22  corrected.  The plan is to ask if Your Honor will let
23  everyone submit something in writing within a week.  Or
24  would you prefer us --
25      THE COURT:  Pardon me?

42 (Pages 162 - 165)

Page 166

1    MS. TANABE:  Or would you prefer us to wrap it up
2   today?  We're at your direction.
3    THE COURT:  So my concern about just allowing you
4   to try to cover all of the bases in oral argument today is
5   that there is a lot of information and a lot of pieces of
6   paper.  And while I will confess that I went through most of
7   the exhibits I anticipated would be received because they
8   were stipulated, I didn't go through all of them.  I think
9   it would be extremely helpful for me if you highlighted what
10  you perceived to be the best evidence in support or
11  opposition of the motion.
12    I heard some information I hadn't expected today.
13  For example, Mr. Craig testified about considering the
14  option of funding a third party to manage the completion of
15  the construction.  I didn't see that in a proposed plan.
16  And one of the conditions for -- should I find cause for
17  dismiss or convert is whether it's possible, even before
18  cause, or if there is cause and then I have to decide about
19  extraordinary circumstances, whether completion might be in
20  the best interest of the creditors.  And I will say that the
21  opening statements I found extremely helpful.
22    To the extent that you think the evidence supports
23  all of those arguments, I think I would like to hear from
24  Red River State Bank about what they think about that.  And
25  I would like to hear from D&M and I would like to hear from

Page 167

1   Watertown about the very same issues.  Does it matter to you
2   if Mr. Craig is not in charge?  Does it matter to you if
3   he's offering $1.3 million of his own money to complete the
4   construction project?  How is that perceived?
5    So it's the kind of thing where I could ask some
6   questions today, but you might be better-suited to look at
7   the evidence and prepare a written response.
8    And so what I'm doing right now is telling you the
9   kinds of things I'm thinking about as I see some evidence of
10  cause, I see some efforts to rebut that evidence of cause.
11   So if I do make a finding of cause, then I have
12  the choice.  Is there extraordinary circumstances here?  Is
13  conversion really the best option?  And so while the focus
14  of a lot of Red River's evidence was on cause and the
15  applicability of a remedy of conversion, there are some
16  other topics that were presented on behalf of Debtors that
17  they might have response to do.  And as for the Debtors, it
18  would be super-helpful for me to hear from you about the
19  response to the allegations regarding cause.
20    So I heard some explanations, but I frankly didn't
21  always follow them.  And I think your perspective about
22  whether that actually negates cause or whether you're
23  looking for a finding of in spite of cause, here's what you
24  believe to be the exceptional circumstances, that might be
25  really helpful to me.  And that would be true of perspective

Page 168

1   from the Watertown Development Company as well as from any
2   of the other creditors who think they might have perspective
3   on what might be in their best interest moving forward.
4    I think that kind of covers my main concerns and
5   what I certainly would appreciate with any written briefing.
6   So yes, I would be delighted to have a written summary of
7   what you think are your best arguments.
8    Any questions?  Anything we should visit about in
9   terms of what I'm looking for?  I'm not going to set a page
10  limit.  If you want to chat for a while, that might be -- I
11  know.  I'm looking at you.
12    MS. TANABE:  I guess as the movant I'm looking for
13  some direction.  Because it was my understanding that what
14  was before the Court today was a motion under Section 1112.
15    THE COURT:  Yeah.
16    MS. TANABE:  And I think at the opening I was kind
17  of dismayed by the opening arguments that it seemed to veer
18  into a question about whether under circumstances completely
19  different than what's in evidence before you whether other
20  parties in the case would prefer that this be a Chapter 11
21  versus a Chapter 7 with full admission that they hadn't
22  invested the time or resources to read anything on the
23  docket.  And I'm sure you can appreciate as the movant that
24  that's exceptionally frustrating to have our motion
25  converted into something that is well outside the legal

Page 169

1   framework in the Eighth Circuit and --
2    THE COURT:  I don't think it's outside.  I think
3   1112 allows me to consider extraordinary circumstances --
4    MS. TANABE:  Extraordinary circumstances --
5    THE COURT:  Okay.
6    MS. TANABE:  And so to the extent that the
7   argument --
8    THE COURT:  That's right in the statute.
9    MS. TANABE:  But in the mechanic lienholders', you
10  know, personal dream world scenario that they would prefer
11  that this be an 11 if the circumstances were completely
12  different than they are.  But I understand the legal
13  framework in the Eighth Circuit to be that if our side
14  established cause, then the Court's second inquiry is
15  whether conversion or dismissal is in the best interest of
16  creditors or whether there are unusual circumstances
17  establishing that something other than conversion or
18  dismissal is in the best interest of creditors.
19    THE COURT:  Exactly right.  I don't dispute that
20  whatsoever.  And the unusual circumstances relate to can the
21  project be salvaged.  Is this one of those circumstances
22  that it's in the best interest of the creditors that the
23  project be completed and if so, does it matter that Mr.
24  Craig would be in charge of that?
25    MS. TANABE:  So we were not on notice that that

43 (Pages 166 - 169)

Page 170

1  was going to be argued. And if we had known that, we would
2  have been happy to present -- and would like an opportunity
3  to supplement the record with evidence about the -- if the
4  question of unusual circumstances is now the focus of the
5  hearing, we'd like the opportunity to put on evidence about
6  that. Because so far we've had a vague implication from the
7  Debtor's principal that he may be willing to use his
8  relationships to finish the project. But we were not on
9  notice that the suggestion of say an operating trustee or a
10  CRO, that was definitely not in the pleadings that were
11  presented to us. And we would have -- but for that lack of
12  notice, we would have designated the original experts that
13  we had lined up for the hearing on September 29th.
14      So I think we have been extremely patient. Under
15  the statute we were allowed a decision within 30 days. We
16  have tried to facilitate the continuances, et cetera. But
17  this is very much like an element of surprise. This is
18  nothing that has ever been discussed in extensive
19  conversations with the Debtors, extensive discovery,
20  depositions, et cetera. It's not in the pleadings. I think
21  it would be extremely unfair and prejudicial to our side if
22  there was a finding about unusual circumstances without
23  notice to us and an opportunity to designate witnesses and
24  exhibits and put those on before the Court. So if that's
25  the direction this is going, I would ask that we be allowed

Page 171

1  an opportunity to provide evidence about the existence or
2  not of unusual circumstances in this case.
3      THE COURT: So I think you heard me say a minute
4  ago I was surprised to learn that today, which is why I
5  wanted a response from Red River Bank and why I thought you
6  might need a week to provide that response.
7      If you think that response will necessitate
8  evidence, I'm happy to allow you that opportunity.
9      MS. TANABE: I do think it would require evidence.
10  Could we schedule a date for us to call our witnesses on
11  that issue?
12      THE COURT: Absolutely. Because I will tell you
13  under 1112, that's part of the analysis. And it's something
14  I announced when I started the hearing.
15      MS. TANABE: And if we had been --
16      THE COURT: These are my questions, and if they
17  are answered and they were answered in ways that I hadn't
18  anticipated -- I knew you were going to show cause or offer
19  evidence in support of cause, but I wouldn't expect other
20  evidence.
21      So, Mr. VerStandig, having heard the concerns of
22  Red River State Bank about a finding under 1112 that this
23  might be one of those situations the despite a showing of
24  cause may or may not be in the best interests of creditors
25  to continue an 11, what are your responses to the concerns

Page 172

1  that Red River State Bank expressed about the new idea,
2  which is essentially appointment of a third party to manage
3  construction?
4      MR. VERSTANDIG: I think I would respond in a
5  couple of ways.
6      THE COURT: Okay.
7      MR. VERSTANDIG: One, as the Court has pointed
8  out, this is contemplated within the statute. We're not
9  asking for 105 relief. We are not introducing some novel
10  legal theory or differentiated approach to this.
11      Additionally, while this is not likely what we are
12  urging -- I use this as a point of analogy and nothing else
13  -- the statute also expressly provides that it's for cause
14  unless the court determines that the appointment under
15  Section 1104(a) of a trustee or an examiner is in the best
16  interest of creditors and the estate. So that possibility
17  is statutorily there regardless of whether or not pleaded.
18  And any 1112 motion normally gets bypassed, because the idea
19  of a Chapter 11 trustee is reductio ad absurdum in most
20  cases, part of the court's analysis is supposed to be once
21  you establish cause -- and let me be clear, we are not
22  conceding cause -- whether or not there should be a trustee
23  or an examiner. I've yet to have a case with an examiner.
24  One day.
25      So I think they are on notice of it by virtue of

Page 173

1  the fact that Congress promulgated the language forty-some-
2  odd years ago.
3      But if the urgings that we have in the
4  presentation of further evidence, I welcome the opportunity
5  to come back here. We would welcome the opportunity to
6  cross-examine any witnesses. We would welcome the
7  opportunity to go through parts of this exercise again.
8  Perhaps there would be some utility in proceeding on whether
9  or not there exists cause. And if the Court found there to
10  be cause, then having a further hearing on the remedy or
11  lack of a remedy that's appropriate thereunder just so there
12  is not too gross of an investment in resources in the
13  interim. But I also want to stress we are not trying to
14  delay. And I realize that may come across that way.
15      If the Court is interested in setting a hearing, I
16  can take up my calendar.
17      THE COURT: So I'm going to ask straight up, is
18  the Debtor, The Ruins, are going unusual circumstances or
19  suggesting that the Court should appoint a trustee or an
20  examiner?
21      MR. VERSTANDIG: Our argument in our closing is
22  going to go threefold. And I'll preview it, and it
23  shouldn't be a surprise. We are first going to urge that
24  there's no cause. And if there's no cause, that the Court
25  should do nothing other than proceed in the ordinary course.

44 (Pages 170 - 173)

Page 174

1  We are second going to urge in the alternative
2  that there is cause allowing the Debtor to designate a chief
3  restructuring officer or some independent third-party
4  fiduciary is in the best interest of the estate and
5  creditors and that the Debtor should be given a finite time
6  period measured in days to file the appropriate motion or
7  application to do so subject to the objection of all
8  parties-in-interest including the bank.
9      Or third in the alternative is if the Court
10  doesn't find either of the first two palatable, that we
11  would favor appointment of a trustee under Section 1104(a).
12  Conversion is the end of this project.  Too many people have
13  too much invested.  And that's going to be the heartstring
14  conclusion that I'll use better words for in writing
15      MS. TANABE:  And my client is the largest
16  stakeholder by far in what he is referring to.  And if we
17  had wanted to bring a motion to remove the debtor-in-
18  possession, we would have.  I think we have been waiting
19  very patiently for a remedy.  We have had no adequate
20  protection in this case as a secured creditor.  We have
21  received no debt service payment.  There's -- just the
22  shocking unfairness of this is -- you know, I'm really gob
23  smacked.  I think that if -- the notion that this was in any
24  way what was in the pleadings -- I think this was introduced
25  by two parties that didn't even file joinders to the motion.

Page 175

1  And it's now on the table because of maybe an offhand remark
2  with no -- I mean, there's no confirmation that the insider
3  is going to put in funding.
4      THE COURT:  There's testimony now.  I mean,
5  there's evidence before the Court now that I have to think
6  about.
7      MS. TANABE:  I would ask to preserve the issue for
8  appeal then.  I think this is -- I mean, we would appeal and
9  try to get a remand,  but I think the notion that this was
10  in any way that we were on notice that we would be debating
11  whether a Chapter 11 trustee should be appointed when we
12  filed a motion under 1112 is just wildly outside ethe
13  expectations based on what was on the docket before we came
14  in here.
15      I think until the two parties in interest who are
16  allowed to be heard who didn't even file joiners mentioned
17  that it would be their preference that the case stayed in
18  Chapter 11 if conditions and circumstances were completely
19  different than they actually are after they fully admitted
20  that they hadn't invested in reading or doing any discovery,
21  et cetera, it hadn't occurred to me that our motion, which
22  is captioned a motion to convert, would turn into a motion
23  to appoint a Chapter 11 trustee.
24      THE COURT:  So it's not the parties who are
25  listening.  It's not the mechanics' lien holders that put a

Page 176

1  witness on the stand to tell me that there's an opportunity
2  here or a creative solution to the problem, whether it's a
3  viable solution or not, it's not clear to me.
4      So if you want extra time to call a witness, I
5  will tell you that it's directly relevant because of the
6  terms of the statute which allow me if I find cause to
7  decide whether it's in the best interest of creditors.  And
8  the suggestion has been by the Debtors and probably by
9  Watertown Development Corporation as well that it's likely
10  that the property would be worth more money if the
11  construction were complete than it is if it weren't.  And
12  that might of even been a concession by Red River Bank with
13  your response being I don't think that's feasible.
14      So if you want to provide more information to me
15  about whether it's feasible, I would like to hear it.
16  Because I can tell you that the evidence appears to
17  establish cause.  I'm going to listen to what you have to
18  say.  But it's going to be worth your time to work on the
19  second two prongs, because I heard a lot of information that
20  would suggest to me that there might be cause.  I will
21  reserve a ruling on that until I read your briefs.  But
22  there's evidence there.  And so the question is dismiss,
23  convert, or is this one of those extraordinary circumstances
24  where a third -- the appointment of a person either by the
25  Debtor and paid by the Debtor to supervise the completion or

Page 177

1  the appointment of a trustee is on the table.  It's
2  statutory and I'm going to consider it.
3      So if you want extra time to offer evidence, I
4  will allow that.  So the question is your concern about
5  timing.  And I understand why.  Tell me how fast you can get
6  it done.
7      MS. TANABE:  We are ready, able, and willing.  I
8  think we need time to put on two witnesses about what we had
9  thought was going to be a feasibility issue, but which now
10  is an unusual circumstances issue.  So we do need time.  I
11  would say a full day.  This has all been already produced,
12  but we could redesignate witnesses and exhibits.  But we
13  would need a day of the Court's time.
14      THE COURT:  So response, Mr. VerStandig, before I
15  go look at my schedule?
16      MR. VERSTANDIG:  For purposes of the record, I
17  think my response should be that they have rested.
18  Recognizing where this is headed, I would say if the Court
19  is going to allow that, we're not going to strenuously
20  object.  But if they are going to bring in an expert on the
21  question of appraisal and valuation, we'll bring in an
22  expert on the issue of appraisal and valuation.  We will
23  have dueling experts and put on a show.
24      THE COURT:  I don't -- it's not really valuation
25  that I am wondering about.  I'm wondering if this is one of

45 (Pages 174 - 177)

Page 178

1 those circumstances where it would be inappropriate to
2 dismiss or convert because it's in the best interest of
3 creditors for the construction to be complete. So if
4 appraisers are necessary for that, they might be. And
5 however you approach it, I defer to you on what you think
6 would be most helpful to the Court.
7         MR. VERSTANDIG: I think my naivete may be showing
8 here. I've been guessing from Ms. Tanabe's comments, and I
9 may be wrong, that I have an idea of which witnesses they
10 are going to bring in, having seen their designation when we
11 were looking at stay relief.
12         By the way, to the adequate protection comment,
13 they have stay relief. But that's neither here nor there.
14 I may be misreading that. It may be that they are looking
15 to bring in some differentiated variety. The next part, it
16 will explain somehow -- and I don't mean to sound cynical
17 about that -- how it would not be to the benefit of
18 creditors and the estate to have the building complete
19 without offering the current valuation and as-completed
20 valuation, whatever it may be.
21         We're going to be prepared to respond to whatever.
22 We may need to see their designation first and respond very
23 quickly. I'm not sure that we can simultaneously designate.
24         Transparently, we have an appraiser who we engaged
25 awhile ago who we have worked with transparently. We have

Page 179

1 one other expert who I was very careful when examining Mr.
2 Craig to not identify what she was going to be an expert in
3 the area of. And we have prepared to come in to offer some
4 information. And we may have I guess some additional
5 factual rebuttal. We are happy to come back for a day.
6 We're happy to come back for two days.
7         THE COURT: The value as completed is of course
8 helpful. I don't expect that to be the most difficult
9 issue. The issue is getting there in a way that's viable,
10 which is what I think is Red River State Bank's -- one of
11 their concerns expressed in opening, is that is this even
12 possible to complete. And if so, why hasn't it been
13 completed?
14         So yes, if you want to have the dueling battles of
15 what it will be worth when it's completed, by all means you
16 are welcome to do that. I am interested in how it gets
17 there as well and if that's possible. So whatever you think
18 is helpful.
19         On behalf of Watertown Development Company, are
20 you planning to participate in any other way than briefing
21 on the question of what happens if there is cause and
22 whether conversation or dismissal or other alternatives
23 should be available or not?
24         MR. FEIST: Thank you, Your Honor. I am trying to
25 process as well. I get -- I obviously read the statute.

Page 180

1 And I was thinking that for the Court to find that
2 appointment of a trustee would be in the best interest of
3 the creditors, that the Debtor would have to present that
4 evidence. And that wasn't presented at this hearing. And I
5 was sort of expecting that there would be a proposal. You
6 know, who is the trustee going to be, what's their plan
7 going to be, how are they going to get financing.
8         I know Mr. Craig said, well, I might do this, I
9 might do that. But there's really no proposal on the table.
10         So if there's going to be additional evidence
11 offered with that information, I would like to participate
12 in that hearing just in terms of listening in like I did on
13 this hearing.
14         But it's hard to really weigh in on whether or not
15 I -- whether or not we -- what argument we'd make when we
16 haven't really heard that evidence from the Debtor in terms
17 of here's why we think a trustee is in the best interest of
18 the estate, here's the evidence proving that, and here's
19 what their plan is and thus why it's in the best interest of
20 creditors. And I guess that's where I'm at presently on the
21 issue.
22         THE COURT: Mr. Krings, I allowed you to speak at
23 the beginning of the hearing. I will permit it again.
24         MR. KRINGS: Thank you, Your Honor. I, like Mr.
25 Feist, would plan to at least listen. I was expecting that

Page 181

1 we would get more testimony about the feasibility of the
2 project and getting it across the finish line. Because at
3 the outset I was always of the opinion that a finished
4 project is going to be more valuable than the as-is
5 condition. And correct, I haven't taken the time to read
6 through 75,000 pages of discovery, but I have had hours upon
7 hours of conversations on this case and have reviewed lots
8 of documents. So I guess on behalf of D&M plan to continue
9 to follow your lead and see what evidence is placed before
10 the Court. And we'll follow the Court's lead, honestly.
11 Thank you.
12         THE COURT: There are parties who are attending by
13 telephone. You were not permitted to offer evidence, cross-
14 examine witnesses. But I have on occasion permitted
15 argument. Is there any comment from any other party?
16         Okay. I am going to allow additional evidence.
17 Here are my restrictions. I have a pretty flexible week
18 this week. Next week I am in Mississippi, so that would be
19 unavailable. And the week following I have some hearings.
20 But we can work around those. So it's what -- what is your
21 preference and what kind of time would you need, Ms. Tanabe?
22         MS. TANABE: So just to clarify, if it's not this
23 week, it would be sometime November 17th or later?
24         THE COURT: Yes. Yes. November 17th. Let's look
25 at what I have. Would that be helpful to you if I told you

46 (Pages 178 - 181)

Page 182

1   what we had available?

2         MS. TANABE:  November 20th would be great.  Or the

3   19th.  20th, 21st.

4         MR. VERSTANDIG:  Preference for the 20th and the

5   21st over the 19th.

6         THE COURT:  Okay.  I have a trial on the 19th it

7   turns out.  The 20th was originally reserved for a

8   retirement party for the clerk, but it wasn't going to start

9   until 4:00.  That might disappear without appropriations.

10  So I think I have some flexibility on the 20th.  What else?

11  Is there anything else on there besides...

12        MS. TANABE:  I'm sad to hear that.  I was planning

13  to attend that.

14        THE COURT:  Yes.  Well, I am not giving up hope

15  yet.  Okay.  Yeah.  There's another Minnesota case that you

16  might be involved in, Ms. Tanabe, that I think would only

17  take a short period of time if it actually goes.  So the

18  20th I would have mostly up until -- what is the time of

19  that hearing in the afternoon?  2:30.  So that hearing may

20  or may not go.  So I would have up until 2:30.  If that

21  hearing doesn't proceed, I would have until 4:00 and maybe

22  later.  And then the 21st is -- anything?  That's pretty

23  much open.

24        MS. TANABE:  Our client is not available on the

25  21st.  How hard is your preference against the 19th?  Oh,

Page 183

1   you have a trial on the 19th.

2         THE COURT:  I have a trial.  And I am afraid that

3   one might go.

4         MS. TANABE:  Okay.

5         MR. VERSTANDIG:  I would point out -- and I may be

6   chastised for this.  We already have a hearing on the 25th,

7   which is just a few days later.  We could...

8         MS. TANABE:  I think that it would be too much to

9   do in one day potentially.  It may take us a whole day to

10  get through the witnesses on feasibility.

11        MR. VERSTANDIG:  If the Court is available and my

12  client doesn't shoot me daggers, we could do the 24th and

13  the 25th.  While we often make light of my efforts to return

14  to the East Coast, I would rather not be traveling the day

15  before Thanksgiving.  So I would hope to get out the night

16  of the 25th.

17        THE COURT:  I will not be here the day before

18  Thanksgiving.

19        MR. VERSTANDIG:  Yes.

20        MS. TANABE:  Can we return to the 20th then?

21  Because I think I didn't hear any problems with the 20th.

22        THE COURT:  The 20th is great.  And so recognizing

23  your client certainly has a right to be here, it could bleed

24  into the 21st if the client representative couldn't be here

25  and would agree to proceed without.

Page 184

1         MR. VERSTANDIG:  Twenty-first works marginally

2   better for me, but it's marginal.  I don't want to overstate

3   it.

4         MS. TANABE:  And it's a problem for us.  So...

5         THE COURT:  It is, for sure.  All right.  I defer.

6   So we could begin on the 20th and wrap up on the next week,

7   whatever that is.

8         MS. TANABE:  I suppose we could wrap up on the

9   25th if needed.

10        THE COURT:  Pardon me?

11        MS. TANABE:  Oh, sorry.  Pardon me or pardon to

12  Sharon?

13        THE COURT:  It was to Sharon.

14        MS. TANABE:  Okay.

15        THE COURT:  Yeeha, okay.  So would you like to

16  proceed to begin on the 20th and then wrap up on the 25th?

17  That would be tricky for you, Mr. VerStandig?

18        MR. VERSTANDIG:  It's not that tricky.  I'll make

19  it work.

20        THE COURT:  Okay.

21        MS. TANABE:  Do you want the 25th to move back

22  since we're doing feasibility on the 20th?  I'm not sure.

23        MR. VERSTANDIG:  Not to horse-trade too openly.

24  We -- so this doesn't look like gamesmanship, we'd be happy

25  to push the disclosure statement into the first week of

Page 185

1   December or something along those lines if it gave us the

2   25th, which is easier for a lot of reasons.

3         MS. TANABE:  It's not easier on our end.  Sorry.

4         THE COURT:  Okay.  If it gave us something other

5   than one of those -- something other than the 20th.  But I

6   also recognize that we don't want this to go on forever and

7   (indiscernible).

8         THE COURT:  What is on the 23rd?

9         MR. VERSTANDIG:  It's a Sunday.

10        THE COURT:  Or the 24th wrapped into the 24th a

11  problem?

12        MR. VERSTANDIG:  No.  That would work wonderfully.

13        THE COURT:  Somebody --

14        MS. TANABE:  It would come at a significant

15  personal cost to me to do it on the 24th and 25th.  It would

16  be my strong preference to do it on the 20th.

17        MR. FEIST:  Your Honor, I know I'm not a driving

18  force here, but I am unavailable on the 24th.

19        THE COURT:  Okay.  What's on the 25th aside the

20  disclosure statement hearing?  Okay.  And at the bottom

21  there is there anything?

22        So if for some reason Congress passes a budget --

23  I know, we're all holding our breath -- and the event for

24  the clerk is actually 2:00 to 4:00.  I thought it started at

25  4:00.  That was my misunderstanding because I can't see the

47 (Pages 182 - 185)

Page 186

1  calendar. It's a 2:00 to 4:00 thing. So I just have to

2  make sure that you're aware that I'm not moving that for

3  this hearing. So I have to be there for that.

4       MR. VERSTANDIG: Could I assume that Black Friday

5  is off the table? That was meant in jest, not a serious

6  suggestion.

7       THE COURT: The courthouse is closed.

8       MS. TANABE: If that event goes forward on the

9  20th, we all plan to be there too. So...

10       THE COURT: Exactly. Of course you would. Yeah.

11       MS. TANABE: So no objection for us.

12       THE COURT: It's like an event.

13       MS. TANABE: No objection from us.

14       MR. VERSTANDIG: Hold on. I have an idea. Could

15  I whisper with counsel for a second?

16       THE COURT: Absolutely.

17       The first week in December is pretty flexible

18  except for the 4th.

19       MR. VERSTANDIG: So, Your Honor, the comment from

20  our side -- and understanding this is likely albeit not

21  certainly to involve experts more so than lay witnesses or

22  at least hybrids, which somewhat reduces the need to stare

23  someone in their beady eyes and assess the wrinkles on their

24  face, I had indicated we would be more flexible in November

25  if we did this as a virtual hearing.

Page 187

1       THE COURT: Oh.

2       MR. VERSTANDIG: If -- first week of December

3  works fine. No -- hold on. Never mind.

4       MS. TANABE: We just strongly prefer to do it on

5  the 20th. If a miracle happens and there is money, we plan

6  to go to that event, too. If not, we shall stay in your

7  presence as long as you let us. And if Mr. VerStandig wants

8  to do it virtually because there's experts, he can do so.

9  We're based here. We're probably going go just physically

10  come down here because we like doing our exhibits with

11  Sharon. So that would be fine with us. If he wants to do

12  it --

13       MS. TANABE: Oh, I'll be here.

14       THE COURT: So start on the 20th and then wrap up

15  on the 25th?

16       MS. TANABE: That would work. And we could start

17  early-ish again, like 9:00.

18       THE COURT: Yeah. I can actually be here at 8:00.

19  Can we start at 8:00? There's no reason why we couldn't

20  start -- no? The doors -- when do the doors to the

21  courthouse open?

22       MS. TANABE: Do you want to start at 8:30?

23       THE COURT: They open at 8:00. So 8:15? 8:15

24  would work?

25       MS. TANABE: So we need a little time to get in

Page 188

1  the front door.

2       THE COURT: Or 8:30.

3       MR. VERSTANDIG: The ask on our side apparently is

4  8:15 based on children and education.

5       THE COURT: Yeah. Or 8:30 is fine, too.

6       MR. VERSTANDIG: Okay.

7       MS. TANABE: 8:30. Because we know you mean it.

8       THE COURT: Yeah. I'll be here. Whether you're

9  here or not, I'm going to start hearing evidence.

10       MS. STANLEY: Judge Hill did that.

11       THE COURT: Actually, he did. And I've been known

12  to start a hearing right on time, a minute before.

13       MS. TANABE: We take your notices literally.

14       THE COURT: Yeah. Okay. I think this will work

15  great. And I appreciate that we have been able to figure

16  this out.

17       So, Mr. Feist, if we begin on the 20th and wrap up

18  on the 25th, that's something that you or your client can

19  accommodate?

20       MR. FEIST: Yes. Thank you, Your Honor. May I

21  still appear on video?

22       THE COURT: Absolutely. Yes. You don't have to

23  file another motion. This is an extension of this hearing

24  is what it is. I'm just going to hear a little bit more

25  evidence because issues arose that none of us were really

Page 189

1  expecting.

2       MR. VERSTANDIG: And I guess for clarity, are we

3  filing papers in a week or are we going to wait and do that

4  after this?

5       THE COURT: You are welcome to wait until after

6  this. Or if you want to brief cause, then I could begin the

7  hearing with my thoughts on cause. It's entirely up to you.

8       MR. VERSTANDIG: I think we want to wait to brief

9  cause then.

10       THE COURT: Pardon me? You want to wait to brief

11  cause?

12       MR. VERSTANDIG: Yeah. We'll throw it in with the

13  others. I'm literate enough to read a room.

14       THE COURT: I'm sorry?

15       MR. VERSTANDIG: Nothing. We'll wait. We'll

16  throw it in with the others.

17       THE COURT: Okay.

18       MS. TANABE: But we are not re-arguing cause,

19  right? We're just doing -- I think you had started to say

20  that you were going to give us some limitations. Or was

21  that just regarding your calendar?

22       THE COURT: What I was going to say is I'm not

23  going to set limitations on the briefing. As long as we

24  agree on what the deadline is, you don't have to limit your

25  pages. Although it's -- you know, charts are good. All

48 (Pages 186 - 189)

Page 190

1 right.

2       MR. HUSHKA: I think the question was, Ms. Tanabe,

3 if I'm correct, I think the question was on the hearing are

4 we limited to the unusual circumstances issue or are we

5 relitigating the hearing on the 20th and --

6       THE COURT: No, I thought we -- I thought we

7 already -- I think we already heard everything. We already

8 heard everything on cause. I'm not expecting new evidence

9 on any issues related to cause.

10       MR. VERSTANDIG: To be clear though, it wouldn't

11 just be unusual circumstances, it would be whether in the

12 alternative it's in the best interest to appoint a trustee.

13 If not unusual circumstances that hold in a status quo 11.

14       THE COURT: So the reason why we're receiving

15 other evidence is that 1112 invites me to consider unusual

16 circumstances even if I find cause. And so I am telling you

17 right up front that there's lots of evidence that was

18 offered on cause, and I'm going to hear the rebuttal. But

19 assuming that I find cause, I'm going to have to make a

20 decision about whether to dismiss or convert. Or now, given

21 the fact that there was a suggestion in the testimony about

22 hiring a professional to oversee the completion of

23 construction, that will -- whether that's a viable option is

24 something I would consider under extraordinary

25 circumstances. And if the Debtors wanted to suggest the

Page 191

1 appointment of a trustee or an examiner, I'll hear whatever

2 you think supports that proposition, because that's not one

3 that I heard in the evidence presented. So I am really

4 looking at extraordinary circumstances, conversion, or

5 dismissal. The evidence related to cause is in and I don't

6 expect to hear anything more on that.

7       MR. VERSTANDIG: Thank you, Your Honor.

8       THE COURT: I would likely sustain an objection to

9 it. All right. Okay. Anything else I can say that would

10 be helpful to you right now other than we'll postpone the

11 briefing until after the next hearing? Is that what--

12 everybody is on the same page, that's what your preference

13 would be? Okay. And then I'll expect you to offer

14 suggestions about when that deadline should be. So you

15 should examine your calendars at the 25th.

16       MR. VERSTANDIG: Yeah. Just to be clear about

17 that, what we had said one week today, we are not going to

18 say one week on the 25th. I do not want this to be

19 Thanksgiving weekend.

20       THE COURT: No.

21       MR. VERSTANDIG: Okay.

22       THE COURT: That would be terrible.

23       MR. VERSTANDIG: Just being very up-front about

24 that.

25       THE COURT: Yes. Well, I'm not going to compel

Page 192

1 you to do that. You'll have to negotiate with each other

2 about when that deadline should be looking at your

3 conference calendars and such.

4       MR. VERSTANDIG: Yes.

5       THE COURT: Okay. Anything further on behalf of

6 Red River?

7       MS. TANABE: Thank you, Your Honor.

8       THE COURT: Debtors?

9       MR. VERSTANDIG: Nothing further from the Debtor,

10 thank you.

11       THE COURT: On behalf of Watertown Development

12 Company?

13       MR. FEIST: No thank you.

14       THE COURT: And on behalf of D&M?

15       MR. KLOBUCAR: Thank you, Your Honor.

16       THE COURT: Anyone else? All right. This matter

17 stands in recess. Have a good day.

18       CLERK: Please rise.

19       (Whereupon these proceedings were concluded at

20 3:09 PM)

21

22

23

24

25

Page 193

1       C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4 transcript is a true and accurate record of the proceedings.

5

6 Sonya L. Ledanski Hyde

7

8 Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20 Veritext Legal Solutions

21 330 Old Country Road

22 Suite 300

23 Mineola, NY 11501

24

25 Date: November 21, 2025

**[& - 1st]**                                                                                Page 1

| & | | | |
|---|---|---|---|
| **&**   4:20 5:9 6:2 6:3 | **10:30**   71:11 | **12,410,000**   93:19 | **150,000**   18:5 |

**0**

**08**   120:22
**09/26/2025**   3:2

**1**

**1**   33:10
**1,200**   22:17,19
**1,500**   11:7,9
**1.1**   98:12
**1.2**   145:19,21   145:24
**1.3**   145:13   167:3
**10**   77:1 80:3,4   81:1 108:16   118:16 137:8
**10,000**   64:16
**10,490,000**   93:9 107:2
**10/10/2025**   3:6
**10/17/2025**   3:10
**100**   5:19
**100,000**   18:19   32:19 39:3   40:23 41:1   43:24 48:8   64:20 65:18
**102**   124:3,9
**103**   7:9 40:8   152:7
**105**   172:9
**109**   3:2

**10:30**   71:11
**10a**   77:1 80:3,4   80:25 108:16
**10bedrock**   111:10,15
**10d**   129:23
**11**   3:2,5,9   95:22 106:25   168:20 169:11   171:25 172:19   175:11,18,23   190:13
**11,658,331.25**   37:1
**11/4**   141:18
**110**   98:11
**1104**   172:15   174:11
**1112**   46:19   168:14 169:3   171:13,22   172:18 175:12   190:15
**112,069.08.**   115:3
**114**   27:21   28:11 41:19,24   42:9,19 43:2,5   115:21
**115**   42:8
**11501**   193:23
**11:30**   102:24
**11c**   130:10
**12**   14:23,25   93:19,22   118:23 132:18   153:2,4

**12,410,000**   93:19
**12,860**   34:21
**12151**   193:6
**12th**   144:11   145:8 147:4,14
**13,701.56.**   115:8
**131**   3:6
**137**   84:19   112:14,16,18   112:18 129:6   130:5,11 137:8   140:10
**13th**   121:19   122:3
**14**   14:23,25   105:25 117:5   119:4
**14,143,972.39**   37:18
**14,220,000**   93:19
**141-12**   31:1
**143**   3:10
**146**   7:7
**148**   7:9
**14th**   4:22   142:15
**15**   22:17 51:19   124:15 163:9   163:10
**15,750,000**   35:2 51:21
**150**   11:13   27:10 28:12,16   28:23

**150,000**   18:5
**1500**   5:19
**151**   7:12
**154**   130:15
**156**   113:2
**156,964.87**   114:16
**15th**   124:14
**160**   132:22   140:11
**160,000**   62:5
**163**   7:13
**1630**   4:5
**16s**   58:16
**17th**   181:23,24
**18**   51:25   162:11,11
**180**   11:13
**180,000**   38:21
**181**   38:22
**181,000**   38:23
**18th**   33:22   34:7 137:14   141:19
**19**   122:1
**191,713.94.**   115:5
**193,400**   116:17
**19th**   182:3,5,6   182:25 183:1
**1:30**   139:17
**1:45**   139:21
**1a**   86:16
**1st**   1:7 2:6   14:18 62:8   79:22 90:4,4,8   152:4 153:11

| | | | |
|---|---|---|---|
| 155:2 160:17 | 144:11,12 | **24th**  183:12 | **3.25**  37:24 |

**2**

**2**  148:4
**2,000**  75:21
  152:20
**2,485,641.14**
  37:9
**2,750,000**
  83:11 97:25
**2.2**  93:11
**2.3**  29:25
**2.6**  110:2
**20**  20:18 38:4
  56:25 59:1
  61:10,14 87:12
**20,000**  95:25
  96:1
**2015**  10:25
**2019**  122:12
**2020**  117:1,13
  118:8 120:21
  121:20 122:3
  124:19,25
  126:6
**2020-04**  120:23
**2020-4**  122:18
**2021**  61:9
**2022**  124:14,16
  124:20 125:6
  136:10 147:4
**2023**  111:14
  136:10 147:5
**2024**  59:8
  144:11
**2025**  2:9 32:8
  33:22,24 34:7
  39:24 102:11

145:8 147:14
153:11 154:22
155:5 193:25
**2026**  104:7
**206**  4:22
**207**  27:10,20
**209**  130:15
  132:22
**20th**  182:2,3,4
  182:7,10,18
  183:20,21,22
  184:6,16,22
  185:5,16 186:9
  187:5,14
  188:17 190:5
**21**  141:18
  193:25
**218**  4:13
**21st**  182:3,5,22
  182:25 183:24
**22**  133:23
  136:16 137:14
  137:16 141:18
  141:19 142:15
  142:19,20
**220**  11:18
**22587**  22:14
  133:10
**23**  20:24
**230**  130:2
**231**  124:9
**23rd**  39:24
  40:5,10 185:8
**24**  20:24 52:1
**24,000**  32:13

185:10,10,15
185:18
**25**  41:20,25
  42:2,4,8,10,18
  43:9 115:21
  124:16 125:21
  126:10
**25,000**  82:15
  83:1,12,16
  104:17 107:12
  109:18 111:19
**25-30002**  1:3
**25-30003**  1:11
**25-30004**  1:19
**25-3004**  8:3
  71:17 103:5
  140:2
**25th**  183:6,13
  183:16 184:9
  184:16,21
  185:2,15,19
  187:15 188:18
  191:15,18
**26**  156:11
**27**  98:13
**27th**  99:22
**290**  124:10
  130:2,3
**29th**  170:13
**2:00**  185:24
  186:1
**2:30**  182:19,20

**3**

**3**  80:13,16 93:6
  93:10

**3.8**  23:1
**30**  87:12 96:18
  170:15
**30,000**  127:6
**300**  5:11,11
  94:17,17
  193:22
**300,000**  18:6
**33,400**  125:11
  127:7
**33,400.61.**
  115:10
**330**  193:21
**341**  28:3,5
**3429**  5:3
**35**  34:1,15
**39**  28:14,16
  53:16
**3:09**  192:20

**4**

**4**  2:9
**4,700**  22:21
**4.25**  107:14
**4.35**  107:14
**40**  64:14 90:23
  123:15 127:1
**40,000**  32:10
**400,000**  23:5
  76:19,25 77:25
  78:7 79:19
  80:1,18,25
  81:2,16 108:18
  143:5,7 148:6
**42**  40:1,22
**43**  7:7

| | | | |
|---|---|---|---|
| **45**  106:23 139:14 | 107:15 108:22 148:6 | **80**  20:18 38:2,5 | **a** |

**45**  106:23
  139:14
**460**  11:5
**4:00**  182:9,21
  185:24,25
  186:1
**4th**  118:8
  186:18

**5**

**5**  134:18,18
**5/18**  133:23
  141:18
**50**  27:25
**509,775**  122:24
  124:6
**55,000**  83:17
**55402**  5:20
**57101-1030**
  4:23
**57104**  5:12
**58102**  2:7 4:14
**58102-4246**  4:6
**58106-9231**  5:5
**589**  114:10
**5c**  90:3 137:9
  137:13
**5th**  5:19

**6**

**6,000**  32:14
  75:21
**60**  16:12 87:13
**60,000**  162:20
**600**  23:6
**600,000**  81:6,8
  81:14 82:1,14
  82:19 83:12

107:15 108:22
  148:6
**63**  7:6
**655**  2:6
**656,929.56**
  125:14
**656,929.56.**
  115:14 125:20
**68,945.09**
  114:21
**6th**  32:8
  102:11

**7**

**7**  3:2,6,9 106:7
  107:3 168:21
**7,490,000**
  93:11
**70**  7:8
**700**  73:18
**700,000**  105:23
**707**  114:19
**714**  114:24
**716**  113:2
**72**  7:7
**725**  115:2
**728**  115:5
**744**  115:8
**75,000**  181:6
**754.396.51.**
  116:20
**760,000**  113:19
**774**  83:11

**8**

**8**  30:25
**8,000**  75:23

**80**  20:18 38:2,5
**80,000**  62:6,6,7
  162:18
**80,134.41.**
  114:25
**800**  73:18
**81,000**  39:2
**815**  42:24 43:1
  43:4
**824**  115:10
**86**  108:25
**87**  129:21
  134:20
**87,000**  82:16
**89**  112:17
**8:00**  187:18,19
  187:23
**8:30**  187:22
  188:2,5,7

**9**

**9**  7:6
**90**  106:10,24
**900,000**  125:5
  125:10
**9231**  5:4
**93**  29:20 30:12
**947,795**  116:22
  125:24
**95,000**  123:1
  123:13,15,19
  124:7,10
**99.91**  35:23
**9:00**  187:17
**9:30**  2:10

**a**

**aarestad**  13:13
  13:19 17:12
  23:5,6 35:20
  73:6 76:14,17
  77:5 80:1 81:3
  81:7,23 82:6
  83:18 84:14
  91:13 96:25
  99:15,17
  101:16 105:22
  107:5 108:2,14
  109:1 140:23
  149:1,6 150:5
**aarestad's**  13:5
  74:2,8,20
  79:17
**ability**  10:4,6
  66:25 90:10
  94:12 153:20
**able**  14:20 17:4
  23:10 24:25
  50:25 51:5
  54:25 55:21
  66:13 88:22
  105:2,2 141:1
  144:17 145:23
  146:7 162:16
  177:7 188:15
**above**  33:7
  48:24 116:6
  160:9
**absolutely**  41:9
  60:5 66:12,22
  86:9 96:9
  125:1 171:12
  186:16 188:22

**[absolve - alexandra]**                                                    Page 4

| | | | |
|---|---|---|---|
| **absolve** 40:6 | **acknowledge** | 64:17 86:19 | **afternoon** |
| **absurdum** | 72:15 121:5 | 87:13 123:11 | 151:9 182:19 |
| 172:19 | **acknowledges** | 146:2 179:4 | **aggregate** |
| **abundance** | 122:11 | 180:10 181:16 | 37:16,17,23 |
| 71:21 | **acknowledgi...** | **additionally** | **agnostic** 50:23 |
| **acceptable** | 58:7 | 172:11 | 51:4 |
| 162:13 | **acronym** 56:10 | **address** 13:8 | **ago** 40:1 43:21 |
| **accommodate** | **acting** 12:19,24 | 49:21 131:2,3 | 51:4 80:7 82:9 |
| 188:19 | **action** 69:5 | 133:10,19,21 | 105:23 128:3 |
| **accomplished** | **actual** 17:1 | 134:9,9,16,17 | 158:12 171:4 |
| 100:13 | 60:3 77:14 | 134:21,23 | 173:2 178:25 |
| **accordance** | 109:3 120:11 | **adequate** | **agree** 25:9 59:2 |
| 157:10 | 149:16 | 174:19 178:12 | 59:9,23 60:19 |
| **account** 47:25 | **actually** 14:22 | **adhesion** 92:7 | 60:24 61:13 |
| 48:3 64:25 | 17:22 18:16 | **administered** | 70:16 114:15 |
| 84:11 99:9,11 | 22:9 51:3 55:5 | 1:3,11 | 114:20 115:15 |
| 110:23 111:4 | 56:19 70:2 | **admission** | 115:16 128:21 |
| 111:20 126:25 | 77:17 84:5 | 168:21 | 134:4,8 183:25 |
| **accountant** | 90:23 93:14 | **admit** 41:21 | 189:24 |
| 24:12 | 106:25 121:12 | 155:8 | **agreed** 18:5 |
| **accounted** | 125:19 129:18 | **admitted** 42:10 | 135:19 |
| 162:19 | 133:10 137:12 | 175:19 | **agreement** |
| **accounts** 24:18 | 147:12 159:13 | **admitting** 42:1 | 25:21 26:1,5 |
| 44:8 | 160:13 167:22 | 42:2,15 122:10 | 60:17 118:17 |
| **accrual** 119:6 | 175:19 182:17 | **advantage** | 127:20,22 |
| **accrued** 83:5,9 | 185:24 187:18 | 106:14 | **ahead** 12:6 |
| 119:2 | 188:11 | **adversary** | 29:25 77:22 |
| **accuracy** 9:23 | **acuity** 9:22 | 106:3 | 78:10 88:23 |
| **accurate** 12:10 | **ad** 172:19 | **affect** 118:7 | 105:17 144:1 |
| 14:1,3 23:21 | **add** 114:18 | **affected** | 149:15 |
| 25:2 28:20 | 124:20 129:13 | 118:10 | **aid** 82:17,18 |
| 33:22 39:12,24 | **added** 125:7 | **affecting** 9:22 | **aimed** 156:20 |
| 59:7 63:13 | **addition** 92:1 | **affidavit** 109:1 | **air** 12:21 58:17 |
| 64:18 73:13,13 | 130:25 131:21 | **affirmative** | 102:6 |
| 73:14 193:4 | 132:20 | 64:24 136:22 | **albeit** 186:20 |
| **accurately** | **additional** | **afraid** 47:4 | **alexandra** 82:5 |
| 29:1,4 | 55:24 63:12 | 183:2 | |

alike   126:24
allegations
    167:19
allow   25:22
    26:5 49:17
    113:11 120:20
    129:20 149:21
    155:23 165:14
    171:8 176:6
    177:4,19
    181:16
allowed   36:25
    103:1 149:4
    170:15,25
    175:16 180:22
allowing   166:3
    174:2
allows   162:6
    169:3
alter   85:16
    99:22 100:2
alteration   87:7
    87:21
altered   85:10
    87:5 89:12,21
    99:18 102:13
    111:23 129:4
alternative
    174:1,9 190:12
alternatives
    179:22
amend   40:23
    65:8
amended   33:19
    34:9,12 35:1
    37:20

american
    139:13
amount   37:1,6
    37:17 38:20
    39:13 63:21
    90:23 95:7
    110:1 114:15
    114:19 116:11
    116:15 122:24
    124:6,15,16,19
    125:3,4,6,14
    125:19,20
    145:23 146:6
amounts   18:4
    37:23 59:11
    64:16 86:17
    100:8 116:7
    126:16 147:18
analogy   172:12
analysis   29:2
    171:13 172:20
analyzed   29:7
analyzing   26:1
anecdote
    156:13
announced
    171:14
answer   9:25
    18:15 26:11
    29:3 37:13
    47:2 49:22
    54:19 68:18
    77:22 84:5
    88:18 117:15
    118:3 127:16
    130:12 154:16
    156:2

answered
    161:10 171:17
    171:17
answering
    10:3
answers   108:1
anthony   4:25
    143:19
anticipate
    75:13
anticipated
    161:19 162:1
    162:16 166:7
    171:18
anybody
    143:11
anymore   48:2
    74:7
anyways   39:18
apart   81:13
apartment
    11:3 48:24
    53:15 151:14
    161:20 163:10
apartments
    76:11 85:21
    132:20 152:6,7
    152:14 158:25
    160:3,13 162:6
apologize
    10:22 14:15
    26:12 33:7
    38:14 58:15,18
    77:23 80:22
    92:17 147:21
    153:9 161:2

apparently
    165:21 188:3
appeal   175:8,8
appear   28:20
    38:9 41:1
    119:22 129:13
    188:21
appearing
    62:14,14 63:5
appears   42:24
    46:20 176:16
appliances
    38:13,16,24
    39:6,7 40:24
    64:21 74:9,11
applicability
    167:15
application
    146:14 174:7
applied   62:7
apply   57:3
    60:13
appoint   173:19
    175:23 190:12
appointed
    175:11
appointment
    172:2,14
    174:11 176:24
    177:1 180:2
    191:1
appraisal   35:5
    93:19 126:16
    158:1 177:21
    177:22
appraisals
    126:15 164:8

appraised  23:1
  106:10 145:22
  146:5
appraiser
  118:22 126:11
  127:2 154:1
  155:15 178:24
appraisers
  126:24 178:4
appreciate
  63:5 107:25
  114:7 168:5,23
  188:15
approach
  172:10 178:5
appropriate
  14:20 173:11
  174:6
appropriations
  182:9
approval  141:1
approve  12:7
approved
  104:6,10 134:3
approximate
  117:2
approximately
  11:5,10 32:10
  32:18 33:22
  35:22 37:24
  38:21 65:13
  152:5 159:14
april  18:4
architect  10:21
area  38:8
  159:5,11,13,22
  160:6 161:5

162:10 179:3
areas  13:10
argued  170:1
arguing  156:13
  189:18
argument
  31:16 165:11
  166:4 169:7
  173:21 180:15
  181:15
arguments
  150:5 166:23
  168:7,17
arm  57:22
  85:21,22
arose  188:25
arrive  35:4
ascertain
  120:7
asia  117:12
  120:10
aside  119:15
  185:19
asked  16:5
  50:9 56:6
  63:10 64:20
  85:20 99:24
  100:7,11 102:3
  111:22 127:16
  136:12 137:10
  154:8,19
  155:16,17
  158:1 161:9
asking  14:15
  16:2 42:4
  76:16,17 77:18
  95:21 99:20

112:22 121:17
  132:4 134:11
  154:2 157:7
  172:9
aspect  152:9
asphalt  90:16
asserted
  108:11
assess  186:23
assessed  59:16
  59:18,23 60:2
  61:19 105:19
assessment
  105:12
assessor's
  59:14
asset  34:23
  35:22
assets  21:15
  32:25 33:16
  34:13,18 36:9
  36:12 40:16
  98:12
assigned  35:1
  78:11 109:9
  148:7,15
assignment
  149:12
associations
  151:14
assume  186:4
assumes  68:16
assuming
  71:21 103:7
  190:19
attach  91:15

attached  13:19
  13:22 14:1,9
  18:17 91:6
  109:3
attaches  30:22
attachment
  16:17
attend  182:13
attending
  181:12
attorney  4:4,21
  5:2,10,17
  55:14 56:15
  65:9 112:22
  136:12 137:7
  137:10 146:10
  146:13
attorneys  4:12
audit  27:2
august  100:6
  136:10 155:1
authority  14:6
availability
  117:4
available  61:23
  87:22 88:22
  142:23 179:23
  182:1,24
  183:11
ave  2:6
avenue  4:5,13
  5:11
average  155:18
  159:2
avoid  76:22
  98:10

**awake**  47:13
**aware**  16:19
  186:2
**awhile**  178:25

**b**

**b**  2:21 4:5
  109:4
**back**  8:2 9:15
  18:15 27:4
  28:3,6 36:1
  48:11 51:3
  53:24 55:17
  60:7,16 63:23
  70:3 71:16
  75:11 83:7
  88:3 89:20
  90:24 94:3,10
  95:5,8 97:7
  98:15 102:2,2
  103:4 104:9,21
  115:21 116:10
  117:21 119:5
  123:20 124:4
  125:6 133:18
  137:8 140:1
  141:11 149:11
  153:11 154:22
  155:3,3 160:12
  173:5 179:5,6
  184:21
**backed**  90:21
  97:20
**background**
  155:13 158:21
  158:24 163:12
**backing**
  118:24

**bad**  46:7 70:2
  123:25 137:2
**badly**  44:14
**baete**  16:4
**bake**  74:17
**baking**  74:17
**ball**  89:3
**balloon**  106:7
**ballpark**  33:24
**band**  82:17,17
**bank**  3:1 4:12
  4:21 6:2,3,4
  8:4 13:14
  14:19 16:12
  17:13,25 18:10
  18:21,24 25:14
  25:18,21 26:5
  36:15,25 37:17
  37:24 38:1,13
  38:16,18 47:25
  53:7 70:24
  71:4,18 76:17
  77:6 78:12,15
  79:1,2,3,5 81:4
  83:6 84:4
  85:11 88:25
  90:10 91:13
  97:7,9,20
  98:11,21 99:8
  99:11,18,20,25
  100:2 101:17
  101:19 106:22
  109:10 111:20
  118:19 119:1,5
  119:6,12 136:3
  136:13,16,19
  140:3 147:10

  147:16,25
  148:2,5,8,10
  148:16 149:14
  166:24 171:5
  171:22 172:1
  174:8 176:12
**bank's**  3:5,8
  46:20 50:22
  79:5 179:10
**banker**  127:2
  162:10 163:21
  163:22 164:3
**bankers**
  126:23
**bankruptcy**
  1:1 2:4,23 4:3
  8:3 33:6,17
  43:22 54:12
  69:4 71:17
  91:1 102:10
  103:5 140:1
  146:14,15
**banks**  135:24
**base**  58:17
**baseboard**
  131:9 132:18
**based**  10:18
  35:15 52:7,20
  54:23 59:16
  118:16 152:12
  155:10 158:10
  175:13 187:9
  188:4
**bases**  166:4
**basically**  42:15
  103:9 141:23
  146:1

**basis**  37:9
  117:24 158:25
**bassford**  5:16
**bat**  117:12
**bates**  34:4
**battles**  179:14
**beady**  186:23
**becoming**
  143:2
**bedbugs**  85:23
**bedroom**
  132:22 159:3,4
  159:4,17 160:2
  160:18
**bedrooms**
  160:17
**began**  117:25
**beginning**
  48:12 77:12
  158:4 180:23
**begins**  112:19
**behalf**  13:17
  167:16 179:19
  181:8 192:5,11
  192:14
**belaboring**
  25:1
**belief**  52:23
**believe**  22:7
  23:24 27:19
  32:13 33:21
  35:20 36:23
  37:17 40:18
  41:2 48:13
  51:22,24,24
  55:17 59:8
  61:4 64:21

[believe - build]                                                                                Page 8

65:12 66:7
67:23 68:9
69:2,7,19 70:1
76:20 82:6
95:1 102:15
108:16 109:1
112:12 114:10
116:14 120:22
121:17,19
123:3 126:12
127:5 128:17
136:18 139:13
143:4 144:5,22
145:2 149:4,6
152:18 153:12
155:1,4 156:14
167:24
**believed** 90:5
**benefit** 25:11
140:24 178:17
**benefitted**
119:2,5,6
**best** 10:3 34:9
56:17 57:20
74:5 77:9,13
148:2 166:10
166:20 167:13
168:3,7 169:15
169:18,22
171:24 172:15
174:4 176:7
178:2 180:2,17
180:19 190:12
**better** 15:11
22:17 161:14
167:6 174:14
184:2

**beyond** 23:24
50:1 149:4
**bid** 86:8 90:21
**bids** 49:10
117:6 118:24
**big** 16:25 22:19
64:16 140:21
**biggest** 64:8
83:5 119:1
**bill** 32:24 90:8
**bills** 89:17
123:20 141:5
**bit** 8:19 33:14
38:9 56:23
89:19 95:4
99:14 121:15
150:24 151:23
155:2 159:8,15
159:16 160:4
162:8,18
188:24
**black** 56:4
186:4
**blanketed**
80:14 81:16
**bleed** 183:23
**blooded**
139:12
**blow** 73:17
**blown** 73:11
**blue** 34:4
**board** 104:8
**booked** 128:4
138:25
**bookends** 86:1
**bookkeeping**
17:3 24:24

**boom** 73:19
75:4 86:11
**borders** 160:10
**borrow** 98:16
145:22
**borrowed**
147:6
**borrower**
98:19,21,23,24
99:2
**bottom** 30:25
116:3 122:2,21
185:20
**boulevard** 5:3
**box** 5:4 28:12
111:11
**boy** 147:3
**branch** 83:23
84:1
**brand** 22:16
160:10
**breadth** 42:16
**break** 8:23
28:1 69:25
70:25 71:8
102:21,22
121:6 138:14
139:20
**breaking**
139:11
**breaks** 9:2
**breath** 185:23
**brick** 49:2
55:23 64:11
**brief** 189:6,8
189:10

**briefing**
165:12 168:5
179:20 189:23
191:11
**briefly** 13:9
32:25 36:1,9
36:12 63:6
70:11 146:23
151:12
**briefs** 176:21
**brilliant** 52:10
**bring** 84:19,20
86:10 96:15
109:15 162:17
174:17 177:20
177:21 178:10
178:15
**bringing** 53:24
**broadly** 103:10
103:11
**broke** 8:4
57:13 71:18
74:14
**broken** 57:8
74:9,11
**broker** 164:8
164:12,13
**brother** 127:24
**brought** 13:8
76:24 94:14
128:6
**budget** 185:22
**build** 22:18
57:25 93:8,12
93:16 118:4,15
126:17,19

**builder** 160:1
**building** 23:14
35:15 45:22
48:20,24 49:1
53:15 61:16,18
61:19 64:7,15
72:25 73:22,23
86:3,5,6,21
93:8,12,16
94:18 103:25
104:16 105:4,9
118:21,23
126:21 153:20
153:22,23
154:4 158:2
160:12 178:18
**buildings** 11:3
11:14 50:10
151:14 152:10
154:3 159:15
**built** 22:16
48:22,22 50:10
86:6 94:15
117:1
**bunch** 82:7
123:6
**burden** 50:22
**burdick** 2:5
**burn** 70:6
**business** 24:14
32:2 118:7
**businesses**
17:9 57:24
**busted** 128:14
145:16
**butterfly** 120:6

**buy** 123:7
**bypassed**
172:18

**c**

**c** 4:1 8:1 9:14
193:1,1
**cabin** 22:17
145:20 146:5
**calculation**
115:13
**calculations**
153:10
**calculator**
35:21
**calendar**
173:16 186:1
189:21
**calendars**
191:15 192:3
**call** 8:5,7 50:4
55:7 82:13
157:9 171:10
176:4
**called** 55:12
85:22 101:11
101:24 127:23
128:2 156:6,9
**calling** 150:5
**calls** 25:25
72:6 108:2
149:1 150:9
158:16
**candidly** 58:7
**cap** 35:8
126:24
**caps** 92:4,19

**captioned**
175:22
**car** 70:4
**care** 41:13
48:21,23 86:21
145:15
**career** 20:22
**careful** 77:17
108:10 157:19
179:1
**caren** 4:17
**carig** 96:23
**carpet** 160:2
**case** 1:3,11,19
3:1,5,9 8:3,14
12:22 27:3
29:11 33:4
36:16 39:10,22
46:20 47:16,21
50:4,21 51:7
51:15 58:8
67:18,20,22,24
68:13,21,24
71:17,18 103:5
121:12 140:2
146:15 148:3
149:10 150:21
158:5 168:20
171:2 172:23
174:20 175:17
181:7 182:15
**caselaw** 101:18
**cases** 14:4
172:20
**cash** 48:6
54:23 88:22
95:2 145:24

**cashflow** 94:2
162:21,21
**cashway** 90:18
**cass** 60:11
**category** 57:10
**cathcart** 4:9
7:12 28:2,5
114:5 150:9,13
151:8,21 152:1
153:1 154:9
155:8 159:1
161:8,14,14,18
161:24,25
162:23
**cause** 166:16
166:18,18
167:10,10,11
167:14,19,22
167:23 169:14
171:18,19,24
172:13,21,22
173:9,10,24,24
174:2 176:6,17
176:20 179:21
189:6,7,9,11
189:18 190:5,8
190:9,16,18,19
191:5
**caused** 85:9,16
**caution** 71:21
**caveat** 50:5
**cclausen's**
113:21
**cco** 6:3
**ceo** 6:2
**certain** 14:9
24:8 31:16,17

54:4 86:13,17
98:17 131:1
137:17
**certainly** 25:17
30:3 41:9
134:24 150:3
168:5 183:23
186:21
**certificate**
24:16 52:2
53:22 54:22
95:3 137:22
**certified**
155:15 193:3
**certifying**
116:7,22
**cetera** 50:11
170:16,20
175:21
**change** 51:19
51:22 94:24
118:24 147:9
152:16
**changed** 15:3
17:10 91:21
134:25
**chaos** 87:10
97:17
**chaotic** 102:9
**chapter** 3:2,5,9
3:9 95:22
168:20,21
172:19 175:11
175:18,23
**charge** 162:16
167:2 169:24

**charitable** 66:8
**charles** 23:5
27:6 76:20,24
77:3,7,25 78:6
78:14 79:19
81:2,11 82:4,6
83:21 84:8,9
84:13 90:4
91:10,13,14
92:10 97:4,16
97:18 98:9
102:5 106:13
106:15 109:1
123:5,8 128:19
133:6 134:2
135:12 141:12
142:6 144:6
147:17,23
148:7,16 149:1
**chart** 110:6
112:19 137:8
**charts** 189:25
**chastised**
183:6
**chat** 168:10
**check** 22:8
**checking** 84:11
114:6
**checks** 155:13
**chief** 45:19
50:4 51:8
174:2
**children** 94:15
94:15 188:4
**children's**
102:17

**choice** 167:12
**christianna** 4:9
**circling** 36:1
**circuit** 169:1
169:13
**circumstances**
160:23 166:19
167:12,24
168:18 169:3,4
169:11,16,20
169:21 170:4
170:22 171:2
173:18 175:18
176:23 177:10
178:1 190:4,11
190:13,16,25
191:4
**circumvent**
135:13
**citizens** 94:21
**city** 45:18 57:2
57:3,22 60:12
60:12,14 61:2
105:11 123:7
152:17
**claim** 36:16
37:1,4,6,12
38:3 40:6 44:9
46:18 59:1
60:8 65:13
144:23 148:3
**claims** 31:7,12
36:2,3 37:16
37:21,24 38:1
38:2,5 97:12
145:2

**clarification**
51:2
**clarify** 14:16
14:24 49:15,18
50:16 84:1
181:22
**clarity** 42:11
53:15 54:20
71:20 84:12
94:22 96:7
130:12 150:11
165:7 189:2
**clausen** 15:9
85:13,19 86:20
112:22 116:11
116:14,22
125:5,9,20,21
127:3,6,21
**clausen's** 114:2
**claw** 94:3
**cleaned** 75:6
**cleaners** 95:6
**cleaning** 45:4
**clear** 74:16
76:16 79:16
90:1 91:20
92:14 100:1
102:6 126:1
172:21 176:3
190:10 191:16
**clearly** 120:4
**clerk** 8:10
71:13,15 103:3
139:23,25
182:8 185:24
192:18

**client**   174:15
   182:24 183:12
   183:23,24
   188:18
**close**   37:25
   71:2 113:24
**closed**   90:4
   138:1 186:7
**closer**   151:23
**closing**   150:6
   165:15 173:21
**coaches**   31:15
**coast**   183:14
**codes**   24:23
**coincide**   68:1
**cold**   32:15
**coldwell**
   163:21,22
   164:3
**collateral**
   81:14 143:2
**collect**   12:7,9
**collecting**
   155:14 164:1
**college**   20:22
   159:7 163:13
**column**   145:10
**combine**   18:9
**combined**
   11:12
**come**   8:9 45:19
   46:5 47:15,20
   49:23 55:17
   57:24 63:23
   75:2 76:13
   85:8 87:4
   89:11,18,21

95:8,23 96:14
96:24 99:17
117:21 123:10
139:7 143:6
159:12 173:5
173:14 179:3,5
179:6 185:14
187:10
**comes**   16:4
138:19
**comfortable**
26:17
**coming**   22:9
35:13 49:6
58:18 75:8
120:10 128:3
141:6 143:16
155:23
**comingle**   79:3
**comment**
178:12 181:15
186:19
**comments**
178:8
**commerce**   97:8
**commercial**
151:15 152:8
164:11,15,16
164:16,17
**commitment**
105:3 106:4
**commitments**
54:17 55:1,5
64:1 94:6
**common**   21:22
23:21 79:22

**companies**
   12:17,18 45:9
   128:15 159:12
**company**   3:4
   5:10 12:8,19
   20:7,17 21:4
   22:5 37:3 56:7
   56:25 57:3,14
   57:20 58:23
   60:11,13,21,25
   61:6,8 71:22
   88:11,15,18,19
   146:5 153:4
   154:21,23
   163:25 168:1
   179:19 192:12
**company's**
   58:25 60:7
**compare**
   159:21
**compared**
   35:24
**compel**   191:25
**compensated**
   157:2
**competitive**
   160:8
**complete**   20:20
   59:20,24 60:4
   61:16,18,20,24
   63:12 94:24
   154:16 167:3
   176:11 178:3
   178:18 179:12
**completed**
   15:15 51:23
   52:15,20,24

64:12 71:18
153:16,18,22
160:8 162:1,3
169:23 178:19
179:7,13,15
**completely**
57:9 65:4 70:7
160:23 163:8
168:18 169:11
175:18
**completing**
145:20
**completion**
53:21 54:5
94:7 166:14,19
176:25 190:22
**complex**
120:13
**complexes**
151:15
**complying**
100:12
**components**
21:16
**comprehensive**
53:12
**computer**
47:11 84:24
**conceding**
172:22
**concern**   138:16
139:3,10
149:12 160:17
166:3 177:4
**concerned**   86:8
138:17

**concerning**
43:21
**concerns**
100:17 151:16
168:4 171:21
171:25 179:11
**concert** 128:3
**concession**
176:12
**conclude** 58:6
**concluded**
192:19
**conclusion**
26:1 174:14
**concrete** 93:2
**condition**
93:16 153:24
181:5
**conditions**
160:22 166:16
175:18
**condo** 151:14
**conducted**
26:14,20 27:2
**confer** 41:6
**conference**
192:3
**conferred** 14:2
**confess** 166:6
**confined**
149:11
**confirmation**
95:13 175:2
**confirmed**
104:4 105:1
**confused**
160:19

**confusing**
16:14 78:13,19
99:19 106:9
**confusion**
24:10
**congress** 173:1
185:22
**connection**
45:24 47:16,21
156:16 157:20
**consider** 160:5
169:3 177:2
190:15,24
**considered**
159:24
**considering**
50:18 166:13
**consist** 163:4
**consistency**
84:12
**consistent**
153:21
**consistently**
17:14 18:1
**consortium**
81:23
**construct**
147:7
**constructed**
23:15 147:1
**constructing**
96:23
**construction**
10:18 11:22,25
12:3,11,13,15
12:19,24 18:19
18:21 22:22

24:3,5 25:14
25:19 54:18
59:20,24 60:4
61:24 75:3
85:13 87:5
88:11 92:23
94:14 108:15
110:25 118:16
124:21 126:14
127:3 138:1
162:5 166:15
167:4 172:3
176:11 178:3
190:23
**consumed** 27:5
**contagion**
120:11
**contemplated**
172:8
**content** 50:4
**contention**
46:17,24
**contents**
121:12
**contested**
157:21,22
158:9
**context** 156:7
**continuances**
170:16
**continue** 79:8
79:9 96:10,12
97:10 108:14
136:23 171:25
181:8
**continued**
140:12

**continuing**
127:16 157:17
**contract** 12:5
12:21 90:22
**contracting**
109:25
**contractor**
10:15,17,18,24
11:16,19 12:1
14:5 20:15
41:20 43:10,11
49:10 93:15
145:12
**contractors**
16:24 24:8,9
54:21 63:12
87:9 88:1
105:2 118:24
123:16 128:1
128:13
**contracts**
118:24
**contribution**
95:11
**contributions**
44:19 45:2,8
95:2
**control** 46:22
**controlled**
44:20
**conundrum**
36:4
**conversation**
141:6,11
179:22
**conversations**
140:25 170:19

181:7
**conversion**
167:13,15
169:15,17
174:12 191:4
**convert** 3:1,5,9
40:20 72:3
156:20 166:17
175:22 176:23
178:2 190:20
**converted**
168:25
**convey** 83:18
84:6
**conveys** 145:2
**convoluted**
110:15
**cookie** 160:5
**copies** 15:21
16:15 80:21
82:2 136:18
**copy** 28:20
142:8
**corner** 28:13
28:23
**corporation**
176:9
**correct** 12:12
13:3,14,21
14:1 15:2,6
17:7 18:2
19:21 24:1
25:8 26:24
27:13,18 29:8
35:17,21 36:19
36:20 37:19
38:7 44:17,18

48:10 52:3
53:4,5,6 59:17
59:22 60:22
61:12,15,17,21
61:25 64:19
65:19 67:16
74:18 80:24
82:15 84:14,15
88:20 91:5
94:8,24 96:2
106:16 107:7
108:15,20
109:7,12
110:10 111:20
112:3,11,23
114:12,25
115:3,6,8,11
116:1,4,8
119:8 123:1,2
123:4 124:11
124:17,22
125:14 127:9
131:6,25
132:12,13
133:1,11,13
134:22 135:2,3
135:5,6 136:10
140:15 141:19
142:4,19 143:3
145:13,17
146:8 147:11
148:1 161:11
161:12 163:5
165:6 181:5
190:3
**corrected** 15:3
16:9 17:5

73:24 133:7
165:22
**correctly**
153:10
**corridor** 74:13
**cost** 53:20
54:20 68:16
93:15 104:15
105:21 118:15
119:1 126:16
126:19 145:13
185:15
**costs** 64:5,14
64:17 86:17,18
109:24 117:5
132:5
**council** 104:5
104:10,17
105:2
**counsel** 14:8
45:24 47:6,8
58:2 63:10
68:24 69:7,17
69:18 108:10
121:7 149:23
150:12,17
186:15
**count** 131:22
**counter** 119:21
**counterfactual**
157:5
**countervails**
46:23
**counting** 76:8
**country** 97:8
193:21

**county** 57:2,2
60:10,10,11
62:6
**couple** 13:10
45:12 67:7
75:9 78:17
102:3 103:7
105:23 156:18
172:5
**course** 41:18
51:25 58:15
96:23 154:24
173:25 179:7
186:10
**courses** 164:7
**court** 1:1 2:4
8:2,9,13,18,22
8:25 9:3,6
21:23 26:2,8
26:10 27:24
28:4,7 30:7,14
30:18,20,23
31:2,20 33:6
41:4,9,13,15
41:17,23 42:7
42:7,18,21
43:1,4,8,12,15
46:8,15,25
47:13 48:15
49:17 50:3,8
50:15,18,19
51:6,9,13 52:5
52:16 54:9
58:3,9,11,14
62:10,13,18,21
62:23,25 63:4
63:7 68:7,18

| | | | |
|---|---|---|---|
| 69:6,23,25 | 149:21 150:1,3 | 190:14 191:8 | 32:25 38:8 |
| 70:7,10,13,23 | 150:8,10,16,20 | 191:20,22,25 | 43:18,20 44:4 |
| 71:7,11,16,23 | 151:2,6,21 | 192:5,8,11,14 | 46:10,13,21 |
| 72:1,7,13,18 | 152:22,25 | 192:16 | 51:1,5,15,18 |
| 77:11,20 78:22 | 153:17 154:5 | **court's**  30:10 | 52:19 53:2,20 |
| 79:7,12 81:8 | 154:13,18 | 30:17 58:1 | 54:16 56:15 |
| 81:25 84:25 | 155:22 158:14 | 69:24 76:2 | 58:21 63:8,10 |
| 85:16 87:16,18 | 158:20 161:4 | 92:20 123:22 | 65:10,13 70:14 |
| 88:16 95:15,21 | 161:10,13,17 | 169:14 172:20 | 70:16,23 72:6 |
| 96:20 101:1,18 | 161:23 162:24 | 177:13 181:10 | 72:7,12,14,20 |
| 102:20,23 | 164:20,22,24 | **courthouse**  2:5 | 74:19 79:4 |
| 103:4,22 | 165:1,3,5,10 | 186:7 187:21 | 80:13 85:5 |
| 107:20,22 | 165:17,25 | **courtroom** | 92:1 96:19 |
| 108:6 110:18 | 166:3 168:14 | 13:3 | 98:4 99:1,6,13 |
| 110:20 113:9 | 168:15 169:2,5 | **covenants** | 102:25 103:23 |
| 113:11,14,17 | 169:8,19 | 136:22 | 103:25 109:20 |
| 117:14,20,23 | 170:24 171:3 | **cover**  55:25 | 109:22 110:1,4 |
| 118:2 119:25 | 171:12,16 | 66:4 166:4 | 110:9,11,13,13 |
| 120:14,20,24 | 172:6,7,14 | **covered**  57:5 | 111:3,20 |
| 121:10,14,17 | 173:9,15,17,19 | 74:7 | 123:19 133:13 |
| 121:21,24 | 173:24 174:9 | **covers**  168:4 | 133:22 135:23 |
| 122:6,9,13,17 | 175:4,5,24 | **covid**  55:16 | 140:4,12,14 |
| 123:23 124:2 | 177:14,18,24 | 90:22 121:19 | 144:22,22 |
| 125:17,23,25 | 178:6 179:7 | 121:23 122:1 | 145:3 146:24 |
| 126:6 127:17 | 180:1,22 | **cp**  24:14 | 147:1 148:13 |
| 129:15,20,25 | 181:10,12,24 | **craig**  7:5 8:8,9 | 148:25 149:10 |
| 130:3,6,9,16 | 182:6,14 183:2 | 8:12,12,17,21 | 150:9,19,19 |
| 137:1,4 138:12 | 183:11,17,22 | 8:24 9:1,5,8,10 | 151:1,5,5,7 |
| 138:16,20,22 | 184:5,10,13,15 | 9:14,15 12:20 | 155:9 156:1,24 |
| 138:24 139:3,8 | 184:20 185:4,8 | 12:23,24 15:18 | 157:23 163:1,3 |
| 139:10,14,17 | 185:10,13,19 | 19:2 20:6,14 | 163:18,18 |
| 139:20 140:1,8 | 186:7,10,12,16 | 20:16 21:4,6 | 166:13 167:2 |
| 143:8,10,18,21 | 187:1,14,18,23 | 21:11,19,22 | 169:24 179:2 |
| 143:25 146:18 | 188:2,5,8,11 | 22:1,3,3,4,4,5 | 180:8 |
| 146:20,22 | 188:14,22 | 23:17,18,19 | **craig's**  99:8 |
| 148:12,22,25 | 189:5,10,14,17 | 27:12 28:8,18 | 150:13 |
| 149:2,8,15,19 | 189:22 190:6 | 29:10 31:6,22 | |

created  138:7
creative  176:2
credit  48:3
credited  148:3
creditor
 174:20
creditors
 166:20 168:2
 169:16,18,22
 171:24 172:16
 174:5 176:7
 178:3,18 180:3
 180:20
crew  95:6
 119:3
criag  7:11
cro  170:10
cross  41:4,8
 43:18 49:15,19
 50:3 51:7,14
 58:6,11 62:19
 72:12 102:20
 103:6,22,23
 140:4,12
 150:14 162:24
 163:1 173:6
 181:13
current  31:22
 32:2 59:18
 96:15 103:25
 151:9 154:14
 159:2 178:19
currently  9:19
 50:8 152:3
 160:16
customary
 136:3,21

cut  104:18
cutter  160:5
cx  7:4
cynical  178:16

**d**

d  5:22 7:1 8:1
 24:23
d&m  5:2 18:19
 18:21 89:22
 90:11 128:21
 129:7,7,21
 130:22 134:11
 134:20 137:10
 140:14,17
 142:16 164:22
 166:25 181:8
 192:14
dad  102:5
daggers  183:12
daily  45:12,12
 102:16
dakota  1:2 4:3
 45:25 47:6
 57:23 59:12
 67:18 68:10
 69:6 111:10
 118:12 119:18
 119:24 120:2
 120:15,21
 121:2,8,18,25
 122:1,5,6,7,18
 146:10,13
 154:10 155:18
 158:4
damage  74:20
 74:23,25 75:14

damaged  75:18
dan  69:12
daniel's  102:4
danielle  6:4
 82:6 83:21
date  32:7 39:21
 116:9 118:9
 120:7 121:8,13
 121:24 122:2
 124:13,22
 141:17,18,19
 142:5,14
 144:12 145:7
 171:10 193:25
dated  120:19
 121:19 126:6
 133:23,24
 137:14 142:19
dates  124:21
 137:21
daughter
 20:18
daughters
 48:21
dave  85:19
 86:7 113:21,22
 127:24
davenport
 4:20
day  15:14,14
 116:21 122:3
 151:15,15
 158:25,25
 163:4,4 172:24
 177:11,13
 179:5 183:9,9
 183:14,17

192:17
days  16:12
 40:1,22 87:13
 102:3 117:5
 119:4 123:16
 157:11 170:15
 174:6 179:6
 183:7
dead  87:2
deadening
 93:2
deadline
 156:12,23
 189:24 191:14
 192:2
dealing  16:10
 161:1 164:2
dealt  135:24
debating
 175:10
debt  23:5
 32:21 35:7
 56:7 57:14
 76:16,17 92:9
 94:1 106:23,24
 109:9 127:10
 128:19 132:7
 133:6,8 135:14
 141:2 142:3
 162:21 174:21
debtor  1:9,17
 1:25 3:8 40:16
 45:9 72:6
 149:1 150:9
 165:4 173:18
 174:2,5,17
 176:25,25

180:3,16 192:9
**debtor's** 170:7
**debtors** 4:4
  21:13 71:19
  72:4 79:4
  167:16,17
  170:19 176:8
  190:25 192:8
**debts** 23:7
  33:17 36:9,13
  78:17
**december**
  185:1 186:17
  187:2
**decide** 166:18
  176:7
**decided** 20:21
  104:16,18
  106:13,14
  124:15,19
  158:12
**decision** 22:18
  106:15 170:15
  190:20
**declaration**
  112:19 114:2
**declared**
  121:25
**decreased**
  159:13
**deed** 144:23
**default** 12:16
  23:10
**defaulted**
  12:23
**defend** 68:9

**defendant**
  67:22 68:17
**defendants**
  68:17
**defending**
  68:21
**defense** 68:3,4
  68:16 72:11
**defer** 50:20
  178:5 184:5
**deficit** 62:7
**defined** 158:9
**definitely** 60:1
  75:3 106:21
  132:19 162:9
  170:10
**delay** 173:14
**delayed** 17:16
  88:8 89:10
**delays** 16:11
  64:18 87:11
  119:1 127:1
**delegated** 61:4
**delete** 92:14
**delighted**
  168:6
**delineation**
  50:25
**delivered**
  104:21
**demand**
  152:13 153:20
  154:10 158:3
**demo** 113:6
**dense** 161:3
**dental** 163:14

**depending**
  159:5
**depends**
  155:16
**deposed** 26:23
  27:13 39:21
**deposit** 34:18
  34:21 105:3
**deposition**
  21:19 24:22
  27:1 28:9,21
  41:20,24,25
  42:2,3,8,14,17
  42:19 65:5
  101:6
**depositions**
  170:20
**describe** 22:15
  151:12 152:12
**description**
  73:14
**design** 159:21
**designate**
  156:5 170:23
  174:2 178:23
**designated**
  156:17 170:12
**designation**
  156:8,12
  178:10,22
**despite** 23:21
  171:23
**detail** 81:10
**details** 9:18
  91:11 159:11
**determined**
  59:12

**determines**
  172:14
**detour** 98:3
**detoured** 99:14
**develop** 56:21
  57:25
**developed** 11:7
  11:11,12 53:17
  85:25 106:12
**developer**
  10:10,12,14,16
  10:19 93:16
  109:25 111:18
  160:1
**developers**
  57:24
**development**
  3:4 5:10 12:23
  12:24 15:18
  20:3,4,6,7,14
  25:10,23 26:7
  26:21 29:15
  34:24 37:3
  56:7,25 57:3
  57:14,20 58:23
  58:25 60:7,11
  60:12,21,25
  61:6,8 65:11
  65:13 71:22
  99:13 109:20
  109:22 110:1,4
  110:10,11,13
  111:3 123:19
  168:1 176:9
  179:19 192:11
**development's**
  111:20

developmental
  48:15
diamond  5:17
died  127:24
difference
  10:16 42:13
  57:6 62:8
different  11:25
  24:23 34:13,18
  56:20 57:9
  69:7 154:3
  159:15,16
  160:4,23 162:8
  163:17 168:19
  169:12 175:19
differentiated
  172:10 178:15
differently
  54:15
difficult  179:8
diffuse  149:24
diminution
  46:18
direct  9:8
  25:10 49:16,19
  50:11,24 51:7
  54:1 56:6 58:8
  72:11,20 141:6
  149:5 150:13
  151:7 155:10
direction
  129:25 166:2
  168:13 170:25
directly  46:17
  72:9 176:5
disagree
  127:17

disappear
  182:9
disbursed
  99:11
disbursement
  41:21 43:10,11
disclosure
  30:20,21
  157:17 184:25
  185:20
discourage
  103:13,17
discovery
  16:18 109:15
  156:7,20
  157:22 170:19
  175:20 181:6
discuss  13:9
discussed
  25:15 150:12
  170:18
discussing  22:9
discussion
  91:10
dismayed
  168:17
dismiss  72:3
  166:17 176:22
  178:2 190:20
dismissal
  169:15,18
  179:22 191:5
dispute  37:10
  158:23 169:19
distinct  23:22
distinction
  155:12

district  1:2
  69:6
divert  128:18
divided  28:12
doc  3:2,6,10
docket  43:1
  124:3,9 134:20
  140:10 168:23
  175:13
document
  25:25 30:2
  31:3,18 33:11
  42:15,16,24,25
  54:8,16 55:13
  85:5 102:14
  116:1,21,25
  118:19 120:18
  120:19,23,24
  124:18 145:1
  156:15
documents
  61:8 109:13
  126:14 129:10
  129:18 134:20
  136:22 149:17
  181:8
doing  20:25
  22:7 27:5
  32:21 47:11
  50:4 72:11
  87:10 90:10
  95:9 100:13
  103:17 107:5
  111:18 130:7
  135:21 136:21
  147:3 155:13
  167:8 175:20

184:22 187:10
  189:19
dollar  93:20
  100:8 145:23
  146:5
dollars  65:14
  92:9 93:13
  94:23 104:19
  132:7 133:5
  135:12,14,15
  136:3 141:24
  142:1 147:9
  159:17
dominion
  46:22
don  92:23
donations  66:9
door  188:1
doors  132:18
  140:20,21
  187:20,20
double  49:10
  84:21 112:15
  112:16 114:6
doubled  17:17
  18:3
downtown
  49:1 105:5
  113:7 159:6,11
  159:13,14,24
  160:10
drafting
  155:14
draw  13:14,16
  13:20 14:10
  15:1 16:10,13
  16:13 17:1,16

18:17,23 38:12
38:15,18 77:1
84:11 87:11
88:9 89:1 91:6
91:12 98:17
99:5 105:25
109:23 110:3
111:4 112:11
114:11 119:12
119:12 123:15
128:23 131:6
132:3 134:5,14
135:1 138:6
140:23 141:9
141:22,23
142:21 156:3
160:15
**draws** 16:11
21:20 25:13,17
80:3,4,4,24
88:8 105:24
108:16 112:3
131:25 137:15
**dream** 22:18
169:10
**drew** 4:18
**driveway**
105:12
**driving** 185:17
**dropped** 74:14
**dropping** 53:1
**drove** 102:4
**drywall** 75:19
**drywallers**
119:3
**ducts** 49:3

**due** 16:12 59:4
59:9 122:1
**dueling** 177:23
179:14
**dump** 86:12,12
86:20
**duties** 163:4
**dx** 7:4

**e**

**e** 2:21,21 4:1,1
7:1 8:1,1 193:1
**ear** 159:7
**earlier** 20:25
26:23 44:15
62:16 73:16
80:8 94:23
108:5 109:17
111:2,23
112:23 115:22
127:20 136:10
137:7,10,18
140:14,22
141:21 142:2
144:5 145:11
145:15 146:9
**early** 39:10,10
39:17 100:6
104:11 117:7
187:17
**earmarked**
39:4 40:24
64:21
**easier** 185:2,3
**easily** 100:9
**east** 183:14
**easy** 27:23
132:14,17

**eating** 139:13
**ecf** 27:9 28:11
29:20 30:25
33:10 34:1,15
40:8 41:14,19
41:23 43:5
84:19 108:25
130:4
**economics**
53:10
**economy** 24:6
49:5
**ecro** 2:25
**edited** 55:13
**education**
188:4
**educational**
163:12
**effect** 141:22
**efficient** 41:7
**effort** 58:5
**efforts** 167:10
183:13
**eight** 11:2,3,14
50:10 82:15
89:3 107:11,14
132:18
**eighth** 138:6
169:1,13
**either** 17:1
32:23 64:17
73:19 74:14
83:7,9 87:1
96:18 99:2
154:18 174:10
176:24

**elaborate**
87:20
**elder** 111:11
**electric** 17:2
**element** 126:4
170:17
**elevator** 63:22
**elicited** 149:10
**eligible** 86:18
109:24
**email** 14:1
15:20 16:17
27:7 78:2,8
79:23,24 91:14
97:18 99:19
100:4
**emailed** 16:5
77:7 100:21
142:11 145:1
**emails** 13:23
15:21 16:2
97:11,24 98:8
136:9,12
**emergencies**
151:16 163:5
164:2
**emergency**
121:25
**employ** 24:12
**employees**
12:17 32:5
**empty** 131:13
**encompassed**
82:1
**endeavored**
54:17

**[ended - excavator]**                                                    Page 19

ended  49:9
  56:20 156:19
engage  45:24
engaged  47:15
  47:20 178:24
engineering
  89:12
enormous  86:6
  95:7
enormously
  120:12
enriched  46:21
  149:14
ensure  26:14
  75:13
entered  13:1
  121:2
entering  43:22
  102:10
entire  158:10
entirely  21:21
  157:5 189:7
entities  19:3,9
  19:18,25 21:9
  21:21 23:20,22
  23:24,25 24:2
  24:13,18 44:20
  46:21
entity  12:14
  20:10,11,12
  23:18 31:23
  46:9
entry  112:23
environment
  53:1
equaled  80:25

error  125:2
  131:16 141:10
es  7:4
escrow  104:20
especially
  153:22
essence  36:5
essentially
  14:9 18:8 20:4
  60:15 63:12
  118:12 172:2
establish  21:21
  172:21 176:17
established
  169:14
establishes
  153:21
establishing
  169:17
estate  20:3,4
  20:11 21:8
  53:10 164:8,10
  164:11 172:16
  174:4 178:18
  180:18
estimate  22:24
  113:19
et  50:11 170:16
  170:20 175:21
ethe  175:12
evaluating
  29:13,22
evaluation
  59:14
evans  4:20
evening  8:4

event  75:7
  185:23 186:8
  186:12 187:6
events  73:16
  75:2,2
eventually
  36:21
everybody
  56:5 102:9
  115:19 126:23
  191:12
everybody's
  47:13
everyone's
  94:10
evidence  13:9
  30:2,13 41:22
  42:10 46:23
  72:2 77:10,14
  77:15 87:14,17
  100:25 101:1
  103:8,9 110:8
  115:22 120:15
  129:11 149:19
  161:4 165:8,9
  165:9 166:10
  166:22 167:7,9
  167:10,14
  168:19 170:3,5
  171:1,8,9,19
  171:20 173:4
  175:5 176:16
  176:22 177:3
  180:4,10,16,18
  181:9,13,16
  188:9,25 190:8
  190:15,17

191:3,5
evident  156:25
evidentiary
  129:14 157:11
evidently
  84:23 148:19
exact  153:10
exactly  108:8
  140:17 169:19
  186:10
exam  103:22
  162:24
examination
  9:8 41:4 43:18
  49:25 51:14
  56:6 58:8 63:8
  70:14 72:20
  103:6,23
  140:12 146:24
  148:13 149:6
  151:7 163:1
examine  62:19
  173:6 181:14
  191:15
examiner
  172:15,23,23
  173:20 191:1
examining
  140:4 179:1
example
  130:22 166:13
exams  50:7
excavation
  116:19
excavator
  86:11

**except** 186:18
**exceptional**
  167:24
**exceptionally**
  168:24
**excess** 107:3
**exchange**
  156:14
**excuse** 38:14
  59:7 90:20
  155:6
**excused** 70:23
  148:25 165:1
**executed**
  135:19
**executive**
  119:18 120:15
  120:21 121:2
  122:18
**exercise** 173:7
**exhausted** 87:2
  88:21
**exhibit** 30:10
  30:16 31:1
  41:20,25 42:1
  42:4,8,10,14
  42:18 43:9
  109:4,5 112:20
  114:2 115:21
  119:22 120:4
  122:14 124:16
  125:21 126:9
  130:10
**exhibits** 42:3
  42:17 109:3
  157:13 165:6
  166:7 170:24

177:12 187:10
**existence** 171:1
**exists** 48:1,4,8
  53:21 74:6
  122:1 173:9
**expect** 171:19
  179:8 191:6,13
**expectations**
  175:13
**expected**
  166:12
**expecting**
  180:5,25 189:1
  190:8
**expense** 66:5
  66:11,23 70:17
  75:13
**expenses** 43:21
  43:25 65:20,23
  67:8,15 162:19
**expensive**
  82:17
**experience**
  10:24 93:15
  152:12,15
  155:10 159:2
  164:14
**experienced**
  145:12
**expert** 47:15
  47:20 67:6
  154:10 155:9
  155:19,24
  156:5,9,11,24
  158:17 160:21
  161:2 177:20
  177:22 179:1,2

**expertise** 161:5
  162:9
**experts** 94:14
  156:17,18,21
  157:7 170:12
  177:23 186:21
  187:8
**expire** 104:1
**expires** 73:4
**explain** 48:14
  56:22 62:3
  81:8 85:16
  87:7 103:14,18
  178:16
**explained**
  57:11
**explanations**
  167:20
**express** 157:6
**expressed**
  172:1 179:11
**expressly**
  172:13
**extended** 39:19
  73:22
**extending** 64:7
**extension**
  45:22 104:23
  188:23
**extensive** 87:9
  170:18,19
**extent** 42:13
  51:8 150:14
  155:17 166:22
  169:6
**extra** 16:6
  124:7 139:18

176:4 177:3
**extraordinary**
  166:19 167:12
  169:3,4 176:23
  190:24 191:4
**extrapolate**
  154:3
**extremely**
  166:9,21
  170:14,21
**eye** 56:4
**eyes** 107:8
  135:15 186:23

**f**

**f** 2:21 58:16
  193:1
**face** 160:13
  186:24
**facilitate**
  170:16
**fact** 81:11
  99:15 153:19
  156:24 158:21
  173:1 190:21
**factor** 160:15
**factors** 46:7
  52:23
**facts** 87:14
  100:25 103:7
**factual** 179:5
**fair** 9:25 17:15
  30:4,6 34:24
  40:8 64:22
  65:21 67:14
  68:3 135:23
  157:6 158:20

**fairly** 113:4
**fairness** 157:15
  158:13
**faith** 46:8
**fall** 57:6
  152:17
**falls** 4:23 5:12
  49:11 58:17
**familiar** 30:3
  33:13 53:9,9
  56:10 74:19,22
  115:25 131:3
  152:9 159:18
  159:20
**familiarity**
  155:11
**family** 46:10
  81:4,23 83:8
  83:19 84:13
  101:25 108:3,5
  108:23 109:8
**far** 107:3
  164:17 170:6
  174:16
**fargo** 2:7 4:6
  4:14 5:5 49:11
  163:16
**fast** 139:17
  177:5
**father** 81:6
  82:11 149:14
**favor** 106:20
  106:21 147:25
  174:11
**fear** 120:10
**feasibility**
  177:9 181:1

183:10 184:22
**feasible** 176:13
  176:15
**february** 104:9
  117:8,13 118:8
  124:24
**fee** 111:18
**fees** 37:2 45:18
  87:24 93:9
  109:25,25
  110:2,3,16,22
**feet** 22:19,21
**feist** 5:14 7:8
  58:11,12,15,20
  70:10,11,15,22
  71:23,24
  143:10 146:18
  146:19 164:20
  164:21 179:24
  180:25 185:17
  188:17 192:13
**felony** 100:22
**felt** 67:9
  123:11
**fertile** 83:23
  84:1,2,3
**fest** 188:20
**fiduciary**
  95:22 174:4
**fifth** 5:18
**fighting** 93:25
**figure** 68:14
  89:4 97:21
  102:8 117:11
  161:15 188:15
**figured** 135:22

**figures** 32:16
**file** 37:4 40:12
  40:15,19 174:6
  174:25 175:16
  188:23
**filed** 3:2,6,9
  29:10 33:3,19
  34:6 36:15
  37:14 39:14
  40:5,8 44:9
  146:14 175:12
**filing** 189:3
**fill** 153:20
  155:2
**filled** 52:1
  162:6,7
**finally** 22:18
**financed** 14:18
  53:6
**finances** 163:4
**financial** 24:2
  24:18 25:11
  81:5 95:11
  100:5 136:4,6
  136:15,23
  147:6
**financials**
  24:12,16
**financing**
  56:14 138:2
  141:3,5 145:25
  151:15 180:7
**find** 17:18
  29:22 49:2,3
  109:3 122:10
  123:21 150:14
  166:16 174:10

176:6 180:1
  190:16,19
**finding** 49:9
  167:11,23
  170:22 171:22
**finds** 10:19
**fine** 50:24 51:1
  139:2 187:3,11
  188:5
**finish** 39:4
  54:13,17,21
  93:11,21,23
  95:9 96:6
  105:21 107:6
  107:16 108:1
  113:12 117:20
  118:20 145:13
  170:8 181:2
**finished** 11:19
  35:16,19 39:7
  63:19 95:10
  96:8 104:20
  181:3
**finishing** 49:6
**finite** 174:5
**fire** 45:19
**firm** 4:3,11
  27:3 45:23
**first** 4:5 6:2,3
  10:25 11:20
  30:24 53:4,17
  76:11 88:9
  89:2 102:5
  104:14 109:23
  114:8 120:23
  121:18,23
  122:11 134:6

142:6 148:4
173:23 174:10
178:22 184:1
184:25 186:17
187:2
**firsthand**
155:21
**fit** 10:20
**five** 41:6
104:18 131:19
131:20,22
152:20 155:4
158:12 159:9
162:14,15
**fix** 75:21
**flashings** 75:5
**flexibility**
182:10
**flexible** 181:17
186:17,24
**flight** 138:23
139:1,2
**floor** 74:13
75:21 76:8,11
**flooring** 63:22
**floors** 75:22,24
76:3 160:2
**flow** 60:7
**flowing** 54:23
**focus** 89:6
167:13 170:4
**follow** 20:22
55:9 88:24
167:21 181:9
181:10
**following**
181:19

**foot** 22:17
132:18
**force** 58:17
185:18
**forced** 77:2
144:6
**foreclosure**
67:18 69:5
144:8,15
147:13 149:16
**foregoing**
60:15 193:3
**forever** 185:6
**forgetting** 60:2
**forgot** 43:6
**forgotten**
143:12
**form** 25:24
68:5 112:5
117:10,14
**formal** 64:1
**forseth** 16:4
**forth** 116:25
149:11 156:22
**forthcoming**
139:6
**forty** 173:1
**forward** 75:13
88:2 168:3
186:8
**found** 15:25
128:8 166:21
173:9
**foundation**
79:1 103:15,19
116:12,15
117:22 118:3,4

**foundational**
103:10
**four** 28:12
34:15 48:16
53:4,17 55:8
56:19 57:4
61:13 75:22
83:17 89:2
96:6 130:23
131:10 153:12
154:24
**fourth** 74:13
**frame** 111:7
**framed** 108:7,8
**framework**
169:1,13
**framing** 90:21
**frankly** 108:7
167:20
**free** 96:4
**frequents**
45:12
**fresh** 76:12
**friday** 186:4
**friends** 127:11
128:11
**frisk** 69:9,11
**front** 8:10 50:8
56:20 86:20
94:5,6 105:11
109:13 151:22
188:1 190:17
191:23
**fronted** 56:21
56:24
**frustrating**
168:24

**full** 9:12 39:12
85:23 162:13
168:21 177:11
**fuller** 5:9
**fully** 153:22
154:9 175:19
**fun** 51:12 70:4
**fund** 38:18
60:21 90:9
98:17 99:5
**funded** 38:20
86:16 88:10,23
105:24,25
106:1 108:16
134:3
**funding** 12:8
16:11 65:21
84:11 87:11
88:8 89:1
109:22 135:13
137:19 138:6
166:14 175:3
**funds** 25:22
26:6 29:7
66:13 86:19
109:21 140:23
142:23 144:17
149:13
**funky** 160:4
**further** 41:3
53:9 64:17
69:21 70:9,10
102:19 148:11
148:21 162:23
164:19 173:4
173:10 192:5,9

**fussy** 150:16
**future** 160:22

**g**

**g** 8:1 9:14
**gained** 163:10
**gamesmanship**
157:16 184:24
**garage** 16:6
76:4,6 93:13
**general** 10:14
10:17,18,24
11:16,18,25
20:15 21:14
29:9 60:6
109:24 117:9
118:10 145:12
158:13
**generally** 17:8
17:18 22:15
126:20
**generating**
67:14
**generations**
1:7 14:18 16:7
19:14,16 20:2
25:2,3,10
35:11 44:7,20
52:8,21 57:10
62:4,8 79:22
87:11,23 88:13
90:3,4,8,17
91:4,7,10,16
91:20,21,22,23
96:24 97:15,19
99:2 119:14
131:23 137:19
137:20 138:9

141:8 152:4
153:11,15
154:15 155:2
160:16
**gentleman**
26:16
**getting** 16:9
21:14 35:15
55:23 86:18
87:22 97:24
138:9 145:16
155:4 179:9
181:2
**give** 8:14 21:13
46:18 107:10
137:4 150:21
153:9 159:10
159:14 162:18
189:20
**given** 136:6
141:1 174:5
190:20
**gives** 57:2,3
60:10,12 162:5
**giving** 20:23
182:14
**glare** 114:20
**global** 120:5,6
**glue** 92:7
**go** 12:6 18:15
18:21 20:22
22:6,19 23:11
29:25 43:13
45:1,16 50:1,5
50:7 51:3 55:5
57:23 58:18
60:11 65:23

72:8 73:1,18
73:18 77:22
78:10 81:19,20
81:20 82:2,3
82:16,20 85:2
88:12 89:11
91:1 93:7
94:10 99:4,6
106:18 109:2,5
111:13 112:14
112:19 114:5,6
115:21 116:10
116:18 119:5
120:14 124:4,9
128:5 130:10
132:21 133:18
134:19 137:8,9
137:13 144:1
145:21 149:4
149:15 166:8
173:7,22
177:15 182:20
183:3 185:6
187:6,9
**goal** 57:23
**goals** 48:15
**gob** 174:22
**god** 8:16 90:12
150:23
**goes** 10:19
24:25 49:16
65:25 68:6
93:19 182:17
186:8
**going** 8:19 22:6
26:2 27:4,15
28:25 30:1

36:5 45:1 47:4
48:16,20 49:1
49:22 50:7,20
51:11,25,25
52:11,16 54:7
55:19 56:1
58:6,7,15 60:4
68:18 70:24
72:7,14 77:8
77:11,20 78:8
78:20,25 79:21
79:21,24 86:6
86:13,14,15,25
86:25 87:12
89:4,18 90:13
92:6 93:21
94:2,5,7,10
95:5,6,6,19,20
97:16 99:23
101:4,20,23
104:19,24
105:23 106:19
106:22,23
108:8 109:3
110:6,25 111:6
112:6 113:4,11
114:5,8 121:11
124:4 126:25
127:17 128:6
129:20 136:23
139:1 140:5
145:12 149:5
150:13 151:2
151:21 153:18
153:19 154:8
154:13 156:24
157:8,13,25

158:1,14
159:11 161:4
162:17 168:9
170:1,25
171:18 173:17
173:18,22,23
174:1,13 175:3
176:17,18
177:2,9,19,19
177:20 178:10
178:21 179:2
180:6,7,7,10
181:4,16 182:8
187:9 188:9,24
189:3,20,22,23
190:18,19
191:17,25
**good** 8:2 9:10
9:11 42:21
43:13 55:15
58:21 71:7
106:1 151:9
152:15 163:8
189:25 192:17
**gotten** 13:10
49:22 87:25
**government**
119:19,20
**governor**
121:25 122:7
122:18
**grade** 33:7
**graffiti** 66:2
74:3,5
**grantee** 145:3
**great** 94:16
128:5 132:23

151:2 153:8
182:2 183:22
188:15
**greedy** 138:25
**green** 8:20
150:25
**greenhouse**
83:24
**gross** 173:12
**ground** 57:7,13
154:12 159:14
**grounds**
153:25
**growth** 57:25
**guarantee**
94:11 104:24
105:1
**guarantor**
98:24
**guess** 11:13
12:18,22 14:24
18:15 23:9
33:23 60:1,17
61:9 93:4 98:1
149:3 168:12
179:4 180:20
181:8 189:2
**guessing** 178:8
**guy** 128:5
**guys** 75:19
128:14
**gypcrete** 92:24
160:2

**h**

**haga** 24:17
**half** 65:14
93:22 104:18

131:10 132:18
138:15,18
**hallways** 45:5
45:13 66:1
**hand** 8:10
11:20,20
**handle** 74:14
150:13
**handling** 69:14
69:16 81:11
**hands** 163:8
**hang** 25:1
**hanging** 32:24
**happen** 100:17
123:15 130:18
139:1 141:4
145:25
**happened** 39:3
70:4 73:25
80:2 93:14
97:11 98:16
120:18 163:15
**happening**
15:15 156:19
157:15
**happens**
179:21 187:5
**happy** 51:10
52:14 122:16
149:23 170:2
171:8 179:5,6
184:24
**hard** 21:3 45:1
48:18 93:25
94:19,20 101:8
101:9 117:3
180:14 182:25

**hardware**
140:20
**harless** 6:4
82:6
**hastings** 2:22
**hate** 85:1
**hats** 12:22
**hauling** 113:6
**haunted**
143:24
**headed** 177:18
**health** 45:20
**hear** 41:17
57:17 62:20
73:5 74:8,20
103:12 132:16
143:17 151:4
166:23,25,25
167:18 176:15
182:12 183:21
188:24 190:18
191:1,6
**heard** 13:5
74:2 123:25
166:12 167:20
171:3,21
175:16 176:19
180:16 190:7,8
191:3
**hearing** 3:1,4,8
156:12,12,16
157:9,12,13
170:5,13
171:14 173:10
173:15 180:4
180:12,13,23
182:19,19,21

183:6 185:20
186:3,25 188:9
188:12,23
189:7 190:3,5
191:11
**hearings**
181:19
**hearsay** 101:12
152:21
**heartstring**
174:13
**heated** 32:15
**heater** 16:6
**heating** 49:2,3
64:6
**heck** 78:13
**heloc** 77:8 78:1
78:4,9 79:16
79:17,19,25
80:2,19
**help** 8:15 29:18
60:16,17 86:20
87:25 95:9
100:14,15,18
101:5 107:6,16
135:12 150:22
**helped** 11:21
**helpful** 43:1
137:4 166:9,21
167:18,25
178:6 179:8,18
181:25 191:10
**helps** 70:2
**hesitate** 156:2
**hide** 129:1
**high** 45:14
61:19 113:24

**higher** 17:14
18:1 126:20,21
132:19 145:23
146:5
**highlight**
122:20
**highlighted**
166:9
**highlights**
126:9
**hill** 188:10
**hire** 27:3 95:5
**hired** 157:1
**hiring** 67:6
190:22
**ho** 143:19,19
**hohn** 4:25
**hold** 23:24
33:1,16 107:20
107:20 112:5
127:15 164:10
186:14 187:3
190:13
**holders** 175:25
**holding** 22:5
48:8 185:23
**holdings** 21:9
21:11,19 22:3
22:4,5 23:17
23:19 144:22
163:18
**holdup** 64:8
**home** 14:17
22:8,10,11,13
22:16,18,21,24
23:9 76:22
77:2,8,24 78:9

78:14,24,25
79:1,4,17,18
79:18,19,25
80:7,11,13
92:4,9,12,15
97:23 112:1,3
112:11 118:13
119:20 128:18
128:19,22
130:23,24
131:11,12,12
131:21 132:2,6
132:9,14,17,23
133:4,6,8,13
133:22 135:9
135:12,15,17
135:20 140:15
140:17,24
141:2,5,7,15
141:25 142:1
142:12 143:2,6
144:7,15,19,20
145:22 147:1,7
147:10
**homes** 94:17
**homework**
102:17
**hon** 2:22
**honest** 27:16
27:18 54:11
90:25 127:12
157:16
**honestly** 26:9
65:4 89:10
118:9 127:2
140:19 141:16
181:10

**honor** 8:7 9:7
21:18 31:13,19
41:3,5,11
42:11,20 43:17
46:6 49:13
50:23 51:16
52:4,11 58:5
58:12 63:2,6
69:22 70:11
71:6,12,20
72:5,10 77:9
77:13 78:20
85:20 94:13
96:18 101:21
102:19 103:21
108:4 118:5,25
119:17,21
122:5,9 129:9
139:12,22
143:19 146:19
146:21,23
147:20 148:11
149:3 150:4,11
155:8 156:4
160:19 162:23
164:23,25
165:4,14,22
179:24 180:24
185:17 186:19
188:20 191:7
192:7,15
**hope** 49:24
182:14 183:15
**hopefully** 96:4
**hoping** 112:15
139:1

horse  87:1
  184:23
hour  138:15,15
  138:18 139:19
hours  181:6,7
house  78:1,4
  81:17,20
housekeeping
  41:11
housing  56:21
  60:18 94:17
  152:13,19
  154:10
human  131:16
hundred  20:7
  38:22 104:19
  125:23
hurts  70:2
hurwitz  4:20
husband  164:3
hushka  4:18
  7:6 8:7 9:7,9
  21:18,25 26:4
  26:13 27:9,11
  27:20,22,25
  28:8,11,16,17
  29:20 30:12
  31:5,19,21
  41:3 46:6
  49:13 50:13,16
  50:23 52:11
  62:11,16 63:6
  63:9 68:8,20
  69:21 71:3,5
  72:10 149:3
  190:2

hvac  63:22
hybrid  156:24
hybrids  186:22
hyde  3:25
  193:3,8
hygiene  163:14
hypothetical
  18:18

i

idea  78:6 86:9
  98:8 120:7
  172:1,18 178:9
  186:14
identified  27:6
  127:3
identify  24:25
  45:17 118:9
  179:2
ignore  62:25
ignored  63:2
immediately
  101:11
impair  10:6
impeached
  130:13
impeachment
  119:23 120:5
  120:17
implication
  120:8 170:6
implications
  120:6
implies  120:6
imply  140:22
important  49:8
  96:5 145:16

importantly
  119:23
inaccurate
  15:2,5,8 17:8
inappropriate
  178:1
incentive  60:18
inch  132:18
inches  131:10
incipiency
  44:21
inclined  36:6
include  33:15
  40:23 124:7
included  123:1
  124:19
includes  37:2
  124:15,16
  126:16
including
  81:17 87:24
  131:23 162:21
  174:8
income  67:15
incorporated
  89:22 90:19
  92:3
increase  59:24
  60:4
increased  35:7
  35:9,10 113:2
increment
  56:14
incur  64:14
incurred  43:21
indebted  76:14

independent
  23:22 174:3
independently
  157:1
indicate  34:6
  77:14 91:20
  106:6 116:7
  124:19 157:11
indicated  64:4
  64:11,24 67:17
  91:15 120:22
  123:3 142:2
  144:6 147:9
  149:7,17
  156:17 157:8
  186:24
indicates  110:8
  125:21 126:2
  133:10
indicating
  80:18 129:16
indication
  156:9 157:12
indicative  91:7
indicia  153:19
indiscernible
  11:19 15:12
  46:4,7 82:5
  83:22 86:24
  90:14 107:15
  117:19 129:24
  158:5 185:7
individual
  23:18 84:14,16
individually
  12:14,20 67:4
  76:14 80:13

147:18 148:9
**individuals**
54:24 55:2,7
55:20 69:12
**indulge** 10:17
**indulgence**
30:11,17 58:1
69:24 76:2
92:20 123:22
**industries** 5:2
89:22 137:11
142:16
**infamous**
147:14
**inference**
103:12
**influence** 9:19
**inform** 52:23
**information**
103:10,19
129:2 131:2,6
132:11 136:13
136:24 141:14
166:5,12
176:14,19
179:4 180:11
**informed** 87:7
**infrastructure**
49:2 89:17
**initial** 126:14
**initially** 20:20
20:21 36:18
39:14
**initials** 82:3,8
**injury** 8:23
**input** 96:5

**inquired**
156:15,21
**inquiries** 15:16
**inquiry** 169:14
**inquisition**
21:15
**inside** 74:6,11
75:6
**insider** 31:11
36:2,3 175:2
**insiders** 31:7
**inspected**
75:16
**inspection**
45:16
**inspector**
45:19
**instance** 16:4
17:23
**institution**
81:5 147:7
**insulation**
75:16
**insurance**
32:11,13 44:12
45:10 65:24
66:11,14 80:14
96:10
**intended** 99:24
**intent** 63:16
108:3
**interest** 19:8
19:11,16,24
20:10 21:2
23:2,8,25
34:19 53:1
77:3,25 83:6,8

83:10 93:9
106:20 119:2,7
119:13,15
137:25 138:3,3
166:20 168:3
169:15,18,22
172:16 174:4,8
175:15 176:7
178:2 180:2,17
180:19 190:12
**interested**
173:15 179:16
**interesting**
51:13
**interests** 68:1
171:24
**interim** 173:13
**internal** 26:14
26:20 27:2
**interrogatories**
156:15 157:20
**interrogatory**
157:6 158:8
**interrupt**
113:9 144:2
**interstate** 5:3
**intricacy** 68:6
**introduced**
174:24
**introducing**
172:9
**inundation**
45:16
**invested**
168:22 174:13
175:20

**investigating**
31:11
**investment**
173:12
**invite** 51:14
108:9
**invites** 190:15
**invoice** 18:3,4
18:8,8,9,12,19
18:23 85:13,17
87:4 89:12,21
92:15 112:2,7
112:7,10 114:8
114:10,15,20
114:24 115:2
115:10 123:1,4
123:21 124:13
127:22 131:9
133:24 137:12
137:13,13,14
140:14 141:17
141:19 142:16
142:18,19
143:2
**invoiced**
125:19
**invoices** 12:7
13:1,20,22,25
14:9,12,17,25
15:4,8 16:3,8,9
16:15 17:6,8
17:13,14,22,24
18:1,8,18
24:10 25:13,18
85:9 88:4,4
91:6,15 111:23
115:13 125:13

128:7,21,22
129:3 130:23
131:1 141:18
143:1
**involve** 186:21
**involved** 96:4
102:9 109:8
111:16 182:16
**involvement**
123:9
**ish** 187:17
**issue** 46:12
86:12 108:6
118:1 141:10
158:13 165:12
171:11 175:7
177:9,10,22
179:9,9 180:21
190:4
**issued** 157:22
**issues** 45:20
49:1 61:5
73:11 110:25
120:10 167:1
188:25 190:9
**items** 75:21
83:5 86:13
165:7

**j**

**j** 4:18 5:14
**jailtime** 100:22
**jake** 82:5 83:21
**janet** 47:16
**january** 32:8
39:14 102:10
137:14,15
153:11 154:22

**jargon** 33:17
**jean** 6:3
**jeffrey** 5:22
**jesse** 8:7,12 9:8
9:14 12:20
15:12 28:8
43:18 44:4
63:8 70:14
72:6,20 85:18
95:7 96:5
103:23 113:22
140:12 144:22
145:2 146:24
148:13 159:25
**jesse's** 92:4,15
131:12
**jessie** 7:5
**jest** 186:5
**job** 12:11 13:2
52:10 88:1
131:2 133:10
133:19 134:9
134:16,21
**john** 5:7 92:23
143:15
**joinder** 3:4
**joinders**
174:25
**joiners** 175:16
**joint** 106:15
**jointly** 1:3,11
**jordan** 5:14
20:18,21
**jr** 5:7
**judge** 2:23
143:15 188:10

**judicial** 119:18
120:1 121:1,18
122:3,10,14
**july** 100:6
136:9,16
142:15,20
**jump** 49:7
**june** 104:6,7
124:14,15
144:10 145:8
147:3,14
**juxtaposed**
129:12

**k**

**kassin** 6:2
**kd** 5:1
**keep** 17:8 24:2
24:18 32:15
44:12 88:1,23
89:18,20 90:12
93:25 101:4,23
109:3 110:6
114:8 159:24
160:1
**keeping** 113:7
158:20
**keihl** 113:22
**kept** 17:11
76:12 123:19
**kesha** 4:16
**kicked** 141:10
**kids** 102:1
**kiehl** 15:12
85:18 95:8
96:5
**kills** 70:3

**kind** 10:20
12:21 35:5
36:4 48:18
55:15 56:4
81:12 89:16
95:2 97:15,21
98:7 99:19
110:15 113:8
116:25 117:13
147:15 163:7
167:5 168:4,16
181:21
**kinds** 167:9
**kitchen** 160:3
**klj** 89:12
111:23,25
112:7,10
**klobucar** 5:22
192:15
**kloos** 17:2
**knees** 147:2
**knew** 39:18,19
82:8 102:16
113:4 131:24
134:2 135:8
141:12 171:18
**knollwood**
22:14 133:11
**know** 8:22 9:4,7
16:5 17:2,3
18:5 19:10
20:1 24:6,8
26:9 27:6
28:25 29:16
33:9 36:15
37:6,13,15
40:7,25 44:25

46:11 47:5,10
48:20,23 49:17
50:20 52:7,8
54:3,6 55:8
56:22 59:7,7
59:13,18 61:2
61:7 62:12
63:4 69:10,12
75:4,7,20 77:4
78:4 80:25
87:23 88:24,25
89:10 90:6
91:25 92:13,25
93:22 94:4,16
95:5 96:25
97:14,17,22,24
98:10,11,11
99:15,23
100:22 101:25
102:7,16 104:2
105:3,4 106:22
107:6 121:11
123:17 125:11
125:11 126:24
128:3,25 130:8
130:18 132:5
133:6,24
134:22,23
135:11,11
137:12,17,21
137:21,21
138:5 139:2
140:18,19
141:1,7,16
142:5 143:23
144:10 146:13
146:16 147:2

147:18 155:22
168:11 169:10
174:22 180:6,8
185:17,23
188:7 189:25
**knowing**  59:25
76:22
**knowingly**
134:1
**knowledge**
34:10 52:20
57:21 74:5
117:9,25 148:2
155:21 158:21
158:24 162:9
163:9
**known**  84:8,9
158:4 170:1
188:11
**kommer**  24:17
**krings**  5:7
62:11,18,20,22
62:24 63:2
143:12,15,15
146:20,21
164:22,23
180:22,24

**l**

**labor**  45:3 96:4
**lack**  149:12
170:11 173:11
**lacks**  103:19
**lags**  48:14
**laid**  103:15
**lake**  14:17
21:19,20 22:8
22:10,11,13,15

22:24 23:2,8,9
25:15,19 76:21
77:2,24 78:14
78:24,25 79:1
79:4,17 80:5,7
80:11,13 81:17
81:20 92:4,9
92:12,15 97:23
112:1,3,11
128:18,19,22
130:23,24
131:11,12,12
131:21 132:2,6
132:9,14,17,23
133:4,6,8,13
133:22 135:9
135:12,14,17
135:20 140:15
140:17,24
141:2,5,7,15
141:25 142:1,3
142:12 143:2,6
144:7,15,19,20
145:22 147:1,7
147:10
**land**  10:20
22:6
**lane**  22:14
133:11
**language**  116:6
173:1
**large**  136:2
**largest**  63:20
174:15
**late**  37:2 55:23
93:9 122:12
137:3

**latitude**  21:14
49:17
**law**  4:11 5:1
45:23 83:23
**lawsuit**  78:12
**lay**  70:3 158:17
158:21,24
160:20,25
161:1,6 186:21
**layer**  72:25
**layers**  73:3
**laying**  149:17
**layouts**  160:3,3
**layperson**
56:17 154:2
**lead**  37:8 49:23
50:1,25 51:11
52:19 181:9,10
**leading**  50:17
**learn**  16:22
171:4
**leasability**
158:3
**leases**  155:14
**leasing**  151:16
155:9,13 163:5
164:1
**leave**  62:7
124:6
**ledanski**  3:25
193:3,8
**leery**  87:10
**left**  28:13,23
64:15 94:19
97:3,14,16
103:11 110:24
131:13 140:3

**legacy** 48:20
**legal** 23:22
  26:1 67:17
  68:6 76:23
  79:23 94:10
  98:10 168:25
  169:12 172:10
  193:20
**lend** 106:9
**lender** 98:20
  98:22 162:8
**lending** 76:23
  79:6 98:1,10
  98:12 135:13
**lent** 98:13
**letters** 63:16
**level** 61:23
  76:4,6 96:25
**levels** 22:21
**liable** 67:24
**license** 164:10
  164:17
**licensed**
  155:15
**lien** 12:9
  135:16 147:25
  175:25
**lienholders**
  169:9
**liens** 39:11,11
**life** 80:14,16
  163:15
**lift** 73:18,25
  91:25 158:8
**light** 150:25
  183:13

**lightly** 8:20
**lights** 44:12
**likely** 13:8
  15:10 59:23
  64:5 153:23
  156:18 172:11
  176:9 186:20
  191:8
**likes** 49:17
**limit** 76:23
  98:1,10,12
  135:14 168:10
  189:24
**limitations**
  189:20,23
**limited** 190:4
**limoges** 15:10
  16:25 87:4
**line** 83:5
  115:25 116:11
  116:18 143:11
  143:14 181:2
**lined** 170:13
**lines** 10:20
  29:3 185:1
**liquid** 93:1
**liquidity**
  136:17
**list** 119:22
  120:4 156:6
  157:23 160:16
  163:14
**listed** 100:5
  127:10
**listen** 176:17
  180:25

**listening** 62:22
  108:10 143:11
  143:20 175:25
  180:12
**literally** 57:17
  105:16 188:13
**literate** 189:13
**litigation** 45:24
  157:1
**little** 8:19
  21:13 28:12
  29:25 33:14
  38:9 53:23
  54:19 56:1,22
  71:9 89:19
  95:4 98:13
  102:21,22
  113:24 121:15
  144:16 146:9
  150:24 151:23
  152:16,23
  155:2 159:8,15
  159:16 160:4
  162:8,18
  165:17 187:25
  188:24
**live** 84:24
**lived** 22:16
  163:13
**lives** 27:5
  45:11
**llc** 1:7,15,23
  19:7 20:6,16
  21:11,19 22:1
  23:18 79:22
**llcs** 98:14

**llp** 4:20
**loa** 77:18
**loaded** 94:1
  162:3
**loan** 25:21,22
  26:1,4,5,15,21
  29:14 57:4
  60:16 61:7,10
  61:23 62:2
  76:19 77:5
  78:15 81:15,22
  82:1,14 84:7
  90:5,6 97:6,25
  108:3 109:22
  118:16 119:13
  136:2,22 138:1
  143:5
**loaned** 80:19
  106:25 107:2
**loans** 15:1 23:9
  25:14,18 29:23
  76:18 79:1,2
  81:3 90:6
  97:11,23 98:3
  98:6,7,9,15,18
  98:19 119:10
**local** 157:10,10
  160:8
**locals** 49:9
**location** 84:3
**lock** 117:6
**lofts** 48:25 49:4
  53:2,11,12,15
  57:9 110:1
**loi** 63:20
**lois** 54:24
  63:24 128:1

**long** 29:21
121:14 124:1
133:7 163:15
187:7 189:23
**longer** 22:8
31:9 84:23
86:11 138:12
**longevity**
73:23
**look** 18:16 27:8
34:1 48:19
111:13 112:6
114:1 120:24
121:13 129:3
129:18,23
130:4 132:21
133:9,17 167:6
177:15 181:24
184:24
**looked** 35:5
41:20 42:5
122:23 128:24
134:6 137:7
142:17 144:21
**looking** 28:10
28:23 30:7
51:18 64:17
75:13,20 87:8
93:4 120:8
125:4 140:15
141:13 147:20
167:23 168:9
168:11,12
178:11,14
191:4 192:2
**lookout** 50:17

**looks** 36:4 46:8
48:19 74:13
92:4 115:3
117:1 134:4,8
134:24,25
140:16
**loose** 141:2
**losing** 125:17
**loss** 44:15,16
46:18
**lost** 32:7,18
**lot** 15:11 16:10
39:13 45:5
51:22 56:2
73:16 78:23
81:10 87:9
97:3 98:2
101:8 106:2
107:24 108:2
117:2 123:9
127:25 128:15
128:21 130:6
135:24 166:5,5
167:14 176:19
185:2
**lots** 181:7
190:17
**lower** 28:13
**lucky** 145:22
**lulls** 152:16
**lumber** 90:18
90:22 118:25
126:25
**lunch** 138:14
139:11,13

**m**

**m** 4:25 5:7
**ma'am** 140:7
**mack** 30:12
**macroscopic...**
46:19
**made** 15:16
22:18 44:21
45:9 63:11
81:1 83:14
95:20 101:6
105:3,7 106:4
107:13 110:2,9
118:13 123:4
**main** 28:11
76:4,6 168:4
**maintenance**
55:9
**major** 63:17
**make** 9:3 12:9
14:2 26:20
45:15,19 55:14
57:6 60:23
75:4,10 79:2
83:2 84:5,20
95:11 100:1
102:6 103:8,17
128:9,9 144:17
145:25 150:5
151:3,21
167:11 180:15
183:13 184:18
186:2 190:19
**makes** 42:12
45:13
**making** 83:1
103:14 108:3

**manage** 95:12
151:14,15
159:6 166:14
172:2
**managed** 11:9
**management**
12:3 20:17
21:4 24:14,15
24:22 152:4
154:21,23
159:12 163:23
163:25 164:6
**manager** 10:10
11:22,25 12:11
12:13,15,19,25
14:2 15:10,25
45:11 65:25
66:21 85:18
88:11 95:8
151:11,18,19
151:19,20
153:5 154:1
158:6 163:3,18
**managers**
15:13,19
**manages**
158:25
**managing**
152:9 163:11
**mandate** 120:2
**maple** 131:10
**march** 33:22
33:24 34:7,10
104:9 121:19
122:3 155:4
**margin** 161:19
162:1

marginal  184:2
marginally
  184:1
mark  69:12,15
  140:19
marked  30:25
  165:9
market  53:10
  53:13 152:9,19
  153:20 155:10
  155:11 160:8
  160:21 162:15
marketing
  164:14
martin  97:3,5
  97:6,16
martin's  98:8
master  132:22
material  72:23
materials  92:3
  117:5
math  93:8
  115:20
matter  1:5,13
  1:21 41:11
  100:19 157:21
  157:22 167:1,2
  169:23 192:16
matters  158:9
maurice  4:8
mean  12:22
  16:24 24:5
  27:5 32:11
  44:4,5 49:3
  52:14 55:7
  60:18 62:25
  74:16 78:3,3,5

80:14 81:4,12
83:4 93:18,18
93:20 94:10,18
95:4 97:3 98:6
98:15,19,23
100:15,21
101:5,8,9
102:17 107:9
107:12 110:13
112:7 113:1
123:24 124:21
126:20,22
127:23 128:13
128:25 131:8
131:18 134:4
137:24 138:17
141:1 142:18
145:21 156:6
159:9 161:22
175:2,4,8
178:16 188:7
meaning  42:16
44:22 73:13
76:14 83:2
84:23 88:8
meaningfully
46:24
means  26:10
42:15 45:10
47:2 51:11
52:1,2 61:18
61:22 66:18
67:4,11 92:25
137:25 162:10
162:10 179:15
meant  62:3
110:13 186:5

measured
  174:6
mechanic
  169:9
mechanics
  175:25
mechanism
  29:13 31:7,11
medications
  9:20,22 10:6
meds  10:22
meet  51:5
  83:24
meeting  102:3
  104:8 155:13
member  19:7
  20:8 81:22
  83:18
members  81:3
  81:23 108:3,5
  108:23 109:8
membership
  21:2
memory  10:6
  103:9
mental  9:22
mentioned
  22:10 80:7
  175:16
met  83:20,22
  85:19 86:7
  102:4
microphone
  8:20 41:15
  140:6 150:15
  151:22 152:24

microwave
  74:13,16
middle  105:5
midwest  97:7,8
  97:9
million  11:13
  23:1 37:24
  51:19 53:23
  54:20 65:14
  80:14,16 92:9
  93:6,10,21,22
  93:22 94:23,25
  95:1,1 98:12
  98:13,13 106:7
  106:25 107:3
  110:2 118:16
  132:7 133:5
  135:11,14,15
  141:23 142:1
  144:16 145:13
  145:19,21,25
  147:9 148:5
  167:3
millions  136:2
millisecond
  99:12
mind  16:4
  35:21 75:25
  92:11 114:6
  121:22 158:20
  187:3
mindy  97:23
  98:4,15 150:9
  150:19 151:5
mine  127:12
mineola  193:23

minneapolis
  5:20
minnesota
  22:14 80:8
  84:2,3 182:15
minute   97:20
  123:22 171:3
  188:12
minutes   41:6
  71:8,10 139:15
  158:12
miracle   187:5
misappropria...
  29:23
misleading
  103:12,19
mispronounce
  90:13
misreading
  178:14
missed   65:4
missing   30:18
mississippi
  181:18
misstatement
  158:7
mistake   138:11
mistakenly
  131:10
misunderstand
  165:19
misundersta...
  185:25
misunderstood
  165:21
mix   27:23

mixed   138:9
mn   5:20
modifications
  16:2
modified   14:9
  14:22,25 16:15
  16:23 17:5
  18:6
modify   14:12
  16:8 18:13
modifying
  143:1
mold   45:16,20
  65:24 66:16
  75:9,10,16
moment   31:24
  43:15 51:4
  75:1 82:9
  92:21 103:1
  149:24 156:2
moments   43:21
  80:7
monetarily
  44:24 76:14
monetary
  44:19 45:1,8
  96:4
money   18:20
  18:24 25:9
  32:7 34:17
  44:10,11 46:11
  46:13 47:25
  48:3 56:24
  64:25 66:8
  67:9 70:19
  76:25 78:25
  81:19,19 83:2

83:6,9,15,19
84:7,10 86:19
87:22,24 88:5
89:15 94:3,7
95:17,23 96:8
96:14 98:16
99:4,6,8,11
100:9 102:7
104:21 107:6,9
108:13 109:21
111:2,3,19
113:3 123:17
127:4 128:18
143:6 145:22
146:2 147:6,23
153:23 167:3
176:10 187:5
monies   21:20
  55:24 123:11
monitor   75:7
month   40:3
  82:15,16 83:1
  83:12 88:9
  99:21 107:12
  162:18,20,20
monthly   83:10
  86:15 155:18
months   24:7
  32:15 49:6
  52:1 82:16
  96:6 118:23
  128:3 137:22
  137:23 152:18
  153:2,4 154:24
  154:25 155:1
  162:11,12

morning   8:2
  9:10,11 58:21
  71:8 84:23
mortgage
  135:17,17,20
  142:6,6,12,14
  142:18,20
  143:7 148:4
  149:12
mortgages
  142:2,5 147:15
  148:7,15
mother   82:7
  83:24
motion   3:1,5,9
  21:17 40:15,19
  72:2 156:20,20
  157:20 166:11
  168:14,24
  172:18 174:6
  174:17,25
  175:12,21,22
  175:22 188:23
motivation
  100:12
mouse   84:22
  84:24
mouth   48:13
movant   168:12
  168:23
move   31:3,19
  41:21 70:25
  121:4,14,22
  155:8 165:11
  184:21
moved   76:18
  100:9 163:16

**movement**
    70:2
**moving**  88:2
    104:3 168:3
    186:2
**mulinda**  7:11
    97:23 98:4
    144:22 151:7
    163:1
**multiple**  13:8
**munlinda**  99:1
**mute**  143:12
    143:21
**muted**  143:14
    143:16,20,22

### n

**n**  2:5,6 4:1 7:1
    8:1 159:7
    193:1
**naivete**  178:7
**name**  8:11 9:12
    9:12 47:12
    78:7,7 98:18
    98:19 145:4
    150:18 151:3
**named**  44:20
    47:16 67:20
    85:24
**narrowly**
    149:11
**nate**  15:9
**national**  6:2,3
**nature**  55:11
    64:6 75:6
    132:19 141:4
**nd**  2:7 4:6,14
    5:5

**necessarily**
    119:19
**necessary**  51:8
    63:18 66:5,11
    66:16,21,23
    67:2,8,15 68:9
    70:17 178:4
**necessitate**
    171:7
**need**  8:22 9:4
    10:23 56:2
    63:23 71:9
    85:17 90:2
    94:17 96:14
    102:21,22
    139:18 152:19
    171:6 177:8,10
    177:13 178:22
    181:21 186:22
    187:25
**needed**  18:21
    45:17,21 54:21
    55:13 63:11,21
    83:7 100:10
    184:9
**needs**  64:11
    78:19 130:18
**negates**  167:22
**negotiate**
    192:1
**neither**  130:3
    178:13
**ness**  47:16
**ness's**  47:18
**net**  162:21
**never**  75:25
    82:2,8 83:24

    99:24 100:11
    106:12 110:15
    110:22 119:14
    121:22 123:13
    125:9 133:8
    156:8 187:3
**new**  20:9 22:7
    22:16,20,22
    31:3 52:17
    73:20 79:12,15
    85:24 108:9
    113:12 160:10
    161:13 162:5
    172:1 190:8
**newer**  159:9
**newness**
    160:15
**night**  102:2
    183:15
**nine**  10:25 11:1
    11:4,14,14,16
    125:23 153:12
**noi**  35:8
**noise**  58:18
**non**  37:23 45:8
**nonresponsive**
    52:12
**normally**
    172:18
**north**  1:2 4:5
    43:24 85:21
    118:12 119:18
    122:1,5
**northern**  4:13
**note**  57:4,4
    60:13,24 61:3
    72:10 77:2,14

    77:17 78:7
    82:3,24 83:9
    108:22 109:2,4
    109:7 110:9
    143:4,7 148:6
    148:7,7
**noted**  78:9
**notes**  41:7
    80:12,21
    108:20
**notice**  40:12
    119:18 120:1,9
    121:1,18 122:4
    122:10,14
    169:25 170:9
    170:12,23
    172:25 175:10
**notices**  188:13
**noticing**  122:8
**notion**  174:23
    175:9
**novel**  172:9
**november**  2:9
    117:12 181:23
    181:24 182:2
    186:24 193:25
**number**  8:3
    18:13 37:10
    49:8 50:10
    71:17 103:5
    113:23 114:11
    115:17 129:8
    134:20 140:2
**numbered**
    18:12
**numbering**
    84:21 129:6

| | | | |
|---|---|---|---|
| **numbers**  18:13 | 103:14 107:18 | **odd**  92:19 | 187:13 |
| 38:20 39:18 | 107:23 108:10 | 147:15 173:2 | **okay**  8:22,25 |
| 114:5,6 162:17 | 117:18,20 | **offenders** | 9:3,5 10:9 |
| **numerous** | 127:18 129:12 | 85:23 86:4 | 13:11 15:4,21 |
| 136:7 | 152:21,22 | **offer**  31:14 | 16:1 19:4,5 |
| **ny**  193:23 | 153:13 154:7 | 72:2 165:6 | 22:19 28:16,24 |
| | 154:14 160:24 | 171:18 177:3 | 28:25 29:19 |
| **o** | 161:21 174:7 | 179:3 181:13 | 31:2,25 32:1 |
| | 186:11,13 | 191:13 | 33:1,8,15,19 |
| **o**  2:21 8:1 | 191:8 | **offered**  30:13 | 33:24 34:23 |
| 76:23 97:24 | **objections** | 30:15 81:14 | 36:24 37:3,8 |
| 100:21 193:1 | 49:16,18 50:17 | 165:8 180:11 | 37:12,16,23 |
| **o'dette**  6:3 | 103:7,16 139:5 | 190:18 | 38:1,10,12,23 |
| **oath**  27:13 | 150:14 155:25 | **offering** | 39:21 42:7,21 |
| 72:8,16 140:6 | 156:3 | 120:15 122:15 | 43:4,8,12,12 |
| **object**  25:24 | **obligation** | 167:3 178:19 | 43:15,15 44:9 |
| 30:1 42:2 46:6 | 156:1 157:17 | **offhand**  175:1 | 44:19 45:23 |
| 52:11 54:10 | **obtained**  52:20 | **office**  59:14 | 48:11 50:15,19 |
| 68:5 78:20 | **obvious**  157:2 | 92:1 102:4 | 51:9 53:9,17 |
| 103:18 107:25 | **obviously** | 122:18 130:25 | 53:20,24 56:15 |
| 112:5 117:10 | 179:25 | 131:21 132:20 | 58:24 59:4 |
| 149:3 153:25 | **occasion** | **officer**  95:16 | 60:14,19 62:10 |
| 154:11 158:15 | 181:14 | 97:6 174:3 | 62:23 63:1,3,7 |
| 177:20 | **occasions** | **officers**  79:5 | 65:3 67:8,11 |
| **objected**  36:18 | 136:7 | **offset**  92:11 | 69:20,25 70:23 |
| 37:12 | **occupancy** | **offsets**  36:25 | 71:7,11 72:1,7 |
| **objecting** | 24:16 52:2 | **oh**  26:12 41:13 | 72:13,14 73:5 |
| 42:14 115:18 | 53:22 54:22 | 43:12 62:18 | 73:8 74:2,5,8 |
| 115:19 117:14 | 95:3 137:23 | 70:7 77:10 | 74:19 78:17 |
| 117:15 | 153:2 154:15 | 90:12 112:18 | 79:20 80:1,11 |
| **objection**  3:8 | 158:3 162:14 | 119:25 121:16 | 80:18 81:8,19 |
| 21:12 31:13,14 | **occupation** | 121:21 123:23 | 81:22,25 82:22 |
| 37:14 40:6,12 | 10:11 | 125:19 127:14 | 84:5,9,16,19 |
| 42:1,6 46:25 | **occupied** | 136:14 138:24 | 85:8,13 86:23 |
| 50:7,14,19 | 153:23 | 142:25 143:12 | 87:7,20 88:7 |
| 52:16 68:14,15 | **occurred**  73:21 | 147:3 182:25 | 88:21 89:6,7 |
| 77:9,13 87:14 | 175:21 | 184:11 187:1 | 89:11,18,20 |
| 88:14 100:24 | | | |
| 101:2,12 | | | |

**[okay - overruled]**                                                    Page 36

| | | | |
|---|---|---|---|
| 90:12,18 91:18 | 165:5,10 169:5 | **operation** | **organize**  41:7 |
| 91:24 92:3,18 | 172:6 181:16 | 52:21 | **organized** |
| 93:3,24 96:17 | 182:6,15 183:4 | **operational** | 161:14 |
| 98:6,23 99:14 | 184:14,15,20 | 155:11 | **original**  17:5 |
| 102:7,23 105:6 | 185:4,19,20 | **operations** | 17:14 73:19 |
| 105:21 108:17 | 188:6,14 | 32:3 | 95:8 97:6 |
| 108:24 109:17 | 189:17 191:9 | **opinion**  145:11 | 104:16 134:20 |
| 109:20 110:5 | 191:13,21 | 158:16 160:7 | 154:12 170:12 |
| 110:21 112:2 | 192:5 | 181:3 | **originally**  15:4 |
| 112:13 114:14 | **old**  49:2,2 | **opponent** | 77:7 78:8 |
| 114:18,23 | 193:21 | 101:15,20 | 79:21 82:4 |
| 115:2,5,19 | **once**  24:3,15 | **opportunity** | 85:20 86:7 |
| 116:10,15,21 | 52:6 60:4 | 100:2 157:18 | 90:20,20 91:22 |
| 117:23 118:2 | 69:13 80:1 | 170:2,5,23 | 91:23 98:8 |
| 120:25 121:10 | 104:14 110:16 | 171:1,8 173:4 | 113:5 182:7 |
| 121:14,24 | 137:22 160:8 | 173:5,7 176:1 | **originated** |
| 122:17 124:9 | 162:13 172:20 | **opposed** | 77:5 78:1,4 |
| 125:25 129:5 | **one's**  94:18 | 158:17 | 86:16 |
| 129:23 130:1 | **ones**  14:22 | **opposition** | **osb**  72:24 |
| 131:1 133:9,18 | 15:23,23 83:16 | 40:19 72:3 | **ouch**  56:17 |
| 134:15,19 | 83:17,21 91:10 | 166:11 | **outdoor**  85:25 |
| 135:19 136:9 | 109:24 131:5 | **optics**  66:2 | **outline**  161:16 |
| 137:18 138:5 | 132:9,11 | **option**  166:14 | **outset**  181:3 |
| 139:3,8,14,20 | 137:19 | 167:13 190:23 | **outside**  55:23 |
| 140:8,22,23 | **ongoing**  32:2 | **oral**  166:4 | 72:24,24 |
| 141:12,21 | **open**  182:23 | **orally**  15:16 | 155:20 168:25 |
| 142:5 143:18 | 187:21,23 | **order**  44:12 | 169:2 175:12 |
| 143:21,22,24 | **opening**  14:8 | 56:20 60:16 | **outskirts**  159:8 |
| 144:1,9 145:19 | 166:21 168:16 | 86:19 98:17 | **overall**  13:2 |
| 146:22 148:20 | 168:17 179:11 | 119:18 120:16 | **overlap**  24:5 |
| 148:22,25 | **openly**  184:23 | 120:21 121:2,8 | **overlapped** |
| 149:2,21 150:1 | **operate**  46:10 | 122:10,18 | 24:7 49:5 |
| 150:8,10 151:6 | **operating** | 141:18 156:22 | **overrule**  68:18 |
| 152:25 154:13 | 12:14 24:3 | **ordinary**  57:15 | 77:20 101:2,20 |
| 154:17 155:22 | 35:16 46:9 | 173:25 | 154:13 |
| 158:19 163:22 | 170:9 | **organization** | **overruled** |
| 164:7,11,14,18 | | 57:22 | 21:23 46:25 |

79:7 87:18
**oversee** 95:16
95:23 96:1
152:5 190:22
**overseeing**
96:3
**oversight**
32:12 45:10
66:22 127:11
**oversights**
155:11
**overstate**
184:2
**overt** 120:11
**overworked**
97:13
**owed** 17:22
54:21 123:11
123:17 125:11
127:4,6,23
142:1
**owes** 135:15
141:23
**own** 13:9 20:2
20:18 21:6
22:10 23:12,14
49:15 66:13
78:9 79:5
87:24 88:5
89:15 115:20
128:10 145:5
155:21 157:22
167:3
**owned** 23:17
164:2
**owner** 17:1
19:20,23 20:8

20:20 25:2
26:16
**ownership**
19:2,8,11,16
19:24 20:8,10
20:23 21:7,22
23:8,21
**owns** 20:18
21:19 22:7
144:20

**p**

**p** 4:1,1 8:1
**p&i** 137:23,24
138:6
**p.o.** 5:4
**pacific** 4:13
**packaging**
140:25
**page** 7:2 27:5,5
27:5,10,24,25
28:11,14,16,16
28:22,23 30:25
34:14 42:22,24
42:24,25 43:1
43:4 85:2
114:14 124:9
130:1 132:21
132:22 133:9
134:18 137:8
140:11 168:9
191:12
**pages** 130:3
181:6 189:25
**paid** 12:5
18:20 32:23
38:3 44:2
45:16 46:2

47:8,18,23
54:24 57:1,18
59:1 60:9,20
73:25 77:2,24
78:14,15 87:13
89:15,17 95:19
104:2,17 105:3
110:12,13
111:19 112:2
112:10 116:22
119:9,9,13
123:13,17,20
125:9,21 126:2
128:13,15,17
145:16,17
147:10 148:18
162:19 176:25
**palace** 85:21
85:22
**palatable**
174:10
**pandemic** 21:1
55:16 117:4,8
117:25 118:7
120:5,8,18
121:3 126:22
**paper** 27:7
166:6
**papers** 189:3
**par** 45:14
**parcels** 22:6
**pardon** 28:4
153:17 165:25
184:10,11,11
189:10
**park** 85:25
86:2,3 160:10

160:12,14
**parking** 76:4
93:13
**parkside** 1:15
16:6 19:22,24
20:2 25:5
35:10 44:7,20
52:8,21 57:9
86:1 87:11,23
88:12 89:2
96:24 97:15
99:3 131:23
152:4 153:12
153:15 154:25
160:11
**parkside's** 25:5
**part** 22:17
37:20 42:15
44:15 45:6
46:20 48:18
79:22 85:25
88:18 94:10
96:24 106:9
118:20 125:2
126:16,18,19
171:13 172:20
178:15
**partially** 91:8
**participants**
90:7
**participate**
179:20 180:11
**participating**
97:19
**particular**
18:25

**particularly**
  36:6
**parties**  36:21
  40:8 72:2 79:2
  143:13 165:6
  168:20 174:8
  174:25 175:15
  175:24 181:12
**parts**  46:16
  173:7
**party**  67:20
  68:22 77:6
  95:12 101:14
  101:16,19
  102:13 147:6
  166:14 172:2
  174:3 181:15
  182:8
**party's**  79:18
**pass**  99:8
**passes**  185:22
**past**  11:4 16:12
  35:6 59:4,9
**patient**  170:14
**patiently**
  174:19
**patio**  140:21
**pause**  137:4
**pay**  18:24 33:7
  44:11,13,16
  55:24 60:7,16
  62:8 66:9,13
  66:18,25 67:4
  67:11,15 70:19
  80:3 83:9,11
  86:15,20 87:25
  88:4 90:9

95:17,22 96:10
96:12 127:21
144:6,14
147:17 148:9
**paying**  21:2
  44:10 67:17
  68:12 83:13,19
  107:24
**payment**  57:15
  60:21 83:10
  148:3 174:21
**payments**
  63:10 83:1,3
  83:14 95:2
  107:12 110:9
  111:19 137:25
  138:3
**payoff**  144:18
**pc**  5:9
**pelican**  22:14
  133:11
**pending**  50:20
**people**  55:5
  83:20 90:8
  117:5 118:13
  119:20 127:11
  145:16 156:18
  160:16 174:12
**perceived**
  166:10 167:4
**percent**  20:8
  20:18,19,23
  35:23 38:2,6
  57:4 64:14
  90:23 94:16
  106:10,23,24
  107:12,14,14

127:1 154:24
154:25 155:4,5
155:6,6 162:14
162:15
**perfect**  60:14
  109:5
**perform**  54:4
**performed**
  25:15,19 63:16
**period**  39:19
  61:14 81:13
  112:8 138:4
  162:4 174:6
  182:17
**permanent**
  90:5,6 138:2
**permit**  45:22
  64:7 73:22
  103:25 104:12
  104:17 105:4,7
  105:9 135:20
  150:3 158:14
  180:23
**permitted**
  119:17 181:13
  181:14
**person**  12:6
  13:16 36:4
  83:25 95:18
  176:24
**personal**  77:8
  78:9 79:19,25
  83:14,19 94:11
  95:11 96:25
  99:18 100:5
  110:23 136:4,6
  136:15 155:21

169:10 185:15
**personally**
  45:5 46:21
  67:24 76:21
  78:16 107:6,10
  108:14 109:18
  110:12 123:3
  145:5
**perspective**
  167:21,25
  168:2
**peterson**  97:6
**petition**  32:7
  46:18 66:5
**pfs**  100:8
**phenomenal**
  94:14
**phillips**  5:11
**phone**  55:11,20
  98:2 143:25
**phrase**  56:10
**physical**  31:24
**physically**
  187:9
**pick**  161:16
**picked**  55:11
**piece**  27:7
**pieces**  166:5
**piss**  78:9
**pivot**  158:11
**place**  1:15
  75:11 86:1
  141:3,5 152:4
  153:12 154:25
  160:11
**placed**  27:13
  97:23 98:3,6

98:15 181:9
**plainly**  129:12
**plains**  97:8
   111:9,15
**plan**  29:10,13
   29:17 30:7,22
   30:24 31:6,16
   37:20 39:5
   53:24,25 54:7
   54:13 63:11,12
   64:4 94:5,7
   95:13 97:22
   104:4 105:1
   133:6 150:17
   165:22 166:15
   180:6,19,25
   181:8 186:9
   187:5
**plane**  138:20
   138:22
**planning**
   165:11 179:20
   182:12
**plans**  36:2
   141:2
**plastic**  72:23
**play**  80:11 89:5
   102:1 157:6
   158:20
**players**  63:17
**pleaded**  172:17
**pleadings**
   170:10,20
   174:24
**please**  8:11,18
   9:12 27:9
   29:21 65:23

71:13,15 84:19
85:2 93:5
102:22 103:3
108:25 109:2
114:3,8,24
115:2 124:4
129:22,23
130:2,5 137:9
139:23,25
140:5 150:18
150:23 192:18
**plex**  53:16
**pllc**  5:1
**plumbing**
   55:10 64:9
**plus**  159:16
   162:18
**plywood**  72:24
**pm**  192:20
**pocket**  89:15
   128:10
**point**  11:9 36:3
   46:14 50:8
   62:12 64:2,3
   65:1 83:8
   87:23 93:14
   101:9,10
   107:16 139:6
   156:4 157:24
   160:22 164:7
   172:12 183:5
**pointed**  172:7
**points**  79:5
**policy**  80:14,16
**poorly**  31:15
**portion**  60:15

**position**
   158:10
**possession**
   174:18
**possibility**
   172:16
**possible**
   124:24 125:3,5
   148:15 166:17
   179:12,17
**possibly**  82:7
**post**  46:17 66:5
**postpone**
   191:10
**potato**  74:17
**potential**  36:25
   49:18 156:7
**potentially**
   32:16 106:24
   183:9
**precast**  93:13
**preceded**
   120:10
**predictable**
   86:25
**prefer**  50:3,21
   50:22 165:24
   166:1 168:20
   169:10 187:4
**preferably**
   99:21
**preference**
   165:20 175:17
   181:21 182:4
   182:25 185:16
   191:12

**prejudicial**
   170:21
**premise**  158:10
**prepare**  167:7
**prepared**  8:5
   154:9 178:21
   179:3
**presence**  187:7
**present**  6:1
   13:3,9 35:18
   50:21 170:2
   180:3
**presentation**
   173:4
**presented**
   167:16 170:11
   180:4 191:3
**presently**
   180:20
**preserve**  175:7
**president**  6:2
   163:24
**pretty**  16:25
   27:4 29:9
   58:19 75:3
   86:18,25 87:8
   88:21 97:17,18
   119:24 159:23
   181:17 182:22
   186:17
**prevailbild**
   15:24
**preview**
   173:22
**previously**
   22:10 105:21
   105:22 106:17

132:8 136:16
**price**  90:22
  113:5 118:25
  126:25
**pride**  56:3
**primary**  10:11
  57:23
**principal**
  137:25 138:3
  170:7
**printed**  92:10
**printing**
  121:21
**prior**  22:9
  136:16 143:2
  153:21 156:8
  157:9
**prism**  157:23
**probably**  11:8
  11:13 12:23
  14:23 27:7
  28:12 32:11,12
  39:17 55:24
  64:14,15 69:15
  75:20 83:16
  89:2 90:23
  92:7 95:4
  101:7 127:23
  128:2 131:20
  160:9 176:8
  187:9
**problem**  38:15
  87:21 105:14
  132:4 152:24
  155:22 157:14
  157:15 176:2
  184:4 185:11

**problems**
  183:21
**procedure**  9:18
**proceed**  9:6
  43:16 51:13
  64:7 103:6
  140:9 144:1
  151:6 158:15
  165:12 173:25
  182:21 183:25
  184:16
**proceeding**
  106:3 173:8
**proceedings**
  192:19 193:4
**proceeds**  26:15
  26:21 29:14
  57:2
**process**  55:18
  130:18 179:25
**procure**  22:6
**produce**  16:23
  17:5
**produced**
  15:21 46:11
  177:11
**producing**
  46:9
**product**  73:11
**profanity**  66:3
**profession**
  10:9
**professional**
  151:9 160:7
  190:22
**proffer**  157:25

**proffered**  14:8
**profit**  161:19
  162:1
**program**  89:4
  106:11,12,13
  106:18 163:14
**project**  10:19
  10:20 11:20,23
  12:3 14:2
  15:13,13,19,24
  16:20 20:3,4
  22:7 25:7,23
  26:7 29:8,15
  34:24 39:4
  44:21,22 45:9
  45:21 46:22
  49:7,7 51:23
  54:5 56:18
  59:20 63:13
  64:18 85:18,24
  87:10 94:13
  95:8,10 104:13
  107:1 111:8,9
  111:25 119:24
  123:8,20 125:9
  127:8 131:7,8
  151:18,19
  159:18,20,22
  162:2,3 167:4
  169:21,23
  170:8 174:12
  181:2,4
**projection**
  35:15,18
**projects**  11:1
  11:17 12:4
  14:13,21 24:9

26:6 48:12,16
  48:22 50:9
  53:4,18 55:8
  55:16 56:19
  88:2,22 97:11
  110:25 111:5
  117:4 118:10
  130:24 131:22
  132:6 151:17
  153:14 155:10
  159:22 162:5
**promise**  70:6
**promissory**
  57:4 60:13,24
  61:3 77:16
  80:21 109:4
**promulgated**
  173:1
**prongs**  176:19
**proof**  36:15,18
  37:4,12
**properly**  78:25
**properties**
  11:11 19:17
  20:16 21:4,6
  22:1,3,4 24:7
  80:13 87:25
  94:1 100:5
  153:3,5,11
  159:6 163:18
  164:2
**property**  10:10
  11:10 20:17
  21:19,20 22:15
  22:20,25 23:2
  23:8,12,15
  24:15,22,24

25:3,5,15,19
31:24 34:19,24
35:22,23 38:4
45:11 46:14
54:25 57:1,1,5
57:6,15,18
59:1,4,6,11,15
59:16 60:3,3,6
60:9,9,15,20
61:11,22 62:2
62:4,5 65:25
66:21,22 70:16
70:19 73:14
74:6,12,23
80:8 87:9
94:15 95:12
105:8 142:3
151:11,19,20
152:3,3 153:5
154:1,21,23
158:6 163:3,17
163:23,24
164:5,6,15,16
164:17 176:10
**proposal**   180:5
180:9
**proposed**
29:10,17 31:6
63:11 159:18
159:20,22
166:15
**proposition**
191:2
**protection**
72:25 174:20
178:12

**protectionary**
126:4
**protest**   28:2,6
**provide**   16:15
25:10 27:15,18
136:23 171:1,6
176:14
**provided**   16:18
60:18,18
103:20 108:13
108:14 118:19
126:11,12,13
135:1 136:15
136:18
**provides**   54:4
172:13
**proving**   180:18
**provision**   30:5
54:3
**published**
152:18
**pull**   27:9 29:20
33:10 40:8
49:10 54:7
90:2 108:25
110:16 112:15
112:17 124:3
129:5,7,22
130:5 140:10
**pulled**   110:23
**pulling**   54:15
**purchase**
38:23 39:1
**purchased**
39:7
**pure**   160:25

**purpose**
120:16 129:9
**purposes**   49:15
49:18 119:23
155:19 157:1
177:16
**pursue**   36:2
91:2
**pursuing**   31:7
31:11
**pursuit**   36:2
**push**   184:25
**put**   35:7 39:5,8
39:9,12 46:11
48:13,23 50:10
72:23 73:19
75:11 77:8,15
78:2,6 82:4
86:2 88:9 92:8
93:7 94:6,7
95:17,23 96:8
97:25 98:17,18
104:19 105:12
115:22 116:25
123:20 131:9
131:10,12
134:1,12 135:9
135:12 137:19
140:17 141:2
141:22 142:2
142:18 143:4
145:24,25
165:18 170:5
170:24 175:3
175:25 177:8
177:23

**putting**   46:13
48:15 86:8

**q**

**quad**   28:12
**qualified**
117:18 155:20
**qualify**   154:9
**quantify**   45:1
**quarter**   107:11
107:14
**quentin**   2:5
**question**   9:25
10:1 14:16,16
22:1 25:25
26:3,4,11,19
29:1,9 30:3,4,4
30:6 31:4
34:16 45:7
50:12 52:12,17
68:6,19 78:11
79:12,15
103:11 108:1,7
108:8,9 109:20
110:17 113:12
117:15,16
118:3,4 127:13
127:16 130:17
130:17,19
142:24 148:23
154:14,18
155:24 158:16
161:8,11,13,22
162:3 163:8
168:18 170:4
176:22 177:4
177:21 179:21
190:2,3

**questioning**
138:13
**questions** 14:3
41:3 58:13,21
62:9,13,22
69:21 146:18
146:20 158:15
164:19,20
167:6 168:8
171:16
**quick** 29:24
31:8 82:17
**quickly** 97:18
113:4 149:25
178:23
**quit** 144:23
145:2
**quite** 73:3
80:21 86:21
88:6 100:16
**quo** 190:13
**quote** 159:8

**r**

**r** 2:21 4:1 8:1
9:14 24:23
193:1
**rain** 75:1
**raise** 8:10
144:17 146:1
**ran** 55:15 83:4
83:24 90:11
**randall** 23:6
81:6 82:11,11
82:12,13 83:20
102:5 147:17
147:23 148:6
148:16

**randoff** 82:10
**randy** 82:6,9
82:13 83:20
102:5 128:20
135:12 144:6
**rapids** 22:14
133:11
**rate** 35:8
106:21 126:24
153:7 154:15
162:14,14
**rates** 53:1
153:2 159:3
**rather** 16:8
64:7 103:14
138:3 183:14
**rcx** 7:4
**rdx** 7:4
**reach** 15:13
63:21
**reached** 14:4
55:11 78:6
97:10 100:14
**read** 28:25
29:1,3 43:11
168:22 176:21
179:25 181:5
189:13
**reading** 29:25
175:20
**ready** 27:12
55:21 89:4
106:11,12,13
106:18 177:7
**real** 20:3,4,11
21:8 23:12,15
25:3,5 29:24

34:19,23 35:22
38:3 53:10
82:17 93:2
164:8,10,11
**realize** 173:14
**really** 44:16
82:8 90:25
97:20 111:3
113:9,24 117:3
126:22 132:17
156:6 158:16
167:13,25
174:22 177:24
180:9,14,16
188:25 191:3
**reason** 45:3
49:8,12 89:25
133:25 135:6
135:10 137:18
185:22 187:19
190:14
**reasons** 14:19
51:24 156:25
185:2
**rebut** 167:10
**rebuttal**
119:23 120:4
179:5 190:18
**recall** 21:8
26:23 28:13
30:14 33:3,19
37:7,13 39:21
51:15 80:20
92:17 102:15
118:12,15
124:22 126:10
127:3 136:11

136:20,21
141:6 153:10
**recalled** 71:1
**receive** 18:7,23
42:7 121:1,5
122:13,17
161:4
**received** 15:5
17:13 30:9
31:15 62:6
63:15 80:1
99:19 153:10
165:5 166:7
174:21
**receiver**
154:21
**receivership**
153:6 155:3
**receiving** 43:4
137:15 190:14
**recent** 8:23
**recently** 9:15
69:5
**recess** 71:14
103:2 139:24
192:17
**recognition**
121:23
**recognize** 50:1
155:24 185:6
**recognizing**
177:18 183:22
**recollection**
10:4 30:15
34:2,14 109:11
129:19 142:9
144:24 165:8

**record**  8:3,11
9:13 28:2
42:12 71:16
72:15 103:4
126:4 140:1
150:12,18
151:3 170:3
177:16 193:4
**records**  24:2
**recross**  69:23
70:14 148:12
148:13
**red**  3:1,4,8
4:12,21 6:4 8:4
13:14 14:19
16:11 17:13,25
18:10,20,24
25:13,18,21
26:5 36:15,24
37:16,23 38:1
38:13,16,18
50:21 51:15
53:6 70:24
71:4,18 76:16
77:5 78:11,15
81:4 83:6
87:12 88:25
90:9 91:13
97:9 98:21
99:25 106:6,21
106:25 109:9
118:19 119:12
131:5 134:14
135:2 136:16
139:12 140:3
147:10,16,25
148:2,5,8,10

148:16 149:14
165:13 166:24
167:14 171:5
171:22 172:1
176:12 179:10
192:6
**redact**  132:11
133:25 135:10
**redacted**
128:22 129:2
129:10,17,17
131:11,24
133:15 134:5,9
134:9 141:14
143:1
**redated**  131:6
**redeem**  144:14
**redesignate**
177:12
**redirect**  62:10
63:8 146:22,24
164:24
**redone**  75:17
**reduces**  186:22
**reductio**
172:19
**redundant**
94:22
**refereed**  131:2
**reference**  29:6
84:1 98:4
**referenced**
78:18 79:16
80:8 100:4
137:13
**referred**  82:9
108:19

**referring**  45:23
84:14 124:10
126:10 174:16
**refi'd**  144:19
**refinance**
54:25 77:2
145:23 146:4
**refinanced**
146:7 147:11
**reflect**  35:11
**refresh**  30:15
34:1,14 103:8
129:19 142:8
144:23 165:8
**refreshed**
130:13
**refute**  46:24
**refutes**  46:17
**reg**  76:23
97:24 100:21
**regarding**  15:7
32:25 58:22
63:10,16 65:10
109:1 167:19
189:21
**regardless**
172:17
**regular**  35:7
**reimbursed**
89:16
**reimbursement**
44:10
**relate**  169:20
**related**  33:17
38:15 102:14
121:2 190:9
191:5

**relates**  154:14
**relationship**
19:6 20:6 22:2
79:3,6
**relationships**
170:8
**relevance**
21:12 46:12,15
78:22 108:6
153:13
**relevancy**
78:21
**relevant**  21:17
23:17 46:12
79:6 176:5
**relief**  40:13
156:16 157:21
172:9 178:11
178:13
**relitigating**
190:5
**remain**  72:8,16
140:5
**remained**
73:21
**remand**  175:9
**remark**  175:1
**remarkable**
94:12
**remediated**
45:18
**remedied**
75:14
**remedy**  167:15
173:10,11
174:19

**remele** 5:16
**remember**
  43:22 51:20
  54:1 56:7
  68:19 79:10
  80:22 85:5
  91:11 102:10
  108:8 119:4
  120:9 144:12
  154:18 161:8
**remind** 43:8
  72:8 140:5
**reminded** 65:5
**remitted**
  149:13
**remnants**
  75:14
**removal**
  116:12,16
**remove** 174:17
**removed** 69:5
  69:13 75:10
  134:23
**renew** 104:12
  104:15
**renewed**
  105:10
**rent** 35:11
  73:18 92:2
  155:18
**rental** 159:2
**rentals** 91:24
**rented** 54:23
  160:18 162:7
**rents** 35:6,7,9
  35:10,13
  155:14 159:13

  162:15 164:1
**reorganization**
  30:8,22,25
  53:25
**repaid** 56:25
  57:14,19 61:10
  82:15,19,25
  83:5 109:18
**repair** 45:15
  66:1 67:2
**repay** 61:23
  84:7
**repaying** 62:2
**repeat** 26:2
  45:6 47:3
**rephrase** 44:6
  91:12 161:24
**replace** 45:15
**replaced** 147:2
**replied** 102:2
**reply** 102:1
**represent**
  146:15
**representative**
  101:19 183:24
**representing**
  69:3,9,12
  146:10
**represents**
  121:7
**request** 13:14
  13:16 14:10
  17:1 18:17,19
  84:20 88:9
  100:12 114:11
  118:20 134:5
  134:14 141:9

  142:21
**requests** 13:2
  13:20 15:1
  16:13,13 17:16
  38:12,15,18
  89:1 91:6,12
  98:17 99:5
  109:23 110:3
  111:4 112:11
  119:12 128:23
  131:6,20 132:9
  135:2 141:22
  156:15
**require** 171:9
**required**
  119:20
**reserve** 154:7
  176:21
**reserved** 182:7
**residential**
  155:9
**resources**
  168:22 173:12
**respective** 20:3
**respond** 46:16
  172:4 178:21
  178:22
**response**
  129:15 149:8,9
  149:15 167:7
  167:17,19
  171:5,6,7
  176:13 177:14
  177:17
**responses**
  171:25

**responsibiliti...**
  61:5 151:12
**responsible**
  62:2
**rest** 16:25 71:5
**rested** 177:17
**restrictions**
  181:17
**restructure**
  54:13
**restructuring**
  95:15 174:3
**rests** 165:4
**result** 8:23
**results** 15:12
**resume** 55:21
  71:11 102:23
  140:4
**retainer** 47:18
**retirement**
  182:8
**return** 33:5
  183:13,20
**revenue** 60:16
  60:20
**revenues** 46:9
**review** 12:7
  26:14,20 27:4
  29:17 31:8
  55:14
**reviewed** 134:2
  141:8 181:7
**revision** 123:4
**right** 8:10,10
  8:18 9:6 10:12
  20:17 22:7,21
  30:15 31:2

[right - ruins]

| | | | |
|---|---|---|---|
| 32:17 35:13 | **rise** 46:18 | **robert** 8:12 | 33:1,3,16,19 |
| 36:10 42:18 | 71:13,15 103:3 | 9:14 | 34:9,13,24 |
| 48:11 54:7 | 139:23,25 | **rodent** 84:24 | 35:12,13,23 |
| 56:15 59:15,21 | 192:18 | **role** 10:13 | 36:18 37:12 |
| 60:25 61:11,20 | **river** 3:1,5,8 | 151:9,13 | 38:2,12,15,23 |
| 64:8 70:25 | 4:12,21 6:4 8:4 | **rolling** 52:6 | 40:5,12,22 |
| 71:3,16 72:3 | 13:14 14:19 | **rollup** 63:11 | 43:21 44:6,9 |
| 72:13,18 75:15 | 16:11 17:13,25 | **ron** 15:9 85:19 | 44:15,16,21,22 |
| 82:19 86:3 | 18:10,21,24 | 86:7 113:22 | 45:9,24 46:14 |
| 89:3 91:19 | 25:14,18,21 | 125:12 | 46:22 47:6,15 |
| 92:10 93:9,18 | 26:5 36:15,24 | **room** 132:23 | 47:20,25 48:3 |
| 93:21 95:10 | 37:16,23 38:1 | 189:13 | 48:6,8,19 |
| 103:22 104:2 | 38:13,16,18 | **rooms** 128:4 | 53:21 54:13,21 |
| 104:22,24,25 | 50:21 51:15 | **rough** 22:24 | 57:8,10,13 |
| 105:15 106:6 | 53:6 70:24 | **roughly** 162:11 | 59:4,18 60:16 |
| 106:12,19 | 71:4,18 76:17 | 162:20 | 60:24 61:7 |
| 107:17 109:14 | 77:5 78:12,15 | **round** 38:20 | 64:25 65:14,21 |
| 109:18 110:14 | 81:4 83:6 | **rounded** | 66:6,8,13,18 |
| 111:4,7,7,8 | 87:12 88:25 | 162:17 | 66:25 67:4,11 |
| 113:8,16 | 90:9 91:13 | **route** 50:6 | 67:14 68:1,4 |
| 114:21 115:14 | 97:9 98:21 | **rubble** 86:14 | 68:12,22,24 |
| 126:6,17 129:2 | 99:25 106:6,21 | 86:14 | 69:5,7 70:17 |
| 129:11 130:15 | 106:25 109:10 | **ruins** 1:23 8:3 | 70:19 71:17 |
| 130:20 135:17 | 118:19 119:12 | 10:13,14 11:22 | 73:2 74:6,11 |
| 138:7,7 139:11 | 131:5 134:14 | 13:17 14:13,14 | 76:13,20 77:1 |
| 139:14,20 | 135:2 136:16 | 15:1,18 16:20 | 79:2,3 80:4,6,6 |
| 140:8 141:8,13 | 140:3 147:10 | 19:6,8,12 20:2 | 80:20,23,24 |
| 143:7 146:2 | 147:16,25 | 23:2,7,9,12,14 | 81:20,21 82:21 |
| 151:22 157:15 | 148:2,5,8,10 | 25:7,7,11,13 | 82:23 83:2,10 |
| 160:21,23 | 148:16 149:14 | 25:14,17,18,21 | 83:17 84:11 |
| 164:24 165:1 | 165:13 166:24 | 25:22,23 26:4 | 85:22,24 86:1 |
| 165:10 167:8 | 171:5,22 172:1 | 26:5,6,14,15 | 89:6,8 90:17 |
| 169:8,19 | 176:12 179:10 | 26:15,19,20,21 | 92:9 93:7,7 |
| 183:23 184:5 | 192:6 | 27:21 29:7,7 | 96:24 97:15,25 |
| 188:12 189:19 | **river's** 167:14 | 29:10,14,14 | 102:10,14 |
| 190:1,17 191:9 | **road** 193:21 | 30:24 31:23 | 103:5 104:1 |
| 191:10 192:16 | | 32:2,5,7,21 | 105:19,22 |

107:7,16
108:15,20
109:2,7 110:2
110:9 111:25
112:3 117:1
118:15 119:9
119:11,16
123:8 125:9,13
125:20 126:11
127:8 131:20
131:25 132:3,5
132:7,9,25
133:3,5,8
134:1 135:9,15
137:15 138:7
140:2,23 141:2
141:23,23
142:3 143:3,7
145:13,20
146:11,15
153:14,15
159:18,22
160:7 162:2
173:18
**rule** 77:10,14
103:9 156:11
**rules** 157:10,11
**ruling** 176:21
**run** 15:24
24:14,15 49:1
55:22 92:10
132:8
**running** 132:5
**runny** 93:2
**russ** 6:2

**s**

**s** 4:1 8:1
**sad** 182:12
**safe** 48:6
**safety** 45:20
**sale** 147:13,17
148:9
**salvaged**
169:21
**sat** 113:21
**save** 145:19
**saw** 15:14
53:24 62:11
84:10 112:19
**saying** 10:7
12:18 17:6
50:5,13 90:25
93:6 113:1
134:11,13
136:23 138:8
**says** 11:6 29:22
31:16 116:14
120:19 132:2
133:13,21
145:2
**scale** 24:6 49:5
**scenario**
169:10
**schedule** 33:17
34:13 38:10
39:5,9 171:10
177:15
**scheduled** 35:6
37:20 38:5
65:3,16
**schedules** 33:3
33:6,15,20

34:9,12,12
35:1 40:23
41:1 51:18
65:8,10 127:4
127:10
**scheduling**
156:22
**schumacher**
63:22
**schwab** 69:11
69:15
**scoot** 150:24
151:23
**scope** 49:16
50:1,7,11,13
51:11 58:6
139:5 148:12
149:5 159:21
**screen** 28:18
85:6 112:17
**screenshots**
99:20 100:7
136:19
**scroll** 29:21,24
33:15 53:25
85:2 86:25
89:19 109:2
110:5 114:2,14
114:18,23
116:3 122:20
**scrolling** 89:20
90:12
**sd** 4:23 5:12
**season** 152:16
**seated** 71:15
103:3 139:25

**second** 8:5
84:3 88:3 94:4
98:3 105:10
114:14 129:6
169:14 174:1
176:19 186:15
**seconds** 96:19
**section** 168:14
172:15 174:11
**sector** 159:7
**securable** 37:1
**secure** 54:17
55:1,4 73:19
**secured** 23:9
76:21 78:14
80:12 82:22,23
174:20
**securing** 99:2
**security** 63:22
81:14 99:3
**see** 28:18 31:10
33:10 34:4
85:17 94:21
97:11 103:16
105:4 114:24
115:25 121:22
121:22 128:5
143:22 149:17
149:24 153:7
164:22 166:15
167:9,10
178:22 181:9
185:25
**seeing** 85:17
**seek** 25:13,17
**seeking** 44:9

**seem** 21:14
  124:18
**seemed** 168:17
**seems** 64:8
  120:11 129:16
  157:16
**seen** 119:14
  162:9 178:10
**self** 156:25
**sell** 40:15
  54:25 153:23
**selling** 164:15
  164:16
**send** 91:9,12
  92:15
**sending** 45:4
  141:7
**sense** 53:20
**sent** 55:12
  85:10 97:19,20
  99:17 134:14
**sentence**
  122:11
**separate** 21:21
  24:2,18 50:22
**september**
  39:24 40:5,10
  137:11 155:1
  170:13
**serious** 75:4
  186:5
**served** 157:7
  158:8
**service** 32:21
  35:7 97:10
  162:22 174:21

**services** 54:4
  67:18
**set** 90:24
  110:23 119:14
  129:6 156:22
  168:9 189:23
**setting** 173:15
**several** 12:22
**sex** 85:23 86:4
**shape** 106:1
**sharon** 27:9
  142:11 184:12
  184:13 187:11
**sheet** 91:3
  106:2,4,6,18
  138:4
**sheriff's**
  147:13,17
  148:9
**ship** 131:2
  133:21 134:8
  134:16,23
**shipping** 120:9
**shock** 127:24
**shocking**
  174:22
**shon** 2:22
**shoot** 183:12
**short** 66:8
  153:6 182:17
**shortfall** 57:5
  57:16,18 62:1
**shortly** 70:25
**shot** 113:24
**show** 54:11
  78:25 129:10
  142:8 144:23

  149:16 171:18
  177:23
**showing** 46:23
  127:5 171:23
  178:7
**shown** 147:16
**shows** 152:19
**shultz** 5:9
**shut** 118:12
  119:19
**shutdown**
  120:8,18 121:8
  121:19
**sick** 117:5
  119:3
**side** 78:24
  112:15,16
  156:10 157:7
  159:9 160:12
  169:13 170:21
  186:20 188:3
**sides** 90:16
  160:11
**sidewalk**
  105:11,14,16
**siding** 55:25
  64:11 73:1
**signature**
  116:4,7 193:6
**signed** 54:24
  60:24 61:2,7
  136:22
**significant**
  105:7 185:14
**sills** 75:9
**similar** 68:16
  155:10 159:23

**simple** 93:8
**simplification**
  120:12
**simply** 41:7
  50:3 95:21
  106:11 158:11
**simultaneously**
  178:23
**sioux** 4:23 5:12
  49:11 58:17
**sips** 10:23
**sir** 9:17 10:2,9
  13:4 22:1
  26:19,23 29:21
  34:5,16 35:20
  59:10
**sister** 82:5
  83:23
**sit** 85:21 87:12
  94:20 107:25
**site** 15:11
  65:25 85:19
  86:8,12,12
  113:21
**sits** 73:2 85:22
**sitting** 56:4
  64:25 70:4
  86:20 90:7
  132:6
**situation** 87:8
**situations**
  171:23
**six** 32:16 38:22
  75:22 152:18
**size** 159:16
**skid** 20:9 45:4

skooch 8:19
slow 88:25
smacked
  174:23
small 16:24,25
  143:4
smith 4:20 5:9
software 24:22
sole 19:7,20,23
  20:8 46:22
solely 42:14
  149:9
solemnly 8:13
  150:20
soliciting 108:5
solution 176:2
  176:3
solutions
  193:20
solve 87:21
somebody
  56:21 185:13
somewhat
  186:22
son 83:22
sonya 3:25
  193:3,8
soo 70:25
soon 58:16,19
  121:1,4
sore 9:1
sorry 22:4 25:1
  25:16 26:12
  27:22 29:25
  33:25 35:3
  36:11 37:7
  38:14 41:16,17

41:19 43:6
45:7 47:5,10
49:14 52:4
62:18,25 77:11
78:10 79:8
82:13 89:19,20
110:19 111:18
112:18 113:10
113:13 117:18
122:7 124:1
130:1,4,8
132:16 134:7
136:11 137:2
137:11 138:10
138:11 142:6
142:25 144:1
151:20 152:23
154:12,17
159:25 162:15
184:11 185:3
189:14
sort 117:13
  119:19 180:5
sorts 68:6
sound 33:22
  39:24 93:2
  115:14 131:3
  178:16
sounds 33:24
  37:19,25 58:16
source 109:21
south 5:11,19
  45:24 47:6
  57:23 59:12
  67:18 68:10
  69:6 85:22
  111:10 119:24

120:2,15,21
121:2,8,18,25
122:6,7,18
146:10,13
154:10 155:18
158:3
spa 98:9
speak 15:7,19
  31:24 50:6
  129:10 180:22
speaking 17:23
  31:14 46:4
  51:6 68:15
speaks 25:25
  30:2 31:3,18
  54:8 126:4
special 86:10
  105:12
specific 118:9
  152:10
specifically
  34:18 54:6
  59:13 65:2
  151:17 152:13
  156:21
specifics
  159:12
speculate
  154:2
speculating
  88:14 160:21
speculation
  108:2 160:25
spelling 9:12
spend 95:7
  130:6

spending 94:2
spent 21:20
  25:9 26:15,21
  29:14 45:4
  67:10 97:3
  98:2 101:8
spite 167:23
splash 86:2,3
split 49:25
spoken 48:11
spot 145:9
spots 45:17
spotting 30:8
spread 107:13
  120:10,11
spreadsheet
  82:4
spring 64:13
  152:17
square 22:17
  22:21
sr 6:3
stabilization
  138:4 162:4
stabilized 52:6
  161:19,21
  162:13
staff 12:6
stakeholder
  174:16
stamp 34:4
stamping
  112:16
stand 8:9,18
  41:10,18 72:9
  140:4 150:23
  165:21 176:1

**standard**  48:24
75:3 160:4
**stands**  192:17
**stanley**  4:17
7:9 27:21,23
28:10,14 41:11
41:14,16,19,24
42:4,23 43:3,6
43:10 47:10
72:11 77:9,13
77:18 78:20
84:20 87:14
88:14 100:24
101:12,16
102:22 103:21
103:24 108:4
108:12,25
109:6 110:5,7
110:19 111:1
112:9,14,21
113:10,16,18
114:4,9 115:16
115:19,24
118:6 119:17
120:1,21
121:17,23
122:5,19,22
123:22,25
124:3,5 125:19
125:24 126:8
127:19 129:16
129:21 130:1,4
130:8,10,15,16
130:20,21
137:6 138:12
138:14 139:16
139:19 140:10

140:13 142:11
142:13 143:24
144:3,4 148:14
148:21 149:16
149:20 188:10
**stapled**  17:11
72:25
**stare**  186:22
**start**  11:18
58:16 76:11
77:12 79:12,15
85:3 120:7
182:8 187:14
187:16,19,20
187:22 188:9
188:12
**started**  10:25
20:24,25 48:25
49:4 54:22
58:16 97:14,23
104:5 111:9
122:11 125:4
144:8 171:14
185:24 189:19
**starting**  97:15
150:17
**state**  3:1,5,8
4:12,21 6:4 8:4
8:11 9:12
13:14 14:19
16:12 17:13,25
18:10,21,24
25:14,18,21
26:5 31:22
36:15,24 37:17
37:24 38:1,13
38:16,18 50:22

53:7,21 70:24
71:4,18 76:17
77:6 78:12,15
81:4 83:6
88:25 90:9
91:13 97:9
98:21 99:25
106:22 109:10
118:19 119:12
121:25 122:1
122:17 140:3
147:10,16,25
148:2,5,8,10
148:16 149:14
150:18 151:2
157:2 166:24
171:22 172:1
179:10
**state's**  120:8
**stated**  78:8
103:11,11
154:20 158:25
**statement**  14:8
30:20,21 59:8
100:5 101:6,14
124:22 135:24
136:4,6 184:25
185:20
**statements**
62:5 99:18,20
100:3 136:13
136:15,19
165:15 166:21
**states**  1:1 2:4
**status**  190:13
**statute**  169:8
170:15 172:8

172:13 176:6
179:25
**statutorily**
172:17
**statutory**
177:2
**stay**  40:13
51:10 58:5
71:1 86:6
95:22 96:4
118:13 119:20
128:4 156:16
157:21 158:8
178:11,13
187:6
**stayed**  127:25
175:17
**steer**  20:9 45:4
**step**  77:4,4
160:9 163:23
163:24
**stepped**  97:4
97:16
**stepping**  95:9
**steps**  55:1,3
**stipulate**  121:8
**stipulated**
166:8
**stipulation**
36:22,24 40:5
**stone**  92:7
132:14
**stood**  159:14
**stop**  29:24
107:22
**stopped**  20:25

storming  28:2
story  97:7
straight  126:13
  173:17
strange  84:13
street  4:22
  5:18,19
strenuously
  177:19
stress  173:13
stressful  102:8
stretch  58:3
  69:25 70:25
strike  74:19
  85:8
stroh  11:21,21
  122:23 123:6,9
  123:13 125:6
  128:9
strong  185:16
strongly  187:4
struck  161:11
structural  92:3
struggled
  155:2
struggles
  126:23
struggling
  161:1
study  53:13
  152:19,19
stuff  10:21
  49:3 75:18
  100:16 111:5
  128:7 140:21
styles  160:5

subcontractor
  18:1,25
subcontractors
  15:7 16:9,16
  16:20 17:18,21
  54:4 85:10
  88:4
subfloor  93:1
subject  36:25
  174:7
submit  18:13
  18:14,23 25:13
  25:17 38:12,15
  165:15,23
submitted
  13:13,16,24
  14:25 16:3
  17:12,21,25
  18:2,9,17,18
  24:11 26:17
  64:1,5 128:23
  131:5 141:14
submitting
  143:1
subordinate
  21:16
subpoenaed
  16:19
subpoenas
  16:23
subs  95:9,19
  145:16
subsequent
  142:16
substantial
  58:8 113:6

substantially
  40:15
sue  36:6 90:24
  90:25 99:1
sufficient  46:9
  67:15 103:15
suggest  95:15
  176:20 190:25
suggesting
  101:18 120:25
  173:19
suggestion
  91:3 170:9
  176:8 186:6
  190:21
suggestions
  191:14
suicide  101:10
suing  36:5
suite  4:5 5:11
  5:19 193:22
suited  167:6
summary
  17:15 41:21
  43:11 85:2
  90:2 91:3
  168:6
summer  45:14
sunday  185:9
super  167:18
supervise
  176:25
supervisor
  15:11 152:3
supplement
  157:17 170:3

supplied
  140:20
support  14:25
  72:2 166:10
  171:19
supports
  166:22 191:2
suppose
  155:18 184:8
supposed  52:7
  82:16 90:9
  118:16 131:25
  135:9 172:20
sure  9:3 12:9
  14:3 21:16
  26:20 34:3
  38:11 39:25
  41:13 42:12
  45:13,15,19
  46:12 55:14
  59:8 60:19,24
  69:13 70:13
  71:23 75:5,10
  75:18 84:5
  96:20 100:2
  102:6 103:8,17
  111:15 117:17
  119:24 123:23
  130:18 136:14
  142:10 144:25
  151:3,21
  168:23 178:23
  184:5,22 186:2
surgery  9:16
surprise  11:6
  16:22 138:5
  170:17 173:23

**surprised**
171:4
**surprising**
17:4,21
**sustain**  52:16
127:18 152:25
191:8
**sustained**  26:8
31:20 68:7
88:16 161:23
**swear**  8:13
150:20
**swore**  27:15
**system**  24:24
63:22
**systems**  5:17

**t**

**t**  193:1,1
**table**  175:1
177:1 180:9
186:5
**tail**  145:17
**tails**  128:14
**take**  8:18 10:23
29:21 41:13
48:21 56:2
70:24 75:4
86:10,13,14,21
94:23 96:6
106:14,22,23
107:9 113:20
114:1 118:20
119:17 120:1
121:1,6,18
122:3,14
126:25 130:22
132:21 133:9

136:2 138:18
139:6 150:23
159:10,15
162:18 164:7
173:16 182:17
183:9 188:13
**taken**  55:1
135:23 181:5
**talk**  19:2 31:22
32:25 89:5
94:4 103:1
106:2 107:5
110:20 150:17
**talked**  15:9,9
19:3 24:21
36:9,12 48:14
49:4 55:12
63:23 65:20
67:6 77:25
88:19 101:6,7
108:19 123:5
125:12 128:1
135:21 136:9
**talking**  14:15
18:16 31:23
36:1 38:3
54:12 58:16
69:4,4 77:15
77:24 89:8
98:11 99:14
100:24 111:5
119:16 123:9
135:16 147:12
**talks**  132:22
**tanabe**  4:16
7:13 152:21,23
153:13,25

154:7,11
155:12 156:4
157:4 158:7,19
158:23 160:19
161:7,12,21
162:25 163:2
164:19 165:14
165:19,21
166:1 168:12
168:16 169:4,6
169:9,25 171:9
171:15 174:15
175:7 177:7
181:21,22
182:2,12,16,24
183:4,8,20
184:4,8,11,14
184:21 185:3
185:14 186:8
186:11,13
187:4,13,16,22
187:25 188:7
188:13 189:18
190:2 192:7
**tanabe's**  178:8
**tap**  8:20
**tape**  75:19
**tape's**  75:5
**taped**  75:11
**tasks**  163:4
**tax**  33:5 56:14
57:1 59:11
60:15 61:22
62:5
**taxes**  32:23
38:4 57:1,5,15
59:1,4,6,15

60:7,9,20
61:11 62:4
70:17,20 83:8
96:15
**team**  71:4
**technical**  157:4
157:14
**telephone**
62:14 143:13
143:13,22
181:13
**tell**  33:25 67:9
78:22 81:25
105:22 118:10
122:2 138:8
139:4 171:12
176:1,5,16
177:5
**telling**  167:8
190:16
**ten**  20:23 71:8
71:10 94:18
**tenant**  79:22
151:16
**tenants**  96:1
155:13,14,14
155:15
**tended**  79:3
**tent**  55:25
**tenth**  88:10
**term**  64:21
106:2,4,6,18
133:7 138:4
158:9
**terms**  55:21
168:9 176:6
180:12,16

**terrible** 112:6
191:22
**territory** 156:3
**terry** 11:21
123:5,6,9,13
128:9
**testament**
55:15
**testified** 13:13
13:19 17:12,24
21:18 43:24
58:25 60:23
61:10 62:1
64:24 73:16
84:16 94:23
106:17 108:13
109:17 111:2
140:14 141:21
144:5 145:11
145:15 161:5
166:13
**testify** 27:1
127:6,20 132:8
137:18 155:16
155:20 157:25
158:15
**testifying**
101:1 120:5
131:14 141:8
158:2 160:20
**testimony** 8:14
13:5 14:24
16:1 17:15
18:7 27:16,18
28:21 43:20
44:14 50:18
53:2 58:22

63:15 73:5,8
73:10 74:2,8
74:20 78:23
87:17 108:5
112:25 124:18
126:1,3 146:9
149:10 150:21
153:21 157:3
175:4 181:1
190:21
**testing** 65:24
66:16 75:9,16
**text** 101:10
**texted** 128:2
**texting** 98:2
**textured** 75:12
**thank** 8:24 9:5
9:7 21:24 28:7
31:20 41:5
42:20 43:6,12
43:17 51:16
52:5 58:4,10
62:24 63:1,4
70:8 71:12,25
72:1,5,18
76:10 89:18
90:15 96:21
101:21 102:18
102:25 103:21
109:5 111:22
113:15 118:5
119:16 122:6,7
137:5 139:22
140:8 146:17
146:19,21
150:2 151:24
161:7 162:25

164:18,21,23
165:2 179:24
180:24 181:11
188:20 191:7
192:7,10,13,15
**thankfully**
56:16
**thanks** 151:23
**thanksgiving**
183:15,18
191:19
**theory** 120:6
172:10
**thereof** 21:16
30:5 121:12
149:12
**thereto** 42:17
**thereunder**
173:11
**thesis** 46:20
**thing** 55:22
74:16 86:2,10
92:8 95:10
102:5 103:10
105:13 112:15
163:23 167:5
186:1
**things** 13:8
24:6 31:17,17
48:23 55:10,10
56:4 64:6 66:3
75:5 76:19
83:4 89:17
95:23 97:12,13
100:23 105:25
118:23 121:14
128:2,6 132:19

140:18 141:1,3
144:21 159:23
167:9
**think** 11:8
20:17 21:7
23:1 24:21
27:21 28:13
32:13 42:21,23
44:25 51:4
53:25 56:3
59:13 60:3,23
62:1,11 65:4
69:15 71:7
73:10 76:22
78:18 79:10
80:25 91:25
94:20 97:14,14
98:7,12 102:2
103:13,15
104:4,6 106:8
106:17,20
109:4,17 111:2
113:24 115:22
116:25 117:8
117:12 120:3
122:23 127:15
131:14,19
137:7,8,17
138:13 140:22
141:21 142:2
142:11 143:16
144:10 145:15
146:9 148:22
152:21 154:2
155:12,16,23
156:13 157:4
157:10,14,16

158:9,11,12
160:19 161:15
162:8 166:8,22
166:23,24
167:21 168:2,4
168:7,16 169:2
169:2 170:14
170:20 171:3,7
171:9 172:4,25
174:18,23,24
175:5,8,9,15
176:13 177:8
177:17 178:5,7
179:10,17
180:17 182:10
182:16 183:8
183:21 188:14
189:8,19 190:2
190:3,7 191:2
**thinking**  70:5
167:9 180:1
**third**  77:6 79:2
79:18 82:23
95:12 102:13
108:19 109:2,7
110:9 116:11
147:6 166:14
172:2 174:3,9
176:24
**thought**  62:16
78:11 113:5
123:13,25
141:9 171:5
177:9 185:24
190:6,6
**thoughts**  189:7

**thousand**
28:15 38:22
42:24,25
104:18 159:16
**three**  14:13
24:7 34:14
35:6 53:23
54:20 63:17,20
75:24 76:1,3
79:4 83:16
89:2 93:21
94:25 95:1,1
98:14 120:5
128:2 154:23
154:24 155:6
159:4 163:15
**threefold**
173:22
**throat**  10:22
**throw**  49:14
189:12,16
**tied**  57:4
**tif**  56:10,11,13
56:18,20 58:23
86:16,17,19
93:20 109:24
109:24 113:3
**tifs**  56:22
**tile**  88:18
**time**  11:9 24:8
24:9 25:16
32:22 38:3,14
39:19 40:22
44:24,25 45:3
46:5,23 47:15
47:20 48:14,25
51:1,14 54:16

67:9 69:6,21
70:6 71:5,8
76:13 81:12,13
83:8 85:9 87:1
87:4 89:11,19
89:21 94:2
95:7,13 97:3
98:2 99:17
100:15,16
101:8,10 102:9
102:13 103:16
104:22 105:6
111:7,12 117:3
117:6 119:4
121:18 123:16
127:2,17 130:7
131:17,18
137:15 138:20
138:22 139:18
143:20 151:3
162:6,19
168:22 174:5
176:4,18 177:3
177:8,10,13
181:5,21
182:17,18
187:25 188:12
**timeframe**
111:13 120:17
153:6
**timeline**  48:16
**times**  15:11
18:11 23:17
45:12 73:17
104:12 117:2
125:12

**timing**  16:10
49:14 177:5
**title**  12:8 43:8
88:11,15,19
151:10
**tizzy**  97:21
**tl**  11:20
**today**  8:25 9:1
19:4 48:1,4,9
53:22 55:20
73:2 74:6 80:9
90:7 139:1
153:15 156:5,8
157:3 166:2,4
166:12 167:6
168:14 171:4
191:17
**together**  17:11
39:5,9 82:4
100:16 123:10
**told**  55:13
101:24 181:25
**tomorrow**
138:23,24
139:2
**ton**  42:12
**took**  9:1 35:5
55:3 75:19
79:19 86:5
93:6,10 110:16
110:22 154:22
155:3
**top**  16:13 34:4
73:1 84:21
86:11 112:16
116:10

| | | | |
|---|---|---|---|
| **topics** 167:16 | **truck** 113:21 | **tuesday** 2:9 | **typically** 12:8 |
| **tore** 105:16 | **trucks** 20:9,9 | **tune** 47:12 | 22:5 152:16 |
| **totaled** 108:18 | 113:23 | **turn** 8:19 | **tyvek** 45:15 |
| **touch** 36:9,12 | **true** 14:10 | 60:10 71:19 | 72:22,23 73:2 |
| 88:3 127:25 | 27:15,18 28:20 | 175:22 | 73:6,9,17,19 |
| **touched** 31:16 | 37:21 40:6 | **turned** 16:1 | 73:20,21 |
| **towards** 60:13 | 116:8 135:8 | **turns** 51:15 | |

| **u** |
|---|

| | | | |
|---|---|---|---|
| 116:10 122:20 | 158:11 167:25 | 182:7 | **u.s.** 2:5,23 |
| **towers** 5:18 | 193:4 | **tweak** 44:14 | **ultimate** 14:6 |
| **town** 57:24 | **trust** 6:2,3 | **twelve** 93:22 | **ultimately** |
| 94:16 97:8 | **trustee** 95:16 | 104:18 | 17:13,25 76:25 |
| 159:5,8 | 170:9 172:15 | **twenty** 184:1 | 78:10,13 97:13 |
| **track** 39:11 | 172:19,22 | **twice** 92:12 | **unavailable** |
| **trade** 64:16 | 173:19 174:11 | **two** 18:4,7,8 | 181:19 185:18 |
| 184:23 | 175:11,23 | 22:21 24:7 | **unclear** 155:19 |
| **trades** 63:23 | 177:1 180:2,6 | 29:3 34:13,18 | **under** 9:19 |
| **training** 163:7 | 180:17 190:12 | 35:6 37:16 | 27:13 46:19,21 |
| **transcribed** | 191:1 | 46:16,19 48:21 | 63:11 72:8,16 |
| 3:25 | **truth** 8:15,15 | 49:5,25 50:6 | 94:6 140:5 |
| **transcript** 28:9 | 8:15 150:22,22 | 50:22 51:24 | 156:1 168:14 |
| 28:11 112:7 | 150:22 | 53:13 68:17 | 168:18 170:14 |
| 193:4 | **try** 29:22 | 80:24 81:1 | 171:13,22 |
| **transparently** | 113:14,17 | 82:17 88:22 | 172:14 174:11 |
| 178:24,25 | 128:5 133:7 | 94:16 101:25 | 175:12 190:24 |
| **trap** 54:8 | 166:4 175:9 | 107:15 108:1 | **underbill** |
| **traveling** | **trying** 33:8 | 108:16 120:4 | 17:18 |
| 183:14 | 49:14 68:14 | 136:9 137:22 | **underneath** |
| **trial** 182:6 | 70:5 76:22 | 137:23 144:16 | 73:12 75:11 |
| 183:1,2 | 89:4 94:3 | 153:5 154:3 | **understaffed** |
| **tricky** 56:1 | 97:21 98:10 | 155:5 157:11 | 97:13 |
| 184:17,18 | 100:14,15 | 159:3 160:11 | **understand** |
| **tried** 53:25 | 101:5 117:10 | 160:17,17 | 9:15 10:7 13:7 |
| 113:3 170:16 | 123:7,21 | 174:10,25 | 23:7 31:6 |
| **trim** 131:10 | 128:25 130:10 | 175:15 176:19 | 59:15 60:14 |
| 140:20 | 141:3 161:15 | 177:8 179:6 | 70:7 72:15 |
| **trip** 33:8 | 173:13 179:24 | **type** 27:2 93:12 | 78:21 113:2 |
| | | | 126:3 140:6 |

161:1 169:12
177:5
**understanding**
18:20 30:5
40:16 55:20
56:17 57:7,12
59:11 60:6
73:8 168:13
186:20
**understood**
10:1 21:13
28:7 52:13
58:9 76:13
112:25 165:10
**undertake**
163:7
**undertaking**
86:22 113:6
**unfair**  170:21
**unfairness**
174:22
**unfinished**
94:19,20,21
**union**  48:3
**unit**  140:19
159:4
**united**  1:1 2:4
91:24
**units**  11:3,7,9
11:10 35:12
39:6 50:11
94:17 152:5,8
152:20 160:5
162:16
**unknown**  2:25
**unpaid**  59:6

**unquote**  159:9
**unusual**
169:16,20
170:4,22 171:2
173:18 177:10
190:4,11,13,15
**updated**  53:13
73:3 125:1
**upkept**  105:15
**upper**  28:23
**upscale**  159:24
160:1
**urge**  173:23
174:1
**urging**  172:12
**urgings**  173:3
**use**  18:18 35:8
49:8 74:16
126:24 145:19
162:17 170:7
172:12 174:14
**used**  16:7
25:22 26:6
77:1 79:1,2
80:3,20,23
83:9 84:7
85:21 99:23
102:17 110:24
117:18 140:24
157:13 165:8
**using**  38:20
83:2 87:24
103:18
**usually**  88:9
**utilities**  32:12
32:14 35:24
44:13 45:10

65:24 66:5,9
96:12
**utility**  34:18,21
173:8

**v**

**vacancies**
153:12
**vacancy**  94:17
153:7 154:21
154:25 155:6
162:14
**vague**  161:22
170:6
**valid**  30:4,5
**valuable**  44:25
181:4
**valuation**
34:17,17 51:19
153:16,19
177:21,22,24
178:19,20
**value**  11:11
22:24 34:13,21
35:1,4,18,18
35:19,23 51:23
52:15,20,24
59:16,18,23,25
60:2,2,3 61:19
61:22 106:10
126:20 129:14
154:4,9 158:1
179:7
**valued**  34:23
**values**  35:22
**varies**  159:5
**variety**  178:15

**various**  14:19
16:19 19:3
21:15 23:20
24:13 33:16
37:20 50:9
65:20 79:5
**vaults**  49:2
**veer**  168:17
**vehicles**  21:7
**vendor**  49:6
**venture**  33:23
**verbalize**
117:11
**verification**
100:7
**verified**  13:25
**veritext**  193:20
**verstandig**  4:8
7:7 13:7 21:12
21:24 25:24
28:1,5 30:1,10
30:17,19,21,24
31:13 37:8
41:5 42:1,6,11
42:20 43:13,16
43:17,19 46:16
47:1,14 49:14
49:19,21 50:24
51:3,10,16,17
52:14,18 54:10
54:14 58:1,5
58:10 64:20
68:5,14 69:14
69:24 70:5,8,9
71:10,12,19,20
72:5,19,21,22
76:2,5 77:16

**[verstandig - watertown]**                                                    Page 56

| | | | |
|---|---|---|---|
| 77:19,21 78:23 | 184:1,17,18,23 | 189:8,10,15 | 189:10 191:18 |
| 79:8,14 84:22 | 185:9,12 186:4 | **waiting**  160:16 | **wanted**  21:13 |
| 85:1,4 86:24 | 186:14,19 | 174:18 | 64:13 66:4 |
| 87:3,17,19 | 187:2,7 188:3 | **waitlist**  163:15 | 85:24 86:1,3 |
| 88:17 92:20,22 | 188:6 189:2,8 | **waivers**  12:9 | 97:10 99:21 |
| 96:18,21,22 | 189:12,15 | **walk**  54:7 77:4 | 103:8 105:17 |
| 101:3,14,17,21 | 190:10 191:7 | 88:1 94:13 | 127:1 128:3 |
| 101:22 102:19 | 191:16,21,23 | 105:2 | 159:24 160:1 |
| 102:25 107:18 | 192:4,9 | **walking**  156:3 | 165:6 171:5 |
| 107:21,24 | **versus**  68:17 | **walkout**  28:6 | 174:17 190:25 |
| 111:22 112:5 | 95:6 120:9 | **walks**  45:13 | **wants**  50:24,25 |
| 114:4 115:16 | 160:11 168:21 | **wall**  5:17 | 187:7,11 |
| 115:18 117:10 | **viable**  176:3 | **walnut**  132:18 | **watch**  94:20 |
| 117:17,22,24 | 179:9 190:23 | **want**  9:18 13:8 | **water**  45:16 |
| 118:5 119:21 | **vibe**  159:24 | 13:9 19:2 | 74:20,22,25 |
| 120:3,17 121:7 | 160:1 | 20:22 21:21 | 75:2,2,6,8,14 |
| 121:11 122:9 | **vice**  163:24 | 29:17,22 31:9 | 75:20 |
| 122:15 126:1 | **video**  62:16,17 | 31:14,22 32:25 | **watered**  113:7 |
| 127:15 129:9 | 63:5 86:5 | 34:1 38:8 | **watertight** |
| 130:12 137:3 | 188:21 | 44:14 48:13 | 18:11 64:9 |
| 138:16,17,21 | **videoconfere...** | 49:18 50:16 | **watertown**  3:4 |
| 138:23,25 | 62:15 | 51:2 56:22 | 5:10 37:3 |
| 139:5,9,12,22 | **violation**  76:23 | 58:2 64:6 | 45:11 48:16 |
| 143:9 146:23 | 76:23 97:25 | 79:16 84:5 | 53:10 56:7,24 |
| 146:25 147:20 | 100:21 | 94:22 100:1,1 | 57:3,13,20,23 |
| 147:22 148:11 | **virtual**  186:25 | 100:23 102:6 | 58:23,25 60:7 |
| 148:24 149:1,9 | **virtually**  187:8 | 102:20 103:13 | 60:10,12,14,21 |
| 149:23 150:2,4 | **virtue**  172:25 | 103:16 105:4 | 60:25 61:2,6,8 |
| 150:11 153:16 | **visit**  168:8 | 119:5 125:16 | 71:21 86:12 |
| 153:18 154:6,8 | **vogel**  4:11 | 130:6 137:12 | 90:18 94:21 |
| 156:11 157:19 | **voice**  150:14 | 149:17 157:19 | 104:8 111:10 |
| 164:25 165:4,7 | **vp**  6:3,4 | 157:24 165:11 | 123:7 128:5 |
| 165:20 171:21 | **w** | 168:10 173:13 | 130:24 151:25 |
| 172:4,7 173:21 | | 176:4,14 177:3 | 152:2,6,7,13 |
| 177:14,16 | **w**  4:17 | 179:14 184:2 | 152:17 154:10 |
| 178:7 182:4 | **wait**  64:13 | 184:21 185:6 | 155:9,18 158:3 |
| 183:5,11,19 | 87:12 137:1 | 187:22 189:6,8 | 159:3,19 |
| | 163:14 189:3,5 | | |

| | | | |
|---|---|---|---|
| 160:22 161:20 | 191:18 | **willing** 55:17 | 129:13 137:2,5 |
| 167:1 168:1 | **weekend** | 55:21 94:9 | 140:7 148:24 |
| 176:9 179:19 | 191:19 | 95:8,17 96:7 | 149:22 150:7 |
| 192:11 | **weigh** 106:20 | 170:7 177:7 | 151:25 154:15 |
| **way** 51:6 52:7 | 106:21 180:14 | **win** 145:10 | 154:17,20 |
| 88:8 102:14 | **weight** 120:14 | **wind** 73:16 | 155:24 156:9 |
| 108:7 113:4 | **welcome** 58:3 | **window** 75:5 | 156:14,25 |
| 117:6 121:4 | 173:4,5,6 | **windows** | 157:23 158:14 |
| 128:16 131:21 | 179:16 189:5 | 140:21 | 158:17,17,22 |
| 140:16 143:21 | **went** 34:14 | **windowsills** | 158:24 160:20 |
| 149:24 150:15 | 78:25 81:21 | 75:17 | 160:21,25 |
| 156:13 157:4 | 84:11 89:7 | **winds** 45:14 | 161:1,2,5,6 |
| 173:14 174:24 | 90:23 97:7 | **wing** 158:17 | 165:2 176:1,4 |
| 175:10 178:12 | 99:5 104:5 | **winter** 32:14 | **witnesses** 71:3 |
| 179:9,20 | 105:17 113:22 | 64:10 | 71:22,24 156:5 |
| **ways** 171:17 | 125:13 134:13 | **wisconsin** | 156:7 157:12 |
| 172:5 | 137:23 138:2,6 | 163:13 | 165:3 170:23 |
| **wdc** 37:3,17,24 | 143:6 147:23 | **wise** 159:16 | 171:10 173:6 |
| 38:1,3 | 166:6 | **wish** 72:2 | 177:8,12 178:9 |
| **we've** 19:3 | **west** 4:22 | 94:12 118:11 | 181:14 183:10 |
| 23:20 24:21 | 11:18 160:12 | **wished** 119:13 | 186:21 |
| 25:15 35:7,10 | **whatsoever** | **withdrawing** | **wives** 17:2 |
| 36:12 45:10 | 169:20 | 40:12 | 101:7 |
| 55:22 75:15,16 | **wherewithal** | **withdrawn** | **woah** 107:21 |
| 87:2 93:18 | 146:1 | 40:17 | 107:21 110:18 |
| 104:23 114:11 | **whisper** 96:19 | **witness** 7:4 8:5 | 110:18,18 |
| 126:10 155:5 | 149:23 186:15 | 26:9,12 29:24 | **wonderfully** |
| 170:6 | **white** 72:23 | 31:15 37:8 | 185:12 |
| **wear** 12:22 | 102:17 | 41:6,10 47:12 | **wondering** |
| **website** 11:6 | **wife** 17:3 22:9 | 47:16,21,23 | 138:10 177:25 |
| **week** 165:16 | 23:19 24:14 | 49:17 50:2,6 | 177:25 |
| 165:23 171:6 | 48:21 52:9 | 52:4,6 54:12 | **woods** 5:9 |
| 181:17,18,18 | 78:10 144:21 | 58:4 70:1,24 | **word** 123:25 |
| 181:19,23 | **wife's** 78:7 | 71:1 72:9,17 | **words** 48:13 |
| 184:6,25 | **wild** 120:6 | 76:3 79:10 | 57:17 78:5 |
| 186:17 187:2 | **wildly** 175:12 | 107:19 110:22 | 92:4,15,16 |
| 189:3 191:17 | | 113:13,15 | 174:14 |

| | | | |
|---|---|---|---|
| **work** 15:15 | 133:5 176:10 | 80:24 82:13 | 38:4 53:14 |
| 17:19 20:9 | 176:18 179:15 | 84:3 87:6 92:5 | 56:25 59:1,6 |
| 25:14,19 39:13 | **wow** 124:1 | 94:19 95:4 | 61:10,13 94:18 |
| 45:5 48:17 | **wrap** 72:22 | 100:23 105:14 | 101:7 105:23 |
| 55:6,9,21 | 73:6,9 166:1 | 105:20 106:5 | 135:25 152:20 |
| 63:13,16,18,21 | 184:6,8,16 | 110:6,15,20,22 | 159:9 163:9,10 |
| 67:2 91:7 | 187:14 188:17 | 112:15,17 | 173:2 |
| 105:7,18 | **wrapped** | 113:11,23 | **yeeha** 184:15 |
| 106:19 111:25 | 185:10 | 115:12,15,23 | **yellow** 115:23 |
| 112:1 123:6,10 | **wrinkles** | 118:1 119:11 | 122:20 126:9 |
| 123:11 128:12 | 186:23 | 122:23 123:23 | **yesterday** 9:2 |
| 128:14 151:17 | **writing** 15:16 | 124:3 125:1 | 13:3,13 17:12 |
| 163:20 176:18 | 165:15,18,23 | 127:1 129:7 | 19:3 30:9,13 |
| 181:20 184:19 | 174:14 | 131:16 132:10 | 41:12,22 42:5 |
| 185:12 187:16 | **written** 167:7 | 132:14 133:12 | 49:24 73:5 |
| 187:24 188:14 | 168:5,6 | 135:6 136:17 | 84:17 85:6 |
| **worked** 11:20 | **wrong** 124:21 | 137:9 138:10 | 122:23 149:4,6 |
| 11:20 36:21 | 131:7,8,15 | 139:9 141:25 | **young** 101:25 |
| 55:8 83:23 | 136:13 178:9 | 142:20,22 | 128:14 |
| 97:9 126:14 | **x** | 143:10 144:13 | **younger** 48:21 |
| 147:19 163:17 | | 145:4,11 | **z** |
| 164:3 178:25 | **x** 1:4,10,12,18 | 168:15 182:15 | |
| **working** 24:9 | 1:20 2:1 7:1 | 186:10 187:18 | **zero** 154:25 |
| 100:15 111:8 | **y** | 188:5,8,14 | 155:6 |
| 111:10 | | 189:12 191:16 | |
| **works** 21:3 | **y** 24:23 | **year** 20:23 | |
| 45:11 56:18 | **yardi** 24:23 | 24:17 26:24 | |
| 184:1 187:3 | **yeah** 8:20,21 | 32:13,18 34:10 | |
| **world** 47:25 | 17:7 28:13 | 39:15,17 55:23 | |
| 48:4,8 73:2 | 30:14 35:10 | 61:7,14 62:5 | |
| 74:6 93:12 | 38:22 39:16,20 | 73:17 82:17 | |
| 169:10 | 40:2 41:9,9 | 94:17 104:4,7 | |
| **worried** | 43:11,12 44:5 | 107:15 147:4 | |
| 101:24 121:13 | 44:13 51:21 | 162:11 163:15 | |
| 128:8 | 54:9,15 55:22 | **years** 10:23,25 | |
| **worth** 11:10 | 60:19 69:10,16 | 11:1,4,14 | |
| 38:23 92:9,13 | 73:17 76:3,7 | 22:17 35:6 | |
| | 77:11,20 78:6 | | |