Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF NORTH DAKOTA

3   Case No. 25-30002 (Jointly Administered)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GENERATIONS ON 1st, LLC,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - x

11  Case No. 25-30003 (Jointly Administered)

12  - - - - - - - - - - - - - - - - - - - - - - - - - - x

13  In the Matter of:

14

15  PARKSIDE PLACE, LLC,

16

17         Debtor.

18  - - - - - - - - - - - - - - - - - - - - - - - - - - x

19  Case No. 25-30004

20  - - - - - - - - - - - - - - - - - - - - - - - - - - x

21  In the Matter of:

22

23  The Ruins, LLC,

24

25         Debtor.

Page 2

```
 1  - - - - - - - - - - - - - - - - - - - - - - - - - - x
 2
 3
 4          United States Bankruptcy Court
 5          Quentin N. Burdick U.S. Courthouse
 6          655 1st Ave. N.
 7          Fargo, ND 58102
 8
 9          Monday, November 3, 2025
10          10:00 AM
11
12
13
14
15
16
17
18
19
20
21  B E F O R E :
22  HON SHON HASTINGS
23  U.S. BANKRUPTCY JUDGE
24
25  ECRO: UNKNOWN
```

Page 3

```
 1  HEARING re Motion by Red River State Bank to Convert Case
 2  from Chapter 11 to 7 filed 09/26/2025 (Doc. 109)
 3
 4  HEARING re Joinder by Watertown Development Company to Red
 5  River State Bank's Motion to Convert Case from Chapter 11 to
 6  7 filed 10/10/2025 (Doc. 131)
 7
 8  HEARING re Objection by Debtor to Red River State Bank's
 9  Motion to Convert Case from Chapter 11 to Chapter 7 filed
10  10/17/2025 (Doc. 143)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by:  Sonya Ledanski Hyde
```

Page 4

```
 1  A P P E A R A N C E S :
 2
 3  THE DAKOTA BANKRUPTCY FIRM
 4      Attorney for Debtors
 5      1630 First Avenue North, Suite B
 6      Fargo, ND 58102-4246
 7
 8  BY:  MAURICE VERSTANDIG
 9      CHRISTIANNA A. CATHCART
10
11  VOGEL LAW FIRM
12      Attorneys for Red River State Bank
13      218 Northern Pacific Avenue
14      Fargo, ND 58102
15
16  BY:  KESHA TANABE
17      CAREN W. STANLEY
18      DREW J. HUSHKA
19
20  DAVENPORT EVANS HURWITZ & SMITH LLP
21      Attorney for Red River State Bank
22      206 West 14th Street
23      Sioux Falls, SD 57101-1030
24
25  BY:  ANTHONY M. HOHN
```

Page 5

```
 1  KD LAW, PLLC
 2      Attorney for D&M Industries, Inc.
 3      3429 Interstate Boulevard
 4      P.O. Box 9231
 5      Fargo, ND 58106-9231
 6
 7  BY:  JOHN M. KRINGS, JR.
 8
 9  WOODS FULLER SHULTZ & SMITH PC
10      Attorney for Watertown Development Company
11      300 South Phillips Avenue, Suite 300
12      Sioux Falls, SD 57104
13
14  BY:  JORDAN J. FEIST
15
16  BASSFORD REMELE
17      Attorney for Diamond Wall Systems
18      Fifth Street Towers
19      100 South 5th Street, Suite 1500
20      Minneapolis, MN 55402
21
22  BY:  JEFFREY D. KLOBUCAR
23
24
25
```

2 (Pages 2 - 5)

Page 6

1  ALSO PRESENT:

2    RUSS KASSIN, President/CEO, First National Bank & Trust

3    JEAN O'DETTE, Sr. VP/CCO, First National Bank & Trust

4    DANIELLE HARLESS, VP, Red River State Bank

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1             I N D E X

2                         PAGE

3

4  WITNESS(ES):        DX  CX  RDX  RCX

5  CHARLES AARESTAD

6    By Ms. Stanley       41     154

7    By Mr. VerStandig         112

8

9          E X H I B I T S

10 NO.      DESCRIPTION            PAGE

11     All stipulated exhibits admitted     39

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1              P R O C E E D I N G S

2        THE COURT:  Good morning.  The case before the

3  court today is Bankruptcy Case Number 25-3002, Generations

4  on 1st, LLC; 25-3003, Parkside Place, LLC; and 25-3004, In

5  re The Ruins.

6        Will the parties please make their appearance for

7  the record?  Let's begin first with debtors.

8        MR. VERSTANDIG:  Good morning, Your Honor.

9  Maurice VerStandig, on behalf of the three debtors.  I'm

10 joined by my co-counsel, Christianna Cathcart, the principal

11 of all three debtors, Jesse Craig and we're also joined in

12 the courtroom by Mulinda Craig, who is the property manager

13 for Generations and Parkside.

14        THE COURT:  All right.  On behalf of Red River

15 State Bank?

16        MS. TANABE:  Good morning, Your Honor.  Kesha

17 Tanabe, from the Vogel Law Firm.  I'm here with my co-

18 counsel, Karen Stanley and Drew Hushka.  I also have

19 representatives from Red River State Bank, Charles Aarestad

20 and Danielle Harless.

21        THE COURT:  Okay.  All right.  On behalf of First

22 National Bank and Trust?

23        MS. O'DETTE:  This is Jean O'Dette here.  Russ

24 Kassin had a schedule conflict.  He'll be joining us within

25 the hour.

Page 9

1        THE COURT:  Do you plan to participate in any way

2  in the hearings today or are you just listening?

3        MS. O'DETTE:  Just listening.

4        THE COURT:  Okay.  On behalf of D&M Industries?

5  Mr. Krings, I think you're still on mute.  Mr. Krings, would

6  you like to make your appearance?  You are on mute.  Okay.

7  I'm going to note for the record that Mr. Krings is

8  attending by video conference.  All right.  How about

9  Watertown Development Company?

10        MR. FEIST:  Good morning, Your Honor.  Jordan

11 Feist, appearing for Watertown Development Company.

12        THE COURT:  And on behalf of Diamond Wall Systems?

13        MR. KLOBUCAR:  Good morning, Your Honor.  Jeff

14 Klobucar, with Bassford Remele, on behalf of Diamond Wall

15 Systems.

16        THE COURT:  Are there any other parties that wish

17 to make an appearance?  Okay.

18        MR. HOHN:  Your Honor, Anthony Hone.  I am South

19 Dakota counsel for Red River State Bank.  I'm just listening

20 today.  Thank you.

21        THE COURT:  Okay.  Welcome, Mr. Hohn.

22        MR. HOHN:  Thank you, Judge.

23        MR. VERSTANDIG:  Your Honor, a preliminary matter,

24 if the court --

25        THE COURT:  Sure.  Is your microphone on?

3 (Pages 6 - 9)

Page 10

1    MR. VERSTANDIG: It's green.

2    THE COURT: Okay.

3    MR. VERSTANDIG: Yes.

4    THE COURT: Then it means it's on. So okay, you

5 may proceed.

6    MR. VERSTANDIG: Your Honor, I'm happy to announce

7 that the parties have resolved three of the four items set

8 for hearing today; not the big one, the three perhaps

9 smaller ones.

10    THE COURT: Okay.

11    MR. VERSTANDIG: I'd like to put the stipulation

12 on the record. Ms. Tanabe will correct me if and where I

13 dare or go astray.

14    As the court's aware, Generations and Parkside

15 have both been holding a certain amount of money turned over

16 by the prepetition receiver in my firm's IOLTA account since

17 shortly after the incipiency of these cases.

18    For Generations, the sum of $80,592.04 will be

19 paid over to Red River State Bank to be credited against

20 indebtedness. For Parkside, the sum of $43,500 will be paid

21 over to Red River State Bank also to be credited against

22 indebtedness. This will leave $10,000 in the Generations

23 sum and $30,000 in the Parkside account. Those sums will

24 then be remitted from my law firm to the respective DIP

25 accounts. So my law firm will no longer be in the money

Page 11

1 holding business, aside from my firm's retainers, which we

2 are more than happy to hold onto.

3    Exclusivity in all three cases will terminate on -

4 - our deal is Black Friday. I've been meaning to look at a

5 calendar and figure out what that actually means. I think

6 that's November 28th. Generations and Parkside will

7 continue to have use of cash collateral to and through

8 December 15th. Red River State Bank withdraws its alleged

9 breach of the cash collateral agreement in those two cases.

10 To the extent there was a breach, and the debtors most

11 certainly do not concede that, Red River State Bank waives

12 said breach. And this resolves by mootness the motion to

13 terminate exclusivity by establishing a new exclusivity

14 date.

15    For clarity, there is a hearing set on The Ruins

16 disclosure statement that very notably is before Black

17 Friday. We intend to move forward with that, and it is very

18 much a part of the design that that will occur before

19 exclusivity ends.

20    And I'm now speaking for the debtors and not

21 really part of the agreement. It is our hope that a

22 disclosure statement will be approved. We obviously

23 recognize parties have the right to object and that we will

24 be on a faster track than would be a competing plan.

25    I believe that encompasses the terms of our

Page 12

1 agreement. But Ms. Tanabe will tell me if and where I've

2 erred.

3    MS. TANABE: That's correct.

4    THE COURT: Okay. So it means that the affidavit

5 of default issues are no longer an issue.

6    MS. TANABE: They're resolved.

7    THE COURT: Resolved. Got it. Okay. All right.

8    MR. VERSTANDIG: Your Honor, in terms of

9 streamlining things, that should leave us today with a

10 motion to convert, which again is the big one. That is

11 going to take some time, we recognize.

12    THE COURT: Great. Right.

13    MR. VERSTANDIG: Thank you.

14    THE COURT: So this is where I spent most of my

15 time expecting that this is where you'd want to spend most

16 of your time. And what I would like to do is tell you what

17 I'm curious about up front so you have an opportunity to

18 offer the evidence that you think might be most helpful.

19 And here's the deal. With the conversion, Red River State

20 Bank proposes that either the court dismiss or that the

21 court appoint Chapter 7 trustee after conversion, right?

22 The natural process that would take place in the event that

23 the court grants a motion to convert.

24    The debtor is proposing in its plan of

25 reorganization to complete the construction of the

Page 13

1 buildings. And in my limited experience of 14 years, I see

2 Chapter 7 trustees want to liquidate property as quickly as

3 possible. I don't see them as the type of third parties

4 that want to continue a construction project. And so I'm

5 wondering how conversion would really benefit the creditors,

6 most importantly Red River State Bank, because you hold the

7 largest stake.

8    What I'm assuming, because I don't know it all, is

9 that it would be in the best interest of all creditors to

10 complete the construction project and sell it to the highest

11 bidder, recognizing a real value from the ultimate project.

12 But I could be wrong. So I'm curious about that. So in the

13 event that you do establish cause, what happens then?

14    Also it's my memory that the court granted relief

15 from the stay to Red River State Bank. And so tell me why

16 you care.

17    All right. Ms. Tanabe, it's Red River State

18 Bank's burden. Would you like to proceed? And you're

19 welcome to provide an intro. You're welcome to call your

20 first witness. We can jump into exhibits. How would you

21 like to proceed?

22    MS. TANABE: I think it'd be helpful to start with

23 some opening comments that are directly responsive to your

24 questions.

25    THE COURT: I would love that.

4 (Pages 10 - 13)

Page 14

1    MS. TANABE:  Just to set the table, so to speak.

2    THE COURT:  Thank you.

3    MS. TANABE:  Well, you know, we gave a lot of
4  thought about how to organize what was just a lot of
5  information and how to make sense of it all and how to
6  distill it into something that was useful for the court.
7  And you know, what it came down to for us is the idea that
8  banking, like bankruptcy, is dependent upon people to be
9  honest.  It is okay for people to make mistakes, it's okay
10 to exercise bad judgment.  You can even fail, but you can't
11 be dishonest.  And it's really the most basic axiomatic
12 notion in bankruptcy that you can be -- you've got to be the
13 honest but unfortunate debtor.

14    And there's no dispute here that The Ruins is an
15 unfortunate debtor.  The building stands unfinished.  The
16 last time I drove by it, there was Tyvek flapping in the
17 wind, that sort of thing.  There's a fair amount of concern
18 about how many people are unpaid who did real work in these
19 buildings.

20    But it's not a case about an honest debtor that
21 fell on hard luck.  After the benefit of dozens of subpoenas
22 and looking through 75,000 pages of documents, we have a
23 pretty good handle on what happened here.  And we're going
24 to get into that today.  And I think we've concluded that
25 Ruins does not belong in Chapter 11.

Page 15

1    The case is really no longer about the fate of an
2  unfinished building.  As you pointed out, we have stay
3  relief.  At this point, what we want to demonstrate today is
4  that the case is about millions, plural, of transfers out of
5  the project to insiders and the value of Chapter 5 claims
6  that remain in the estate and that the real reason why as
7  secure creditors we could just take our ball and go home.

8    But the real significance of whether there's a
9  debtor-in-possession versus a Chapter 7 trustee is whether
10 there is somebody who is neutral in a fiduciary capacity to
11 investigate and prosecute the transfers that we're about to
12 put on evidence for the court to demonstrate the way in
13 which again, millions plural was transferred out of the
14 project.  Money that was advanced by the bank intended for
15 the payment of creditors, but that was diverted out of the
16 project to insiders.

17    So the appointment of a Chapter 7 trustee would
18 benefit all creditors.  My creditor has a large unsecured
19 deficiency claim.  So obviously it's not pure altruism.  You
20 know, we probably are at maybe half of the general unsecured
21 claim pool.  But I think the most realistic way for
22 creditors to get paid in the case is to bring that money
23 back into the estate that was originally advanced by our
24 clients in the form of loan proceeds that was originally
25 intended for the payment of trade creditors.  If we can claw

Page 16

1  back those transfers and distribute them to the creditor
2  pool ratably, that I think is a realistic way of making
3  people whole.

4    And then to address your second point, why don't
5  we just finish the building?  I was wary about wading into
6  that, but with the court's permission, I will.  I didn't
7  designate any witnesses or exhibits related to that.  But
8  just for argument's sake, we did consider that because
9  again, we are the largest unsecured creditor.  So we thought
10 about what is the right way to go about recovery for the
11 unsecured portion of the claim.  And it's simply not
12 economically feasible to build a building based on a
13 patchwork of in-kind promises from people who are already
14 not paid.

15    The bankruptcy plan that is proposed would ask the
16 very same creditors who are already -- for companies of
17 their type and their size are already really suffering from
18 not being paid in the first place, the debtor would
19 essentially go back to the well and say to those creditors,
20 the only way that I can pay you is if you're willing to go
21 deeper in the hole with me.  And not only do I need an
22 individual creditor to do that, but I need a whole patchwork
23 of creditors to do that in order to finish a whole building.
24 And that just seems like a really tenuous coalition.

25    And so to break it down, I thought about, you

Page 17

1  know, is there a realistic possibility of rehabilitation in
2  this case, if we bring it back to the factors under 1112.
3  If the patchwork of in-kind donations from already not paid
4  trade creditors is the pathway to rehabilitation and to
5  completion of the building, that seems really precarious to
6  me.

7    And I hesitate to get too far into a feasibility
8  issue, but to the extent that it's relevant for the prospect
9  of rehabilitation in Chapter 11 as one of the factors for
10 cause --

11    THE COURT:  It is.

12    MS. TANABE:  -- we humbly submit that that just
13 seems like a longshot plan.  Secondly, I think we have done
14 a lot of research with experts and we put in declarations
15 that are on the docket.  And knowing your thoroughness,
16 you're probably acquainted with every sentence on your
17 docket.  So I'll hazard a guess that you're aware that we
18 put in some expert reports that were attached to
19 declarations from construction experts.  And if we were
20 allowed to proffer those and whatnot, I think we would get
21 into why we don't think it's realistic or feasible to finish
22 the building with less than $1.4 million and that doing it
23 with a patchwork of in-kind donations is really -- is just
24 too attenuated.  It's not something that we want to bank on.
25 I think it asks too much of the creditors, a lot of whom are

5 (Pages 14 - 17)

Page 18

1 closely held small local businesses. You know, to ask them
2 to go further into debt to finish a building, we just aren't
3 comfortable that that's a strategy.
4        And I think we also have concerns about
5 substantial consummation. You know, can the debtor really
6 substantially consummate a plan in the sense that can the
7 debtor, a debtor that's not complete, that has no revenue
8 stream, that generates no money, that hasn't made debt
9 service payments for a couple of years, like does the debtor
10 have the wherewithal to make a cash distribution to its
11 creditors? You know, but for the fact that the debtor
12 hasn't made any debt service payments, there would be no
13 cash in the DIP accounts at all for Ruins specifically. So
14 I think substantial consummation is also just highly
15 unlikely in this case without our client's, you know,
16 collateral being used to pay the cost of administration in
17 this case.
18        So we have thought about, you know, liquidation is
19 not a great option, but it is the best option we have at the
20 moment because otherwise I think we have kind of a
21 collective action problem around who's going to really
22 litigate these claims. And I think that the possibility
23 that small trade creditors could bring Uniform Fraudulent
24 Transfer Act claims or veil piercing claims or that type of
25 litigation is just not economically feasible without, for

Page 19

1 lack of a better word, the Chapter 7 trustee kind of solves
2 the collective action problem of creditors who have claims
3 that probably feel very big to them but not quite big enough
4 to litigate and truly get paid in state court or something
5 like that.
6        So that's why we strongly prefer conversion to
7 dismissal and really think it's in the best interests of
8 everyone, my client included, and the folks on the phone as
9 well. I hope that's helpful.
10        THE COURT: It is.
11        Mr. VerStandig? And you may remain seated because
12 frankly, it's so much easier for me to hear through the
13 microphone. So --
14        MR. VERSTANDIG: Thank you, Your Honor.
15        THE COURT: Yeah.
16        MR. VERSTANDIG: I've been passed a Post-it note
17 urging me to point out that the poster board shows the
18 current condition of The Ruins building, which hopefully
19 give some sense of what things are. Honestly, the court can
20 see it and I can't. So the look on your face is scaring me
21 a little bit right now.
22        THE COURT: So I'm not -- I don't have the
23 greatest eyesight. That's what that face is all about.
24        MR. VERSTANDIG: Oh, that makes two of us.
25        THE COURT: So, yeah. Okay.

Page 20

1        MR. VERSTANDIG: Let me start by addressing cause
2 or the lack thereof and then let me touch upon your
3 questions and some of Ms. Tanabe's opening.
4        THE COURT: Yeah.
5        MR. VERSTANDIG: The argument for cause set forth
6 in the motion is twofold. One is an ongoing loss or
7 diminution. I don't believe there's going to be evidence in
8 the record that supports that. The only ongoing loss or
9 diminution in this case is the accrual of an administrative
10 expense claim in favor of my law firm. Without being too
11 modest, I believe our fees are ultimately de minimis
12 relative to the scope of the project, the scope of the
13 claims.
14        This is not a case where we have teams of
15 investment bankers and accountants and other people running
16 around running up the admin tab on a go forward basis nor is
17 this a case where the debtor has meaningfully fallen behind
18 in any postpetition obligations, in part because there
19 aren't any postpetition obligations. Although Mr. Craig's
20 testimony will show that there have been donative efforts on
21 the part of equity and related parties, not the two other
22 debtors in bankruptcy, to make sure that insurance stays
23 current and to make sure that there is a utility connection
24 to the extent necessary and that the building stays secured.
25        The second form of alleged cause you're going to

Page 21

1 hear about is prepetition activity, and I think that's very
2 meaningful that it's prepetition activity. The allegation
3 is going to be that on a number of occasions, and we're not
4 sure what that number is, we look forward to seeing how
5 evidence is presented, Mr. Craig allegedly received an
6 invoice from a subcontractor and made some alteration
7 thereto before passing it on to Red River State Bank to
8 fund, and what Mr. Craig's testimony is going to establish
9 is that in several instances that is absolutely true.
10        And the reasons for the alterations generally fall
11 into two buckets of categories. One are circumstances where
12 as he was reviewing the invoice, he recognized some
13 incongruity or error. He got on the phone with the
14 subcontractor, and I'm paraphrasing, said I believe you got
15 this wrong, we should fix it. And the subcontractor gave a
16 blessing to do so. The second are circumstances where he
17 realized there were just plain errors.
18        It's important to observe that this is not money
19 that ended up in his pocket. The invoices that were
20 allegedly altered were invoices to pay draw requests as the
21 project went on and the project went forward. It's a
22 question of how much got funded and when did it get funded.
23 There is no suggestion that an invoice was changed to have
24 the routing and account number for some offshore Mauritian
25 bank account that Mr. Craig holds. And to be clear, the

6 (Pages 18 - 21)

Page 22

1 doesn't have an offshore Mauritian bank account to the best

2 of my knowledge.

3       The evidence is also going to show that Mr. Craig

4 was put in this position not by choice. The term sheets for

5 all three properties, but the relevant one in evidence is

6 The Ruins term sheet, shows that the bank committed to have

7 a third-party handle draw requests and lien waivers. And

8 that was meaningful for a very simple reason. Mr. Craig is

9 an excellent developer. Mr. Craig knows construction inside

10 out and backward. And as best I can tell, Mr. Craig has

11 myriad other interesting skills. Handling draw requests and

12 lien waivers is not one of them. It's not something he ever

13 feigned to be qualified to do. It's not something he ever

14 volunteered to do. It's not something he held himself out

15 as being proper to do. But the bank thrust him into this

16 situation.

17       Couple that with the awkwardness of having some

18 small-town contractors who don't have a lot of experience on

19 projects of this size submitting invoices that don't

20 necessarily conform to what's expected or what's

21 anticipated. And Mr. Craig is in this impossibly untrained

22 situation of trying to call balls and strikes while trying

23 to keep construction of this building going forward and

24 trying to do what he thinks is right in his subjective view

25 of the world at every moment along the way. And it's easy

Page 23

1 to look back in hindsight and say he shouldn't have done

2 this. He should have footnoted that. He should have sent

3 an email that expressly said this or that. But that's the

4 benefit of hindsight. Rarely does a company end up in

5 bankruptcy without having many things that have been learned

6 in hindsight that it would want to do differently.

7       There is not going to be any allegation that he

8 has done anything improper with so much as a penny

9 postpetition. There's not going to be any allegation that

10 he did that in either of the other two pending cases, that

11 he lacks any fiduciary credibility as a debtor-in-possession

12 of the principal thereof and that he hasn't hewed to the

13 strictures of the Bankruptcy Code ever since putting Ruins

14 alongside Generations and Parkside into Chapter 11.

15       There's going to be an acknowledgement that some

16 mistakes were made but that ultimately, they don't rise to

17 bad faith, and bad faith is the cause that we associated

18 therewith, right? There is nothing in 1112 that speaks to

19 conversion because of prepetition accounting or paperwork

20 issues or the alteration of prepetition documents. It has

21 to be the broad catch all of bad faith.

22       And we recognize that 1112 isn't exhaustive.

23 Every circuit in the country recognizes there is some bad

24 faith allowance. Ms. Cathcart and I have had lots of fun

25 dealing with a two-step case in another jurisdiction. But

Page 24

1 this doesn't seem to fit any of the bad case -- bad faith

2 case law, and that's going to be meaningful.

3       I would also point out that Red River State Bank

4 is being sued. That no doubt drives part of the motivation

5 for bringing the motion. I don't know that goes to the

6 merits of the motion. But the court's question was the best

7 interest of creditors, which is one of the determinative

8 factors if you were to find clause is extant and Red River

9 State Bank stands in a very different position than every

10 other creditor in this case because Red River State Bank no

11 doubt would love to have a different counterparty in its

12 litigation. Just as trustees oftentimes sell assets very

13 quickly, trustees are known to, albeit not guaranteed to

14 compromise litigation rights very quickly.

15       I recognize in this case the trustee, Mr. Ahlgren,

16 whose penchant for settling at a very high price has caused

17 me some heartburn. But it is still something that would

18 motivate the bank and that differentiates them from the rest

19 of the creditor body.

20       It's also worth noting that we were more than

21 seven months into this case when the motion was brought.

22 And I'm not saying more than seven months today. Today

23 we're more than 10 months in. But there have been delays

24 occasioned by medical issues that are absolutely not the

25 bank's doing and not chargeable to the bank. It does seem

Page 25

1 convenient that this motion was brought as litigation had

2 progressed and as a plan of reorganization and disclosure

3 statement hit the docket.

4       Now, I recognize that they're going to say they

5 needed time to go subpoena the world and to gather those

6 documents. The counterpoint to that is there were a lot of

7 subpoenas issued in related litigation in Codington County,

8 South Dakota. It is not as though Red River State Bank was

9 without subpoena power before there was a petition for

10 relief or even a contested 2004 motion in this litigation.

11       Everyone is better if the project's completed.

12 I'm glad that the court asked the question. It was a

13 comment I was going to try to drive home as hard as I could

14 today and, if need be, tomorrow. I would also point out

15 that all of the remedies under the Bankruptcy Code are there

16 unless and until the project is completed. If a debtor

17 confirms a plan and departs from the strictures of the plan,

18 there are remedies for a violation of plan, including

19 remedies under 1112, a default under the plan.

20       What was described by Ms. Tanabe as sort of the

21 gratuitous contributions of subcontractors I think is a

22 misnomer. I don't want to get into the plan in too much

23 detail now, right? We have a disclosure statement hearing

24 in three weeks. We're hoping to have a confirmation

25 hearing. I shudder when I do the math. I'm trusting we're

7 (Pages 22 - 25)

Page 26

1  not going to do it between Christmas and New Year's.  So
2  probably the first week of 2026, probably the second week,
3  somewhere in there.
4        THE COURT:  We're not doing it between Christmas
5  and New Year's.
6        MR. VERSTANDIG:  Thank you.
7        THE COURT:  I wouldn't do that to anybody.
8        MR. VERSTANDIG:  But the contributions being made
9  by subs are being paid with interest, and I say this to our
10  potential detriment because it will be an exotic issue to be
11  talked about at future hearings.  There's a roll-up
12  component.  We have monetarily incentivized the
13  subcontractors to come back and do this.  We are not begging
14  their generosity.  We're not begging their goodwill.  We're
15  not suggesting this is a charitable pursuit.
16        So I think that to the extent we need to hint at
17  feasibility without addressing it, the plan very much is
18  feasible.  And to the extent there's a question about their
19  ability to complete construction, Mr. Craig has completed
20  construction on three other properties in Watertown, South
21  Dakota.  We don't hear in these cases much about The Lofts,
22  which was the first one, which was financed by a different
23  bank and which never entered bankruptcy.
24        But just moments ago, we put on the record an
25  agreement where a fairly significant sum of money is being

Page 27

1  remitted to Red River State Bank because the DIP accounts in
2  Generations and Parkside have grown sufficiently robust post
3  Mr. Craig's construction and under Ms. Craig's property
4  management as to allow monies to be free to be dispersed to
5  the bank as part of an agreement.  So the idea that it would
6  be difficult for him to complete construction, the idea that
7  this is a fool's errand, I think is repugnant to the record
8  that has been established and will continue to be
9  established.
10        Finally, I'd point out that the plan which is in
11  evidence for purposes of showing there's a plan, is a 100
12  percent plan.  And part of that, and that's going to be true
13  in all three cases, is to assuage attacks concerning alleged
14  Chapter 5 claims.  But to the extent we still need to answer
15  the question that Ms. Tanabe begged, which is which of the
16  small creditors would have the financial wherewithal or the
17  motivation to pursue a Chapter 5 claim inside or outside of
18  bankruptcy against my client, I would point out the obvious.
19  Red River State Bank is defending an adversary proceeding.
20  Red River State Bank is represented by the finest counsel in
21  North Dakota.  I will say that even not on the record.  Red
22  River State Bank surely knows how to file a counterclaim.
23        We look forward to showing that there's an absence
24  of cause.  And if the court were to find there to be cause,
25  we believe there are extraordinary circumstances, and our

Page 28

1  ask in that circumstance would be that the court deny
2  without prejudice and probably give an appropriately stern
3  warning that if a plan isn't confirmed forthwith, this is an
4  issue that would be revisited in the earliest days of 2026.
5        THE COURT:  Okay.  I would like to hear from at
6  least one more party.  In the event that cause is
7  established, then the court may have to consider conversion
8  or dismissal.  I noticed that Watertown Development Company
9  had submitted a joinder to the motion to dismiss or convert,
10  and I don't know a lot about the entity, but it says
11  Watertown Development, suggesting to me that a completed
12  building developed in Watertown, South Dakota would be a
13  great idea.  So tell me, what is your position regarding
14  those issues, Mr. Feist?
15        MR. FEIST:  Yes.  Thank you, Your Honor.  I
16  appreciate the opportunity to speak to that.  We don't
17  intend to offer any evidence today, but I'm happy to explain
18  the thought process.  Certainly I started off with this case
19  of the same mindset as you, Judge, that the completed
20  building is going to be the best way for my client to get
21  paid, especially due to just some issues with priority
22  subordination agreements and things like that.
23        But the problem that we've seen, I think
24  throughout this case is that -- and I'm just going to give
25  an argument, I mean, we're not hearing feasibility at the

Page 29

1  time, but I want the court to understand our thought
2  process.
3        THE COURT:  Yes.
4        MR. FEIST:  But it just doesn't seem like there's
5  any ability to get that done in terms of completing the
6  building.  And in a liquidation scenario, I think the
7  construction will occur much faster.  I mean if a third
8  party comes in and buys this, they're going to complete the
9  project.  They're going to have financing.
10        We look at the pending plan, and as Mr. VerStandig
11  was just discussing, there's a roll-up provision which I
12  think are highly disfavored and it would elevate at least a
13  million dollars of prepetition unsecured claims over secured
14  creditors.  So I don't -- I think that there's going to be a
15  lot of problems with confirmation and this just continues to
16  get delayed.  We're coming up on a year now since the case
17  has been filed.
18        I agree with Ms. Tanabe in terms of the Chapter 5
19  claims.  Those might be the only way many people on this
20  call today get paid and they're not being pursued,
21  investigated, at least as far as we can tell.
22        Something else that was really important to my
23  client, Your Honor, is the initial plan here in The Ruins
24  case was filed, I think, in May and I filed a pretty
25  detailed objection to that, even knowing that there was not

8 (Pages 26 - 29)

Page 30

1  going to be a confirmation hearing on that particular plan.
2  I filed a detailed objection. I explained how just under
3  the loan documents with the Watertown Development Company
4  why the plan just completely misstated the obligations of
5  the parties. And that understanding is that plan was filed
6  with the disclaimer that it was, you know, a discussion
7  starting point for discussions between the parties.
8      I've never heard from debtors' counsel regarding
9  my objection. We've never had any discussions and they just
10  simply turn around and filed the substantially the same plan
11  in September without addressing any of the issues raised.
12  And, you know, when we have an opportunity to litigate those
13  issues, I think the documents will speak for themselves in
14  terms of who has what obligations.
15      The TIF financing, I realize, is maybe a little
16  out of the ordinary, but it's pretty straightforward if
17  someone were to walk through my objection in the documents,
18  and it just doesn't seem as though debtors are interested
19  in, you know, addressing those issues. So that's another
20  reason we filed a joinder.
21      I mean, I realize this is not a confirmation
22  hearing, but I think there's a lot of issues with the
23  pending plan, especially with the roll-up, especially with
24  my client's plan treatment. And we feel that with the
25  Chapter 7 trustee, we have a much better opportunity to

Page 31

1  pursue potential Chapter 5 claims that could put some money
2  back in the pool for any creditor that ends up with an
3  unsecured claim. And ultimately, at this point, it's
4  seeming like that may be the best way to get the building
5  completed is to bring in whether it's, you know, it gets
6  sold to a third party. Any investor is going to be
7  motivated to quickly complete the project rather than sort
8  of languishing, you know, in a bankruptcy where there's all
9  this litigation and, you know, plans being proposed that
10  just don't seem to have a really good shot of confirmation.
11      So that's where we're coming from, Your Honor, in
12  terms of why we've joined the motion and why we're asking
13  the court to convert the case.
14      THE COURT: Okay. Any other party wish to present
15  an opening statement of any kind?
16      MR. KRINGS: Your Honor, John Krings here. Can
17  you hear me now?
18      THE COURT: I can. Thank you.
19      MR. KRINGS: Thank you. Sorry for the IT issues.
20      THE COURT: I totally get it.
21      MR. KRINGS: So on behalf of D&M Industries, we're
22  honestly in a really tough position. I have always believed
23  D&M is owed about $250,000 on mechanics lien and they're at
24  the end of the line, basically. So whatever path forward
25  which would lead to a recovery for D&M, and Mr. Klobucar

Page 32

1  represents Diamond Wall System. So D&M and those like D&M,
2  we would support. For a long time, I have thought that the
3  best pathway to recover money for the mechanics lienholders
4  is to complete the project, sell it as a going concern.
5  That with every bit of common sense in me, and I have a
6  construction background, that seems to make most sense.
7      I agree that a Chapter 7 trustee -- I office with
8  one, and he would obviously be in conflict. But any Chapter
9  7 trustee, the first thing they're going to do is to figure
10  out how to most quickly sell the property in its current
11  state and move on.
12      So my problem is I've not heard the testimony from
13  the experts as to what is it going to cost to finish the
14  building, what will it be worth in a going concern sale. So
15  as much as my gut tells me that D&M is best off and those in
16  D&M's shoes are best off, we have to hear the evidence to
17  see who's right. Either the building has a market value as
18  finished of $6 or $7 million, all the money goes to Red
19  River State Bank and it's not going to matter or Mr. Craig,
20  on behalf of The Ruins, presents evidence that, hey, this
21  building can be finished, rented up, and it will be worth an
22  amount that will benefit D&M and other mechanics
23  lienholders.
24      I don't know what the evidence is going to be.
25  I've seen some evidence which sways one way, some evidence

Page 33

1  which sways the other way. So I don't want to patronize
2  you, Judge, but honestly, I told my client, well, I think
3  Judge Hastings should hear all the evidence and make a make
4  the best path.
5      So as much as I say I think the best path is to
6  finish the building and sell it as a going concern, I
7  haven't heard all the evidence and my client can't pay me to
8  be in the courtroom for the next two days to hear all the
9  evidence. And I haven't charged my client to look through
10  75,000 pages of discovery. And it doesn't make any
11  financial sense with the low likelihood of recovery to
12  invest any of that money.
13      So we're really stuck. I think the best thing for
14  D&M and those mechanics lienholders is for the building to
15  be finished and sold. It sounds like there's really good
16  objections raised by opposing counsel that that's pie in the
17  sky and not possible. And so I guess the way I see the
18  purpose of today and tomorrow's hearing is for you to hear
19  all the evidence and make an educated decision about what
20  the best path forward is for all creditors to get paid.
21      And it's really hard too, because there is an
22  adversary action against Red River State Bank. The motion
23  to dismiss was granted in part and denied in part. Again, I
24  can't charge my client to pour through all those records and
25  give advice to my client on who's right, who's wrong. But I

9 (Pages 30 - 33)

Page 34

1 know you did, Your Honor, and if there were no merits to the
2 case, you would have granted the dismissal. You did not, or
3 at least at the pleading stage, you did not grant a
4 dismissal.
5      And so, realizing that if Red River State Bank
6 wins everything across the board, my client's probably not
7 going to get any money regardless of the outcome. But the
8 only way my client is likely to receive any money is to see
9 how today's hearing plays out and to see how the adversary
10 action plays out, and because I can't charge my client for
11 weeks of me coming up with my own opinions, I'm going to
12 respectfully trust the court.
13      THE COURT: Okay. These are proving to be really
14 interesting.
15      MR. KLOBUCAR: Your Honor, Jeff Klobucar.
16      THE COURT: Yes, please, Mr. Klobucar.
17      MR. KLOBUCAR: Thank you. I'd like to just take a
18 quick minute. I think most of what I'll say would echo what
19 Mr. Krings just said. My client has a potentially little
20 bit better position, but is also owed a little bit more
21 money. So I think it's a wash with respect to our
22 perspectives in many respects.
23      I think the other troubling thing about this case
24 is my understanding is that the bank has a guarantee against
25 Mr. Craig. And so maybe I'm wrong about that. But one of

Page 35

1 the issues here sort of raises a marshaling issue in some
2 respects. Many of the creditors would do well to recover
3 from the building if it was finished. And I can't see Ms.
4 Tanabe, maybe she's shaking her head that I'm wrong.
5      But one of the issues here is how these claims are
6 going to be handled and who's going to be left holding the
7 bag. I don't know that I would concede so quickly that we
8 wouldn't have recourse in some of those cases. As
9 everyone's alluded to, there is that case in Codington,
10 South Dakota now, which, frankly, there's just been a
11 petition for removal filed in that state court matter to
12 bring it to federal court in South Dakota. And from there,
13 I expect it to be transferred to you as part of the
14 adversary case, which would involve my client, Mr. Krings's
15 clients as well. So we may all be dancing in that adversary
16 soon, which raises additional concerns.
17      But I have also shared the position that the best-
18 case scenario for all these creditors, for this project to
19 be finished, completed and sold, and then potentially,
20 depending on what Mr. Craig's assets look like, perhaps the
21 bank is able to go after him and leave some of the rest of
22 the things on the table for us.
23      But I'm in a similar position where my client
24 being owed in the neighborhood of about $350,000, I also
25 don't have the time or money to pour over 75,000 pages of

Page 36

1 documents and to really get a handle on the extent of the
2 alleged fraud and other things. Nor do I have the
3 wherewithal to do so with respect to the debtors' claims
4 against the bank with respect to its dealings.
5      So we're in the same boat. We're going to trust
6 Your Honor. And I hope the court won't be offended if I
7 don't attend the next two days. Certainly we'll probably
8 request a transcript. But at some point after opening
9 statements, I think my client would prefer that I tend to
10 other matters. So if you don't have further questions of
11 me, Your Honor. Thank you.
12      THE COURT: I don't, and I wouldn't be the least
13 bit offended. You get to choose what's in your client's
14 best interest and I respect that.
15      I know everybody's itching to respond, but I'm not
16 going to allow it. I'm just going to save it for the end
17 and proceed straight with evidence.
18      So, on behalf of Red River State Bank, would you
19 like to call your first witness? You know what we should do
20 first, though, is to make sure that the exhibits have been
21 received so that you don't have to go to the trouble of
22 doing that as you question your witness.
23      So I am grateful that the debtor and Red River
24 State Bank filed a joint exhibit list. And before the other
25 creditors decide to hang up, I want to make sure that there

Page 37

1 isn't any other evidence that any party wishes to offer in
2 support of the motion to dismiss or convert. And so I'm
3 looking at the joint exhibit list and it appears as though
4 many of the exhibits are stipulated, and I can go through
5 them individually.
6      I'm just going to ask first, on behalf of Red
7 River State Bank, whether there's been any changes to the
8 joint exhibit list that I should know about before I just
9 receive those that are stipulated?
10      MS. STANLEY: No, Your Honor. I believe we are --
11 we worked hard on this and we're in agreement on the ones
12 that are stipulated.
13      MR. VERSTANDIG: Your Honor, no change from the
14 debtor with one caveat. The court's indulgence for half a
15 second.
16      THE COURT: Oh, sure. So I'm looking at The Ruins
17 Document 154. For those other interested parties, I'm going
18 to inquire of you first while the other parties are
19 visiting. I am looking at 25-3004. It's The Ruins Document
20 154. These are the stipulated exhibits and those other
21 exhibits that the parties may offer and that the court would
22 then consider receiving. Do any of the parties have
23 exhibits other than those that I anticipate will be received
24 or considered? Do you have any interest in offering any
25 exhibits? Let me look first to D&M Industries.

10 (Pages 34 - 37)

Page 38

1　　　MR. KRINGS:  No, Your Honor.  Thank you.

2　　　THE COURT:  No exhibits and no witnesses, I

3　assume?

4　　　MR. KRINGS:  Correct, Your Honor.

5　　　THE COURT:  Okay, and for Diamond Wall Systems?

6　　　MR. KLOBUCAR:  Also correct.  Thank you, Your

7　Honor.

8　　　THE COURT:  Okay, and on behalf of Watertown

9　Development Company, any additional exhibits or witnesses?

10　　　MR. FEIST:  No, Your Honor.  Thank you.

11　　　THE COURT:  Great.  You will each be given an

12　opportunity to cross-examine witnesses if you want to.  If

13　your clients can't afford it and you're going to be hanging

14　up, that's fine, too.  I completely understand.  But just

15　please know that if you are attending by video conference,

16　you'll have that opportunity.  For those people or parties

17　attending by telephone, you aren't given the opportunity to

18　cross-examine witnesses or offer evidence.  And now we'll

19　just wait a moment for the parties to continue negotiating

20　exhibits.

21　　　MR. VERSTANDIG:  Thank you.  Your Honor, debtors'

22　position is not changed.  But I'm going to clarify two

23　things on the record.  The stipulation of Mr. Aarestad's

24　various declarations is contingent upon him remaining here

25　to be examined.  He's present in the courtroom, and we're

Page 39

1　not really worried about him running out the back door.  And

2　then two, and this just touches on something Ms. Tanabe said

3　during her opening, while it is present on the docket, none

4　of the stipulated exhibits contain an expert report.  And my

5　client most certainly would not be stipulating to entry of

6　an expert report without the ability to cross-examine an

7　expert on the contents thereupon.

8　　　THE COURT:  Okay.  So I think what this means is

9　I'm going to receive stipulated exhibits with the

10　understanding that if there's an affidavit of Mr. Aarestad,

11　that he remain available for cross-examination.  So the

12　court will receive at this time ECF 84, the amended proof of

13　claim first, and then ECF 84, 85, 86, 87, 88, 89 -- nope --

14　yes, 90, 91, 96, 97, 98, 101, 102, 132, 133, 134, 135, 136,

15　137.  It looks like we're going backward in number to Docket

16　32, 78, 79, 80, 81, 82, 83, 84.  Red River State Bank,

17　Exhibit 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11.  ECF 144 -- 141,

18　sorry, 141-11, 141-12, the disclosure statement at 141-13,

19　141-14 and 141-15.  Have I missed anything?

20　　　(Stipulated exhibits admitted into evidence.)

21　　　THE COURT:  Okay.  All right.  Any other

22　documents, information I should consider before you call

23　your first witness, Ms. Tanabe, or whoever's going to do

24　that?

25　　　MS. TANABE:  No.  I think Caren is ready.

Page 40

1　　　THE COURT:  Ms. Stanley, you're going to proceed

2　with the witnesses?

3　　　MS. STANLEY:  Yes.

4　　　THE COURT:  Okay.

5　　　MS. STANLEY:  Your Honor, we call Charles

6　Aarestad.

7　　　THE COURT:  Okay.  Mr. Aarestad, I'm going to have

8　you come stand in front of the clerk to be sworn, and then

9　I'll ask that you take the witness stand.  So you can stand

10　here first.  Yes, you may bring your water.

11　　　CLERK:  Please state your name for the record.

12　　　MR. AARESTAD:  Charles Aarestad.

13　　　CLERK:  Do you solemnly swear that the testimony

14　you are about to give in this case will be the truth, the

15　whole truth and nothing but the truth, so help you God?

16　　　MR. AARESTAD:  Yes.

17　　　CLERK:  Please take the stand.

18　　　THE COURT:  Okay.  I'm going to have you scoot up

19　and then take a look at the base of your microphone.  And

20　there'll be a light there.  Is it green or red?

21　　　MR. AARESTAD:  Green.

22　　　THE COURT:  Okay.  I'm going to have you state

23　your name for the record again only so that I can make sure

24　that I can hear you.  Do you need to adjust that?  Thank

25　you.  Good?

Page 41

1　　　MR. AARESTAD:  Charles Aarestad.

2　　　THE COURT:  Thank you.

3　　　All right.  Ms. Stanley, you may proceed.

4　　　DIRECT EXAMINATION OF CHARLES AARESTAD

5　BY MS. STANLEY:

6　Q　Mr. Aarestad, can you please spell your last name for

7　the court?

8　A　A-A-R-E-S-T-A-D.

9　Q　And in addition to bringing up the water, what is the

10　other item that you brought with you?

11　A　A basic calculator from ninth grade.

12　　　THE COURT:  I've got one of those too.

13　　　MS. STANLEY:  No objection to the use of a

14　calculator, Mr. VerStandig?

15　　　MR. VERSTANDIG:  We will stipulate to the laws of

16　arithmetic.

17　　　MS. STANLEY:  Thank you.

18　BY MS. STANLEY:

19　Q　Mr. Aarestad, can you please provide a brief summary of

20　your educational background?

21　A　Graduated high school, did postsecondary at North

22　Dakota State University, graduated in agricultural

23　economics, emphasis in business in 2011.  And then we went

24　to graduate school of banking sometime thereafter in the

25　year of 2013 through 2015.  That's Graduate School of

11 (Pages 38 - 41)

Page 42

1  Banking, Madison, Wisconsin.

2  Q    And did you graduate from the Graduate School of

3  Banking?

4  A    Yes.

5  Q    What's your current occupation?

6  A    Vice president --

7  Q    Of?

8  A    -- of Red River State Bank.

9  Q    Okay, and how long have you worked for Red River State

10 Bank?

11 A    I worked -- I started full-time employment in the

12 summer of 2011, but I had worked prior a couple summers

13 interning as a teller, summer intern, a few summers before

14 that at different periods of time.

15 Q    And what is a day in the life?  What is your day-to-day

16 duties?

17 A    Show up, unlock everything, start the coffee, shovel

18 snow, fix the toilets, help all the customers as they come

19 in with their credit requests, dispersing checks, helping

20 with deposits, a little bit of everything.  IT.

21 Q    Do you have loan officer duties?

22 A    Yes.

23 Q    Do you know Jesse Craig?

24 A    Yes.

25 Q    When and how did you first meet Jesse Craig?

Page 43

1  A    It's my recollection that I first met Jesse Craig in

2  the summer of, I believe, it was 2021, at around August time

3  frame.

4  Q    And are you familiar with an entity called The Ruins

5  LLC?

6  A    Yes.

7  Q    Do you know if Mr. Craig is involved with The Ruins

8  LLC?

9  A    It's to my understanding Jesse Robert Craig is 100

10 percent equity.  It's a single member LLC.

11 Q    Is Red River involved with The Ruins?

12 A    Yes.

13 Q    How?

14 A    Red River State Bank has three loans with them, I

15 believe.

16 Q    Okay.  So how many loans did Red River extend to The

17 Ruins that are still due and owing right now?

18 A    I believe three.

19 Q    Okay.  Did you recently file or sign three separate

20 affidavits in this bankruptcy case regarding the loan

21 disbursements and payment histories for those three Ruins

22 loans?

23 A    Yes.

24 Q    And they've already been accepted into evidence, so I

25 don't really want to beat the dead horse, but --

Page 44

1       THE COURT:  I appreciate that.

2  BY MS. STANLEY:

3  Q    Okay.  So that would be ECF 84, 85 and 86.  Was all the

4  information in those three affidavits discussing the payment

5  histories on The Ruins notes, was that true and correct to

6  the best of your knowledge?

7  A    It is.

8  Q    And did Red River file an amended proof of claim in The

9  Ruins bankruptcy case on or about September 12th of this

10 year?

11 A    I believe so.

12      MS. STANLEY:  Can we pull up the amended proof of

13 claim, please?  Actually, it looks like it was filed

14 September 22nd is the date that's on there.  If you scroll

15 down a little bit on this one to Page 8.  Thank you.

16 There's a ton of exhibits that are attached to this proof of

17 claim, such as the promissory notes and stuff.  Is that --

18 or actually, that was the original proof of claim.  Yeah.

19      THE COURT:  We're looking for the one with $11

20 million.  That's got 1$3 million.

21      MS. STANLEY:  Yeah, this was the original one,

22 wasn't it?

23      THE COURT:  That's the original.  Yeah.  Because

24 that says January 6th.  So we're looking for the amended.

25      MR. VERSTANDIG:  I think we're in the wrong case.

Page 45

1       THE COURT:  It's in Generations.

2       MR. VERSTANDIG:  Yeah.

3       THE COURT:  Good catch.  True.

4  BY MS. STANLEY:

5  Q    All right.  Let's just go to the original.  We can do

6  the original one.  Okay.  Eighty-one pages on that one.  To

7  the best of your knowledge, were all of the loan documents,

8  mortgages, et cetera, attached to the original proof of

9  claim true and correct copies of Red River's loan documents

10 with The Ruins?

11 A    I believe so.

12 Q    And now if we go to the amended one, and then back to

13 Page 8.  Is that Page 8?

14      THE COURT:  That's eight.

15      MS. STANLEY:  Go back up then.  Sorry.  There we

16 go.  Yep.  There.

17 BY MS. STANLEY:

18 Q    As of January 6, 2025, in this case, the petition date,

19 was the amount identified there of $8,169,647.92, is that

20 the balance that was due and owing on the first Ruins note,

21 to the best of your knowledge?

22 A    On January 6th, the first Ruins note?

23 Q    Yeah.

24 A    $8,169.647.92 with an accrual of $966 a day.

25 Q    Okay, and that's --

12 (Pages 42 - 45)

Page 46

1  A  Yes.

2  Q  -- that's true, true to the best of your knowledge?

3  A  Yes.

4  Q  What about the second Ruins note?  How much was due in

5  owing as of January 6th?

6  A  $2,911,499.84 with a daily accrual of $346.47.

7  Q  And what's been noted, called the third Ruins note,

8  what was the balance on that?

9  A  $577,183.49 cents with a daily accrual of $106.38.

10  Q  So the total amount of all of three loans as of the

11  petition date was what?

12  A  $11,658,331.25.

13  Q  Okay.  Are these three outstanding loans on The Ruins

14  secured by any property?

15  A  Yes.

16  Q  And what is Red River's collateral?

17  A  My understanding, based on my recollection, it's

18  secured by two secured mortgages, an assignment of rents,

19  and I believe a commercial security agreement.

20  Q  Okay.  So the commercial security agreement would cover

21  personal property?

22  A  Yeah, it's a -- it would be a blanket UCC filing across

23  numerous categories.

24  Q  Has The Ruins made any payments, principal, or interest

25  to Red River after the petition date of January 6, 2025?

Page 47

1  A  No.

2  Q  Do you recall ballpark when the last payment was made

3  to Red River with respect to The Ruins notes?

4  A  Based on my recollection, it would have been like the

5  fall of '23 at or around October, I believe.

6  Q  Do you know if The Ruins is current on its real estate

7  taxes?

8  A  They are not current last time I checked.

9  Q  Are you familiar with the current condition of The

10  Ruins property?

11  A  Yes.

12  Q  How are you familiar with it?

13  A  I've done several site inspections throughout the

14  litigation process on several different significant time

15  intervals.  With the last one, I believe it was May of '25.

16  Q  And based on these periodic inspections of The Ruins,

17  is the condition of the property stable or is it

18  deteriorating, in your opinion?

19  A  Based on my recollection of the times I've been there

20  and reviewing the photos that I had in my possession of each

21  time, it appears to me the condition is deteriorating over

22  time.

23  Q  So what have you observed that causes you to believe

24  The Ruins property is deteriorating?  Can you give us any

25  examples?

Page 48

1  A  In review of my prior inspections and photographic

2  evidence that I took on site and me physically being there,

3  there's water penetrating the building envelope at or around

4  windows and other flashing points.

5  Q  Is the Tyvek wrap finished?

6  A  No.

7        THE COURT:  I'm sorry.  Will you repeat that

8  question?  I didn't hear or understand.

9  BY MS. STANLEY:

10  Q  Is the Tyvek wrap, the wrapping that goes around

11  buildings, you see them on constructions, that's not

12  finished or it's --

13  A  The current exterior condition is it is wrapped in

14  Tyvek with Tyvek taping at or around like window seals and

15  with that tape pulling apart at certain places.  Upon other

16  times when I was there, I'd visibly seen Tyvek ripped and/or

17  pulling away from the substrate behind it like the wood.

18  Q  Are you aware there's been any vandalism on the

19  property?

20  A  Yes.

21  Q  What have you observed?

22  A  Upon one of my inspections, I believe it was in

23  September of '24, we saw and documented graffiti within the

24  interior of the building as well as broken appliances.

25  Q  Have you conducted an inventory of the appliances at

Page 49

1  The Ruins?

2  A  Yes, I had performed an inventory.

3  Q  What did you find with respect to that inventory?

4  A  Based on my recollection, there was only appliances

5  deployed, meaning put in place in the top floor of The Ruins

6  apartment and this would be the second and third floor.  I

7  don't recall any being delivered throughout.

8  Q  Are there any appliances that are missing?

9  A  Yes, I believe so.

10  Q  Did you file a police report --

11  A  Yes.

12  Q  -- regarding the missing appliances?

13  A  Yes.

14  Q  Who did you file that with?

15  A  When did I or who did I?

16  Q  Both.

17  A  It would have been fall of 2024 and it was with the

18  Watertown Police Department.

19  Q  Did the deteriorating condition of The Ruins property

20  cause you to make any claims as a secured lender?

21  A  Yes.

22  Q  Who did you make a claim with?

23  A  Liberty Mutual.

24  Q  So the insurance company?

25  A  Yeah.  They were the ones that held the insurance

13 (Pages 46 - 49)

Page 50

1  policy at the time, and I believe they continue to.

2  Q   What happened with that insurance claim?

3  A   It was withdrawn.

4  Q   So what -- let me back up.  What was the insurance

5  claim based on?  Like, what was the damage that was alleged?

6  A   The insurance claim that was submitted outlined several

7  concerns that we, as the mortgagee holder on the policy,

8  notified the insurance company of a wind and water event

9  that had happened prior and that we wanted to get an

10  adjuster out to determine the scope of the damages, to

11  protect the collateral.

12  Q   So Red River put in its own insurance, submitted a

13  claim on its own behalf basically?

14  A   Yeah, because when we had first determined that the

15  water damage had happened, seeping in based on our

16  photographic -- we had pictures from the first site

17  inspection we did in the course of litigation, which was in

18  the spring of 2024 at or around April, May, March.  I can't

19  remember the exact date.

20      When we did that inspection q significant weather event

21  happened the night before with driving rain and wind.  And

22  it was evidently clear that there was problems within it.

23  And then in September of '24, when we came back and

24  inspected the property the second time throughout

25  litigation, it was clearly evident that what we had

Page 51

1  discovered at the prior inspection hadn't been resolved.

2  And the water marking damage was getting worse.

3  Q   Okay.  So in essence, it was a claim for water damage

4  that was submitted to the insurance company.

5  A   Yes.

6  Q   And what happened with that insurance claim?

7  A   It was withdrawn.

8  Q   Withdrawn by whom?

9  A   I believe it was withdrawn by the debtor and/or at the

10  direction of the debtor.

11  Q   Has Red River been able to successfully submit a claim

12  to Liberty Insurance for the water damage at The Ruins

13  property?

14  A   No.

15  Q   Between your earlier visits in, you know, say, starting

16  in 2023 and your last visit in May of 2025, have there been

17  any significant improvements made to The Ruins property?

18  A   Not that I can recall.

19  Q   Did Red River, in the course of its lending

20  relationship, ever request personal financial statements

21  from Jesse Craig?

22  A   Yes.

23  Q   And why would you want -- if the debtor is The Ruins

24  or, I'm sorry, the customer, why would Red River want

25  information from Mr. Craig individually?

Page 52

1  A   Because he was a guarantor.

2      MS. STANLEY:  Can we pull up Red River 1?  I think

3  that's the Generations, not Red River 1.  Sorry, Ruins.  Red

4  River 1.  I think that's the wrong set of documents.  This

5  is the Generations and Parkside Red River 1.

6      MR. VERSTANDIG:  One housekeeping matter while we

7  look for it.  And I meant to say this at the beginning,

8  since Mr. Craig is still in a little bit of pain.  Not for

9  now, but we will likely ask for recesses slightly more often

10  than normal without disrupting the flow and without being

11  offensive.

12      THE COURT:  That would be absolutely fine.  You're

13  also welcome to stand as you need to.

14      I only saw one set of Red River.  Did you provide

15  a second set of Red River?

16      MS. STANLEY:  Yeah, there's Red River 1 through 9.

17  These are the ones 1 through 9.  Or I'm -- yeah, it's Red

18  River.  Sorry.  Red River 1 through 12.  1 through 12 was

19  provided for The Ruins.  And this would have been way back

20  when we were first doing our -- yeah, this would have been

21  back in September.

22      THE COURT:  Yeah.  I remember seeing only one set.

23      MS. STANLEY:  Let me see if I can find my email

24  that I sent.  Yeah, it was sent on October 16th.  Can I try

25  to re-forward it to you?  I don't know if it'll work, but.

Page 53

1      THE COURT:  Would now be a good time for a short

2  break?  It's up to you.  Do you have --

3      MR. VERSTANDIG:  Do you want to stand up and, you

4  know, do you want to take a couple minutes?

5      MS. STANLEY:  It came from Sony.

6      CLERK:  I found it.

7      MS. STANLEY:  I was having a heart attack on that.

8      THE COURT:  Did that go through?

9      CLERK:  Yeah.

10      THE COURT:  Yeah.  This looks different.

11      MS. STANLEY:  Okay.  Yes.

12      CLERK:  Which page?

13      MS. STANLEY:  This is fine.

14      THE COURT:  Did you need to take a break or can we

15  --

16  BY MS. STANLEY:

17  Q   Okay.  Mr. Aarestad, can you identify this document

18  that is Red River 1?

19  A   It appears to be an email.

20  Q   From?

21  A   Jesse Craig to myself.

22  Q   And what's the date of it?

23  A   July 27, 2022 with an attachment from CP Business

24  Management PDF.

25  Q   And what was there the purpose of the email?

14 (Pages 50 - 53)

Page 54

1  A  My recollection is it was asking for him to provide the
2  bank statements that tied out to the recently provided PFS
3  back in June.
4  Q  When you say PFS, what do you mean?
5  A  Personal financial statement, balance sheet.
6  Q  So you were asking Mr. Craig to provide bank statements
7  for his support for his -- in support of his personal
8  financial statement?
9  A  Correct.
10  Q  Did he provide documents?
11  A  Yeah, as they are I believe attached to this email.
12      MS. STANLEY:  Okay.  If we scroll down to Page 6.
13      MR. VERSTANDIG:  One note, since this is going to
14  end up on a docket, the account numbers aren't redacted.
15      MS. STANLEY:  Yeah, they are.
16      MR. VERSTANDIG:  Nope.
17      MS. STANLEY:  1711.
18      MR. VERSTANDIG:  If you go up to the next page, we
19  just scrolled past the full account number.
20      THE COURT:  So these will not end up on the
21  docket.
22      MS. STANLEY:  Oh, the customer number?
23      THE COURT:  They're not filed on the docket and we
24  don't file them on the docket afterward unless or until
25  there's an appeal.

Page 55

1      MR. VERSTANDIG:  Thank you, Your Honor.
2      MS. STANLEY:  Is it the customer number that
3  you're --
4      MR. VERSTANDIG:  I believe so, yeah.
5  BY MS. STANLEY:
6  Q  Okay.  Number Page 6, was part of Mr. Craig's emailed
7  response back to you a bank statement for Town and Country
8  Credit Union for Jesse Craig.
9  A  My recollection, yes.
10  Q  And looking at this in front of you, what was the
11  member number for that account?
12  A  The statement was to him at a Fargo address with a
13  member number of 641 for statement period of May of -- May
14  4, 2022 to 5/31/22.
15  Q  And what was the amount that shows in the total
16  checking?
17  A  $233,000, or $233,456.78.
18  Q  Okay, and if we scroll down to Page 7, was another part
19  of Mr. Craig's response to your email a bank statement for
20  First Community Credit Union?
21  A  I believe so, yes.
22  Q  And what is the account number for that one?
23  A  I believe it ends in 4695.
24  Q  And what is the statement ending date on that one?
25  A  It was June 30, 2022.

Page 56

1  Q  And what does it indicate for an amount in the business
2  rewards section there in the middle?
3  A  I believe it was an ending balance of $260,106.94.
4  Q  Did Red River in the course of this litigation,
5  subpoena documents, including bank statements, checks,
6  deposits from Town and Country Credit Union and also First
7  Community Credit Union.
8  A  Yes.
9  Q  Did Red River receive copies of bank statements
10  directly from TCCU and FCCU?
11  A  Yes.
12  Q  And did you compare -- once those were received, did
13  you compare the bank statements provided by Jesse Craig in
14  this email of July 27, '22 to the subpoenaed records from
15  those two credit unions?
16  A  Yes.
17  Q  Were the documents the same?
18  A  No.
19  Q  How did they differ?
20  A  The liquidity or check balance was enhanced.
21      MS. STANLEY:  Okay.  Let's please pull up ECF 97
22  or actually hang on.  Yeah, we did have 97.  Ninety-seven,
23  yes, thank you, and go to --
24  BY MS. STANLEY:
25  Q  Is this a declaration from Town and Country Credit

Page 57

1  Union?
2  A  I believe so.
3      MS. STANLEY:  Can you go to Page 7, please?  Oh,
4  that is seven.  Okay.  Is this the point where it's possible
5  to pull up the two documents so we can look at them side by
6  side?  And when I say that, I'm talking about Red River 1
7  versus this document.
8      THE COURT:  I don't know how to do it either.  Do
9  you know how to do that?
10      MS. STANLEY:  Well, there is a way to have two
11  separate PDFs open.
12      MR. VERSTANDIG:  If it just mirrors your screen,
13  you can drag one to the side and one to the other and it
14  should lock them in on half the screen.
15      CLERK:  So you want Page 1?
16      MS. STANLEY:  Yeah.  Red River 1 and then that ECF
17  97.
18      THE COURT:  We're making progress.  Can you just
19  display that?
20      MS. STANLEY:  You did it?  Good job.  Awesome.
21  Thank you.
22      THE COURT:  The next one will go smoother.
23      MS. STANLEY:  There you go.  So on the -- let's
24  see, Docket 97.  Can you go back to Page 7?  That's fine.
25  BY MS. STANLEY:

15 (Pages 54 - 57)

Page 58

1  Q   Does this appear to be the same statement period for
2  member number statement 641?

3  A   Yes.

4  Q   And does that total closed end loan number match those
5  two between the two documents?

6  A   Yes.

7  Q   And again, the one on the right is Exhibit 1.  This was
8  the one that was provided to you in the email by Mr. Craig
9  in July of '22, correct?

10 A   The one on the right and that's currently blue.

11 Q   Yes, that's blue.  Yeah.  What is the total checking
12 number in the one on the left that came from the credit
13 union directly?

14 A   The true and correct certified copy from Town and
15 Country came with a total checking of $0, $0 savings.

16 Q   And this was something you didn't find out until in the
17 last couple of months, correct?

18 A   Yeah.  Yes, and excuse me, $5 in savings.

19     MS. STANLEY:  Can we look at -- scroll on the one
20 in blue down one page to, let's see, Page 7.  Yeah, go up
21 just a little bit more.  Perfect.

22 BY MS. STANLEY:

23 Q   So the one on the right was Red River 1, which was the
24 email provided to you from Mr. Craig, correct?

25 A   The statement on the right was an attachment within

Page 59

1  that email.  Yes.

2  Q   And that was -- it's really hard to see, but that was
3  First Community Credit Union?

4  A   Yeah, that was FCCU.

5  Q   And what is the redacted account number on that one?

6  A   It ended in 4695.

7  Q   And the statement date?

8  A   6/30/22.

9     MS. STANLEY:  Okay.  Is there a way now to change
10 Number 97 to Number 98?  Oh, look at that.

11 BY MS. STANLEY:

12 Q   Looking at Number ECF 98, this was a declaration from
13 First Community Credit Union of its business records; is
14 that correct?

15 A   I believe so, yes.

16 Q   And if we look at Page 433, does this appear to be the
17 same account number 4695?

18 A   Yes.

19 Q   And does it appear to be the same statement end date?

20 A   Yeah, it ends in June 30, 2022.

21 Q   And what is the -- what does the business rewards one
22 say on the one that came directly from First Community?

23 A   The business rewards beginning balance on this
24 statement was $91,139.45 and the ending was $60,106.94.

25 Q   And what is the difference between the one that came

Page 60

1  from First Community and the one that actually came in Mr.
2  Craig's email to you?

3  A   It appears to be an enhancement of $200,000 of
4  liquidity.

5  Q   Did Mr. -- did Red River rely on this personal
6  financial information that Mr. Craig provided on July 27,
7  '22?

8  A   Yes.

9  Q   How did it rely on this information?

10 A   It was part of underwriting of Mr. Craig's personal
11 guarantee.

12 Q   Did Red River at this time in July of '22 also extend
13 additional loans to Mr. -- for The Ruins?

14 A   Yes.

15 Q   Was that the $2.7 million loan?

16 A   Yes, I believe so.

17 Q   Was the Generations note Number 8 at about that same
18 time or was that later?  That was --

19 A   Repeat that.

20 Q   Sorry, I'm going to withdraw that question.  I think
21 I got my time mixed up.

22     Did Mr. Craig provide any other financial statements to
23 Red River during the course of this lending relationship?

24 A   Yes.

25     MS. STANLEY:  Can we go to Exhibit Red River 2?

Page 61

1  BY MS. STANLEY:

2  Q   Can you identify what this Red River 2 document is?

3  A   It appears to be an email.

4  Q   From?

5  A   Jesse Craig to myself.

6  Q   And what was the purpose of the email?

7  A   It looks to be the subject matter was a PFS and looking
8  to have it updated.

9  Q   And again, what's PFS?

10 A   A personal financial statement, balance sheet.

11     THE COURT:  I really appreciate it that you're
explaining the acronyms because sometimes I know them and
sometimes I don't.  So if you can be helpful in remembering,
14 that's great.

15     MS. STANLEY:  We had a lot of talk about the WDC
16 and what that means.  Watertown Development.

17     THE COURT:  Thank you again.

18     MS. STANLEY:  Yep.

19     THE COURT:  Thank you.

20 BY MS. STANLEY:

21 Q   So did Mr. Craig in this email -- or sorry, what's the
22 date of the email?

23 A   August 15, 2023.

24 Q   And attached to this email, did Mr. Craig provide
25 copies of bank statements?

16 (Pages 58 - 61)

Page 62

1  A    It appears that he provided a scan out of CP Business
2  Management which, based on my recollection, was attached
3  bank statements as well as an Excel for cash flows for
4  company he owns as well as the excel of his PFS, personal
5  financial statement.
6       MS. STANLEY:  And can we go to Page 12 of Red
7  River 2?
8  BY MS. STANLEY:
9  Q    Was this one of the bank statements provided by Mr.
10 Craig?
11 A    Yes, I believe so.
12 Q    And it appears to be another First Community Credit
13 Union one?
14 A    Yes, I believe so.
15 Q    And what is the account number?
16 A    Ending in 7124.
17 Q    And what's the statement date?
18 A    June 30, '23.
19 Q    What does the -- where it says member checking below,
20 what does it indicate for a beginning balance?
21 A    $622,148.27.
22 Q    And what's the ending balance?
23 A    $742,092.57.
24      MS. STANLEY:  Okay.  Can we go on?  Yes, the
25 Exhibit 98.  Yeah.  ECF 98.  Can we go to Page 623?

Page 63

1  BY MS. STANLEY:
2  Q    ECF 98.  Was this a document provided directly to Red
3  River from First Community Credit Union?
4  A    Yes, I believe it came in the certification of business
5  records.
6  Q    And is this reference the same account number?
7  A    References an account of 7124.
8  Q    And what's the statement end date?
9  A    June 30, '23.
10 Q    Does that appear to be the same account?
11 A    It appears to be the same account.
12 Q    Okay.  What's the difference between the two?
13 A    Well, the one provided at the bank states member
14 checking account with significant liquidity in it versus the
15 one from FCCU looks to reference a debt and an obligation.
16 Q    So that's a loan.  Is that a loan under 125 commercial
17 real estate?
18 A    It looks to be a commercial real estate loan.
19 Q    So is it your understanding based on comparison of
20 these two documents that the one provided to the bank
21 indicated there was $742,000 in this checking account?
22 A    Yes.
23      MS. STANLEY:  Can we go to page -- on the Red
24 River 2, Page 13 or just go to the next page down?  Yeah,
25 perfect.

Page 64

1  BY MS. STANLEY:
2  Q    Okay.  Was this a Town and Country Credit Union
3  statement provided by Mr. Craig to you in that email of
4  August 15, '23?
5  A    Yes, I believe so.
6  Q    And what is the member number on that?
7  A    303.
8  Q    And this was an account of what entity?
9  A    Craig Development, LLC.
10 Q    And what is the statement period?
11 A    June 1, '23 through June 30th of '23.
12      MS. STANLEY:  Okay, and then can we go to ECF 97?
13 Go to Page 4.
14 BY MS. STANLEY:
15 Q    Is ECF 97 -- this was the original documents provided
16 by Town and Country Credit Union, correct?
17 A    I believe so, yes.
18 Q    And Is that the same statement member number?
19 A    Ending in 303, yes.
20 Q    And what is the statement period?
21 A    6/1/23 through 6/30/23.
22 Q    Okay, and if we compare the two, the one provided by
23 Mr. Craig on the right showed a total checking balance of
24 what?
25 A    The one on the right showed a total checking of

Page 65

1  $603,222.88.
2  Q    So over $600,000?
3  A    Yeah, over $600,000 with no debts or obligations.
4  Q    And the one on the left that came directly from Town
5  and Country, did that have any funds in total checking?
6  A    There was no funds in the total checking or liquidity
7  in any other accounts besides the total closed end loan as
8  specified there.
9  Q    So based on these -- this compare, based on these
10 records, is it your belief that the one provided to the bank
11 in August of '23 falsely indicated that there was $600,000
12 in that account?
13 A    Based on comparing these two documents, what was
14 provided to the bank as well as what was given to TCCU,
15 there was a false indication of $603,222.88 of liquidity
16 that wasn't there.
17 Q    Did Red River rely on the information in these two bank
18 statements back in August of 2023?
19 A    Yes.
20 Q    How did it rely on this?
21 A    At that period of time, these were supposedly the funds
22 that were provided in the last Ruins note.  And as no
23 construction was moving along on The Ruins, we had asked for
24 verification that the funds were still available to be
25 utilized and pay contractors to get the project finished.

17 (Pages 62 - 65)

Page 66

1  Q    And that's where the $600,000 one came from?  Is that
2  your understanding?
3  A    Yes.  I believe so.
4  Q    Did Red River State Bank delay commencing a foreclosure
5  action on The Ruins because of Mr. Craig's assurance that
6  the $600,000 from that third loan was still there?
7  A    It was probably -- it was one of the factors likely,
8  yes, because it still showed the liquidity was there, that
9  the funds were still available to be utilized.
10 Q    Let's move on to talk about the foreclosure.  In
11 February of 2024, did Red River commence a foreclosure
12 lawsuit in Codington County, South Dakota state court with
13 respect to The Ruins property?
14 A    What was the date?
15 Q    February 2024.
16 A    Yeah.  At or around there, yes.
17       MS. STANLEY:  Can we look at Red River 7, please?
18 You might want to go to the little bookmark thing on the
19 left.  Not that one.  The one down.  Nope.  The next one.
20 Yeah, that one.  Perfect.
21 BY MS. STANLEY:
22 Q    Is Red River 7, the document in front of you, the
23 complaint that was filed on behalf of Red River State Bank
24 with respect to The Ruins property?
25 A    Yes, I believe so.

Page 67

1  Q    Okay.  And if you scroll down to the bottom of that
2  Page 85, what does it indicate was the date it was filed
3  with the court?
4  A    February 27, 2024.
5  Q    Okay, and did Red River file a motion for partial
6  summary judgment in the Ruins South Dakota foreclosure
7  lawsuit?
8  A    I believe so, yes.
9       MS. STANLEY:  If you go back to the bookmark.  Can
10 we go to Number 8?  Perfect.  And scroll down a little bit.
11 BY MS. STANLEY:
12 Q    What was the date?  Or was this the motion for partial
13 summary judgment that was filed?
14       MS. STANLEY:  If you scroll up a little bit.
15 There you go.
16       THE WITNESS:  Yeah, I believe so.
17 BY MS. STANLEY:
18 Q    And what was the date that partial summary judgment
19 motion was filed?
20 A    June 25, 2024.
21 Q    Was that hearing ever held in the South Dakota lawsuit?
22 A    No, it was perpetually delayed.
23 Q    What was your understanding of why there was a delay or
24 there was never a hearing?
25 A    It is based on my recollection and simple understanding

Page 68

1  of the court systems was because the defendants, The Ruins
2  was requesting numerous amounts of discovery and not ever
3  specifying and/or providing the requested discovery back to
4  us.
5  Q    Did it also get delayed because when the bankruptcy
6  case got filed?
7  A    Well, it got stopped because the bankruptcy case got
8  filed.  Yeah.
9  Q    And did Red River seek the appointment of a receiver
10 for The Ruins property in the South Dakota foreclosure
11 action?
12 A    I believe so.  We filed a motion in the early part of
13 December of '24.
14       MS. STANLEY:  If we can go to Red River 9?
15 BY MS. STANLEY:
16 Q    Is that the motion for appointment of a receiver filed
17 in The Ruins foreclosure action?
18 A    It appears to be.
19 Q    And if we scroll to the bottom of that page, when was
20 that filed with the South Dakota State Court?
21 A    December 6, '24.
22 Q    Okay.  Was there ever a hearing on the receivership
23 motion?
24 A    Nope.
25 Q    And was that because the bankruptcy case got filed

Page 69

1  fairly soon after that?
2  A    Yes.
3  Q    Or actually exactly a month after that.  At the time of
4  this foreclosure action in The Ruins, did Red River have any
5  other pending foreclosures going on --
6  A    Yes.
7  Q    -- sorry, in Codington County?
8  A    Yes.
9  Q    And what were those properties?
10 A    Parkside Place LLC as well as Generations on 1st LLC.
11 Q    And those are also properties involved, or Mr. Craig
12 owns both of those entities; is that correct?
13 A    Is my understanding he is sole equity in both of those
14 entities as well.
15 Q    Had Red River requested receivers be appointed in the
16 Generations and Parkside foreclosure cases?
17 A    Yes, we did.
18 Q    And do you recall if those requests were granted?
19 A    Yes, they were.
20       MS. STANLEY:  Can we look at Red River 11?  And
21 does that appear to be the -- we'll probably have to go to
22 Page 10, which is the signature page.
23 BY MS. STANLEY:
24 Q    Does that appear to be the order appointing receivers
25 in The Ruins -- or I'm sorry, in the Parkside and

18 (Pages 66 - 69)

Page 70

1 Generations cases.

2 A   Yeah, it appears to be the signed order.

3 Q   And what was the date of that?

4 A   October 1, '24.

5 Q   Okay.  Now turning to the draw requests or the actual

6 construction of The Ruins property, was there a general

7 contractor for the property?

8 A   Yes.

9 Q   Or I'm sorry, for the project.  And who was the general

10 contractor?

11 A   Jesse Robert Craig d/b/a Craig Development LLC.

12 Q   So Craig Development LLC was the --

13 A   Entity.

14 Q   -- entity doing the -- as the general contractor.  And

15 what's the relationship between Craig Development LLC and

16 Mr. Craig?

17 A   He's sole equity.

18 Q   And can you just explain for the court how funds are

19 dispersed on The Ruins loans just kind of in general?

20 A   Craig Development provided draw invoices for work that

21 was to be done or was done by the contractors summarized,

22 and then he made a certification of it, a statement of this

23 is what it is.  We funded directly to him for the

24 disbursement of the draw requests that were provided to the

25 bank.

Page 71

1 Q   So the funds on the draw requests, they went to -- the

2 money actually went to Mr. Craig individually or to Craig

3 Development?

4 A   They went to the general contractor.

5 Q   Craig Development?

6 A   Craig Development.

7 Q   Okay.  So the type of documentation or proof that Red

8 River was expecting before funds would be dispersed, what

9 did it include?

10 A   Invoices.  And he provided what appeared to be at the

11 time a nice summary sheet detailing them all out.

12 Q   Okay.  Anything else come in those?

13 A   The contractor invoices.

14 Q   Okay.  Were there -- and was it your understanding that

15 these were funds that were being -- had either been paid to

16 subcontractors already or that they were requesting money to

17 pay subcontractors?

18 A   They were invoices to pay subcontractors, based on my

19 recollection.

20 Q   Okay.  Was there a construction loan agreement for The

21 Ruins?

22 A   Yes.

23       MS. STANLEY: Can we look at Red River 4, please?

24 BY MS. STANLEY:

25 Q   Does this appear to be a Red River -- or I'm sorry, The

Page 72

1 Ruins construction loan agreement for the large first Ruins

2 note?

3 A   It appears to be.  Yes.

4 Q   Okay, and if we go to the end of that, is that your

5 signature at the bottom?

6 A   Yes.

7 Q   And who signed on behalf of The Ruins?

8 A   Jesse Robert Craig.

9       MS. STANLEY:  And if we can go back to page --

10 well, it's 54 at the top.  Page 3 of this document, I

11 believe.  Okay, never mind.  Let's go to Page 56.  There it

12 is.  Can you make that a little bigger?  I'm having problems

13 seeing.  Okay.  Project costs.

14 BY MS. STANLEY:

15 Q   Did the construction loan agreement identify a total

16 cost for The Ruins project?

17 A   Based on my recollection, I believe it did.

18 Q   And is it in that project cost paragraph there?

19 A   Yeah, at the top.  Yep.

20 Q   What was the total cost of The Ruins expected to be?

21 A   It specifies total cost not to exceed $10,691,893.35.

22 Q   And how did that -- what's your recollection of how

23 that number was arrived at?

24 A   It was provided on a contractor disbursement sheet

25 provided by Jesse Craig to the bank.

Page 73

1 Q   And does this project cost paragraph also indicate the

2 borrower, i.e., The Ruins, shall take all necessary steps to

3 prevent the actual cost of the improvement from exceeding

4 the project costs?

5 A   Yeah.  It says the project costs are true and accurate

6 estimates of the cost necessary to complete the improvement

7 in good and workmanlike manner according to the plans and

8 specs presented by the borrower to lender, and borrower

9 shall take all necessary steps to prevent the actual cost of

10 the improvements from exceeding the project costs.  That's

11 what you said, yes.

12 Q   Yes.  Okay.  If we look down a little bit further,

13 where it says conditions precedent to each advance, right in

14 the middle there.  And what does that sentence say?

15       THE COURT:  You know, you don't have to read to

16 me.

17       MS. STANLEY:  Okay.

18       THE COURT:  It's good.

19 BY MS. STANLEY:

20 Q   Was it your understanding that draw requests had to be

21 made in writing?

22 A   Yes.  Requested in writing, yes.

23 Q   Okay, and no deviation from what it was requested for

24 was authorized?

25 A   No.  It matches the designated uses as provided the

19 (Pages 70 - 73)

Page 74

1 bank as provided to the bank in those draw requests.

2 Q   And was it your understanding that the borrower was

3 certifying in these draw requests that they were true and

4 correct and that was what the funds were to be used for?

5 A   Yes.

6 Q   On behalf of Red River State Bank, were you responsible

7 for dispersing The Ruins draw request funding?

8 A   Yes.

9 Q   And were you the originating loan officer?

10 A   Yes.

11 Q   And that was -- was that just for The Ruins?

12 A   It was for the entirety of The Ruins.  And I did a

13 portion of the other projects at the tail end.

14 Q   Okay.

15 A   Of each of them.

16 Q   Did you ever authorize Mr. Craig to apply funds being

17 dispersed on The Ruins loans for the benefit of his other

18 projects, such as Generations or Parkside?

19 A   Not that I explicitly remember giving authorization

20 for.

21 Q   And did you ever authorize Mr. Craig to apply the funds

22 being dispersed on these Ruins notes for personal projects

23 such as construction of his lake home?

24 A   No.

25 Q   And to the best of your knowledge, did anyone else at

Page 75

1 Red River authorize Mr. Craig or Jesse or Craig Development

2 or The Ruins to apply the funds being dispersed on these

3 loans to anything but The Ruins property?

4 A   Nothing I'm aware of.

5 Q   Let's move on to talking about the draw requests.

6     MR. VERSTANDIG:  You Honor, if we're moving on, at

7 some point we're going to ask for a couple of minutes just

8 to stretch.

9     THE COURT:  Sure.

10     MS. STANLEY:  This would be a good time.

11     MR. VERSTANDIG:  Thank you.

12     THE COURT:  Okay.  So tell me what you would like

13 to do about lunch.  The attorney group, how would you like

14 to proceed?  I am flexible and will accommodate your

15 requests.

16     MR. VERSTANDIG:  We're going to defer to Ms.

17 Stanley, within the realm of reason.  We'd like to eat lunch

18 at some point today, but we're deferential.

19     THE COURT:  Is now a good time or should we resume

20 and try another hour and then break?  Really, it's entirely

21 up to you.

22     MS. STANLEY:  Yeah.  I think I could get a decent

23 chunk in in like another half hour.

24     THE COURT:  Okay.  All right.  For what I

25 anticipate is about to come, do you anticipate using

Page 76

1 Document 137-1 as your summary document?

2     MS. STANLEY:  So that's interesting.  Exhibit Red

3 River 12 is a clean copy --

4     THE COURT:  Okay.

5     MS. STANLEY:  -- of 137-A.

6     THE COURT:  Okay.

7     MS. STANLEY:  So we filed it duplicate because you

8 know how the court's numbering at the top.

9     THE COURT:  Yes.

10     MS. STANLEY:  That caused -- it's hard to read.

11     THE COURT:  Okay.

12     MS. STANLEY:  So we plan to go to use the one that

13 has not been stipulated to.  But it is essentially exactly

14 the same as 137 Exhibit A.  It's just easier to read.

15     THE COURT:  Okay.  So if that's the kind of thing

16 that might expedite the next block of testimony, then maybe,

17 Sharon, you could print me a copy of Red River 12.  And if

18 you will both agree that it's the same as 137-1, then we can

19 just move that process along.

20     Okay.  Let's take a 15-minute break right now.

21 And then we're going to come back and go until that

22 particular part of your examination is complete.

23     MS. STANLEY:  Okay.

24     THE COURT:  Okay.  All right.

25     MR. VERSTANDIG:  Thank you, Your Honor.

Page 77

1     CLERK:  Please rise.

2     (Recess)

3     THE COURT:  All right.  Now we're back on the

4 record with Bankruptcy Case Number 25-3002, 3 and 4.  And

5 when we broke, Mr. Aarestad was testifying about some

6 documents.

7     So Ms. Stanley, you may proceed, and if I need my

8 glasses to read something, I'll have to wait.  Go ahead.

9 BY MS. STANLEY:

10 Q   In total, how many draw requests did Red River receive

11 copies of with respect to The Ruins construction?

12 A   It's based on my recollection, Red River State Bank

13 received 14.

14 Q   So there were 14 draw requests for The Ruins?

15 A   I believe so.

16 Q   Okay, and how did you designate them?  1 through 14?

17 A   Yeah.

18 Q   And what about draws 1 through 3?  Were those funded by

19 Red River?

20 A   No, they were not.

21 Q   How were those -- what was the purpose of 1 through 3?

22 A   My recollection of 1 through 3 was 1 and 2 were how the

23 WDC or the Watertown Development Company's TIF financing

24 proceeds were utilized as provided by Jesse.  And Number 3

25 was his equity contribution to the project.

20 (Pages 74 - 77)

Page 78

1  Q   Okay.  Did Red River get copies of Draws 1 through 3?

2  A   Yes, we did.

3  Q   And did you ask Mr. Craig to provide those to you?

4  A   Yes, I did.

5  Q   Did Mr. Craig provide all of the draw requests to you?

6  A   No, he did not.  On I believe one or two occasions, he

7  was cc'd on them, and they were provided by Mulinda Sue

8  Craig.

9  Q   So Mulinda provided one or two of them, but he was

10 copied on those?

11 A   Yes, I believe so.  That's my recollection.

12 Q   But all the other ones, he was the only one who sent

13 them to Red River; is that right?

14 A   Yes, I believe so.

15 Q   And did Red River rely on these draw request copies of

16 1 through 3 when electing to provide -- I mean, Red River

17 didn't provide that funding, correct?

18 A   Correct.

19 Q   So did it -- how did it rely or did it rely on Draw

20 Requests 1 through 3 when Red River decided to give funding

21 for The Ruins?

22 A   It was relied upon, yes.

23 Q   And how so why was it important to the Red River?

24 A   Because the importance of 1 and 2 as well as 3 was

25 because it was part of the in total construction of the

Page 79

1  property.  And without the WDC support and dispersing the

2  funds and utilization for the project itself throughout the

3  underwriting, it became apparently evident that it wouldn't

4  -- the successfulness of the project wouldn't be without

5  those specific fundings used for that project.

6  Q   Okay.  I mean, is this part of the draw requests?  Are

7  these part of the cost of construction?

8  A   Yes.

9  Q   And do they wind up on, you know, a spreadsheet showing

10 the cost of construction at some point?

11 A   Yes.

12 Q   Is that used for anything?

13 A   Yes.

14 Q   What is it used for?

15 A   It's used for tracking the progress of the build as

16 well as it is a document that the bank and/or its designees,

17 the appraiser utilizes for a valuation of the property.

18 Q   So how is that used in a valuation?  What type of

19 valuation is it?

20 A   The cost analysis.  This is one of the many ways an

21 appraiser values a property.

22 Q   Is it the cost to construct something?

23     MR. VERSTANDIG:  Objection, calls for speculation.

24 He's testifying what an appraiser considers when valuing

25 property.

Page 80

1     THE COURT:  Sustained.

2     MS. STANLEY:  I lost my pen.

3  BY MS. STANLEY:

4  Q   Did you review some of the appraisals that were made

5  for The Ruins?

6  A   Yes.

7  Q   Was this spreadsheet that we're talking about showing

8  the cost to construct, was that actually included in the

9  appraisal?

10 A   Yes, it was.

11 Q   ECF 102.  Did you provide a declaration including all

12 of the Draw Requests 1 through 14 for the court?

13 A   I believe so, yes.

14 Q   Okay, and that included the ones for WDC, correct?

15     THE COURT:  Watertown Development?

16     MS. STANLEY:  Yes.

17     THE WITNESS:  I believe so.  But we could scroll

18 down on the left because I think they're attached to this

19 document.

20     MS. STANLEY:  Yes.  Okay.  So it might help if you

21 do the -- click on the left for the bookmark.  Where's the

22 bookmark?  I think it's that second weird little box.  No,

23 one more over.  That one.  Is that bookmarks?  Yeah, there

24 you go.  And click the dropdown on that.

25 BY MS. STANLEY:

Page 81

1  Q   Do these appear to be the draw requests that were in

2  Red River's business records?

3  A   It appears to be.

4  Q   And what is the -- when you look at the bottom of -- so

5  look at Invoice 001 is in front of you.  Scroll to the

6  bottom of that page.  There's Bate (sic) numbering down

7  there.  How did we designate these in our discovery?

8  A   We designated them RRSB Runes with a Bate page.

9  Q   Did Red River -- with respect to the Draw Request 4

10 through 14, did Red River fund all of those?

11 A   In respect to 4 through 14?

12 Q   Right.

13 A   I believe so.  I can't say or can't recall whether 14

14 was a partial advance on it or not.

15 Q   Okay.

16 A   Looking at records.

17 Q   So the first ones for sure, but not towards the end.

18 Maybe there were some that were not funded?

19 A   Four through 13, I believe for sure.  I just can't

20 recall 14 with specificity without looking in our records.

21 Q   At some point during the South Dakota foreclosure

22 litigation, did you become aware of any discrepancies

23 regarding the draw request for The Ruins?

24 A   Yes, I did.

25 Q   What was the discrepancy?

21 (Pages 78 - 81)

Page 82

1 A   Upon review of filed mechanics liens and in review of
2 one of the draws, it became clear there was a discovery
3 between Watertight's filed mechanics lien as well, versus
4 what we had provided in the draw request.
5 Q   So Watertight's actual mechanics lien, the
6 documentation in that was different from what Red River had
7 in The Ruins draw request in its file; is that right?
8 A   Based on my recollection, the filed state court
9 documents differed from what we had in our loan file,
10 lending file for the draw request for Watertight.
11 Q   And Watertight actually had recorded a mechanics lien,
12 correct?
13 A   I believe so, yes.
14 Q   So when you discovered this discrepancy, what did we
15 do?
16 A   At that period of time, we had not been provided the
17 discovery request we had requested upon the debtor as well
18 as Jesse Craig.  So we subpoenaed the contractors that were
19 not part of the lawsuit as well as issued I think the
20 terminology is discovery requests on those that were part of
21 the lawsuit.
22 Q   Okay.  So what -- were their subpoenas issued as well?
23 A   Yes.
24 Q   Okay, and what type of information did the subpoenas
25 request?

Page 83

1 A   Based on my recollection, I think the subpoena request
2 was all information, drawings, invoices, correspondence
3 regarding several construction projects that were done by
4 Jesse Robert Craig, I believe, including The Lofts LLC,
5 Parkside Place LLC, Generations on 1st LLC, The Ruins LLC,
6 and I believe, Jesse and Mulinda's lake home in Pelican
7 Rapids.
8 Q   What is The Lofts LLC?
9 A   It is my understanding that The Lofts LLC was the first
10 building that Jesse constructed In Watertown, South Dakota.
11 Q   Did Red River have any involvement with that one with
12 respect to funding?
13 A   Not that I'm aware of.
14 Q   Okay.  So the subpoenas, did they request, like,
15 invoices, payment applications?
16 A   My recollection of what the subpoenas asked for was
17 invoices, contractor pay statements, lien waivers, emails,
18 architectural drawings, general ledgers, if they existed
19 within the business records, photos, everything under the
20 sun, basically, regarding what they would have had in the
21 records of said project.
22 Q   And so they were also discovery, I think you also
23 mentioned was served on other defendants that were in The
24 Ruins case in the state court litigation; is that right?
25 A   Yes.

Page 84

1 Q   So were these, like, the mechanics lien claimants?
2 A   Yeah, it would be the other individuals that are on the
3 header of the bankruptcy lawsuit, I believe, from a short
4 explanation of who they were.  But, yeah, I was asking the
5 identical documentation that was in the South Dakota civil
6 subpoenas, but the technical legal term falling under the
7 discovery requests.  I don't know.
8 Q   Okay.  So did D&M Industries provide copies of its
9 business records?
10 A   Yes.
11 Q   What about KLJ Engineering?
12 A   Yes, I believe so.
13 Q   What about Clausen Construction?
14 A   Yes.
15 Q   And what about did Watertight provide copies of its
16 records?
17 A   Yep.
18 Q   What about TL Stroh Architects?
19 A   Yes.
20 Q   Did Hebron Brick provide copies of its records?
21 A   Yes, I believe so.
22 Q   What about Limoges Construction?
23 A   Yes, Limoges did.
24 Q   What about Baete-Forseth HVAC?
25 A   Yes, I believe so.

Page 85

1 Q   Did Infrastructure Design provide copies of its
2 records?
3 A   Yes, I believe so.
4 Q   Did Kloos Electric provide copies of its records?
5 A   Yes, I believe so.
6 Q   Did Cashway Lumber provide records?
7 A   Yes, I believe so.
8 Q   And finally, did Gage Brothers Concrete Products
9 provide copies of its records?
10 A   Yes, I believe so.
11 Q   Did you review each and every one of those sets of
12 records?
13 A   Yeah, as received.  I reviewed them.
14       MS. STANLEY:  I'm at the point of wanting to dive
15 into Red River 12, but I don't know if you want to break now
16 or keep going.
17       THE COURT:  I defer to you.  I'm good if you are.
18       MR. VERSTANDIG:  We're agnostic.
19       MS. STANLEY:  You're agnostic?  Okay.  Let's go
20 through a couple of them then, if we can.
21       THE COURT:  Okay.
22 BY MS. STANLEY:
23 Q   Have you assisted with preparing a summary of the
24 invoices that were in the draw requests provided to Red
25 River compared to the original subcontractor invoices that

22 (Pages 82 - 85)

Page 86

1 we just talked about that came in through subpoenas or

2 discovery?

3 A   Yes, I helped prepare that.

4 Q   And exhibit, or I'm sorry, ECF 137.  Did you help or

5 did you -- are you familiar with this declaration that was

6 filed as ECF 137?  It's called the second declaration of

7 Charles Aarestad regarding The Ruins motion to convert.

8 A   Is that what just pulled up on the left?

9 Q   Yep.

10 A   Yeah, I'm familiar with that document.

11        MS. STANLEY:  Okay, and if we take a look at

12 Exhibit A to this.  Yeah.  I think if --

13        MR. VERSTANDIG:  ECF kills the bookmarks.

14        MS. STANLEY:  Does it?

15        MR. VERSTANDIG:  Yeah.

16        MS. STANLEY:  If you click on that little bookmark

17 thing.  I don't think it does, does it?  The second one in.

18 Move one more over and move two more over.  Straight across.

19 Yeah, you were up right on it.  Keep going.  No, back to

20 the.  And over one to the right, it looks like -- yeah, that

21 one right there.  It doesn't do anything?

22        MR. VERSTANDIG:  ECF sanitizes everything.

23        MS. STANLEY:  Okay.  All right.  Well, then you're

24 in page -- just click on it.  Okay, so scroll up.  We want

25 to go to Exhibit A.  There you go.  Right there.  Perfect.

Page 87

1 BY MS. STANLEY:

2 Q   Is this the summary of draw request invoices versus

3 original invoices that we were just discussing?

4 A   Yes.

5 Q   And did you help prepare this?

6 A   Yes.

7 Q   And Exhibit Red River 12.  Is that essentially the same

8 document?

9        MR. VERSTANDIG:  Objection to essentially.

10 BY MS. STANLEY:

11 Q   Is that the same document?

12 A   I believe they're identical.

13        MS. STANLEY:  If we scroll down on ECF 137.  Keep

14 going to where we get to that Invoice 001.  Okay, one more

15 page there.  Go back up.  Okay.  And then look at that same

16 page on Red River 12.  Oh, you're in 12.  Yeah.

17 BY MS. STANLEY:

18 Q   What is the difference between these two documents?

19 A   Can you drag the one screen over?  Because you're

20 cutting off the ECF file.  I can see it.  You can just leave

21 it zoomed out the way it is.

22 Q   So what is essentially the difference between this

23 Invoice 001 from 137-A to 12-A, or 12?

24 A   137 is on the left.

25 Q   Yeah.

Page 88

1 A   They appear to be the same document, except the one on

2 the right has some highlighted descriptive contractors as

3 well as amounts corresponding to them.  And the difference

4 is the little court header up top.  One being got, what, two

5 overlaid, I believe.  And the one is just clean.

6        MS. STANLEY:  Right.  So, Your Honor, as I

7 explained the purpose of this was that it's so hard to read

8 when there's two court Bate numbering at the top on 137.  So

9 we essentially made Red River 12 so that it was easier to

10 read without the second court numbering of 137 at the top.

11        MR. VERSTANDIG:  Your Honor, I think our concern

12 is not getting rid of the overlay of the header.  That's

13 fine.  I don't understand why one has highlighting and the

14 other doesn't.  And I realize that highlighting is not

15 material, but that causes me to believe they're two

16 different documents, even if they clearly have commonality

17 and probably an ultimate common core.  And I don't know what

18 other alterations distinguish them.  Just highlighting in a

19 stray pen mark, that makes no meaningful difference

20 whatsoever.  But without understanding why they're

21 different, there's some concern to accepting that one is the

22 effective duplication of the other.

23        THE COURT:  Is there any reason we just can't

24 proceed with 137?  Did I already receive that?

25        MS. STANLEY:  You did already receive that.  It's

Page 89

1 hard to read with the double court numbering at the top.

2        THE COURT:  Okay.  Well, without an agreement from

3 counsel, I think we'll just use 137.  I don't have any

4 expectation that you're going to go through each one of

5 these things.  I'm thinking I'll just use the summary

6 document if everybody agrees that it's an accurate summary.

7 Do we have that agreement?

8        MR. VERSTANDIG:  We're not objecting to the

9 summary as an accurate summary.

10        THE COURT:  Okay.

11        MR. VERSTANDIG:  And they followed the

12 completeness rule by attaching everything to it.

13        THE COURT:  Okay.  Then you don't have to go

14 through it all, because I can.  What you could do is tell me

15 about it in oral argument.  Were you planning on taking me

16 through each and every thing?

17        MS. STANLEY:  I was.

18        THE COURT:  Oh, God, no.  I don't think you need

19 to do that unless counsel objects and he -- counsel didn't

20 object.  So that must mean that the summary is accurate.

21 What it means is a whole different thing, and you get to

22 tell me that later.

23        MS. STANLEY:  Okay.  Then if we can, let's take --

24 if we can do lunch now.

25        THE COURT:  Okay.  Yeah.

23 (Pages 86 - 89)

Page 90

1    MS. STANLEY: And then we'll discuss it because
2 this may shorten the whole day.
3    THE COURT: Wonderful. If that's what you want it
4 to be. Okay. So tell me how much time you would like,
5 recognizing that you might have witnesses to prep or things
6 to look at. I don't know. So tell me what you would like
7 to do about lunch.
8    MS. STANLEY: Can we do at least an hour?
9    THE COURT: Sure. Will that be adequate for you?
10    MR. VERSTANDIG: That's fine, Your Honor.
11    THE COURT: All right. So then let's -- it's
12 12:22. Let's just make it easy and go 1:30.
13    MR. VERSTANDIG: Thank you, Your Honor.
14    THE COURT: Okay.
15    MS. STANLEY: Okay.
16    THE COURT: All right. This matter stands in
17 recess.
18    CLERK: Please rise.
19    (Recess)
20    CLERK: All rise. Please be seated.
21    THE COURT: Back on the record with Bankruptcy
22 Cases 25-3002, 3 and 4, which is In re Generations, Parkside
23 Place and The Ruins. I know that the issue that we're
24 focusing on right now with regard to the evidence and the
25 motion is excluded exclusively The Ruins.

Page 91

1    But before we get there, I just want to do a
2 little housekeeping. The parties had mentioned that they
3 stipulated to continuing use of cash collateral through I
4 think you said December 15th. And I prepared an order, that
5 if you want to avoid having to actually file a stipulation,
6 we could use. Sharon has a copy of it. Has she provided it
7 to you? It basically looks like all the other orders,
8 except for I'm just referencing an oral stipulation. So if
9 you want to you can, at a break, look at that. If you need
10 a little extra time rather than rushing through it. But if
11 you want to just agree that that order may be entered, it
12 would save you a few minutes, or you could add language to
13 it. So perhaps on a break, you want to take a look at it.
14    Okay, and then the other little detail is, does
15 Red River plan on withdrawing the affidavit of default on
16 the docket? Is that what your plan is for that, and then I
17 could cancel the hearing.
18    MS. TANABE: I think that makes sense. With the
19 caveat that we probably won't be able to do it until
20 tonight.
21    THE COURT: Oh, that's fine. I'm just cleaning it
22 all up. So just assuring you that right now there will be
23 no hearing. And as soon as you withdraw the motion on the
24 docket, whoever does that on your behalf, then you'll see a
25 notation from the court canceling the hearing. So I'm just

Page 92

1 cleaning up all the things. Okay.
2    MR. VERSTANDIG: Thank you, Your Honor.
3    THE COURT: Any other housekeeping matters we
4 should visit about before we resume the testimony?
5    MS. TANABE: Well, technically, I think the motion
6 to convert was also resolved, and so that hearing is
7 technically -- I'm sorry, the motion to terminate
8 exclusivity.
9    THE COURT: And I just provided Sharon an order on
10 that one.
11    MS. TANABE: Okay.
12    MR. VERSTANDIG: That I agree with. Yes.
13    MS. TANABE: I apologize. There was not a miracle
14 over the lunch hour. I'm sorry.
15    THE COURT: You can only hope, but --
16    MS. TANABE: Yes, Your Honor. That was wishful
17 thinking.
18    THE COURT: All right. Anything further other
19 than that? All right.
20    All right, then you may resume your questioning,
21 Ms. Stanley.
22    MS. STANLEY: Ms. Horsager just informed me that
23 she was miraculously able to figure out how to remove the
24 double court stamping on the top of Exhibit 137.
25    THE COURT: Okay.

Page 93

1    MS. STANLEY: Do you have any objections to
2 removing the double court stamping on top of 137?
3    MR. VERSTANDIG: I have no objection. It's a
4 function of how ECF works. It's not really there. It's an
5 illusion.
6    THE COURT: That's actually true. Okay.
7    MS. STANLEY: So that's essentially, we don't have
8 to worry about Exhibit 12.
9    THE COURT: So I am not accepting Red River's
10 Exhibit Number 12, but I have already accepted 137-1.
11    MS. STANLEY: Yes, thank you, Your Honor, without
12 the horrible double.
13    THE COURT: In whatever form you need it to be.
14    MS. STANLEY: Can we pull up 137-1? That's 102.
15 BY MS. STANLEY:
16 Q   When we left off, Mr. Aarestad, we were talking about
17 the second declaration of Charles Aarestad. And you were
18 personally familiar with this declaration, correct?
19 A   Yes.
20    MS. STANLEY: And if we go to Exhibit A. Oh, I
21 mean -- sorry, keep going there. Yep, that one. Exhibit A.
22 BY MS. STANLEY:
23 Q   This is the summary of draw request. The original draw
24 request invoices versus what was obtained from
25 subcontractors through subpoenas, correct?

24 (Pages 90 - 93)

Page 94

1  A   Subpoenas and discovery.  Correct.

2         MS. STANLEY:  Okay, and without belaboring

3  everybody and going through all of it, can we go to page --

4  the end of this summary?  Yep.  Page 9, which is 14.  Page

5  14 of 209.  Docket Entry 137.

6  BY MS. STANLEY:

7  Q   Under the part that says across all draw requests, is

8  it your belief that when having gone through all of those

9  underlying summaries and individual documents that this

10  chart is made out of, what was the difference between the

11  amounts submitted in draw requests to Red River versus what

12  the original subcontractor invoices said?

13  A   In my help in preparation of this exhibit, based on my

14  calculation, the total difference between draw request

15  invoices and original contractor invoices was $2,169,472.51.

16  Q   And what was the total amount in your calculations of

17  the draw request invoices for non-Ruins projects or

18  purposes?

19  A   In my help and preparation of this exhibit and based on

20  my calculation, it was the total amount of draw request

21  invoices for non-Ruins project was $1,253,972.84 that were

22  for non-Ruins projects.

23  Q   So is it your testimony that The Ruins and/or Craig

24  Development and/or Jesse Craig wrongfully obtained the sum

25  of $3,423,445.35?

Page 95

1         MR. VERSTANDIG:  Objection to wrongfully obtained,

2  mischaracterizes evidence, assumes facts not an evidence,

3  seeks a characterization and probably a couple other things

4  that I'm not thinking of.

5         THE COURT:  It might be pretty close to a legal

6  conclusion as well.  So I'm going to sustain.

7  BY MS. STANLEY:

8  Q   Is the sum of those two numbers we just went over, the

9  difference between the draw request invoices and the

10  original invoices and the two total amount of draw request

11  invoices for non-Ruins project, does that arrive at the sum

12  of $3,423,445.35?

13  A   Yes.  Based on my prior calculation when I did this

14  exhibit, yes.

15         MS. STANLEY:  I just want to go through a couple

16  short ones so we won't belabor it.

17         THE COURT:  Sure.

18         MS. STANLEY:  Can we go to ECF 102?  And -- oh,

19  you're on 282.  Let's go to Page 115, please.

20  BY MS. STANLEY:

21  Q   With respect to Draw Request Number 7, what was -- did

22  this draw request include amounts to be paid to Dugan's?

23  A   Yes.

24  Q   And what is Dugan's?

25  A   What is Dugan's?

Page 96

1  Q   Yeah.

2  A   It's my understanding Dugan's is an appliance wholesale

3  retailer down in the Watertown Sioux Falls market.

4  Q   Okay.  So they sell appliances.

5  A   Yes.

6  Q   Okay.  If we go to the next page, 116, was this

7  document submitted in support of Draw Request Number 7?

8  A   Yes.

9         MS. STANLEY:  If you scroll up just a little bit

10  or, oh, whoops.  I'm sorry.

11  BY MS. STANLEY:

12  Q   How many appliances based on this invoice were sold?

13  Like how many apartments would have been filled with the

14  appliances on this invoice?

15  A   Looking through the detailed description, it would

16  appear that it would likely furnish 36 appliance or 36

17  units.  So 36 apartments.

18  Q   And you previously testified that you had done an

19  inventory of The Ruins appliances, correct?

20  A   Correct.

21  Q   And I think you previously testified they were only on

22  the fourth floor that you found them, correct?

23  A   Yeah.  The top floor, I believe that's the fourth.

24  Yes.

25  Q   And how many units were on that floor?

Page 97

1  A   Sixty-three divided by three would be 21.  So 21.

2  Q   So is it your belief that 15 sets are missing?

3  A   Yes.

4  Q   And that was -- was that the basis of the police report

5  that you filed?

6  A   Yes.

7         MS. STANLEY:  Can you scroll to the next page?

8  Okay, and sorry, go back up to the bottom of the prior one.

9  BY MS. STANLEY:

10  Q   So the amount of the appliances that, the 36 sets of

11  appliances, what was the amount to be paid to Dugan's for

12  that?

13  A   With sales tax, It was $119,965.86.

14         MS. STANLEY:  Can we go please to -- I believe it

15  is Jesse Craig's deposition, which was 208.  Or is that --

16  I'm sorry, was that 207, I think.  No, no, it was also filed

17  in Ruins.  Oh, not 200.  I'm sorry, 100.  And we're just

18  going to look at Exhibit 24, which is -- can you go one more

19  down?  This one?  Yes.  I'm sorry, that is 20 -- is that 25?

20  You might have to flip it.  Is there -- does that arrow at

21  the very, very right side of the -- yeah, that one.  Does

22  that let you flip it?  Rotate.  There.  Perfect.  Wonderful.

23  Okay.  Can you scroll down towards the bottom?  And I think

24  this is Exhibit 25.  Is that right?  Yes.  Okay.  Thank you.

25  BY MS. STANLEY:

25 (Pages 94 - 97)

Page 98

1 Q   Mr. Aarestad, are you familiar with exhibit -- what was
2 marked as Exhibit 25 to Mr. Craig's deposition?
3 A   Can you scroll up to the top of the document?  Yeah,
4 I'm familiar with this.
5 Q   What is it?
6 A   This is a contractor disbursement summary.
7 Q   And where did you get this or where have you seen this
8 document before?
9 A   Jesse provided it to me prior as well as CBRE Appraisal
10 Services.
11 Q   And if we look towards the bottom, there's a line item
12 there that says architect engineer.  Do you see that one?
13 A   Yep.
14 Q   And who was the architect engineer for The Ruins
15 project?
16 A   It was Stroh Architect.
17 Q   And what does this contractor disbursement summary
18 indicate that Stroh Architect was paid on The Ruins project?
19 A   That's the middle column, right?
20 Q   I believe so.
21      MS. STANLEY:  Can you go back up?
22      THE WITNESS:  Scroll up.
23 BY MS. STANLEY:
24 Q   So if you go back down, what was the amount paid for
25 Stroh Architect on The Ruins according to this?

Page 99

1 A   Next to that highlighted field, the one that's white,
2 it's is $509,775.
3      MS. STANLEY:  Okay, and then can we please go to
4 Docket Number 91.  And go down to page -- I believe it is
5 just -- I'm sorry.  Keep going down to exhibit -- what was
6 Exhibit A.  There we go.  The next page.  This is Page 4 of
7 19 on docket number 91.
8 BY MS. STANLEY:
9 Q   Can you identify this document?
10 A   This is a document we received in the subpoena to Terry
11 Stroh.
12 Q   And how many invoices are identified for Terry Stroh's
13 services on The Ruins project?
14 A   It appears there's just three invoices.
15 Q   And what are the amounts of those invoices?
16 A   Invoice 5254, dated September 6, '22, was for $21,550.
17 There's an Invoice 5172, April 7, 2022, for $5,325.  And
18 then there's Invoice 5105, 12/16/21 for $409,450.
19 Q   And how many payments are identified on the transaction
20 report?
21 A   There's just two.
22 Q   And what were those payments?
23 A   $409,450 and $5,325.
24 Q   And with your calculator, how much were those two
25 payments worth?

Page 100

1 A   Unless this Texas Instrument is broken, it'd be
2 $414,775.  $775 even.
3 Q   So is it your understanding that Terry Stroh
4 Architects' records indicate they were paid the sum of
5 $414,775 for The Ruins project?
6 A   Based on Terry's general ledger of this project, that's
7 what this would indicate.
8      MS. STANLEY:  Can we scroll down, please, to the
9 next page?
10 BY MS. STANLEY:
11 Q   What is the date of this invoice for The Ruins project?
12 A   September 1, 2022.
13 Q   And what is the amount?
14 A   The amount is $21,550.
15 Q   And what does it indicate for a fixed fee?
16 A   431 even.  $431,000 even.
17 Q   And based on that prior document we just looked at, was
18 this one paid?
19 A   Not to my recollection from a few moments ago.
20      MS. STANLEY:  Can we go to the next page?
21 BY MS. STANLEY:
22 Q   What is the date of -- and this is 6 of 19 on ECF 91.
23 What is the date of this invoice?
24 A   April 5, '22.
25 Q   And how much is due and owing on this one?

Page 101

1 A   $5,325.
2 Q   And based on the Stroh transaction report, was this one
3 paid?
4 A   I believe it was, yes.
5 Q   And what is the fixed fee amount for this one?
6 A   431.  $431,000 even.
7 Q   Okay, next page, please.  Do you know what this is?
8 A   Looks like an invoice from NTI, the Geotech people.
9 Q   Is there what was referred to in the invoice that we
10 just looked at?
11 A   I believe so, yes.
12      MS. STANLEY:  And go to the next page, please.
13 BY MS. STANLEY:
14 Q   What is the date of this invoice?
15 A   December 16, 2021.
16 Q   And how much is due on this one?
17 A   431.  $431,000 fixed fee of -- excuse me, you said
18 amount owed?
19 Q   Yeah.  The amount owed.
20 A   Sorry.  $409,450.
21 Q   And I was going to ask what's the fixed fee amount?
22 A   Yeah.  431.
23 Q   So all of these consistently indicate that there was a
24 fixed fee for Ruins of $431,000; is that correct?
25 A   It would appear so.

26 (Pages 98 - 101)

Page 102

1      MS. STANLEY:  Okay.  Can we scroll down to the
2  next page?  And then that gets to Generations.  Can we
3  switch over to ECF 102?  And go to Page 32 of 290?
4  BY MS. STANLEY:
5  Q   Did Draw Request Number 4 request any amounts to be
6  paid for Stroh?
7  A   Draw 4?  I believe so, yes.
8  Q   And what amount was to be paid to Stroh?
9  A   It was for $409,450.
10  Q   And did Red River fund Draw Number 4?
11  A   Yes.
12  Q   And do you recall, was there an invoice submitted in
13  support of Draw Number 4 for Mr. Stroh?
14  A   I think there was.  My recollection, there was.
15  Q   I don't think.  We can scroll through, if you don't
16  mind.  So now we're on five, so I don't -- did you see a
17  Stroh invoice in there?
18  A   No.
19  Q   Okay.  But Red River funded the $409,450, based on the
20  information that was in Invoice 004, correct?
21  A   Yep.
22      MS. STANLEY:  And if we can go next to Page 187.
23  Sorry, can you -- yeah, I meant to go here, but can we go to
24  the Invoice 009?  That would be up.  Oh, wait a minute.  I'm
25  sorry.  This was the one that did not have a summary page,

Page 103

1  in case we're all wondering.  I'm sorry.  Go back to 187.
2  That was my fault.  Excuse me.
3  BY MS. STANLEY:
4  Q   What is the date of -- was this Stroh invoice funded in
5  Draw Number 9, to your recollection?
6  A   Yes, I believe so.
7  Q   And what is the date of this invoice?
8  A   April 5, '22.
9  Q   And how much is being requested for funding?
10  A   It was for that Geotech report, $5,325.
11  Q   And does this one match what we just looked at in
12  Stroh's original records?
13  A   Yep.  Yes.
14  Q   Okay.  Can you -- and was this funded through Draw 9?
15  A   Yes, I believe so.
16      MS. STANLEY:  Can you go to the next page?  Okay.
17  And let's go, please, next to Page 11, or Draw 11, which is
18  Page 230.  A little bit further.  I think it's right at the
19  bottom there.
20  BY MS. STANLEY:
21  Q   Did Draw 11 include amounts to be paid to Stroh?
22  A   Yes.
23  Q   And how much?
24  A   $95,000.
25      MS. STANLEY:  Can we go to the very next page?

Page 104

1  BY MS. STANLEY:
2  Q   And what is the date of -- was this invoice submitted
3  in support of Draw Number 11?
4  A   Yep.
5  Q   And did this -- what's the date of this invoice?
6  A   June 15, 2022.
7      MS. STANLEY:  And if we scroll down just a little
8  bit more.  There we go.
9  BY MS. STANLEY:
10  Q   What amount is being requested on this?
11  A   $95,000.
12  Q   And what does it indicate for a fixed fee?
13  A   $511,000 even.
14  Q   And does fixed fee amount match the ones at all that we
15  just looked at in Stroh's original records?
16  A   No, they do not.
17  Q   Were you present at Mr. Craig's deposition when he
18  testified about this invoice?
19  A   Yes, I was.
20  Q   What do you recall about his testimony?
21      MR. VERSTANDIG:  Objection, hearsay.  It's 804(b)
22  -- the court's indulgence -- 804(b)(1)(A) provides that a
23  witness's former deposition -- I'm paraphrasing --
24  deposition testimony may only be used in their absence
25  unless used for impeachment or other purposes.  The

Page 105

1  following are not excluded by the rule against hearsay, if
2  the declarant is unavailable as a witness, obviously the
3  claim is not unavailable.  Former testimony, testimony that
4  was given as a witness at trial hearing or lawful
5  deposition, whether given during the current proceeding or a
6  different one.  Mr. Craig would have to be unavailable.
7      THE COURT:  Response?
8      MS. STANLEY:  I think it's a statement against
9  interest.
10      THE COURT:  It sounds like a statement against
11  interest.  Is there a response to that?  Statement and a
12  party opponent?  Yes.
13      MR. VERSTANDIG:  In that case, I'm going to go
14  with best evidence because we're going to get a paraphrase
15  unless there's a quotation in front of him.  A transcript's
16  available.
17      THE COURT:  That one I can sustain.
18      MR. VERSTANDIG:  Thank you.
19      THE COURT:  That is the second time in my life
20  I've ever had a best evidence rule, and it was Judge Nail on
21  the first one.
22      MS. STANLEY:  I love that.
23  BY MS. STANLEY:
24  Q   Based on your review of these records, do you believe
25  that this invoice in front of us here for $95,000 was

27 (Pages 102 - 105)

Page 106

1 altered or somehow falsified as it was provided to the bank
2 in Draw Request Number 11?
3        MR. VERSTANDIG:  No objection as to altered.
4 There's some legal innuendo to falsified that I would take
5 issue with calling for a legal conclusion.
6        THE COURT:  Sustained.
7 BY MS. STANLEY:
8 Q   Was altered?
9        THE COURT:  New question.  Why don't you rephrase
10 the whole question for him so the record is clear?
11 BY MS. STANLEY:
12 Q   Do you believe, based on your review of these records
13 that we just went through, that this invoice for $95,000 was
14 altered when it was provided to Red River in Draw Number 11?
15 A   Based on the review of Terry's certified records that
16 indicated very specific fixed fee amounts, and in review of
17 this invoice that was provided to Red River State Bank that
18 it relied upon for funding, it is evident to me that this
19 document that I'm looking at, dated June 15th, was provided
20 to coerce the bank providing funding for an invoice and a
21 purpose that didn't exist.
22 Q   And so if we determine, based on Mr. Stroh's records,
23 that $414,775 was paid for Stroh's work on The Ruins
24 project, correct?
25 A   Could you repeat that one more time?

Page 107

1        THE COURT:  Yeah, I missed it, too.
2 BY MS. STANLEY:
3 Q   Your earlier calculation of the amounts that were
4 actually paid to Mr. Stroh was $414,775; is that correct?
5 A   I believe that's what I said.
6        MS. STANLEY:  Okay, and if we can go back to
7 Exhibit 114, Exhibit 25.  Sorry.  I should have had you
8 leave that open.
9 BY MS. STANLEY:
10 Q   What did it indicate again was paid to Stroh as the
11 architect engineer?
12 A   $509,775.
13 Q   Based on your review of this contractor disbursement
14 summary, do you believe that number is incorrect?
15 A   Yes.
16 Q   And whose signature is on the bottom of this Exhibit
17 25?
18 A   Can you scroll down?  I think it's under Corrective
19 Element LLC, contractor, Jesse Craig, owner.
20 Q   And did Red River rely on the information in this
21 contractor disbursement summary?
22 A   Yes.
23 Q   How?
24 A   This contract, the bank relied on this contractor
25 statement as a statement from the general contractor of

Page 108

1 everything that's been put into the project, which then was
2 relied upon in an appraisal done for Red River State Bank by
3 CBRE as part of, I believe, their cost approach.  And this
4 document is, I believe, on the backside of that said
5 appraisal is a document that they attested to.
6 Q   Does the -- if you scroll back up a little bit, that
7 very last column, what is the title of that very last
8 column?  If you keep scrolling up.  What did you understand
9 that last column balance to mean?
10 A   Balance like balance to be paid.  I believe it's the
11 difference between the contractor and the amount.
12 Q   Okay.  So now looking back and with the benefit of
13 hindsight, how did these altered invoices in the draw
14 requests get missed?
15 A   Well, hindsight's 20/20 and the bank and/or anybody in
16 a professional industry, whether it's farming or anything
17 like that, we rely on statements and documents and what we
18 are being provided is true and correct.  And we take things
19 at face value as to what they are when we get them.  It's
20 not our job to be experts in every field across the board.
21 It's our job to trust but verify what is being provided
22 within us.  Reasonably verify.
23        And the only reason why it's easy now to see certain
24 alterations of the arts and crafts across the $80,000 pages
25 of subpoena documents is because we had to subpoena 20-some

Page 109

1 different contractors and issue discovery to get access to
2 those original records because we were being stonewalled.
3 And then in comparing them, it's clear, looking at them now,
4 how they were done and changed, but at the time they just
5 look like, pardon my French, shitty scans provided to the
6 bank which whether you use an app on your phone called Tiny
7 Scanner to make PDFs or you whip them through a
8 multifunction machine like the Craigs have at their office.
9        MR. VERSTANDIG:  Objection, assumes facts not in
10 evidence, is speculative and doesn't seem to be directly
11 responsive.
12        THE COURT:  I'm going to sustain as to being
13 responsive and allow you to ask another question.
14 BY MS. STANLEY:
15 Q   Under the construction loan document that we looked at
16 earlier, did it require The Ruins to provide a
17 certification, if you will, that the information was true
18 and correct in the draw requests?
19        MR. VERSTANDIG:  Objection.  The document speaks
20 for itself.  I also think we're at a point where the witness
21 is curating exhibits that are already in evidence.  It was
22 one thing for him to testify that things had been paid.
23 That is an evidentiary fact over and above what the
24 documents themselves say.  It's another thing for him to
25 extrapolate upon how they were or were not relied upon.

Page 110

1 That's also an evidentiary fact over and above what they
2 say. But we're now just using his recollection as to what
3 some of them say, having him read off of other ones that are
4 already there. The record is what the record is.
5       THE COURT: Sustained.
6 BY MS. STANLEY:
7 Q   When you received these draw requests from Mr. Craig,
8 were you relying on the representation made inside the draw
9 request?
10 A   I was relying upon the true and correct nature of the
11 document, the invoice prefacing us, as well as the documents
12 within, as well as the Docusign certification that he stated
13 beyond the loan documents itself that what was being
14 provided was true and correct and for the property at hand.
15       MS. STANLEY: If we can go back and look at ECF
16 102. And let's go to page just 31 of 290. You said that
17 there was a certification. Can you scroll to the bottom of
18 this page?
19 BY MS. STANLEY:
20 Q   Is that the certification you were talking about?
21 A   Yes, beyond the constructive loan agreement.
22       MS. STANLEY: Okay, and I mean, Your Honor can
23 read that, but --
24       THE COURT: And you're welcome to highlight it
25 again in your closing for sure.

Page 111

1       MS. STANLEY: Okay. And this was -- this was
2 actually a certification for -- if you scroll up a little
3 bit --
4 BY MS. STANLEY:
5 Q   -- for three different draw requests; was it not?
6 A   Yes.
7 Q   And I think, are there -- were there more
8 certifications provided similar to this for other draw
9 requests?
10 A   Similar to other draw requests, yes.
11 Q   And was this signed by Mr. Craig?
12 A   Yeah, via Docusign.
13       MS. STANLEY: I think we are done with our direct.
14       THE COURT: Okay. Cross examination, Mr.
15 VerStandig.
16       MR. VERSTANDIG: Thank you, Your Honor. Could we
17 please go to 141-14. Fourteen, I'm sorry. So this is
18 confusing because I gave the exhibits different numbers than
19 what ECF deemed them because the main document's one. So
20 then exhibit one is two, and so on and so forth. So I guess
21 it's -- I guess it's really -- this is actually weird. On
22 my computer, it does show it's 141-14, but it says 15 there.
23       THE COURT: It'll say 15 and you click on it. And
24 now it's going to show 14.
25       MR. VERSTANDIG: No, it shows nothing.

Page 112

1       THE COURT: If the header's on.
2       MR. VERSTANDIG: That's right.
3       THE COURT: Would you prefer that it go back on?
4       MR. VERSTANDIG: No, no strong opinion as to that.
5       THE COURT: We'll Just leave it off for now then.
6       CROSS-EXAMINATION OF CHARLES AARESTAD
7 BY MR. VERSTANDIG:
8 Q   Mr. Aarestad, do you recognize this document?
9 A   Yes.
10 Q   What is it?
11 A   It's a term sheet.
12 Q   Is it for The Ruins loan?
13 A   It's a term sheet for The Ruins project.
14 Q   Okay, and is it your bank's letterhead?
15 A   Yes.
16 Q   And is the signature at the bottom from a then officer
17 of your bank?
18 A   Yes. Martin Peterson.
19 Q   Okay, and this was sent to The Ruins? Actually sent to
20 Craig Development, The Ruins LLC and Jesse Craig, right?
21 A   That is the two, yes.
22 Q   Okay, and do you see in the middle of the page where it
23 says conditions?
24 A   Yeah.
25 Q   And can you see the third line there?

Page 113

1 A   The third line?
2 Q   Yes. Where it says draws and lien waivers to be done
3 through First Dakota Title, Watertown, SD?
4 A   Yeah.
5 Q   Okay, and just to make sure I understand, because I
6 think this is manifest, but I could be wrong. That was a
7 representation that draws and lien waivers for The Ruins
8 loans from Red River State Bank would be handled by First
9 Dakota Title, which I'm guessing is in Watertown, South
10 Dakota.
11 A   Yes.
12 Q   Okay. Were draws and lien waivers handled through
13 First Dakota Title in Watertown, South Dakota?
14 A   Draws and lien waivers were handled by Craig
15 Development, Jesse Robert Craig.
16 Q   Okay. Why is it that the bank didn't follow through
17 with using a third party to do draws and lien waivers?
18 A   Because Jesse Robert Craig handled them.
19 Q   Well, why did the bank choose to have a developer do
20 them instead of either the entity indicated on the term
21 sheet or another comparable entity in the business of doing
22 draws and lien waivers?
23 A   Because Jesse Robert Craig expressly had wanted to
24 handle them by providing them directly to the bank, as well
25 as providing draw requests and lien waivers directly to the

29 (Pages 110 - 113)

Page 114

1 bank.

2 Q   Let's be very clear about this.  Are you saying that

3 Mr. Craig went to the bank, said that, never mind First

4 Dakota Title, I, Jesse Craig, want to do this?

5 A   I don't specifically recall exact specificity of that

6 over our numerous conversations.

7 Q   Okay.  Well, at some point in time, there had to be the

8 first draw request and lien waiver to the bank, right?

9 A   Say that again, Mac.

10 Q   At some point in time, there had to be the first draw

11 request or lien waiver to the bank.  I think you testified

12 earlier that the first three draw requests went to Watertown

13 Development Company, right?

14 A   Correct.

15 Q   Okay.  So can I assume that Number 4 was the first one

16 that got sent to Red River State Bank?

17 A   Correct.

18 Q   Okay.  Surely at some point in time, either when that

19 was sent or I'd imagine prior thereto, there was a question

20 of is Mr. Craig handling these?  Is First Dakota Title

21 handling these?  Is another title company handling these?

22 When and how was that decision made?

23 A   Upon the time Jesse Robert Craig requested the loan

24 funds to be dispersed to him because he had bills to be

25 paid.

Page 115

1 Q   Okay.  Had the bank not secured the services of First

2 Dakota Title in Watertown, South Dakota?

3 A   To my recollection, that wasn't the condition of the

4 loan because this is a term sheet.

5 Q   So to be clear, the thing under the bolded word

6 conditions was not a condition of the loan?

7 A   A term sheet is not a legally binding contract.  It is

8 a proposal of terms.

9 Q   Is your position that something signed by an officer of

10 your bank and accepted is not legally binding?

11 A   Look up the term, term sheet.  Term sheet is a non-

12 legally binding agreement.  Jesse Robert Craig also in his

13 deposition did not specify that this was a legally binding

14 contract.  He also attested to that he didn't agree to these

15 terms in this term, and this was an outline.

16 Q   Mr. Aarestad, can we agree that of the entirely too

17 many lawyers in this room, neither you nor Mr. Craig are

18 amongst them?

19 A   I'm not a -- no, I'm not an attorney.

20 Q   To the best of your knowledge, Mr. Craig isn't either?

21 A   I don't know.  He's had a lot of school, he said over

22 his years.  So biology.  I don't know.  He might have did

23 some law school.

24 Q   I know you're being a little facetious, but you

25 attended his deposition, didn't you?

Page 116

1 A   Yes.

2 Q   He was asked at his deposition how far he went in

3 school, didn't he?

4 A   I don't recall specifically, but I remember bio was one

5 of his accolades that he studied.

6 Q   Do we think bio is the practice of law?

7 A   No.

8 Q   Okay.  At any point in time when receiving these draw

9 requests, did the bank ask Mr. Craig to start using First

10 Dakota Title?

11 A   I don't recall.

12 Q   Well, who would recall?

13 A   It was a long time ago, Mac.  There's a lot of

14 documents that I've had to recently pour over, so my -- it's

15 hard for me to specifically recall that.

16 Q   Let's talk about some context then.  This is dated

17 January 26, 2021, correct?

18 A   I don't know.

19 Q   It's at the top of it.  I wasn't trying to trick you, I

20 promise.

21 A   1/26/2021.

22 Q   Okay, and what is your position at Red River State

23 Bank?

24 A   Vice president.

25 Q   And was it vice president in January of 2021?

Page 117

1 A   Yes.

2 Q   Okay, and you're on the Board of Directors of Red River

3 State Bank, correct?

4 A   Correct.

5 Q   And I believe with one exception, all the members of

6 the board of directors are related by blood or marriage,

7 correct?

8       MS. STANLEY:  Objection, relevance.

9       THE COURT:  I don't know how that's relevant.

10       MR. VERSTANDIG:  I'm going to establish the

11 reason.  Understood.  I'll withdraw that one and move on.

12       MS. STANLEY:  Okay.

13       THE COURT:  Sustained then.

14 BY MR. VERSTANDIG:

15 Q   Do you know what Red River State Bank held in deposit

16 deposits in January of 2021?

17       MS. STANLEY:  Objection, relevance.

18       MR. VERSTANDIG:  If he says he doesn't recollect,

19 I'd like to point out that this loan was a significant

20 percentage of the bank's deposits, and that that is probably

21 something he should recollect.

22       THE COURT:  Overruled.

23       THE WITNESS:  What was the question, Mac?

24 BY MR. VERSTANDIG:

25 Q   What did the bank hold in deposits in January of 2021?

30 (Pages 114 - 117)

Page 118

1  A   Based on my recollection, I would say at or around

2  north of $100 million.

3  Q   Okay, and how much money was loaned to Ruins,

4  Generations and Parkside by the bank?

5        MS. STANLEY: Objection. What's the time frame?

6  Are we still 2021?

7  BY MR. VERSTANDIG:

8  Q   From the beginning of time to the present.

9  A   Could you rephrase the question?

10 Q   How much bank -- how much money did Red River State

11 Bank loan to Ruins, Generations and Parkside from the

12 beginning of time through the present day?

13 A   Now, I'm just -- can you repeat it one more time, just

14 so I have clarity of what you're asking?

15 Q   How much money did Red River State Bank lend to Ruins,

16 Generations and Parkside from the beginning of time through

17 the present?

18 A   Without undermining my affidavits regarding the proof

19 of claims, and based on just simple recollection, quickly

20 here, it would be of the sum or more of $22,900,000.

21 Q   Okay. Somewhere north or of -- somewhere north of one

22 out of every five dollars the bank had on deposit.

23 A   Of loans originated.

24 Q   Correct. Now, can we agree that Ruins, Generations and

25 Parkside are, I think you testified earlier, under the

Page 119

1  common control of Mr. Craig?

2  A   Correct.

3  Q   Okay. Can we agree that $22 million divided by three

4  would be $7,333,000 and change, right?

5  A   You said 22 divided by three?

6  Q   Yeah.

7  A   Okay.

8  Q   Okay. How many loans in excess of $7 million has Red

9  River State Bank made in the preceding 10 years?

10 A   In the preceding 10 years?

11 Q   Yeah.

12 A   A couple dozen.

13 Q   Okay. How many times has Red River State Bank loaned

14 more than $20 million to companies under the common control

15 of one person?

16        MS. STANLEY: Objection, Your Honor. This is

17 getting farther beyond the scope of what was --

18        THE COURT: I'm not really sure what that has --

19        MR. VERSTANDIG: I'll move on.

20        THE COURT: Okay. Sustained.

21 BY MR. VERSTANDIG:

22 Q   There's a similar provision in the Generations and

23 Parkside term sheets for the use of First Dakota Title,

24 isn't there?

25 A   Without looking specifically at those term sheets, I

Page 120

1  can't say. Do you have them?

2  Q   I do.

3        MR. VERSTANDIG: Your Honor, this is a bit of an

4  odd position.

5        MS. STANLEY: This is beyond the --

6        MR. VERSTANDIG: It's not going to be on the

7  exhibit list in this case. It would have been --

8        MS. STANLEY: It's beyond the scope of the direct.

9        MR. VERSTANDIG: Your Honor, as to scope, I'd

10 indicate this. If we need to recall him in our case, he's

11 Going to be a hostile witness anyway. So I'm going to be

12 able to lead. It seems more efficient to do it now, but I'm

13 happy to respect that and stay within scope.

14        THE COURT: I mean, you're right. It is beyond

15 the scope, but it would be more efficient to just get it all

16 done, if you would agree to that.

17        MS. STANLEY: I would, but this -- we're just

18 talking about The Ruins today. We're not going into

19 Generations or Parkside.

20        MR. VERSTANDIG: I'm simply -- the simple point

21 that I'm trying to make is that Ruins came third, that the

22 bank had gone through this with Generations and Parkside,

23 that there had similarly been a representation that First

24 Dakota Title of Watertown, South Dakota would be used. That

25 the bank did not follow through in either of those. That

Page 121

1  the bank continued to not follow through with Ruins when it

2  came third. And that by this point in time, the bank was at

3  least tacitly acknowledging the fact that it was using Mr.

4  Craig, who had no experience acting as a disbursing agent,

5  to do this in lieu of the reputable company it had indicator

6  on its own term sheet.

7        THE COURT: It's relevant evidence, at least

8  tangentially. So if you want to ask the witness about the

9  other term sheets, I will permit it.

10        MR. VERSTANDIG: Thank you.

11 BY MR. VERSTANDIG:

12 Q   Mr. Aarestad, would you be surprised if that was on the

13 other two term sheets?

14 A   Based on my review of the 80,000 pages of subpoenas, at

15 this point in time, not much would surprise me if I haven't

16 seen something that I would never have thought I would have

17 seen in my career.

18 Q   Okay. Did you hear my proffer a moment ago?

19 A   What?

20 Q   Did you hear the comment I made to the court a moment

21 ago? Never mind. Am I correct that Ruins came third and

22 that Generations and Parkside were developed first?

23 A   I believe so, yes.

24 Q   You say you believe so. Do you have some doubt as to

25 that?

31 (Pages 118 - 121)

Page 122

1  A   No, I believe that was the third in that role.

2  Specifically when it started, I can't say with exact

3  specificity where the prior building was erected or

4  destroyed.

5  Q   Do you believe either of the prior buildings have been

6  destroyed?

7  A   Talking about the what was sitting where 315 Kemp was

8  before.

9  Q   Okay.  Did Mr. Craig end up handling draw requests for

10  Generations and Parkside?

11  A   Yes, I believe so.

12  Q   Mr. Aarestad, the draw requests for Ruins were sent to

13  you, weren't they?

14  A   Yes.

15  Q   And after Mr. -- strike that.

16      Mr. Peterson left the bank, correct?

17  A   Correct.

18  Q   And after Mr. Peterson left the bank, the remaining

19  draw requests for Generations and Parkside were sent to you,

20  correct?

21  A   Correct.

22  Q   They were sent by Mr. Craig, right?

23  A   Yes.

24  Q   Did you ever receive a draw request from First Dakota

25  Title?

Page 123

1  A   Yes.

2  Q   In connection with one of these three debtors?

3  A   The draw requests went for the -- Draws 1 and 2 I

4  believe with WDC went through First Dakota Title.

5  Q   Okay.  But you said those were for WDC, not for the

6  bank.

7  A   They were for The Ruins project.

8  Q   Okay.  Why is it that WDC used First Dakota Title and

9  the bank did not?

10      MS. STANLEY:  Objection, calls for speculation of

11  somebody else's plan.

12      THE COURT:  That's true.  Sustained.

13  BY MR. VERSTANDIG:

14  Q   Did you review the draw request when they were received

15  by you at the time of their receipt for Ruins?

16  A   Did I review them?

17  Q   At the time of their receipt?

18  A   At the time of their receipt, at or around when they

19  were received, the email specifically, not the moment they

20  were sent.  I opened the document and reviewed them to check

21  for reasonableness within them.

22  Q   Did you ever pay any of them without reviewing the

23  underlying documents?

24  A   Not that I'm aware of.

25  Q   Would you be surprised if there was an email where you

Page 124

1  indicated that you were catching up on old draw requests?

2  A   Meaning going and specifically reviewing them with

3  specificity, going back, and looking again.  If there was an

4  email like that, I wouldn't be surprised if there was one.

5  That doesn't negate the fact that I had looked at them

6  prior.

7      MS. STANLEY:  Objection.  This is a vague

8  question.  It's confusing.

9      THE COURT:  I don't remember the question anymore.

10  So let's try again.

11      MR. VERSTANDIG:  Your Honor, I think I got the

12  answer, for what it's worth.

13      THE COURT:  So then your objection came untimely

14  and I'm going to allow it.

15  BY MR. VERSTANDIG:

16  Q   You had testified earlier that Ruins is not current on

17  taxes.  Do you remember that?

18  A   Current on property taxes?

19  Q   Yes.

20  A   Correct.

21  Q   And what is your understanding of what property taxes

22  Ruins has or has not paid?

23  A   The ones that are owed in Codington County, South

24  Dakota, first and second half.

25  Q   For which year?

Page 125

1  A   I believe it was year '24, because they're paid in the

2  arrears.

3  Q   Okay.

4  A   '23 might be outstanding, but I specifically remember

5  '24 being delinquent.

6  Q   Where do you garner this knowledge from?

7  A   South Dakota.  Codington County, South Dakota's tax

8  assessor website.

9  Q   Okay.  I'm paraphrasing you.  So it's not a quote.  You

10  had also testified that the property is deteriorating,

11  correct?

12  A   Yes.

13  Q   Okay, and I want to walk you through some of this again

14  just to make sure I understand what it is you believe is

15  deteriorating.  What harms do you believe have befallen the

16  property between January 6, 2025, which is the date the

17  bankruptcy petition was filed, and today?

18  A   Repeat your question.

19  Q   What harms do you believe have befallen the property

20  between January 6, 2025, which is the date the bankruptcy

21  petition was filed, and today?

22  A   Deteriorating condition of the interior.

23  Q   Can you be more specific?

24  A   The drywall at or around the windows flashing or around

25  the header and the footer of the windows on the north as

32 (Pages 122 - 125)

Page 126

1 well as east facing side that are solely wrapped in Tyvek.

2 Q   Now you're basing that on your observations from May of

3 this year, correct?

4 A   I'm basing that observations over a period of time from

5 2020 inspection in 2024 through the last one done at or

6 around May '25.

7 Q   Well, let's be careful with this because my question

8 was what harms have befallen the property between January 6,

9 2025 and now?  And you had testified earlier that you

10 inspected the property in May of 2025, right?

11 A   Yes.

12 Q   And when was your prior inspection of the property?

13 A   September of '24.

14 Q   Okay.  So if you observed a difference between

15 September of '24 and May of '25, you would not know when

16 that difference had occurred between those two dates, right?

17 A   It would have been between that period.

18 Q   Okay.  But you wouldn't have known if it was before or

19 after January 6th.

20      MS. STANLEY:  Asked and answered.

21      THE COURT:  I don't think he actually answered

22 that particular question.

23      MS. STANLEY:  Repeat the question.

24 BY MR. VERSTANDIG:

25 Q   This one I can't repeat by heart.  I was proud of the

Page 127

1 ability to do the last one.  If you observed the property in

2 September of '24 and you observed the property in May of

3 '25, how would you know that any change occurred before or

4 after January 6th of '25?

5 A   Because as I've just recalled, when I was there on site

6 in May of 2025, when I myself as well as with Gehrtz

7 Construction and CBRE, when we walked through there was damp

8 drywall at the time right around the windows and to the

9 point where I could touch it and it was moving and flexing.

10 Q   In May of '25?

11 A   May of '25?

12 Q   And you have deduced that that means it wasn't damp in

13 April of '25.

14 A   No, that there was continual water seeping in because

15 otherwise -- how otherwise would of the drywall taping

16 joints be damp and wet when there was no ongoing

17 construction happening at the property at that point in

18 time?  So that water, that moisture was coming in from

19 somewhere.

20 Q   But that moisture could have been coming in since

21 before January 6th.

22 A   But why would it have been wet the day of in May after

23 significant time would have passed.  If it happened before

24 the bankruptcy filing on 1/6/2025, one would simply deduce

25 likely that it probably would have dried molded at the time.

Page 128

1 But if was damp the day I was there in May of 2025 to the

2 point where I was able to move the taping with my finger

3 would deduce -- based on my recollection that it was getting

4 wet even up through the bankruptcy period.  Because how else

5 would that have been?

6      The only other way it would have been would be is if

7 somebody was actively working in the facility.  But that had

8 been said many times.  No work or construction has been

9 done.  So water seepage in would have been the only likely

10 reason there.  Unless there's vandals going into it,

11 magically spraying water around, which could be, but doubt

12 it, because it is in the same spot as where the prior water

13 was seeping in and staining the underlying gypcrete.

14 Q   Just to be clear, I'm not trying to be redundant here.

15 It's your testimony there was water intruding there before

16 the bankruptcy, and water continued to intrude after the

17 bankruptcy?

18 A   Yeah.  Based on the water staining and damage.

19 Q   Okay.  Other than water continuing to go through some

20 cavity that was there since before the bankruptcy, anything

21 else that you know occurred during the bankruptcy's

22 pendency?

23 A   And if water is seeping in, that means mold's being

24 grown.

25 Q   How do you know that that means there's mold?

Page 129

1 A   What was that?

2 Q   How do you know that that means there's mold?

3 A   Because we had Gehrtz Construction.

4      MR. VERSTANDIG:  Objection, hearsay.

5      THE WITNESS:  Within Gehrtz Constructions

6 construction --

7      THE COURT:  No, no.  There's an objection, sir.

8 You can't testify.  He is testifying to what Gehrtz

9 Construction told him, so that will be sustained.

10 BY MR. VERSTANDIG:

11 Q   Other than based on what someone else told you, how do

12 you know that there's mold?

13 A   Because Gehrtz Construction contracted ServiceMaster to

14 do an assessment based on their professional opinion of the

15 construction photos at the time of the inspection and

16 provide their analysis of the likelihood of that.

17      MR. VERSTANDIG:  I think it's going to be the same

18 objection as to hearsay.  We're just now at another third

19 party.

20      THE COURT:  Sustained.

21      MR. VERSTANDIG:  Thank you.

22 BY MR. VERSTANDIG:

23 Q   I'm jumping around a little bit, and I apologize for

24 that.  I want to go back to the loan disbursements.  I think

25 we had established that after Mr. Peterson left, you handled

33 (Pages 126 - 129)

Page 130

1 the disbursements for all three projects, correct?

2 A   Yes.

3 Q   And I believe you had testified earlier, if I'm wrong,

4 please tell me, that there was also some work done on Mr.

5 Craig's lake home in Minnesota?

6 A   Yes.

7 Q   Okay.  Did the bank furnish financing for that?

8 A   Yes, a portion of it.

9 Q   Did there ever come a time -- strike that.

10     For all three projects plus the lake home were

11 disbursements made to one of Mr. Craig's companies directly?

12     MS. STANLEY:  Objection.  That's really vague.

13     THE COURT:  Yeah.  That is sustained.

14 MR. VERSTANDIG:  Okay.  Court's indulgence.

15     THE COURT:  Sharon, do you have another --

16 MR. VERSTANDIG:  For all three -- sorry.

17     THE COURT:  Hold on a second.  Thank you.  Okay.

18 BY MR. VERSTANDIG:

19 Q   For all three projects, meaning Generations, Parkside

20 and Ruins, disbursements were sent to Craig Development,

21 correct?

22 A   Repeat the question.

23 Q   For all three projects, Generations, Parkside and

24 Ruins, disbursements were made to Craig Development,

25 correct?

Page 131

1 A   Based on my recollection, I believe -- I believe the

2 disbursements were made directly to Craig Development via

3 cashier's check or wire transfer.

4 Q   Okay.  That's true for all three of the projects

5 checks, right?

6 A   Without going back and specifically looking at the

7 disbursement records line by line by line by loan

8 disbursement, based on my recollection, I believe so.

9 Q   Okay.  Do you believe the bank paid any of the

10 subcontractors directly?

11 A   On any of the disbursements?

12 Q   Correct.

13 A   Not that I recall.

14 Q   Okay, and were disbursements also made to Craig

15 Development for work on Mr. Craig's lake home in Minnesota?

16 A   Jesse Craig utilized the and/or Craig Properties, I

17 believe, as the vehicle that he used to construct his lake

18 home in Pelican Rapids.

19 Q   Okay.  Did the bank ever disperse money for more than

20 one of those four projects at the same time?

21 A   Yes.

22 Q   Okay.  How often did that happen?

23 A   Specifically, without going back and looking at line by

24 line by disbursement time frame exactly, I can't say with

25 specificity.

Page 132

1 Q   Okay.  When the bank dispersed money from more than one

2 project at the same time, did it through a single

3 disbursement to Craig Development, right?

4 A   Repeat that.

5 Q   When the bank dispersed money to more than one project

6 at the same time, it did it through a single disbursement to

7 Craig Development, right?

8 A   No.

9 Q   Okay.  How did it do it?

10 A   Based on my recollection, without going and

11 specifically looking at -- there was multiple disbursements,

12 multiple checks, and/or wires, but they were specifically

13 tied to the certified draw requests that were provided to

14 the bank.  So the amounts of funding matched what was

15 provided by Craig.

16 Q   But you're saying it never got two disbursements never

17 got bundled together into one wire transfer or cashier's

18 check?

19 A   To my recollection, the only ones that got -- had

20 multiple draws bundled into one wire, one cashier's check

21 would have been Ruins 4, 5 and 6 that were all

22 simultaneously dispersed per the records that were provided

23 or draw requests provided by Jesse Robert Craig that he

24 certified that the intended uses were for there.  That's the

25 one I recall.

Page 133

1 Q   Okay.  So we'll come back to that in a second.  But I

2 just want to be clear.  You're saying but at no point did

3 some Ruins money and Parkside money get dispersed in the

4 same wire?

5 A   Ruins and Parkside funds?

6 Q   Or Ruins and Generations or Ruins and lake house.  You

7 can mix and match how you want.

8 A   It is my recollection that the funds that were

9 dispersed were to that matched the draw requests that were

10 provided from Jesse Craig to the bank.

11 Q   Except you testified a minute ago that at least three

12 of the draw requests got bundled together.

13 A   Yeah, as provided, those three that were provided from

14 him.

15 Q   Okay.  Why was there such a delay on Draw Request 4

16 that it didn't get paid until Draw Request 6?

17 A   On the Ruins?

18 Q   Yeah.  I think you had said a moment ago 4, 5 and 6 got

19 dispersed together, right?

20 A   Yes.

21 Q   Why didn't 4 get paid before 5 and 6?

22 A   Because the note was originated on March 11th through

23 17th.  Somewhere in that period of time, 2021.

24 Q   Respectfully, I'm not sure I understand your answer.

25 Why?  What do you mean?  I'm sorry.

34 (Pages 130 - 133)

Page 134

1 A   Well, I'm confused what you're asking.

2 Q   Can we agree that Draw Request 4 came before Draw

3 Request 5, which came before Draw Request 6?

4 A   Yeah.  Four, five, six, six, seven.  You know?  Yeah.

5 That would be the line of order.  Okay.

6 Q   Why didn't Draw Request 4 get funded before Draw

7 Request 5 and 6.

8 A   On The Ruins?

9 Q   Yes.

10 A   Because the note was originated in March of 2023.

11 Q   Are you saying the draw requests were made before there

12 was a promissory note?

13 A   Yeah, because he put the invoices together and emailed

14 them to, I believe it was CCF Bank that was set up to take

15 over the financing of The Ruin project.  And that fell

16 through.  And then he reached out to me to help him with a

17 different vehicle for funding of The Ruins.

18 Q   All right.  Let's take this back for a second.

19 A   And so if Craig was working with them at the time and

20 they didn't follow through with their commitment, that's

21 probably the reason why there was four, five and six

22 altogether because we were trying to help him step in and

23 provide that funding that CCF bank, lack of a better term,

24 ghosted Craig on.

25 Q   Okay.  Do you remember earlier today we looked at Red

Page 135

1 River State Bank Exhibit 4, which was a construction loan

2 agreement?

3 A   Yes.

4 Q   I think you were going to read from it.  Yeah.  Yes.

5 A   Yes.

6 Q   Okay, and that construction loan agreement's dated

7 March 9, 2022, right?

8 A   Yes.  So if I said March of '21, I had my years mixed

9 up.

10 Q   Not too hung up on the year.  Don't worry.  The

11 construction loan agreement set forth the amount to be

12 funded, right?  You cited that earlier in your testimony.

13 A   Okay.

14 Q   Okay.  Are you saying that construction loan agreement

15 wasn't executed until after Draw Requests 4 and 5 were

16 already submitted?

17 A   What did you ask?

18 Q   You saying that construction loan agreement wasn't

19 executed until after Draw Request 4 and 5 had already been

20 submitted?

21 A   I don't specifically remember the exact date I received

22 them when he had provided or signed out Loan 4, 5 and 6.

23 Not four, five and six.  Excuse me.  That construction loan

24 agreement.

25       MR. VERSTANDIG:  The court's indulgence for one

Page 136

1 moment.

2       THE COURT:  Mm-hmm.

3 BY MR. VERSTANDIG:

4 Q   The construction loan agreement provides for $11

5 million and change in financing, correct?

6       MS. STANLEY:  Objection.  I believe the number in

7 the construction loan agreement was $10 million something.

8       MR. VERSTANDIG:  I think Ms. Stanley is correct,

9 actually.  So I will rephrase.  It provides for $10 million

10 and change of financing.

11       THE COURT:  Okay.  All right.  So why don't you

12 re-ask the question?

13 BY MR. VERSTANDIG:

14 Q   The construction loan agreement provides for $10

15 million and change of financing, correct?

16 A   No.  The construction loan agreement specifically

17 stated $7.74 million, I believe was the total promissory

18 note for a total construction cost not to exceed $10 million

19 and some change.

20 Q   Okay.

21 A   It also represents several certification statements of

22 what's being provided in there are true and correct.

23 Q   How is that responsive to the question I just asked

24 you?

25 A   I was elaborating on the document.  Thought you'd want

Page 137

1 to know.

2       THE COURT:  Okay.  I'm going to just take a minute

3 here.  Mr. Aarestad, I know that this is frustrating from

4 you, I can tell obviously.  Your testimony is not meant to

5 serve as responses to Mr. VerStandig.  It's meant to provide

6 me information.  So it's helpful for me for you to testify

7 to the questions that are asked and, if possible, twist your

8 chair a little bit.  Every now and then, I miss something.

9       THE WITNESS:  I'm sorry, Your Honor.

10       THE COURT:  Yeah, no, you know what?  It's your

11 temptation, because it's like a deposition, except for

12 you're on a witness stand now and lots of people.  Actually,

13 most witnesses forget about the court.  But it's coming to a

14 point where you're certainly frustrated and less patient.

15 And so I'm just inviting you to remember that it's me who

16 doesn't know all the things, even though he does and you do.

17 You're here to help me through this.

18       THE WITNESS:  Understood.  Sorry.

19       THE COURT:  Yeah.  No, until I remind you, people,

20 don't even think twice about it.  So, Mr. VerStandig, you

21 may proceed.

22       MR. VERSTANDIG:  Thank you.

23       MS. STANLEY:  And Your Honor, if I may, there were

24 three which have been stipulated to affidavits regarding the

25 loan disbursements that are already in evidence.  So we're

35 (Pages 134 - 137)

Page 138

1 kind of retreading ground here.
2      THE COURT: Well, here's the thing. When you
3 presented your evidence, a lot of it had already been
4 received, but it was helpful to me for you to lay the
5 foundation so that you could get to the point you really
6 wanted to make. And so I'm allowing the same sort of
7 opportunity to Mr. VerStandig to sort of lay the background
8 so that he can get to the information that I really need.
9 So I'm going to be more patient than I maybe should.
10      Mr. VerStandig?
11      MR. VERSTANDIG: Thank you, Your Honor.
12 BY MR. VERSTANDIG:
13 Q   Mr. Aarestad, do you remember earlier today you
14 identified a series of bank statements that have been
15 produced by Mr. Craig that appeared to be incongruous with
16 those produced by the correlative financial institutions?
17 A   What's the -- please define whatever big word you just
18 used. I'm not trying to be smart.
19 Q   Incongruous, right? Different. You highlighted a
20 bunch of bank statements that Mr. Craig had sent you that
21 were different than the ones the bank sent you?
22      MS. STANLEY: When you say the bank, do you mean
23 the credit unions?
24      MR. VERSTANDIG: I actually got that part right.
25 I said the correlative financial institution on the original

Page 139

1 question. I even said financial institution knowing there
2 was a credit union in there.
3      THE COURT: Let's try one new question. We're
4 going to try one out one more.
5 BY MR. VERSTANDIG:
6 Q   Do you remember earlier today you highlighted a number
7 of account statements that Mr. Craig had sent you that
8 appeared to be different than ones later sent by the
9 correlative financial institutions?
10 A   Yes.
11 Q   Okay. Those were sent to you in connection with your
12 request of Mr. Craig to have an updated personal financial
13 statement, correct?
14 A   As the guarantor, yes.
15 Q   Okay, and that was after the construction loan
16 agreement had been executed, right?
17 A   Those financial statements that were outlined that were
18 different. The bank statements that were different were
19 after the $7.74 million loan was originated. Yes.
20 Q   Can we agree the loan wouldn't have been originated
21 before the construction loan agreement was executed?
22 A   I'm sorry. Repeat that.
23 Q   Mr. Aarestad, I say this as much for your benefit as
24 anyone else's. I know my bow tie is fabulous, but if you
25 look more at the judge than me, it's going to serve you much

Page 140

1 better. Can we agree that the loan wouldn't have been
2 originated until after the construction loan agreement was
3 signed?
4 A   Well, the construction loan agreement was one of the
5 many documents that were part of the original loan package.
6 Q   Okay. So you asked for the personal financial
7 statement to be updated after the construction loan
8 agreement was signed.
9 A   I asked for a personal financial statement to be
10 updated in connection with another note that was being
11 originated because we had prior received a personal
12 financial statement from him many times prior.
13 Q   Okay. But again, it was after the construction loan
14 agreement was signed, right?
15 A   There was several construction loan agreements that
16 were signed as well as normal loan agreements.
17 Q   Okay. Was it after the term sheet was sent out?
18 A   It is a normal course of business for a borrower or
19 guarantor to provide updated financial statements throughout
20 the course of all borrowings.
21 Q   I appreciate that, but that wasn't my question. I just
22 asked if it was after the term sheet.
23      MS. STANLEY: I mean, objection, Your Honor. The
24 documents and the dates on the documents speak for
25 themselves. I'm not sure where this is going.

Page 141

1      MR. VERSTANDIG: I'll ask my follow-up question if
2 we can accept that it's after the term sheet.
3 BY MR. VERSTANDIG:
4 Q   If the bank had already committed --
5      THE COURT: Hold on. I haven't ruled yet. All
6 right. I'm going to allow the new question, but then we're
7 going to just have to get out the documents to refresh or
8 move on.
9 BY MR. VERSTANDIG:
10 Q   If the bank had already committed to lending the money,
11 why was Mr. Craig's personal financial statement material?
12 A   Because he was requesting other credit at the same
13 time.
14 Q   Credit over and above what the bank had already
15 committed to for Ruins?
16 A   Yeah.
17 Q   You're saying that in a voice that suggests I'm too
18 simple of a boy from too simple of a town. Why is that?
19 A   Because originally $7.74, paraphrasing on my
20 recollection, was lent on the first Ruins note. And the
21 second one, for $2.75 million, was above and beyond what was
22 specified on the term sheet.
23 Q   And you're saying that this was requested before the
24 second note?
25      MS. STANLEY: Wait, what was requested before the

36 (Pages 138 - 141)

Page 142

1 second note?

2 BY MR. VERSTANDIG:

3 Q   The updated personal financial statement.  That's why

4 you needed it.

5 A   The personal financial statement was received prior to

6 the second note --

7        MS. STANLEY:  Objection, Your Honor.  I mean, the

8 email that we were talking about is the best evidence of

9 what the date was.

10       THE COURT:  That's a good objection.

11       MR. VERSTANDIG:  I'm fine with that objection.

12 The question I'm really getting to is -- let's strike that.

13 I've been here for a couple hours -- well, for 90

14 minutes.  Can we take five?

15       THE COURT:  Sure.  I think this is a good time for

16 a -- let's take 10.  How about that?

17       MR. VERSTANDIG:  Thank you, Your Honor.

18       THE COURT:  At 3:10, we'll resume.

19       CLERK:  Please rise.

20       (Recess)

21       THE COURT:  Please be seated.  All right.  #e're

22 back on the record with Bankruptcy Case Number 3002, 3 and

23 four.  And when we broke, Mr. Aarestad was testifying on

24 cross-examination.  So, Mr. VerStandig, you may proceed.

25       MR. VERSTANDIG:  Thank you.

Page 143

1 BY MR. VERSTANDIG:

2 Q   Mr. Aarestad, you testified earlier that there were a

3 couple million dollars and change based on your analysis of

4 variance between the invoices that subcontractors had in

5 their files and those that were submitted to the bank.  Do

6 you remember that?

7 A   Yes.

8 Q   Okay.  Do you believe that money went to Mr. Craig

9 personally?

10       MS. STANLEY:  Objection.  Are we asking him to

11 speculate?

12       THE COURT:  There's a question about do you

13 believe.  Are you asking him to speculate?

14       MR. VERSTANDIG:  I'm not asking him to speculate.

15 BY MR. VERSTANDIG:

16 Q   Do you have a reason to believe that money went to --

17 I'm correcting myself here.  Do you have a reason to believe

18 that money went to Mr. Craig personally?

19 A   Based on my review of all the draws amongst all three

20 of these properties and in review of the 80,000 pages of

21 subpoenaed documents including the 2004 motion, bank

22 statements and reconciliation and review of those bank

23 statements and the checks that were dispersed out of those

24 bank statements from Town and Country Credit Union as well

25 as FCCU and Starion and how the money was deposited,

Page 144

1 transferred and/or checks written out thereafter from where

2 the loan proceeds were deposited into, it is based on my

3 recollection and my simple understanding that the loan

4 proceeds were dispersed.  Mr. -- and I'm going to use this

5 very generally.  Mr. Craig commingled the funds making

6 likely, and I'm not a legal expert, corporate veil breaching

7 in my review of the bank statements and/or checks written

8 out of FCCU based on the 2004 subpoenaed bank statements.

9 Q   You say that you believe he commingled the monies.  Do

10 you mean in his personal bank account?  In the Craig

11 Development account?  What do you mean by that?

12 A   That based on my recollection and review of this 2004

13 subpoenaed documents, when the funds were dispersed, checks

14 were written out to various entities controlled by Craig and

15 then further disbursements were made to several insiders

16 including Jesse Jordan Horner, Mulinda Craig and several

17 cash withdrawals as well out of FCCU.

18 Q   Say there were disbursements to insiders.  What do you

19 premise that upon?

20 A   Loan proceeds that were directly from a specified draw

21 that was then there transferred interbankly to a different

22 entity controlled by Craig.

23 Q   Okay.  Which ones do you have in mind when you say

24 that?

25 A   Craig Properties.

Page 145

1 Q   Sorry.  Which transfers?

2 A   Based on my recollection, several transfers over

3 several periods of time.

4 Q   When did you first discover this?

5 A   In the 2004 subpoena.

6 Q   When was that?

7 A   This spring.

8 Q   Approximately when is it that you first learned this?

9 A   A month is fine.

10       MS. STANLEY:  Objection on relevance here and it's

11 beyond the scope.

12       THE COURT:  Whether there were transfers to

13 insiders is not relevant to you?

14       MS. STANLEY:  Well, good point.

15       THE COURT:  Okay.  So I'll overrule that one.

16       THE WITNESS:  Could you ask the question again,

17 Mac?

18 BY MR. VERSTANDIG:

19 Q   When is it that you first discovered --

20       MS. STANLEY:  The timing of it.

21       THE COURT:  Timing of it.  Got it.  No, I'm going

22 to allow it.

23       MR. VERSTANDIG:  Thank you.

24       THE COURT:  Timing of it.  You can answer.

25 BY MR. VERSTANDIG:

37 (Pages 142 - 145)

Page 146

1 Q   When did you first discover these transfers to

2 insiders?

3 A   Upon my review of the 2004 subpoenaed bank statement

4 documents that we had, it would have been based on my

5 recollection when I went through each statement and check

6 line by line item, it would have been August of 2025, July

7 of '25.  Somewhere at or around there.

8 Q   Okay, and I think -- and please correct me if I'm

9 wrong, I'm not trying to put words in your mouth.  I think

10 you had testified earlier that you noticed the first

11 disparity between an invoice that had been submitted to the

12 bank and an invoice from a subcontractor when you saw a

13 mechanic's lien filed.

14 A   Yes.

15 Q   When was that?

16 A   September in or around 2024.

17 Q   September of 2024 is when you first noticed a

18 disparity?

19 A   When they filed with the Watertight invoice that was

20 filed in the state -- South Dakota state court did not match

21 the records provided by Jesse Craig to the bank.  That was

22 when it was first discovered.

23 Q   When did you discover a second invoice that you

24 believed had been changed?

25 A   Days thereafter.

Page 147

1 Q   So days thereafter in September of 2024?

2 A   Correct.

3 Q   Okay.  And a third?  I'm not going to keep going.

4 A   Don't worry.

5 Q   Days thereafter.  Specifically, I don't remember or

6 recall the exact contractor that followed Watertight.

7 Q   Okay.  When did you become aware that Ruins had sought

8 bankruptcy protection?

9 A   When it was filed.

10 Q   So on or about January 6, 2025?

11 A   1/6/2025.

12 Q   A little over two months after you made these

13 discoveries, right?  Three months.

14 A   Yes.

15 Q   Okay.  The bank waited until September 26, 2025, so a

16 little more than nine and a half months later to file a

17 motion to convert.  Why?

18 A   As you so eloquently, you know, pointed out earlier, I

19 don't have a law degree, so at under advice of counsel.

20 Q   I don't want to know what your lawyer told you.

21       THE COURT:  Yeah.  Sustained.

22       MR. VERSTANDIG:  Yep.  Not looking for what

23 lawyers told him.

24       THE COURT:  Right.  Got it.

25 BY MR. VERSTANDIG:

Page 148

1 Q   Okay.  But you've known, and the bank's known from

2 January 6, 2025 through September 26, 2025, that at least

3 three invoices have been changed.

4 A   Yes.

5 Q   Okay.  You testified earlier that you did review the

6 draw requests when they came in, albeit you were very clear

7 not that moment, but within a few days, right?

8 A   No, I believe what I had said was I had reviewed the

9 draw request prior to funding.

10 Q   Would it surprise you if some of the invoices attached

11 to draw requests for Ruins clearly indicate work being done

12 on Generations?

13       MS. STANLEY:  Objection.  Counsel's testifying

14 here.

15       THE COURT:  He can ask leading questions on cross.

16 So overruled.  You can answer.

17       THE WITNESS:  Upon my review of the draw requests,

18 when I went back and looked with specificity, I did see one

19 or two that ended up having a Generations on there.

20 Specifically, I believe one was Hebron Brick.

21 BY MR. VERSTANDIG:

22 Q   But you didn't notice that at the time?

23 A   When I first reviewed it, no.  I clearly missed it.

24 Okay.

25       MR. VERSTANDIG:  Sorry.  I don't know if I spoke

Page 149

1 over someone or just my echo got to me.  I'm sorry.  I think

2 it was my echo.

3 BY MR. VERSTANDIG:

4 Q   Okay.  I want to put aside Parkside, Generations,

5 Ruins, the lake house, and anything having to do with Jesse

6 Craig.  In your experience as a banker, how often has your

7 bank, Red River State bank, used a third-party title company

8 to handle draw requests on a loan?

9 A   How often?

10 Q   Yeah.  How many times?

11 A   Probably a third of the time.

12 Q   I'm not trying to be a smart aleck.  I don't know if

13 you mean a third of all loans or a third of something else.

14 I'm guessing you don't do it with like consumer mortgages,

15 but maybe I'm wrong.

16 A   Yes.

17 Q   Okay.  Do you mean on a third of commercial loans?

18 A   Just a third of all construction, like one to four

19 apartments, building, a farmer building a shop.

20 Q   Okay, and based on your experience, I'm not asking you

21 to hypothecate, but your experience as an officer of Red

22 River State Bank, what services do the title companies

23 perform when they handle draw requests on a loan?

24 A   Now, speaking on the assumption of what they would do

25 is they would collect the documents similar to what Jesse

38 (Pages 146 - 149)

Page 150

1 was doing, providing invoices as submitted from the general
2 contractor or architect. And those submitted invoices would
3 be attested to and certified that they are true and correct.
4 And then they would disperse.
5 Q   They would go through the invoices in some detail?
6 A   I specifically have absolutely no idea what the
7 policies and the standard operating procedures, the SOP of a
8 title company would be and what specificity they would
9 review everything.
10 Q   Who pays them when that happens?
11 A   The borrower.
12       MR. VERSTANDIG: Okay. Court's indulgence.
13 BY MR. VERSTANDIG:
14 Q   Mr. Aarestad, you testified earlier today that you had
15 filed a police report. Do you remember that? Take your
16 time.
17 A   Sorry, I was blowing pressure into my ears and I
18 couldn't hear anything.
19 Q   You had testified earlier today that you filed a police
20 report. Do you remember that?
21 A   Yes.
22 Q   And who is the police report against?
23 A   It was a police report notifying missing appliances.
24 Q   Did you suggest to the police department who you
25 believed had taken the appliances?

Page 151

1 A   No. As I reported to the officer on charge or the
2 gentleman that took the police report, I specifically told
3 him that we were in the property. This is what the bank's
4 records state. This does not match my inventory. I don't
5 know where they are. I don't know who, if anybody has
6 taken, who took them, but they are not on site. And I left
7 it vague of that because I did not have any information to
8 specifically make an allegation against somebody. And I
9 wanted the police to be well aware that based on news
10 reports down in Watertown that there was break ins and
11 vandalism, that the bank's records did not match what we had
12 seen on site and our photographic evidence and inventorying
13 of the appliances did not match and that there potentially
14 was theft of the appliances.
15 Q   To the best of your knowledge, has anyone ever been
16 arrested for that?
17 A   Not that I'm aware of. I believe the -- I believe it
18 is based on my recollection, the police department made note
19 of the filing and left the matter at that and gave me a case
20 number in case it ever turned into a potential insurance
21 claim or whatever for the borrower.
22 Q   On the point of insurance claims, you just read earlier
23 that you did make an insurance claim on The Ruins policy,
24 correct?
25 A   Correct.

Page 152

1 Q   Okay, and when was that?
2 A   The insurance claim?
3 Q   Yes.
4 A   It was submitted in September of 2023 at or around the
5 end of third quarter '23, I believe. '24.
6 Q   I believe you also testified earlier that it was then
7 withdrawn. Am I correct about that?
8 A   That it was what?
9 Q   Withdrawn?
10 A   The submitted insurance claim was withdrawn by the
11 insured, correct.
12 Q   How do you know that it was withdrawn by the insured?
13 A   Because we were notified by Liberty Mutual.
14 Q   Liberty Mutual told you that it was withdrawn or told
15 you it was withdrawn by the insured?
16 A   The Liberty Mutual agent that was processing the claim
17 notified us it was withdrawn by the insured and/or the agent
18 at the discretion of the insured. It was either it was --
19 Q   Well, hold on. By the insured or by the agent?
20 A   I believe the agent was the one that actually withdrew
21 it at the direction of the insured. That is what, based on
22 my recollection, what Liberty communicated to us.
23 Q   Okay. How many appliances do you believe are missing?
24 A   Well, based on that one invoice, 36 were delivered and
25 I inventoried 21 and/or less because based on my records and

Page 153

1 recollection, not every unit had that exact number of items
2 within it. For instance, there was less microwaves, there
3 was less window Frigidaire window units. And in my last
4 inspection there was three stacked up in the hallway of The
5 Ruins in the box, dirty, clearly had been used and the
6 serial numbers did not match the boxes in the hallway.
7       MR. VERSTANDIG: Can we go to 141-11, which I'm
8 guessing really means 141, sub 12 or sub 10. I guess it's
9 exhibit. It's Exhibit 11. It's actually described as
10 Exhibit 11. Thank you. And could you scroll down to the
11 second page, please? Sorry. Strike it up.
12 BY MR. VERSTANDIG:
13 Q   Let's start at the first page. Do you recognize this
14 email?
15 A   This specific email? I don't recall. There's been
16 numerous sent back and forth to us, to me and Jesse.
17 Q   Can we agree it appears to be an email exchange between
18 your yourself and Mr. Craig?
19 A   It appears to be an email exchange between myself and
20 Mr. Craig, but I don't know. Did this come from our Bates
21 documents?
22 Q   Mr. Aarestad, I'll represent this is on the exhibit
23 list for today. Without telling me what you did or didn't
24 do with counsel, did you review today's exhibits before the
25 trial?

39 (Pages 150 - 153)

Page 154

1 A   I reviewed our exhibits.  I don't know if I

2 specifically reviewed this email.

3 Q   Okay.  On the second page, does it appear that the

4 black ink is your email and the red ink is Mr. Craig's

5 response to you?

6 A   Without specifically looking for this email in my

7 records, I don't know if that black is my typing or his

8 typing or not.

9       MR. VERSTANDIG:  Fair enough.  Nothing further,

10 Your Honor.

11       THE COURT:  Mr. Feist, do you have any questions?

12       MR. FEIST:  I do not.  Thank you.

13       THE COURT:  Redirect?

14       MS. STANLEY:  Yes, Your Honor.

15       REDIRECT EXAMINATION OF CHARLES AARESTAD

16 BY MS. STANLEY:

17 Q   Mr. Aarestad, there was a lot of questions about the

18 timing of the signing on the construction agreement.  I'm

19 trying to recall the exact name of that document.

20 A   The construction loan agreement.

21 Q   Construction loan agreement.  Thank you.  And it seemed

22 like there was the concern had to do with the emails and

23 from between you and Mr. Craig for the personal financial

24 statements.

25       MS. STANLEY:  Can we go back to Red River 1?

Page 155

1 BY MS. STANLEY:

2 Q   What is the date of Red River 1 with this email?

3 A   It appears to be July 27, 2022.

4 Q   And I believe you indicated there was -- the request

5 for the personal financial statement, was this related to

6 new financing that was being requested by The Ruins?

7 A   Yes.

8       MS. STANLEY:  Can we go look at, please -- I

9 believe it's the amended proof of claim.  Please go to Page

10 10.

11 BY MS. STANLEY:

12 Q   Can you identify what this document is?

13 A   This is the second promissory note to The Ruins.

14 Q   And what is the amount of it?

15 A   $2.75 million.

16 Q   And what is the date of that loan?

17 A   August 1, 2022.

18 Q   So this is three days, four days after that July 27th

19 email; is it not?

20 A   Correct.

21 Q   Did Red River rely on the information in that email in

22 order to make this second loan?

23 A   Yes.

24 Q   Does Red River consistently request updated financial

25 statements throughout the course of a lending relationship?

Page 156

1 A   Yes.

2 Q   Why?

3 A   Because every new loan, every loan advance, any farm

4 advance, is a further extension of credit and any further

5 extension of credit the bank has its right to request to

6 make sure the deteriorating economic condition of the

7 borrower hasn't happened.

8 Q   I believe you were asked the question about did Mr.

9 Craig personally receive any of these funds.  Do you recall

10 that?

11 A   Yeah, I recall that question.

12 Q   Having gone through all of these draw requests --

13       MS. STANLEY:  Or actually, could we just look at -

14 - let's just look at the summary page for 137-A.  Go to Page

15 4 of Exhibit A, which -- oops, slow down.  Go back up one.

16 Yeah, there.  Tiny little bit up so we can see that very

17 last entry.  So this is Page 9 of 137-1.

18 BY MS. STANLEY:

19 Q   Can you tell me what was in the summary exhibit for 8-

20 C?  Or we could look at it if you don't recall.

21 A   It's been a long day.  But based on my recollection, I

22 believe in Draw 8 that was defined as the 8-C was an invoice

23 to D&M Industries.  And based on that recollection

24 specifically of that draw, it was an invoice that had a ship

25 to address and likely a PO that was redacted out to mask the

Page 157

1 intent of the invoice.

2 Q   And would payment by The Ruins of something worth

3 $17,910 that was going for Mr. Craig's lake home, could that

4 be interpreted as being to Mr. Craig directly?

5 A   Yeah, that --

6       MR. VERSTANDIG:  Objection to interpreting

7 (indiscernible) --

8 BY MS. STANLEY:

9 Q   Is that your understanding, that it would benefit Mr.

10 Craig directly?

11       THE COURT:  That was sustained.  Okay.  It's a new

12 question with no objection.

13       MR. VERSTANDIG:  My mic was cold too.  I'm sorry

14 about that.

15       THE COURT:  Pardon me?

16       MR. VERSTANDIG:  My mic was cold.

17       THE COURT:  Okay.

18       MR. VERSTANDIG:  Sorry.

19       THE COURT:  No, no problem.  Ms. Stanley, why

20 don't you just ask a new question, start all over.  Then

21 we'll have a clear path to the answer.

22       MS. STANLEY:  Sure.

23 BY MS. STANLEY:

24 Q   This in Exhibit 8-C, the D&M Industries original, the

25 invoice for $17,910.93 for the Craig lake home.  Would

40 (Pages 154 - 157)

Page 158

1  payment by The Ruins of this invoice intended for the Craig
2  lake home benefit Mr. Craig directly?
3  A   It is my understanding, based on -- it is based on my
4  understanding of Jesse Robert Craig's sophisticated business
5  structure of his multiple entities, including the one that
6  held this Craig lake home, as in quotations by Craig
7  Holdings LLC, whom he is a single member of that LLC, a
8  payment from a third party corporate entity for $17,910.93
9  for the direct benefit of an insider entity and/or a closely
10 held entity would be a breach of the corporate veil.
11 Q   But my question --
12      MR. VERSTANDIG:  Objection as to the legal
13 conclusion.
14      THE COURT:  Sustained.
15 BY MS. STANLEY:
16 Q   But did it benefit Mr. Craig directly to have The Ruins
17 pay for this invoice?
18 A   It would have based on that poorly worded response
19 prior, it would have benefited him because him being the
20 singer member LLC, a member of that LLC having a third-party
21 entity pay something on behalf of that would benefit him due
22 to that ownership structure.
23      MS. STANLEY:  Okay.  Let's go to -- scroll down to
24 Page 7 of the summary.  Yes.
25 BY MS. STANLEY:

Page 159

1  Q   This is the summary page 10-D, Hebron Brick.  Do you
2  recall anything about the original draw request invoice
3  versus the one that was obtained directly from Hebron Brick
4  that we're looking at here in 10-D?
5  A   Based on my recollection of the of the draw request
6  invoices, the one that was provided from Hebron Brick in
7  Draw 10 had no it had no customer purchase order PO
8  identified.  It was white and blank and redacted versus the
9  one that we received from Hebron Brick's subpoena clearly
10 had a lake home in the customer PO.
11 Q   And would this payment by a Ruins disbursement benefit
12 Mr. Craig and/or his closely held entities for the
13 personally?
14 A   Yes.
15 Q   And what was the amount of that Hebron Brook invoice?
16 A   $39,197.08.
17 Q   Let's just do a couple more.  Let's do another page.
18 11-C.  This is another D&M Industries one.  What do you
19 recall about the draw request invoice versus the original
20 that came directly from -- invoice that came directly from
21 D&M Industries?
22 A   My recollection of Draw 11 had D&M Industries with a
23 ship to notifier, number notifier but no discerning address
24 or name thereafter.  It just had the ship to number and then
25 the one from the D&M Industries subpoena we received or from

Page 160

1  Discovery had Craig lake home, I believe Pelican Rapids,
2  Minnesota listed clearly in the ship to line.
3  Q   And what was the amount of that one?
4  A   $17,155.84.
5  Q   And would payment by Ruins disbursements for the
6  benefit of Craig properties and/or Mr. Craig for his lake
7  home personally benefit Mr. Craig?
8  A   A disbursement from The Ruins the for the benefit of
9  the Craig Lake home held by Craig Holdings LLC would benefit
10 him being the sole member.  Yes.
11 Q   And one more page.  Let's look at 11-D.  This is
12 another D&M Industries one.  What do you recall about the
13 draw request invoice versus the original that came from
14 directly from D&M?
15 A   My recollection on Draw 11 in review of the D&M invoice
16 242252 was similar to the prior one just discussed where it
17 just had that ship to number notifier and nothing else next
18 to it versus the one received from D&M's subpoena or
19 discovery request had Craig lake home and I believe Pelican
20 Rapids address next to that ship two number identifier.
21 Q   And again finally, would that payment by The Ruins
22 disbursement for bills owed on the Craig lake home benefit
23 Mr. Craig and/or his closely held entity.
24 A   A payment for what that Invoice was for $48,026.70 if
25 paid by The Ruins, paid by The Ruins to the benefit of that

Page 161

1  invoice for a third-party property, the Craig lake home
2  would benefit Jesse Craig as he was the sole member of Craig
3  Holdings LLC.
4  Q   One more quick topic.  There was a lot of discussion
5  about using a title company and should the title company do
6  a better job basically on doing draw requests.
7      MS. STANLEY:  Can we please go to -- well, let's -
8  - we're in there already.  Let's look at -- scroll down to
9  Exhibit 1-A.  And next page please.
10 BY MS. STANLEY:
11 Q   Okay.  So Invoice 001, Draw 1, that was a WDC draw
12 request, correct?  That was one that was paid for by the
13 WDC?
14 A   It is my understanding that Draw Request 1 was provided
15 to the WDC for funding on.
16 Q   And what amounts on this Draw Request Number 1 are to
17 be paid to Clausen, Clausen Construction.
18 A   Clausen had several line items in here.  Clausen demo
19 for $258,200, a grading for $264,600.  And then I think
20 there was a third one, a foundation removal for $193,400 in
21 here.
22      MS. STANLEY:  Okay, and if we go to the next page,
23 which at the top -- if you go back up.  Oh, it does have the
24 -- it came back.  Perfect.
25 BY MS. STANLEY:

41 (Pages 158 - 161)

Page 162

1  Q   Okay. Was this the invoice provided to the bank in
2  Draw Request Number 1?
3  A   Can you scroll down to the bottom of this page please?
4  Yes, it was.
5  Q   And what did it -- what does it say on this Page 6 as
6  you know, like the purpose?
7      MS. STANLEY: Oh, go, sorry, go back down. Right
8  there on the left corner of Page 6 of 290.
9      THE WITNESS: Right where her mouse cursor is?
10     MS. STANLEY: Yep.
11     THE WITNESS: On Page 6 of 290 of document defined
12 in front of me of 102, it says Palace Apartments, demo
13 excavation, and grading.
14 BY MS. STANLEY:
15 Q   And what do you understand is the Palace Apartments
16 reference?
17 A   The Palace Apartments was the building that stood at
18 315 Kemp prior to The Ruins being erected.
19 Q   And so it was demoed and then excavated, graded?
20 A   Clearly that's what this invoice portrays.
21 Q   Okay, and what is the amount, the total due on the
22 invoice that was provided to the bank in Draw Number 1?
23 A   Based on this document in front of me that was provided
24 and Draw Number 1 to the bank's records for what was
25 requested to WDC that they funded upon was $716,200.

Page 163

1      MS. STANLEY: Okay, and if you can go back up to
2  the prior page. Oh, back down. Sorry, I'm a very bad
3  driver.
4  BY MS. STANLEY:
5  Q   What is the please pay box in the middle there? The
6  dark green ones say.
7  A   $156,964.87.
8  Q   Okay, if you go back up to the invoice 001 and grab
9  your calculator if you would, what do the three Clausen
10 entry or line items add up to? We've got $258,200 plus
11 $264,600 plus $193,400.
12 A   $716,200.
13 Q   Okay.
14 A   I might have fat fingered that. But I think that's --
15 Q   $716, 200. And then let's go back down to next page,
16 Page 6 of 290. Does that correspond to that?
17 A   Yeah, there was tie out.
18     MS. STANLEY: Okay. Let's go to the next page.
19 Please go down. If you scroll back up to the top so you can
20 see that this comes from Docket 89.
21 BY MS. STANLEY:
22 Q   Is this a document that was obtained through the
23 subpoena to Clausen Construction?
24 A   Can you scroll to the bottom of the document? Yep. It
25 was provided from Clausen's subpoena.

Page 164

1  Q   Okay, and what is the --
2      MS. STANLEY: If you go back down to the Page 7 of
3  290.
4  BY MS. STANLEY:
5  Q   What does it say on the left there.
6  A   In the description field or where it just says Palace
7  Apartments demo.
8  Q   Yeah. So that was a little different than the one that
9  we looked at that was in the draw request, correct?
10 A   Yeah, it's missing excavation and grading, I think.
11 Q   Okay, and what is the amount? The total that was on
12 the invoice provided by Clausen directly?
13 A   $156,964.87.
14 Q   Okay. So if this one was paid for in Draw Request
15 Number 1 by WDC, does it appear as if the title company that
16 did the closing on this one missed it?
17 A   It would appear so.
18     MS. STANLEY: Anything else? No further
19 questions.
20     THE COURT: Recross?
21     MR. VERSTANDIG: Your Honor, I don't want to be
22 overly lax with the breaks. But I need to have a discussion
23 with my client before I assess whether or not to recross.
24     THE COURT: Sure.
25     MR. VERSTANDIG: Could I borrow --

Page 165

1      THE COURT: Yeah.
2      MR. VERSTANDIG: -- just a few moments?
3      THE COURT: Sure.
4      MR. VERSTANDIG: Thank you.
5      THE COURT: I can just stay here and you can come
6  back by 4 o'clock or we can take a longer break. What's
7  your request?
8      MR. VERSTANDIG: Your Honor, 4 o'clock should be
9  more than generous.
10     THE COURT: Okay.
11     MR. VERSTANDIG: Thank you.
12     THE COURT: All right.
13     (Recess)
14     THE COURT: All right. We're back on the record
15 with Bankruptcy Case Number 25-3002, 3 and 4. And you may
16 proceed with your recross.
17     MR. VERSTANDIG: You Honor, we have nothing
18 further for this witness.
19     THE COURT: Terrific. Okay.
20     MS. STANLEY: You promised me it would be less
21 than a second.
22     THE COURT: That's remarkable. And Mr. Feist, I
23 assume you have no questions since you didn't cross-examine
24 before?
25     MS. FEIST: Correct. Thank you.

42 (Pages 162 - 165)

Page 166

1    THE COURT: Okay. All right. So you may be
2 excused.
3    All right. Does Red River Bank have any other
4 evidence that you would like to present to today?
5    MR. HUSHKA: Your Honor, we would call Jesse Craig
6 and just procedurally, I think it may make sense, my direct
7 is going to be relatively brief. I think it may make sense
8 to do direct today and then defer either cross or if Mr.
9 VerStandig would want to call Mr. Craig in their case-in-
10 chief as well. I think that might make a decent break
11 point.
12    THE COURT: So I guess the question is, shall we
13 go for the next 25 minutes or -- because I understand timing
14 should be wrapped up by 4:30.
15    MR. VERSTANDIG: Your Honor, thinking loud and
16 quite candidly, if the thought is that his direct is 25 to
17 30 minutes, understanding my cross will probably get wrapped
18 into what would have been my direct will exceed scope once
19 more.
20    THE COURT: Yeah.
21    MR. VERSTANDIG: I don't think I have more than an
22 hour or two. Without being too strategic, if the bank could
23 indicate if it has any other witnesses, I just want to make
24 sure that if we defer, we're not running out of time
25 tomorrow.

Page 167

1    THE COURT: Do you have other witnesses?
2    MR. HUSHKA: No, Your Honor.
3    MR. VERSTANDIG: Your Honor, in that case, and
4 rarely do I say this, my druthers would be to not have my
5 client on the stand overnight. I'd like to be able to chat
6 with him this evening.
7    THE COURT: Any reason we can't just break right
8 now given the fact that we have all day tomorrow?
9    MR. HUSHKA: That would be acceptable, Your Honor.
10    THE COURT: Okay. All right. Well, then we will
11 take an early recess and you will have the evening to
12 prepare for the next witness.
13    MR. VERSTANDIG: Thank you, Your Honor.
14    THE COURT: Okay. It's going to stand in recess
15 in a moment, as long as there isn't any other logistical
16 things we should visit about like motions and the like.
17    MS. TANABE: You had asked us to look at a draft
18 motion and a draft order and --
19    THE COURT: Stipulation, yes.
20    MS. TANABE: It's probably a good time for recess.
21 I'm conflating all sorts of things.
22    THE COURT: It's at the end of my day too.
23    MS. TANABE: Do you want to talk for a few minutes
24 and get that done today or should we resolve it overnight
25 and bring it back in the morning?

Page 168

1    MR. VERSTANDIG: I'm happy to hear any comments
2 Ms. Tanabe has. We have no comments other than one thing I
3 should clarify on the record from the stipulation, which is
4 myself and not my clients, given that I'm here, and given
5 that I'm going to be here again at 9 a.m. tomorrow, I think
6 I would want 48 hours to wire the money since it's coming
7 out of my trust account. I just don't want there to be an
8 expectation that the money's going to move while I'm still
9 in this courtroom.
10    MS. TANABE: And you probably haven't had a chance
11 to look at -- I drafted the two business days request in
12 too.
13    MR. VERSTANDIG: Oh.
14    MS. TANABE: So could we submit just one extra
15 paragraph to be added?
16    THE COURT: Yeah. Yeah, that's great.
17    MS. TANABE: Yeah? Okay.
18    THE COURT: Take your time. I was just trying to
19 help clean things up. So it's just efficient.
20    MS. TANABE: Yeah.
21    THE COURT: Do your thing. Works for me. We'll
22 take up any other procedural issues first thing tomorrow
23 morning, too, if you want to.
24    MR. VERSTANDIG: And for clarity, it is 9 a.m.
25 tomorrow?

Page 169

1    THE COURT: 9 a.m. tomorrow.
2    MR. VERSTANDIG: Thank you, Your Honor.
3    THE COURT: Okay.
4    MS. TANABE: Thank you.
5    THE COURT: All right. This matter stands in
6 recess. You can go ahead and sit. I'm going to clean out
7 myself, so you can.
8    (Whereupon these proceedings were concluded)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

43 (Pages 166 - 169)

Page 170

1          C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   *Sonya V. Ledanski Hyde*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  November 21, 2025

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

| & | | | |
|---|---|---|---|

**&**   4:20 5:9 6:2
6:3

**0**

**0**   58:15,15
**001**   81:5 87:14
87:23 161:11
163:8
**004**   102:20
**009**   102:24
**09/26/2025**   3:2

**1**

**1**   39:17 44:20
52:2,3,4,5,16
52:17,18,18
53:18 57:6,15
57:16 58:7,23
64:11 70:4
77:16,18,21,22
77:22 78:1,16
78:20,24 80:12
100:12 104:22
123:3 154:25
155:2,17 161:9
161:11,14,16
162:2,22,24
164:15
**1,253,972.84**
94:21
**1.4**   17:22
**1/26/2021**
116:21
**1/6/2025**
127:24 147:11
**10**   24:23 39:17
69:22 119:9,10

136:7,9,14,18
142:16 153:8
155:10 159:1,4
159:7
**10,000**   10:22
**10,691,893.35.**
72:21
**10/10/2025**   3:6
**10/17/2025**
3:10
**100**   5:19 27:11
43:9 97:17
118:2
**101**   39:14
**102**   39:14
80:11 93:14
95:18 102:3
110:16 162:12
**106.38.**   46:9
**109**   3:2
**10:00**   2:10
**11**   3:2,5,9
14:25 17:9
23:14 39:17
44:19 69:20
103:17,17,21
104:3 106:2,14
136:4 153:9,10
159:18,22
160:11,15
**11,658,331.25.**
46:12
**1112**   17:2
23:18,22 25:19
**112**   7:7
**114**   107:7

**115**   95:19
**11501**   170:23
**116**   96:6
**119,965.86.**
97:13
**11th**   133:22
**12**   52:18,18
62:6 76:3,17
85:15 87:7,16
87:16,23,23
88:9 93:8,10
153:8
**12/16/21**   99:18
**12151**   170:6
**125**   63:16
**12:22**   90:12
**12th**   44:9
**13**   63:24 81:19
**131**   3:6
**132**   39:14
**133**   39:14
**134**   39:14
**135**   39:14
**136**   39:14
**137**   39:15 76:5
76:14 86:4,6
87:13,23,24
88:8,10,24
89:3 92:24
93:2 94:5
156:14
**137-1**   76:1,18
93:10,14
156:17
**14**   13:1 77:13
77:14,16 80:12
81:10,11,13,20

**94:4,5 111:24**
**141**   39:17
153:8
**141-11**   39:18
153:7
**141-12**   39:18
**141-13**   39:18
**141-14**   39:19
111:17,22
**141-15**   39:19
**143**   3:10
**144**   39:17
**14th**   4:22
**15**   61:23 64:4
76:20 97:2
104:6 111:22
111:23
**1500**   5:19
**154**   7:6 37:17
37:20
**156,964.87.**
163:7 164:13
**15th**   11:8 91:4
106:19
**16**   101:15
**1630**   4:5
**16th**   52:24
**17,155.84.**
160:4
**17,910**   157:3
**17,910.93**
157:25 158:8
**1711**   54:17
**17th**   133:23
**187**   102:22
103:1

**19**  99:7 100:22
**193,400**  161:20
  163:11
**1:30**  90:12
**1st**  1:7 2:6 8:4
  69:10 83:5

**2**

**2**  39:17 60:25
  61:2 62:7
  63:24 77:22
  78:24 123:3
**2,169,472.51.**
  94:15
**2,911,499.84**
  46:6
**2.7**  60:15
**2.75**  141:21
  155:15
**20**  97:19
  108:25 119:14
**20/20**  108:15
**200**  97:17
  163:15
**200,000**  60:3
**2004**  25:10
  143:21 144:8
  144:12 145:5
  146:3
**2011**  41:23
  42:12
**2013**  41:25
**2015**  41:25
**2020**  126:5
**2021**  43:2
  101:15 116:17
  116:25 117:16
  117:25 118:6

133:23
**2022**  53:23
  55:14,25 59:20
  99:17 100:12
  104:6 135:7
  155:3,17
**2023**  51:16
  61:23 65:18
  134:10 152:4
**2024**  49:17
  50:18 66:11,15
  67:4,20 126:5
  146:16,17
  147:1
**2025**  2:9 45:18
  46:25 51:16
  125:16,20
  126:9,10 127:6
  128:1 146:6
  147:10,15
  148:2,2 170:25
**2026**  26:2 28:4
**206**  4:22
**207**  97:16
**208**  97:15
**209**  94:5
**21**  97:1,1 135:8
  152:25 170:25
**21,550**  99:16
  100:14
**218**  4:13
**22**  56:14 58:9
  60:7,12 99:16
  100:24 103:8
  119:3,5
**22,900,000**
  118:20

**22nd**  44:14
**23**  47:5 62:18
  63:9 64:4,11
  64:11 65:11
  125:4 152:5
**230**  103:18
**233,000**  55:17
**233,456.78.**
  55:17
**24**  48:23 50:23
  68:13,21 70:4
  97:18 125:1,5
  126:13,15
  127:2 152:5
**242252**  160:16
**25**  47:15 67:20
  97:19,24 98:2
  107:7,17 126:6
  126:15 127:3,4
  127:10,11,13
  146:7 166:13
  166:16
**25-30002**  1:3
**25-30003**  1:11
**25-30004**  1:19
**25-3002**  8:3
  77:4 90:22
  165:15
**25-3003**  8:4
**25-3004**  8:4
  37:19
**250,000**  31:23
**258,200**  161:19
  163:10
**26**  116:17
  147:15 148:2

**260,106.94.**
  56:3
**264,600**  161:19
  163:11
**27**  53:23 56:14
  60:6 67:4
  155:3
**27th**  155:18
**282**  95:19
**28th**  11:6
**290**  102:3
  110:16 162:8
  162:11 163:16
  164:3

**3**

**3**  2:9 39:17
  44:20 72:10
  77:4,18,21,22
  77:24 78:1,16
  78:20,24 90:22
  142:22 165:15
**3,423,445.35**
  94:25 95:12
**30**  55:25 59:20
  62:18 63:9
  166:17
**30,000**  10:23
**300**  5:11,11
  170:22
**3002**  142:22
**303**  64:7,19
**30th**  64:11
**31**  110:16
**315**  122:7
  162:18
**32**  39:16 102:3

| | | | |
|---|---|---|---|
| **330**  170:21 | **48**  168:6 | 54:12 55:6 | 66:17,22 95:21 |
| **3429**  5:3 | **48,026.70** | 68:21 99:16 | 96:7 99:17 |
| **346.47.**  46:6 | 160:24 | 100:22 125:16 | 119:8 158:24 |
| **350,000**  35:24 | **4:30**  166:14 | 125:20 126:8 | 164:2 |
| **36**  96:16,16,17 | **5** | 132:21 133:16 | **7,333,000** |
| 97:10 152:24 | | 133:18,21 | 119:4 |
| **39**  7:11 | **5**  15:5 27:14,17 | 134:3,7 135:22 | **7.74**  136:17 |
| **39,197.08.** | 29:18 31:1 | 147:10 148:2 | 139:19 141:19 |
| 159:16 | 39:17 58:18 | 162:5,8,11 | **7124**  62:16 |
| **3:10**  142:18 | 100:24 103:8 | 163:16 | 63:7 |
| **4** | 132:21 133:18 | **6/1/23**  64:21 | **716**  163:15 |
| | 133:21 134:3,7 | **6/30/22**  59:8 | **716,200**  162:25 |
| **4**  39:17 55:14 | 135:15,19,22 | **6/30/23**  64:21 | 163:12 |
| 64:13 71:23 | **5,325**  99:17,23 | **60,106.94.** | **742,000**  63:21 |
| 77:4 81:9,11 | 101:1 103:10 | 59:24 | **742,092.57.** |
| 90:22 99:6 | **5/31/22**  55:14 | **600,000**  65:2,3 | 62:23 |
| 102:5,7,10,13 | **509,775**  99:2 | 65:11 66:1,6 | **75,000**  14:22 |
| 114:15 132:21 | 107:12 | **603,222.88** | 33:10 35:25 |
| 133:15,18,21 | **5105**  99:18 | 65:15 | **775**  100:2 |
| 134:2,6 135:1 | **511,000**  104:13 | **603,222.88.** | **78**  39:16 |
| 135:15,19,22 | **5172**  99:17 | 65:1 | **79**  39:16 |
| 156:15 165:6,8 | **5254**  99:16 | **622,148.27.** | **8** |
| 165:15 | **54**  72:10 | 62:21 | |
| **409,450**  99:18 | **55402**  5:20 | **623**  62:25 | **8**  39:17 44:15 |
| 99:23 101:20 | **56**  72:11 | **641**  55:13 58:2 | 45:13,13 60:17 |
| 102:9,19 | **57101-1030** | **655**  2:6 | 67:10 156:19 |
| **41**  7:6 | 4:23 | **6th**  44:24 | 156:22,22 |
| **414,775**  100:2 | **57104**  5:12 | 45:22 46:5 | 157:24 |
| 100:5 106:23 | **577,183.49** | 126:19 127:4 | **8,169,647.92** |
| 107:4 | 46:9 | 127:21 | 45:19 |
| **43,500**  10:20 | **58102**  2:7 4:14 | **7** | **8,169,647.92** |
| **431**  100:16 | **58102-4246**  4:6 | | 45:24 |
| 101:6,17,22 | **58106-9231**  5:5 | **7**  3:2,6,9 12:21 | **80**  39:16 |
| **431,000**  100:16 | **5th**  5:19 | 13:2 15:9,17 | **80,000**  108:24 |
| 101:6,17,24 | **6** | 19:1 30:25 | 121:14 143:20 |
| **433**  59:16 | | 32:7,9,18 | **80,592.04** |
| **4695**  55:23 | **6**  32:18 39:17 | 39:17 55:18 | 10:18 |
| 59:6,17 | 45:18 46:25 | 57:3,24 58:20 | |

| | | | |
|---|---|---|---|
| **804** 104:21,22 | **a** | **accepted** 43:24 | **acronyms** |
| **81** 39:16 | | 93:10 115:10 | 61:12 |
| **82** 39:16 | **a.m.** 168:5,24 | **accepting** | **act** 18:24 |
| **83** 39:16 | 169:1 | 88:21 93:9 | **acting** 121:4 |
| **84** 39:12,13,16 | **aarestad** 7:5 | **access** 109:1 | **action** 18:21 |
| 44:3 | 8:19 39:10 | **accolades** | 19:2 33:22 |
| **85** 39:13 44:3 | 40:6,7,12,12 | 116:5 | 34:10 66:5 |
| 67:2 | 40:16,21 41:1 | **accommodate** | 68:11,17 69:4 |
| **86** 39:13 44:3 | 41:1,4,6,19 | 75:14 | **actively** 128:7 |
| **87** 39:13 | 53:17 77:5 | **account** 10:16 | **activity** 21:1,2 |
| **88** 39:13 | 86:7 93:16,17 | 10:23 21:24,25 | **actual** 70:5 |
| **89** 39:13 | 98:1 112:6,8 | 22:1 54:14,19 | 73:3,9 82:5 |
| 163:20 | 115:16 121:12 | 55:11,22 59:5 | **actually** 11:5 |
| | 122:12 137:3 | 59:17 62:15 | 44:13,18 56:22 |
| **9** | 138:13 139:23 | 63:6,7,10,11 | 60:1 69:3 71:2 |
| | 142:23 143:2 | 63:14,21 64:8 | 80:8 82:11 |
| **9** 39:17 52:16 | 150:14 153:22 | 65:12 139:7 | 91:5 93:6 |
| 52:17 68:14 | 154:15,17 | 144:10,11 | 107:4 111:2,21 |
| 94:4 103:5,14 | **aarestad's** | 168:7 | 112:19 126:21 |
| 135:7 156:17 | 38:23 | **accountants** | 136:9 137:12 |
| 168:5,24 169:1 | **ability** 26:19 | 20:15 | 138:24 152:20 |
| **90** 39:14 | 29:5 39:6 | **accounting** | 153:9 156:13 |
| 142:13 | 127:1 | 23:19 | **add** 91:12 |
| **91** 39:14 99:4,7 | **able** 35:21 | **accounts** 10:25 | 163:10 |
| 100:22 | 51:11 91:19 | 18:13 27:1 | **added** 168:15 |
| **91,139.45** | 92:23 120:12 | 65:7 | **addition** 41:9 |
| 59:24 | 128:2 167:5 | **accrual** 20:9 | **additional** |
| **9231** 5:4 | **above** 109:23 | 45:24 46:6,9 | 35:16 38:9 |
| **95,000** 103:24 | 110:1 141:14 | **accurate** 73:5 | 60:13 |
| 104:11 105:25 | 141:21 | 89:6,9,20 | **address** 16:4 |
| 106:13 | **absence** 27:23 | 170:4 | 55:12 156:25 |
| **96** 39:14 | 104:24 | **acknowledge...** | 159:23 160:20 |
| **966** 45:24 | **absolutely** 21:9 | 23:15 | **addressing** |
| **97** 39:14 56:21 | 24:24 52:12 | **acknowledgi...** | 20:1 26:17 |
| 56:22 57:17,24 | 150:6 | 121:3 | 30:11,19 |
| 59:10 64:12,15 | **accept** 141:2 | **acquainted** | **adequate** 90:9 |
| **98** 39:14 59:10 | **acceptable** | 17:16 | |
| 59:12 62:25,25 | 167:9 | | |
| 63:2 | | | |

| | | | |
|---|---|---|---|
| **adjust**  40:24 | **agree**  29:18 | **alleged**  11:8 | 101:5,18,19,21 |
| **adjuster**  50:10 | 32:7 76:18 | 20:25 27:13 | 102:8 104:10 |
| **admin**  20:16 | 91:11 92:12 | 36:2 50:5 | 104:14 108:11 |
| **administered** | 115:14,16 | **allegedly**  21:5 | 135:11 155:14 |
| 1:3,11 | 118:24 119:3 | 21:20 | 159:15 160:3 |
| **administration** | 120:16 134:2 | **allow**  27:4 | 162:21 164:11 |
| 18:16 | 139:20 140:1 | 36:16 109:13 | **amounts**  68:2 |
| **administrative** | 153:17 | 124:14 141:6 | 88:3 94:11 |
| 20:9 | **agreement** | 145:22 | 95:22 99:15 |
| **admitted**  7:11 | 11:9,21 12:1 | **allowance** | 102:5 103:21 |
| 39:20 | 26:25 27:5 | 23:24 | 106:16 107:3 |
| **advance**  73:13 | 37:11 46:19,20 | **allowed**  17:20 | 132:14 161:16 |
| 81:14 156:3,4 | 71:20 72:1,15 | **allowing**  138:6 | **analysis**  79:20 |
| **advanced** | 89:2,7 110:21 | **alluded**  35:9 | 129:16 143:3 |
| 15:14,23 | 115:12 135:2 | **alongside** | **announce**  10:6 |
| **adversary** | 135:11,14,18 | 23:14 | **answer**  27:14 |
| 27:19 33:22 | 135:24 136:4,7 | **alteration**  21:6 | 124:12 133:24 |
| 34:9 35:14,15 | 136:14,16 | 23:20 | 145:24 148:16 |
| **advice**  33:25 | 139:16,21 | **alterations** | 157:21 |
| 147:19 | 140:2,4,8,14 | 21:10 88:18 | **answered** |
| **affidavit**  12:4 | 154:18,20,21 | 108:24 | 126:20,21 |
| 39:10 91:15 | **agreement's** | **altered**  21:20 | **anthony**  4:25 |
| **affidavits** | 135:6 | 106:1,3,8,14 | 9:18 |
| 43:20 44:4 | **agreements** | 108:13 | **anticipate** |
| 118:18 137:24 | 28:22 140:15 | **altogether** | 37:23 75:25,25 |
| **afford**  38:13 | 140:16 | 134:22 | **anticipated** |
| **afterward** | **agrees**  89:6 | **altruism**  15:19 | 22:21 |
| 54:24 | **agricultural** | **amended**  39:12 | **anybody**  26:7 |
| **agent**  121:4 | 41:22 | 44:8,12,24 | 108:15 151:5 |
| 152:16,17,19 | **ahead**  77:8 | 45:12 155:9 | **anymore**  124:9 |
| 152:20 | 169:6 | **amount**  10:15 | **anyway**  120:11 |
| **agnostic**  85:18 | **ahlgren**  24:15 | 14:17 32:22 | **apart**  48:15 |
| 85:19 | **albeit**  24:13 | 45:19 46:10 | **apartment** |
| **ago**  26:24 | 148:6 | 55:15 56:1 | 49:6 |
| 100:19 116:13 | **aleck**  149:12 | 94:16,20 95:10 | **apartments** |
| 121:18,21 | **allegation**  21:2 | 97:10,11 98:24 | 96:13,17 |
| 133:11,18 | 23:7,9 151:8 | 100:13,14 | 149:19 162:12 |

162:15,17
164:7
**apologize**
92:13 129:23
**app** 109:6
**apparently**
79:3
**appeal** 54:25
**appear** 58:1
59:16,19 63:10
69:21,24 71:25
81:1 88:1
96:16 101:25
154:3 164:15
164:17
**appearance**
8:6 9:6,17
**appeared**
71:10 138:15
139:8
**appearing** 9:11
**appears** 37:3
47:21 53:19
60:3 61:3 62:1
62:12 63:11
68:18 70:2
72:3 81:3
99:14 153:17
153:19 155:3
**appliance** 96:2
96:16
**appliances**
48:24,25 49:4
49:8,12 96:4
96:12,14,19
97:10,11
150:23,25

151:13,14
152:23
**applications**
83:15
**apply** 74:16,21
75:2
**appoint** 12:21
**appointed**
69:15
**appointing**
69:24
**appointment**
15:17 68:9,16
**appraisal** 80:9
98:9 108:2,5
**appraisals**
80:4
**appraiser**
79:17,21,24
**appreciate**
28:16 44:1
61:11 140:21
**approach**
108:3
**appropriately**
28:2
**approved**
11:22
**approximately**
145:8
**april** 50:18
99:17 100:24
103:8 127:13
**architect** 98:12
98:14,16,18,25
107:11 150:2

**architects**
84:18 100:4
**architectural**
83:18
**argument** 20:5
28:25 89:15
**argument's**
16:8
**arithmetic**
41:16
**arrears** 125:2
**arrested**
151:16
**arrive** 95:11
**arrived** 72:23
**arrow** 97:20
**arts** 108:24
**aside** 11:1
149:4
**asked** 25:12
65:23 83:16
116:2 126:20
136:23 137:7
140:6,9,22
156:8 167:17
**asking** 31:12
54:1,6 84:4
118:14 134:1
143:10,13,14
149:20
**asks** 17:25
**assess** 164:23
**assessment**
129:14
**assessor** 125:8
**assets** 24:12
35:20

**assignment**
46:18
**assisted** 85:23
**associated**
23:17
**assuage** 27:13
**assume** 38:3
114:15 165:23
**assumes** 95:2
109:9
**assuming** 13:8
**assumption**
149:24
**assurance** 66:5
**assuring** 91:22
**astray** 10:13
**attached** 17:18
44:16 45:8
54:11 61:24
62:2 80:18
148:10
**attaching**
89:12
**attachment**
53:23 58:25
**attack** 53:7
**attacks** 27:13
**attend** 36:7
**attended**
115:25
**attending** 9:8
38:15,17
**attenuated**
17:24
**attested** 108:5
115:14 150:3

**attorney**  4:4,21
  5:2,10,17
  75:13 115:19
**attorneys**  4:12
**august**  43:2
  61:23 64:4
  65:11,18 146:6
  155:17
**authorization**
  74:19
**authorize**
  74:16,21 75:1
**authorized**
  73:24
**available**  39:11
  65:24 66:9
  105:16
**ave**  2:6
**avenue**  4:5,13
  5:11
**avoid**  91:5
**aware**  10:14
  17:17 48:18
  75:4 81:22
  83:13 123:24
  147:7 151:9,17
**awesome**  57:20
**awkwardness**
  22:17
**axiomatic**
  14:11

**b**

**b**  2:21 4:5 7:9
  70:11 104:21
  104:22
**back**  15:23
  16:1,19 17:2

23:1 26:13
31:2 39:1
45:12,15 50:4
50:23 52:19,21
54:3 55:7
57:24 65:18
67:9 68:3 72:9
76:21 77:3
86:19 87:15
90:21 97:8
98:21,24 103:1
107:6 108:6,12
110:15 112:3
124:3 129:24
131:6,23 133:1
134:18 142:22
148:18 153:16
154:25 156:15
161:23,24
162:7 163:1,2
163:8,15,19
164:2 165:6,14
167:25
**background**
  32:6 41:20
  138:7
**backside**  108:4
**backward**
  22:10 39:15
**bad**  14:10
  23:17,17,21,23
  24:1,1 163:2
**baete**  84:24
**bag**  35:7
**balance**  45:20
  46:8 54:5 56:3
  56:20 59:23

61:10 62:20,22
64:23 108:9,10
108:10
**ball**  15:7
**ballpark**  47:2
**balls**  22:22
**bank**  3:1 4:12
  4:21 6:2,3,4
  8:15,19,22
  9:19 10:19,21
  11:8,11 12:20
  13:6,15 15:14
  17:24 21:7,25
  22:1,6,15 24:3
  24:9,10,18,25
  25:8 26:23
  27:1,5,19,20
  27:22 32:19
  33:22 34:5,24
  35:21 36:4,18
  36:24 37:7
  39:16 42:8,10
  43:14 54:2,6
  55:7,19 56:5,9
  56:13 61:25
  62:3,9 63:13
  63:20 65:10,14
  65:17 66:4,23
  70:25 72:25
  74:1,1,6 77:12
  79:16 106:1,17
  106:20 107:24
  108:2,15 109:6
  112:17 113:8
  113:16,19,24
  114:1,3,8,11
  114:16 115:1

115:10 116:9
116:23 117:3
117:15,25
118:4,10,11,15
118:22 119:9
119:13 120:22
120:25 121:1,2
122:16,18
123:6,9 130:7
131:9,19 132:1
132:5,14
133:10 134:14
134:23 135:1
138:14,20,21
138:22 139:18
141:4,10,14
143:5,21,22,24
144:7,8,10
146:3,12,21
147:15 149:7,7
149:22 156:5
162:1,22 166:3
166:22
**bank's**  3:5,8
  13:18 24:25
  112:14 117:20
  148:1 151:3,11
  162:24
**banker**  149:6
**bankers**  20:15
**banking**  14:8
  41:24 42:1,3
**bankruptcy**
  1:1 2:4,23 4:3
  8:3 14:8,12
  16:15 20:22
  23:5,13 25:15

| | | | |
|---|---|---|---|
| 26:23 27:18 | 159:5 162:23 | **believe**  11:25 | 136:17 143:8 |
| 31:8 43:20 | **basic**  14:11 | 20:7,11 21:14 | 143:13,16,17 |
| 44:9 68:5,7,25 | 41:11 | 27:25 37:10 | 144:9 148:8,20 |
| 77:4 84:3 | **basically**  31:24 | 43:2,15,18 | 151:17,17 |
| 90:21 125:17 | 50:13 83:20 | 44:11 45:11 | 152:5,6,20,23 |
| 125:20 127:24 | 91:7 161:6 | 46:19 47:5,15 | 155:4,9 156:8 |
| 128:4,16,17,20 | **basing**  126:2,4 | 47:23 48:22 | 156:22 160:1 |
| 142:22 147:8 | **basis**  20:16 | 49:9 50:1 51:9 | 160:19 |
| 165:15 | 97:4 | 54:11 55:4,21 | **believed**  31:22 |
| **bankruptcy's** | **bassford**  5:16 | 55:23 56:3 | 146:24 150:25 |
| 128:21 | 9:14 | 57:2 59:15 | **belong**  14:25 |
| **base**  40:19 | **bate**  81:6,8 | 60:16 62:11,14 | **benefit**  13:5 |
| **based**  16:12 | 88:8 | 63:4 64:5,17 | 14:21 15:18 |
| 46:17 47:4,16 | **bates**  153:20 | 66:3,25 67:8 | 23:4 32:22 |
| 47:19 49:4 | **beat**  43:25 | 67:16 68:12 | 74:17 108:12 |
| 50:5,15 62:2 | **befallen** | 72:11,17 77:15 | 139:23 157:9 |
| 63:19 65:9,9 | 125:15,19 | 78:6,11,14 | 158:2,9,16,21 |
| 65:13 67:25 | 126:8 | 80:13,17 81:13 | 159:11 160:6,7 |
| 71:18 72:17 | **begged**  27:15 | 81:19 82:13 | 160:8,9,22,25 |
| 77:12 82:8 | **begging**  26:13 | 83:4,6 84:3,12 | 161:2 |
| 83:1 94:13,19 | 26:14 | 84:21,25 85:3 | **benefited** |
| 95:13 96:12 | **beginning**  52:7 | 85:5,7,10 | 158:19 |
| 100:6,17 101:2 | 59:23 62:20 | 87:12 88:5,15 | **best**  13:9 18:19 |
| 102:19 105:24 | 118:8,12,16 | 96:23 97:14 | 19:7 22:1,10 |
| 106:12,15,22 | **behalf**  8:9,14 | 98:20 99:4 | 24:6 28:20 |
| 107:13 118:1 | 8:21 9:4,12,14 | 101:4,11 102:7 | 31:4 32:3,15 |
| 118:19 121:14 | 31:21 32:20 | 103:6,15 | 32:16 33:4,5 |
| 128:3,18 | 36:18 37:6 | 105:24 106:12 | 33:13,20 35:17 |
| 129:11,14 | 38:8 50:13 | 107:5,14 108:3 | 36:14 44:6 |
| 131:1,8 132:10 | 66:23 72:7 | 108:4,10 117:5 | 45:7,21 46:2 |
| 143:3,19 144:2 | 74:6 91:24 | 121:23,24 | 74:25 105:14 |
| 144:8,12 145:2 | 158:21 | 122:1,5,11 | 105:20 115:20 |
| 146:4 149:20 | **belabor**  95:16 | 123:4 125:1,14 | 142:8 151:15 |
| 151:9,18 | **belaboring** | 125:15,19 | **better**  19:1 |
| 152:21,24,25 | 94:2 | 130:3 131:1,1 | 25:11 30:25 |
| 156:21,23 | **belief**  65:10 | 131:8,9,17 | 34:20 134:23 |
| 158:3,3,18 | 94:8 97:2 | 134:14 136:6 | 140:1 161:6 |

**beyond**  110:13 110:21 119:17 120:5,8,14 141:21 145:11
**bidder**  13:11
**big**  10:8 12:10 19:3,3 138:17
**bigger**  72:12
**bills**  114:24 160:22
**binding**  115:7 115:10,12,13
**bio**  116:4,6
**biology**  115:22
**bit**  19:21 32:5 34:20,20 36:13 42:20 44:15 52:8 58:21 67:10,14 73:12 96:9 103:18 104:8 108:6 111:3 120:3 129:23 137:8 156:16
**black**  11:4,16 154:4,7
**blank**  159:8
**blanket**  46:22
**blessing**  21:16
**block**  76:16
**blood**  117:6
**blowing** 150:17
**blue**  58:10,11 58:20
**board**  19:17 34:6 108:20

117:2,6
**boat**  36:5
**body**  24:19
**bolded**  115:5
**bookmark** 66:18 67:9 80:21,22 86:16
**bookmarks** 80:23 86:13
**borrow**  164:25
**borrower**  73:2 73:8,8 74:2 140:18 150:11 151:21 156:7
**borrowings** 140:20
**bottom**  67:1 68:19 72:5 81:4,6 97:8,23 98:11 103:19 107:16 110:17 112:16 162:3 163:24
**boulevard**  5:3
**bow**  139:24
**box**  5:4 80:22 153:5 163:5
**boxes**  153:6
**boy**  141:18
**breach**  11:9,10 11:12 158:10
**breaching** 144:6
**break**  16:25 53:2,14 75:20 76:20 85:15 91:9,13 151:10

165:6 166:10 167:7
**breaks**  164:22
**brick**  84:20 148:20 159:1,3 159:6
**brick's**  159:9
**brief**  41:19 166:7
**bring**  15:22 17:2 18:23 31:5 35:12 40:10 167:25
**bringing**  24:5 41:9
**broad**  23:21
**broke**  77:5 142:23
**broken**  48:24 100:1
**brook**  159:15
**brothers**  85:8
**brought**  24:21 25:1 41:10
**buckets**  21:11
**build**  16:12 79:15
**building**  14:15 15:2 16:5,12 16:23 17:5,22 18:2 19:18 20:24 22:23 28:12,20 29:6 31:4 32:14,17 32:21 33:6,14 35:3 48:3,24 83:10 122:3

149:19,19 162:17
**buildings**  13:1 14:19 48:11 122:5
**bunch**  138:20
**bundled** 132:17,20 133:12
**burden**  13:18
**burdick**  2:5
**business**  11:1 41:23 53:23 56:1 59:13,21 59:23 62:1 63:4 81:2 83:19 84:9 113:21 140:18 158:4 168:11
**businesses** 18:1
**buys**  29:8

**c**

**c**  4:1 8:1 156:20,22 157:24 159:18 170:1,1
**calculation** 94:14,20 95:13 107:3
**calculations** 94:16
**calculator** 41:11,14 99:24 163:9
**calendar**  11:5

call   13:19
   22:22 29:20
   36:19 39:22
   40:5 166:5,9
called   43:4
   46:7 86:6
   109:6
calling   106:5
calls   79:23
   123:10
cancel   91:17
canceling
   91:25
candidly
   166:16
capacity   15:10
care   13:16
career   121:17
careful   126:7
caren   4:17
   39:25
case   1:3,11,19
   3:1,5,9 8:2,3
   14:20 15:1,4
   15:22 17:2
   18:15,17 20:9
   20:14,17 23:25
   24:1,2,10,15
   24:21 28:18,24
   29:16,24 31:13
   34:2,23 35:9
   35:14,18 40:14
   43:20 44:9,25
   45:18 68:6,7
   68:25 77:4
   83:24 103:1
   105:13 120:7

   120:10 142:22
   151:19,20
   165:15 166:9
   167:3
cases   10:17
   11:3,9 23:10
   26:21 27:13
   35:8 69:16
   70:1 90:22
cash   11:7,9
   18:10,13 62:3
   91:3 144:17
cashier's   131:3
   132:17,20
cashway   85:6
catch   23:21
   45:3
catching   124:1
categories
   21:11 46:23
cathcart   4:9
   8:10 23:24
cause   13:13
   17:10 20:1,5
   20:25 23:17
   27:24,24 28:6
   49:20
caused   24:16
   76:10
causes   47:23
   88:15
caveat   37:14
   91:19
cavity   128:20
cbre   98:9
   108:3 127:7

cc'd   78:7
ccf   134:14,23
cco   6:3
cents   46:9
ceo   6:2
certain   10:15
   48:15 108:23
certainly   11:11
   28:18 36:7
   39:5 137:14
certification
   63:4 70:22
   109:17 110:12
   110:17,20
   111:2 136:21
certifications
   111:8
certified   58:14
   106:15 132:13
   132:24 150:3
   170:3
certifying   74:3
cetera   45:8
chair   137:8
chance   168:10
change   37:13
   59:9 119:4
   127:3 136:5,10
   136:15,19
   143:3
changed   21:23
   38:22 109:4
   146:24 148:3
changes   37:7
chapter   3:2,5,9
   3:9 12:21 13:2
   14:25 15:5,9

   15:17 17:9
   19:1 23:14
   27:14,17 29:18
   30:25 31:1
   32:7,8
characterizat...
   95:3
charge   33:24
   34:10 151:1
chargeable
   24:25
charged   33:9
charitable
   26:15
charles   7:5
   8:19 40:5,12
   41:1,4 86:7
   93:17 112:6
   154:15
chart   94:10
chat   167:5
check   56:20
   123:20 131:3
   132:18,20
   146:5
checked   47:8
checking   55:16
   58:11,15 62:19
   63:14,21 64:23
   64:25 65:5,6
checks   42:19
   56:5 131:5
   132:12 143:23
   144:1,7,13
chief   166:10
choice   22:4

choose 36:13
  113:19
christianna 4:9
  8:10
christmas 26:1
  26:4
chunk 75:23
circuit 23:23
circumstance
  28:1
circumstances
  21:11,16 27:25
cited 135:12
civil 84:5
claim 15:19,21
  16:11 20:10
  27:17 31:3
  39:13 44:8,13
  44:17,18 45:9
  49:22 50:2,5,6
  50:13 51:3,6
  51:11 105:3
  151:21,23
  152:2,10,16
  155:9
claimants 84:1
claims 15:5
  18:22,24,24
  19:2 20:13
  27:14 29:13,19
  31:1 35:5 36:3
  49:20 118:19
  151:22
clarify 38:22
  168:3
clarity 11:15
  118:14 168:24

clause 24:8
clausen 84:13
  161:17,17,18
  161:18 163:9
  163:23 164:12
clausen's
  163:25
claw 15:25
clean 76:3 88:5
  168:19 169:6
cleaning 91:21
  92:1
clear 21:25
  50:22 82:2
  106:10 109:3
  114:2 115:5
  128:14 133:2
  148:6 157:21
clearly 50:25
  88:16 148:11
  148:23 153:5
  159:9 160:2
  162:20
clerk 40:8,11
  40:13,17 53:6
  53:9,12 57:15
  77:1 90:18,20
  142:19
click 80:21,24
  86:16,24
  111:23
client 19:8
  27:18 28:20
  29:23 33:2,7,9
  33:24,25 34:8
  34:10,19 35:14
  35:23 36:9

39:5 164:23
  167:5
client's 18:15
  30:24 34:6
  36:13
clients 15:24
  35:15 38:13
  168:4
close 95:5
closed 58:4
  65:7
closely 18:1
  158:9 159:12
  160:23
closing 110:25
  164:16
coalition 16:24
code 23:13
  25:15
codington 25:7
  35:9 66:12
  69:7 124:23
  125:7
coerce 106:20
coffee 42:17
cold 157:13,16
collateral 11:7
  11:9 18:16
  46:16 50:11
  91:3
collect 149:25
collective
  18:21 19:2
column 98:19
  108:7,8,9
come 26:13
  40:8 42:18

71:12 75:25
  76:21 130:9
  133:1 153:20
  165:5
comes 29:8
  163:20
comfortable
  18:3
coming 29:16
  31:11 34:11
  127:18,20
  137:13 168:6
commence
  66:11
commencing
  66:4
comment
  25:13 121:20
comments
  13:23 168:1,2
commercial
  46:19,20 63:16
  63:18 149:17
commingled
  144:5,9
commitment
  134:20
committed
  22:6 141:4,10
  141:15
common 32:5
  88:17 119:1,14
commonality
  88:16
communicated
  152:22

| community | 29:8 31:7 32:4 | condition | construct |
|---|---|---|---|
| 55:20 56:7 | 73:6 76:22 | 19:18 47:9,17 | 79:22 80:8 |
| 59:3,13,22 | **completed** | 47:21 48:13 | 131:17 |
| 60:1 62:12 | 25:11,16 26:19 | 49:19 115:3,6 | **constructed** |
| 63:3 | 28:11,19 31:5 | 125:22 156:6 | 83:10 |
| **companies** | 35:19 | **conditions** | **construction** |
| 16:16 119:14 | **completely** | 73:13 112:23 | 12:25 13:4,10 |
| 130:11 149:22 | 30:4 38:14 | 115:6 | 17:19 22:9,23 |
| **company**   3:4 | **completeness** | **conducted** | 26:19,20 27:3 |
| 5:10 9:9,11 | 89:12 | 48:25 | 27:6 29:7 32:6 |
| 23:4 28:8 30:3 | **completing** | **conference**   9:8 | 65:23 70:6 |
| 38:9 49:24 | 29:5 | 38:15 | 71:20 72:1,15 |
| 50:8 51:4 62:4 | **completion** | **confirmation** | 74:23 77:11 |
| 114:13,21 | 17:5 | 25:24 29:15 | 78:25 79:7,10 |
| 121:5 149:7 | **component** | 30:1,21 31:10 | 83:3 84:13,22 |
| 150:8 161:5,5 | 26:12 | **confirmed**   28:3 | 109:15 127:7 |
| 164:15 | **compromise** | **confirms**   25:17 | 127:17 128:8 |
| **company's** | 24:14 | **conflating** | 129:3,6,9,13 |
| 77:23 | **computer** | 167:21 | 129:15 135:1,6 |
| **comparable** | 111:22 | **conflict**   8:24 | 135:11,14,18 |
| 113:21 | **concede**   11:11 | 32:8 | 135:23 136:4,7 |
| **compare**   56:12 | 35:7 | **conform**   22:20 | 136:14,16,18 |
| 56:13 64:22 | **concern**   14:17 | **confused**   134:1 | 139:15,21 |
| 65:9 | 32:4,14 33:6 | **confusing** | 140:2,4,7,13 |
| **compared** | 88:11,21 | 111:18 124:8 | 140:15 149:18 |
| 85:25 | 154:22 | **connection** | 154:18,20,21 |
| **comparing** | **concerning** | 20:23 123:2 | 161:17 163:23 |
| 65:13 109:3 | 27:13 | 139:11 140:10 | **constructions** |
| **comparison** | **concerns**   18:4 | **consider**   16:8 | 48:11 129:5 |
| 63:19 | 35:16 50:7 | 28:7 37:22 | **constructive** |
| **competing** | **concluded** | 39:22 | 110:21 |
| 11:24 | 14:24 169:8 | **considered** | **consumer** |
| **complaint** | **conclusion** | 37:24 | 149:14 |
| 66:23 | 95:6 106:5 | **considers** | **consummate** |
| **complete**   12:25 | 158:13 | 79:24 | 18:6 |
| 13:10 18:7 | **concrete**   85:8 | **consistently** | **consummation** |
| 26:19 27:6 | | 101:23 155:24 | 18:5,14 |

contain 39:4
contents 39:7
contested
  25:10
context 116:16
contingent
  38:24
continual
  127:14
continue 11:7
  13:4 27:8
  38:19 50:1
continued
  121:1 128:16
continues
  29:15
continuing
  91:3 128:19
contract
  107:24 115:7
  115:14
contracted
  129:13
contractor
  70:7,10,14
  71:4,13 72:24
  83:17 94:15
  98:6,17 107:13
  107:19,21,24
  107:25 108:11
  147:6 150:2
contractors
  22:18 65:25
  70:21 82:18
  88:2 109:1
contribution
  77:25

contributions
  25:21 26:8
control 119:1
  119:14
controlled
  144:14,22
convenient
  25:1
conversations
  114:6
conversion
  12:19,21 13:5
  19:6 23:19
  28:7
convert 3:1,5,9
  12:10,23 28:9
  31:13 37:2
  86:7 92:6
  147:17
copied 78:10
copies 45:9
  56:9 61:25
  77:11 78:1,15
  84:8,15,20
  85:1,4,9
copy 58:14
  76:3,17 91:6
core 88:17
corner 162:8
corporate
  144:6 158:8,10
correct 10:12
  12:3 38:4,6
  44:5 45:9 54:9
  58:9,14,17,24
  59:14 64:16
  69:12 74:4

78:17,18 80:14
82:12 93:18,25
94:1 96:19,20
96:22 101:24
102:20 106:24
107:4 108:18
109:18 110:10
110:14 114:14
114:17 116:17
117:3,4,7
118:24 119:2
121:21 122:16
122:17,20,21
124:20 125:11
126:3 130:1,21
130:25 131:12
136:5,8,15,22
139:13 146:8
147:2 150:3
151:24,25
152:7,11
155:20 161:12
164:9 165:25
correcting
  143:17
corrective
  107:18
correlative
  138:16,25
  139:9
correspond
  163:16
corresponde...
  83:2
corresponding
  88:3

cost 18:16
  32:13 72:16,18
  72:20,21 73:1
  73:3,6,9 79:7
  79:10,20,22
  80:8 108:3
  136:18
costs 72:13
  73:4,5,10
counsel 8:10
  8:18 9:19
  27:20 30:8
  33:16 89:3,19
  89:19 147:19
  153:24
counsel's
  148:13
counterclaim
  27:22
counterparty
  24:11
counterpoint
  25:6
country 23:23
  55:7 56:6,25
  58:15 64:2,16
  65:5 143:24
  170:21
county 25:7
  66:12 69:7
  124:23 125:7
couple 18:9
  22:17 42:12
  53:4 58:17
  75:7 85:20
  95:3,15 119:12
  142:13 143:3

| | | | |
|---|---|---|---|
| 159:17 | 76:24 77:3 | 157:19 158:14 | 71:2,2,5,6 72:8 |
| **course**  51:19 | 80:1,12,15 | 164:20,24 | 72:25 74:16,21 |
| 56:4 60:23 | 82:8 83:24 | 165:1,3,5,10 | 75:1,1 78:3,5,8 |
| 140:18,20 | 85:17,21 88:4 | 165:12,14,19 | 82:18 83:4 |
| 155:25 | 88:8,10,23 | 165:22 166:1 | 94:23,24 105:6 |
| **court**  1:1 2:4 | 89:1,2,10,13 | 166:12,20 | 107:19 110:7 |
| 8:2,3,14,21 9:1 | 89:18,25 90:3 | 167:1,7,10,14 | 111:11 112:20 |
| 9:4,12,16,21 | 90:9,11,14,16 | 167:19,22 | 112:20 113:14 |
| 9:24,25 10:2,4 | 90:21 91:21,25 | 168:16,18,21 | 113:15,18,23 |
| 10:10 12:4,7 | 92:3,9,15,18 | 169:1,3,5 | 114:3,4,20,23 |
| 12:12,14,20,21 | 92:24,25 93:2 | **court's**  10:14 | 115:12,17,20 |
| 12:23 13:14,25 | 93:6,9,13 95:5 | 16:6 24:6 | 116:9 119:1 |
| 14:2,6 15:12 | 95:17 105:7,10 | 37:14 76:8 | 121:4 122:9,22 |
| 17:11 19:4,10 | 105:17,19 | 104:22 130:14 | 130:20,24 |
| 19:15,19,22,25 | 106:6,9 107:1 | 135:25 150:12 | 131:2,14,16,16 |
| 20:4 25:12 | 109:12 110:5 | **courthouse**  2:5 | 132:3,7,15,23 |
| 26:4,7 27:24 | 110:24 111:14 | **courtroom** | 133:10 134:19 |
| 28:1,5,7 29:1,3 | 111:23 112:1,3 | 8:12 33:8 | 134:24 138:15 |
| 31:13,14,18,20 | 112:5 117:9,13 | 38:25 168:9 | 138:20 139:7 |
| 34:12,13,16 | 117:22 119:18 | **cover**  46:20 | 139:12 143:8 |
| 35:11,12 36:6 | 119:20 120:14 | **cp**  53:23 62:1 | 143:18 144:5 |
| 36:12 37:16,21 | 121:7,20 | **crafts**  108:24 | 144:10,14,16 |
| 38:2,5,8,11 | 123:12 124:9 | **craig**  8:11,12 | 144:22,25 |
| 39:8,12,21 | 124:13 126:21 | 21:5,25 22:3,8 | 146:21 149:6 |
| 40:1,4,7,18,22 | 129:7,20 | 22:9,10,21 | 153:18,20 |
| 41:2,7,12 44:1 | 130:13,15,17 | 26:19 32:19 | 154:23 156:9 |
| 44:19,23 45:1 | 136:2,11 137:2 | 34:25 42:23,25 | 157:4,10,25 |
| 45:3,14 48:7 | 137:10,13,19 | 43:1,7,9 51:21 | 158:1,2,6,6,16 |
| 52:12,22 53:1 | 138:2 139:3 | 51:25 52:8 | 159:12 160:1,6 |
| 53:8,10,14 | 141:5 142:10 | 53:21 54:6 | 160:6,7,9,9,19 |
| 54:20,23 57:8 | 142:15,18,21 | 55:8 56:13 | 160:22,23 |
| 57:18,22 61:11 | 143:12 145:12 | 58:8,24 60:6 | 161:1,2,2 |
| 61:17,19 66:12 | 145:15,21,24 | 60:22 61:5,21 | 166:5,9 |
| 67:3 68:1,20 | 146:20 147:21 | 61:24 62:10 | **craig's**  20:19 |
| 70:18 73:15,18 | 147:24 148:15 | 64:3,9,23 | 21:8 27:3,3 |
| 75:9,12,19,24 | 154:11,13 | 69:11 70:11,11 | 35:20 55:6,19 |
| 76:4,6,9,11,15 | 157:11,15,17 | 70:12,15,16,20 | 60:2,10 66:5 |

**[craig's - debtors]**                                                           Page 15

97:15 98:2
104:17 130:5
130:11 131:15
141:11 154:4
157:3 158:4
**craigs** 109:8
**credibility**
23:11
**credit** 42:19
55:8,20 56:6,7
56:15,25 58:12
59:3,13 62:12
63:3 64:2,16
138:23 139:2
141:12,14
143:24 156:4,5
**credited** 10:19
10:21
**creditor** 15:18
16:1,9,22
24:10,19 31:2
**creditors** 13:5
13:9 15:7,15
15:18,22,25
16:16,19,23
17:4,25 18:11
18:23 19:2
24:7 27:16
29:14 33:20
35:2,18 36:25
**cross** 38:12,18
39:6,11 111:14
112:6 142:24
148:15 165:23
166:8,17
**curating**
109:21

**curious** 12:17
13:12
**current** 19:18
20:23 32:10
42:5 47:6,8,9
48:13 105:5
124:16,18
**currently**
58:10
**cursor** 162:9
**customer**
51:24 54:22
55:2 159:7,10
**customers**
42:18
**cutting** 87:20
**cx** 7:4

**d**

**d** 5:22 7:1 8:1
41:8 70:11
159:1,4 160:11
**d&m** 5:2 9:4
31:21,23,25
32:1,1,15,22
33:14 37:25
84:8 156:23
157:24 159:18
159:21,22,25
160:12,14,15
**d&m's** 32:16
160:18
**daily** 46:6,9
**dakota** 1:2 4:3
9:19 25:8
26:21 27:21
28:12 35:10,12
41:22 66:12

67:6,21 68:10
68:20 81:21
83:10 84:5
113:3,9,10,13
113:13 114:4
114:20 115:2,2
116:10 119:23
120:24,24
122:24 123:4,8
124:24 125:7
146:20
**dakota's** 125:7
**damage** 50:5
50:15 51:2,3
51:12 128:18
**damages** 50:10
**damp** 127:7,12
127:16 128:1
**dancing** 35:15
**danielle** 6:4
8:20
**dare** 10:13
**dark** 163:6
**date** 11:14
44:14 45:18
46:11,25 50:19
53:22 55:24
59:7,19 61:22
62:17 63:8
66:14 67:2,12
67:18 70:3
100:11,22,23
101:14 103:4,7
104:2,5 125:16
125:20 135:21
142:9 155:2,16
170:25

**dated** 99:16
106:19 116:16
135:6
**dates** 126:16
140:24
**davenport**
4:20
**day** 42:15,15
42:15 45:24
90:2 118:12
127:22 128:1
156:21 167:8
167:22
**days** 28:4 33:8
36:7 146:25
147:1,5 148:7
155:18,18
168:11
**de** 20:11
**dead** 43:25
**deal** 11:4 12:19
**dealing** 23:25
**dealings** 36:4
**debt** 18:2,8,12
63:15
**debtor** 1:9,17
1:25 3:8 12:24
14:13,15,20
15:9 16:18
18:5,7,7,9,11
20:17 23:11
25:16 36:23
37:14 51:9,10
51:23 82:17
**debtors** 4:4 8:7
8:9,11 11:10
11:20 20:22

30:8,18 36:3
38:21 123:2
**debts** 65:3
**december** 11:8
68:13,21 91:4
101:15
**decent** 75:22
166:10
**decide** 36:25
**decided** 78:20
**decision** 33:19
114:22
**declarant**
105:2
**declaration**
56:25 59:12
80:11 86:5,6
93:17,18
**declarations**
17:14,19 38:24
**deduce** 127:24
128:3
**deduced**
127:12
**deemed** 111:19
**deeper** 16:21
**default** 12:5
25:19 91:15
**defendants**
68:1 83:23
**defending**
27:19
**defer** 75:16
85:17 166:8,24
**deferential**
75:18

**deficiency**
15:19
**define** 138:17
**defined** 156:22
162:11
**degree** 147:19
**delay** 66:4
67:23 133:15
**delayed** 29:16
67:22 68:5
**delays** 24:23
**delinquent**
125:5
**delivered** 49:7
152:24
**demo** 161:18
162:12 164:7
**demoed** 162:19
**demonstrate**
15:3,12
**denied** 33:23
**deny** 28:1
**department**
49:18 150:24
151:18
**departs** 25:17
**dependent**
14:8
**depending**
35:20
**deployed** 49:5
**deposit** 117:15
118:22
**deposited**
143:25 144:2
**deposition**
97:15 98:2

104:17,23,24
105:5 115:13
115:25 116:2
137:11
**deposits** 42:20
56:6 117:16,20
117:25
**described**
25:20 153:9
**description**
7:10 96:15
164:6
**descriptive**
88:2
**design** 11:18
85:1
**designate** 16:7
77:16 81:7
**designated**
73:25 81:8
**designees**
79:16
**destroyed**
122:4,6
**detail** 25:23
91:14 150:5
**detailed** 29:25
30:2 96:15
**detailing** 71:11
**deteriorating**
47:18,21,24
49:19 125:10
125:15,22
156:6
**determinative**
24:7

**determine**
50:10 106:22
**determined**
50:14
**detriment**
26:10
**developed**
28:12 121:22
**developer** 22:9
113:19
**development**
3:4 5:10 9:9,11
28:8,11 30:3
38:9 61:16
64:9 70:11,12
70:15,20 71:3
71:5,6 75:1
77:23 80:15
94:24 112:20
113:15 114:13
130:20,24
131:2,15 132:3
132:7 144:11
**deviation**
73:23
**diamond** 5:17
9:12,14 32:1
38:5
**differ** 56:19
**differed** 82:9
**difference**
59:25 63:12
87:18,22 88:3
88:19 94:10,14
95:9 108:11
126:14,16

**different**  24:9
  24:11 26:22
  42:14 47:14
  53:10 82:6
  88:16,21 89:21
  105:6 109:1
  111:5,18
  134:17 138:19
  138:21 139:8
  139:18,18
  144:21 164:8
**differentiates**
  24:18
**differently**
  23:6
**difficult**  27:6
**diminution**
  20:7,9
**dip**  10:24
  18:13 27:1
**direct**  41:4
  111:13 120:8
  158:9 166:6,8
  166:16,18
**direction**  51:10
  152:21
**directly**  13:23
  56:10 58:13
  59:22 63:2
  65:4 70:23
  109:10 113:24
  113:25 130:11
  131:2,10
  144:20 157:4
  157:10 158:2
  158:16 159:3
  159:20,20

160:14 164:12
**directors**  117:2
  117:6
**dirty**  153:5
**disbursement**
  70:24 72:24
  98:6,17 107:13
  107:21 131:7,8
  131:24 132:3,6
  159:11 160:8
  160:22
**disbursements**
  43:21 129:24
  130:1,11,20,24
  131:2,11,14
  132:11,16
  137:25 144:15
  144:18 160:5
**disbursing**
  121:4
**discerning**
  159:23
**disclaimer**
  30:6
**disclosure**
  11:16,22 25:2
  25:23 39:18
**discover**  145:4
  146:1,23
**discovered**
  51:1 82:14
  145:19 146:22
**discoveries**
  147:13
**discovery**
  33:10 68:2,3
  81:7 82:2,17

82:20 83:22
  84:7 86:2 94:1
  109:1 160:1,19
**discrepancies**
  81:22
**discrepancy**
  81:25 82:14
**discretion**
  152:18
**discuss**  90:1
**discussed**
  160:16
**discussing**
  29:11 44:4
  87:3
**discussion**  30:6
  161:4 164:22
**discussions**
  30:7,9
**disfavored**
  29:12
**dishonest**
  14:11
**dismiss**  12:20
  28:9 33:23
  37:2
**dismissal**  19:7
  28:8 34:2,4
**disparity**
  146:11,18
**disperse**
  131:19 150:4
**dispersed**  27:4
  70:19 71:8
  74:17,22 75:2
  114:24 132:1,5
  132:22 133:3,9

133:19 143:23
  144:4,13
**dispersing**
  42:19 74:7
  79:1
**display**  57:19
**dispute**  14:14
**disrupting**
  52:10
**distill**  14:6
**distinguish**
  88:18
**distribute**  16:1
**distribution**
  18:10
**district**  1:2
**dive**  85:14
**diverted**  15:15
**divided**  97:1
  119:3,5
**doc**  3:2,6,10
**docket**  17:15
  17:17 25:3
  39:3,15 54:14
  54:21,23,24
  57:24 91:16,24
  94:5 99:4,7
  163:20
**document**
  37:17,19 53:17
  57:7 61:2 63:2
  66:22 72:10
  76:1,1 79:16
  80:19 86:10
  87:8,11 88:1
  89:6 96:7 98:3
  98:8 99:9,10

100:17 106:19
108:4,5 109:15
109:19 110:11
112:8 123:20
136:25 154:19
155:12 162:11
162:23 163:22
163:24
**document's**
111:19
**documentation**
71:7 82:6 84:5
**documented**
48:23
**documents**
14:22 23:20
25:6 30:3,13
30:17 36:1
39:22 45:7,9
52:4 54:10
56:5,17 57:5
58:5 63:20
64:15 65:13
77:6 82:9
87:18 88:16
94:9 108:17,25
109:24 110:11
110:13 116:14
123:23 140:5
140:24,24
141:7 143:21
144:13 146:4
149:25 153:21
**docusign**
110:12 111:12
**doing** 17:22
24:25 26:4

36:22 52:20
70:14 113:21
150:1 161:6
**dollars** 29:13
118:22 143:3
**donations** 17:3
17:23
**donative** 20:20
**door** 39:1
**double** 89:1
92:24 93:2,12
**doubt** 24:4,11
121:24 128:11
**dozen** 119:12
**dozens** 14:21
**draft** 167:17
167:18
**drafted** 168:11
**drag** 57:13
87:19
**draw** 21:20
22:7,11 70:5
70:20,24 71:1
73:20 74:1,3,7
75:5 77:10,14
78:5,15,19
79:6 80:12
81:1,9,23 82:4
82:7,10 85:24
87:2 93:23,23
94:7,11,14,17
94:20 95:9,10
95:21,22 96:7
102:5,7,10,13
103:5,14,17,21
104:3 106:2,14
108:13 109:18

110:7,8 111:5
111:8,10
113:25 114:8
114:10,12
116:8 122:9,12
122:19,24
123:3,14 124:1
132:13,23
133:9,12,15,16
134:2,2,3,6,6
134:11 135:15
135:19 144:20
148:6,9,11,17
149:8,23
156:12,22,24
159:2,5,7,19
159:22 160:13
160:15 161:6
161:11,11,14
161:16 162:2
162:22,24
164:9,14
**drawings** 83:2
83:18
**draws** 77:18
78:1 82:2
113:2,7,12,14
113:17,22
123:3 132:20
143:19
**drew** 4:18 8:18
**dried** 127:25
**drive** 25:13
**driver** 163:3
**drives** 24:4
**driving** 50:21

**dropdown**
80:24
**drove** 14:16
**druthers** 167:4
**drywall** 125:24
127:8,15
**due** 28:21
43:17 45:20
46:4 100:25
101:16 158:21
162:21
**dugan's** 95:22
95:24,25 96:2
97:11
**duplicate** 76:7
**duplication**
88:22
**duties** 42:16,21
**dx** 7:4

| e |
| --- |

**e** 2:21,21 4:1,1
7:1,9 8:1,1
41:8 170:1
**e're** 142:21
**earlier** 51:15
107:3 109:16
114:12 118:25
124:16 126:9
130:3 134:25
135:12 138:13
139:6 143:2
146:10 147:18
148:5 150:14
150:19 151:22
152:6
**earliest** 28:4

**early**  68:12
167:11
**ears**  150:17
**easier**  19:12
76:14 88:9
**east**  126:1
**easy**  22:25
90:12 108:23
**eat**  75:17
**ecf**  39:12,13,17
44:3 56:21
57:16 59:12
62:25 63:2
64:12,15 80:11
86:4,6,13,22
87:13,20 93:4
95:18 100:22
102:3 110:15
111:19
**echo**  34:18
149:1,2
**economic**
156:6
**economically**
16:12 18:25
**economics**
41:23
**ecro**  2:25
**educated**  33:19
**educational**
41:20
**effective**  88:22
**efficient**
120:12,15
168:19
**efforts**  20:20

**eight**  45:14
**eighty**  45:6
**either**  12:20
23:10 32:17
57:8 71:15
113:20 114:18
115:20 120:25
122:5 152:18
166:8
**elaborating**
136:25
**electing**  78:16
**electric**  85:4
**element**  107:19
**elevate**  29:12
**eloquently**
147:18
**else's**  123:11
139:24
**email**  23:3
52:23 53:19,25
54:11 55:19
56:14 58:8,24
59:1 60:2 61:3
61:6,21,22,24
64:3 123:19,25
124:4 142:8
153:14,15,17
153:19 154:2,4
154:6 155:2,19
155:21
**emailed**  55:6
134:13
**emails**  83:17
154:22
**emphasis**
41:23

**employment**
42:11
**encompasses**
11:25
**ended**  21:19
59:6 148:19
**ends**  11:19
31:2 55:23
59:20
**engineer**  98:12
98:14 107:11
**engineering**
84:11
**enhanced**
56:20
**enhancement**
60:3
**entered**  26:23
91:11
**entirely**  75:20
115:16
**entirety**  74:12
**entities**  69:12
69:14 144:14
158:5 159:12
**entity**  28:10
43:4 64:8
70:13,14
113:20,21
144:22 158:8,9
158:10,21
160:23
**entry**  39:5 94:5
156:17 163:10
**envelope**  48:3
**equity**  20:21
43:10 69:13

70:17 77:25
**erected**  122:3
162:18
**errand**  27:7
**erred**  12:2
**error**  21:13
**errors**  21:17
**es**  7:4
**especially**
28:21 30:23,23
**essence**  51:3
**essentially**
16:19 76:13
87:7,9,22 88:9
93:7
**establish**  13:13
21:8 117:10
**established**
27:8,9 28:7
129:25
**establishing**
11:13
**estate**  15:6,23
47:6 63:17,18
**estimates**  73:6
**et**  45:8
**evans**  4:20
**evening**  167:6
167:11
**event**  12:22
13:13 28:6
50:8,20
**everybody**
89:6 94:3
**everybody's**
36:15

everyone's
  35:9
evidence   12:18
  15:12 20:7
  21:5 22:3,5
  27:11 28:17
  32:16,20,24,25
  32:25 33:3,7,9
  33:19 36:17
  37:1 38:18
  39:20 43:24
  48:2 90:24
  95:2,2 105:14
  105:20 109:10
  109:21 121:7
  137:25 138:3
  142:8 151:12
  166:4
evident   50:25
  79:3 106:18
evidentiary
  109:23 110:1
evidently
  50:22
exact   50:19
  114:5 122:2
  135:21 147:6
  153:1 154:19
exactly   69:3
  76:13 131:24
examination
  39:11 41:4
  76:22 111:14
  112:6 142:24
  154:15
examine   38:12
  38:18 39:6

165:23
examined
  38:25
examples
  47:25
excavated
  162:19
excavation
  162:13 164:10
exceed   72:21
  136:18 166:18
exceeding   73:3
  73:10
excel   62:3,4
excellent   22:9
except   88:1
  91:8 133:11
  137:11
exception
  117:5
excess   119:8
exchange
  153:17,19
excluded   90:25
  105:1
exclusively
  90:25
exclusivity
  11:3,13,13,19
  92:8
excuse   58:18
  101:17 103:2
  135:23
excused   166:2
executed
  135:15,19
  139:16,21

exercise   14:10
exhaustive
  23:22
exhibit   36:24
  37:3,8 39:17
  58:7 60:25
  62:25 76:2,14
  86:4,12,25
  87:7 92:24
  93:8,10,20,21
  94:13,19 95:14
  97:18,24 98:1
  98:2 99:5,6
  107:7,7,16
  111:20 120:7
  135:1 153:9,9
  153:10,22
  156:15,19
  157:24 161:9
exhibits   7:11
  13:20 16:7
  36:20 37:4,20
  37:21,23,25
  38:2,9,20 39:4
  39:9,20 44:16
  109:21 111:18
  153:24 154:1
exist   106:21
existed   83:18
exotic   26:10
expect   35:13
expectation
  89:4 168:8
expected   22:20
  72:20
expecting
  12:15 71:8

expedite   76:16
expense   20:10
experience
  13:1 22:18
  121:4 149:6,20
  149:21
expert   17:18
  39:4,6,7 144:6
experts   17:14
  17:19 32:13
  108:20
explain   28:17
  70:18
explained   30:2
  88:7
explaining
  61:12
explanation
  84:4
explicitly
  74:19
expressly   23:3
  113:23
extant   24:8
extend   43:16
  60:12
extension
  156:4,5
extent   11:10
  17:8 20:24
  26:16,18 27:14
  36:1
exterior   48:13
extra   91:10
  168:14
extraordinary
  27:25

**extrapolate**
109:25
**eyesight** 19:23

**f**

**f** 2:21 170:1
**fabulous**
139:24
**face** 19:20,23
108:19
**facetious**
115:24
**facility** 128:7
**facing** 126:1
**fact** 18:11
109:23 110:1
121:3 124:5
167:8
**factors** 17:2,9
24:8 66:7
**facts** 95:2
109:9
**fail** 14:10
**fair** 14:17
154:9
**fairly** 26:25
69:1
**faith** 23:17,17
23:21,24 24:1
**fall** 21:10 47:5
49:17
**fallen** 20:17
**falling** 84:6
**falls** 4:23 5:12
96:3
**false** 65:15
**falsely** 65:11

**falsified** 106:1
106:4
**familiar** 43:4
47:9,12 86:5
86:10 93:18
98:1,4
**far** 17:7 29:21
116:2
**fargo** 2:7 4:6
4:14 5:5 55:12
**farm** 156:3
**farmer** 149:19
**farming**
108:16
**farther** 119:17
**faster** 11:24
29:7
**fat** 163:14
**fate** 15:1
**fault** 103:2
**favor** 20:10
**fccu** 56:10 59:4
63:15 143:25
144:8,17
**feasibility** 17:7
26:17 28:25
**feasible** 16:12
17:21 18:25
26:18
**february** 66:11
66:15 67:4
**federal** 35:12
**fee** 100:15
101:5,17,21,24
104:12,14
106:16

**feel** 19:3 30:24
**fees** 20:11
**feigned** 22:13
**feist** 5:14 9:10
9:11 28:14,15
29:4 38:10
154:11,12
165:22,25
**fell** 14:21
134:15
**fiduciary**
15:10 23:11
**field** 99:1
108:20 164:6
**fifth** 5:18
**figure** 11:5
32:9 92:23
**file** 27:22 43:19
44:8 49:10,14
54:24 67:5
82:7,9,10
87:20 91:5
147:16
**filed** 3:2,6,9
29:17,24,24
30:2,5,10,20
35:11 36:24
44:13 54:23
66:23 67:2,13
67:19 68:6,8
68:12,16,20,25
76:7 82:1,3,8
86:6 97:5,16
125:17,21
146:13,19,20
147:9 150:15
150:19

**files** 143:5
**filing** 46:22
127:24 151:19
**filled** 96:13
**finally** 27:10
85:8 160:21
**financed** 26:22
**financial** 27:16
33:11 51:20
54:5,8 60:6,22
61:10 62:5
138:16,25
139:1,9,12,17
140:6,9,12,19
141:11 142:3,5
154:23 155:5
155:24
**financing** 29:9
30:15 77:23
130:7 134:15
136:5,10,15
155:6
**find** 24:8 27:24
49:3 52:23
58:16
**fine** 38:14
52:12 53:13
57:24 88:13
90:10 91:21
142:11 145:9
**finest** 27:20
**finger** 128:2
**fingered**
163:14
**finish** 16:5,23
17:21 18:2
32:13 33:6

finished  32:18
32:21 33:15
35:3,19 48:5
48:12 65:25
firm  4:3,11
8:17 10:24,25
20:10
firm's  10:16
11:1
first  4:5 6:2,3
8:7,21 13:20
16:18 26:2,22
32:9 36:19,20
37:6,18,25
39:13,23 40:10
42:25 43:1
45:20,22 50:14
50:16 52:20
55:20 56:6
59:3,13,22
60:1 62:12
63:3 72:1
81:17 83:9
105:21 113:3,8
113:13 114:3,8
114:10,12,15
114:20 115:1
116:9 119:23
120:23 121:22
122:24 123:4,8
124:24 141:20
145:4,8,19
146:1,10,17,22
148:23 153:13
168:22
fit  24:1

five  102:16
118:22 134:4
134:21 135:23
142:14
fix  21:15 42:18
fixed  100:15
101:5,17,21,24
104:12,14
106:16
flapping  14:16
flashing  48:4
125:24
flexible  75:14
flexing  127:9
flip  97:20,22
floor  49:5,6
96:22,23,25
flow  52:10
flows  62:3
focusing  90:24
folks  19:8
follow  113:16
120:25 121:1
134:20 141:1
followed  89:11
147:6
following
105:1
fool's  27:7
footer  125:25
footnoted  23:2
foreclosure
66:4,10,11
67:6 68:10,17
69:4,16 81:21
foreclosures
69:5

foregoing
170:3
forget  137:13
form  15:24
20:25 93:13
former  104:23
105:3
forseth  84:24
forth  20:5
111:20 135:11
153:16
forthwith  28:3
forward  11:17
20:16 21:4,21
22:23 27:23
31:24 33:20
52:25
found  53:6
96:22
foundation
138:5 161:20
four  10:7 81:19
131:20 134:4
134:21 135:23
142:23 149:18
155:18
fourteen
111:17
fourth  96:22
96:23
frame  43:3
118:5 131:24
frankly  19:12
35:10
fraud  36:2
fraudulent
18:23

free  27:4
french  109:5
friday  11:4,17
frigidaire
153:3
front  12:17
40:8 55:10
66:22 81:5
105:15,25
162:12,23
frustrated
137:14
frustrating
137:3
full  42:11
54:19
fuller  5:9
fun  23:24
function  93:4
fund  21:8
81:10 102:10
funded  21:22
21:22 70:23
77:18 81:18
102:19 103:4
103:14 134:6
135:12 162:25
funding  74:7
78:17,20 83:12
103:9 106:18
106:20 132:14
134:17,23
148:9 161:15
fundings  79:5
funds  65:5,6
65:21,24 66:9
70:18 71:1,8

71:15 74:4,16
74:21 75:2
79:2 114:24
133:5,8 144:5
144:13 156:9
**furnish**  96:16
130:7
**further**  18:2
36:10 73:12
92:18 103:18
144:15 154:9
156:4,4 164:18
165:18
**future**  26:11

**g**

**g**  8:1
**gage**  85:8
**garner**  125:6
**gather**  25:5
**gehrtz**  127:6
129:3,5,8,13
**general**  15:20
70:6,9,14,19
71:4 83:18
100:6 107:25
150:1
**generally**
21:10 144:5
**generates**  18:8
**generations**
1:7 8:3,13
10:14,18,22
11:6 23:14
27:2 45:1 52:3
52:5 60:17
69:10,16 70:1
74:18 83:5

90:22 102:2
118:4,11,16,24
119:22 120:19
120:22 121:22
122:10,19
130:19,23
133:6 148:12
148:19 149:4
**generosity**
26:14
**generous**  165:9
**gentleman**
151:2
**geotech**  101:8
103:10
**getting**  51:2
88:12 119:17
128:3 142:12
**ghosted**  134:24
**give**  19:19 28:2
28:24 33:25
40:14 47:24
78:20
**given**  38:11,17
65:14 105:4,5
167:8 168:4,4
**giving**  74:19
**glad**  25:12
**glasses**  77:8
**go**  10:13 15:7
16:10,19,20
18:2 20:16
25:5 35:21
36:21 37:4
45:5,12,15,16
53:8 54:18
56:23 57:3,22

57:23,24 58:20
60:25 62:6,24
62:25 63:23,24
64:12,13 66:18
67:9,10,15
68:14 69:21
72:4,9,11
76:12,21 77:8
80:24 85:19
86:25,25 87:15
89:4,13 90:12
93:20 94:3
95:15,18,19
96:6 97:8,14
97:18 98:21,24
99:3,4,6
100:20 101:12
102:3,22,23,23
103:1,16,17,25
104:8 105:13
107:6 110:15
110:16 111:17
112:3 128:19
129:24 150:5
153:7 154:25
155:8,9 156:14
156:15 158:23
161:7,22,23
162:7,7 163:1
163:8,15,18,19
164:2 166:13
169:6
**god**  40:15
89:18
**goes**  24:5 32:18
48:10

**going**  9:7 12:11
14:23 18:21
20:7,25 21:3,8
22:3,23 23:7,9
23:15 24:2
25:4,13 26:1
27:12 28:20,24
29:8,9,14 30:1
31:6 32:4,9,13
32:14,19,24
33:6 34:7,11
35:6,6 36:5,16
36:16 37:6,17
38:13,22 39:9
39:15,23 40:1
40:7,18,22
54:13 60:20
69:5 75:7,16
76:21 85:16
86:19 87:14
89:4 93:21
94:3 95:6
97:18 99:5
101:21 105:13
105:14 109:12
111:24 117:10
120:6,11,11,18
124:2,3,14
128:10 129:17
131:6,23
132:10 135:4
137:2 138:9
139:4,25
140:25 141:6,7
144:4 145:21
147:3,3 157:3
166:7 167:14

168:5,8 169:6
**good** 8:2,8,16
9:10,13 14:23
31:10 33:15
40:25 45:3
53:1 57:20
73:7,18 75:10
75:19 85:17
142:10,15
145:14 167:20
**goodwill** 26:14
**grab** 163:8
**grade** 41:11
**graded** 162:19
**grading** 161:19
162:13 164:10
**graduate** 41:24
41:25 42:2,2
**graduated**
41:21,22
**graffiti** 48:23
**grant** 34:3
**granted** 13:14
33:23 34:2
69:18
**grants** 12:23
**grateful** 36:23
**gratuitous**
25:21
**great** 12:12
18:19 28:13
38:11 61:14
168:16
**greatest** 19:23
**green** 10:1
40:20,21 163:6

**ground** 138:1
**group** 75:13
**grown** 27:2
128:24
**guarantee**
34:24 60:11
**guaranteed**
24:13
**guarantor** 52:1
139:14 140:19
**guess** 17:17
33:17 111:20
111:21 153:8
166:12
**guessing** 113:9
149:14 153:8
**gut** 32:15
**gypcrete**
128:13

**h**

**h** 7:9
**half** 15:20
37:14 57:14
75:23 124:24
147:16
**hallway** 153:4
153:6
**hand** 110:14
**handle** 14:23
22:7 36:1
113:24 149:8
149:23
**handled** 35:6
113:8,12,14,18
129:25
**handling** 22:11
114:20,21,21

122:9
**hang** 36:25
56:22
**hanging** 38:13
**happen** 131:22
**happened**
14:23 50:2,9
50:15,21 51:6
127:23 156:7
**happening**
127:17
**happens** 13:13
150:10
**happy** 10:6
11:2 28:17
120:13 168:1
**hard** 14:21
25:13 33:21
37:11 59:2
76:10 88:7
89:1 116:15
**harless** 6:4
8:20
**harms** 125:15
125:19 126:8
**hastings** 2:22
33:3
**hazard** 17:17
**he'll** 8:24
**head** 35:4
**header** 84:3
88:4,12 125:25
**header's** 112:1
**hear** 19:12
21:1 26:21
28:5 31:17
32:16 33:3,8

33:18 40:24
48:8 121:18,20
150:18 168:1
**heard** 30:8
32:12 33:7
**hearing** 3:1,4,8
10:8 11:15
25:23,25 28:25
30:1,22 33:18
34:9 67:21,24
68:22 91:17,23
91:25 92:6
105:4
**hearings** 9:2
26:11
**hearsay** 104:21
105:1 129:4,18
**heart** 53:7
126:25
**heartburn**
24:17
**hebron** 84:20
148:20 159:1,3
159:6,9,15
**held** 18:1 22:14
49:25 67:21
117:15 158:6
158:10 159:12
160:9,23
**help** 40:15
42:18 80:20
86:4 87:5
94:13,19
134:16,22
137:17 168:19
**helped** 86:3

| helpful 12:18 | holdings 158:7 | 165:8,17 166:5 | **i** |
| 13:22 19:9 | 160:9 161:3 | 166:15 167:2,3 | i.e. 73:2 |
| 61:13 137:6 | holds 21:25 | 167:9,13 169:2 | idea 14:7 27:5 |
| 138:4 | hole 16:21 | hope 11:21 | 27:6 28:13 |
| helping 42:19 | home 15:7 | 19:9 36:6 | 150:6 |
| hesitate 17:7 | 25:13 74:23 | 92:15 | identical 84:5 |
| hewed 23:12 | 83:6 130:5,10 | hopefully | 87:12 |
| hey 32:20 | 131:15,18 | 19:18 | identified |
| high 24:16 | 157:3,25 158:2 | hoping 25:24 | 45:19 99:12,19 |
| 41:21 | 158:6 159:10 | horner 144:16 | 138:14 159:8 |
| highest 13:10 | 160:1,7,9,19 | horrible 93:12 | identifier |
| highlight | 160:22 161:1 | horsager 92:22 | 160:20 |
| 110:24 | hon 2:22 | horse 43:25 | identify 53:17 |
| highlighted | hone 9:18 | hostile 120:11 | 61:2 72:15 |
| 88:2 99:1 | honest 14:9,13 | hour 8:25 | 99:9 155:12 |
| 138:19 139:6 | 14:20 | 75:20,23 90:8 | illusion 93:5 |
| highlighting | honestly 19:19 | 92:14 166:22 | imagine 114:19 |
| 88:13,14,18 | 31:22 33:2 | hours 142:13 | impeachment |
| highly 18:14 | honor 8:8,16 | 168:6 | 104:25 |
| 29:12 | 9:10,13,18,23 | house 133:6 | importance |
| hindsight 23:1 | 10:6 12:8 | 149:5 | 78:24 |
| 23:4,6 108:13 | 19:14 28:15 | housekeeping | important |
| hindsight's | 29:23 31:11,16 | 52:6 91:2 92:3 | 21:18 29:22 |
| 108:15 | 34:1,15 36:6 | humbly 17:12 | 78:23 |
| hint 26:16 | 36:11 37:10,13 | hung 135:10 | importantly |
| histories 43:21 | 38:1,4,7,10,21 | hurwitz 4:20 | 13:6 |
| 44:5 | 40:5 55:1 75:6 | hushka 4:18 | impossibly |
| hit 25:3 | 76:25 88:6,11 | 8:18 166:5 | 22:21 |
| hmm 136:2 | 90:10,13 92:2 | 167:2,9 | improper 23:8 |
| hohn 4:25 9:18 | 92:16 93:11 | hvac 84:24 | improvement |
| 9:21,22 | 110:22 111:16 | hyde 3:25 | 73:3,6 |
| hold 11:2 13:6 | 119:16 120:3,9 | 170:3,8 | improvements |
| 117:25 130:17 | 124:11 137:9 | hypothecate | 51:17 73:10 |
| 141:5 152:19 | 137:23 138:11 | 149:21 | incentivized |
| holder 50:7 | 140:23 142:7 | | 26:12 |
| holding 10:15 | 142:17 154:10 | | incipiency |
| 11:1 35:6 | 154:14 164:21 | | 10:17 |

| | | | |
|---|---|---|---|
| **include**  71:9 | **individually** | **inside**  22:9 | 158:1 |
| 95:22 103:21 | 37:5 51:25 | 27:17 110:8 | **intent**  157:1 |
| **included**  19:8 | 71:2 | **insider**  158:9 | **interbankly** |
| 80:8,14 | **individuals** | **insiders**  15:5 | 144:21 |
| **including** | 84:2 | 15:16 144:15 | **interest**  13:9 |
| 25:18 56:5 | **indulgence** | 144:18 145:13 | 24:7 26:9 |
| 80:11 83:4 | 37:14 104:22 | 146:2 | 36:14 37:24 |
| 143:21 144:16 | 130:14 135:25 | **inspected** | 46:24 105:9,11 |
| 158:5 | 150:12 | 50:24 126:10 | **interested** |
| **incongruity** | **industries**  5:2 | **inspection** | 30:18 37:17 |
| 21:13 | 9:4 31:21 | 50:17,20 51:1 | **interesting** |
| **incongruous** | 37:25 84:8 | 126:5,12 | 22:11 34:14 |
| 138:15,19 | 156:23 157:24 | 129:15 153:4 | 76:2 |
| **incorrect** | 159:18,21,22 | **inspections** | **interests**  19:7 |
| 107:14 | 159:25 160:12 | 47:13,16 48:1 | **interior**  48:24 |
| **indebtedness** | **industry** | 48:22 | 125:22 |
| 10:20,22 | 108:16 | **instance**  153:2 | **intern**  42:13 |
| **indicate**  56:1 | **information** | **instances**  21:9 | **interning** |
| 62:20 67:2 | 14:5 39:22 | **institution** | 42:13 |
| 73:1 98:18 | 44:4 51:25 | 138:25 139:1 | **interpreted** |
| 100:4,7,15 | 60:6,9 65:17 | **institutions** | 157:4 |
| 101:23 104:12 | 82:24 83:2 | 138:16 139:9 | **interpreting** |
| 107:10 120:10 | 102:20 107:20 | **instrument** | 157:6 |
| 148:11 166:23 | 109:17 137:6 | 100:1 | **interstate**  5:3 |
| **indicated** | 138:8 151:7 | **insurance** | **intervals**  47:15 |
| 63:21 65:11 | 155:21 | 20:22 49:24,25 | **intro**  13:19 |
| 106:16 113:20 | **informed** | 50:2,4,6,8,12 | **intrude**  128:16 |
| 124:1 155:4 | 92:22 | 51:4,6,12 | **intruding** |
| **indication** | **infrastructure** | 151:20,22,23 | 128:15 |
| 65:15 | 85:1 | 152:2,10 | **inventoried** |
| **indicator** | **initial**  29:23 | **insured**  152:11 | 152:25 |
| 121:5 | **ink**  154:4,4 | 152:12,15,17 | **inventory** |
| **indiscernible** | **innuendo** | 152:18,19,21 | 48:25 49:2,3 |
| 157:7 | 106:4 | **intend**  11:17 | 96:19 151:4 |
| **individual** | **inquire**  37:18 | 28:17 | **inventorying** |
| 16:22 94:9 | **ins**  151:10 | **intended**  15:14 | 151:12 |
| | | 15:25 132:24 | |

**invest** 33:12
**investigate**
  15:11
**investigated**
  29:21
**investment**
  20:15
**investor** 31:6
**inviting** 137:15
**invoice** 21:6,12
  21:23 81:5
  87:14,23 96:12
  96:14 99:16,17
  99:18 100:11
  100:23 101:8,9
  101:14 102:12
  102:17,20,24
  103:4,7 104:2
  104:5,18
  105:25 106:13
  106:17,20
  110:11 146:11
  146:12,19,23
  152:24 156:22
  156:24 157:1
  157:25 158:1
  158:17 159:2
  159:15,19,20
  160:13,15,24
  161:1,11 162:1
  162:20,22
  163:8 164:12
**invoices** 21:19
  21:20 22:19
  70:20 71:10,13
  71:18 83:2,15
  83:17 85:24,25

  87:2,3 93:24
  94:12,15,15,17
  94:21 95:9,10
  95:11 99:12,14
  99:15 108:13
  134:13 143:4
  148:3,10 150:1
  150:2,5 159:6
**involve** 35:14
**involved** 43:7
  43:11 69:11
**involvement**
  83:11
**iolta** 10:16
**issue** 12:5 17:8
  26:10 28:4
  35:1 90:23
  106:5 109:1
**issued** 25:7
  82:19,22
**issues** 12:5
  23:20 24:24
  28:14,21 30:11
  30:13,19,22
  31:19 35:1,5
  168:22
**it'd** 13:22
  100:1
**it'll** 52:25
  111:23
**itching** 36:15
**item** 41:10
  98:11 146:6
**items** 10:7
  153:1 161:18
  163:10

## j

**j** 4:18 5:14
**january** 44:24
  45:18,22 46:5
  46:25 116:17
  116:25 117:16
  117:25 125:16
  125:20 126:8
  126:19 127:4
  127:21 147:10
  148:2
**jean** 6:3 8:23
**jeff** 9:13 34:15
**jeffrey** 5:22
**jesse** 8:11
  42:23,25 43:1
  43:9 51:21
  53:21 55:8
  56:13 61:5
  70:11 72:8,25
  75:1 77:24
  82:18 83:4,6
  83:10 94:24
  97:15 98:9
  107:19 112:20
  113:15,18,23
  114:4,23
  115:12 131:16
  132:23 133:10
  144:16 146:21
  149:5,25
  153:16 158:4
  161:2 166:5
**job** 57:20
  108:20,21
  161:6

**john** 5:7 31:16
**joinder** 3:4
  28:9 30:20
**joined** 8:10,11
  31:12
**joining** 8:24
**joint** 36:24
  37:3,8
**jointly** 1:3,11
**joints** 127:16
**jordan** 5:14
  9:10 144:16
**jr** 5:7
**judge** 2:23
  9:22 28:19
  33:2,3 105:20
  139:25
**judgment**
  14:10 67:6,13
  67:18
**july** 53:23
  56:14 58:9
  60:6,12 146:6
  155:3,18
**jump** 13:20
**jumping**
  129:23
**june** 54:3
  55:25 59:20
  62:18 63:9
  64:11,11 67:20
  104:6 106:19
**jurisdiction**
  23:25

| **k** | 57:8,9 61:12 | **lacks** 23:11 | **leave** 10:22 |
|---|---|---|---|
| **karen** 8:18 | 73:15 76:8 | **lake** 74:23 83:6 | 12:9 35:21 |
| **kassin** 6:2 8:24 | 79:9 84:7 | 130:5,10 | 87:20 107:8 |
| **kd** 5:1 | 85:15 88:17 | 131:15,17 | 112:5 |
| **keep** 22:23 | 90:6,23 101:7 | 133:6 149:5 | **ledanski** 3:25 |
| 85:16 86:19 | 115:21,22,24 | 157:3,25 158:2 | 170:3,8 |
| 87:13 93:21 | 116:18 117:9 | 158:6 159:10 | **ledger** 100:6 |
| 99:5 108:8 | 117:15 126:15 | 160:1,6,9,19 | **ledgers** 83:18 |
| 147:3 | 127:3 128:21 | 160:22 161:1 | **left** 35:6 58:12 |
| **kemp** 122:7 | 128:25 129:2 | **language** 91:12 | 65:4 66:19 |
| 162:18 | 129:12 134:4 | **languishing** | 80:18,21 86:8 |
| **kesha** 4:16 | 137:1,3,10,16 | 31:8 | 87:24 93:16 |
| 8:16 | 139:24 147:18 | **large** 15:18 | 122:16,18 |
| **kills** 86:13 | 147:20 148:25 | 72:1 | 129:25 151:6 |
| **kind** 16:13 | 149:12 151:5,5 | **largest** 13:7 | 151:19 162:8 |
| 17:3,23 18:20 | 152:12 153:20 | 16:9 | 164:5 |
| 19:1 31:15 | 154:1,7 162:6 | **law** 4:11 5:1 | **legal** 84:6 95:5 |
| 70:19 76:15 | **knowing** 17:15 | 8:17 10:24,25 | 106:4,5 144:6 |
| 138:1 | 29:25 139:1 | 20:10 24:2 | 158:12 170:20 |
| **klj** 84:11 | **knowledge** | 115:23 116:6 | **legally** 115:7 |
| **klobucar** 5:22 | 22:2 44:6 45:7 | 147:19 | 115:10,12,13 |
| 9:13,14 31:25 | 45:21 46:2 | **lawful** 105:4 | **lend** 118:15 |
| 34:15,15,16,17 | 74:25 115:20 | **laws** 41:15 | **lender** 49:20 |
| 38:6 | 125:6 151:15 | **lawsuit** 66:12 | 73:8 |
| **kloos** 85:4 | **known** 24:13 | 67:7,21 82:19 | **lending** 51:19 |
| **know** 13:8 14:3 | 126:18 148:1,1 | 82:21 84:3 | 60:23 82:10 |
| 14:7 15:20 | **knows** 22:9 | **lawyer** 147:20 | 141:10 155:25 |
| 17:1 18:1,5,11 | 27:22 | **lawyers** 115:17 | **lent** 141:20 |
| 18:15,18 24:5 | **krings** 5:7 9:5 | 147:23 | **letterhead** |
| 28:10 30:6,12 | 9:5,7 31:16,16 | **lax** 164:22 | 112:14 |
| 30:19 31:5,8,9 | 31:19,21 34:19 | **lay** 138:4,7 | **liberty** 49:23 |
| 32:24 34:1 | 38:1,4 | **lead** 31:25 | 51:12 152:13 |
| 35:7 36:15,19 | **krings's** 35:14 | 120:12 | 152:14,16,22 |
| 37:8 38:15 | | **leading** 148:15 | **lien** 22:7,12 |
| 42:23 43:7 | **l** | **learned** 23:5 | 31:23 82:3,5 |
| 47:6 51:15 | **lack** 19:1 20:2 | 145:8 | 82:11 83:17 |
| 52:25 53:4 | 134:23 | | 84:1 113:2,7 |

| | | | |
|---|---|---|---|
| 113:12,14,17 | **listed** 160:2 | 45:7,9 58:4 | **logistical** |
| 113:22,25 | **listening** 9:2,3 | 60:15 63:16,16 | 167:15 |
| 114:8,11 | 9:19 | 63:18 65:7 | **long** 32:2 42:9 |
| 146:13 | **litigate** 18:22 | 66:6 71:20 | 116:13 156:21 |
| **lienholders** | 19:4 30:12 | 72:1,15 74:9 | 167:15 |
| 32:3,23 33:14 | **litigation** 18:25 | 82:9 109:15 | **longer** 10:25 |
| **liens** 82:1 | 24:12,14 25:1 | 110:13,21 | 12:5 15:1 |
| **lieu** 121:5 | 25:7,10 31:9 | 112:12 114:23 | 165:6 |
| **life** 42:15 | 47:14 50:17,25 | 115:4,6 117:19 | **longshot** 17:13 |
| 105:19 | 56:4 81:22 | 118:11 129:24 | **look** 11:4 19:20 |
| **light** 40:20 | 83:24 | 131:7 135:1,6 | 21:4 23:1 |
| **likelihood** | **little** 19:21 | 135:11,14,18 | 27:23 29:10 |
| 33:11 129:16 | 30:15 34:19,20 | 135:22,23 | 33:9 35:20 |
| **likely** 34:8 52:9 | 42:20 44:15 | 136:4,7,14,16 | 37:25 40:19 |
| 66:7 96:16 | 52:8 58:21 | 137:25 139:15 | 52:7 57:5 |
| 127:25 128:9 | 66:18 67:10,14 | 139:19,20,21 | 58:19 59:10,16 |
| 144:6 156:25 | 72:12 73:12 | 140:1,2,4,5,7 | 66:17 69:20 |
| **limited** 13:1 | 80:22 86:16 | 140:13,15,16 | 71:23 73:12 |
| **limoges** 84:22 | 88:4 91:2,10 | 144:2,3,20 | 81:4,5 86:11 |
| 84:23 | 91:14 96:9 | 149:8,23 | 87:15 90:6 |
| **line** 31:24 | 103:18 104:7 | 154:20,21 | 91:9,13 97:18 |
| 98:11 112:25 | 108:6 111:2 | 155:16,22 | 98:11 109:5 |
| 113:1 131:7,7 | 115:24 129:23 | 156:3,3 | 110:15 115:11 |
| 131:7,23,24 | 137:8 147:12 | **loaned** 118:3 | 139:25 155:8 |
| 134:5 146:6,6 | 147:16 156:16 | 119:13 | 156:13,14,20 |
| 160:2 161:18 | 164:8 | **loans** 43:14,16 | 160:11 161:8 |
| 163:10 | **llc** 1:7,15,23 | 43:22 46:10,13 | 167:17 168:11 |
| **liquidate** 13:2 | 8:4,4 43:5,8,10 | 60:13 70:19 | **looked** 100:17 |
| **liquidation** | 64:9 69:10,10 | 74:17 75:3 | 101:10 103:11 |
| 18:18 29:6 | 70:11,12,15 | 113:8 118:23 | 104:15 109:15 |
| **liquidity** 56:20 | 83:4,5,5,5,8,9 | 119:8 149:13 | 124:5 134:25 |
| 60:4 63:14 | 107:19 112:20 | 149:17 | 148:18 164:9 |
| 65:6,15 66:8 | 158:7,7,20,20 | **local** 18:1 | **looking** 14:22 |
| **list** 36:24 37:3 | 160:9 161:3 | **lock** 57:14 | 37:3,16,19 |
| 37:8 120:7 | **llp** 4:20 | **lofts** 26:21 83:4 | 44:19,24 55:10 |
| 153:23 | **loan** 15:24 30:3 | 83:8,9 | 59:12 61:7 |
| | 42:21 43:20 | | 81:16,20 96:15 |

106:19 108:12
109:3 119:25
124:3 131:6,23
132:11 147:22
154:6 159:4
**looks** 39:15
44:13 53:10
61:7 63:15,18
86:20 91:7
101:8
**loss** 20:6,8
**lost** 80:2
**lot** 14:3,4
17:14,25 22:18
25:6 28:10
29:15 30:22
61:15 115:21
116:13 138:3
154:17 161:4
**lots** 23:24
137:12
**loud** 166:15
**love** 13:25
24:11 105:22
**low** 33:11
**luck** 14:21
**lumber** 85:6
**lunch** 75:13,17
89:24 90:7
92:14

**m**

**m** 4:25 5:7
**mac** 114:9
116:13 117:23
145:17
**machine** 109:8

**made** 18:8,12
21:6 23:16
26:8 46:24
47:2 51:17
70:22 73:21
80:4 88:9
94:10 110:8
114:22 119:9
121:20 130:11
130:24 131:2
131:14 134:11
144:15 147:12
151:18
**madison** 42:1
**magically**
128:11
**main** 111:19
**make** 8:6 9:6
9:17 14:5,9
18:10 20:22,23
32:6 33:3,3,10
33:19 36:20,25
40:23 49:20,22
72:12 90:12
109:7 113:5
120:21 125:14
138:6 151:8,23
155:22 156:6
166:6,7,10,23
**makes** 19:24
88:19 91:18
**making** 16:2
57:18 144:5
**management**
27:4 53:24
62:2

**manager** 8:12
**manifest** 113:6
**manner** 73:7
**march** 50:18
133:22 134:10
135:7,8
**mark** 88:19
**marked** 98:2
**market** 32:17
96:3
**marking** 51:2
**marriage**
117:6
**marshaling**
35:1
**martin** 112:18
**mask** 156:25
**match** 58:4
103:11 104:14
133:7 146:20
151:4,11,13
153:6
**matched**
132:14 133:9
**matches** 73:25
**material** 88:15
141:11
**math** 25:25
**matter** 1:5,13
1:21 9:23
32:19 35:11
52:6 61:7
90:16 151:19
169:5
**matters** 36:10
92:3

**maurice** 4:8
8:9
**mauritian**
21:24 22:1
**mean** 28:25
29:7 30:21
54:4 78:16
79:6 89:20
93:21 108:9
110:22 120:14
133:25 138:22
140:23 142:7
144:10,11
149:13,17
**meaning** 11:4
49:5 124:2
130:19
**meaningful**
21:2 22:8 24:2
88:19
**meaningfully**
20:17
**means** 10:4
11:5 12:4 39:8
61:16 89:21
127:12 128:23
128:25 129:2
153:8
**meant** 52:7
102:23 137:4,5
**mechanic's**
146:13
**mechanics**
31:23 32:3,22
33:14 82:1,3,5
82:11 84:1

medical  24:24
meet  42:25
member  43:10
  55:11,13 58:2
  62:19 63:13
  64:6,18 158:7
  158:20,20
  160:10 161:2
members
  117:5
memory  13:14
mentioned
  83:23 91:2
merits  24:6
  34:1
met  43:1
mic  157:13,16
microphone
  9:25 19:13
  40:19
microwaves
  153:2
middle  56:2
  73:14 98:19
  112:22 163:5
million  17:22
  29:13 32:18
  44:20,20 60:15
  118:2 119:3,8
  119:14 136:5,7
  136:9,15,17,18
  139:19 141:21
  143:3 155:15
millions  15:4
  15:13
mind  72:11
  102:16 114:3

121:21 144:23
mindset  28:19
mineola  170:23
minimis  20:11
minneapolis
  5:20
minnesota
  130:5 131:15
  160:2
minute  34:18
  76:20 102:24
  133:11 137:2
minutes  53:4
  75:7 91:12
  142:14 166:13
  166:17 167:23
miracle  92:13
miraculously
  92:23
mirrors  57:12
mischaracter...
  95:2
misnomer
  25:22
missed  39:19
  107:1 108:14
  148:23 164:16
missing  49:8
  49:12 97:2
  150:23 152:23
  164:10
misstated  30:4
mistakes  14:9
  23:16
mix  133:7
mixed  60:21
  135:8

mm  136:2
mn  5:20
modest  20:11
moisture
  127:18,20
mold  128:25
  129:2,12
mold's  128:23
molded  127:25
moment  18:20
  22:25 38:19
  121:18,20
  123:19 133:18
  136:1 148:7
  167:15
moments  26:24
  100:19 165:2
monday  2:9
monetarily
  26:12
money  10:15
  10:25 15:14,22
  18:8 21:18
  26:25 31:1
  32:3,18 33:12
  34:7,8,21
  35:25 71:2,16
  118:3,10,15
  131:19 132:1,5
  133:3,3 141:10
  143:8,16,18,25
  168:6
money's  168:8
monies  27:4
  144:9
month  69:3
  145:9

months  24:21
  24:22,23 58:17
  147:12,13,16
mootness
  11:12
morning  8:2,8
  8:16 9:10,13
  167:25 168:23
mortgagee
  50:7
mortgages
  45:8 46:18
  149:14
motion  3:1,5,9
  11:12 12:10,23
  20:6 24:5,6,21
  25:1,10 28:9
  31:12 33:22
  37:2 67:5,12
  67:19 68:12,16
  68:23 86:7
  90:25 91:23
  92:5,7 143:21
  147:17 167:18
motions
  167:16
motivate  24:18
motivated  31:7
motivation
  24:4 27:17
mouse  162:9
mouth  146:9
move  11:17
  32:11 66:10
  75:5 76:19
  86:18,18
  117:11 119:19

128:2 141:8
168:8
**moving**  65:23
75:6 127:9
**mulinda**  8:12
78:7,9 144:16
**mulinda's**  83:6
**multifunction**
109:8
**multiple**
132:11,12,20
158:5
**mute**  9:5,6
**mutual**  49:23
152:13,14,16
**myriad**  22:11

**n**

**n**  2:5,6 4:1 7:1
8:1 170:1
**nail**  105:20
**name**  40:11,23
41:6 154:19
159:24
**national**  6:2,3
8:22
**natural**  12:22
**nature**  110:10
**nd**  2:7 4:6,14
5:5
**necessarily**
22:20
**necessary**
20:24 73:2,6,9
**need**  16:21,22
25:14 26:16
27:14 40:24
52:13 53:14

77:7 89:18
91:9 93:13
120:10 138:8
164:22
**needed**  25:5
142:4
**negate**  124:5
**negotiating**
38:19
**neighborhood**
35:24
**neither**  115:17
**neutral**  15:10
**never**  26:23
30:8,9 67:24
72:11 114:3
121:16,21
132:16,16
**new**  11:13 26:1
26:5 106:9
139:3 141:6
155:6 156:3
157:11,20
**news**  151:9
**nice**  71:11
**night**  50:21
**nine**  147:16
**ninety**  56:22
**ninth**  41:11
**non**  94:17,21
94:22 95:11
115:11
**nope**  39:13
54:16 66:19
68:24
**normal**  52:10
140:16,18

**north**  1:2 4:5
27:21 41:21
118:2,21,21
125:25
**northern**  4:13
**notably**  11:16
**notation**  91:25
**note**  9:7 19:16
45:20,22 46:4
46:7 54:13
60:17 65:22
72:2 133:22
134:10,12
136:18 140:10
141:20,24
142:1,6 151:18
155:13
**noted**  46:7
**notes**  44:5,17
47:3 74:22
**notice**  148:22
**noticed**  28:8
146:10,17
**notified**  50:8
152:13,17
**notifier**  159:23
159:23 160:17
**notifying**
150:23
**noting**  24:20
**notion**  14:12
**november**  2:9
11:6 170:25
**nti**  101:8
**number**  8:3
21:3,4,24
39:15 54:19,22

55:2,6,11,13
55:22 58:2,4
58:12 59:5,10
59:10,12,17
60:17 62:15
63:6 64:6,18
67:10 72:23
77:4,24 93:10
95:21 96:7
99:4,7 102:5
102:10,13
103:5 104:3
106:2,14
107:14 114:15
136:6 139:6
142:22 151:20
153:1 159:23
159:24 160:17
160:20 161:16
162:2,22,24
164:15 165:15
**numbering**
76:8 81:6 88:8
88:10 89:1
**numbers**  54:14
95:8 111:18
153:6
**numerous**
46:23 68:2
114:6 153:16
**ny**  170:23

**o**

**o**  2:21 8:1
170:1
**o'clock**  165:6,8
**o'dette**  6:3
8:23,23 9:3

**object** 11:23
89:20
**objecting** 89:8
**objection** 3:8
29:25 30:2,9
30:17 41:13
79:23 87:9
93:3 95:1
104:21 106:3
109:9,19 117:8
117:17 118:5
119:16 123:10
124:7,13 129:4
129:7,18
130:12 136:6
140:23 142:7
142:10,11
143:10 145:10
148:13 157:6
157:12 158:12
**objections**
33:16 93:1
**objects** 89:19
**obligation**
63:15
**obligations**
20:18,19 30:4
30:14 65:3
**observations**
126:2,4
**observe** 21:18
**observed** 47:23
48:21 126:14
127:1,2
**obtained** 93:24
94:24 95:1
159:3 163:22

**obvious** 27:18
**obviously**
11:22 15:19
32:8 105:2
137:4
**occasioned**
24:24
**occasions** 21:3
78:6
**occupation**
42:5
**occur** 11:18
29:7
**occurred**
126:16 127:3
128:21
**october** 47:5
52:24 70:4
**odd** 120:4
**offended** 36:6
36:13
**offensive** 52:11
**offer** 12:18
28:17 37:1,21
38:18
**offering** 37:24
**office** 32:7
109:8
**officer** 42:21
74:9 112:16
115:9 149:21
151:1
**offshore** 21:24
22:1
**oftentimes**
24:12

**oh** 19:24 37:16
54:22 57:3
59:10 87:16
89:18 91:21
93:20 95:18
96:10 97:17
102:24 161:23
162:7 163:2
168:13
**okay** 8:21 9:4,6
9:17,21 10:2,4
10:10 12:4,7
14:9,9 19:25
28:5 31:14
34:13 38:5,8
39:8,21 40:4,7
40:18,22 42:9
43:16,19 44:3
45:6,25 46:13
46:20 51:3
53:11,17 54:12
55:6,18 56:21
57:4 59:9
62:24 63:12
64:2,12,22
67:1,5 68:22
70:5 71:7,12
71:14,20 72:4
72:11,13 73:12
73:17,23 74:14
75:12,24 76:4
76:6,11,15,20
76:23,24 77:16
78:1 79:6
80:14,20 81:15
82:22,24 83:14
84:8 85:19,21

86:11,23,24
87:14,15 89:2
89:10,13,23,25
90:4,14,15
91:14 92:1,11
92:25 93:6
94:2 96:4,6
97:8,23,24
99:3 101:7
102:1,19
103:14,16
107:6 108:12
110:22 111:1
111:14 112:14
112:19,22
113:5,12,16
114:7,15,18
115:1 116:8,22
117:2,12 118:3
118:21 119:3,7
119:8,13,20
121:18 122:9
123:5,8 125:3
125:9,13
126:14,18
128:19 130:7,9
130:14,17
131:4,9,14,19
131:22 132:1,9
133:1,15 134:5
134:25 135:6
135:13,14
136:11,20
137:2 139:11
139:15 140:6
140:13,17
143:8 144:23

**[okay - page]**

145:15 146:8
147:3,7,15
148:1,5,24
149:4,17,20
150:12 152:1
152:23 154:3
157:11,17
158:23 161:11
161:22 162:1
162:21 163:1,8
163:13,18
164:1,11,14
165:10,19
166:1 167:10
167:14 168:17
169:3
**old** 124:1
170:21
**once** 56:12
166:18
**ones** 10:9
37:11 49:25
52:17 78:12
80:14 81:17
95:16 104:14
110:3 124:23
132:19 138:21
139:8 144:23
163:6
**ongoing** 20:6,8
127:16
**oops** 156:15
**open** 57:11
107:8
**opened** 123:20
**opening** 13:23
20:3 31:15

36:8 39:3
**operating**
150:7
**opinion** 47:18
112:4 129:14
**opinions** 34:11
**opponent**
105:12
**opportunity**
12:17 28:16
30:12,25 38:12
38:16,17 138:7
**opposing** 33:16
**option** 18:19
18:19
**oral** 89:15 91:8
**order** 16:23
69:24 70:2
91:4,11 92:9
134:5 155:22
159:7 167:18
**orders** 91:7
**ordinary** 30:16
**organize** 14:4
**original** 44:18
44:21,23 45:5
45:6,8 64:15
85:25 87:3
93:23 94:12,15
95:10 103:12
104:15 109:2
138:25 140:5
157:24 159:2
159:19 160:13
**originally**
15:23,24
141:19

**originated**
118:23 133:22
134:10 139:19
139:20 140:2
140:11
**originating**
74:9
**outcome** 34:7
**outline** 115:15
**outlined** 50:6
139:17
**outside** 27:17
**outstanding**
46:13 125:4
**overlaid** 88:5
**overlay** 88:12
**overly** 164:22
**overnight**
167:5,24
**overrule**
145:15
**overruled**
117:22 148:16
**owed** 31:23
34:20 35:24
101:18,19
124:23 160:22
**owing** 43:17
45:20 46:5
100:25
**own** 34:11
50:12,13 121:6
**owner** 107:19
**ownership**
158:22
**owns** 62:4
69:12

**p**

**p** 4:1,1 8:1
**p.o.** 5:4
**pacific** 4:13
**package** 140:5
**page** 7:2,10
44:15 45:13,13
53:12 54:12,18
55:6,18 57:3
57:15,24 58:20
58:20 59:16
62:6,25 63:23
63:24,24 64:13
67:2 68:19
69:22,22 72:9
72:10,11 81:6
81:8 86:24
87:15,16 94:3
94:4,4 95:19
96:6 97:7 99:4
99:6,6 100:9
100:20 101:7
101:12 102:2,3
102:22,25
103:16,17,18
103:25 110:16
110:18 112:22
153:11,13
154:3 155:9
156:14,14,17
158:24 159:1
159:17 160:11
161:9,22 162:3
162:5,8,11
163:2,15,16,18
164:2

**pages** 14:22
33:10 35:25
45:6 108:24
121:14 143:20
**paid** 10:19,20
15:22 16:14,18
17:3 19:4 26:9
28:21 29:20
33:20 71:15
95:22 97:11
98:18,24 100:4
100:18 101:3
102:6,8 103:21
106:23 107:4
107:10 108:10
109:22 114:25
124:22 125:1
131:9 133:16
133:21 160:25
160:25 161:12
161:17 164:14
**pain** 52:8
**palace** 162:12
162:15,17
164:6
**paperwork**
23:19
**paragraph**
72:18 73:1
168:15
**paraphrase**
105:14
**paraphrasing**
21:14 104:23
125:9 141:19
**pardon** 109:5
157:15

**parkside** 1:15
8:4,13 10:14
10:20,23 11:6
23:14 27:2
52:5 69:10,16
69:25 74:18
83:5 90:22
118:4,11,16,25
119:23 120:19
120:22 121:22
122:10,19
130:19,23
133:3,5 149:4
**part** 11:18,21
20:18,21 24:4
27:5,12 33:23
33:23 35:13
55:6,18 60:10
68:12 76:22
78:25 79:6,7
82:19,20 94:7
108:3 138:24
140:5
**partial** 67:5,12
67:18 81:14
**participate** 9:1
**particular** 30:1
76:22 126:22
**parties** 8:6
9:16 10:7
11:23 13:3
20:21 30:5,7
37:17,18,21,22
38:16,19 91:2
**party** 22:7 28:6
29:8 31:6,14
37:1 105:12

113:17 129:19
149:7 158:8,20
161:1
**passed** 19:16
127:23
**passing** 21:7
**past** 54:19
**patchwork**
16:13,22 17:3
17:23
**path** 31:24
33:4,5,20
157:21
**pathway** 17:4
32:3
**patient** 137:14
138:9
**patronize** 33:1
**pay** 16:20
18:16 21:20
33:7 65:25
71:17,18 83:17
123:22 158:17
158:21 163:5
**payment** 15:15
15:25 43:21
44:4 47:2
83:15 157:2
158:1,8 159:11
160:5,21,24
**payments** 18:9
18:12 46:24
99:19,22,25
**pays** 150:10
**pc** 5:9
**pdf** 53:24

**pdfs** 57:11
109:7
**pelican** 83:6
131:18 160:1
160:19
**pen** 80:2 88:19
**penchant**
24:16
**pendency**
128:22
**pending** 23:10
29:10 30:23
69:5
**penetrating**
48:3
**penny** 23:8
**people** 14:8,9
14:18 16:3,13
20:15 29:19
38:16 101:8
137:12,19
**percent** 27:12
43:10
**percentage**
117:20
**perfect** 58:21
63:25 66:20
67:10 86:25
97:22 161:24
**perform**
149:23
**performed**
49:2
**period** 55:13
58:1 64:10,20
65:21 82:16
126:4,17 128:4

133:23
**periodic**  47:16
**periods**  42:14
145:3
**permission**
16:6
**permit**  121:9
**perpetually**
67:22
**person**  119:15
**personal**  46:21
51:20 54:5,7
60:5,10 61:10
62:4 74:22
139:12 140:6,9
140:11 141:11
142:3,5 144:10
154:23 155:5
**personally**
93:18 143:9,18
156:9 159:13
160:7
**perspectives**
34:22
**peterson**
112:18 122:16
122:18 129:25
**petition**  25:9
35:11 45:18
46:11,25
125:17,21
**pfs**  54:2,4 61:7
61:9 62:4
**phillips**  5:11
**phone**  19:8
21:13 109:6

**photographic**
48:1 50:16
151:12
**photos**  47:20
83:19 129:15
**physically**  48:2
**pictures**  50:16
**pie**  33:16
**piercing**  18:24
**place**  1:15 8:4
12:22 16:18
49:5 69:10
83:5 90:23
**places**  48:15
**plain**  21:17
**plan**  9:1 11:24
12:24 16:15
17:13 18:6
25:2,17,17,18
25:19,22 26:17
27:10,11,12
28:3 29:10,23
30:1,4,5,10,23
30:24 76:12
91:15,16
123:11
**planning**  89:15
**plans**  31:9 73:7
**plays**  34:9,10
**pleading**  34:3
**please**  8:6
34:16 38:15
40:11,17 41:6
41:19 44:13
56:21 57:3
66:17 71:23
77:1 90:18,20

95:19 97:14
99:3 100:8
101:7,12
103:17 111:17
130:4 138:17
142:19,21
146:8 153:11
155:8,9 161:7
161:9 162:3
163:5,19
**pllc**  5:1
**plural**  15:4,13
**plus**  130:10
163:10,11
**po**  156:25
159:7,10
**pocket**  21:19
**point**  15:3 16:4
19:17 24:3
25:14 27:10,18
30:7 31:3 36:8
57:4 75:7,18
79:10 81:21
85:14 109:20
114:7,10,18
116:8 117:19
120:20 121:2
121:15 127:9
127:17 128:2
133:2 137:14
138:5 145:14
151:22 166:11
**pointed**  15:2
147:18
**points**  48:4
**police**  49:10,18
97:4 150:15,19

150:22,23,24
151:2,9,18
**policies**  150:7
**policy**  50:1,7
151:23
**pool**  15:21 16:2
31:2
**poorly**  158:18
**portion**  16:11
74:13 130:8
**portrays**
162:20
**position**  22:4
24:9 28:13
31:22 34:20
35:17,23 38:22
115:9 116:22
120:4
**possession**
15:9 23:11
47:20
**possibility**  17:1
18:22
**possible**  13:3
33:17 57:4
137:7
**post**  19:16 27:2
**poster**  19:17
**postpetition**
20:18,19 23:9
**postsecondary**
41:21
**potential**  26:10
31:1 151:20
**potentially**
34:19 35:19
151:13

pour  33:24
35:25 116:14
power  25:9
practice  116:6
precarious
17:5
precedent
73:13
preceding
119:9,10
prefacing
110:11
prefer  19:6
36:9 112:3
prejudice  28:2
preliminary
9:23
premise  144:19
prep  90:5
preparation
94:13,19
prepare  86:3
87:5 167:12
prepared  91:4
preparing
85:23
prepetition
10:16 21:1,2
23:19,20 29:13
present  6:1
31:14 38:25
39:3 104:17
118:8,12,17
166:4
presented  21:5
73:8 138:3

presents  32:20
president  6:2
42:6 116:24,25
pressure
150:17
pretty  14:23
29:24 30:16
95:5
prevent  73:3,9
previously
96:18,21
price  24:16
principal  8:10
23:12 46:24
print  76:17
prior  42:12
48:1 50:9 51:1
95:13 97:8
98:9 100:17
114:19 122:3,5
124:6 126:12
128:12 140:11
140:12 142:5
148:9 158:19
160:16 162:18
163:2
priority  28:21
probably
15:20 17:16
19:3 26:2,2
28:2 34:6 36:7
66:7 69:21
88:17 91:19
95:3 117:20
127:25 134:21
149:11 166:17
167:20 168:10

problem  18:21
19:2 28:23
32:12 157:19
problems
29:15 50:22
72:12
procedural
168:22
procedurally
166:6
procedures
150:7
proceed  10:5
13:18,21 36:17
40:1 41:3
75:14 77:7
88:24 137:21
142:24 165:16
proceeding
27:19 105:5
proceedings
169:8 170:4
proceeds  15:24
77:24 144:2,4
144:20
process  12:22
28:18 29:2
47:14 76:19
processing
152:16
produced
138:15,16
products  85:8
professional
108:16 129:14
proffer  17:20
121:18

progress  57:18
79:15
progressed
25:2
project  13:4,10
13:11 15:5,14
15:16 20:12
21:21,21 25:16
29:9 31:7 32:4
35:18 65:25
70:9 72:13,16
72:18 73:1,4,5
73:10 77:25
79:2,4,5 83:21
94:21 95:11
98:15,18 99:13
100:5,6,11
106:24 108:1
112:13 123:7
132:2,5 134:15
project's  25:11
projects  22:19
74:13,18,22
83:3 94:17,22
130:1,10,19,23
131:4,20
promise
116:20
promised
165:20
promises  16:13
promissory
44:17 134:12
136:17 155:13
proof  39:12
44:8,12,16,18
45:8 71:7

118:18 155:9
**proper**  22:15
**properties**  22:5
26:20 69:9,11
131:16 143:20
144:25 160:6
**property**  8:12
13:2 27:3
32:10 46:14,21
47:10,17,24
48:19 49:19
50:24 51:13,17
66:13,24 68:10
70:6,7 75:3
79:1,17,21,25
110:14 124:18
124:21 125:10
125:16,19
126:8,10,12
127:1,2,17
151:3 161:1
**proposal**  115:8
**proposed**
16:15 31:9
**proposes**  12:20
**proposing**
12:24
**prosecute**
15:11
**prospect**  17:8
**protect**  50:11
**protection**
147:8
**proud**  126:25
**provide**  13:19
41:19 52:14
54:1,6,10

60:22 61:24
78:3,5,16,17
80:11 84:8,15
84:20 85:1,4,6
85:9 109:16
129:16 134:23
137:5 140:19
**provided**  52:19
54:2 56:13
58:8,24 60:6
62:1,9 63:2,13
63:20 64:3,15
64:22 65:10,14
65:22 70:20,24
71:10 72:24,25
73:25 74:1
77:24 78:7,9
82:4,16 85:24
91:6 92:9 98:9
106:1,14,17,19
108:18,21
109:5 110:14
111:8 132:13
132:15,22,23
133:10,13,13
135:22 136:22
146:21 159:6
161:14 162:1
162:22,23
163:25 164:12
**provides**
104:22 136:4,9
136:14
**providing**  68:3
106:20 113:24
113:25 150:1

**proving**  34:13
**provision**
29:11 119:22
**pull**  44:12 52:2
56:21 57:5
93:14
**pulled**  86:8
**pulling**  48:15
48:17
**purchase**
159:7
**pure**  15:19
**purpose**  33:18
53:25 61:6
77:21 88:7
106:21 162:6
**purposes**  27:11
94:18 104:25
**pursue**  27:17
31:1
**pursued**  29:20
**pursuit**  26:15
**put**  10:11
15:12 17:14,18
22:4 26:24
31:1 49:5
50:12 108:1
134:13 146:9
149:4
**putting**  23:13

**q**

**qualified**  22:13
**quarter**  152:5
**quentin**  2:5
**question**  21:22
24:6 25:12
26:18 27:15

36:22 48:8
60:20 106:9,10
109:13 114:19
117:23 118:9
124:8,9 125:18
126:7,22,23
130:22 136:12
136:23 139:1,3
140:21 141:1,6
142:12 143:12
145:16 156:8
156:11 157:12
157:20 158:11
166:12
**questioning**
92:20
**questions**
13:24 20:3
36:10 137:7
148:15 154:11
154:17 164:19
165:23
**quick**  34:18
161:4
**quickly**  13:2
24:13,14 31:7
32:10 35:7
118:19
**quite**  19:3
166:16
**quotation**
105:15
**quotations**
158:6
**quote**  125:9

| r | | | |
|---|---|---|---|
| **r**  2:21 4:1 8:1 | 18:21 19:7 | **receipt**  123:15 | **recognized** |
| 41:8 170:1 | 29:22 31:10,22 | 123:17,18 | 21:12 |
| **rain**  50:21 | 33:13,15,21 | **receive**  34:8 | **recognizes** |
| **raised**  30:11 | 34:13 36:1 | 37:9 39:9,12 | 23:23 |
| 33:16 | 39:1 43:25 | 56:9 77:10 | **recognizing** |
| **raises**  35:1,16 | 59:2 61:11 | 88:24,25 | 13:11 90:5 |
| **rapids**  83:7 | 75:20 93:4 | 122:24 156:9 | **recollect** |
| 131:18 160:1 | 111:21 119:18 | **received**  21:5 | 117:18,21 |
| 160:20 | 130:12 138:5,8 | 36:21 37:23 | **recollection** |
| **rarely**  23:4 | 142:12 153:8 | 56:12 77:13 | 43:1 46:17 |
| 167:4 | **realm**  75:17 | 85:13 99:10 | 47:4,19 49:4 |
| **ratably**  16:2 | **reason**  15:6 | 110:7 123:14 | 54:1 55:9 62:2 |
| **rather**  31:7 | 22:8 30:20 | 123:19 135:21 | 67:25 71:19 |
| 91:10 | 75:17 88:23 | 138:4 140:11 | 72:17,22 77:12 |
| **rcx**  7:4 | 108:23 117:11 | 142:5 159:9,25 | 77:22 78:11 |
| **rdx**  7:4 | 128:10 134:21 | 160:18 | 82:8 83:1,16 |
| **reached**  134:16 | 143:16,17 | **receiver**  10:16 | 100:19 102:14 |
| **read**  73:15 | 167:7 | 68:9,16 | 103:5 110:2 |
| 76:10,14 77:8 | **reasonableness** | **receivers**  69:15 | 115:3 118:1,19 |
| 88:7,10 89:1 | 123:21 | 69:24 | 128:3 131:1,8 |
| 110:3,23 135:4 | **reasonably** | **receivership** | 132:10,19 |
| 151:22 | 108:22 | 68:22 | 133:8 141:20 |
| **ready**  39:25 | **reasons**  21:10 | **receiving**  37:22 | 144:3,12 145:2 |
| **real**  13:11 | **recall**  47:2 | 116:8 | 146:5 151:18 |
| 14:18 15:6,8 | 49:7 51:18 | **recently**  43:19 | 152:22 153:1 |
| 47:6 63:17,18 | 69:18 81:13,20 | 54:2 116:14 | 156:21,23 |
| **realistic**  15:21 | 102:12 104:20 | **recess**  77:2 | 159:5,22 |
| 16:2 17:1,21 | 114:5 116:4,11 | 90:17,19 | 160:15 |
| **realize**  30:15 | 116:12,15 | 142:20 165:13 | **reconciliation** |
| 30:21 88:14 | 120:10 131:13 | 167:11,14,20 | 143:22 |
| **realized**  21:17 | 132:25 147:6 | 169:6 | **record**  8:7 9:7 |
| **realizing**  34:5 | 153:15 154:19 | **recesses**  52:9 | 10:12 20:8 |
| **really**  11:21 | 156:9,11,20 | **recognize** | 26:24 27:7,21 |
| 13:5 14:11 | 159:2,19 | 11:23 12:11 | 38:23 40:11,23 |
| 15:1 16:17,24 | 160:12 | 23:22 24:15 | 77:4 90:21 |
| 17:5,23 18:5 | **recalled**  127:5 | 25:4 112:8 | 106:10 110:4,4 |
| | | 153:13 | 142:22 165:14 |

168:3 170:4
**recorded**  82:11
**records**  33:24
  56:14 59:13
  63:5 65:10
  81:2,16,20
  83:19,21 84:9
  84:16,20 85:2
  85:4,6,9,12
  100:4 103:12
  104:15 105:24
  106:12,15,22
  109:2 131:7
  132:22 146:21
  151:4,11
  152:25 154:7
  162:24
**recourse**  35:8
**recover**  32:3
  35:2
**recovery**  16:10
  31:25 33:11
**recross**  164:20
  164:23 165:16
**red**  3:1,4,8
  4:12,21 6:4
  8:14,19 9:19
  10:19,21 11:8
  11:11 12:19
  13:6,15,17
  21:7 24:3,8,10
  25:8 27:1,19
  27:20,21 32:18
  33:22 34:5
  36:18,23 37:6
  39:16 40:20
  42:8,9 43:11

43:14,16 44:8
45:9 46:16,25
47:3 50:12
51:11,19,24
52:2,3,3,5,14
52:15,16,17,18
53:18 56:4,9
57:6,16 58:23
60:5,12,23,25
61:2 62:6 63:2
63:23 65:17
66:4,11,17,22
66:23 67:5
68:9,14 69:4
69:15,20 71:7
71:23,25 74:6
75:1 76:2,17
77:10,12,19
78:1,13,15,16
78:20,23 81:2
81:9,10 82:6
83:11 85:15,24
87:7,16 88:9
91:15 93:9
94:11 102:10
102:19 106:14
106:17 107:20
108:2 113:8
114:16 116:22
117:2,15
118:10,15
119:8,13
134:25 149:7
149:21 154:4
154:25 155:2
155:21,24
166:3

**redacted**  54:14
  59:5 156:25
  159:8
**redirect**  154:13
  154:15
**redundant**
  128:14
**reference**  63:6
  63:15 162:16
**references**  63:7
**referencing**
  91:8
**referred**  101:9
**refresh**  141:7
**regard**  90:24
**regarding**
  28:13 30:8
  43:20 49:12
  81:23 83:3,20
  86:7 118:18
  137:24
**regardless**  34:7
**rehabilitation**
  17:1,4,9
**related**  16:7
  20:21 25:7
  117:6 155:5
**relationship**
  51:20 60:23
  70:15 155:25
**relative**  20:12
**relatively**
  166:7
**relevance**
  117:8,17
  145:10

**relevant**  17:8
  22:5 117:9
  121:7 145:13
**relied**  78:22
  106:18 107:24
  108:2 109:25
**relief**  13:14
  15:3 25:10
**rely**  60:5,9
  65:17,20 78:15
  78:19,19
  107:20 108:17
  155:21
**relying**  110:8
  110:10
**remain**  15:6
  19:11 39:11
**remaining**
  38:24 122:18
**remarkable**
  165:22
**remedies**  25:15
  25:18,19
**remele**  5:16
  9:14
**remember**
  50:19 52:22
  74:19 116:4
  124:9,17 125:4
  134:25 135:21
  137:15 138:13
  139:6 143:6
  147:5 150:15
  150:20
**remembering**
  61:13

remind 137:19
remitted 10:24
  27:1
removal 35:11
  161:20
remove 92:23
removing 93:2
rented 32:21
rents 46:18
reorganization
  12:25 25:2
repeat 48:7
  60:19 106:25
  118:13 125:18
  126:23,25
  130:22 132:4
  139:22
rephrase 106:9
  118:9 136:9
report 39:4,6
  49:10 97:4
  99:20 101:2
  103:10 150:15
  150:20,22,23
  151:2
reported 151:1
reports 17:18
  151:10
represent
  153:22
representation
  110:8 113:7
  120:23
representatives
  8:19
represented
  27:20

represents
  32:1 136:21
repugnant
  27:7
reputable
  121:5
request 36:8
  51:20 74:7
  78:15 81:9,23
  82:4,7,10,17
  82:25 83:1,14
  87:2 93:23,24
  94:14,17,20
  95:9,10,21,22
  96:7 102:5,5
  106:2 110:9
  114:8,11
  122:24 123:14
  133:15,16
  134:2,3,3,6,7
  135:19 139:12
  148:9 155:4,24
  156:5 159:2,5
  159:19 160:13
  160:19 161:12
  161:14,16
  162:2 164:9,14
  165:7 168:11
requested 68:3
  69:15 73:22,23
  82:17 103:9
  104:10 114:23
  141:23,25
  155:6 162:25
requesting
  68:2 71:16
  141:12

requests 21:20
  22:7,11 42:19
  69:18 70:5,24
  71:1 73:20
  74:1,3 75:5,15
  77:10,14 78:5
  78:20 79:6
  80:12 81:1
  82:20 84:7
  85:24 94:7,11
  108:14 109:18
  110:7 111:5,9
  111:10 113:25
  114:12 116:9
  122:9,12,19
  123:3 124:1
  132:13,23
  133:9,12
  134:11 135:15
  148:6,11,17
  149:8,23
  156:12 161:6
require 109:16
research 17:14
resolve 167:24
resolved 10:7
  12:6,7 51:1
  92:6
resolves 11:12
respect 34:21
  36:3,4,14 47:3
  49:3 66:13,24
  77:11 81:9,11
  83:12 95:21
  120:13
respectfully
  34:12 133:24

respective
  10:24
respects 34:22
  35:2
respond 36:15
response 55:7
  55:19 105:7,11
  154:5 158:18
responses
  137:5
responsible
  74:6
responsive
  13:23 109:11
  109:13 136:23
rest 24:18
  35:21
resume 75:19
  92:4,20 142:18
retailer 96:3
retainers 11:1
retreading
  138:1
revenue 18:7
review 48:1
  80:4 82:1,1
  85:11 105:24
  106:12,15,16
  107:13 121:14
  123:14,16
  143:19,20,22
  144:7,12 146:3
  148:5,17 150:9
  153:24 160:15
reviewed 85:13
  123:20 148:8
  148:23 154:1,2

**reviewing**
21:12 47:20
123:22 124:2
**revisited**  28:4
**rewards**  56:2
59:21,23
**rid**  88:12
**right**  8:14,21
9:8 11:23 12:7
12:12,21 13:17
16:10 19:21
22:24 23:18
25:23 32:17
33:25 39:21
41:3 43:17
45:5 58:7,10
58:23,25 64:23
64:25 73:13
75:24 76:20,24
77:3 78:13
81:12 82:7
83:24 86:19,20
86:21,23,25
88:2,6 90:11
90:16,24 91:22
92:18,19,20
97:21,24 98:19
103:18 112:2
112:20 114:8
114:13 119:4
120:14 122:22
126:10,16
127:8 131:5
132:3,7 133:19
134:18 135:7
135:12 136:11
138:19,24

139:16 140:14
141:6 142:21
147:13,24
148:7 156:5
162:7,9 165:12
165:14 166:1,3
167:7,10 169:5
**rights**  24:14
**ripped**  48:16
**rise**  23:16 77:1
90:18,20
142:19
**river**  3:1,5,8
4:12,21 6:4
8:14,19 9:19
10:19,21 11:8
11:11 12:19
13:6,15,17
21:7 24:3,8,10
25:8 27:1,19
27:20,22 32:19
33:22 34:5
36:18,23 37:7
39:16 42:8,9
43:11,14,16
44:8 46:25
47:3 50:12
51:11,19,24
52:2,3,4,5,14
52:15,16,18,18
53:18 56:4,9
57:6,16 58:23
60:5,12,23,25
61:2 62:7 63:3
63:24 65:17
66:4,11,17,22
66:23 67:5

68:9,14 69:4
69:15,20 71:8
71:23,25 74:6
75:1 76:3,17
77:10,12,19
78:1,13,15,16
78:20,23 81:9
81:10 82:6
83:11 85:15,25
87:7,16 88:9
91:15 94:11
102:10,19
106:14,17
107:20 108:2
113:8 114:16
116:22 117:2
117:15 118:10
118:15 119:9
119:13 135:1
149:7,22
154:25 155:2
155:21,24
166:3
**river's**  45:9
46:16 81:2
93:9
**road**  170:21
**robert**  43:9
70:11 72:8
83:4 113:15,18
113:23 114:23
115:12 132:23
158:4
**robust**  27:2
**role**  122:1
**roll**  26:11
29:11 30:23

**room**  115:17
**rotate**  97:22
**routing**  21:24
**rrsb**  81:8
**ruin**  134:15
**ruins**  1:23 8:5
11:15 14:14,25
18:13 19:18
22:6 23:13
29:23 32:20
37:16,19 43:4
43:7,11,17,21
44:5,9 45:10
45:20,22 46:4
46:7,13,24
47:3,6,10,16
47:24 49:1,5
49:19 51:12,17
51:23 52:3,19
60:13 65:22,23
66:5,13,24
67:6 68:1,10
68:17 69:4,25
70:6,19 71:21
72:1,1,7,16,20
73:2 74:7,11
74:12,17,22
75:2,3 77:11
77:14 78:21
80:5 81:23
82:7 83:5,24
86:7 90:23,25
94:17,21,22,23
95:11 96:19
97:17 98:14,18
98:25 99:13
100:5,11

101:24 106:23
109:16 112:12
112:13,19,20
113:7 118:3,11
118:15,24
120:18,21
121:1,21
122:12 123:7
123:15 124:16
124:22 130:20
130:24 132:21
133:3,5,6,6,17
134:8,17
141:15,20
147:7 148:11
149:5 151:23
153:5 155:6,13
157:2 158:1,16
159:11 160:5,8
160:21,25,25
162:18
**rule** 89:12
105:1,20
**ruled** 141:5
**runes** 81:8
**running** 20:15
20:16 39:1
166:24
**rushing** 91:10
**russ** 6:2 8:23

**s**

**s** 4:1 7:9 8:1
41:8
**sake** 16:8
**sale** 32:14
**sales** 97:13

**sanitizes** 86:22
**save** 36:16
91:12
**savings** 58:15
58:18
**saw** 48:23
52:14 146:12
**saying** 24:22
114:2 132:16
133:2 134:11
135:14,18
141:17,23
**says** 28:10
44:24 62:19
73:5,13 94:7
98:12 111:22
112:23 113:2
117:18 162:12
164:6
**scan** 62:1
**scanner** 109:7
**scans** 109:5
**scaring** 19:20
**scenario** 29:6
35:18
**schedule** 8:24
**school** 41:21
41:24,25 42:2
115:21,23
116:3
**scoot** 40:18
**scope** 20:12,12
50:10 119:17
120:8,9,13,15
145:11 166:18
**screen** 57:12
57:14 87:19

**scroll** 44:14
54:12 55:18
58:19 67:1,10
67:14 68:19
80:17 81:5
86:24 87:13
96:9 97:7,23
98:3,22 100:8
102:1,15 104:7
107:18 108:6
110:17 111:2
153:10 158:23
161:8 162:3
163:19,24
**scrolled** 54:19
**scrolling** 108:8
**sd** 4:23 5:12
113:3
**seals** 48:14
**seated** 19:11
90:20 142:21
**second** 16:4
20:25 21:16
26:2 37:15
46:4 49:6
50:24 52:15
80:22 86:6,17
88:10 93:17
105:19 124:24
130:17 133:1
134:18 141:21
141:24 142:1,6
146:23 153:11
154:3 155:13
155:22 165:21
**secondly** 17:13

**section** 56:2
**secure** 15:7
**secured** 20:24
29:13 46:14,18
46:18 49:20
115:1
**security** 46:19
46:20
**see** 13:1,3
19:20 32:17
33:17 34:8,9
35:3 48:11
52:23 57:24
58:20 59:2
87:20 91:24
98:12 102:16
108:23 112:22
112:25 148:18
156:16 163:20
**seeing** 21:4
52:22 72:13
**seek** 68:9
**seeks** 95:3
**seem** 24:1,25
29:4 30:18
31:10 109:10
**seemed** 154:21
**seeming** 31:4
**seems** 16:24
17:5,13 32:6
120:12
**seen** 28:23
32:25 48:16
98:7 121:16,17
151:12
**seepage** 128:9

seeping  50:15
  127:14 128:13
  128:23
sell  13:10
  24:12 32:4,10
  33:6 96:4
sense  14:5 18:6
  19:19 32:5,6
  33:11 91:18
  166:6,7
sent  23:2 52:24
  52:24 78:12
  112:19,19
  114:16,19
  122:12,19,22
  123:20 130:20
  138:20,21
  139:7,8,11
  140:17 153:16
sentence  17:16
  73:14
separate  43:19
  57:11
september
  30:11 44:9,14
  48:23 50:23
  52:21 99:16
  100:12 126:13
  126:15 127:2
  146:16,17
  147:1,15 148:2
  152:4
serial  153:6
series  138:14
serve  137:5
  139:25

served  83:23
service  18:9,12
servicemaster
  129:13
services  98:10
  99:13 115:1
  149:22
set  10:7 11:15
  14:1 20:5 52:4
  52:14,15,22
  134:14 135:11
sets  85:11 97:2
  97:10
settling  24:16
seven  24:21,22
  56:22 57:4
  134:4
several  21:9
  47:13,14 50:6
  83:3 136:21
  140:15 144:15
  144:16 145:2,3
  161:18
shaking  35:4
shared  35:17
sharon  76:17
  91:6 92:9
  130:15
sheet  22:6 54:5
  61:10 71:11
  72:24 112:11
  112:13 113:21
  115:4,7,11,11
  121:6 140:17
  140:22 141:2
  141:22

sheets  22:4
  119:23,25
  121:9,13
ship  156:24
  159:23,24
  160:2,17,20
shitty  109:5
shoes  32:16
shon  2:22
shop  149:19
short  53:1 84:3
  95:16
shorten  90:2
shortly  10:17
shot  31:10
shovel  42:17
show  20:20
  22:3 42:17
  111:22,24
showed  64:23
  64:25 66:8
showing  27:11
  27:23 79:9
  80:7
shows  19:17
  22:6 55:15
  111:25
shudder  25:25
shultz  5:9
sic  81:6
side  57:5,6,13
  97:21 126:1
sign  43:19
signature
  69:22 72:5
  107:16 112:16
  170:6

signed  70:2
  72:7 111:11
  115:9 135:22
  140:3,8,14,16
significance
  15:8
significant
  26:25 47:14
  50:20 51:17
  63:14 117:19
  127:23
signing  154:18
similar  35:23
  111:8,10
  119:22 149:25
  160:16
similarly
  120:23
simple  22:8
  67:25 118:19
  120:20 141:18
  141:18 144:3
simply  16:11
  30:10 120:20
  127:24
simultaneously
  132:22
singer  158:20
single  43:10
  132:2,6 158:7
sioux  4:23 5:12
  96:3
sir  129:7
sit  169:6
site  47:13 48:2
  50:16 127:5
  151:6,12

| | | | |
|---|---|---|---|
| **sitting** 122:7 | **soon** 35:16 | 68:20 81:21 | **specs** 73:8 |
| **situation** 22:16 | 69:1 91:23 | 83:10 84:5 | **speculate** |
| 22:22 | **sop** 150:7 | 113:9,13 115:2 | 143:11,13,14 |
| **six** 134:4,4,21 | **sophisticated** | 120:24 124:23 | **speculation** |
| 135:23 | 158:4 | 125:7,7 146:20 | 79:23 123:10 |
| **sixty** 97:1 | **sorry** 31:19 | **speak** 14:1 | **speculative** |
| **size** 16:17 | 39:18 45:15 | 28:16 30:13 | 109:10 |
| 22:19 | 48:7 51:24 | 140:24 | **spell** 41:6 |
| **skills** 22:11 | 52:3,18 60:20 | **speaking** 11:20 | **spend** 12:15 |
| **sky** 33:17 | 61:21 69:7,25 | 149:24 | **spent** 12:14 |
| **slightly** 52:9 | 70:9 71:25 | **speaks** 23:18 | **spoke** 148:25 |
| **slow** 156:15 | 86:4 92:7,14 | 109:19 | **spot** 128:12 |
| **small** 18:1,23 | 93:21 96:10 | **specific** 79:5 | **spraying** |
| 22:18 27:16 | 97:8,16,17,19 | 106:16 125:23 | 128:11 |
| **smaller** 10:9 | 99:5 101:20 | 153:15 | **spreadsheet** |
| **smart** 138:18 | 102:23,25 | **specifically** | 79:9 80:7 |
| 149:12 | 103:1 107:7 | 18:13 114:5 | **spring** 50:18 |
| **smith** 4:20 5:9 | 111:17 130:16 | 116:4,15 | 145:7 |
| **smoother** | 133:25 137:9 | 119:25 122:2 | **sr** 6:3 |
| 57:22 | 137:18 139:22 | 123:19 124:2 | **stable** 47:17 |
| **snow** 42:18 | 145:1 148:25 | 125:4 131:6,23 | **stacked** 153:4 |
| **sold** 31:6 33:15 | 149:1 150:17 | 132:11,12 | **stage** 34:3 |
| 35:19 96:12 | 153:11 157:13 | 135:21 136:16 | **staining** |
| **sole** 69:13 | 157:18 162:7 | 147:5 148:20 | 128:13,18 |
| 70:17 160:10 | 163:2 | 150:6 151:2,8 | **stake** 13:7 |
| 161:2 | **sort** 14:17 | 154:2,6 156:24 | **stamping** |
| **solely** 126:1 | 25:20 31:7 | **specificity** | 92:24 93:2 |
| **solemnly** 40:13 | 35:1 138:6,7 | 81:20 114:5 | **stand** 40:8,9,9 |
| **solutions** | **sorts** 167:21 | 122:3 124:3 | 40:17 52:13 |
| 170:20 | **sought** 147:7 | 131:25 148:18 | 53:3 137:12 |
| **solves** 19:1 | **sounds** 33:15 | 150:8 | 167:5,14 |
| **somebody** | 105:10 | **specified** 65:8 | **standard** 150:7 |
| 15:10 123:11 | **south** 5:11,19 | 141:22 144:20 | **stands** 14:15 |
| 128:7 151:8 | 9:18 25:8 | **specifies** 72:21 | 24:9 90:16 |
| **sony** 53:5 | 26:20 28:12 | **specify** 115:13 | 169:5 |
| **sonya** 3:25 | 35:10,12 66:12 | **specifying** 68:3 | **stanley** 4:17 |
| 170:3,8 | 67:6,21 68:10 | | 7:6 8:18 37:10 |

| | | | |
|---|---|---|---|
| 40:1,3,5 41:3,5 | 97:14,25 98:21 | 157:20 | 55:7,12,13,19 |
| 41:13,17,18 | 98:23 99:3,8 | **started**  28:18 | 55:24 58:1,2 |
| 44:2,12,21 | 100:8,10,20,21 | 42:11 122:2 | 58:25 59:7,19 |
| 45:4,15,17 | 101:12,13 | **starting**  30:7 | 59:24 61:10 |
| 48:9 52:2,16 | 102:1,4,22 | 51:15 | 62:5,17 63:8 |
| 52:23 53:5,7 | 103:3,16,20,25 | **state**  3:1,5,8 | 64:3,10,18,20 |
| 53:11,13,16 | 104:1,7,9 | 4:12,21 6:4 | 70:22 105:8,10 |
| 54:12,15,17,22 | 105:8,22,23 | 8:15,19 9:19 | 105:11 107:25 |
| 55:2,5 56:21 | 106:7,11 107:2 | 10:19,21 11:8 | 107:25 139:13 |
| 56:24 57:3,10 | 107:6,9 109:14 | 11:11 12:19 | 140:7,9,12 |
| 57:16,20,23,25 | 110:6,15,19,22 | 13:6,15,17 | 141:11 142:3,5 |
| 58:19,22 59:9 | 111:1,4,13 | 19:4 21:7 24:3 | 146:3,5 155:5 |
| 59:11 60:25 | 117:8,12,17 | 24:9,10 25:8 | **statements** |
| 61:1,15,18,20 | 118:5 119:16 | 27:1,19,20,22 | 36:9 51:20 |
| 62:6,8,24 63:1 | 120:5,8,17 | 32:11,19 33:22 | 54:2,6 56:5,9 |
| 63:23 64:1,12 | 123:10 124:7 | 34:5 35:11 | 56:13 60:22 |
| 64:14 66:17,21 | 126:20,23 | 36:18,24 37:7 | 61:25 62:3,9 |
| 67:9,11,14,17 | 130:12 136:6,8 | 39:16 40:11,22 | 65:18 83:17 |
| 68:14,15 69:20 | 137:23 138:22 | 41:22 42:8,9 | 108:17 136:21 |
| 69:23 71:23,24 | 140:23 141:25 | 43:14 66:4,12 | 138:14,20 |
| 72:9,14 73:17 | 142:7 143:10 | 66:23 68:20 | 139:7,17,18 |
| 73:19 75:10,17 | 145:10,14,20 | 74:6 77:12 | 140:19 143:22 |
| 75:22 76:2,5,7 | 148:13 154:14 | 82:8 83:24 | 143:23,24 |
| 76:10,12,23 | 154:16,25 | 106:17 108:2 | 144:7,8 154:24 |
| 77:7,9 80:2,3 | 155:1,8,11 | 113:8 114:16 | 155:25 |
| 80:16,20,25 | 156:13,18 | 116:22 117:3 | **states**  1:1 2:4 |
| 85:14,19,22 | 157:8,19,22,23 | 117:15 118:10 | 63:13 |
| 86:11,14,16,23 | 158:15,23,25 | 118:15 119:9 | **stay**  13:15 15:2 |
| 87:1,10,13,17 | 161:7,10,22,25 | 119:13 135:1 | 120:13 165:5 |
| 88:6,25 89:17 | 162:7,10,14 | 146:20,20 | **stays**  20:22,24 |
| 89:23 90:1,8 | 163:1,4,18,21 | 149:7,22 151:4 | **step**  23:25 |
| 90:15 92:21,22 | 164:2,4,18 | **stated**  110:12 | 134:22 |
| 93:1,7,11,14 | 165:20 | 136:17 | **steps**  73:2,9 |
| 93:15,20,22 | **starion**  143:25 | **statement** | **stern**  28:2 |
| 94:2,6 95:7,15 | **start**  13:22 | 11:16,22 25:3 | **stipulate**  41:15 |
| 95:18,20 96:9 | 20:1 42:17 | 25:23 31:15 | **stipulated**  7:11 |
| 96:11 97:7,9 | 116:9 153:13 | 39:18 54:5,8 | 37:4,9,12,20 |

39:4,9,20
76:13 91:3
137:24
**stipulating**
39:5
**stipulation**
10:11 38:23
91:5,8 167:19
168:3
**stonewalled**
109:2
**stood**  162:17
**stopped**  68:7
**straight**  36:17
86:18
**straightforw...**
30:16
**strategic**
166:22
**strategy**  18:3
**stray**  88:19
**stream**  18:8
**streamlining**
12:9
**street**  4:22
5:18,19
**stretch**  75:8
**strictures**
23:13 25:17
**strike**  122:15
130:9 142:12
153:11
**strikes**  22:22
**stroh**  84:18
98:16,18,25
99:11 100:3
101:2 102:6,8

102:13,17
103:4,21 107:4
107:10
**stroh's**  99:12
103:12 104:15
106:22,23
**strong**  112:4
**strongly**  19:6
**structure**
158:5,22
**stuck**  33:13
**studied**  116:5
**stuff**  44:17
**sub**  153:8,8
**subcontractor**
21:6,14,15
85:25 94:12
146:12
**subcontractors**
25:21 26:13
71:16,17,18
93:25 131:10
143:4
**subject**  61:7
**subjective**
22:24
**submit**  17:12
51:11 168:14
**submitted**  28:9
50:6,12 51:4
94:11 96:7
102:12 104:2
135:16,20
143:5 146:11
150:1,2 152:4
152:10

**submitting**
22:19
**subordination**
28:22
**subpoena**  25:5
25:9 56:5 83:1
99:10 108:25
108:25 145:5
159:9,25
160:18 163:23
163:25
**subpoenaed**
56:14 82:18
143:21 144:8
144:13 146:3
**subpoenas**
14:21 25:7
82:22,24 83:14
83:16 84:6
86:1 93:25
94:1 121:14
**subs**  26:9
**substantial**
18:5,14
**substantially**
18:6 30:10
**substrate**
48:17
**successfully**
51:11
**successfulness**
79:4
**sue**  78:7
**sued**  24:4
**suffering**  16:17
**sufficiently**
27:2

**suggest**  150:24
**suggesting**
26:15 28:11
**suggestion**
21:23
**suggests**
141:17
**suite**  4:5 5:11
5:19 170:22
**sum**  10:18,20
10:23 26:25
94:24 95:8,11
100:4 118:20
**summaries**
94:9
**summarized**
70:21
**summary**
41:19 67:6,13
67:18 71:11
76:1 85:23
87:2 89:5,6,9,9
89:20 93:23
94:4 98:6,17
102:25 107:14
107:21 156:14
156:19 158:24
159:1
**summer**  42:12
42:13 43:2
**summers**  42:12
42:13
**sums**  10:23
**sun**  83:20
**support**  32:2
37:2 54:7,7
79:1 96:7

**[support - testified]**                                                    Page 48

102:13 104:3
**supports**  20:8
**supposedly**
  65:21
**sure**  9:25 20:22
  20:23 21:4
  36:20,25 37:16
  40:23 75:9
  81:17,19 90:9
  95:17 110:25
  113:5 119:18
  125:14 133:24
  140:25 142:15
  156:6 157:22
  164:24 165:3
  166:24
**surely**  27:22
  114:18
**surprise**
  121:15 148:10
**surprised**
  121:12 123:25
  124:4
**sustain**  95:6
  105:17 109:12
**sustained**  80:1
  106:6 110:5
  117:13 119:20
  123:12 129:9
  129:20 130:13
  147:21 157:11
  158:14
**sways**  32:25
  33:1
**swear**  40:13
**switch**  102:3

**sworn**  40:8
**system**  32:1
**systems**  5:17
  9:12,15 38:5
  68:1

**t**

**t**  7:9 41:8
  170:1,1
**tab**  20:16
**table**  14:1
  35:22
**tacitly**  121:3
**tail**  74:13
**take**  12:11,22
  15:7 34:17
  40:9,17,19
  53:4,14 73:2,9
  76:20 86:11
  89:23 91:13
  106:4 108:18
  134:14,18
  137:2 142:14
  142:16 150:15
  165:6 167:11
  168:18,22
**taken**  150:25
  151:6
**talk**  61:15
  66:10 116:16
  167:23
**talked**  26:11
  86:1
**talking**  57:6
  75:5 80:7
  93:16 110:20
  120:18 122:7
  142:8

**tanabe**  4:16
  8:16,17 10:12
  12:1,3,6 13:17
  13:22 14:1,3
  17:12 25:20
  27:15 29:18
  35:4 39:2,23
  39:25 91:18
  92:5,11,13,16
  167:17,20,23
  168:2,10,14,17
  168:20 169:4
**tanabe's**  20:3
**tangentially**
  121:8
**tape**  48:15
**taping**  48:14
  127:15 128:2
**tax**  97:13 125:7
**taxes**  47:7
  124:17,18,21
**tccu**  56:10
  65:14
**teams**  20:14
**technical**  84:6
**technically**
  92:5,7
**telephone**
  38:17
**tell**  12:1,16
  13:15 22:10
  28:13 29:21
  75:12 89:14,22
  90:4,6 130:4
  137:4 156:19
**teller**  42:13

**telling**  153:23
**tells**  32:15
**temptation**
  137:11
**tend**  36:9
**tenuous**  16:24
**tenure**  50:17
**term**  22:4,6
  84:6 112:11,13
  113:20 115:4,7
  115:11,11,11
  115:15 119:23
  119:25 121:6,9
  121:13 134:23
  140:17,22
  141:2,22
**terminate**  11:3
  11:13 92:7
**terminology**
  82:20
**terms**  11:25
  12:8 29:5,18
  30:14 31:12
  115:8,15
**terrific**  165:19
**terry**  99:10,12
  100:3
**terry's**  100:6
  106:15
**testified**  96:18
  96:21 104:18
  114:11 118:25
  124:16 125:10
  126:9 130:3
  133:11 143:2
  146:10 148:5
  150:14,19

152:6

**testify** 109:22
129:8 137:6

**testifying** 77:5
79:24 129:8
142:23 148:13

**testimony**
20:20 21:8
32:12 40:13
76:16 92:4
94:23 104:20
104:24 105:3,3
128:15 135:12
137:4

**texas** 100:1

**thank** 9:20,22
12:13 14:2
19:14 26:6
28:15 31:18,19
34:17 36:11
38:1,6,10,21
40:24 41:2,17
44:15 55:1
56:23 57:21
61:17,19 75:11
76:25 90:13
92:2 93:11
97:24 105:18
111:16 121:10
129:21 130:17
137:22 138:11
142:17,25
145:23 153:10
154:12,21
165:4,11,25
167:13 169:2,4

**theft** 151:14

**thereof** 20:2
23:12

**thereto** 21:7
114:19

**therewith**
23:18

**thing** 14:17
32:9 33:13
34:23 66:18
76:15 86:17
89:16,21
109:22,24
115:5 138:2
168:2,21,22

**things** 12:9
19:19 23:5
28:22 35:22
36:2 38:23
89:5 90:5 92:1
95:3 108:18
109:22 137:16
167:16,21
168:19

**think** 9:5 11:5
12:18 13:22
14:24 15:21
16:2 17:13,20
17:21,25 18:4
18:14,20,22
19:7 21:1
25:21 26:16
27:7 28:23
29:6,12,14,24
30:13,22 33:2
33:5,13 34:18
34:21,23 36:9

39:8,25 44:25
52:2,4 60:20
75:22 80:18,22
82:19 83:1,22
86:12,17 88:11
89:3,18 91:4
91:18 92:5
96:21 97:16,23
102:14,15
103:18 105:8
107:18 109:20
111:7,13 113:6
114:11 116:6
118:25 124:11
126:21 129:17
129:24 133:18
135:4 136:8
137:20 142:15
146:8,9 149:1
161:19 163:14
164:10 166:6,7
166:10,21
168:5

**thinking** 89:5
92:17 95:4
166:15

**thinks** 22:24

**third** 13:3 22:7
29:7 31:6 46:7
49:6 66:6
112:25 113:1
113:17 120:21
121:2,21 122:1
129:18 147:3
149:7,11,13,13
149:17,18
152:5 158:8,20

161:1,20

**thoroughness**
17:15

**thought** 14:4
16:9,25 18:18
28:18 29:1
32:2 121:16
136:25 166:16

**three** 8:9,11
10:7,8 11:3
22:5 25:24
26:20 27:13
43:14,18,19,21
44:4 46:10,13
97:1,1 99:14
111:5 114:12
119:3,5 123:2
130:1,10,16,19
130:23 131:4
133:11,13
137:24 143:19
147:13 148:3
153:4 155:18
163:9

**thrust** 22:15

**tie** 139:24
163:17

**tied** 54:2
132:13

**tif** 30:15 77:23

**time** 12:11,15
12:16 14:16
25:5 29:1 32:2
35:25 39:12
42:11,14 43:2
47:8,14,21,22
50:1,24 53:1

| | | | |
|---|---|---|---|
| 60:12,18,21 | 161:5,5 164:15 | 92:24 93:2 | **transcript's** |
| 65:21 69:3 | **tl**  84:18 | 96:23 98:3 | 105:15 |
| 71:11 75:10,19 | **today**  8:3 9:2 | 116:19 161:23 | **transfer**  18:24 |
| 82:16 90:4 | 9:20 10:8 12:9 | 163:19 | 131:3 132:17 |
| 91:10 105:19 | 14:24 15:3 | **topic**  161:4 | **transferred** |
| 106:25 109:4 | 24:22,22 25:14 | **total**  46:10 | 15:13 35:13 |
| 114:7,10,18,23 | 28:17 29:20 | 55:15 58:4,11 | 144:1,21 |
| 116:8,13 118:5 | 33:18 75:18 | 58:15 64:23,25 | **transfers**  15:4 |
| 118:8,12,13,16 | 120:18 125:17 | 65:5,6,7 72:15 | 15:11 16:1 |
| 121:2,15 | 125:21 134:25 | 72:20,21 77:10 | 145:1,2,12 |
| 123:15,17,18 | 138:13 139:6 | 78:25 94:14,16 | 146:1 |
| 126:4 127:8,18 | 150:14,19 | 94:20 95:10 | **treatment** |
| 127:23,25 | 153:23 166:4,8 | 136:17,18 | 30:24 |
| 129:15 130:9 | 167:24 | 162:21 164:11 | **trial**  105:4 |
| 131:20,24 | **today's**  34:9 | **totally**  31:20 | 153:25 |
| 132:2,6 133:23 | 153:24 | **touch**  20:2 | **trick**  116:19 |
| 134:19 141:13 | **together** | 127:9 | **trouble**  36:21 |
| 142:15 145:3 | 132:17 133:12 | **touches**  39:2 | **troubling** |
| 148:22 149:11 | 133:19 134:13 | **tough**  31:22 | 34:23 |
| 150:16 166:24 | **toilets**  42:18 | **towards**  81:17 | **true**  21:9 27:12 |
| 167:20 168:18 | **told**  33:2 129:9 | 97:23 98:11 | 44:5 45:3,9 |
| **times**  47:19 | 129:11 147:20 | **towers**  5:18 | 46:2,2 58:14 |
| 48:16 119:13 | 147:23 151:2 | **town**  22:18 | 73:5 74:3 93:6 |
| 128:8 140:12 | 152:14,14 | 55:7 56:6,25 | 108:18 109:17 |
| 149:10 | **tomorrow** | 58:14 64:2,16 | 110:10,14 |
| **timing**  145:20 | 25:14 166:25 | 65:4 141:18 | 123:12 131:4 |
| 145:21,24 | 167:8 168:5,22 | 143:24 | 136:22 150:3 |
| 154:18 166:13 | 168:25 169:1 | **track**  11:24 | 170:4 |
| **tiny**  109:6 | **tomorrow's** | **tracking**  79:15 | **truly**  19:4 |
| 156:16 | 33:18 | **trade**  15:25 | **trust**  6:2,3 8:22 |
| **title**  108:7 | **ton**  44:16 | 17:4 18:23 | 34:12 36:5 |
| 113:3,9,13 | **tonight**  91:20 | **transaction** | 108:21 168:7 |
| 114:4,20,21 | **took**  48:2 | 99:19 101:2 | **trustee**  12:21 |
| 115:2 116:10 | 151:2,6 | **transcribed** | 15:9,17 19:1 |
| 119:23 120:24 | **top**  49:5 72:10 | 3:25 | 24:15 30:25 |
| 122:25 123:4,8 | 72:19 76:8 | **transcript**  36:8 | 32:7,9 |
| 149:7,22 150:8 | 88:4,8,10 89:1 | 170:4 | |

trustees  13:2
24:12,13
trusting  25:25
truth  40:14,15
40:15
try  25:13 52:24
75:20 124:10
139:3,4
trying  22:22,22
22:24 116:19
120:21 128:14
134:22 138:18
146:9 149:12
154:19 168:18
turn  30:10
turned  10:15
151:20
turning  70:5
twice  137:20
twist  137:7
two  11:9 19:24
20:21 21:11
23:10,25 33:8
36:7 38:22
39:2 46:18
56:15 57:5,10
58:5,5 63:12
63:20 64:22
65:13,17 78:6
78:9 86:18
87:18 88:4,8
88:15 95:8,10
99:21,24
111:20 112:21
121:13 126:16
132:16 147:12
148:19 160:20

166:22 168:11
twofold  20:6
type  13:3 16:17
18:24 71:7
79:18 82:24
typing  154:7,8
tyvek  14:16
48:5,10,14,14
48:16 126:1

**u**

u.s.  2:5,23
ucc  46:22
ultimate  13:11
88:17
ultimately
20:11 23:16
31:3
unavailable
105:2,3,6
under  17:2
25:15,19,19
27:3 30:2
63:16 83:19
84:6 94:7
107:18 109:15
115:5 118:25
119:14 147:19
underlying
94:9 123:23
128:13
undermining
118:18
understand
29:1 38:14
48:8 88:13
108:8 113:5
125:14 133:24

162:15 166:13
understanding
30:5 34:24
39:10 43:9
46:17 63:19
66:2 67:23,25
69:13 71:14
73:20 74:2
83:9 88:20
96:2 100:3
124:21 144:3
157:9 158:3,4
161:14 166:17
understood
117:11 137:18
underwriting
60:10 79:3
unfinished
14:15 15:2
unfortunate
14:13,15
uniform  18:23
union  55:8,20
56:6,7 57:1
58:13 59:3,13
62:13 63:3
64:2,16 139:2
143:24
unions  56:15
138:23
unit  153:1
united  1:1 2:4
units  96:17,25
153:3
university
41:22

unknown  2:25
unlock  42:17
unpaid  14:18
unsecured
15:18,20 16:9
16:11 29:13
31:3
untimely
124:13
untrained
22:21
updated  61:8
139:12 140:7
140:10,19
142:3 155:24
urging  19:17
use  11:7 41:13
76:12 89:3,5
91:3,6 109:6
119:23 144:4
used  18:16
74:4 79:5,12
79:14,15,18
104:24,25
120:24 123:8
131:17 138:18
149:7 153:5
useful  14:6
uses  73:25
132:24
using  75:25
110:2 113:17
116:9 121:3
161:5
utility  20:23
utilization  79:2

utilized   65:25
66:9 77:24
131:16
utilizes   79:17

**v**

vague   124:7
130:12 151:7
valuation
79:17,18,19
value   13:11
15:5 32:17
108:19
values   79:21
valuing   79:24
vandalism
48:18 151:11
vandals   128:10
variance   143:4
various   38:24
144:14
vehicle   131:17
134:17
veil   18:24
144:6 158:10
verification
65:24
verify   108:21
108:22
veritext   170:20
verstandig   4:8
7:7 8:8,9 9:23
10:1,3,6,11
12:8,13 19:11
19:14,16,24
20:1,5 26:6,8
29:10 37:13
38:21 41:14,15

44:25 45:2
52:6 53:3
54:13,16,18
55:1,4 57:12
75:6,11,16
76:25 79:23
85:18 86:13,15
86:22 87:9
88:11 89:8,11
90:10,13 92:2
92:12 93:3
95:1 104:21
105:13,18
106:3 109:9,19
111:15,16,25
112:2,4,7
117:10,14,18
117:24 118:7
119:19,21
120:3,6,9,20
121:10,11
123:13 124:11
124:15 126:24
129:4,10,17,21
129:22 130:14
130:16,18
135:25 136:3,8
136:13 137:5
137:20,22
138:7,10,11,12
138:24 139:5
141:1,3,9
142:2,11,17,24
142:25 143:1
143:14,15
145:18,23,25
147:22,25

148:21,25
149:3 150:12
150:13 153:7
153:12 154:9
157:6,13,16,18
158:12 164:21
164:25 165:2,4
165:8,11,17
166:9,15,21
167:3,13 168:1
168:13,24
169:2
versus   15:9
57:7 63:14
82:3 87:2
93:24 94:11
159:3,8,19
160:13,18
vice   42:6
116:24,25
video   9:8 38:15
view   22:24
violation   25:18
visibly   48:16
visit   51:16 92:4
167:16
visiting   37:19
visits   51:15
vogel   4:11 8:17
voice   141:17
volunteered
22:14
vp   6:3,4

**w**

w   4:17
wading   16:5

wait   38:19
77:8 102:24
141:25
waited   147:15
waiver   114:8
114:11
waivers   22:7
22:12 83:17
113:2,7,12,14
113:17,22,25
waives   11:11
walk   30:17
125:13
walked   127:7
wall   5:17 9:12
9:14 32:1 38:5
want   12:15
13:2,4 15:3
17:24 23:6
25:22 29:1
33:1 36:25
38:12 43:25
51:23,24 53:3
53:4 57:15
66:18 85:15
86:24 90:3
91:1,5,9,11,13
95:15 114:4
121:8 125:13
129:24 133:2,7
136:25 147:20
149:4 164:21
166:9,23
167:23 168:6,7
168:23
wanted   50:9
113:23 138:6

151:9

**wanting**  85:14

**warning**  28:3

**wary**  16:5

**wash**  34:21

**water**  40:10
41:9 48:3 50:8
50:15 51:2,3
51:12 127:14
127:18 128:9
128:11,12,15
128:16,18,19
128:23

**watertight**
82:10,11 84:15
146:19 147:6

**watertight's**
82:3,5

**watertown**  3:4
5:10 9:9,11
26:20 28:8,11
28:12 30:3
38:8 49:18
61:16 77:23
80:15 83:10
96:3 113:3,9
113:13 114:12
115:2 120:24
151:10

**way**  9:1 15:12
15:21 16:2,10
16:20 22:25
28:20 29:19
31:4 32:25
33:1,17 34:8
52:19 57:10
59:9 87:21

128:6

**ways**  79:20

**wdc**  61:15
77:23 79:1
80:14 123:4,5
123:8 161:11
161:13,15
162:25 164:15

**we've**  14:24
28:23 30:9
31:12 163:10

**weather**  50:20

**website**  125:8

**week**  26:2,2

**weeks**  25:24
34:11

**weird**  80:22
111:21

**welcome**  9:21
13:19,19 52:13
110:24

**went**  21:21,21
41:23 71:1,2,4
95:8 106:13
114:3,12 116:2
123:3,4 143:8
143:16,18
146:5 148:18

**west**  4:22

**wet**  127:16,22
128:4

**whatnot**  17:20

**whatsoever**
88:20

**wherewithal**
18:10 27:16
36:3

**whip**  109:7

**white**  99:1
159:8

**whoever's**
39:23

**wholesale**  96:2

**whoops**  96:10

**willing**  16:20

**wind**  14:17
50:8,21 79:9

**window**  48:14
153:3,3

**windows**  48:4
125:24,25
127:8

**wins**  34:6

**wire**  131:3
132:17,20
133:4 168:6

**wires**  132:12

**wisconsin**  42:1

**wish**  9:16
31:14

**wishes**  37:1

**wishful**  92:16

**withdraw**
60:20 91:23
117:11

**withdrawals**
144:17

**withdrawing**
91:15

**withdrawn**
50:3 51:7,8,9
152:7,9,10,12
152:14,15,17

**withdraws**
11:8

**withdrew**
152:20

**witness**  7:4
13:20 36:19,22
39:23 40:9
67:16 80:17
98:22 105:2,4
109:20 117:23
120:11 121:8
129:5 137:9,12
137:18 145:16
148:17 162:9
162:11 165:18
167:12

**witness's**
104:23

**witnesses**  16:7
38:2,9,12,18
40:2 90:5
137:13 166:23
167:1

**wonderful**
90:3 97:22

**wondering**
13:5 103:1

**wood**  48:17

**woods**  5:9

**word**  19:1
115:5 138:17

**worded**  158:18

**words**  146:9

**work**  14:18
52:25 70:20
106:23 128:8
130:4 131:15

**[work - zoomed]**                                                                 Page 54

| | **x** | 157:5 163:17 |
|---|---|---|
| 148:11 | **x**   1:4,10,12,18 | 164:8,10 165:1 |
| **worked**   37:11 | 1:20 2:1 7:1,9 | 166:20 168:16 |
| 42:9,11,12 | **y** | 168:16,17,20 |
| **working**   128:7 | | **year**   29:16 |
| 134:19 | **yeah**   19:15,25 | 41:25 44:10 |
| **workmanlike** | 20:4 44:18,21 | 124:25 125:1 |
| 73:7 | 44:23 45:2,23 | 126:3 135:10 |
| **works**   93:4 | 46:22 49:25 | **year's**   26:1,5 |
| 168:21 | 50:14 52:16,17 | **years**   13:1 18:9 |
| **world**   22:25 | 52:20,22,24 | 115:22 119:9 |
| 25:5 | 53:9,10 54:11 | 119:10 135:8 |
| **worried**   39:1 | 54:15 55:4 | **yep**   45:16 |
| **worry**   93:8 | 56:22 57:16 | 61:18 72:19 |
| 135:10 147:4 | 58:11,18,20 | 84:17 86:9 |
| **worse**   51:2 | 59:4,20 62:25 | 93:21 94:4 |
| **worth**   24:20 | 63:24 65:3 | 98:13 102:21 |
| 32:14,21 99:25 | 66:16,20 67:16 | 103:13 104:4 |
| 124:12 157:2 | 68:8 70:2 | 147:22 162:10 |
| **wrap**   48:5,10 | 72:19 73:5 | 163:24 |
| **wrapped**   48:13 | 75:22 77:17 | **z** |
| 126:1 166:14 | 80:23 84:2,4 | **zoomed**   87:21 |
| 166:17 | 85:13 86:10,12 | |
| **wrapping** | 86:15,19,20 | |
| 48:10 | 87:16,25 89:25 | |
| **writing**   73:21 | 96:1,23 97:21 | |
| 73:22 | 98:3 101:19,22 | |
| **written**   144:1,7 | 102:23 107:1 | |
| 144:14 | 111:12 112:24 | |
| **wrong**   13:12 | 113:4 119:6,11 | |
| 21:15 33:25 | 128:18 130:13 | |
| 34:25 35:4 | 133:13,18 | |
| 44:25 52:4 | 134:4,4,13 | |
| 113:6 130:3 | 135:4 137:10 | |
| 146:9 149:15 | 137:19 141:16 | |
| **wrongfully** | 147:21 149:10 | |
| 94:24 95:1 | 156:11,16 | |