Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF NORTH DAKOTA

3    Case No. 25-30002 (Jointly Administered)

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GENERATIONS ON 1st, LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   Case No. 25-30003 (Jointly Administered)

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   In the Matter of:

14

15   PARKSIDE PLACE, LLC,

16

17           Debtor.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19   Case No. 25-30004

20   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21   In the Matter of:

22

23   The Ruins, LLC,

24

25           Debtor.

Page 2

```
1  - - - - - - - - - - - - - - - - - - - - - - - - - - x
2
3
4            United States Bankruptcy Court
5            Quentin N. Burdick U.S. Courthouse
6            655 1st Ave. N.
7            Fargo, ND 58102
8
9            Thursday, November 20, 2025
10           8:15 AM
11
12
13
14
15
16
17
18
19
20
21  B E F O R E :
22  HON SHON HASTINGS
23  U.S. BANKRUPTCY JUDGE
24
25  ECRO: UNKNOWN
```

Page 3

```
1  HEARING re Motion by Red River State Bank to Convert Case
2  from Chapter 11 to 7 filed 09/26/2025 (Doc. 109)
3
4  HEARING re Joinder by Watertown Development Company to Red
5  River State Bank's Motion to Convert Case from Chapter 11 to
6  7 filed 10/10/2025 (Doc. 131)
7
8  HEARING re Objection by Debtor to Red River State Bank's
9  Motion to Convert Case from Chapter 11 to Chapter 7 filed
10  10/17/2025 (Doc. 143)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by:  Sonya Ledanski Hyde
```

Page 4

```
1  A P P E A R A N C E S :
2
3  THE DAKOTA BANKRUPTCY FIRM
4      Attorney for Debtors
5      1630 First Avenue North, Suite B
6      Fargo, ND 58102-4246
7
8  BY:  MAURICE VERSTANDIG
9       CHRISTIANNA A. CATHCART
10
11  VOGEL LAW FIRM
12      Attorneys for Red River State Bank
13      218 Northern Pacific Avenue
14      Fargo, ND 58102
15
16  BY:  KESHA TANABE
17       CAREN W. STANLEY
18       DREW J. HUSHKA
19
20  DAVENPORT EVANS HURWITZ & SMITH LLP
21      Attorney for Red River State Bank
22      206 West 14th Street
23      Sioux Falls, SD 57101-1030
24
25  BY:  ANTHONY M. HOHN
```

Page 5

```
1  KD LAW, PLLC
2      Attorney for D&M Industries, Inc.
3      3429 Interstate Boulevard
4      P.O. Box 9231
5      Fargo, ND 58106-9231
6
7  BY:  JOHN M. KRINGS, JR.
8
9  WOODS FULLER SHULTZ & SMITH PC
10      Attorney for Watertown Development Company
11      300 South Phillips Avenue, Suite 300
12      Sioux Falls, SD 57104
13
14  BY:  JORDAN J. FEIST
15
16  BASSFORD REMELE
17      Attorney for Diamond Wall Systems
18      Fifth Street Towers
19      100 South 5th Street, Suite 1500
20      Minneapolis, MN 55402
21
22  BY:  JEFFREY D. KLOBUCAR
23
24
25
```

2 (Pages 2 - 5)

Page 6

1              I N D E X

2

3    WITNESSES:      DIRECT:   CROSS:   REDIRECT: RECROSS:

4    MATTHEW GEHRTZ    8/25/84   142    175

5

6    VOIR DIRE OF MATTHEW GEHRTZ BY MR. VERSTANDIG: Page 22

7

8    EXHIBITS:                    PAGE:

9    Exhibit 60-1(A)    Expert Report, Pages 1-401   84

10   Exhibit 60-1     Expert Report, Page 406    132

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1              P R O C E E D I N G S

2         THE COURT:  We are back on the record with

3    bankruptcy Case Number 25-30004, The Ruins LLC.  And when we

4    broke, the parties had presented testimony and argument,

5    some argument on whether the Court should find cause to

6    dismiss or convert.  During that hearing, I advised the

7    court that under the statute I must also consider unusual

8    circumstances if that's presented.  And so the parties

9    requested an opportunity to provide some additional

10   evidence, which I am happy to grant.

11        So it's your motion, Red River State Bank.  You

12   may proceed with calling your next witness.

13        MR. HUSHKA:  Thank you, Your Honor.  We would call

14   Mr. Matthew Gehrtz.

15        THE COURT:  Please state your name for the record.

16        MR. GEHRTZ:  Matthew Gehrtz.

17        THE COURT:  Do you solemnly swear that the

18   testimony you are about to give in this case will be the

19   truth, the whole truth, and nothing but the truth, so help

20   you God?

21        MR. GEHRTZ:  (indiscernible).

22        THE COURT:  Please take the stand.  All right.

23   I'm going to have you scooch up to the microphone and then

24   tap it until you see that it's green.  There's a little

25   button on the base.  There you go.  So you have to just

Page 8

1    lightly tap it.  Is it green?

2         MR. GEHRTZ:  There we go.  Yes.  Thank you.

3         THE COURT:  All right.  I'm going to have you

4    state your name for the record just so I can make sure I

5    hear.

6         MR. GEHRTZ:  Matthew Gehrtz.

7         THE COURT:  All right.  I can hear.  You may

8    proceed.

9         MR. HUSHKA:  Thank you, Your Honor.

10        DIRECT EXAMINATION OF MATTHEW GEHRTZ

11   BY MR. HUSHKA:

12   Q   Mr. Gehrtz, I'd like to begin with your educational

13   background.  Did you attend high school?

14   A   Yes, I did.

15   Q   Which high school?

16   A   Park Christian in Moorhead.

17   Q   Here in Fargo?

18   A   In Moorhead.

19   Q   In Moorhead, okay.

20   A   Yeah.

21   Q   Did you graduate?

22   A   I did, yes.

23   Q   When did you graduate from high school?

24   A   Graduated in 2007.

25   Q   What did you do after graduation?

Page 9

1    A   After graduation I went to NDSU and attended civil

2    engineering school from 2007 through 2011.

3    Q   Did you graduate in 2011?

4    A   I did, yes.

5    Q   And what was your major?

6    A   Civil engineering with an emphasis in structural.

7    Q   What did you --

8         THE COURT:  I'm going to have you speak up just a

9    little bit.

10        THE WITNESS:  Sorry.

11        THE COURT:  And repeat what your degree was in

12   because I didn't catch it.

13        THE WITNESS:  My degree was in civil engineering

14   with an emphasis in structural engineering.

15        THE COURT:  Great.  Thank you.  I can hear you so

16   much better.  Thanks.

17        THE WITNESS:  Thank you.

18   BY MR. HUSHKA:

19   Q   What did you do after graduation from NDSU?

20   A   I moved to Colorado and worked for an engineering firm

21   for approximately four years.  Just over four years.

22   Q   Did you go receive any additional schooling while in

23   Colorado?

24   A   Yes.  While I was at my employer in Colorado, I

25   attended CU -- University of Colorado Denver and obtained my

3 (Pages 6 - 9)

Page 10

1  master's in business administration with an emphasis in
2  finance.
3  Q   When did you receive that degree?
4  A   It was approximately -- I believe it was around 2018 or
5  so.
6  Q   Do you hold any professional certificates, licenses or
7  credentials?
8  A   I do. I am a professional engineer in the state of
9  Wyoming.
10  Q   And what are the requirements to be licensed as a
11  professional engineer by Wyoming?
12  A   You have to work under a professional engineer for four
13  years or more. And then you have to take a licensure test,
14  pass it, obviously, and then receive your licensure.
15  Q   Okay. I can assume that you passed then?
16  A   I did, yes.
17  Q   Have you ever bene subject to any disciplinary
18  proceedings related to that license?
19  A   No.
20  Q   Have you ever been subject to any disciplinary
21  proceedings related to any court or administrative
22  proceeding?
23  A   No.
24  Q   You briefly touched on your work history. I want to
25  talk about that a little bit more. You said you were

Page 11

1  working on receiving your MBA. Is that correct?
2  A   That's correct, yes.
3  Q   What was the name of that employer?
4  A   Black & Veatch.
5  Q   What does Black & Veatch do?
6  A   They are a municipal engineering firm that specializes
7  in power transmission and infrastructure design and
8  construction.
9  Q   Approximately how many employees?
10  A   It's a large company. I think it's approximately --
11  it's -- I want to say it's more than 10,000. I don't know
12  that for sure. But it's a large and it's a global company.
13  Q   Okay. What was your position or job title with Black &
14  Veatch?
15  A   My position was civil engineer. And at that time it
16  was engineering training. It was the designation I have
17  until I have my professional licensure. So I was an
18  engineer that was working underneath a professional engineer
19  at that time.
20  Q   What were your job responsibilities for them?
21  A   My job responsibilities primarily were specific --
22  doing the design and the calculations for the particular
23  projects that we work on. Primarily it was structural,
24  foundation, and at that time I was working in power
25  transmission. So I was designing foundations for overhead

Page 12

1  power lines and substations and things of that nature.
2  Q   And that was four years of your employment there?>
3  A   Correct, yes.
4  Q   When did your employment with Black & Veatch end?
5  A   I finished with Black & Veatch in 2015. And then moved
6  back here to Fargo and started work with Gehrtz Construction
7  Services in 2016.
8  Q   So is that why you left Black & Veatch?
9  A   It was, yes.
10  Q   No disciplinary issues? You weren't terminated or
11  anything?
12  A   Correct, no.
13  Q   Okay. You said you worked for who when you moved back?
14  A   Gehrtz Construction Services.
15  Q   Okay. What is Gehrtz Construction Services?
16  A   Gehrtz Construction Service is a construction
17  management firm. We specialize in project management and
18  oversight of construction. We don't self-perform any work.
19  So our primary goals are to schedule, coordinate, and we'll
20  be overseeing a project from start to finish, whether that
21  be budget creation, estimation on the front end of a
22  project, bid and scope developments that we can bid out a
23  job and price it out, work on subcontracts. So we really
24  handle all of the construction-related activities from start
25  to finish throughout the entire course of a construction

Page 13

1  project without actually self-performing any of the work.
2  So our primary responsibility is management, oversight, and
3  quality control.
4  Q   So you're not doing the construction, but you're
5  overseeing the construction. Is that a fair --
6  A   That's correct, yes.
7  Q   Okay. What is your title with Gehrtz Construction?
8  A   Currently principal construction manager.
9  Q   Okay. Looking at the Gehrtz Construction website, it
10  looks like you kind of have services broken down into pre-
11  construction and then the construction phase. Is that an
12  accurate description?
13  A   That is accurate, yes.
14  Q   Okay. What are the pre-construction phase or design
15  phase services offered?
16  A   Pre-construction services would be estimating. As a
17  drawing set is developed with an architect, we'll create
18  budgets to identify a cost of a potential project. And as
19  the drawings further develop, we'll do schematic design,
20  design development and construction documents, estimates so
21  we can see how the budget is progressing as the design is
22  progressing. Once it is complete, then we'll put together
23  scopes of work to identify what work each subcontractor
24  would be responsible for. We'll then prepare bid documents
25  to send out to the market to bid. Typically we like to see

4 (Pages 10 - 13)

Page 14

1  two, three, four bidders in every bid package so that we
2  ensure competitiveness.  Once we receive all those bids and
3  we qualify the bids, make sure that there isn't anything
4  that's missing from bidder A to bidder B to bidder C, we'll
5  qualify the bidders to make sure that they can complete the
6  work on time, they can complete it within the schedule that
7  we need them to complete and that they have the manpower to
8  do the job that needs to be done.
9      So once that's all completed, then we'll put that
10  together as a package and review it with the owner or the
11  stakeholders, whoever that particular case.  And that
12  essentially concludes the pre-construction portion of a
13  project.
14  Q   Are you personally familiar and experienced with all
15  those pre-construction services?
16  A   Yes, I am.
17  Q   Okay.  Approximately how many projects, if you even
18  have a rough ballpark, have you provided pre-construction
19  services for?
20  A   Oh, it's been I would say more than 50.  I mean, quite
21  a few.  Every single project we deal with typically we're
22  involved in pre-construction in some manner.
23  Q   And what types of projects would these all be?
24  A   It ranges from industrial to education to religious to
25  mixed use.  It spans pretty much every industry.  I mean,

Page 15

1  there isn't anything that we wouldn't necessarily do from a
2  construction management standpoint.
3  Q   You mentioned mixed use.  Is that what you consider The
4  Ruins development to be?
5  A   I would, yeah.
6  Q   Okay.  So you're familiar with mixed use development?
7  A   Yes, I am.
8  Q   From both a pre-planning and a construction aspect?
9  A   Yes, correct.
10  Q   All right.  Were any of these services that you just
11  kind of discussed relevant -- particularly relevant to what
12  you've been asked for to look at with respect to The Ruins?
13  A   I would say yes in the respect that we need to have a
14  fairly good understanding of what typically falls within
15  certain subcontractors' responsibilities.  So having that
16  knowledge would help me base my assumptions on where I came
17  to -- from the reporting standpoint.
18  Q   Does Gehrtz Construction also provide construction
19  phase services?
20  A   We do, yes.
21  Q   Okay.  Construction administrative services?
22  A   We do, yes.
23  Q   Can you define that term for the Court?
24  A   Construction administration services would be anything
25  that relates to contractual documents, putting together

Page 16

1  subcontracts for any trade that's on the site.  We would
2  also be doing budget and cost management throughout the
3  course of construction.  Anything related to the contractual
4  side of things we would provide in the course of a
5  construction project under that scope of work.
6  Q   I took a peek at the Gehrtz Construction Services
7  website and I found 32 different construction administration
8  services.  I don't want to belabor it for the Court, but can
9  you identify if there's any of those 32 services that would
10  be particularly relevant to what you were asked to look into
11  for The Ruins?
12  A   Can you list a few that you see on there?
13  Q   I'll have to --
14  A   Just so that I don't belabor as well.
15  Q   I guess what construction services are particularly
16  relevant for The Ruins in what you were asked to do if
17  anything.
18  A   I would say quality control, site management, budget
19  control, budget estimating.  I would say site inspections,
20  documentation, punch listing.  A lot of those items and
21  activities would be pertinent to this scenario.
22  Q   Are you personally familiar with all those services?
23  A   Yes, I am.
24  Q   Can you explain your personal familiarity or experience
25  with those services?

Page 17

1  A   on this particular project or in general?
2  Q   Just in general for your background.
3  Q   Okay.  In general, I mean, my role as a construction
4  manager if I'm on a particular project, I will be receiving
5  pay requests from all the subcontractors.  I'll review the
6  pay request, make sure that it's complete, make sure the
7  work that they're requesting payment for has actually been
8  completed on the site.  I'll also verify if they're complete
9  and accurate from a documentation standpoint, reviewing that
10  the contract total and the initial total is correct, any
11  change orders are correct and the process -- or the progress
12  is shown accurately on the pay request and approve it.
13      In addition to that, to supplement that we'll do site
14  visits and if we're not already on site to validate that
15  work is complete, we'll provide photos and documentation to
16  support the pay request to ensure the work that's being
17  requested for payment is actually being completed so that
18  it's not billing ahead of where progress is actually at.
19  Q   You said your current position with Gehrtz Construction
20  was what again?  Sorry.
21  A   Principal construction manager.
22  Q   And what are your job duties and responsibilities,
23  anything that we haven't already discussed?
24  A   In addition to the project-related duties, there's also
25  business-related duties as a principal construction manager,

5 (Pages 14 - 17)

Page 18

1  but I don't know if that pertains necessarily to this.

2  Q   Fair enough.  I want to talk about whether or not

3  you've provided expert services before.  Have you ever

4  testified as an expert in a prior lawsuit or arbitration or

5  anything of that nature?

6  A   I have not.

7  Q   Okay.  Have you ever provided expert services for an

8  entity before?

9  In a legal context?

10  Q   Well just as -- have you ever been retained by a third

11  party kind of after the fact to come in and take a look at a

12  project?

13  A   Yes, we have.

14  Q   What kind of services do you provide in those

15  circumstances?

16  A   It would be similar to this in the respect of a third-

17  party site inspection to validate construction is where it

18  says it is.  Typically those are for a bank as a third party

19  inspection to validate pay requests prior to paying

20  subcontractors.

21  Q   Do you have an approximation of how many times you've

22  provided those types of services?

23  A   More than a dozen.  I don't have a specific number for

24  that, but numerous times.

25  Q   And you said normally these are provided for banks.

Page 19

1  Have you provided these services for Red River State Bank

2  before?

3  A   I have not.

4  Q   Do you have any connection to Red River State Bank that

5  would influence your opinions in this matter?

6  A   No.

7  Q   Has the Vogel Law Firm ever retained you to provide

8  such expert services?

9  A   No.

10  Q   Do you have any connection to the Vogel Law Firm that

11  would influence your opinions in this case?

12  A   No.

13  Q   Have you ever been hired by Jesse Craig, The Ruins LLC,

14  or any Craig entities before?

15  A   I have not.

16  Q   Do you have any connection to Jesse Craig, The Ruins,

17  or any Craig entities that are influencing your opinions?

18  A   I do not.

19  Q   Have you ever been retained by the Dakota Bankruptcy

20  Firm, Mr. VerStadig, who you can see on the screen, or Ms.

21  Cathcart, who is down at the other table?

22  A   I have not, no.

23  Q   Okay.  Any connection with any of the that would

24  influence your opinion in this case?

25  A   No.

Page 20

1  Q   When did you first learn about The Ruins matter?

2  A   Red River State Bank had contacted Gehertz Construction

3  at or around late March, early April of 2024 in regards to

4  the case.

5  Q   You said Red River State Bank.  Who at the bank?

6  A   Charlie Aarstad, Charles Aarstad.

7  Q   You said that was in twenty...

8  A   It was in 2024.  I believe it was late March, early

9  April timeframe.  I don't recall the exact date on when the

10  call happened or the -- when the contact happened.

11  Q   Okay.  What was the nature of that contact?  Was he

12  reaching out to request something or discuss it, or how did

13  this kind of start for you?

14  A   The context of the call was to retain us to do a site

15  inspection for the particular project at hand.

16  Q   Okay.  Were you ever formally retained then?

17  A   We were, yes.

18  Q   Okay.  And who retained you?

19  A   Red River State Bank.

20  Q   Were you formally retained around that same time period

21  you were talking about or...

22  A   I believe we had a proposal that was dated April 4th I

23  believe.  And on that proposal we gave two different

24  options, one to do a full and complete punch list type

25  report and a second option to do more of a cursory overview

Page 21

1  of the project status.  And the option one was selected to

2  do a full and complete report.

3  Q   Were you compensated for that?

4  A   We were, yes.

5  Q   How much have you been paid to date approximately?

6  A   Just let me walk through this a little bit as we speak.

7  I believe the initial report was for a lump sum of $12,500.

8  And then additional services after that were paid hourly or

9  billed hourly.  And I believe were somewhere in the mid-

10  twenties for total compensation, twenty-thousands.

11  Q   So the initial report was a lump sum and it's been

12  hourly since?

13  A   Correct, yes.

14  Q   Okay.  Is your compensation in this matter at all

15  contingent or dependent on the outcome of this case?

16  A   It is not.

17  Q   Has your compensation that you've received in any way

18  affected your opinions?

19  A   It has not.

20  MR. HUSHKA:  Your Honor, at this time I would

21  offer Mr. Gehrtz as an expert in the field of commercial

22  construction and supervision.

23  THE COURT:  Any objection?

24  MR. VERSTANDIG:  Permission to voir dire.

25  THE COURT:  You may.

6 (Pages 18 - 21)

Page 22

1    MR. VERSTANDIG: Thank you
2    VOIR DIRE EXAMINATION OF MATTHEW GEHRTZ
3  BY MR. VERSTANDIG:
4  Q    Mr. Gehrtz, are you aware of the relief that is being
5  sought by Red River State Bank at this hearing?
6  A    Can you expand on the explanation of what that is?
7  Q    Sure. Do you know what it is that Red River State Bank
8  is asking the Court to order at the end of this hearing?
9  A    I believe I do.
10  Q    Okay. Could you share what that is?
11  A    I believe that it is the position of the bank to put it
12  into bankruptcy. I guess -- I'm sorry, I don't know the
13  terminology behind that.
14  Q    That's quite all right. Is it your understanding that
15  the bank would like to gain possession of The Ruins project
16  for some combination of events that may follow this hearing?
17  A    I don't know that for sure. I haven't had those
18  specific discussions with them.
19  Q    Okay. Have you ever talked to the bank or any officer
20  or agent of the bank, Mr. Aarestad or anyone else, about
21  whether or not Gehrtz Construction would be hired to do work
22  if the bank were to take over The Ruins project?
23  A    We haven't specifically talked to that to my memory.
24  Certainly not in any official capacity.
25  Q    Well, would there have been any unofficial discussions

Page 23

1  about what a good job you can do once it's in your hands?
2  A    I guess not specifically, but personally I naturally
3  just go to as a business owner what it might look like. But
4  there's been no formal discussion or informal discussion
5  about taking the project over.
6  Q    Okay. The report you put together does include some
7  fees that would be charged if Gehrtz were to do work,
8  correct?
9  A    The fees would be included if anybody were to complete
10  the project. So if it's in the capacity of a third party,
11  someone would need to be paid to finish the project I guess
12  is kind of how my perspective is on that, whether it's us or
13  it's a third party.
14  Q    Without getting into what I'm sure Mr. Hushka is going
15  to ask you about in some detail, broadly speaking if Gehrtz
16  were to take over this project, approximately how much would
17  it stand to make in fees?
18  A    It's anywhere between six and eight percent is
19  typically what we would charge on a project as a
20  construction manager.
21  Q    So I want to be careful not to ask you the cost of
22  completion because I, you know, object to that. But six to
23  eight percent of a number that's likely north of a million
24  dollars, right?
25  A    I guess aside from doing the math, I would have to

Page 24

1  determine what that number actually is. I don't know for
2  sure if it's north of a million dollars. That seems high to
3  me if the total cost of construction is around $1.7 million
4  in our estimation.
5  Q    And then six to eight percent of a number north of $1
6  million. Yeah.
7  A    That would be correct. Yeah. Sorry.
8  Q    We can agree 1.7 is north of a million, right? And you
9  do own part of the company, correct?
10  A    Correct.
11  Q    Okay. so you do stand to economically benefit if the
12  bank is given control of this project and Gehrtz is then
13  hired to finish the work, right?
14  A    That would be correct.
15  Q    Okay. Have you ever been denied qualification as an
16  expert witness in any arbitration, state court, federal
17  court, foreign court, native American court, moot court?
18  Any court?
19  A    No, I have not.
20  Q    Okay.
21    MR. VERSTANDIG: Your Honor, we would object on
22  the limited basis that it appears the witness is
23  economically incentivized based upon the testimony offered
24  today. We don't object to his qualifications . He seems to
25  be very well-qualified. And it would be the monetary

Page 25

1  component that is problematic.
2    THE COURT: I am going to overrule because your
3  concerns relate to the weight of the testimony rather than
4  the admissibility.
5    MR. VERSTANDIG: Thank you, Your Honor.
6    THE COURT: Approved as an expert. And you may
7  proceed.
8    MR. HUSHKA: All right. Thank you, Your Honor.
9    RESUMED DIRECT EXAMINATION OF MATTHEW GEHRTZ
10  BY MR. HUSHKA:
11  Q    I guess maybe just put a button on what Mr. VerStandig
12  asked you, Mr. Gehrtz. You have not been asked to complete
13  construction in this project, have you?
14  A    That's correct, we have not.
15  Q    And you haven't had any formal or informal discussions
16  with whether or not you would take over this project or
17  whether you'd even be available to take over this project?
18  A    Correct.
19  Q    Okay. Mr. Gehrtz, I want to get to your expert
20  opinions then since we have you qualified.
21    MR. HUSHKA: And if I could have the Court pull up
22  ECF 60-1, Exhibit A.
23  BY MR. HUSHKA:
24  Q    And please let me know when you see that on the screen
25  in front of you, sir.

7 (Pages 22 - 25)

Page 26

1   A   I can see it.

2   Q   Okay.  Do you recognize that document?

3   A   I do, yeah.

4   Q   What is that document?

5   A   This was our initial report that we were hired to

6   complete for the project.

7   Q   If we scroll to the next page, at the very bottom of

8   what's been designated page one on the report, do you see a

9   signature?

10  A   I do.

11  Q   Is that your signature?

12  A   Yes, it is.

13  Q   By signing this document, are you attesting to the

14  opinions that are expressed in this report?

15  A   Yes.

16  Q   Okay.  To form the opinions in this report, did you

17  make any observations?

18  A   We did.

19  Q   What observations did you undertake?

20  A   We made visual observations as we completed our site

21  inspection.

22  Q   Site inspection of what?

23  A   Of The Ruins project.

24  Q   Okay.  Down in Watertown, South Dakota?

25  A   Correct.

Page 27

1   Q   When you say a site inspection, you went down

2   personally and walked around and checked everything out?

3   A   Correct.  We went down.  We completed an inspection.

4   It took approximately the entire day to walk through the

5   entire building.  And we photo documented everything that we

6   saw and we prepared this report, which I think is fairly

7   lengthy.

8   Q   You said you took photos?

9   A   We did, yes.

10  Q   Any approximation of how many photos?

11  A   I would have to say more than a thousand.  I don't know

12  an exact number, but a lot of photos.

13  Q   Okay.  Are there photos in this report?

14  A   There are, yes.

15  Q   Do those photos truly and accurately depict and

16  represent what you observed during your site inspection?

17  A   Yes, they do.

18  Q   Did you make any assumptions in drafting this report?

19  A   We did, yeah.

20  Q   What were some of those assumptions?

21  A   Some of the assumptions that we had to make were what

22  scopes of work contained in each of the particular bid

23  packages that would be on the sworn construction statement.

24  That was basically the document that helped us formulate the

25  table of contents and the structure for this report, is that

Page 28

1   we used the same essentially schedule values on the sworn

2   construction statement for each individual bid packages.  So

3   we made assumptions on what might be contained in each one

4   of those particular packages to arrive at our estimated

5   percentage complete.

6   Q   When you say sworn construction statement, was that a

7   document?

8   A   That was a document, yes.

9   Q   Was that a document to the best of your knowledge that

10  was provided by Craig Development or Craig Holdings or some

11  Craig entity?

12  A   That's my understanding.

13  Q   And then what was all depicted in that document?

14  A   It had a list of the subcontracts line by line of like

15  -- it would be waterproofing and it would be CMU block and

16  it would be general work and labor, carpentry.  Items like

17  that that, that if you continue going down the report, that

18  table of contents is laid out in that same structure.

19  Q   So essentially you took the format that had been

20  provided by the Craig entities and you used that to adapt

21  your report?

22  A   Correct.  Yeah.

23  Q   Okay.  Can you describe for me briefly -- and we'll get

24  into it a little bit more obviously as we go.  But just kind

25  of give an overview of your process of how you reached the

Page 29

1   opinions that you expressed in this report.

2   A   Initially doing the site visit, we tried to take as

3   many photos and tried to organize a structure that made

4   sense as we walked through the building.  We didn't have an

5   accurate floor plan at that time, so we made some

6   assumptions on which room numbers were associated with which

7   rooms.  We structured a folder system within our -- we have

8   a software, an online software that we use.  So we take a

9   photo and it automatically puts it on the software.  So it

10  helps organize all of the documentation.  So we organized.

11  Each room had its own folder.  And so then we had photos

12  that are associated with each room.  And then as we were

13  taking photos, we assigned what we assumed would be a

14  particular trace that would be responsible for completing

15  that particular task.

16      So the way that we view it as a construction manager,

17  it was essentially a punch list, which is a list of things

18  that needed to be complete.  And then in order for a punch

19  list to be effective, you need to assign a subcontractor or

20  a bid package that needs to be responsible to complete that

21  package.  And so that's how we've structured and assigned

22  what we felt -- if a typical scope of work is X for a

23  subcontract and we in our observations felt that it was 80

24  percent complete, that's kind of how we've established our

25  report structure.

8 (Pages 26 - 29)

Page 30

1  Q  Sir, you used the pronoun we a number of times in that.
2  Are you speaking in the royal we, or was there a team that
3  went with you down to the site?
4  A  For this initial site, I had a team of three
5  individuals plus myself just due to the essence of trying to
6  complete the entire report.  And then I put together the
7  report personally and compiled everything.  So I had a team
8  helping me take all the photos and organize things.  But
9  then I personally put the report together myself.
10  Q  Okay.  So you were the leader of the team?
11  A  Yes, I was.
12  Q  Okay.  Is it typical in the construction industry for a
13  project of this size for an inspection to use a team of that
14  nature?
15  A  I would say yes.
16  Q  Are you confident in your team that they took true and
17  accurate renderings and pictures and observations?
18  A  Absolutely, yes.
19  Q  Is there anything that you believe you didn't
20  personally observe that could have affected or misconstrued
21  your opinions in this case?
22  A  No.
23     MR. HUSHKA:  All right.  If the Court can proceed
24  to the next page of the report.
25  BY MR. HUSHKA:

Page 31

1  Q  Is this kind of the breakdown that you've discussed or
2  briefly referenced before?
3  A  Yes, it is.
4  Q  Okay.  And this breakdown you indicated was taken from
5  the sworn construction statement provided?
6  A  Correct.
7  Q  Okay.  I understand it may be slightly tedious, but I
8  think it may be helpful for the Court if the Court will
9  allow for us to kind of go through each of these subparts to
10  explain and identify the work that has been performed and
11  still needs to be performed.  Is that something you can
12  provide for us?
13  A  It is.
14  Q  All right.  We can proceed to the next page of the
15  report then.  And what is the first category in this report?
16  A  The first category is concrete waterproofing and
17  insulation.
18  Q  What is that?
19  A  So our assumption would be that concrete waterproofing
20  was not observable because it was for foundation.  However,
21  insulation, we felt like that was building envelope and
22  insulation within the walls of the building.  In addition to
23  that, basically sealing up any penetration on the exterior
24  of the building would be how I view insulation.  That's why
25  we categorized that under this particular line item.

Page 32

1  Q  And did you form an opinion for how much of this work
2  had been finished as of the time of your inspection?
3  A  We did, yeah.
4  Q  And I guess to circle back around, I don't know if we
5  have it in yet.  But when did you inspect The Ruins on this
6  first initial inspection?
7  A  I think if you scroll up on the document, I believe
8  that it was April 17th of 2024 is when we were on site for
9  the particular visit.
10  Q  And are you aware if there's been any additional
11  construction done to the project since that April 17th, 2024
12  date?
13  A  We performed a follow-up inspection in September of
14  2024 to determine if any significant work had been
15  completed.  And we observed that there was no significant --
16  and I believe there's additional exhibits of that.  And then
17  we did a third visit to determine what is the cost to
18  complete in addition to see if any additional work had been
19  completed.
20  Q  So am I to understand that the report that we're going
21  to go through and the percentage complete is still what you
22  understand the status of The Ruins today?
23  A  I would say yes.
24     MR. HUSHKA:  Let me go back down to the actual
25  opinion section, Sharon.  Thank you.

Page 33

1  BY MR. HUSHKA:
2  Q  What was the opinion for the percentage complete of
3  concrete and waterproofing?
4  A  So my assumption was that the entire building envelope
5  insulation was completed, obviously because it's behind
6  sheetrock and vapor barrier.  However, it appeared that
7  there was insulation missing around the A/C sleeves, which
8  is the air conditioning sleeve, and louvers and other
9  miscellaneous penetrations through the building which in my
10  experience would typically fall under the insulation scope
11  of work.
12  Q  Were those just things that hadn't been completed or
13  were those deficiencies with what had been done?
14  A  Most of what I observed was yet to be complete.  But it
15  did appear that there were some deficiencies with spray
16  foam.  Overspray under the brick.  Just minor things that
17  just needed to be corrected.
18  Q  And you said those would need to be corrected.  They're
19  not something that could just kind of be ignored?
20  A  In my opinion they should be corrected.
21  Q  Okay.  What would be required to complete the -- to
22  correct those from a cost and materials or labor standpoint?
23  A  I think cost and materials is fairly minor.  And I
24  think maybe two to three days of work for this particular
25  package would complete.

9 (Pages 30 - 33)

Page 34

1  Q   That would be two or three additional days to --
2  construction is one and then the remediation would be an
3  additional two or three days?
4  A   For this particular package, remediation is maybe a
5  day.  Not a significant one on this particular one.
6  Q   Fair enough.  If I can direct your attention to the
7  bottom of page 3.  Do you see a section titled gypcrete?
8  A   Yes.
9  Q   What is gypcrete?
10  A   Gypcrete is a subfloor overlay.  It's typically
11  installed for minimizing sound transfer between floors in
12  residential application.  It also provides a level of fire
13  rating to the floor system.
14  Q   How much of that work had been completed?
15  A   We observed that all the gypcrete had been placed and
16  completed.  So our assumption was that it's 99 percent
17  complete.  Very minor items that needed to be addressed.
18  Q   You said some items that needed to be addressed though?
19  A   We observed that there were some bubbling on the
20  surface of the gypcrete.  We also observed, as you can see
21  in the photo to the right, that there in some areas must
22  have been a hole in the substrate which would allow some of
23  the gypcrete to drip down through until it got hard enough
24  to set up.  They are fairly minor deficiencies, but I feel
25  like they might have been an issue when placing flooring on

Page 35

1  there for adhesive to properly bond to the flooring membrane
2  and things like that.  So minor items, but felt like there
3  were deficiencies that needed to be corrected.
4  Q   And those again would need to be corrected at some
5  point?
6  A   Our opinion would be yes.
7  Q   What kind of crew or time and materials are we talking
8  for those remedies?
9  A   I would say less than -- I would say a day per floor to
10  address the gypcrete.  So two days total for that.  And
11  minor equipment needed for that.  Just to sand the floor
12  down essentially what that would be.
13  Q   What kind of sub or trade would perform that work
14  generally?
15  A   typically what I would see is a flooring subcontractor
16  to do that trade.  And I'm going to get a little bit into
17  the details on this.  And the reason why is because if --
18  what I've seen in the past, if a gypcrete subcontractor is
19  requested to do that, it tends to not be corrected in the
20  manner that is necessary for a flooring subcontractor to lay
21  floor and glue on there.  So we like to have a flooring
22  subcontractor come in, prep the surface that they need to
23  see for their particular materials so that warranties and
24  installation patterns are done properly and then it's
25  corrected.

Page 36

1  Q   I didn't ask for the previous one, but for the concrete
2  waterproofing and insulation, what kind of crew would be
3  used to both finish that or remediate the deficiencies that
4  we talked about?
5  A   Typically I would see an insulation subcontractor that
6  would be involved with that particular package.
7  Q   If we can proceed to the next page.  There's a category
8  entitled CMU block.  Can you explain for the Court what that
9  is?
10        THE COURT:  Can I interrupt with a question?
11        MR. HUSHKA:  Certainly.
12        THE COURT:  When you're soliciting information
13  about what type of subcontractor would be needed to do the
14  repair, is that also included in part of this report or are
15  you providing additional information to me that's not in a
16  report?
17        MR. HUSHKA:  That's not in the report.
18        THE COURT:  Thank you.  Okay.
19  BY MR. HUSHKA:
20  Q   So the question was, the next section is CMU block; can
21  you explain for the Court what that category is or what was
22  assessed?
23  A   CMU block is concrete masonry unit.  And as you can see
24  in the photos, it appears that the entire first floor
25  exterior was concrete masonry unit.  And so one of the

Page 37

1  assumptions we made within this package is that typically
2  you would see the subcontract that is required to install
3  the CMU block also provides a waterproofing membrane on the
4  face of that.  And so that was our assumption that that
5  spray-applied weather barrier was included within this
6  particular scope of work.  And the reason that is important
7  to mention is because we felt like on the exterior where
8  there was not masonry brick installed yet, we could see
9  openings, we could see penetrations through the CMU block,
10  which as you can see in these first few photos showed
11  significant signs of moisture penetration within the
12  building on the first floor.
13  Q   Are those deficiencies in your opinion?
14  A   They are.
15  Q   Would those need to be corrected?
16  A   Yes.
17  Q   What would need to be done to correct those
18  deficiencies?
19  A   In my opinion we would need to have the control joints
20  -- which periodically I would say it's every 20 or so feet
21  there should be a joint that allows for building movement
22  and separation and minor movements to that the block doesn't
23  crack.  All of those would need to be sealed prior to the
24  spray applied.  Because the spray-applied membrane is acting
25  as kind of a continuous barrier over the face of the wall.

10 (Pages 34 - 37)

Page 38

1  And if there's any gap in the wall, it can't bridge that
2  gap.  And so providing some sort of a caulking or a sealant
3  or some sort of item that would fill that gap is important
4  prior to the spray-applied membrane.  And so all of that
5  would need to be done.  In addition, if you can scroll down
6  just a little bit more on this particular page, we noticed
7  that the first floor, which was a precast plank, extended to
8  the exterior of that wall, which is typical.  However,
9  there's numerous gaps in that precast plank that at this
10  point is allowing moisture into the building.  So all of
11  that would need to be sealed and it would need to be either
12  resprayed or some sort of additional membrane would need to
13  be put over the top of that so that there is not any gaps in
14  that exterior wall.
15  Q   And so in addition to those remediation efforts,
16  there's also about 25 percent of the CMU block would still
17  need to be completed as well?  Is that a fair reading of the
18  report?
19  A   Our assumption was that there were some walls on the
20  first floor that still needed to be completed within what we
21  felt was a common space.  At that time we didn't have an
22  accurate plan that noted those areas.  So our assumption was
23  that there was some work still that needed to be done on the
24  first floor on the inside of the building.
25  Q   What crew or crews would be needed to complete the CMU

Page 39

1  block work plus the remediation work?
2  A   That would be typically either a mason or some trades
3  have a spray-applied weather barrier division.  So either a
4  mason or a subcontractor that specializes in spray-applied
5  barrier.
6  Q   How long approximately to finish this or the
7  remediation efforts?
8  A   I would estimate maybe a week to two weeks depending on
9  the actual scope that's required on the first floor for the
10  CMU.
11  Q   We can scroll to the next page.  There's a section
12  titled miscellaneous metals.  Can you describe what's
13  assessed in there?
14  A   Miscellaneous metals would be just non-structural
15  related steel or metal.  Items like bollards, roof access
16  ladder, railings in the stairwells, items that are just kind
17  of miscellaneous in nature.  And we observed that the
18  material was on site but had not been installed yet.
19  Q   Any deficiencies noted?
20  A   Not for this particular package other than the fact
21  that it was not installed, was not complete.
22  Q   And what crew or trade would be needed to finish that
23  last 20 percent work on this?
24  A   This one typically is completed by a general work and
25  labor contractor.

Page 40

1  Q   If we can go to the next page, the general W and L
2  rough carpentry labor.  Do you see that section?
3  A   I do.
4  Q   What is that?
5  A   This would be the package that typically does the
6  majority of the framing on the building, all the wood
7  framing.  They would also do the installation of all the
8  windows.  They would also do the installation of the Tyvek
9  weather barrier on the exterior of the building.  And then
10  any other miscellaneous related items such as miscellaneous
11  metals could fall within this package from a labor
12  standpoint.  So this package is a fairly large package in
13  terms of mixed use building construction.
14  Q   About 25 percent of this item is still to be completed?
15  A   That was our best assumption.  Based on not knowing
16  specifically what all was in this particular package, we had
17  to make some assumptions to get to that point.
18  Q   It looks like there were some deficiencies noted as
19  well.
20  A   As we walked through the building, we noted that there
21  were quite a few windows that had signs of moisture
22  penetration.  And so you can see that we've noted between 45
23  and 50 with some sort of moisture penetration on the north
24  and the east elevations of the building.  10 to 15 windows
25  were either broken or missing some sort of glass.  12 to 17

Page 41

1  of these windows were -- in addition to those 12 to 17
2  windows were either broken or malfunctioning latches or
3  cranks so that you couldn't actually close the window
4  completely and secure it.  And six to ten of those windows,
5  the frames appeared to be either warped, not level, or some
6  other scenario that wasn't causing it to function properly.
7  Q   Are those deficiencies that would need to be remedied
8  in your opinion?
9  A   Yes, yes.
10  Q   What kind of crew would be needed, or crew or trades
11  would be needed to provide those remediation efforts?
12  A   I would say a general work and labor contractor would
13  be necessary for these.  The other potential would be a
14  supplier for the windows depending on if their replacement
15  windows are on site or not or if additional replacement
16  windows needed to be ordered.  So it would be a window
17  supplier as well in addition to that.
18  Q   Did you see any replacement windows on site?
19  A   I believe if I recall there were a few on the first
20  floor.  I don't recall the number of how many were there.
21  Q   Enough to replace all the windows that you thought were
22  affected?
23  A   my opinion, no, there was not enough there.
24  Q   All right.  If we could proceed to the next page and
25  the next section entitled General W and L Finish Carpentry

11 (Pages 38 - 41)

Page 42

1   Labor. What is this?
2   A   This would be general carpentry that's associated with
3   finishes within the building. So doors and frames,
4   potentially cabinets. Things of that nature that are
5   supplied for this particular subcontractor to install.
6   Q   And your report says 25 percent of the work hadn't been
7   completed yet for this?
8   A   That was our assumption, yeah, based on what we
9   typically see within this package and what we felt was
10  remaining work completed on the site.
11  Q   But you did note deficiencies with what had been
12  completed.
13  A   We did, yes.
14  Q   Can you kind of outline or give a high-level overview
15  of that for the Court?
16  A   Yeah. We noticed that there were several unit entry
17  doors that were damaged that most likely needed to be
18  replaced. Number of units which had, you know, just the
19  back sides of the bifold doors and the closets had been
20  ripped down just to fit properly. It felt like that was a
21  deficiency that should be corrected.
22      The third note on the potential deficiencies were
23  observed wood base installed prior to flooring with no gaps
24  in substrate between the bottom of the base.
25      Typically what I see is that the flooring goes in first

Page 43

1   and then the base goes on top of the floor so that you have
2   a nice -- basically you're hiding the gap where the floor
3   meets the wall. It didn't appear that that was able to be
4   accomplished in this case. So it's more of an aesthetic
5   deficiency in my opinion than really a functionality
6   deficiency, but it's something to note.
7   Q   If this is going to be sold and marketed as a high-end
8   apartment complex, are those the types of finishes, the lack
9   of gap, that you would expect to see?
10  A   I would not like to see that in a high-end apartment
11  personally.
12  Q   So you're saying that these are deficiencies that would
13  need to be remedied?
14  A   Yes.
15  Q   What crew or subs or trades are required to finish this
16  work?
17  A   General work and labor, finish carpentry would be able
18  to handle all of those items in combination with a flooring
19  subcontractor. But I think that's another package later on.
20  Q   Okay. You know that there were some doors that were
21  damaged. Were there replacements on site that you observed?
22  A   I don't recall seeing any replacement doors during the
23  time of our inspection.
24  Q   If you had, would you have properly noted it in your
25  report?

Page 44

1   A   We would have, yeah.
2   Q   If we can proceed to the next page and the next
3   category, Millwork-Cabinets. Can you described for the
4   Court what is assessed in there?
5   A   This would be the supply of any kitchen cabinets
6   throughout all the residential units. And as we were going
7   through and doing our observations, we noticed that there
8   were a handful of cabinets that were not installed, either
9   missing or damaged. So I think I noted on the report that
10  on the second floor there was one unit where the cabinets
11  were not completed. And you can see that in that first
12  photo on the left. On the third floor there were 17 units
13  that were missing at least one cabinet and four units that
14  appeared to have more that were missing. So I would say
15  overall to get to our assumption of what was completed, we
16  did a count on the number of units and how many units didn't
17  have cabinets installed fully and arrived at our assumption,
18  our percentage.
19  Q   When you say missing, did you observe them on site and
20  they just hadn't been installed yet, or were they totally
21  absent?
22  A   Most of the cabinets were on site that we observed. I
23  didn't do an actual count of the individual units, but it
24  appeared that most of the materials was there. It had just
25  not been installed.

Page 45

1   Q   You mentioned that some had been damaged though as
2   well?
3   A   Correct, yes.
4   Q   Were there replacement materials or replacements for
5   ones that had been damaged? What would have to be done with
6   those?
7   A   They would have to be replaced. I don't recall seeing
8   any replacement pieces on the site.
9   Q   You noted some potential deficiencies as well?
10  A   There were a few areas that we noticed where the
11  countertop was overhanging too far where it would prevent an
12  appliance from being installed. You know, like a stove or
13  something like that. And in some cases the countertop
14  overhung the edge of the cabinet too far where a
15  refrigerator wouldn't be able to get installed. So a couple
16  different areas where the countertops would need to be
17  adjusted to accommodate appliances as well.
18  Q   So when you say overhung, essentially they jutted out
19  too far for you to be able to slide in a range or a
20  refrigerator?
21  A   Correct. Correct. Typically -- to expand on that, in
22  the installation of a range, the countertop should be flush
23  with the edge of the cabinet so that it slips in there
24  without any significant gap on either side of the range. In
25  this case, we noted that there were a couple instances where

12 (Pages 42 - 45)

Page 46

1  the countertop had overhung too far to prevent the range
2  from being installed.
3  Q   So would those deficiencies need to be remedied in your
4  opinion?
5  A   Yes.
6  Q   What crew or crew or trades would be needed to remedy
7  any of these deficiencies?
8  A   Again, I think a general work and labor contractor
9  would be able to handle all of those trades or all of those
10  scopes.  In this case, I think it's fairly straightforward
11  with that scope.
12  Q   And same trade to complete the remaining 15 percent?
13  A   Yes.
14  Q   If we could proceed to the next page, Countertops-
15  Kitchen and Bathroom.  Can you describe what that is?
16  A   My assumption is that this includes the supply and the
17  installation of the countertops specifically.  And through
18  our observations we noticed that there were a couple units
19  on the second floor that the countertops were not installed.
20  Third floor, it appeared that all the countertops were in
21  place.  And when I say 95 percent complete, I mean minor
22  punch list items.  So nothing significant from that
23  perspective.  And on the fourth floor we noted that one unit
24  was not complete but the other units appeared to be in
25  place.  So only punch list related items on that.

Page 47

1  Q   Were the countertops on site or were they still needing
2  to be brought in?
3  A   I believe they were on site.  I don't recall
4  specifically though.
5  Q   Did you note any deficiencies for the countertops?
6  A   Other than the items that we talked through with the
7  cabinets, those would be the same deficiencies.
8  Q   The trades to complete this work or remedy those
9  deficiencies are?
10  A   Generally a work and labor contractor would perform
11  this package as well.
12  Q   Next page, section Bathroom Vanities.  Can you describe
13  and explain that for the Court?
14  A   Bathroom vanities, appeared that this was a supplied
15  piece of millwork that in each bathroom was kind of a
16  complete package.  Countertop, sink and cabinet was all part
17  of like a full vanity piece.  And we observed that there
18  were a couple units that did not have the vanity installed.
19  It appeared that it was there, it just wasn't installed.
20  And a couple where there was some damage to the sink and to
21  the countertop that needed to be repaired.  I don't recall
22  if there was any replacements for the damaged pieces.  I
23  think when we took our counts, there was enough for one --
24  or one in every location, but no additional.
25  Q   So enough to finish outfitting the units but not to fix

Page 48

1  any of the damages.
2  A   Correct, yeah.
3  Q   What trade or trades would be needed to finish
4  installing these units and what is needed to be done to
5  install them?
6  A   Yeah.  I would say a general work and labor contractor
7  would set the vanity in place and then a plumber would need
8  to hook the sink up and get everything tied in.  So multiple
9  trades for this particular package to complete.
10  Q   On the next page, Page 11, there's a section titled
11  Moisture Protection.  Can you describe what that is?
12  A   Generally roughing membrane for both low and high roof
13  would fall under this package.
14  Q   And you thought this had been mostly done at 95
15  percent?
16  A   It appeared that all of the roofing membrane was in
17  place.  The only items that we noted, just minor flashings
18  and rough cap, things like that that wasn't in place.  But
19  primarily the majority of this was completed.  At the time
20  of this report we didn't know that there was any additional
21  work on top of that.  But it appears that there is a patio
22  or a rooftop patio in some sense here.  Which is that were
23  the case, there is patio pavers that fall under this
24  particular scope.  So we may have underestimated this a
25  little bit on our first report after now seeing the final

Page 49

1  plan set at the end of the project.  But at the time of our
2  inspection, we noted that the majority of the scope had been
3  completed just with minor items.
4  Q   What trades to finish that last five percent?
5  A   This would be a roofing contractor that would be needed
6  for that.
7  Q   Any deficiencies noted with what had been performed?
8  A   We noticed that there were a couple of soft spots on
9  the roofing area on that lower --
10  Q   What's a soft spot?  Sorry to interrupt you.
11  Q   Soft spot would be if the substate below the membrane
12  was not -- typically you have a rigid insulation underneath
13  it that provides the thermal value.  And then your membrane
14  is over the top of that.  And in some cases if there is some
15  deterioration of that either coverboard or that insulation,
16  then you get a soft spot as you're walking across the roof.
17       So our opinion would be that some of those areas would
18  maybe need to be opened back up and replaced and then
19  patched in order to correct the deficiency.
20  Q   Roofing company do that work, or some other trade?
21  A   A roofing company would be doing that.
22  Q   You can proceed to the next page, the masonry section.
23  Can you describe what masonry was involved with The Ruins
24  development?
25  A   In this package we assumed that this was the face brick

13 (Pages 46 - 49)

Page 50

1  on the face of the building.  And we noticed that the east
2  elevation had -- I'm sorry, the north elevation needed to be
3  completed.  There were three course of brick on the bottom,
4  but nothing else had been completed above that.  And in
5  addition to that, none of the joints in the masonry that had
6  been installed were properly sealed at that time.
7  Q    What type of trade?  I'm assuming a mason to finish
8  this work or --
9  A    Mason would be required to finish this trade.
10  Q    Does this type of brick -- I know the local law firm
11  building is brick as well.  And we require a sealant in our
12  brick.  Is that required for all brick or would it be
13  required on this brick?
14  A    I would say at all of the joints sealant would need to
15  be required.  Typically after brick is installed and after
16  the mortar is cleaned off, you would acid wash it and clean
17  it so that it's presentable.  That's a typical installation
18  process with brick.
19  Q    That would be included in the 20 percent to be done or
20  is that --
21  A    That would be included, yes.
22  Q    Also still by a mason, or is that a different person?
23  A    Correct.
24  Q    Okay.  Next section is Metal Siding/Metal Panels, on
25  Page 13.  Do you see that?

Page 51

1  A    Yes.
2  Q    Can you explain to the Court what that section is?
3  A    Metal siding is what you think it would be.  It's the
4  skin that goes on the building over the top of the weather
5  barrier, the Tyvek layer.  It appeared at the time of our
6  inspection that the north elevation had not been completed.
7  The east elevation had not been completed.  There were some
8  soffit panels missing on the low roof on the west side of
9  the building.  Flashing and metal returns typically are in
10  this package that would cover the brick that would return at
11  any door openings to basically seal the building in its
12  entirety.  So a lot of those items had not yet been
13  completed ate the time of our inspection.
14  Q    I think you indicated 60 percent complete
15  approximately?
16  A    That was our assumption assuming that two elevations
17  had been completed, materials were on site, and two
18  elevations still needed to be completed.  So that was how we
19  arrived at our 60 percent.
20  Q    You noted some deficiencies in what had been completed
21  though?
22  A    We did.  It appeared that there were some metal panels
23  that were falling off the building or detached.
24  Q    What would cause a metal panel to fall off or detach
25  like that?

Page 52

1  A    Either a failure of a fastener, which potentially could
2  be deterioration of substrate that it's being fastened into.
3  Just over time not being completed and being open to the
4  elements and wind and things like that could also
5  deteriorate.  So just a number of different things that
6  could lead to the metal panel falling off or coming loose
7  from the building.  It's not intended to be set by itself.
8  It's intended to be a system.  Right?  So I think just over
9  time having that not completed is causing some of that
10  deterioration in my opinion.
11      And then, yeah, just a couple of other items that we
12  noted, that there were some penetrations through the panels
13  that hadn't been completed and properly trimmed.  And there
14  was some tape that was on the face of the panels, which we
15  weren't sure exactly why that was.  But just a couple of
16  different deficiencies we felt needed to be addressed in
17  order to complete the package and finish the project.
18  Q    You indicated that time can exacerbate these issues.
19  Is that correct?
20  A    That's my opinion, yes.
21  Q    All right.  And so this inspection was in April of '24.
22  Do you believe that things would have improved or continued
23  to deteriorate from then?
24  A    If no work had been completed since this inspection, my
25  opinion is that it would only further deteriorate from then

Page 53

1  until now.
2  Q    What trades or subs would be needed to both finish this
3  portion and correct these deficiencies that you noted?
4  A    This would be a siding subcontractor.  Typically a
5  contractor that specializes in installation of exterior
6  siding would be who I would expect to need to be finishing
7  this scope.
8  Q    Proceed to the next page, Page 14.  At the top there's
9  a section, Commercial Doors, Frames, Hardware.  Can you
10  explain what that section reviewed?
11  A    Yeah.  This would be the supply of all the doors,
12  frames, and hardware that a general work and labor
13  contractor would finish the installation of.  So we noted
14  that all the doors, frames, and hardware for the stair tower
15  still needed to be installed.  Same for trash rooms.  So
16  most of the unit entry doors and frames appeared to be hung,
17  but none of the hardware was finished.  Common area doors,
18  we noticed that none of that work had been completed.  So
19  all of that would still need to be supplied to then be
20  installed.
21  Q    And you said need to be supplied.  So materials weren't
22  on site for all this?
23  A    Yeah, correct.  I think there was additional doors.
24  You can see in the picture on the right that some doors were
25  leaned up against the doors and placed in certain areas.

14 (Pages 50 - 53)

Page 54

1   But none of that had been installed.  So our assumption was
2   that some of that material may need to be installed.  So we
3   assumed that half the material was on site and available.
4   Q    And I don't know if I misheard you or not.  You said
5   general contractor to finish this work or a different sub?
6   A    General work and labor subcontractors, yeah.
7   Q    All right.  Later down the page there is a Vinyl
8   Windows Supply Only section.  What is that?
9   A    So this would be the supply of the windows on the
10  exterior of the building, the residential windows.
11  Q    And you thought 95 percent complete?
12  A    Yeah.  We assumed that, I mean, obviously all the
13  windows were installed with the exception of a handful of
14  them that appeared to be used for stocking material in and
15  out of the building.  So just to get material up to upper
16  floors.  Those windows hadn't been installed yet.  But on
17  the more concerning side, we noticed that a number of
18  windows had deficiencies that potentially would need to be
19  replaced, may not be able to be fixed in place.  So we noted
20  this as 95 complete.  Not fully completed, assuming that
21  there would be some windows that would need to be supplied
22  to correct the deficiencies that we observed.
23  Q    What sub or trades to either correct the deficiencies
24  or finish the remaining work?
25  A    A window supplier for the actual material itself.  For

Page 55

1   this particular one, the labor we talked through with the
2   general work and labor subcontractor as well.
3   Q    But you would need contributions from the supplier you
4   believe?
5   A    Yeah.  I believe we would, yes.
6   Q    All right.  At the very bottom of the page there is a
7   section Glass and Glazing.  What is that?
8   A    This would be the aluminum frame systems on the first
9   floor exterior as it goes out to the rooftop patio area.
10  All of those areas appeared to be installed and complete.
11  Q    Just punch list items then?
12  A    Just minor punch list items, yeah.
13  Q    Next page, next section is Drywall on Page 15.  I think
14  we all know what that is, but can you confirm our
15  assumptions?
16  A    Yeah.  Drywall is the installation of the drywall on
17  the walls.  Typically in my experience this package includes
18  the installation of the drywall, the supply of the drywall,
19  and the finishing of the drywall.  So tape, texture, and
20  potentially painting.  In a residential application
21  typically that's all lumped into one just because there's
22  efficiencies for them to do the whole scope of work as
23  opposed to taking and giving the painting to a specific
24  subcontractor.  So my assumption in getting the percent
25  complete was that this subcontractor supplied, installed the

Page 56

1   drywall, taped, textured, and completed the finishing.
2   Q    Okay.  You have 75 percent complete for that?
3   A    Correct.
4   Q    Would it be a drywall sub or trade then to finish that
5   remaining 25 work?
6   A    That's correct, yeah.
7   Q    Any issues with the 75 percent that had been completed?
8   A    I think one of the biggest deficiencies that would
9   impact this particular subcontractor was where there was any
10  moisture penetration or repairs that would need to be worked
11  on at the windows.  It doesn't specifically relate to this,
12  but it requires their work to patch and repair.  So I would
13  consider that a deficiency that impacts this particular
14  subcontractor.
15  Q    All right.  Next page, Page 16, Section, Carpet.
16  Again, I think we can all guess what that is.  But can you
17  confirm our suspicions?
18  A    Yeah.  This would be the carpet in the residential
19  units is how we viewed this.  So this would be like the
20  rolled carpet that would go into the bedrooms and into the -
21  - within the unit itself.  So what we saw is that the common
22  space of the unit, like the kitchen and the dining areas,
23  was an LVT type floor.  And the bedrooms was a --
24  Q    Can you explain that acronym for us, please?
25  A    It's a luxury vinyl tile or a thinner, more durable

Page 57

1   type floor.  And sometimes it's either LVT, which is luxury
2   vinyl tile, or LVP, which is luxury vinyl plank.  So kind of
3   interchangeable in my opinion.  Carpet would be within the
4   bedrooms.  So it's a pad and the carpet that would be there.
5   And what we observed was that second and third floor, none
6   of the units had carpet in the bedrooms.  And we didn't
7   observe any materials stocked in those units, either.  On
8   the fourth floor we observed most of the carpet had been
9   installed with exception to two units.
10  Q    When you said no carpeting installed or on site, was
11  the carpet pad or anything down, or were these just
12  completely bare plywood floor?
13  A    Yeah.  We didn't notice any of that material on site at
14  the time of our inspection.
15  Q    Flooring sub to complete this work, or someone else?
16  A    A flooring subcontractor would complete this package, y
17  es.
18  Q    Next page, Page 17, section Painting/Staining.  Again,
19  we can make assumptions, but why don't you tell us?
20  A    So this painting and staining I think would apply to
21  finishing the drywall, which in these rooms primarily
22  through the residential areas would just be painting.  I
23  assume that staining was associated with any of the wood
24  materials that was supplied on the project if they were not
25  already prefinished.  I don't know the makeup of how that

15 (Pages 54 - 57)

Page 58

1  was created. But we made some assumptions that the entire
2  building was painted within this particular package. And we
3  noticed that there were quite a few areas that still needed
4  to be touched up. Primarily first floor had no paint
5  completed on it. Second, third and fourth floor was mostly
6  complete. There were some significant patching areas that
7  still needed to be finished, which is kind of how we arrived
8  at our percent complete.
9  Q   Earlier I believe you testified that your assumption
10 would be that whoever does the drywall generally would do
11 the painting. Accurate?
12 A   Typically that's how we have seen it in most cases.
13 Q   But the sworn report in this case had painting and
14 staining broken out separately from drywall.
15 A   Correct.
16 Q   And that was Craig -- or that was the Craig or Craig
17 entities that did it that way.
18 A   Correct.
19 Q   Okay. Any deficiencies noted or just a lack of
20 completion for this?
21 A   Lack of completion.
22 Q   Okay. And I think you indicated maybe drywall or any
23 other trades potentially involved to complete this? Could
24 it be a separate paint crew?
25 A   Correct.

Page 59

1  Q   Next page, Page 18, Fill Nail Holes. Can you confirm
2  for us what that means?
3  A   Typically when you install wood base, there's nail
4  holes that need to be filled from an aesthetic standpoint.
5  So this would be generally completed by a general work and
6  labor carpenter or a finish carpenter.
7  Q   It looks like just punch lists on floors three and
8  four, but nothing on floor two?
9  A   Correct.
10 Q   And you already indicated that punch list carpenter to
11 come in to complete that work?
12 A   Yes.
13 Q   All right. Next section, still on this page, is Postal
14 Specialties, Bike Rack, Door Markers. What is that?
15 A   That would be mailboxes for the residential units. I
16 wasn't sure if there was actually door racks, door markers,
17 things like that. We didn't observe any of those. We also
18 didn't observe any postal specialties or mailboxes on site
19 or installed at the time of our inspection.
20 Q   Okay. General contractor or who would do that work?
21 A   Installation would typically be by a general contractor
22 or general or general working labor subcontractor. But they
23 would need to be supplied by a vendor of some sort.
24 Q   Post boxes, do those need to be supplied by the U.S.
25 Post Office or can you get those yourself?

Page 60

1  A   You can get those yourself. You just need to
2  coordinate the installation with the post office.
3  Q   So it would require cooperation with the U.S. Postal.
4  A   Correct, yeah.
5  Q   Next page, Page 19, Fire Extinguishers and Cabinets.
6  Can you explain that?
7  A   On each floor there is a box that contains a fire
8  extinguisher in case of an emergency. And we didn't observe
9  any of those installed and we did not observe any of the
10 material on site either for those materials.
11 Q   Despite not being installed, you still noted
12 deficiencies. What were those?
13 A   It appeared that they were higher than what you would
14 typically see for a fire extinguisher cabinet generally
15 speaking. It depends on the jurisdiction, but there is a
16 required maximum height so that if you're in a handicap or
17 accessibility requirements that need to be met from an
18 installation standpoint. I didn't look up the official --
19 the local codes to determine whether or not it was an issue.
20 Just we observed it being higher than what we typically see
21 in our experience.
22 Q   And if that's obviously a code issue, that would need
23 to be remedied potentially?
24 A   Correct. It would need to be lowered, which would
25 require a framer to come in and cut a new opening, drop the

Page 61

1  hole, patch the opening, drywall repair, painting and
2  touchup as well.
3  Q   So multiple crews potentially.
4  A   Correct.
5  Q   And what about just the installation or the order and
6  mode? Who would do that?
7  A   If it was just installing the cabinet and the fire
8  extinguisher, that would be done typically by a general work
9  and labor subcontractor.
10 Q   Next page, Page 20, Ceiling Fans. I think we know what
11 that is. Can you confirm and just percentage done?
12 A   Yeah. It appeared that each bedroom had a ceiling fan
13 installed. We observed all the ceiling fans installed. It
14 was just minor punch list related items that would pertain
15 to this. Typically this would fall under an electrician.
16 They would either do the installation only or sometimes
17 supply and install. It just depends on how it's packaged
18 for this particular job.
19 Q   Electrician required then for those punch list issues?
20 A   Correct.
21 Q   Next page, Page 21, Closet Shelving. What is that?
22 A   Closet shelving would be in the bedrooms. Typically we
23 see wire shelving in these areas. We didn't observe any of
24 the shelving installed and we didn't observe any materials
25 on site. So we noted it as zero percent complete.

16 (Pages 58 - 61)

Page 62

1  Q   So that would still have to be ordered conceivably and
2  delivered.
3  A   Correct.  Correct.
4  Q   And then installed.
5  A   Correct.
6  Q   By whom?
7  A   Typically this could be done by a general work and
8  labor subcontractor.  We sometimes see a specific trade come
9  in and do this by themselves.  But I would say generally
10  speaking it could be done by a general work and labor
11  subcontractor.
12  Q   Next page, Page 22, Toilets and accessories.
13  A   Toilet and accessories.  Obviously toilets within the
14  bathrooms.  Accessories being toilet paper holders, grab
15  bars in the accessible units, things like that nature.  We
16  observed that the toilets were on site.  I did not take an
17  actual count of how many toilets were on site.  But none of
18  them had been installed throughout the entire building.  So
19  the --
20  Q   If they were on site, were they boxed, unboxed?  Were
21  you able to observe what kind of condition they were in?
22  A   They were boxed.  We didn't observe the condition of
23  the toilets.
24  Q   And construction, is it typical that there's some
25  breakage or damage to a large number of toilets when they're

Page 63

1  delivered like that?
2  A   Certainly possible.
3  Q   So it could be possible that there might be
4  replacements needed to be ordered if all on site?
5  A   Correct.
6  Q   And you said no installation at all on these.
7  A   Correct.
8  Q   What subs or trades to get these into the proper
9  position and installed?
10  A   A plumber would be required.
11  Q   So it says toilets and accessories.  Any particular
12  accessories that you noted or anything else needed to be
13  done if they categorize this as toilets and accessories?
14  A   In my experience, it would be toilet paper holder, it
15  would be towel or a robe hook.  Just general accessories
16  that would be within the bathroom.  Those would be installed
17  by the plumber or would be installed by a general work and
18  labor subcontractor.  It just depends on how it's packaged
19  in the project.
20  Q   Any of those noted on site?
21  A   I did not notice or observe any of those on site.
22  Q   Next page, Appliances and A/C Units.  Can you describe
23  what you observed with respect to those?
24  A   This typically would be the supply of the appliances
25  and the installation of the appliances in hooking them up.

Page 64

1  We observed that on the second floor there were not any --
2  and you can kind of go through the list here.  A/C units
3  were missing throughout all floors or all the second floor.
4  Washer and dryers were missing from the units on the second
5  floor.  The dishwasher is missing from the unit.  The range
6  and refrigerators were also missing on the second floor.
7  Same applies for the third floor.
8      And then on the fourth floor we noticed that the A/C
9  units were stocked, but not installed.  So they were on site
10  in the unit.  The washer and dryers, we did not observe
11  those on site anywhere.  The dishwashers, we observed they
12  were in the units but they were still in the box and not
13  installed.  And then range and refrigerators, most of them
14  were stocked in the units, but not installed.
15  Q   You say most.  So not all appliances for every unit
16  were on site?
17  A   From what we observed, we did not locate any washer and
18  dryers throughout the building.  Most of the other units the
19  ranges, refrigerators, dishwashers appeared -- on the fourth
20  floor specifically appeared to be on site, not installed.
21  Q   Who does installations.  Is it an electrician or a
22  general contractor, or who?
23  A   It would be multiple trades for these.  So you would
24  have the appliance vendor would typically come in, put them
25  in place and prepare them for connections.  And then the

Page 65

1  washer, dryers and the -- so the washer and the dishwasher
2  would require a plumber and an electrician.  And the range
3  would require electrician.  So there's multiple
4  subcontractors that would be required to get the appliances
5  functional.
6  Q   HVAC required at all for A/C units or can those be done
7  by whom?
8  A   Typically those would be installed and plugged in by
9  the appliance supplier.  And generally speaking the dryer,
10  it's a fairly minor hookup.  Usually the appliance
11  subcontractor would hook that up and push it into place.
12  Q   Fair enough.  Next page, Page 24.  Kitchen Sinks,
13  Faucets.  What did you observe with that?
14  A   We observed that there were no sinks installed or
15  faucets or any trim-out done related to the kitchens and the
16  bathrooms on second, third, or fourth floor.
17  Q   Were those in unit or were those missing from the site?
18  A   I believe I recall a pallet of sinks and faucets on the
19  first floor, but it had not been unboxed or verified that
20  there was any damage or issues with it.
21  Q   It's unclear whether there's enough to finish the
22  project on site?
23  A   Unclear.  We did not take a count of how many were
24  there.
25  Q   What subs or trades to get this work done?

17 (Pages 62 - 65)

Page 66

1  A   This would be a plumber.

2  Q   Next page, Page 25.  Bath, Faucets, Showerheads.

3  A   Same thing.  It would be the trim-out of the showers.

4  A plumber would be required to trim all of the stuff out.

5  None of these we observed in the units installed.  Again, I

6  believe there was a pallet of material on the first floor,

7  but I don't recall how many there were and what specifics

8  there were within the pallet.

9  Q   So obviously you don't know the condition of the un-

10  palleted materials?

11  A   Correct.

12  Q   Plumber or anyone else you needed for this?

13  A   A plumber would be required for this scope.

14  Q   Next page, Page 26.  Bathroom mirrors.  Can you

15  summarize that?

16  A   Bathroom mirrors would -- it appeared that this was a

17  purchased mirror that would need to be installed by a

18  general work and labor subcontractor.  Appeared that most of

19  them were installed.  However, there were a couple of units

20  where it wasn't installed and a couple where we noticed

21  there was some damage with it.  So...

22  Q   And it looks like some of those, looking at Photo 2,

23  were still boxed?

24  A   Correct.

25  Q   Do you know if any of those were damaged or undamaged?

Page 67

1  A   We do not know, no.

2  Q   Did it look like there were replacement materials on

3  site?

4  A   Not that I noticed, no.

5  Q   Who would finish that work?

6  A   General work and labor subcontractor could finish the

7  trim-out for this work.

8  Q   Next page, Page 27, top.  Window Treatments.

9  A   Window treatments would be blinds, whether they are --

10  the type of blind kind of varies between projects, but it's

11  installation at the windows in the residential units.

12  Q   You have zero percent on that?

13  A   We did not observe any window treatments on site.  And

14  we didn't observe any window treatments installed, either.

15  So we noted them as zero percent complete.  This in our

16  experience is usually a supply and install package.

17  Q   Install and supply from who?  A separate trade or...

18  A   Separate trade.

19  Q   What kind of trade would that be?

20  A   There are trades that specifically do window

21  treatments, supply and install.  So that's who we have used

22  in the past.  In my experience it's a separate trade

23  completely.

24  Q   Window treatments generally required to finish a

25  building, especially a high-end apartment complex?

Page 68

1  A   In my opinion, yes.

2  Q   Next section is Conveying Systems.  What is that?

3  A   This would be the elevator.

4  Q   You have 90 percent complete?

5  A   Yeah.  It appeared that the elevator was installed.

6  The components were on first floor.  I was unclear whether

7  it was hooked up and functional.  It didn't appear that it

8  was functional.  Typically they -- an elevator subcontractor

9  would not turn over an elevator until the lobbies are fully

10  completed, proper lighting in those areas.  So there is --

11  based on my experience, this is to a point where they won't

12  finish and turn over the elevator until all the surrounding

13  finishes are completely done.  And it's the last item to

14  terminate any connections, test, balance and get the

15  elevator operational.

16  Q   That sounds like specific work, specific sub needed to

17  do that?

18  A   The elevator supplier or subcontractor would need to be

19  on site to do that work.

20  Q   Would that require a city inspection as well?

21  A   It would, yes.

22  Q   Who pays for that usually?

23  A   Usually it's the project would pay for that.

24  Q   Next page, Page 28, Building Sprinkler.  Can you

25  explain what you observed?

Page 69

1  A   Building sprinkler would be the fire sprinkler system

2  within the building.  There is coverage -- typically it's

3  concealed within the truss spaces between the floors so you

4  can't really see it at this stage of the project, which is

5  why we noted the majority of the scope was completed.  The

6  majority of that scope happens during the framing before

7  drywall happens.  And the only items that we observed needed

8  to be complete were trimming out sprinkler heads.  We noted

9  on first floor that the final inspection tags had not been

10  completed.  It appeared that the riser pipe and values were

11  wired and installed, but without the final inspection tags,

12  they wouldn't be able to turn the system on and have it be

13  operational.  So that would require fire inspection with the

14  city.  That would require the fire sprinkler subcontractor

15  to be on site to assist in that process and finalize any

16  items that were required.

17  Q   You said the fire sprinkler subcontractor.  So this

18  isn't general plumbing work?

19  A   Correct.  Not general plumbing work.

20  Q   Next page, Plumbing.  Can you describe what you

21  observed for that?

22  A   Yeah.  Plumbing would be just what -- you know, all of

23  the rough-in within the walls for PVC for drains, for water

24  piping.  But it also includes trimming out all of the

25  showers and the accessories and the sinks and the toilets.

18 (Pages 66 - 69)

Page 70

1  Our assumption is that all of the work within the walls is
2  completed because it's behind sheetrock and was not
3  observable.
4  Q    You didn't rip anything open to take a peek?
5  A    We did not.  However, there were areas where there were
6  not showers mounted, as you can see in those first two
7  photos.  So there was still significant work that needed to
8  be done to set those showers and to get them plumbed and
9  hooked up.  Obviously those would require a drain connection
10  and water connections in and to the shower itself.  So
11  there's work that would be required for that subcontractor
12  to complete the job.
13  Q    You've used the phrase trim out on a few different
14  occasions.  What do you mean by that term of art?
15  A    Trim out in the context of plumbing would be -- the
16  rough-in would be the piping within the walls.  And
17  generally they'll stub a pipe out of the wall that they'll
18  hook into later with the finish materials.  So a showerhead
19  will have a pipe, a copper pipe coming out of the wall and
20  then they'll tie onto that with the finished showerhead to
21  trim out the unit.  So when I say trim-out, it's putting the
22  items that you are seeing as a finished product beyond the
23  rough-in stage if that makes sense.
24  Q    Kind of put the finishing touches on whatever the sub
25  is.

Page 71

1  A    Finishing touches, exactly.  Yeah.
2  Q    Thank you.  Next page, Page 30, HVAC.  What
3  specifically was needed for HVAC in this building?
4  A    HVAC is heating, ventilation, air conditioning.  So
5  this is the -- this would be the exhaust fans in the
6  bathrooms.  We noted that none of those had been trimmed out
7  on the upper floors, which is why we've noted it as 90
8  percent complete.  The assumption was that there was
9  additional work that needed to be happening on the first
10  floor to support the common spaces.  At that time we were
11  unsure of what the full scope of that project was.  So our
12  assumption would be that there is an HVAC contractor that
13  would need to be on site to finish that particular scope of
14  work.  Trim-out the grills and the diffusers within the
15  bathrooms.  As you can see by those first --
16  Q    What are grills and diffusers?  Sorry.
17  A    It's basically a trim piece that conceals the fan and
18  the motor that makes it look finished and complete.
19  Q    Who would do that work?
20  A    An HVAC subcontractor would do that work.
21  Q    Couldn't be done by a general?
22  A    I have not seen a general subcontractor do that work on
23  any of the projects that I've been on.
24  Q    Next page, Page 31, Electrical Security System.  What's
25  in there?

Page 72

1  A    Our assumption was that this was the electrical
2  package.  So any work associated with wiring, panels.  And
3  you could see on the couple of photos there it appeared that
4  the electrician had installed the devices prior to
5  sheetrock, which is very atypical.  In our experience it's
6  finished, painted before any of the devices are trimmed out
7  in the units.  So in order to get that to a completed state,
8  I would assume that that would need to be taken off, let the
9  drywall subcontractor come in, repair the walls, finish
10  everything, and then have the electrical subcontractor come
11  back in and trim all the devices out after paint is
12  complete.
13       We did observe that most of the panels within the units
14  had been labeled and what appeared to be trimmed out.  We
15  did not test the system to determine if it was fully
16  functional.  So that was -- it appeared that there was still
17  some work and final inspections that needed to be done to
18  close that package out.
19  Q    This would need to be performed by an electrician?
20  A    Correct.
21  Q    And that was all electrical work.  Did you notice any
22  type of security system on site?
23  A    I did not, no.
24  Q    If there was going to be a security system, would that
25  be an electrician or a separate sub?

Page 73

1  A    It could be an electrician. It also could be a separate
2  subcontractor.  It depends on the scope there.  But it could
3  be another trade.
4  Q    And again, electrical/security system was the category
5  used by The Ruins LLC?
6  A    Correct.
7  Q    Next page, Page 32, Paving and Sidewalk.  75 percent
8  complete.  What was that?
9  A    Site concrete around the building.  At the time of our
10  inspection, we observed that there was some concrete work
11  between the street and the building that had not been
12  completed yet.  We also observed that there was elevation
13  discrepancies between the garage and the exterior alley
14  which would require some removal of concrete and
15  reinstallation of concrete to make sure that there isn't a
16  step as you drive into the building.
17  Q    To remove that concrete and pour new concrete.  Is that
18  a concrete crew?  Is that a general in concrete?  Or who
19  gets that done?
20  A    Typically that would be done by a concrete
21  subcontractor.  They could perform the removal and the setup
22  and the replacement of that particular item.
23  Q    Did you identify any materials on site that would be
24  able to finish that remediation?
25  A    We did not.

19 (Pages 70 - 73)

Page 74

1  Q   All right. Next page, Page 33, is Bid Packages not
2  applicable for the site inspection. Can you explain for the
3  Court what that is?
4  A   These would be items that just weren't observable.
5  Could be items that were completed prior to the stage of the
6  process such as building demolition, site survey, civil,
7  asbestos. My assumption is that those items were pertaining
8  to the existing site prior to construction of the new
9  building, testing and inspections, foundation removal.
10 Again, those are items that just are not observable. So
11 categorized all of these that were not applicable because we
12 couldn't observe actual work, whether they were done or not.
13 Q   So these were their categories, but you couldn't
14 provide an opinion for them?
15 A   Correct.
16 Q   If we go to the next page, Page 34, Additional
17 Considerations.   Can you summarize this for the Court at
18 all?
19 A   Additional considerations is just items that we noticed
20 as we were walking through doing our inspections that we
21 felt would need to be addressed in one way or another. On
22 the exterior side we noted that there were a couple leaks
23 within the building that we identified as we were walking
24 through. We took some photos of those. We did not do an
25 investigation to determine where those leaks were coming

Page 75

1  from, but there would have to be some potential work
2  associated with that. There could also be remediation with
3  those obviously. So that would entail roofing
4  subcontractor, general work and labor contractor potentially
5  to open the cavity up to determine where the leak is coming
6  from and then repair it back. Potentially electrician.
7  There was one area we noted that there was an actual light
8  that was filled with water in the hallway. And so that
9  would require an electrician to come and potentially do some
10 remediation on that.
11 Q   What would indicate a possible cause for that, the
12 water in the light?
13 A   Our assumption would be that it was a roof leak and
14 that somehow water got down into the roof cavity or the
15 truss cavity, found a wire, went along the wire and into the
16 light. It's unlikely that it was directly above the light,
17 but it somehow navigated to -- whether it ran on the top of
18 the sheetrock and then made it to the light, which is the
19 lowest or the point of release for the water, if you will.
20 So a number of different things, but it would require a
21 little bit more investigation to determine where exactly the
22 leaks may be coming from in that particular instance.
23 Q   When you say investigation, what type of -- what do you
24 mean by investigation? How would you find where it's coming
25 from?

Page 76

1  A   If I were doing that, I would cut open the ceiling and
2  understand where the water is coming in. Typically when
3  we're doing leak investigation, we'll try to recreate the
4  leak first. So we'll go up and we'll -- if it's a roof
5  leak, we'll try to put water on the roof to recreate the
6  water coming in to signify where the leak is. So then we
7  open up the ceiling, determine where the water is coming in,
8  and trace it back to its source. So at its most intensive,
9  it becomes a bit of a process to try to correct those items.
10 Q   Obviously I say, but assuming a leaking roof is
11 something that needs to be fixed before you can get a
12 certificate of occupancy or various...
13 A   Correct.
14 Q   Okay. And you were not asked to investigate the source
15 of the leak for this Ruins building, were you?
16 A   No, we were not.
17 Q   Do you know if anyone has investigated the source of a
18 leak?
19 A   I'm not aware of that.
20 Q   If we can skip to Page 36. Can you provide a brief
21 depiction of what these punch items are?
22 A   if you can scroll a little bit further there.
23 Q   One more page here. I'm sorry.
24 A   Yeah. So this -- just to kind of give some context for
25 this, the software that we u sed to compile and organize

Page 77

1  everything with our photos and our inspection was a software
2  called Procore. And so this is a report that Procore
3  generates after we put all of the information into it.
4  Associated with this is a specific item that we identify.
5  So where it says number 581, complete door hardware, I would
6  consider that a punch list item or a task that needed to be
7  completed. We identify a location with that. So a second
8  floor fitness center in this particular case. The date that
9  it was created. The due date is an arbitrary date that's
10 just applied if it was in the context of a normal project
11 would set a particular day that it needs to be completed in.
12 Status initiated, again, that's just -- it's either
13 initiated, addressed, completed. There's a couple different
14 phases that would be appropriate for that.
15    Generally speaking, we use this to try to organize all
16 of the potential items that needed to be completed. We can
17 assign photos to each particular item so that it's
18 organized. When we look at a photo, we know what it's
19 associated with.
20    So for this particular one, we took four photos of this
21 particular door that had not been installed. So doorframe,
22 door hardware, all noted that needed to be completed. So
23 generally speaking that's how every one of these items is
24 laid out.
25    MR. HUSHKA: Obviously the Court has been very

20 (Pages 74 - 77)

Page 78

1  deferential for us in allowing us to go through these.  I'm
2  not going to go through the next 360 pages of this punch
3  list.
4      THE COURT:  Thank you.  Thank you.
5  BY MR. HUSHKA:
6  Q   But am I safe to assume that this depicts everything
7  that needs to be completed in more detail beyond just kind
8  of the overview you gave for each category?
9  A   Yes, correct.
10 Q   Okay.  And the Court can obviously look at that and see
11 if it wants to look at any particular thing that needs to be
12 done in this appendix?
13 A   Yes.
14 Q   Mr. Gehrtz, the multiple opinions that we just
15 discussed with respect to this report, did you reach those
16 opinions utilizing your training and experience?
17 A   I did.
18 Q   And did you reach those opinions to a reasonable degree
19 of certainty?
20 A   Yes.
21     MR. HUSHKA:  Your Honor, at this time we would
22 offer ECF 60-1(A).
23     THE COURT:  Any objection?
24     MR. VERSTANDIG:  I believe there's going to be an
25 objection, but I'd like to talk to my client for a moment

Page 79

1  before I make the objection.
2      THE COURT:  Okay.
3      MR. VERSTANDIG:  And I realize that creates
4  awkward timing.  I'm happy to preview what the objection is.
5  But there's a strategic question, and this is the first
6  moment where I feel unfortunate not being in the courtroom.
7      THE COURT:  Any objection to a short recess before
8  we complete the examination?
9      MR. HUSHKA:  No, Your Honor.
10     THE COURT:  Thank you.  Okay.  Why don't we just
11 take a 15-minute morning break and then resume at 10:15.
12     MR. VERSTANDIG:  Thank you, Your Honor.
13     (Recess)
14     THE COURT:  Please be seated.  We are back on the
15 record with bankruptcy Case Number 25-30004, In re The
16 Ruins.  And when we took a break, Red River State Bank had
17 just offered an expert report for receipt into evidence and
18 I was waiting to hear whether there might be an objection to
19 the Court receiving the report as evidence.
20     MR. VERSTANDIG:  Your Honor, thank you for the
21 break.  And obviously not normally accustomed to talking to
22 a client before interjecting an objection, but recognizing
23 where this may take us for the day.
24     The Debtor is going to object on hearsay grounds
25 under Rule 801(d).  And the Debtor is going to point to two

Page 80

1  authorities.  One is a Sixth Circuit case called Engebretsen
2  v. Fairchild Aircraft Corp. found at 21 F.3d 721 that
3  provides, "Rule 702 permits the admission of expert opinion
4  testimony, not opinions contained in documents prepared out
5  of court."
6      The second is going to be a Northern District of
7  Iowa case from 2017.  It's unreported but found at 2017 WL
8  752282.  The name of the case is Bruhn Farms Joint Venture
9  v. Fireman's Fund Insurance Company.  And that provides with
10 a string citation, "Although neither party has raised the
11 issue, the court begins its analysis with the finding that
12 an expert's report is hearsay and is not admissible in
13 evidence unless a party can establish an exception to the
14 hearsay rule."  It then proceeds to cite several cases
15 including the Sixth Circuit case I cited a moment ago and
16 further provides, "Accordingly, the court will not admit the
17 written report of any expert unless a party can lay a proper
18 foundation for an exception to the hearsay rule."
19     In visiting Rule 801(d) itself, it is clear that a
20 declarant witness's prior statement is admissible if it is
21 inconsistent with the declarant's testimony and was given
22 under penalty of perjury at a trial here in another
23 proceeding or in a deposition or if it is consistent with
24 the declarant's testimony but is offered to rebut an express
25 or implied charge that the declarant recently fabricated it

Page 81

1  or acted from a recent improper influence or motive in so
2  testifying.
3      We don't believe any of those conditions are
4  satisfied here.  Obviously his testimony carries the weight
5  that it does.  And we're not seeking to strike the witness's
6  testimony, but we don't believe the report itself is
7  properly admissible.
8      THE COURT:  Would you like to respond?
9      MR. HUSHKA:  So I guess if I'm following the
10 objection correctly, they are not objecting that the report
11 is based on inadmissible hearsay, but that the report itself
12 is an out-of-court statement made for the truth of the
13 matter asserted?
14     THE COURT:  Yes.  And it's not like I haven't
15 heard this the first time.  I'll let you respond and then
16 I'll tell you what I think.
17     MR. HUSHKA:  Your Honor, I guess we would ask the
18 Court accept the report.  It outlines the opinions of the
19 expert as he's testified to.  We didn't go through line by
20 line, item by item so that we could put the report in.  I
21 guess if the Court would object to taking the report itself
22 to the extent that we want to get those opinions in, it
23 would require us to again go through those four-hundred-and-
24 some-odd pages of the report, which I guess we can do if the
25 Court would be inclined not to receive it.  But I certainly

21 (Pages 78 - 81)

Page 82

1  hope that we don't have to do that.

2      THE COURT:  That's the way I see it.  that's

3  exactly -- you must be a mind reader.  Yes.  It's absolutely

4  a legitimate objection, but the response that I would tell

5  you is that if you don't want me to read that report after

6  today, then I'm going to let the expert testify as to every

7  detail.

8      MR. VERSTANDIG:  And, Your Honor, for clarity

9  without waiving privilege, I think that was anticipated.

10  And that was the reason for wanting some colloquy with the

11  client, was understanding that this might be a very lengthy

12  trip to the expert stand.

13      THE COURT:  Yes.  So am I hearing that you still

14  want to maintain your objection and we'll sit and listen to

15  what all of the expert opinions are, or that you now

16  recognize that you have a legitimate objection but are

17  willing to waive it so that you don't have to listen to

18  every line of the expert report?

19      MR. VERSTANDIG:  I -- Your Honor, based on my

20  colloquy with my client, unless Ms. Cathcart is going to bob

21  her head in a different direction, I think we would note

22  that we're open to the expert testifying in broad summary

23  form and we're open to the expert offering the conclusions

24  from his report without going over them on a line-by-line

25  basis.  We are not trying to turn this into a ten-day trip

Page 83

1  to the witness stand by any means.  But there are some

2  concerns about allowing the report in without them being

3  testified to.

4      Is there any chance Ms. Cathcart is bobbing her

5  head?

6      THE COURT:  She's shaking her head no.  So I don't

7  know what that means in your exchange.

8      MR. VERSTANDIG:  Your Honor, Court's indulgence

9  for one second.

10      THE COURT:  Okay.

11      MR. VERSTANDIG:  I will be there Tuesday.  I

12  promise.

13      THE COURT:  You know what?  nobody really

14  anticipated how long this hearing would take.  So we're just

15  going to be flexible.

16      MR. VERSTANDIG:  Your Honor, we'll consent to

17  letting it in.

18      THE COURT:  Okay.  All right.  The Court receives

19  the expert report at Docket 60-1.  Is that right?

20      MR. HUSHKA:  60-1(A).

21      THE COURT:  60-1(A).  Okay.

22      MR. HUSHKA:  Pages 1 through 401.  Sorry for

23  interrupting.

24      THE COURT:  I'm sorry?

25      MR. HUSHKA:  It's pages 1 through 401 of 60-1.

Page 84

1  Sorry to interrupt.

2      THE COURT:  Pages 1 through 401 of 60-1 is

3  received.  Okay.  Thank you.

4      (Exhibit 60-1(A) admitted into evidence.)

5      THE COURT:  All right.

6      RESUMED DIRECT EXAMINATION OF MATTHEW GEHRTZ

7  BY MR. HUSHKA:

8  Q  All right.  Mr. Gehrtz, before we get to your second

9  report, I want to talk briefly about The Ruins development

10  and the construction project.  I believe you earlier

11  testified that you have experience in these type of multi-

12  use developments.  Is that correct?

13  A  That's correct.

14  Q  If you had been in charge of a development of this type

15  of scope, can you explain for the Court what your process

16  would have been from a pre-design or pre-construction phase

17  leading up to ground break?  And then we'll kind of draw the

18  line there and we'll talk about what comes later after.

19  Q  From a pre-construction standpoint, I would go through

20  the process of developing individual scopes of work for each

21  of the subcontractors that would be required to be on the

22  job to complete the project.  And that may be anywhere from

23  20 to 35 different subcontractors that would have individual

24  scopes of work to be completed.  In that development phase,

25  we would put together a list of items that we would expect

Page 85

1  that particular subcontractor to complete for their full

2  scope.  We call it a scope of work document.  And so we put

3  that together when we send that out for bidding.  We would

4  get all of the pricing put together for each of the

5  subcontractors.  Typically we would receive two to three

6  different bidders in every subcontractor package and would

7  tabulate all the bidders, make sure that all of the scopes

8  of work are comparable so that there isn't any missing scope

9  or missing item, to make sure that the bids are comparable

10  apples to apples.  So if one bidder is lower and the other

11  is higher, we want to make sure that they have the same

12  scope of work to ensure that the price is comparable before

13  we recommend awarding to a certain subcontractor.

14      Once we put that all together, we'll associate or put

15  together a schedule that coordinates all of the different

16  trades in sequential order.  And the reason that's important

17  is because if they're not acting in unison with the overall

18  project, they may -- they only care about their own work

19  unless they're told otherwise.  And so we make sure that we

20  put together a scope or a schedule that says this

21  subcontractor is expected to be on site from this time to

22  this time.  And once that's complete, then this next

23  subcontractor comes in.  We don't want --

24  Q  I'm going to interrupt you there for a second, Mr.

25  Gehrtz.  My apologies.  You said you put together a schedule

22 (Pages 82 - 85)

Page 86

1  as part of your process.  And I believe you were explaining
2  that schedule.  Is that the responsibility of the
3  construction manager?  Or who is responsible for putting
4  that together and deciding which subs or which trades are
5  going to be on site at any given time?
6  A   I would say it's the responsibility of whoever is
7  managing the project, whether that's a construction manager
8  or project manager, whatever the term is used.  It's whoever
9  is managing the work of the project.
10 Q   And you described the schedule as sequential.  Does
11 that mean that you have certain subs or trades in before
12 others?  Or what did you mean by that?
13 A   Yeah.  There's a certain sequence that's required to be
14 efficient for contractors to their work.  And so --
15 Q   What is that sequence?
16 A   So sequencing, in broad terms it's -- it's foundation,
17 it's framing, it's rough-in.  So there's orders that things
18 need to be done in order for it to be efficient, in order
19 for quality to be where it needs to be.
20     For example, from a flooring standpoint, you typically
21 don't see the flooring installed after some of the base and
22 the trim and stuff is installed.  So we need to have the
23 floor installer in there first to do all of the flooring and
24 then a finish carpenter to come in, trim out the doors,
25 frames, base, things like that.  So you achieve the level of

Page 87

1  quality that's expected by doing the sequential order of
2  operations.
3  Q   Are there dangers that manifest if that proper
4  sequential order isn't followed?  Not I guess from like a
5  physical danger to people, but to the building or the
6  construction process?
7  A   I think generally speaking if a subcontractor comes in
8  out of sequence, there is potential for materials to be
9  damaged.  There's potential for work that has to be redone
10 because it's -- one of the examples that I would point to is
11 appliances being delivered to the site before they're ready.
12 If there's other activities of construction that are
13 happening that are going to risk damaging the appliances
14 that are delivered to the site out of sequence, there could
15 be cost to replace or to repair particular items.  That's
16 just one example that I can point to to illustrate.
17 Q   If things aren't properly sequenced, is there an
18 increased danger of water penetration or other damages such
19 as that?
20 A   I could see that being the case, yes.
21 Q   Talking specifically to this project, based on your
22 observations and your inspection and your knowledge of this
23 project, was this building properly sequenced?
24 A   It seemed that there were a few items that were out of
25 sequence in my opinion.

Page 88

1  Q   What items?
2  A   Generally I would say the water tightness of the
3  building is a priority prior to finishing any of the inside
4  of the building.  So when I look at the siding not being
5  completed and I see visible signs of moisture penetration at
6  windows and whatnot, that to me says that the exterior isn't
7  watertight, therefore some of the finishes if they're going
8  on inside the building could be damaged and have to be
9  repaired.  So that's to me out of sequence.  It's not
10 uncommon to have those happening simultaneously.  But for
11 one to be completely not finished while others continue to
12 move forward on the inside is for my opinion is out of
13 sequence.
14 Q   So just to put a button on this, do you believe that
15 The Ruins development was properly sequenced?
16 A   I do not.
17 Q   All right, Mr. Gehrtz, I would like to turn your
18 attention to the second report that you prepared.
19     Sharon, if you can pull up ECF 60-1, Page 402.
20 It's Exhibit B.
21 BY MR. VERSTANDIG:
22 Q   Please let me know when you see that on the screen,
23 sir.
24 A   I can see it.
25 Q   All right.  Do you recognize this document?

Page 89

1  A   I do.
2  Q   What is this document?
3  A   This is our follow-up inspection to our original
4  inspection.  And I believe that this -- it's dated September
5  27th.  I believe we were on site September 24th to do a
6  reinspection to understand if there had been any additional
7  work that had been completed since our first inspection.
8  Q   Okay.  If we scroll to the bottom of this page, is
9  there a signature on this document?
10 A   Yes.
11 Q   Is that your signature?
12 A   It is, yes.
13 Q   All right.  Does this report contain our opinion as to
14 the progress that had been done on The Ruins?
15 A   Yes.
16 Q   And what was that opinion?
17 A   Based on the observations I made on the site, I felt
18 like there was no significant advancement of any of the
19 work, specifically any items pertaining to the water
20 penetration and the damage that we had noted on the first
21 report.
22 Q   You mentioned water penetration.  Does this report also
23 identify your opinion as to water penetration and damage to
24 The Ruins?
25 A   Yes, it does.

23 (Pages 86 - 89)

Page 90

1  Q   And what was that opinion?

2  A   My opinion was that there was more water damage or more

3  signs of moisture penetrating into the building from the

4  first inspection to the second inspection.

5  Q   Was that opinion informed by observations that you made

6  during your second inspection?

7  A   Yes.

8  Q   What observations?

9  A   Visual observations.

10  Q   Does this report contain photos of those visible

11  observations?

12  A   Yes, it does.

13  Q   Are those photos true and accurate representations of

14  what you observed?

15  A   Yes.

16  Q   All right.  If we were to scroll down to Page 2 of the

17  report, are these photos of what you observed during your

18  second --

19  A   Yes.

20  Q   Can you kind of go through these for the Court and

21  explain what we're looking at and what you're observing and

22  what your conclusions are?

23  A   Sure.  The photo on the left was from the original site

24  inspection.  It showed cardboard taped over the window.  And

25  the middle photo was that same window but it had appeared

Page 91

1  that the cardboard was removed and replaced with some sort

2  of a clear tape or clear plastic of some sort.  The window

3  had not been replaced, but it had just -- the cardboard had

4  been removed and replaced with some other type of temporary

5  solution.

6      And the photo to the right is just a closer-up photo of

7  that.  You can see the tape there in the middle of the photo

8  over the top of the window.

9  Q   What's that discoloration on the top above the frame?

10  A   My assumption is that that discoloration was from

11  moisture penetration at the particular head of that window.

12  Q   Why do you believe that?

13  A   It's consistent with what I've seen in the past with

14  other areas where water is leaking above the window.

15  Q   Are you familiar with water penetration from other jobs

16  and inspections you've performed?

17  A   Yes.

18  Q   If we go down to the next line and the next pair of

19  photos, what are -- can you describe those for the Court

20  what we're looking at?

21  A   The photo on the left in comparison to the photo on the

22  right is taken from approximately the same location.  And it

23  illustrates in my opinion that there had been no significant

24  work to the point where there appears to be a pile of debris

25  that's swept into a pile and is in the same approximate

Page 92

1  location as it was during our first inspection in addition

2  to the material and the door and the frame and everything

3  that was -- all appeared to be roughly in the same spot.

4  Q   If we were to scroll down to the next three photos, the

5  next line, can you describe what these photos depict?

6  A   The photo on the left is from the original April 17th

7  inspection, which if you -- it's a little bit hard to see.

8  But on the right side of the window at the head, you can see

9  that there's a little bit of drywall tape that has sagging

10  down from the head of the window.  And the middle photo,

11  that was taken on September 24th.  And it shows further

12  deterioration of the head of that window where there's now a

13  spot just to the left of that center of the window that

14  shows some material that's hanging down there.  And then the

15  photo on the right is just a close-up of the head of that

16  window to further emphasize that further deterioration from

17  inspection one and two over time.

18  Q   Just to make clear, you didn't peel back any of that

19  material, did you, for your inspection?

20  A   We did not, no.

21  Q   Do you have an idea of what caused that material to

22  bubble and peel like that?

23  A   My assumption is that it's water damage or water

24  penetration of some sort.  It's consistent with what I've

25  seen in the past for water penetration.

Page 93

1  Q   If we go to the next page, there's another three-photo

2  lineup.  Can you describe these photos for the Court?

3  A   Yeah.  The photo on the left again is from the first

4  inspection.  And it shows that at the head of the window

5  there was a little bit of deterioration with the drywall

6  material there and the tape.  The second photo, which is in

7  the middle, it shows that that's further deteriorated and

8  it's now hanging down from the head of the window.  And

9  another item I would note just in the foreground of the

10  photo, there is equipment.  I believe these are appliances

11  that are in boxes.  It still appeared to be in generally the

12  exact location as they were when we did our first report.

13  The photo on the right is just again a closeup photo of that

14  same scenario where it shows that there's further

15  deterioration at the head of that window.

16  Q   And again just to clarify, you didn't peel back any of

17  the tape or anything on this window?

18  A   Correct.

19  Q   What do you believe is the cause of that bubbling and

20  peeling?

21  A   Moisture penetration.

22  Q   The next set of three photos.  We were on that page.

23  What are these three?

24  A   Again, this is another scenario that just shows from

25  the first inspection of the second inspection that further

24 (Pages 90 - 93)

Page 94

1   deterioration.  This photo orientation isn't in exactly the
2   same location, but it does show the further deterioration of
3   the head of the window essentially.
4   Q    The cause of this deterioration in your opinion?
5   A    Moisture penetration.
6   Q    Okay.  We've looked at window photos.  Just to clarify
7   for the Court, is this the same window from different angles
8   or are these various sets of two or three slides, are these
9   different, separate windows?
10  A    This particular window is a different orientations.  In
11  the first photo it's to the left essentially.  And the
12  second two photos are to the right.
13  Q    I guess what I'm asking -- I phrased that unartfully.
14  There's one, two, three, four, five different lines of
15  photos.  Are those five lines depicting an individual five
16  different areas, or are those multiple angles of fewer than
17  five areas?
18  A    They're different areas.
19  Q    Mr. Gehrtz, the multiple opinions that we just
20  discussed with respect to this report, did you reach those
21  opinions utilizing your training and experience?
22  A    Yes.
23  Q    And did you reach those opinions to a reasonable degree
24  of certainty?
25  A    Yes.

Page 95

1        MR. HUSHKA:  Your Honor, we would offer ECF
2   Exhibit 60-1(B), Pages 402 through 404 of the ECF number.
3        MR. VERSTANDIG:  Your Honor, this time we're going
4   to assert the same objection but in hybrid form.  We don't
5   object to pages 403 and 404, which are the photographs
6   insofar as the expert opinion this time is a neat three
7   paragraphs.  We would object to the actual expert opinion.
8        THE COURT:  Response?
9        MR. HUSHKA:  I can certainly read in the opinion
10  and ask if that is still his opinion and we can omit Page 1
11  and just put in the photo pages if that would alleviate the
12  objection and concern.
13        THE COURT:  So the objection is sustained, and
14  I'll allow you to offer whatever you would like to offer.
15        MR. HUSHKA:  All right.  Sharon, if we can scroll
16  back to the first page of that, Page 402 of the ECF.  All
17  right.
18  BY MR. HUSHKA:
19  Q    Mr. Gehrtz, I'm going to read from this page.  And
20  please follow along and let me know if I read it accurately
21  at the end.  Okay?
22  A    Mm-hmm.
23  Q    "Gehrtz Construction Services, GCS, is pleased to
24  present our independent third-party follow-up inspection and
25  report for The Ruins.  We understand the subject is an

Page 96

1   under-construction 63-unit mid-high-rise property at 315
2   East Kemp Avenue in Watertown, South Dakota."
3        MR. VERSTANDIG:  Objection, hearsay.
4        THE COURT:  Hold on.
5        MR. VERSTANDIG:  Objection, hearsay.
6        THE COURT:  It is hearsay.
7        MR. HUSHKA:  I'm going to summarize, Your Honor,
8   and then I'm going to ask if that is still his opinion.  And
9   so I guess I can go line through line and ask if that's your
10  opinion or go through this.  But I believe that he can
11  testify what his opinion is currently and whether it's
12  consistent with this.
13        THE COURT:  He can, but reading straight from the
14  report, is that necessary?  Or can you just ask questions?
15        MR. HUSHKA:  I guess I thought it would be more
16  efficient to just do that and summarize.  But I guess I can
17  ask questions if we want to do it that way.
18        THE COURT:  You can -- you know what?  You're in
19  charge.  It's your examination.  I'll just tell you -- I'm
20  calling balls and strikes.  And you just --
21        MR. HUSHKA:  I guess was that sustained, Your
22  Honor, and you want me to ask shorter questions, or was it
23  overruled?
24        THE COURT:  So it is hearsay when you read it.  If
25  you ask questions and he answers them, no matter how close

Page 97

1   they are to the written word, it would be different.  So the
2   objection is sustained.
3   BY MR. HUSHKA:
4   Q    Mr. Gehrtz, did Gehrtz Construction Services provide
5   independent third-party inspection to The Ruins?
6   A    Yes.
7   Q    Was that inspection performed on or about -- was the
8   follow-up inspection performed on or about September 24th,
9   2024 at or about 2:30 p.m.?  12:30 p.m.
10  A    12:30 p.m., yes.
11  Q    Was that inspection completed by or about 2:00 p.m.?
12  A    Yes, it was.
13  Q    During that inspection, did GCS observe any significant
14  --
15        MR. VERSTANDIG:  Objection, leading.
16        MR. HUSHKA:  Well, it's did not --
17        THE COURT:  Yeah.
18        MR. HUSHKA:  It's the Court's ruling.
19        THE COURT:  It appeared leading to me.  I'm going
20  to sustain this one and allow you to ask another question.
21  BY MR. HUSHKA:
22  Q    Was any significant advancement observed at The Ruins
23  inspection site during that second inspection from the
24  initial inspection?
25  A    No.

25 (Pages 94 - 97)

Page 98

1  Q   Were any signs of water penetration noted during this
2  second inspection?
3  A   Yes.
4  Q   Were those signs off water penetration more or the same
5  as from during the first inspection?
6  A   More.
7  Q   Do the remainder of these report pages, pages 2 and 3,
8  provide photos of that water penetration and that
9  progression?
10  A   Yes.
11  Q   Are those photos true and accurate representations of
12  what was observed during the second observation as well as
13  the first observation?
14  A   Yes.
15  Q   And I believe we already testified as to your opinions
16  of what is particularly depicted in those photos.
17  A   Yes.
18      MR. HUSHKA:  Your Honor, at this time we would
19  offer Pages 2 and 3 of Report Two, the photos.
20      THE COURT:  So that would be 60-1(B) at 403 and
21  404?
22      MR. HUSHKA:  For clarity, we have no objection
23  to the photographs.
24      THE COURT:  The Court receives 60-1(B),
25  photographs at Pages 403 and 404.

Page 99

1  BY MR. HUSHKA:
2  Q   Did you have any other opinions from your second site
3  inspection for which we have not gone over?
4  A   No.
5      MR. HUSHKA:  Sharon, if we can pull up Page 405,
6  Exhibit C, the same ECF number.
7  BY MR. HUSHKA:
8  Q   Mr. Gehrtz, do you see a document on the screen?
9  A   I do.
10  Q   Do you recognize that document?
11  A   Yes.
12  Q   What is this document?
13  A   This was our third site inspection or second follow-up
14  inspection, which the goal was to complete an opinion of
15  cost to complete the project.
16  Q   Is that your signature on the first page?
17  A   Let me scroll down to -- yes, it is.
18  Q   Are you attesting to the opinions expressed in this
19  report?
20  A   I am.
21  Q   Does this report contain your opinion regarding
22  progress to The Ruins Development since the first follow-up
23  inspection?
24  A   Yes.
25  Q   What was your opinion regarding any progress to The

Page 100

1  Ruins?
2  A   My opinion was that there was no significant
3  advancement on the project.  However, at the time of our
4  inspection, we did notice that there were some minor drywall
5  repair activities happening.  However, we also observed that
6  even in areas where they were patched, it appeared that
7  there was still additional moisture penetrating through what
8  was being patched.
9  Q   So if I understand correctly, is it your observations
10  during the second follow-up that there was ongoing water
11  penetration in The Ruins?
12  A   That's correct.
13  Q   Does this report also contain your opinion regarding
14  the cost to complete The Ruins development?
15  A   Yes, it does.
16  Q   I want to focus on that portion of the report for a
17  moment.
18      MR. HUSHKA:  If you an scroll to Page 2, Sharon?
19  BY MR. HUSHKA:
20  Q   I would like to direct your attention to the first
21  column entitled Bid Package.  Do you see that?
22  A   I do.
23  Q   Are theses the same categories that were contained in
24  your first report?
25  A   Yes, they are.

Page 101

1  Q   And can you remind us where those categories came from?
2  A   Those came from the sworn construction statement.
3  Q   And if we were to look at the third column, Assumed
4  Scope of Work to Complete, what does that column summarize?
5  A   Those are the assumptions I made in arriving at a
6  dollar value to complete the particular scope of work.
7  Q   Okay.  And so if we look at the second column, the
8  middle column, Opinion Cost to Complete, is that your
9  opinion regarding the cost to complete the various subparts
10  of The Ruins?
11  A   That's correct.
12  Q   What did you rely upon in reaching those opinions?
13  A   Visual observations from our site inspections and the
14  expertise in what we typically would see.  We also relied on
15  some exterior or outside subcontractors that -- to validate
16  some of the pricing that we've arrived to.
17  Q   If we were to go through these opinions, the first one
18  is General Conditions.  What is that?
19  A   General conditions is a line item that typically covers
20  items that are not within specific bid packages.  So it
21  would be facilities, toilets, dumpsters.  Just utility
22  hookup costs, inspection fees, things like that that would
23  be required to finish that cost work.
24  Q   Those would be necessary to finish The Ruins?
25  A   In my opinion they would be, yes.

26 (Pages 98 - 101)

Page 102

1 Q   And in your opinion would that cost be $50,000 to

2 complete The Ruins?

3 A   Yes.

4       MR. VERSTANDIG:  Objection.  The objection is

5 hearsay.  And the testimony has been that some of these

6 numbers (indiscernible) isn't articulated which are based

7 upon the input of third-party subcontractors.  To the extent

8 that is the foundation, the foundation is hearsay.  To the

9 extent that is not the foundation for certain line items --

10 and I don't know which it is and which it isn't -- the line

11 items for which there's no third party input as a foundation

12 would not be hearsay.  This is not going to fall within the

13 learned treatises objection and the third parties are not

14 here to speak to their bids or their quotes.

15       MR. HUSHKA:  Your Honor, I believe that the rule

16 is clear that an expert is allowed to rely on hearsay when

17 forming their opinion.  I believe it's within the scope of

18 his bidding and processing and application for a scope of

19 work and expert opinion that he's already been qualified for

20 to rely upon some types of bids and his knowledge of the

21 industry and the cost for various things to reach an

22 opinion.

23       As for whether or not the actual opinion itself is

24 hearsay, I asked, is it your opinion that it would cost

25 $50,000.  So I didn't ask what the opinion in the report

Page 103

1 was.  I'm not asking what the report is.  I'm asking if his

2 opinion today is that it's $50,000 to complete the general

3 conditions.  So I don't believe it's a hearsay objection as

4 it relates to the report.

5       MR. VERSTANDIG:  To be clear, I should be more

6 articulate about this.  There's hearsay and there's hearsay

7 within hearsay.  To the extent the expert is simply reading

8 from his report, that's hearsay.  But I'm not really

9 standing on that.  That is fine.  To the extent there's

10 hearsay within hearsay, which is to say that the numbers in

11 the report are derivative of what third parties told him,

12 that's not within the scope of what's allowed by Rule 703.

13 Rule 703 provides an expert may base an opinion on facts or

14 data in the case that the expert is to be made aware of or

15 personally observed.  If experts in the particular field

16 reasonably rely on those kinds of facts or data in forming

17 an opinion on the subject, they need not be admissible for

18 the opinion to be admitted.

19       This isn't a question of whether or not he's

20 reviewed other pictures in this case.  It isn't a question

21 of whether he has reviewed affidavits in this case.  It's a

22 question of whether he went out and solicited third-party

23 information that is not an existing learned treatise, that

24 is not an existing piece of information concerning how

25 carpentry is to be done or plumbing is to be done, but

Page 104

1 rather something in the nature of a bid, a quote or an

2 estimation.  That is hearsay within hearsay.  That's

3 inadmissible.

4       MR. HUSHKA:  Your Honor, I believe that the second

5 part of 703 gets to Mr. VerStandig's point that the hearsay

6 is only in the quote, but if the facts or data would be --

7 otherwise would be inadmissible, the proponent of the

8 opinion may disclose them to the jury only if the probative

9 value in helping the jury evaluate the opinion substantially

10 outweighs their prejudicial effect.

11       I'm not asking him to say did you get any quotes

12 from subcontractors and what are those quotes that you

13 received.  That would be hearsay, and I'm not soliciting

14 that.  I'm asking what is your opinion based on your

15 experience in the region and building multiple of these

16 muti-unit dwellings what it would cost to complete these

17 various line items.

18       MR. VERSTANDIG:  If it was based on what it costs

19 to get plumbing for a similarly-situated building of this

20 size on a project managed in the past, that would be one

21 thing.  And again, I say hearsay within hearsay.  There is a

22 foundational element to this, right?  The foundation of his

23 testimony is facts ascertained for the idiosyncratic prism

24 of this case; what would it cost to do -- and I'm making

25 this up because I don't know which he got from subs and

Page 105

1 which he didn't.  But what would it cost to do the concrete

2 work?  Someone presumably said $27,000.  What would it cost

3 to do the CMU block?  And someone presumably said $50,000.

4 That's outside the scope of the rule.

5       And it's enormously prejudicial because it's going

6 to ultimately go to a cost of completion which goes to the

7 argument that is being made that the cost of completion

8 being proffered by the Debtor is not reliable and accurate.

9       THE COURT:  So given the previous colloquy and the

10 foundation that was previously laid, the objection is

11 sustained.  You may ask more questions.

12 BY MR. HUSHKA:

13 Q   Mr. Gehrtz, you said you are familiar with the

14 construction of multi-unit, multi-purpose dwelling units.

15 Is that correct?

16 A   Yes.

17 Q   You have an opinion regarding the general conditions

18 and what the cost would be to complete those.

19 A   Yes, I do.

20 Q   How did you reach your opinion what the cost would be

21 to complete the general conditions?

22 A   Typically on a construction project, it's anywhere

23 between three to seven percent of the total cost of work.

24 So that was the basis for my assumption.

25 Q   So your basis for the assumption was not based on

27 (Pages 102 - 105)

Page 106

1  soliciting a particular number or quote from any particular
2  sub or vendor?
3  A   It was not.
4      MR. HUSHKA:  Your Honor, again we would ask that -
5  -
6  BY MR. HUSHKA:
7  Q   What is your opinion regarding the cost to complete the
8  general conditions of The Ruins?
9  A   $50,000.
10 Q   Sir, the next line item on here is Testing and
11 Inspections.  Do you see that?
12 A   I do.
13 Q   What is testing and inspections?
14 A   My opinion of that line item would be any permitting or
15 inspections or follow-up that would be required by the city
16 to validate any concerns that are on the project.  That's a
17 line item that could contain a number of different things.
18 So it was hard to identify exactly what that might be.  But
19 the permit can -- the permit cost can be calculated from the
20 City of Watertown and a number of other things can be
21 calculated to get to that point.
22     I conservatively put three times that in there just to
23 make sure that we were covered on any additional inspections
24 that would be required to satisfy the city's concern and in
25 getting the project complete.

Page 107

1  Q   Does this report contain your opinion regarding the
2  cost to complete the testing and inspections?
3  A   Yes, it does.
4  Q   Is that opinion based solely from statements made to
5  you by a third party?
6  A   No.
7  Q   Is that opinion regarding your or derived from your
8  experience and knowledge in this field?
9  A   Yes.
10 Q   What is your estimate and opinion for the cost to
11 complete the testing and inspections for The Ruins?
12 A   $39,555.
13 Q   Sir, in this report the next line item for which you
14 provide a cost is concrete.  Can you explain why you didn't
15 have a line item for any of the four intermediaries?
16 A   I didn't feel that there was any scope of work
17 associated with any of those line items that needed to be
18 completed.
19 Q   What did you believe needed to be done for concrete
20 still?
21 A   My estimation was based on the fact that there was some
22 concrete that needed to be removed and replaced in order to
23 get the grades to allow -- or to align with the garage, with
24 the alley in the back area, and some other areas around the
25 building.  The sidewalks and accessibility routes, things

Page 108

1  like that.  So exterior concrete-related scope of work.
2  Q   And you provided an amount for what you believe the
3  cost would be to complete that work?
4  A   Yes, I did.
5  Q   Is that opinion a product of your experience and
6  knowledge in the field?
7  A   It is.
8  Q   It is not the byproduct of a direct quote from any one
9  competitor?
10 A   Correct.
11 Q   What is your opinion regarding the cost to complete the
12 concrete work?
13 A   $27,000.
14 Q   The next five line items don't have a cost associated
15 with them.  Why is that?
16 A   I didn't feel that there was any work associated with
17 those particular packages to complete the project.
18 Q   For the line item CMU Block, what would be encompassed
19 in that?
20 A   CMU block would be any remediation work associated with
21 the exterior with the waterproofing membrane to make sure
22 that it's watertight.  That would be also any CMU block
23 that's required within the first floor common area.  I
24 assumed it was roughly a thousand square feet of block that
25 would need to be installed.  So I made an assumption on what

Page 109

1  the true scope of work was required on that first floor to
2  arrive at that number.
3  Q   And you provided an opinion regarding the cost to
4  complete the CMU block?
5  A   Yes.
6  Q   Is that opinion a product of your knowledge and
7  experience in the field of construction project management?
8  A   Yes.
9  Q   What awas that opinion?
10 A   $50,000.
11 Q   The next line item, Miscellaneous Metals.  What is
12 that?
13 A   Miscellaneous metals would be any stairs, ladders,
14 railings.  And the majority of this cost based on the final
15 set of plans as we were reviewing to put this together,
16 noted that there was some railing on the second floor patio
17 area.  And without quoting it out, I made some assumptions
18 based on our experience with other projects and estimating
19 services that we do to apply a dollar value to approximately
20 how many linear feet of rail we felt was needed to complete
21 the job.
22 Q   So this was not based on any particular quote?
23 A   No.
24 Q   What was your opinion regarding the cost to complete
25 the miscellaneous metals?

Page 110

1  A   $60,000.
2  Q   The next line item, General W&L Rough Carpentry Labor.
3  What is that?
4  A   This is any general related items that would need to be
5  installed that don't fall under any other package
6  necessarily.  Typically when we're putting together an
7  estimate, we'll assign a number of hours that can be used
8  for any sort of things that may come up that a subcontractor
9  is not specifically noted to do.  So we have applied an
10 allowance of 80 hours at $125 an hour to arrive at the
11 $10,000.
12 Q   And how did you reach that 80-hour allotment?
13 A   From experience.
14 Q   Not a particular bid quote?
15 A   No.
16 Q   What is your opinion regarding the cost to complete the
17 general W&L rough carpentry labor?
18 A   $10,000.
19 Q   Next line item where there's a "General W&L Finish
20 Carpentry Labor."  What is that?
21 A   Finish carpentry labor would be the installation of any
22 cabinets, countertops, frames in commercial spaces.  So in
23 arriving at that number, if we observed three residential
24 units that still needed some type of cabinet installation to
25 be completed in addition to the frames and the doors and the

Page 111

1  hardware throughout the building, that would fall within
2  this category.
3  Q   How did you -- you provided an opinion as to price.
4  How was that opinion reached?
5  A   Through our experience and our past work on other
6  estimates and projects similar to this.
7  Q   What was your opinion?
8  A   $12,500.
9  Q   Next line item, Millwork, Cabinets.  Can you describe
10 what would be included in there?
11 A   This would be the supply of any cabinets that were not
12 on site assuming that three units may need to be replaced in
13 its entirety.  So the supply of those particular cabinets to
14 be installed by the general W&L finish carpentry labor.
15 Q   Did you have an opinion as to the price for that?
16 A   Our opinion was established based on other estimates
17 that we've done, similar costs for projects that are similar
18 in scope.
19 Q   And what was your opinion?
20 A   $9,000.
21 Q   Countertops, kitchen and bathroom.  What's that?
22 A   That is the supply of the material for the countertops.
23 And again in arriving at that assumption, we assume that
24 there were three units that needed to be replaced, three
25 units of countertops that needed to be replaced throughout

Page 112

1  the building.
2  Q   Did you have an opinion as to price?
3  A   $6,000.
4  Q   How is that opinion formed?
5  A   Through expertise and prior experience.
6  Q   Next line item with a price is Moisture and
7  Protections.  What's included in there?
8  A   This would be the -- this is the roofing scope of work.
9  And upon understanding that there is a rooftop patio on that
10 second floor area that did not have any roof pavers
11 installed, that's the cost that -- our opinion of the cost
12 that it would take to supply and install those roof pavers.
13 A couple reasons why the paver system is a membrane roof is
14 primarily to protect the membrane so it doesn't -- it's not
15 damaged by people walking on it essentially.
16 Q   When you say supply, were there pavers on site to
17 complete this portion of the project?
18 A   There was not.  Not that we witnessed or observed.
19 Q   Did you have an opinion as to the price for this line
20 item?
21 A   Yes.
22 Q   How was that opinion reached?
23 A   Through experience and similar projects of similar
24 scope.
25 Q   What was that opinion?

Page 113

1  A   $80,000.
2  Q   Line item for masonry, what would be included in that
3  completion?
4  A   Masonry would be the brick veneer on the face of the
5  building on the elevation where it was not completed.  It
6  would also include a mobilization cost for a mason to come
7  on site, set up mixers, towers, equipment to finish the
8  work.  And then also to clean and seal the brick when
9  completed.
10 Q   Did you have an opinion as to price for that?
11 A   I did, yes.
12 Q   And how did you reach that opinion?
13 A   Again, through history, experience and performing
14 estimates that are very similar scope and scale for this
15 project.
16 Q   That opinion was?
17 A   $90,000.
18 Q   Is that still your opinion?
19 A   Yes.
20 Q   Next line item, Metal Siding/Metal Panels.  What is
21 that?
22 A   This would be the supply of the material and the
23 installation of the material to complete the skin of the
24 building essentially.  This also includes additional Tyvek,
25 either new Tyvek or remove and replace the existing Tyvek on

29 (Pages 110 - 113)

Page 114

1  the face of the building that the panels are not -- they are
2  not installed.  All that in my opinion would fall under this
3  particular package.
4  Q  Did you have an opinion as to the price to finish this?
5  A  Yes.
6  Q  How did you form that opinion?
7  A  This opinion was assuming that all the material was on
8  site.  So this is primarily labor.  We did observe pallets
9  of panels.  We didn't count all the panels and do a
10  quantitative analysis of what was there to determine if
11  there was enough.  Our assumption was that there was enough
12  panels there to complete.  So this is primarily labor.  And
13  again --
14  Q  This is a best-case assumption then almost.
15  A  Yeah, exactly.  And we based our labor rate on past
16  projects of similar size and scope.
17  Q  And what is your opinion?
18  A  $195,000.
19  Q  Is that still your opinion?
20  A  It is.
21  Q  Next line item, Sealants.  What's included in that?
22  A  Typically this is every -- Sealant is a separate
23  subcontract that -- essentially where there is a dissimilar
24  material is the way we say it.  So if it's block to drywall
25  or if it's tile to drywall, typically we see all of that

Page 115

1  sealed.  And in most cases this also includes any sealant on
2  the exterior where there is a penetration through the
3  siding, if there's any window sealants, any -- just general
4  -- I would say typically less than a half an inch gap would
5  fall within the scope of sealants.
6  Q  The purpose of all those sealants is?
7  A  To seal and to provide an aesthetic finish to the
8  building.
9  Q  Did you have an opinion as to the cost to finish that?
10  A  Yes.
11  Q  How was that opinion formed?
12  A  Typically when we're putting together an estimate for
13  building, we're estimating a cost on a per square foot of
14  the floor plan.  And so anywhere between $1 and $2 per
15  square foot.  I used the higher range of that because of
16  some unknowns with the building.  So that's how I arrived at
17  my $182,712, was based on $2 a square foot for the footprint
18  of the building.
19  Q  Is that still your opinion?
20  A  Yes.
21  Q  Next line item, Commercial Doors, Frames and Hardware.
22  What's included in that?
23  A  This is any miscellaneous hardware that is not already
24  on the site.  It's just the supply of the material.  I'm
25  assuming that all the material is there, but I've applied an

Page 116

1  allowance of $2,500 if we found that there was not
2  particular material.  If we needed to get a handle or
3  replace a handle or something like that.  Fairly small item,
4  but felt that without doing an actual count of every piece
5  of equipment and hardware and handle set and closure and
6  hinge and all of those items, to determine that there might
7  be something that needs to be replace or is missing over the
8  course of the time from the start to the finish.
9  Q  And you said you assumed that all the stuff was on-
10  site.
11  A  Correct.
12  Q  So this is a best-case assumption?
13  A  Correct.
14  Q  Did you have an opinion as to price?
15  A  $2,500.
16  Q  And that was based on?
17  A  My experience that something will go missing over the
18  course of construction and need to be replaced.
19  Q  Next line item, overhead doors.  What is that?
20  A  Overhead door is the entrance of the garage door
21  basically into the on-grade parking area.
22  Q  How many doors for this project?
23  A  I don't recall a specific -- this particular estimate
24  was based on the replacement of one door that we observed
25  some damage to.

Page 117

1  Q  And so how did you reach that opinion as to price?
2  A  History and experience with other estimates and scopes
3  of work in similar size and scale.
4  Q  And what was your opinion?
5  A  $10,000.
6  Q  Stil your opinion?
7  A  Yes.
8  Q  Vinyl windows.  What would be included in that?
9  A  This would be the supply of any windows that needed to
10  be replaced.  The assumption was that five windows needed to
11  be replaced with the remaining windows being on-site and the
12  ones that we noted for damage.  So this is again kind of a
13  best-case scenario assuming that there may be a few parts
14  and pieces that need to be purchased in order to fix any
15  damaged windows that we observed.
16  Q  Did you have an opinion as to price?
17  A  Yes.
18  Q  Formed how?
19  A  From historical estimates and experience.
20  Q  And that price was?
21  A  $3,000.
22  Q  Still believe that's accurate?
23  A  Yes.
24  Q  Drywall.  What would be included in there?
25  A  Drywall would be any patching, repairing, taping,

30 (Pages 114 - 117)

Page 118

1  texturing, finishing of any drywall areas.  We noted that in
2  the first floor there was some additional work that needed
3  to be done in the lobby areas that did not appear to be
4  completed.  So that was primarily where this scope entailed.
5  Q    Did you have an opinion as to the cost to finish that?
6  A    Yeah.
7  Q    How did you reach that opinion?
8  A    Experience, historical estimates, pricing similar in
9  scope and scale to what we witnessed or observed on site.
10  Q    What was your opinion?
11  A    $5,250.
12  Q    Is that still your opinion?
13  A    Yes.
14  Q    Carpet (Materials).  I assume I know what that is, but
15  can you confirm?
16  A    This is the supply of the carpet in the bedroom areas.
17  I assume that it's also the LVT.  But --
18  Q    Again, that's luxury vinyl tile?
19  A    Correct.  It doesn't specifically say it on the line
20  item, but I've assumed that it's included within this
21  package.  Typically I see that as part of one package when
22  we are putting together these projects.  So that was how I
23  formed my assumption.
24  Q    Did you have an opinion as to this?
25  A    Yes.

Page 119

1  Q    What was that opinion?
2  A    Opinion was $120,000.
3  Q    And how was that opinion formed?
4  A    This particular one, I don't know exactly the type of
5  material or the cost of the specific material, so I applied
6  a typical rate that we would see in a similar project from a
7  cost --
8  Q    So based on a square footage allowance essentially?
9  A    Correct, square footage allowance, yeah.
10  Q    Is that reasonable in your industry to give a square
11  footage allowance for flooring costs?
12  A    Yeah.  And generally what that does is allows for some
13  flexibility when we're putting together an estimate to say
14  it could be floor A or floor B, but it falls within that
15  estimate.
16  Q    Carpet install.  Again, I think I know, but can you
17  confirm what's in there?
18  A    This is the installation of the flooring materials.
19  And that would be both carpet in the bedrooms and luxury
20  vinyl tile in eh kitchen and dining spaces.
21  Q    And did you have an opinion as to those costs?
22  A    Yes.
23  Q    Sorry, I forget if I asked.  Did you ask your opinion
24  as to what it would cost for the materials for the carpet?
25  A    $120,000.

Page 120

1  Q    Still your opinion?
2  A    Yes.
3  Q    How did you reach your opinion regarding the cost to
4  install carpet or flooring in The Ruins?
5  A    Again, historical experience on past projects of
6  similar size to arrive at that assumption.
7  Q    And what was your opinion as to the cost for the
8  installation of carpeting?
9  A    It was $50,000.
10  Q    Still your opinion?
11  A    Yes.
12  Q    Painting and staining.  What would all be included in
13  there?
14  A    Yeah.  The painting and staining would be painting of
15  any finished materials within the inside of the building,
16  whether that be drywall, block, or any other finish
17  materials.  Typically -- in this instance we included an
18  allowance of $15,000 just to cover any miscellaneous patches
19  that would be required throughout the building.  So in
20  addition to finishing scope, we also included allowances to
21  touch up and repair any drywall patching that would be
22  required.
23  Q    Is that typical for a project of this type and scope?
24  A    Yes.
25  Q    And what was your ultimate opinion for the cost for

Page 121

1  painting and staining?
2  A    $51,000.
3  Q    And that was based on?
4  A    Experience and historical estimating.
5  Q    Postal specialties, bike rack, door markers.  What
6  would all be included in there?
7  A    This would be the material for postal boxes, mailboxes
8  essentially.  I did not include any additional cost for bike
9  racks or door markers or anything of that nature.  I didn't
10  know what was there.  I do know that postal boxes are
11  required for occupancy.  So that's what we included in the
12  cost.
13  Q    So best case opinion?
14  A    Yeah.
15  Q    How did your each your opinion as to this line item?
16  A    Historical costs on other projects of similar size.
17  Q    What was that opinion?
18  A    $8,700.
19  Q    Still your opinion?
20  A    Yes.
21  Q    Exterior signage.  What would all be included there?
22  A    This would be the building identification signage,
23  which would be typically a larger format type sign.  We
24  noted that there was some signage in the drawing set, so we
25  assumed that it would need to be installed for completion of

31 (Pages 118 - 121)

Page 122

1  the project.
2  Q   Did you provide an opinion as to the cost for that
3  completion?
4  A   Yes.
5  Q   How did you reach that opinion?
6  A   Square footage of size of sign based on other projects
7  that are similar types of sign, where it's a backlit sign
8  with letters or some -- some type of design similar to that.
9  So basically square footage cost of the footprint of the
10 sign.
11 Q   What was that opinion?
12 A   $30,000.
13 Q   Fire extinguishers and cabinets.  What's in there?
14 A   this would be the cabinets throughout the building that
15 hold the fire extinguishers and then the fire extinguishers
16 themselves.  And this would be just the installation
17 assuming that all of the materials was on site without
18 physically going in and taking an accounting of everything.
19 We assumed that it was all there.
20 Q   Okay.  You had earlier testified that you believed that
21 some of the fire extinguishers were set too high.  Would
22 costs of moving those boxes down be included in here?
23 A   No, they would not.
24 Q   So this is a best-case scenario?
25 A   Right.

Page 123

1  Q   Do you have an opinion as to the cost for this?
2  A   $1,000.
3  Q   And that was based on what?
4  A   It was based on historical experience and past
5  estimates.
6      MR. HUSHKA:  If I may indulge the Court and Mr.
7  VerStandig, if I asked for his opinion in that and if he
8  answers, can he clarify if he has anything different, or do
9  we want to keep clarifying this for the record for every
10 line item as we continue to go?
11     MR. VERSTANDIG:  I have a hunch that the witness
12 was well attuned to a certain objection and we're going to
13 get the same response.  I'm fine foregoing the standard
14 question at this point.
15     THE COURT:  Okay.  Then you may proceed.
16     MR. VERSTANDIG:  Thank you.
17 BY MR. VERSTANDIG:
18 Q   Next line item that has a price is -- sorry, Closet
19 Shelving.  What's included there?
20 A   This would be the shelving for the -- essentially the
21 closets in the residential -- yeah, bedroom closets.  And
22 it's typically a wire shelving that is, yeah, bolted to the
23 wall with some support.  And we applied a typical rate that
24 we see for projects that are similar to this to arrive at
25 that number on a per-unit basis.

Page 124

1  Q   And I see you have supply and install 63 units.
2  A   Correct.
3  Q   So am I correct in assuming that these materials were
4  not on site?
5  A   We did not observe any of this material on site.
6  Q   And your opinion as to the cost to complete this work?
7  A   $25,000.
8  Q   Toilet accessories.  What's included there?
9  A   Toilet accessories would be any grab bars for
10 accessibility throughout the residential units.  Primarily
11 this is applying to the first floor common space where there
12 was a common area bathroom that it appeared would require
13 some type of toilet partition.  So the dividers between the
14 toilets is where this material would be covered.  So that
15 would be the supply and the installation of those materials.
16 Q   Did you have an opinion as to price?
17 A   Yes.
18 Q   What was that?
19 A   $30,000.
20 Q   Appliances and A/C units.  What would be included
21 there?
22 A   This would be all of the -- it would be residential
23 appliances.  So refrigerators, stoves, washer/dryers,
24 microwaves.  And our assumption was based on the total
25 contract amount assuming that 42 of the units were not on-

Page 125

1  site and there were a number of units that -- the fourth
2  floor had the units on -- or in the units but hadn't been
3  installed.  So there's a certain labor that would be
4  associated with the installation of them.  But we assumed
5  that the other two floors would need to be supplied and
6  installed.  And so that's how we arrived at the estimate.
7  Q   And what was the estimate?
8  A   $160,000.
9  Q   Next line item, Window Treatments.  What would be in
10 there?
11 A   This would be the window treatments that each of the
12 windows at the residential apartments.  And so that would be
13 supplying and installing -- I take that back.  It would be
14 supply-only.  We assume that the installation would be in
15 the general work and labor.  So this would be supply only
16 for the 174 -- or sorry, 147 blinds.  It would be one at
17 each window essentially.
18 Q   Cost for supplying those blinds?
19 A   $30,000.
20 Q   Conveying system.  I believe you earlier indicated this
21 was the elevator?
22 A   This is the elevator, yeah.  So assuming that -- let's
23 say this is 60 percent complete or whatever the original
24 estimation of what the elevator installation was, that they
25 would need to come back on site once all the finishes are

32 (Pages 122 - 125)

Page 126

1  completed, test the car, balance the car, make sure all the
2  inspections are completed, and then do the complete turnover
3  of the elevator system.
4  Q   Cost for all that work?
5  A   $90,000.
6  Q   Building Sprinkler.  What's in there?
7  A   This would be any related work associated with the
8  building sprinkler system throughout the whole building.
9  The majority of the work appeared to be finished based on
10  our observations other than finishing the -- trimming out
11  the heads in the units.  We also assumed that the system was
12  not filled because it had not been tagged and inspected.  So
13  we -- our assumption was that a building sprinkler
14  subcontractor would need to come onto the site, fill the
15  system, test it, witness the test with the fire department
16  and then turn over the system.
17  Q   The cost for that work?
18  A   $15,000.
19  Q   Plumbing.  What would all be included in that to get
20  The Ruins completed?
21  A   Installation of all of the toilets, sinks, faucets,
22  hooking up the sinks and faucets.  Anything related to
23  showers, valves, sinks.  All plumbing-related scope of work
24  within the residential areas.  In addition to that, there
25  are also connections and water piping and items that needed

Page 127

1  to be completed that we observed in the commercial areas and
2  in the garage areas.  So in addition to trimming out all the
3  units, there was still some infrastructure that needed to be
4  in place and installed within those lower two levels.
5  Q   The price to get that work done?
6  A   $100,000.
7  Q   HVAC.  What would be included there?
8  A   Trimming out any of those bathroom fans within the
9  residential units.  I think primarily the scope of work
10  pertained to the first floor in the common areas.  It was
11  unclear whether all of that scope of work had been completed
12  at the time of our observations.  So we assumed that there
13  was a substantial amount of work there that needed to be
14  done as far as that scope.
15  Q   Cost?
16  A   $25,000.
17  Q   Electrical system -- Electrical Security System.
18  What's that?
19  A   Again, this is assuming that there is some scope of
20  work that needed to be completed within the footprint of the
21  building to get the building operational.  So electrical is
22  a little bit more unclear in terms of how we arrive to a
23  number just because we can't go in there as a -- with
24  observing, visual observing, it's hard to determine exactly
25  what might be a potential discrepancy or issues specifically

Page 128

1  regarding water penetration if there is any of those systems
2  that has -- that have failure due to water.  I can't test
3  that as observing, so I have to assume that there may be
4  some work associated with that.
5       In addition, down in the main electrical room, it was
6  packed fairly tightly in there.  And I know that there's
7  restrictions and requirements that there's distances from
8  main panels to other items within that electrical room.  And
9  should there have been any issues or discrepancy that needed
10  to be corrected there, there obviously would be significant
11  cost with that.  There's also cost associated with
12  finalizing the elevator and working with the elevator
13  supplier to test, terminate, and finalize the elevator.  So
14  a fairly substantial scope of work in my opinion to get that
15  completely finished and ready for occupancy.
16  Q   And your opinion as to the price to finish that scope
17  of work?
18  A   $125,000.
19  Q   Last line item with a price associated with it, Paving
20  and Sidewalks.  What was that?
21  A   It was just any exterior concrete work.  Primarily
22  striping.  We covered the concrete work on the beginning
23  part of this.  So this would just be striping the parking
24  lot and striping a handicapped stall.  So it's based on kind
25  of our experience on past projects.

Page 129

1  Q   All right.  Price associated with that?
2  A   $2,750.
3       MR. HUSHKA:  Sharon, if we can scroll up a little
4  bit before we get to the conclusion.  Scroll up.  Sorry.
5  BY MR. HUSHKA:
6  Q   Mr. Gehrtz, I know we've gone through these, but what I
7  want you to help explain for the Court is in your opinion
8  what subs or crews would be required to perform these works
9  or how many different -- essentially how many different
10  groups we would need to get on site to get this thing
11  completed in a timely package.  So I don't know if you --
12  I'll defer to you if it's best to go line-by-line and
13  explain who, or if you can just kind of give an overview of
14  the Court on how many or who you think.
15  A   I guess in general terms, the way I view this, every
16  one of these line items would be a separate subcontractor.
17  There might be some overlap with a general work and labor
18  contractor that may pick up some of these packages and
19  combine some of these packages.  But in my experience, each
20  one of these packages would typically be a separate
21  subcontractor wherever there is a line item for cost to
22  complete.
23  Q   So it's your opinion that over a dozen subcontractors
24  would be needed to finish The Ruins in a professional
25  manner?

33 (Pages 126 - 129)

Page 130

1  A   Yeah.

2  Q   Did you have an opinion regarding the ultimate cost to

3  complete The Ruins development?

4  A   Yes.

5  Q   And what was that opinion?

6  A   $1,695,967.

7  Q   Is that still your opinion today?

8  A   Yes.

9  Q   Included in that is there any cost associated with

10  remediating any deficiencies that have been noted or any

11  water penetration issues?

12  A   No, there is not.

13  Q   Mr. Gehrtz, based on your training and experience, how

14  long would it take to coordinate all of these subcontractors

15  required to finish this work, to get all the necessary

16  materials on site, and then to ultimately complete the

17  project? Assuming you had an unlimited checkbook today, how

18  long would it take for you to actually line everything up to

19  get it properly sequenced in and in the proper order and

20  then wrapped up and a bow tied so to speak?

21  A   I mean, I would -- my best estimation would be three to

22  four months assuming there's a month that would be required

23  to get any additional materials on site to complete the

24  installation. So I would say one month of acquiring any

25  materials that are necessary or doing an accounting of what

Page 131

1  we have on the site. And then I would say two to three

2  months after all the materials are there to finish

3  everything to completion.

4  Q   And that's assuming that the subs that are necessary

5  are available to complete the work right then and there.

6  A   Correct.

7  Q   Do subs typically line up projects in advance and are

8  they always available?

9  A   They do line up in advance and they are not typically

10  readily available if schedules change.

11  Q   How far in advance do they usually line things up?

12  A   Typically what we see is anywhere from three to six

13  months in advance of any work. Ideally more than six

14  months. But it doesn't always work that way.

15  Q   Fair enough. Mr. Gehrtz, the opinions that you've

16  offered here, were those based upon your training and

17  experience in construction management?

18  A   Yes.

19  Q   Are those all still your opinions?

20  A   Yes, they are.

21  MR. HUSHKA: Your Honor, at this time we would

22  offer ECF 60-1, Page 406 as a summary exhibit under 107. I

23  believe it summarizes the opinions that he provided today

24  and would be outside the scope of any hearsay objection

25  under 107.

Page 132

1  MR. VERSTANDIG: Your Honor, no objection to Page

2  406.

3  THE COURT: The Court receives 406 in Document 60-

4  1.

5  (Exhibit 60-1 admitted into evidence)

6  BY MR. HUSHKA:

7  Q   Mr. Gehrtz, we've talked this morning at a few

8  different times about water damage and water penetration.

9  Do you believe that remediation efforts are necessary to fix

10  both the issues and any damage provided to the building?

11  A   In my opinion, yes, it is.

12  Q   As part of your investigation of this project, did you

13  -- do you have an opinion as to what the cost would be to

14  complete such remediation efforts?

15  A   Yes.

16  Q   What is that opinion?

17  MR. HUSHKA: Objection, foundation. Your Honor,

18  previewing, it's going -- it would at least seem that it's

19  about to be a quote from a third party.

20  THE COURT: Yeah. I'm not hearing that yet. But

21  your foundation was not --

22  MR. VERSTANDIG: The objection is not hearsay.

23  It's lack of foundation.

24  THE COURT: It's lack of foundation. You know, we

25  heard some foundation about remediation, but I think for the

Page 133

1  purposes of understanding the scope of the particular

2  opinion, I would like to hear more. So I'm going to

3  sustain.

4  MR. HUSHKA: Certainly, Your Honor.

5  BY MR. HUSHKA:

6  Q   Mr. Gehrtz, what remediation efforts do you believe are

7  required to correct the water damage and water damage in The

8  Ruins?

9  A   In my opinion based on what I've seen on other projects

10  that have similar scenarios, we would have to take the

11  sheetrock off the walls, we would have to treat any

12  potential areas where there's moisture where there could be

13  mold growth, whether it's currently there or there's still

14  moisture that could lead to mold. Treat it, dry it, make

15  sure that it's not in a condition where it would allow for

16  mold growth and then put it back together.

17  Q   In your area, do you -- strike that. To provide that

18  type of work, does the construction industry sometimes

19  employ a remediation specialist?

20  A   Yes.

21  Q   Would you in your line of work trying to line up that

22  scope of work typically send out quotes or bids to provide

23  those services?

24  A   Yes.

25  Q   In your field does an expert generally rely on the

34 (Pages 130 - 133)

Page 134

1  facts and data of bids when reaching an ultimate opinion

2  regarding the cost associated with providing a service?

3  A   Yes.

4  Q   Do you have an opinion regarding the costs of

5  remediation efforts to fix the water damage and penetration

6  issues in The Ruins?

7  A   Yes.

8  Q   What is that opinion?

9       MR. VERSTANDIG: Calls for hearsay.

10       THE COURT: Hold on. Don't answer yet.

11       MR. VERSTANDIG: Objection. Calls for hearsay.

12  The testimony is that it's based on bids that were

13  solicited. And I think that's customary of an expert in the

14  field that is not in line with what's permitted by the

15  Federal Rules of Evidence.

16       MR. HUSHKA: Your Honor, the Federal Rules of

17  Evidence allow that if an expert in a particular field would

18  reasonably rely on those kinds of facts or data in forming

19  an opinion on the subject, they need not be admissible for

20  the opinion to be admitted. That's directly from 703.

21       MR. VERSTANDIG: The facts or data referenced in

22  703 in that context are learned treatises and items that

23  speak to the nature of the profession and the facts relied

24  upon in going about the work, not information procured for a

25  specific case that is a quote from a third party. This is a

Page 135

1  back door way of getting a third party's quote for putative

2  remediation work into evidence. The third party is not here

3  to be cross-examined about their quote, how it is they came

4  up with the quote, what considerations went into the quote,

5  what considerations did not go into the quote.

6       MR. HUSHKA: Your Honor, that would go to I

7  believe the weight as opposed to the admissibility. If

8  there's issues regarding that weight or the quote and the

9  particular accuracy of that quote, I believe that would go

10  to weight as opposed to the actual admissibility of the

11  opinion and this Court can obviously assign any weight that

12  it believes is appropriate.

13       THE COURT: So just for clarification, are you

14  relying on specific quotes from remediation experts in --

15  that actually looked at this particular scope of work for

16  The Ruins?

17       THE WITNESS: Can I explain the...

18       THE COURT: Yes.

19       THE WITNESS: Okay. So I had reached out for an

20  opinion on what a general scope might be because I don't do

21  mold remediation specifically. We did not have anybody go

22  onto the site. So it was more general in nature in order to

23  arrive at a cost to remediate. If that answers the

24  question.

25       THE COURT: And your opinion is based on the

Page 136

1  advice of that person who typically does remediation work

2  and like projects?

3       THE WITNESS: Correct.

4       THE COURT: The objection is sustained.

5  BY MR. HUSHKA:

6  Q   So you indicated to the Court that you received a quote

7  as it relates to this particular project.

8  A   Yes.

9  Q   Have you received quotes on other project for

10  remediation work?

11  A   Yes.

12  Q   For water and mold remediation work?

13  A   Yes.

14  Q   Was the quote that you received for this particular

15  project consistent with the -- accounting for scope, was the

16  quote that you received in this project consistent with the

17  costs in those other project where remediation services were

18  provided?

19  A   Yes, I would say that is correct.

20  Q   What was the cost for the remediation services quoted

21  in this case?

22  A   I believe --

23       MR. VERSTANDIG: Objection. Objection. Hearsay.

24       THE COURT: Sustained.

25       MR. VERSTANDIG: I'm sorry, I didn't hear the

Page 137

1  Court.

2       THE COURT: I said sustained.

3       MR. VERSTANDIG: Thank you.

4       MR. HUSHKA: Your Honor, as an offer of proof, we

5  would offer that they received a ServiceMaster restore quote

6  that remediation services would be required in 39 different

7  units in this case, including three hallways and that the

8  cost of those remediation services would be $293,951.43.

9  Additionally, those remediation services would take 22 days,

10  neither of which were accounted for in the opinions

11  currently provided and before the Court as an offer of proof

12  if we were allowed to go in on this.

13       THE COURT: So response to the offer of proof?

14       MR. VERSTANDIG: Your Honor, we appreciate the

15  proffer. It is clearly set forth on the docket, which is

16  how I know where this is going. It is very clearly the

17  quote of a third party. It remains rank hearsay. If

18  anything, the fact that it ends in 43 cents shows the

19  specificity of the hearsay. It is not -- sorry.

20       THE COURT: Right. So I sustained the objection.

21  And now for purposes of appeal, the Red River State Bank is

22  making an offer of proof. I'm looking to you for your

23  response to that offer of proof.

24       MR. VERSTANDIG: Your Honor, we would have no

25  response for purposes of appeal.

35 (Pages 134 - 137)

Page 138

1     THE COURT: Okay, then I will accept that as an
2  offer of proof.
3     MR. HUSHKA: Thank you.
4  BY MR. HUSHKA:
5  Q   Mr. Gehrtz, again, without speaking to the
6  particularity of any quotes received or considered by you,
7  the timeline that you have provided and the 1.6 million and
8  change number that you provided, did that include any cost
9  or time for remediation services?
10 A   No, it did not.
11 Q   But do you believe that such remediation services are
12 necessary?
13 A   I do believe there is, yes.
14 Q   If you were to see a mold testing inspection that did
15 not yield -- did not receive -- excuse me.  If there was a
16 mold test performed and that test came back negative but did
17 not test every unit where you observed water penetration or
18 every common space that you observed water penetration, do
19 you believe that that would be sufficient to exclude the
20 possibility of mold in The Ruins?
21 A   I do not personally.  No.  I'd like to see it at each
22 location to make sure that there is no potential for mold to
23 grow wherever there was water visible or penetration
24 visible.
25 Q   And in your report, I think report one that came in the

Page 139

1  punch list, does that identify the areas where there's water
2  penetration in the units that such testing would be
3  required?
4  A   It does, yes.
5  Q   All right.  Mr. Gehrtz, I'm reaching the termination of
6  my initial questioning.  But just a couple more brief issues
7  here before we wrap up.
8     I believe you testified that over a dozen trades or
9  subs were necessary and $1.69 million was needed to complete
10 this project.  Is that a correct summary?
11 A   Yes.
12 Q   Do you believe that this project could be completed in
13 a timely manner with only labor and material contributions
14 from B&W Construction, Lakeside Construction, Limoges
15 Construction and Watertight?
16 A   Personally I don't feel that it would get all the way
17 there.
18 Q   Why not?
19 A   I think there's other trades that need to be involved
20 in getting the project to completion in my opinion.
21 Q   What specific trades?
22 A   Well, I'm not exactly familiar with the specific
23 subcontractors that were identified.
24 Q   If we look at the summary exhibit that's in front of
25 you that has been allowed in, which line items do you

Page 140

1  believe that those four subcontractors would not be able to
2  provide?
3  A   Elevator, building sprinkler, appliances, exterior
4  signage, supply of postal specialties, carpet material and
5  installation.  If you can scroll up a little bit more.
6  Q   What about electrical before we go up.  Would they be
7  able to do that?
8  A   I don't believe so.  I'm not familiar with all four of
9  those, but I don't believe they are an electrician.  So...
10 Q   Sorry for interrupting.  Any others that you see on
11 this list?
12 A   Moisture protection and the supply of miscellaneous
13 metals and CMU block, masonry.
14 Q   And you believe obviously that the cost associated with
15 those line items are what is in this summary exhibit?
16 A   Correct.
17     MR. HUSHKA: No further questions at this time,
18 Your Honor.
19     THE COURT: Okay.  Do we want to take a break
20 before you begin with cross-examination or are you ready to
21 just proceed?
22     MR. VERSTANDIG: Your Honor, we are prepared to
23 proceed.  I would caution I think it's going to be on the
24 lengthier side.  And I would likely ask for a recess before
25 I conclude to confer with my client.  But I'm happy to begin

Page 141

1  now.
2     THE COURT: Okay.  I say we try to go another half
3  hour for sure and then take a short break.
4     Just by way of logistics, is everybody prepared to
5  go without lunch?  Okay.
6     Mr. VerStandig, I can't really see if you nodded
7  or not.
8     MR. VERSTANDIG: Your Honor, yes.  Admittedly I
9  also have the privilege of being able to turn off my camera
10 for two seconds and grab a granola bar.
11     THE COURT: Okay.  You are the lucky one here for
12 sure.
13     MR. VERSTANDIG: Yes.
14     THE COURT: Okay.  I'll try to take, you know, a
15 15-minute break or around noon depending on where you are
16 with your examination so that you can enjoy a granola bar.
17 But given the fact that I'm going to have to stop at 2:00, I
18 think it would be helpful if we can find a way to complete
19 this witness's testimony if at all possible.  Okay.
20     MR. VERSTANDIG: Thank you, Your Honor.
21     THE COURT: So we're just going to begin.  So Mr.
22 VerStandig, you may begin.
23     MR. VERSTANDIG: Thank you.  And I think we can at
24 least for the time being take the exhibit down.
25     CROSS-EXAMINATION OF MATTHEW GEHRTZ

36 (Pages 138 - 141)

Page 142

1  BY MR. VERSTANDIG:
2  Q  Mr. Gehrtz, what is the aesthetic of The Ruins design?
3  A  I guess an apartment building. I don't -- is that --
4  I'm not exactly sure the -- what you're asking necessarily.
5  But my assumption of the aesthetic, the completion of -- the
6  completion aesthetic would be a finished residential
7  apartment complex.
8  Q  Can we agree that different finished residential
9  apartment complexes have different looks, some more modern
10  than others?
11  A  Yeah.
12  Q  Can we agree that with the ebbs and flows of time,
13  certain things come in and out of style?
14  A  Yeah.
15  Q  What might have been awfully chic in the 1930s might be
16  repugnant today?
17  A  I'd say that's fair to say. I'm not a designer, but I
18  would generally agree with you on that.
19  Q  As part of your inspection in this case, what steps did
20  you take to investigate the intended aesthetic for this
21  building at completion? Did you review anything suggesting
22  what Mr. Craig and his team intended to look at at the time
23  the certificate of occupancy is obtained?
24  A  I did not. My investigation was based on site
25  observations and my experience on what I reasonably expect

Page 143

1  for a finished building of that caliber.
2  Q  Can we agree that the aesthetic would probably have a
3  material impact on the cost of signage, whether it be up or
4  down?
5  A  It could, yeah.
6  Q  Okay. And it would probably have a material impact on
7  the cost of gypcrete. Again, up or down.
8  A  I would maybe not agree with gypcrete. That's a pretty
9  standard item that's not visible. That has to do with the -
10  that has to do with the design of the building and the
11  construction of the building, not necessarily the aesthetic
12  of the building in my opinion.
13  Q  Well, the design and the aesthetic would seem to be
14  rather similar, albeit not identical notions, correct?
15  A  Let me clarify. Design meaning code-related components
16  versus aesthetic-related components. For example, a one-
17  hour rated floor assembly needs to have gypcrete on it
18  whether it's a high-end apartment or a base-level apartment.
19  So there are some components that don't in my opinion have a
20  design-related -- sorry -- component to it.
21  Q  And in some cases, but not nearly all, the aesthetic
22  would also impact sequencing, would it not?
23  A  I would say sequencing is important regardless of the -
24  - sequencing is important regardless of the project. It
25  will have an impact on aesthetic if it's not done properly.

Page 144

1  Q  But again, the order of sequencing -- and I think that
2  sounds like a grotesque redundancy -- would be somewhat not
3  nearly entirely, related to the desired aesthetic.
4  A  I'd say yeah.
5  Q  Okay. Did you view the buildings known as Generations
6  or Parkside?
7  A  No.
8  Q  They're both in Watertown, South Dakota. You didn't
9  visit them while you were down there?
10  A  We did not.
11  Q  Okay. Do you have any idea of whether those buildings
12  are in high demand, low demand, or any other sort of demand
13  for renters?
14  A  I do not.
15  Q  Did you know those buildings existed until three
16  minutes ago?
17  A  I did.
18  Q  Okay. Now, generally -- and we'll be a little more
19  specific later on -- when you gave your cost to complete
20  estimate, I didn't see a line item in there for your
21  company's fees. What was that?
22  A  It wasn't included. Was asked to put a cost to
23  complete the scope of the work and I didn't account for any
24  management, whether it was by me or by somebody else. So it
25  was strictly scopes of work based on the sworn construction

Page 145

1  statement that was provided.
2  Q  Were any of those items marked up understanding that a
3  general contractor would likely take a cut?
4  A  I don't know.
5  Q  Well, you put it together. Why would you know?
6  A  Are you asking specifically of my estimate that I put
7  together?
8  Q  Yeah.
9  A  I didn't mark up any of the cost. It was a direct
10  cost. Typically -- I will just expand a little bit on how I
11  operate from a construction management standpoint. I don't
12  apply a markup on individual subcontractor packages. I'll
13  either operate on a lump sum fee for a total project or I'll
14  apply an overall percentage to the entire project, but I
15  won't apply it on an individual subcontractor.
16  So the way I put my estimates together is each
17  individual line item is what the cost for that particular
18  subcontractor would be. And in this particular case, I did
19  not apply a factor for management or for oversight or
20  anything because I was trying to establish the cost of the
21  work for the project.
22  Q  You had some laborers in there at I believe $125 an
23  hour, correct?
24  A  Correct, yeah.
25  Q  Do you think that's the going rate for a laborer in

37 (Pages 142 - 145)

Page 146

1  Watertown, South Dakota?
2  A   I don't know. Basically for a skilled laborer it's
3  probably on the higher end. For an unskilled laborer it's
4  maybe -- sorry, the other way around. For a skilled laborer
5  I would say it's closer to that. For a non-skilled laborer
6  it's maybe a little bit high.
7  Q   Would you be surprised to learn that the rough average
8  -- and I don't --
9       MR. HUSHKA: Objection, Your Honor. Foundation.
10      MR. VERSTANDIG: Asking if he would be surprised
11 to learn something. I'm not asking if it's true.
12      MR. HUSHKA: Surprised if he learned. It would be
13 a fact in evidence. It's not in evidence. There is no
14 foundation for this.
15      MR. VERSTANDIG: We'll have it in evidence at the
16 end of the --
17      THE COURT: Hold on. Say it again, Mr.
18 VerStandig?
19      MR. VERSTANDIG: I mean, it will be in evidence by
20 the end of the hearing. It's going to come from a
21 subsequent witness. I'm just trying to garner whether or
22 not it would surprise him.
23      THE COURT: Yeah.
24      MR. VERSTANDIG: My asking the question doesn't
25 establish the fact.

Page 147

1       THE COURT: No, but it infers that it is a fact.
2  And so without the foundation, that presents a problem the
3  way that this particular question was asked. So I'm
4  actually going to sustain that one.
5  BY MR. VERSTANDIG:
6  Q   Mr. Gehrtz, did you investigate how much was paid to
7  laborers on the project thus far?
8  A   No.
9  Q   Could you have investigated that?
10 A   I'm not sure how I would have done that. I guess by
11 observations and site inspections.
12 Q   Well, you could have done more than observations and
13 site inspections. You could have called Mr. Craig, right?
14 A   I suppose I could have.
15 Q   You could have looked through permits and liens to see
16 what laborers worked on the project, couldn't you?
17 A   I did not note the account for any liens on my
18 estimate.
19 Q   But I'm not asking about cost. I'm saying you had
20 means of figuring out which subcontractors had done work,
21 right?
22 A   I suppose.
23 Q   But you didn't choose to reach out to a general or any
24 of the subs to get a sense of what the cost had been, right?
25 A   I guess given the nature of the case, I didn't feel

Page 148

1  like I would get appropriate answers I guess. I did not
2  reach out to the builder because my assumption was that I
3  wouldn't be getting accurate information considering the
4  gravity of the situation.
5  Q   I'm not sure I understand. I understand why you may
6  have been concerned that the builder wouldn't give you
7  information, but what would lead you to believe the builder
8  would give you inaccurate information?
9  A   Because I'm doing it under the hire of the opposing
10 attorney I guess. Just the situation feels like it's -- I
11 don't know. I don't know how to answer it I guess. But...
12 Q   It says you were hired by the opposing attorney. I
13 thought you had testified that you were hired by Mr.
14 Aarestad.
15 A   I'm sorry, correction. I'm hired by Red River State
16 Bank.
17 Q   You said you had spoken to Mr. Aarestad, right?
18 A   Correct.
19 Q   Did you speak with opposing counsel?
20 A   Not during or not until -- not until just recently for
21 this case. All my communication has gone through Red River
22 State Bank.
23 Q   When you say just recently, ballpark. I'm not asking
24 you a precise date. Season, year.
25 A   Within the last few months. I guess when the original

Page 149

1  -- the first hearing was scheduled and then settled was the
2  first time we started to -- I started to have conversations.
3  Q   So you didn't reach out to Mr. Craig. Why didn't you
4  reach out to any of the subcontractors who had done work
5  there?
6  A   Felt like that might have been an overstep of my
7  request. My request was to do a site observation and give
8  my expert opinion on what the cost to complete the project
9  would be. And that's how I established my estimates.
10 Q   Well, in at least one instance -- and I don't want you
11 to say what they told you. But you did reach out to a third
12 party to get a bid or a quote, right?
13 A   In one instance I did for -- yeah, correct.
14 Q   Okay. Would it have made sense to reach out to the
15 subs who are already working on this project to see what
16 their completion cost would be?
17 A   I guess I relied on my experience and my historical
18 data. We do a lot of estimating work in putting together
19 budgets for projects that are either to be started or under
20 design. So I guess I relied on my historical experience
21 with similar projects to develop it rather than digging
22 further into it with the actual subcontractors that were on
23 the job.
24 Q   How many apartment projects in Watertown, South Dakota
25 have you done estimates for in the past?

38 (Pages 146 - 149)

Page 150

1  A  None.

2  Q  How many projects in Watertown, South Dakota?

3  A  In Watertown specifically, none.

4  Q  How many projects within 50 miles of Watertown?

5  A  We've done work down in Sioux Falls as a company.  And

6  primarily most of our work is in Fargo, Moorhead, West

7  Fargo area.  So within 50 miles.

8  Q  I realize you're not here as a geography expert.  But

9  can we agree Sioux falls is more than 50 miles from

10  Watertown?

11  A  Yeah.

12  Q  Okay.  Would it not have been beneficial to speak with

13  someone who has done work in the Watertown market?

14  A  My opinion is that, whether it's in the Watertown

15  market or it's in the Fargo or Moorhead market, they are

16  similar enough.  The scope of work with the project is

17  similar enough.  It's going to get within a range of what I

18  would expect.  I don't see it ranging further because it's

19  in Watertown specifically that would require me to reach out

20  to subcontractors directly in Watertown to establish my

21  opinion of the cost.  So that was my basis for assumption in

22  getting to that.

23  Q  I don't want to belabor this point.  I'm aware that

24  you're an expert in one field, and I'm not going to try to

25  cross-qualify you.  But you have been to Watertown at least

Page 151

1  a few times, right?

2  A  Correct.

3  Q  And you live somewhere in or about the Fargo-Moorhead

4  market, correct?

5  A  Correct?

6  Q  Generally speaking, just observations as a human being,

7  not as an expert, there is a slightly different economic

8  condition in Watertown, South Dakota than in Fargo, North

9  Dakota, right?

10  A  I would -- in my opinion they are similar enough where

11  I could use my experience within the Fargo-Moorhead market

12  to establish a cost.

13  Q  You think your experience in Fargo-Moorhead establishes

14  what contractors in Watertown would charge?

15  A  Personally I do, at least to a range close enough to

16  get to a number.  If you're a plumber or an electrician,

17  whether you have ten employees or a hundred employees,

18  generally you're going to operate similar as a business

19  whether you're in Watertown or you're in Fargo.  So the type

20  of subcontractor that's on these mixed use projects are very

21  similar.  They are smaller generally in size and operate

22  very similarly, whether they are in the Fargo-Moorhead

23  market or they're in a Watertown market or another market

24  that's similar.

25  Q  You said a range, correct?  Meaning there is a range of

Page 152

1  potential costs and expenses for all of the subs Mr. Hushka

2  asked you about, right?

3  A  Correct.

4  Q  Okay.  Your expert opinion though is that the cost of

5  completion is $1,695,967 and no cents, correct?

6  A  Correct.

7  Q  That's not a range.  That's a very precise number.  It

8  ends with seven dollars.  Why didn't you provide a range if

9  there's some potential variance?

10  A  When I'm putting together an estimate, even though

11  there could be a range plus or minus, I don't provide that

12  range necessarily.  So I guess I've never given an estimate

13  with a range like that.  I'm doing what I typically would do

14  when I put together a cost or an opinion of cost.  And I get

15  to a number.

16  Q  Can we agree that with a range that number could be

17  lower or higher?

18  A  Yeah.

19  Q  Okay.  I mean, it could be $1,695,966.

20  A  It could be.

21  Q  Or even lower than that.

22  A  Yeah.  The cost is our opinion of what it would take to

23  complete the project.  So that could range depending on

24  timing of when subcontractors are bidding it.  That could

25  vary on their current scope of work.  That could vary in a

Page 153

1  market.  That could vary with a number of different things.

2  So it's a moment in time we're trying to capture a cost of

3  what it might be to the best of our abilities without

4  physically going and getting hard bids and hard numbers.

5  That's a whole other process to develop a cost.

6  Q  Let's take a step back.  When your company does general

7  contractor work, does it pay subs with its own funds?

8  A  When we operate as a construction manager, we -- I'm

9  going to get a little bit into the weeds I guess to explain

10  that question.  So construction manager versus general

11  contractor.  General contractor holds a single contract and

12  pays all the subs directly.  A construction manager, if it's

13  acting as agent of the owner, it's a contractual delivery

14  method.  The contract for the sub is actually held directly

15  with the owner and the owner pays the sub directly.  If it's

16  construction manager at risk, then the construction manager

17  holds the contract for the sub and we pay the sub directly

18  after we receive payment for the owner.  So we as a company

19  have operated in all three capacities, whether it's a GC, a

20  CMA or a CM at risk, if that makes sense.

21  Q  That was actually enormously helpful.  Thank you.  Did

22  your company act as a general contractor during the first 18

23  months of the pandemic?  And for ballpark purposes, say

24  March 2020 forward.

25  A  If we -- for a project similar to this or just in

39 (Pages 150 - 153)

Page 154

1  general capacity?  What's your...

2  Q    That's a fair question.  I appreciate it.  Did your

3  company act as a general contractor for an MDU, mixed

4  dwelling unit project, during the period beginning March

5  2020 and ending September 2021?

6  A    We acted as a construction manager, as an agent of the

7  owner.  Since we don't self-perform, we operate and manage

8  the project as a construction manager and not a GC.

9  Q    Now, you said a moment ago your company has acted as a

10  GC, correct?

11  A    Correct.

12  Q    How many times?

13  A    Numerous times.  It just depends on the client and the

14  project and the size of project.  It varies.  But numerous

15  times.

16  Q    How many times since March of 2020?

17  A    Probably more than 20, more than 30, somewhere in that

18  range.  I don't know the specific number for you.

19  Q    But none during that 18-month period.

20  Q    None for mixed use type projects.  But we have acted as

21  a GC for other type projects during that timeframe for other

22  clients and whatnot.

23  Q    Did you observe a general fluctuation in the cost of

24  materials during that time period?

25  A    Yeah.

Page 155

1  Q    Did they go up or down?

2  A    Generally they went up as a result of the pandemic.

3  Q    Significantly or marginally?

4  A    I'd say significantly.

5  Q    Okay.  Let's talk about your report.  You said that you

6  made an assumption regarding the CMU block completion.  Do

7  you remember that?

8  A    Yeah.

9  Q    What was the assumption?

10  A    The assumption was the scope of what was entailed

11  within that.  So my assumption was that there was some

12  amount of work that needed to be installed on the first

13  floor to complete CMU.

14  Q    Now, why is that an assumption and not something that

15  you were able to objectively discern based on your multiple

16  visits to the property?

17  A    During the first report, at the time of the first

18  report I did not have a floor plan that showed accurately

19  what was being built there.  At the time of cost of

20  completion, I did have a full set of plans that I was able

21  to reference.  So when I referred to my assumption, it was

22  based on my assumptions that I made during my observations

23  in the first report.

24  Q    So the various times you talked about assumptions,

25  that's based on an outdated scope of knowledge on your part?

Page 156

1  A    Well, I guess my assumptions were still based on my

2  observations.  The fact that I have an incomplete set of

3  plans at the time of that inspection I don't think changes

4  what I observed I guess if that makes sense.

5  Q    Okay.  You testified about an air conditioning can

6  issue.  Do you remember that?

7  A    Yeah.

8  Q    You indicated that one of them appeared to be -- and

9  I'm paraphrasing -- one of them appeared to be too low,

10  correct?

11  A    Say that again?

12  Q    You indicated one of them appeared to be too low.

13  A    Too low?

14  Q    Too low proximate to the ground.

15  A    I don't recall --

16       MR. HUSHKA:  So, Your Honor, I'd object.  I think

17  that mischaracterizes the too low or -- the wrong heights I

18  think was the fire extinguishers, not in the AC unit.  But I

19  guess he can answer I guess his testimony.  But...

20       MR. VERSTANDIG:  I remember the fire

21  extinguishers, and I may have just misheard the witness.

22       THE WITNESS:  I don't recall saying anything about

23  an AC being too low.  That's not typically a scenario that

24  is a concern on a project like that.

25  BY MR. VERSTANDIG:

Page 157

1  Q    Were there issues with the placement of the AC cans

2  that you observed?

3  A    Nothing specific that I recall without seeing the --

4  forgive me if there's a note in the report.  It was in April

5  of 2024.

6  Q    Okay.  Now, you testified there with doors you were

7  assuming half of them were on site and available.  Do you

8  remember saying that?

9  A    Yes.

10  Q    Why would that be an assumption?  Why wouldn't you just

11  check to see how many doors there are?

12  A    I did not do an accounting of all of the particular

13  doors that were on site.  Some of them were leaned up

14  against the door openings or near the door openings.  Others

15  were not there.  So I don't recall how many and how specific

16  the observation was.

17  Q    You did account for certain things.  You testified that

18  there's no washers and dryers, right?

19  A    Right.

20  Q    Why would you account for certain things and not others

21  if it was going to go into your cost of materials

22  assessment?

23  A    Well, specifically regarding the appliances, it's

24  fairly easy as we're walking through the units to determine

25  is there a washer and a dryer in the unit.  If there's not,

40 (Pages 154 - 157)

Page 158

1  is there a large stack of washer and dryers on the first
2  floor.  Those are fairly easy items to identify whether
3  they're on site or not.  But boxes of hardware and
4  components that are in small packages that typically once
5  you open them up and they're not secure, they just -- in the
6  course of construction they tend to be lost.  So I didn't
7  want to rummage through any materials to cause further issue
8  with cost of completion or construction completion.  So
9  items that were easily identifiable by visible inspection or
10  observation were the items that we validate.  Others that
11  were more specific like that, we didn't open things up and
12  do counts of everything.
13  Q   I don't want to be too argumentative here, but surely
14  we can agree that a door is of a size it's easily countable.
15  It's not a screw or a bolt.
16  A   That's fair.
17  Q   Okay.  So you could have checked, but you chose not to.
18  A   Yes.
19  Q   Okay.  Why is the absence of washers and dryers a
20  problem?
21  A   Why is the absence a problem?
22  Q   Yeah.
23  A   The cost of the material I guess is the main issue from
24  my perspective.
25  Q   How many units is this building supposed to be?

Page 159

1  A   My understanding is 63 I believe without looking at --
2  Q   That's -- what you have in your second report for what
3  it's worth.  Okay.  So 63 units.  How many washers and
4  dryers would that be?
5  A   It would be 63 washers and 63 dryers.
6  Q   Okay.
7      MR. VERSTANDIG:  Your Honor -- I'm sorry, Madam
8  Clerk, could we pull up Docket Entry 61?  And we're going to
9  go to Paragraph 20.  I guess we'll just start on the first
10  page.
11  BY MR. VERSTANDIG:
12  Q   I'm going to represent to you that this is an affidavit
13  of Charles Aarestad.  I don't expect you to have ever seen
14  this document before.  But can we agree that's at least what
15  it says?
16  A   Yes.
17  Q   Okay.  And Charles Aarestad is the person who
18  originally engaged your services, correct?
19  A   Yes.
20  Q   All right.  And can we scroll to Paragraph 20 please?
21  Which is going to sort of split two pages.  Here it says,
22  "I've reviewed all of the Debtor's prior draw requests and
23  related invoices for appliances for The Ruins project.  I've
24  also personally inventoried, photographed and recorded the
25  serial numbers of the appliances on site at The Ruins

Page 160

1  project.  Based on my records and inspection, I believe the
2  following appliances are currently missing from The Ruins
3  project.  15 dishwashers, 15 ranges/stoves, 16 microwaves,
4  28 refrigerators, 25 washing machines, 28 clothes dryers."
5      MR. HUSHKA:  Your Honor, we would object.  I don't
6  believe that this document is in evidence.  I'm not sure if
7  he's trying to impeach Mr. Gehrtz that he's providing an
8  inaccurate number or if he's implying that Mr. Aarestad's
9  tabulation is incomplete.  I'm not sure where this is going
10  at this point.
11      THE COURT:  Me neither.  So I'm going to let him
12  ask the next question.  And you may object again.
13  BY MR. VERSTANDIG:
14  Q   Mr. Gehrtz, if 25 washing machines are missing, would
15  that lead you to believe that thirty-some-odd washing
16  machines are present?
17      MR. HUSHKA:  Objection, Your Honor.  Foundation.
18  It assumes that 25 are missing.  This document is not in
19  evidence.
20      THE COURT:  Sustained.
21      MR. VERSTANDIG:  All right.  Then in that case we
22  would ask to go to docket entry 60-1 at Page 309.  And this
23  document is in evidence.  This is the expert's report.
24      THE COURT:  I missed the page number.  Which
25  number?

Page 161

1      MR. VERSTANDIG:  309.
2      THE COURT:  Thank you.
3      MR. VERSTANDIG:  Thank you, Your Honor.
4  BY MR. VERSTANDIG:
5  Q   All right.  And Mr. Gehrtz, you took the photographs
6  that are in this document, correct?
7  A   Correct.
8  Q   Okay.  Mr. Gehrtz, do you see a box in the first
9  photograph to the right of the text?
10  A   Yeah.
11  Q   Can you read what that box says?
12  A   It appears to say washer.
13  Q   That leads you to believe there was a washer on site?
14  A   On that particular photo it would be, yes.
15  Q   Okay.  So when you testified previously that there were
16  no washers or dryers, that was probably inaccurate to some
17  degree.
18  A   Specifically to that I would say yes, I don't recall if
19  my report indicated it that way or if I just misspoke.
20  Q   Okay.  You testified a bit about -- I'm sorry, we can
21  close the report.  Thank you, Madam Clerk.  You testified
22  about luxury vinyl tile.  Do you remember that?
23  A   Yeah.
24  Q   And I think that's referred to as LVT, correct?
25  A   Correct.

41 (Pages 158 - 161)

Page 162

1  Q   I know that Mr. Hushka asked you this, and I don't mean
2  to be redundant.  But I'll be honest, it's a phrase I didn't
3  really know until a week ago.  What is luxury vinyl tile?
4  A   It's a laminate flooring of some sort essentially.
5  There's various different types of floorings that can be
6  classified as LVT.
7  Q   Does an apartment building require luxury vinyl tile?
8  A   No.
9  Q   Are there apartment buildings constructed in this day
10  and age -- not historic times -- without luxury vinyl tile?
11  A   I can't speak for them, but I would assume probably
12  there are some that don't have LVT in them.
13  Q   Okay.  Did you do anything to ascertain whether or not
14  LVT is part of the design for this building?
15  A   It was installed on one of the floors I believe.  I
16  think the fourth floor had --
17  Q   And you're confident that what you saw is LVT?
18  A   I take that back.  I don't believe there was any
19  flooring installed.
20  Q   Okay.  So why are you assuming a need for LVT in this
21  project?
22  A   There was carpet installed in the bedrooms.  So if some
23  areas had carpet in the rooms but not the entire room being
24  carpeted, my assumption was that it was a typical flooring
25  to apartment, which would be an LVT type product.

Page 163

1  Q   But there are other types of flooring that could have
2  been there.  Or I believe your quote called for additional -
3  - sorry, carpeting, not carpentry.
4  A   Yeah.  Yeah.  It could be a carpet tile.  It could be a
5  padded carpet.  But some type of flooring material would
6  have to be installed over the gypcrete.
7  Q   Okay.
8       MR. VERSTANDIG:  And madam clerk, I'm sorry.  Can
9  we go back to the same docket entry?  I will admit that I'm
10  trying not to hop around as badly as I think I am.  At this
11  time I'd like to go to Page 21, please.
12  BY MR. VERSTANDIG:
13  Q   Now, here you indicated that ceiling fans are
14  approximately 95 percent complete, correct?
15  A   Correct.
16  Q   Okay.  And on the second floor you observed them in all
17  units.
18  A   That's what I recall, yes.
19  Q   Same for the third and fourth floor, right?
20  A   Correct.  Correct.
21  Q   I'm sorry.  I literally didn't hear you, and I
22  apologize.
23  A   That's correct.
24  Q   Okay.  And you said that there's only minor if any
25  punch items -- punch list items remaining, correct?

Page 164

1  A   That's correct.
2  Q   If any means there may not be any, right?
3  A   That's possible.
4  Q   Okays.  Why is it 95 percent and not a hundred?
5  A   The way I classify percent completion is typically the
6  last five percent of a project isn't deemed fully completed
7  until a full punch list and detailed walk-through with
8  either owner or stakeholders have been completed.  So that's
9  why even though it may be complete, I deem it as 95 percent
10  complete until it's been verifiably completed with an
11  official punch list with owner and stakeholders.
12  Q   So if it's possible that there wouldn't be punch list
13  items, this might actually be a hundred percent, right?
14  A   It is possible, yes.
15  Q   Okay.  So for each of your approximations of progress,
16  five percent that's been deducted, for wont of a better
17  term, is hypothetical.
18  A   I guess that's based on my experience in project
19  closeout.  It also relates to retainage payment.  Typically
20  retainage payment isn't released to subcontractors until a
21  punch list is formally completed and items are checked and
22  verified to be completed.  So when I think about fully
23  complete, I think about a completed punch list when a
24  building is being turned overr and then the retainage
25  payment is paid to a subcontractor.

Page 165

1       MR. VERSTANDIG:  Madam Clerk, this time I promise
2  that I actually an done with this document.
3  BY MR. VERSTANDIG:
4  Q   Now, we talked -- and Mr. Hushka mentioned this again a
5  moment ago about the fire extinguishers and the cavities for
6  them in the hallways, correct?
7  A   Correct.
8  Q   Okay.  And you said that you thought they seemed high.
9  And again, that's a paraphrase, not a quote.
10  A   That's correct.
11  Q   Did you check the state municipal -- whatever the
12  applicable building code would have been?
13  A   I didn't, no.
14  Q   Are you familiar with South Dakota's building codes?
15  A   I believe that it's a similar building code nationally.
16  There may be some local jurisdictions that provide, but
17  generally speaking it's international building code.
18  Q   Did you measure the height from the floor?
19  A   I don't recall measuring specifically.
20  Q   So you eyeballed it and you didn't look at the local
21  building code.
22  A   I also didn't include any of that in the cost to
23  repair, either.
24  Q   But you included it as an issue with the project.
25  A   I believe I referred to it as a potential issue.

42 (Pages 162 - 165)

Page 166

1 Q   Okay.  And going back to things that weren't counted.
2 You didn't count the number of toilets on site, did you?
3 A   I personally did not.
4 Q   Did a member of your team?
5 A   I don't believe so.
6 Q   That would impact cost of completion, would it not?
7 A   When I put together my cost of completion, I'm assuming
8 best case scenario that materials are on site.  So if it
9 didn't account for it, it would be more cost.
10 Q   Okay.  You talked about the broken boxed toilet at one
11 point.  Do you remember that?
12 A   I don't recall that.  Can you reference when that was?
13 Q   I'm not trying to be a smart aleck.  Your testimony
14 this morning.
15 A   Okay.
16 Q   Let me ask it differently then.  Did you observe any
17 broken toilets that have formed a part of your expert
18 opinion in this case?
19 A   I believe that I did.
20 Q   Okay.  Were any of the ones you observed still in their
21 box?
22 A   I don't recall.  I believe so, but I don't recall for
23 certain.
24 Q   And I think you did testify that when toilets are
25 shipped in boxes, there are sometimes issues where they are

Page 167

1 broken or in need of repair, correct?
2 A   Correct.
3 Q   Okay.  And when those issues arise, those are normally
4 covered by a warranty in your experience, aren't they?
5 A   Depending on the situation, if it was a shipping issue,
6 it may not be a warranty issue.  So it may need to be with
7 the vendor.  But in general terms it's possible.
8 Q   In your experience, how often is a builder made to bear
9 the replacement cost of something that arrives in broken
10 condition?
11 A   It it's arrived or if it arrives in broken condition,
12 and it's documented and recorded at the time of receipt,
13 then typically there is a case for warranty.  If it's not
14 documented at the time of receipt, then it's usually bore by
15 the contractor.
16 Q   And you don't know what was documented at the time of
17 receipt here, do you?
18 A   I do not.
19 Q   You would have been able to find that out by
20 contracting Mr. Craig though, right?
21 A   I don't know.  I don't know that answer.  That's
22 assuming that it was documented properly at the time and
23 it's...
24 Q   Well, I'm not asking if it was documented properly.
25 I'm asking if you wanted to find out if something was

Page 168

1 documented at the time of receipt, the project manager or
2 general contractor would have been the appropriate person
3 with whom to make inquiry, right?
4 A   Yeah.
5 Q   In your experience is concrete work normally
6 warrantied?
7 A   If it's not installed per plan, there is a potential
8 for it to be warrantied or warrantable.
9 Q   I didn't mean to cut you off.  I'm sorry about that.  I
10 think you had testified that there was some sort of concrete
11 issue that led to there being a step approaching the
12 building.
13 A   On the alley side of the building I recall a step from
14 the alley to the finished grade of the parking area.
15 Q   Okay.  In your experience would that be within
16 warranty?
17 A   No, because my experience would be that the -- my
18 assumption in this case is that there is -- typically what I
19 see is that a subcontractor will install it per the plan.
20 And if the elevations aren't noted properly on a plan set,
21 then it's not really their responsibility to try to solve
22 it.  What I see is they install it.  If there isn't proper
23 oversight or management, they're trying to complete their
24 scope of work and get paid and get out of the job.
25        So in this particular case, would have to confirm and

Page 169

1 verify that the drawing set had shown an elevation
2 difference.  Regardless if it was shown or not, it's work
3 that has to be repaired to be functional.
4 Q   And you didn't look into what the drawing set did or
5 did not show in this case?
6 A   During our site observation, we did not have that
7 information.
8 Q   Okay.  You're currently sitting in a bankruptcy
9 courtroom, right?
10 A   Correct.
11 Q   You also didn't look into whether the subcontractor had
12 been paid, did you?
13 A   I did not look into whether they had been paid.
14 Q   Okay.  A significant part of your estimate was the cost
15 of Tyvek.  I think you had it at about $195,000.  Does that
16 sound right?
17 A   That was for the installation of all the siding.  In
18 addition to that was replacement of Tyvek.  Or included in
19 that, excuse me, was the installation for Tyvek.  The
20 majority of that scope was the installation of the metal
21 panels on the exterior of the building.
22 Q   And when did you last observe the existence or lack
23 thereof of Tyvek on this building?
24 A   It would be our most recent site visit, which would be
25 when we prepared the opinion for cost of work.

43 (Pages 166 - 169)

Page 170

1    MR. VERSTANDIG: Madam clerk, could we please pull
2 up docket entry 182-2?
3 BY MR. VERSTANDIG:
4 Q   Does this appear to be the building that you've
5 inspected?
6 A   Yes, it does appear that way.
7 Q   And if we could scroll to the second page, please.  I
8 can't believe I'm asking this question, but I'm going to.
9 Is the thing clearly labelled Tyvek what you have referred
10 to as Tyvek?
11 A   Yes.  That's what I'm referring to.
12 Q   Okay.
13 A   Building wrap.
14 Q   Was that Tyvek there when you last inspected?
15 A   What was the date of this photo?
16 Q   If I answer that question, Mr. Hushka is going to
17 object.  So I'm just asking if what you saw was there.  Or
18 if you don't remember, that's a perfectly fine answer.
19 A   I don't recall.  I'm not sure whether or not this
20 section of Tyvek had been repaired at the time.  I don't
21 believe it was, but I don't recall specially.
22 Q   Okay.  And could we please scroll to the third page?
23 Just a different angle.  Does this give you any better
24 recollection?
25 A   I don't recall.

Page 171

1 Q   Okay.
2    MR. VERSTANDIG:  That's all I have with that
3 exhibit.  Thank you.
4 BY MR. VERSTANDIG:
5 Q   You had been asked about certain trades.  And that's
6 sort of parlance for subcontractors, right?
7 A   Yes.
8 Q   And Mr. Hushka had rattled off four of them toward the
9 end of your direct examination.  Do you remember that?
10 A   I do.
11 Q   I think you said -- and again, not wanting to put words
12 in your mouth -- that you're not familiar with at least one
13 of them.
14 A   Correct.
15 Q   Okay.  So you don't know which services those trades
16 would or would not be qualified to do?
17 A   I haven't worked specifically with them as a
18 subcontractor, so no.
19 Q   You don't know if those trades employ a master
20 electrician, a properly licensed plumber, a painting crew,
21 or anything else?
22 A   No.
23 Q   Okay.  You don't know if those trades perform one
24 discrete area of work or a multitude of areas of work, do
25 you?

Page 172

1 A   No.
2 Q   You don't know what those trades charge as your usual
3 and customary rates, do you?
4 A   No.
5 Q   And you don't know if those trades earned any money for
6 their work on Ruins, do you?
7 A   I don't know that specifically.  If there is a lien on
8 the building for that particular subcontractor, I would
9 assume that would imply that they are owed money, but I
10 don't know that for sure.
11 Q   Now, you viewed this building three times and you're an
12 expert in commercial construction, right?
13 A   Correct.
14 Q   Let's turn this around.  Let's not focus for a second
15 on the cost of completion.  Do you have a sense of what the
16 cost to get the building into its current condition would
17 have been?
18 A   If I were to put this -- if I were to do an estimate of
19 an initial build, I would imagine that the cost would be
20 anywhere between $225,000 to $250,000 per residential unit.
21 It's typically how -- just a ballpark range.  I don't know
22 how that fits into the math, but that's generally speaking
23 where I would put it.
24 Q   So you said $225,000 to $250,000.  Correct?
25 A   Correct.

Page 173

1 Q   And if I told you that $225,000 times 63 units --
2 that's what you have in your report, right?
3 A   Correct.
4 Q   Was $14.1 million and change.  That would sound right,
5 yeah?
6 A   Cost of construction it's the very low end.  And I
7 would say that's probably at the start of the project pre-
8 pandemic.
9 Q   Okay.
10    MR. VERSTANDIG:  Your Honor, I would like to take
11 a brief recess before I conclude with the witness just so I
12 can speak to my client.  I know we were hoping to get closer
13 to the top of the hour.  And I'm sorry if I moved a little
14 to quickly.
15    THE COURT:  No, now is a good time to take a
16 break.  So ten minutes.  Maybe get back around 12:35.
17    MR. VERSTANDIG:  Sounds good.  Thank you, Your
18 Honor.
19    (Recess)
20    THE COURT:  Please be seated.  All right.  We're
21 back on the record with bankruptcy Case Number 25-30004, In
22 re The Ruins.  And when we broke, you were about to complete
23 your cross-examination, Mr. VerStandig.  You may proceed.
24    MR. VERSTANDIG:  Thank you, Your Honor.  Just a
25 couple more questions.

44 (Pages 170 - 173)

Page 174

1  BY MR. VERSTANDIG:

2  Q   Mr. Gehrtz, from everything you've testified to today,

3  while it would certainly take materials and effort, it would

4  be very feasible to complete this project, correct?

5  A   I think it's feasible to complete this project, yes.

6  Q   Okay.  And in your experience in the field, completing

7  the project would add significant value to it, correct?

8       MR. HUSHKA:  Objection.  I believe beyond the

9  scope of his certified expertise regarding appraisal.

10      THE COURT:  No, I'll allow it.

11      MR. HUSHKA:  Okay.

12      MR. VERSTANDIG:  I didn't ask for the number.  I

13  just asked whether or not it would add value.

14      THE COURT:  Yeah.  I overruled the objection.

15  Sorry.  I wasn't very articulate about that.  So you may

16  answer.

17      THE WITNESS:  Okay.  Furthering the construction

18  would add value to the project.

19      MR. VERSTANDIG:  Thank you, Your Honor.  Nothing

20  further for this witness.

21      THE COURT:  Mr. Feist, do you have any questions?

22      MR. FEIST:  No, I do not.  Thank you.

23      THE COURT:  Is there anybody else on the video

24  conference that is not appearing right now, that you have

25  your video conference equipment off?  Okay.  All right.  I

Page 175

1  only permit those parties that appear by video conference or

2  in-person to offer evidence or cross-exam.  There are no

3  other parties indicating a -- wishing to ask questions or

4  eligible to ask questions, so I'm going to go back to

5  redirect.  Mr. Hushka?

6       MR. HUSHKA:  Thank you, Your Honor.

7       REDIRECT EXAMINATION OF MATTHEW GEHRTZ

8  BY MR. HUSHKA:

9  Q   Mr. Gehrtz, one thing I want to clear up to make sure I

10  am understanding it correctly.  Mr. VerStandig asked you

11  about various assumptions you made versus the completed

12  plans and everything of that nature.  And I just wanted to

13  clarify to make sure I have it right or for you to correct

14  me.  You said I believe at the time of the first inspection

15  that you made assumptions because you had not viewed

16  completed plans.  Is that accurate?

17  A   That's correct.

18  Q   But you ultimately did receive at some point a plan for

19  The Ruins development?

20  A   That's correct.

21  Q   When was that?

22  A   It was during my development of the cost of work,

23  opinion of cost of work.

24  Q   So prior to your third report?

25  A   Prior to my report.

Page 176

1  Q   When making your third report and your opinions, the

2  assumptions that you made, were you basing that on what was

3  actually to be constructed and just your views, or how did

4  those two interact?  I'm not sure I understood or fully

5  tracked that.  Were you assuming -- were you using your same

6  assumptions from the first report or were you actually

7  making assumptions to complete per project specifications?

8  A   I was making my cost on the project and specifications,

9  but also referencing my assumptions and my observations.

10  Sorry, my observations from my prior reports.

11  Q   So your observations were from prior, but you were

12  tying those to relate it to how this project is supposed to

13  be completed?

14  A   Correct.

15  Q   Thank you.  One thing on that report --

16      MR. HUSHKA:  and Sharon, if I can have you pull up

17  ECF 60-1, Page 406.  This is that summary exhibit that was

18  admitted.

19  BY MR. HUSHKA:

20  Q   While she's getting that pulled up, Mr. Gehrtz, do you

21  recall being asked questions regarding ceiling fans from Mr.

22  VerStandig?

23  A   Yes.

24  Q   And specifically was asked that you only noted it as 95

25  percent completed even though it may have been a hundred

Page 177

1  percent completed.  Is that an accurate summary?

2  A   Yes.

3  Q   Do you recall -- and we'll get this pulled up.  Did you

4  have any costs associated with completing ceiling fan

5  construction in this summary?

6  A   No.

7  Q   Even though you had it down as 95 percent complete and

8  allowing for a punch list five percent, you didn't associate

9  any cost with that five percent?

10  A   Correct.

11  Q   The estimates that you did provide in here are your

12  opinions as to cost to completion, when was this provided

13  again?

14  A   I believe it's dated May 13th of 2025.

15  Q   Would that have been post-COVID-influenced inflation?

16  A   Yes.

17  Q   And these are the costs essentially post-COVID, not

18  pre-COVID?

19  A   Correct.

20  Q   When you were asked to provide your opinions in this

21  report, were you retained to try to figure out the cost if

22  these same subcontractors were used that had begun the

23  project, or were you asked to provide a general estimate

24  regarding general market for the cost?

25  A   General market for the cost.

45 (Pages 174 - 177)

Page 178

1  Q   Is that why you didn't talk to any of the
2  subcontractors that had performed work?
3  A   Correct.
4  Q   As for the subcontractors that did perform work on this
5  project -- this is a continued hearing.  So earlier on Mr.
6  Craig had testified that he brought in subcontractors from
7  out of town and had essentially stacked them to work on this
8  project and the other two projects.
9      MR. HUSHKA:  Mr. VerStandig, you can object if you
10 believe I'm mischaracterizing that.
11 BY MR. HUSHKA:
12 Q   But if crews were brought in from outside the Watertown
13 region, do you believe that your knowledge and your general
14 experience and the quotes that you used are applicable if
15 the crews that performed work on this were brought in from
16 outside the region?
17 A   I do.
18 Q   And do you have any trepidations or reservations or
19 concerns as we sit here today about the accuracy of the
20 projections and opinions that you provided?
21 A   No, I don't.
22     MR. HUSHKA:  Nothing further, Your Honor.
23     THE COURT:  Recross?
24     MR. VERSTANDIG:  None, Your Honor.
25     THE COURT:  On behalf of Watertown Development

Page 179

1  anything further?
2      MR. FEIST:  No, thank you.
3      THE COURT:  Okay.  Then you may be excused.
4      MR. HUSHKA:  Your Honor, procedurally -- I'm going
5  to defer to the court on how it wants to proceed.  Our next
6  witness would be Mr. Josh Luther would be another expert,
7  would be our appraisal expert.  Obviously, his testimony I
8  believe is going to be much longer than the one hour that we
9  have today.  So I don't know if the Court would want to keep
10 him on the stand for the five days or if we want to just
11 call him on Tuesday, or how the Court wants to proceed.
12 Also obviously wanting to maximize times that we can
13 hopefully wrap this up next week as well.  So I don't -- I'd
14 defer to the Court to how it wants to handle this
15 logistically.
16     THE COURT:  So can you tell me if you are asking -
17 - if you are going to call any other witnesses other than
18 Mr. Luther, or is he your last witness?
19     MR. HUSHKA:  He is not our last witness.  We also
20 I believe will be calling Ms. Danielle Harless as well.  And
21 I believe we may call Mr. Craig.  We haven't made a decision
22 as to that.  While Ms. Harless' testimony would be
23 significantly shorter, it builds upon the expert opinions
24 that will be provided by Mr. Luther.  And so calling her now
25 would be a bit confusing or there wouldn't be foundation I

Page 180

1  believe for some of the various things she will testify.
2      THE COURT:  Okay.  So I'm going to look to Debtor.
3  Do you have a witness that you think could be taken out of
4  order.  Or if you would prefer to, you can definitely follow
5  the order that you want to, just like Red River State Bank
6  is.  And then do you have an opinion about whether you think
7  it would be helpful to just begin with that witness knowing
8  that we have to have a cutoff somewhere between 1:30 and
9  1:45?  So what are your thoughts about that?  About the
10 logistics of the remaining hearing.  Go ahead.
11     MR. VERSTANDIG:  Yeah.  With the witness out of
12 order, I think the answer is twofold, but not helpful.
13 While it's probably theoretically doable, we also didn't
14 expect any of our witnesses were going to testify today.  So
15 they are not exactly here and ready.  So I think one happens
16 to be watching on Zoom, but that's not something that we're
17 really prepared to launch into at the moment.
18     I will say generally I don't think any of our
19 witnesses, with the possible exception of Mr. Craig are
20 going to be overly loquacious.  I expect it will be a
21 relatively brief presentation.  There may be a number of
22 them, but they will be short and punchy on Tuesday.
23     I can certainly respect and appreciate that the
24 bank doesn't want someone on the stand for five days knowing
25 that would limit their ability to communicate with them

Page 181

1  during the recess.  I'm also indifferent to that.  Obviously
2  if they want to put them up, that's fine by me and I'm happy
3  to cross them on Tuesdays.  But there may be better flow to
4  having a two-minute recess between direct and cross as
5  opposed to 24 times -- what is it, 120 hours?
6      THE COURT:  So is it the bank's preference to just
7  wait until Tuesday to begin?  Am I understanding?
8      MR. HUSHKA:  I believe it would be, Your Honor.
9      THE COURT:  Okay.  So I'm hearing lots of
10 witnesses left.  Are we going to be able to finish on
11 Tuesday?
12     MR. HUSHKA:  I believe Mr. Luther may be a similar
13 timeframe to what Mr. Gehrtz was today.  Again, not knowing
14 what the cross would be from the other side, I believe my
15 outline for his direct is slightly shorter length, but a
16 similar -- he has three different or four different
17 appraisal reports that we're at least going to touch on,
18 focusing more on one than the rest of them.  But at least
19 touch to show the kind of flow of valuations that had been
20 provided in this case.  I believe or I am anticipating Mr.
21 VerStandig will have some objections and we'll have some
22 cross as it relates to him as well.  And I see him nodding
23 in affirmance.  So I believe that would be most of the
24 morning.  Ms. Harless, I believe will be much shorter than
25 our experts.  But -- hour-and-a-half at most.  And then

46 (Pages 178 - 181)

Page 182

1  again, I don't know -- again, we haven't made any decision
2  as to Mr. Craig. I think it will depend on what comes in
3  with those other two. And then I don't know what Mr.
4  VerStandig believes is necessary or not for him.
5      MR. VERSTANDIG: So, Your Honor, from our side,
6  whether we try to synergistically do it through cross or do
7  it as direct, Mr. Craig is going to take the stand. In
8  terms of our other witnesses -- and I'm pulling up the list
9  as we speak -- it is more likely than not that Barry Matson
10  and Jason Biggins will each testify, but I don't think
11  either of them are going to be very long. And I think my
12  direct will probably be well under half an hour for each of
13  them.
14      Ms. Craig may retake the stand. But similarly,
15  whether it's Ms. Cathcart or myself, I would anticipate
16  that's 10 to 20 minutes. And then obviously we're going to
17  use the weekend to assess strategy. But the other people on
18  our list would be similar duration. And that's without
19  cross. And I don't know how much time the bank would take
20  there. I think Tuesday is certainly going to be a day. And
21  I recognize, or at least I hope that no one is going to
22  suggest Wednesday morning as the extension of Tuesday.
23      THE COURT: Well, that was my next question. I
24  don't remember where the parties were, but I was highly
25  reluctant to use Wednesday. And I assume that means that

Page 183

1  you have a conflict, Mr. VerStandig?
2      MR. VERSTANDIG: Your Honor, honestly, no. I'm
3  supposed to take a one-way rental car from Fargo to Maine
4  and spend the holiday in Canada, which is my idea of
5  dreaminess. But I don't know that I want to ask everyone to
6  be here the day before Thanksgiving. That seems a little
7  bit cruel.
8      THE COURT: I think so, too. Do you have any
9  conflicts on behalf of Red River State Bank?
10      MR. HUSHKA: I don't. I'm looking at my co-
11  counsel and --
12      MS. TANABE: On Wednesday? Wednesday morning?
13      MR. HUSHKA: Red River State Bank would be
14  available Wednesday morning if need be.
15      THE COURT: Not excited. What's the backup plan?
16  Will you bring up my calendar, Sharon?
17      MS. TANABE: Your Honor, did we say Monday is not
18  available, Monday the 24th?
19      THE COURT: So --
20      MS. TANABE: We are open on Wednesday the 26th. I
21  just was confirming.
22      THE COURT: Trying to remember. I ended up
23  scheduling some hearings because I thought it was not
24  available. I don't know. Mr. VerStandig?
25      MR. VERSTANDIG: Assuming the availability of

Page 184

1  Erica, there is no reason -- I'm supposed to come out on
2  Monday at the moment, but I'm sure I could rejigger that to
3  Sunday.
4      MS. TANABE: My co-counsel just reminded me that
5  we do have court in another case on Monday. So we can
6  definitely be here on Tuesday and Wednesday, but not Monday.
7      THE COURT: Okay. Court in different -- different
8  court, not this court?
9      MR. HUSHKA: Southern District in New York.
10      MS. TANABE: Yes.
11      MR. HUSHKA: On Monday morning. And then I
12  believe we do have the status conference in Hartford and CCU
13  and Promark at 2:30 on my calendar at least.
14      THE COURT: Yeah. That's -- yeah. So the morning
15  is out you're telling me, right? Because I -- yeah, the
16  morning is out. And so the afternoon I did schedule some
17  hearings, which could take not that much time. But I don't
18  know. If we wanted to start in the afternoon and carry it
19  over, we could do that. When did I schedule them? Are they
20  at 2:00 or -- okay. So in theory we could do 3:00 to 5:00.
21  Does your flight get you in here by then?
22      MR. VERSTANDIG: I'm actually scheduled to land a
23  hair after -- a hair before 2:00 p.m. at the moment. So if
24  planes land on time, I'll be there Monday anyway without
25  rejiggering travel.

Page 185

1      THE COURT: Do we want to put two hours in on
2  Monday? That would be something your witness could
3  accommodate?
4      MR. HUSHKA: I guess -- obviously we haven't
5  confirmed with Mr. Luther, but we would all be available if
6  we want to tentatively put that on the calendar. And we can
7  inform the Court ASAP if he would not be available for some
8  reason.
9      THE COURT: Oh, is he on video? Do you want to
10  ask him?
11      MR. LUTHER: Yes, I am available. Sorry.
12      THE COURT: Oh, great. Well, that worked out
13  handy. All right. I mean, I think getting two hours in on
14  direct might be a great idea.
15      MR. HUSHKA: I agree. I think that if nothing
16  else, we could find a good stopping spot. And one day
17  overnight I am a lot more comfortable with than six days
18  between now and Tuesday.
19      THE COURT: Me too. And then it's important that
20  I remember what's already been testified to. So that's a
21  great help, to do it on Monday afternoon rather than now.
22  Okay. So we'll resume then on Monday. If you're not
23  finished, which I'm hopeful that that will be a really good
24  start -- what's the following week? I think I have some
25  flexibility the following week. Monday, December 1st is

47 (Pages 182 - 185)

Page 186

1  open. You know what? I have some flexibility the following
2  week which we can visit about late on Tuesday if it looks
3  like it's not going to happen. Do you want to preview that
4  for me or do we want to just wait and hope that Tuesday is
5  going to work?
6      MR. VERSTANDIG: Your Honor, if it's going to be
7  the following week, there would be a strong preference for
8  it to be Monday. I'm looking. I have a non-essential and
9  certainly re-schedulable medical appointment on Tuesday.
10  And then I don't know if anyone else is headed to winter
11  leadership, but that's Wednesday, Thursday, Friday.
12      THE COURT: So it looks like I have Monday, right?
13  What is that on there? Okay, great. Monday. I have Monday
14  the -- is it the first of December? Yeah. So we can do our
15  best on Tuesday.
16      MR. VERSTANDIG: Your Honor, for this coming
17  Monday if there is an issue with my flight and it's not
18  going to be on time, may I appear via video again from
19  presumably a hotel in Chicago or wherever it may be without
20  filing a motion?
21      THE COURT: Yes, you may.
22      MR. VERSTANDIG: Thank you.
23      THE COURT: Yes. Okay. I think we have the
24  logistics. We are going to start Monday at 3:00. I may
25  touch base with the security officers to see if we can stay

Page 187

1  until 6:00. Is that going to impose any -- yeah, that will
2  be a problem? If it is, it is. I get the --
3      MR. HUSHKA: I would have to confirm with my wife
4  that she can do daycare pickup. But if she can, it's not a
5  problem. But I don't know that as we sit here.
6      THE COURT: Okay. So I will reserve. I
7  completely understand those restrictions and obligations.
8  So we'll shoot for wrapping up by 5:00 unless there is some
9  opportunity extend. It wouldn't be any later than 6:00 I
10  know because the building closes. And they'll get really
11  angry with me. And then most of the Tuesday I at this time
12  have one hearing in South Dakota that I know is going to go
13  away. But that would be like a five-minute hearing. Oh, I
14  might have to move another one, too. I've got another
15  Minnesota hearing. I'll do my best to clear it so we can
16  proceed.
17      All right. Any other concerns about conflicts? I
18  didn't ask you, Mr. Feist. Are you available Monday
19  afternoon, all day Tuesday?
20      MR. FEIST: Yes, I am. Thank you.
21      THE COURT: Okay. Great. All right.
22      MS. TANABE: Just for clarity.
23      THE COURT: Sure.
24      MS. TANABE: Is The Ruins disclosure statement
25  hearing off the calendar on the 25th?

Page 188

1      THE COURT: Not yet.
2      MR. VERSTANDIG: Yeah. We're going to file an
3  amended disclosure statement to go with the new plan. We
4  don't plan to proceed on that.
5      THE COURT: Okay.
6      MS. TANABE: What time would you like us here on
7  Tuesday the 25th?
8      THE COURT: I don't have anything in the morning.
9  Do we start at 8:30 again? That was early.
10      MS. TANABE: 8:30 is good.
11      THE COURT: Yeah. No, I'm not -- yeah. 8:30 was
12  early. 8:30 is great for Tuesday. 3:00 for Monday.
13      As to the disclosure statement, there have been
14  cases where amended disclosure statements are filed and no
15  party objects to the fact that there has been sufficient
16  notice. But the parties here anticipate that would be a
17  problem and you would need to serve it from the beginning
18  ant notice it for 28 days. Is that your understanding?
19      MR. VERSTANDIG: Your Honor, transparently, we'd
20  love to go forward with it on Tuesday. We'd love to argue
21  that it's not such a material amendment as to be an issue.
22  But we've added a plan trustee. I don't know that I'm going
23  to win that argument in good faith. And I think adding a
24  plan trustee probably does require us giving the postal
25  service some more money.

Page 189

1      THE COURT: Okay. And you don't disagree, Red
2  River State Bank?
3      MS. TANABE: Correct.
4      THE COURT: Okay. All right. So then I'm going
5  to anticipate that that will not go forward if I see an
6  amended disclosure statement. So we'll cross that bridge in
7  terms of when that next hearing will be on another day. So
8  that should leave most of the day on Tuesday for that.
9      MS. TANABE: And then just to clarify, we could
10  potentially spill over into the 26th, or did you want us to
11  not go forward --
12      THE COURT: I would really like you to not.
13      MS. TANABE: Okay.
14      THE COURT: I think if Monday the 1st is
15  available, I think we should not proceed on the 26th.
16      If it happens to be a circumstance we're on the
17  last witness and we have a half hour of testimony or some
18  really unusual circumstance like that, I would consider it.
19  But I'm going to try to avoid it in the interest of the
20  sanity of all people participating. Okay. Anything
21  further? Anything else you can think of?
22      All right. This matter stands in recess until
23  3:00 on Monday.
24      (Whereupon these proceedings were concluded at
25  12:59 PM)

48 (Pages 186 - 189)

Page 190

1          C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     *Sonya L. Ledanski Hyde*

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 2, 2025

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

**[& - 27,000]**  Page 1

| & |
|---|
| **&**  4:20 5:9 11:4,5,13 12:4 12:5,8 |

| 0 |
|---|
| **09/26/2025**  3:2 |

| 1 |
|---|

**1**  24:5 83:22,25 84:2 95:10 115:14 132:4
**1,000**  123:2
**1,695,966**  152:19
**1,695,967**  130:6 152:5
**1-401**  6:9
**1.6**  138:7
**1.69**  139:9
**1.7**  24:3,8
**10**  40:24 182:16
**10,000**  11:11 110:11,18 117:5
**10/10/2025**  3:6
**10/17/2025**  3:10
**100**  5:19
**100,000**  127:6
**107**  131:22,25
**109**  3:2
**10:15**  79:11
**11**  3:2,5,9 48:10
**11501**  190:23

**12**  40:25 41:1
**12,500**  21:7 111:8
**120**  181:5
**120,000**  119:2 119:25
**12151**  190:6
**125**  110:10 145:22
**125,000**  128:18
**12:30**  97:9,10
**12:35**  173:16
**12:59**  189:25
**13**  50:25
**131**  3:6
**132**  6:10
**13th**  177:14
**14**  53:8
**14.1**  173:4
**142**  6:4
**143**  3:10
**147**  125:16
**14th**  4:22
**15**  40:24 46:12 55:13 79:11 141:15 160:3,3
**15,000**  120:18 126:18
**1500**  5:19
**16**  56:15 160:3
**160,000**  125:8
**1630**  4:5
**17**  40:25 41:1 44:12 57:18
**174**  125:16
**175**  6:4

**17th**  32:8,11 92:6
**18**  59:1 153:22 154:19
**182,712**  115:17
**182-2**  170:2
**19**  60:5
**1930s**  142:15
**195,000**  114:18 169:15
**1:30**  180:8
**1:45**  180:9
**1st**  1:7 2:6 185:25 189:14

| 2 |
|---|

**2**  66:22 90:16 98:7,19 100:18 115:14,17 190:25
**2,500**  116:1,15
**2,750**  129:2
**20**  2:9 37:20 39:23 50:19 61:10 84:23 154:17 159:9 159:20 182:16
**2007**  8:24 9:2
**2011**  9:2,3
**2015**  12:5
**2016**  12:7
**2017**  80:7,7
**2018**  10:4
**2020**  153:24 154:5,16
**2021**  154:5
**2024**  20:3,8 32:8,11,14

**97:9 157:5
2025**  2:9 177:14 190:25
**206**  4:22
**21**  61:21 80:2 163:11
**218**  4:13
**22**  6:6 62:12 137:9
**225,000**  172:20 172:24 173:1
**24**  52:21 65:12 181:5
**24th**  89:5 92:11 97:8 183:18
**25**  38:16 40:14 42:6 56:5 66:2 160:4,14,18
**25,000**  124:7 127:16
**25-30002**  1:3
**25-30003**  1:11
**25-30004**  1:19 7:3 79:15 173:21
**250,000**  172:20 172:24
**25th**  187:25 188:7
**26**  66:14
**26th**  183:20 189:10,15
**27**  67:8
**27,000**  105:2 108:13

**27th**  89:5
**28**  68:24 160:4
  160:4 188:18
**293,951.43.**
  137:8
**2:00**  97:11
  141:17 184:20
  184:23
**2:30**  97:9
  184:13

**3**

**3**  34:7 98:7,19
**3,000**  117:21
**30**  71:2 154:17
**30,000**  122:12
  124:19 125:19
**300**  5:11,11
  190:22
**309**  160:22
  161:1
**31**  71:24
**315**  96:1
**32**  16:7,9 73:7
**33**  74:1
**330**  190:21
**34**  74:16
**3429**  5:3
**35**  84:23
**36**  76:20
**360**  78:2
**39**  137:6
**39,555**  107:12
**3:00**  184:20
  186:24 188:12
  189:23

**4**

**401**  83:22,25
  84:2
**402**  88:19 95:2
  95:16
**403**  95:5 98:20
  98:25
**404**  95:2,5
  98:21,25
**405**  99:5
**406**  6:10
  131:22 132:2,3
  176:17
**42**  124:25
**43**  137:18
**45**  40:22
**4th**  20:22

**5**

**5,250**  118:11
**50**  14:20 40:23
  150:4,7,9
**50,000**  102:1
  102:25 103:2
  105:3 106:9
  109:10 120:9
**51,000**  121:2
**55402**  5:20
**57101-1030**
  4:23
**57104**  5:12
**581**  77:5
**58102**  2:7 4:14
**58102-4246**  4:6
**58106-9231**  5:5
**5:00**  184:20
  187:8

**5th**  5:19

**6**

**6,000**  112:3
**60**  51:14,19
  125:23 132:3
**60,000**  110:1
**60-1**  6:9,10
  25:22 78:22
  83:19,20,21,25
  84:2,4 88:19
  95:2 98:20,24
  131:22 132:5
  160:22 176:17
**61**  159:8
**63**  96:1 124:1
  159:1,3,5,5
  173:1
**655**  2:6
**6:00**  187:1,9

**7**

**7**  3:2,6,9
**702**  80:3
**703**  103:12,13
  104:5 134:20
  134:22
**721**  80:2
**75**  56:2,7 73:7
**752282**  80:8

**8**

**8,700**  121:18
**8/25/84**  6:4
**80**  29:23
  110:10,12
**80,000**  113:1
**801**  79:25
  80:19

**84**  6:9
**8:15**  2:10
**8:30**  188:9,10
  188:11,12

**9**

**9,000**  111:20
**90**  68:4 71:7
**90,000**  113:17
  126:5
**9231**  5:4
**95**  46:21 48:14
  54:11,20
  163:14 164:4,9
  176:24 177:7
**99**  34:16

**a**

**aarestad**  22:20
  148:14,17
  159:13,17
**aarestad's**
  160:8
**aarstad**  20:6,6
**abilities**  153:3
**ability**  180:25
**able**  43:3,17
  45:15,19 46:9
  54:19 62:21
  69:12 73:24
  140:1,7 141:9
  155:15,20
  167:19 181:10
**above**  50:4
  75:16 91:9,14
**absence**  158:19
  158:21

absent  44:21
absolutely
  30:18 82:3
ac  156:18,23
  157:1
accept  81:18
  138:1
access  39:15
accessibility
  60:17 107:25
  124:10
accessible
  62:15
accessories
  62:12,13,14
  63:11,12,13,15
  69:25 124:8,9
accommodate
  45:17 185:3
accomplished
  43:4
account  144:23
  147:17 157:17
  157:20 166:9
accounted
  137:10
accounting
  122:18 130:25
  136:15 157:12
accuracy  135:9
  178:19
accurate  13:12
  13:13 17:9
  29:5 30:17
  38:22 58:11
  90:13 98:11
  105:8 117:22

148:3 175:16
177:1 190:4
accurately
  17:12 27:15
  95:20 155:18
accustomed
  79:21
achieve  86:25
acid  50:16
acquiring
  130:24
acronym  56:24
act  153:22
  154:3
acted  81:1
  154:6,9,20
acting  37:24
  85:17 153:13
activities  12:24
  16:21 87:12
  100:5
actual  32:24
  39:9 44:23
  54:25 62:17
  74:12 75:7
  95:7 102:23
  116:4 135:10
  149:22
actually  13:1
  17:7,17,18
  24:1 41:3
  59:16 130:18
  135:15 147:4
  153:14,21
  164:13 165:2
  176:3,6 184:22

adapt  28:20
add  174:7,13
  174:18
added  188:22
adding  188:23
addition  17:13
  17:24 31:22
  32:18 38:5,15
  41:1,17 50:5
  92:1 110:25
  120:20 126:24
  127:2 128:5
  169:18
additional  7:9
  9:22 21:8
  32:10,16,18
  34:1,3 36:15
  38:12 41:15
  47:24 48:20
  53:23 71:9
  74:16,19 89:6
  100:7 106:23
  113:24 118:2
  121:8 130:23
  163:2
additionally
  137:9
address  35:10
addressed
  34:17,18 52:16
  74:21 77:13
adhesive  35:1
adjusted  45:17
administered
  1:3,11
administration
  10:1 15:24

16:7
administrative
  10:21 15:21
admissibility
  25:4 135:7,10
admissible
  80:12,20 81:7
  103:17 134:19
admission  80:3
admit  80:16
  163:9
admitted  84:4
  103:18 132:5
  134:20 176:18
admittedly
  141:8
advance  131:7
  131:9,11,13
advancement
  89:18 97:22
  100:3
advice  136:1
advised  7:6
aesthetic  43:4
  59:4 115:7
  142:2,5,6,20
  143:2,11,13,16
  143:21,25
  144:3
affected  21:18
  30:20 41:22
affidavit
  159:12
affidavits
  103:21
affirmance
  181:23

**afternoon**
184:16,18
185:21 187:19
**age** 162:10
**agent** 22:20
153:13 154:6
**ago** 80:15
144:16 154:9
162:3 165:5
**agree** 24:8
142:8,12,18
143:2,8 150:9
152:16 158:14
159:14 185:15
**ahead** 17:18
180:10
**air** 33:8 71:4
156:5
**aircraft** 80:2
**albeit** 143:14
**aleck** 166:13
**align** 107:23
**alleviate** 95:11
**alley** 73:13
107:24 168:13
168:14
**allotment**
110:12
**allow** 31:9
34:22 95:14
97:20 107:23
133:15 134:17
174:10
**allowance**
110:10 116:1
119:8,9,11
120:18

**allowances**
120:20
**allowed** 102:16
103:12 137:12
139:25
**allowing** 38:10
78:1 83:2
177:8
**allows** 37:21
119:12
**aluminum** 55:8
**amended** 188:3
188:14 189:6
**amendment**
188:21
**american**
24:17
**amount** 108:2
124:25 127:13
155:12
**analysis** 80:11
114:10
**angle** 170:23
**angles** 94:7,16
**angry** 187:11
**answer** 134:10
148:11 156:19
167:21 170:16
170:18 174:16
180:12
**answers** 96:25
123:8 135:23
148:1
**ant** 188:18
**anthony** 4:25
**anticipate**
182:15 188:16

189:5
**anticipated**
82:9 83:14
**anticipating**
181:20
**anybody** 23:9
135:21 174:23
**anyway** 184:24
**apartment**
43:8,10 67:25
142:3,7,9
143:18,18
149:24 162:7,9
162:25
**apartments**
125:12
**apologies**
85:25
**apologize**
163:22
**appeal** 137:21
137:25
**appear** 33:15
43:3 68:7
118:3 170:4,6
175:1 186:18
**appeared** 33:6
41:5 44:14,24
46:20,24 47:14
47:19 48:16
51:5,22 53:16
54:14 55:10
60:13 61:12
64:19,20 66:16
66:18 68:5
69:10 72:3,14
72:16 90:25

92:3 93:11
97:19 100:6
124:12 126:9
156:8,9,12
**appearing**
174:24
**appears** 24:22
36:24 48:21
91:24 161:12
**appendix**
78:12
**apples** 85:10
85:10
**appliance**
45:12 64:24
65:9,10
**appliances**
45:17 63:22,24
63:25 64:15
65:4 87:11,13
93:10 124:20
124:23 140:3
157:23 159:23
159:25 160:2
**applicable**
74:2,11 165:12
178:14
**application**
34:12 55:20
102:18
**applied** 37:5
37:24,24 38:4
39:3,4 77:10
110:9 115:25
119:5 123:23
**applies** 64:7

**apply** 57:20
109:19 145:12
145:14,15,19
**applying**
124:11
**appointment**
186:9
**appraisal**
174:9 179:7
181:17
**appreciate**
137:14 154:2
180:23
**approaching**
168:11
**appropriate**
77:14 135:12
148:1 168:2
**approve** 17:12
**approved** 25:6
**approximate**
91:25
**approximately**
9:21 10:4 11:9
11:10 14:17
21:5 23:16
27:4 39:6
51:15 91:22
109:19 163:14
**approximation**
18:21 27:10
**approximati...**
164:15
**april** 20:3,9,22
32:8,11 52:21
92:6 157:4

**arbitrary** 77:9
**arbitration**
18:4 24:16
**architect** 13:17
**area** 49:9
53:17 55:9
75:7 107:24
108:23 109:17
112:10 116:21
124:12 133:17
150:7 168:14
171:24
**areas** 34:21
38:22 45:10,16
49:17 53:25
55:10 56:22
57:22 58:3,6
61:23 68:10
70:5 91:14
94:16,17,18
100:6 107:24
118:1,3,16
126:24 127:1,2
127:10 133:12
139:1 162:23
171:24
**argue** 188:20
**argument** 7:4
7:5 105:7
188:23
**argumentative**
158:13
**arrive** 28:4
109:2 110:10
120:6 123:24
127:22 135:23

**arrived** 44:17
51:19 58:7
101:16 115:16
125:6 167:11
**arrives** 167:9
167:11
**arriving** 101:5
110:23 111:23
**art** 70:14
**articulate**
103:6 174:15
**articulated**
102:6
**asap** 185:7
**asbestos** 74:7
**ascertain**
162:13
**ascertained**
104:23
**aside** 23:25
**asked** 15:12
16:10,16 25:12
25:12 76:14
102:24 119:23
123:7 144:22
147:3 152:2
162:1 171:5
174:13 175:10
176:21,24
177:20,23
**asking** 22:8
94:13 103:1,1
104:11,14
142:4 145:6
146:10,11,24
147:19 148:23
167:24,25

170:8,17
179:16
**aspect** 15:8
**assembly**
143:17
**assert** 95:4
**asserted** 81:13
**assess** 182:17
**assessed** 36:22
39:13 44:4
**assessment**
157:22
**assign** 29:19
77:17 110:7
135:11
**assigned** 29:13
29:21
**assist** 69:15
**associate** 85:14
177:8
**associated** 29:6
29:12 42:2
57:23 72:2
75:2 77:4,19
107:17 108:14
108:16,20
125:4 126:7
128:4,11,19
129:1 130:9
134:2 140:14
177:4
**assume** 10:15
57:23 72:8
78:6 111:23
118:14,17
125:14 128:3
162:11 172:9

182:25

**assumed**  29:13
49:25 54:3,12
101:3 108:24
116:9 118:20
121:25 122:19
125:4 126:11
127:12

**assumes**
160:18

**assuming**  50:7
51:16 54:20
76:10 111:12
114:7 115:25
117:13 122:17
124:3,25
125:22 127:19
130:17,22
131:4 157:7
162:20 166:7
167:22 176:5
183:25

**assumption**
31:19 33:4
34:16 37:4
38:19,22 40:15
42:8 44:15,17
46:16 51:16
54:1 55:24
58:9 70:1 71:8
71:12 72:1
74:7 75:13
91:10 92:23
105:24,25
108:25 111:23
114:11,14
116:12 117:10

118:23 120:6
124:24 126:13
142:5 148:2
150:21 155:6,9
155:10,11,14
155:21 157:10
162:24 168:18

**assumptions**
15:16 27:18,20
27:21 28:3
29:6 37:1
40:17 55:15
57:19 58:1
101:5 109:17
155:22,24
156:1 175:11
175:15 176:2,6
176:7,9

**ate**  51:13

**attend**  8:13

**attended**  9:1
9:25

**attention**  34:6
88:18 100:20

**attesting**  26:13
99:18

**attorney**  4:4,21
5:2,10,17
148:10,12

**attorneys**  4:12

**attuned**  123:12

**atypical**  72:5

**authorities**
80:1

**automatically**
29:9

**availability**
183:25

**available**  25:17
54:3 131:5,8
131:10 157:7
183:14,18,24
185:5,7,11
187:18 189:15

**ave**  2:6

**avenue**  4:5,13
5:11 96:2

**average**  146:7

**avoid**  189:19

**awarding**
85:13

**aware**  22:4
32:10 76:19
103:14 150:23

**awas**  109:9

**awfully**  142:15

**awkward**  79:4

**b**

**b**  2:21 4:5 14:4
88:20 95:2
98:20,24
119:14

**b&w**  139:14

**back**  7:2 12:6
12:13 32:4,24
42:19 49:18
72:11 75:6
76:8 79:14
92:18 93:16
95:16 107:24
125:13,25
133:16 135:1
138:16 153:6

162:18 163:9
166:1 173:16
173:21 175:4

**background**
8:13 17:2

**backlit**  122:7

**backup**  183:15

**badly**  163:10

**balance**  68:14
126:1

**ballpark**  14:18
148:23 153:23
172:21

**balls**  96:20

**bank**  3:1 4:12
4:21 7:11
18:18 19:1,4
20:2,5,5,19
22:5,7,11,15
22:19,20,22
24:12 79:16
137:21 148:16
148:22 180:5
180:24 182:19
183:9,13 189:2

**bank's**  3:5,8
181:6

**bankruptcy**
1:1 2:4,23 4:3
7:3 19:19
22:12 79:15
169:8 173:21

**banks**  18:25

**bar**  141:10,16

**bare**  57:12

**barrier**  33:6
37:5,25 39:3,5

40:9 51:5
**barry** 182:9
**bars** 62:15
124:9
**base** 7:25
15:16 42:23,24
43:1 59:3
86:21,25
103:13 143:18
186:25
**based** 24:23
40:15 42:8
68:11 81:11
82:19 87:21
89:17 102:6
104:14,18
105:25 107:4
107:21 109:14
109:18,22
111:16 114:15
115:17 116:16
116:24 119:8
121:3 122:6
123:3,4 124:24
126:9 128:24
130:13 131:16
133:9 134:12
135:25 142:24
144:25 155:15
155:22,25
156:1 160:1
164:18
**basically** 27:24
31:23 43:2
51:11 71:17
116:21 122:9
146:2

**basing** 176:2
**basis** 24:22
82:25 105:24
105:25 123:25
150:21
**bassford** 5:16
**bath** 66:2
**bathroom**
46:15 47:12,14
47:15 63:16
66:14,16
111:21 124:12
127:8
**bathrooms**
62:14 65:16
71:6,15
**bear** 167:8
**bedroom** 61:12
118:16 123:21
**bedrooms**
56:20,23 57:4
57:6 61:22
119:19 162:22
**beginning**
128:22 154:4
188:17
**begins** 80:11
**begun** 177:22
**behalf** 178:25
183:9
**belabor** 16:8
16:14 150:23
**believe** 10:4
20:8,22,23
21:7,9 22:9,11
30:19 32:7,16
41:19 47:3

52:22 55:4,5
58:9 65:18
66:6 78:24
81:3,6 84:10
86:1 88:14
89:4,5 91:12
93:10,19 96:10
98:15 102:15
102:17 103:3
104:4 107:19
108:2 117:22
125:20 131:23
132:9 133:6
135:7,9 136:22
138:11,13,19
139:8,12 140:1
140:8,9,14
145:22 148:7
159:1 160:1,6
160:15 161:13
162:15,18
163:2 165:15
165:25 166:5
166:19,22
170:8,21 174:8
175:14 177:14
178:10,13
179:8,20,21
180:1 181:8,12
181:14,20,23
181:24 184:12
**believed**
122:20
**believes** 135:12
182:4
**bene** 10:17

**beneficial**
150:12
**benefit** 24:11
**best** 28:9 40:15
114:14 116:12
117:13 121:13
122:24 129:12
130:21 153:3
166:8 186:15
187:15
**better** 9:16
164:16 170:23
181:3
**beyond** 70:22
78:7 174:8
**bid** 12:22,22
13:24,25 14:1
27:22 28:2
29:20 74:1
100:21 101:20
104:1 110:14
149:12
**bidder** 14:4,4,4
85:10
**bidders** 14:1,5
85:6,7
**bidding** 85:3
102:18 152:24
**bids** 14:2,3
85:9 102:14,20
133:22 134:1
134:12 153:4
**bifold** 42:19
**biggest** 56:8
**biggins** 182:10
**bike** 59:14
121:5,8

**billed** 21:9
**billing** 17:18
**bit** 9:9 10:25
    21:6 28:24
    35:16 38:6
    48:25 75:21
    76:9,22 92:7,9
    93:5 127:22
    129:4 140:5
    145:10 146:6
    153:9 161:20
    179:25 183:7
**black** 11:4,5,13
    12:4,5,8
**blind** 67:10
**blinds** 67:9
    125:16,18
**block** 28:15
    36:8,20,23
    37:3,9,22
    38:16 39:1
    105:3 108:18
    108:20,22,24
    109:4 114:24
    120:16 140:13
    155:6
**bob** 82:20
**bobbing** 83:4
**bollards** 39:15
**bolt** 158:15
**bolted** 123:22
**bond** 35:1
**bore** 167:14
**bottom** 26:7
    34:7 42:24
    50:3 55:6 89:8

**boulevard** 5:3
**bow** 130:20
**box** 5:4 60:7
    64:12 161:8,11
    166:21
**boxed** 62:20,22
    66:23 166:10
**boxes** 59:24
    93:11 121:7,10
    122:22 158:3
    166:25
**break** 79:11,16
    79:21 84:17
    140:19 141:3
    141:15 173:16
**breakage**
    62:25
**breakdown**
    31:1,4
**brick** 33:16
    37:8 49:25
    50:3,10,11,12
    50:12,13,15,18
    51:10 113:4,8
**bridge** 38:1
    189:6
**brief** 76:20
    139:6 173:11
    180:21
**briefly** 10:24
    28:23 31:2
    84:9
**bring** 183:16
**broad** 82:22
    86:16
**broadly** 23:15

**broke** 7:4
    173:22
**broken** 13:10
    40:25 41:2
    58:14 166:10
    166:17 167:1,9
    167:11
**brought** 47:2
    178:6,12,15
**bruhn** 80:8
**bubble** 92:22
**bubbling** 34:19
    93:19
**budget** 12:21
    13:21 16:2,18
    16:19
**budgets** 13:18
    149:19
**build** 172:19
**builder** 148:2,6
    148:7 167:8
**building** 27:5
    29:4 31:21,22
    31:24 33:4,9
    37:12,21 38:10
    38:24 40:6,9
    40:13,20,24
    42:3 50:1,11
    51:4,9,11,23
    52:7 54:10,15
    58:2 62:18
    64:18 67:25
    68:24 69:1,2
    71:3 73:9,11
    73:16 74:6,9
    74:23 76:15
    87:5,23 88:3,4

    88:8 90:3
    104:15,19
    107:25 111:1
    112:1 113:5,24
    114:1 115:8,13
    115:16,18
    120:15,19
    121:22 122:14
    126:6,8,8,13
    127:21,21
    132:10 140:3
    142:3,21 143:1
    143:10,11,12
    158:25 162:7
    162:14 164:24
    165:12,14,15
    165:17,21
    168:12,13
    169:21,23
    170:4,13 172:8
    172:11,16
    187:10
**buildings**
    144:5,11,15
    162:9
**builds** 179:23
**built** 155:19
**burdick** 2:5
**business** 10:1
    17:25 23:3
    151:18
**button** 7:25
    25:11 88:14
**byproduct**
    108:8

**[c - certainly]**                                                    Page 9

| c |
|---|

**c** 4:1 7:1 14:4
33:7 63:22
64:2,8 65:6
99:6 124:20
190:1,1
**cabinet** 44:13
45:14,23 47:16
60:14 61:7
110:24
**cabinets** 42:4
44:3,5,8,10,17
44:22 47:7
60:5 110:22
111:9,11,13
122:13,14
**calculated**
106:19,21
**calculations**
11:22
**calendar**
183:16 184:13
185:6 187:25
**caliber** 143:1
**call** 7:13 20:10
20:14 85:2
179:11,17,21
**called** 77:2
80:1 147:13
163:2
**calling** 7:12
96:20 179:20
179:24
**calls** 134:9,11
**camera** 141:9
**canada** 183:4

**cans** 157:1
**cap** 48:18
**capacities**
153:19
**capacity** 22:24
23:10 154:1
**capture** 153:2
**car** 126:1,1
183:3
**cardboard**
90:24 91:1,3
**care** 85:18
**careful** 23:21
**caren** 4:17
**carpenter** 59:6
59:6,10 86:24
**carpentry**
28:16 40:2
41:25 42:2
43:17 103:25
110:2,17,20,21
111:14 163:3
**carpet** 56:15
56:18,20 57:3
57:4,6,8,11
118:14,16
119:16,19,24
120:4 140:4
162:22,23
163:4,5
**carpeted**
162:24
**carpeting**
57:10 120:8
163:3
**carries** 81:4

**carry** 184:18
**case** 1:3,11,19
3:1,5,9 7:3,18
14:11 19:11,24
20:4 21:15
30:21 43:4
45:25 46:10
48:23 58:13
60:8 77:8
79:15 80:1,7,8
80:15 87:20
103:14,20,21
104:24 114:14
116:12 117:13
121:13 122:24
134:25 136:21
137:7 142:19
145:18 147:25
148:21 160:21
166:8,18
167:13 168:18
168:25 169:5
173:21 181:20
184:5
**cases** 45:13
49:14 58:12
80:14 115:1
143:21 188:14
**catch** 9:12
**categories**
74:13 100:23
101:1
**categorize**
63:13
**categorized**
31:25 74:11

**category** 31:15
31:16 36:7,21
44:3 73:4 78:8
111:2
**cathcart** 4:9
19:21 82:20
83:4 182:15
**caulking** 38:2
**cause** 7:5 51:24
75:11 93:19
94:4 158:7
**caused** 92:21
**causing** 41:6
52:9
**caution** 140:23
**cavities** 165:5
**cavity** 75:5,14
75:15
**ccu** 184:12
**ceiling** 61:10
61:12,13 76:1
76:7 163:13
176:21 177:4
**center** 77:7
92:13
**cents** 137:18
152:5
**certain** 15:15
53:25 85:13
86:11,13 102:9
123:12 125:3
142:13 157:17
157:20 166:23
171:5
**certainly** 22:24
36:11 63:2
81:25 95:9

133:4 174:3
180:23 182:20
186:9
**certainty** 78:19
94:24
**certificate**
76:12 142:23
**certificates**
10:6
**certified** 174:9
190:3
**chance** 83:4
**change** 17:11
131:10 138:8
173:4
**changes** 156:3
**chapter** 3:2,5,9
3:9
**charge** 23:19
80:25 84:14
96:19 151:14
172:2
**charged** 23:7
**charles** 20:6
159:13,17
**charlie** 20:6
**check** 157:11
165:11
**checkbook**
130:17
**checked** 27:2
158:17 164:21
**chic** 142:15
**chicago** 186:19
**choose** 147:23
**chose** 158:17

**christian** 8:16
**christianna** 4:9
**circle** 32:4
**circuit** 80:1,15
**circumstance**
189:16,18
**circumstances**
7:8 18:15
**citation** 80:10
**cite** 80:14
**cited** 80:15
**city** 68:20
69:14 106:15
106:20
**city's** 106:24
**civil** 9:1,6,13
11:15 74:6
**clarification**
135:13
**clarify** 93:16
94:6 123:8
143:15 175:13
189:9
**clarifying**
123:9
**clarity** 82:8
98:22 187:22
**classified**
162:6
**classify** 164:5
**clean** 50:16
113:8
**cleaned** 50:16
**clear** 80:19
91:2,2 92:18
102:16 103:5
175:9 187:15

**clearly** 137:15
137:16 170:9
**clerk** 159:8
161:21 163:8
165:1 170:1
**client** 78:25
79:22 82:11,20
140:25 154:13
173:12
**clients** 154:22
**close** 41:3
72:18 92:15
96:25 151:15
161:21
**closeout**
164:19
**closer** 91:6
146:5 173:12
**closes** 187:10
**closet** 61:21,22
123:18
**closets** 42:19
123:21,21
**closeup** 93:13
**closure** 116:5
**clothes** 160:4
**cm** 153:20
**cma** 153:20
**cmu** 28:15 36:8
36:20,23 37:3
37:9 38:16,25
39:10 105:3
108:18,20,22
109:4 140:13
155:6,13
**code** 60:22
143:15 165:12

165:15,17,21
**codes** 60:19
165:14
**colloquy** 82:10
82:20 105:9
**colorado** 9:20
9:23,24,25
**column** 100:21
101:3,4,7,8
**combination**
22:16 43:18
**combine**
129:19
**come** 18:11
35:22 59:11
60:25 62:8
64:24 72:9,10
75:9 86:24
110:8 113:6
125:25 126:14
142:13 146:20
184:1
**comes** 84:18
85:23 87:7
182:2
**comfortable**
185:17
**coming** 52:6
70:19 74:25
75:5,22,24
76:2,6,7
186:16
**commercial**
21:21 53:9
110:22 115:21
127:1 172:12

**common**  38:21
53:17 56:21
71:10 108:23
124:11,12
127:10 138:18
**communicate**
180:25
**communicati...**
148:21
**company**  3:4
5:10 11:10,12
24:9 49:20,21
80:9 150:5
153:6,18,22
154:3,9
**company's**
144:21
**comparable**
85:8,9,12
**comparison**
91:21
**compensated**
21:3
**compensation**
21:10,14,17
**competitiven...**
14:2
**competitor**
108:9
**compile**  76:25
**compiled**  30:7
**complete**  13:22
14:5,6,7 17:6,8
17:15 20:24
21:2 23:9
25:12 26:6
28:5 29:18,20

29:24 30:6
32:18,21 33:2
33:14,21,25
34:17 38:25
39:21 46:12,21
46:24 47:8,16
48:9 51:14
52:17 54:11,20
55:10,25 56:2
57:15,16 58:6
58:8,23 59:11
61:25 67:15
68:4 69:8
70:12 71:8,18
72:12 73:8
77:5 79:8
84:22 85:1,22
99:14,15
100:14 101:4,6
101:8,9 102:2
103:2 104:16
105:18,21
106:7,25 107:2
107:11 108:3
108:11,17
109:4,20,24
110:16 112:17
113:23 114:12
124:6 125:23
126:2 129:22
130:3,16,23
131:5 132:14
139:9 141:18
144:19,23
149:8 152:23
155:13 163:14
164:9,10,23

168:23 173:22
174:4,5 176:7
177:7
**completed**  14:9
17:8,17 26:20
27:3 32:15,19
33:5,12 34:14
34:16 38:17,20
39:24 40:14
42:7,10,12
44:11,15 48:19
49:3 50:3,4
51:6,7,13,17
51:18,20 52:3
52:9,13,24
53:18 54:20
56:1,7 58:5
59:5 68:10
69:5,10 70:2
72:7 73:12
74:5 77:7,11
77:13,16,22
78:7 84:24
88:5 89:7
97:11 107:18
110:25 113:5,9
118:4 126:1,2
126:20 127:1
127:11,20
129:11 139:12
164:6,8,10,21
164:22,23
175:11,16
176:13,25
177:1
**completely**
41:4 57:12

67:23 68:13
88:11 128:15
187:7
**completing**
29:14 174:6
177:4
**completion**
23:22 58:20,21
105:6,7 113:3
121:25 122:3
131:3 139:20
142:5,6,21
149:16 152:5
155:6,20 158:8
158:8 164:5
166:6,7 172:15
177:12
**complex**  43:8
67:25 142:7
**complexes**
142:9
**component**
25:1 143:20
**components**
68:6 143:15,16
143:19 158:4
**concealed**  69:3
**conceals**  71:17
**conceivably**
62:1
**concern**  95:12
106:24 156:24
**concerned**
148:6
**concerning**
54:17 103:24

**concerns**  25:3
83:2 106:16
178:19 187:17
**conclude**
140:25 173:11
**concluded**
189:24
**concludes**
14:12
**conclusion**
129:4
**conclusions**
82:23 90:22
**concrete**  31:16
31:19 33:3
36:1,23,25
73:9,10,14,15
73:17,17,18,18
73:20 105:1
107:14,19,22
108:1,12
128:21,22
168:5,10
**condition**
62:21,22 66:9
133:15 151:8
167:10,11
172:16
**conditioning**
33:8 71:4
156:5
**conditions**
81:3 101:18,19
103:3 105:17
105:21 106:8
**confer**  140:25

**conference**
174:24,25
175:1 184:12
**confident**
30:16 162:17
**confirm**  55:14
56:17 59:1
61:11 118:15
119:17 168:25
187:3
**confirmed**
185:5
**confirming**
183:21
**conflict**  183:1
**conflicts**  183:9
187:17
**confusing**
179:25
**connection**
19:4,10,16,23
70:9
**connections**
64:25 68:14
70:10 126:25
**consent**  83:16
**conservatively**
106:22
**consider**  7:7
15:3 56:13
77:6 189:18
**considerations**
74:17,19 135:4
135:5
**considered**
138:6

**considering**
148:3
**consistent**
80:23 91:13
92:24 96:12
136:15,16
**constructed**
162:9 176:3
**construction**
11:8 12:6,14
12:15,16,16,18
12:24,25 13:4
13:5,7,8,9,11
13:11,14,16,20
14:12,15,18,22
15:2,8,18,18
15:21,24 16:3
16:5,6,7,15
17:3,19,21,25
18:17 20:2
21:22 22:21
23:20 24:3
25:13 27:23
28:2,6 29:16
30:12 31:5
32:11 34:2
40:13 62:24
74:8 84:10,16
84:19 86:3,7
87:6,12 95:23
96:1 97:4
101:2 105:14
105:22 109:7
116:18 131:17
133:18 139:14
139:14,15
143:11 144:25

145:11 153:8
153:10,12,16
153:16 154:6,8
158:6,8 172:12
173:6 174:17
177:5
**contact**  20:10
20:11
**contacted**  20:2
**contain**  89:13
90:10 99:21
100:13 106:17
107:1
**contained**
27:22 28:3
80:4 100:23
**contains**  60:7
**contents**  27:25
28:18
**context**  18:9
20:14 70:15
76:24 77:10
134:22
**contingent**
21:15
**continue**  28:17
88:11 123:10
**continued**
52:22 178:5
**continuous**
37:25
**contract**  17:10
124:25 153:11
153:14,17
**contracting**
167:20

| | | | |
|---|---|---|---|
| **contractor** | **correct** 11:1,2 | 161:24,25 | 115:9,13 118:5 |
| 39:25 41:12 | 12:3,12 13:6 | 163:14,15,20 | 119:5,7,24 |
| 46:8 47:10 | 15:9 17:10,11 | 163:20,23,25 | 120:3,7,25 |
| 48:6 49:5 53:5 | 21:13 23:8 | 164:1 165:6,7 | 121:8,12 122:2 |
| 53:13 54:5 | 24:7,9,10,14 | 165:10 167:1,2 | 122:9 123:1 |
| 59:20,21 64:22 | 25:14,18 26:25 | 169:10 171:14 | 124:6 125:18 |
| 71:12 75:4 | 27:3 28:22 | 172:13,24,25 | 126:4,17 |
| 129:18 145:3 | 31:6 33:22 | 173:3 174:4,7 | 127:15 128:11 |
| 153:7,11,11,22 | 37:17 45:3,21 | 175:13,17,20 | 128:11 129:21 |
| 154:3 167:15 | 45:21 48:2 | 176:14 177:10 | 130:2,9 132:13 |
| 168:2 | 49:19 50:23 | 177:19 178:3 | 134:2 135:23 |
| **contractors** | 52:19 53:3,23 | 189:3 | 136:20 137:8 |
| 86:14 151:14 | 54:22,23 56:3 | **corrected** | 138:8 140:14 |
| **contractual** | 56:6 58:15,18 | 33:17,18,20 | 143:3,7 144:19 |
| 15:25 16:3 | 58:25 59:9 | 35:3,4,19,25 | 144:22 145:9 |
| 153:13 | 60:4,24 61:4 | 37:15 42:21 | 145:10,17,20 |
| **contributions** | 61:20 62:3,3,5 | 128:10 | 147:19,24 |
| 55:3 139:13 | 63:5,7 66:11 | **correction** | 149:8,16 |
| **control** 13:3 | 66:24 69:19 | 148:15 | 150:21 151:12 |
| 16:18,19 24:12 | 72:20 73:6 | **correctly** 81:10 | 152:4,14,14,22 |
| 37:19 | 74:15 76:9,13 | 100:9 175:10 | 153:2,5 154:23 |
| **conversations** | 78:9 84:12,13 | **cost** 13:18 16:2 | 155:19 157:21 |
| 149:2 | 93:18 100:12 | 23:21 24:3 | 158:8,23 |
| **convert** 3:1,5,9 | 101:11 105:15 | 32:17 33:22,23 | 165:22 166:6,7 |
| 7:6 | 108:10 116:11 | 87:15 99:15 | 166:9 167:9 |
| **conveying** 68:2 | 116:13 118:19 | 100:14 101:8,9 | 169:14,25 |
| 125:20 | 119:9 124:2,3 | 101:23 102:1 | 172:15,16,19 |
| **cooperation** | 131:6 133:7 | 102:21,24 | 173:6 175:22 |
| 60:3 | 136:3,19 | 104:16,24 | 175:23 176:8 |
| **coordinate** | 139:10 140:16 | 105:1,2,6,7,18 | 177:9,12,21,24 |
| 12:19 60:2 | 143:14 145:23 | 105:20,23 | 177:25 |
| 130:14 | 145:24 148:18 | 106:7,19 107:2 | **costs** 101:22 |
| **coordinates** | 149:13 151:2,4 | 107:10,14 | 104:18 111:17 |
| 85:15 | 151:5,25 152:3 | 108:3,11,14 | 119:11,21 |
| **copper** 70:19 | 152:5,6 154:10 | 109:3,14,24 | 121:16 122:22 |
| **corp** 80:2 | 154:11 156:10 | 110:16 112:11 | 134:4 136:17 |
| | 159:18 161:6,7 | 112:11 113:6 | 152:1 177:4,17 |

**counsel** 148:19
183:11 184:4
**count** 44:16,23
62:17 65:23
114:9 116:4
166:2
**countable**
158:14
**counted** 166:1
**countertop**
45:11,13,22
46:1 47:16,21
**countertops**
45:16 46:14,17
46:19,20 47:1
47:5 110:22
111:21,22,25
**country** 190:21
**counts** 47:23
158:12
**couple** 45:15
45:25 46:18
47:18,20 49:8
52:11,15 66:19
66:20 72:3
74:22 77:13
112:13 139:6
173:25
**course** 12:25
16:3,4 50:3
116:8,18 158:6
**court** 1:1 2:4
7:2,5,7,15,17
7:22 8:3,7 9:8
9:11,15 10:21
15:23 16:8
21:23,25 22:8

24:16,17,17,17
24:17,18 25:2
25:6,21 30:23
31:8,8 36:8,10
36:12,18,21
42:15 44:4
47:13 51:2
74:3,17 77:25
78:4,10,23
79:2,7,10,14
79:19 80:5,11
80:16 81:8,12
81:14,18,21,25
82:2,13 83:6
83:10,13,18,18
83:21,24 84:2
84:5,15 90:20
91:19 93:2
94:7 95:8,13
96:4,6,13,18
96:24 97:17,19
98:20,24,24
105:9 123:6,15
129:7,14 132:3
132:3,20,24
134:10 135:11
135:13,18,25
136:4,6,24
137:1,2,11,13
137:20 138:1
140:19 141:2
141:11,14,21
146:17,23
147:1 160:11
160:20,24
161:2 173:15
173:20 174:10

174:14,21,23
178:23,25
179:3,5,9,11
179:14,16
180:2 181:6,9
182:23 183:8
183:15,19,22
184:5,7,7,8,8
184:14 185:1,7
185:9,12,19
186:12,21,23
187:6,21,23
188:1,5,8,11
189:1,4,12,14
**court's** 83:8
97:18
**courthouse** 2:5
**courtroom**
79:6 169:9
**cover** 51:10
120:18
**coverage** 69:2
**coverboard**
49:15
**covered** 106:23
124:14 128:22
167:4
**covers** 101:19
**covid** 177:15
177:17,18
**crack** 37:23
**craig** 19:13,14
19:16,17 28:10
28:10,11,20
58:16,16,16
142:22 147:13
149:3 167:20

178:6 179:21
180:19 182:2,7
182:14
**cranks** 41:3
**create** 13:17
**created** 58:1
77:9
**creates** 79:3
**creation** 12:21
**credentials**
10:7
**crew** 35:7 36:2
38:25 39:22
41:10,10 43:15
46:6,6 58:24
73:18 171:20
**crews** 38:25
61:3 129:8
178:12,15
**cross** 6:3 135:3
140:20 141:25
150:25 173:23
175:2 181:3,4
181:14,22
182:6,19 189:6
**cruel** 183:7
**cu** 9:25
**current** 17:19
152:25 172:16
**currently** 13:8
96:11 133:13
137:11 160:2
169:8
**cursory** 20:25
**customary**
134:13 172:3

cut  60:25 76:1
145:3 168:9
cutoff  180:8

**d**

d  5:22 6:1 7:1
79:25 80:19
d&m  5:2
dakota  1:2 4:3
19:19 26:24
96:2 144:8
146:1 149:24
150:2 151:8,9
187:12
dakota's
165:14
damage  47:20
62:25 65:20
66:21 89:20,23
90:2 92:23
116:25 117:12
132:8,10 133:7
133:7 134:5
damaged  42:17
43:21 44:9
45:1,5 47:22
66:25 87:9
88:8 112:15
117:15
damages  48:1
87:18
damaging
87:13
danger  87:5,18
dangers  87:3
danielle  179:20
data  103:14,16
104:6 134:1,18

134:21 149:18
date  20:9 21:5
32:12 77:8,9,9
148:24 170:15
190:25
dated  20:22
89:4 177:14
davenport
4:20
day  27:4 34:5
35:9 77:11
79:23 82:25
162:9 182:20
183:6 185:16
187:19 189:7,8
daycare  187:4
days  33:24
34:1,3 35:10
137:9 179:10
180:24 185:17
188:18
deal  14:21
debris  91:24
debtor  1:9,17
1:25 3:8 79:24
79:25 105:8
180:2
debtor's
159:22
debtors  4:4
december
185:25 186:14
190:25
deciding  86:4
decision
179:21 182:1

declarant
80:20,25
declarant's
80:21,24
deducted
164:16
deem  164:9
deemed  164:6
defer  129:12
179:5,14
deferential
78:1
deficiencies
33:13,15 34:24
35:3 36:3
37:13,18 39:19
40:18 41:7
42:11,22 43:12
45:9 46:3,7
47:5,7,9 49:7
51:20 52:16
53:3 54:18,22
54:23 56:8
58:19 60:12
130:10
deficiency
42:21 43:5,6
49:19 56:13
define  15:23
definitely
180:4 184:6
degree  9:11,13
10:3 78:18
94:23 161:17
delivered  62:2
63:1 87:11,14

delivery
153:13
demand
144:12,12,12
demolition
74:6
denied  24:15
denver  9:25
department
126:15
depend  182:2
dependent
21:15
depending
39:8 41:14
141:15 152:23
167:5
depends  60:15
61:17 63:18
73:2 154:13
depict  27:15
92:5
depicted  28:13
98:16
depicting
94:15
depiction
76:21
depicts  78:6
deposition
80:23
derivative
103:11
derived  107:7
describe  28:23
39:12 46:15
47:12 48:11

49:23 63:22
69:20 91:19
92:5 93:2
111:9
**described**  44:3
86:10
**description**
13:12
**design**  11:7,22
13:14,19,20,21
84:16 122:8
142:2 143:10
143:13,15,20
149:20 162:14
**designated**
26:8
**designation**
11:16
**designer**
142:17
**designing**
11:25
**desired**  144:3
**despite**  60:11
**detach**  51:24
**detached**  51:23
**detail**  23:15
78:7 82:7
**detailed**  164:7
**details**  35:17
**deteriorate**
52:5,23,25
**deteriorated**
93:7
**deterioration**
49:15 52:2,10
92:12,16 93:5

93:15 94:1,2,4
**determine**  24:1
32:14,17 60:19
72:15 74:25
75:5,21 76:7
114:10 116:6
127:24 157:24
**develop**  13:19
149:21 153:5
**developed**
13:17
**developing**
84:20
**development**
3:4 5:10 13:20
15:4,6 28:10
49:24 84:9,14
84:24 88:15
99:22 100:14
130:3 175:19
175:22 178:25
**developments**
12:22 84:12
**devices**  72:4,6
72:11
**diamond**  5:17
**difference**
169:2
**different**  16:7
20:23 45:16
50:22 52:5,16
54:5 70:13
75:20 77:13
82:21 84:23
85:6,15 94:7,9
94:10,14,16,18
97:1 106:17

123:8 129:9,9
132:8 137:6
142:8,9 151:7
153:1 162:5
170:23 181:16
181:16 184:7,7
**differently**
166:16
**diffusers**  71:14
71:16
**digging**  149:21
**dining**  56:22
119:20
**dire**  6:6 21:24
22:2
**direct**  6:3 8:10
25:9 34:6 84:6
100:20 108:8
145:9 171:9
181:4,15 182:7
182:12 185:14
**direction**  82:21
**directly**  75:16
134:20 150:20
153:12,14,15
153:17
**disagree**  189:1
**discern**  155:15
**disciplinary**
10:17,20 12:10
**disclose**  104:8
**disclosure**
187:24 188:3
188:13,14
189:6
**discoloration**
91:9,10

**discrepancies**
73:13
**discrepancy**
127:25 128:9
**discrete**  171:24
**discuss**  20:12
**discussed**
15:11 17:23
31:1 78:15
94:20
**discussion**  23:4
23:4
**discussions**
22:18,25 25:15
**dishwasher**
64:5 65:1
**dishwashers**
64:11,19 160:3
**dismiss**  7:6
**dissimilar**
114:23
**distances**
128:7
**district**  1:2
80:6 184:9
**dividers**
124:13
**division**  39:3
**doable**  180:13
**doc**  3:2,6,10
**docket**  83:19
137:15 159:8
160:22 163:9
170:2
**document**  26:2
26:4,13 27:24
28:7,8,9,13

32:7 85:2
88:25 89:2,9
99:8,10,12
132:3 159:14
160:6,18,23
161:6 165:2
**documentation**
16:20 17:9,15
29:10
**documented**
27:5 167:12,14
167:16,22,24
168:1
**documents**
13:20,24 15:25
80:4
**doing** 11:22
13:4 16:2
23:25 29:2
44:7 49:21
74:20 76:1,3
87:1 116:4
130:25 148:9
152:13
**dollar** 101:6
109:19
**dollars** 23:24
24:2 152:8
**door** 51:11
59:14,16,16
77:5,21,22
92:2 116:20,20
116:24 121:5,9
135:1 157:14
157:14 158:14
**doorframe**
77:21

**doors** 42:3,17
42:19 43:20,22
53:9,11,14,16
53:17,23,24,25
86:24 110:25
115:21 116:19
116:22 157:6
157:11,13
**dozen** 18:23
129:23 139:8
**drafting** 27:18
**drain** 70:9
**drains** 69:23
**draw** 84:17
159:22
**drawing** 13:17
121:24 169:1,4
**drawings**
13:19
**dreaminess**
183:5
**drew** 4:18
**drip** 34:23
**drive** 73:16
**drop** 60:25
**dry** 133:14
**dryer** 65:9
157:25
**dryers** 64:4,10
64:18 65:1
124:23 157:18
158:1,19 159:4
159:5 160:4
161:16
**drywall** 55:13
55:16,16,18,18
55:19 56:1,4

57:21 58:10,14
58:22 61:1
69:7 72:9 92:9
93:5 100:4
114:24,25
117:24,25
118:1 120:16
120:21
**due** 30:5 77:9
128:2
**dumpsters**
101:21
**durable** 56:25
**duration**
182:18
**duties** 17:22,24
17:25
**dwelling**
105:14 154:4
**dwellings**
104:16

**e**

**e** 2:21,21 4:1,1
6:1 7:1,1 190:1
**earlier** 58:9
84:10 122:20
125:20 178:5
**early** 20:3,8
188:9,12
**earned** 172:5
**easily** 158:9,14
**east** 40:24 50:1
51:7 96:2
**easy** 157:24
158:2
**ebbs** 142:12

**ecf** 25:22 78:22
88:19 95:1,2
95:16 99:6
131:22 176:17
**economic**
151:7
**economically**
24:11,23
**ecro** 2:25
**edge** 45:14,23
**education**
14:24
**educational**
8:12
**effect** 104:10
**effective** 29:19
**efficiencies**
55:22
**efficient** 86:14
86:18 96:16
**effort** 174:3
**efforts** 38:15
39:7 41:11
132:9,14 133:6
134:5
**eh** 119:20
**eight** 23:18,23
24:5
**either** 38:11
39:2,3 40:25
41:2,5 44:8
45:24 49:15
52:1 54:23
57:1,7 60:10
61:16 67:14
77:12 113:25
145:13 149:19

164:8 165:23
182:11
**electrical** 71:24
72:1,10,21
73:4 127:17,17
127:21 128:5,8
140:6
**electrician**
61:15,19 64:21
65:2,3 72:4,19
72:25 73:1
75:6,9 140:9
151:16 171:20
**element** 104:22
**elements** 52:4
**elevation** 50:2
50:2 51:6,7
73:12 113:5
169:1
**elevations**
40:24 51:16,18
168:20
**elevator** 68:3,5
68:8,9,12,15
68:18 125:21
125:22,24
126:3 128:12
128:12,13
140:3
**eligible** 175:4
**emergency**
60:8
**emphasis** 9:6
9:14 10:1
**emphasize**
92:16

**employ** 133:19
171:19
**employees** 11:9
151:17,17
**employer** 9:24
11:3
**employment**
12:2,4
**encompassed**
108:18
**ended** 183:22
**ends** 137:18
152:8
**engaged**
159:18
**engebretsen**
80:1
**engineer** 10:8
10:11,12 11:15
11:18,18
**engineering**
9:2,6,13,14,20
11:6,16
**enjoy** 141:16
**enormously**
105:5 153:21
**ensure** 14:2
17:16 85:12
**entail** 75:3
**entailed** 118:4
155:10
**entire** 12:25
27:4,5 30:6
33:4 36:24
58:1 62:18
145:14 162:23

**entirely** 144:3
**entirety** 51:12
111:13
**entities** 19:14
19:17 28:20
58:17
**entitled** 36:8
41:25 100:21
**entity** 18:8
28:11
**entrance**
116:20
**entry** 42:16
53:16 159:8
160:22 163:9
170:2
**envelope** 31:21
33:4
**equipment**
35:11 93:10
113:7 116:5
174:25
**erica** 184:1
**es** 57:17
**especially**
67:25
**essence** 30:5
**essential** 186:8
**essentially**
14:12 28:1,19
29:17 35:12
45:18 94:3,11
112:15 113:24
114:23 119:8
121:8 123:20
125:17 129:9
162:4 177:17

178:7
**establish** 80:13
145:20 146:25
150:20 151:12
**established**
29:24 111:16
149:9
**establishes**
151:13
**estimate** 39:8
107:10 110:7
115:12 116:23
119:13,15
125:6,7 144:20
145:6 147:18
152:10,12
169:14 172:18
177:23
**estimated** 28:4
**estimates**
13:20 111:6,16
113:14 117:2
117:19 118:8
123:5 145:16
149:9,25
177:11
**estimating**
13:16 16:19
109:18 115:13
121:4 149:18
**estimation**
12:21 24:4
104:2 107:21
125:24 130:21
**evaluate** 104:9
**evans** 4:20

**events** 22:16
**everybody**
  141:4
**evidence** 7:10
  79:17,19 80:13
  84:4 132:5
  134:15,17
  135:2 146:13
  146:13,15,19
  160:6,19,23
  175:2
**exacerbate**
  52:18
**exact** 20:9
  27:12 93:12
**exactly** 52:15
  71:1 75:21
  82:3 94:1
  106:18 114:15
  119:4 127:24
  139:22 142:4
  180:15
**exam** 175:2
**examination**
  8:10 22:2 25:9
  79:8 84:6
  96:19 140:20
  141:16,25
  171:9 173:23
  175:7
**examined**
  135:3
**example** 86:20
  87:16 143:16
**examples**
  87:10

**exception**
  54:13 57:9
  80:13,18
  180:19
**exchange** 83:7
**excited** 183:15
**exclude** 138:19
**excuse** 138:15
  169:19
**excused** 179:3
**exhaust** 71:5
**exhibit** 6:9,10
  25:22 84:4
  88:20 95:2
  99:6 131:22
  132:5 139:24
  140:15 141:24
  171:3 176:17
**exhibits** 6:8
  32:16
**existed** 144:15
**existence**
  169:22
**existing** 74:8
  103:23,24
  113:25
**expand** 22:6
  45:21 145:10
**expect** 43:9
  53:6 84:25
  142:25 150:18
  159:13 180:14
  180:20
**expected** 85:21
  87:1
**expenses** 152:1

**experience**
  16:24 33:10
  55:17 60:21
  63:14 67:16,22
  68:11 72:5
  78:16 84:11
  94:21 104:15
  107:8 108:5
  109:7,18
  110:13 111:5
  112:5,23
  113:13 116:17
  117:2,19 118:8
  120:5 121:4
  123:4 128:25
  129:19 130:13
  131:17 142:25
  149:17,20
  151:11,13
  164:18 167:4,8
  168:5,15,17
  174:6 178:14
**experienced**
  14:14
**expert** 6:9,10
  18:3,4,7 19:8
  21:21 24:16
  25:6,19 79:17
  80:3,17 81:19
  82:6,12,15,18
  82:22,23 83:19
  95:6,7 102:16
  102:19 103:7
  103:13,14
  133:25 134:13
  134:17 149:8
  150:8,24 151:7

**152:4 166:17**
  172:12 179:6,7
  179:23
**expert's** 80:12
  160:23
**expertise**
  101:14 112:5
  174:9
**experts** 103:15
  135:14 181:25
**explain** 16:24
  31:10 36:8,21
  47:13 51:2
  53:10 56:24
  60:6 68:25
  74:2 84:15
  90:21 107:14
  129:7,13
  135:17 153:9
**explaining**
  86:1
**explanation**
  22:6
**express** 80:24
**expressed**
  26:14 29:1
  99:18
**extend** 187:9
**extended** 38:7
**extension**
  182:22
**extent** 81:22
  102:7,9 103:7
  103:9
**exterior** 31:23
  36:25 37:7
  38:8,14 40:9

53:5 54:10
55:9 73:13
74:22 88:6
101:15 108:1
108:21 115:2
121:21 128:21
140:3 169:21
**extinguisher**
60:8,14 61:8
**extinguishers**
60:5 122:13,15
122:15,21
156:18,21
165:5
**eyeballed**
165:20

**f**

**f** 2:21 190:1
**f.3d** 80:2
**fabricated**
80:25
**face** 37:4,25
49:25 50:1
52:14 113:4
114:1
**facilities**
101:21
**fact** 18:11
39:20 107:21
137:18 141:17
146:13,25
147:1 156:2
188:15
**factor** 145:19
**facts** 103:13,16
104:6,23 134:1
134:18,21,23

**failure** 52:1
128:2
**fair** 13:5 18:2
34:6 38:17
65:12 131:15
142:17 154:2
158:16
**fairchild** 80:2
**fairly** 15:14
27:6 33:23
34:24 40:12
46:10 65:10
116:3 128:6,14
157:24 158:2
**faith** 188:23
**fall** 33:10
40:11 48:13,23
51:24 61:15
102:12 110:5
111:1 114:2
115:5
**falling** 51:23
52:6
**falls** 4:23 5:12
15:14 119:14
150:5,9
**familiar** 14:14
15:6 16:22
91:15 105:13
139:22 140:8
165:14 171:12
**familiarity**
16:24
**fan** 61:12
71:17 177:4
**fans** 61:10,13
71:5 127:8

163:13 176:21
**far** 45:11,14,19
46:1 127:14
131:11 147:7
**fargo** 2:7 4:6
4:14 5:5 8:17
12:6 150:6,7
150:15 151:3,8
151:11,13,19
151:22 183:3
**farms** 80:8
**fastened** 52:2
**fastener** 52:1
**faucets** 65:13
65:15,18 66:2
126:21,22
**feasible** 174:4
174:5
**federal** 24:16
134:15,16
**fee** 145:13
**feel** 34:24 79:6
107:16 108:16
139:16 147:25
**feels** 148:10
**fees** 23:7,9,17
101:22 144:21
**feet** 37:20
108:24 109:20
**feist** 5:14
174:21,22
179:2 187:18
187:20
**felt** 29:22,23
31:21 35:2
37:7 38:21
42:9,20 52:16

74:21 89:17
109:20 116:4
149:6
**fewer** 94:16
**field** 21:21
103:15 107:8
108:6 109:7
133:25 134:14
134:17 150:24
174:6
**fifth** 5:18
**figure** 177:21
**figuring**
147:20
**file** 188:2
**filed** 3:2,6,9
188:14
**filing** 186:20
**fill** 38:3 59:1
126:14
**filled** 59:4 75:8
126:12
**final** 48:25
69:9,11 72:17
109:14
**finalize** 69:15
128:13
**finalizing**
128:12
**finance** 10:2
**find** 7:5 75:24
141:18 167:19
167:25 185:16
**finding** 80:11
**fine** 103:9
123:13 170:18
181:2

[finish - focusing]                                                                 Page 21

**finish**   12:20,25
23:11 24:13
36:3 39:6,22
41:25 43:15,17
47:25 48:3
49:4 50:7,9
52:17 53:2,13
54:5,24 56:4
59:6 65:21
67:5,6,24
68:12 70:18
71:13 72:9
73:24 86:24
101:23,24
110:19,21
111:14 113:7
114:4 115:7,9
116:8 118:5
120:16 128:16
129:24 130:15
131:2 181:10
**finished**   12:5
32:2 53:17
58:7 70:20,22
71:18 72:6
88:11 120:15
126:9 128:15
142:6,8 143:1
168:14 185:23
**finishes**   42:3
43:8 68:13
88:7 125:25
**finishing**   53:6
55:19 56:1
57:21 70:24
71:1 88:3
118:1 120:20

126:10
**fire**   34:12 60:5
60:7,14 61:7
69:1,13,14,17
122:13,15,15
122:21 126:15
156:18,20
165:5
**fireman's**   80:9
**firm**   4:3,11
9:20 11:6
12:17 19:7,10
19:20 50:10
**first**   4:5 20:1
31:15,16 32:6
36:24 37:10,12
38:7,20,24
39:9 41:19
42:25 44:11
48:25 55:8
58:4 65:19
66:6 68:6 69:9
70:6 71:9,15
76:4 79:5
81:15 86:23
89:7,20 90:4
92:1 93:3,12
93:25 94:11
95:16 98:5,13
99:16,22
100:20,24
101:17 108:23
109:1 118:2
124:11 127:10
149:1,2 153:22
155:12,17,17
155:23 158:1

159:9 161:8
175:14 176:6
186:14
**fit**   42:20
**fitness**   77:8
**fits**   172:22
**five**   49:4 94:14
94:15,15,17
108:14 117:10
164:6,16 177:8
177:9 179:10
180:24 187:13
**fix**   47:25
117:14 132:9
134:5
**fixed**   54:19
76:11
**flashing**   51:9
**flashings**   48:17
**flexibility**
119:13 185:25
186:1
**flexible**   83:15
**flight**   184:21
186:17
**floor**   29:5
34:13 35:9,11
35:21 36:24
37:12 38:7,20
38:24 39:9
41:20 43:1,2
44:10,12 46:19
46:20,23 55:9
56:23 57:1,5,8
57:12 58:4,5
59:8 60:7 64:1
64:3,5,6,7,8,20

65:16,19 66:6
68:6 69:9
71:10 77:8
86:23 108:23
109:1,16
112:10 115:14
118:2 119:14
119:14 124:11
125:2 127:10
143:17 155:13
155:18 158:2
162:16 163:16
163:19 165:18
**flooring**   34:25
35:1,15,20,21
42:23,25 43:18
57:15,16 86:20
86:21,23
119:11,18
120:4 162:4,19
162:24 163:1,5
**floorings**   162:5
**floors**   34:11
54:16 59:7
64:3 69:3 71:7
125:5 162:15
**flow**   181:3,19
**flows**   142:12
**fluctuation**
154:23
**flush**   45:22
**foam**   33:16
**focus**   100:16
172:14
**focusing**
181:18

| | | | |
|---|---|---|---|
| **folder** 29:7,11 | 166:17 | 64:19 65:16 | 93:25 94:2 |
| **follow** 22:16 | **forming** | 125:1 162:16 | 140:17 149:22 |
| 32:13 89:3 | 102:17 103:16 | 163:19 | 150:18 158:7 |
| 95:20,24 97:8 | 134:18 | **frame** 55:8 | 174:20 178:22 |
| 99:13,22 | **formulate** | 91:9 92:2 | 179:1 189:21 |
| 100:10 106:15 | 27:24 | **framer** 60:25 | **furthering** |
| 180:4 | **forth** 137:15 | **frames** 41:5 | 174:17 |
| **followed** 87:4 | **forward** 88:12 | 42:3 53:9,12 | **g** |
| **following** 81:9 | 153:24 188:20 | 53:14,16 86:25 | **g** 7:1 |
| 160:2 185:24 | 189:5,11 | 110:22,25 | **gain** 22:15 |
| 185:25 186:1,7 | **found** 16:7 | 115:21 | **gap** 38:1,2,3 |
| **foot** 115:13,15 | 75:15 80:2,7 | **framing** 40:6,7 | 43:2,9 45:24 |
| 115:17 | 116:1 | 69:6 86:17 | 115:4 |
| **footage** 119:8,9 | **foundation** | **friday** 186:11 | **gaps** 38:9,13 |
| 119:11 122:6,9 | 11:24 31:20 | **front** 12:21 | 42:23 |
| **footprint** | 74:9 80:18 | 25:25 139:24 | **garage** 73:13 |
| 115:17 122:9 | 86:16 102:8,8 | **full** 20:24 21:2 | 107:23 116:20 |
| 127:20 | 102:9,11 | 47:17 71:11 | 127:2 |
| **foregoing** | 104:22 105:10 | 85:1 155:20 | **garner** 146:21 |
| 123:13 190:3 | 132:17,21,23 | 164:7 | **gc** 153:19 |
| **foreground** | 132:24,25 | **fuller** 5:9 | 154:8,10,21 |
| 93:9 | 146:9,14 147:2 | **fully** 44:17 | **gcs** 95:23 97:13 |
| **foreign** 24:17 | 160:17 179:25 | 54:20 68:9 | **gehertz** 20:2 |
| **forget** 119:23 | **foundational** | 72:15 164:6,22 | **gehrtz** 6:4,6 |
| **forgive** 157:4 | 104:22 | 176:4 | 7:14,16,16,21 |
| **form** 26:16 | **foundations** | **function** 41:6 | 8:2,6,6,10,12 |
| 32:1 82:23 | 11:25 | **functional** 65:5 | 12:6,14,15,16 |
| 95:4 114:6 | **four** 9:21,21 | 68:7,8 72:16 | 13:7,9 15:18 |
| **formal** 23:4 | 10:12 12:2 | 169:3 | 16:6 17:19 |
| 25:15 | 14:1 44:13 | **functionality** | 21:21 22:2,4 |
| **formally** 20:16 | 59:8 77:20 | 43:5 | 22:21 23:7,15 |
| 20:20 164:21 | 81:23 94:14 | **fund** 80:9 | 24:12 25:9,12 |
| **format** 28:19 | 107:15 130:22 | **funds** 153:7 | 25:19 78:14 |
| 121:23 | 140:1,8 171:8 | **further** 13:19 | 84:6,8 85:25 |
| **formed** 112:4 | 181:16 | 52:25 76:22 | 88:17 94:19 |
| 115:11 117:18 | **fourth** 46:23 | 80:16 92:11,16 | 95:19,23 97:4 |
| 118:23 119:3 | 57:8 58:5 64:8 | 92:16 93:7,14 | 97:4 99:8 |

| | | | |
|---|---|---|---|
| 105:13 129:6 | **generally** | **glazing**  55:7 | 79:25 80:6 |
| 130:13 131:15 | 35:14 47:10 | **global**  11:12 | 82:6,20,24 |
| 132:7 133:6 | 48:12 58:10 | **glue**  35:21 | 83:15 85:24 |
| 138:5 139:5 | 59:5 60:14 | **go**  7:25 8:2 | 86:5 87:13 |
| 141:25 142:2 | 62:9 65:9 | 9:22 23:3 | 88:7 95:3,19 |
| 147:6 160:7,14 | 67:24 70:17 | 28:24 31:9 | 96:7,8 97:19 |
| 161:5,8 174:2 | 77:15,23 87:7 | 32:21,24 40:1 | 102:12 105:5 |
| 175:7,9 176:20 | 88:2 93:11 | 56:20 64:2 | 122:18 123:12 |
| 181:13 | 119:12 133:25 | 74:16 76:4 | 132:18 133:2 |
| **general**  17:1,2 | 142:18 144:18 | 78:1,2 81:19 | 134:24 137:16 |
| 17:3 28:16 | 151:6,18,21 | 81:23 84:19 | 140:23 141:17 |
| 39:24 40:1 | 155:2 165:17 | 90:20 91:18 | 141:21 145:25 |
| 41:12,25 42:2 | 172:22 180:18 | 93:1 96:9,10 | 146:20 147:4 |
| 43:17 46:8 | **generates**  77:3 | 101:17 105:6 | 150:17,24 |
| 48:6 53:12 | **generations** | 116:17 123:10 | 151:18 153:4,9 |
| 54:5,6 55:2 | 1:7 144:5 | 127:23 129:12 | 157:21 159:8 |
| 59:5,20,21,22 | **geography** | 135:5,6,9,21 | 159:12,21 |
| 59:22 61:8 | 150:8 | 137:12 140:6 | 160:9,11 166:1 |
| 62:7,10 63:15 | **getting**  23:14 | 141:2,5 155:1 | 170:8,16 175:4 |
| 63:17 64:22 | 55:24 106:25 | 157:21 159:9 | 179:4,8,17 |
| 66:18 67:6 | 135:1 139:20 | 160:22 163:9 | 180:2,14,20 |
| 69:18,19 71:21 | 148:3 150:22 | 163:11 175:4 | 181:10,17 |
| 71:22 73:18 | 153:4 176:20 | 180:10 187:12 | 182:7,11,16,20 |
| 75:4 101:18,19 | 185:13 | 188:3,20 189:5 | 182:21 186:3,5 |
| 103:2 105:17 | **give**  7:18 28:25 | 189:11 | 186:6,18,24 |
| 105:21 106:8 | 42:14 76:24 | **goal**  99:14 | 187:1,12 188:2 |
| 110:2,4,17,19 | 119:10 129:13 | **goals**  12:19 | 188:22 189:4 |
| 111:14 115:3 | 148:6,8 149:7 | **god**  7:20 | 189:19 |
| 125:15 129:15 | 170:23 | **goes**  42:25 43:1 | **good**  15:14 |
| 129:17 135:20 | **given**  24:12 | 51:4 55:9 | 23:1 173:15,17 |
| 135:22 145:3 | 80:21 86:5 | 105:6 | 185:16,23 |
| 147:23 153:6 | 105:9 141:17 | **going**  7:23 8:3 | 188:10,23 |
| 153:10,11,22 | 147:25 152:12 | 9:8 23:14 25:2 | **grab**  62:14 |
| 154:1,3,23 | **giving**  55:23 | 28:17 32:20 | 124:9 141:10 |
| 167:7 168:2 | 188:24 | 35:16 43:7 | **grade**  116:21 |
| 177:23,24,25 | **glass**  40:25 | 44:6 72:24 | 168:14 |
| 178:13 | 55:7 | 78:2,24 79:24 | |

grades  107:23
graduate  8:21
  8:23 9:3
graduated
  8:24
graduation
  8:25 9:1,19
granola  141:10
  141:16
grant  7:10
gravity  148:4
great  9:15
  185:12,14,21
  186:13 187:21
  188:12
green  7:24 8:1
grills  71:14,16
grotesque
  144:2
ground  84:17
  156:14
grounds  79:24
groups  129:10
grow  138:23
growth  133:13
  133:16
guess  16:15
  22:12 23:2,11
  23:25 25:11
  32:4 56:16
  81:9,17,21,24
  87:4 94:13
  96:9,15,16,21
  129:15 142:3
  147:10,25
  148:1,10,11,25
  149:17,20

152:12 153:9
156:1,4,19,19
158:23 159:9
164:18 185:4
gypcrete  34:7
  34:9,10,15,20
  34:23 35:10,18
  143:7,8,17
  163:6

**h**

hair  184:23,23
half  54:3 115:4
  141:2 157:7
  181:25 182:12
  189:17
hallway  75:8
hallways  137:7
  165:6
hand  20:15
handful  44:8
  54:13
handicap
  60:16
handicapped
  128:24
handle  12:24
  43:18 46:9
  116:2,3,5
  179:14
hands  23:1
handy  185:13
hanging  92:14
  93:8
happen  186:3
happened
  20:10,10

happening
  71:9 87:13
  88:10 100:5
happens  69:6,7
  180:15 189:16
happy  7:10
  79:4 140:25
  181:2
hard  34:23
  92:7 106:18
  127:24 153:4,4
hardware  53:9
  53:12,14,17
  77:5,22 111:1
  115:21,23
  116:5 158:3
harless  179:20
  179:22 181:24
hartford
  184:12
hastings  2:22
head  82:21
  83:5,6 91:11
  92:8,10,12,15
  93:4,8,15 94:3
headed  186:10
heads  69:8
  126:11
hear  8:5,7 9:15
  79:18 133:2
  136:25 163:21
heard  81:15
  132:25
hearing  3:1,4,8
  7:6 22:5,8,16
  82:13 83:14
  132:20 146:20

149:1 178:5
180:10 181:9
187:12,13,15
187:25 189:7
hearings
  183:23 184:17
hearsay  79:24
  80:12,14,18
  81:11 96:3,5,6
  96:24 102:5,8
  102:12,16,24
  103:3,6,6,7,8
  103:10,10
  104:2,2,5,13
  104:21,21
  131:24 132:22
  134:9,11
  136:23 137:17
  137:19
heating  71:4
height  60:16
  165:18
heights  156:17
held  153:14
help  7:19 15:16
  129:7 185:21
helped  27:24
helpful  31:8
  141:18 153:21
  180:7,12
helping  30:8
  104:9
helps  29:10
hiding  43:2
high  8:13,15
  8:23 24:2
  42:14 43:7,10

| | | | |
|---|---|---|---|
| 48:12 67:25 | **honest** 162:2 | **hopeful** 185:23 | 102:15 104:4 |
| 96:1 122:21 | **honestly** 183:2 | **hopefully** | 105:12 106:4,6 |
| 143:18 144:12 | **honor** 7:13 8:9 | 179:13 | 123:6 129:3,5 |
| 146:6 165:8 | 21:20 24:21 | **hoping** 173:12 | 131:21 132:6 |
| **higher** 60:13 | 25:5,8 78:21 | **hotel** 186:19 | 132:17 133:4,5 |
| 60:20 85:11 | 79:9,12,20 | **hour** 110:10,12 | 134:16 135:6 |
| 115:15 146:3 | 81:17 82:8,19 | 141:3 143:17 | 136:5 137:4 |
| **highly** 182:24 | 83:8,16 95:1,3 | 145:23 173:13 | 138:3,4 140:17 |
| **hinge** 116:6 | 96:7,22 98:18 | 179:8 181:25 | 146:9,12 152:1 |
| **hire** 148:9 | 102:15 104:4 | 182:12 189:17 | 156:16 160:5 |
| **hired** 19:13 | 106:4 131:21 | **hourly** 21:8,9 | 160:17 162:1 |
| 22:21 24:13 | 132:1,17 133:4 | 21:12 | 165:4 170:16 |
| 26:5 148:12,13 | 134:16 135:6 | **hours** 110:7,10 | 171:8 174:8,11 |
| 148:15 | 137:4,14,24 | 181:5 185:1,13 | 175:5,6,8 |
| **historic** 162:10 | 140:18,22 | **human** 151:6 | 176:16,19 |
| **historical** | 141:8,20 146:9 | **hunch** 123:11 | 178:9,11,22 |
| 117:19 118:8 | 156:16 159:7 | **hundred** 81:23 | 179:4,19 181:8 |
| 120:5 121:4,16 | 160:5,17 161:3 | 151:17 164:4 | 181:12 183:10 |
| 123:4 149:17 | 173:10,18,24 | 164:13 176:25 | 183:13 184:9 |
| 149:20 | 174:19 175:6 | **hung** 53:16 | 184:11 185:4 |
| **history** 10:24 | 178:22,24 | **hurwitz** 4:20 | 185:15 187:3 |
| 113:13 117:2 | 179:4 181:8 | **hushka** 4:18 | **hvac** 65:6 71:2 |
| **hmm** 95:22 | 182:5 183:2,17 | 7:13 8:9,11 | 71:3,4,12,20 |
| **hohn** 4:25 | 186:6,16 | 9:18 21:20 | 127:7 |
| **hold** 10:6 96:4 | 188:19 | 23:14 25:8,10 | **hybrid** 95:4 |
| 122:15 134:10 | **hook** 48:8 | 25:21,23 30:23 | **hyde** 3:25 |
| 146:17 | 63:15 65:11 | 30:25 32:24 | 190:3,8 |
| **holder** 63:14 | 70:18 | 33:1 36:11,17 | **hypothetical** |
| **holders** 62:14 | **hooked** 68:7 | 36:19 77:25 | 164:17 |
| **holdings** 28:10 | 70:9 | 78:5,21 79:9 | |
| **holds** 153:11 | **hooking** 63:25 | 81:9,17 83:20 | **i** |
| 153:17 | 126:22 | 83:22,25 84:7 | |
| **hole** 34:22 61:1 | **hookup** 65:10 | 95:1,9,15,18 | **idea** 92:21 |
| **holes** 59:1,4 | 101:22 | 96:7,15,21 | 144:11 183:4 |
| **holiday** 183:4 | **hop** 163:10 | 97:3,16,18,21 | 185:14 |
| **hon** 2:22 | **hope** 82:1 | 98:18 99:1,5,7 | **ideally** 131:13 |
| | 182:21 186:4 | 100:18,19 | **identical** |
| | | | 143:14 |

identifiable
  158:9
identification
  121:22
identified
  74:23 139:23
identify  13:18
  13:23 16:9
  31:10 73:23
  77:4,7 89:23
  106:18 139:1
  158:2
idiosyncratic
  104:23
ignored  33:19
illustrate  87:16
illustrates
  91:23
imagine  172:19
impact  56:9
  143:3,6,22,25
  166:6
impacts  56:13
impeach  160:7
implied  80:25
imply  172:9
implying  160:8
important  37:6
  38:3 85:16
  143:23,24
  185:19
impose  187:1
improper  81:1
improved
  52:22
inaccurate
  148:8 160:8

161:16
inadmissible
  81:11 104:3,7
incentivized
  24:23
inch  115:4
inclined  81:25
include  23:6
  113:6 121:8
  138:8 165:22
included  23:9
  36:14 37:5
  50:19,21
  111:10 112:7
  113:2 114:21
  115:22 117:8
  117:24 118:20
  120:12,17,20
  121:6,11,21
  122:22 123:19
  124:8,20
  126:19 127:7
  130:9 144:22
  165:24 169:18
includes  46:16
  55:17 69:24
  113:24 115:1
including
  80:15 137:7
incomplete
  156:2 160:9
inconsistent
  80:21
increased
  87:18
independent
  95:24 97:5

indicate  75:11
indicated  31:4
  51:14 52:18
  58:22 59:10
  125:20 136:6
  156:8,12
  161:19 163:13
indicating
  175:3
indifferent
  181:1
indiscernible
  7:21 102:6
individual  28:2
  44:23 84:20,23
  94:15 145:12
  145:15,17
individuals
  30:5
indulge  123:6
indulgence
  83:8
industrial
  14:24
industries  5:2
industry  14:25
  30:12 102:21
  119:10 133:18
infers  147:1
inflation
  177:15
influence  19:5
  19:11,24 81:1
influenced
  177:15
influencing
  19:17

inform  185:7
informal  23:4
  25:15
information
  36:12,15 77:3
  103:23,24
  134:24 148:3,7
  148:8 169:7
informed  90:5
infrastructure
  11:7 127:3
initial  17:10
  21:7,11 26:5
  30:4 32:6
  97:24 139:6
  172:19
initially  29:2
initiated  77:12
  77:13
input  102:7,11
inquiry  168:3
inside  38:24
  88:3,8,12
  120:15
insofar  95:6
inspect  32:5
inspected
  126:12 170:5
  170:14
inspection
  18:17,19 20:15
  26:21,22 27:1
  27:3,16 30:13
  32:2,6,13
  43:23 49:2
  51:6,13 52:21
  52:24 57:14

59:19 68:20
69:9,11,13
73:10 74:2
77:1 87:22
89:3,4,7 90:4,4
90:6,24 92:1,7
92:17,19 93:4
93:25,25 95:24
97:5,7,8,11,13
97:23,23,24
98:2,5 99:3,13
99:14,23 100:4
101:22 138:14
142:19 156:3
158:9 160:1
175:14
**inspections**
16:19 72:17
74:9,20 91:16
101:13 106:11
106:13,15,23
107:2,11 126:2
147:11,13
**install**   37:2
42:5 48:5 59:3
61:17 67:16,17
67:21 112:12
119:16 120:4
124:1 168:19
168:22
**installation**
35:24 40:7,8
45:22 46:17
50:17 53:5,13
55:16,18 59:21
60:2,18 61:5
61:16 63:6,25

67:11 110:21
110:24 113:23
119:18 120:8
122:16 124:15
125:4,14,24
126:21 130:24
140:5 169:17
169:19,20
**installations**
64:21
**installed**   34:11
37:8 39:18,21
42:23 44:8,17
44:20,25 45:12
45:15 46:2,19
47:18,19 50:6
50:15 53:15,20
54:1,2,13,16
55:10,25 57:9
57:10 59:19
60:9,11 61:13
61:13,24 62:4
62:18 63:9,16
63:17 64:9,13
64:14,20 65:8
65:14 66:5,17
66:19,20 67:14
68:5 69:11
72:4 77:21
86:21,22
108:25 110:5
111:14 112:11
114:2 121:25
125:3,6 127:4
155:12 162:15
162:19,22
163:6 168:7

**installer**   86:23
**installing**   48:4
61:7 125:13
**instance**   75:22
120:17 149:10
149:13
**instances**
45:25
**insulation**
31:17,21,22,24
33:5,7,10 36:2
36:5 49:12,15
**insurance**  80:9
**int**   119:20
**intended**   52:7
52:8 142:20,22
**intensive**   76:8
**interact**   176:4
**interchangea...**
57:3
**interest**   189:19
**interjecting**
79:22
**intermediaries**
107:15
**international**
165:17
**interrupt**
36:10 49:10
84:1 85:24
**interrupting**
83:23 140:10
**interstate**   5:3
**inventoried**
159:24
**investigate**
76:14 142:20

147:6
**investigated**
76:17 147:9
**investigation**
74:25 75:21,23
75:24 76:3
132:12 142:24
**invoices**
159:23
**involved**   14:22
36:6 49:23
58:23 139:19
**iowa**   80:7
**issue**   34:25
60:19,22 80:11
156:6 158:7,23
165:24,25
167:5,6 168:11
186:17 188:21
**issues**   12:10
52:18 56:7
61:19 65:20
127:25 128:9
130:11 132:10
134:6 135:8
139:6 157:1
166:25 167:3
**item**   31:25
38:3 40:14
68:13 73:22
77:4,6,17
81:20,20 85:9
93:9 101:19
106:10,14,17
107:13,15
108:18 109:11
110:2,19 111:9

**[item - labor]** Page 28

112:6,20 113:2
113:20 114:21
115:21 116:3
116:19 118:20
121:15 123:10
123:18 125:9
128:19 129:21
143:9 144:20
145:17

**items** 16:20
28:16 34:17,18
35:2 39:15,16
40:10 43:18
46:22,25 47:6
48:17 49:3
51:12 52:11
55:11,12 61:14
69:7,16 70:22
74:4,5,7,10,19
76:9,21 77:16
77:23 84:25
87:15,24 88:1
89:19 101:20
102:9,11
104:17 107:17
108:14 110:4
116:6 126:25
128:8 129:16
134:22 139:25
140:15 145:2
158:2,9,10
163:25,25
164:13,21

**j**

**j** 4:18 5:14
**jason** 182:10

**jeffrey** 5:22
**jesse** 19:13,16
**job** 11:13,20
11:21 12:23
14:8 17:22
23:1 61:18
70:12 84:22
109:21 149:23
168:24
**jobs** 91:15
**john** 5:7
**joinder** 3:4
**joint** 37:21
80:8
**jointly** 1:3,11
**joints** 37:19
50:5,14
**jordan** 5:14
**josh** 179:6
**jr** 5:7
**judge** 2:23
**jurisdiction**
60:15
**jurisdictions**
165:16
**jury** 104:8,9
**jutted** 45:18

**k**

**kd** 5:1
**keep** 123:9
179:9
**kemp** 96:2
**kesha** 4:16
**kind** 13:10
15:11 18:11,14
20:13 23:12
28:24 29:24

31:1,9 33:19
35:7,13 36:2
37:25 39:16
41:10 42:14
47:15 57:2
58:7 62:21
64:2 67:10,19
70:24 76:24
78:7 84:17
90:20 117:12
128:24 129:13
181:19
**kinds** 103:16
134:18
**kitchen** 44:5
46:15 56:22
65:12 111:21
119:20
**kitchens** 65:15
**klobucar** 5:22
**know** 11:11
18:1 22:7,12
22:17 23:22
24:1 25:24
27:11 32:4
42:18 43:20
45:12 48:20
50:10 54:4
55:14 57:25
61:10 66:9,25
67:1 69:22
76:17 77:18
83:7,13 88:22
95:20 96:18
102:10 104:25
118:14 119:4
119:16 121:10

121:10 128:6
129:6,11
132:24 137:16
141:14 144:15
145:4,5 146:2
148:11,11
154:18 162:1,3
167:16,21,21
171:15,19,23
172:2,5,7,10
172:21 173:12
179:9 182:1,3
182:19 183:5
183:24 184:18
186:1,10 187:5
187:10,12
188:22
**knowing** 40:15
180:7,24
181:13
**knowledge**
15:16 28:9
87:22 102:20
107:8 108:6
109:6 155:25
178:13
**known** 144:5
**krings** 5:7

**l**

**l** 40:1 41:25
**labeled** 72:14
**labelled** 170:9
**labor** 28:16
33:22 39:25
40:2,11 41:12
42:1 43:17
46:8 47:10

48:6 53:12
54:6 55:1,2
59:6,22 61:9
62:8,10 63:18
66:18 67:6
75:4 110:2,17
110:20,21
111:14 114:8
114:12,15
125:3,15
129:17 139:13
**laborer** 145:25
146:2,3,4,5
**laborers**
145:22 147:7
147:16
**lack** 43:8 58:19
58:21 132:23
132:24 169:22
**ladder** 39:16
**ladders** 109:13
**laid** 28:18
77:24 105:10
**lakeside**
139:14
**laminate** 162:4
**land** 184:22,24
**large** 11:10,12
40:12 62:25
158:1
**larger** 121:23
**latches** 41:2
**late** 20:3,8
186:2
**launch** 180:17
**law** 4:11 5:1
19:7,10 50:10

**lawsuit** 18:4
**lay** 35:20 80:17
**layer** 51:5
**lead** 52:6
133:14 148:7
160:15
**leader** 30:10
**leadership**
186:11
**leading** 84:17
97:15,19
**leads** 161:13
**leak** 75:5,13
76:3,4,5,6,15
76:18
**leaking** 76:10
91:14
**leaks** 74:22,25
75:22
**leaned** 53:25
157:13
**learn** 20:1
146:7,11
**learned** 102:13
103:23 134:22
146:12
**leave** 189:8
**led** 168:11
**ledanski** 3:25
190:3,8
**left** 12:8 44:12
90:23 91:21
92:6,13 93:3
94:11 181:10
**legal** 18:9
190:20

**legitimate** 82:4
82:16
**length** 181:15
**lengthier**
140:24
**lengthy** 27:7
82:11
**letters** 122:8
**letting** 83:17
**level** 34:12
41:5 42:14
86:25 143:18
**levels** 127:4
**license** 10:18
**licensed** 10:10
171:20
**licenses** 10:6
**licensure** 10:13
10:14 11:17
**lien** 172:7
**liens** 147:15,17
**light** 75:7,12
75:16,16,18
**lighting** 68:10
**lightly** 8:1
**likely** 23:23
42:17 140:24
145:3 182:9
**limit** 180:25
**limited** 24:22
**limoges** 139:14
**line** 28:14,14
31:25 81:19,20
82:18,24,24
84:18 91:18
92:5 96:9,9
101:19 102:9

102:10 104:17
106:10,14,17
107:13,15,17
108:14,18
109:11 110:2
110:19 111:9
112:6,19 113:2
113:20 114:21
115:21 116:19
118:19 121:15
123:10,18
125:9 128:19
129:12,12,16
129:21 130:18
131:7,9,11
133:21,21
134:14 139:25
140:15 144:20
145:17
**linear** 109:20
**lines** 12:1
94:14,15
**lineup** 93:2
**list** 16:12 20:24
28:14 29:17,17
29:19 46:22,25
55:11,12 59:10
61:14,19 64:2
77:6 78:3
84:25 139:1
140:11 163:25
164:7,11,12,21
164:23 177:8
182:8,18
**listen** 82:14,17
**listing** 16:20

**lists** 59:7
**literally** 163:21
**little** 7:24 9:9
  10:25 21:6
  28:24 35:16
  38:6 48:25
  75:21 76:22
  92:7,9 93:5
  127:22 129:3
  140:5 144:18
  145:10 146:6
  153:9 173:13
  183:6
**live** 151:3
**llc** 1:7,15,23
  7:3 19:13 73:5
**llp** 4:20
**lobbies** 68:9
**lobby** 118:3
**local** 50:10
  60:19 165:16
  165:20
**locate** 64:17
**location** 47:24
  77:7 91:22
  92:1 93:12
  94:2 138:22
**logistically**
  179:15
**logistics** 141:4
  180:10 186:24
**long** 39:6 83:14
  130:14,18
  182:11
**longer** 179:8
**look** 15:12
  16:10 18:11

23:3 60:18
67:2 71:18
77:18 78:10,11
88:4 101:3,7
139:24 142:22
165:20 169:4
169:11,13
180:2
**looked** 94:6
  135:15 147:15
**looking** 13:9
  66:22 90:21
  91:20 137:22
  159:1 183:10
  186:8
**looks** 13:10
  40:18 59:7
  66:22 142:9
  186:2,12
**loose** 52:6
**loquacious**
  180:20
**lost** 158:6
**lot** 16:20 27:12
  51:12 128:24
  149:18 185:17
**lots** 181:9
**louvers** 33:8
**love** 188:20,20
**low** 48:12 51:8
  144:12 156:9
  156:12,13,14
  156:17,23
  173:6
**lower** 49:9
  85:10 127:4
  152:17,21

**lowered** 60:24
**lowest** 75:19
**lucky** 141:11
**lump** 21:7,11
  145:13
**lumped** 55:21
**lunch** 141:5
**luther** 179:6,18
  179:24 181:12
  185:5,11
**luxury** 56:25
  57:1,2 118:18
  119:19 161:22
  162:3,7,10
**lvp** 57:2
**lvt** 56:23 57:1
  118:17 161:24
  162:6,12,14,17
  162:20,25

**m**

**m** 4:25 5:7
**machines**
  160:4,14,16
**madam** 159:7
  161:21 163:8
  165:1 170:1
**made** 26:20
  28:3 29:3,5
  37:1 58:1
  75:18 81:12
  89:17 90:5
  101:5 103:14
  105:7 107:4
  108:25 109:17
  149:14 155:6
  155:22 167:8
  175:11,15

176:2 179:21
182:1
**mailboxes**
  59:15,18 121:7
**main** 128:5,8
  158:23
**maine** 183:3
**maintain** 82:14
**major** 9:5
**majority** 40:6
  48:19 49:2
  69:5,6 109:14
  126:9 169:20
**make** 8:4 14:3
  14:5 17:6,6
  23:17 26:17
  27:18,21 40:17
  57:19 73:15
  79:1 85:7,9,11
  85:19 92:18
  106:23 108:21
  126:1 133:14
  138:22 168:3
  175:9,13
**makes** 70:23
  71:18 153:20
  156:4
**makeup** 57:25
**making** 104:24
  137:22 176:1,7
  176:8
**malfunctioni...**
  41:2
**manage** 154:7
**managed**
  104:20

| | | | |
|---|---|---|---|
| **management** | **markup** | 124:15 130:16 | **measuring** |
| 12:17,17 13:2 | 145:12 | 130:23,25 | 165:19 |
| 15:2 16:2,18 | **mason**  39:2,4 | 131:2 154:24 | **medical**  186:9 |
| 109:7 131:17 | 50:7,9,22 | 157:21 158:7 | **meets**  43:3 |
| 144:24 145:11 | 113:6 | 166:8 174:3 | **member**  166:4 |
| 145:19 168:23 | **masonry**  36:23 | **math**  23:25 | **membrane** |
| **manager**  13:8 | 36:25 37:8 | 172:22 | 35:1 37:3,24 |
| 17:4,21,25 | 49:22,23 50:5 | **matson**  182:9 | 38:4,12 48:12 |
| 23:20 29:16 | 113:2,4 140:13 | **matter**  1:5,13 | 48:16 49:11,13 |
| 86:3,7,8 153:8 | **master**  171:19 | 1:21 19:5 20:1 | 108:21 112:13 |
| 153:10,12,16 | **master's**  10:1 | 21:14 81:13 | 112:14 |
| 153:16 154:6,8 | **material**  39:18 | 96:25 189:22 | **memory**  22:23 |
| 168:1 | 54:2,3,14,15 | **matthew**  6:4,6 | **mention**  37:7 |
| **managing**  86:7 | 54:25 57:13 | 7:14,16 8:6,10 | **mentioned** |
| 86:9 | 60:10 66:6 | 22:2 25:9 84:6 | 15:3 45:1 |
| **manifest**  87:3 | 92:2,14,19,21 | 141:25 175:7 | 89:22 165:4 |
| **manner**  14:22 | 93:6 111:22 | **maurice**  4:8 | **met**  60:17 |
| 35:20 129:25 | 113:22,23 | **maximize** | **metal**  39:15 |
| 139:13 | 114:7,24 | 179:12 | 50:24,24 51:3 |
| **manpower** | 115:24,25 | **maximum** | 51:9,22,24 |
| 14:7 | 116:2 119:5,5 | 60:16 | 52:6 113:20,20 |
| **march**  20:3,8 | 121:7 124:5,14 | **mba**  11:1 | 169:20 |
| 153:24 154:4 | 139:13 140:4 | **mdu**  154:3 | **metals**  39:12 |
| 154:16 | 143:3,6 158:23 | **mean**  14:20,25 | 39:14 40:11 |
| **marginally** | 163:5 188:21 | 17:3 46:21 | 109:11,13,25 |
| 155:3 | **materials** | 54:12 70:14 | 140:13 |
| **mark**  145:9 | 33:22,23 35:7 | 75:24 86:11,12 | **method**  153:14 |
| **marked**  145:2 | 35:23 44:24 | 130:21 146:19 | **microphone** |
| **markers**  59:14 | 45:4 51:17 | 152:19 162:1 | 7:23 |
| 59:16 121:5,9 | 53:21 57:7,24 | 168:9 185:13 | **microwaves** |
| **market**  13:25 | 60:10 61:24 | **meaning** | 124:24 160:3 |
| 150:13,15,15 | 66:10 67:2 | 143:15 151:25 | **mid**  21:9 96:1 |
| 151:4,11,23,23 | 70:18 73:23 | **means**  59:2 | **middle**  90:25 |
| 151:23 153:1 | 87:8 118:14 | 83:1,7 147:20 | 91:7 92:10 |
| 177:24,25 | 119:18,24 | 164:2 182:25 | 93:7 101:8 |
| **marketed**  43:7 | 120:15,17 | **measure** | **miles**  150:4,7,9 |
| | 122:17 124:3 | 165:18 | |

**million** 23:23
24:2,3,6,8
138:7 139:9
173:4
**millwork** 44:3
47:15 111:9
**mind** 82:3
**mineola** 190:23
**minimizing**
34:11
**minneapolis**
5:20
**minnesota**
187:15
**minor** 33:16,23
34:17,24 35:2
35:11 37:22
46:21 48:17
49:3 55:12
61:14 65:10
100:4 163:24
**minus** 152:11
**minute** 79:11
141:15 181:4
187:13
**minutes** 144:16
173:16 182:16
**mirror** 66:17
**mirrors** 66:14
66:16
**miscellaneous**
33:9 39:12,14
39:17 40:10,10
109:11,13,25
115:23 120:18
140:12

**mischaracter...**
156:17
**mischaracter...**
178:10
**misconstrued**
30:20
**misheard** 54:4
156:21
**missed** 160:24
**missing** 14:4
33:7 40:25
44:9,13,14,19
51:8 64:3,4,5,6
65:17 85:8,9
116:7,17 160:2
160:14,18
**misspoke**
161:19
**mixed** 14:25
15:3,6 40:13
151:20 154:3
154:20
**mixers** 113:7
**mm** 95:22
**mn** 5:20
**mobilization**
113:6
**mode** 61:6
**modern** 142:9
**moisture** 37:11
38:10 40:21,23
48:11 56:10
88:5 90:3
91:11 93:21
94:5 100:7
112:6 133:12
133:14 140:12

**mold** 133:13
133:14,16
135:21 136:12
138:14,16,20
138:22
**moment** 78:25
79:6 80:15
100:17 153:2
154:9 165:5
180:17 184:2
184:23
**monday**
183:17,18
184:2,5,6,11
184:24 185:2
185:21,22,25
186:8,12,13,13
186:17,24
187:18 188:12
189:14,23
**monetary**
24:25
**money** 172:5,9
188:25
**month** 130:22
130:24 154:19
**months** 130:22
131:2,13,14
148:25 153:23
**moorehead**
8:19
**moorhead** 8:16
8:18 150:6,15
151:3,11,13,22
**moot** 24:17
**morning** 79:11
132:7 166:14

181:24 182:22
183:12,14
184:11,14,16
188:8
**mortar** 50:16
**motion** 3:1,5,9
7:11 186:20
**motive** 81:1
**motor** 71:18
**mounted** 70:6
**mouth** 171:12
**move** 88:12
187:14
**moved** 9:20
12:5,13 173:13
**movement**
37:21
**movements**
37:22
**moving** 122:22
**multi** 84:11
105:14,14
**multiple** 48:8
61:3 64:23
65:3 78:14
94:16,19
104:15 155:15
**multitude**
171:24
**municipal** 11:6
165:11
**muti** 104:16

| **n** |
|---|

**n** 2:5,6 4:1 6:1
7:1 190:1
**nail** 59:1,3

| | | | |
|---|---|---|---|
| **name** 7:15 8:4 | 37:17,19,23 | 77:6,16,22 | **north** 1:2 4:5 |
| 11:3 80:8 | 38:5,11,11,12 | 107:17,19,22 | 23:23 24:2,5,8 |
| **nationally** | 38:17 41:7 | 109:20 110:24 | 40:23 50:2 |
| 165:15 | 43:13 45:16 | 111:24,25 | 51:6 151:8 |
| **native** 24:17 | 46:3 48:7 | 116:2 117:9,10 | **northern** 4:13 |
| **naturally** 23:2 | 49:18 50:14 | 118:2 126:25 | 80:6 |
| **nature** 12:1 | 53:6,19,21 | 127:3,13,20 | **note** 42:11,22 |
| 18:5 20:11 | 54:2,18,21 | 128:9 129:24 | 43:6 47:5 |
| 30:14 39:17 | 55:3 56:10 | 139:9 155:12 | 82:21 93:9 |
| 42:4 62:15 | 59:4,23,24 | **needing** 47:1 | 147:17 157:4 |
| 104:1 121:9 | 60:1,17,22,24 | **needs** 14:8 | **noted** 38:22 |
| 134:23 135:22 | 66:17 68:18 | 29:20 31:11 | 39:19 40:18,20 |
| 147:25 175:12 | 71:13 72:8,19 | 76:11 77:11 | 40:22 43:24 |
| **navigated** | 74:21 86:18,22 | 78:7,11 86:19 | 44:9 45:9,25 |
| 75:17 | 103:17 108:25 | 116:7 143:17 | 46:23 48:17 |
| **nd** 2:7 4:6,14 | 110:4 111:12 | **negative** | 49:2,7 51:20 |
| 5:5 | 116:18 117:14 | 138:16 | 52:12 53:3,13 |
| **ndsu** 9:1,19 | 121:25 125:5 | **neither** 80:10 | 54:19 58:19 |
| **near** 157:14 | 125:25 126:14 | 137:10 160:11 | 60:11 61:25 |
| **nearly** 143:21 | 129:10 134:19 | **never** 152:12 | 63:12,20 67:15 |
| 144:3 | 139:19 162:20 | **new** 60:25 | 69:5,8 71:6,7 |
| **neat** 95:6 | 167:1,6 183:14 | 73:17 74:8 | 74:22 75:7 |
| **necessarily** | 188:17 | 113:25 184:9 | 77:22 89:20 |
| 15:1 18:1 | **needed** 29:18 | 188:3 | 98:1 109:16 |
| 110:6 142:4 | 33:17 34:17,18 | **nice** 43:2 | 110:9 117:12 |
| 143:11 152:12 | 35:3,11 36:13 | **nigher** 152:17 | 118:1 121:24 |
| **necessary** | 38:20,23,25 | **nodded** 141:6 | 130:10 168:20 |
| 35:20 41:13 | 39:22 41:10,11 | **nodding** | 176:24 |
| 96:14 101:24 | 41:16 42:17 | 181:22 | **notice** 57:13 |
| 130:15,25 | 46:6 47:21 | **non** 39:14 | 63:21 72:21 |
| 131:4 132:9 | 48:3,4 49:5 | 146:5 186:8 | 100:4 188:16 |
| 138:12 139:9 | 50:2 51:18 | **noon** 141:15 | 188:18 |
| 182:4 | 52:16 53:2,15 | **normal** 77:10 | **noticed** 38:6 |
| **need** 14:7 | 58:3,7 63:4,12 | **normally** 18:25 | 42:16 44:7 |
| 15:13 23:11 | 66:12 68:16 | 79:21 167:3 | 45:10 46:18 |
| 29:19 33:18 | 69:7 70:7 71:3 | 168:5 | 49:8 50:1 |
| 35:4,22 37:15 | 71:9 72:17 | | 53:18 54:17 |

58:3 64:8
66:20 67:4
74:19
**notions**  143:14
**november**  2:9
**number**  7:3
18:23 23:23
24:1,5 27:12
30:1 41:20
42:18 44:16
52:5 54:17
62:25 75:20
77:5 79:15
95:2 99:6
106:1,17,20
109:2 110:7,23
123:25 125:1
127:23 138:8
151:16 152:7
152:15,16
153:1 154:18
160:8,24,25
166:2 173:21
174:12 180:21
**numbers**  29:6
102:6 103:10
153:4 159:25
**numerous**
18:24 38:9
154:13,14
**ny**  190:23

**o**

**o**  2:21 7:1
190:1
**object**  23:22
24:21,24 79:24
81:21 95:5,7

156:16 160:5
160:12 170:17
178:9
**objecting**
81:10
**objection**  3:8
21:23 78:23,25
79:1,4,7,18,22
81:10 82:4,14
82:16 95:4,12
95:13 96:3,5
97:2,15 98:22
102:4,4,13
103:3 105:10
123:12 131:24
132:1,17,22
134:11 136:4
136:23,23
137:20 146:9
160:17 174:8
174:14
**objections**
181:21
**objectively**
155:15
**objects**  188:15
**obligations**
187:7
**observable**
31:20 70:3
74:4,10
**observation**
98:12,13 149:7
157:16 158:10
169:6
**observations**
26:17,19,20

29:23 30:17
44:7 46:18
87:22 89:17
90:5,8,9,11
100:9 101:13
126:10 127:12
142:25 147:11
147:12 151:6
155:22 156:2
176:9,10,11
**observe**  30:20
44:19 57:7
59:17,18 60:8
60:9 61:23,24
62:21,22 63:21
64:10 65:13
67:13,14 72:13
74:12 97:13
114:8 124:5
154:23 166:16
169:22
**observed**  27:16
32:15 33:14
34:15,19,20
39:17 42:23
43:21 44:22
47:17 54:22
57:5,8 60:20
61:13 62:16
63:23 64:1,11
64:17 65:14
66:5 68:25
69:7,21 73:10
73:12 90:14,17
97:22 98:12
100:5 103:15
110:23 112:18

116:24 117:15
118:9 127:1
138:17,18
156:4 157:2
163:16 166:20
**observing**
90:21 127:24
127:24 128:3
**obtained**  9:25
142:23
**obviously**
10:14 28:24
33:5 54:12
60:22 62:13
66:9 70:9 75:3
76:10 77:25
78:10 79:21
81:4 128:10
135:11 140:14
179:7,12 181:1
182:16 185:4
**occasions**
70:14
**occupancy**
76:12 121:11
128:15 142:23
**odd**  81:24
160:15
**offer**  21:21
78:22 95:1,14
95:14 98:19
131:22 137:4,5
137:11,13,22
137:23 138:2
175:2
**offered**  13:15
24:23 79:17

80:24 131:16
**offering** 82:23
**office** 59:25
60:2
**officer** 22:19
**officers** 186:25
**official** 22:24
60:18 164:11
**oh** 14:20 185:9
185:12 187:13
**okay** 8:19
10:15 11:13
12:13,15 13:7
13:9,14 14:17
15:6,21 17:3
18:7 19:23
20:11,16,18
21:14 22:10,19
23:6 24:11,15
24:20 25:19
26:2,16,24
27:13 28:23
30:10,12 31:4
31:7 33:21
36:18 43:20
50:24 56:2
58:19,22 59:20
76:14 78:10
79:2,10 83:10
83:18,21 84:3
89:8 94:6
95:21 101:7
122:20 123:15
135:19 138:1
140:19 141:2,5
141:11,14,19
143:6 144:5,11

144:18 149:14
150:12 152:4
152:19 155:5
156:5 157:6
158:17,19
159:3,6,17
161:8,15,20
162:13,20
163:7,16,24
164:15 165:8
166:1,10,15,20
167:3 168:15
169:8,14
170:12,22
171:1,15,23
173:9 174:6,11
174:17,25
179:3 180:2
181:9 184:7,20
185:22 186:13
186:23 187:6
187:21 188:5
189:1,4,13,20
**okays** 164:4
**old** 190:21
**omit** 95:10
**once** 13:22
14:2,9 23:1
85:14,22
125:25 158:4
**ones** 45:5
117:12 166:20
**ongoing**
100:10
**online** 29:8
**open** 52:3 70:4
75:5 76:1,7

82:22,23 158:5
158:11 183:20
186:1
**opened** 49:18
**opening** 60:25
61:1
**openings** 37:9
51:11 157:14
157:14
**operate** 145:11
145:13 151:18
151:21 153:8
154:7
**operated**
153:19
**operational**
68:15 69:13
127:21
**operations**
87:2
**opinion** 19:24
32:1,25 33:2
33:20 35:6
37:13,19 41:8
41:23 43:5
46:4 49:17
52:10,20,25
57:3 68:1
74:14 80:3
87:25 88:12
89:13,16,23
90:1,2,5 91:23
94:4 95:6,7,9
95:10 96:8,10
96:11 99:14,21
99:25 100:2,13
101:8,9,25

102:1,17,19,22
102:23,24,25
103:2,13,17,18
104:8,9,14
105:17,20
106:7,14 107:1
107:4,7,10
108:5,11 109:3
109:6,9,24
110:16 111:3,4
111:7,15,16,19
112:2,4,11,19
112:22,25
113:10,12,16
113:18 114:2,4
114:6,7,17,19
115:9,11,19
116:14 117:1,4
117:6,16 118:5
118:7,10,12,24
119:1,2,3,21
119:23 120:1,3
120:7,10,25
121:13,15,17
121:19 122:2,5
122:11 123:1,7
124:6,16
128:14,16
129:7,23 130:2
130:5,7 132:11
132:13,16
133:2,9 134:1
134:4,8,19,20
135:11,20,25
139:20 143:12
143:19 149:8
150:14,21

151:10 152:4
152:14,22
166:18 169:25
175:23 180:6
**opinions**  19:5
19:11,17 21:18
25:20 26:14,16
29:1 30:21
78:14,16,18
80:4 81:18,22
82:15 94:19,21
94:23 98:15
99:2,18 101:12
101:17 131:15
131:19,23
137:10 176:1
177:12,20
178:20 179:23
**opportunity**
7:9 187:9
**opposed**  55:23
135:7,10 181:5
**opposing**  148:9
148:12,19
**option**  20:25
21:1
**options**  20:24
**order**  22:8
29:18 49:19
52:17 61:5
72:7 85:16
86:18,18 87:1
87:4 107:22
117:14 130:19
135:22 144:1
180:4,5,12

**ordered**  41:16
62:1 63:4
**orders**  17:11
86:17
**organize**  29:3
29:10 30:8
76:25 77:15
**organized**
29:10 77:18
**orientation**
94:1
**orientations**
94:10
**original**  89:3
90:23 92:6
125:23 148:25
**originally**
159:18
**outcome**  21:15
**outdated**
155:25
**outfitting**
47:25
**outline**  42:14
181:15
**outlines**  81:18
**outside**  101:15
105:4 131:24
178:12,16
**outweighs**
104:10
**overall**  44:15
85:17 145:14
**overhanging**
45:11
**overhead**
11:25 116:19

116:20
**overhung**
45:14,18 46:1
**overlap**  129:17
**overlay**  34:10
**overly**  180:20
**overnight**
185:17
**overr**  164:24
**overrule**  25:2
**overruled**
96:23 174:14
**overseeing**
12:20 13:5
**oversight**
12:18 13:2
145:19 168:23
**overspray**
33:16
**overstep**  149:6
**overview**  20:25
28:25 42:14
78:8 129:13
**owed**  172:9
**own**  24:9 29:11
85:18 153:7
**owner**  14:10
23:3 153:13,15
153:15,18
154:7 164:8,11

| p |
| --- |

**p**  4:1,1 7:1
**p.m.**  97:9,9,10
97:11 184:23
**p.o.**  5:4
**pacific**  4:13

**package**  14:1
14:10 29:20,21
33:25 34:4
36:6 37:1
39:20 40:5,11
40:12,12,16
42:9 43:19
47:11,16 48:9
48:13 49:25
51:10 52:17
55:17 57:16
58:2 67:16
72:2,18 85:6
100:21 110:5
114:3 118:21
118:21 129:11
**packaged**
61:17 63:18
**packages**  27:23
28:2,4 74:1
101:20 108:17
129:18,19,20
145:12 158:4
**packed**  128:6
**pad**  57:4,11
**padded**  163:5
**page**  6:6,8,10
26:7,8 30:24
31:14 34:7
36:7 38:6
39:11 40:1
41:24 44:2
46:14 47:12
48:10,10 49:22
50:25 53:8,8
54:7 55:6,13
55:13 56:15,15

57:18,18 59:1
59:1,13 60:5,5
61:10,10,21,21
62:12,12 63:22
65:12,12 66:2
66:2,14,14
67:8,8 68:24
68:24 69:20
71:2,2,24,24
73:7,7 74:1,1
74:16,16 76:20
76:23 88:19
89:8 90:16
93:1,22 95:10
95:16,16,19
99:5,16 100:18
131:22 132:1
159:10 160:22
160:24 163:11
170:7,22
176:17
**pages** 6:9 78:2
81:24 83:22,25
84:2 95:2,5,11
98:7,7,19,25
159:21
**paid** 21:5,8
23:11 147:6
164:25 168:24
169:12,13
**paint** 58:4,24
72:11
**painted** 58:2
72:6
**painting** 55:20
55:23 57:18,20
57:22 58:11,13

61:1 120:12,14
120:14 121:1
171:20
**pair** 91:18
**pallet** 65:18
66:6,8
**palleted** 66:10
**pallets** 114:8
**pandemic**
153:23 155:2
173:8
**panel** 51:24
52:6
**panels** 50:24
51:8,22 52:12
52:14 72:2,13
113:20 114:1,9
114:9,12 128:8
169:21
**paper** 62:14
63:14
**paragraph**
159:9,20
**paragraphs**
95:7
**paraphrase**
165:9
**paraphrasing**
156:9
**park** 8:16
**parking**
116:21 128:23
168:14
**parkside** 1:15
144:6
**parlance** 171:6

**part** 24:9 36:14
47:16 86:1
104:5 118:21
128:23 132:12
142:19 155:25
162:14 166:17
169:14
**participating**
189:20
**particular**
11:22 14:11
17:1,4 20:15
27:22 28:4
29:14,15 31:25
32:9 33:24
34:4,5 35:23
36:6 37:6 38:6
39:20 40:16
42:5 48:9,24
55:1 56:9,13
58:2 61:18
63:11 71:13
73:22 75:22
77:8,11,17,20
77:21 78:11
85:1 87:15
91:11 94:10
101:6 103:15
106:1,1 108:17
109:22 110:14
111:13 114:3
116:2,23 119:4
133:1 134:17
135:9,15 136:7
136:14 145:17
145:18 147:3
157:12 161:14

168:25 172:8
**particularities**
138:6
**particularly**
15:11 16:10,15
98:16
**parties** 7:4,8
102:13 103:11
175:1,3 182:24
188:16
**partition**
124:13
**parts** 117:13
**party** 18:11,17
18:18 23:10,13
80:10,13,17
95:24 97:5
102:7,11
103:22 107:5
132:19 134:25
135:2 137:17
149:12 188:15
**party's** 135:1
**pass** 10:14
**passed** 10:15
**past** 35:18
67:22 91:13
92:25 104:20
111:5 114:15
120:5 123:4
128:25 149:25
**patch** 56:12
61:1
**patched** 49:19
100:6,8
**patches** 120:18

patching  58:6
  117:25 120:21
patio  48:21,22
  48:23 55:9
  109:16 112:9
patterns  35:24
paver  112:13
pavers  48:23
  112:10,12,16
paving  73:7
  128:19
pay  17:5,6,12
  17:16 18:19
  68:23 153:7,17
paying  18:19
payment  17:7
  17:17 153:18
  164:19,20,25
pays  68:22
  153:12,15
pc  5:9
peek  16:6 70:4
peel  92:18,22
  93:16
peeling  93:20
penalty  80:22
penetrating
  90:3 100:7
penetration
  31:23 37:11
  40:22,23 56:10
  87:18 88:5
  89:20,22,23
  91:11,15 92:24
  92:25 93:21
  94:5 98:1,4,8
  100:11 115:2

128:1 130:11
132:8 134:5
138:17,18,23
139:2
penetrations
  33:9 37:9
  52:12
people  87:5
  112:15 182:17
  189:20
percent  23:18
  23:23 24:5
  29:24 34:16
  38:16 39:23
  40:14 42:6
  46:12,21 48:15
  49:4 50:19
  51:14,19 54:11
  55:24 56:2,7
  58:8 61:25
  67:12,15 68:4
  71:8 73:7
  105:23 125:23
  163:14 164:4,5
  164:6,9,13,16
  176:25 177:1,7
  177:8,9
percentage
  28:5 32:21
  33:2 44:18
  61:11 145:14
perfectly
  170:18
perform  12:18
  35:13 47:10
  73:21 129:8
  154:7 171:23

178:4
performed
  31:10,11 32:13
  49:7 72:19
  91:16 97:7,8
  138:16 178:2
  178:15
performing
  13:1 113:13
period  20:20
  154:4,19,24
periodically
  37:20
perjury  80:22
permission
  21:24
permit  106:19
  106:19 175:1
permits  80:3
  147:15
permitted
  134:14
permitting
  106:14
person  50:22
  136:1 159:17
  168:2 175:2
personal  16:24
personally
  14:14 16:22
  23:2 27:2 30:7
  30:9,20 43:11
  103:15 138:21
  139:16 151:15
  159:24 166:3
perspective
  23:12 46:23

158:24
pertain  61:14
pertained
  127:10
pertaining
  74:7 89:19
pertains  18:1
pertinent
  16:21
phase  13:11,14
  13:15 15:19
  84:16,24
phases  77:14
phillips  5:11
photo  27:5
  29:9 34:21
  44:12 66:22
  77:18 90:23,25
  91:6,6,7,21,21
  92:6,10,15
  93:1,3,6,10,13
  93:13 94:1,11
  95:11 161:14
  170:15
photograph
  161:9
photographed
  159:24
photographs
  95:5 98:23,25
  161:5
photos  17:15
  27:8,10,12,13
  27:15 29:3,11
  29:13 30:8
  36:24 37:10
  70:7 72:3

74:24 77:1,17
77:20 90:10,13
90:17 91:19
92:4,5 93:2,22
94:6,12,15
98:8,11,16,19
**phrase** 70:13
162:2
**phrased** 94:13
**physical** 87:5
**physically**
122:18 153:4
**pick** 129:18
**pickup** 187:4
**picture** 53:24
**pictures** 30:17
103:20
**piece** 47:15,17
71:17 103:24
116:4
**pieces** 45:8
47:22 117:14
**pile** 91:24,25
**pipe** 69:10
70:17,19,19
**piping** 69:24
70:16 126:25
**place** 1:15
46:21,25 48:7
48:17,18 54:19
64:25 65:11
127:4
**placed** 34:15
53:25
**placement**
157:1

**placing** 34:25
**plan** 29:5
38:22 49:1
115:14 155:18
168:7,19,20
175:18 183:15
188:3,4,22,24
**planes** 184:24
**plank** 38:7,9
57:2
**planning** 15:8
**plans** 109:15
155:20 156:3
175:12,16
**plastic** 91:2
**please** 7:15,22
25:24 56:24
79:14 88:22
95:20 159:20
163:11 170:1,7
170:22 173:20
**pleased** 95:23
**pllc** 5:1
**plugged** 65:8
**plumbed** 70:8
**plumber** 48:7
63:10,17 65:2
66:1,4,12,13
151:16 171:20
**plumbing**
69:18,19,20,22
70:15 103:25
104:19 126:19
126:23
**plus** 30:5 39:1
152:11

**plywood** 57:12
**pm** 189:25
**point** 35:5
38:10 40:17
68:11 75:19
79:25 87:10,16
91:24 104:5
106:21 123:14
150:23 160:10
166:11 175:18
**portion** 14:12
53:3 100:16
112:17
**position** 11:13
11:15 17:19
22:11 63:9
**possession**
22:15
**possibility**
138:20
**possible** 63:2,3
75:11 141:19
164:3,12,14
167:7 180:19
**post** 59:24,25
60:2 177:15,17
**postal** 59:13,18
60:3 121:5,7
121:10 140:4
188:24
**potential** 13:18
41:13 42:22
45:9 75:1
77:16 87:8,9
127:25 133:12
138:22 152:1,9
165:25 168:7

**potentially**
42:4 52:1
54:18 55:20
58:23 60:23
61:3 75:4,6,9
189:10
**pour** 73:17
**power** 11:7,24
12:1
**pre** 13:10,14
13:16 14:12,15
14:18,22 15:8
84:16,16,19
173:7 177:18
**precast** 38:7,9
**precise** 148:24
152:7
**prefer** 180:4
**preference**
181:6 186:7
**prefinished**
57:25
**prejudicial**
104:10 105:5
**prep** 35:22
**prepare** 13:24
64:25
**prepared** 27:6
80:4 88:18
140:22 141:4
169:25 180:17
**present** 95:24
160:16
**presentable**
50:17
**presentation**
180:21

presented 7:4
7:8
presents 147:2
presumably
105:2,3 186:19
pretty 14:25
143:8
prevent 45:11
46:1
preview 79:4
186:3
previewing
132:18
previous 36:1
105:9
previously
105:10 161:15
price 12:23
85:12 111:3,15
112:2,6,19
113:10 114:4
116:14 117:1
117:16,20
123:18 124:16
127:5 128:16
128:19 129:1
pricing 85:4
101:16 118:8
primarily
11:21,23 48:19
57:21 58:4
112:14 114:8
114:12 118:4
124:10 127:9
128:21 150:6
primary 12:19
13:2

principal 13:8
17:21,25
prior 18:4,19
37:23 38:4
42:23 72:4
74:5,8 80:20
88:3 112:5
159:22 175:24
175:25 176:10
176:11
priority 88:3
prism 104:23
privilege 82:9
141:9
probably
143:2,6 146:3
154:17 161:16
162:11 173:7
180:13 182:12
188:24
probative
104:8
problem 147:2
158:20,21
187:2,5 188:17
problematic
25:1
procedurally
179:4
proceed 7:12
8:8 25:7 30:23
31:14 36:7
41:24 44:2
46:14 49:22
53:8 123:15
140:21,23
173:23 179:5

179:11 187:16
188:4 189:15
proceeding
10:22 80:23
proceedings
10:18,21
189:24 190:4
proceeds 80:14
process 17:11
28:25 50:18
69:15 74:6
76:9 84:15,20
86:1 87:6
153:5
processing
102:18
procore 77:2,2
procured
134:24
product 70:22
108:5 109:6
162:25
profession
134:23
professional
10:6,8,11,12
11:17,18
129:24
proffer 137:15
proffered
105:8
progress 17:11
17:18 89:14
99:22,25
164:15
progressing
13:21,22

progression
98:9
project 12:17
12:20,22 13:1
13:18 14:13,21
16:5 17:1,4,24
18:12 20:15
21:1 22:15,22
23:5,10,11,16
23:19 24:12
25:13,16,17
26:6,23 30:13
32:11 49:1
52:17 57:24
63:19 65:22
68:23 69:4
71:11 77:10
84:10,22 85:18
86:7,8,9 87:21
87:23 99:15
100:3 104:20
105:22 106:16
106:25 108:17
109:7 112:17
113:15 116:22
119:6 120:23
122:1 130:17
132:12 136:7,9
136:15,16,17
139:10,12,20
143:24 145:13
145:14,21
147:7,16 149:8
149:15 150:16
152:23 153:25
154:4,8,14,14
156:24 159:23

160:1,3 162:21
164:6,18
165:24 168:1
173:7 174:4,5
174:7,18 176:7
176:8,12
177:23 178:5,8
**projections**
178:20
**projects**  11:23
14:17,23 67:10
71:23 109:18
111:6,17
112:23 114:16
118:22 120:5
121:16 122:6
123:24 128:25
131:7 133:9
136:2 149:19
149:21,24
150:2,4 151:20
154:20,21
178:8
**promark**
184:13
**promise**  83:12
165:1
**pronoun**  30:1
**proof**  137:4,11
137:13,22,23
138:2
**proper**  63:8
68:10 80:17
87:3 130:19
168:22
**properly**  35:1
35:24 41:6

42:20 43:24
50:6 52:13
81:7 87:17,23
88:15 130:19
143:25 167:22
167:24 168:20
171:20
**property**  96:1
155:16
**proponent**
104:7
**proposal**  20:22
20:23
**protect**  112:14
**protection**
48:11 140:12
**protections**
112:7
**provide**  7:9
15:18 16:4
17:15 18:14
19:7 31:12
41:11 74:14
76:20 97:4
98:8 107:14
115:7 122:2
133:17,22
140:2 152:8,11
165:16 177:11
177:20,23
**provided**  14:18
18:3,7,22,25
19:1 28:10,20
31:5 108:2
109:3 111:3
131:23 132:10
136:18 137:11

138:7,8 145:1
177:12 178:20
179:24 181:20
**provides**  34:12
37:3 49:13
80:3,9,16
103:13
**providing**
36:15 38:2
134:2 160:7
**proximate**
156:14
**pull**  25:21
88:19 99:5
159:8 170:1
176:16
**pulled**  176:20
177:3
**pulling**  182:8
**punch**  16:20
20:24 29:17,18
46:22,25 55:11
55:12 59:7,10
61:14,19 76:21
77:6 78:2
139:1 163:25
163:25 164:7
164:11,12,21
164:23 177:8
**punchy**  180:22
**purchased**
66:17 117:14
**purpose**
105:14 115:6
**purposes**  133:1
137:21,25
153:23

**push**  65:11
**put**  13:22 14:9
22:11 23:6
25:11 30:6,9
38:13 64:24
70:24 76:5
77:3 81:20
84:25 85:2,4
85:14,14,20,25
88:14 95:11
106:22 109:15
133:16 144:22
145:5,6,16
152:14 166:7
171:11 172:18
172:23 181:2
185:1,6
**putative**  135:1
**puts**  29:9
**putting**  15:25
70:21 86:3
110:6 115:12
118:22 119:13
149:18 152:10
**pvc**  69:23

**q**

**qualification**
24:15
**qualifications**
24:24
**qualified**  24:25
25:20 102:19
171:16
**qualify**  14:3,5
150:25
**quality**  13:3
16:18 86:19

87:1
**quantitative**
114:10
**quentin** 2:5
**question** 36:10
36:20 79:5
97:20 103:19
103:20,22
123:14 135:24
146:24 147:3
153:10 154:2
160:12 170:8
170:16 182:23
**questioning**
139:6
**questions**
96:14,17,22,25
105:11 140:17
173:25 174:21
175:3,4 176:21
**quickly** 173:14
**quite** 14:20
22:14 40:21
58:3
**quote** 104:1,6
106:1 108:8
109:22 110:14
132:19 134:25
135:1,3,4,4,5,8
135:9 136:6,14
136:16 137:5
137:17 149:12
163:2 165:9
**quoted** 136:20
**quotes** 102:14
104:11,12
133:22 135:14

136:9 138:6
178:14
**quoting** 109:17

**r**

**r** 2:21 4:1 7:1
190:1
**rack** 59:14
121:5
**racks** 59:16
121:9
**rail** 109:20
**railing** 109:16
**railings** 39:16
109:14
**raised** 80:10
**ran** 75:17
**range** 45:19,22
45:24 46:1
64:5,13 65:2
115:15 150:17
151:15,25,25
152:7,8,11,12
152:13,16,23
154:18 172:21
**ranges** 14:24
64:19 160:3
**ranging** 150:18
**rank** 137:17
**rate** 114:15
119:6 123:23
145:25
**rated** 143:17
**rates** 172:3
**rather** 25:3
104:1 143:14
149:21 185:21

**rating** 34:13
**rattled** 171:8
**reach** 78:15,18
94:20,23
102:21 105:20
110:12 113:12
117:1 118:7
120:3 122:5
147:23 148:2
149:3,4,11,14
150:19
**reached** 28:25
111:4 112:22
135:19
**reaching** 20:12
101:12 134:1
139:5
**read** 82:5 95:9
95:19,20 96:24
161:11
**reader** 82:3
**readily** 131:10
**reading** 38:17
96:13 103:7
**ready** 87:11
128:15 140:20
180:15
**realize** 79:3
150:8
**really** 12:23
43:5 69:4
83:13 103:8
141:6 162:3
168:21 180:17
185:23 187:10
189:12,18

**reason** 35:17
37:6 82:10
85:16 184:1
185:8
**reasonable**
78:18 94:23
119:10
**reasonably**
103:16 134:18
142:25
**reasons** 112:13
**rebut** 80:24
**recall** 20:9
41:19,20 43:22
45:7 47:3,21
65:18 66:7
116:23 156:15
156:22 157:3
157:15 161:18
163:18 165:19
166:12,22,22
168:13 170:19
170:21,25
176:21 177:3
**receipt** 79:17
167:12,14,17
168:1
**receive** 9:22
10:3,14 14:2
81:25 85:5
138:15 153:18
175:18
**received** 21:17
84:3 104:13
136:6,9,14,16
137:5 138:6

**receives** 83:18
98:24 132:3
**receiving** 11:1
17:4 79:19
**recent** 81:1
169:24
**recently** 80:25
148:20,23
**recess** 79:7,13
140:24 173:11
173:19 181:1,4
189:22
**recognize** 26:2
82:16 88:25
99:10 182:21
**recognizing**
79:22
**recollection**
170:24
**recommend**
85:13
**record** 7:2,15
8:4 79:15
123:9 173:21
190:4
**recorded**
159:24 167:12
**records** 160:1
**recreate** 76:3,5
**recross** 6:3
178:23
**red** 3:1,4,8
4:12,21 7:11
19:1,4 20:2,5
20:19 22:5,7
79:16 137:21
148:15,21

180:5 183:9,13
189:1
**redirect** 6:3
175:5,7
**redone** 87:9
**redundancy**
144:2
**redundant**
162:2
**reference**
155:21 166:12
**referenced**
31:2 134:21
**referencing**
176:9
**referred**
155:21 161:24
165:25 170:9
**referring**
170:11
**refrigerator**
45:15,20
**refrigerators**
64:6,13,19
124:23 160:4
**regarding**
99:21,25
100:13 101:9
105:17 106:7
107:1,7 108:11
109:3,24
110:16 120:3
128:1 130:2
134:2,4 135:8
155:6 157:23
174:9 176:21
177:24

**regardless**
143:23,24
169:2
**regards** 20:3
**region** 104:15
178:13,16
**reinspection**
89:6
**reinstallation**
73:15
**rejigger** 184:2
**rejiggering**
184:25
**relate** 25:3
56:11 176:12
**related** 10:18
10:21 12:24
16:3 17:24,25
39:15 40:10
46:25 61:14
65:15 108:1
110:4 126:7,22
126:23 143:15
143:16,20
144:3 159:23
**relates** 15:25
103:4 136:7
164:19 181:22
**relatively**
180:21
**release** 75:19
**released**
164:20
**relevant** 15:11
15:11 16:10,16
**reliable** 105:8

**relied** 101:14
134:23 149:17
149:20
**relief** 22:4
**religious** 14:24
**reluctant**
182:25
**rely** 101:12
102:16,20
103:16 133:25
134:18
**relying** 135:14
**remainder**
98:7
**remaining**
42:10 46:12
54:24 56:5
117:11 163:25
180:10
**remains**
137:17
**remediate** 36:3
135:23
**remediating**
130:10
**remediation**
34:2,4 38:15
39:1,7 41:11
73:24 75:2,10
108:20 132:9
132:14,25
133:6,19 134:5
135:2,14,21
136:1,10,12,17
136:20 137:6,8
137:9 138:9,11

**remedied** 41:7
43:13 46:3
60:23
**remedies** 35:8
**remedy** 46:6
47:8
**remele** 5:16
**remember**
155:7 156:6,20
157:8 161:22
166:11 170:18
171:9 182:24
183:22 185:20
**remind** 101:1
**reminded**
184:4
**removal** 73:14
73:21 74:9
**remove** 73:17
113:25
**removed** 91:1
91:4 107:22
**renderings**
30:17
**rental** 183:3
**renters** 144:13
**repair** 36:14
56:12 61:1
72:9 75:6
87:15 100:5
120:21 165:23
167:1
**repaired** 47:21
88:9 169:3
170:20
**repairing**
117:25

**repairs** 56:10
**repeat** 9:11
**replace** 41:21
87:15 113:25
116:3,7
**replaced** 42:18
45:7 49:18
54:19 91:1,3,4
107:22 111:12
111:24,25
116:18 117:10
117:11
**replacement**
41:14,15,18
43:22 45:4,8
67:2 73:22
116:24 167:9
169:18
**replacements**
43:21 45:4
47:22 63:4
**report** 6:9,10
20:25 21:2,7
21:11 23:6
26:5,8,14,16
27:6,13,18,25
28:17,21 29:1
29:25 30:6,7,9
30:24 31:15,15
32:20 36:14,16
36:17 38:18
42:6 43:25
44:9 48:20,25
58:13 77:2
78:15 79:17,19
80:12,17 81:6
81:10,11,18,20

81:21,24 82:5
82:18,24 83:2
83:19 84:9
88:18 89:13,21
89:22 90:10,17
93:12 94:20
95:25 96:14
98:7,19 99:19
99:21 100:13
100:16,24
102:25 103:1,4
103:8,11 107:1
107:13 138:25
138:25 155:5
155:17,18,23
157:4 159:2
160:23 161:19
161:21 173:2
175:24,25
176:1,6,15
177:21
**reporting**
15:17
**reports** 176:10
181:17
**represent**
27:16 159:12
**representations**
90:13 98:11
**repugnant**
142:16
**request** 17:6
17:12,16 20:12
149:7,7
**requested** 7:9
17:17 35:19

**requesting**
17:7
**requests** 17:5
18:19 159:22
**require** 50:11
60:3,25 65:2,3
68:20 69:13,14
70:9 73:14
75:9,20 81:23
124:12 150:19
162:7 188:24
**required** 33:21
37:2 39:9
43:15 50:9,12
50:13,15 60:16
61:19 63:10
65:4,6 66:4,13
67:24 69:16
70:11 84:21
86:13 101:23
106:15,24
108:23 109:1
120:19,22
121:11 129:8
130:15,22
133:7 137:6
139:3
**requirements**
10:10 60:17
128:7
**requires** 56:12
**reservations**
178:18
**reserve** 187:6
**residential**
34:12 44:6
54:10 55:20

56:18 57:22
59:15 67:11
110:23 123:21
124:10,22
125:12 126:24
127:9 142:6,8
172:20
**respect**  15:12
15:13 18:16
63:23 78:15
94:20 180:23
**respond**  81:8
81:15
**response**  82:4
95:8 123:13
137:13,23,25
**responsibiliti...**
11:20,21 15:15
17:22
**responsibility**
13:2 86:2,6
168:21
**responsible**
13:24 29:14,20
86:3
**resprayed**
38:12
**rest**  181:18
**restore**  137:5
**restrictions**
128:7 187:7
**result**  155:2
**resume**  79:11
185:22
**resumed**  25:9
84:6

**retain**  20:14
**retainage**
164:19,20,24
**retained**  18:10
19:7,19 20:16
20:18,20
177:21
**retake**  182:14
**return**  51:10
**returns**  51:9
**review**  14:10
17:5 142:21
**reviewed**  53:10
103:20,21
159:22
**reviewing**  17:9
109:15
**right**  7:22 8:3
8:7 15:10
22:14 23:24
24:8,13 25:8
30:23 31:14
34:21 41:24
52:8,21 53:24
54:7 55:6
56:15 59:13
74:1 83:18,19
84:5,8 88:17
88:25 89:13
90:16 91:6,22
92:8,15 93:13
94:12 95:15,17
104:22 122:25
129:1 131:5
137:20 139:5
147:13,21,24
148:17 149:12

151:1,9 152:2
157:18,19
159:20 160:21
161:5,9 163:19
164:2,13
167:20 168:3
169:9,16 171:6
172:12 173:2,4
173:20 174:24
174:25 175:13
184:15 185:13
186:12 187:17
187:21 189:4
189:22
**rigid**  49:12
**rip**  70:4
**ripped**  42:20
**rise**  96:1
**riser**  69:10
**risk**  87:13
153:16,20
**river**  3:1,5,8
4:12,21 7:11
19:1,4 20:2,5
20:19 22:5,7
79:16 137:21
148:15,21
180:5 183:9,13
189:2
**road**  190:21
**robe**  63:15
**role**  17:3
**rolled**  56:20
**roof**  39:15
48:12 49:16
51:8 75:13,14
76:4,5,10

112:10,12,13
**roofing**  48:16
49:5,9,20,21
75:3 112:8
**rooftop**  48:22
55:9 112:9
**room**  29:6,11
29:12 128:5,8
162:23
**rooms**  29:7
53:15 57:21
162:23
**rough**  14:18
40:2 48:18
69:23 70:16,23
86:17 110:2,17
146:7
**roughing**
48:12
**roughly**  92:3
108:24
**routes**  107:25
**royal**  30:2
**ruins**  1:23 7:3
15:4,12 16:11
16:16 19:13,16
20:1 22:15,22
26:23 32:5,22
49:23 73:5
76:15 79:16
84:9 88:15
89:14,24 95:25
97:5,22 99:22
100:1,11,14
101:10,24
102:2 106:8
107:11 120:4

126:20 129:24
130:3 133:8
134:6 135:16
138:20 142:2
159:23,25
160:2 172:6
173:22 175:19
187:24
**rule** 79:25 80:3
80:14,18,19
102:15 103:12
103:13 105:4
**rules** 134:15,16
**ruling** 97:18
**rummage**
158:7

**s**

**s** 4:1 7:1
**safe** 78:6
**sagging** 92:9
**sand** 35:11
**sanity** 189:20
**satisfied** 81:4
**satisfy** 106:24
**saw** 27:6 56:21
162:17 170:17
**saying** 43:12
147:19 156:22
157:8
**says** 18:18 42:6
63:11 77:5
85:20 88:6
148:12 159:15
159:21 161:11
**scale** 113:14
117:3 118:9

**scenario** 16:21
41:6 93:14,24
117:13 122:24
156:23 166:8
**scenarios**
133:10
**schedulable**
186:9
**schedule** 12:19
14:6 28:1
85:15,20,25
86:2,10 184:16
184:19
**scheduled**
149:1 184:22
**schedules**
131:10
**scheduling**
183:23
**schematic**
13:19
**school** 8:13,15
8:23 9:2
**schooling** 9:22
**scooch** 7:23
**scope** 12:22
16:5 29:22
33:10 37:6
39:9 46:11
48:24 49:2
53:7 55:22
66:13 69:5,6
71:11,13 73:2
84:15 85:2,2,8
85:12,20 101:4
101:6 102:17
102:18 103:12

105:4 107:16
108:1 109:1
111:18 112:8
112:24 113:14
114:16 115:5
118:4,9 120:20
120:23 126:23
127:9,11,14,19
128:14,16
131:24 133:1
133:22 135:15
135:20 136:15
144:23 150:16
152:25 155:10
155:25 168:24
169:20 174:9
**scopes** 13:23
27:22 46:10
84:20,24 85:7
117:2 144:25
**screen** 19:20
25:24 88:22
99:8
**screw** 158:15
**scroll** 26:7 32:7
38:5 39:11
76:22 89:8
90:16 92:4
95:15 99:17
100:18 129:3,4
140:5 159:20
170:7,22
**sd** 4:23 5:12
**seal** 51:11
113:8 115:7
**sealant** 38:2
50:11,14

114:22 115:1
**sealants**
114:21 115:3,5
115:6
**sealed** 37:23
38:11 50:6
115:1
**sealing** 31:23
**season** 148:24
**seated** 79:14
173:20
**second** 20:25
44:10 46:19
57:5 58:5 64:1
64:3,4,6 65:16
77:7 80:6 83:9
84:8 85:24
88:18 90:4,6
90:18 93:6,25
94:12 97:23
98:2,12 99:2
99:13 100:10
101:7 104:4
109:16 112:10
159:2 163:16
170:7 172:14
**seconds** 141:10
**section** 32:25
34:7 36:20
39:11 40:2
41:25 47:12
48:10 49:22
50:24 51:2
53:9,10 54:8
55:7,13 56:15
57:18 59:13
68:2 170:20

**secure** 41:4
158:5
**security** 71:24
72:22,24 73:4
127:17 186:25
**sed** 76:25
**see** 7:24 13:21
13:25 16:12
19:20 25:24
26:1,8 32:18
34:7,20 35:15
35:23 36:5,23
37:2,8,9,10
40:2,22 41:18
42:9,25 43:9
43:10 44:11
50:25 53:24
60:14,20 61:23
62:8 69:4 70:6
71:15 72:3
78:10 82:2
86:21 87:20
88:5,22,24
91:7 92:7,8
99:8 100:21
101:14 106:11
114:25 118:21
119:6 123:24
124:1 131:12
138:14,21
140:10 141:6
144:20 147:15
149:15 150:18
157:11 161:8
168:19,22
181:22 186:25
189:5

**seeing** 43:22
45:7 48:25
70:22 157:3
**seeking** 81:5
**seem** 132:18
143:13
**seemed** 87:24
165:8
**seems** 24:2,24
183:6
**seen** 35:18
58:12 71:22
91:13 92:25
133:9 159:13
**selected** 21:1
**self** 12:18 13:1
154:7
**send** 13:25
85:3 133:22
**sense** 29:4
48:22 70:23
147:24 149:14
153:20 156:4
172:15
**separate** 58:24
67:17,18,22
72:25 73:1
94:9 114:22
129:16,20
**separately**
58:14
**separation**
37:22
**september**
32:13 89:4,5
92:11 97:8
154:5

**sequence** 86:13
86:15 87:8,14
87:25 88:9,13
**sequenced**
87:17,23 88:15
130:19
**sequencing**
86:16 143:22
143:23,24
144:1
**sequential**
85:16 86:10
87:1,4
**serial** 159:25
**serve** 188:17
**service** 12:16
134:2 188:25
**servicemaster**
137:5
**services** 12:7
12:14,15 13:10
13:15,16 14:15
14:19 15:10,19
15:21,24 16:6
16:8,9,15,22
16:25 18:3,7
18:14,22 19:1
19:8 21:8
95:23 97:4
109:19 133:23
136:17,20
137:6,8,9
138:9,11
159:18 171:15
**set** 13:17 34:24
48:7 49:1 52:7
70:8 77:11

93:22 109:15
113:7 116:5
121:24 122:21
137:15 155:20
156:2 168:20
169:1,4
**sets** 94:8
**settled** 149:1
**setup** 73:21
**seven** 105:23
152:8
**several** 42:16
80:14
**shaking** 83:6
**share** 22:10
**sharon** 32:25
88:19 95:15
99:5 100:18
129:3 176:16
183:16
**sheetrock** 33:6
70:2 72:5
75:18 133:11
**shelving** 61:21
61:22,23,24
123:19,20,22
**shipped** 166:25
**shipping** 167:5
**shon** 2:22
**shoot** 187:8
**short** 79:7
141:3 180:22
**shorter** 96:22
179:23 181:15
181:24
**show** 94:2
169:5 181:19

**showed** 37:10
90:24 155:18
**shower** 70:10
**showerhead**
70:18,20
**showerheads**
66:2
**showers** 66:3
69:25 70:6,8
126:23
**shown** 17:12
169:1,2
**shows** 92:11,14
93:4,7,14,24
137:18
**shultz** 5:9
**side** 16:4 45:24
51:8 54:17
74:22 92:8
140:24 168:13
181:14 182:5
**sides** 42:19
**sidewalk** 73:7
**sidewalks**
107:25 128:20
**siding** 50:24
51:3 53:4,6
88:4 113:20
115:3 169:17
**sign** 121:23
122:6,7,7,10
**signage** 121:21
121:22,24
140:4 143:3
**signature** 26:9
26:11 89:9,11
99:16 190:6

**significant**
32:14,15 34:5
37:11 45:24
46:22 58:6
70:7 89:18
91:23 97:13,22
100:2 128:10
169:14 174:7
**significantly**
155:3,4 179:23
**signify** 76:6
**signing** 26:13
**signs** 37:11
40:21 88:5
90:3 98:1,4
**similar** 18:16
111:6,17,17
112:23,23
113:14 114:16
117:3 118:8
119:6 120:6
121:16 122:7,8
123:24 133:10
143:14 149:21
150:16,17
151:10,18,21
151:24 153:25
165:15 181:12
181:16 182:18
**similarly**
104:19 151:22
182:14
**simply** 103:7
**simultaneously**
88:10
**single** 14:21
153:11

**sink** 47:16,20
48:8
**sinks** 65:12,14
65:18 69:25
126:21,22,23
**sioux** 4:23 5:12
150:5,9
**sir** 25:25 30:1
88:23 106:10
107:13
**sit** 82:14
178:19 187:5
**site** 16:1,18,19
17:8,13,14
18:17 20:14
26:20,22 27:1
27:16 29:2
30:3,4 32:8
39:18 41:15,18
42:10 43:21
44:19,22 45:8
47:1,3 51:17
53:22 54:3
57:10,13 59:18
60:10 61:25
62:16,17,20
63:4,20,21
64:9,11,16,20
65:17,22 67:3
67:13 68:19
69:15 71:13
72:22 73:9,23
74:2,6,8 85:21
86:5 87:11,14
89:5,17 90:23
97:23 99:2,13
101:13 111:12

112:16 113:7
114:8 115:24
116:10 117:11
118:9 122:17
124:4,5 125:1
125:25 126:14
129:10 130:16
130:23 131:1
135:22 142:24
147:11,13
149:7 157:7,13
158:3 159:25
161:13 166:2,8
169:6,24
**sitting** 169:8
**situated**
104:19
**situation** 148:4
148:10 167:5
**six** 23:18,22
24:5 41:4
131:12,13
185:17
**sixth** 80:1,15
**size** 30:13
104:20 114:16
117:3 120:6
121:16 122:6
151:21 154:14
158:14
**skilled** 146:2,4
146:5
**skin** 51:4
113:23
**skip** 76:20
**sleeve** 33:8

sleeves  33:7
slide  45:19
slides  94:8
slightly  31:7
    151:7 181:15
slips  45:23
small  116:3
    158:4
smaller  151:21
smart  166:13
smith  4:20 5:9
soffit  51:8
soft  49:8,10,11
    49:16
software  29:8
    29:8,9 76:25
    77:1
sold  43:7
solely  107:4
solemnly  7:17
solicited
    103:22 134:13
soliciting  36:12
    104:13 106:1
solution  91:5
solutions
    190:20
solve  168:21
somebody
    144:24
somewhat
    144:2
sonya  3:25
    190:3,8
sorry  9:10
    17:20 22:12
    24:7 49:10

50:2 71:16
76:23 83:22,24
84:1 119:23
123:18 125:16
129:4 136:25
137:19 140:10
143:20 146:4
148:15 159:7
161:20 163:3,8
163:21 168:9
173:13 174:15
176:10 185:11
sort  38:2,3,12
    40:23,25 59:23
    91:1,2 92:24
    110:8 144:12
    159:21 162:4
    168:10 171:6
sought  22:5
sound  34:11
    169:16 173:4
sounds  68:16
    144:2 173:17
source  76:8,14
    76:17
south  5:11,19
    26:24 96:2
    144:8 146:1
    149:24 150:2
    151:8 165:14
    187:12
southern  184:9
space  38:21
    56:22 124:11
    138:18
spaces  69:3
    71:10 110:22

119:20
spans  14:25
speak  9:8 21:6
    102:14 130:20
    134:23 148:19
    150:12 162:11
    173:12 182:9
speaking  23:15
    30:2 60:15
    62:10 65:9
    77:15,23 87:7
    138:5 151:6
    165:17 172:22
specialist
    133:19
specialize
    12:17
specializes
    11:6 39:4 53:5
specially
    170:21
specialties
    59:14,18 121:5
    140:4
specific  11:21
    18:23 22:18
    55:23 62:8
    68:16,16 77:4
    101:20 116:23
    119:5 134:25
    135:14 139:21
    139:22 144:19
    154:18 157:3
    157:15 158:11
specifically
    22:23 23:2
    40:16 46:17

47:4 56:11
64:20 67:20
71:3 87:21
89:19 110:9
118:19 127:25
135:21 145:6
150:3,19
157:23 161:18
165:19 171:17
172:7 176:24
specifications
    176:7,8
specificity
    137:19
specifics  66:7
spend  183:4
spill  189:10
split  159:21
spoken  148:17
spot  49:10,11
    49:16 92:3,13
    185:16
spots  49:8
spray  33:15
    37:5,24,24
    38:4 39:3,4
sprinkler
    68:24 69:1,1,8
    69:14,17 126:6
    126:8,13 140:3
square  108:24
    115:13,15,17
    119:8,9,10
    122:6,9
stack  158:1
stacked  178:7

stage  69:4
    70:23 74:5
staining  57:18
    57:20,23 58:14
    120:12,14
    121:1
stair  53:14
stairs  109:13
stairwells
    39:16
stakeholders
    14:11 164:8,11
stall  128:24
stand  7:22
    23:17 24:11
    82:12 83:1
    179:10 180:24
    182:7,14
standard
    123:13 143:9
standing  103:9
standpoint
    15:2,17 17:9
    33:22 40:12
    59:4 60:18
    84:19 86:20
    145:11
stands  189:22
stanley  4:17
start  12:20,24
    20:13 116:8
    159:9 173:7
    184:18 185:24
    186:24 188:9
started  12:6
    149:2,2,19

state  3:1,5,8
    4:12,21 7:11
    7:15 8:4 10:8
    19:1,4 20:2,5
    20:19 22:5,7
    24:16 72:7
    79:16 137:21
    148:15,22
    165:11 180:5
    183:9,13 189:2
statement
    27:23 28:2,6
    31:5 80:20
    81:12 101:2
    145:1 187:24
    188:3,13 189:6
statements
    107:4 188:14
states  1:1 2:4
status  21:1
    32:22 77:12
    184:12
statute  7:7
stay  186:25
steel  39:15
step  73:16
    153:6 168:11
    168:13
steps  142:19
stil  117:6
stocked  57:7
    64:9,14
stocking  54:14
stop  141:17
stopping
    185:16

stove  45:12
stoves  124:23
    160:3
straight  96:13
straightforw...
    46:10
strategic  79:5
strategy
    182:17
street  4:22
    5:18,19 73:11
strictly  144:25
strike  81:5
    133:17
strikes  96:20
string  80:10
striping  128:22
    128:23,24
strong  186:7
structural  9:6
    9:14 11:23
    39:14
structure
    27:25 28:18
    29:3,25
structured
    29:7,21
stub  70:17
stuff  66:4
    86:22 116:9
style  142:13
sub  35:13 54:5
    54:23 56:4
    57:15 68:16
    70:24 72:25
    106:2 153:14
    153:15,17,17

subcontract
    29:23 37:2
    114:23
subcontractor
    13:23 29:19
    35:15,18,20,22
    36:5,13 39:4
    42:5 43:19
    53:4 55:2,24
    55:25 56:9,14
    57:16 59:22
    61:9 62:8,11
    63:18 65:11
    66:18 67:6
    68:8,18 69:14
    69:17 70:11
    71:20,22 72:9
    72:10 73:2,21
    75:4 85:1,6,13
    85:21,23 87:7
    110:8 126:14
    129:16,21
    145:12,15,18
    151:20 164:25
    168:19 169:11
    171:18 172:8
subcontractors
    15:15 17:5
    18:20 54:6
    65:4 84:21,23
    85:5 101:15
    102:7 104:12
    129:23 130:14
    139:23 140:1
    147:20 149:4
    149:22 150:20
    152:24 164:20

[subcontractors - tagged]                                          Page 51

171:6 177:22
178:2,4,6
**subcontracts**
12:23 16:1
28:14
**subfloor**  34:10
**subject**  10:17
10:20 95:25
103:17 134:19
**subparts**  31:9
101:9
**subs**  43:15
53:2 63:8
65:25 86:4,11
104:25 129:8
131:4,7 139:9
147:24 149:15
152:1 153:7,12
**subsequent**
146:21
**substantial**
127:13 128:14
**substantially**
104:9
**substate**  49:11
**substations**
12:1
**substrate**
34:22 42:24
52:2
**sufficient**
138:19 188:15
**suggest**  182:22
**suggesting**
142:21
**suite**  4:5 5:11
5:19 190:22

**sum**  21:7,11
145:13
**summarize**
66:15 74:17
96:7,16 101:4
**summarizes**
131:23
**summary**
82:22 131:22
139:10,24
140:15 176:17
177:1,5
**sunday**  184:3
**supervision**
21:22
**supplement**
17:13
**supplied**  42:5
47:14 53:19,21
54:21 55:25
57:24 59:23,24
125:5
**supplier**  41:14
41:17 54:25
55:3 65:9
68:18 128:13
**supply**  44:5
46:16 53:11
54:8,9 55:18
61:17 63:24
67:16,17,21
111:11,13,22
112:12,16
113:22 115:24
117:9 118:16
124:1,15
125:14,15

140:4,12
**supplying**
125:13,18
**support**  17:16
71:10 123:23
**suppose**
147:14,22
**supposed**
158:25 176:12
183:3 184:1
**sure**  8:4 11:12
14:3,5 17:6,6
22:7,17 23:14
24:2 52:15
59:16 73:15
85:7,9,11,19
90:23 106:23
108:21 126:1
133:15 138:22
141:3,12 142:4
147:10 148:5
160:6,9 170:19
172:10 175:9
175:13 176:4
184:2 187:23
189:8
**surely**  158:13
**surface**  34:20
35:22
**surprise**
146:22
**surprised**
146:7,10,12
**surrounding**
68:12
**survey**  74:6

**suspicions**
56:17
**sustain**  97:20
133:3 147:4
**sustained**
95:13 96:21
97:2 105:11
136:4,24 137:2
137:20 160:20
**swear**  7:17
**swept**  91:25
**sworn**  27:23
28:1,6 31:5
58:13 101:2
144:25
**synergistically**
182:6
**system**  29:7
34:13 52:8
69:1,12 71:24
72:15,22,24
73:4 112:13
125:20 126:3,8
126:11,15,16
127:17,17
**systems**  5:17
55:8 68:2
128:1

|  t  |
|---|

**t**  190:1,1
**table**  19:21
27:25 28:18
**tabulate**  85:7
**tabulation**
160:9
**tagged**  126:12

**tags**  69:9,11
**take**  7:22 10:13
  18:11 22:22
  23:16 25:16,17
  29:2,8 30:8
  62:16 65:23
  70:4 79:11,23
  83:14 112:12
  125:13 130:14
  130:18 133:10
  137:9 140:19
  141:3,14,24
  142:20 145:3
  152:22 153:6
  162:18 173:10
  173:15 174:3
  182:7,19 183:3
  184:17
**taken**  31:4
  72:8 91:22
  92:11 180:3
**talk**  10:25 18:2
  78:25 84:9,18
  155:5 178:1
**talked**  22:19
  22:23 36:4
  47:6 55:1
  132:7 155:24
  165:4 166:10
**talking**  20:21
  35:7 79:21
  87:21
**tanabe**  4:16
  183:12,17,20
  184:4,10
  187:22,24
  188:6,10 189:3

  189:9,13
**tap**  7:24 8:1
**tape**  52:14
  55:19 91:2,7
  92:9 93:6,17
**taped**  56:1
  90:24
**taping**  117:25
**task**  29:15 77:6
**team**  30:2,4,7
  30:10,13,16
  142:22 166:4
**tedious**  31:7
**tell**  57:19 81:16
  82:4 96:19
  179:16
**telling**  184:15
**temporary**
  91:4
**ten**  41:4 82:25
  151:17 173:16
**tend**  158:6
**tends**  35:19
**tentatively**
  185:6
**term**  15:23
  70:14 86:8
  164:17
**terminate**
  68:14 128:13
**terminated**
  12:10
**termination**
  139:5
**terminology**
  22:13

**terms**  40:13
  86:16 127:22
  129:15 167:7
  182:8 189:7
**test**  10:13
  68:14 72:15
  126:1,15,15
  128:2,13
  138:16,16,17
**testified**  18:4
  58:9 81:19
  83:3 84:11
  98:15 122:20
  139:8 148:13
  156:5 157:6,17
  161:15,20,21
  168:10 174:2
  178:6 185:20
**testify**  82:6
  96:11 166:24
  180:1,14
  182:10
**testifying**  81:2
  82:22
**testimony**  7:4
  7:18 24:23
  25:3 80:4,21
  80:24 81:4,6
  102:5 104:23
  134:12 141:19
  156:19 166:13
  179:7,22
  189:17
**testing**  74:9
  106:10,13
  107:2,11
  138:14 139:2

**text**  161:9
**texture**  55:19
**textured**  56:1
**texturing**
  118:1
**thank**  7:13 8:2
  8:9 9:15,17
  22:1 25:5,8
  32:25 36:18
  71:2 78:4,4
  79:10,12,20
  84:3 123:16
  137:3 138:3
  141:20,23
  153:21 161:2,3
  161:21 171:3
  173:17,24
  174:19,22
  175:6 176:15
  179:2 186:22
  187:20
**thanks**  9:16
**thanksgiving**
  183:6
**theoretically**
  180:13
**theory**  184:20
**thereof**  169:23
**thermal**  49:13
**thing**  66:3
  78:11 104:21
  129:10 170:9
  175:9 176:15
**things**  12:1
  16:4 29:17
  30:8 33:12,16
  35:2 42:4

48:18 52:4,5
52:22 59:17
62:15 75:20
86:17,25 87:17
101:22 102:21
106:17,20
107:25 110:8
131:11 142:13
153:1 157:17
157:20 158:11
166:1 180:1
**think**   11:10
27:6 31:8 32:7
33:23,24 43:19
44:9 46:8,10
47:23 51:3,14
52:8 53:23
55:13 56:8,16
57:20 58:22
61:10 81:16
82:9,21 87:7
119:16 127:9
129:14 132:25
134:13 138:25
139:19 140:23
141:18,23
144:1 145:25
151:13 156:3
156:16,18
161:24 162:16
163:10 164:22
164:23 166:24
168:10 169:15
171:11 174:5
180:3,6,12,15
180:18 182:2
182:10,11,20

183:8 185:13
185:15,24
186:23 188:23
189:14,15,21
**thinner**   56:25
**third**   18:10,16
18:18 23:10,13
32:17 42:22
44:12 46:20
57:5 58:5 64:7
65:16 95:24
97:5 99:13
101:3 102:7,11
102:13 103:11
103:22 107:5
132:19 134:25
135:1,2 137:17
149:11 163:19
170:22 175:24
176:1
**thirty**   160:15
**thought**   41:21
48:14 54:11
96:15 148:13
165:8 183:23
**thoughts**   180:9
**thousand**
27:11 108:24
**thousands**
21:10
**three**   14:1 30:4
33:24 34:1,3
50:3 59:7 85:5
92:4 93:1,22
93:23 94:8,14
95:6 105:23
106:22 110:23

111:12,24,24
130:21 131:1
131:12 137:7
144:15 153:19
172:11 181:16
**thursday**   2:9
186:11
**tie**   70:20
**tied**   48:8
130:20
**tightly**   128:6
**tightness**   88:2
**tile**   56:25 57:2
114:25 118:18
119:20 161:22
162:3,7,10
163:4
**time**   11:15,19
11:24 14:6
20:20 21:20
29:5 32:2 35:7
38:21 43:23
48:19 49:1
50:6 51:5,13
52:3,9,18
57:14 59:19
71:10 73:9
78:21 81:15
85:21,22 86:5
92:17 95:3,6
98:18 100:3
116:8 127:12
131:21 138:9
140:17 141:24
142:12,22
149:2 153:2
154:24 155:17

155:19 156:3
163:11 165:1
167:12,14,16
167:22 168:1
170:20 173:15
175:14 182:19
184:17,24
186:18 187:11
188:6
**timeframe**
20:9 154:21
181:13
**timeline**   138:7
**timely**   129:11
139:13
**times**   18:21,24
30:1 106:22
132:8 151:1
154:12,13,15
154:16 155:24
162:10 172:11
173:1 179:12
181:5
**timing**   79:4
152:24
**title**   11:13 13:7
**titled**   34:7
39:12 48:10
**today**   24:24
32:22 82:6
103:2 130:7,17
131:23 142:16
174:2 178:19
179:9 180:14
181:13
**together**   13:22
14:10 15:25

Page 54

23:6 30:6,9
84:25 85:3,4
85:14,15,20,25
86:4 109:15
110:6 115:12
118:22 119:13
133:16 145:5,7
145:16 149:18
152:10,14
166:7
**toilet** 62:13,14
63:14 124:8,9
124:13 166:10
**toilets** 62:12,13
62:16,17,23,25
63:11,13 69:25
101:21 124:14
126:21 166:2
166:17,24
**told** 85:19
103:11 149:11
173:1
**took** 16:6 27:4
27:8 28:19
30:16 47:23
74:24 77:20
79:16 161:5
**top** 38:13 43:1
48:21 49:14
51:4 53:8 67:8
75:17 91:8,9
173:13
**total** 17:10,10
21:10 24:3
35:10 105:23
124:24 145:13

**totally** 44:20
**touch** 120:21
181:17,19
186:25
**touched** 10:24
58:4
**touches** 70:24
71:1
**touchup** 61:2
**toward** 171:8
**towel** 63:15
**tower** 53:14
**towers** 5:18
113:7
**town** 178:7
**trace** 29:14
76:8
**tracked** 176:5
**trade** 16:1
35:13,16 39:22
46:12 48:3
49:20 50:7,9
56:4 62:8
67:17,18,19,22
73:3
**trades** 39:2
41:10 43:15
46:6,9 47:8
48:3,9 49:4
53:2 54:23
58:23 63:8
64:23 65:25
67:20 85:16
86:4,11 139:8
139:19,21
171:5,15,19,23
172:2,5

**training** 11:16
78:16 94:21
130:13 131:16
**transcribed**
3:25
**transcript**
190:4
**transfer** 34:11
**transmission**
11:7,25
**transparently**
188:19
**trash** 53:15
**travel** 184:25
**treat** 133:11,14
**treatise** 103:23
**treatises**
102:13 134:22
**treatments**
67:8,9,13,14
67:21,24 125:9
125:11
**trepidations**
178:18
**trial** 80:22
**tried** 29:2,3
**trim** 65:15
66:3,4 67:7
70:13,15,21,21
71:14,17 72:11
86:22,24
**trimmed** 52:13
71:6 72:6,14
**trimming** 69:8
69:24 126:10
127:2,8

**trip** 82:12,25
**true** 30:16
90:13 98:11
109:1 146:11
190:4
**truly** 27:15
**truss** 69:3
75:15
**trustee** 188:22
188:24
**truth** 7:19,19
7:19 81:12
**try** 76:3,5,9
77:15 141:2,14
150:24 168:21
177:21 182:6
189:19
**trying** 30:5
82:25 133:21
145:20 146:21
153:2 160:7
163:10 166:13
168:23 183:22
**tuesday** 83:11
179:11 180:22
181:7,11
182:20,22
184:6 185:18
186:2,4,9,15
187:11,19
188:7,12,20
189:8
**tuesdays** 181:3
**turn** 68:9,12
69:12 82:25
88:17 126:16
141:9 172:14

**turned** 164:24
**turnover** 126:2
**twenties** 21:10
**twenty** 20:7
21:10
**two** 14:1 20:23
33:24 34:1,3
35:10 39:8
51:16,17 57:9
59:8 70:6
79:25 85:5
92:17 94:8,12
94:14 98:19
125:5 127:4
131:1 141:10
159:21 176:4
178:8 181:4
182:3 185:1,13
**twofold** 180:12
**tying** 176:12
**type** 20:24
36:13 50:7,10
56:23 57:1
67:10 72:22
75:23 84:11,14
91:4 110:24
119:4 120:23
121:23 122:8
124:13 133:18
151:19 154:20
154:21 162:25
163:5
**types** 14:23
18:22 43:8
102:20 122:7
162:5 163:1

**typical** 29:22
30:12 38:8
50:17 62:24
119:6 120:23
123:23 162:24
**typically** 13:25
14:21 15:14
18:18 23:19
33:10 34:10
35:15 36:5
37:1 39:2,24
40:5 42:9,25
45:21 49:12
50:15 51:9
53:4 55:17,21
58:12 59:3,21
60:14,20 61:8
61:15,22 62:7
63:24 64:24
65:8 68:8 69:2
73:20 76:2
85:5 86:20
101:14,19
105:22 110:6
114:22,25
115:4,12
118:21 120:17
121:23 123:22
129:20 131:7,9
131:12 133:22
136:1 145:10
152:13 156:23
158:4 164:5,19
167:13 168:18
172:21
**tyvek** 40:8 51:5
113:24,25,25

169:15,18,19
169:23 170:9
170:10,14,20

**u**

**u** 76:25
**u.s.** 2:5,23
59:24 60:3
**ultimate**
120:25 130:2
134:1
**ultimately**
105:6 130:16
175:18
**un** 66:9
**unartfully**
94:13
**unboxed** 62:20
65:19
**unclear** 65:21
65:23 68:6
127:11,22
**uncommon**
88:10
**undamaged**
66:25
**under** 7:7
10:12 16:5
31:25 33:10,16
48:13,23 61:15
79:25 80:22
96:1 110:5
114:2 131:22
131:25 148:9
149:19 182:12
**underestimat...**
48:24

**underneath**
11:18 49:12
**understand**
31:7 32:20,22
76:2 89:6
95:25 100:9
148:5,5 187:7
**understanding**
15:14 22:14
28:12 82:11
112:9 133:1
145:2 159:1
175:10 181:7
188:18
**understood**
176:4
**undertake**
26:19
**unfortunate**
79:6
**unison** 85:17
**unit** 36:23,25
42:16 44:10
46:23 53:16
56:21,22 64:5
64:10,15 65:17
70:21 96:1
104:16 105:14
123:25 138:17
154:4 156:18
157:25 172:20
**united** 1:1 2:4
**units** 42:18
44:6,12,13,16
44:16,23 46:18
46:24 47:18,25
48:4 56:19

**[units - video]**                                              Page 56

57:6,7,9 59:15
62:15 63:22
64:2,4,9,12,14
64:18 65:6
66:5,19 67:11
72:7,13 105:14
110:24 111:12
111:24,25
124:1,10,20,25
125:1,2,2
126:11 127:3,9
137:7 139:2
157:24 158:25
159:3 163:17
173:1
**university**  9:25
**unknown**  2:25
**unknowns**
115:16
**unlimited**
130:17
**unofficial**
22:25
**unreported**
80:7
**unskilled**
146:3
**unsure**  71:11
**unusual**  7:7
189:18
**upper**  54:15
71:7
**use**  14:25 15:3
15:6 29:8
30:13 40:13
77:15 84:12
151:11,20

154:20 182:17
182:25
**used**  28:1,20
30:1 36:3
54:14 67:21
70:13 73:5
86:8 110:7
115:15 177:22
178:14
**using**  176:5
**usual**  172:2
**usually**  65:10
67:16 68:22,23
131:11 167:14
**utility**  101:21
**utilizing**  78:16
94:21

**v**

**v**  80:2,9
**validate**  17:14
18:17,19
101:15 106:16
158:10
**valuations**
181:19
**value**  49:13
101:6 104:9
109:19 174:7
174:13,18
**values**  28:1
69:10
**valves**  126:23
**vanities**  47:12
47:14
**vanity**  47:17
47:18 48:7

**vapor**  33:6
**variance**  152:9
**varies**  67:10
154:14
**various**  76:12
94:8 101:9
102:21 104:17
155:24 162:5
175:11 180:1
**vary**  152:25,25
153:1
**veatch**  11:4,5
11:14 12:4,5,8
**vendor**  59:23
64:24 106:2
167:7
**veneer**  113:4
**ventilation**
71:4
**venture**  80:8
**verifiably**
164:10
**verified**  65:19
164:22
**verify**  17:8
169:1
**veritext**  190:20
**verstandig**  4:8
6:6 19:20
21:24 22:1,3
24:21 25:5,11
78:24 79:3,12
79:20 82:8,19
83:8,11,16
88:21 95:3
96:3,5 97:15
98:22 102:4

103:5 104:18
123:7,11,16,17
132:1,22 134:9
134:11,21
136:23,25
137:3,14,24
140:22 141:6,8
141:13,20,22
141:23 142:1
146:10,15,18
146:19,24
147:5 156:20
156:25 159:7
159:11 160:13
160:21 161:1,3
161:4 163:8,12
165:1,3 170:1
170:3 171:2,4
173:10,17,23
173:24 174:1
174:12,19
175:10 176:22
178:9,24
180:11 181:21
182:4,5 183:1
183:2,24,25
184:22 186:6
186:16,22
188:2,19
**verstandig's**
104:5
**versus**  143:16
153:10 175:11
**video**  174:23
174:25 175:1
185:9 186:18

**view**  29:16
  31:24 129:15
  144:5
**viewed**  56:19
  172:11 175:15
**views**  176:3
**vinyl**  54:7
  56:25 57:2,2
  117:8 118:18
  119:20 161:22
  162:3,7,10
**visible**  88:5
  90:10 138:23
  138:24 143:9
  158:9
**visit**  29:2 32:9
  32:17 144:9
  169:24 186:2
**visiting**  80:19
**visits**  17:14
  155:16
**visual**  26:20
  90:9 101:13
  127:24
**vogel**  4:11 19:7
  19:10
**voir**  6:6 21:24
  22:2

**w**

**w**  4:17 40:1
  41:25
**w&l**  110:2,17
  110:19 111:14
**wait**  181:7
  186:4
**waiting**  79:18

**waive**  82:17
**waiving**  82:9
**walk**  21:6 27:4
  164:7
**walked**  27:2
  29:4 40:20
**walking**  49:16
  74:20,23
  112:15 157:24
**wall**  5:17 37:25
  38:1,8,14 43:3
  70:17,19
  123:23
**walls**  31:22
  38:19 55:17
  69:23 70:1,16
  72:9 133:11
**want**  10:24
  11:11 16:8
  18:2 23:21
  25:19 81:22
  82:5,14 84:9
  85:11,23 96:17
  96:22 100:16
  123:9 129:7
  140:19 149:10
  150:23 158:7
  158:13 175:9
  179:9,10 180:5
  180:24 181:2
  183:5 185:1,6
  185:9 186:3,4
  189:10
**wanted**  167:25
  175:12 184:18
**wanting**  82:10
  171:11 179:12

**wants**  78:11
  179:5,11,14
**warped**  41:5
**warrantable**
  168:8
**warrantied**
  168:6,8
**warranties**
  35:23
**warranty**
  167:4,6,13
  168:16
**wash**  50:16
**washer**  64:4,10
  64:17 65:1,1
  124:23 157:25
  158:1 161:12
  161:13
**washers**
  157:18 158:19
  159:3,5 161:16
**washing**  160:4
  160:14,15
**watching**
  180:16
**water**  69:23
  70:10 75:8,12
  75:14,19 76:2
  76:5,6,7 87:18
  88:2 89:19,22
  89:23 90:2
  91:14,15 92:23
  92:23,25 98:1
  98:4,8 100:10
  126:25 128:1,2
  130:11 132:8,8
  133:7,7 134:5

  136:12 138:17
  138:18,23
  139:1
**waterproofing**
  28:15 31:16,19
  33:3 36:2 37:3
  108:21
**watertight**
  88:7 108:22
  139:15
**watertown**  3:4
  5:10 26:24
  96:2 106:20
  144:8 146:1
  149:24 150:2,3
  150:4,10,13,14
  150:19,20,25
  151:8,14,19,23
  178:12,25
**way**  21:17
  29:16 58:17
  74:21 82:2
  96:17 114:24
  129:15 131:14
  135:1 139:16
  141:4,18
  145:16 146:4
  147:3 161:19
  164:5 170:6
  183:3
**we've**  29:21,24
  40:22 71:7
  94:6 101:16
  111:17 129:6
  132:7 150:5
  188:22

**weather**  37:5
  39:3 40:9 51:4
**website**  13:9
  16:7
**wednesday**
  182:22,25
  183:12,12,14
  183:20 184:6
  186:11
**weeds**  153:9
**week**  39:8
  162:3 179:13
  185:24,25
  186:2,7
**weekend**
  182:17
**weeks**  39:8
**weight**  25:3
  81:4 135:7,8
  135:10,11
**went**  9:1 27:1,3
  30:3 75:15
  103:22 135:4
  155:2
**west**  4:22 51:8
  150:6
**whatnot**  88:6
  154:22
**wife**  187:3
**willing**  82:17
**win**  188:23
**wind**  52:4
**window**  41:3
  41:16 54:25
  67:8,9,13,14
  67:20,24 90:24
  90:25 91:2,8

91:11,14 92:8
  92:10,12,13,16
  93:4,8,15,17
  94:3,6,7,10
  115:3 125:9,11
  125:17
**windows**  40:8
  40:21,24 41:1
  41:2,4,14,15
  41:16,18,21
  54:8,9,10,13
  54:16,18,21
  56:11 67:11
  88:6 94:9
  117:8,9,10,11
  117:15 125:12
**winter**  186:10
**wire**  61:23
  75:15,15
  123:22
**wired**  69:11
**wiring**  72:2
**wishing**  175:3
**witness**  7:12
  9:10,13,17
  24:16,22 83:1
  123:11 126:15
  135:17,19
  136:3 146:21
  156:21,22
  173:11 174:17
  174:20 179:6
  179:18,19
  180:3,7,11
  185:2 189:17
**witness's**  80:20
  81:5 141:19

**witnessed**
  112:18 118:9
**witnesses**  6:3
  179:17 180:14
  180:19 181:10
  182:8
**wl**  80:7
**wood**  40:6
  42:23 57:23
  59:3
**woods**  5:9
**word**  97:1
**words**  171:11
**work**  10:12,24
  11:23 12:6,18
  12:23 13:1,23
  13:23 14:6
  16:5 17:7,15
  17:16 22:21
  23:7 24:13
  27:22 28:16
  29:22 31:10
  32:1,14,18
  33:11,24 34:14
  35:13 37:6
  38:23 39:1,1
  39:23,24 41:12
  42:6,10 43:16
  43:17 46:8
  47:8,10 48:6
  48:21 49:20
  50:8 52:24
  53:12,18 54:5
  54:6,24 55:2
  55:22 56:5,12
  57:15 59:5,11
  59:20 61:8

62:7,10 63:17
  65:25 66:18
  67:5,6,7 68:16
  68:19 69:18,19
  70:1,7,11 71:9
  71:14,19,20,22
  72:2,17,21
  73:10 74:12
  75:1,4 84:20
  84:24 85:2,8
  85:12,18 86:9
  86:14 87:9
  89:7,19 91:24
  101:4,6,23
  102:19 105:2
  105:23 107:16
  108:1,3,12,16
  108:20 109:1
  111:5 112:8
  113:8 117:3
  118:2 124:6
  125:15 126:4,7
  126:9,17,23
  127:5,9,11,13
  127:20 128:4
  128:14,17,21
  128:22 129:17
  130:15 131:5
  131:13,14
  133:18,21,22
  134:24 135:2
  135:15 136:1
  136:10,12
  144:23,25
  145:21 147:20
  149:4,18 150:5
  150:6,13,16

[work - zoom]                                                                    Page 59

| | | **z** |
|---|---|---|
| 152:25 153:7 | 27:19 28:22 | **zero**   61:25 |
| 155:12 168:5 | 32:3 42:8,16 |   67:12,15 |
| 168:24 169:2 | 44:1 48:2,6 | **zoom**   180:16 |
| 169:25 171:24 | 52:11 53:11,23 | |
| 171:24 172:6 | 54:6,12 55:5 | |
| 175:22,23 | 55:12,16 56:6 | |
| 178:2,4,7,15 | 56:18 57:13 | |
| 186:5 | 60:4 61:12 | |
| **worked**   9:20 | 68:5 69:22 | |
| 12:13 56:10 | 71:1 76:24 | |
| 147:16 171:17 | 86:13 93:3 | |
| 185:12 | 97:17 114:15 | |
| **working**   11:1 | 118:6 119:9,12 | |
| 11:18,24 59:22 | 120:14 121:14 | |
| 128:12 149:15 | 123:21,22 | |
| **works**   129:8 | 125:22 130:1 | |
| **worth**   159:3 | 132:20 142:11 | |
| **wrap**   139:7 | 142:14 143:5 | |
| 170:13 179:13 | 144:4 145:8,24 | |
| **wrapped** | 146:23 149:13 | |
| 130:20 | 150:11 152:18 | |
| **wrapping** | 152:22 154:25 | |
| 187:8 | 155:8 156:7 | |
| **written**   80:17 | 158:22 161:10 | |
| 97:1 | 161:23 163:4,4 | |
| **wrong**   156:17 | 168:4 173:5 | |
| **wyoming**   10:9 | 174:14 180:11 | |
| 10:11 | 184:14,14,15 | |
| **x** | 186:14 187:1 | |
| | 188:2,11,11 | |
| **x**   1:4,10,12,18 | **year**   148:24 | |
| 1:20 2:1 6:1 | **years**   9:21,21 | |
| 29:22 | 10:13 12:2 | |
| **y** | **yield**   138:15 | |
| **y**   57:16 | **york**   184:9 | |
| **yeah**   8:20 15:5 | | |
| 24:6,7 26:3 | | |