**Page 1**

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF NORTH DAKOTA

3    Case No. 25-30002 (Jointly Administered)

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GENERATIONS ON 1st, LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   Case No. 25-30003 (Jointly Administered)

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   In the Matter of:

14

15   PARKSIDE PLACE, LLC,

16

17           Debtor.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19   Case No. 25-30004

20   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21   In the Matter of:

22

23   The Ruins, LLC,

24

25           Debtor.

Page 2

```
 1  - - - - - - - - - - - - - - - - - - - - - - - - - - - x
 2
 3
 4            United States Bankruptcy Court
 5            Quentin N. Burdick U.S. Courthouse
 6            655 1st Ave. N.
 7            Fargo, ND 58102
 8
 9            Monday, November 24, 2025
10            8:30 AM
11
12
13
14
15
16
17
18
19
20
21  B E F O R E :
22  HON SHON HASTINGS
23  U.S. BANKRUPTCY JUDGE
24
25  ECRO: UNKNOWN
```

Page 3

```
 1  HEARING re Motion by Red River State Bank to Convert Case
 2  from Chapter 11 to 7 filed 09/26/2025 (Doc. 109)
 3
 4  HEARING re Joinder by Watertown Development Company to Red
 5  River State Bank's Motion to Convert Case from Chapter 11 to
 6  7 filed 10/10/2025 (Doc. 131)
 7
 8  HEARING re Objection by Debtor to Red River State Bank's
 9  Motion to Convert Case from Chapter 11 to Chapter 7 filed
10  10/17/2025 (Doc. 143)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by:  Sonya Ledanski Hyde
```

Page 4

```
 1  A P P E A R A N C E S :
 2
 3  THE DAKOTA BANKRUPTCY FIRM
 4      Attorney for Debtors
 5      1630 First Avenue North, Suite B
 6      Fargo, ND 58102-4246
 7
 8  BY:  MAURICE VERSTANDIG
 9       CHRISTIANNA A. CATHCART
10
11  VOGEL LAW FIRM
12      Attorneys for Red River State Bank
13      218 Northern Pacific Avenue
14      Fargo, ND 58102
15
16  BY:  KESHA TANABE
17       CAREN W. STANLEY
18       DREW J. HUSHKA
19
20  DAVENPORT EVANS HURWITZ & SMITH LLP
21      Attorney for Red River State Bank
22      206 West 14th Street
23      Sioux Falls, SD 57101-1030
24
25  BY:  ANTHONY M. HOHN
```

Page 5

```
 1  KD LAW, PLLC
 2      Attorney for D&M Industries, Inc.
 3      3429 Interstate Boulevard
 4      P.O. Box 9231
 5      Fargo, ND 58106-9231
 6
 7  BY:  JOHN M. KRINGS, JR.
 8
 9  WOODS FULLER SHULTZ & SMITH PC
10      Attorney for Watertown Development Company
11      300 South Phillips Avenue, Suite 300
12      Sioux Falls, SD 57104
13
14  BY:  JORDAN J. FEIST
15
16  BASSFORD REMELE
17      Attorney for Diamond Wall Systems
18      Fifth Street Towers
19      100 South 5th Street, Suite 1500
20      Minneapolis, MN 55402
21
22  BY:  JEFFREY D. KLOBUCAR
23
24
25
```

Page 6

1                  I N D E X

2                                PAGE

3

4  WITNESS(ES):            DX  CX  RDX  RCX

5  JOSHUA LUTHER

6     By Mr. Hushka        12      92

7     By Mr. VerStandig          63    95

8     By Mr. Feist            89

9

10              E X H I B I T S

11  NO.         DESCRIPTION              PAGE

12  ECF 95-2      Second Appraisal Report        37

13  ECF 95-3      Third Appraisal Report         37

14  ECF 59        Red River Appraisal Report       62

15

16

17

18

19

20

21

22

23

24

25

Page 7

1              P R O C E E D I N G S

2        THE COURT:  So the next case I am going to call is

3  bankruptcy Case Number 25-30004, in re The Ruins.  And this

4  is a continued hearing on the issues that we wrapped up last

5  week.  Well, we didn't wrap up.  We're in the process of

6  considering the motion to dismiss or convert that was filed

7  by Red River State Bank.

8        And we needed extra time before we go straight

9  into the evidence.  I think I'd first like to take

10  appearances so I know who's all here now that there aren't

11  very many people in the courtroom.  So let's begin first

12  with Debtor.  Who's appearing on behalf of Debtor.

13        MR. VERSTANDIG:  Good afternoon, Your Honor.  I'm

14  Maurice VerStandig on behalf of Debtor.  And I am joined by

15  Christiana Cathcart, who is my co-counsel.  The Debtor's

16  principal, Jesse Craig, is present in the courtroom.

17        THE COURT:  And he is.  Okay.  On behalf of Red

18  River State Bank.

19        MR. HUSHKA:  Good afternoon, Your Honor.  Attorney

20  Drew Hushka appearing with Caren Stanley in person in the

21  courtroom.  Co-counsel Kesha Tanabe is appearing via Zoom.

22  We have the representatives from Red River State Bank with

23  us as well.  And I see our expert is already on the Zoom as

24  well.

25        THE COURT:  Okay.  On behalf of Watertown

Page 8

1  Development Corp -- Company.

2        MR. FEIST:  Good afternoon.  Jordan Feist on

3  behalf of Watertown Development Company.

4        THE COURT:  Is there anyone appearing on behalf of

5  D&M Industries?

6        MR. KRINGS:  Good afternoon, Your Honor.  John

7  Krings on behalf of D&M Industries.

8        THE COURT:  Diamond Wall Systems?  Any other

9  parties who'd like to make an appearance?  Okay.  Now that

10  we've taken appearances, and I know who's all here, I wanted

11  to go through a couple of logistics.  We're supposed to get

12  bad weather, which is why there are a lot of people

13  appearing by the video conference today.  I get that.  And I

14  approved that.  I don't anticipate that people can't get to

15  the courthouse, including me, tomorrow.

16        If something happens, I will just ask that you

17  call the clerk's office.  The clerk's office will have

18  somebody answering the phone, no matter how bad it is

19  outside, because we have teleworking policies in place to

20  ensure that those phones are answered.  And so I will know

21  if for some reason there are crucial witnesses that can't

22  make it to the courthouse tomorrow.

23        I only live a mile away, so I fully anticipate

24  that I can get here, but you'll have to let me know if

25  you're having a problem.  And by let me, I mean let the

Page 9

1  court know.

2        I think based on what I am hearing in terms of the

3  order of testimony that we'll hear the expert witness today

4  and then tomorrow, do you have a rough idea of who will be

5  testifying, Mr. Hushka?

6        MR. HUSHKA:  Your Honor, it would be potentially

7  the completion of Mr. Luther if we haven't done that today.

8  I believe Ms. Daniele Harless, and then I don't believe

9  we've made a final decision on whether or not we would need

10  Mr. Aarestad or Mr. Craig as additional witnesses, but those

11  two or one and a half for sure.

12        THE COURT:  Okay.  Do you anticipate that the

13  representatives or their employees and/or representatives of

14  Red River State Bank will be testifying in person?

15        MR. HUSHKA:  Your Honor, I believe we did put in a

16  remote request asking that this court approved depending on

17  when the weather moves in.  They will try to be here if

18  possible in person, but if not, I believe using the remote

19  appearance that has been approved as a fallback.

20        THE COURT:  So it would be my strong preference to

21  hear that testimony in person from representatives of Red

22  River State Bank and from Mr. Craig.  So if we run into some

23  weather issues, those are the witnesses I would like you to

24  postpone until the very end.  And if it means some logistics

25  in terms of having the Debtor present expert testimony in

3 (Pages 6 - 9)

Page 10

1 between.

2      Credibility is always important, but it seems to

3 be particularly important in the context of some of the

4 witnesses in this particular case. And so while I am happy

5 to accommodate expert witness testimony by video conference,

6 it would be my strong preference to hear representatives of

7 either party in person.

8      So if you could visit, you know, after we're

9 finished today or whenever is convenient for you about how

10 to order those, you know, in terms of whose turn it will be,

11 I'd certainly appreciate that.

12      MR. HUSHKA: Understood, Your Honor. Thank you.

13      THE COURT: Yeah. Thank you. I have to let you

14 know that tomorrow I have a final pretrial conference at

15 10:00 a.m. I can't reschedule it, so we're just going to

16 take a short morning break. I can't imagine that it would

17 take longer than 15-20 minutes tops. There will be no

18 hearings on Wednesday.

19      So if we don't finish, then I am going to look to

20 you to make a suggestion tomorrow after talking to each

21 other and your witnesses about when might be the best day.

22 I think we had some conversation about that last week, but I

23 can't remember what we settled.

24      MR. HUSHKA: I think we had talked about a week

25 from today, Your Honor, the Monday after the Thanksgiving

Page 11

1 holiday, but that was kind of penciled in and nothing inked,

2 so to speak.

3      THE COURT: Okay. I am just going to look at my

4 calendar real quick. Monday the 1st of December is

5 wide open for me. If that still works for your witnesses,

6 that would work for me. Yeah. Okay. So I will look to you

7 to confirm that tomorrow for sure. All right. I think that

8 covers everything on my list. Anything further before we

9 begin with the testimony?

10      MR. HUSHKA: Not from Red River, Your Honor.

11      THE COURT: On behalf of Debtors?

12      MR. VERSTANDIG: Your Honor, nothing from the

13 Debtor other than to note that I anticipate our case will be

14 relatively brief but will likely involve three witnesses.

15      THE COURT: Relatively brief and then I missed the

16 other part of your sentence.

17      MR. VERSTANDIG: I anticipate we'll probably be

18 calling three witnesses. I anticipate two of them will be

19 in the 10- to 15-minute range, and one might push closer to

20 half an hour.

21      THE COURT: That's terrific. I won't hold you to

22 that, though, because I find that so hard to believe. I

23 might time you just, you know, for setting a record or

24 something. All right. Mr. Hushka, you can call your next

25 witness.

Page 12

1      MR. HUSHKA: Thank you, Your Honor. Red River

2 State Bank would call Joshua Luther.

3      THE COURT: Okay. I am going to have you remain

4 seated but raise your right hand and the clerk will swear

5 you in.

6      CLERK: Please state your name for the record.

7      THE WITNESS: Joshua Luther.

8      CLERK: Do you solemnly swear that the testimony

9 you are about to give in this case will be the truth, the

10 whole truth, and nothing but the truth, so help you God?

11      THE WITNESS: I do.

12 WHEREUPON,

13           JOSHUA LUTHER,

14 called as a witness, and having been first duly sworn to

15 tell the truth, the whole truth, and nothing but the truth,

16 was examined and testified as follows:

17      THE COURT: You may proceed.

18      MR. HUSHKA: Thank you, Your Honor.

19      DIRECT EXAMINATION OF JOSHUA LUTHER

20 BY MR. HUSHKA:

21  Q   Good afternoon, sir. Can you please state your

22 name, spelling your last name for the record?

23  A   Joshua Luther, L-U-T-H-E-R.

24  Q   Did you attend high school, sir?

25  A   Yes.

Page 13

1  Q   Where at?

2  A   I started at Washington High School, transferred

3 to Sioux Falls Christian and graduated from Sioux Falls

4 Christian.

5  Q   When did you graduate, sir?

6  A   1995.

7  Q   What did you do after graduating high school?

8  A   I started at South Dakota State University in my

9 four-year undergraduate degree. And then transferred to

10 Black Hills State University after that and graduated from

11 Black Hills State University.

12  Q   What degree did you obtain from Black Hills State?

13  A   Business Administration.

14  Q   When was that?

15  A   December of 1999.

16  Q   Did you attend any schooling after Black Hills

17 State?

18  A   I obtained a master's degree from Colorado

19 Technical University from its Sioux Falls campus.

20  Q   And when did you obtain that degree?

21  A   That would have been, oh boy, approximately 2005.

22 I want to say. I don't have that in front of me.

23  Q   Do you hold any professional licenses?

24  A   I have a certified general license in the State of

25 South Dakota, State of Minnesota, State of Iowa, and State

4 (Pages 10 - 13)

Page 14

1 of Nebraska.

2 Q  General license for what?

3 A  It's for appraising real property.

4 Q  What were the licensure requirements for those

5 states, generally speaking?

6 A  Generally, it's an approximate three-year process

7 that combines a minimum number of credit hours that we need

8 -- of classes that we need to take that have been approved

9 by the state and pass.  And then also exams for each of

10 those classes that we need to pass.  There's also a final

11 exam that we need to pass.  And we also have to meet -- we

12 have to perform a certain number of hours underneath another

13 licensed appraiser who supervises all our work during that

14 period of time as well.

15 Q  Have you ever been subject to any disciplinary

16 procedures as it relates to any of those licenses?

17 A  No, sir.

18 Q  Have you ever been subject to a disciplinary

19 procedure as it relates to a court proceeding?

20 A  No.

21 Q  I will talk to your work experience and background

22 a little bit.  Can you provide me an overview of your

23 current position and employer?

24 A  I currently work with CBRE.  CBRE is the -- is a

25 global commercial real estate firm and is the largest

Page 15

1 commercial real estate firm in the world, actually.  I

2 manage the Sioux Falls office, and I have two staff

3 appraisers who work underneath me.  We cover a large

4 territory for the company and do appraisals on a daily basis

5 for the company in the states that I am licensed in.

6 Q  When did you start working at CBRE?

7 A  Approximately 2017, I believe.

8 Q  Have you held any other positions with CBRE?

9 A  No.

10 Q  I believe you did, but -- kind of went over this,

11 but your current job duties and responsibilities on a day-

12 to-day basis, so to speak?

13 A  On a day-to-day basis, we are performing appraisal

14 assignments for clients all day, every day.  And then also,

15 I supervise the work that the staff appraisers complete

16 underneath me.  I answer any questions that they have,

17 review their work, and field calls from clients, answer

18 questions from clients, those types of things.

19 Q  Approximately how many appraisals have you

20 completed in your career?

21 A  It's probably been -- I would estimate, it's been

22 in the thousands, probably over 1,500 assignments over the

23 course of my career.

24 Q  Have any of those appraisals been of mixed-use,

25 multifamily, mid-high-rise buildings?

Page 16

1 A  Yes, sir.

2 Q  Is that what you consider The Ruins to be?

3 A  Yes.

4 Q  Are you familiar with the Watertown real estate

5 market?  Watertown --

6 A  Yes.

7 Q  -- South Dakota?

8 A  Yes.

9 Q  How so?

10 A  It's within my normal area of practice where we

11 provide service for our clients.  And so any appraisal

12 assignments or requests that we're hired to do in Watertown,

13 we travel up there, inspect the property, and complete the

14 assignment.  So over the course of my career, I've been to

15 Watertown many times, and have looked at -- studied

16 demographics and other market data over the course of my

17 time as an appraiser.

18 Q  Speaking of your prior time as an appraiser, have

19 you provided expert testimony before?

20 A  Not in court.  No.

21 Q  Have you ever worked as an expert for Red River

22 State Bank before this?

23 A  Not prior to this assignment.  No.

24 Q  Do you have any connection to Red River State Bank

25 that would influence or prejudice your opinions in this

Page 17

1 case?

2 A  No.

3 Q  Prior to this case, have you ever worked as an

4 expert for the Vogel Law Firm?

5 A  No.

6 Q  Any connection to the Vogel Law Firm that would

7 have an influence in this case?

8 A  No.

9 Q  Have you ever worked as an expert for Jesse Craig,

10 The Ruins, LLC, or any entity owned by Mr. Craig?

11 A  No.

12 Q  Any connection with any of those that would

13 influence you?

14 A  No.

15 Q  Ever worked as an expert for the Dakota Bankruptcy

16 Firm, Mr. VerStandig or Ms. Cathcart?

17 A  No.

18 Q  Any connection with any of those that would

19 influence you in this case?

20 A  No, sir.

21 Q  Mr. Luther, how did you first learn about The

22 Ruins, LLC?

23 A  We were first hired in 2021 to appraise the

24 property as proposed.  It did not exist at that time.

25 Q  Do you remember who contacted you?

5 (Pages 14 - 17)

Page 18

1    A    It would have been a representative of Red River
2    State Bank.  I believe Michael Martin, I think was his name.
3    Q    What information were you provided at that time?
4    A    We were provided kind of the typical information
5    that banks will provide us when they hire us to do an
6    assignment.  So floor plan drawings, cost budget, pro forma
7    income and expense statement, and things of that nature.
8    Q    Were you formally retained?
9    A    Yes.  We were hired.  Yes.
10    Q    Okay.  And what was your specific assignment when
11    you were retained?
12    A    We were asked to provide an opinion of value for
13    the subject property, or The Ruins property, in its as-
14    stabilized condition in the as-complete condition.  And then
15    we also provide an as-is value conclusion as well, which is
16    a FIRREA requirement.
17    Q    You provided multiple reports as it relates to
18    this property.  Are you retained separately each time or is
19    that one overarching retainer agreement?
20    A    It's a separate contract for each assignment.  So
21    we are hired for one assignment at a time.  And when we
22    complete that assignment, we get paid and then that
23    essentially goes away, and the process repeats each time.
24    Q    Okay.  You just said that you are paid.  So you
25    are paid for your services as it relates to this matter?

Page 19

1    A    That's correct.  Yes, sir.
2    Q    All right.  Is that on an hourly basis?  Is that a
3    flat fee, or what does your compensation package look like?
4    A    We're compensated on a -- we bid on a flat-fee
5    price for each assignment.  We're not allowed to provide a
6    compensation that's per -- you know that's dependent upon
7    the outcome of the appraisal.  So we always bid on a flat-
8    fee basis for that reason.
9    Q    So is your compensation in this case at all
10    determined by the outcome of this case?
11    A    No, sir.
12    MR. HUSHKA:  Your Honor, at this time I would
13    offer Mr. Luther as an expert in the field of commercial
14    real estate appraisal.
15    THE COURT:  Any objection?
16    MR. VERSTANDIG:  Your Honor, very briefly on voir
17    dire.
18    THE COURT:  Yes.  Thank you.
19    MR. VERSTANDIG:  Mr. Luther, has any federal,
20    state, or tribal court ever denied you recognition as an
21    expert witness?
22    THE WITNESS:  No.
23    MR. VERSTANDIG:  Your Honor, no objection.
24    THE COURT:  The court will recognize this expert
25    witness.  If I could have the court pull up ECF 95-1.

Page 20

1    This may take a moment since I am springing this on her.  I
2    didn't give her pre-advisory on that.  Please let me know,
3    Mr. Luther, when you can see that document on your screen.
4    THE WITNESS:  Okay.  I can see the beginning of
5    that document now.
6    THE COURT:  All right.  Perfect.  Do you recognize
7    that document?
8    THE WITNESS:  Yes.  I do.  I have to scroll down
9    so I can see the title.  There we go.  Yep.  I recognize
10    that.
11    BY MR. HUSHKA:
12    Q    What is that document?
13    A    That's the appraisal that we completed for Red
14    River State Bank in 2021.
15    MR. HUSHKA:  All right.  Now, I believe my friend
16    on the other side is willing to stipulate to this exhibit.
17    I guess I will put that to him.  Mr. VerStandig?
18    MR. VERSTANDIG:  Just for one moment.  Okay.  If I
19    am not being difficult, I thought we were stipulating to the
20    July 20, 2022 one, but if the Court gives me one moment, I
21    suspect we may be able to stipulate to this.
22    THE COURT:  Okay.  You have a moment.
23    MR. VERSTANDIG:  Thank you.  Apologies.  I wasn't
24    trying to spring that on you, Mac.  I thought Caren thought
25    it was this one.  What's the documentary that we're looking

Page 21

1    at?
2    THE COURT:  95-1.
3    MR. VERSTANDIG:  I say this respectfully.  I am
4    not sure I believe that.  Maybe.  Hold on.  I am looking at
5    the Bates stamp, so I think it's 95-1.  Are you in
6    Generations by accident, maybe?
7    THE COURT:  I may be in the wrong case.  All
8    right.  I am repairing this.  Oh, it's all three of them.
9    MR. VERSTANDIG:  Yes.  A, B, and C.
10    THE COURT:  Okay.
11    MR. VERSTANDIG:  Yes.  We will stipulate.
12    THE COURT:  Thank you.
13    MR. VERSTANDIG:  Yes.  B is the one that I thought
14    it was, and A and C are fine.  We will stipulate to
15    admissibility.
16    THE COURT:  Okay.  The court receives 95-1.
17    MR. HUSHKA:  Thank you, Your Honor.
18    BY MR. HUSHKA:
19    Q    If we were to turn to the bottom of Page 3, are
20    there signatures on that page, sir?
21    A    Yes.
22    Q    Who are those signatures from?
23    A    The first signature is from Scott Mosbach, who was
24    a senior appraiser with CBRE at that time.  Chris Jenkins is
25    the other signature, and he is our regional director and my

6 (Pages 18 - 21)

Page 22

1 direct boss.

2    Q    And if we scroll to the next page, is there

3 another signature?

4    A    Yes. That is my signature.

5    Q    Okay. And what did you attest to by signing this

6 document?

7    A    That I am taking responsibility for the contents

8 of the report.

9    Q    Do you know when this report was created?

10    A    Yes. It was done in May of 2021, bearing the

11 timestamp at the top.

12    Q    And do you know what the status of The Ruins

13 development was in May 2021?

14    A    At the time, the site, there was a building on the

15 site that had been demolished, and there are some

16 photographs in this report that provide a visual description

17 of what that property looked like on the day that we

18 inspected it, but essentially was unimproved land at that

19 time.

20    Q    If we were to scroll back up to Page 2 of this

21 report, do you know how big The Ruins development project

22 was supposed to be when completed?

23    A    Let's see here. It shows 4,162 square feet of

24 commercial retail space, but I am not seeing the size of the

25 apartments on this first page.

Page 23

1    Q    How many units?

2    A    I will have to -- they go to the 63.

3    Q    And would the total square footage be included

4 somewhere else in this report, perhaps the executive

5 summary?

6    A    Yes. That's correct.

7    Q    All right. Were those sizes used in reaching the

8 valuation for this property?

9    A    Yes.

10    Q    And does this page that we're looking at, Page 2,

11 provide a top-line overview of what the valuation was for

12 The Ruins?

13    A    Yes. It does.

14    Q    And what are those values?

15    A    It shows an as-is value as of May 4, 2021, which

16 was the date of inspection, for $520,000. The as-complete

17 value was estimated at $10,730,000, and that is as of the

18 effective date of June 4, 2022. And the as-stabilized value

19 was estimated at $11,140,000 as of the effective date of

20 March 4, 2023.

21    Q    Can you explain for the Court what the as-is

22 appraisal is or kind of differentiate between these three?

23    A    Sure. The as-is value reflects our opinion of

24 value the day that we inspect the property. In this case,

25 because there was no building present and it was essentially

Page 24

1 undeveloped, that value represents the land value. The as-

2 complete value reflects the property and its with all

3 construction complete, but prior to having any tenant

4 occupancy in the property, so zero percent occupancy.

5    Construction's all done, but it's not occupied. And

6 then, the as-stabilized value reflects the value of it fully

7 stabilized based on our estimated stabilized occupancy rate

8 that is described in the report or identified in the report.

9    Q    How long does it take a building to stabilize or

10 what do you use to determine that?

11    A    We look at a variety of factors. We're looking at

12 changing demographics. So for example, you know, what is

13 the population growth forecasted to be? And then, we

14 attempt to drill that down to determine what percentage of

15 the population are going to need apartment units.

16    We also interview or can interview local market

17 participants that would be knowledgeable as such. It could

18 be local real estate developers or local real estate

19 brokers. We can use other projects that we've completed in

20 the Watertown area that we have -- that are, you know,

21 retained in our work file that are confidential that don't

22 show up in the report.

23    And then, we also look at third-party providers

24 that give us market data such as CoStar that provide market

25 analytic data for us to look at.

Page 25

1    MR. HUSHKA:  If I can have the Court scroll down

2 to Page 10 of this document.

3 BY MR. HUSHKA:

4    Q    I want to just walk through, Mr. Luther, a few of

5 these various categories that the Court should look at is

6 document further, understand what's being outlined there.

7 And can you explain what this section is?

8    A    This is the executive summary section, which kind

9 of hits the highlights of the property characteristics and

10 corresponding reconciled values.

11    Q    Can you provide a brief summary for the Court of

12 what is all provided in the executive summary?

13    A    So for example, the property name and location,

14 the client who hires us will identify the parcel number if

15 one has been assigned to it. We'll also summarize the

16 highest and best use conclusions. We also will summarize

17 the day that we inspect the property in our opinion of

18 exposure and marketing time, identify the zoning that's

19 associated with the property.

20    And then other important improvement characteristics

21 such as building size, year built, average unit size, total

22 number of units, who your likely buyer is.

23    And then, it gets into our financial indicator section,

24 which kind of summarizes the income characteristics of the

25 property that are developed in the income capitalization or

7 (Pages 22 - 25)

Page 26

1  income approach to value.
2      So and then, below that, on the following page, we'll
3  summarize the value conclusions from each valuation
4  technique and then the reconciled values at the very bottom
5  of the values that we reconcile to, sir?
6      Q    Anything in particular that you believe should be
7  highlighted for the Court in this section that you haven't
8  gone over?
9      A    No.
10      Q    All right.
11      A    No.
12      Q    Can we turn to Page 15, and can you identify for
13  the Court what this section is, sir?
14      A    This is the scope of work section, which kind of
15  identifies the scope of work that we use to develop our
16  opinion of value or values.  So it goes through and
17  identifies what the intended use of the report is, who our
18  client is, who the intended users are for the report.  It
19  identifies the purpose of the appraisal.
20      We define the value that we're -- opinion that we're
21  giving here.  So it includes that definition of value.
22  Below that is the interest appraised section.  So this will
23  identify the property rights that are appraised for the
24  assignment.  It also identifies how we identify the
25  property.  So some various sources that we use to identify

Page 27

1  the data.  We talk about how or what we did for the property
2  inspections or kind of summarizing how we inspected the
3  property.
4      And then, also the data that we research for the
5  assignment is itemized in that type and extent of data
6  research section.  Beyond that, is the data.  There's
7  another table with the data sources of information that
8  we're collecting and where it came from.
9      And then, the final appraisal methodology section talks
10  about the various ways to value a property and then how --
11  you know, why we considered or completed certain valuation
12  techniques --
13      Q    If you were --
14      A    -- for the assignment.
15      Q    -- to scroll up slightly back to that table on
16  data sources, the building area you have is provided plans.
17  Can you explain what that means?
18      A    Yeah.  That simply means that we were provided
19  floor plan drawings and that we rely on those to develop or
20  identify the building size and then the various size
21  characteristics such as unit mix and unit size, and those
22  things.
23      Q    We can go down to Page 19.  Can you explain what
24  that section is, sir?
25      A    Page 19, that is the area analysis.  So this is

Page 28

1  kind of a high level view of the area that the property is
2  located.  It gives a -- kind of a brief summary of some of
3  the demographic information.  Obviously, it shows a map
4  there and just kind of gives a general overview of the -- in
5  this case, the Watertown market.
6      Q    If we were to go to Page 21, can you explain what
7  that section is?
8      A    This section is the neighborhood analysis.  So
9  this kind of drills down a little bit further.  So within
10  the area analysis, we're identifying kind of a specific area
11  within that that we consider the neighborhood area, which is
12  more in close proximity to the subject property.
13      So again, we're talking about specific -- generally
14  identifying specific land uses that happen in the area, if
15  it's fully built up or if it's a growing area.  And then,
16  there's also some additional demographic information that's
17  specific to the neighborhood that is identified here.
18      Q    If we were to jump down to Page 26, can you
19  summarize what that section is?
20      A    This is the site analysis section.  So this
21  section identifies all the important characteristics
22  surrounding the site or the land.  So it gets into the site
23  size, the zoning, parcel ID number, whether or not it's
24  located in a floodplain.  And then our ratings of its
25  visibility, functional utility, observed traffic counts, and

Page 29

1  then also utilities that are provided to the site.  And if
2  there's any kind of unusual easements or encumbrances, we'll
3  identify those here as well if they're present.
4      Q    If we jump to Page 31, can you summarize that
5  section?
6      A    This is the improvement analysis section.  So this
7  section describes all of the site improvements on the land.
8  So this would be any buildings that are constructed on the
9  site and also any site improvements such as parking lots,
10  landscaping, those things.
11      So this first table here that you have got, are showing
12  is highlighting the characteristics of the building that is
13  proposed to be constructed on the site.  So again,
14  summarizes its expected size, unit mix, average unit size,
15  some important characteristics of the property, you know,
16  amenities of that property that are expected, what type of
17  parking it has, the year built, and total economic life, and
18  effective age, and those.
19      And then, below that would be a unit mix table that
20  identifies the anticipated unit mix and its as complete
21  condition.
22      Q    If we were to jump to Page 36, what does that
23  section depict?
24      A    This is the zoning section.  So this simply
25  summarizes the zoning that encumbers the property and

8 (Pages 26 - 29)

Page 30

1  identifies what type of uses are permitted within that
2  zoning district.  And then, we also offer an opinion on if
3  the proposed improvements are expected to conform with those
4  zoning requirements.
5     Q   Jumping down to the Page 38, what is this section?
6     A   This is the tax and assessment data section which
7  summarizes the property's either current and or projected
8  property assessment, and then its corresponding real estate
9  tax liability.
10    Q   Going on to Page 40, what is this market analysis
11 section?
12    A   So the market analysis section takes in a lot of
13 kind of macro, both macroeconomic information and then also
14 information that's specific to the local market.  So this
15 first section is the macroeconomic section which is more on
16 kind of a national basis of what's happening nationally.
17    And then, we get down to more of a local analysis of
18 what's happening with the market segment of the subject.  So
19 if you scroll down, I don't know, it's going to be a few
20 pages through this.  This is all kind of the national
21 information.  This just kind of gives a high-level overview
22 of what's going on in the economy.  That's kind of the
23 intent of the macro.
24    And then the -- and then it gets into the multifamily
25 market segment which is specific to -- this is the market

Page 31

1  segment that the subject -- one of the market segments that
2  the subject property is expected to compete in.  It's the
3  primary market segment since most of the income is generated
4  by multifamily units.
5     So this particular section that you have got showing on
6  the screen is more of a national level analysis of the
7  multifamily market.  And then, if you continue to scroll
8  down, we'll have more local multifamily data that's more
9  specific to the Watertown market.
10    Q   Is all of that data informing your opinions
11 regarding valuations?
12    A   Yes.  We -- all of that information is considered
13 in our development of opinion of all of the opinions of
14 value.
15    Q   If we were to jump to Page 60, what is the highest
16 and best use portion of this report?
17    A   Yeah.  So this section identifies what we think
18 that the highest and best use of the property is.  And we're
19 supposed to look at it on an as-vacant basis and as as-
20 improved because they can be different depending upon the
21 circumstances.
22    So in this case, we start with the as vacant, we talk
23 about what's -- what are the legally permissible uses, what
24 are the uses that are also physically possible, and then we
25 get into kind of financial feasibility and maximum

Page 32

1  productivity.  So we go through those four steps to identify
2  what is the use that is legally possible, physically
3  possible, the use that is financially feasible, and the use
4  that creates the -- that is the most productive use.
5     In other words, kind of the highest return to the land
6  in income.  So we do that for the site and then we also do
7  it in the as-improved condition as well.
8     Q   If we were to jump to Page 62, what is the land
9  value section?
10    A   This section begins the analysis of comparable
11 land sales to -- that we use to value or come up with our
12 opinion of the underlying land value.
13    Q   Jumping to Page 66, cost approach.  Can you
14 summarize for the Court what's contained therein?
15    A   Yep.  So the cost approach is the section where we
16 estimate what is the cost to build the proposed site
17 improvements to the site.  And we consider -- can consider
18 multiple sources here for this assignment.  We considered
19 Marshall Valuation Service, which is a national cost service
20 estimation company that provides us data that we formulate
21 our own kind of independent opinion of what we think the
22 property will cost to build.
23    And then, we also typically get the developer's cost
24 estimate of what they expect the project to cost.  And that
25 will be identified, I think, on the next page after this.

Page 33

1  Nope, that's the continuing with the Marshall valuation cost
2  estimate.  So this section here, this summarizes the
3  budgeted construction cost.
4     And then, we also for this assignment used cost
5  comparables.  So other properties that were similar in
6  composition of the subject that we've appraised, and we have
7  cost information that's retained in file.  We also consider
8  those and compare it to the developer's estimate.
9     So we -- after we look at all of those, we come down
10 and reconcile to a final cost estimate for what we think is
11 going to cost the property to -- or to build the property.
12 And then, we apply any applicable depreciation to that cost
13 estimate.
14    And then, the cost approach conclusion section
15 summarizes those calculations.  So it will summarize what
16 our reconciled construction cost is, any applicable
17 depreciation, and then adds the land value to develop a
18 total value indicated by the cost approach.
19    Q   So in the cost approach, if the estimate is that
20 the building is more expensive to build, what does that do
21 to the ultimate conclusion as to value, if anything?
22    A   Well, ultimately, you know, the cost has to be
23 supported by the market.  So we're -- and this is one reason
24 why we do different approaches to value.  So the sales
25 approach and income approach are testing the financial

9 (Pages 30 - 33)

Page 34

1 feasibility of the construction cost.

2    So the cost can go higher, could go higher. That

3 doesn't necessarily translate to value as it will depend

4 upon if those higher construction costs are supported by the

5 market in terms of either higher market rents or comparable

6 sales are -- that market participants pay more for because

7 they cost more to build.

8    Q   So they're related, but there's not a direct

9 correlation? Fair summary?

10    A   Yes. That's correct.

11    Q   If we were to go to the next page, Page 71, what

12 is the sales comparison approach?

13    A   The sales comparison approach summarizes the

14 comparable sales we've selected to value the subject

15 property under this valuation technique. So we identify the

16 comparable sales. We put together an adjustment grid that

17 identifies the adjustments that we make to those sales and

18 then reconcile to a value conclusion based on those

19 comparable sales, and the adjustments that we make to them.

20    Q   On Page 77, there's a section titled income

21 capitalization approach. What is that?

22    A   This section identifies the income characteristics

23 of the property. So we look at the income characteristics

24 of the property and translate that to value via the use of a

25 capitalization or an overall cap rate. So this section is

Page 35

1 essentially developing our expected profit loss statement

2 for the subject property when it's stabilized.

3    And then, we convert that to an opinion of value

4 through market extracted capitalization rates.

5    Q   If we were to go all the way down to Page 97,

6 what's this section?

7    A   This is the reconciliation of value section. So

8 this section kind of summarizes the value indicated from --

9 the values that are indicated or developed from each

10 valuation technique. So it just kind of recaptures or

11 summarizes all of the different value conclusions. And

12 then, we talk about which value or which valuation technique

13 we think is most applicable in order to reconcile our final

14 opinion of value.

15    So it just talks about how we come to that final

16 reconciled value with -- after looking at all of the three

17 valuation techniques that we completed.

18    Q   And then, finally, if we were to jump to Page 99,

19 what is this assumptions and limiting conditions portion?

20    A   So these assumptions and limiting conditions,

21 these are standard assumptions that go in every appraisal

22 report that we do. And this just kind of identifies to the

23 client that it gives them a better idea of the scope of work

24 that we are and aren't doing.

25    You know so for example, we're not researching the

Page 36

1 title of the property because we're not title insurance

2 companies. And so we have an assumption about, you know,

3 the fact that we're assuming good and marketable title, for

4 example. So these are kind of general assumptions that we

5 use for every -- excuse me -- appraisal report that we do.

6    Q   Now, sir, I don't want the Court to think that I

7 had no point of that. So are these sections that we just

8 went over, are they the same from one report to the next?

9 Are they consistent throughout? So I understand the numbers

10 may change, but does the methodology and the source of data

11 remain consistent from one report to the next?

12    A   Yes. They are consistent from one report to the

13 next.

14    Q   So the cost analysis in this is going to be

15 similar to or explanatory for the cost analysis in Reports

16 2, 3, and 4?

17    A   Yes. It would be if the cost approach was

18 completed.

19    Q   Okay. And the opinions that you have provided

20 both in this report and testified to in the court here

21 today, did you reach those opinions based on your training

22 and experience in commercial real estate appraisal?

23    A   Yes, sir.

24    Q   And did you reach those opinions to a reasonable

25 degree of certainty?

Page 37

1    A   Yes.

2    MR. HUSHKA: All right. I'd like to proceed to

3 the next report, ECF 95-2, if we could, please. I think

4 it's going to be a whole separate document.

5 BY MR. HUSHKA:

6    Q   Do you recognize that document, sir?

7    A   Yes. I do.

8    Q   And what is that document?

9    A   That is the appraisal we completed for Red River

10 State Bank in 2022. So that would be the second appraisal

11 that we did.

12    MR. HUSHKA: I believe this is already indicated,

13 but I guess we would offer the second appraisal report, ECF

14 95-2.

15    MR. VERSTANDIG: No objection to 95-2 or 95-3.

16    MR. HUSHKA: We'll offer 95-3 as well then, Your

17 Honor.

18    THE COURT: The court receives 95-2 and 95-3.

19    (Exhibits ECF 95-2 & ECF 95-3 were admitted

20    into evidence.)

21 BY MR. HUSHKA:

22    Q   All right. Sir, if we were to look at the bottom

23 of Page 3, are there signatures there?

24    A   Yes.

25    Q   From whom?

10 (Pages 34 - 37)

Page 38

1    A    The first signature is from Matthew Johnson. He's
2  a staff appraiser with CBRE. The second signature on the
3  right is Michael Moyna. He, at that time, was the regional
4  director of the Minneapolis area and is Matthew Johnson's
5  direct supervisor. And then, my signature is at the bottom
6  below those two.
7    Q    And what did you certify by signing this document?
8    A    I am agreeing to the -- you know, the results and
9  conclusions, taking responsibility for the report.
10    Q    All right. If we were to scroll back up to the
11  second page of this, does this report provide an appraised
12  value for The Ruins development?
13    A    Yes. It does.
14    Q    Does it provide three in particular?
15    A    Yes.
16    Q    What are those three?
17    A    The first is the as-is value conclusion, and that
18  was completed on July 12, 2022, and our value estimate or
19  opinion of value is $6,980,000.
20        The as-complete value was concluded at $11,740,000 as
21  of the effective date of May 1, 2023. And then, the as-
22  stabilized value was concluded at $12,410,000 as of the
23  effective date of September 1, 2023.
24    Q    Do you know what the status of the development of
25  The Ruins was in July of 2022?

Page 39

1    A    At that time, it was under construction.
2    Q    Approximately how far along, if you have any idea,
3  or?
4    A    Well, judging by the as-is value, you know, it was
5  probably about 50 percent along. I don't know for sure, but
6  that would be a rough estimate.
7    Q    All right. Speaking of the as-is value, that went
8  up from 520,000 in May of 2021 to nearly 7 million in July
9  of 2022. Can you explain for me the cause of that change?
10    A    Yeah. And that's primarily attributed to the fact
11  that now they have been constructing and improving the site
12  with the proposed improvements. So they have done a lot of
13  work and added a lot of infrastructure and improvements to
14  the property.
15    Q    The as-complete value changed as well, going up to
16  11.7 million and change from 10.7 million. Can you explain
17  to me the cause of that change?
18    A    So the as-is value, that is a value that is
19  developed after the as-stabilized value is developed.
20    Q    The as-is or --
21    A    We develop the --
22    Q    -- the as-complete value?
23    A    Excuse me. The as-complete value. So we develop
24  the as-stabilized value first, primarily because that is
25  where our best source of information is. The comparable

Page 40

1  sales that we research are stabilized. And when we're
2  developing our pro forma, we have good information about
3  what market rents will be and operating expenses and such.
4        And generally, we deduct the costs of -- lease-up costs
5  from the stabilized value to get to the as-complete value.
6  So I would say that the reason the as-complete value is
7  higher is also because the as-stabilized value is higher or
8  the lease-up costs anticipated with the development have
9  decreased or changed from the previous report. I am not
10  sure exactly which off the top of my head.
11    Q    Okay. This report also contains a market value
12  conclusion regarding the net present value of TIF. Can you
13  explain that? That wasn't in the previous report.
14    A    Yeah. So a TIF is an acronym for tax increment
15  financing district. And occasionally, the clients will ask
16  us to provide a value of that cash flow. And so they didn't
17  request that the first appraisal. They did request it for
18  this assignment. So that's why it wasn't in the first one.
19  So it's strictly driven based on client need.
20        But the net present value of the TIF is an opinion of
21  the cash flow that is -- it's the cash flow that is either
22  created by the tax increment financing district or some type
23  of -- it may not be a cash flow. It may be, you know, an
24  upfront cash payment. It depends on how the TIF is
25  structured.

Page 41

1        But essentially, the tax increment financing district
2  is set up by the city and/or county. And then, they provide
3  some type of incentive or benefit to the developer to
4  incentivize them to develop the project. And that usually
5  creates a cash flow that has some value that can be assigned
6  or sold in the secondary market.
7        So we take that value or that cash flow and apply
8  present value to the -- discounting to the cash flows to
9  come up with a net present value for the client.
10    Q    Do you remember how the TIF was set up as it
11  relates to The Ruins?
12    A    Off the top of my head, I do not. Generally, I
13  believe there's a section in this report that should value
14  the TIF. Usually it is a -- I believe it's -- I don't know
15  if you can scroll to that section. There should be a
16  dedicated section for valuing the TIF. But if I recall, I
17  believe it's going to be, let's see here.
18        It's probably going to -- it doesn't look like it's in
19  the table of contents, but I am guessing it's probably near
20  the reconciliation section. So towards the end of the
21  report.
22    Q    Page 59.
23    A    Scroll down a little. Yeah. It's going to
24  be a number of pages yet. We're still right in the middle
25  of the income approach.

11 (Pages 38 - 41)

Page 42

1      THE COURT:  Can we do a word search?

2      THE WITNESS:  So there's the reconciliation that

3   might be -- if you could scroll down, it might be at the --

4   sometimes it's put in the -- there it is.  Tax increment

5   financing.  So it's in the reconciliation section.

6   BY MR. HUSHKA:

7      Q   Okay.  And that's --

8      A   So here --

9      Q   -- outlines how it was calculated in this case?

10     A   That's right.  So the cash flow that we expected

11   that was generated from that TIF district is summarized and

12   then added up to a net present value here.

13     Q   Okay.  We've just scrolled through some of them,

14   but does this report contain a number of similar sections to

15   your prior report?

16     A   Yes.  It does.

17     Q   All right.  And similar methodology and data

18   information?

19     A   Yes, sir.

20     Q   Anything in particular that you want to highlight

21   for the Court in this report at this time?

22     A   No.

23     Q   Mr. Luther, the multiple opinions in this report

24   and that you just testified to, did you reach those opinions

25   utilizing your training and experience?

Page 43

1      A   Yes.

2      Q   And are you sure of them to a reasonable degree of

3   certainty in your field?

4      A   Yes.

5      MR. HUSHKA:  Could I have the Court pull up the

6   third appraisal report, ECF 95-3, which has also been

7   accepted.

8   BY MR. HUSHKA:

9      Q   Sir, do you recognize this document?

10     A   Yes.  I do.

11     Q   And what is this document?

12     A   This is the appraisal report we prepared for Red

13   River State Bank in 2023.  So this would be the third

14   report.

15     Q   If we were to turn to the bottom of Page 3, are

16   there signatures?

17     A   Yes.

18     Q   Can you walk through those people quick, please?

19     A   First signature is Matthew Johnson.  He's a staff

20   appraiser with CBRE.  Second signature is Michael Moyna, who

21   is the regional director in our Minneapolis office.  And

22   then, the third signature is my signature.

23     Q   And what did you attest to by signing this

24   document, if anything?

25     A   I take responsibility for the report.

Page 44

1      Q   When was this report created approximately?

2      A   Let's see.  It would have been -- scroll up for me

3   -- October of 2023.

4      Q   What was the status of The Ruins development in

5   October of 2023?

6      A   It was still under construction at that time.

7      Q   Does this page, if we scroll down slightly,

8   provide appraised value opinions as to The Ruins?

9      A   Yes.  It does.

10     Q   Are those as-is, as-complete, and as-stabilized

11   the same categories as were provided in Reports 1 and 2?

12     A   Yes, sir.

13     Q   The value as-is of 9.9 million and change, can you

14   provide for the increase from 6.9 million?

15     A   I would assume that it's because they have gotten

16   further along in the construction.  Typically, that's what

17   it is a reflection of, that they have progressed further on

18   the construction.  So it's simply higher because of that.

19     Q   Okay.  And then, if we were to go to -- you said

20   the as-complete is a somewhat product of as-stabilization.

21   So if we were to look at as-stabilization, the value was

22   12.41 million in July of '22, and is now back down to 11.46

23   in October of '23.  Can you explain that decrease?

24     A   Can you go to the executive summary for me?  Okay.

25   So scroll down a little bit.  So the capitalization rate

Page 45

1   looks like it, that that was higher, and that would be one

2   of the primary drivers of a decrease in value would be a

3   higher capitalization rate.  The values are inverse to

4   capitalization rates.  So when a capitalization rate moves

5   higher, values go lower.

6      Q   And how is the capitalization rate calculated for

7   you?  Or how do you calculate it, I guess maybe a more

8   artful way?

9      A   Yeah.  So they're extracted from the market, and

10   it's simply a ratio of income to value.  So the mathematical

11   formula is taking the net operating income that's stabilized

12   and dividing it into the corresponding sale price.  So it's

13   just a ratio.  So we extract that from comparable sales to

14   help us convert our NOI to value when we do the income

15   approach.

16     Q   So you asked to look at the executive summary to

17   answer my questions.  Would it be fair that if the Court's

18   wanting to look at a quick summary, compare the executive

19   summaries from one report to the next?  Do you hear me, Mr.

20   Luther?

21     A   Oh, yes.  No, I am sorry.  I didn't realize you

22   were asking me.  Yes.  That would be reasonable to compare

23   the two.

24     Q   Okay.  Any other portions of this report that you

25   want to highlight for the Court?

Page 46

1    A   No.

2    Q   And are the methodologies and data in this report

3  similar and consistent to the methodologies and data in

4  Reports 1 and 2?

5    A   Yes.

6    Q   And did you reach the opinions in this report and

7  that you testified to based on your training and experience?

8    A   Yes.

9    Q   And to a reasonable degree of certainty?

10    A   Yes.

11        MR. HUSHKA:  All right.  If I could finally have

12  the Court pull up ECF 59 beginning on Page 4.

13  BY MR. HUSHKA:

14    Q   Do you recognize that document, sir?

15    A   Yes.  I do.

16    Q   What is that document?

17    A   This is the appraisal report that I prepared for

18  Red River State Bank in, let's see, it would have been,

19  scroll down here, July of 2025.

20    Q   If we were to go to Page 6, is that your

21  signature?

22    A   Yes.  It is.

23    Q   And what did you attest to, if anything, by

24  signing this report?

25    A   That I take responsibility for the assignment and

Page 47

1  the contents therein.

2    Q   Is this the most recent report that you prepared

3  as it relates to The Ruins?

4    A   Yes.

5    Q   If we were to go back up to Page 5, does that

6  provide your most recent opinions as to the value of The

7  Ruins?

8    A   Yes.

9    Q   All right.  What is your opinion as to the as-is

10  value of The Ruins?

11    A   The as-is opinion of value was estimated at or

12  concluded at $4,520,000 as of May 6, 2025.

13    Q   Can you explain the significant decrease down from

14  9.9?

15    A   Yes.  So again, the as-is value is developed

16  similar to the as-complete value where we're -- we develop

17  the -- or excuse me, the as-stabilized value gets developed

18  first.  We deduct the lease-up costs and costs associated

19  with stabilization from the as-stabilized value to get to

20  the as-complete value.

21        And then, from the as-complete value, we're

22  deducting whatever costs there are to finish construction

23  completion to arrive at the as-is value.

24        MR. HUSHKA:  If I can have the Court jump to Page

25  13.  The executive summary.

Page 48

1  BY MR. HUSHKA:

2    Q   Do you see that, sir?

3    A   Yes.  I do.

4    Q   If we walk through this, will it help explain some

5  of the decrease in values for the three evaluations?

6    A   Yeah.  Scroll down just a touch.  So first --

7        MR. HUSHKA:  But before we get into that, sir, can

8  I have the Court pull up, in a side-by-side comparison, the

9  executive summary from 95-3, the third report?  Four,

10  please.  95-3, number -- Part 4.  That would be Page 8 of

11  this one.  You have to pull the tab out from the address

12  bar, I think.

13  BY MR. HUSHKA:

14    Q   All right.  Sir, do you see your third report

15  executive summary on the left and your fourth report

16  executive summary on the right?

17    A   Yes.  I do.

18    Q   All right.  The first line or category is Property

19  Name.  Do you see that?

20    A   Yes.  I do.

21    Q   What is that?

22    A   The Ruins on the left, and then on the right is

23  The Ruins Apartments.

24    Q   Any reason for the change, or what does the

25  property name describe?

Page 49

1    A   No.  It's just our internal name that we give to

2  the property to help us remember what type of property we're

3  working on.  So it's -- there was no material reason for

4  that difference.

5    Q   Okay.  Location, what does that describe, the next

6  one down?

7    A   Location is typically the physical mailing address

8  that's assigned to the property.

9    Q   Did that remain the same from Reports 3 to 4?

10    A   Yes.

11    Q   Next category is Parcel Numbers.  What does that

12  describe?

13    A   That's the tax identification number that's

14  assigned by the county to the subject property.

15    Q   And did that remain the same?

16    A   Yes.  That remained the same.

17    Q   The next category is Client.  What is that

18  category?

19    A   That identifies the client for each assignment,

20  and it happens to be the same for both, Red River State

21  Bank.

22    Q   And highest and best use, what does that describe?

23    A   Summarizes our opinion of what the highest and

24  best use is for the property in its as-vacant condition and

25  also as-improved.

13 (Pages 46 - 49)

Page 50

1    Q   All right.  If we were to jump down to estimated
2  exposure time, what does that describe?
3    A   So the exposure time is the amount of time that we
4  expect it to be required to be on the market for a sale to
5  happen.  Exposure time is -- I will just remember here, look
6  at my notes.  Exposure time is prior to the effective date
7  of value, and marketing time --
8         MR. VERSTANDIG:  Hold on.  Objection.  I don't
9  know what the witness is looking at.
10        THE COURT:  Yeah.  I don't either.
11        MR. HUSHKA:  I don't either.  So, Mr. Luther, if
12  you can turn over anything you have on your desk so you
13  aren't looking at anything that we aren't --
14        THE WITNESS:  Oh.
15        MR. HUSHKA:  -- looking at the same time.
16        THE WITNESS:  Yep.  No problem.
17        MR. VERSTANDIG:  Thank you, Your Honor.
18        THE COURT:  Okay.  Yeah.  I will just invite you
19  from now on to make sure that you're not looking at any
20  notes or exhibits outside from those displayed by the Court.
21  Okay?
22        THE WITNESS:  Okay.  I apologize.  I didn't
23  realize that.
24        THE COURT:  Yeah.  Not everybody does.  Thank you.
25  BY MR. HUSHKA:

Page 51

1    Q   All right.  If we were to compare the two reports,
2  one is six months while one is six to twelve months.  Can
3  you explain any significance of that, if any?
4    A   Generally, we're just forming -- giving our
5  opinion of how much time we expect it to take.  Sometimes we
6  express that in a range and sometimes we express it in a
7  single point.  And in this case, there really isn't much
8  difference between those two.  You just have a range
9  expressed in one report and a single point in time in the
10  other.
11    Q   All right.  If we were to jump down to
12  Improvements, do you see that category?
13    A   Yes.  I do.
14    Q   The first three subcategories are the same, so I
15  want to begin with gross building area.  Do you see that?
16    A   Yes.  I do.
17    Q   To be blunt, is the building smaller in the fourth
18  report than it was believed to be in the third report?
19    A   Yes.
20    Q   Why did you believe that the building is smaller
21  in the fourth report compared to the third?
22    A   We were provided different architectural drawings
23  for the most recent report.
24    Q   Were there measurements taken as well?
25    A   Yes.  I measured the exterior of the building with

Page 52

1  a wheel when I was there during my on-site inspection.
2    Q   So am I reading this report correctly that the
3  building was built smaller than the initial plans that you
4  reviewed?
5    A   Yes.
6    Q   What effect, if any, generally speaking, does a
7  smaller building have on the valuation?
8    A   Generally, all else being equal, a smaller
9  building is less valuable.
10    Q   Why is that?
11    A   Well, it cannot -- it produces generally less
12  income if it's an income-producing property because it has
13  less rentable area.
14    Q   And if you charge rent on a square-footage basis,
15  what would that do?
16    A   It decreases the total rent that you can achieve
17  with the property.
18    Q   So again, all things being equal, are you able to
19  charge and produce greater income on a bigger building?
20    A   Yes.  On a bigger building, all else being equal,
21  you're typically able to charge for more income, generate
22  more income.
23    Q   If we were to look at the average unit size line
24  item, do you see that?
25    A   Yes.  I do.

Page 53

1    Q   Does that differ from one report to the other?
2    A   Yes.
3    Q   How is it?  Is it bigger or smaller for the most
4  recent report?
5    A   It is smaller for the most recent report.
6    Q   Would that have an effect on your valuation
7  calculations?
8    A   Yes.  It would.
9    Q   What effect?
10    A   All else being equal, it would decrease.
11    Q   Why?
12    A   The apartment units are smaller, therefore, gross
13  monthly income would go down, again, all else being equal.
14    Q   And again, similar question to before, how did you
15  get the unit size for the most recent report as opposed to
16  the prior reports?
17    A   That was developed based on the architectural
18  drawings provided to us for that assignment.
19    Q   And then, bottom line, does losing over 8 percent
20  of square footage per residential unit affect your valuation
21  for the development?
22    A   Yes.
23    Q   How so?
24    A   The property has less rentable area to charge
25  rent, so your total income that the property can produce has

14 (Pages 50 - 53)

Page 54

1  decreased.

2      Q   Focusing next on the financial indicators

3  category, you have a subcategory called stabilized

4  occupancy.  What does that describe?

5      A   That is the occupancy that the property achieves

6  to be considered, you know, stabilized or equivalent to what

7  the market around it is experiencing.

8      Q   It was 96 percent in the prior report and is now

9  down to 93.5.  Can you explain for me that difference?

10     A   Yeah.  And that's generally because there had been

11 some softening in occupancy between the third assignment on

12 the left and the fourth assignment on the right.

13     Q   What does the softening of the market do to

14 valuation?

15     A   It is a -- all else being equal, decreases the

16 value.

17     Q   Why is that?

18     A   In this case, when occupancy declines, there is

19 less revenue.  So again, all else being equal, less revenue

20 is -- results in a lower value.

21     Q   There's a line item called overall capitalization

22 rate.  Do you see that one, sir?

23     A   Yes.

24     Q   What is that?

25     A   That is the property -- our estimate of what the

Page 55

1  capitalization rate would be applied to the subject property

2  if exposed to the market.  And the overall capitalization

3  rate is a ratio of income to value.  So that number is

4  developed based on market-extracted information and

5  estimated for the subject property.

6      Q   And I believe you testified prior that the number

7  is inversely related to the valuation.

8      A   That is correct.  So in this case --

9      Q   I was going to say, can you expand on that a

10 little, please?

11     A   Sure.  Yeah.  So in this case, the appraisal on

12 the left, the third appraisal, the capitalization rate was

13 lower.  When you apply a lower capitalization rate to the

14 same income, it results in a higher indication of value.  So

15 on the appraisal to the right, having the capitalization

16 rate increase, again, all else being equal, when you apply a

17 higher cap rate to the same income, value is affected

18 negatively or goes down.

19     Q   I skipped over a line item, estimated lease-up

20 period.  What is that line?

21     A   That is our estimation of how much time it would

22 take to stabilize the property.  So basically, it's how much

23 time from construction completion to when it achieves the

24 stabilized occupancy identified in the report.

25     Q   And how did you reach your 24-month opinion in the

Page 56

1  most recent report?

2      A   Based on current market conditions from multiple

3  data sources at the time.

4      Q   Can you describe those market conditions and/or

5  data sources?

6      A   Excuse me.  So we've got CoStar analytic

7  information that is in the report and also demographic

8  analysis that we look at.  So I believe in the report on the

9  right -- well, in general, those are the things that we're

10 looking at in determining the lease-up period.

11     Q   Next section is pro forma operating data.  What is

12 that?

13     A   That is our projection of the stabilized income

14 characteristics of the property.

15     Q   The first subcategory, effective gross income.

16 Can you expound on that?

17     A   So the effective gross income is the income that's

18 expected to be collected by the property after vacancy and

19 credit loss happens.  So this is the actual income that they

20 are able to generate.  With stabilized occupancy.

21     Q   And how is that calculated for the most recent

22 report?

23     A   It is -- well, we start with estimating potential

24 gross income for all rent areas of rentable areas of the

25 property.  And then, we deduct vacancy and credit loss to

Page 57

1  get to effective gross income.

2      Q   Was that methodology the same as in the prior

3  report?

4      A   Yes.

5      Q   Same as in 1, 2, and 3?

6      A   Yes.

7      Q   Does that affect the ultimate valuation?

8      A   Yes.  On an income-producing property, the income

9  characteristics affect the value.

10     Q   And how does the effective gross income affect the

11 value?

12     A   In this, I guess maybe clarify, you're talking

13 about the most recent report?

14     Q   Yes.

15     A   Yeah.  So that's just a summary of the -- of what

16 we think that the total income the property can produce

17 after occupancy.  So you know the higher that effective

18 gross income is, the more income is available to makes the

19 property more valuable.  And the lower that number is makes

20 it less valuable, all else being equal.

21     Q   The next line item is operating expenses.  Do you

22 see that?

23     A   Yes.

24     Q   What goes into that subcategory?

25     A   So the operating expenses are detailed in the

15 (Pages 54 - 57)

Page 58

1 income approach in the report.

2 Q Property insurance?

3 A Yes. Property insurance.

4 Q Utilities?

5 A Yes.

6 Q Repairs and maintenance?

7 A Yes.

8 Q Management fees?

9 A Yes.

10 Q Payroll?

11 A Yes.

12 Q Advertising?

13 A Yes.

14 Q Reserves?

15 A Yes.

16 Q What about debt service?

17 A No.

18 Q What about payments to builders that haven't been

19 paid out yet?

20 A No.

21 Q Any payments to the WDC included in there?

22 A No.

23 Q Any payments to whatever state bank included in

24 there?

25 A No.

Page 59

1 Q The net operating income line, is that a product

2 of the gross income minus operating expenses?

3 A Yes. Effective gross income less operating

4 expenses equals net operating income.

5 Q Now, is that expressed as a monthly calculation or

6 an annual calculation in your report?

7 A These figures that we're looking at here are

8 expressed on an annual basis.

9 Q If I were --

10 THE COURT: I'm sorry. You're going to have to --

11 did you say annual? I didn't hear.

12 THE WITNESS: Yes. They're expressed on an annual

13 basis.

14 THE COURT: Annual. Thank you.

15 THE WITNESS: On this particular table that is

16 showing in the report on the right-hand side.

17 BY MR. HUSHKA:

18 Q So that $495,060 is approximately $41,000 and

19 change per month?

20 A I would assume so. I can't do math in my head

21 that quick, but it sounds right.

22 Q And so that would be effective $41,000 left for

23 The Ruins to pay any debt services needed?

24 A Yeah. Yes.

25 Q Is that number, the net operating income, is that

Page 60

1 a calculation made for as-completed or is that not done

2 until an as-stabilized income?

3 A That shows the as-stabilized income.

4 Q So that 41,000 per month would not be captured

5 until, in your estimation, two years after completion of

6 this project?

7 A Correct.

8 Q And during that interim 24 months, would the

9 property be expected to be making more or less than $41,000

10 a month?

11 A Prior to the as-stabilized effective date, it

12 would be generating something less. Depends on where in the

13 time continuum it is.

14 Q Turning now to the valuations here in your most

15 recent report, you provide two valuations for as-is. Do you

16 see those?

17 A Yes. I do.

18 Q What are those two different approaches?

19 A The sales comparison approach and income

20 capitalization approach.

21 Q How did you decide to ultimately use the income

22 approach in valuing The Ruins?

23 A Well, multifamily or mixed-use properties like the

24 subject all have tenants. And the once-stabilized, your

25 primary buyer is going to be an investor. And investors are

Page 61

1 heavily concerned with the income characteristics of the

2 property and the cash flow it generates in determining or

3 formulating their opinion of value, and what they're willing

4 to pay.

5 Q You also provide two valuations for a as-complete

6 value.

7 A Yes. That's correct.

8 Q What are those two approaches?

9 A The sales comparison approach and income approach.

10 Q I guess same question. Why did you choose to go

11 with the income approach for as-complete?

12 A Same answer. Typical buyer is going to place most

13 weight on the income approach.

14 Q Are there also two valuations for the stabilized

15 value?

16 A Yes.

17 Q What were those two approaches?

18 A Sales comparison approach and income approach.

19 Q Which one do you believe provided a more accurate

20 valuation for The Ruins?

21 A The income approach.

22 Q Why is that?

23 A Again, because I believe the most likely buyer is

24 an investor who's going to give primary weight to its income

25 characteristics.

16 (Pages 58 - 61)

Page 62

1    Q   Now, sir, I don't know if we'll have to go through
2  this all, but assuming that we won't here momentarily, are
3  there any sections of this report that you believe should be
4  highlighted for the Court that you want to go over at this
5  time?
6    A   No.
7    Q   Mr. Luther, the multiple opinions that we just
8  discussed with respect to this report, did you reach those
9  opinions utilizing your training and experience?
10   A   Yes.
11   Q   And did you reach those to a reasonable degree of
12 certainty?
13   A   Yes.
14       MR. HUSHKA:  Your Honor, at this time, we would
15 offer Exhibit ECF 59, pages 4 through 170, the most recent
16 appraisal report.
17       MR. VERSTANDIG:  Not an objection.
18       THE COURT:  No objection?
19       MR. VERSTANDIG:  No objection, Your Honor.
20       THE COURT:  The Court receives Exhibit 59, pages 4
21 through 170.
22       (Exhibit ECF 59 was admitted
23       into evidence.)
24       MR. HUSHKA:  No further questions at this time,
25 Your Honor.

Page 63

1        THE COURT:  Okay.  I would like to take just a --
2  how about 10 minutes before we hear from cross examination.
3  So how about we just resume at 4:40?
4        MR. VERSTANDIG:  Thank you, Your Honor.
5        CLERK:  All rise.
6        (Off the record.)
7        THE COURT:  Okay.  We're back on the record with
8  bankruptcy Case Number 25-30004 of The Ruins.  And when we
9  broke, we were getting ready for cross examination.  So Mr.
10 VerStandig?
11       MR. VERSTANDIG:  Thank you, Your Honor.
12         CROSS EXAMINATION OF JOSHUA LUTHER
13 BY MR. VERSTANDIG:
14   Q   Mr. Luther, what is a comparable sale?
15   A   It's a property that would be considered similar
16 to the property that we're appraising that has sold in the
17 marketplace.
18       MR. VERSTANDIG:  Madam Clerk, could we please go
19 to -- keeping both of them up side by side, because we're
20 going to reference both, but could we please go to Page 61
21 of Docket Entry 59?  And could you kindly scroll just a
22 little bit?  Perfect.
23 BY MR. VERSTANDIG:
24   Q   Mr. Luther, is this a visual depiction of the
25 comparable sales that you used in crafting your most recent

Page 64

1  report?
2    A   Yes.  This would be the map of where they're
3  located approximately.
4    Q   Okay.  And if, and I am not asking the clerk to do
5  so at the moment, if the clerk were to scroll down, the next
6  several pages would be data sets that correlate to each of
7  those, correct?
8    A   Yes.  That's correct.
9        MR. VERSTANDIG:  And I think actually, Madam
10 Clerk, if you could scroll right back up to that page.
11 Perfect.  Down one.  I am sorry.
12 BY MR. VERSTANDIG:
13   Q   These would be the eight comparable properties you
14 used, correct?
15   A   Yes.
16   Q   And these are sales from December of '23 through
17 March of '25.
18   A   Yes.
19   Q   Nebraska, Iowa, Minnesota, and South Dakota,
20 correct?
21   A   Yes.  That looks right.
22   Q   Good.  Now, none of these are from Watertown,
23 South Dakota.
24   A   Correct.
25   Q   Okay.  When was the last sale of a mixed-use

Page 65

1  apartment building in Watertown, South Dakota?
2    A   One that's comparable to the subject or any?
3    Q   Any of which you're aware.
4    A   I am not sure how to answer your question.  Off
5  the top of my head, I don't know.
6    Q   Okay.
7    A   I do know that I researched to see if there was
8  anything recent that would have been comparable and nothing was
9  recent.  So within that timeframe of the comparable sales
10 that we selected, I didn't identify anything recent in
11 Watertown.
12   Q   Are you familiar with a property called The Lofts?
13   A   Yes.  I believe that's in the report.  I believe
14 it's in the report as a rent comparable.  It would be a -- I
15 don't know if you need to see it, but I believe I used it as
16 a rent comparable in the report.  So a summary of that
17 property is in the report.
18       It's another project downtown Watertown.
19   Q   Why did you not use it as a sales comparable?
20   A   I was not aware that it sold.
21   Q   It sold in March of 2024, didn't it?
22   A   If you say so.  I was not aware of it.
23   Q   Okay.  Would The Lofts be a good comparable if it
24 had in fact sold in 2024?
25   A   Yes.

17 (Pages 62 - 65)

Page 66

1    Q    Okay.  Your latest appraisal removes the TIF
2  valuation.  Why is that?
3    A    We weren't asked to provide it, so --
4    Q    Now --
5    A    -- we don't do it if we're not asked.
6    Q    Previously, and we can pull this up if you'd like,
7  I believe the TIF had been valued at $1.8 million in your
8  2022 appraisal.  Does that sound accurate to you?
9    A    I believe so.
10    Q    Okay.  Why would you exclude an asset component
11  with a value of $1.8 million?
12    A    It's run separate from the real estate or can be
13  separated so, and it's a wasting asset.  So it's different
14  than the real estate component.  And so typically, when
15  we're doing an assignment for properties that are in a TIF,
16  we go off of client instructions on if they want to include
17  it or not.
18      In this case, it was not required for us to include it
19  in the report.
20    Q    So to be clear, the bank asked for it to be
21  included in 2022, correct?
22    A    Correct.
23    Q    And the bank asked for it not to be included in
24  your most recent report, correct?
25    A    To the best of my knowledge.  Yes.

Page 67

1    Q    Okay
2    A    That's correct.
3    Q    You said it can be separated from the property,
4  right?
5    A    Typically, the cash flows can be assigned and sold
6  to a third party.
7    Q    Do you have any reason to believe the TIF in this
8  case has been separated from the property?
9    A    I don't have any reason to believe it is or isn't.
10  I don't know.
11    Q    How often do you perform four appraisals of a
12  single asset in a four-year time span.
13    A    Not real often.  I mean it happens, but it's not
14  the bulk of the work that we do.
15    Q    Have you ever had a client ask you to include a
16  TIF in one appraisal and then remove it from a subsequent
17  appraisal before?
18    A    Usually.  Yeah.  I mean we've included it or
19  excluded it based on, you know, at the time.  Generally,
20  when I am quoting an appraisal, somebody comes and asks us
21  what we want or what our fee is to do an appraisal.  If I
22  know that they want us to value the TIF, that's more work
23  for me to value the TIF.  And so I bid differently based on
24  the TIF.  And then, sometimes the client decides it is
25  relevant and they want to include it or it's not relevant

Page 68

1  for this assignment and they don't need it, so.
2    Q    You had already valued the TIF in this case.  So
3  presumably it wouldn't have been a ton more work to include
4  it in your latest appraisal, right?
5    A    I suppose that's true.  Yes.
6    Q    By the way, your first three appraisals each have
7  three signatures.  It's your signature and those of two
8  colleagues of yours, correct?
9    A    That's correct.
10    Q    And your latest appraisal's just your signature,
11  right?
12    A    Yes.
13    Q    Why is that?
14    A    So the last or the most recent appraisal was one
15  that I prepared and did exclusively on my own.  And the
16  previous reports were completed with the help of the signing
17  appraisers.  So if there's duties that are assigned to other
18  appraisers that are licensed, that they will sign the report
19  to take responsibility for that.
20      So it's simply a matter of this most recent
21  report.  I just did completely on my own without the aid of
22  other internal staff appraisers here in our company.
23      MR. VERSTANDIG: Madam Clerk, on the left side of
24  the screen, could we please go to Page 8?  And on the right
25  side of the screen, could we please go to Page 13?  And

Page 69

1  could you scroll down a little bit on both of them toward
2  the bottom of the pages?  Up a little bit, I am sorry, Page
3  13.  Thank you.
4  BY MR. VERSTANDIG:
5    Q    Now, you see the stabilized occupancy rate, Mr.
6  Luther?
7    A    Yes.  I do.
8    Q    Why did that drop from 96 percent to 93-1/2
9  percent?
10      MR. HUSHKA:  Objection.
11      THE WITNESS:  Yeah.  So we're looking at --
12      MR. HUSHKA:  Asked and answered.
13      THE COURT:  So this is tricky with
14  videoconferencing.  There was an objection.  So I am glad
15  that you completely stopped.  The objection was that it's
16  been asked and answered.  Response, Mr. VerStandig?
17      MR. VERSTANDIG:  I believe there was a high level
18  discussion of the variance between the two, but there wasn't
19  a specific identification of the cause that invited a 2.5
20  percent drop in the projection for stabilized occupancy.
21      THE COURT:  I am going to allow the witness to
22  answer again or embellish either way.
23      THE WITNESS:  So in the most recent report, in the
24  income approach section where we go through all of these
25  income characteristics, the stabilized occupancy is

18 (Pages 66 - 69)

Page 70

1  developed using sources referenced there.  So it is simply a
2  function of changes in market conditions from one report to
3  the next as to how that changes.
4      Because that comes from generally third-party
5  providers that provide us analytical information about the
6  status of the market.
7  BY MR. VERSTANDIG:
8      Q   Are you familiar with two buildings known as
9  Parkside and Generations?
10     A   Yes.
11     Q   Are you familiar that they're both currently
12  debtors in bankruptcy in this court?
13     A   No.  I was not.
14     Q   Okay.  Did you have -- and are they both located
15  in Watertown, South Dakota?
16     A   Yes.
17     Q   From a rental perspective, are they comparable to
18  what Ruins would be upon completion?
19     A   Yes.  I believe that I use them as rent
20  comparables in my most recent report.
21     Q   Okay.  If they are at or near 100 percent,
22  would that suggest --
23     MR. HUSHKA:  Objection, Your Honor --
24     MR. VERSTANDIG:  -- a hybrid --
25     MR. HUSHKA:  Assumes facts not in evidence.

Page 71

1      MR. VERSTANDIG:  I actually think it is in
2  evidence.  I believe Ms. Craig testified at the end of Day
3  2.  Because we -- at the end of Day 2, we had the testimony
4  as to what rental revenue would be.  And it was based on how
5  long it would take to achieve what has been achieved for
6  Parkside, what has been achieved for Generations and the
7  projection of numbers therefrom.
8      THE COURT:  Did you say Ms. Craig or Mister?
9      MR. VERSTANDIG:  Yes.  Ms. Craig.
10     THE COURT:  That's my memory as well.
11     MR. VERSTANDIG:  Ms. Cathcart has asked the
12  question.
13     THE COURT:  So I am going to overrule the
14  objection and allow the witness to testify.
15     THE WITNESS:  Can you repeat the question for me?
16  I am sorry.
17  BY MR. VERSTANDIG:
18     Q   If those properties are at or near 100 percent
19  rental rate, would that suggest an increase in stabilized
20  occupancy rate?
21     A   It would be an indicator.  They're not the only
22  properties in the market.  So there are other considerations
23  to consider, but it's a data point or an indicator of how
24  the market's performing.
25     Q   And just for clarity, the higher stabilized

Page 72

1  occupancy, the higher the value, correct?
2      A   All else being equal, that would be true.  Yes.
3      Q   You had spoken generally about, and probably more
4  than generally, I think you named some specifically, about
5  the data sources you used.  Did you use any market studies
6  conducted by the City of Watertown in drafting either of the
7  reports that are on the screen?
8      A   Not in my recollection.  No.
9      Q   And do you still believe that a 24-month lease-up
10  period is the appropriate metric for this property?
11     A   That was my opinion on the day that I wrote that
12  report, the most recent report.  Yes.
13     Q   Almost five months ago, though.
14     A   I do not have the information in front of me to
15  formulate any opinions at this time.
16     Q   Well, let's be clear about this.  Are these your
17  opinions as of July of 2025 or as of today?
18     A   They're as of the day I wrote the report or issued
19  the report.  So the date of the report, I believe, is July
20  2025.
21     Q   Okay.  And the report on the left is from 2022,
22  correct?
23     A   I can't see the date on that.  I thought that was
24  in 2023, the most recent report.
25     Q   I believe you are correct.  I apologize for the

Page 73

1  error.  It is 2023.  So your estimated lease-up period
2  quadrupled over two years.
3      A   Yes.  If you say so, yes, it does.  Yes.  I can
4  see it now.  Excuse me.
5      Q   Does it not make sense then to sort of verify that
6  data almost half a year later?
7      A   I was not asked to provide an opinion of value as
8  of today.  I was asked to do it back in July of 2025, which
9  is what I did.
10     Q   Now, the 2023 report contains a cost approach.  Do
11  you remember that?
12     A   Yes.
13     Q   Okay.  And if we go to Page 23 of the new report
14  on the right -- sorry, that was a bit of a fake out.  It
15  actually discusses the cost approach, does it not?
16     A   It does.
17     Q   Why is there no cost approach appraisal in the new
18  report?
19     A   I am not required to do one to provide credible
20  appraisal results.  And in my reconciliation, I was of the
21  opinion that you're most likely buyer is an investor who
22  give primary consideration to the income approach.  So I
23  elected to not do the cost approach for this most recent
24  assignment.
25     Q   Well, on the left side, we're looking at the old,

19 (Pages 70 - 73)

Page 74

1 your buyer profile is still an investor, is it not?

2    A   Yes.  It is.

3    Q   But you still use the cost approach then?

4    A   We did.  Keep in mind that I was not the only

5 appraisal involved in those appraisal assignments.  So there

6 were other appraisers working on those assignments.  And

7 that was the lead appraiser decided to complete the cost

8 approach in that assignment.  And I felt it was reasonable

9 to include it at that time.

10    Q   Did you have any communications with Red River

11 State Bank or any agent thereof about including the cost

12 approach in your new appraisal?

13    A   I believe I suggested that it wasn't necessary at

14 the beginning of the engagement.  I don't recall exactly,

15 but I might have said something like I don't know that it's

16 necessarily warranted to develop a credible opinion of

17 value.

18        MR. VERSTANDIG:  Okay.  Can we please go to Page

19 14 of the new report on the right?  And could we scroll down

20 toward the bottom of the page?  Thank you.

21 BY MR. VERSTANDIG:

22    Q   I am going to read the last bullet point just sort

23 of for clarity.  It says, "The property has been partially

24 finished with no construction activity occurring recently,

25 and the developer has been in the local news due to the

Page 75

1 recent bankruptcy filing and other historic construction

2 delays.  This increases the risk of the subject property

3 having a negative stigma with local market participants or

4 potential buyers."  What is a bankruptcy stigma?

5    A   Well, any negative stigma can occur if a property

6 is not performing how it should in the market.  And so

7 market participants may identify, you know, an opportunity

8 to buy it at a discount or get it on the cheap.  And so

9 there's a risk of that.  So we're identifying that that risk

10 may exist in the market.

11    Q   How do you quantify that risk in terms of your

12 appraisal?

13    A   Yeah.  That's a good question.  The -- quantifying

14 something like that is extremely challenging.  Most likely

15 that would be quantified by interviewing market participants

16 and getting their opinions as to what they felt would be an

17 appropriate discount because of that stigma.

18    Q   Which market participants did you interview?

19    A   I didn't interview any for that particular

20 characteristic.

21    Q   Okay.  How did you go about applying that

22 characteristic to your appraisal then?

23    A   Well, just because the characteristic or this is

24 identified as a weakness or threat doesn't mean it

25 necessarily exists with the subject property being

Page 76

1 appraised.  So in this case, this section is SWOT analysis

2 identifies potential strengths, opportunities, weaknesses or

3 threats that exist in the market.  It doesn't mean that they

4 necessarily affect the property.

5    So in this case, I didn't reflect any additional

6 stigma, but I am recognizing or relaying to the client that

7 there is a risk that it may be present.

8    Q   I am honestly not sure that I understand.  You're

9 saying it may be present in the market but not in the

10 property?

11    A   Excuse me.  Present or associated with the

12 property because it is -- it would be specific to the

13 property if it's underperforming.

14    Q   Are you aware of how other Watertown properties in

15 bankruptcy have performed historically?

16    A   No.

17    Q   Have you done anything to investigate that?

18    A   No.

19    Q   Okay.  The line above that says, "There are two

20 other properties similar to the subject in the central

21 business district that are currently operating below

22 stabilized occupancy."  Which two properties are you

23 referring to?

24    A   Those would be the two properties in the income

25 capitalization approach that were used as rent comparables.

Page 77

1 I believe they were the two properties you referenced

2 earlier, but I'd have to go back and look at the rental

3 survey in the income approach in my report to make that

4 determination.

5    Q   Generations and --

6    A   So --

7    Q   -- Parkside being the two I referenced, correct?

8    A   I -- yes.  I believe those are the two.  It does -

9 - I do identify the vacancy, there are identified vacancy at

10 the time of the survey for each rent comparable and those

11 are summarized in the income approach.  So I am going from

12 memory, excuse me.  But I believe that those are the two

13 that had below stabilized occupancy at the time of survey.

14    Q   Were you aware that those were two properties that

15 had just recently been removed from receivership?

16    A   No.

17    Q   How does that observation impact the valuation of

18 the property?

19    A   Again, it's another identified like weakness in

20 the market that I am trying to make the client aware.  In

21 this case, I specifically referenced the lease-up period.

22 So the more apartments or units that are vacant at the time

23 of my survey, that's going to impact the lease-up period

24 based on the demographic analysis and other analysis that we

25 do to determine what a reasonable timeframe is for the

Page 78

1   property to achieve stabilized occupancy.

2      Because essentially, the subject property is competing

3   with all the other properties in the market that have below

4   stabilized occupancy for tenants. And they also compete for

5   tenants as tenants roll over or move in and out of

6   stabilized properties as well. So there's constant

7   transitioning and churn that's happening.

8      Q   Could we please scroll to the next page on the

9   right, Page 15, and the market volatility section? So this

10  talk, I am going to read this a little bit. "President

11  Trump's announcement of broad-based global tariffs on April

12  2nd sent shockwaves through global financial markets.

13  Potential impacts will depend on how long tariffs remain in

14  place, and the extent to which retaliatory tariffs by other

15  countries will impact the U.S. economy. The full economic

16  effect of the tariffs is evolving and can result in slower

17  growth as well as potential inflationary pressures."

18      It then goes on, second sentence in the next paragraph

19  to say, "The impacts on interest rates, the 10-year treasury

20  yield, leasing activity, real estate demand, construction

21  costs, availability of financing, and other values remain

22  unclear." Do you see that?

23      A   I do. Yes.

24      Q   Okay. Let's talk about the impact on interest

25  rates. Do you know what the Fed funds rate was on April 2nd

Page 79

1   when the tariffs were announced?

2      A   Off the top of my head, I do not. I know that

3   they were -- that the Fed was in a position of decreasing

4   rates or the Fed funds rate between the 2023 report and the

5   most recent report.

6      Q   Would it refresh your recollection if I suggested

7   that on April 2nd, the Fed funds rate was 4.37 percent and

8   that as of today, it's 3.88 percent?

9      A   Sure. I will believe you on that. Yes.

10     Q   All right. So the Fed funds rate has actually

11  gone down.

12     A   Correct.

13     Q   Okay. And am I correct that the prime rate was

14  7.5 percent on April 2nd and is 7 percent today?

15     A   I will assume that those figures are correct. I

16  don't have those in front of me.

17     Q   All right. And a decrease in interest rates would

18  actually make the building more valuable, not less valuable,

19  correct?

20     A   All else being equal, a decrease in interest rates

21  would have an impact on what buyers and sellers -- or what

22  buyers are willing to pay because of financing terms. The

23  Fed funds rate is a short-term overnight rate that's

24  different from the borrowing rates that the borrower secures

25  from the bank, so.

Page 80

1      Q   There's generally a correlation between a

2   borrower's rate and the prime rate though, correct?

3      A   If the prime rate is another short-term interest

4   rate, so it depends on what financial or what the objective

5   of the borrower is. If they want a variable interest rate

6   loan, then that loan will be priced off of a spread over

7   prime. If they want a long-term fixed rate loan, then in

8   many cases, banks may price that differently, and use a

9   longer-term fixed benchmark as their cost of funds, like a

10  10-year treasury or a federal home loan bank, you know, cost

11  of funds to them. So --

12     Q   And 10-year Treasury was 4.13 percent on April

13  2nd, right?

14     A   Okay. I will believe that's correct. I

15  don't have that in front of me.

16     Q   And it was 4.11 percent at the close of last week.

17     MR. HUSHKA: Objection, Your Honor. He's

18  testifying at this point. I don't know if he's asking the

19  Court to take judicial notice of the various rates, which we

20  certainly happen to do since it was 4.25 in April of '25 and

21  up to 4.5 in July of '25.

22     MR. VERSTANDIG: 4.28 in July of '25 if you use

23  the second, which is the date of the report, but 4.13 on

24  April 2nd and 4.11 as of the close of last Friday. I think

25  the bigger point, though, is --

Page 81

1      THE COURT: Okay. Just a minute.

2      MR. VERSTANDIG: -- the expert --

3      THE COURT: The point of the objection is that

4   you're testifying, and so that is sustained. If you want me

5   to take judicial notice of the rates, I am going to need

6   something other than the recitation of counsel.

7      MR. VERSTANDIG: I will work on something for

8   tomorrow, Your Honor.

9      THE COURT: Okay.

10  BY MR. VERSTANDIG:

11     Q   Mr. Luther, how familiar are you with these

12  benchmarks that you reference in your report?

13     A   You know I am familiar with the benchmarks. I

14  can't rattle them off the top of my head, but when I am

15  researching and preparing an appraisal report, we will look

16  at them on the computer screen and, you know, take their

17  movement and a part of the overall picture.

18     Q   All right. Without my testifying this time, is it

19  your understanding that the 10-year treasury yield at the

20  close of last week was roughly what it was back in April?

21     A   I guess I don't know that. I don't have the 10-

22  year treasury information in front of me. Sorry.

23     Q   Nothing to be sorry about. What would the current

24  cap rate be for Watertown, South Dakota as we sit here

25  today?

21 (Pages 78 - 81)

Page 82

1     A   I can't opine on what a cap rate would be today
2   because I -- the appraisal takes many days of research and
3   study and thought to come up with all the conclusions in the
4   report. I am not prepared to offer an opinion on that
5   today.
6     Q   So the cap rate in your report is your belief as
7   of July, but not necessarily your belief as of today.
8     A   That is correct. Yes.
9     Q   You just talked earlier today that the plans for
10  the property changed between two of your appraisals. Do you
11  remember that?
12    A   Yes.
13    Q   What leads you to believe they changed?
14    A   Well, I took a physical measurement of the
15  building when I was there, and I could identify that the
16  building footprint was different than what was identified in
17  the previous appraisal reports. And then, I combined that
18  with the new architectural drawings that were provided to me
19  by the client.
20    Q   You say new architectural drawings, are those
21  different than old architectural drawings?
22    A   The drawings were different than the drawings that
23  were provided to us for the first assignment.
24    Q   Really?
25    A   To my knowledge, they were. Yes.

Page 83

1     Q   Were they by the same architect?
2     A   Off the top of my head, I don't recall.
3     Q   Did you look at architectural drawings for your
4   second or third appraisal?
5     A   We had those as a part of the work file. So those
6   would have been incorporated in the report and considered.
7   Yes.
8     Q   Okay. Where did you receive those from in the
9   beginning?
10    A   The very first appraisal report that we did, we
11  received the drawings from our client, Red River State Bank.
12    Q   And for the most recent one, you also received
13  them from your client?
14    A   Yes. That's correct.
15    Q   Have you ever asked the Debtor for the
16  architectural drawings?
17    A   No.
18        MR. VERSTANDIG: Could we please go to Page 14 on
19  the right, so up one page, a little bit further up? Thank
20  you.
21  BY MR. VERSTANDIG:
22    Q   Now, your pro forma has net operating income of
23  $495,060. Do you see that?
24    A   Yes. I do.
25    Q   And I believe you testified earlier, and correct

Page 84

1   me if I am wrong, but that's an annualized number.
2     A   Yes.
3     Q   There was testimony earlier in this hearing by Ms.
4   Craig that net income would be $60,000 a month. I don't
5   know if you were present for that or not. Were you present
6   for that?
7     A   No. I was not.
8     Q   Okay. Can we agree that $60,000 a month would be
9   $720,000 a year?
10    A   Yes.
11    Q   Okay. Would net operating income of $720,000 a
12  year, juxtaposed to $495,060, increase the value of the
13  property?
14    A   All other characteristics being equal, yes, it
15  would have a positive influence on value.
16    Q   That's an almost, emphasis on the word almost, 50
17  percent increase in month-over-month net revenue, isn't it?
18    A   Sounds correct.
19    Q   Okay. And to be clear, if that was the figure
20  that would cause your appraisal to be for a higher sum,
21  based on the sale approach, correct?
22    A   If that was the net operating income that I would
23  have concluded at. Yes. All else -- all other factors
24  being equal, it would have resulted in a higher value.
25    Q   So I want to be careful not to be too summary

Page 85

1   here, but if the net operating income was significantly
2   higher, and the lease-up period was significantly lower,
3   that would lead to a material change in your appraisal,
4   right?
5     A   Yes. Again, all other factors being equal, aside
6   from those two changes, yes, those would be positive
7   influences on value.
8     Q   Okay. And as you may have caught on, I spent
9   perhaps too much time reading these. It looks like the
10  average median income -- I am sorry, the average end to
11  median income went up in Watertown, South Dakota from 2022
12  to 2025, correct?
13    A   I don't see it. So I guess I can't speak to that.
14  But I don't know that information off the top of my head.
15        MR. VERSTANDIG: Madam clerk on the left, could we
16  please look at Page 18 and on the right, could we please
17  look at Page 26?
18  BY MR. VERSTANDIG:
19    Q   It looks like we went from $81,000 and change to
20  $86,000 and change for average household income, correct?
21    A   Yes. That's correct.
22    Q   Okay. And median income popped from 64,000 and
23  change to 68,000 and change, correct?
24    A   Yes. That's correct.
25    Q   And in your expert opinion, that would lead to at

22 (Pages 82 - 85)

Page 86

1 least a marginal increase in prevailing rental rates,
2 correct?
3     A   Not necessarily.  That is one characteristic of
4 the market that may or may not influence rental rates.
5 Rental rates can be influenced by a supply and demand
6 characteristics of the market, and that's one
7 characteristic.  So not necessarily.  No.
8     Q   Could we please go to Page 58 of the report on the
9 right?  Now, this is a chart that shows market sale price
10 per unit.  Can I assume that's for apartment buildings in
11 Watertown, South Dakota?
12     A   Yes.  That would be for the multifamily market
13 segment of the area studied.  So it includes Watertown, but
14 there's a map that is earlier, on the pages earlier that
15 show the market area that is included in these graphical
16 representations of the data.
17     Q   I'm not trying to quiz you, so if we need to
18 scroll to the map, we can.  But do you have a generalized
19 sense of, is this going to be a map of the South Dakota
20 region, of the Midwest, the United States, the Western
21 Hemisphere?
22     A   Be it generally Northeastern South Dakota.
23     Q   Okay.  So it would be of a region of the state?
24     A   Yes.
25     Q   Good.  And this shows the forecast for market sale

Page 87

1 price per unit in 2026 coming to, if I am reading this
2 correct, about $5,000 less than the high over the trailing
3 10-year period, right?
4     A   Let's see here.  So it looks like the high was
5 approximately a little over 80,000 a unit.  And then, I am
6 not sure which number you're referencing.  Are you
7 referencing the current or the end of the year forecast
8 that's indicated by CoStar?
9     Q   As best I can tell, the end of '26, and please
10 correct me, I am not trying to read this for you.  It looks
11 like the line hits the 75K mark right at the end of '26, if
12 I am reading that right.
13     A   Oh, at the end of 2026, yes, I see that.  Yes.  It
14 looks like the line does cross 75,000 per unit.
15     Q   Okay.  So the forecast would be that a year from
16 now it's about $5,000 per unit off the high from '22 or late
17 '21, depending on how you look at that, right?
18     A   Yeah.  Using this chart in isolation.  Yes.
19     Q   Okay.  And on a 63-unit building, can we agree
20 that $5,000 per unit would be a discount of $315,000?
21     A   I don't have a calculator in front of me.  I would
22 assume that you're calculating correctly, but I can't
23 calculate it here in my head, so.
24         MR. VERSTANDIG:  Your Honor, court's indulgence
25 for one moment.  And I am intentionally looking at my phone

Page 88

1 to see if I have any texts from the courtroom.
2         THE COURT:  Take your time.
3         MR. VERSTANDIG:  Your Honor, if we could take
4 perhaps 90 seconds just to make sure I am not missing
5 something, and otherwise I suspect I will be finished with
6 this witness.
7         THE COURT:  Sure.
8         MR. VERSTANDIG:  I know we're at the end of a long
9 day.
10         THE COURT:  Take your 90 seconds.
11         MR. VERSTANDIG:  Thank you.  And I am going to
12 have a couple more questions, then we will be finished, I
13 promise.
14 BY MR. VERSTANDIG:
15     Q   On the right side, could we please go to Page 85?
16 These are the vacancy rates that you had referenced earlier,
17 correct, Mr. Luther?
18     A   Yes.
19     Q   And this shows Parkside Place being 100 percent
20 occupied, correct?
21     A   Yes.
22         MR. VERSTANDIG:  Your Honor, nothing further for
23 this witness.
24         THE COURT:  Mr. Feist, any questions?
25         MR. FEIST:  Yes.  Your Honor, briefly, if I may.

Page 89

1         THE COURT:  Yes.
2         CROSS EXAMINATION OF JOSHUA LUTHER
3 BY MR. FEIST:
4     Q   Good afternoon, Mr. Luther.  You had given an
5 opinion about the net present value of the TIF for The
6 Ruins.  Is that right?
7     A   Yes.  In an earlier report.  Yeah.
8     Q   Right.  I believe it was your earlier reports,
9 including your third report, correct?
10     A   I believe so.  I would have to review that third
11 report, but I -- to the best of my recollection.
12     Q   And when you provided that opinion, I believe you
13 said you were valuing the expected cash flow from the TIF
14 and reducing it to present value.  Is that correct?
15     A   Yes.  That's correct.
16     Q   Does the TIF increase the value of the real estate
17 itself, or is it an independent -- or is the value
18 independent of the real estate?
19     A   It's independent of the real estate.  It's kind of
20 like a separate component since it is -- can be separated
21 from the real estate and sold independently from the real
22 property.
23     Q   Right.  So if the TIF revenue is sold, the TIF
24 wouldn't have any value to the property, would it?
25     A   Well, the TIF has value to whoever owns the TIF.

23 (Pages 86 - 89)

Page 90

1  So if -- you know if the current property owner that owns
2  the real property that were -- that I appraised sold it,
3  then there is no value to that property owner.  It's whoever
4  owns it, whoever bought it, has the value of the TIF.
5      Q    Right.  So if the property were sold, but the TIF
6  revenue was not transferred to the buyer, the TIF wouldn't
7  have any value to the new owner.
8      A    That's correct.
9      Q    Similarly then, if the TIF revenue was assigned to
10  a third party, would the TIF have any value to the property
11  itself?
12      A    No.
13      MR. FEIST:  I don't have any further questions.
14      THE COURT:  Okay.  So we're past 5:00.  How long
15  do you have for redirect?
16      MR. HUSHKA:  Your Honor, I think it would be
17  relatively brief, but I also wouldn't mind being able to
18  consult with my clients as well for any areas on redirect if
19  we could continue this to the morning.  And then I think it
20  would be a short witness to wrap up if the Court is
21  comfortable keeping them on overnight and whether Mr.
22  Luther's available tomorrow morning.
23      THE COURT:  So my hard stop is 6:00, CSOs won't
24  permit me to go any longer than that.  I don't know if we
25  can finish.  That's really my question.

Page 91

1      MS. STANLEY:  Can we take a quick five-minute?
2      THE COURT:  Yeah.  To consult?  Sure.
3      MS. STANLEY:  Yes.
4      MR. HUSHKA:  Yes.
5      THE COURT:  Yes.  Yes.  You may.  I will just stay
6  here.
7      MR. HUSHKA:  Thank you, Your Honor.
8      MR. VERSTANDIG:  Are you trying to hotbox us out
9  of here?
10      THE COURT:  Yeah.
11      UNIDENTIFIED SPEAKER:  Yeah.
12      MR. HUSHKA:  And good thing I wore my turtleneck
13  and undershirt.
14      MR. HUSHKA:  Well, we should be very brief, I
15  believe, Your Honor, if we're --
16      THE COURT:  Great.
17      MR. HUSHKA:  -- allowed to go --
18      THE COURT:  Yes.
19      MR. HUSHKA:  -- forward.
20      THE COURT:  Yes.  Let's see if we can't finish
21  with this witness today.
22      MR. HUSHKA:  All right.
23      THE COURT:  You may proceed.
24      MR. HUSHKA:  Thank you.  If I could have the clerk
25  turn to Page 25 on 95-3, so that left document, Page 25.

Page 92

1      REDIRECT EXAMINATION OF JOSHUA LUTHER
2  BY MR. HUSHKA:
3      Q    Mr. Luther, do you see that left document?  And
4  can you describe what that is?
5      A    Yes.  That's the floor plan of the first floor, or
6  drawing of the first floor that was provided to us for that
7  assignment.
8      Q    All right.  And if we can compare that, if you can
9  pull up on the right, Page 42.  Do you see that, sir?
10      A    Yes.  That is also the floor plan or drawing that
11  was provided to us for that assignment.
12      Q    All right.  If we look in the upper right corner
13  of that right document, is there something in that corner?
14      A    Yes.  There's a -- on the right-hand side, there's
15  an identification of the individual who prepared that or
16  drew the document.
17      Q    Okay.  What is that -- if there's any significance
18  to that, what is it?
19      A    I think it says Stroh, S-T-R-O-H.  It's pretty
20  small for me to read, but I believe that's what it says.
21      Q    Okay.  And is anything certified by an architect
22  stamp such as that?
23      A    I am sorry.  I am not following your question.
24      Q    When an architect stamps a document, such as it
25  appears Mr. Stroh did in this case, does that signify

Page 93

1  anything to your knowledge or opinion?
2      A    Oh, so that would be signifying it's like an
3  official, you know,  final version of the document.
4      Q    So is it your understanding that the floor plans
5  and blueprints reviewed for the most recent report are the
6  official as-built plans?
7      A    Yes.  That's my understanding.
8      Q    We also talked or was asked -- you were asked
9  briefly about the potential sale of The Lofts.  Do you
10  remember that?
11      A    Yes.  I do.
12      Q    When you're compiling sale data for sales
13  comparison approach, how do you collect that sales data or
14  how do you know what properties have been sold?
15      A    Generally, we're researching a number of different
16  sources that we have to us.  So one would be county records.
17  We'll look through county records to see if there's been any
18  sales that have been recorded.  We'll look through our
19  CBRE's proprietary database that has sales in it that have
20  been entered in by other appraisers in our company.  We also
21  have third-party services like CoStar that provide sale
22  transaction data that we also review and look at to identify
23  sales for the assignment.
24      Q    Would any of those data sources potentially
25  identify a membership sale where a membership interest in an

24 (Pages 90 - 93)

Page 94

1 LLC is sold from one member to another?

2    A   My experiences is, is those generally are not

3 recorded publicly when they're between two members.  I don't

4 frequently see those as recorded with like the county, for

5 example.  So if it's not recorded with the county, it

6 wouldn't show up.

7    Q   And you don't know if the sale of The Lofts was a

8 membership sale or not?

9    A   I don't know.  No.

10    Q   Was there any particular reason why you did not

11 include The Lofts in your sale comparison report, to your

12 knowledge?

13    A   If I am not aware of it selling, then I --

14 there's no reason to include it.

15    Q   Okay.  Lastly, you have talked about the

16 valuations and your opinions as they relate to a moment in

17 time, essentially a snapshot of July 2, 2025.  Is that a

18 fair summary of your fourth report?

19    A   Yes.  All value opinions are issued as of the

20 effective date of the report.  And it represents the

21 appraiser's position as of that date.

22    Q   And so essentially, if you wanted to provide a

23 opinion as to that particular date for this hearing that

24 started, it was originally noticed for September, and then

25 continued to October and now continued again to November,

Page 95

1 would you have had to have prepared three separate reports?

2    A   Well, three or maybe more, depending upon how

3 many times, you know, when they asked me to set that

4 timestamp, if you will, that snapshot in time.

5    MR. HUSHKA:  Okay.  No further questions, Your

6 Honor.

7    THE COURT:  Cross examination, Mr. VerStandig?

8    MR. VERSTANDIG:  One question, Your Honor.

9    RECROSS EXAMINATION OF JOSHUA LUTHER

10 BY MR. VERSTANDIG:

11    Q   Mr. Luther, just for clarity, the images on the

12 screen at the moment, the one on the left is the first

13 floor, the one on the right is the second floor, correct?

14    A   Yes.  That's correct.

15    MR. VERSTANDIG:  Thank you.  Nothing further, Your

16 Honor.

17    THE COURT:  Mr. Feist.

18    MR. FEIST:  Nothing from me, thank you.

19    THE COURT:  Then the witness may be excused.

20 Thank you for appearing today.

21    MR. HUSHKA:  Your Honor, we would state that I

22 don't believe our next witness can get done in half an hour,

23 so this might be a good time for the day.

24    THE COURT:  Yeah.  Yes.  Yes.  We are definitely

25 stopping right now.  Thank you.  Okay.  So we will resume

Page 96

1 this hearing at 8:30 tomorrow morning providing everybody

2 can get here.  I am going to assume that you can get here

3 unless you call the clerk's office.  Okay?  All right.

4    MR. VERSTANDIG:  And, Your Honor, just for

5 clarity, the Court's going to be taking a recess at 10:00

6 a.m., correct?

7    THE COURT:  Yes, at 10:00 a.m.  I need to take a

8 recess for 15 to 20 minutes is my best guess.

9    MR. VERSTANDIG:  May we reasonably count on the

10 fact that we won't be in court from 10:00 to 10:15?  I am

11 scheduling a call with a judicial mediator in a totally

12 unrelated matter.

13    THE COURT:  Yes.  You are --

14    MR. VERSTANDIG:  Thank you, Your Honor.

15    THE COURT:  -- absolutely.  And if I happen to

16 finish in 10 minutes, I will just take five minutes to

17 myself.

18    MR. VERSTANDIG:  I can learn to try to speak more

19 quickly than I do.  But thank you.

20    THE COURT:  That's fine.  In fact, I -- you know I

21 think it's possible it could go to 10:30, but it won't go

22 after that.  Okay.  All right.  Then we stand in recess.

23 See you tomorrow morning at 8:30, I hope.

24    CLERK:  All rise.

25    (Whereupon these proceedings were concluded.)

Page 97

1       C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4 transcript is a true and accurate record of the proceedings.

5 *Sonya V. Ledanski Hyde*

6

7

8 Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20 Veritext Legal Solutions

21 330 Old Country Road

22 Suite 300

23 Mineola, NY 11501

24

25 Date:  December 2, 2025

25 (Pages 94 - 97)

**[& - 5,000]** Page 1

| **&** |
| --- |
| **&**  4:20 5:9 37:19 |

| **0** |
| --- |
| **09/26/2025**  3:2 |

| **1** |
| --- |
| **1**  38:21,23 44:11 46:4 57:5 |
| **1,500**  15:22 |
| **1.8**  66:7,11 |
| **10**  11:19 25:2 63:2 78:19 80:10,12 81:19 81:21 87:3 96:16 |
| **10,730,000**  23:17 |
| **10.7**  39:16 |
| **10/10/2025**  3:6 |
| **10/17/2025**  3:10 |
| **100**  5:19 70:21 71:18 88:19 |
| **109**  3:2 |
| **10:15**  96:10 |
| **10:30**  96:21 |
| **11**  3:2,5,9 |
| **11,140,000**  23:19 |
| **11,740,000**  38:20 |
| **11.46**  44:22 |
| **11.7**  39:16 |
| **11501**  97:23 |

**12**  6:6 38:18
**12,410,000**  38:22
**12.41**  44:22
**12151**  97:5
**13**  47:25 68:25 69:3
**131**  3:6
**14**  74:19 83:18
**143**  3:10
**14th**  4:22
**15**  11:19 26:12 78:9 96:8
**15-20**  10:17
**1500**  5:19
**1630**  4:5
**170**  62:15,21
**18**  85:16
**19**  27:23,25
**1995**  13:6
**1999**  13:15
**1st**  1:7 2:6 11:4

| **2** |
| --- |
| **2**  22:20 23:10 36:16 44:11 46:4 57:5 71:3 71:3 94:17 97:25 |
| **2.5**  69:19 |
| **20**  20:20 96:8 |
| **2005**  13:21 |
| **2017**  15:7 |
| **2021**  17:23 20:14 22:10,13 23:15 39:8 |
| **2022**  20:20 23:18 37:10 |

38:18,25 39:9
66:8,21 72:21
85:11
**2023**  23:20
38:21,23 43:13
44:3,5 72:24
73:1,10 79:4
**2024**  65:21,24
**2025**  2:9 46:19
47:12 72:17,20
73:8 85:12
94:17 97:25
**2026**  87:1,13
**206**  4:22
**21**  28:6 87:17
**218**  4:13
**22**  44:22 87:16
**23**  44:23 64:16
73:13
**24**  2:9 55:25
60:8 72:9
**25**  64:17 80:20
80:21,22 91:25
91:25
**25-30002**  1:3
**25-30003**  1:11
**25-30004**  1:19
7:3 63:8
**26**  28:18 85:17
87:9,11
**2nd**  78:12,25
79:7,14 80:13
80:24

| **3** |
| --- |
| **3**  21:19 36:16 37:23 43:15 49:9 57:5 |

**3.88**  79:8
**300**  5:11,11 97:22
**31**  29:4
**315,000**  87:20
**330**  97:21
**3429**  5:3
**36**  29:22
**37**  6:12,13
**38**  30:5

| **4** |
| --- |
| **4**  23:15,18,20 36:16 46:12 48:10 49:9 62:15,20 |
| **4,162**  22:23 |
| **4,520,000** 47:12 |
| **4.11**  80:16,24 |
| **4.13**  80:12,23 |
| **4.25**  80:20 |
| **4.28**  80:22 |
| **4.37**  79:7 |
| **4.5**  80:21 |
| **40**  30:10 |
| **41,000**  59:18 59:22 60:4,9 |
| **42**  92:9 |
| **495,060**  59:18 83:23 84:12 |
| **4:40**  63:3 |

| **5** |
| --- |
| **5**  47:5 |
| **5,000**  87:2,16 87:20 |

**50**   39:5 84:16
**520,000**   23:16
  39:8
**55402**   5:20
**57101-1030**
  4:23
**57104**   5:12
**58**   86:8
**58102**   2:7 4:14
**58102-4246**   4:6
**58106-9231**   5:5
**59**   6:14 41:22
  46:12 62:15,20
  62:22 63:21
**5:00**   90:14
**5th**   5:19

**6**

**6**   46:20 47:12
**6,980,000**
  38:19
**6.9**   44:14
**60**   31:15
**60,000**   84:4,8
**61**   63:20
**62**   6:14 32:8
**63**   6:7 23:2
  87:19
**64,000**   85:22
**655**   2:6
**66**   32:13
**68,000**   85:23
**6:00**   90:23

**7**

**7**   3:2,6,9 39:8
  79:14

**7.5**   79:14
**71**   34:11
**720,000**   84:9
  84:11
**75,000**   87:14
**75k**   87:11
**77**   34:20

**8**

**8**   48:10 53:19
  68:24
**80,000**   87:5
**81,000**   85:19
**85**   88:15
**86,000**   85:20
**89**   6:8
**8:30**   2:10 96:1
  96:23

**9**

**9.9**   44:13 47:14
**90**   88:4,10
**92**   6:6
**9231**   5:4
**93-1/2**   69:8
**93.5.**   54:9
**95**   6:7
**95-1**   19:25 21:2
  21:5,16
**95-2**   6:12 37:3
  37:14,15,18,19
**95-3**   6:13 37:15
  37:16,18,19
  43:6 48:9,10
  91:25
**96**   54:8 69:8
**97**   35:5

**99**   35:18

**a**

**a.m.**   10:15 96:6
  96:7
**aarestad**   9:10
**able**   20:21
  52:18,21 56:20
  90:17
**above**   76:19
**absolutely**
  96:15
**accepted**   43:7
**accident**   21:6
**accommodate**
  10:5
**accurate**   61:19
  66:8 97:4
**achieve**   52:16
  71:5 78:1
**achieved**   71:5
  71:6
**achieves**   54:5
  55:23
**acronym**   40:14
**activity**   74:24
  78:20
**actual**   56:19
**actually**   15:1
  64:9 71:1
  73:15 79:10,18
**added**   39:13
  42:12
**additional**   9:10
  28:16 76:5
**address**   48:11
  49:7

**adds**   33:17
**adjustment**
  34:16
**adjustments**
  34:17,19
**administered**
  1:3,11
**administration**
  13:13
**admissibility**
  21:15
**admitted**   37:19
  62:22
**advertising**
  58:12
**advisory**   20:2
**affect**   53:20
  57:7,9,10 76:4
**affected**   55:17
**afternoon**   7:13
  7:19 8:2,6
  12:21 89:4
**age**   29:18
**agent**   74:11
**ago**   72:13
**agree**   84:8
  87:19
**agreeing**   38:8
**agreement**
  18:19
**aid**   68:21
**allow**   69:21
  71:14
**allowed**   19:5
  91:17
**amenities**
  29:16

amount   50:3
analysis   27:25
  28:8,10,20
  29:6 30:10,12
  30:17 31:6
  32:10 36:14,15
  56:8 76:1
  77:24,24
analytic   24:25
  56:6
analytical   70:5
announced
  79:1
announcement
  78:11
annual   59:6,8
  59:11,12,14
annualized
  84:1
answer   15:16
  15:17 45:17
  61:12 65:4
  69:22
answered   8:20
  69:12,16
answering
  8:18
anthony   4:25
anticipate   8:14
  8:23 9:12
  11:13,17,18
anticipated
  29:20 40:8
apartment
  24:15 53:12
  65:1 86:10

apartments
  22:25 48:23
  77:22
apologies
  20:23
apologize
  50:22 72:25
appearance
  8:9 9:19
appearances
  7:10 8:10
appearing   7:12
  7:20,21 8:4,13
  95:20
appears   92:25
applicable
  33:12,16 35:13
applied   55:1
apply   33:12
  41:7 55:13,16
applying   75:21
appraisal   6:12
  6:13,14 15:13
  16:11 19:7,14
  20:13 23:22
  26:19 27:9
  35:21 36:5,22
  37:9,10,13
  40:17 43:6,12
  46:17 55:11,12
  55:15 62:16
  66:1,8 67:16
  67:17,20,21
  68:4,14 73:17
  73:20 74:5,5
  74:12 75:12,22
  81:15 82:2,17

  83:4,10 84:20
  85:3
appraisal's
  68:10
appraisals
  15:4,19,24
  67:11 68:6
  82:10
appraise   17:23
appraised
  26:22,23 33:6
  38:11 44:8
  76:1 90:2
appraiser
  14:13 16:17,18
  21:24 38:2
  43:20 74:7
appraiser's
  94:21
appraisers
  15:3,15 68:17
  68:18,22 74:6
  93:20
appraising
  14:3 63:16
appreciate
  10:11
approach   26:1
  32:13,15 33:14
  33:18,19,25,25
  34:12,13,21
  36:17 41:25
  45:15 58:1
  60:19,20,22
  61:9,9,11,13
  61:18,18,21
  69:24 73:10,15

  73:17,22,23
  74:3,8,12
  76:25 77:3,11
  84:21 93:13
approaches
  33:24 60:18
  61:8,17
appropriate
  72:10 75:17
approved   8:14
  9:16,19 14:8
approximate
  14:6
approximately
  13:21 15:7,19
  39:2 44:1
  59:18 64:3
  87:5
april   78:11,25
  79:7,14 80:12
  80:20,24 81:20
architect   83:1
  92:21,24
architectural
  51:22 53:17
  82:18,20,21
  83:3,16
area   16:10
  24:20 27:16,25
  28:1,10,10,11
  28:14,15 38:4
  51:15 52:13
  53:24 86:13,15
areas   56:24,24
  90:18
arrive   47:23

**artful**  45:8
**aside**  85:5
**asked**  18:12
  45:16 66:3,5
  66:20,23 69:12
  69:16 71:11
  73:7,8 83:15
  93:8,8 95:3
**asking**  45:22
  64:4 80:18
**asks**  67:20
**assessment**
  30:6,8
**asset**  66:10,13
  67:12
**assigned**  25:15
  41:5 49:8,14
  67:5 68:17
  90:9
**assignment**
  16:14,23 18:6
  18:10,20,21,22
  19:5 26:24
  27:5,14 32:18
  33:4 40:18
  46:25 49:19
  53:18 54:11,12
  66:15 68:1
  73:24 74:8
  82:23 92:7,11
  93:23
**assignments**
  15:14,22 16:12
  74:5,6
**associated**
  25:19 47:18
  76:11

**assume**  44:15
  59:20 79:15
  86:10 87:22
  96:2
**assumes**  70:25
**assuming**  36:3
  62:2
**assumption**
  36:2
**assumptions**
  35:19,20,21
  36:4
**attempt**  24:14
**attend**  12:24
  13:16
**attest**  22:5
  43:23 46:23
**attorney**  4:4,21
  5:2,10,17 7:19
**attorneys**  4:12
**attributed**
  39:10
**availability**
  78:21
**available**  57:18
  90:22
**ave**  2:6
**avenue**  4:5,13
  5:11
**average**  25:21
  29:14 52:23
  85:10,10,20
**aware**  65:3,20
  65:22 76:14
  77:14,20 94:13

**b**

**b**  2:21 4:5 6:10
  21:9,13
**back**  22:20
  27:15 38:10
  44:22 47:5
  63:7 64:10
  73:8 77:2
  81:20
**background**
  14:21
**bad**  8:12,18
**bank**  3:1 4:12
  4:21 7:7,18,22
  9:14,22 12:2
  16:22,24 18:2
  20:14 37:10
  43:13 46:18
  49:21 58:23
  66:20,23 74:11
  79:25 80:10
  83:11
**bank's**  3:5,8
**bankruptcy**
  1:1 2:4,23 4:3
  7:3 17:15 63:8
  70:12 75:1,4
  76:15
**banks**  18:5
  80:8
**bar**  48:12
**based**  9:2 24:7
  34:18 36:21
  40:19 46:7
  53:17 55:4
  56:2 67:19,23
  71:4 77:24

  78:11 84:21
**basically**  55:22
**basis**  15:4,12
  15:13 19:2,8
  30:16 31:19
  52:14 59:8,13
**bassford**  5:16
**bates**  21:5
**bearing**  22:10
**beginning**  20:4
  46:12 74:14
  83:9
**begins**  32:10
**behalf**  7:12,14
  7:17,25 8:3,4,7
  11:11
**belief**  82:6,7
**believe**  9:8,8
  9:15,18 11:22
  15:7,10 18:2
  20:15 21:4
  26:6 37:12
  41:13,14,17
  51:20 55:6
  56:8 61:19,23
  62:3 65:13,13
  65:15 66:7,9
  67:7,9 69:17
  70:19 71:2
  72:9,19,25
  74:13 77:1,8
  77:12 79:9
  80:14 82:13
  83:25 89:8,10
  89:12 91:15
  92:20 95:22

**believed**  51:18
**benchmark**
    80:9
**benchmarks**
    81:12,13
**benefit**  41:3
**best**  10:21
    25:16 31:16,18
    39:25 49:22,24
    66:25 87:9
    89:11 96:8
**better**  35:23
**beyond**  27:6
**bid**  19:4,7
    67:23
**big**  22:21
**bigger**  52:19
    52:20 53:3
    80:25
**bit**  14:22 28:9
    44:25 63:22
    69:1,2 73:14
    78:10 83:19
**black**  13:10,11
    13:12,16
**blueprints**
    93:5
**blunt**  51:17
**borrower**
    79:24 80:5
**borrower's**
    80:2
**borrowing**
    79:24
**boss**  22:1
**bottom**  21:19
    26:4 37:22

38:5 43:15
53:19 69:2
74:20
**bought**  90:4
**boulevard**  5:3
**box**  5:4
**boy**  13:21
**break**  10:16
**brief**  11:14,15
    25:11 28:2
    90:17 91:14
**briefly**  19:16
    88:25 93:9
**broad**  78:11
**broke**  63:9
**brokers**  24:19
**budget**  18:6
**budgeted**  33:3
**build**  32:16,22
    33:11,20 34:7
**builders**  58:18
**building**  22:14
    23:25 24:9
    25:21 27:16,20
    29:12 33:20
    51:15,17,20,25
    52:3,7,9,19,20
    65:1 79:18
    82:15,16 87:19
**buildings**
    15:25 29:8
    70:8 86:10
**built**  25:21
    28:15 29:17
    52:3 93:6
**bulk**  67:14

**bullet**  74:22
**burdick**  2:5
**business**  13:13
    76:21
**buy**  75:8
**buyer**  25:22
    60:25 61:12,23
    73:21 74:1
    90:6
**buyers**  75:4
    79:21,22

**c**

**c**  4:1 7:1 21:9
    21:14 97:1,1
**calculate**  45:7
    87:23
**calculated**  42:9
    45:6 56:21
**calculating**
    87:22
**calculation**
    59:5,6 60:1
**calculations**
    33:15 53:7
**calculator**
    87:21
**calendar**  11:4
**call**  7:2 8:17
    11:24 12:2
    96:3,11
**called**  12:14
    54:3,21 65:12
**calling**  11:18
**calls**  15:17
**campus**  13:19
**cap**  34:25
    55:17 81:24

82:1,6
**capitalization**
    25:25 34:21,25
    35:4 44:25
    45:3,4,4,6
    54:21 55:1,2
    55:12,13,15
    60:20 76:25
**captured**  60:4
**career**  15:20
    15:23 16:14
**careful**  84:25
**caren**  4:17
    7:20 20:24
**case**  1:3,11,19
    3:1,5,9 7:2,3
    10:4 11:13
    12:9 17:1,3,7
    17:19 19:9,10
    21:7 23:24
    28:5 31:22
    42:9 51:7
    54:18 55:8,11
    63:8 66:18
    67:8 68:2 76:1
    76:5 77:21
    92:25
**cases**  80:8
**cash**  40:16,21
    40:21,23,24
    41:5,7,8 42:10
    61:2 67:5
    89:13
**categories**  25:5
    44:11
**category**  48:18
    49:11,17,18

[category - compiling]                                    Page 6

51:12 54:3
**cathcart** 4:9
7:15 17:16
71:11
**caught** 85:8
**cause** 39:9,17
69:19 84:20
**cbre** 14:24,24
15:6,8 21:24
38:2 43:20
**cbre's** 93:19
**central** 76:20
**certain** 14:12
27:11
**certainly** 10:11
80:20
**certainty** 36:25
43:3 46:9
62:12
**certified** 13:24
92:21 97:3
**certify** 38:7
**challenging**
75:14
**change** 36:10
39:9,16,17
44:13 48:24
59:19 85:3,19
85:20,23,23
**changed** 39:15
40:9 82:10,13
**changes** 70:2,3
85:6
**changing**
24:12
**chapter** 3:2,5,9
3:9

**characteristic**
75:20,22,23
86:3,7
**characteristics**
25:9,20,24
27:21 28:21
29:12,15 34:22
34:23 56:14
57:9 61:1,25
69:25 84:14
86:6
**charge** 52:14
52:19,21 53:24
**chart** 86:9
87:18
**cheap** 75:8
**choose** 61:10
**chris** 21:24
**christian** 13:3
13:4
**christiana** 7:15
**christianna** 4:9
**churn** 78:7
**circumstances**
31:21
**city** 41:2 72:6
**clarify** 57:12
**clarity** 71:25
74:23 95:11
96:5
**classes** 14:8,10
**clear** 66:20
72:16 84:19
**clerk** 12:4,6,8
63:5,18 64:4,5
64:10 68:23
85:15 91:24

96:24
**clerk's** 8:17,17
96:3
**client** 25:14
26:18 35:23
40:19 41:9
49:17,19 66:16
67:15,24 76:6
77:20 82:19
83:11,13
**clients** 15:14
15:17,18 16:11
40:15 90:18
**close** 28:12
80:16,24 81:20
**closer** 11:19
**colleagues** 68:8
**collect** 93:13
**collected** 56:18
**collecting** 27:8
**colorado** 13:18
**combined**
82:17
**combines** 14:7
**come** 32:11
33:9 35:15
41:9 82:3
**comes** 67:20
70:4
**comfortable**
90:21
**coming** 87:1
**commercial**
14:25 15:1
19:13 22:24
36:22

**communicati...**
74:10
**companies**
36:2
**company** 3:4
5:10 8:1,3 15:4
15:5 32:20
68:22 93:20
**comparable**
32:10 34:5,14
34:16,19 39:25
45:13 63:14,25
64:13 65:2,8,9
65:14,16,19,23
70:17 77:10
**comparables**
33:5 70:20
76:25
**compare** 33:8
45:18,22 51:1
92:8
**compared**
51:21
**comparison**
34:12,13 48:8
60:19 61:9,18
93:13 94:11
**compensated**
19:4
**compensation**
19:3,6,9
**compete** 31:2
78:4
**competing**
78:2
**compiling**
93:12

**complete** 15:15
16:13 18:14,22
23:16 24:2,3
29:20 38:20
39:15,22,23
40:5,6 44:10
44:20 47:16,20
47:21 61:5,11
74:7
**completed**
15:20 20:13
22:22 24:19
27:11 35:17
36:18 37:9
38:18 60:1
68:16
**completely**
68:21 69:15
**completion** 9:7
47:23 55:23
60:5 70:18
**component**
66:10,14 89:20
**composition**
33:6
**computer**
81:16
**concerned** 61:1
**concluded**
38:20,22 47:12
84:23 96:25
**conclusion**
18:15 33:14,21
34:18 38:17
40:12
**conclusions**
25:16 26:3

35:11 38:9
82:3
**condition**
18:14,14 29:21
32:7 49:24
**conditions**
35:19,20 56:2
56:4 70:2
**conducted**
72:6
**conference**
8:13 10:5,14
**confidential**
24:21
**confirm** 11:7
**conform** 30:3
**connection**
16:24 17:6,12
17:18
**consider** 16:2
28:11 32:17,17
33:7 71:23
**consideration**
73:22
**considerations**
71:22
**considered**
27:11 31:12
32:18 54:6
63:15 83:6
**considering**
7:6
**consistent** 36:9
36:11,12 46:3
**constant** 78:6
**constructed**
29:8,13

**constructing**
39:11
**construction**
24:3 33:3,16
34:1,4 39:1
44:6,16,18
47:22 55:23
74:24 75:1
78:20
**construction's**
24:5
**consult** 90:18
91:2
**contacted**
17:25
**contain** 42:14
**contained**
32:14
**contains** 40:11
73:10
**contents** 22:7
41:19 47:1
**context** 10:3
**continue** 31:7
90:19
**continued** 7:4
94:25,25
**continuing**
33:1
**continuum**
60:13
**contract** 18:20
**convenient**
10:9
**conversation**
10:22

**convert** 3:1,5,9
7:6 35:3 45:14
**corner** 92:12
92:13
**corp** 8:1
**correct** 19:1
23:6 34:10
55:8 60:7 61:7
64:7,8,14,20
64:24 66:21,22
66:24 67:2
68:8,9 72:1,22
72:25 77:7
79:12,13,15,19
80:2,14 82:8
83:14,25 84:18
84:21 85:12,20
85:21,23,24
86:2 87:2,10
88:17,20 89:9
89:14,15 90:8
95:13,14 96:6
**correctly** 52:2
87:22
**correlate** 64:6
**correlation**
34:9 80:1
**corresponding**
25:10 30:8
45:12
**cost** 18:6 32:13
32:15,16,19,22
32:23,24 33:1
33:3,4,7,10,11
33:12,14,16,18
33:19,22 34:1
34:2,7 36:14

36:15,17 73:10
73:15,17,23
74:3,7,11 80:9
80:10
**costar**  24:24
56:6 87:8
93:21
**costs**  34:4 40:4
40:4,8 47:18
47:18,22 78:21
**counsel**  7:15
7:21 81:6
**count**  96:9
**countries**
78:15
**country**  97:21
**counts**  28:25
**county**  41:2
49:14 93:16,17
94:4,5
**couple**  8:11
88:12
**course**  15:23
16:14,16
**court**  1:1 2:4
7:2,17,25 8:4,8
9:1,12,16,20
10:13 11:3,11
11:15,21 12:3
12:17 14:19
16:20 19:15,18
19:20,24,24,25
20:6,20,22
21:2,7,10,12
21:16,16 23:21
25:1,5,11 26:7
26:13 32:14

36:6,20 37:18
37:18 42:1,21
43:5 45:25
46:12 47:24
48:8 50:10,18
50:20,24 59:10
59:14 62:4,18
62:20,20 63:1
63:7 69:13,21
70:12 71:8,10
71:13 80:19
81:1,3,9 88:2,7
88:10,24 89:1
90:14,20,23
91:2,5,10,16
91:18,20,23
95:7,17,19,24
96:7,10,13,15
96:20
**court's**  45:17
87:24 96:5
**courthouse**  2:5
8:15,22
**courtroom**
7:11,16,21
88:1
**cover**  15:3
**covers**  11:8
**crafting**  63:25
**craig**  7:16 9:10
9:22 17:9,10
71:2,8,9 84:4
**created**  22:9
40:22 44:1
**creates**  32:4
41:5

**credibility**
10:2
**credible**  73:19
74:16
**credit**  14:7
56:19,25
**cross**  63:2,9,12
87:14 89:2
95:7
**crucial**  8:21
**csos**  90:23
**current**  14:23
15:11 30:7
56:2 81:23
87:7 90:1
**currently**
14:24 70:11
76:21
**cx**  6:4

### d

**d**  5:22 6:1 7:1
**d&m**  5:2 8:5,7
**daily**  15:4
**dakota**  1:2 4:3
13:8,25 16:7
17:15 64:19,23
65:1 70:15
81:24 85:11
86:11,19,22
**daniele**  9:8
**data**  16:16
24:24,25 27:1
27:4,5,6,7,16
30:6 31:8,10
32:20 36:10
42:17 46:2,3
56:3,5,11 64:6

71:23 72:5
73:6 86:16
93:12,13,22,24
**database**  93:19
**date**  23:16,18
23:19 38:21,23
50:6 60:11
72:19,23 80:23
94:20,21,23
97:25
**davenport**
4:20
**day**  10:21
15:11,12,13,13
15:14,14 22:17
23:24 25:17
71:2,3 72:11
72:18 88:9
95:23
**days**  82:2
**debt**  58:16
59:23
**debtor**  1:9,17
1:25 3:8 7:12
7:12,14 9:25
11:13 83:15
**debtor's**  7:15
**debtors**  4:4
11:11 70:12
**december**  11:4
13:15 64:16
97:25
**decide**  60:21
**decided**  74:7
**decides**  67:24
**decision**  9:9

**declines**  54:18
**decrease**  44:23
   45:2 47:13
   48:5 53:10
   79:17,20
**decreased**  40:9
   54:1
**decreases**
   52:16 54:15
**decreasing**
   79:3
**dedicated**
   41:16
**deduct**  40:4
   47:18 56:25
**deducting**
   47:22
**define**  26:20
**definitely**
   95:24
**definition**
   26:21
**degree**  13:9,12
   13:18,20 36:25
   43:2 46:9
   62:11
**delays**  75:2
**demand**  78:20
   86:5
**demographic**
   28:3,16 56:7
   77:24
**demographics**
   16:16 24:12
**demolished**
   22:15

**denied**  19:20
**depend**  34:3
   78:13
**dependent**
   19:6
**depending**
   9:16 31:20
   87:17 95:2
**depends**  40:24
   60:12 80:4
**depict**  29:23
**depiction**
   63:24
**depreciation**
   33:12,17
**describe**  48:25
   49:5,12,22
   50:2 54:4 56:4
   92:4
**described**  24:8
**describes**  29:7
**description**
   6:11 22:16
**desk**  50:12
**detailed**  57:25
**determination**
   77:4
**determine**
   24:10,14 77:25
**determined**
   19:10
**determining**
   56:10 61:2
**develop**  26:15
   27:19 33:17
   39:21,23 41:4
   47:16 74:16

**developed**
   25:25 35:9
   39:19,19 47:15
   47:17 53:17
   55:4 70:1
**developer**  41:3
   74:25
**developer's**
   32:23 33:8
**developers**
   24:18
**developing**
   35:1 40:2
**development**
   3:4 5:10 8:1,3
   22:13,21 31:13
   38:12,24 40:8
   44:4 53:21
**diamond**  5:17
   8:8
**differ**  53:1
**difference**  49:4
   51:8 54:9
**different**  31:20
   33:24 35:11
   51:22 60:18
   66:13 79:24
   82:16,21,22
   93:15
**differentiate**
   23:22
**differently**
   67:23 80:8
**difficult**  20:19
**dire**  19:17
**direct**  12:19
   22:1 34:8 38:5

**director**  21:25
   38:4 43:21
**disciplinary**
   14:15,18
**discount**  75:8
   75:17 87:20
**discounting**
   41:8
**discussed**  62:8
**discusses**  73:15
**discussion**
   69:18
**dismiss**  7:6
**displayed**
   50:20
**district**  1:2
   30:2 40:15,22
   41:1 42:11
   76:21
**dividing**  45:12
**doc**  3:2,6,10
**docket**  63:21
**document**  20:3
   20:5,7,12 22:6
   25:2,6 37:4,6,8
   38:7 43:9,11
   43:24 46:14,16
   91:25 92:3,13
   92:16,24 93:3
**documentary**
   20:25
**doing**  35:24
   66:15
**downtown**
   65:18
**drafting**  72:6

[drawing - exist]                                                                    Page 10

**drawing**   92:6
92:10
**drawings**   18:6
27:19 51:22
53:18 82:18,20
82:21,22,22
83:3,11,16
**drew**   4:18 7:20
92:16
**drill**   24:14
**drills**   28:9
**driven**   40:19
**drivers**   45:2
**drop**   69:8,20
**due**   74:25
**duly**   12:14
**duties**   15:11
68:17
**dx**   6:4

**e**

**e**   2:21,21 4:1,1
6:1,10 7:1,1
12:23 97:1
**earlier**   77:2
82:9 83:25
84:3 86:14,14
88:16 89:7,8
**easements**   29:2
**ecf**   6:12,13,14
19:25 37:3,13
37:19,19 43:6
46:12 62:15,22
**economic**
29:17 78:15
**economy**   30:22
78:15

**ecro**   2:25
**effect**   52:6 53:6
53:9 78:16
**effective**   23:18
23:19 29:18
38:21,23 50:6
56:15,17 57:1
57:10,17 59:3
59:22 60:11
94:20
**eight**   64:13
**either**   10:7
30:7 34:5
40:21 50:10,11
69:22 72:6
**elected**   73:23
**embellish**
69:22
**emphasis**
84:16
**employees**   9:13
**employer**
14:23
**encumbers**
29:25
**encumbrances**
29:2
**engagement**
74:14
**ensure**   8:20
**entered**   93:20
**entity**   17:10
**entry**   63:21
**equal**   52:8,18
52:20 53:10,13
54:15,19 55:16
57:20 72:2

79:20 84:14,24
85:5
**equals**   59:4
**equivalent**
54:6
**error**   73:1
**es**   6:4
**essentially**
18:23 22:18
23:25 35:1
41:1 78:2
94:17,22
**estate**   14:25
15:1 16:4
19:14 24:18,18
30:8 36:22
66:12,14 78:20
89:16,18,19,21
**estimate**   15:21
32:16,24 33:2
33:8,10,13,19
38:18 39:6
54:25
**estimated**
23:17,19 24:7
47:11 50:1
55:5,19 73:1
**estimating**
56:23
**estimation**
32:20 55:21
60:5
**evaluations**
48:5
**evans**   4:20
**everybody**
50:24 96:1

**evidence**   7:9
37:20 62:23
70:25 71:2
**evolving**   78:16
**exactly**   40:10
74:14
**exam**   14:11
**examination**
12:19 63:2,9
63:12 89:2
92:1 95:7,9
**examined**
12:16
**example**   24:12
25:13 35:25
36:4 94:5
**exams**   14:9
**exclude**   66:10
**excluded**   67:19
**exclusively**
68:15
**excuse**   36:5
39:23 47:17
56:6 73:4
76:11 77:12
**excused**   95:19
**executive**   23:4
25:8,12 44:24
45:16,18 47:25
48:9,15,16
**exhibit**   20:16
62:15,20,22
**exhibits**   37:19
50:20
**exist**   17:24
75:10 76:3

exists  75:25
expand  55:9
expect  32:24
  50:4 51:5
expected  29:14
  29:16 30:3
  31:2 35:1
  42:10 56:18
  60:9 89:13
expense  18:7
expenses  40:3
  57:21,25 59:2
  59:4
expensive
  33:20
experience
  14:21 36:22
  42:25 46:7
  62:9
experiences
  94:2
experiencing
  54:7
expert  7:23 9:3
  9:25 10:5
  16:19,21 17:4
  17:9,15 19:13
  19:21,24 81:2
  85:25
explain  23:21
  25:7 27:17,23
  28:6 39:9,16
  40:13 44:23
  47:13 48:4
  51:3 54:9
explanatory
  36:15

exposed  55:2
exposure  25:18
  50:2,3,5,6
expound  56:16
express  51:6,6
expressed  51:9
  59:5,8,12
extent  27:5
  78:14
exterior  51:25
extra  7:8
extract  45:13
extracted  35:4
  45:9 55:4
extremely
  75:14

f

f  2:21 97:1
fact  36:3 39:10
  65:24 96:10,20
factors  24:11
  84:23 85:5
facts  70:25
fair  34:9 45:17
  94:18
fake  73:14
fallback  9:19
falls  4:23 5:12
  13:3,3,19 15:2
familiar  16:4
  65:12 70:8,11
  81:11,13
far  39:2
fargo  2:7 4:6
  4:14 5:5
feasibility
  31:25 34:1

feasible  32:3
fed  78:25 79:3
  79:4,7,10,23
federal  19:19
  80:10
fee  19:3,4,8
  67:21
fees  58:8
feet  22:23
feist  5:14 6:8
  8:2,2 88:24,25
  89:3 90:13
  95:17,18
felt  74:8 75:16
field  15:17
  19:13 43:3
fifth  5:18
figure  84:19
figures  59:7
  79:15
file  24:21 33:7
  83:5
filed  3:2,6,9
  7:6
filing  75:1
final  9:9 10:14
  14:10 27:9
  33:10 35:13,15
  93:3
finally  35:18
  46:11
financial  25:23
  31:25 33:25
  54:2 78:12
  80:4
financially
  32:3

financing
  40:15,22 41:1
  42:5 78:21
  79:22
find  11:22
fine  21:14
  96:20
finish  10:19
  47:22 90:25
  91:20 96:16
finished  10:9
  74:24 88:5,12
firm  4:3,11
  14:25 15:1
  17:4,6,16
firrea  18:16
first  4:5 7:9,11
  12:14 17:21,23
  21:23 22:25
  29:11 30:15
  38:1,17 39:24
  40:17,18 43:19
  47:18 48:6,18
  51:14 56:15
  68:6 82:23
  83:10 92:5,6
  95:12
five  72:13 91:1
  96:16
fixed  80:7,9
flat  19:3,4,7
floodplain
  28:24
floor  18:6
  27:19 92:5,5,6
  92:10 93:4
  95:13,13

**flow**   40:16,21
   40:21,23 41:5
   41:7 42:10
   61:2 89:13
**flows**   41:8 67:5
**focusing**   54:2
**following**   26:2
   92:23
**follows**   12:16
**footage**   23:3
   52:14 53:20
**footprint**   82:16
**forecast**   86:25
   87:7,15
**forecasted**
   24:13
**foregoing**   97:3
**forma**   18:6
   40:2 56:11
   83:22
**formally**   18:8
**forming**   51:4
**formula**   45:11
**formulate**
   32:20 72:15
**formulating**
   61:3
**forward**   91:19
**four**   13:9 32:1
   48:9 67:11,12
**fourth**   48:15
   51:17,21 54:12
   94:18
**frequently**
   94:4
**friday**   80:24

**friend**   20:15
**front**   13:22
   72:14 79:16
   80:15 81:22
   87:21
**full**   78:15
**fuller**   5:9
**fully**   8:23 24:6
   28:15
**function**   70:2
**functional**
   28:25
**funds**   78:25
   79:4,7,10,23
   80:9,11
**further**   11:8
   25:6 28:9
   44:16,17 62:24
   83:19 88:22
   90:13 95:5,15

**g**

**g**   7:1
**general**   13:24
   14:2 28:4 36:4
   56:9
**generalized**
   86:18
**generally**   14:5
   14:6 28:13
   40:4 41:12
   51:4 52:6,8,11
   54:10 67:19
   70:4 72:3,4
   80:1 86:22
   93:15 94:2
**generate**   52:21
   56:20

**generated**   31:3
   42:11
**generates**   61:2
**generating**
   60:12
**generations**
   1:7 21:6 70:9
   71:6 77:5
**getting**   63:9
   75:16
**give**   12:9 20:2
   24:24 49:1
   61:24 73:22
**given**   89:4
**gives**   20:20
   28:2,4 30:21
   35:23
**giving**   26:21
   51:4
**glad**   69:14
**global**   14:25
   78:11,12
**go**   7:8 8:11
   20:9 23:2
   27:23 28:6
   32:1 34:2,2,11
   35:5,21 44:19
   44:24 45:5
   46:20 47:5
   53:13 61:10
   62:1,4 63:18
   63:20 66:16
   68:24,25 69:24
   73:13 74:18
   75:21 77:2
   83:18 86:8
   88:15 90:24

   91:17 96:21,21
**god**   12:10
**goes**   18:23
   26:16 55:18
   57:24 78:18
**going**   7:2 10:15
   10:19 11:3
   12:3 24:15
   30:10,19,22
   33:11 36:14
   37:4 39:15
   41:17,18,23
   55:9 59:10
   60:25 61:12,24
   63:20 69:21
   71:13 74:22
   77:11,23 78:10
   81:5 86:19
   88:11 96:2,5
**good**   7:13,19
   8:2,6 12:21
   36:3 40:2
   64:22 65:23
   75:13 86:25
   89:4 91:12
   95:23
**gotten**   44:15
**graduate**   13:5
**graduated**
   13:3,10
**graduating**
   13:7
**graphical**
   86:15
**great**   91:16
**greater**   52:19

grid   34:16
gross   51:15
   53:12 56:15,17
   56:24 57:1,10
   57:18 59:2,3
growing   28:15
growth   24:13
   78:17
guess   20:17
   37:13 45:7
   57:12 61:10
   81:21 85:13
   96:8
guessing   41:19

**h**

h   6:10 12:23
   92:19
half   9:11 11:20
   73:6 95:22
hand   12:4
   59:16 92:14
happen   28:14
   50:5 80:20
   96:15
happening
   30:16,18 78:7
happens   8:16
   49:20 56:19
   67:13
happy   10:4
hard   11:22
   90:23
harless   9:8
hastings   2:22
head   40:10
   41:12 59:20
   65:5 79:2

81:14 83:2
85:14 87:23
hear   9:3,21
   10:6 45:19
   59:11 63:2
hearing   3:1,4,8
   7:4 9:2 84:3
   94:23 96:1
hearings   10:18
heavily   61:1
held   15:8
help   12:10
   45:14 48:4
   49:2 68:16
hemisphere
   86:21
high   12:24
   13:2,7 15:25
   28:1 30:21
   69:17 87:2,4
   87:16
higher   34:2,2,4
   34:5 40:7,7
   44:18 45:1,3,5
   55:14,17 57:17
   71:25 72:1
   84:20,24 85:2
highest   25:16
   31:15,18 32:5
   49:22,23
highlight   42:20
   45:25
highlighted
   26:7 62:4
highlighting
   29:12

highlights   25:9
hills   13:10,11
   13:12,16
hire   18:5
hired   16:12
   17:23 18:9,21
hires   25:14
historic   75:1
historically
   76:15
hits   25:9 87:11
hohn   4:25
hold   11:21
   13:23 21:4
   50:8
holiday   11:1
home   80:10
hon   2:22
honestly   76:8
honor   7:13,19
   8:6 9:6,15
   10:12,25 11:10
   11:12 12:1,18
   19:12,16,23
   21:17 37:17
   50:17 62:14,19
   62:25 63:4,11
   70:23 80:17
   81:8 87:24
   88:3,22,25
   90:16 91:7,15
   95:6,8,16,21
   96:4,14
hope   96:23
hotbox   91:8
hour   11:20
   95:22

hourly   19:2
hours   14:7,12
household
   85:20
hurwitz   4:20
hushka   4:18
   6:6 7:19,20 9:5
   9:6,15 10:12
   10:24 11:10,24
   12:1,18,20
   19:12 20:11,15
   21:17,18 25:11
   25:3 37:2,5,12
   37:16,21 42:6
   43:5,8 46:11
   46:13 47:24
   48:1,7,13
   50:11,15,25
   59:17 62:14,24
   69:10,12 70:23
   70:25 80:17
   90:16 91:4,7
   91:12,14,17,19
   91:22,24 92:2
   95:5,21
hybrid   70:24
hyde   3:25 97:3
   97:8

**i**

idea   9:4 35:23
   39:2
identification
   49:13 69:19
   92:15
identified   24:8
   28:17 32:25
   55:24 75:24

77:9,19 82:16
**identifies**
  26:15,17,19,24
  28:21 29:20
  30:1 31:17
  34:17,22 35:22
  49:19 76:2
**identify**  25:14
  25:18 26:12,23
  26:24,25 27:20
  29:3 32:1
  34:15 65:10
  75:7 77:9
  82:15 93:22,25
**identifying**
  28:10,14 75:9
**images**  95:11
**imagine**  10:16
**impact**  77:17
  77:23 78:15,24
  79:21
**impacts**  78:13
  78:19
**important**  10:2
  10:3 25:20
  28:21 29:15
**improved**
  31:20 32:7
  49:25
**improvement**
  25:20 29:6
**improvements**
  29:7,9 30:3
  32:17 39:12,13
  51:12
**improving**
  39:11

**incentive**  41:3
**incentivize**
  41:4
**include**  66:16
  66:18 67:15,25
  68:3 74:9
  94:11,14
**included**  23:3
  58:21,23 66:21
  66:23 67:18
  86:15
**includes**  26:21
  86:13
**including**  8:15
  74:11 89:9
**income**  18:7
  25:24,25 26:1
  31:3 32:6
  33:25 34:20,22
  34:23 41:25
  45:10,11,14
  52:12,12,19,21
  52:22 53:13,25
  55:3,14,17
  56:13,15,17,17
  56:19,24 57:1
  57:8,8,10,16
  57:18,18 58:1
  59:1,2,3,4,25
  60:2,3,19,21
  61:1,9,11,13
  61:18,21,24
  69:24,25 73:22
  76:24 77:3,11
  83:22 84:4,11
  84:22 85:1,10
  85:11,20,22

**incorporated**
  83:6
**increase**  44:14
  55:16 71:19
  84:12,17 86:1
  89:16
**increases**  75:2
**increment**
  40:14,22 41:1
  42:4
**independent**
  32:21 89:17,18
  89:19
**independently**
  89:21
**indicated**
  33:18 35:8,9
  37:12 87:8
**indication**
  55:14
**indicator**
  25:23 71:21,23
**indicators**  54:2
**individual**
  92:15
**indulgence**
  87:24
**industries**  5:2
  8:5,7
**inflationary**
  78:17
**influence**
  16:25 17:7,13
  17:19 84:15
  86:4
**influenced**
  86:5

**influences**  85:7
**information**
  18:3,4 27:7
  28:3,16 30:13
  30:14,21 31:12
  33:7 39:25
  40:2 42:18
  55:4 56:7 70:5
  72:14 81:22
  85:14
**informing**
  31:10
**infrastructure**
  39:13
**initial**  52:3
**inked**  11:1
**inspect**  16:13
  23:24 25:17
**inspected**
  22:18 27:2
**inspection**
  23:16 52:1
**inspections**
  27:2
**instructions**
  66:16
**insurance**  36:1
  58:2,3
**intended**  26:17
  26:18
**intent**  30:23
**intentionally**
  87:25
**interest**  26:22
  78:19,24 79:17
  79:20 80:3,5
  93:25

**interim**  60:8
**internal**  49:1
  68:22
**interstate**  5:3
**interview**
  24:16,16 75:18
  75:19
**interviewing**
  75:15
**inverse**  45:3
**inversely**  55:7
**investigate**
  76:17
**investor**  60:25
  61:24 73:21
  74:1
**investors**  60:25
**invite**  50:18
**invited**  69:19
**involve**  11:14
**involved**  74:5
**iowa**  13:25
  64:19
**isolation**  87:18
**issued**  72:18
  94:19
**issues**  7:4 9:23
**item**  52:24
  54:21 55:19
  57:21
**itemized**  27:5

### j

**j**  4:18 5:14
**jeffrey**  5:22
**jenkins**  21:24
**jesse**  7:16 17:9

**job**  15:11
**john**  5:7 8:6
**johnson**  38:1
  43:19
**johnson's**  38:4
**joinder**  3:4
**joined**  7:14
**jointly**  1:3,11
**jordan**  5:14
  8:2
**joshua**  6:5 12:2
  12:7,13,19,23
  63:12 89:2
  92:1 95:9
**jr**  5:7
**judge**  2:23
**judging**  39:4
**judicial**  80:19
  81:5 96:11
**july**  20:20
  38:18,25 39:8
  44:22 46:19
  72:17,19 73:8
  80:21,22 82:7
  94:17
**jump**  28:18
  29:4,22 31:15
  32:8 35:18
  47:24 50:1
  51:11
**jumping**  30:5
  32:13
**june**  23:18
**juxtaposed**
  84:12

### k

**kd**  5:1
**keep**  74:4
**keeping**  63:19
  90:21
**kesha**  4:16
  7:21
**kind**  11:1
  15:10 18:4
  23:22 25:8,24
  26:14 27:2
  28:1,2,4,9,10
  29:2 30:13,16
  30:20,21,22
  31:25 32:5,21
  35:8,10,22
  36:4 89:19
**kindly**  63:21
**klobucar**  5:22
**know**  7:10 8:10
  8:20,24 9:1
  10:8,10,14
  11:23 19:6
  20:2 22:9,12
  22:21 24:12,20
  27:11 29:15
  30:19 33:22
  35:25 36:2
  38:8,24 39:4,5
  40:23 41:14
  50:9 54:6
  57:17 62:1
  65:5,7,15
  67:10,19,22
  74:15 75:7
  78:25 79:2
  80:10,18 81:13

  81:16,21 84:5
  85:14 88:8
  90:1,24 93:3
  93:14 94:7,9
  95:3 96:20
**knowledge**
  66:25 82:25
  93:1 94:12
**knowledgeable**
  24:17
**known**  70:8
**krings**  5:7 8:6
  8:7

### l

**l**  12:23
**land**  22:18
  24:1 28:14,22
  29:7 32:5,8,11
  32:12 33:17
**landscaping**
  29:10
**large**  15:3
**largest**  14:25
**lastly**  94:15
**late**  87:16
**latest**  66:1 68:4
  68:10
**law**  4:11 5:1
  17:4,6
**lead**  74:7 85:3
  85:25
**leads**  82:13
**learn**  17:21
  96:18
**lease**  40:4,8
  47:18 55:19
  56:10 72:9

73:1 77:21,23
85:2
**leasing** 78:20
**ledanski** 3:25
97:3,8
**left** 48:15,22
54:12 55:12
59:22 68:23
72:21 73:25
85:15 91:25
92:3 95:12
**legal** 97:20
**legally** 31:23
32:2
**level** 28:1
30:21 31:6
69:17
**liability** 30:9
**license** 13:24
14:2
**licensed** 14:13
15:5 68:18
**licenses** 13:23
14:16
**licensure** 14:4
**life** 29:17
**likely** 11:14
25:22 61:23
73:21 75:14
**limiting** 35:19
35:20
**line** 23:11
48:18 52:23
53:19 54:21
55:19,20 57:21
59:1 76:19
87:11,14

**list** 11:8
**little** 14:22
28:9 41:23
44:25 55:10
63:22 69:1,2
78:10 83:19
87:5
**live** 8:23
**llc** 1:7,15,23
17:10,22 94:1
**llp** 4:20
**loan** 80:6,6,7
80:10
**local** 24:16,18
24:18 30:14,17
31:8 74:25
75:3
**located** 28:2,24
64:3 70:14
**location** 25:13
49:5,7
**lofts** 65:12,23
93:9 94:7,11
**logistics** 8:11
9:24
**long** 24:9 71:5
78:13 80:7
88:8 90:14
**longer** 10:17
80:9 90:24
**look** 10:19 11:3
11:6 19:3
24:11,23,25
25:5 31:19
33:9 34:23
37:22 41:18
44:21 45:16,18

50:5 52:23
56:8 77:2
81:15 83:3
85:16,17 87:17
92:12 93:17,18
93:22
**looked** 16:15
22:17
**looking** 20:25
21:4 23:10
24:11 35:16
50:9,13,15,19
56:10 59:7
69:11 73:25
87:25
**looks** 45:1
64:21 85:9,19
87:4,10,14
**losing** 53:19
**loss** 35:1 56:19
56:25
**lot** 8:12 30:12
39:12,13
**lots** 29:9
**lower** 45:5
54:20 55:13,13
57:19 85:2
**luther** 6:5 9:7
12:2,7,13,19
12:23 17:21
19:13,19 20:3
25:4 42:23
45:20 50:11
62:7 63:12,14
63:24 69:6
81:11 88:17
89:2,4 92:1,3

95:9,11
**luther's** 90:22

## m

**m** 4:25 5:7
**mac** 20:24
**macro** 30:13
30:23
**macroecono...**
30:13,15
**madam** 63:18
64:9 68:23
85:15
**made** 9:9 60:1
**mailing** 49:7
**maintenance**
58:6
**make** 8:9,22
10:20 34:17,19
50:19 73:5
77:3,20 79:18
88:4
**makes** 57:18
57:19
**making** 60:9
**manage** 15:2
**management**
58:8
**map** 28:3 64:2
86:14,18,19
**march** 23:20
64:17 65:21
**marginal** 86:1
**mark** 87:11
**market** 16:5,16
24:16,24,24
28:5 30:10,12
30:14,18,25,25

31:1,3,7,9
33:23 34:5,5,6
35:4 40:3,11
41:6 45:9 50:4
54:7,13 55:2,4
56:2,4 70:2,6
71:22 72:5
75:3,6,7,10,15
75:18 76:3,9
77:20 78:3,9
86:4,6,9,12,15
86:25
**market's**  71:24
**marketable**
36:3
**marketing**
25:18 50:7
**marketplace**
63:17
**markets**  78:12
**marshall**  32:19
33:1
**martin**  18:2
**master's**  13:18
**material**  49:3
85:3
**math**  59:20
**mathematical**
45:10
**matter**  1:5,13
1:21 8:18
18:25 68:20
96:12
**matthew**  38:1
38:4 43:19
**maurice**  4:8
7:14

**maximum**
31:25
**mean**  8:25
67:13,18 75:24
76:3
**means**  9:24
27:17,18
**measured**
51:25
**measurement**
82:14
**measurements**
51:24
**median**  85:10
85:11,22
**mediator**  96:11
**meet**  14:11
**member**  94:1
**members**  94:3
**membership**
93:25,25 94:8
**memory**  71:10
77:12
**methodologies**
46:2,3
**methodology**
27:9 36:10
42:17 57:2
**metric**  72:10
**michael**  18:2
38:3 43:20
**mid**  15:25
**middle**  41:24
**midwest**  86:20
**mile**  8:23
**million**  39:8,16
39:16 44:13,14

44:22 66:7,11
**mind**  74:4
90:17
**mineola**  97:23
**minimum**  14:7
**minneapolis**
5:20 38:4
43:21
**minnesota**
13:25 64:19
**minus**  59:2
**minute**  11:19
81:1 91:1
**minutes**  10:17
63:2 96:8,16
96:16
**missed**  11:15
**missing**  88:4
**mister**  71:8
**mix**  27:21
29:14,19,20
**mixed**  15:24
60:23 64:25
**mn**  5:20
**moment**  20:1
20:18,20,22
64:5 87:25
94:16 95:12
**momentarily**
62:2
**monday**  2:9
10:25 11:4
**month**  55:25
59:19 60:4,10
72:9 84:4,8,17
84:17

**monthly**  53:13
59:5
**months**  51:2,2
60:8 72:13
**morning**  10:16
90:19,22 96:1
96:23
**mosbach**  21:23
**motion**  3:1,5,9
7:6
**move**  78:5
**movement**
81:17
**moves**  9:17
45:4
**moyna**  38:3
43:20
**multifamily**
15:25 30:24
31:4,7,8 60:23
86:12
**multiple**  18:17
32:18 42:23
56:2 62:7

| n |
|---|

**n**  2:5,6 4:1 6:1
7:1 97:1
**name**  12:6,22
12:22 18:2
25:13 48:19,25
49:1
**named**  72:4
**national**  30:16
30:20 31:6
32:19
**nationally**
30:16

nature  18:7
nd  2:7 4:6,14
  5:5
near  41:19
  70:21 71:18
nearly  39:8
nebraska  14:1
  64:19
necessarily
  34:3 74:16
  75:25 76:4
  82:7 86:3,7
necessary
  74:13
need  9:9 14:7,8
  14:10,11 24:15
  40:19 65:15
  68:1 81:5
  86:17 96:7
needed  7:8
  59:23
negative  75:3,5
negatively
  55:18
neighborhood
  28:8,11,17
net  40:12,20
  41:9 42:12
  45:11 59:1,4
  59:25 83:22
  84:4,11,17,22
  85:1 89:5
new  73:13,17
  74:12,19 82:18
  82:20 90:7
news  74:25

noi  45:14
nope  33:1
normal  16:10
north  1:2 4:5
northeastern
  86:22
northern  4:13
note  11:13
notes  50:6,20
notice  80:19
  81:5
noticed  94:24
november  2:9
  94:25
number  7:3
  14:7,12 25:14
  25:22 28:23
  41:24 42:14
  48:10 49:13
  55:3,6 57:19
  59:25 63:8
  84:1 87:6
  93:15
numbers  36:9
  49:11 71:7
ny  97:23

**o**

o  2:21 7:1
  92:19 97:1
objection  3:8
  19:15,23 37:15
  50:8 62:17,18
  62:19 69:10,14
  69:15 70:23
  71:14 80:17
  81:3

objective  80:4
observation
  77:17
observed  28:25
obtain  13:12
  13:20
obtained  13:18
obviously  28:3
occasionally
  40:15
occupancy
  24:4,4,7 54:4,5
  54:11,18 55:24
  56:20 57:17
  69:5,20,25
  71:20 72:1
  76:22 77:13
  78:1,4
occupied  24:5
  88:20
occur  75:5
occurring
  74:24
october  44:3,5
  44:23 94:25
offer  19:13
  30:2 37:13,16
  62:15 82:4
office  8:17,17
  15:2 43:21
  96:3
official  93:3,6
oh  13:21 21:8
  45:21 50:14
  87:13 93:2
okay  7:17,25
  8:9 9:12 11:3,6

12:3 18:10,24
  20:4,18,22
  21:10,16 22:5
  36:19 40:11
  42:7,13 44:19
  44:24 45:24
  49:5 50:18,21
  50:22 63:1,7
  64:4,25 65:6
  65:23 66:1,10
  67:1 70:14,21
  72:21 73:13
  74:18 75:21
  76:19 78:24
  79:13 80:14
  81:1,9 83:8
  84:8,11,19
  85:8,22 86:23
  87:15,19 90:14
  92:17,21 94:15
  95:5,25 96:3
  96:22
old  73:25 82:21
  97:21
once  60:24
open  11:5
operating  40:3
  45:11 56:11
  57:21,25 59:1
  59:2,3,4,25
  76:21 83:22
  84:11,22 85:1
opine  82:1
opinion  18:12
  23:23 25:17
  26:16,20 30:2
  31:13 32:12,21

35:3,14 38:19
40:20 47:9,11
49:23 51:5
55:25 61:3
72:11 73:7,21
74:16 82:4
85:25 89:5,12
93:1 94:21,23
**opinions** 16:25
31:10,13 36:19
36:21,24 42:23
42:24 44:8
46:6 47:6 62:7
62:9 72:15,17
75:16 94:16,19
**opportunities**
76:2
**opportunity**
75:7
**opposed** 53:15
**order** 9:3
10:10 35:13
**originally**
94:24
**outcome** 19:7
19:10
**outlined** 25:6
**outlines** 42:9
**outside** 8:19
50:20
**overall** 34:25
54:21 55:2
81:17
**overarching**
18:19
**overnight**
79:23 90:21

**overrule** 71:13
**overview** 14:22
23:11 28:4
30:21
**own** 32:21
68:15,21
**owned** 17:10
**owner** 90:1,3,7
**owns** 89:25
90:1,4

**p**

**p** 4:1,1 7:1
**p.o.** 5:4
**pacific** 4:13
**package** 19:3
**page** 6:2,11
21:19,20 22:2
22:20,25 23:10
23:10 25:2
26:2,12 27:23
27:25 28:6,18
29:4,22 30:5
30:10 31:15
32:8,13,25
34:11,11,20
35:5,18 37:23
38:11 41:22
43:15 44:7
46:12,20 47:5
47:24 48:10
63:20 64:10
68:24,25 69:2
73:13 74:18,20
78:8,9 83:18
83:19 85:16,17
86:8 88:15
91:25,25 92:9

**pages** 30:20
41:24 62:15,20
64:6 69:2
86:14
**paid** 18:22,24
18:25 58:19
**paragraph**
78:18
**parcel** 25:14
28:23 49:11
**parking** 29:9
29:17
**parkside** 1:15
70:9 71:6 77:7
88:19
**part** 11:16
48:10 81:17
83:5
**partially** 74:23
**participants**
24:17 34:6
75:3,7,15,18
**particular** 10:4
26:6 31:5
38:14 42:20
59:15 75:19
94:10,23
**particularly**
10:3
**parties** 8:9
**party** 10:7
24:23 67:6
70:4 90:10
93:21
**pass** 14:9,10,11
**past** 90:14

**pay** 34:6 59:23
61:4 79:22
**payment** 40:24
**payments**
58:18,21,23
**payroll** 58:10
**pc** 5:9
**penciled** 11:1
**people** 7:11
8:12,14 43:18
**percent** 24:4
39:5 53:19
54:8 69:8,9,20
70:21 71:18
79:7,8,14,14
80:12,16 84:17
88:19
**percentage**
24:14
**perfect** 20:6
63:22 64:11
**perform** 14:12
67:11
**performed**
76:15
**performing**
15:13 71:24
75:6
**period** 14:14
55:20 56:10
72:10 73:1
77:21,23 85:2
87:3
**permissible**
31:23
**permit** 90:24

permitted   30:1
person   7:20
    9:14,18,21
    10:7
perspective
    70:17
phillips   5:11
phone   8:18
    87:25
phones   8:20
photographs
    22:16
physical   49:7
    82:14
physically
    31:24 32:2
picture   81:17
place   1:15 8:19
    61:12 78:14
    88:19
plan   18:6
    27:19 92:5,10
plans   27:16
    52:3 82:9 93:4
    93:6
please   12:6,21
    20:2 37:3
    43:18 48:10
    55:10 63:18,20
    68:24,25 74:18
    78:8 83:18
    85:16,16 86:8
    87:9 88:15
pllc   5:1
point   36:7 51:7
    51:9 71:23
    74:22 80:18,25

81:3
policies   8:19
popped   85:22
population
    24:13,15
portion   31:16
    35:19
portions   45:24
position   14:23
    79:3
positions   15:8
positive   84:15
    85:6
possible   9:18
    31:24 32:2,3
    96:21
postpone   9:24
potential   56:23
    75:4 76:2
    78:13,17 93:9
potentially   9:6
    93:24
practice   16:10
pre   20:2
preference
    9:20 10:6
prejudice
    16:25
prepared
    43:12 46:17
    47:2 68:15
    82:4 92:15
    95:1
preparing
    81:15
present   7:16
    9:25 23:25

29:3 40:12,20
    41:8,9 42:12
    76:7,9,11 84:5
    84:5 89:5,14
president
    78:10
pressures
    78:17
presumably
    68:3
pretrial   10:14
pretty   92:19
prevailing   86:1
previous   40:9
    40:13 68:16
    82:17
previously
    66:6
price   19:5
    45:12 80:8
    86:9 87:1
priced   80:6
primarily
    39:10,24
primary   31:3
    45:2 60:25
    61:24 73:22
prime   79:13
    80:2,3,7
principal   7:16
prior   16:18,23
    17:3 24:3
    42:15 50:6
    53:16 54:8
    55:6 57:2
    60:11

pro   18:6 40:2
    56:11 83:22
probably
    11:17 15:21,22
    39:5 41:18,19
    72:3
problem   8:25
    50:16
procedure
    14:19
procedures
    14:16
proceed   12:17
    37:2 91:23
proceeding
    14:19
proceedings
    96:25 97:4
process   7:5
    14:6 18:23
produce   52:19
    53:25 57:16
produces
    52:11
producing
    52:12 57:8
product   44:20
    59:1
productive
    32:4
productivity
    32:1
professional
    13:23
profile   74:1
profit   35:1

progressed
  44:17
project  22:21
  32:24 41:4
  60:6 65:18
projected  30:7
projection
  56:13 69:20
  71:7
projects  24:19
promise  88:13
properties  33:5
  60:23 64:13
  66:15 71:18,22
  76:14,20,22,24
  77:1,14 78:3,6
  93:14
property  14:3
  16:13 17:24
  18:13,13,18
  22:17 23:8,24
  24:2,4 25:9,13
  25:17,19,25
  26:23,25 27:1
  27:3,10 28:1
  28:12 29:15,16
  29:25 30:8
  31:2,18 32:22
  33:11,11 34:15
  34:23,24 35:2
  36:1 39:14
  48:18,25 49:2
  49:2,8,14,24
  52:12,17 53:24
  53:25 54:5,25
  55:1,5,22
  56:14,18,25

57:8,16,19
58:2,3 60:9
61:2 63:15,16
65:12,17 67:3
67:8 72:10
74:23 75:2,5
75:25 76:4,10
76:12,13 77:18
78:1,2 82:10
84:13 89:22,24
90:1,2,3,5,10
property's
  30:7
proposed
  17:24 29:13
  30:3 32:16
  39:12
proprietary
  93:19
provide  14:22
  16:11 18:5,12
  18:15 19:5
  22:16 23:11
  24:24 25:11
  38:11,14 40:16
  41:2 44:8,14
  47:6 60:15
  61:5 66:3 70:5
  73:7,19 93:21
  94:22
provided  16:19
  18:3,4,17
  25:12 27:16,18
  29:1 36:19
  44:11 51:22
  53:18 61:19
  82:18,23 89:12

92:6,11
providers
  24:23 70:5
provides  32:20
providing  96:1
proximity
  28:12
publicly  94:3
pull  19:25 43:5
  46:12 48:8,11
  66:6 92:9
purpose  26:19
push  11:19
put  9:15 20:17
  34:16 42:4

q

quadrupled
  73:2
quantified
  75:15
quantify  75:11
quantifying
  75:13
quentin  2:5
question  53:14
  61:10 65:4
  71:12,15 75:13
  90:25 92:23
  95:8
questions
  15:16,18 45:17
  62:24 88:12,24
  90:13 95:5
quick  11:4
  43:18 45:18
  59:21 91:1

quickly  96:19
quiz  86:17
quoting  67:20

r

r  2:21 4:1 7:1
  12:23 92:19
  97:1
raise  12:4
range  11:19
  51:6,8
rate  24:7 34:25
  44:25 45:3,4,6
  54:22 55:1,3
  55:12,13,16,17
  69:5 71:19,20
  78:25 79:4,7
  79:10,13,23,23
  80:2,2,3,4,5,7
  81:24 82:1,6
rates  35:4 45:4
  78:19,25 79:4
  79:17,20,24
  80:19 81:5
  86:1,4,5 88:16
ratings  28:24
ratio  45:10,13
  55:3
rattle  81:14
rcx  6:4
rdx  6:4
reach  36:21,24
  42:24 46:6
  55:25 62:8,11
reaching  23:7
read  74:22
  78:10 87:10
  92:20

reading  52:2
  85:9 87:1,12
ready  63:9
real  11:4 14:3
  14:25 15:1
  16:4 19:14
  24:18,18 30:8
  36:22 66:12,14
  67:13 78:20
  89:16,18,19,21
  89:21 90:2
realize  45:21
  50:23
really  51:7
  82:24 90:25
reason  8:21
  19:8 33:23
  40:6 48:24
  49:3 67:7,9
  94:10,14
reasonable
  36:24 43:2
  45:22 46:9
  62:11 74:8
  77:25
reasonably
  96:9
recall  41:16
  74:14 83:2
recaptures
  35:10
receive  83:8
received  83:11
  83:12
receivership
  77:15

receives  21:16
  37:18 62:20
recent  47:2,6
  51:23 53:4,5
  53:15 56:1,21
  57:13 60:15
  62:15 63:25
  65:8,9,10
  66:24 68:14,20
  69:23 70:20
  72:12,24 73:23
  75:1 79:5
  83:12 93:5
recently  74:24
  77:15
recess  96:5,8
  96:22
recitation  81:6
recognition
  19:20
recognize
  19:24 20:6,9
  37:6 43:9
  46:14
recognizing
  76:6
recollection
  72:8 79:6
  89:11
reconcile  26:5
  33:10 34:18
  35:13
reconciled
  25:10 26:4
  33:16 35:16
reconciliation
  35:7 41:20

42:2,5 73:20
record  11:23
  12:6,22 63:6,7
  97:4
recorded  93:18
  94:3,4,5
records  93:16
  93:17
recross  95:9
red  3:1,4,8
  4:12,21 6:14
  7:7,17,22 9:14
  9:21 11:10
  12:1 16:21,24
  18:1 20:13
  37:9 43:12
  46:18 49:20
  74:10 83:11
redirect  90:15
  90:18 92:1
reducing  89:14
reference
  63:20 81:12
referenced
  70:1 77:1,7,21
  88:16
referencing
  87:6,7
referring  76:23
reflect  76:5
reflection
  44:17
reflects  23:23
  24:2,6
refresh  79:6
regarding
  31:11 40:12

region  86:20
  86:23
regional  21:25
  38:3 43:21
relate  94:16
related  34:8
  55:7
relates  14:16
  14:19 18:17,25
  41:11 47:3
relatively
  11:14,15 90:17
relaying  76:6
relevant  67:25
  67:25
rely  27:19
remain  12:3
  36:11 49:9,15
  78:13,21
remained
  49:16
remele  5:16
remember
  10:23 17:25
  41:10 49:2
  50:5 73:11
  82:11 93:10
remote  9:16,18
remove  67:16
removed  77:15
removes  66:1
rent  52:14,16
  53:25 56:24
  65:14,16 70:19
  76:25 77:10
rentable  52:13
  53:24 56:24

| | | | |
|---|---|---|---|
| **rental** 70:17 | 72:21,24 73:10 | **researched** | **review** 15:17 |
| 71:4,19 77:2 | 73:13,18 74:19 | 65:7 | 89:10 93:22 |
| 86:1,4,5 | 77:3 79:4,5 | **researching** | **reviewed** 52:4 |
| **rents** 34:5 40:3 | 80:23 81:12,15 | 35:25 81:15 | 93:5 |
| **repairing** 21:8 | 82:4,6 83:6,10 | 93:15 | **right** 11:7,24 |
| **repairs** 58:6 | 86:8 89:7,9,11 | **reserves** 58:14 | 12:4 19:2 20:6 |
| **repeat** 71:15 | 93:5 94:11,18 | **residential** | 20:15 21:8 |
| **repeats** 18:23 | 94:20 | 53:20 | 23:7 26:10 |
| **report** 6:12,13 | **reports** 18:17 | **respect** 62:8 | 37:2,22 38:3 |
| 6:14 22:8,9,16 | 36:15 44:11 | **respectfully** | 38:10 39:7 |
| 22:21 23:4 | 46:4 49:9 51:1 | 21:3 | 41:24 42:10,17 |
| 24:8,8,22 | 53:16 68:16 | **response** 69:16 | 46:11 47:9 |
| 26:17,18 31:16 | 72:7 82:17 | **responsibiliti...** | 48:14,16,18,22 |
| 35:22 36:5,8 | 89:8 95:1 | 15:11 | 50:1 51:1,11 |
| 36:11,12,20 | **representations** | **responsibility** | 54:12 55:15 |
| 37:3,13 38:9 | 86:16 | 22:7 38:9 | 56:9 59:16,21 |
| 38:11 40:9,11 | **representative** | 43:25 46:25 | 64:10,21 67:4 |
| 40:13 41:13,21 | 18:1 | 68:19 | 68:4,11,24 |
| 42:14,15,21,23 | **representatives** | **result** 78:16 | 73:14 74:19 |
| 43:6,12,14,25 | 7:22 9:13,13 | **resulted** 84:24 | 78:9 79:10,17 |
| 44:1 45:19,24 | 9:21 10:6 | **results** 38:8 | 80:13 81:18 |
| 46:2,6,17,24 | **represents** | 54:20 55:14 | 83:19 85:4,16 |
| 47:2 48:9,14 | 24:1 94:20 | 73:20 | 86:9 87:3,11 |
| 48:15 51:9,18 | **request** 9:16 | **resume** 63:3 | 87:12,17 88:15 |
| 51:18,21,23 | 40:17,17 | 95:25 | 89:6,8,23 90:5 |
| 52:2 53:1,4,5 | **requests** 16:12 | **retail** 22:24 | 91:22 92:8,9 |
| 53:15 54:8 | **required** 50:4 | **retained** 18:8 | 92:12,12,13,14 |
| 55:24 56:1,7,8 | 66:18 73:19 | 18:11,18 24:21 | 95:13,25 96:3 |
| 56:22 57:3,13 | **requirement** | 33:7 | 96:22 |
| 58:1 59:6,16 | 18:16 | **retainer** 18:19 | **rights** 26:23 |
| 60:15 62:3,8 | **requirements** | **retaliatory** | **rise** 15:25 63:5 |
| 62:16 64:1 | 14:4 30:4 | 78:14 | 96:24 |
| 65:13,14,16,17 | **reschedule** | **return** 32:5 | **risk** 75:2,9,9 |
| 66:19,24 68:18 | 10:15 | **revenue** 54:19 | 75:11 76:7 |
| 68:21 69:23 | **research** 27:4 | 54:19 71:4 | **river** 3:1,5,8 |
| 70:2,20 72:12 | 27:6 40:1 82:2 | 84:17 89:23 | 4:12,21 6:14 |
| 72:12,18,19,19 | | 90:6,9 | 7:7,18,22 9:14 |

9:22 11:10
12:1 16:21,24
18:1 20:14
37:9 43:13
46:18 49:20
74:10 83:11
**road** 97:21
**roll** 78:5
**rough** 9:4 39:6
**roughly** 81:20
**ruins** 1:23 7:3
16:2 17:10,22
18:13 22:12,21
23:12 38:12,25
41:11 44:4,8
47:3,7,10
48:22,23 59:23
60:22 61:20
63:8 70:18
89:6
**run** 9:22 66:12

**s**

**s** 4:1 6:10 7:1
92:19
**sale** 45:12 50:4
63:14 64:25
84:21 86:9,25
93:9,12,21,25
94:7,8,11
**sales** 32:11
33:24 34:6,12
34:13,14,16,17
34:19 40:1
45:13 60:19
61:9,18 63:25
64:16 65:9,19
93:12,13,18,19

93:23
**saying** 76:9
**says** 74:23
76:19 92:19,20
**scheduling**
96:11
**school** 12:24
13:2,7
**schooling**
13:16
**scope** 26:14,15
35:23
**scott** 21:23
**screen** 20:3
31:6 68:24,25
72:7 81:16
95:12
**scroll** 20:8 22:2
22:20 25:1
27:15 30:19
31:7 38:10
41:15,23 42:3
44:2,7,25
46:19 48:6
63:21 64:5,10
69:1 74:19
78:8 86:18
**scrolled** 42:13
**sd** 4:23 5:12
**search** 42:1
**seated** 12:4
**second** 6:12
37:10,13 38:2
38:11 43:20
78:18 80:23
83:4 95:13

**secondary** 41:6
**seconds** 88:4
88:10
**section** 25:7,8
25:23 26:7,13
26:14,22 27:6
27:9,24 28:7,8
28:19,20,21
29:5,6,7,23,24
30:5,6,11,12
30:15,15 31:5
31:17 32:9,10
32:15 33:2,14
34:20,22,25
35:6,7,8 41:13
41:15,16,20
42:5 56:11
69:24 76:1
78:9
**sections** 36:7
42:14 62:3
**secures** 79:24
**see** 7:23 20:3,4
20:9 22:23
41:17 44:2
46:18 48:2,14
48:19 51:12,15
52:24 54:22
57:22 60:16
65:7,15 69:5
72:23 73:4
78:22 83:23
85:13 87:4,13
88:1 91:20
92:3,9 93:17
94:4 96:23

**seeing** 22:24
**seems** 10:2
**segment** 30:18
30:25 31:1,3
86:13
**segments** 31:1
**selected** 34:14
65:10
**sellers** 79:21
**selling** 94:13
**senior** 21:24
**sense** 73:5
86:19
**sent** 78:12
**sentence** 11:16
78:18
**separate** 18:20
37:4 66:12
89:20 95:1
**separated**
66:13 67:3,8
89:20
**separately**
18:18
**september**
38:23 94:24
**service** 16:11
32:19,19 58:16
**services** 18:25
59:23 93:21
**set** 41:2,10
95:3
**sets** 64:6
**setting** 11:23
**settled** 10:23
**several** 64:6

**shockwaves**
   78:12
**shon**   2:22
**short**   10:16
   79:23 80:3
   90:20
**show**   24:22
   86:15 94:6
**showing**   29:11
   31:5 59:16
**shows**   22:23
   23:15 28:3
   60:3 86:9,25
   88:19
**shultz**   5:9
**side**   20:16 48:8
   48:8 59:16
   63:19,19 68:23
   68:25 73:25
   88:15 92:14
**sign**   68:18
**signature**
   21:23,25 22:3
   22:4 38:1,2,5
   43:19,20,22,22
   46:21 68:7,10
   97:5
**signatures**
   21:20,22 37:23
   43:16 68:7
**significance**
   51:3 92:17
**significant**
   47:13
**significantly**
   85:1,2

**signify**   92:25
**signifying**   93:2
**signing**   22:5
   38:7 43:23
   46:24 68:16
**similar**   33:5
   36:15 42:14,17
   46:3 47:16
   53:14 63:15
   76:20
**similarly**   90:9
**simply**   27:18
   29:24 44:18
   45:10 68:20
   70:1
**single**   51:7,9
   67:12
**sioux**   4:23 5:12
   13:3,3,19 15:2
**sir**   12:21,24
   13:5 14:17
   16:1 17:20
   19:1,11 21:20
   26:13 27:24
   36:6,23 37:6
   37:22 42:19
   43:9 44:12
   46:14 48:2,7
   48:14 54:22
   62:1 92:9
**sit**   81:24
**site**   22:14,15
   28:20,22,22
   29:1,7,9,9,13
   32:6,16,17
   39:11 52:1

**six**   51:2,2
**size**   22:24
   25:21,21 27:20
   27:20,21 28:23
   29:14,14 52:23
   53:15
**sizes**   23:7
**skipped**   55:19
**slightly**   27:15
   44:7
**slower**   78:16
**small**   92:20
**smaller**   51:17
   51:20 52:3,7,8
   53:3,5,12
**smith**   4:20 5:9
**snapshot**   94:17
   95:4
**softening**
   54:11,13
**sold**   41:6 63:16
   65:20,21,24
   67:5 89:21,23
   90:2,5 93:14
   94:1
**solemnly**   12:8
**solutions**   97:20
**somebody**   8:18
   67:20
**somewhat**
   44:20
**sonya**   3:25
   97:3,8
**sorry**   45:21
   59:10 64:11
   69:2 71:16
   73:14 81:22,23

   85:10 92:23
**sort**   73:5 74:22
**sound**   66:8
**sounds**   59:21
   84:18
**source**   36:10
   39:25
**sources**   26:25
   27:7,16 32:18
   56:3,5 70:1
   72:5 93:16,24
**south**   5:11,19
   13:8,25 16:7
   64:19,23 65:1
   70:15 81:24
   85:11 86:11,19
   86:22
**space**   22:24
**span**   67:12
**speak**   11:2
   15:12 85:13
   96:18
**speaker**   91:11
**speaking**   14:5
   16:18 39:7
   52:6
**specific**   18:10
   28:10,13,14,17
   30:14,25 31:9
   69:19 76:12
**specifically**
   72:4 77:21
**spelling**   12:22
**spent**   85:8
**spoken**   72:3
**spread**   80:6

| | | | |
|---|---|---|---|
| **spring** 20:24 | **state** 3:1,5,8 | **strictly** 40:19 | **summarize** |
| **springing** 20:1 | 4:12,21 7:7,18 | **stroh** 92:19,25 | 25:15,16 26:3 |
| **square** 22:23 | 7:22 9:14,22 | **strong** 9:20 | 28:19 29:4 |
| 23:3 52:14 | 12:2,6,21 13:8 | 10:6 | 32:14 33:15 |
| 53:20 | 13:10,11,12,17 | **structured** | **summarized** |
| **stabilization** | 13:24,25,25,25 | 40:25 | 42:11 77:11 |
| 44:20,21 47:19 | 14:9 16:22,24 | **studied** 16:15 | **summarizes** |
| **stabilize** 24:9 | 18:2 19:20 | 86:13 | 25:24 29:14,25 |
| 55:22 | 20:14 37:10 | **studies** 72:5 | 30:7 33:2,15 |
| **stabilized** | 43:13 46:18 | **study** 82:3 | 34:13 35:8,11 |
| 18:14 23:18 | 49:20 58:23 | **subcategories** | 49:23 |
| 24:6,7,7 35:2 | 74:11 83:11 | 51:14 | **summarizing** |
| 38:22 39:19,24 | 86:23 95:21 | **subcategory** | 27:2 |
| 40:1,5,7 44:10 | **statement** 18:7 | 54:3 56:15 | **summary** 23:5 |
| 45:11 47:17,19 | 35:1 | 57:24 | 25:8,11,12 |
| 54:3,6 55:24 | **states** 1:1 2:4 | **subject** 14:15 | 28:2 34:9 |
| 56:13,20 60:2 | 14:5 15:5 | 14:18 18:13 | 44:24 45:16,18 |
| 60:3,11,24 | 86:20 | 28:12 30:18 | 47:25 48:9,15 |
| 61:14 69:5,20 | **status** 22:12 | 31:1,2 33:6 | 48:16 57:15 |
| 69:25 71:19,25 | 38:24 44:4 | 34:14 35:2 | 65:16 84:25 |
| 76:22 77:13 | 70:6 | 49:14 55:1,5 | 94:18 |
| 78:1,4,6 | **stay** 91:5 | 60:24 65:2 | **supervise** |
| **staff** 15:2,15 | **steps** 32:1 | 75:2,25 76:20 | 15:15 |
| 19:25 38:2 | **stigma** 75:3,4,5 | 78:2 | **supervises** |
| 43:19 68:22 | 75:17 76:6 | **subsequent** | 14:13 |
| **stamp** 21:5 | **stipulate** 20:16 | 67:16 | **supervisor** |
| 92:22 | 20:21 21:11,14 | **suggest** 70:22 | 38:5 |
| **stamps** 92:24 | **stipulating** | 71:19 | **supply** 86:5 |
| **stand** 96:22 | 20:19 | **suggested** | **supported** |
| **standard** 35:21 | **stop** 90:23 | 74:13 79:6 | 33:23 34:4 |
| **stanley** 4:17 | **stopped** 69:15 | **suggestion** | **suppose** 68:5 |
| 7:20 91:1,3 | **stopping** 95:25 | 10:20 | **supposed** 8:11 |
| **start** 15:6 | **straight** 7:8 | **suite** 4:5 5:11 | 22:22 31:19 |
| 31:22 56:23 | **street** 4:22 | 5:19 97:22 | **sure** 9:11 11:7 |
| **started** 13:2,8 | 5:18,19 | **sum** 84:20 | 21:4 23:23 |
| 94:24 | **strengths** 76:2 | **summaries** | 39:5 40:10 |
| | | 45:19 | 43:2 50:19 |

55:11 65:4
76:8 79:9 87:6
88:4,7 91:2
**surrounding**
28:22
**survey**  77:3,10
77:13,23
**suspect**  20:21
88:5
**sustained**  81:4
**swear**  12:4,8
**sworn**  12:14
**swot**  76:1
**systems**  5:17
8:8

**t**

**t**  6:10 12:23
92:19 97:1,1
**tab**  48:11
**table**  27:7,15
29:11,19 41:19
59:15
**take**  7:9 10:16
10:17 14:8
20:1 24:9 41:7
43:25 46:25
51:5 55:22
63:1 68:19
71:5 80:19
81:5,16 88:2,3
88:10 91:1
96:7,16
**taken**  8:10
51:24
**takes**  30:12
82:2

**talk**  14:21 27:1
31:22 35:12
78:10,24
**talked**  10:24
82:9 93:8
94:15
**talking**  10:20
28:13 57:12
**talks**  27:9
35:15
**tanabe**  4:16
7:21
**tariffs**  78:11,13
78:14,16 79:1
**tax**  30:6,9
40:14,22 41:1
42:4 49:13
**technical**  13:19
**technique**  26:4
34:15 35:10,12
**techniques**
27:12 35:17
**teleworking**
8:19
**tell**  12:15 87:9
**tenant**  24:3
**tenants**  60:24
78:4,5,5
**term**  79:23
80:3,7,9
**terms**  9:2,25
10:10 34:5
75:11 79:22
**terrific**  11:21
**territory**  15:4
**testified**  12:16
36:20 42:24

46:7 55:6 71:2
83:25
**testify**  71:14
**testifying**  9:5
9:14 80:18
81:4,18
**testimony**  9:3
9:21,25 10:5
11:9 12:8
16:19 71:3
84:3
**testing**  33:25
**texts**  88:1
**thank**  10:12,13
12:1,18 19:18
20:23 21:12,17
50:17,24 59:14
63:4,11 69:3
74:20 83:19
88:11 91:7,24
95:15,18,20,25
96:14,19
**thanksgiving**
10:25
**therefrom**  71:7
**thereof**  74:11
**thing**  91:12
**things**  15:18
18:7 27:22
29:10 52:18
56:9
**think**  7:9 9:2
10:22,24 11:7
18:2 21:5
31:17 32:21,25
33:10 35:13
36:6 37:3

48:12 57:16
64:9 71:1 72:4
80:24 90:16,19
92:19 96:21
**third**  6:13
24:23 43:6,13
43:22 48:9,14
51:18,21 54:11
55:12 67:6
70:4 83:4 89:9
89:10 90:10
93:21
**thought**  20:19
20:24,24 21:13
72:23 82:3
**thousands**
15:22
**threat**  75:24
**threats**  76:3
**three**  11:14,18
14:6 21:8
23:22 35:16
38:14,16 48:5
51:14 68:6,7
95:1,2
**tif**  40:12,14,20
40:24 41:10,14
41:16 42:11
66:1,7,15 67:7
67:16,22,23,24
68:2 89:5,13
89:16,23,23,25
89:25 90:4,5,6
90:9,10
**time**  7:8 11:23
14:14 16:17,18
17:24 18:3,18

18:21,23 19:12
21:24 22:14,19
25:18 38:3
39:1 42:21
44:6 50:2,3,5
50:6,7,15 51:5
51:9 55:21,23
56:3 60:13
62:5,14,24
67:12,19 72:15
74:9 77:10,13
77:22 81:18
85:9 88:2
94:17 95:4,23
**timeframe**
65:9 77:25
**times**  16:15
95:3
**timestamp**
22:11 95:4
**title**  20:9 36:1
36:1,3
**titled**  34:20
**today**  8:13 9:3
9:7 10:9,25
36:21 72:17
73:8 79:8,14
81:25 82:1,5,7
82:9 91:21
95:20
**together**  34:16
**tomorrow**  8:15
8:22 9:4 10:14
10:20 11:7
81:8 90:22
96:1,23

**ton**  68:3
**took**  82:14
**top**  22:11
23:11 40:10
41:12 65:5
79:2 81:14
83:2 85:14
**tops**  10:17
**total**  23:3
25:21 29:17
33:18 52:16
53:25 57:16
**totally**  96:11
**touch**  48:6
**toward**  69:1
74:20
**towards**  41:20
**towers**  5:18
**traffic**  28:25
**trailing**  87:2
**training**  36:21
42:25 46:7
62:9
**transaction**
93:22
**transcribed**
3:25
**transcript**  97:4
**transferred**
13:2,9 90:6
**transitioning**
78:7
**translate**  34:3
34:24
**travel**  16:13
**treasury**  78:19
80:10,12 81:19

81:22
**tribal**  19:20
**tricky**  69:13
**true**  68:5 72:2
97:4
**trump's**  78:11
**truth**  12:9,10
12:10,15,15,15
**try**  9:17 96:18
**trying**  20:24
77:20 86:17
87:10 91:8
**turn**  10:10
21:19 26:12
43:15 50:12
91:25
**turning**  60:14
**turtleneck**
91:12
**twelve**  51:2
**two**  9:11 11:18
15:2 38:6
45:23 51:1,8
60:5,15,18
61:5,8,14,17
68:7 69:18
70:8 73:2
76:19,22,24
77:1,7,8,12,14
82:10 85:6
94:3
**type**  27:5 29:16
30:1 40:22
41:3 49:2
**types**  15:18
**typical**  18:4
61:12

**typically**  32:23
44:16 49:7
52:21 66:14
67:5

---

**u**

**u**  12:23
**u.s.**  2:5,23
78:15
**ultimate**  33:21
57:7
**ultimately**
33:22 60:21
**unclear**  78:22
**under**  34:15
39:1 44:6
**undergraduate**
13:9
**underlying**
32:12
**underneath**
14:12 15:3,16
**underperfor...**
76:13
**undershirt**
91:13
**understand**
25:6 36:9 76:8
**understanding**
81:19 93:4,7
**understood**
10:12
**undeveloped**
24:1
**unidentified**
91:11
**unimproved**
22:18

unit 25:21
  27:21,21 29:14
  29:14,19,20
  52:23 53:15,20
  86:10 87:1,5
  87:14,16,19,20
united 1:1 2:4
  86:20
units 23:1
  24:15 25:22
  31:4 53:12
  77:22
university 13:8
  13:10,11,19
unknown 2:25
unrelated
  96:12
unusual 29:2
upfront 40:24
upper 92:12
use 15:24
  24:10,19 25:16
  26:15,17,25
  31:16,18 32:2
  32:3,3,4,11
  34:24 36:5
  49:22,24 60:21
  60:23 64:25
  65:19 70:19
  72:5 74:3 80:8
  80:22
used 23:7 33:4
  63:25 64:14
  65:15 72:5
  76:25
users 26:18

uses 28:14 30:1
  31:23,24
using 9:18 70:1
  87:18
usually 41:4,14
  67:18
utilities 29:1
  58:4
utility 28:25
utilizing 42:25
  62:9

**v**

vacancy 56:18
  56:25 77:9,9
  88:16
vacant 31:19
  31:22 49:24
  77:22
valuable 52:9
  57:19,20 79:18
  79:18
valuation 23:8
  23:11 26:3
  27:11 32:19
  33:1 34:15
  35:10,12,17
  52:7 53:6,20
  54:14 55:7
  57:7 61:20
  66:2 77:17
valuations
  31:11 60:14,15
  61:5,14 94:16
value 18:12,15
  23:15,17,18,23
  23:24 24:1,1,2
  24:6,6 26:1,3

26:16,20,21
  27:10 31:14
  32:9,11,12
  33:17,18,21,24
  34:3,14,18,24
  35:3,7,8,11,12
  35:14,16 38:12
  38:17,18,19,20
  38:22 39:4,7
  39:15,18,18,19
  39:22,23,24
  40:5,5,6,7,11
  40:12,16,20
  41:5,7,8,9,13
  42:12 44:8,13
  44:21 45:2,10
  45:14 47:6,10
  47:11,15,16,17
  47:19,20,21,23
  50:7 54:16,20
  55:3,14,17
  57:9,11 61:3,6
  61:15 66:11
  67:22,23 72:1
  73:7 74:17
  84:12,15,24
  85:7 89:5,14
  89:16,17,24,25
  90:3,4,7,10
  94:19
valued 66:7
  68:2
values 23:14
  25:10 26:4,5
  26:16 35:9
  45:3,5 48:5
  78:21

valuing 41:16
  60:22 89:13
variable 80:5
variance 69:18
variety 24:11
various 25:5
  26:25 27:10,20
  80:19
verify 73:5
veritext 97:20
version 93:3
verstandig 4:8
  6:7 7:13,14
  11:12,17 17:16
  19:16,19,23
  20:17,18,23
  21:3,9,11,13
  37:15 50:8,17
  62:17,19 63:4
  63:10,11,13,18
  63:23 64:9,12
  68:23 69:4,16
  69:17 70:7,24
  71:1,9,11,17
  74:18,21 80:22
  81:2,7,10
  83:18,21 85:15
  85:18 87:24
  88:3,8,11,14
  88:22 91:8
  95:7,8,10,15
  96:4,9,14,18
video 8:13 10:5
videoconfere...
  69:14
view 28:1

| | | | |
|---|---|---|---|
| **visibility**  28:25 | **way**  35:5 45:8 | 69:21,23 71:14 | **y** |
| **visit**  10:8 | 68:6 69:22 | 71:15 88:6,23 | **yeah**  10:13 |
| **visual**  22:16 | **ways**  27:10 | 90:20 91:21 | 11:4,6 27:18 |
| 63:24 | **wdc**  58:21 | 95:19,22 | 31:17 39:10 |
| **vogel**  4:11 17:4 | **we've**  8:10 9:9 | **witnesses**  8:21 | 40:14 41:23 |
| 17:6 | 24:19 33:6 | 9:10,23 10:4 | 45:9 48:6 |
| **voir**  19:16 | 34:14 42:13 | 10:21 11:5,14 | 50:10,18,24 |
| **volatility**  78:9 | 56:6 67:18 | 11:18 | 54:10 55:11 |
| **w** | **weakness** | **woods**  5:9 | 57:15 59:24 |
| **w**  4:17 | 75:24 77:19 | **word**  42:1 | 67:18 69:11 |
| **walk**  25:4 | **weaknesses** | 84:16 | 75:13 87:18 |
| 43:18 48:4 | 76:2 | **words**  32:5 | 89:7 91:2,10 |
| **wall**  5:17 8:8 | **weather**  8:12 | **wore**  91:12 | 91:11 95:24 |
| **want**  13:22 | 9:17,23 | **work**  11:6 | **year**  13:9 14:6 |
| 25:4 36:6 | **wednesday** | 14:13,21,24 | 25:21 29:17 |
| 42:20 45:25 | 10:18 | 15:3,15,17 | 67:12 73:6 |
| 51:15 62:4 | **week**  7:5 10:22 | 24:21 26:14,15 | 78:19 80:10,12 |
| 66:16 67:21,22 | 10:24 80:16 | 35:23 39:13 | 81:19,22 84:9 |
| 67:25 80:5,7 | 81:20 | 67:14,22 68:3 | 84:12 87:3,7 |
| 81:4 84:25 | **weight**  61:13 | 81:7 83:5 | 87:15 |
| **wanted**  8:10 | 61:24 | **worked**  16:21 | **years**  60:5 73:2 |
| 94:22 | **went**  15:10 | 17:3,9,15 | **yep**  20:9 32:15 |
| **wanting**  45:18 | 36:8 39:7 | **working**  15:6 | 50:16 |
| **warranted** | 85:11,19 | 49:3 74:6 | **yield**  78:20 |
| 74:16 | **west**  4:22 | **works**  11:5 | 81:19 |
| **washington** | **western**  86:20 | **world**  15:1 | **z** |
| 13:2 | **wheel**  52:1 | **wrap**  7:5 90:20 | |
| **wasting**  66:13 | **wide**  11:5 | **wrapped**  7:4 | **zero**  24:4 |
| **watertown**  3:4 | **willing**  20:16 | **wrong**  21:7 | **zoning**  25:18 |
| 5:10 7:25 8:3 | 61:3 79:22 | 84:1 | 28:23 29:24,25 |
| 16:4,5,12,15 | **witness**  6:4 9:3 | **wrote**  72:11,18 | 30:2,4 |
| 24:20 28:5 | 10:5 11:25 | **x** | **zoom**  7:21,23 |
| 31:9 64:22 | 12:7,11,14 | | |
| 65:1,11,18 | 19:21,22,25 | **x**  1:4,10,12,18 | |
| 70:15 72:6 | 20:4,8 42:2 | 1:20 2:1 6:1,10 | |
| 76:14 81:24 | 50:9,14,16,22 | | |
| 85:11 86:11,13 | 59:12,15 69:11 | | |