```
                                            Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    DISTRICT OF NORTH DAKOTA

 3    Case No. 25-30002 (Jointly Administered)

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    GENERATIONS ON 1st, LLC,

 8

 9            Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11    Case No. 25-30003 (Jointly Administered)

12    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13    In the Matter of:

14

15    PARKSIDE PLACE, LLC,

16

17            Debtor.

18    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19    Case No. 25-30004

20    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21    In the Matter of:

22

23    The Ruins, LLC,

24

25            Debtor.
```

Page 2

1 - - - - - - - - - - - - - - - - - - - - - - - - - x

2

3

4          United States Bankruptcy Court

5          Quentin N. Burdick U.S. Courthouse

6          655 1st Ave. N.

7          Fargo, ND 58102

8

9          Tuesday, November 25, 2025

10         8:29 AM

11

12

13

14

15

16

17

18

19

20

21    B E F O R E :

22    HON SHON HASTINGS

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO: UNKNOWN

Page 3

1  HEARING re Motion by Red River State Bank to Convert Case

2  from Chapter 11 to 7 filed 09/26/2025 (Doc. 109)

3

4  HEARING re Joinder by Watertown Development Company to Red

5  River State Bank's Motion to Convert Case from Chapter 11 to

6  7 filed 10/10/2025 (Doc. 131)

7

8  HEARING re Objection by Debtor to Red River State Bank's

9  Motion to Convert Case from Chapter 11 to Chapter 7 filed

10  10/17/2025 (Doc. 143)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sonya Ledanski Hyde

Page 4

1  A P P E A R A N C E S :

2

3  THE DAKOTA BANKRUPTCY FIRM

4      Attorney for Debtors

5      1630 First Avenue North, Suite B

6      Fargo, ND 58102-4246

7

8  BY:  MAURICE VERSTANDIG

9      CHRISTIANNA A. CATHCART

10

11  VOGEL LAW FIRM

12      Attorneys for Red River State Bank

13      218 Northern Pacific Avenue

14      Fargo, ND 58102

15

16  BY:  KESHA TANABE

17      CAREN W. STANLEY

18      DREW J. HUSHKA

19

20  DAVENPORT EVANS HURWITZ & SMITH LLP

21      Attorney for Red River State Bank

22      206 West 14th Street

23      Sioux Falls, SD 57101-1030

24

25  BY:  ANTHONY M. HOHN

Page 5

1  KD LAW, PLLC

2      Attorney for D&M Industries, Inc.

3      3429 Interstate Boulevard

4      P.O. Box 9231

5      Fargo, ND 58106-9231

6

7  BY:  JOHN M. KRINGS, JR.

8

9  WOODS FULLER SHULTZ & SMITH PC

10      Attorney for Watertown Development Company

11      300 South Phillips Avenue, Suite 300

12      Sioux Falls, SD 57104

13

14  BY:  JORDAN J. FEIST

15

16  BASSFORD REMELE

17      Attorney for Diamond Wall Systems

18      Fifth Street Towers

19      100 South 5th Street, Suite 1500

20      Minneapolis, MN 55402

21

22  BY:  JEFFREY D. KLOBUCAR

23

24

25

2 (Pages 2 - 5)

Page 6

1            I N D E X
2                          PAGE
3
4   WITNESS(ES):        DX  CX  RDX  RCX
5   DANIELLE HARLESS
6     By Ms. Tanabe        9      174
7     By Mr. VerStandig        122    189
8   BARRY MATSON
9     By Mr. VerStandig       191
10    By Mr. Hushka          195
11  JASON BIGGINS
12    By Mr. VerStandig       198
13  MULINDA CRAIG
14    By Mr. VerStandig       203
15    By Ms. Stanley        218
16
17            E X H I B I T S
18  NO.        DESCRIPTION          PAGE
19  ECF 175    Aarestad Declaration       8
20  ECF 176    Greenwood Second Declaration    8
21  ECF 177    Attachments A - I         8
22  ECF 181    Second Amended Plan       93
23  ECF 182-2   Photographs         216
24
25

Page 7

1        P R O C E E D I N G S
2        THE COURT: All right. So we're back on the
3   record with Bankruptcy Case Number 25-30004, In re The
4   Ruins. And when we left off, I think the Red River State
5   Bank was getting ready to call its next witness. Am I right
6   about that?
7        MS. TANABE: You are correct.
8        MS. STANLEY: And if I might interrupt, there were
9   just one housekeeping matter.
10       THE COURT: Okay.
11       MS. STANLEY: Mr. VerStandig and I had discussed
12  admission of a couple of exhibits.
13       THE COURT: Oh, great. Great. That's wonderful.
14       MS. STANLEY: Hopefully. This was the declaration
15  of Charles Aarestad certifying bank records.
16       THE COURT: Okay.
17       MS. STANLEY: So that was ECF 175. Sorry, I
18  didn't mean to blindside you there, Mr. VerStandig.
19       THE COURT: Yeah. Yeah. Okay.
20       MR. VERSTANDIG: No, you're good. That one we had
21  discussed and absolutely.
22       THE COURT: All right. So the parties agree that
23  ECF 175 may be received. Have I got that right, Mr.
24  VerStandig?
25       MR. VERSTANDIG: Yes.

Page 8

1        THE COURT: Okay. The court receives Docket 175.
2        (Exhibit 175 entered into evidence)
3        THE COURT: All right.
4        MS. STANLEY: And then the second one, or two out
5   of three, was ECF 176, which is the second declaration of
6   Clay Greenwood, First Community Credit Union, certifying
7   bank records.
8        THE COURT: Okay, and were there any others? And
9   I'll just take them all at one time.
10       MR. VERSTANDIG: We would also stipulate to the
11  attachment to ECF 177, but not to the affidavit itself.
12       MS. STANLEY: And that was my understanding as
13  well, that it would be Exhibits A through I only.
14       THE COURT: Okay. So, Mr. VerStandig, the debtors
15  agree that I can receive ECF 176, and only the attachments,
16  Exhibit A through I, of ECF 177.
17       MR. VERSTANDIG: Yes, Your Honor.
18       THE COURT: Okay. The court receives ECF 176 and
19  the attachments to ECF 177.
20       (Exhibits 176 and 177-A-I entered into evidence)
21       THE COURT: What else?
22       MS. STANLEY: Ms. Tanabe is going to call the
23  first witness, I believe.
24       THE COURT: Oh, okay.
25       MS. STANLEY: I don't have any more housekeeping.

Page 9

1        THE COURT: All right. Are there any other
2   housekeeping matters?
3        All right. Ms. Tanabe, feel free to call your
4   next witness.
5        MS. TANABE: Thank you, Your Honor. I'm going to
6   call Danielle Harless to the stand, please.
7        THE COURT: Ms. Harless, I'll have you come stand
8   in front of the clerk and be sworn.
9        CLERK: Please state your name for the record.
10       MS. HARLESS: Danielle Harless.
11       CLERK: Do you solemnly swear that the testimony
12  you are about to give in this case will be the truth, the
13  whole truth and nothing but the truth, so help you God?
14       MS. HARLESS: I do.
15       CLERK: Please take the stand.
16       THE COURT: Oh, you know the drill. I love that.
17  All right. I'm going to have you state your name again for
18  the record just so I can hear you.
19       MS. HARLESS: Danielle Harless.
20       THE COURT: Perfect.
21       All right. Ms. Tanabe, you may proceed.
22       MS. TANABE: Thank you, Your Honor.
23         DIRECT EXAMINATION OF DANIELLE HARLESS
24  BY MS. TANABE:
25  Q   Good morning, Ms. Harless.

3 (Pages 6 - 9)

Page 10

1  A   Good morning.

2  Q   Could you please state your full name one more time for

3  the record?

4  A   Danielle Harless.

5  Q   And can you describe your educational background?

6  A   I graduated from Concordia College in 2008 with a dual

7  major in international business and Spanish, and I went to

8  graduate school of banking at University of Wisconsin, and

9  that's a master's degree in banking.

10  Q   And what is your current occupation?

11  A   I'm a community banker.

12  Q   And how long have you worked in banking?

13  A   Well, I was a teller in high school, but full-time

14  since 2008.

15  Q   And how long have you worked for Red River State Bank

16  specifically?

17  A   Full-time since July of 2008.

18  Q   And how would you describe your experience or

19  familiarity with commercial real estate lending?

20  A   I'm quite familiar with it.  I started my career when

21  the mortgage crisis was kind of unfolding.  So I lend on a

22  daily basis.  I do special assets.  In a smaller bank, you

23  wear a lot of different hats.  And so my current role is I

24  do a lot of our training and supervision.  So I don't know

25  if that answers your question.

Page 11

1  Q   It does, and just for the benefit of us who are not

2  professional full-time bankers, what did you mean by special

3  assets?

4  A   When credits start to move sideways, like death,

5  divorce, things that maybe weren't the customer's fault all

6  the time, I come in and I assist with helping fix a

7  situation, provide solutions.

8  Q   So you frequently loan to businesses?

9  A   Yes.

10  Q   Okay, and do you know Jesse Craig?

11  A   Yes.  He's a customer of Red River State Bank.

12  Q   And are you familiar with The Ruins project in

13  Watertown, South Dakota?

14  A   Yes, I am.

15  Q   And are you familiar with the loan history between Red

16  River State Bank and The Ruins?

17  A   The loan history between Red River -- yes.

18  Q   So you're personally familiar with that customer

19  relationship and those loans?

20  A   Yes.

21       MS. TANABE:  Okay.  Sharon, could you please pull

22  up the amended proof of claim filed by Red River State Bank?

23  It would have been filed on September 12, 2025.  It's on the

24  claims register.  Great, and could you please scroll to Page

25  6 out of 84?  There we go.  That table there.

Page 12

1  BY MS. TANABE:

2  Q   Can you just take a look at the table that's on Page 6

3  of 84?  Let me know if you recognize that.

4  A   I recognize it.

5  Q   Okay, and were you present when Charles Aarestad, also

6  a banker at Red River State Bank, previously testified that

7  the amounts on this table were due and owing as of the

8  petition date in this case?

9  A   Yes, I was.

10  Q   And do you agree with Charles's testimony?

11  A   Yes, I do.

12  Q   And do the per diem rates of interest look correct to

13  you?

14  A   They look correct.

15  Q   What was the interest rate?  Do you know the interest

16  rate on the first note?

17  A   4.25 percent.

18  Q   Okay, and the second note?

19  A   4.6 percent.

20  Q   And the third note?

21  A   7.75 percent.

22  Q   Okay, and are you familiar with the declarations that

23  Charles Aarestad submitted in this case discussing the three

24  Ruins notes?

25  A   Yes, I am.

Page 13

1       MS. TANABE:  Just for the court's benefit, that's

2  ECF Numbers 84, 85 and 86.

3  BY MS. TANABE:

4  Q   Okay.  Did you recently assist with drafting a

5  declaration for yourself that was filed before this court?

6  A   Yes, I did.

7  Q   And did that declaration distribute, or discuss, rather

8  distributions of Ruins note proceeds?

9  A   Distributions meaning?

10  Q   Sorry.  Did that declaration discuss loan disbursements

11  for the three Ruins notes?

12  A   Yes, it did.

13  Q   And did you sign that declaration?

14  A   I did.

15  Q   And to the best of your knowledge, the information in

16  that declaration is true and correct?

17  A   To my understanding of what I know, yes.

18  Q   Okay, and how did you form your opinions about what's

19  in that declaration?  What documents did you review to

20  prepare that declaration?

21  A   Would you be able to pull the declaration up?

22       MS. TANABE:  Sure.  Madam Clerk, could you pull up

23  Docket Number 177, please?

24       THE WITNESS:  My apologies.  I reviewed a lot of

25  documents.

4 (Pages 10 - 13)

Page 14

1      MS. TANABE:  No, that's fine.  And Sharon, if it's
2  not too much trouble, could you pull up Docket 84 side by
3  side?  We're going to get to both of them, so it may be
4  helpful to just have them both handy.  Oh, with 84.  Thank
5  you.  Sharon, I'll just ask you to scroll slowly through
6  Docket Number 177.
7  BY MS. TANABE:
8  Q    And Danielle, could you just peruse that as we're going
9  to refresh your recollection?
10 A    Yep.
11 Q    Is that helpful?
12 A    It is.  Yep.
13 Q    Okay.  Would it help if we parked on Page 3?  There we
14 go.  Does this refresh your recollection?
15 A    It does.  Thank you.
16 Q    Good.  Okay.  So to the best of your knowledge, the
17 information in this declaration is true?
18 A    Yes, it is.
19 Q    And how did you form that opinion?  What sorts of
20 documents did you review?
21 A    Specifically to Page 3 or the document --
22 Q    In the declaration.  Did you subpoena documents from
23 other banks?
24 A    Yes, we subpoenaed -- in the bankruptcy, we subpoenaed
25 -- we largely -- we subpoenaed FCCU, or First Community

Page 15

1  Credit Union.  I'm going to work on my acronyms.
2      THE COURT:  Thank you.
3      THE WITNESS:  My apologies.  First Community
4  Credit Union.
5      THE COURT:  Okay.
6      THE WITNESS:  There was 24 files, over 25,000
7  pages, over 15,000 transaction lines that I reviewed related
8  to putting together this document.
9  BY MS. TANABE:
10 Q    And you reviewed your bank's own records as well?
11 A    Yes.
12 Q    Okay.  Thank you.  So on this, I'm going to switch now
13 to looking at Docket Number 84.  That's on the other side of
14 your screen.
15     MS. TANABE:  Sharon, could you please scroll to
16 Exhibit F?  That starts at Page 57.  There we go.
17 BY MS. TANABE:
18 Q    This might be a little hard to see, but are you
19 familiar with this spreadsheet?
20 A    Yes.
21 Q    And what does it show?  Do you remember what Ruins note
22 this is for?
23 A    Based on the dates, it's the first Ruins note.
24 Q    Okay, and --
25 A    It's the loan transcript of sorts.

Page 16

1  Q    And how many loan disbursements or draws -- are those
2  words synonymous, by the way?  If I say loan disbursement
3  and draws, does that mean the same thing to you?
4  A    Loan disbursements is what my -- or what I normally use
5  for the language.  They mean the same thing, but they're
6  slightly different.
7  Q    Okay.  So loan disbursement is money from The Ruins
8  first note that's being disbursed to the customer.  Is that
9  your understanding of what's in the spreadsheet?
10 A    In the spreadsheet on the right?
11 Q    Yes, in Docket Number 84.
12 A    Yeah.  So, like, on March 11th of 2022, there's a
13 $2,952,702.33 disbursement, which was Draws 4 through 6.
14 Q    Okay.  Perfect.  And so is there a second disbursement
15 on this spreadsheet?  Loan disbursement?
16 A    Yep.  It's in a different format than I'm used to
17 seeing because I look at our accounting core.  That's what
18 I'm used to seeing.  So on March 23rd of 2022, there was a
19 disbursement for $181,947.80, and that correlated to Draw
20 Number 7 and was deposited in the Red River State Bank Ruins
21 account.
22 Q    And what is the line entry April 8, 2022?  Do you
23 recognize that?
24 A    Yep.  That was Draw Number 8 done on April 8 for
25 $2,274,820.42 deposited in the Red River State Bank Ruins

Page 17

1  account.
2  Q    Okay, and are there any other loan disbursements on
3  this chart?
4  A    There was one on May 10th.  The font is really small.
5  So my eyes are getting old.
6  Q    Yes.
7  A    Yeah.
8  Q    So I may be wrong when I said there were three.  I
9  misspoke.  So I think there are five on this spreadsheet,
10 are there not?  One, two, three, four, five.  So on May
11 10th, what do you see at that line item?
12 A    One million four hundred -- I'm going to look at the
13 left-hand side because the text is bigger.  $1,478,434.10,
14 and that was on May 10th of 2022, for Draw 9.  Nine, I
15 believe.
16 Q    Okay.
17 A    Following the lines here, yeah.  Draw 9 that was
18 deposited in the Red River State Bank Ruins account.
19 Q    And is there one more loan disbursement on this chart?
20 A    Yes, on June 10th of 2022, for $852,095.36 that was
21 Draw 10.  And that was deposited in the Red River State Bank
22 Rooms account.
23 Q    Okay.  Thank you.
24     MS. TANABE:  And Sharon, could you go to Exhibit
25 C?  That should be Page 7 out of 50.  Let's see.  In 84-1,

5 (Pages 14 - 17)

Page 18

1 Exhibit C-1. There we go.

2 BY MS. TANABE:

3 Q   Do you recognize the document on your right that's

4 labeled Exhibit C-1, Danielle?

5 A   Yes, that's a wire transfer request form.  That was --

6 Q   Okay, and -- go ahead.

7 A   That was tied to the first draw.

8 Q   The first Ruins note?

9 A   The first Ruins disbursement on the -- so the first

10 Ruins note, Draws 4 through 6, that was the disbursement to

11 the First Community Credit Union Craig Properties account.

12 Q   And how much is this?  What's the amount and date of

13 this disbursement?

14 A   The amount and date?

15 Q   Yes.

16 A   The amount is $2,952,702.33, and the date was March

17 11th of 2022.

18 Q   And does that dollar amount and date match the table of

19 disbursements on the left side of your screen that's Docket

20 Number 177?

21 A   It does.

22 Q   And what's the bank standard procedure when disbursing

23 funds by wire like this transfer was?  Who's the info

24 supplied by?

25 A   If you could scroll down a little bit on the wire

Page 19

1 transfer so I can see.  So wires can be done in person or

2 not in person.  And this wire, based on how the form is

3 filled out was done not in person.  And we received a voided

4 check from Jesse Craig to provide payment instructions for

5 where he wanted the funds to go.  So there would have been a

6 voided check attached to this.

7     And when we send the wire, if it's not in person, we do

8 wire callbacks.  And see did a wire callback at 8:18 a.m. to

9 Jesse to the number that would have been on file for the

10 customer.  It's identity theft protection.  Wire fraud is a

11 really high area of concern for banks.  So there's a lot of

12 procedures that go into wire transfers.  So we're very

13 regimented how we handle that.

14 Q   So you --

15     THE COURT:  Before you --

16     MS. TANABE:  Go ahead.

17     THE COURT:  I would like to know what a wire

18 callback is before you proceed with your next questions,

19 please.

20     THE WITNESS:  A wire callback is we use the

21 customer information that we validated on file as the

22 accurate information for the customer.  So when they set up

23 an account, they give us their contact information.  We

24 verify their identity through different means, depending on

25 what the customer has available.  So we have that

Page 20

1 established for the customer.  And then when a wire transfer

2 request that comes in, not in person, so they email it, we

3 don't know who the person on the other end is that's

4 emailing us the wire transfer instructions.  So we actually

5 have to use our contact information on file to contact the

6 customer to make sure that we're actually dealing with the

7 right person and the money gets to where it needs to go.  So

8 that's the purpose of a wire callback, is to ensure

9 integrity in the system.

10     THE COURT:  Thanks.

11 BY MS. TANABE:

12 Q   Okay, and so can you tell from this form where the

13 first disbursement, loan disbursement for the first Ruins

14 note was sent to by your bank?

15 A   Yes.  It would have been sent to Craig Properties LLC

16 at First Community Credit Union.  It was up on the form.

17 Q   And you're confident that Jesse Craig provided these

18 instructions to you based on your callback procedure?

19 A   He would have provided it to Charles Aarestad, as he's

20 the one that signed the originating loan officer signature.

21 Q   That's what the signature in the middle of the page

22 indicates?

23 A   Yes, that he -- he's ensuring that we follow our normal

24 procedures in authorizing the wire from an internal

25 standpoint.

Page 21

1 Q   So why wasn't this loan dispersed into a Red River

2 State Bank account?  Is that also standard procedure?

3     MR. VERSTANDIG:  Objection, relevance.  Your

4 Honor, we're here on unusual circumstances and whether or

5 not there are grounds that would merit the appointment of a

6 Chapter 11 trustee.  The cause portion of this hearing was

7 held several weeks ago and concluded.  I've been trying to

8 give some leeway here, but I don't see what possible

9 correlation there is between this line of questions and the

10 existence of unusual circumstances or the absence thereof.

11     THE COURT:  So --

12     MS. TANABE:  May I respond?

13     THE COURT:  Sure.

14     MS. TANABE:  Okay.  So it's directly relevant --

15 or I'm sorry, did I cut Your Honor off?  Were you planning

16 to speak?

17     THE COURT:  You get to speak first.

18     MS. TANABE:  Okay.  Great.  So the debtor does

19 have the burden in this case of proving the existence of

20 unusual circumstances.  And the purpose of this hearing is

21 to determine what is the appropriate remedy, if there is, in

22 fact, cause, a finding of cause.  We're not using this to

23 show cause.  We're using this to demonstrate what the

24 appropriate remedy is.  And as our questioning unfolds, it

25 will become clear why this goes to the inadequacy of the

6 (Pages 18 - 21)

Page 22

1 proposed remedy in the debtor's new plan of simply
2 appointing an estate representative. It will become clear.
3 We're just trying to -- we're anticipating other objections,
4 so trying to lay some foundation here for what she knows,
5 how she knows it, and what the context leading up to the
6 evidence that we're getting to will be.
7       THE COURT: Okay. So I'm going to overrule the
8 relevance based on the fact that, first, the proposal is for
9 this witness to lay some foundation. Secondly, I never
10 closed the hearing. We're here on a motion to dismiss or
11 convert, and part of the statute allows me to consider
12 unusual circumstances. I'm going to consider from the
13 moment we had our first hearing, where I got an introduction
14 from all the parties regarding the motion to convert or
15 dismiss all the way through the end to consider all the
16 elements that are in the statute. So this is one big, long
17 hearing. It's not parsed out into two separate.
18       MR. VERSTANDIG: Thank you, Your Honor.
19       MS. TANABE: Thank you, Your Honor. That's
20 helpful. I'm just going to look at my notes to see where I
21 was. One moment.
22 BY MS. TANABE:
23 Q   Okay. I think, Ms. Harless, I was asking why was this
24 sent, or what do you recall about why this was dispersed to
25 an account at a bank other than Red River?

Page 23

1 A   By looking at the dates, March 11th, The Ruins account
2 wasn't open until March 17th of 2022. So construction is a
3 timely -- timeliness is important. There would have been
4 contractors waiting to get payment. So to help with the
5 overall situation, to help the customer, we would have wired
6 the money to get the money in his hands faster, to pay his
7 contractors faster, so if that answers your question.
8 Q   So there were special circumstances that allowed this
9 to be dispersed to an account other than The Ruins account?
10 A   Correct. And with Craig Development, Craig Properties,
11 they're all controlled by the same equity or owner. It
12 wouldn't be unusual, from my experience in banking, dealing
13 with many, many, many commercial customers, it's not unusual
14 that we would wire to a complimentary account like that
15 (indiscernible) The Ruins.
16       MS. TANABE: Okay. On the right side of the
17 screen, Sharon, could we scroll down to Exhibit C-2? I
18 believe that starts at Page 18 of 50 in the PDF.
19       THE COURT: I think she's looking at 18 of the
20 court's stamping on the top and not the actual PDF itself.
21       MS. TANABE: Correct. So I think it's a little
22 hard to see. It overlaps at the top. So it would be 84-1,
23 Exhibit C-2.
24       MR. HUSHKA: Twenty-six, I think.
25       MS. TANABE: There we go. Thank you.

Page 24

1 BY MS. TANABE:
2 Q   And Danielle, do you recognize these two documents?
3 A   Those would be internal tickets of ours.
4 Q   Okay, and are those internal tickets related to the
5 second disbursement for The Ruins notes, the first Ruins
6 note?
7 A   Yes. They would have been related to Draw 7 on the
8 first Ruins note. The bottom ticket is the loan debit. So
9 that would be the loan advance. That would be what creates
10 the disbursement. And then the top ticket would be the
11 credit, a checking account credit. And that moved the funds
12 in full to the Red River State Bank Ruins account.
13 Q   And what date did this transaction happen on?
14 A   3/23 of '22.
15 Q   And what dollar amount was involved?
16 A   $181,947.80.
17 Q   And this was deposited to Red River?
18 A   Yes. This is a set of internal transactions. So it's
19 going from a loan internally to a checking account
20 internally.
21 Q   And does that information on these documents in Exhibit
22 C-2 match the information about this draw on the left side
23 of the screen in Docket Number 177?
24 A   It does match.
25 Q   Thank you.

Page 25

1       MS. TANABE: Sharon, could you scroll down to
2 Exhibit C-3 on the right side? Thank you.
3 BY MS. TANABE:
4 Q   And do you recognize these documents, Danielle?
5 A   Yep. Similar to before, the bottom one is the loan
6 disbursement, the debit creating the money and then off of
7 Draw 8 and depositing it in the Red River State Bank
8 checking account for he same sum for The Ruins.
9 Q   So you said these are deposit slips for Draw 8 or the
10 third disbursement on the first Ruins note?
11 A   Correct.
12 Q   And does the information on the right-hand side of the
13 screen match the information in the table on the left side
14 of your screen?
15 A   It does match.
16 Q   And that's for the Draw Number 8, you said?
17 A   Draw 8, correct.
18 Q   Thank you.
19       MS. TANABE: Sharon, could you scroll to C-4,
20 please, on the right side?
21 BY MS. TANABE:
22 Q   Danielle, do you recognize these documents?
23 A   Yep. The bottom is the loan disbursement. And then
24 the top is the checking account credit into The Ruins
25 account for $1,478,434.10 for Draw 9.

7 (Pages 22 - 25)

Page 26

1  Q   For Draw Number 9.  And what's this dated?

2  A   The stated amount?  If I misspoke --

3  Q   Sorry.  My question wasn't clear.  What's the date of

4  the transaction in the slips, the internal Red River slips

5  that are on the right-hand side of your screen?

6  A   May 10th of 2022.

7  Q   Does the information in these slips match the

8  information in the table on your left for May 10, 2022?

9  A   It does.

10  Q   Thank you.

11      MS. TANABE:  Sharon, could you keep these two

12  open?  But I'd like -- nope, sorry.  On the right-hand side,

13  I'd like to replace 84-1 with 85-1.  And can you scroll down

14  to Exhibit G?  I think that's in the blue marking at the top

15  of the page.  You'll see Page 19 of 19.  There we go.  Thank

16  you.  Is it possible to zoom in on the right?  Thank you.

17  BY MS. TANABE:

18  Q   Okay.  Do you recognize this document, Danielle?

19  A   Yes.

20  Q   Which of The Ruins notes is this table for?

21  A   The second Ruins note.

22      MS. TANABE:  I'm sorry.  Actually, I think I

23  missed something.  Could you go back to exhibit, or sorry,

24  Document Number 84-1 on the right?  I think we need Exhibit

25  C-5.  Thank you.

Page 27

1  BY MS. TANABE:

2  Q   Do you recognize these documents, Danielle?

3  A   In C-5?

4  Q   Yes.

5  A   Yes.  The bottom is a loan disbursement off the loan

6  and the debit created, then being credited into the checking

7  account deposit above at the Red River State Bank Ruins

8  account in an amount of $852,095.36 on June 10th, June 10th

9  of 2022.

10  Q   And does the information in the deposit slips on your

11  right side or the transaction slips on the right side of

12  your screen match the information for the line dated June

13  10, 2022, on the left side of your screen?

14  A   It matches the line for Draw 10 for the first Ruins

15  note.

16  Q   Okay.  Thank you.

17      MS. TANABE:  All right.  So now I think, Sharon,

18  we could move to Document 85-1, Exhibit G.

19  BY MS. TANABE:

20  Q   Okay.  Do you recognize the document on the right-hand

21  side of your screen?

22  A   Yes.  It's the second Ruins note.  It's a payment

23  history.

24  Q   Which of The Ruins notes is this for?

25  A   The second Ruins note.

Page 28

1  Q   And how many loan disbursements does this table show

2  were made for the second Ruins note?

3  A   How many disbursements were made in total?

4  Q   Yes.  How many loan disbursements from Red River State

5  Bank were made for the second Ruins note in this table?

6  A   Three.

7  Q   And does the table indicate which draws were made under

8  the second Ruins note?

9  A   Eleven, 12 and 13 is the first three lines.

10  Q   And what are the dates and amounts associated with

11  Ruins Draw Number 11?

12  A   Ruins Draw Number 11 was done on August 1st of 2022, in

13  an amount of $1,268,944.90.

14  Q   And what is the date and amount associated with Draw

15  Number 12?

16  A   Draw 12 was done on August 16th of 2022, in an amount

17  of $1,312,454.31.

18  Q   And what are the -- what's the amount associated with

19  Ruins Draw Number 13?

20  A   The amount for Draw 13 is $158,679 on August 31st of

21  2022.

22  Q   Okay, and does that match -- the Draw Numbers 11, 12

23  and 13 match the table on the left side of your screen?

24  A   Yes, it does.

25      MS. TANABE:  Okay.  Let's go to Exhibit Number C

Page 29

1  in 85-1.  I think I should be page -- it should say Page 5

2  of 19 on the top.  There we go.

3  BY MS. TANABE:

4  Q   Do you recognize this document, Danielle?

5  A   Yep, those are internal tickets.

6  Q   And which draw -- are these deposit slips for Draw

7  Number 11?

8  A   The bottom is a loan debit, which then creates the

9  offset for the checking account deposit for Draw 11 into The

10  Ruins checking account at Red River State Bank in an amount

11  of $1,268,944.90 on August 2nd of 2022.

12  Q   Thank you.  And does the information on the documents

13  on the right side of your screen match the information about

14  drought Draw Number 11 on the left side of your screen?

15  A   It does.

16      MS. TANABE:  All right, and Sharon, could you go

17  to Exhibit D?  There we go.

18  BY MS. TANABE:

19  Q   Do you recognize this document?

20  A   That's a checking account statement at Red River State

21  Bank.

22  Q   Okay, and what's the time period on this statement?

23  A   Essentially it's August, but it'd be July 29th of '22

24  to August 31st of 2022.

25  Q   And if we scroll to the middle of this page where it

8 (Pages 26 - 29)

Page 30

1 says account credit transactions, does this document confirm
2 that Draw Number 11 was deposited into this account?
3 A   Yep, on August -- so underneath the header account
4 credit transactions in the middle, the first line item is on
5 8/2 and that matches what's in the table.
6 Q   And does it confirm that Draw Number 12 was also
7 deposited into The Ruins account at Red River State Bank?
8 A   Yep, it's the second line.  That's Draw Number 12 on
9 8/16.
10 Q   What's the date and amount?
11 A   The 8/16 of 2022, for $1,322,454.31.
12 Q   And does the information on this document about Draws
13 number 11 and 12 match the table of disbursements on the
14 left-hand side of your screen?
15 A   It does match.
16 Q   Thank you.  Let's stay on this for a moment.  Does this
17 document also confirm the date and amount of Draw Number 13?
18 A   Yes, it does.  Line 3 matches what's in the table done
19 on August 31st of 2022, $158,679 for Draw 13.
20 Q   And that information on the document on the right
21 matches the information in the table on the left about Draw
22 Number 13?
23 A   Correct.
24 Q   Thank you.
25     MS. TANABE:  Let's see.  Sharon, could you open --

Page 31

1 replace 85-1 with 86-1, please?  Scroll to Exhibit C please,
2 on the right-hand side.  Thank you.
3 BY MS. TANABE:
4 Q   Danielle, do you recognize this document?
5 A   Yes, it's a cashier's check.  The top is the internal
6 ticket and then the middle is a triplicate form.  The middle
7 is the credit or the customer copy.  And then there's a
8 cashier's check at the bottom.
9 Q   And who was this check payable to?
10 A   The check was payable to Craig Development.
11 Q   And is this check related to the third Ruins note?
12 A   Yes.  This was what draw disbursement -- well, the last
13 disbursement for The Ruins property, but Draw 14, these were
14 the proceeds.
15 Q   And what's the date of the check?
16 A   The date of the check is February 17th of 2023.
17 Q   And does this match the information -- the information
18 in the check match the information in the table for Draw 14?
19 A   Yes.
20     MS. TANABE:  Okay.  Sharon, could you go to
21 Exhibit D on the right?  There we go.  Thank you.
22 BY MS. TANABE:
23 Q   Danielle, what is this document?
24 A   On the right?
25 Q   Correct.

Page 32

1 A   That was part of the subpoena documentation that came
2 back from First Community Credit Union.  I had to make sure
3 -- they don't put decimals and commas.  So I had to make
4 sure that the number -- this shows the incoming credit or
5 the deposit for the $600,000 that the cashier's check funded
6 into that deposit account.
7 Q   And so who is the depository bank on Exhibit D on the
8 right-hand side?
9 A   First Community Credit Union.  And this would be the
10 Craig Development account.
11 Q   And if you compare the information in the document on
12 the right, does it match the information about Draw 14 in
13 the table on the left?
14 A   It does.
15 Q   Thank you.  Okay, I'm going to go -- just focus your
16 attention now on the left side of your screen, Danielle.
17 That's Docket Number 177.  So just to recap, for Draws 4
18 through 14 on The Ruins notes, what was the total amount
19 that the bank disbursed in loan disbursements for The Ruins
20 project?
21 A   So for Draws 4 through 14, the total amount was
22 $11,090,000.01.
23 Q   Thank you.
24     MS. TANABE:  Okay.  Sharon, I'm going to close the
25 document on the right and the left and replace them both

Page 33

1 with ECF 141, please.  Go to Exhibit 14.  Oh, sorry.  It's
2 actually The Ruins term sheet and I think the numbering on
3 ECF is a little bit off.  Could you go back one screen?  Do
4 you see what's -- it's Hyperlink 15 for Exhibit 14, Ruins
5 term sheet.  And you can close the left side of the screen.
6 So we'll just have ECF 141.  Thank you.  Danielle -- can we
7 scroll slowly through this, Sharon?  Thank you.
8 BY MS. TANABE:
9 Q   Danielle, do you recognize this document?
10 A   Yes.  This is the term sheet for The Ruins project.
11 Q   And if we scroll up a little bit, is there a date on
12 this document?
13 A   January 26th of 2021.
14 Q   And in your professional experience, is a term sheet
15 like this meant to be a binding agreement?
16 A   No.
17 Q   Between the bank and its customer?
18 A   No.  A term sheet --
19     MR. VERSTANDIG:  Objection.  Sorry, I was a little
20 slow getting off mute.  I meant to do that a second earlier.
21 Objection, calls for an expert opinion and calls for
22 speculation.
23     MS. TANABE:  I'd be happy to rephrase the
24 question.
25     THE COURT:  Okay.  Then I'll sustain and you can

9 (Pages 30 - 33)

Page 34

1  try again.
2      MS. TANABE:  Okay.  Thank you.
3  BY MS. TANABE:
4  Q   Danielle, for your bank and your internal practices,
5  would you have intended this document to be a binding
6  agreement with your customer?
7      MR. VERSTANDIG:  Objection, calls for a legal
8  conclusion, unless it's expressly limited to intent.
9      MS. TANABE:  I am asking what the bank's internal
10  practice, what's customary for the bank.  I'm getting to
11  what was intended by the parties.
12      THE COURT:  I'm just going to invite you to
13  rephrase so that the witness knows exactly what you're
14  asking and so do I.
15      MS. TANABE:  Very good.  I'll do that.
16  BY MS. TANABE:
17  Q   Danielle, are you familiar with this document?
18  A   Yes.
19  Q   And what's the purpose of this document?
20  A   The purpose of this document is it's meant in a
21  nonbinding way to communicate between two different parties,
22  the creditor, which would be the bank, and a potential
23  customer, generalized terms to make sure that everybody is
24  on the same page for terms and conditions that are
25  acceptable.

Page 35

1      For instance, as a bank, if a customer is not going to
2  be okay with 25 percent down, I don't want to go through the
3  process of underwriting them completely and losing two weeks
4  of my life to then have it fall through.  And likewise on
5  the customer, they don't want to waste time because time is
6  of the essence.  So it's a way, in a nonbinding way, to get
7  banks and customers on the same page for terms and
8  conditions.
9  Q   Thank you.  So would it be fair to say that it
10  represents an understanding?  I know you said nonbinding,
11  but it represents an understanding of kind of what the
12  general terms of the transaction will be in formal loan
13  documentation later.
14  A   Yep.  So a term sheet like this would be replaced by
15  loan documentation.  And this is just a snapshot in time.
16  So these details would have been a snapshot in time as of
17  that time.  And so things morph over time.  Nothing's ever
18  perfect.  Conditions change.  Does that answer your
19  question?
20  Q   Thank you.  It does.  So as of January 26, 2021, what
21  was the contemplated interest rate?  Well, let me ask a
22  different question first.  I'm sorry.  As of January 26,
23  2021, what did the parties mean or what does -- what was
24  intended by construction phase versus permanent phase in
25  this document?

Page 36

1  A   So typically in commercial real estate, you have a
2  construction phase and then you have a permanent phase.  And
3  the construction meaning, like it says, it's the
4  construction of the project.  It's to get the project like
5  stabilized out and established time periods.  There's
6  different ways to skin a cat on these things.  So this is
7  just an example of one way, but -- and then the permanent
8  phase is when the loan is actually amortizing principal and
9  interest.
10      So that's when the project's done and stabilized out
11  and there's payments being made.  So it's two different
12  views because there's a life cycle that any new development
13  has to go through.  And so you've got to look at every phase
14  and make sure what is being done is appropriate and works
15  and is feasible.
16  Q   So at this stage, what was proposed?  How did the
17  parties propose to calculate the interest rate during the
18  construction phase?
19  A   So just reading the document here in front of us, it
20  was meant to be at a variable interest rate referencing Wall
21  Street Journal prime rate, which -- and then plus a risk
22  factor or a variance of 1.1 percent.
23  Q   And so what is the number in parentheses next to it?
24  A   That would have been -- so prime at that time would
25  have been 3.25 percent.  So 3.25 plus 1.15 equals 4.35.

Page 37

1  Q   So 4.35 was just the variable rate at that snapshot
2  moment in time?
3  A   Yeah, for illustration purposes.  It was put on there
4  for illustration purposes.
5  Q   Okay.
6  Q   So it's variable.  So it could change any day.
7  Q   And is the construction phase temporary or is this
8  meant to be replaced by the financing described in the
9  permanent phase section of the document?
10  A   Ideally, all construction should be finished, so it is
11  meant to be replaced out.  And it's meant to not be in an
12  extended time period.  It's meant to be limited to like
13  here, a draw period of 12 months with an interest-only
14  period of 18 months.
15      So it would have been a term of 18 months, as an
16  example, but it would have only been -- the loan had only
17  been advanceable for 12 months, so there would have been a
18  six-month time period.  The construction theoretically
19  should have been done, you know, in that 12 months if the
20  construction was done at the same time as the advances.
21  Q   Okay.  So the construction phase with this variable
22  rate of interest, which happened to be 4.35 percent, was
23  meant to last 18 months.  That's the interest-only period?
24  A   That was the interest-only period, correct, on the term
25  sheet.

10 (Pages 34 - 37)

Page 38

1  Q   And then it would be replaced by the permanent phase?

2  A   Correct.

3  Q   And what did the parties contemplate when they decided

4  how they would calculate the rate of interest for the

5  permanent phase of the loan?

6      MR. VERSTANDIG:  Objection, calls for speculation

7  based on the word parties.  To the extent the question is

8  what the bank contemplated, there's no objection.  But to

9  the extent it seeks speculation as to what the debtor

10 contemplated, it is unduly speculative.

11     THE COURT:  Sustained.

12     MS. TANABE:  I'd be happy to rephrase it.

13 BY MS. TANABE:

14 Q   So, based on what's written in this proposal, if I can

15 call it that, or the term sheet, what did the bank offer as

16 the interest rate for the permanent phase, the financing

17 that would replace the temporary construction phase?  How

18 did it offer to calculate the rate of interest during that

19 time period?

20 A   So it's written off of Wall Street Journal.  So it

21 would be off of prime with the same variance factor of 1.1

22 percent at the time of funding.  So it would have been 18 --

23 theoretically, it would have been 18 months after the

24 construction note would have been initiated, fixed for a 10-

25 year interval.

Page 39

1  Q   And do you happen to know what the prime rate was at

2  that point in time?  And I can be more clear.

3  A   Yeah -- what -- so it was March 11th of '22, and it'd

4  be 18 months after than.  So that'd be 9 of '23.  I believe

5  rates had gone up, Wall Street Journal had gone up.  I don't

6  know offhand.

7  Q   That's fine.  Just one moment.

8      THE COURT:  I don't want you to read the rate from

9  a research query that you are -- if that's what you're

10 intending to do, you can move with that documentation later

11 --

12     MS. TANABE:  No.  I'm looking at my notes.

13     THE COURT:  -- if you want to take judicial

14 notice.

15     MS. TANABE:  Yes.  We could ask you -- yeah, we

16 could ask you to take judicial notice of the interest rate

17 at the time.

18     THE COURT:  But I'm not going to do it based on a

19 computer inquiry that you're doing right in the middle of

20 the witness examination.  You can provide me the

21 documentation later if you'd like.

22     MS. TANABE:  Yes, I'm actually just thinking.  I

23 lost my track of my point in my notes.

24     THE COURT:  Okay.

25     MS. TANABE:  So this is my thinking face.  So here

Page 40

1  we go.

2  BY MS. TANABE:

3  Q   So we got to what the -- in the permanent phase, we

4  talked about the interest rate.  What was the -- how did the

5  parties propose to amortize this note on a long-term basis?

6  A   It was to be amortized over 20 years.

7  Q   And what was the anticipated term of the permanent

8  loan?

9  A   Ten years.

10 Q   And what did the bank indicate would be acceptable to

11 it in terms of loan-to-value ratio for this financing?

12 A   Are you referencing the conditions below for the loan-

13 to-value?

14 Q   In the term sheet, does it specify what loan-to-value

15 ratio would be acceptable to the bank?

16 A   Yes, it does.  And it's not quite as clear as what the

17 document says.  So, I mean, I can go -- if you can indulge

18 me, I can draw it out for you.

19 Q   My next question was going to be what does that

20 sentence mean?  There's a sentence.  I'll rephrase the

21 question.  The term sheet indicates that the loan-to-value

22 ratio is not to exceed 90 percent of construction cost or

23 appraisal less TIF, whichever is lower.  What does that

24 sentence mean to you?

25 A   So there's two different factors and it's the lesser of

Page 41

1  the two.  So the loan-to-value is not to exceed 90 percent

2  of the construction.  So that's one analysis.  Or the

3  appraisal less the TIF because the TIF value's been

4  assigned.  So you determine those two factors.  However,

5  there is a reference to the REDI program above which brings

6  in another factor.

7  Q   So the phrase less the TIF has a meaning to you?

8  A   Yes.

9  Q   And does it mean that the TIF is no longer part of the

10 building?  Or what does it mean to you?

11 A   Less the TIF because the TIF doesn't add value to the

12 property.  It's not an asset to the property.  The property

13 doesn't own those revenues anymore.  They've been assigned.

14 Q   And who have they been assigned to?

15 A   The WDC.  And then WDC is assigned a chunk.

16 Q   So when you look at the appraised value of the

17 building, you're saying the appraised value cannot include

18 the TIF, for purposes of --

19 A   Correct.  It would be improper to include the TIF.

20 Q   Okay, and an LTV, a loan-to-value ratio of 90

21 percent higher than customary or is that customary?  Or is

22 it lower than customary?

23 A   And that's what I meant --

24 Q   For this type of project.

25 A   Pardon me.  That's what I meant where it's not quite

11 (Pages 38 - 41)

Page 42

1  clear. It's not clear on the paper when you're looking at
2  this unless you understand what the REDI program is because
3  the South Dakota REDI program requires a cash injection of
4  10 percent. And so you have to factor that in, in kind of a
5  waterfall and --
6      MR. VERSTANDIG: Objection, foundation. The South
7  Dakota REDI program's a legal program that I don't believe
8  was ever utilized in connection with this project. Without
9  a foundation as to the witness's knowledge of the contours
10 of the program, this seems speculative and beyond the scope
11 of anything that has a proper foundation.
12     MS. TANABE: May I respond?
13     THE COURT: Sure.
14     MS. TANABE: The face of this document makes
15 reference to the South Dakota REDI program, number one.
16 Number two, I'm asking the witness to explain a sentence in
17 the document that seems to have some banking-type emails
18 that are maybe not obvious to the rest of us. So I'm just
19 asking her to explain her recollection about what the bank
20 might have meant when it wrote this document.
21     MR. VERSTANDIG: To be clear, the objection wasn't
22 to the question. It was to the scope of the answer. Asking
23 what the bank intended by something is one thing. Having
24 the witness delve into an explanation of a pretty
25 complicated legal program is another thing.

Page 43

1      MS. TANABE: Well --
2      THE COURT: The objection is sustained. So you
3  can start with another question.
4  BY MS. TANABE:
5  Q   What is a customary loan-to-value ratio for this type
6  of a project?
7  A   It's typical to require 25 percent down.
8  Q   And who would typically be the source of that 25
9  percent down? Would it be the bank or --
10 A   Equity or a business owner. Somebody that typically
11 has skin in the game with owning whatever the project is,
12 they're the ones typically providing the cash.
13 Q   And what's the purpose from a bank's perspective or
14 from your bank's perspective, what's the purpose of
15 requiring a particular loan-to-value ratio for a project
16 like this?
17 A   Equity provides a cushion for risk. As a bank, we're
18 margin managers basically. So we want -- we mitigate risk.
19 And one of the ways that we mitigate risk is by having the
20 customer have skin in the game. It allows -- there's
21 fluctuations in market, there's things that happen. And
22 equity provides that cushion for all parties involved, one
23 to provide a little wiggle room if the bank would need to
24 step in for whatever reason to assist. But it allows the
25 customer also, in addition to that risk mitigation, it also

Page 44

1  assists in making sure that the property doesn't have too
2  high of debt service, debt, basically. So as banks it's
3  cash flow first, collateral second, you know, because you
4  can't make your payments, you know, so that's kind of the
5  waterfall order for decisioning in a bank.
6  Q   Let me ask you just to clarify a couple terms you use
7  there for us non-bankers. When you say it's debt service
8  first, so right now we're talking about you said that the
9  purpose of the loan-to-value term was something to do with
10 risk management for the bank. What did you mean when you
11 said it's cash flow first and you said debt service first?
12 Can you unpack that for us?
13 A   If a customer can't repay their loan debts, they can't
14 repay, there's really -- there's no discussion about other
15 things because it doesn't cash flow. So you typically try
16 to -- the banks have several risk metrics. You've got loan-
17 to-value, you have debt service coverage and you have
18 amortization. And between those two, three or between those
19 three things, you can navigate. And there's, there's
20 standard recommendations by banks and it's just industrywide
21 for how to set certain asset types up for success. And so
22 if you have to deviate from the norm on one, typically the
23 others have to compensate. And so when I say debt service,
24 the payments are the most important, but equity is a very
25 important sister to it where you can't replace it out.

Page 45

1  Q   So can I recap what you said?
2  A   They work together.
3  Q   If the loan-to-value ratio gets higher than a customary
4  amount, what happens to the debtor's ability to make debt
5  service?
6  A   It becomes much harder if they have a higher loan-to-
7  value.
8  Q   So from your perspective as a bank, does it make the
9  risk of default higher?
10 A   Yes.
11 Q   Okay, and so you just testified that a customary loan-
12 to-value ratio for this type of property is probably like 75
13 percent. Why does this term sheet say 90 percent?
14 A   It says 90 percent because of the REDI program. The
15 REDI program would allow the bank to reduce -- it would have
16 reduced the loan-to-value inherently because of the economic
17 development program.
18 Q   So what does -- I'm going to just direct your attention
19 to the part of the agreement that says permanent phase loan
20 amount. What does the information in the parentheses there,
21 what does 50 percent participated to SD-REDI program mean?
22 Or what do you recall that would have meant?
23 A   Yep. So the REDI program still is a program that's
24 available. It's a great program, and Bank of North Dakota
25 has something. They all have something similar, North

Page 46

1   Dakota and South Dakota. But the intent is to provide loan
2   terms on -- they match. So if the project costs $10.6
3   million, REDI would require 10 percent cash. So you'd have
4   to have --
5       MR. VERSTANDIG: Objection. Your Honor, it's
6   going to be the same objection. There isn't a foundation
7   for knowledge of the REDI program. The question was what's
8   in parens. That's fine. But explaining a program created
9   under local law from someone who's not an attorney and who
10  doesn't have a foundational experience dealing with the
11  program and the intricacies thereof is beyond the permissive
12  scope.
13      MS. TANABE: I'd like to respond to the
14  characterization of our witness as a person who's not
15  skilled and experienced in her field. We already explained
16  that she has a graduate degree in banking, that she's done
17  this type of lending for many years, that this is the
18  primary focus of her work. She's just testified that she
19  knows not only about the existence of this program in South
20  Dakota, but in North Dakota as well. I think it's a little
21  bit patronizing to characterize our witness as someone who's
22  not skilled in her own profession and knowledgeable about
23  the way that commercial real estate is financed in our
24  region.
25      MR. VERSTANDIG: I'm sorry, that was absolutely

Page 47

1   not the objection and that's a grotesque
2   mischaracterization. The comment was she isn't skilled and
3   experienced in the REDI program. I'm not questioning her
4   skill and experience as a banker (indiscernible).
5       MS. TANABE: And at that point you're testifying
6   (indiscernible) --
7       THE COURT: Okay. Whoa, whoa, whoa. Okay.
8   Here's the thing. The way that the testimony came out, it's
9   an explanation of the program. So the objection is
10  sustained. But the witness can testify how the REDI program
11  might affect her decision-making and how it would affect her
12  decision-making as a banker. So it's just the way that the
13  testimony came out that's objectionable. At the heart is
14  how does it affect the decision-making of a banker. She has
15  expertise in that. So I'm going to allow another question
16  and then we'll move from there.
17      MS. TANABE: Thank you, Your Honor.
18  BY MS. TANABE:
19  Q   Danielle, did you rely on the debtor obtaining 50
20  percent of the $7 million that would be loaned by -- so the
21  term sheet indicates that a total of $7.2 million would be
22  loaned to The Ruins project. Did you intend for 50 percent
23  of that loan to be provided, the loan money would be
24  provided by the South Dakota REDI program? Is that what the
25  language in the parens means?

Page 48

1   A   Oh, I turned it off because of my calculator. Sorry.
2   The bank would not have put loan-to-value not to exceed 90
3   percent of construction unless the REDI program would have
4   been included. And the reason is because the REDI program
5   requires that cash injection which inherently reduces the
6   overall loan-to-value down to acceptable loan-to-value
7   limits. So I hand calculated it would have brought us down
8   to 66 percent.
9   Q   Loan-to-value ratio? And when you say 66, you mean 66
10  percent loan-to-value ratio if South Dakota REDI program had
11  been used?
12  A   Yep, and I can just follow my math. You know, It'd be
13  the 10.6 construction cost minus the million cash gets you
14  to $9.5 million, less the TIF because that's -- that would
15  have been -- and then that gets you to $7.3 million amount
16  that would then been split 50/50 between Red River and REDI.
17  So the loan at Red River would have been 3.6 percent. No,
18  sorry. The loan at Red Eiver would have been $3.6 million.
19  And REDI would have had the same and would have been a
20  shared first. So if you add this, if you take the 7.3
21  divided by the appraised amount of $11,140,000, that gets
22  you to that 66 percent loan-to-value, so.
23  Q   And was the South Dakota REDI program used in this, for
24  this loan or for this project?
25  A   No, it wasn't.

Page 49

1   Q   And so not using the South Dakota REDI program, would
2   that be a material change in risk from your perspective as a
3   banker?
4   A   Yes, it would have been.
5   Q   Okay. Were you present when Charles Aarestad testified
6   on November 3, 2025, in this proceeding?
7   A   Yes, I was.
8   Q   Do you recall that Charles originally testified that
9   the total cost of The Ruins project was estimated to be
10  $10,691,893?
11  A   Yes, I was.
12  Q   Do you agree with that number?
13  A   I do.
14  Q   That's your recollection about what the project was
15  supposed to cost?
16  A   From the documents that I reviewed from the beginning
17  of the process, and granted it's been difficult because
18  there has been lots of customer-provided arts and crafts, so
19  determining what's real and what's not from a banker's
20  perspective is very difficult.
21  Q   And so originally --
22      MR. VERSTANDIG: Objection to arts and crafts.
23      THE COURT: Sorry?
24      MR. VERSTANDIG: I said I think I object to the
25  characterization of arts and crafts. But noted for the

13 (Pages 46 - 49)

Page 50

1  record.

2        MS. TANABE:  I can ask a different question.

3        THE COURT:  Right, except for she's already

4  testified arts and crafts.  So I would like an explanation

5  of what that is.

6        But I'm going to allow you to ask a question, Ms.

7  Tanabe.

8        MS. TANABE:  Thank you.

9  BY MS. TANABE:

10  Q    You just used the phrase arts and crafts.  You said

11  there's been arts and crafts in this matter.  What did you

12  mean by that?

13  A    Typically when I look at a loan file, banking is an

14  integrity-based system.  Typically there's one version of

15  things in the file and when comparing the documentation

16  provided by the customer compared to the subpoenaed

17  documents, they don't match.  And it's difficult to

18  ascertain what was reality when there's varying versions of

19  reality from the subpoenas was provided from the customer.

20  So that's what I mean by that.

21  Q    And when you say the documents don't match, what do you

22  mean about the customer-provided documents?  Are you saying

23  that the customer-provided documents are different than the

24  subpoenaed documents from banks and other financial

25  institutions?

Page 51

1  A    The customer -- for instance, when trying to come up

2  with a value for the property, when the floor plan changes,

3  the property value changes.  So when I'm looking at an

4  appraisal from 2021 or 2022, and it has the wrong square

5  footage because the customer provided the wrong square

6  footage, the appraiser can't get the number right.  So there

7  are certain benchmark numbers that as a banker we use that

8  are very foundational, that go into other decision-making.

9  And when the information that we're provided is not correct,

10  it makes my job very hard for what is reality, if that

11  explains it.

12        MS. TANABE:  Your Honor, Would you like me to ask

13  any other clarifying questions?

14        THE COURT:  No, no, because there was an

15  objection.  Thank you.

16        MS. TANABE:  Okay.  Thank you.

17  BY MS. TANABE:

18  Q    I think we had just established what the proposed cost

19  of the building was and what Red River had proposed it would

20  loan.  So I'm just trying to pick up now.  All right.  So

21  Charles testified that the original cost of the project was

22  $10,691,893, correct?

23  A    Correct.

24  Q    And you agree?

25  A    Yes.

Page 52

1  Q    And originally, how much did Red River propose that it

2  would loan to the debtor to construct The Ruins project?

3  A    $7.2 million.

4  Q    And when the permanent financing went into place, if

5  the South Dakota REDI program had been used, how much would

6  Red River effectively have loaned to the debtor?

7  A    Say that one more time.

8  Q    If the South Dakota REDI program had been used in the

9  permanent phase, how much would Red River have loaned to the

10  debtor in the permanent phase --

11  A    3.67 --

12  Q    Say that again.

13  A    $3,670,000.  I'm rounding.

14  Q    Thank you, and the bank -- you previously testified

15  that the bank actually loaned over $11 million; is that

16  correct?

17  A    Correct.

18  Q    Was it $11,090,000?

19  A    Yep, $11,090,000.01, I think.

20  Q    So how much money did the WDC provide to the project in

21  addition to what Red River provided?

22  A    I believe it's $2.2 million.  I'm rounding.

23  Q    So if the bank was originally supposed to loan $7.2

24  million and WDC loaned $2.2 million, how much would the

25  debtor have had to build the building?

Page 53

1  A    Between the bank and WDC, they would have had $9.4

2  million.

3  Q    So that's not enough to build the original projected

4  cost of the building, correct?

5  A    No.

6  Q    So why didn't the bank agree to just loan as much money

7  was needed to build the building or finish the building?

8  A    As we previously talked, equity typically comes in, so

9  a down payment.

10  Q    And did that happen in this case?

11  A    No, it didn't.

12  Q    Okay.  Did the bank make loans for similar projects

13  during the same period of time as The Ruins?

14  A    Parkside and Generations in Watertown, South Dakota.

15  Q    Did you have other multifamily commercial construction

16  in that same time period?

17  A    As?

18  Q    Did you have -- I'm sorry, I'll rephrase the question.

19  I think my question was inartful.  Did the bank make other

20  commercial real estate loans and construction loans during

21  the same time period as The Ruins notes?

22  A    Specifically to?

23  Q    Commercial real estate.

24  A    Across the bank or -- yes.

25  Q    Just other loans.

14 (Pages 50 - 53)

Page 54

1  A   Oh, yeah.  All the time.

2  Q   To other customers.  And did you see other -- is this

3  atypical or typical for your customers during this time

4  period?  The Ruins loan performance?

5  A   Which people -- related --

6  Q   I'll rephrase the question.

7  A   Yeah.

8  Q   Did you have other commercial real estate loans with

9  similar problems in terms of costing more, not being

10 finished, the things you've testified about for The Ruins

11 projects?  Were other projects having the same problems, the

12 same extent, during the same period?

13 A   There was a -- that's difficult because every situation

14 is a little bit different and unique.  Every loan done is a

15 little bit unique.  I'm biased a little bit because I get

16 involved in problem solving.  So, you know, I hear -- I get

17 involved in the worst ones.  All the ones that go smoothly I

18 don't hear about because I don't have to provide coaching

19 and guidance.  So I'm a little bit biased on answering that.

20     Most -- I mean, there was pain and this would have been

21 -- there's been pain recently related to inflation and

22 depending on the customer and their expertise with dealing

23 with that volatility, in the last five years of my banking

24 career, we've had more -- we've had an uptick in customers

25 having a little bit of -- we call it stress.  It's not

Page 55

1  stress, stress in meaning like it's fixable, but it's

2  stress, so you've just got to kind of modify and adjust.

3     The Ruins situation is in a league of its own.  I've

4  never seen anything like this ever.  So they're not

5  comparable at all.  But there is -- I mean, the reality is,

6  I mean, there has been inflation, there has been time frames

7  as pipelines for different products and services.  Things

8  aren't back to normal quite yet, if that makes any sense.

9  Q   Thank you.  And with the benefit of hindsight, why do

10 you think the bank loaned so much more than what was in the

11 original proposal?

12 A   The customer kept coming back saying he needed more

13 money.

14 Q   And did you have the same experience with other

15 customers during that time period?

16 A   Not to that extent, no.  It's very rare.  And maybe

17 this is just a Midwest pride thing because it's where our

18 customer base is.  People don't like admitting that they --

19 they don't like asking for help.  So when you sit down and

20 create a budget and get down to the nitty-gritty on

21 establishing, you know, the parameters for a successful

22 product, project, loan, customers don't like coming to us

23 saying, I need more money.  So they typically dip in their

24 own pockets for equity cash.  So it's unusual for the

25 customer to come back to us to ask for more money.  As a

Page 56

1  general, that's very unusual.  Outside of death, divorce,

2  things that are just totally like, you know, when your wife

3  gets cancer, you know, you have $100,000 in, you know,

4  unknown expenses, you can't budget for that.  You know,

5  those are the types of things where customers would come to

6  us.  Things that are manageable and in their control, those

7  customers, they go to their equity, their own cash, and they

8  typically solve the problem themselves.  And the bank

9  doesn't even get involved.

10     MS. TANABE:  Thank you.  And I'm just being

11 mindful of time.  I think the court had said we need a

12 recess in 10 minutes from now; is that correct?

13     THE COURT:  Oh, thank you for watching, because I

14 sure wasn't.  Yeah.  So we can go another five minutes, but

15 if you're at a point where you think it'd be helpful to

16 stop, it's up to you.  I'll defer.

17     MS. TANABE:  I think I only have one more

18 question.  And then it would be a natural breaking point.

19     THE COURT:  Great.  Perfect.

20 BY MS. TANABE:

21 Q   So you had previously mentioned that when there are

22 shortfalls that or when the loans are not sufficient to

23 build, it's not 100 percent of the cost of construction,

24 that equity or owners would tend to contribute money to the

25 project.  And now you've testified that you kept loaning,

Page 57

1  that additional loans were made even when it went beyond

2  what the bank had originally proposed it would do.  Did you

3  ever just ask Mr. Craig to use his own cash or make a

4  capital contribution to The Ruins to finish the building,

5  instead of the bank making additional loans to finish the

6  building?  What do you recall about that?

7  A   Yeah, so there was.  I did.  So after the second Ruins

8  note, but before the third Ruins note, Jesse Craig came

9  to Red River asking for another $1.5 million to finish the

10 project.  And going off my experience, it's highly

11 irregular.  The whole situation, it wasn't sitting well in

12 my gut at that time.

13     I had referenced a personal financial statement

14 submitted in December of 2022, and it showed that he had $2

15 million in cash.  And so that seems reasonable for what I

16 knew about -- what I then knew about the customer.  And so

17 customer comes in saying, I'm short again.  So we had done a

18 loan for $7.75 million for the first Ruins note.  He came in

19 a time period after that and said, you know, I need $2.75

20 million more.  And then he came back the third time for

21 another 1.5.  That's what he was asking.  And knowing the

22 cash on hand and the request, it didn't make sense.

23     So customers don't come to banks when they have cash

24 because in this situation, it would have been appropriate

25 for the customer to use their equity into the project.  So I

15 (Pages 54 - 57)

Page 58

1  had asked Jesse Craig in my office that, well, I don't
2  understand why you need this.  Your personal financial
3  statement from like a month or two prior says you have $2
4  million in cash.  You should be utilizing your cash to
5  finish the property.  That would be -- and he got -- and it
6  stands out in my mind because there's -- we're a bank.
7  Things are very quiet, very calm.  Things, you know, are
8  very controlled.  We've got processes for everything.
9      And he got upset, raised his voice and said, you will
10  be hearing from my attorney.  And it was like a light switch
11  flipped.  And so I'm just asking, why aren't you using your
12  cash?  Because that would be appropriate.  And he got angry
13  with me.  And so then I had to calm the customer down.
14  Like, I don't understand why.  Can you just explain why?
15  Because it's not making sense.  And I had to double down a
16  couple times on that.  And he finally calmed down.
17      But I remember thinking at the time, highly unusual.
18  When a customer is applying for a loan, they don't typically
19  threaten to sue you just because you're asking why you're
20  not putting your own equity into something.  It is very
21  irregular.  I've never had a customer do that, ever.  I've
22  had customers get upset because, you know, their money, you
23  know, their debit card's not working, you know, that kind of
24  stuff.  And I've just never had a situation quite like this.
25  And it really stood out in my mind.  So we did ask if he

Page 59

1  would put money into it.
2      MS. TANABE:  Thank you.  I think that's the
3  promised five minutes, Your Honor.
4      THE COURT:  Great.  Right on the money.  Okay.  So
5  let's take a short recess while I handle another matter.
6  And I'm guessing we'll resume -- maybe be prepared to resume
7  around 10:20-ish.  So okay, so this particular matter stands
8  in recess.  And I'll be back.
9      (Off the record.)
10      THE COURT:  All right.  We're back on the record
11  with Bankruptcy Case Number 24-30004.
12      And when we broke -- well, I'm not really sure if
13  you're done with direct examination.  So Ms. Tanabe, you may
14  proceed.
15      MS. TANABE:  I apologize.  I meant that we were at
16  a natural break between topics as opposed to a break between
17  witnesses.  So --
18      THE COURT:  Okay.
19      MS. TANABE:  Thank you.
20  BY MS. TANABE:
21  Q   All right.  Danielle, I'd like to ask you some more
22  questions about other terms of The Ruins loans.  We've
23  talked a lot about payment terms and risk management terms,
24  financial terms.  But I want to ask you about some
25  nonpayment-related terms.  So to your knowledge, do you

Page 60

1  recall ever telling The Ruins or anyone at the bank
2  authorizing The Ruins to use loan proceeds for anything
3  other than The Ruins project?
4  A   No.
5  Q   And has the bank made other business loans to Mr.
6  Craig?
7  A   Parkside and Generations were two properties that we
8  financed also.
9  Q   And have you ever made loans to Mr. Craig that were
10  specifically for his personal use?
11  A   We did a $2 million loan on his lake home.  Red River
12  State Bank did.
13  Q   And to your knowledge, does The Ruins own any portion
14  of that lake home?
15  A   No, they are completely independent of each other, not
16  connected.
17  Q   And who currently owns that lake home that you just
18  referred to?
19  A   I believe the property ownership is in Jesse Craig's
20  name.
21  Q   So to the best of your recollection or based on your
22  knowledge of the bank's typical operations or this loan
23  specifically, if the bank has ever made loans to Mr. Craig
24  for a purpose other than The Ruins project, would those have
25  been documented in separate loan agreements?

Page 61

1  A   Say the question one more time.  It got kind of long.
2  I want to make sure I completely understood.
3  Q   So if the bank made loans to Mr. Craig for other
4  purposes, not The Ruins, would those loans have been
5  documented in different or separate loan agreements than
6  The Ruins loan agreements?
7  A   Yes.  Each loan would show where the money's going, the
8  disbursement, everything would be documented within the silo
9  of each loan.  Does that answer your question?
10  Q   It does.
11      MS. TANABE:  Sharon, can we please pull up Docket
12  Number 86 and go to Exhibit A?  I just want to pull up a
13  Ruins note and use it as an example.  Thank you.
14  BY MS. TANABE:
15  Q   If we scroll down a little bit, will there be a
16  purposes section in each loan?  Danielle, is that standard
17  in Red River loan agreements?
18  A   Yes, but typically it's not in the promissory note.
19  They would be on like the disbursement.  The first word is
20  disbursement, so disbursement summary and request, I think
21  is maybe what the document name is.
22  Q   Okay.  Let's use this exhibit for something different
23  then.  If we scroll back up to the top of this document, so
24  you had just testified that if a loan is made to a borrower
25  for a specific purpose, that you would have separate loan

16 (Pages 58 - 61)

Page 62

1  agreements if there were separate borrowers with different
2  purposes.  What do you recall about why this loan agreement
3  or this note rather has so many borrowers on it then?
4  A    So all the borrowers that are attached to this note are
5  closely held entities by Jesse Craig.  And the context of
6  this time period of this loan was done after that situation
7  in my office.  So we would have attached borrowers, these
8  borrowers from a risk mitigation standpoint.
9  Q    So you're referring to before the recess, you testified
10 that you had growing concerned or that there was something
11 irregular about the loan and that you had asked Mr. Craig to
12 put in his own money into the project.  Was that a factor in
13 why he is listed as a borrower on this note?
14 A    That would be, yes.
15 Q    And is it typical to have this many borrowers on a
16 note?
17 A    No, it is not typical.  It's not typical because the
18 context of which we were -- the context of which this loan
19 request was -- the situation surrounding and the context, it
20 was very unusual with the borrower coming back multiple
21 times for money, having the altercation, if you can call it
22 that.  So this was a way to control risk.
23 Q    So what purpose would it have served to put so many
24 entities on the third note if you didn't do it on the first
25 and second Ruins notes?

Page 63

1  A    Can you rephrase that?
2  Q    So what purpose -- from your perspective as a banker,
3  what was the benefit to the bank of putting so many
4  borrowers on the third Ruins note?
5  A    What was the benefit?
6  Q    If you can't recall, that's fine.  We can move on.
7  A    I just don't know how to put it into words.
8  Q    You've testified a lot about your role at the bank
9  being one of risk management or specifically working on loan
10 files.  I think you used the word sideways.  Loans that are
11 moving sideways or projects that are moving sideways.  Is
12 that a factor in why you put multiple borrowers on this
13 note, made them principal obligors of this note?
14 A    This is just from my memory from two and a half years
15 ago, over two and a half years ago.  In lending, your gut is
16 highly accurate.  But when you -- so as a banker, we're
17 supposed to review documentation and be accurate.  And we
18 assume that the documentation that we're looking at, there's
19 integrity built in the system.  We assume that what we
20 receive is correct within a reasonable degree.  My gut was
21 saying at the time something feels off, but based on the
22 documentation that we had in the file at the time, you know,
23 the reasonable side of your brain saying it's fine, you
24 know, based on documentation, but your gut's saying
25 something different.  So this was a way, in another way of

Page 64

1  saying to control kind of like the money flow, essentially,
2  like it just -- it's a way to control, you know, the risk.
3  I don't know if that better explains it.  It's the context.
4  It makes sense.  Looking back at what I knew happened at the
5  time for why we decisioned that, things weren't making
6  sense, but we couldn't see why.  I don't know.  I'm not
7  answering the question.  I'm sorry.
8  Q    That's fine.  That's helpful.  I want to go back to --
9  I'm going to kind of go backward and see if that's helpful.
10      MS. TANABE:  Sharon, is it possible to go to
11 Exhibit B?
12 BY MS. TANABE:
13 Q    Do you recognize this document?
14 A    Yep.  This is the disbursement request and
15 authorization form.
16 Q    And which loan would this have been for?
17 A    That would have been for the third Ruins note for
18 $600,000 in February of 2023.
19 Q    And is there anything in this document that confirms
20 for you or your customer what the purpose of the loan
21 proceed is for?
22 A    Yep.  So this document --
23 Q    The loan disbursement.  Sorry.
24 A    Yep, and so the middle part of the document, so the
25 primary purpose of the loan is for business purposes, and so

Page 65

1  the borrowers, so all the entities that would be above would
2  be attesting to this document and would sign.  So if you
3  scroll down, you'll see the signatures.  But in the middle
4  it says -- you can scroll.  Sorry.  So in the middle it says
5  amount paid to borrower directly.  So this is how we're
6  disbursing $600,000 via cashier's check payable to Craig
7  Development LLC for payable to Ruins Project.  So it's
8  showing -- in banking, everything's about documentation.  So
9  it's showing the money flow in a very transparent way and
10 the purpose of having all the entities attached from a risk
11 mitigation standpoint.  So all those entities would be
12 attesting that they're going to use the funds according to
13 what's written out there.  And so if you scroll down, they
14 would all sign.
15 Q    And is -- so if this loan was intended to be used for
16 anything other than The Ruins project, would the form be
17 different?  This form confirms that it's not personal in
18 nature?
19 A    The funds are supposed to be used according to what the
20 form and the borrowers attest to.  Any deviation from that
21 is outside of what they're signing for.
22 Q    Thank you.  I'm going to ask you some questions now
23 about bank records that you've subpoenaed or you've asked
24 your counsel to subpoena in this case.  Did you instruct
25 your counsel to subpoena documents directly from banking

17 (Pages 62 - 65)

Page 66

1  institutions in this case for Mr. Craig and other insiders
2  like Craig Development, Craig Properties, Craig Holdings,
3  any of the entities listed on the third Ruins note?
4  A   Yes.
5  Q   And did I think you previously testified that FCCU,
6  that's First Community Credit Union, had provided documents
7  in response to your subpoena?
8  A   Yes, they did.
9  Q   And approximately how many pages did you receive,
10  subpoenaed documents did you receive?
11  A   Pages?
12  Q   Yeah.
13  A   There was over 25,000 pages, but -- yeah, over 25,000
14  pages.  It was a lot of documentation.  But there was 24
15  files.
16  Q   What do you mean by 24 files?  Is that 24 different
17  accounts or --
18  A   Yep, 24 different -- so the bank, when they put
19  together the subpoena request, they broke it out into 24
20  files.  And largely I reviewed the Craig Properties and the
21  Craig Development because that's where the activity largely
22  was.
23  Q   Okay.  So you personally reviewed some of the subpoena
24  documents or --
25  A   Yup.  Hours and hours of my life.

Page 67

1  Q   And in your experience as a loan officer, is it typical
2  for loan proceeds for a construction project to be
3  commingled with other projects?
4  A   No.
5      MR. VERSTANDIG:  Objection to the word commingled,
6  which calls for a legal conclusion.  No objection if a
7  synonym is used.
8      THE COURT:  I think commingle has both a legal and
9  a layperson connotation.  So I'm going to overrule.
10      MR. VERSTANDIG:  Thank you, Your Honor.
11      THE WITNESS:  It's unusual to commingle.  It's
12  irregular.
13  BY MS. TANABE:
14  Q   So you testified that you review a lot of special
15  assets related files.  Would you think of that as a red flag
16  in your experience?
17  A   That would be a red flag.  It's against best practices
18  for accounting.  Yeah.
19      MS. TANABE:  Okay.  Let's maybe go to -- Sharon,
20  could you go to ECF Number 177-1, Exhibit A?  I'm going to
21  go through this quickly.  Counsel has already stipulated to
22  this being admitted and the court has already received it.
23  BY MS. TANABE:
24  Q   So I'm going to ask you very limited questions about
25  it.

Page 68

1      MS. TANABE:  In Exhibit A, can you scroll to Page
2  2, Sharon, please?
3  BY MS. TANABE:
4  Q   Do you recognize this summary?
5  A   Yes.  It's transfers from the Red River State Bank
6  Ruins account to the FCC or First Community Credit Union
7  Craig accounts.
8  Q   And what does Craig accounts mean to you?
9  A   There primarily was two accounts at FCCU, or First
10  Community Credit Union, that funds were deposited in or move
11  to.  So it's kind of a general term for Craig Properties and
12  Craig Development.
13  Q   And so Craig Properties and Craig Development are not
14  the same as The Ruins?
15  A   No, they're separate legal entities.
16  Q   Why would -- well, how much was transferred out of The
17  Ruins account into the Craig accounts based on this summary?
18  A   Based on this summary, $3,617,312.75.
19      MS. TANABE:  Okay.  Sharon, would you scroll down
20  to Exhibit B, please?  We'll go to I think it's Page 28 at
21  the top of the page in blue.  It will be Exhibit B.  There
22  we go.
23  BY MS. TANABE:
24  Q   Is that -- okay, and do you recognize this document?
25  A   Yes.

Page 69

1      MS. TANABE:  And, Sharon, would you scroll slowly
2  through it.
3  BY MS. TANABE:
4  Q   Once you get your bearings, Danielle, can you tell me
5  what this table shows?
6  A   Yep.  These are transfers made to Jesse Craig that
7  either had an ending deposit location of either Craig
8  Development or Craig Properties.
9  Q   So this is money that would have been transferred to
10  him individually?
11  A   Correct.
12  Q   And what's the total amount of the transfers on this
13  chart?
14  A   The total amount between the two different accounts
15  made to Jesse Craig was $191,513.05.
16  Q   Thank you.
17      MS. TANABE:  And, Sharon, would you please go to
18  Exhibit C?
19  BY MS. TANABE:
20  Q   Do you recognize this?
21  A   Yep.
22  Q   This summary?
23  A   Yep.  This is a summary table for transfers made to
24  Mulinda Craig.
25  Q   And can you tell what is the time period of these

18 (Pages 66 - 69)

Page 70

1 transfers?

2 A   The time period?  So, January 12th of '22, through

3 April 18th of 2023.

4 Q   And what was the total amount transferred to Ms. Craig?

5 A   $106,597.13.

6 Q   Thank you.

7       MS. TANABE:  And let's go to Exhibit D, please.

8 Oh, there we go.  Can we just scroll through this, Sharon,

9 until Danielle indicates that she recognizes this?

10 BY MS. TANABE:

11 Q   Danielle, do you recognize this document?

12 A   Yep.  These are the transfers made to Jordan Horner.

13 Q   And who's Jordan Horner?

14 A   Jesse Craig's daughter.  And I believe she works at

15 Craig Properties.

16 Q   And what's the total dollar amount of these transfers?

17 A   $124,663.56.

18 Q   Thank you.

19       MS. TANABE:  Sharon, could we please go to Exhibit

20 E?  There we go.

21 BY MS. TANABE:

22 Q   And do you recognize this summary?

23 A   Yes.

24 Q   What does it show?

25 A   Transfers made to Sydney, Sydney Craig.

Page 71

1 Q   And who is Sydney Craig?

2 A   Another daughter of Jesse Craig.

3       MS. TANABE:  Can we scroll down to the bottom,

4 Sharon?

5 BY MS. TANABE:

6 Q   What was the total amount of these transfers?

7 A   $78,840.

8 Q   Thank you.

9       MS. TANABE:  Then Sharon, could we go to Exhibit

10 F-1?  And on the next page.  There we go.

11 BY MS. TANABE:

12 Q   Danielle, do you recognize this table?

13 A   Yes.

14 Q   And what is it?

15 A   Transfers to Craig entities.

16 Q   So with this, does Craig entities here mean just

17 projects other than The Ruins?

18 A   It would be separate legal entities that he owns.

19 Q   So, for example --

20 A   It wouldn't be part of any of the properties for

21 construction.

22 Q   So, for example, what is The Lofts?  Do you recognize

23 that?

24 A   The Lofts was a construction or a building that he

25 constructed in Watertown, South Dakota, that preceded

Page 72

1 Parkside Place.  We didn't have anything to do with it.

2       MS. TANABE:  Okay, and if you scroll down to the

3 bottom.

4 BY MS. TANABE:

5 Q   What's the total amount of these transfers?

6 A   $928,947.86.

7 Q   And I missed a question.  I wanted to ask if you know

8 or do you recognize the entity 220 West LLC that appears in

9 this table?

10 A   220 West is a property in Fargo.  It's like, maybe four

11 or five blocks to the northwest of the courthouse.  I might

12 be off by --

13 Q   So that's a property unrelated --

14 A   Yep, it's unrelated to --

15 Q   Sorry.  That's a property --

16 A   Yep, it's unrelated --

17 Q   Very good.  Thank you.

18 A   Okay.  So The Lofts --

19       MS. TANABE:  Okay.  So can we go to --

20       THE COURT:  (Indiscernible) wait until Ms. Tanabe

21 finishes her question before you begin your answer, and the

22 same thing, Ms. Tanabe has to wait until you finish.  The

23 record's unclear, and there's this little gap with video

24 conferencing.  So it takes extra patience.  So thank you.

25       MS. TANABE:  My apologies.  At the risk of boring

Page 73

1 everyone, I was trying to move up a the pace a little bit.

2 But I shall slow down now.

3 BY MS. TANABE:

4 Q   So I had asked you if you recognized 220 West LLC.  And

5 your answer was?

6 A   It's a property unrelated to The Ruins that Jesse Craig

7 has membership in in Fargo, North Dakota.

8 Q   Thank you.

9       MS. TANABE:  Can we go to Exhibit G?  There we go.

10 BY MS. TANABE:

11 Q   Do you recognize this table, Danielle?

12 A   Yes.

13 Q   And if we scroll through it, I want you to take time to

14 look at the entities on the left.  Okay.  So who do you

15 think these entities are?  Or do you recognize what this

16 table shows?

17 A   So these would have been contractors related to the

18 Craig lake home.  And the reason why I know that they're not

19 related to The Ruins, one, if you look at the address lines

20 made out to these contractors, they're in the Otter Tail

21 County area.  And these contractors also weren't listed in

22 any of the draw requests.

23 Q   And what is the significance of the Otter Tail County

24 area?

25 A   That's where the lake home is located.

19 (Pages 70 - 73)

Page 74

1  Q   And if we scroll to the bottom, what's the total amount
2  of these transfers?
3  A   $556,790.91.
4  Q   Thank you.
5      MS. TANABE:  Sharon, would you go to Exhibit H,
6  please?  Thank you.
7  BY MS. TANABE:
8  Q   And do you recognize this summary?
9  A   Yes.
10 Q   And what is the significance of the parties on the
11 left?
12 A   The significance of the parties on the left?
13 Q   Let me rephrase that.  It's kind of artful.  What does
14 this table show?  Or who are the parties on the left column?
15 A   The parties on the left-hand column are either
16 financial institutions or I see a title company in there
17 too.  So they would be financial type, industry entities.
18 Q   And based on your knowledge of The Ruins, and as your
19 customer, are you aware of whether The Ruins had bank
20 accounts at these banks that were related to the project?
21 A   Say that one more time.
22 Q   I think you testified before that you tend to review
23 the files that are in default for the bank.  In your review
24 of The Ruins matter specifically, did you come across these
25 banks?  Does The Ruins own bank accounts at these banks?

Page 75

1  A   No.  These bank names are completely independent of any
2  of the subpoena stuff that I -- we --
3  Q   So do any of these banks have an interest in The Ruins
4  property or mortgage?
5  A   No.  No, they do not.  These banks don't have any
6  connection to The Ruins from my understanding.
7  Q   So you have no reason to believe that these are
8  creditors of The Ruins?
9  A   No.
10 Q   And what's the total amount of the transfers in this
11 summary?
12 A   $912,784.33.
13 Q   Thank you.
14      MS. TANABE:  Just one more.  Can we go to Exhibit
15 I, please?  Almost there, Sharon.  There we go.
16 BY MS. TANABE:
17 Q   Do you recognize this summary?
18 A   Yes.
19 Q   And what do you think this summary shows?
20 A   These are miscellaneous transfers to entities unrelated
21 to The Ruins.
22 Q   And how do you know they're unrelated to The Ruins?
23 A   Well, they weren't any of the draw requests.  And then
24 just logically speaking, I mean, I've reviewed tax returns
25 for Jesse Craig.  I mean, Apollo Air is in his tax return.

Page 76

1  It's an aircraft share.  You can buy shares in an airplane,
2  you know, to fly around like.
3  Q   So would you characterize these as non-Ruins-related
4  expenses then?
5  A   Yes.
6  Q   And what was the total amount of these transfers?
7  A   $1,465,668.49.
8  Q   Thank you.  And so if we were to go to your
9  declaration, which is in Exhibit 177.
10      MS. TANABE:  Scroll down to Page 6.
11 BY MS. TANABE:
12 Q   What's the total amount of the transfers listed in
13 Exhibits A through I that we just walked through?
14 A   $4,365,805.33.
15 Q   And based on your review of these documents and your
16 prior testimony about the purpose of The Ruins loan
17 disbursements, do you think these were authorized uses of or
18 intended uses of Ruins loans proceeds?
19 A   No.
20 Q   Thank you.  All right.  I'm going to move on to some
21 slightly different topic now.  You've testified that you
22 were here when Charles Aarestad testified on the 3rd.  I
23 think he said that the last payment on any of The Ruins
24 notes was made in November of 2023.  Is that your
25 recollection as well?

Page 77

1  A   Correct.  And I think the payment made previous to that
2  was September of '23 on the third note.
3  Q   And before The Ruins filed for bankruptcy, how much
4  were the regular monthly payments that were due to the bank
5  for The Ruins notes?
6  A   So The Ruins notes would have -- can you -- that's a
7  multiple layer --
8  Q   How much -- yeah, how much are the under just the loan
9  documents and the promissory notes?  What are the regular
10 monthly payments for The Ruins notes?
11 A   So for the first Ruins note, there was an 18-month
12 interest-only period.  So it would have been interest only.
13 Does that answer your question?
14 Q   It does.  And what was the dollar amount that the bank
15 should have received per month on The Ruins notes?
16 A   $27,450 approximate for the first Ruins note, which
17 would be the interest only.
18 Q   And for the second Ruins note?
19 A   I don't have my decimals in the right place.  Sorry.
20 $10,541.67.
21 Q   And for the third Ruins note?
22 A   That one had a -- I don't know the payment structure
23 off of that one offhand.
24 Q   So could you estimate in the aggregate how much late
25 payments are for the three notes?

20 (Pages 74 - 77)

Page 78

1  A   You're looking for?  Just to clarify, you're looking
2  for the total payment amount?
3  Q   Per month for all three notes if the loans were
4  performing.
5  A   From recollection the third -- would we be able to pull
6  up the third Ruins note by chance, the promissory note?
7  Because then I can look at the payment stream and give you
8  an accurate answer.  Is that on --
9       MS. TANABE:  Yes.  Let's go to -- Sharon, would
10 you go to Docket Number 86?  It should be Exhibit A.  Let's
11 just see if we can refresh your recollection.
12      THE WITNESS:  So what time period are we -- are we
13 talking November of '23?
14 BY MS. TANABE:
15 Q   Just what -- I guess assuming this note was not
16 matured, what would be the monthly payment?  How much
17 interest would accrue?
18      MR. VERSTANDIG:  Objection.  One, the document
19 speaks for itself.  Two, calls for a hypothetical
20 conclusion.  The plain terms of the document state that it's
21 to be paid in four monthly payments of a very flat sum with
22 a five months following thereafter, and then different sums
23 thereafter, different dates and a balloon.  Trying to
24 project what the payment would be after the putative
25 maturity date is outside the contours of it and calls for

Page 79

1  speculation.
2       MS. TANABE:  I'm actually happy to rephrase the
3  question.
4       THE COURT:  Okay.  you would have to do that
5  anyway, because I will sustain it.  Sounds good.
6       MS. TANABE:  Yeah.  It was inartful.  My
7  apologies.
8       So just scroll up a tiny bit, Sharon, please.
9  BY MS. TANABE:
10 Q   Or maybe you can see it, Danielle, at the top of this
11 document.  What's the date of maturity date of this note?
12 A   12/30 of 2023.
13 Q   And so how much interest has accrued on the third Ruins
14 note since the petition date in this case?
15 A   Just to make sure I understood -- or just rephrase the
16 -- restate the question.  I understood the question.  I just
17 want to make sure I --
18 Q   Sure.  I think I'm asking since the debtor filed for
19 bankruptcy, how much interest has accrued on the notes, The
20 Ruins notes.  And if it helps you to do them one by one, you
21 can or you could just state the number in the aggregate, if
22 that's easier.
23 A   Well, I'll answer two ways.  Since the bankruptcy
24 petition, roughly the third Ruins note has accrued around
25 $45,000.  I'm just using annual because we're only one month

Page 80

1  off.  So, you know, it'd be $40,000 probably.  And
2  specifically because the interest accrual is $1,353.  I
3  don't know the cents, but it's $1,353 between all three
4  loans, using an 11-month time period, the interest accrual
5  since bankruptcy is $452,691.25.  So I think that's what
6  you're ultimately asking.
7  Q   Yes.  So you said $452,691 --
8  A   And 25 cents.
9  Q   -- of accrued interest on all three notes since the
10 petition date in this case.
11 A   Correct.
12 Q   And before the bankruptcy, what efforts did the bank
13 take to protect its collateral from loss?
14 A   Before bankruptcy, we had started a foreclosure lawsuit
15 in Codington County and there was an appointment of a
16 receiver to protect the assets.
17 Q   Were you personally involved in those efforts?
18 A   Yes.
19 Q   And did you review legal invoices for the bank or other
20 professional invoices for the bank?
21 A   Yes.
22 Q   Can you estimate how much the bank has spent prior to
23 filing for bankruptcy on The Ruins default?
24 A   Just using round numbers, prepetition, the bank had
25 spent around -- it was north of $100,000 in the South Dakota

Page 81

1  foreclosure.  And then since bankruptcy started, it's been
2  another 200.  So roughly it's over 300 for The Ruins --
3  Q   And is the --
4  A   Sorry.
5  Q   Sorry.  Continue.  I apologize.  On Zoom, I can't quite
6  see your face, so I wasn't sure if you were done talking.
7  So would you describe this as very time consuming for the
8  bank?
9  A   Unfortunately, yes, it's very time consuming.
10 Q   And given the time you've spent on this matter, have
11 you ever tried to analyze the risk-benefit to the bank of
12 just loaning more money to finish the building?
13 A   Yes, but in situations like this, using my professional
14 experience as a banker, giving more money is not going to
15 fix the problem because it's not going to cash flow.
16 Q   And have you hired experts to visit the project and
17 analyze the project?
18 A   Yes.
19 Q   And you've read expert reports or met with those
20 experts.
21 A   The bank, several members of the bank, myself included.
22 I've been on site at The Ruins.  I am not a construction
23 expert.  And so we've hired construction experts to give us
24 the knowledge that we need to make informed decisions.
25 Q   And just based on your walkthrough site visits, does

21 (Pages 78 - 81)

Page 82

1  the building look better, worse, the same than it did a year
2  ago?
3  A   Outside of the time frame piece, over time, my
4  perspective is the building has deteriorated.
5  Q   And I think we heard yesterday.  Were you present when
6  Josh Luther testified?
7  A   Yes.
8  Q   And he testified that the bank hired him for four
9  reports.  Do you agree with that?
10  A   Correct.
11  Q   And I think a question was asked about whether that was
12  an unusually high number of reports in a short period of
13  time for a project.  Do you recall that?
14  A   Yes.
15  Q   From your recollection, why did the bank order so many
16  appraisal reports?
17  A   The customer kept asking for money.  And the variables
18  kept changing, if that makes any sense.  So the customer
19  comes and says, I need more money.  The bank needs to
20  reassess at each time that occurs because a credit decision
21  is made each time.  And so you need updated documentation
22  each time those things occur.
23  Q   And I think there was the fourth report.  Josh Luther
24  testified that the property is currently worth less than it
25  was in his first report.  What does the bank -- does the

Page 83

1  bank have an internal process when the value of its
2  collateral has decreased, or do you have a way of
3  determining whether the value of your collateral has
4  decreased?
5  A   We're not property valuation experts, so we rely on
6  appraisers.  So when we order an appraisal, we're utilizing
7  that to make credit decisions.
8  Q   And when you reviewed those appraisals and you made
9  those credit decisions, did you determine that there was not
10  enough equity in the building to support additional lending
11  beyond the third Ruins note?
12  MR. VERSTANDIG:  Objection, leading.
13  THE COURT:  Sustained.
14  BY MS. TANABE:
15  Q   When you reviewed those appraisals and -- how did it
16  affect your determination about the creditworthiness of The
17  Ruins?
18  A   When I reviewed the appraisals?
19  Q   Correct.
20  A   So appraisals would be used to underwrite in
21  conjunction with financials provided by the borrower.  And a
22  property -- more debt does not fix -- you get to the point
23  where there's so much debt that a property doesn't cash
24  flow.  So looking at appraisals over time, we would have
25  made credit decisions at the time based on the information

Page 84

1  that we would have had in the file.  But it's -- I mean, the
2  whole situation is irregular.
3  Q   And so based on your experience and your assessment
4  about debt service, collateral value, creditworthiness,
5  however you make decisions as a bank, how confident are you
6  that giving the debtor more time and more money would cause
7  this project to be completed?
8  A   I have zero confidence that if more time or more money
9  was given that it's going to end in a positive result.  And
10  that's coming from my banking experience.  There's too much
11  debt on the property.
12  Q   Thank you.
13  MS. TANABE:  Sharon, could we pull up Docket
14  Number 181, please, and Docket 141 side by side.  Okay, and
15  I think we need the term sheet again, whis is Hyperlink 15.
16  Okay.  Then can we maybe just scroll down a little bit on
17  the left?  There we go.
18  BY MS. TANABE:
19  Q   All right.  Danielle, you've already confirmed that
20  you're familiar with the term sheet on the left.  Can you
21  tell us whether you're familiar with the document on the
22  right?
23  A   I believe I am.
24  Q   And what is that document on the right?
25  A   I believe that's the debtor's second Chapter 11

Page 85

1  reorganization plan proposal.
2  MS. TANABE:  Okay, and Sharon, on the right-hand
3  side of the screen, could you go down to Page 6.  And let's
4  scroll down to Class 1.  All right.  There we go.
5  BY MS. TANABE:
6  Q   So I'm focusing on Page 6 on the right-hand side right
7  now where it says Class 1 disputed secured claim of Red
8  River State Bank.  There's a sentence that begins with
9  whatever the allowed secure claim of RRSB may ultimately be,
10  such will be retired through the making of regular monthly
11  payments beginning on the planned commencement date based
12  on.  And then there are three little romanettes there.  With
13  the benefit of your banking experience and your knowledge of
14  amortization schedules and your handy-dandy calculator, can
15  you translate all of that text into just a monthly payment
16  for us?
17  A   I think if you scroll down, it has a monthly payment of
18  $55,207.33.
19  Q   Do you agree with that number?
20  A   Yes, based on how I read that paragraph anyway.
21  MS. TANABE:  Okay, and Sharon, can we scroll up a
22  little bit?
23  BY MS. TANABE:
24  Q   And so what amortization period does the debtor's plan
25  propose for the payment of Red River's -- the claim based on

22 (Pages 82 - 85)

Page 86

1  the three Ruins notes?
2  A   They have it based on a 30-year amortization.  So
3  that's the length of time that the payments are stretched
4  over, principal and interest at a 4.35 interest rate.
5  Q   And I've got the term sheet on the left to refresh your
6  recollection.  Did the parties ever agree to a 30-year
7  amortization of the debt on a long-term basis?
8  A   No.
9  Q   And what was originally contemplated at the beginning
10  of the deal in the term sheet?
11  A   Twenty years.
12  Q   Or proposed rather?  Twenty years?  And did the bank
13  ever propose to the debtor that it would provide permanent
14  financing at a fixed rate of 4.350 percent in the term
15  sheet?
16  A   No.  As you can see in the term sheet on the left
17  underneath permanent phase, the second line where it says
18  rate, it says at Wall Street Journal prime, which is a
19  variable.  And then there's a variance off of that.  But it
20  would be a fixed.  So the adjustable period would be 10
21  years.  But it's based on Wall Street Journal, so that's
22  variable.  It's not a fixed product.
23  Q   And what is the -- so the plan indicates on the right
24  hand of your screen that 4.350 percent was the rate agreed
25  upon by the parties at the time RRSB solicited the debtor's

Page 87

1  business.  Are you aware of a different document in which
2  the bank solicited The Ruins business?
3  A   Are you referring to is do I know if there's an
4  existence of another term sheet?
5  Q   Maybe I'll just ask you the debtor's plan indicates
6  that the parties agreed on a fixed rate of 4.35 percent at
7  the time, at the beginning of the deal, before the building
8  was built, before the loan was made.  Do you agree with that
9  statement that.
10  A   The bank at the 4.35 percent because prime would have
11  been 3.25 at the time plus the 1.1, the 110 basis point
12  variance which would get you to that 4.35.
13  Q   But that was in your memory or based on your
14  recollection or based on your review of the term sheet, you
15  can tell us what you think is the most reliable basis for
16  your opinion.  Do you agree with the statement that the bank
17  agreed to a fixed rate of 4.35 percent to solicit the
18  debtor's business?
19  A   I would look at what the promissory note says because
20  that would be the final terms of whatever the agreement
21  would have been for --
22  Q   I'm sorry.  I'm not asking the question well.  The plan
23  says that the debtor solicited the debtor's business.  So
24  this is before the loan documentation was drawn up, just at
25  the phase that the bank was soliciting the debtor as a

Page 88

1  customer.  Did the bank ever offer a fixed 4.35 percent rate
2  of interest for long-term financing?
3  A   No.
4  Q   On a 30-year amortization schedule?
5  A   No.
6  Q   Okay.  Thank you.  So if it took the debtor 12 months
7  to finish construction, find renters and stabilize The
8  Ruins, how much would the monthly plan payments -- how much
9  -- what would be the total of the monthly plan payments due
10  to Red River in that 12-month period?  Oh, I think the plan
11  says the --
12      MR. VERSTANDIG:  Objection, Your Honor.  The
13  document speaks for itself.  And there's a specific reason
14  for this objection, which is there's a defined phrase which
15  is plan payment commencement date, which is not synonymous
16  with a confirmation date or an effective date.  And I think
17  we're trying to have a lay witness read into what is
18  admittedly a somewhat complicated, not overly complicated,
19  legal document that's in evidence.
20      THE COURT:  Sustained.  The plan speaks for
21  itself.  If the bank has different expectations, you can
22  testify to that.
23      MS. TANABE:  Understood, I can ask a different
24  question.
25  BY MS. TANABE:

Page 89

1  Q   Has the debtor made any payments to the bank since the
2  bankruptcy case was started?
3  A   No, not on The Ruins.
4  Q   And would interest continue to accrue on notes or is
5  interest continuing to accrue on the notes?
6  A   Yes, interest continues to accrue.  There's a cost of
7  capital.
8  Q   And what would you estimate that cost of capital to be
9  since the petition date in this case?
10  A   It was $452,691.25, I believe.
11  Q   And is that the annual amount of interest that accrues?
12  A   That would be 11 months.  That would be as of assuming
13  through November.
14      MS. TANABE:  Okay.  So.  Let's move on to the
15  debtor's proposed treatment of Codington County, which I
16  think is on the right-hand side.  We can scroll down a bit.
17  BY MS. TANABE:
18  Q   Okay.  How much -- based on your review of just
19  deliverables from your customer, how much property tax do
20  you think The Ruins will have an obligation to pay?
21      MR. VERSTANDIG:  Objection, calls for speculation.
22      THE COURT:  Sustained.
23  BY MS. TANABE:
24  Q   In your prior review of the property tax statements for
25  the property, how much did the debtor owe per year in

23 (Pages 86 - 89)

Page 90

1 property tax?

2 A   I believe, and this is going off memory, there's two

3 years of property taxes owed unpaid.  The first year was

4 $36,000 because it was 18 per installment.  And then the

5 2024, I think was roughly around $55,000.  And that should

6 get you to the math of roughly $91,000.

7 Q   What do you mean by the math of $91,000?

8 A   Oh, in Class 3, it says the priority tax claim in

9 amount of $91,263.98.

10 Q   So that's the amount of back taxes.  I'm sorry, I must

11 have confused you by leading you to this portion of the

12 document.  Let me just rephrase the question.  You said that

13 the amount of real estate tax for The Ruins is approximately

14 $55,000 a year on an ongoing basis?

15 A   The real estate taxes are based on, and I am not a city

16 expert, but they take the value of the property times a

17 factor.  And so depending on what the value of the property

18 is, the real estate taxes theoretically could fluctuate.  So

19 if the value of the property goes up, the real estate taxes

20 go up.  But as it stands, since nothing has happened on the

21 property for any sort of a value add, you could

22 theoretically use 2020.  You could use the last set that

23 were due, which is roughly around $55,000.

24 Q   Okay.  I'm going to ask you to -- I'm going to have you

25 add up some numbers for me.  So based on the plan that's in

Page 91

1 front of you on the right, how much would the debtor have to

2 generate in cash flow to pay the bank, the mechanic

3 lienholders, the back taxes to Codington County and regular

4 taxes to Codington County under the plan?

5 MR. VERSTANDIG:  Objection.  The document speaks

6 for itself.  The laws of mathematics speak for themselves.

7 And again, we're asking a lay witness who had nothing to do

8 with the drafting of this document to interpret the

9 document.  And to be clear, counsel can argue the document

10 in closing.  It's in evidence.  There's no objection to

11 argument being premised upon it or argument being premised

12 upon the terms thereof.  But asking a lay witness to read

13 certain provisions and to do math, it doesn't add anything

14 from an evidentiary perspective to this hearing.

15 THE COURT:  I agree.  So I can certainly

16 understand why it's helpful to lead the witness and lead me

17 through some of the exhibits that the witness has prepared.

18 But I just would like to remind everyone that you have the

19 opportunity to compile all this information and make an

20 argument to me rather than having a witness testify to that

21 in advance.  So if there's something unique about this

22 witness's testimony, which has been certainly on point up

23 until now, I just would like, in the interest of time, to

24 make sure that you are not using a witness to provide

25 argument when you will have -- you will certainly have the

Page 92

1 opportunity to do that.

2 MR. HUSHKA:  Your Honor, sorry to interrupt --

3 MS. TANABE:  I was going to ask her -- go ahead,

4 Drew.

5 MR. HUSHKA:  I'm not sure if 181 is in evidence,

6 as was attested to by Mr. VerStandig.  I don't believe it at

7 the initial hearing, at the stipulation, and I don't know if

8 we've stipulated to it since.  So to the extent that the

9 court is relying on this being in evidence and being able to

10 be argued it's not in evidence at this point.

11 THE COURT:  I couldn't find it on my exhibit list

12 either.  But I don't -- I am sustaining any objection to

13 this witness testifying about that plan.  So you're right.

14 It's not in evidence.

15 MR. HUSHKA:  I just wanted to make sure my exhibit

16 notes were accurate.

17 THE COURT:  Yes.  I think they are because I

18 couldn't find it.  But Ms. Horsager, is 181 in?  I don't

19 think it is, but I'm going to make sure.

20 MR. VERSTANDIG:  I think Mr. Hushka is correct.  I

21 plan on moving it later today.

22 THE COURT:  Okay.  It is not.  So you are

23 absolutely correct.

24 MR. VERSTANDIG:  So add to my objection assumes

25 facts not in evidence.

Page 93

1 THE COURT:  Okay.  All right.

2 MS. TANABE:  I apologize.  I was -- I thought

3 there had been an agreement that it was admitted, but I

4 think at the housekeeping section of the hearing, we did not

5 cover that.

6 MR. VERSTANDIG:  To be clear, we'd be thrilled to

7 have admitted right now and save us a question later today.

8 MS. TANABE:  I think there may have been an

9 oversight.  I think there was an intention to agree that it

10 was admitted, Mac, or Mr. VerStandig.

11 THE COURT:  So are you moving for the court to

12 receive it right now, or are you just moving to a new

13 question?

14 MS. TANABE:  I would like to move for it to be

15 admitted based on the parties' agreement that it's

16 admissible.

17 MR. VERSTANDIG:  Thank you, Ms. Tanabe.  And

18 obviously no objection from the plan proponent, and it's

19 appreciated.

20 THE COURT:  Okay.  Then the court will receive the

21 second amended plan filed at Document 181.

22 (Exhibit 181 entered into evidence)

23 MS. TANABE:  And if I can respond, I think I would

24 like a chance to at least just chime in on the objection.

25 It is legally relevant under Section 1112, especially the

24 (Pages 90 - 93)

Page 94

1  unusual circumstances test that the debtor is purporting to
2  have filed a 100 percent plan.  In the case law for our
3  circuit, that is one of the most compelling examples of
4  unusual circumstances.  And so being allowed to ask
5  questions about whether this really is 100 percent plan is
6  directly relevant to the legal issues before the court.  And
7  so us -- precluding us from entering evidence about whether
8  this really is a 100 percent plan and therefore whether
9  there really are unusual circumstances in this case would be
10 a disadvantage for us.  And I think the possibility of
11 confirming a plan is also legally relevant.  And so we were
12 not trying to go on a tangent so much as to -- I'm happy to
13 say it's the debtor's burden to prove the existence of those
14 unusual circumstances.  But I was anticipating that that was
15 in fact their plan and hoping to address that.
16          THE COURT:  So let me be clear.  I was not
17 precluding you from offering any evidence.  I was sustaining
18 an objection to interpretation of the plan.  What you may
19 certainly offer, and what I suggested before is you can
20 offer the bank's perspective on what you believe the bank is
21 owed.  You can tell me the sum of money.  You can tell me
22 the sum of the payments.  All of those things frame what the
23 bank perceives that it is owed.  It's just interpreting the
24 plan is what I sustained.  So you can have the witness
25 testify about the bank's perspective, including what debt is

Page 95

1  owed, whether they think it can cash flow, all the things.
2          MS. TANABE:  Okay.  That is where in fact we were
3  going.  And so I think I will assume that I'm not going to
4  get a foundation objection then to foregoing a review of
5  what the plan payments would actually cost.
6          THE COURT:  No, that isn't what I just said.  You
7  may solicit information --
8          MS. TANABE:  No, I understand that.
9          THE COURT:  -- about the bank's perspective of
10 what it's owed.  So there isn't a nobody gets to object to
11 anything.  I certainly didn't mean to suggest that.  So
12 foundation objections could still occur if the witness
13 testifies about what the debtor said in the plan as opposed
14 to what it perceives it is owed.  I'm not -- I hope we're on
15 the same page here.
16          MS. TANABE:  I think I'm being asked to formulate
17 a question about whether a project can cash flow without
18 being allowed to put in a baseline for how much cash the
19 project needs to generate in order to have cash above and
20 beyond or at that level.  So I will try --
21          THE COURT:  No, I'm not -- no, I'm not doing that.
22 It was interpreting the plan.  Now you can -- if the witness
23 is asked to take a look at the plan and interpret it without
24 -- you can ask questions about cash flow.  It was only what
25 did the debtor say in the plan.  I can read that.  What does

Page 96

1  the bank perceive that the debtor can cash flow using all
2  the other metrics that the debtor used, of course you can do
3  that.  Same for your perspective about what the debt is
4  owed.  So I am not limiting the ability to give the bank's
5  perspective.  I am sustaining an objection to the narrow
6  question that was specifically asked at the time.
7          MS. TANABE:  I will try again.
8  BY MS. TANABE:
9  Q   So Ms. Harless, you've reviewed the debtors plan and
10 you frequently -- you've testified that you frequently
11 evaluate the cash flow of your customers.  Is it your
12 opinion as a banker, from a banker's perspective, that the
13 debtor, that The Ruins can generate enough cash flow to make
14 the payments that it has promised to make under or proposed
15 to make under the plan?
16 A   I don't believe there's enough cash flow for The Ruins
17 to be able to cash flow the payments in the plan.
18 Q   How much do you think the debtors -- have you tried to
19 calculate whether there will be a shortfall?
20 A   In cash flow?
21 Q   Yes.
22 A   Yes.  So I referenced the -- I think it was July of
23 '25, the 2025 appraisal and the appraiser included $495,000.
24 I don't know the -- $495,000 in net operating income.  So
25 that's the amount of net income that's available to make

Page 97

1  debt service.  And if you just take 495 divided by 12,
2  that's $41,250 a month in available excess cash flows to
3  apply to debt service, which is underneath -- I mean just
4  the first, the $55,000 that was proposed for our class, the
5  income is underneath just even that first, that first entry
6  into the gate.
7  Q   So how much do you think the debtor would have to
8  generate just to break even?  You can do it per month or per
9  year.
10 A   Say it one more time.
11 Q   How much cash flow would the debtor need to generate
12 just to break even on the proposed plan payments.
13 A   During the bankruptcy period?  During what period?
14 Q   If the debtor made all the payments it's promising to
15 make under the plan, not the takeout financing but after.
16 Before takeout financing and after commencement of the.  I
17 guess it's the payment commencement date.  So prior to
18 takeout financing, how much cash flow would the debtor need
19 to generate to make the monthly payments do under the plan?
20          MR. VERSTANDIG:  Either the plan speaks for itself
21 or it calls for an expert opinion.  And it's not both.  It's
22 going to be one or the other.
23          MS. TANABE:  Can I respond?
24          MR. VERSTANDIG:  Can I keep going for a second?
25          MS. TANABE:  Sure.

25 (Pages 94 - 97)

Page 98

1    MR. VERSTANDIG:  To the extent the witness is
2  being asked to interpret the payment provisions of the
3  document and simply apply the laws of mathematics, the
4  numbers contained therein, the document speaks for itself.
5  The witness has no topical expertise.  The witness doesn't
6  add anything to the colloquy.  To the extent the witness is
7  being asked to add some expertise to the colloquy, namely
8  the witness's acute knowledge of how finance works in X
9  sphere, Y industry, whatever it may be, that's the
10  solicitation of an expert opinion from someone who has not
11  been qualified, much less offered as an expert.
12    MS. TANABE:  May I respond?  Yes, please.  And
13  this is what I was trying to avoid.  And I think we're being
14  told that she's either not an expert and that people can do
15  math.  Whether the document speaks for itself, we're being
16  shut down from testifying on something that's directly
17  relevant to the legal standard in this case.  We just
18  established that she's allowed to testify from a banker's
19  perspective about whether or not the plan, cash flows.  And
20  this is just kind of repetitive interference with our
21  ability to put in evidence about something that's directly
22  relevant.
23    THE COURT:  So I assume.  I haven't looked at this
24  particular plan.  Is there a cash flow statement attached to
25  it or with it?

Page 99

1    MS. TANABE:  No.  Okay.  Which is why we have to
2  do this.
3    THE COURT:  Okay.
4    MS. TANABE:  So I'm trying to.  So the debtor.
5    THE COURT:  So I get your concern.  So it's one
6  thing for counsel to argue that the debtor is short on cash
7  flow.  It's another thing for the debtor to offer a cash
8  flow statement that shows, you know, whether the plan.  The
9  payments in the plan.  The sum of the payments in the plan.
10  So the debtor's presumably going to attach one.  The concern
11  here is whether this witness is the person to actually go
12  through and prepare cash flow.  Maybe there's foundation
13  that you want to lay for this person to go through and do
14  that which is part of the foundation.  Expert, Expert
15  witness, Foundation.  Objection.  It's another thing for the
16  witness to go through and say the sum of money that the
17  debtors have or debtor has allocated to pay the bank is
18  insufficient to meet whatever debt requirements the
19  contracts provide.  This witness is without question
20  qualified to do that.  It's possible that you could lay
21  sufficient foundation for her to be an expert in cash flow
22  and finance to give me the same answer.  But I also know
23  that you can do the Math and provide it to me in argument.
24  So if this witness has a unique expertise that you think
25  it's helpful for me to know from the bank's perspective what

Page 100

1  the debt will be and whether there are weaknesses that a
2  financial analyst or a banker could recognize in any cash
3  flow that the debtor has proposed.  I can see that, but the
4  specific foundation objection raises concerns as to the
5  particular question.  So if you want to lay more foundation,
6  that's an option, but at this particular time, I don't know,
7  other than being a banker, whether you've laid.  I don't
8  think you've laid unless you refresh my memory foundation
9  sufficient for her to be the person to do the cat.
10    MS. TANABE:  Cash flow.  Understood.  I think
11  we're in the difficult position of reviewing a plan without
12  a cash flow with wording that doesn't make it clear what the
13  debtor is really proposing to pay.
14    THE COURT:  Yes.
15    MS. TANABE:  And we're up against the debtor who
16  is purporting it's 100 cent plan, which is legally relevant
17  in this context.
18    THE COURT:  So you'll have to either argue the
19  weaknesses or have your witness highlight the weaknesses
20  that are specifically relevant to the bank.
21    MS. TANABE:  Okay.  Ms. Harless, were you present
22  when.
23    THE COURT:  I'm sorry, Were you.
24    MS. TANABE:  Oh, was I supposed to continue?  I'm
25  sorry.

Page 101

1    THE COURT:  So I want.  I Just for the record.
2  The objection is sustained.  And so now I'm going to invite
3  you to ask the next question without me interrupting.
4    MR. VERSTANDIG:  Sorry about that.
5    THE COURT:  This is tricky with this video.
6    MS. TANABE:  Thank you.  It is.  I apologize.  I
7  was unclear.
8  BY MS. TANABE:
9  Q   So, Ms. Harless, were you present when Ms. Craig
10  testified that The Ruins project as stabilized, which she
11  defined as having 5 percent vacancy or less, that it would
12  generate $60,000 per month in net cash available?  Yes, I
13  think she called it net operating income.  And.
14  A   Yes.
15  Q   And then your.  And in your opinion is that.  I could
16  ask, do you believe the plan is feasible?
17    MR. VERSTANDIG:  Objection.  Calls for a legal
18  conclusion.
19    MS. TANABE:  I'll rework.  I'm happy to rephrase
20  it.
21  BY MS. TANABE:
22  Q   Okay.  Do you believe that's enough cash to pay the
23  bank?  What?  The debtor has proposed to pay you under class
24  one of the plan.
25  A   I don't believe that's enough cash flow.  Just the

26 (Pages 98 - 101)

Page 102

1 60,000. Using this. So. 92 percent of all the net
2 operating income is going to the one class, not including
3 the other classes. I just know offhand that's not going to
4 globally cash flow.
5 Q  So do you believe that the plan would default or. I
6 mean, sorry. Do you believe that the debtor would fail to
7 make the payments and that you would end up in another
8 Default situation with The Ruins.
9 A  So when the underlying property does not have enough
10 cash flow, it typically waterfalls over to the guarantors.
11 And that's the exact situation that we're in here, is we
12 weren't getting payments. So I don't think things are going
13 to change in the future where they're going to supplement
14 any cash flows they would have already.
15 Q  Okay. So if the plan was a new loan proposal, would
16 you approve it?
17 A  No, no, not on these terms at all.
18 Q  Would the risk of payment default be acceptable or
19 unacceptable to you? As an experienced lender.
20 A  It would be well outside the risk parameters that a
21 normal bank would underwrite on.
22 Q  Okay. Thank you. I'm going to switch gears a little
23 bit now. The plan also talks about the concept of takeout
24 financing. Would it help you to look at that definition in
25 the plan or do you know what that means?

Page 103

1 A  If you could bring it up, that'd be helpful.
2 Q  It's in the definition section at the beginning of the
3 document, so we could scroll backward. They're alphabetized
4 at takeout. Oh, we just passed it. There it is. It's
5 double M there at the top of the page. Does that help to
6 remind you?
7 A  Yes.
8 Q  Okay. So. From your perspective As a Class 1 creditor
9 with a claim in excess of $11 million, how confident are you
10 that the debtor would be able to get take out financing as
11 it's described in the plan?
12 A  I don't have any confidence that based on the asset
13 value of the last appraisal using, I mean, even using
14 today's numbers compared to what the secured amount of our
15 claim is, the 11 million or even future looking, the debt is
16 going to be way in excess of what you can finance. There's
17 going to have to be a significant haircut.
18 Q  So if the bank was to end up with an unsecured
19 deficiency claim in this case, and the debtor purports to
20 have a 100 cent claim or 100 cent plan where they're going
21 to pay all claims in full, What would need to happen? Let
22 me rephrase that. Did you just testify that you're not
23 confident that would happen?
24 A  Based on the numbers, I don't see how it's possible
25 without significant, without a significant equity injection.

Page 104

1 Q  And if the plan had an equity injection, how much would
2 you be comfortable with? What would make you think that
3 takeout financing was possible and that your unsecured claim
4 would actually get paid? How much would that injection need
5 to be for you to believe that your plan, your unsecured
6 claim would be paid?
7 A  Can you rephrase that because my mind goes in two
8 different directions related to your question.
9 Q  So you've stated that you don't think the debtor's
10 financial conditions would make takeout financing likely and
11 that if you have an unsecured claim in the case, which you
12 anticipate you will, you've said that you don't think it
13 will get paid off by takeout financing. And I think you
14 started to say, but I'm not sure. So I'm asking you, do you
15 know what changes the debtor could make to the plan that
16 would make you believe the takeout financing would benefit
17 your claim or pay your claim?
18      MR. VERSTANDIG: Objection, Relevance. And to a
19 lesser degree, speculation. I think part of the question
20 sheds light on the inappropriateness of this witness for the
21 interpretation of a plan. The question is premised in part
22 upon the idea that part of the claim may be unsecured. The
23 foundation laid assumes a forward looking role of interest
24 on the totality of the bank's claim. Now, if a legal expert
25 were to opine on a Chapter 11 plan, they would note that

Page 105

1 there isn't going to be an accrual of a trespass petition on
2 the unsecured portion of a claim. But presumably, and I
3 haven't asked the witness, I don't think she'd be aware of
4 that, nor should she be aware of that, nor is that within a
5 banker's field. So we're asking a lay witness to opine on a
6 Chapter 11 plan. I think it was reasonable to ask what the
7 cash flow would need to be. It's reasonable to ask what
8 equity injection would give the bank comfort or confidence.
9 But asking what legal tweaks would be made to a legal
10 document in a hypothetical universe just seems outside the
11 normative contours of what's appropriate.
12      MS. TANABE: Should I respond?
13      THE COURT: Sure you can.
14      MS. TANABE: Yes, I'm asking her about her claim
15 and the likelihood that she perceives that her claim will be
16 paid in full by the plan.
17      THE COURT: Right. And your focus here is on
18 takeout financing. And her expertise is as a banker in
19 financing.
20      MR. VERSTANDIG: So.
21      THE COURT: In my memory the question was within
22 her area of expertise and the bank's claim. So unless I
23 missed the question, which I don't think I did, the
24 objection is overruled. Do you remember the question?
25      THE WITNESS: Could you restate it? I think I do,

Page 106

1 but.

2      THE COURT: Okay, sure.

3 BY MS. TANABE:

4 Q   Try again. Okay. That was a lot of words. So let's

5 bring us back to where we were. Do you know the value of

6 your. The current amount of your allowed claim in the case

7 and under the plan?

8 A   I believe it's 11 million 90.

9 Q   And you're aware that the debtors plan purports to pay

10 all claims in full?

11 A   Correct.

12 Q   And how confident are you that takeout financing would

13 be available to pay your claim in full?

14 A   I the prop. Just on our claim based on the 11 million

15 building in the normal equity margin, that mean. That means

16 the property would have to go up to 13,862,500 about. So

17 either that or from like a. Yeah, I have nothing further to

18 say on that. Sorry.

19 Q   Okay. So you're not confident that the billing will go

20 up in value and enough to make takeout financing pay your

21 claim in full.

22 A   When I read the plan document, including all the

23 numbers for all the different classes, it got to like 15.9

24 million. Which means if you work that backwards based on

25 the equity factor, the property would have to appreciate to

Page 107

1 22 million based on the current debt level, assuming 100

2 percent payout. That was my understanding.

3 Q   And in from your perspective as a bank, would you be

4 willing to offer that type of takeout financing for The

5 Ruins?

6 A   No, not based on the appraised value.

7 Q   Okay, and would it matter if. Would your answer change

8 if there was a capital contribution from the building owner?

9 A   Would it change from just Red River's perspective?

10 Q   Yeah. From the bank's perspective, if the building

11 doesn't go up in value, is there anything else that would

12 make you believe that the takeout financing could pay your

13 $11 million claim in full?

14 A   Sorry, you're asking the question kind of from a

15 backwards standpoint because my brain has to convert because

16 there's multiple things at play here. So just using $11

17 million. So if you're assuming the value of the property is

18 at $7,070,000 I think is -- which was the appraised amount

19 for as completed, I believe the total value of the -- I

20 don't know how to answer this in a concise way because the

21 decisioning kind of bifurcates and like you can't sometimes

22 when you're underwriting something, one invalidates the

23 other because you need both talking equity and cash flow.

24 So I'm struggling kind of mentally going through this

25 exercise. Just with which benchmark rates or which

Page 108

1 benchmark metrics are we talking about? You know, value,

2 the proper property is one of them and the net operating

3 income of the property is another. Those are two really key

4 pieces how that relates to our $11 million claim the

5 property. So a bank, when they're underwriting, they would

6 look at the property at $7,070,000 and your max loan-to-

7 value on that would be 5,302,000. So, you know, that's a 6

8 million dollar difference. That would have to.

9 Theoretically, an equity injection to bridge the difference

10 just on our amount based on. I mean, I don't know if that's

11 what you're asking.

12 Q   What was the last part you said about it? Did you say

13 equity injection? Yeah.

14 A   It'd have to be cash. Something has to bridge the gap.

15 Because if the Property's only worth 7 million, but our

16 claim's 11, the bank's going to be using the 7,070,000,

17 assuming that's what the amount on the appraisal was as

18 completed value. This is assuming takeout financing. So

19 you work it backwards because you need a 25 percent equity

20 cushion. And so if you work that backwards, that max loan

21 amount is 5.3 million. And so between 5.3 million and 11

22 million for us to be made whole, something's got to come up

23 with the difference. What's going to come up with the

24 difference? I mean, the only thing that could possibly be

25 would be a property appreciation. But going from 7 million

Page 109

1 to. I think I said 13 million to take out our claim by the

2 what, the required equity portion. Normal, based on normal

3 rates and terms and conditions. And you could make the

4 argument that bankruptcy may not be normal rates and term

5 condition type, but 25 percent. Something's got to bridge

6 the gap. You follow me?

7 Q   Okay. So you used the phrase equity injection. Can

8 you just say in simple terms what that would mean?

9 A   Cash or cash equivalents.

10 Q   And where would equity injections come from typically?

11 Or who would it come from?

12      THE COURT: Sorry?

13 A   Typically they come from the ownership group, the

14 guarantors.

15 Q   And how much did you say that equity injection would

16 have to be? I just didn't catch you.

17 A   I think it's around 6. Well, 5.3. So let me write

18 this number down. So if our secured claim amount is

19 11,090,000 and the max loan amount is 5,302,500, the net

20 difference between those two numbers is 5,787,500, which

21 would have to be some sort of an equity injection because

22 that's when you determine the 7 million as the asset value

23 for completed. You have to have a 25 percent equity

24 cushion. So that's how you get to the 5.3. So that's the

25 net difference. So something would need to bridge the gap.

28 (Pages 106 - 109)

Page 110

1  Q   Thank you. Okay. So I just want to switch gears a
2  little bit. Sharon, could you scroll up just a little bit
3  till you get to the word Tiffany? Oh, no, I'm sorry. I'm
4  sorry, I have the wrong document. Could you replace docket
5  1? We replace the left hand side of the screen with Docket
6  Number 178. I'm just going to use this to refresh a
7  recollection if needed. Let me scroll down to the
8  definition of a Tiffany.
9       MR. VERSTANDIG: Not an objection, but just a
10 comment. For the record, I want to be very clear that
11 either counsel's about to read or ask the witness to read
12 into the record something from a creditor plan three days
13 before the exclusivity date.
14      THE COURT: I think it's more than three days. I
15 think it's a month and three days. But yes, I'm concerned
16 that this is the document that's used to refresh
17 recollection when I've heard so much about Tiffany.
18 Q   Okay, we can take it down. It's fine.
19      MR. VERSTANDIG: Thank you, Your Honor.
20 Q   And okay. So are you familiar with the WDC's claim in
21 this case?
22 A   Yes.
23 Q   Okay, and are you familiar with the TIF.
24 A   Tax increment financing as it involves with rooms.
25 Q   And you heard Josh Luther testify yesterday about the

Page 111

1  TIF revenue?
2  A   Yes.
3  Q   Or the appraised value of the TIF? What's your
4  understanding of who owns the TIF revenue right now?
5  A   So the TIF revenue was assigned and it was assigned
6  from the developer to the WDC. And then the WDC assigned
7  first out portion to Red River State Bank in the amount of
8  580,000.
9  Q   So do you understand, based on your understanding, do
10 you think the bank and the WDC own the TIF? Would that be
11 fair to say?
12 A   We were assigned the revenues. So, I mean, in lay
13 terms, yeah, you could say we own those future revenues.
14 Q   Okay, and when Mr. Luther was testifying, he was asked
15 why CBRE only valued the TIF in three out of the four
16 appraisal reports. Do you know why it was only in three out
17 of the four appraisal reports?
18      MR. VERSTANDIG: Objection. Calls for
19 speculation. And is testifying as to why someone else did
20 or did not put something in their report.
21 Q   Can I respond?
22      THE COURT: Yes, you may.
23 Q   Yesterday, Mr. Luther testified that the reports were
24 ordered by the customer. The customer was the bank. I'm
25 asking her if she recalls why the bank only hired the

Page 112

1  appraiser to do it in one out of the four reports.
2       THE COURT: That question is not objectionable.
3  I'm not sure that's the question that was asked, but that.
4  Q   So I. Should I re.
5       THE COURT: Ask what she just asked?
6  Q   Current question? Yeah.
7  A   If you could repeat, that'd be wonderful.
8  Q   Okay. Why do you recall? Why now? I can't remember
9  my own question. Why did the bank only hire the appraiser
10 to appraise the TIF in one of the four reports?
11 A   So in the last report. From the bank's perspective,
12 the TIF is largely irrelevant from a. For what our exercise
13 was we were trying to value the property. And since the --
14 or since the future revenue streams had been assigned, that
15 is no longer an asset of the debtor. So for us, it didn't
16 need to be included because it was essentially irrelevant
17 from our perspective.
18 Q   Okay. Thank you. Has the bank actually received any
19 TIF revenue yet?
20 A   No, we've not received any TIF revenue.
21 Q   Okay, and I just have one more question. Or one. Just
22 a couple questions on one topic. So for housekeeping
23 purposes, I think we're nearing the end of this line of
24 questions. So do you recall yesterday that Mr. Luther
25 testified that the architectural drawings in his appraisals

Page 113

1  were provided to him? Yes, and I think he said those were
2  provided to him by the bank. Do you agree with that?
3  A   Yes, we would get the appraisals provided. No, we
4  would get the. Say that again. Making sure I'm not.
5  Q   Architectural drawings. Yeah. So he said that the
6  architectural drawings were given to CBRE by the bank.
7  Where did the bank get those drawings?
8  A   We would have received them from the customer, Jesse
9  Craig.
10 Q   And I think he testified that the drawings were
11 different for the first three reports than the fourth
12 report. Did you provide a different set of drawings to him
13 for the fourth report?
14 A   Yes, we did. The first three reports, that was the
15 information that we had that was provided to us. So we
16 assumed that was true and accurate. And the last appraisal.
17 Sorry, I've been talking about appraisals too much. Last
18 architecture, that piece, we had subpoenaed TL Stroh and
19 received copies directly from him. And based on some of the
20 inconsistencies that we had seen at that time and other file
21 documentation provided by the borrower, we instructed the
22 appraiser to only use documentation that we provided, which
23 would come from subpoenas, basically validated
24 documentation.
25 Q   So you testified that the fourth appraisal had

29 (Pages 110 - 113)

Page 114

1  documents, had drawings that had been subpoenaed directly
2  from the architect, correct?
3  A   Correct.
4  Q   And what was the difference between the drawings from
5  the architect versus the drawings that were supplied by your
6  customer?
7  A   The square footage was different.  Comparing the first
8  appraisal square footage and just using the net rentable
9  area to the last one, it was 11 percent square footage
10  difference in the net rentable area.
11  Q   So was the customer provided drawings bigger or smaller
12  than the architect provided drawings?
13  A   The customer inflated the size of the building, so the
14  customer provided bigger than what was actually built.
15  Q   And what impact would that have on you as a bank when
16  making.
17  A   Sorry?
18  Q   What Impact would the building.  Sorry, I'll start
19  over.  If the customer provided drawings that were 11
20  percent larger in net rentable area than the drawings from
21  the architect, what impact would that have on your decision
22  to loan money for The Ruins project.
23  A   At that time?
24  Q   At the time.  At the beginning of the project, yep.
25  A   So at those times we would utilize higher numbers, and

Page 115

1  so we would have lent more money than we should have.
2  Q   Did it change the value of your collateral?
3       MR. VERSTANDIG:  Objection.  Calls for an expert
4  opinion as devaluation.
5  Q   May I respond?
6       THE COURT:  Sure.
7  Q   I'm trying to ask her what she remembers about the
8  decision to extend credit to the debtors.  Then the impact
9  of the inflated drawings.  As you testified, that they were
10  11 percent bigger.
11       MR. VERSTANDIG:  It's not a relevance objection.
12  The question's whether it had an impact on value.  That
13  would call for an expert opinion.  The Supreme Court
14  building is smaller than my neighbor's farm, but I promise
15  you it's of a higher value than my neighbor's farm.  An
16  appraiser would be able to test hard at the valuation of the
17  two respective buildings and structures.  This witness is
18  not qualified or has not been qualified to do so.
19       MS. TANABE:  I'm asking her how it factored into
20  her decision to loan money to the debtor.
21       THE COURT:  Well, you haven't asked that yet.  So
22  the way the question came out is how does it affect the
23  value of collateral?
24       MS. TANABE:  So I can reword.
25       THE COURT:  I'm going to sustain the objection and

Page 116

1  invite you to ask a new question.
2       MS. TANABE:  Okay.  Thank you.
3  BY MS. TANABE:
4  Q   So you testified that the customer provided documents
5  were 11 percent bigger than the architect provided drawings.
6  How did that affect your decision?  How did that affect the
7  loan-to-value ratio in your loan approval process?
8       MR. VERSTANDIG:  Objection.  The question seems to
9  contravene the time space continuum.  I think we're being
10  asked how something discovered in connection with the July
11  2025 of appraisal.  That's an evidence that impacted the
12  approval of loan documents from 2021 that are in evidence.
13       MS. TANABE:  Can I respond?
14       MR. VERSTANDIG:  Yes, you may.
15       MS. TANABE:  So the court has invited us to
16  continue testifying about cause.  First of all, I think that
17  Mr. VerStandig also created some confusion on cross-
18  examination of Mr. Luther yesterday that he wasn't really
19  qualified to testify about the origin of the different
20  documents and the different sizes, which would allow the
21  court to draw an inaccurate inference about why the report
22  changed.  It is also relevant because under cause, the bank
23  has been testifying about, I guess what we called arts and
24  crafts before, and this is another example of arts and
25  crafts.  So it has more than one form of relevance.

Page 117

1       THE COURT:  There's no question that it has
2  relevance.  The objection Related to the clarity of the
3  question about the time frame.  So the ratio, the dollar per
4  value.  I'm sorry, what is the loan-to-value ratio?  The
5  loan-to-value ratio.  The way the question came out, it's
6  not clear that, that you were asking about the loan-to-value
7  ratio when in the inception or today or sometime in between.
8  So as I understood, the objection relates to the lack of
9  context.  So if that's the objection that I'm sustaining.
10  So if you can, can you provide some time frame so that I'm
11  clear about the perspective of when we're talking about from
12  the beginning, would it affect loan-to-value from today?
13  Does it affect loan-to-value from the date of petition?  So
14  give me some context.
15  BY MS. TANABE:
16  Q   Okay.  So this is last question, I hope.  Danielle, you
17  testified that if the building size was 11 percent.  You
18  testified that if the customer told you the net rentable
19  area was larger that the amount of money you would loan
20  would be greater.  With the benefit of hindsight, do you
21  think you loaned more money?  Do you think the bank loaned
22  more money then it intended to loan to the debtors?  Yes.
23  And or stated differently, do you believe the bank was
24  misled about the value of its collateral?
25  A   Yes.

30 (Pages 114 - 117)

Page 118

1  Q  When you approved the loan?

2  A  Yes.

3      MS. TANABE: Okay. Thank you. I think that is

4  the end of our questions on direct. Let me just have a

5  brief moment to check in.

6      THE COURT: Sure.

7      MS. TANABE: Yeah. We have nothing further.

8      THE COURT: I think this would be a good time for

9  a break. I guess my question is do you want a real lunch

10 break as in till 1 o'clock or do you want to just take 15

11 minutes? I'm not sure how much more evidence you have for

12 today and so can you give me an estimate or your preference

13 about how we should proceed? Let's start with the bank

14 because it's your witness.

15     MS. TANABE: So this was the -- all the questions

16 we were planning to ask Ms. Harless. Let me just check with

17 my co counsel. Okay.

18     MS. STANLEY: I don't think that we have any more

19 witnesses on direct. So the rest would be Mr. VerStandig's

20 cross-examination and whatever he decides, I think he

21 indicated yesterday he had three witnesses. That would be

22 less than an hour between all three. He swore that up and

23 down.

24     THE COURT: So tell me from all of your

25 perspective, do you want to take a 45-minute break or a 15-

Page 119

1  minute break? I'm good with either.

2      MS. STANLEY: Let's do 45.

3      MR. VERSTANDIG: If the bank is done with its case

4  in chief, my cross of Ms. Harless, I can't say it's going to

5  be short, but I hope it'll be snappy, if that makes sense.

6  And then our witnesses, I actually stand by the estimation

7  from yesterday, should be relatively brief. One will be

8  moderately longer than the others, but nothing is going to

9  be of epic duration.

10     THE COURT: So you think 45 minutes would be Okay.

11 Then we'll press forward afterward?

12     MR. VERSTANDIG: Yes, sure. That would take us to

13 1 o'clock. And can I assume the courts will only go until 5

14 p.m.

15     THE COURT: Yes, for sure.

16     MR. VERSTANDIG: I'm confident that we can do our

17 cross and our case in chief in, well, less than four hours.

18     THE COURT: Okay, well then we can have a whole 45

19 minutes for lunch. So let's take a break. This matter

20 stands in recess until 1 o'clock.

21     (Off the record.)

22     THE COURT: Okay. We're back on the record with

23 Bankruptcy Case Number 24-30004, In re The Ruins. Before we

24 get back to witness testimony, over the noon hour, I noticed

25 that the amended disclosure statement was filed in this

Page 120

1  case. And having reviewed the redlined version, there are

2  material changes to the disclosure statement. So as

3  anticipated, the court canceled the hearing on the

4  disclosure statement. And I'll schedule a hearing on the

5  new disclosure statement. Twenty-eight days ends up to be

6  December 22nd, which would mean hearing on December 23rd.

7      Unless the parties have real objections, it would

8  be my plan to put it on my ordinary hearing date for

9  January, which would be January 8th. Are there any concerns

10 about postponing that hearing until January 8th? Mr.

11 VerStandig? I'll look to you first. Oh, you're on mute.

12     MR. VERSTANDIG: Thank you, Your Honor. No

13 concerns. I'm looking at my calendar. I have something in

14 Maryland on January 8th, but I suspect it can be easily

15 moved.

16     THE COURT: Okay. Or I think I have some time

17 earlier that week too. We could hold on one second. I

18 think I might have time on the 6th and 7th.

19     MR. VERSTANDIG: Your Honor, either of those would

20 work wonderfully.

21     THE COURT: Do you have a preference as between

22 the two?

23     MR. VERSTANDIG: Marginal preference for the 6th

24 only because it would let me fly back that night, but fairly

25 agnostic.

Page 121

1      THE COURT: What about the calendars for Red River

2  State Bank? Any preference as between the sixth or seventh?

3      MS. TANABE: I have a conflict on the 6th, so.

4      THE COURT: Okay.

5      MS. TANABE: Sorry.

6      THE COURT: What do I have on the 6th and 7th?

7      MS. TANABE: Is the 7th possible?

8      THE COURT: Early on the 7th? I have the 7th. I

9  have the morning of the 7th open. No? What trial? I do

10 have a trial. Oh, yeah. Okay. So January 7th is open and

11 6th. Okay, but do you have a conflict for the 6th? Ms.

12 Tanabe? So 7th at 10. Does that work for everybody?

13     MS. STANLEY: And this is confirming that the

14 Capital Credit Union Pro Mark pretrial for 10 o'clock on the

15 7th was canceled.

16     MS. TANABE: Right.

17     MS. STANLEY: Like we did that yesterday.

18     MS. TANABE: Yes.

19     MS. STANLEY: Yes. Take it off mine.

20     MR. HUSHKA: I know this hasn't gone out yet.

21     THE COURT: Yes, you're right.

22     MS. TANABE: You're right.

23     THE COURT: Yes, you are right. Because it's that

24 --

25     MS. TANABE:

31 (Pages 118 - 121)

Page 122

```
1        THE COURT: Okay, good. Just trying to keep up
2   with all these things. I'm going to schedule the hearing on
3   the amended disclosure statement for January 7th at 10:00.
4        MR. VERSTANDIG: Thank you, Your Honor.
5        THE COURT: Okay, great. Then I think we can
6   proceed with the cross-examination.
7        I will remind you -- sorry, I'll remind you that
8   you remain under oath.
9        All right. You may proceed, Mr. VerStandig.
10       MR. VERSTANDIG: Thank you, Your Honor.
11       CROSS-EXAMINATION OF DANIELLE HARLESS
12  BY MR. VERSTANDIG:
13  Q   Ms. Harless, during your direct examination, do you
14  remember testifying that the permanent financing for The
15  Ruins project was supposed to be at a variable interest
16  rate?
17  A   It stated fixed rate at Wall Street Journal, which is
18  typically tied to variable. So if I misspoke, because
19  typically Wall Street Journal is tied to variable rate.
20       MR. VERSTANDIG: So Madam Clark, could we pull up
21  141, Exhibit 14, which is the term sheet. Thank you.
22  BY MR. VERSTANDIG:
23  Q   Ms. Harless, under the permanent phase, you see where
24  it says rate 10 year fixed rate.
25  A   Yes.
```

Page 123

```
1   Q   Okay. That would mean a fixed interest rate, not a
2   variable interest rate. That would change during that 10
3   year period, correct?
4   A   Correct. It would have been a 10-year fixed rate over
5   a term of 10 years, amortized over 20 years. So when I said
6   variable rate, it's a software selection for the tools that
7   we use. So if we reference Wall Street Journal prime, it's
8   a variable product within our software. So it's a fixed
9   rate. That makes sense. That would be --
10  Q   I'm sorry, I did not mean to interrupt you.
11  A   I'm done.
12  Q   Okay, just for clarity, I think everyone knows what a
13  fixed rate is, but that means that the first month's payment
14  would be the same as the 45th month's payment without regard
15  to what fluctuation there might be in interest rates between
16  those dates.
17  A   Typically, yes, but not always, because I can. As a
18  banker, I can schedule. I can have different payment
19  streams. So yes, but no.
20  Q   Well, if it's amortized over 20 years, can we agree
21  that means that there is supposed to be an even monthly
22  payment every month for. I realize the term is shorter, but
23  the amortization would provide an even monthly payment every
24  month for at least 19 years and 11 months. And possibly a
25  few cents off in the final payment?
```

Page 124

```
1   A   No, not necessarily. And this is just coming from a
2   commercial banker perspective, where and when I made the
3   statement of payment streams, you're making the assumption
4   that all amortizations are a straight level amortization.
5   We have the ability as a bank to create payment streams
6   where the amortization isn't on a straight level. It can
7   occur front loaded or backloaded or so. I mean, when I look
8   at the term amortization, I see flexibility in that, but
9   it's done. The loan is paid off in 20 years.
10  Q   Okay. So what you're saying is that something can be
11  amortized with fewer payments up front and then larger
12  payments beginning down the line, Correct?
13  A   Correct.
14  Q   Thank you.
15       MR. VERSTANDIG: And Madam Clark, could we please
16  go to Docket Entry 177? And I'm going to ask you, once
17  we're there, to go to Paragraph Number 14, please. Well, I
18  guess we'll start on the first page.
19  BY MR. VERSTANDIG:
20  Q   Ms. Harless, while not in evidence, this is a
21  declaration that you executed, correct?
22  A   Yes.
23  Q   Okay, and could we please go to paragraph 14. Now?
24  Here, you wrote that in total, $7,170,015.08 of Ruins notes.
25  Loan proceeds were ultimately transferred into the FCCU
```

Page 125

```
1   Craig accounts during the period of March 11, 2022 to
2   February 17, 2023.
3   A   Do you see that under 14? Yes.
4   Q   Okay. Are you saying that those are monies that were
5   loaned by the bank?
6   A   Well, yes, because it came from The Ruins notes.
7   Q   Okay, and are you saying those are monies that were
8   loaned by the bank that were not then used in connection
9   with The Ruins project?
10  A   No. That is what went to the FCC accounts.
11  Q   I'm not trying to be a smart-aleck about this, but the
12  way you said. No, I honestly, I don't know if you meant
13  that you agree with me. They weren't used on The Ruins
14  project, or if you were disagreeing with my premise.
15  A   The $7.1 million ultimately ended up in the FCCU Craig
16  accounts. They came from loan funds.
17  Q   And are you saying that means they weren't used on
18  The Ruins project?
19  A   No.
20  Q   In reality, money in the Kreg accounts would have been
21  used on The Ruins project, wouldn't it?
22  A   Some of it, yes.
23  Q   Okay. How much of it?
24  A   How much of what?
25  Q   How much of it was used on The Ruins project?
```

32 (Pages 122 - 125)

Page 126

1    MS. TANABE:  Can I pause?  Objection.  I thought
2  we had said this was not in evidence.  And I'm just confused
3  as to what we're doing right now or why.
4    MR. VERSTANDIG:  So the exhibits to this are in
5  evidence, and the sums, and the sums would add up
6  to $7.1 million.  And the witnesses testimony was that she
7  was the one who went through everything that led to those
8  compilations.  And I'm trying to understand if the
9  testimonies of those Monies really weren't spent on The
10  Ruins project, or if the testimony is simply that they were
11  spent on The Ruins project, they just went through an
12  intermediary bank account along the way.
13    MS. TANABE:  And I'm going to object that you're
14  calling for speculation.  I think she's only testified that
15  the money was transferred out of The Ruins account into
16  other accounts and that that was irregular.  She didn't
17  testify that she knows for sure where every dollar was spent
18  or not spent.  And I think it's mischaracterizing her
19  testimony to say that she said in extreme that it was all
20  used for the project or none used for the project.  That's
21  mischaracterizing her testimony.
22    MR. VERSTANDIG:  Your Honor, I think the
23  impression one would naturally take from this morning's
24  testimony was that large amounts of money were spent on
25  things other than the project.  Now, if the bank's

Page 127

1  acknowledging that that's not the characterization we should
2  have taken from this morning.  And then in reality, large
3  amounts of money may have gone through another bank account
4  but were spent on the project, that's one thing.  But unless
5  the bank's going to acknowledge that, I'd like the witness
6  to clarify as the person who went through all the documents
7  and compiled the records that are in evidence.
8    THE COURT:  So reaching back to the question, the
9  original objection related to the relevance.  I think if
10  it's relevance that the objection is related to, then that's
11  overruled.  If there's another objection, I missed it.  Ms.
12  Tanabe, is there?
13    MS. TANABE:  It states that it was.  That it
14  called for speculation, that she's only testified that she
15  knows for certain that the money was transferred into
16  multiple accounts and that that's irregular.  But she didn't
17  testify that she knows where every dollar was spent.  And so
18  I think he's creating confusion about what she testified.
19    MR. VERSTANDIG:  The witnesses testimony, coupled
20  with the exhibits she testified to preparing, was that the
21  money was transferred, but some of it was spent on, I
22  believe an airplane was part of the testimony, but some of
23  it went to banks that have no relation to the project, et
24  cetera.  The witness laid her own foundation for knowledge
25  about the money's comprising the sum.  Now, she's not

Page 128

1  actually knowledgeable.  She's certainly welcome to testify
2  to that.
3    THE COURT:  The objection is overruled.  And I
4  think.  I don't even know if the witness has answered that
5  particular question yet.  Do you know what the question is
6  anymore?  Okay.
7    MR. VERSTANDIG:  I don't do that.
8    THE COURT:  So let's start all over.
9    MR. VERSTANDIG:  Thank you.
10  BY MR. VERSTANDIG:
11  Q   Ms. Harless, how much of the $7.1 million in change
12  actually was spent on The Ruins project.
13  A   So I think.  And I'm just trying to wrap my head around
14  your question, so that 7.1 million is the amount that was
15  transferred to FCCU Craig account.  So transferred, meaning
16  it could have gone into The Ruins checking account and then
17  wrote a check back to FCCU.
18    So some of the funds then logically would have had to
19  come out of The Ruins checking account.  So my exercise was
20  looking for money that didn't go where it was supposed to go
21  with the draws in the time period of which -- of the
22  applicable period within that draw period.  So I can't
23  really answer your question because it's -- you're
24  suggesting that the 7 million.  I can't answer it in the
25  form that it's in.

Page 129

1  Q   Just to be clear, of the $7.1 million that you
2  testified about leaving The Ruins bank account, you don't
3  know how much of that was ultimately spent on The Ruins
4  project.
5  A   Well, if 11,090,000, assuming the documentation that
6  was in the file for the draw request is all correct.  So
7  assuming the money as presented that way, we disbursed
8  11,090,000.  If 4,300,000 change was not applied to of those
9  funds during that time period, that would leave.
10  676,790,000 in loan funds that theoretically of our loan
11  funds were used for The Ruins project.
12    So that 7.1 million is referring to funds transferred
13  to the FCCU Craig accounts.  It's not quantifying in total
14  the amount spent to contractors or not spent to contractors
15  for ineligible uses.
16  Q   Okay.  So of the $7 million in question, you believe
17  more than 6 million of it was spent to contractors for The
18  Ruins project.
19  A   The property is partially built, so I believe some of
20  it was spent on the property.  What amount was spent on the
21  property is uncertain because of the documentation that we
22  received through direct from the customer.  And the
23  subpoenas.  They don't match.  So what's reality?
24  Q   Well, let's talk about that for a moment, because you
25  did testify about the volume of documents earlier today,

33 (Pages 126 - 129)

Page 130

1  right?
2  A   Say that again.
3  Q   I believe you testified earlier this morning about the
4  volume of documents produced more.
5  A   Than 20,000 pages, I believe, from FCCU.  Correct.
6  Q   Okay, and subpoenas were also issued to subcontractors,
7  correct?
8  A   Yes.
9  Q   So putting aside what I think you referred to as arts
10 and crafts, which I'm guessing was a reference to my
11 client's documentation, the bank has obtained financial
12 records from, I think you said 24 subpoena counterparties.
13 A   Twenty-four.  It was 24 FCCU checking account
14 statements that I reviewed.
15 Q   Okay, and how many subcontractors did the bank cause to
16 be subpoenaed?
17 A   I don't know that offhand.
18 Q   Did you review those records?
19 A   I did not review those records before this hearing, no.
20 Q   Who is it that reviewed the subcontractor records to
21 ascertain whether or not they matched what the debtor
22 submitted?
23 A   Charles Aarestad.
24 Q   Okay.  Can we agree that between the subcontractor
25 records and the financial records, the bank could ascertain

Page 131

1  what was spent on the project?
2  A   State it one more time.
3  Q   Could we agree that between the subcontractor records
4  and the bank records, the bank could ascertain what was
5  spent on the project?
6  A   No.
7  Q   Why not?
8  A   Check in an EP when I'm reviewing the account
9  transcripts?
10 Q   How?
11 A   Let's just say for Limoges.  How do I know the Limoges
12 invoice?  How do the checking accounts -- the transcript
13 doesn't detail which project it went to or.  I don't know
14 which project.
15 Q   Limoges sent the invoice pursuant to the subpoena
16 indicating the project and even the address where either
17 goods were delivered or services were performed.  Right.
18 A   I did not.  For my understanding of the hearing today
19 was from a feasibility.  What you're talking about is
20 looking backwards and I was looking forwards.  So I didn't
21 review that is what I'm saying.  To compare the two.
22 Q   Okay.  Were you present in court?  To be honest, it's a
23 blur.  I want to say it was yesterday, but it may have been
24 last week when the bank's expert testified that the cost of
25 construction for The Ruins to date would be somewhere

Page 132

1  between $225,000 and $250,000 per unit.
2  A   I believe so, yes.
3  Q   Now let's talk about what you did go through.  The
4  reports that you prepared are based on all of the expenses
5  of Craig Properties and Craig Development, right?
6  A   Yes.  Between two time periods, which would have been
7  during the draw time periods.
8  Q   Okay, and Craig Properties and Craig Development had
9  economic inflows other than transfers from The Ruins,
10 correct?
11 A   They would have, yes.
12 Q   Okay.  So some of the expenses could have been paid
13 with monies from non-Ruins-related economic inflows, right?
14 A   Correct.
15 Q   And let's use an example.  Red River State Bank
16 actually loaned money for the construction of the Minnesota
17 lake house, correct?
18 A   There was a $2 million loan, yes.
19 Q   Okay.  So some of the inflows, either directly or
20 through intermediaries could have been from those funds.
21 Right.
22 A   There would be documentation showing if the loans were
23 dispersed from those loans into those accounts.  I don't
24 know offhand if that's correct.  I looked at a time period.
25 That the draws were done underneath.

Page 133

1  Q   I think I just want to be clear that these charts that
2  you prepared, that goes with the documents behind your
3  affidavit.
4        MR. VERSTANDIG:  So, Madam Clerk, we look at 177-
5  1, which I'm guessing means.  Just scroll down a little bit.
6  One more page, please.  Thank you.  I picked the worst
7  possible anecdote.  This is the one chart that is not
8  helpful to the point I'm trying to make.  I'm sorry, could
9  we please look at.  I'll give you a page number in a second.
10 Madam Clerk, I'm sorry, could we look at PDF Page 28.
11 Meaning page instead of 34.  So unlike Ms. Tanabe, I'm going
12 off the PDF numbers.  I'm sorry.  Perfect.
13 BY MR. VERSTANDIG:
14 Q   So this shows transfers from Craig Development LLC to
15 Jesse Craig, correct?
16 A   Correct.
17 Q   But monies came into Craig Development LLC from sources
18 other than The Ruins bank account during the impacted time
19 period.
20 A   Correct.  But not of the sizable amounts that the draw
21 requests.  And this was a discussion, you know, because
22 there's assumptions that go into any kind of an analysis.
23 When does the time period end?  When are the funds fully
24 extinguished?  The account was overdrawn, so that made it
25 really crystal clear as to the funds were the loan funds

34 (Pages 130 - 133)

Page 134

1  that we loaned were fully extinguished in that time period.
2  Because you can't use future revenues to repay something
3  paid, not paid during.  From the draws that should have been
4  paid.  Does that make sense?  So like -- so we were
5  comfortable with the analysis when we did it that we
6  adequately compensated for that.  Because by that
7  assumption, if he had income coming in and he still overdrew
8  the account, that money's gone and you'd have to have future
9  revenues to compensate back.
10  Q   Now, Mr. Craig's entitled to certain fees as the
11  general contractor and project manager, correct?
12  A   For The Ruins project.
13  Q   Yes.
14  A   Yes.
15  Q   Okay.  Does the bank have any way of knowing which
16  monies that went into Craig Development LLC were earmarked
17  as being for those fees?
18  A   I believe in his draw requests.  I'm going off memory
19  here because this is a long time ago.  He would have stated
20  on his draw requests which ones are for a member draws.
21  Q   And he did state that some of them are for his fees,
22  correct?
23  A   Right.  But that -- I believe they were at the
24  beginning, not at the end.  I'm going off memory here.  So
25  it would be not logical to have.  I wouldn't -- for just --

Page 135

1  in my experience I wouldn't -- it is not normal to see a
2  developer take income like laid out here as their developer
3  fee in small minute things.  It would be in lump sums.
4  Sorry.
5  Q   Don't be sorry.  And I didn't mean to speak over you.
6  I'm sorry.  And Zoom does make it a little strange.  You're
7  saying it would not be usual in your experience for a
8  developer to get paid during the life of the project?
9  A   No, I'm saying in small.  In small increments, like
10  this.
11  Q   Okay, but these are the transfers from Craig
12  development to Mr. Craig once the sums are in the Craig
13  Development account.  My question was, you have no way of
14  knowing what's been earmarked as owner equity and what's
15  been earmarked as just being general business funds.
16  A   Right.
17  A   I could go back to the draws, and then assuming that
18  the draws match the checks, that would be a way to cross
19  reference.  But if his submitted draws, the accounting
20  doesn't match what he actually submitted.  There's no way
21  for me to know because they don't match.  So I would have no
22  idea if his second set of accounting is what you suggest.
23  Q   But either way, it's certainly not reflected on the
24  charts appended to your affidavit.
25  A   When somebody doesn't -- when somebody submits

Page 136

1  documentation that isn't reality, there's no way I can know
2  for certain.
3  Q   Respectfully, I don't think that's what I asked.  I
4  asked if it's reflected on the chart you prepared, Ms.
5  Harless?
6  A   What was the question?
7  Q   I think I'm just trying to ascertain whether or not
8  that's reflected on the chart you prepared.
9  A   What's reflected?
10  Q   Any owner equity that's earmarked to Mr. Craig
11  personally.
12  A   Unless he would have put some sort of a -- there's no
13  way we would know that.  No.  Other than looking at the draw
14  request, and then there'd be a connection there.
15       MR. VERSTANDIG:  Madam Clerk, could we please go
16  to PDF Page 462?  Thank you.  We're off by seven, and I'm
17  not sure how that is.  I think I'm looking at the same
18  document on my computer.
19  BY MR. VERSTANDIG:
20  Q   Ms. Harless, do you see the fourth line down?  It says
21  discovery.
22  A   Yes.
23  Q   And testified during the direct examination that you
24  saw transfers to Discover and Capital One, correct?
25  A   Correct.

Page 137

1  Q   And I believe you indicated on direct that you
2  understand those to be credit card payments, correct?
3  A   Correct.
4  Q   Do you know if those credit cards were used to purchase
5  materials for The Ruins project?
6  A   I do not know that for sure.
7  Q   So it's possible that part or all of the credit card
8  payments were reimbursement or the coverage of expenses for
9  The Ruins project?
10  Q   Could be.
11       MR. VERSTANDIG:  And Madam Clerk, we could go back
12  to PDF Page 4, please.  Thank you.
13  BY MR. VERSTANDIG:
14  Q   Ms. Harless, here you noted that Jesse Craig received
15  at least $191,513.05 between January of '22, and March of
16  '23.  Do you see that?
17  A   Yes.
18  Q   And do you believe that's consistent with the
19  compensation he was entitled to take as general contractor
20  and project manager?
21  A   Can you ask that question in a different way?
22  Q   Do you believe that is in line with the amount of
23  compensation he was entitled to take as general contractor
24  and project manager?
25       MS. TANABE:  Objection.  You're asking her to

35 (Pages 134 - 137)

Page 138

1  speculate. It's about things like what a credit card was
2  used for or when he did or didn't decide to pay himself.
3  These are not things that she can know for certain.
4       THE COURT: That's the point. That's the point of
5  the cross-examination. So overruled.
6       THE WITNESS: Jesse Craig is owed -- he develops
7  his own in The Ruins case. He developed his own property.
8  He's the developer, and he owns it. In the end, he's the
9  single member. In my experience, your question is hard to
10  answer because every loan situation is different. In times
11  where there's a lot of volatility, like, let's just say,
12  inflation, equity, or the ownership would come in and do
13  things like, I'm going to build the property for myself for
14  no fee because I'm going to own it. In the end, that's not
15  unheard of. And then there's other situations where
16  somebody would pay themselves. So since he's an insider, I
17  can't say what's normal, what's not, for if that's a
18  reasonable amount or not, because I've seen a little bit of
19  everything, so I can't really answer that in a straight
20  answer.
21  BY MR. VERSTANDIG:
22  Q   I believe you also testified this morning about
23  transfers to Jordan Horn. Do you remember that?
24  A   Yes.
25  Q   And I believe you testified that Ms. Horner is Mr.

Page 139

1  Craig's daughter. Do you remember that?
2  A   That is my understanding. She is, yes.
3  Q   Okay. Do you know if Ms. Horner is an employee of
4  Craig Properties?
5  A   Sorry, I didn't hear the full. You stepped on
6  yourself.
7  Q   Oh, I'm sorry. Do you know if Ms. Horner is an
8  employee of Craig Properties?
9  A   I believe she is an employee and owner of Craig
10  Properties.
11  Q   Were you able to ascertain which of the transfers to
12  her were ordinary payroll payments?
13  A   No, but that still goes back to my statement of the
14  draws. The time period.
15  Q   I think I'm just asking if the transfers to Ms. Horner
16  were in line with being payroll payments or not.
17  A   I would have no idea if they're payroll payments. If
18  there's a notation on a check notating that it was for
19  payroll, then that would Be the only way I would know.
20  Q   You would have included it on your list regardless,
21  wouldn't you have?
22  A   I would have included it because it was during the time
23  period of the draws and at the end of the draw time period,
24  the accounts were overdrawn so the funds were fully
25  extinguished. So that's why we included it, because it

Page 140

1  happened in that condensed time period.
2       MR. VERSTANDIG: Madam Clerk, could we please go
3  to Docket Entry 86-1? Thank you.
4  BY MR. VERSTANDIG:
5  Q   I believe you testified about this document earlier
6  this morning. Do you remember that?
7  A   Yes.
8  Q   This is a promissory note that I believe you referred
9  to as the third Ruins note. Does that sound familiar?
10  A   Correct.
11  Q   And you testified this morning that in addition to The
12  Ruins LLC, the borrowers included Mr. Craig individually.
13  Craig Development, Craig holdings and Craig Properties.
14  Right.
15  A   Say that one more time.
16  Q   Sure. You testified this morning that in addition to
17  The Ruins LLC, the borrowers on this note include Mr. Craig,
18  Craig Development, Craig holdings and Craig Properties.
19  Q   Correct?
20  A   Correct.
21  Q   Let me start with an easy question. I think why did
22  the bank insist on lending to one, two, three, four entities
23  or three entities in a person in addition to the debtor as
24  opposed to simply asking for guarantees?
25  A   I am not a legal person, but from a bank's perspective

Page 141

1  for creating documentation for how we intended we the on the
2  disbursement and disbursement and authorization statement
3  that supplements the promissory note, they all have to sign.
4  So it's a way to get the. Documents done in a way that
5  we're comfortable with, if that makes any sense.
6  Q   Does the bank also use guarantees or does it always
7  just list the obligors as borrowers?
8  A   It depends on the situation we've done. It's not
9  unusual to have multiple borrowers.
10  Q   Okay. But the bank also had Mr. Craig guarantee a
11  large amount of the debt on the generations and Parkside
12  matters to end up.
13  A   He would have, I believe. Yes.
14  Q   Okay. Now, at the time this loan was made, so February
15  17, 2023, the bank held a lien on Mr. Craig's lake home in
16  Minnesota, correct?
17  A   I can't speak. I can't speak to that. I can't say yes
18  or no for sure without I would want to reference.
19  Q   Let's try separately then. Do you know if the bank has
20  ever had a lien on Mr. Craig's Lake home in Minnesota?
21  A   Yes.
22  Q   Do you know if the banks ever had a lien on any car
23  owned by Mr. Craig?
24  A   I don't know the entity name, but I believe there was a
25  Tahoe or some other type of. Four wheel drive theater

36 (Pages 138 - 141)

Page 142

1  cycle.
2  Q    I'm sorry, I didn't mean to cut you off.  And I heard
3  four wheel drive after I spoke.
4  Q    Yep.
5  Q    What about a motorcycle owned by Mr. Craig?
6  A    Whether we loan directly on that for like the purchase
7  of that or just.
8  Q    Asking if the bank had a lien on it?
9  A    I believe the bank has a lien on it, but I don't recall
10  which loan it's attached to.
11  Q    And the skid steer?
12  A    I think there was two skid steers at play.  Don't quote
13  me on that.  So one was.  One skid steer was financed with
14  The Ruins and traded, then traded according to Jesse's
15  testimony.  And I think there was a separate skid steer.
16  But you're asking questions that are backward looking for
17  some things that are not part of the.  What my preparation
18  went into today.
19  Q    Okay.  Are you familiar with an entity called 1023
20  Flats?
21  A    Yes.
22  Q    And what is that entity?
23  A    It's a realist.  What is the entity?  Yes, it's an LLC
24  based out of North Dakota.
25  Q    Do you know what purpose it serves?

Page 143

1  A    It's a real estate holding company.
2  Q    Do you know what real estate it holds?
3  A    1023.
4       MS. TANABE:  Objection.  Okay.  Two objections.  I
5  think this is way outside the scope of direct, and I just
6  kind of struggling to understand the relevance as well.
7       MR. VERSTANDIG:  Direct covered a putatively vast
8  swath of financial transactions.  We've learned that just
9  because some of those transactions went away from Ruins
10  doesn't mean they weren't actually spent on Ruins.
11       I'm now trying to establish that the bank held
12  liens on a vast number of assets owned or controlled by Mr.
13  Craig.  And that by necessary extension of that, to the
14  extent that money's removing through these accounts, they
15  could have been bank monies on other loans, which would be
16  ironic to say the least.  But two, that to the extent they
17  were used on assets upon which the bank holds a lien, such
18  utilization would not have been to the detriment of the
19  bank.
20       THE COURT:  The objection is overruled.
21  BY MR. VERSTANDIG:
22  Q    Ms. Harless, what property does 1023 Flats own?
23  A    It's called 1023 Flats, I believe.
24  Q    Okay.  Do you know what state it's in?
25  A    North Dakota.

Page 144

1  Q    And is it a construction project?
2  A    No, it's a finished project.  So it's a finished multi
3  family.
4  Q    It sounded like you were going to say something more
5  and I didn't want to cut you off.  You said a finished
6  multifamily.
7  A    A finished multi family real estate.
8  Q    And it was constructed by Mr. Craig, correct?
9  A    I think the answer my understanding is yes, but I
10  wasn't involved, so I don't know.
11  Q    Do you know if Red River State Bank did the financing
12  on that project.
13  A    Red River State Bank has a loan a permanent loan.  Red
14  River State Bank didn't -- my understanding, Red River State
15  Bank didn't do the construction.  Red River State Bank has
16  the permanent financing loan on that project, on that real
17  estate.
18  Q    Okay, and to the best of your knowledge, is Mr. Craig
19  involved in the operation of that real estate or the
20  servicing of that loan?
21  A    From what?  I need a more specific question.
22  Q    Sure.  To the best of your knowledge, does Mr. Craig
23  have anything whatsoever to do with 1023 flats?
24  A    I believe he is the member owner.
25  Q    Thank you.  Now, shifting a little bit.

Page 145

1       MR. VERSTANDIG:  And Madam Clark, we can close
2  that exhibit for at least the time being.
3  BY MR. VERSTANDIG:
4  Q    The first monies used to construct Ruins were funded by
5  the TIF, correct?
6  A    Correct.
7  Q    And I believe you testified this morning that the bank
8  owns either part of the TIF or an assignment of funds from
9  the TIF.
10  A    Correct.
11  Q    Okay.  Why hasn't the bank filed a proof of claim in
12  this case based on its ownership of part of the TIF or the
13  funds therefrom?
14  A    Are you asking me a legal opinion.
15  Q    Asking if you know why the bank hasn't filed a proof of
16  claim?
17       MS. TANABE:  Objection.  I think it's two things.
18  I mean, it's asking her to share the advice of counsel and
19  it's asking her.  We've heard repeatedly that she's a lay
20  person not qualified to speculate about legal matters within
21  the bankruptcy plan, et cetera.  And so I think the same
22  holds here as well.  She testified that she doesn't think
23  the estate owns the asset and that she doesn't think it's
24  part of the bankruptcy case.  So as well I just testify it's
25  asked and answered.

37 (Pages 142 - 145)

Page 146

1    MR. VERSTANDIG: Your Honor, I think I would
2 respond as follows.  One, if her response is on the advice
3 of counsel, I'm most certainly not entitled to ask the
4 follow up question.  It goes to the size of the bank's
5 claim, the nature and the composition of the bank's claim
6 and the interests of the bank juxtaposed to those of other
7 secured and unsecured creditors.  In this case, it also goes
8 to the generalized manner in which the bank has accurately
9 or inaccurately accounted for the inflow and outflow of
10 monies from itself to the project and for the betterment of
11 the project.
12    MS. TANABE: And Your Honor, they've already
13 stipulated to the amount of our claim.  They've stipulated
14 to the validity of our claim history.  The burden was
15 shifted on us to demonstrate the value of our claim.  They
16 stipulated to that.  Without carrying their burden, I think
17 they shouldn't be allowed to reopen and Rehash that issue
18 now.
19    THE COURT: Yeah, that's a pretty compelling
20 argument, Mr. VerStandig.  Why would you need to know about
21 how is that related to the issues for this hearing?
22    MR. VERSTANDIG: Your Honor, I think one of the
23 things we're going to touch upon is the best interests of
24 creditors and the unusual circumstances.  We've been very
25 upfront about that.  And generally speaking, creditors are

Page 147

1 going to be divided into two universes.  Red River State
2 Bank and everyone else.  We've heard from some of the
3 everyone else, including Mr. Feis's client, to the extent
4 the bank is now saying that it owns part of the claim that's
5 being advanced by Mr. Feist's client, which perhaps
6 coincidentally, perhaps not, is the only other entity that
7 appears to be favoring conversion.  That would seem to weigh
8 upon what are the best interests of creditors writ large
9 and whether or not there are unusual circumstances.  Keeping
10 in mind Mr. Klobucar's comments about potential implication
11 of the doctrine of marshaling as well.
12    MS. TANABE: Okay.  So far, outside the scope of
13 direct.
14    THE COURT: Well, no, we heard a lot about the TIF
15 on direct from and other witnesses.  I'm not sure that the
16 complete relevance is clear to me right now.  But relevance
17 is a broad concept, so the witness may answer to the extent
18 that you know and to the extent that it doesn't involve any
19 conversations that you've had with your lawyers.
20    MR. VERSTANDIG: Your Honor, may I ask that the
21 question be repeated so that she doesn't inadvertently
22 answer the wrong question?
23    THE COURT: Yes, because --
24 BY MR. VERSTANDIG:
25 Q    Ms. Harless, without telling me anything you discussed

Page 148

1 with counsel, why did the bank not file a proof of claim for
2 the TIF monies it owns or is due?
3 Q    And I'm going to object because I think this is going
4 to trip up my client.  She filed the proof of claim with the
5 advice of counsel, and so if she wants to assert privilege,
6 she should do so now.  She's not obligated to answer the
7 question in some way that defeats that privilege.
8    MS. TANABE: Your Honor, I think this narrative is
9 problematic coming from counsel, and we're getting very
10 close to coaching the witness.  Proof of claim form, by
11 design, is something that was created to be completed by
12 laypersons.  There are rules in this court and elsewhere
13 that even allow unrepresented corporate entities to file a
14 proof of claim without the assistance of counsel.
15    To the extent a decision was made to file or not
16 file a proof of claim, the witness is competent to answer
17 it.  Now, if the answer is that was not done on the OSI
18 counsel, so be it.  That's the answer.  But it awfully seems
19 like the objections aimed at coaching the witness into
20 Invoking when that wouldn't otherwise or necessarily be the
21 situation.
22    MR. VERSTANDIG: And this returns to the point
23 that we, with the advice of counsel, they filed the proof of
24 claim and this has already been stipulated to.  It seems
25 like he's trying to trip the client up into saying something

Page 149

1 she doesn't.  It's just hashing and rehashing something the
2 debtor has already stipulated to.
3    THE COURT: With the limitations I set before.  In
4 other words, without revealing any privileged information.
5 You may answer the question.
6    THE WITNESS: And the question was just to restate
7 because why didn't the bank submit a proof of claim for the
8 580,000?
9    THE COURT: Yes.  Well, for the TIF.  I don't know
10 how much it.
11 BY MR. VERSTANDIG:
12 Q    Precisely.
13 A    That is for the -- yeah.  I think that we're talking
14 about the same thing.  I'm a banker.  Everything that we do
15 is very accurate, very specific and we use specialists like
16 our attorneys.  And so I wouldn't make a decision without
17 having counsel from my attorneys on that.
18    So I've put no thought into that question until you
19 just asked it.  And now it's very difficult to.  I don't
20 think I can answer for.  I mean, I don't know the date that
21 we filed our proof of claim, but it was months and months
22 and months ago.  What I know now, what I know then, I can't
23 answer that because I would have relied on my attorneys for
24 whatever they would have suggested.
25    THE COURT: New question.

38 (Pages 146 - 149)

Page 150

1  BY MR. VERSTANDIG:
2  Q   We'll shift.  Ms. Harless, when did you last personally
3  witness The Ruins building in person?  That was redundant,
4  by the way, and I apologize.
5  A   I've seen it multiple times.
6  Q   When was the most recent time?
7  A   It was really cold and I was wearing my black boots
8  with my winter coat.  So it's over a year ago, but it would
9  have been either in the spring or the fall.  I can't recall.
10  So that would have had to been.  It wasn't during.  We
11  haven't.  I've not been on site during the bankruptcy time
12  period, so I'm guessing September of '24.  Don't quote me on
13  that type of -- I don't need to.  I don't need to know that
14  from a documentation.  It doesn't need space in my brain.
15  Q   Ms. Harless, to the best of your knowledge of other
16  agents of the bank viewed the property during the
17  bankruptcy.
18  A   During the bankruptcy period?
19  Q   Yes.
20  A   We have visited the property outside on, you know, like
21  public.  So like on the road, you know, and walked around
22  and viewed the property?
23  Q   Yes.  Were you present in court when Mr. Luther
24  testified yesterday?
25  A   Yes.

Page 151

1  Q   He's the bank's appraiser, correct?
2  A   Yes.
3  Q   Do you remember him testifying to an appraisal done in
4  or about July of 2025?
5  Q   Yes.
6  Q   Do you believe he accessed the interior of the property
7  to do that appraisal?
8  A   I don't know how to answer that.
9  Q   Do you remember when Mr. Gehrtz testified?
10  A   Yes.
11  Q   He had photographs that were sort of time lapse
12  photographs from the inside of the property.  Do you
13  remember that.
14  A   Time lapse from two different periods?  Yes.
15  Q   Do you believe he was on the interior of the property
16  during 2025?
17  A   It was not during 2025.
18  Q   Okay.  So you're not sure if an agent of the bank has
19  been inside the property this calendar year?
20  A   I don't believe my understanding.  I do not believe
21  anybody has been inside the building during the bankruptcy
22  period.
23  Q   Let's talk about the building's plans.  Do you remember
24  testifying earlier that they appear to have changed?
25  A   Say that one more time.

Page 152

1  Q   Do you remember testifying earlier that the building's
2  plans appear to have changed?
3  A   Material or imperial?  Your voice is a little bit low,
4  so it.
5  Q   I'm sorry, I didn't use either of those words, which
6  concerns me.  Do you remember testifying earlier that the
7  building's plans appear to have changed.
8  A   Over the -- yes.
9  Q   Who is the banker at Red River State Bank who initially
10  had the relationship with The Ruins?
11  A   Martin Peterson.
12  Q   Do you know if the original plans for The Ruins were
13  emailed to Martin Peterson?
14  A   I believe they were.
15  Q   Have you been through Mr. Peterson's emails to look at
16  the ones that were sent to Mr. Peterson?
17  A   So in a bank we have different roles and
18  responsibilities and that wasn't part of my roles and
19  responsibility.  So I don't have firsthand knowledge of
20  doing what?  Anything that you're talking about.
21  Q   Ms. Harless, were you present for Charles Arsted's
22  deposition in this case?
23  A   His deposition from September?
24  Q   That sounds about right.  I came out and conducted, I
25  believe, both of your depositions in a conference room at

Page 153

1  the Vogel Law Firm.
2  A   Correct.
3  Q   Do you remember during his deposition Mr. Arstad
4  indicated that Mr. Peterson's email account had been
5  destroyed?
6  A   That's correct.
7  Q   To the best of your knowledge, has Mr. Peterson's email
8  account ever been reconstructed or recreated?
9  A   No.  When it's gone, it's gone.
10  Q   So whatever plans were sent to Mr. Peterson wouldn't be
11  amongst the records to which the bank has access today?
12  A   Say that question one more time.
13  Q   Sure.  Whatever record, whatever plans were sent to Mr.
14  Peterson would not be amongst the records to which the bank
15  has access today?
16  A   Not necessarily.  So we use a file documentation system
17  and.  I, for instance, when I'm building my loan files.
18  There's certain key things from an insurance coverage
19  standpoint and making sure that I'm organized in my file.  I
20  actually drag over emails from Outlook into the customer's
21  file as a native format.  So the box might be gone, but I
22  might either have a PDF or a native file.
23  Q   Do you know if any of Mr. Peterson's emails were
24  dragged over into the.
25  A   System, you would have been provided what documentation

39 (Pages 150 - 153)

Page 154

1 that we had in discovery.

2 Q   Now, you testified earlier that the bank has spent

3 approximately $300,000 both before and during the bankruptcy

4 in legal fees on The Ruins matter.  Do you remember that?

5 A   Yes.

6 Q   Just for clarification, this is not meant as a trick

7 question.  Did you really mean on The Ruins matter, or did

8 you mean on The Ruins matter coupled with the Parkside and

9 Generations matters?

10 A   I wish it was all three, but it's the one.

11 Q   I believe you testified this morning that your cash

12 flow analysis is based upon the pro forma contained in Mr.

13 Luther's July 2025 appraisal; is that correct?

14 A   My pro forma cash flow analysis is based on his

15 assumptions for net operating income.  Correct.

16 Q   You were present in court when Ms. Craig testified that

17 the property would be able to put off approximately $720,000

18 per year in net operating income, correct?

19 A   You said 780?

20 Q   720.  720, I believe.  Her testimony was 60 a month.

21 A   Yep, I remember 60.  I don't remember 720.

22 Q   Can we agree that 60 times 12 is 720?

23 A   It is.

24 Q   Okay.  Can we also agree that that's much higher than

25 the pro forma in Mr. Luther's most recent appraisal?

Page 155

1 A   It is a higher number.

2 Q   I think.  You testified this morning that your position

3 on takeout financing was also premised on Mr. Luther's most

4 recent appraisal, correct?

5 A   Correct.

6 Q   And that's his appraisal from July of 2025, correct?

7 A   Correct.

8 Q   Okay.  Let's shift a little bit.  The bank had filed a

9 foreclosure action against The Ruins prior to the

10 bankruptcy, correct?

11 A   Yes.  In South Dakota.

12 Q   Without telling me anything that was discussed with

13 counsel, did the bank make a determination as to whether or

14 not it would credit bid at a foreclosure sale?

15 A   State the question one more time.

16 Q   Without telling me anything that was discussed with

17 counsel, did the bank make a determination as to whether or

18 not it would credit bid at a foreclosure sale?

19 A   We haven't gotten far enough to have those

20 conversations.  Just to be frank and honest.

21 Q   Has the bank also, without telling me anything,

22 discussed with counsel, which, by the way, is true for Every

23 question I ask you, has the bank had any discussions about

24 whether or not it would try to buy the property from a

25 Chapter 7 trustee?

Page 156

1       MS. TANABE:  Objection.  This is just kind of

2 beating around the same bush that this is trying to get our

3 client to disclose whether she has or has not had

4 conversations with counsel about strategic matters related

5 to their case.  And her last answer demonstrates that she

6 cannot answer the question without revealing, you know,

7 whether and what and why she talks to her lawyers about

8 something related to the case.  So this just feels like it's

9 chipping away at the same problem somewhat relentlessly.

10      MR. VERSTANDIG:  Your Honor, I think I'd respond

11 in two parts.  One, the healthy part of this morning was

12 testimony premised upon subpoenas she directed her lawyers

13 to issue and the analysis she derived therefrom, which

14 included an analysis of a plan of reorganization that I have

15 to imagine without knowing, was discussed with legal

16 counsel.

17      The fact that something is discussed with counsel

18 does not make it privileged.  It's what said to counsel, or

19 in certain circumstances, the advice of counsel, that's

20 privileged.  But two, and I want to be careful not to give

21 this away, because I think the witnesses attuned to the

22 objection colloquy.  This is not going where counsel thinks

23 it's going.  And I'm two questions away from making clear

24 that this is enormously relevant to the issue before the

25 court asking the.

Page 157

1       MS. TANABE:  Client to testify about her strategy.

2 You're asking your creditor to testify about their strategy

3 for recovery in a bankruptcy case.  It's just.  It's

4 inappropriate.  These are matters she's discussed with

5 counsel.  It represents the byproduct of advice of counsel.

6 It is all circling around the same issue that it is going to

7 trip the witness up into blowing her attorney client

8 privilege and disclosing matters that she doesn't need to

9 disclose to this court.

10      MR. VERSTANDIG:  I think the idea that a strategy

11 for recovery is innately privileged is not only flawed, but

12 antithetical to the very hearing we're having.  The bank's

13 contention is that creditors will be better off Recovering

14 in Chapter 7 Debtors contention is that myriad creditors,

15 actually, including the bank, will be better off recovering

16 in Chapter 11.  The bank is a creditor.  Yeah.  The bank is

17 trying to blow holes in the plan of reorganization that the

18 debtor has proposed, arguing that it's not a feasible or

19 sustainable mechanism for recovery.  We're entitled to ask

20 questions about how it is that the bank plans to recover if

21 they get the very relief for which they are currently

22 petitioning.

23      MS. TANABE:  Debtors have consistently shifted

24 their burden of proof onto the creditor in this case, she

25 does not have the obligation to prove the feasibility of

40 (Pages 154 - 157)

Page 158

1  someone else's plan. And she doesn't have the. We've been
2  scolded for suggesting that there are plans that are more
3  beneficial to creditors in the case. So it seems like
4  counsel is trying to have it both ways. He can talk about
5  it, but the creditor can't.
6       THE COURT: I don't remember scolding you. Maybe
7  somebody else did. The objections overruled. The answer.
8       THE WITNESS: I can answer?
9       THE COURT: Yes, you can.
10      THE WITNESS: What was the question again?
11 BY MR. VERSTANDIG:
12 Q   Would the bank attempt to purchase the asset from a
13 Chapter 7 trustee?
14 A   Are you asking me my opinion as an individual or are
15 you asking me my business? Which would be a team of people
16 who have not had this conversation. So I would have to
17 speculate. From my perspective. And it's reinforcing what
18 I stated prior to. We started a foreclosure in February of
19 2024 down in Coddington County. We have been trying to
20 collect after not getting paid since November of 2023.
21      So normal recourse for a bank when they're not getting
22 paid is to liquidate the collateral that has been pledged.
23 We still have not been paid. And at this point, because
24 that's. We're going to be coming up on the two year
25 anniversary, in my mind, it's almost comical on how long

Page 159

1  this has been taking that it almost seems too far off to
2  even consider. You're talking about a threshold that seems
3  like I can't even see the light at the end of the tunnel is
4  my point. So we haven't had these discussions.
5  Q   Ms. Harless, if the bank came into ownership of the
6  property, whether through foreclosure, Chapter 7 trustee
7  sale or otherwise, would the bank finish construction?
8  A   I am not the only one that makes that decision. I
9  can't answer that.
10 Q   Have there been any discussions other than with counsel
11 about whether the bank would finish construction?
12 A   We have done analysis for what it could possibly look
13 like, but that doesn't. That's not a -- you're asking on a
14 -- you're asking about a decision. And a decision would
15 mean that we have enough concrete or concrete details. And
16 the one factor on that is not talked about at all. Here is
17 the time element. Like I said, we've been trying to
18 foreclose since February of 2024.
19      The answer theoretically is if we would have had all
20 the information that a manager would use to make decisions,
21 the answer could have changed over time. I still can't
22 answer that. I'm not trying to be obstinate. I'm just
23 saying I don't have the right people and the right
24 information because we're missing the timepiece. Are we
25 talking about a year from now?

Page 160

1  A   Because then the property would have sat for however
2  many more years.
3  Q   You understand the bank's currently asking to have this
4  case converted to Chapter 7, correct?
5  A   Correct.
6  Q   You understand that in Chapter 7, a trustee would
7  potentially not certainly dispose of the estate's assets at
8  sale, correct?
9       MS. TANABE: Objection. I mean, he's asking her
10 to speculate about what a different person would or wouldn't
11 do. He's. I mean, this. If we're going to be consistent.
12 If we're going to be consistent, you can stop.
13      THE COURT: Sustained.
14 BY MR. VERSTANDIG:
15 Q   Ms. Harless, is it your understanding that the property
16 will be worth more once construction is completed?
17 A   The property will be worth more once it's completed
18 after more money is put in.
19 Q   Going to shift gears a bit here. You testified earlier
20 today about the bank's loan being approximately $3.6 million
21 if the REDI program was used as part of permanent financing.
22 Do you remember that?
23 A   Correct.
24 Q   For clarity, though, the bank would have still loaned
25 $7.2 million during the construction phase of financing,

Page 161

1  correct?
2  A   No. Because you would have --
3       MR. VERSTANDIG: Madam Clerk, could we please pull
4  up Docket Entry 141, Exhibit 14?
5       MS. TANABE: I'd like to lodge an objection, Your
6  Honor. Ms. Harless wasn't allowed to testify in a way that
7  explained the role of the REDI program during the
8  construction phase of the. Of the loan. And it seems like
9  council is now asking her to talk about the REDI program
10 during the construction phase of the loan. So it seems
11 inappropriate that she could not testify on direct, but now
12 she suddenly qualified to testify about it on cross. I'm
13 not sure what's happening right now.
14      MR. VERSTANDIG: Over our objection, Ms. Harless
15 was permitted to testify that the REDI program would have
16 allowed the bank's exposure to be $3.6 million. We objected
17 to her testifying about the nature of a program that is a
18 legal program, and it requires some legal understanding.
19 I'm trying to cross-examine her on the very, very narrow bit
20 that she did testify to, and namely that the REDI program
21 would have reduced the bank's exposure to $3.6 million. And
22 I believe the exhibit we're about to put up is going to
23 facially reveal the folly of her testimony.
24      MS. TANABE: Your Honor, counsel is conflating
25 testimony about the permanent construction phase with the

41 (Pages 158 - 161)

Page 162

1 temporary construct or the permanent phase of the loan and
2 the earlier construction phase of the loan. The question
3 itself misrepresents her testimony.
4 THE COURT: So there isn't a question yet. What
5 happened was he asked her to Recall the time when that
6 testimony was received. So there were limits to what she
7 could testify regarding how the there were limits to what
8 she could testify regarding how the person program was
9 administered, not how it was going to affect a bank's
10 decision. So she testified about that. But I will keep
11 your objection and the scope that happened earlier in mind
12 as soon as the questions are asked about the program. So
13 I'm going to invite you to wait until after the question is
14 asked just a couple of seconds to allow Ms. Tanabe to insert
15 an objection just in case.
16 BY MR. VERSTANDIG:
17 Q Ms. Harless, under permanent phase, do you see where it
18 says loan amount $7.2 million 50 percent participated to SD-
19 REDI program?
20 A I see that.
21 Q Correct.
22 Q Under construction phase, do you see any reference to
23 SD-REDI program?
24 MS. TANABE: Objection. This is precisely what
25 she was prevented from testifying about. No, it's not the

Page 163

1 specific question.
2 THE COURT: No, it's not.
3 MR. VERSTANDIG: No. It was in connection with
4 the discussion of loan-to-value and she had started to
5 explain. We can deal with it on redirect, but I
6 specifically asked her this question on direct and he lodged
7 an objection and it was sustained.
8 MR. VERSTANDIG: I don't believe this is the
9 question Ms. Tanabe asked. I believe she was asking about
10 the program. I'm not going to ask about the program. I'm
11 simply trying to show that there's absolutely no reference
12 to the program in connection with the construction phase
13 part of the loan.
14 THE COURT: Listen, this particular objection is
15 overruled. Let's hear an answer to the first question and
16 then there will be another question that follows that might
17 go to the heart of the REDI program or not, but you can
18 answer that question.
19 THE WITNESS: Okay, can you repeat the question?
20 BY MR. VERSTANDIG:
21 Q Under the construction phase portion of the term sheet,
22 do you see any reference to the SD-REDI program?
23 A It's not overtly listed, but if you the REDI program is
24 meant for new construction, the idea is it's an economic
25 development loan product to have a better term. And so they

Page 164

1 want the approvals done before you break ground. So
2 inherently would have been part if it's in the permanent
3 phase, it inherently would have been. You would have to
4 back into the approval for the construction if you're going
5 to do it. And if you're going to have on the permanent
6 side to be compliant on the permanent side, you'd have to
7 back into it on the construction side, if that makes any
8 sense.
9 Q But it's not listed under the construction phase
10 portion of the term sheet, is it?
11 A It's not listed, but that's how you do it. If that
12 makes sense.
13 MR. VERSTANDIG: Madam Clerk, I finished with this
14 exhibit. Thank you.
15 BY MR. VERSTANDIG:
16 Q Ms. Harless, has the bank participated any of the three
17 Ruins loans?
18 MS. TANABE: Objection, relevance.
19 THE COURT: You know, I'm sorry, I was writing and
20 I don't remember the question. I didn't hear the question.
21 Sorry.
22 MR. VERSTANDIG: The question was has the bank
23 participated any of the three Ruins loans?
24 MS. TANABE: And I objected because it's not
25 relevant to the inquiry under section 1112 whether the bank

Page 165

1 owns 100 percent of its claim or assigned 1 percent of its
2 claim, 10 percent of its claim to another party. The debtor
3 bears the burden here.
4 THE COURT: How is that relevant, Mr. VerStandig?
5 MR. VERSTANDIG: One of the questions is the best
6 interest of creditors and trying to establish a foundation
7 to ask the follow up question, which is whether or not all
8 the participants favor conversion or any participants favor
9 remaining in Chapter 11.
10 MS. TANABE: And this is an issue for solicitation
11 and plan confirmation. You're asking Ms. Harless to
12 speculate about how parties who are not here right now might
13 vote for in favor of a plan later. It's also asking her to
14 reveal internal discussions. But again, it's just not
15 relevant. Under 1112, the internal discussions are not.
16 MR. VERSTANDIG: Privileged in terms of
17 solicitation and plan confirmation. If the bank wasn't
18 trying to stop us from getting there, I don't think that
19 would be an issue. But the question under 1112 is
20 admittedly multi prong. And I appreciate the confirmability
21 of a plan is one of the prongs, but what I'm focused on is
22 the best interest of creditors. We have a small polling of
23 creditors who have participated in this hearing, but to the
24 extent we can get a feel for the expressed interests and
25 inclinations of other economic stakeholders, I believe

1  that's relevant.

2       THE COURT:  Just a minute.  Just remind me again

3  with the question.  I think I missed the question again

4  because this colloquy isn't making sense to me.  Say the

5  question again.  Maybe I didn't hear it.

6       MR. VERSTANDIG:  Sure.  The question is whether or

7  not the bank has participated, any of the three loans.

8       THE COURT:  Participated.

9       MR. VERSTANDIG:  Participated would mean that they

10  have sold part of the loan or it's equivalent to assigning

11  part of your claim if you're a general unsecured creditor or

12  something like that.  They're a fiduciary for other loan

13  participants and it seems to be inviting some kind of

14  hearsay about what other loan participants have said about

15  whether they favor conversion or not.  So I'm not really

16  sure where he's going with this.  So relevance invites

17  hearsay.

18       MS. TANABE:  I don't think hearsay is an

19  objection.  If I actually ask a question that calls for

20  hearsay, that's one thing.  For now, the question is whether

21  or not.

22       MR. VERSTANDIG:  So for now the question is, is it

23  relevant whether or not the bank owns 100 percent of the

24  loan right here today for whether a case should be

25  converted?  It's not a factor under section 1112.

1       THE COURT:  Okay.  So I understand what

2  participated means.  My concern is, what I don't understand

3  is if is whether the bank has to reveal whether any other

4  participant would or would not vote.  If it's the one

5  extending the vote, is there something, there might be

6  something that I don't understand in that regard to frame

7  the relevance of this.

8       So Mr. VerStandig, is the bank obligated to

9  provide debtors with the background of whether the

10  participants would vote for the plan?  If it has the vote

11  for the plan, do participants get to vote?  I don't know.

12  Is that a thing?

13       MR. VERSTANDIG:  The interest, best I understand

14  it is it would depend on the participation agreement.  We

15  don't have the participation agreement in my experience,

16  which is not this case.  I want to be very clear about that.

17  Normally the lending institution would be the entity that

18  cast a Chapter 11 ballot with a fiduciary charge to

19  participants.  I think what I'm driving at is I'd like to

20  know whether or not there's something different here,

21  meaning whether or not an entity or coalition of entities

22  other than the bank are actually in control.  But more

23  pointedly, since I don't believe any privilege would attach

24  to conversations between the bank and participants, meaning

25  the bank and its co-stakeholders, I want to really ask the

1  question which is do all of the stakeholders favor

2  conversion or have some of them indicated a preference for

3  remaining in Chapter 11?  That's all I'm trying to get out

4  of this foundation.

5       MS. TANABE:  And if she answers that question, it

6  would be hearsay.  And you've also repeated counsel has also

7  repeatedly said that she's just a layperson, not qualified

8  to testify about the meaning of complex legal documents.

9  And so if she's not qualified to testify about the meaning

10  of a Chapter 11 plan, she shouldn't be asked to testify

11  about the rights of parties under a loan participation

12  agreement either.

13       MR. VERSTANDIG:  To be clear, I'm not going to ask

14  her to interpret an agreement that we don't have, simply

15  going to ask probably.  I mean my follow-up questions from

16  rough order are going to be who are the participants?  What

17  percentages of the loans do they have?  And do you have an

18  understanding, which I'll ask artfully to get around hearsay

19  as to whether each of them favors conversion to Chapter 7 or

20  remaining in Chapter 11.

21       THE COURT:  So I really feel like it would only be

22  relevant if the participation agreement required that the

23  bank either vote on behalf of the majority of the

24  participants or if the bank doesn't have the exclusive

25  authority to make a decision about that vote.  So if I.  If

1  the participation agreement is not available, I can't decide

2  about the relevance.

3       MR. VERSTANDIG:  Very well, Your Honor, I can move

4  on.

5       THE COURT:  So, yeah, I'm going to sustain the

6  objection.

7  BY MR. VERSTANDIG:

8  Q   Ms. Harless, this morning, do you remember testifying

9  about the bank making other commercial loans during the time

10  period of The Ruins loans?

11  A   Yes.

12       THE COURT:  You can switch the monitor back to the

13  witness.

14       MR. VERSTANDIG:  Thank you, Your Honor.

15  BY MR. VERSTANDIG:

16  Q   Were any of those other loans for some in excess of $2

17  million?

18  A   Can you remind me of my testimony just to make sure

19  that a lot has gone?  Is that even possible?

20  Q   I am broadly paraphrasing and I am not trying to put

21  words into your mouth.  My notes are that you testified it

22  was in the context of other borrowers going over budget and

23  making equity contributions and things of the like.  And I

24  believe you testified that the bank made other commercial

25  loans during the same time period that it was making The

43 (Pages 166 - 169)

Page 170

1 Ruins loans. None of that is a precise quote.

2 A   Okay.

3       THE COURT: So now, reminder of the question

4 again. Thank you.

5       MR. VERSTANDIG: Sure.

6 BY MR. VERSTANDIG:

7 Q   Were any of those other loans for some in excess of $2

8 million?

9 A   And you said The Ruins time period?

10 Q   Yes.

11 A   My apologies, but I have a banking brain and so when

12 you. When we use broad generalizations, I struggle with

13 that just because my default is to be hyper specific,

14 because the details matter. And so I don't want to

15 misspeak. Even if this might be an obvious. You are.

16 Everybody already knows the answer, if that makes any sense.

17 Q   Sure. So I'm not trying to trip you up and I'm not

18 referring to Generations or Parkside, for what it's worth.

19 I'm simply trying to get an understanding. You had

20 testified that other loans that had gone over budget had

21 equity contributions, and I wanted to know if those loans

22 were for more than $2 million. I'm trying to get a sense of

23 whether they're of a comparable size or not.

24 A   Say that one more time because I think I misunderstood

25 you.

Page 171

1 Q   The other loans that the bank made during the time

2 period of The Ruins loan, other than the ones to Generations

3 in Parkside, were any of them for a sum in excess of $2

4 million.

5 A   Outside of the lake home, you said?

6 Q   I didn't say that. But you can exclude that as well?

7 Yes.

8       MR. HUSHKA: Your Honor, can we clarify? Is he

9 asking to the Craig and the Craig entities or Is this any

10 loan to any Red River State Bank entities? I don't know if

11 it's clear.

12 BY MR. VERSTANDIG:

13 Q   Any loan to any Red River State Bank entity? It's

14 cross-examination premised on the witness's testimony about

15 how other borrowers comported themselves during the same

16 time period.

17 A   So just so I'm clear, you're asking if the bank did any

18 loans to anybody during the March of '22 to I think it was

19 like April of '23. Don't quote me on that. On the back end

20 time frame.

21 Q   For a sum in excess of $2 million.

22 A   I'm sure we did that because $2 million.

23 Q   Two.

24 A   And that would be to -- across the bank is what you're

25 saying.

Page 172

1 Q   I'm not sure I know what you mean by across the bank --

2 A   Not specific.

3 Q   -- residential loans.

4 A   Not specific to Jesse Craig or any of these entities.

5 Q   Correct. Any commercial entity on the face of the

6 earth?

7 A   Yes. Then yes.

8 Q   Okay. Approximately how many of those borrowers came

9 back and asked for further funds? Strike that. I asked

10 that horribly and I'm sorry. How many of those were

11 construction loans?

12 A   I don't track data that way.

13 Q   Do you know if the bank had more than half a dozen

14 construction loans of that amount during that time period?

15 A   We don't measure data that way. You're asking for

16 information in a way that provides no relevance from a

17 management standpoint, so I don't know it offhand.

18 Q   Ms. Harless, you're an equity holder in the bank, are

19 you not?

20       MS. TANABE: Objection, relevance.

21       MR. VERSTANDIG: I'm trying to establish why she

22 should know the answer to this question.

23       MR. FEIST: She's present in her capacity as a

24 representative of the bank and she's testified that about

25 what is typical in other loans during the same time period,

Page 173

1 what her personal financial matters are should really have

2 no relevance to this case.

3       THE COURT: It goes to credibility. I'm going to

4 overrule.

5       THE WITNESS: What was your question again?

6 BY MR. VERSTANDIG:

7 Q   You're an equity holder in the bank, correct?

8 A   I am not an equity holder in the bank.

9 Q   You're an equity holder in the bank holding company?

10 A   Yes.

11 Q   The bank has less than $120 million in deposits.

12 Correct.

13 Q   For what time period?

14 Q   As we sit here today.

15 A   I don't think that's accurate. As of today, what do

16 you believe.

17 Q   The bank's total deposits to be as of today?

18 A   $115 million possibly.

19 Q   Can we agree that's less than $120 million?

20 A   Yes.

21 Q   You're saying you're not sure how many of the loans in

22 excess of $2 million were for construction projects over the

23 past few years?

24 A   So in our loan system, we don't type code based on if

25 they were used for construction or if they are already

44 (Pages 170 - 173)

Page 174

1 finished projects, they're lumped into call report codes.
2 So I don't look at reports based off of if they're being
3 constructed or not. I'm looking at other financial data.
4 It's hyper specific to the angle of what you're asking.
5        MR. VERSTANDIG: You Honor, may I have the court's
6 indulgence for one moment just to quickly touch base with my
7 client?
8        THE COURT: Yes, you may.
9        MR. VERSTANDIG: Thank you. Thank you. Your
10 Honor, nothing further for this witness.
11       THE COURT: Mr. Feist, do you have any questions?
12       MR. VERSTANDIG: I do not.
13       THE COURT: Thank you.
14       Redirect?
15       MS. TANABE: Thank you, Your Honor.
16       REDIRECT EXAMINATION OF DANIELLE HARLESS
17 BY MS. TANABE:
18 Q    I just want to kind of clarify some things that were
19 discussed a moment ago, Danielle. So I'm going to go back
20 over some questions you were just asked. Has the debtor
21 ever provided an accounting to you of how it spent The Ruins
22 notes proceeds.
23 A    Well when they submit draw requests. Theoretically
24 that's an accounting because that's saying how I'm spending
25 it. There would be budgets that came before.

Page 175

1 Q    Until you received loan requests that were proposing to
2 spend it on certain things. But have you ever seen a
3 breakdown of all the dollars that were spent on the project
4 from the debtor? And if my word accounting is confusing.
5 Do you remember at the beginning of this case there was a
6 request for an accounting and sometimes it's been called a
7 loan history or so just. Have you seen any kind of detailed
8 accounting of how the debtor spent money on the project.
9 A    Outside of what was submitted when the loan advances
10 were done? No. Nothing like post (indiscernible) or
11 whatever? Like nothing from that perspective.
12 Q    Okay, and are you a forensic accounting or do you have
13 forensic accounting training?
14 A    No, but I feel like I have it now.
15 Q    Well, facetiously aside or jokes aside, are you
16 literally a forensic accountant?
17 A    No, I am not.
18 Q    So when you drafted your declaration, was it your
19 intention to prove exactly how The Ruins loan proceeds were
20 spent by the debtor?
21 A    No, it was to show that this occurred and it's
22 something to look into because I feel it's concerning and it
23 shouldn't have happened and I feel that there's value there.
24 Coming from a creditor standpoint, do you.
25 Q    Have a good-faith belief then that some Ruins loans

Page 176

1 proceeds were commingled with other projects or maybe spent
2 on other projects?
3 A    Do I have a good-faith belief?
4 Q    Just based on your -- you've testified that you work on
5 a lot of special assets projects, that you've worked many,
6 many hours on this project. Are you concerned that that
7 Ruins loan proceeds may have been used for other projects?
8        MR. VERSTANDIG: Objection, leading.
9        THE COURT: Ms. Tanabe?
10       MS. TANABE: May I respond? Yes. I'm just trying
11 to clarify what the purpose of the chart was. We were going
12 to save it for closing, but I think it'd be helpful to just
13 kind of illustrate what the purpose of the charts are while
14 it's still fresh in our minds.
15       MR. VERSTANDIG: The question was what's the
16 purpose of the chart? That would not be leading and I have
17 no objection.
18       THE COURT: Is that the question you'd like to
19 ask?
20       MS. TANABE: I think my last question was when you
21 drafted your declaration, was it your intention to prove
22 exactly how each time dollar was spent? My second question.
23       THE COURT: Okay, well, hold it, hold it, hold it,
24 hold it. We just got to do this one at a time because it's
25 already confusing. So why don't you ask a question like

Page 177

1 we're going to start from scratch, ask a new question, just
2 one at a time.
3 BY MS. TANABE:
4 Q    It's difficult subject matter so we'll give it a try
5 again here. Okay. So we established that you are not a
6 forensic accountant. Notwithstanding how you feel, when you
7 drafted the declaration, was it your intention to provide
8 some kind of like last in, first out, first in, first out
9 type of analysis of the debtors accounts?
10 A    What do you mean by first in, first out, last in or
11 those are account?
12 Q    Well, this is further evidence that you're not LIFO,
13 FIFO. So I think what I was asking you is. Excuse me.
14 Excuse me. Okay. Sorry about that. Do you -- when you
15 produced your declaration and the charts in your
16 declaration, were you concerned by the commingling or by the
17 transfers?
18 A    As a banker, we don't like to see any funds commingled.
19 We trust that the customer is doing what they say they're
20 going to do as part of the contract. So when we see that,
21 that's a red flag. When we see that things didn't happen
22 the way that the customer stated they were going to happen.
23 And there's typically domino things that go off of. When
24 you see one thing you typically see more. That's just
25 coming from my experience.

45 (Pages 174 - 177)

Page 178

1  Q   So did this pattern of transfers, does this negatively
2  affect your business relationship with Mr. Craig and the
3  Craig entities?
4  A   Yes.
5  Q   And were you present when Mr. Craig testified that he
6  would not be inclined to investigate or sue himself?  I
7  believe the phrase was yes.  And are you confident that the
8  plan proposed by the debtors would cause someone to
9  investigate these transfers?
10 A   Doesn't look like Mac has a problem with it.  I didn't
11 see anywhere in the plan that that was laid out that they
12 were going to pursue those.
13 Q   And do you think that's in your interest as a creditor
14 or do you think that serves the interests of the Insider?
15 A   That would serve the interest of the insider.
16 Q   So when you produced these charts, what were you hoping
17 to achieve or what would be a benefit?  What were you hoping
18 a Chapter 7 trustee would do with this chart?
19 A   As a banker, information leads us to make decisions.
20 So whether or not my numbers weren't meant to be hyper
21 accurate to the penny, but the dollar amounts are big enough
22 that I would hope that when the trustee looks at it, they
23 would say there's value here and they would look into doing
24 what's proper for what they should be doing for the
25 creditors.

Page 179

1  Q   So your goal wasn't to prove how much anybody, how
2  anybody, how much anyone owes the estate or something like
3  that, but just to demonstrate that, or it's your hope that
4  as a creditor that a Chapter 7 trustee would investigate
5  those?
6  A   Correct.
7  Q   I'm going to switch gears.  Do you believe the TIF is
8  an asset of the estate?  Right now?  We're on the petition
9  date.
10 A   It was assigned well before, so it's not an asset.
11 Q   So did you think you needed to file a claim to get it
12 back or something like that?
13 A   It should never have been on the.  It logically
14 wouldn't have been on the table to make that decision.
15 Q   And by the table, you mean the schedules in the case.
16 Okay, and just want to clarify something that Mr. VerStandig
17 said about physical visits or site visits to the property.
18 Mr. VerStandig asked you if you thought a bank
19 representative or an agent of the bank had been on site in
20 the past year.  When he asked you that, were you talking
21 about yourself and Charles, that you haven't personally been
22 on site in the last year?
23       MR. VERSTANDIG:  Objection, mischaracterizes the
24 question.  The testimony and asked and answered the question
25 was very clear.  The agent of the bank, and it even included

Page 180

1  a specific reference to both the appraiser and the
2  construction expert.
3        MS. TANABE:  Bank representative is a term that's
4  specifically used in the two other in the cash collateral
5  stipulations for the two other debtors.  And it specifically
6  means Charles and Danielle.  So the use of the words bank
7  representative might have been confusing.  Trying to clarify
8  what she meant when she heard that phrase and answered that
9  question.
10       MR. VERSTANDIG:  I'm aware, though, which is why I
11 asked about a bank agent and not representative.
12       MS. TANABE:  And being a layperson, I think I'm
13 just trying to clarify what she meant by that, given the
14 possibility for confusion, given the special meaning of the
15 term in this case or in these cases.
16       THE COURT:  Okay.  I'm just going to ask you
17 because you'd have to repeat the question anyway.  Why don't
18 you restate the Question or repeat it?  Either one.
19       MS. TANABE:  Sure.
20 BY MS. TANABE:
21 Q   When Mr. VerStandig asked you if a bank representative
22 had been on site at The Ruins in the past year, did you
23 think he meant you and Charles personally?
24 A   That's what I --
25 Q   As opposed -- okay, and so do you.  Were you present

Page 181

1  when Matt Gehrtz testified recently about his building
2  report?
3  A   Yes.
4  Q   And do you recall that he testified that he went to the
5  site, made a site visit and took photos?  I think Mr.
6  VerStandig referenced that too.
7  A   I was there when he did that.
8  Q   So did you hire Matt Gehrtz to go to The Ruins and take
9  those photos and make that report after the bankruptcy case
10 was filled?  The most recent report was that after the
11 bankruptcy case was filed.
12 A   I'm starting to confuse dates because he did multiple
13 reports.  So I just don't want to be inaccurate.
14 Q   We could refresh your recollection.
15       MS. TANABE:  Could the clerk please pull up Docket
16 Number 61?  Thank you.  And can we scroll to Exhibit C?  I
17 think it's going to be Number 405 in the PDF.  It might be
18 the page.  The ECF pagination.  It might be 405.  There's
19 some noise on the line.  I'm not sure where it's coming
20 from.  Right.
21       THE COURT:  Me neither.  Can you tell --
22       MR. VERSTANDIG:  (Indiscernible) muted for once.
23       MS. TANABE:  (Indiscernible) I can mute too.
24       MR. VERSTANDIG:  It looks like it's coming from
25 the --

46 (Pages 178 - 181)

Page 182

1    THE COURT: Number with the 218 area code on my
2 screen.
3    MR. VERSTANDIG: Anyway.
4    THE COURT: Can you mute that person?
5    MS. TANABE: Thank you. Okay.
6    THE COURT: Thanks.
7    MS. TANABE: Thank you. That's helpful.
8 BY MS. TANABE:
9 Q   Okay. Do you recognize this report?
10 A   I do.
11 Q   And did the bank hire Gehrtz to produce this report?
12 A   We did.
13 Q   And what's the date on that report?
14 A   June 10th of 2025.
15 Q   And the first sentence of the second paragraph. Can
16 you take a look there?
17 A   Paraphrasing, there was an observation on April 17th of
18 '24, with a follow-up September 24th of '24, with a second
19 follow-up May 6th of 2025.
20 Q   And then after that it says there was a follow-up
21 inspection.
22 A   That would be the same. The follow-up further, that's
23 referencing the second interval of time, I think.
24 Q   So with the benefit of some refreshing here, when you
25 were asked whether any bank representative or agent of the

Page 183

1 bank had been at the project, do you think. Would you
2 change your answer to that question now?
3 A   I would. We hired Gehrtz and he was an agent of the
4 bank and he used the on site visit to prepare his report.
5 Q   Okay. Very good. So just to move on, there was some
6 discussion about original plans versus subpoenaed plans or I
7 think they've been referred to as customer supplied plans
8 versus subpoenaed plans. So I'm going to ask you, I'm going
9 to transition to talking about that for a moment. Would the
10 bank have created any plans or architectural drawings for
11 The Ruins?
12 A   We're bankers. We know our numbers. We know our
13 spreadsheets. But we don't design buildings. We're not
14 artists. We're the opposite of artists. So we would not
15 have created or modified any floor plans, architecture
16 drawings, anything like that.
17 Q   And so either based on your recollection, do you know
18 how the bank came to acquire the architectural drawings? At
19 the beginning of the construction, before the first Ruins.
20 A   Note the drawings were provided to Martin Peterson from
21 Jesse Craig.
22 Q   And how do you know that?
23 A   I've seen an email. And it would be logical that since
24 he's the one that ordered the appraisal, that he would have
25 had to receive it.

Page 184

1 Q   So you think it was emailed to the bank or you have a
2 memory of seeing an email at some point in time?
3 A   There's so many documents and details on all this
4 stuff. I don't want to misspeak. Because there's multiple
5 properties and we're only talking about The Ruins today.
6 So.
7 Q   Was another bank ever involved before Red River State
8 Bank in providing financing for The Ruins?
9 A   Another bank was being courted, was my understanding.
10 But financing, never. I wasn't involved directly in those
11 discussions. But another bank was involved. I don't recall
12 the reason for why it didn't go through with the other bank.
13 Obviously I wouldn't have inside knowledge either. But I
14 know that there was another bank as part of the. As part of
15 the beginning life of before everything happened.
16 Q   And did Martin Peterson have a relationship with that
17 other bank?
18 A   I wouldn't know that, no.
19 Q   Is it possible that Jesse Craig handed the
20 architectural drawings to Martin Peterson?
21    MR. VERSTANDIG: Objection, calls for speculation.
22 The question is literally phrased is it possible?
23    THE COURT: Sustained.
24    MS. TANABE: Shall I reword it?
25 BY MS. TANABE:

Page 185

1 Q   Based on your review of the loan file and your
2 familiarity with the matter, did Mr. Craig ever physically
3 visit the bank in connection with Ruins file?
4 A   He physically has visited the bank and so it is
5 possible that we would have received it not through email
6 also.
7 Q   And if it had been emailed to you by Mr. Craig, you
8 think it would have been from his email account as opposed
9 to some other third party at his direction?
10 A   It would be unusual that somebody else would email.
11 Like from the architect, you mean?
12 Q   Yes. So you testified that to get drawings for the
13 last appraisal from the architect that you had to subpoena
14 those documents. So did you Directly request. Do you know
15 whether the bank directly requested documents from an
16 architect or some other third party for The Ruins?
17 A   We had to subpoena for those to get a copy.
18 Q   But so you're confident that you got the original
19 drawings from Mr. Craig as opposed to an architect. For the
20 original drawings?
21 A   Correct, because if we would have gotten them from the
22 architect, they should match.
23 Q   Okay, and did the drawings in the first report have any
24 signature or stamp or any other kind of logo, et cetera,
25 from an architect?

47 (Pages 182 - 185)

Page 186

1   A   Upon reviewing the appraisals, I don't recall seeing --
2   I don't recall seeing a stamp like that was similar to.
3   They looked very similar, but they were not the same. It
4   was subtle. And the most recent subpoena, there was a red,
5   you know, like an old wax stamp looking in the upper right
6   hand corner. So they were -- they're different.
7   Q   Would it help to see the first report that contains the
8   architectural drawings that I'm returning to right now?
9   A   Yes.
10  Q   One moment.
11       THE COURT: Wasn't this highlighted
12  (indiscernible) testimony. Is it necessary?
13       MS. TANABE: I think it -- I was actually just
14  kind of questioning whether I'm being redundant, Your Honor.
15  And whether I think it might be. I was policing myself. So
16  I'm going to retract that question.
17       THE COURT: Thank you.
18       MS. TANABE: The only -- I think I have asked the
19  source of the drawings and that's probably enough. Can you
20  go back to ECF 177. And this will be my last question. I'm
21  sorry, I have the wrong document number. Looking for The
22  Ruins term sheet that Mr. VerStandig had open a moment ago.
23  Can we pull that back up?
24       MR. VERSTANDIG: 141. Exhibit 14, for what it's
25  worth.

Page 187

1       MS. TANABE: Thank you.
2   BY MS. TANABE:
3   Q   So I think we need to go up to -- there we go -- the
4   term sheet. So a moment ago you testified about the South
5   Dakota REDI program and it was clear what your testimony was
6   to me about the permanent phase. But I want to clarify
7   something you said about the construction phase. Is the
8   South Dakota REDI program relevant to the second condition
9   in the construction phase of the term sheet? Is it factored
10  into that condition?
11  A   I believe it matches the verbiage exact. If you scroll
12  down just a bit.
13  Q   So you had said that the South Dakota REDI program was
14  factored into the construction phase. What did you mean by
15  that?
16  A   When you do as a banker, you have to look at the entire
17  life cycle and you have to structure a loan based on not
18  handicapping yourself for one phase or the other. So if you
19  knew in the permanent phase that you were going to do the or
20  utilize the REDI program, you would need the language is the
21  same. You would need to make sure that. You would need to
22  make sure that the parameters of the first loan don't
23  invalidate your second phase.
24  Q   Okay. So if I understand you correctly, you're saying
25  it wouldn't be possible to have REDI program financing in

Page 188

1   the permanent phase if you had not had it in the prior
2   phase.
3   A   Correct. It had to be done at the very beginning. It
4   had to be part of the plan. You have to apply for it at the
5   beginning. You can't get it after.
6   Q   And I see that loan-to-value ratio is a condition of
7   both the construction and the permanent phase. Would not
8   having the REDI program increase the loan-to-value ratio or
9   did I should ask the question better? If the debtor did not
10  have the REDI program at the time these loans were made,
11  would it increase the loan-to-value ratio beyond what the
12  bank found acceptable?
13  A   Because there's no notation of a cash injection. It's
14  read through as a requirement from the REDI program. So
15  since if you remove out the REDI program, that automatically
16  removes out a million dollars in down payment money. If you
17  follow me. So it would affect the loan-to-value because you
18  were moving out of an equity injection. The whole document
19  would have been written different without that. It all
20  matters.
21       MS. TANABE: Okay. Thank you. I just need a
22  moment. Okay. Nothing further.
23       THE COURT: Recross?
24       RECROSS-EXAMINATION OF DANIELLE HARLESS
25  BY MR. VERSTANDIG:

Page 189

1   Q   Ms. Harless, how much was the TIF loan for Ruins?
2   A   $2.2 million rounded. I don't know the exact dollar
3   amount.
4   Q   The bank's financing commitment was 7.2 million.
5   Right?
6   A   The bank's financing off the term or the term sheet
7   number. Is that what you're referring to?
8   Q   Yep.
9   A   Correct.
10  Q   You agree that $2.2 million is a little more than 23.4
11  percent of $9.4 million?
12  A   Yes, but that's not the entire picture.
13  Q   Just asked if we could agree that it's a little more
14  than 23.4 percent. And you testified earlier that the TIF
15  money went in before the bank's money, correct?
16  A   Correct.
17       MR. VERSTANDIG: Thank you. Nothing further.
18       THE COURT: Mr. Feist, anything?
19       MR. FEIST: No.
20       THE COURT: Thank you. All right, then you may be
21  excused.
22       MS. HARLESS: All right.
23       THE COURT: Any other evidence on behalf of Red
24  River State Bank?
25       MS. TANABE: No, Your Honor.

48 (Pages 186 - 189)

Page 190

1    THE COURT:  All right.  On behalf of debtors, Mr.
2  VerStandig, (indiscernible) to call.
3    MR. VERSTANDIG:  Yes, Your Honor.  Debtor calls
4  Barry Matson.
5    CLERK:  Please state your name for the record.
6    MR. MATSON:  Barry Matson.
7    CLERK:  Do you solemnly swear that the testimony
8  you are about to give in this case will be the truth, the
9  whole truth and nothing but the truth, so help you God?
10    MR. MATSON:  Yes.
11    CLERK:  Please take the stand.
12    THE COURT:  Have you scooch up and then you might
13  want to pull that microphone a little bit closer to you.
14  And then is the box green or red.  All right, now state your
15  name for the record so that I know if I can hear you.
16    MR. MATSON:  Barry Matson.
17    THE COURT:  I'm going to have you either scooch
18  the microphone closer or you could scoot up.  Whatever's
19  most comfortable.  Okay.  Let's try again.
20    MR. MATSON:  Barry Matson.
21    THE COURT:  You'll have to be mindful of either
22  speaking up or getting closer to it because I can just
23  barely hear you.
24    MR. MATSON:  Okay.  Sorry.
25    THE COURT:  All right, Mr. VerStandig, you may

Page 191

1  proceed.
2    MR. VERSTANDIG:  Thank you, Your Honor.
3    DIRECT EXAMINATION OF BARRY MATSON
4  BY MR. VERSTANDIG:
5  Q   Mr. Matson, what do you do for a living?
6  A   I do framing and siding construction.
7  Q   How long?
8  A   I've been doing it about 25 years now.
9  Q   Where do you do framing and siding?
10  A   Where do I do it?  I do it in South Dakota.
11  Q   Okay.  All over South Dakota?
12  A   Yeah.  Yes.
13  Q   How did you learn to do framing and siding?
14  A   I learned it from my dad starting up as a kid, and then
15  I learned from my brothers and then started my own company,
16  2020.
17  Q   What's your company?
18  A   B&W Construction.
19  Q   Mr. Matson, during those 25 years, approximately how
20  many job sites have you been on?
21  A   Thousands.
22  A   Lots.
23  Q   Are you familiar with a building known as The Ruins?
24  A   Yes.
25  Q   Have you visited The Ruins in person?

Page 192

1  A   Yes.
2  Q   Did you do some work on The Ruins before construction
3  stopped?
4  A   Yes, I framed it and cited what is down there, about 60
5  percent of it.
6  Q   When did you last visit The Ruins?
7  A   I was there Friday before I came up here.  The 21st.
8  Q   So about four days ago?
9  A   Yes.
10  Q   Did you have an opportunity to look at it when you were
11  there?
12  A   Yes, I did.  About a half hour.  Walked through it,
13  looked at the outside.
14  Q   How did its condition compare to when construction
15  stopped?
16  A   It's not that bad.  The inside looks about the same.
17  There's some broken windows.  They were broken when I put
18  them in.  They were supposed to be fixed.  Overall, it's not
19  that much different.
20    MR. VERSTANDIG:  Madam Clerk, could you please
21  pull up Document 182-1 and go to Page 37.
22  BY MR. VERSTANDIG:
23  Q   Mr. Matson, while the clerk's pulling up a document,
24  can you explain a little more about the framing and siding
25  work you did on The Ruins before construction stopped?  What

Page 193

1  does that entail?
2  A   We got prebuilt walls and we erected the whole building
3  for the framing part and then we sided or then we papered it
4  with the Tyvek, installed the windows, and then we proceeded
5  to install the siding until.  Yeah.
6  Q   Of the work you were handling, how much remains to be
7  done?
8  A   How much remains to be done?  Yeah, there's about 40
9  percent probably left.
10    MR. VERSTANDIG:  Madam Clerk, could you scroll
11  down?  For reasons I don't fully understand your page
12  numbers and mine are a little bit off.  Thank you.
13  BY MR. VERSTANDIG:
14  Q   Mr. Matson, do you recognize this document?
15  A   Yes.
16  Q   What is this?
17  A   It's an LOI.  We're going to propose to finish the job,
18  and then once it's completed and rented, then we'll get paid
19  for it.
20    MR. VERSTANDIG:  Madam Clerk, could you scroll
21  down a little bit?
22  BY MR. VERSTANDIG:
23  Q   Is that your signature, Mr. Matson?
24  A   Yes.
25  Q   Are you willing to do the completion work on the

49 (Pages 190 - 193)

Page 194

1  conditions set forth in here?

2  A   Yes.

3  Q   Were you approached by anyone about doing this?

4  A   About this LOI?

5  Q   Yeah.  Did anyone present it to you?

6  A   Yes.

7  Q   Who was that?

8  A   Jesse.

9  Q   And you reviewed it with Mr. Craig?

10  A   Yes.

11  Q   And you knew that if you signed it, it would be relied

12  upon?

13  A   Yes.

14      MR. VERSTANDIG:  Okay.  Your Honor, I'm not moving

15  this into evidence for the sole reason that it's already in

16  evidence.  An exhibit to the plan.  But that's all we have

17  with this exhibit.

18  BY MR. VERSTANDIG:

19  Q   Mr. Matson, is your company owed money by The Ruins?

20  A   Yes.

21  Q   So you're a creditor in this case?

22  A   Yes.

23  Q   As a creditor, do you have a preference as to whether

24  construction should be finished or not?

25  A   Yeah.

Page 195

1  Q   What's your preference?

2  A   We would like it to be finished.

3      MR. VERSTANDIG:  Thank you, Your Honor.  I have

4  nothing further for this witness.

5      THE COURT:  Cross-examination?

6      MR. HUSHKA:  Thank you, Your Honor

7          CROSS-EXAMINATION OF BARRY MATSON

8  BY MR. HUSHKA:

9  Q   Good afternoon.  Mr. Matson, you indicated that you

10  signed that LOI that Mr. VerStandig was just referring to;

11  is that correct?

12  A   Yes.

13  Q   And that letter essentially outlined the total terms of

14  the potential future contract agreement between you and The

15  Ruins to finish The Ruins project?

16  A   Yes.

17  Q   You would agree that one of those terms is that the BW

18  be paid in full within 24 months of plan approval; is that

19  correct?

20  A   Yes.

21  Q   Would you be willing to perform the completion work for

22  The Ruins if you were not paid in full within 24 months?

23  A   Can you repeat that?  Sorry.

24  Q   A material term of the LOI is that you'll be paid in

25  full within 24 months.  Yeah.  It would be a breach of that

Page 196

1  agreement if you were not paid in full within 24 months?

2  A   Yes.

3  Q   Are you relying on being paid in full within 24 months

4  to perform completion work on The Ruins development?

5  Q   Yes.

6  Q   Additionally, you indicated that you are a creditor of

7  The Ruins at this point.

8  A   Fair.  Yes.

9  Q   Specifically, you filed a proof of claim, and when I

10  say you B&W filed a proof of claim for approximately

11  $575,000, correct?

12  A   Yes.

13  Q   So if The Ruins were sold in June, your construction

14  liens were stripped off, you'd be a general unsecured claim

15  for 575,000.

16  A   Yes.

17  Q   But is it your understanding of the current proposed

18  plan that that amount actually be bootstrapped up?

19  A   Yes.

20  Q   And so if the plan is approved, you stand to not only

21  make money on materials and labor to finish the

22  construction, but your current claim of 575,000 would be

23  see, better priority than what it would currently.

24  A   Yes.

25      MR. HUSHKA:  Just a moment, Your Honor.

Page 197

1  BY MR. HUSHKA:

2  Q   Mr. Matson, you said you started B&W in 2020?

3  A   Yes, I believe that was a year.

4  Q   All right.  Is $575,000 your largest account receivable

5  outstanding?

6  A   Currently, yes.

7      MR. HUSHKA:  No further questions, Your Honor.

8      THE COURT:  Mr. Feist, anything?

9      MR. FEIST:  No, Your Honor.  Thank you.

10      MS. STANLEY:  Redirect?

11      MR. VERSTANDIG:  Your Honor, nothing in the way of

12  redirect, but since I'm not there in person, my gratitude to

13  Mr. Matson for driving up and dressing so nicely for court

14  today.  And my gratitude for his testimony.

15      THE COURT:  Yeah, and mine for coming in this

16  weather.  So thank you.  You may be excused, which means you

17  can leave now.  Thank you.

18      All right.  Mr. VerStandig, next witness, or do

19  you need a break?

20      MR. VERSTANDIG:  No, the next witness should be

21  similarly quick.  I'm actually going to be good to my word

22  on speed for the first two.  The debtor calls Jason Biggins.

23      THE COURT:  We're not seeing anybody, Mr.

24  VerStandig.  Is Jason on video conference?  Oh, got it.  Got

25  it.  Okay.  Sorry.

Page 198

1    MR. VERSTANDIG:  Your Honor, if the clerk might
2  swipe Mr. Biggins first.
3    THE COURT:  I want to make sure that he's got his
4  microphone on.  Can you say your name so I can hear you?
5    MR. BIGGINS:  Testing.  This is Jason Biggins.
6    THE COURT:  Great.  Thank you.  Now, will you
7  raise your right hand and this clerk will swear you.
8    CLERK:  Please state your name for the record.
9    MR. BIGGINS:  Jason Biggins.
10    CLERK:  Do you solemnly swear that the testimony
11  you are about to give in this case will be the truth, the
12  whole truth, and nothing but the truth, so help you God?
13    MR. BIGGINS:  Yes, I do.
14    DIRECT EXAMINATION OF JASON BIGGINS
15  BY MR. VERSTANDIG:
16  Q    Mr. Biggins, what do you do for a living?
17  A    I do a variety of environmental consulting work.
18  Primarily, we do asbestos inspection, asbestos abatement,
19  mold inspection, and a little bit of mold remediation work.
20  Q    In what geographic area do you do that work?
21  A    We work primarily in the state of South Dakota, rarely
22  venturing outside of the state.
23  Q    Where are you?  I don't need an exact address, but what
24  city are you in at the moment?
25  A    Sioux Falls.

Page 199

1  Q    Sioux Falls, you said?
2  A    Yes, correct.
3  Q    Are you familiar with a building called The Ruins?
4  A    Yes, I am.
5  Q    Have you ever visited The Ruins in person?
6  A    Yes, I have.
7  Q    When did you visit The Ruins?
8  A    I believe I conducted a mold inspection in The Ruins in
9  winter of last year.  Last winter, I think maybe December of
10  '24.
11  Q    So just for clarity, approximately one year ago.
12  A    Yes, approximately.
13  Q    Why did you do a Mold inspection?
14  A    Jesse Craig asked me to conduct a mold inspection.
15  Q    Do you have any reason to believe that the inspection
16  you did was going to be shared with anyone other than Mr.
17  Craig?
18  A    No, I did not.
19  Q    Are you aware of anything related to the permitting
20  process in Watertown, South Dakota?
21  A    I'm not.
22  Q    Were you made aware of anything related to how an
23  inspection would interplay with permitting?
24  A    No.  No, sir.  Not at all.
25  Q    Okay.  Do you perform mold remediation work?

Page 200

1  A    We do on a limited basis.  Perform mold mediation for
2  some of the colleges and universities in South Dakota.
3  Q    Did Mr. Craig or The Ruins ever hire you to do mold
4  remediation work?
5  A    I was not hired to do mold remediation.
6  Q    After you did your inspection, did you recommend to
7  them that you be hired to do mold remediation?
8  A    I didn't believe remediation was necessary based on the
9  inspection that I conducted.
10    MR. VERSTANDIG:  Thank you, Your Honor.  I have
11  nothing further for this witness.
12    THE COURT:  Cross-examination.
13    MR. HUSHKA:  Can I have a moment please, Your
14  Honor?
15    THE COURT:  Sure, sure.
16    MR. HUSHKA:  As a point of order, Mr. VerStandig,
17  the December 11, 2024, report, that's not in evidence
18  anywhere.  It's not an attachment turn exhibit to anything
19  that I'm aware, correct?
20    MR. VERSTANDIG:  Sorry.  I was muted and realized
21  I had a millisecond delay.  For clarity, we didn't introduce
22  the report.  I did not ask him about the contents of the
23  report.  I didn't ask him about any types of spores.  I
24  didn't ask him how spores are measured.  That may have been
25  a very quick examination, but that was more carefully done

Page 201

1  on my part than I probably gave off.
2    MR. HUSHKA:  No questions.
3    THE COURT:  Mr. Feist, anything?
4    MR. FEIST:  No.  Thank you.
5    THE COURT:  All right, then.  Mr. Biggins, you can
6  be excused, which means you get to hang up.
7    MR. VERSTANDIG:  Thank you very much, Mr. Biggins.
8  My gratitude to you as well.  Since we're not there in
9  person, I don't get to shake your hand, but thank you for
10  hanging around for a long day.
11    MR. BIGGINS:  Thank you, sir.
12    MR. VERSTANDIG:  Your Honor, if the court's
13  inclined to take a break, this would be an opportune
14  occasion.  Our next witness will be our last witness.
15    THE COURT:  Okay.  I would very much like to take
16  a break.  So how about we resume at 3:30?
17    MR. VERSTANDIG:  Thank you, Your Honor.
18    (Off the record.)
19    THE COURT:  Okay.  We are back on the record with
20  Bankruptcy Case Number 24-30004, In re The Ruins.  And when
21  we broke, the debtors were getting ready to call their next
22  witness.
23    MR. VERSTANDIG:  Thank you, Your Honor.  The
24  debtor calls Mulinda Craig.
25    THE COURT:  So, Ms. Craig, you may take the stand

51 (Pages 198 - 201)

Page 202

1 because you've already served as a witness in this case, and

2 so I'm just going to remind you that you remain under oath,

3 actually a witness related to this hearing. So you might

4 have other hearings that you're invited to. And I won't re-

5 swear, but for this time, I'm just going to remind you, and

6 then I'm just going to ask you to state your name and answer

7 the question. Do you remember that you remain under oath?

8        MS. CRAIG: I do.

9        THE COURT: Okay, and your name is?

10       MS. CRAIG: Mindy Craig.

11       THE COURT: All right. Mr. VerStandig, you may

12 proceed.

13       MR. HUSHKA: Your Honor, if I may briefly, as a

14 point of order, is it okay with the court if I do objections

15 while Ms. Stanley prepares an outline? We had anticipated

16 Mr. Craig, not Ms. Craig. And so she can prepare. I don't

17 want to be seen as double-teaming the witness, but just so

18 she can prepare questions. If I can handle objections or

19 does the court want one person to do the cross-examination

20 objections?

21       THE COURT: You know what? I am so not uptight

22 about this stuff. You must have sensed that already. I

23 just do your thing and I am --

24       MR. HUSHKA: But you are an anomaly as it comes to

25 that aspect. And so I just wanted to clarify ahead of --

Page 203

1        THE COURT: We don't have a jury here. And so for

2 that reason, I am super flexible about these things.

3        MR. HUSHKA: So thank you. Sorry, Mac.

4        MR. VERSTANDIG: Not at all. And for what it's

5 worth, if you two want to rotate one question apiece.

6        THE COURT: You know, I find that lawyers really

7 enjoy this opportunity.

8        MS. STANLEY: I think I would suffer by

9 comparison. So I don't know.

10       THE COURT: Okay. You may proceed.

11       MR. VERSTANDIG: Thank you, Your Honor.

12       DIRECT EXAMINATION OF MULINDA CRAIG

13 BY MR. VERSTANDIG:

14 Q   Ms. Craig, are you familiar with a property in or about

15 Watertown, South Dakota, known as The Lofts?

16 A   I am.

17 Q   How is it that you're familiar with that property?

18 A   My husband, Jesse Craig, was a developer on the

19 property. And then I managed it under CP Business

20 Management.

21 Q   How long did you manage the property?

22 A   From the date of receiving the certificate of occupancy

23 was August of 2020 until the sale of it, which was March

24 21st of 2024.

25 Q   I think you had said that you did so under CP Business

Page 204

1 Management. I don't remember from your original testimony

2 if we covered this. Can you just establish your

3 relationship with CP Business Management?

4 A   I am an owner in CP Business Management.

5 Q   Why did CP Business management stop managing The Lofts?

6 A   It was sold to a different owner.

7 Q   And you said it was sold in 2024? A moment ago, I

8 believe.

9 A   Correct. March 21st.

10 Q   Okay. Do you know how much money it sold for?

11 A   The purchase price was $5,750,000. And then you have

12 to add back in a value of the TIF of $800,000.

13 Q   When you say you have to add back in the value of the

14 TIF, is that because the purchaser Agreed to pay the TIF.

15 A   Correct. It was a back ended TIF. So they received

16 the benefit of paying no taxes or what the tax is?

17       MR. HUSHKA: Objection, Your Honor, I believe this

18 is beyond the scope. She's not a tax professional. I

19 believe she's qualified as a department manager the first

20 time around. I believe tax consequences would be on the

21 scope of that expertise.

22       MR. VERSTANDIG: Your Honor, I'm not going to ask

23 Ms. Craig questions in her capacity as an expert on taxes or

24 tax law or anything else. For now, I'm just -- I think my

25 question was simply whether the purchaser agreed to pay the

Page 205

1 TIF, which was sort of a yes or no type question.

2        MR. HUSHKA: And she was testifying as to the tax

3 consequences of it, which I believe there's nothing proper

4 foundation or support for.

5        THE COURT: Okay. The objection is sustained.

6 You can just -- I think your answer -- well, what was your

7 answer?

8        THE WITNESS: The purchaser received the benefit

9 of the TIF.

10 BY MR. VERSTANDIG:

11 Q   Okay. Yes. So do you know if the purchaser agreed to

12 pay money under a TIF.

13 A   Yes.

14 Q   How much money did the purchaser agree to pay?

15       MR. HUSHKA: Objection, Your Honor, I'm going to

16 say foundation. She was the manager. She wasn't the

17 purchaser or the seller of this. And I think the best

18 evidence of what was offered and agreed to be paid would be

19 the actual purchase agreement documents.

20       THE COURT: If she has memory of the purchase

21 agreement documents, she can testify to that. So do you

22 remember.

23       THE WITNESS: Not specifically seeing the purchase

24 agreement just would have been conversation.

25       THE COURT: So then the objection is sustained.

52 (Pages 202 - 205)

Page 206

1 BY MR. VERSTANDIG:

2 Q   Ms. Craig, how many units were in The Lofts at the time

3 that it was sold?

4 A   Thirty-nine.

5 Q   Okay, and you had said a moment ago that the purchase

6 price was 5.7, I believe.

7 A   5.75, yes.

8 Q   Okay. I don't know if you've done the math or not. Do

9 you happen to know what that.

10 A   Comes out to per unit it should be. Well, adding back

11 in the value of the TIF, it should be 168,000 per unit.

12         MR. HUSHKA:  Again, Your Honor, I'm going to ask

13 object and ask that they be stricken about adding back in

14 the value of the TIF. I believe that that's beyond the

15 scope of whether the TIF value should be added or if it's.

16 That's calculations and construction beyond of what the per

17 unit price is and whether or not the TIF can or should be

18 added in or what the status of the TIF was in this sale.

19 It's a valuation issue that would go to an appraiser, but

20 not, I believe again, what qualification she has with this

21 court.

22         THE COURT:  So the objection goes to credibility

23 and you'll be able to highlight that on cross in her

24 calculation. She's added it in. So you can criticize that

25 or not going to credibility.

Page 207

1         MR. HUSHKA:  Thank you, Your Honor.

2         THE COURT:  So I am not going to strike the

3 answer. New question.

4 BY MR. VERSTANDIG:

5 Q   Ms. Craig, do you know who the purchaser was?

6 A   I do. It was The Lofts DTW LLC.

7 Q   Okay. Ms. Craig, are you familiar with the plans for

8 The Ruins and what's being built as The Ruins?

9 A   I am.

10 Q   Are there any differences in terms of units or

11 otherwise between The Lofts and The Ruins?

12 A   Very much so.

13 Q   Can you tell the court about those differences?

14 A   The layout of the units themselves are quite a bit

15 different. The aesthetics are quite a bit different. The.

16 The unit numbers between one bedroom or efficiencies or two

17 bedrooms are quite a bit different. Obviously, The Ruins is

18 63 units. The Lofts is 39 units. Location is quite a bit

19 different. The parking situation is quite a bit different.

20 Q   So does one building have larger average units than the

21 other?

22 A   Yes. The Ruins by far has much larger units than the

23 loft does.

24 Q   Okay. Does one building have larger parking than the

25 other?

Page 208

1         MR. HUSHKA:  Your Honor, I'm going to object to

2 the line of inquiry. I'm not sure of the relevance. I

3 thought that this was going to go to whether it was a comp

4 that was excluded from our expert, but I don't know what the

5 relevance of comparing one building to the other is when she

6 just testified that they're vastly different buildings in

7 her own testimony. So I'm not sure what the relevance of

8 what The Lofts is or isn't as to any issue pending before

9 the court.

10        MR. VERSTANDIG:  Your Honor, Mr. Huschka is

11 actually correct as to part of the objection. It's going to

12 go to the exclusion of the comp. And we're trying to

13 establish, having established a baseline per unit price, I'm

14 simply trying to get Ms. Craig to note that if anything, it

15 would trend more favorably insofar as The Ruins units are

16 larger than The Lofts units and The Ruins parking facilities

17 larger than The Lofts are parking facility. While I

18 appreciate the rest of her comments, I wasn't really looking

19 to rely on the rest of her comments, to be honest.

20        THE COURT:  I sustain, in part, So a comparison of

21 the size was appropriate. And in terms of the other

22 testimony, you were asking about whether parking was the

23 equivalent, and I'm going to allow the witness to answer

24 that question, overruling the objection.

25        MR. VERSTANDIG:  Thank you, Your Honor.

Page 209

1         THE WITNESS:  I'm sorry, Mac. Could you please

2 repeat what part you'd like me to answer?

3 BY MR. VERSTANDIG:

4 Q   Of course. Do you know if one building has more

5 generous parking than the other building?

6 A   Yes. And the parking structures themselves vary

7 greatly. The Lofts parking is an underground parking

8 garage. And the top of that would be a city owned parking

9 lot. And then the building splits about half and half. So

10 city owned parking lot and then the building itself, the

11 structure of the building, apartments sit above the other

12 half. But then you've got a big square and the parking

13 garage is underneath the big square. The Ruins on the other

14 hand, is an L shape and the parking level is the main level.

15 So you don't have to drive up, you don't have to drive down.

16 You just drive straight off the street into the parking

17 garage.

18 Q   Does one of them have a larger parking facility than

19 the other?

20 A   Yes. The Ruins counts for, oh boy, 53 parking spaces,

21 if I remember correctly. And The Lofts accounts for 39

22 parking spaces.

23 Q   Thank you. Ms. Craig, do you know if there's ever been

24 any change to the plans to construct The Ruins?

25 A   There was a slight change and it was very quick in

53 (Pages 206 - 209)

Page 210

1  sequence. The first one that I recall, and I remember
2  seeing it in my folder because I put old plans don't use was
3  September, mid September of 2021 from Terry Stroh
4  Architects. And they were changed literally. I think it
5  was two weeks later, September 30th of 2021, by Terry Stroh
6  Architects, that removed part of the commercial space, if
7  that's what we want to call it, that the city had requested
8  as part of the construction.
9        They have the City Park that sits right in the L of The
10  Ruins and the commercial space then that the city wanted or
11  has a lease on for a dollar per year is a warming house and
12  public bathrooms. And they decided that they did not need
13  that much space. So instead of it being following the
14  building footprint in L-shaped commercial public space, they
15  just needed a little straight shot. So smaller bathrooms,
16  smaller warming house. So it removed the bottom L of the L.
17  Q  To be clear, you reference this as city space, meaning
18  it's being leased to the city of Watertown.
19  A  Correct. For a dollar.
20  Q  A dollar a year, a dollar a week, a dollar a month?
21  A  A dollar per year.
22  Q  Good. Did the amount being paid under the lease change
23  when the size of the space changed?
24  A  It did not. It did not.
25  Q  Stole the full house?

Page 211

1  A  Yes.
2  Q  Okay. Did the size of any of the residential units to
3  be leased change?
4  A  Not that I specifically recall or remember. The
5  layouts are pretty much the same. I should back up one
6  statement. The only other change I recall seeing or having
7  been part of was the. The janitorial closets were very,
8  very large, abnormally large and knowing what I know from
9  The Lofts, Parkside, Generations, we definitely do not need
10  that much space for janitorial. So they were converted into
11  rentable stores, storage units where tenants could have an
12  extra space for decor, storage in general, whatever have
13  you. And then lease those per month.
14  Q  Would that lead to more or less lease revenue on a per
15  month basis?
16  A  More.
17        MR. VERSTANDIG: Your Honor, with my next two
18  questions, if there's an asked and answered objection, I'm
19  going to shrug and say I just don't remember if Ms. Cathcart
20  covered it. And I recognize that.
21  BY MR. VERSTANDIG:
22  Q  Ms. Craig, do you know how long it would take to lease
23  up The Ruins?
24        MR. HUSHKA: Objection, asked and answered. I can
25  -- it's available at Page 162, Lines 10 To 12 of her prior

Page 212

1  testimony.
2        MR. VERSTANDIG: We're not looking for a separate
3  answer and we're happy with that. Thank you, Mr. Hushka.
4        MR. HUSHKA: No problem.
5        THE COURT: That's good.
6  BY MR. VERSTANDIG:
7  Q  Ms. Craig, is there any reason your testimony would
8  have changed between the time you gave that and today?
9  A  I don't recall what my exact answer was. And I would
10  question whether or not it was stabilization period or what
11  I felt stable the lease up period would be. That's my only
12  hesitation.
13        THE COURT: Did you testify to both?
14        MR. VERSTANDIG: I don't have the transcript.
15        THE COURT: No, I know I'm looking at Mr. Hushka.
16        MR. HUSHKA: I can read the transcript in if the
17  court wants. Give me one second pulling it up.
18        THE COURT: That would be very helpful. Thank
19  you.
20        MR. HUSHKA: Beginning on Line 13:
21        "A  Once it's stabilized in full or has an
22  acceptable occupancy rate of less than 5 percent.
23  Vacancy rate. I'm sorry, of less than 5 percent. The
24  market rents that I anticipate to be able to be
25  charged. The unit should be bring in. I'm going to

Page 213

1  use round off numbers of 80,000 months plus, give or
2  take a little bit. By the time all expenses are
3  accounted for and paid for every month, there should be
4  roughly 60,000 a month in cash flow or net cash flow.
5  That's not including the debt service."
6        That's to Line 22.
7        "And I realized that it was the timeline which
8  begins at 8. I think from what I've seen, my
9  knowledge, definitely not an expertise in this area by
10  any means. I'm not a banker by any means, but it would
11  roughly be 18 months. Anywhere from a year to 18
12  months.
13  BY MR. VERSTANDIG:
14  Q  Ms. Craig, is it still -- so your testimony that would
15  take a year and 18 months to lease up the property?
16  A  Not to fully lease up. And that is. I apologize. I
17  don't know what that question was right before Mr. Hushka
18  read my answer.
19        MR. HUSHKA: I could identify it to the court.
20        THE COURT: Sure. Let's find out what the
21  question is.
22        MR. HUSHKA: The question posed at lines 1 to 2:
23        "Q  What is the anticipated profit margin for the
24  completed Ruins project?"
25  BY MR. VERSTANDIG:

54 (Pages 210 - 213)

Page 214

1 Q   Okay, in that case, it sounds like it may have been
2 partially answered but not asked.  So if the court will
3 indulge, I would ask how long from the certificate of
4 occupancy would it take to lease up the property.
5 A   Based off of the current rental market that I'm my
6 daily.  What I look like at daily on my computer screen and
7 rent out for Parkside and Generations.  And then being part
8 of the lease up period for Parkside and Generations, I'd
9 have to say it's far less than the 18 months to
10 stabilization period.  I don't want to give 100 percent
11 guarantee, but I would say it's 95 percent sure it would be
12 less than 18 months and 90 percent sure it'd be less than a
13 year and probably 70 percent less than six months.
14       MR. VERSTANDIG: Madam Clerk, could we please pull
15 up Document 182-2?  If we scroll down, it's going to be the
16 one that says Exhibit 2, photographs of property at the top.
17 It's probably a decent ways down.  It's past the floor.
18 Thank you.  Madam Clerk, could you please just sort of
19 slowly scroll through the three pages that are photographs?
20 Thank you.
21 BY MR. VERSTANDIG:
22 Q   Ms. Craig, do you recognize these photographs?
23 A   I do.
24 Q   What are they?
25 A   They are photos of the south-facing facade of The

Page 215

1 Ruins.
2 Q   Are you familiar with what the south facing facade of
3 The Ruins looks like as we sit here today?
4 A   Yes.
5 Q   Are these photos a true and accurate depiction of the
6 south facing facade of The Ruins?
7 A   Unless there has been some severe wind in Watertown
8 this morning, it should look the exact same.
9       MR. VERSTANDIG: Your Honor, I'd move Exhibit 2
10 into evidence.
11       THE COURT: I'm sorry, I didn't hear that.
12       MR. VERSTANDIG: Your Honor, at this time, we
13 would move what we've marked as Exhibit Number 2 for the
14 continued portion of this hearing into evidence.
15       THE COURT: This isn't already received?
16       MR. HUSHKA: This was attached to the plans.  Mac,
17 is that what you just had pulled up to the proposed plan
18 anyway?
19       MR. VERSTANDIG: No.  This documentary is all of
20 the exhibits that we marked for this hearing.  The continued
21 portion thereof.  The first exhibit happens to be the plan.
22 And then the clerk scrolled down to Part 2, which is the
23 photographs.  So the plan is in, but the photographs are not
24 presently in.
25       THE COURT: Okay.  Any objection to the court

Page 216

1 receiving the photographs?
2       MR. HUSHKA: No, Your Honor.
3       THE COURT: The court receives the photographs.
4 So that would be just the three photographs in Docket 181 --
5       MR. VERSTANDIG: 182, Exhibit 2.
6       THE COURT: 182.  Got it.
7       (Exhibit 182-2 entered into evidence)
8       MR. VERSTANDIG: I guess for housekeeping and
9 clarity, all of the exhibits that had originally been marked
10 for this hearing were dealt with either by stipulation or
11 otherwise during sort of the original portion of the
12 hearing.  For the continued hearing, we marked six
13 additional exhibits.  The first is the second amended plan.
14 The second's the photographs, and the last four are emails.
15 I believe the first and the second are now in evidence and
16 we do not intend to move Exhibits 3 to 6.
17       THE COURT: All right.  So what I just did was
18 receive Exhibit 182, which are three photographs that's
19 received in.
20       MR. VERSTANDIG: Yes.
21       THE COURT: Okay.
22       MR. VERSTANDIG: For clarity and fairness, I think
23 it's 182-2.  There are 182 has several subparts, and we are
24 not moving forward.
25       THE COURT: Got it.  182-2.  Thank you.

Page 217

1       MR. VERSTANDIG: Madam Clerk, that's all I have
2 with that exhibit.
3 BY MR. VERSTANDIG:
4 Q   Ms. Craig, did you hear some testimony earlier today
5 about "luxury expenditures"?
6 A   I did.
7 Q   Okay.  Are you familiar with what some of those
8 putatively luxurious expenditures are?
9 A   I am.
10 Q   Could you explain that to the court?
11 A   There were a handful of arrow expenditures, and
12 majority of those stem from other projects that my husband
13 has been is part of development projects, scoping out
14 different sites and different locations for different
15 development groups that have hired him to go out, scope out,
16 find places to build.  And then he reports back with his
17 findings or visit sites quite often through city meetings
18 and official meetings and different contractor meetings and
19 whatnot.  So some of those majority of those expenses were
20 reimbursed by those outside developer entities,
21 corporations, businesses.
22 Q   This is a really obvious question, but just for clarity
23 of the record, who is your husband?
24 A   Jesse Craig.
25 Q   Okay.  Ms. Craig, you had mentioned earlier that you

Page 218

1 own CP Business Management, correct?
2 A Yes.
3 Q Is CP Business Management a creditor in this case?
4 A Yes.
5 Q I'm not sure if I paused my own witness or didn't get
6 an answer that I just didn't hear.
7 A Oh, I think your video glitched. Sorry, Mac.
8 Q I'm so sorry.
9 A No, that's okay.
10 Q Okay.
11 Q Thank you.
12 Q And does CP Business Management favor conversion of
13 this case to Chapter 7 or retention in Chapter 11?
14 A Obviously retention.
15 Q Thank you.
16 A Yeah.
17     MR. VERSTANDIG: Your Honor, I have nothing
18 further for this witness.
19     THE COURT: Cross-examination?
20     CROSS-EXAMINATION OF MULINDA CRAIG
21 BY MS. STANLEY:
22 Q Ms. Craig, you testified you have never seen a copy of
23 the purchase agreement for The Lofts; is that correct?
24 A I don't believe in its entirety. I believe I've seen
25 bits and pieces, but I don't believe I've fully reviewed a

Page 219

1 full purchase agreement.
2 Q Isn't it true that the purchase was of a membership
3 interest in The Lofts LLC and not actually of the real
4 estate itself?
5 A Don't they go hand in hand?
6 Q Well, if you -- let's think about the Vogel Law Firm
7 has a building that's three, four blocks that far. Is it
8 different to purchase a membership interest and be part of
9 the Vogel Law Firm building partnership? Is it different to
10 do that and be part of the partnership or to actually
11 purchase the dirt, the building itself? Those are different
12 things, aren't they?
13 A Yes. And the purchaser purchased the dirt, the
14 buildings, the doors, the leases? Yes.
15 Q Well, my question though is the members buying a
16 membership interest in The Lofts LLC as an entity. Isn't
17 that what that's purchase agreement was?
18 A Yeah. I'm not even going to speculate or say yes or
19 no.
20 Q Were you present yesterday when Mr. Luther indicated
21 that he did not find a sale document in the real estate
22 records?
23 A I was.
24     MR. VERSTANDIG: Objection, mischaracterizes the
25 record. That was not Mr. Luther's testimony. Mr. Luther

Page 220

1 testified that there are reasons he would not have seen a
2 sale. But he didn't testify as to any specific search or
3 attempted search from The Lofts.
4     THE COURT: Sustained.
5 BY MS. STANLEY:
6 Q Do you know if the TIF for The Lofts had got previously
7 been assigned? Do you have any personal knowledge of that?
8 A I don't have personal knowledge of the TIF previously
9 been assigned.
10 Q Were you present when Mr. Luther indicated that he
11 personally measured the footprint of The Ruins building
12 using a wheel?
13 A I don't recall his exact words of how he measured it,
14 but I do recall him saying that he personally measured.
15 Q Have you yourself personally measured the footprint of
16 The Ruins building?
17 A I have not.
18 Q You just indicated that there was a change in the plans
19 of The Ruins at one point? Do you personally know if that
20 information was ever conveyed to the bank or provided those
21 plans were changed? The changed plans. I'm sorry, that was
22 -- that was bad.
23 A I can't say if the updated plans had been provided. I
24 do know from overhearing conversations between Jesse and
25 Charles that they --

Page 221

1 Q That would be hearsay. So I asked if do you personally
2 know?
3     THE COURT: Okay. The answer do you personally
4 know is the question. Whether it's hearsay is a whole
5 different thing. So we'll just wait for a new question.
6 BY MS. STANLEY:
7 Q Do you have any idea if the terms of The Lofts sale
8 were publicly public information?
9 A That is a question unfortunately I wouldn't be able to
10 answer.
11 Q Ms. Craig, you gave sworn testimony in this matter at
12 the beginning of the month, correct?
13 A I believe so.
14 Q And during that sworn testimony you were asked about
15 the anticipated profit margins, correct?
16 A Anticipated profit margins of The Ruins? Yes.
17 Q That's correct, isn't it?
18 A I believe so.
19 Q And in response to the question, which I believe Mr.
20 Hushka just read out, you volunteered that the question was,
21 "loaded" because it would depend if it's filled up or it's
22 fit, stable and or stabilized.
23 A That's true.
24 Q Okay, and you testified it would be roughly 18 months,
25 anywhere from a year to 18 months to stabilize; is that

56 (Pages 218 - 221)

Page 222

1 correct?

2 A   Yep.  That matches what I said today.

3 Q   And that was before any testimony regarding whether The

4 Ruins would be able to generate sufficient money to cash

5 flow.

6 A   Are you asking cash flow regarding P & I or strictly

7 interest only during a stabilization period?

8 Q   It would be debt service.

9 A   So after it's been stabilized, yes.  Okay, I apologize.

10 Can you repeat your -- what was your question?  Which one

11 was it?

12 Q   That was before there was any testimony regarding

13 whether The Ruins would be able to generate sufficient money

14 to cash flow for debt service.

15       THE COURT:  I'll wait for the objection.

16       MR. VERSTANDIG:  Misstates the record in a sort of

17 weirdly meta fashion.  She's asking if the question that

18 would have.  My friend is asking if the question that went

19 to cash flow was posed before or after questions about cash

20 flow, and that is, at best, ambiguous.

21 BY MS. STANLEY:

22 Q   Well, have you changed your testimony today that now

23 that we have a cash flow being specifically identified as a

24 problem, are you now testifying that it's going to take

25 significantly less time to stabilize?

Page 223

1 A   My testimony before, and my testimony today was a year

2 to 18 months.  Today I said it could be 18 months.  I'm 95

3 percent certain it will be stabilized in 18 months.  I'm

4 certain it would be filled within a year.  And then I went

5 back down to six months stabilized.

6 Q   You didn't say six months the first time you testified,

7 though, correct?

8 A   Correct.

9       THE COURT:  Okay.  So there's a whole new question

10 asked, so I'm assuming then the original objection will be

11 sustained because it was a whole new thing.  Just to clear

12 up that record part.

13       MS. STANLEY:  I apologize.  I'm bad at closing

14 that loop.

15       THE COURT:  It's a hard thing to do.

16 BY MS. STANLEY:

17 Q   Ms. Craig, do you work for Craig Development?

18 A   I do not.

19       MS. STANLEY:  Sharon, can we please pull up

20 Exhibit 177 or ECF 177.

21 BY MS. STANLEY:

22 Q   And while she does that, Ms. Craig, do you work for

23 Craig Properties?

24 A   Not any longer.

25 Q   And what was the time frame when you quit working at

Page 224

1 Craig Properties?

2 A   2014.  When our twins were born would have been the

3 last time I did any work of any substance.

4 Q   So at least 10 years ago?

5 A   Yes.

6 Q   Okay, and did you -- if we scroll through some of these

7 documents that are after the summary page.  Oh, I'm sorry.

8 I apologize.  This should be 98.  If we continue scrolling

9 through some of these, do these appear to be payments made

10 to you directly from Craig Development.

11       MR. VERSTANDIG:  Objection.  Scope.

12       MS. STANLEY:  Well, I'm pretty sure you brought up

13 information on the Exhibit 177.

14       MR. VERSTANDIG:  I asked a very narrow question

15 about luxury expenses.  That was the only portion of this we

16 went into.

17       MS. STANLEY:  I think it goes to her credibility.

18       THE COURT:  It does, but the objection is to

19 scope.  And so you would have to recall her if you wanted to

20 ask about.  I don't recall her testifying either at the

21 first time or this time about any payment, unless you can

22 scroll and look in the previous testimony and remind me

23 where that is.  But it appears to be out of scope unless you

24 have a specific memory of something she testified to.  So

25 I'm going to sustain the objection until you recall

Page 225

1 something and then you can circle back to it.

2 BY MS. STANLEY:

3 Q   It's been a long day yet, but I believe Mr. VerStandig

4 asked you some questions about payments made to CP Business

5 Management.  Am I remembering that correctly?

6       MR. VERSTANDIG:  I don't -- I guess objection.

7 Mischaracterizes the record.  My question about CP Business

8 Management were what her relationship is with it and whether

9 or not it's a creditor in this case.

10       THE COURT:  Sustained.

11       THE WITNESS:  Can I get that question?

12       MR. VERSTANDIG:  (Indiscernible) I don't think

13 (indiscernible) --

14       MS. STANLEY:  Okay.  Can I have two minutes?  I

15 think we're almost done.

16       THE COURT:  Absolutely.

17 BY MS. STANLEY:

18 Q   Just a point of clarification.  I think you testified

19 one of the buildings in Watertown has a warming house.

20 A   The Ruins has a plan to have a warming house.

21 Q   Yes, The Ruins does.  Okay.  For some reason, I thought

22 you said Parkside, so I was just clarifying that one.

23 A   It's meant for the people that are visiting the park in

24 the wintertime to go and warm up as part of the city public

25 space.  So it's not a true house in the sense of separate

57 (Pages 222 - 225)

Page 226

1  structure. It's part of the -- half of the L for people to
2  go.
3      MS. STANLEY: Okay, I don't -- nothing further.
4      THE COURT: Okay. Mr. Feist, any questions?
5      MR. FEIST: I do not have any.
6      THE COURT: Thank you.
7      Redirect, Mr. VerStandig?
8      MR. VERSTANDIG: None, Your Honor.
9      THE COURT: All right, you may be excused again.
10     MS. CRAIG: Thank you.
11     MR. VERSTANDIG: My same gratitude to Ms. Craig,
12 but I will actually speak to her later.
13     Your Honor, the debtor rests (indiscernible)
14 rebuttal.
15     MR. HUSHKA: Nothing, Your Honor.
16     THE COURT: Okay. So the record is closed. Okay.
17 What I'm going to invite you to do is after this hearing's
18 over, I'd like you to stay on the line, Mr. VerStandig.
19 Now, Mr. Feist, if you'd like to.
20     And also for counsel for Red River State Bank to
21 until you've gone through the exhibit list with Ms. Horsager
22 to make sure that it's consistent with your memory is.
23 I just want to make sure that we have all of the same
24 records.
25     MR. HUSHKA: Your Honor, I guess as a point of

Page 227

1  clarification, just to clear it up for the record, I don't
2  know if you asked Mr. Feist if he had any witnesses or
3  exhibits he wanted to put on.
4      THE COURT: I didn't ask him.
5      Mr. Feist, witnesses or exhibits?
6      MR. FEIST: I do not.
7      THE COURT: Okay.
8      MR. FEIST: I do not. But I appreciate you
9  asking. Thanks.
10     THE COURT: Yes. Thank you. I thought I might
11 have said something earlier in the hearing.
12     MR. HUSHKA: I think you did the first time
13 around.
14     THE COURT: You're right. But this is a whole
15 different substantive area. And I'm also very grateful for
16 those reminders. So thank you. Anytime you feel welcome to
17 do that.
18     Okay. We had visited briefly at the close of the
19 last hearing about closing argument and whether you wanted
20 to present something today or in writing or both. I feel
21 like given the days in between and the sheer number of
22 exhibits that my preference might be for writing is your
23 preference. It looks like all parties agree writing is
24 good.
25     Highlighting the exhibits, there were some that

Page 228

1  you did by summary fashion and there were some that I
2  received, you know, a play by play. And so the weight you
3  think I should give them and the importance to any
4  particular element, particularly since you know now that I
5  am going to consider dismissal, conversion and possible
6  unusual circumstances. So I made that perfectly clear and I
7  anticipate to hear from you about that. How much time? So
8  let's begin with the movant. How much time would you like?
9      MR. HUSHKA: Your Honor, I believe Ms. Tanabe is
10 going to be our principal brief, or at least the initial
11 draft on that. So I see she just messaged me two weeks, so
12 just because of the holidays and whatnot. I wonder if it's
13 unrealistic to do it faster than two weeks, but I flexible.
14     THE COURT: Your thoughts, Mr. VerStandig?
15     MR. VERSTANDIG: Your Honor, the debtor's fine
16 with two weeks. I think the follow-up question would be
17 simultaneous or successive. And I don't want to misstate
18 anything.
19     My understanding at the close of the last hearing
20 had been that we were looking at simultaneous, which is
21 certainly fine with the debtor. If the movant would prefer
22 to do successive closings where they close, we respond and
23 they rebut. We're also fine with that and we're going to be
24 deferential one way or another. But two weeks would be
25 fine, assuming that's also our deadline.

Page 229

1      THE COURT: So if simultaneous, then for sure I
2  would grant rebuttal. Let's look where that takes us. I've
3  got to see the calendar. So two weeks from today, which is
4  the 25th, would be the 9th and then rebuttal by the 16th.
5      MR. VERSTANDIG: I think that's right. That would
6  mean both sides are rebutting each other. There's no
7  exclusive right to rebuttal, correct?
8      THE COURT: I'm sorry. Reply. I don't mean
9  rebuttal. Reply.
10     MR. VERSTANDIG: Thank you.
11     THE COURT: It would be simultaneous and then a
12 reply, if that's your preference. Do you have a preference?
13     MS. TANABE: That's fine.
14     MR. VERSTANDIG: That works for the debtor, Your
15 Honor.
16     THE COURT: Great. So the 9th and then the 16th,
17 you agree on those dates?
18     MS. TANABE: Correct, yes.
19     THE COURT: Okay. Mr. VerStandig, I'm sorry, I
20 didn't hear you.
21     MR. VERSTANDIG: Yes, we agree on those dates.
22 And just for clarity, especially with this group, no page
23 limit, correct?
24     THE COURT: You know, I made that mistake in Pro
25 Mark. No page limit. That's correct. I'll let you --

58 (Pages 226 - 229)

Page 230

1     MR. VERSTANDIG:  My apologies about that in Pro
2  Mark.
3         THE COURT:  No, yeah.  No, actually, no page
4  limit.  It's complicated.  So if you can do it concisely,
5  great.  Two weeks isn't a lot of time.  So I expect a lot of
6  paper.
7     MR. VERSTANDIG:  Thank you, Your Honor.
8         THE COURT:  All right.  Okay.  Anything further?
9  We have our deadlines.  We have our record closed.
10    MR. VERSTANDIG:  The debtor wishes everyone a
11 Happy Thanksgiving.
12        THE COURT:  Happy Thanksgiving to you.  All right.
13 That's it.  This matter stands in recess.  You can remain
14 seated and put away your things.  I'm going to do the same.
15    MR. HUSHKA:  Your Honor, if you could wait just a
16 second, I want to clarify something with Mr. VerStandig.  We
17 might need to reopen the record if the court needs a
18 stipulation on the record.
19    Mac, have you looked into that issue regarding the
20 adversary complaint yet and/or are you willing to stipulate
21 to an extension for our answer or motion to dismiss deadline
22 in light of that issues that we've discussed?  Not trying to
23 involve the court in any of those discussions, but I just
24 want to know if I needed to be finishing our answer and
25 counter over the Thanksgiving holiday or if you're going to

Page 231

1  put a stipulation on the record that we're still working
2  that out.
3     MR. VERSTANDIG:  So the honest answer is I started
4  to do the research and didn't get deep enough.  But the
5  equally honest answer is I have no interest in torturing you
6  over a holiday.  So if you indicate what extension you want
7  for your responsive pleading, as long as it ends with 2025,
8  I'm going to be amenable.
9     MR. HUSHKA:  Stipulate to the -- I think it'd be
10 due on the 3rd.  An additional two weeks when we maybe
11 figure that out, to the 17th of December?
12    MR. VERSTANDIG:  That's perfectly agreeable.
13    MR. HUSHKA:  But we can try and get it done
14 sooner.
15    MR. VERSTANDIG:  Yeah.
16    MR. HUSHKA:  Would you want that stipulation in
17 writing, Your Honor, or just on the record or care one way
18 or the other?
19        THE COURT:  Would you remind me the adversary
20 number so that Sharon and I could docket this properly?
21    MR. HUSHKA:  Certainly.  The Adversary Number is
22 25-07009.
23        THE COURT:  Okay, and it's a stipulated motion for
24 an extension of time to?
25    MR. HUSHKA:  File either a -- file an answer or

Page 232

1  motion to dismiss, which we're trying to avoid, and work
2  something out.
3         THE COURT:  Okay.
4     MR. HUSHKA:  On a small issue.
5     MR. VERSTANDIG:  For clarity on the stipulation,
6  the debtor/plaintiff does not concede that there would be a
7  right to file a motion to dismiss.  That would be a
8  contested issue if one was filed.
9     But Mr. Hushka, without speaking to the sum and
10 substance of it, has raised an interesting legal question,
11 and I owe him an educated response as to whether we concur
12 with his legal position or take issue with it.  And I think
13 that would be dispositive of whether or not we would then
14 argue over the scope of the motion to dismiss.
15        THE COURT:  Okay.  So here's the deal.  I'm going
16 to let you fashion a written pleading and just assure you
17 that I will grant it.
18    MR. HUSHKA:  Okay.
19        THE COURT:  Okay.  All right.
20    MR. HUSHKA:  I just didn't want to be defaulted.
21        THE COURT:  Clarity with the record running,
22 especially knowing that there's about to be a holiday.
23    Mr. Hushka, I am going to agree to a two-week
24 extension to anything within the scope of reason.  And you
25 ought not take a moment away from turkey, stuffing or any

Page 233

1  cranberries, knowing that that is out there.
2     MR. HUSHKA:  Appreciate it.  Thank you.
3         THE COURT:  Okay.  So you can go ahead and confer,
4  or if you want to just go ahead and list the exhibits,
5  Sharon, that were received and the counsel can follow along.
6  Yeah.  Let's just do it on the record.  Leave it running.
7  Okay.  Yeah, you can go up.  I'm just going to pick up my
8  papers.
9         CLERK:  This is going off of the amended exhibit
10 list?
11        THE COURT:  Yeah.  Doc 180.
12        CLERK:  One-eighty.  Okay.
13        THE COURT:  Okay.
14        CLERK:  I show 59, 60-A, B and C, 84, 85, 86, 95,
15 95-2, 95-3 --
16    MS. STANLEY:  I'm sorry.  Are we looking at, like,
17 from the beginning of these hearings or just the new ones?
18 Because --
19    MR. HUSHKA:  The very beginning.
20    MS. STANLEY:  From the very beginning, I have, you
21 know, like, 86, 87 is the declaration of D&M Industries.
22 Those were all stipulated two in the prior one.
23        CLERK:  Yeah.  I have that.
24    MR. VERSTANDIG:  For what it's worth, I agree that
25 87, 88, 89, 90, 91 were all stipulated to.

59 (Pages 230 - 233)

Page 234

1    MS. STANLEY: I tried to keep the X on the second
2    column if they'd previously been stipulated to.
3        CLERK: Okay. So, yes, I have 86, 87, 88, 89.
4        MS. STANLEY: Yep.
5        CLERK: ECF 90, 91, 96.
6        MS. STANLEY: And then I think it was 95-1, 95-2
7    and 95-3.
8        CLERK: Yes. Correct.
9        MS. STANLEY: Agree with that.
10       MS. TANABE: Agreed.
11       CLERK: Ninety-six, 97.
12       MS. STANLEY: Yes.
13       CLERK: Ninety-eight, 101, 102. Then I have 132,
14   133, 134, 135, 136, 137, and then ECF 32, ECF 78, ECF 79,
15   ECF 80, ECF 81, ECF 82, ECF 83, ECF 84, Red River 1, Red
16   River 2, Red River 3, Red River 4, Red River 5, Red River 6,
17   Red River 7, Red River 8, Red River 9, Red River 10, Red
18   River 11, ECF 141-11.
19       MR. VERSTANDIG: Just for clarification, backing
20   up, my note is that on seven and eight, they're not
21   introduced for the truthfulness of the assertions contained
22   therein. It's a complaint and a motion for summary judgment
23   in state court. And we stipulated to their admissibility,
24   but not to the validity of the assertions.
25       MS. STANLEY: Right, just that basically there'd

Page 235

1    been a foreclosure filed.
2        MR. HUSHKA: It exists.
3        MS. STANLEY: It exists, and that a partial motion
4    had been filed.
5        MR. VERSTANDIG: Agreed. Same with Red River 9,
6    for what it's worth.
7        MS. STANLEY: Yeah.
8        CLERK: I believe I said ECF 141-11 and 141-12.
9        MR. HUSHKA: Yeah.
10       CLERK: And 141-13, 141-14, 141-15.
11       MS. TANABE: Did we miss 114.
12       MS. STANLEY: There was exhibit --
13       MS. TANABE: Exhibit 25?
14       MS. STANLEY: So to the transcript of Jesse Craig,
15   there was an Exhibit 25, the summary, contractor summary
16   disbursement. That one had been admitted.
17       THE COURT: Just the exhibit.
18       MS. STANLEY: Just that exhibit.
19       THE COURT: That's what I have.
20       MS. STANLEY: Yeah.
21       MS. TANABE: Okay. Sorry to interrupt.
22       CLERK: And then I have -- yes, that's right.
23   Exhibit 25 to Doc 114.
24       MS. TANABE: Yes.
25       CLERK: And then the state of South Dakota

Page 236

1    executive order.
2        MS. TANABE: Oh, yeah.
3        MR. HUSHKA: The judicial notice --
4        THE COURT: Notice.
5        MR. HUSHKA: Yeah.
6        THE COURT: And then --
7        MR. VERSTANDIG: (Indiscernible) taking judicial
8    notice that there is a pandemic, right?
9        THE COURT: Yes.
10       MS. TANABE: Yes.
11       MR. VERSTANDIG: Okay.
12       MR. HUSHKA: The date of the declaration, I
13   believe.
14       MR. VERSTANDIG: Yeah. That was a fun sideshow.
15       CLERK: And then 175, 176, 177, only the
16   Attachments A through I.
17       MS. STANLEY: Yes.
18       CLERK: And then 181, and 182-2 Exhibit 2.
19       MR. VERSTANDIG: Yes.
20       THE COURT: That was not easy.
21       MS. STANLEY: I'm just tired.
22       THE COURT: Okay.
23       CLERK: We're all good?
24       THE COURT: We're all good.
25       CLERK: Okay.

Page 237

1        THE COURT: You can close the record.
2        (Whereupon, at 4:30 p.m., these proceedings were
3    concluded)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400

Page 238

```
 1          C E R T I F I C A T I O N

 2

 3       I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  December 2, 2025
```

61 (Page 238)

**[& - 143]**                                                                    Page 1

| & | | | |
|---|---|---|---|
| **&**   4:20 5:9 222:6 | 234:17 | 106:8,14 | **12/30**   79:12 |
| **0** | **10,541.67.** 77:20 | 107:13,16 | **120**   173:11,19 |
| **09/26/2025**   3:2 | **10,691,893** 49:10 51:22 | 108:4,16,21 | **12151**   238:6 |
| **1** | **10.6**   46:2 48:13 | 114:9,19 | **122**   6:7 |
| **1**   18:1,4 71:10 85:4,7 103:8 110:5 118:10 119:13,20 133:5 165:1 213:22 234:15 | **10/10/2025**   3:6 | 115:10 116:5 | **124,663.56.** 70:17 |
| | **10/17/2025** 3:10 | 117:17 123:24 | **12th**   70:2 |
| | **100**   5:19 56:23 94:2,5,8 100:16 103:20 103:20 107:1 165:1 166:23 214:10 | 125:1 157:16 | **13**   28:9,19,20 28:23 30:17,19 30:22 109:1 212:20 |
| | | 165:9 167:18 | |
| | | 168:3,10,20 | |
| | | 200:17 218:13 | |
| | | 234:18 | |
| **1,268,944.90** 29:11 | | **11,090,000** 52:18 109:19 129:5,8 | **13,862,500** 106:16 |
| **1,268,944.90.** 28:13 | **100,000**   56:3 80:25 | | **131**   3:6 |
| **1,322,454.31.** 28:17 30:11 | **101**   234:13 | **11,090,000.01** 52:19 | **132**   234:13 |
| **1,353**   80:2,3 | **102**   234:13 | **11,090,000.01.** 32:22 | **133**   234:14 |
| **1,465,668.49.** 76:7 | **1023**   142:19 143:3,22,23 144:23 | **11,140,000** 48:21 | **134**   234:14 |
| | | | **135**   234:14 |
| **1,478,434.10** 17:13 25:25 | **106,597.13.** 70:5 | **110**   87:11 | **136**   234:14 |
| | | **1112**   93:25 164:25 165:15 165:19 166:25 | **137**   234:14 |
| **1.1**   36:22 38:21 87:11 | **109**   3:2 | | **14**   31:13,18 32:12,18,21 33:1,4 122:21 124:17,23 125:3 161:4 186:24 |
| | **10:00**   122:3 | | |
| **1.15**   36:25 | **10:20**   59:7 | **114**   235:11,23 | |
| **1.5**   57:9 | **10th**   17:4,11 17:14,20 26:6 27:8,8 182:14 | **115**   173:18 | |
| **1.5.**   57:21 | | **11501**   238:23 | |
| **10**   17:21 26:8 27:13,14 38:24 42:4 46:3 56:12 86:20 121:12,14 122:24 123:2,4 123:5 165:2 211:25 224:4 | | **11th**   16:12 18:17 23:1 39:3 | **141**   33:1,6 84:14 122:21 161:4 186:24 |
| | **11**   3:2,5,9 21:6 28:11,12,22 29:7,9,14 30:2 30:13 52:15 80:4 84:25 89:12 103:9,15 104:25 105:6 | | |
| | | **12**   11:23 28:9 28:15,16,22 30:6,8,13 37:13,17,19 88:6,10 97:1 154:22 211:25 | **141-11**   234:18 235:8 |
| | | | **141-12**   235:8 |
| | | | **141-13**   235:10 |
| | | | **141-14**   235:10 |
| | | | **141-15**   235:10 |
| | | | **143**   3:10 |

| | | | |
|---|---|---|---|
| **14th**  4:22 | 38:22,23 39:4 | **2** | 28:12,16,21 |
| **15**  33:4 84:15 | 77:11 90:4 | **2**  23:17,23 | 29:11,24 30:11 |
| 118:10,25 | 213:11,11,15 | 24:22 57:14 | 30:19 51:4 |
| **15,000**  15:7 | 214:9,12 | 58:3 60:11 | 57:14 125:1 |
| **15.9**  106:23 | 221:24,25 | 68:2 132:18 | **2023**  31:16 |
| **1500**  5:19 | 223:2,2,3 | 169:16 170:7 | 64:18 70:3 |
| **158,679**  28:20 | **180**  233:11 | 170:22 171:3 | 76:24 79:12 |
| 30:19 | **181**  6:22 84:14 | 171:21,22 | 125:2 141:15 |
| **162**  211:25 | 92:5,18 93:21 | 173:22 213:22 | 158:20 |
| **1630**  4:5 | 93:22 216:4 | 214:16 215:9 | **2024**  90:5 |
| **168,000**  206:11 | 236:18 | 215:13,22 | 158:19 159:18 |
| **16th**  28:16 | **181,947.80** | 216:5 234:16 | 200:17 203:24 |
| 229:4,16 | 16:19 | 236:18 238:25 | 204:7 |
| **17**  125:2 | **181,947.80.** | **2,274,820.42** | **2025**  2:9 11:23 |
| 141:15 | 24:16 | 16:25 | 49:6 96:23 |
| **174**  6:6 | **182**  216:5,6,18 | **2,952,702.33** | 116:11 151:4 |
| **175**  6:19 7:17 | 216:23 | 16:13 18:16 | 151:16,17 |
| 7:23 8:1,2 | **182-1**  192:21 | **2.2**  52:22,24 | 154:13 155:6 |
| 236:15 | **182-2**  6:23 | 189:2,10 | 182:14,19 |
| **176**  6:20 8:5,15 | 214:15 216:7 | **2.75**  57:19 | 231:7 238:25 |
| 8:18,20 236:15 | 216:23,25 | **20**  40:6 123:5 | **203**  6:14 |
| **177**  6:21 8:11 | 236:18 | 123:20 124:9 | **206**  4:22 |
| 8:16,19,20 | **189**  6:7 | **20,000**  130:5 | **216**  6:23 |
| 13:23 14:6 | **18th**  70:3 | **200**  81:2 | **218**  4:13 6:15 |
| 18:20 24:23 | **19**  26:15,15 | **2008**  10:6,14 | 182:1 |
| 32:17 76:9 | 29:2 123:24 | 10:17 | **21st**  192:7 |
| 124:16 133:4 | **191**  6:9 | **2014**  224:2 | 203:24 204:9 |
| 186:20 223:20 | **191,513.05** | **2020**  90:22 | **22**  24:14 29:23 |
| 223:20 224:13 | 137:15 | 191:16 197:2 | 39:3 70:2 |
| 236:15 | **191,513.05.** | 203:23 | 107:1 137:15 |
| **177-1**  67:20 | 69:15 | **2021**  33:13 | 171:18 213:6 |
| **178**  110:6 | **195**  6:10 | 35:20,23 51:4 | **220**  72:8,10 |
| **17th**  23:2 | **198**  6:12 | 116:12 210:3,5 | 73:4 |
| 31:16 182:17 | **1st**  1:7 2:6 | **2022**  16:12,18 | **225,000**  132:1 |
| 231:11 | 28:12 | 16:22 17:14,20 | **22nd**  120:6 |
| **18**  23:18,19 | | 18:17 23:2 | **23**  39:4 77:2 |
| 37:14,15,23 | | 26:6,8 27:9,13 | 78:13 137:16 |

**[23 - 575,000]**                                                            Page 3

| 171:19 | **2nd**  29:11 | **4** | **5** |
|---|---|---|---|
| **23.4**  189:10,14 | **3** | **4**  16:13 18:10 | **5**  26:25 27:3 |
| **23rd**  16:18 | **3**  14:13,21 25:2 | 25:19 32:17,21 | 29:1 101:11 |
| 120:6 | 30:18 49:6 | 137:12 234:16 | 119:13 212:22 |
| **24**  15:6 66:14 | 90:8 216:16 | **4,300,000** | 212:23 234:16 |
| 66:16,16,18,19 | 234:16 | 129:8 | **5,302,000** |
| 130:12,13 | **3,617,312.75.** | **4,365,805.33.** | 108:7 |
| 150:12 182:18 | 68:18 | 76:14 | **5,302,500** |
| 182:18 195:18 | **3,670,000** | **4.25**  12:17 | 109:19 |
| 195:22,25 | 52:13 | **4.35**  37:1,22 | **5,750,000** |
| 196:1,3 199:10 | **3.25**  36:25,25 | 86:4 87:6,10 | 204:11 |
| **24-30004**  59:11 | 87:11 | 87:17 88:1 | **5,787,500** |
| 119:23 201:20 | **3.6**  48:17,18 | **4.35.**  36:25 | 109:20 |
| **24th**  182:18 | 160:20 161:16 | 87:12 | **5.3**  108:21,21 |
| **25**  2:9 35:2 | 161:21 | **4.350**  86:14,24 | **5.3.**  109:17,24 |
| 43:7,8 80:8 | **3.67**  52:11 | **4.6**  12:19 | **5.7**  206:6 |
| 96:23 108:19 | **3/23**  24:14 | **40**  193:8 | **5.75**  206:7 |
| 109:5,23 191:8 | **30**  86:2,6 88:4 | **40,000**  80:1 | **50**  17:25 23:18 |
| 191:19 235:13 | **300**  5:11,11 | **405**  181:17,18 | 45:21 47:19,22 |
| 235:15,23 | 81:2 238:22 | **41,250**  97:2 | 162:18 |
| **25,000**  15:6 | **300,000**  154:3 | **45**  118:25 | **50/50**  48:16 |
| 66:13,13 | **30th**  210:5 | 119:2,10,18 | **53**  209:20 |
| **25-07009** | **31st**  28:20 | **45,000**  79:25 | **55,000**  90:5,14 |
| 231:22 | 29:24 30:19 | **452,691**  80:7 | 90:23 97:4 |
| **25-30002**  1:3 | **32**  234:14 | **452,691.25** | **55,207.33.** |
| **25-30003**  1:11 | **330**  238:21 | 89:10 | 85:18 |
| **25-30004**  1:19 | **34**  133:11 | **452,691.25.** | **55402**  5:20 |
| 7:3 | **3429**  5:3 | 80:5 | **556,790.91.** |
| **250,000**  132:1 | **36,000**  90:4 | **45th**  123:14 | 74:3 |
| **25th**  229:4 | **37**  192:21 | **462**  136:16 | **57**  15:16 |
| **26**  35:20,22 | **39**  207:18 | **495**  97:1 | **57101-1030** |
| **26th**  33:13 | 209:21 | **495,000**  96:23 | 4:23 |
| **27,450**  77:16 | **3:30**  201:16 | 96:24 | **57104**  5:12 |
| **28**  68:20 | **3rd**  76:22 | **4:30**  237:2 | **575,000**  196:11 |
| 133:10 | 231:10 | | 196:15,22 |
| **29th**  29:23 | | | 197:4 |

| | | | |
|---|---|---|---|
| **580,000**  111:8 | 155:25 157:14 | 213:8 234:17 | **9** |
| 149:8 | 158:13 159:6 | **8/16**  30:9,11 | |
| **58102**  2:7 4:14 | 160:4,6 168:19 | **8/2**  30:5 | **9**  6:6 17:14,17 |
| **58102-4246**  4:6 | 178:18 179:4 | **80**  234:15 | 25:25 26:1 |
| **58106-9231**  5:5 | 218:13 234:17 | **80,000**  213:1 | 39:4 234:17 |
| **59**  233:14 | **7,070,000** | **800,000**  204:12 | 235:5 |
| **5th**  5:19 | 107:18 108:6 | **81**  234:15 | **9.4**  53:1 189:11 |
| | 108:16 | **82**  234:15 | **9.5**  48:14 |
| **6** | **7,170,015.08** | **83**  234:15 | **90**  40:22 41:1 |
| | 124:24 | **84**  11:25 12:3 | 41:20 45:13,14 |
| **6**  11:25 12:2 | **7.1**  125:15 | 13:2 14:2,4 | 48:2 106:8 |
| 16:13 18:10 | 126:6 128:11 | 15:13 16:11 | 214:12 233:25 |
| 76:10 85:3,6 | 128:14 129:1 | 233:14 234:15 | 234:5 |
| 108:7 109:17 | 129:12 | **84-1**  17:25 | **91**  233:25 |
| 129:17 216:16 | **7.2**  47:21 52:3 | 23:22 26:13,24 | 234:5 |
| 234:16 | 52:23 160:25 | **85**  13:2 233:14 | **91,000**  90:6,7 |
| **60**  154:20,21 | 162:18 189:4 | **85-1**  26:13 | **91,263.98.**  90:9 |
| 154:22 192:4 | **7.3**  48:15,20 | 27:18 29:1 | **912,784.33.** |
| 233:14 | **7.75**  12:21 | 31:1 | 75:12 |
| **60,000**  101:12 | 57:18 | **852,095.36** | **92**  102:1 |
| 102:1 213:4 | **70**  214:13 | 17:20 27:8 | **9231**  5:4 |
| **600,000**  32:5 | **720**  154:20,20 | **86**  13:2 61:12 | **928,947.86.** |
| 64:18 65:6 | 154:21,22 | 78:10 233:14 | 72:6 |
| **61**  181:16 | **720,000**  154:17 | 233:21 234:3 | **93**  6:22 |
| **63**  207:18 | **75**  45:12 | **86-1**  31:1 140:3 | **95**  214:11 |
| **655**  2:6 | **78**  234:14 | **87**  233:21,25 | 223:2 233:14 |
| **66**  48:8,9,9,22 | **78,840**  71:7 | 234:3 | **95-1**  234:6 |
| **676,790,000** | **780**  154:19 | **88**  233:25 | **95-2**  233:15 |
| 129:10 | **79**  234:14 | 234:3 | 234:6 |
| **6th**  120:18,23 | **7th**  120:18 | **89**  233:25 | **95-3**  233:15 |
| 121:3,6,11,11 | 121:6,7,8,8,9 | 234:3 | 234:7 |
| 182:19 | 121:10,12,15 | **8:18**  19:8 | **96**  234:5 |
| **7** | 122:3 | **8:29**  2:10 | **97**  234:11 |
| | **8** | **8th**  120:9,10 | **98**  224:8 |
| **7**  3:2,6,9 16:20 | | 120:14 | **9th**  229:4,16 |
| 17:25 24:7 | **8**  6:19,20,21 | | |
| 47:20 108:15 | 16:22,24,24 | | |
| 108:25 109:22 | 25:7,9,16,17 | | |
| 128:24 129:16 | | | |

| **a** | 23:1,9,9,14 | **accrue** 78:17 | 202:3 208:11 |
|---|---|---|---|
| **a.m.** 19:8 | 24:11,12,19 | 89:4,5,6 | 219:3,10 |
| **aarestad** 6:19 | 25:8,24,25 | **accrued** 79:13 | 226:12 230:3 |
| 7:15 12:5,23 | 27:7,8 29:9,10 | 79:19,24 80:9 | **acute** 98:8 |
| 20:19 49:5 | 29:20 30:1,2,3 | **accrues** 89:11 | **add** 41:11 |
| 76:22 130:23 | 30:7 32:6,10 | **accurate** 19:22 | 48:20 90:21,25 |
| **abatement** | 68:6,17 126:12 | 63:16,17 78:8 | 91:13 92:24 |
| 198:18 | 126:15 127:3 | 92:16 113:16 | 98:6,7 126:5 |
| **ability** 45:4 | 128:15,16,19 | 149:15 173:15 | 204:12,13 |
| 96:4 98:21 | 129:2 130:13 | 178:21 215:5 | **added** 206:15 |
| 124:5 | 131:8 133:18 | 238:4 | 206:18,24 |
| **able** 13:21 78:5 | 133:24 134:8 | **accurately** | **adding** 206:10 |
| 92:9 96:17 | 135:13 153:4,8 | 146:8 | 206:13 |
| 103:10 115:16 | 177:11 185:8 | **achieve** 178:17 | **addition** 43:25 |
| 139:11 154:17 | 197:4 | **acknowledge** | 52:21 140:11 |
| 206:23 212:24 | **accountant** | 127:5 | 140:16,23 |
| 221:9 222:4,13 | 175:16 177:6 | **acknowledgi...** | **additional** 57:1 |
| **abnormally** | **accounted** | 127:1 | 57:5 83:10 |
| 211:8 | 146:9 213:3 | **acquire** 183:18 | 216:13 231:10 |
| **above** 27:7 | **accounting** | **acronyms** 15:1 | **additionally** |
| 41:5 65:1 | 16:17 67:18 | **action** 155:9 | 196:6 |
| 95:19 209:11 | 135:19,22 | **activity** 66:21 | **address** 73:19 |
| **absence** 21:10 | 174:21,24 | **actual** 23:20 | 94:15 131:16 |
| **absolutely** 7:21 | 175:4,6,8,12 | 205:19 | 198:23 |
| 46:25 92:23 | 175:13 | **actually** 20:4,6 | **adequately** |
| 163:11 225:16 | **accounts** 66:17 | 26:22 33:2 | 134:6 |
| **acceptable** | 68:7,8,9,17 | 36:8 39:22 | **adjust** 55:2 |
| 34:25 40:10,15 | 69:14 74:20,25 | 52:15 79:2 | **adjustable** |
| 48:6 102:18 | 125:1,10,16,20 | 95:5 99:11 | 86:20 |
| 188:12 212:22 | 126:16 127:16 | 104:4 112:18 | **administered** |
| **access** 153:11 | 129:13 131:12 | 114:14 119:6 | 1:3,11 162:9 |
| 153:15 | 132:23 139:24 | 128:1,12 | **admissibility** |
| **accessed** 151:6 | 143:14 177:9 | 132:16 135:20 | 234:23 |
| **account** 16:21 | 209:21 | 143:10 153:20 | **admissible** |
| 17:1,18,22 | **accrual** 80:2,4 | 157:15 166:19 | 93:16 |
| 18:11 19:23 | 105:1 | 167:22 186:13 | **admission** 7:12 |
| 21:2 22:25 | | 196:18 197:21 | |

admitted  67:22
93:3,7,10,15
235:16
admittedly
88:18 165:20
admitting
55:18
advance  24:9
91:21
advanceable
37:17
advanced
147:5
advances
37:20 175:9
adversary
230:20 231:19
231:21
advice  145:18
146:2 148:5,23
156:19 157:5
aesthetics
207:15
affect  47:11,11
47:14 83:16
115:22 116:6,6
117:12,13
162:9 178:2
188:17
affidavit  8:11
133:3 135:24
afternoon
195:9
afterward
119:11
agent  151:18
179:19,25

180:11 182:25
183:3
agents  150:16
aggregate
77:24 79:21
agnostic
120:25
ago  21:7 63:15
63:15 82:2
134:19 149:22
150:8 174:19
186:22 187:4
192:8 199:11
204:7 206:5
224:4
agree  7:22 8:15
12:10 49:12
51:24 53:6
82:9 85:19
86:6 87:8,16
91:15 93:9
113:2 123:20
125:13 130:24
131:3 154:22
154:24 173:19
189:10,13
195:17 205:14
227:23 229:17
229:21 232:23
233:24 234:9
agreeable
231:12
agreed  86:24
87:6,17 204:14
204:25 205:11
205:18 234:10
235:5

agreement
33:15 34:6
45:19 62:2
87:20 93:3,15
167:14,15
168:12,14,22
169:1 195:14
196:1 205:19
205:21,24
218:23 219:1
219:17
agreements
60:25 61:5,6
61:17 62:1
ahead  18:6
19:16 92:3
202:25 233:3,4
aimed  148:19
air  75:25
aircraft  76:1
airplane  76:1
127:22
aleck  125:11
allocated  99:17
allow  45:15
47:15 50:6
116:20 148:13
162:14 208:23
allowed  23:8
85:9 94:4
95:18 98:18
106:6 146:17
161:6,16
allows  22:11
43:20,24
alphabetized
103:3

altercation
62:21
ambiguous
222:20
amenable
231:8
amended  6:22
11:22 93:21
119:25 122:3
216:13 233:9
amortization
44:18 85:14,24
86:2,7 88:4
123:23 124:4,6
124:8
amortizations
124:4
amortize  40:5
amortized  40:6
123:5,20
124:11
amortizing
36:8
amount  18:12
18:14,16,18
24:15 26:2
27:8 28:13,14
28:16,18,20
29:10 30:10,17
32:18,21 45:4
45:20 48:15,21
65:5 69:12,14
70:4,16 71:6
72:5 74:1
75:10 76:6,12
77:14 78:2
89:11 90:9,10

90:13 96:25
103:14 106:6
107:18 108:10
108:17,21
109:18,19
111:7 117:19
128:14 129:14
129:20 137:22
138:18 141:11
146:13 162:18
172:14 189:3
196:18 210:22
**amounts** 12:7
28:10 126:24
127:3 133:20
178:21
**analysis** 41:2
133:22 134:5
154:12,14
156:13,14
159:12 177:9
**analyst** 100:2
**analyze** 81:11
81:17
**anecdote** 133:7
**angle** 174:4
**angry** 58:12
**anniversary**
158:25
**annual** 79:25
89:11
**anomaly**
202:24
**answer** 35:18
42:22 61:9
72:21 73:5
77:13 78:8

79:23 99:22
107:7,20
128:23,24
138:10,19,20
144:9 147:17
147:22 148:6
148:16,17,18
149:5,20,23
151:8 156:5,6
158:7,8 159:9
159:19,21,22
163:15,18
170:16 172:22
183:2 202:6
205:6,7 207:3
208:23 209:2
212:3,9 213:18
218:6 221:3,10
230:21,24
231:3,5,25
**answered**
128:4 145:25
179:24 180:8
211:18,24
214:2
**answering**
54:19 64:7
**answers** 10:25
23:7 168:5
**anthony** 4:25
**anticipate**
104:12 212:24
228:7
**anticipated**
40:7 120:3
202:15 213:23
221:15,16

**anticipating**
22:3 94:14
**antithetical**
157:12
**anybody**
151:21 171:18
179:1,2 197:23
**anymore** 41:13
128:6
**anytime**
227:16
**anyway** 79:5
85:20 180:17
182:3 215:18
**apartments**
209:11
**apiece** 203:5
**apollo** 75:25
**apologies**
13:24 15:3
72:25 79:7
170:11 230:1
**apologize**
59:15 81:5
93:2 101:6
150:4 213:16
222:9 223:13
224:8
**appear** 151:24
152:2,7 224:9
**appears** 72:8
147:7 224:23
**appended**
135:24
**applicable**
128:22

**applied** 129:8
**apply** 97:3
98:3 188:4
**applying** 58:18
**appointing**
22:2
**appointment**
21:5 80:15
**appraisal**
40:23 41:3
51:4 82:16
83:6 96:23
103:13 108:17
111:16,17
113:16,25
114:8 116:11
151:3,7 154:13
154:25 155:4,6
183:24 185:13
**appraisals**
83:8,15,18,20
83:24 112:25
113:3,17 186:1
**appraise**
112:10
**appraised**
41:16,17 48:21
107:6,18 111:3
**appraiser** 51:6
96:23 112:1,9
113:22 115:16
151:1 180:1
206:19
**appraisers**
83:6
**appreciate**
106:25 165:20

208:18 227:8
233:2

**appreciated**
93:19

**appreciation**
108:25

**approached**
194:3

**appropriate**
21:21,24 36:14
57:24 58:12
105:11 208:21

**approval**  116:7
116:12 164:4
195:18

**approvals**
164:1

**approve**
102:16

**approved**
118:1 196:20

**approximate**
77:16

**approximately**
66:9 90:13
154:3,17
160:20 172:8
191:19 196:10
199:11,12

**april**  16:22,24
70:3 171:19
182:17

**architect**  114:2
114:5,12,21
116:5 185:11
185:13,16,19
185:22,25

**architects**
210:4,6

**architectural**
112:25 113:5,6
183:10,18
184:20 186:8

**architecture**
113:18 183:15

**area**  19:11
73:21,24
105:22 114:9
114:10,20
117:19 182:1
198:20 213:9
227:15

**argue**  91:9
99:6 100:18
232:14

**argued**  92:10

**arguing**  157:18

**argument**
91:11,11,20,25
99:23 109:4
146:20 227:19

**arrow**  217:11

**arstad**  153:3

**arsted's**  152:21

**artful**  74:13

**artfully**  168:18

**artists**  183:14
183:14

**arts**  49:18,22
49:25 50:4,10
50:11 116:23
116:24 130:9

**asbestos**
198:18,18

**ascertain**
50:18 130:21
130:25 131:4
136:7 139:11

**aside**  130:9
175:15,15

**asked**  58:1
62:11 65:23
73:4 82:11
95:16,23 96:6
98:2,7 105:3
111:14 112:3,5
115:21 116:10
136:3,4 145:25
149:19 162:5
162:12,14
163:6,9 168:10
172:9,9 174:20
179:18,20,24
180:11,21
182:25 186:18
189:13 199:14
211:18,24
214:2 221:1,14
223:10 224:14
225:4 227:2

**asking**  22:23
34:9,14 42:16
42:19,22 55:19
57:9,21 58:11
58:19 79:18
80:6 82:17
87:22 91:7,12
104:14 105:5,9
105:14 107:14
108:11 111:25
115:19 117:6

137:25 139:15
140:24 142:8
142:16 145:14
145:15,18,19
156:25 157:2
158:14,15
159:13,14
160:3,9 161:9
163:9 165:11
165:13 171:9
171:17 172:15
174:4 177:13
208:22 222:6
222:17,18
227:9

**aspect**  202:25

**assert**  148:5

**assertions**
234:21,24

**assessment**
84:3

**asset**  41:12
44:21 103:12
109:22 112:15
145:23 158:12
179:8,10

**assets**  10:22
11:3 67:15
80:16 143:12
143:17 160:7
176:5

**assigned**  41:4
41:13,14,15
111:5,5,6,12
112:14 165:1
179:10 220:7,9

**assigning**
166:10
**assignment**
145:8
**assist** 11:6 13:4
43:24
**assistance**
148:14
**assists** 44:1
**associated**
28:10,14,18
**assume** 63:18
63:19 95:3
98:23 119:13
**assumed**
113:16
**assumes** 92:24
104:23
**assuming**
78:15 89:12
107:1,17
108:17,18
129:5,7 135:17
223:10 228:25
**assumption**
124:3 134:7
**assumptions**
133:22 154:15
**assure** 232:16
**attach** 99:10
167:23
**attached** 19:6
62:4,7 65:10
98:24 142:10
215:16
**attachment**
8:11 200:18

**attachments**
6:21 8:15,19
236:16
**attempt** 158:12
**attempted**
220:3
**attention** 32:16
45:18
**attest** 65:20
**attested** 92:6
**attesting** 65:2
65:12
**attorney** 4:4,21
5:2,10,17 46:9
58:10 157:7
**attorneys** 4:12
149:16,17,23
**attuned** 156:21
**atypical** 54:3
**august** 28:12
28:16,20 29:11
29:23,24 30:3
30:19 203:23
**authority**
168:25
**authorization**
64:15 141:2
**authorized**
76:17
**authorizing**
20:24 60:2
**automatically**
188:15
**available** 19:25
45:24 96:25
97:2 101:12
106:13 169:1

211:25
**ave** 2:6
**avenue** 4:5,13
5:11
**average** 207:20
**avoid** 98:13
232:1
**aware** 74:19
87:1 105:3,4
106:9 180:10
199:19,22
200:19
**awfully** 148:18

**b**

**b** 2:21 4:5 6:17
64:11 68:20,21
233:14
**b&w** 191:18
196:10 197:2
**back** 7:2 26:23
32:2 33:3 55:8
55:12,25 57:20
59:8,10 61:23
62:20 64:4,8
90:10 91:3
106:5 119:22
119:24 120:24
127:8 128:17
134:9 135:17
137:11 139:13
164:4,7 169:12
171:19 172:9
174:19 179:12
186:20,23
201:19 204:12
204:13,15
206:10,13

211:5 217:16
223:5 225:1
**background**
10:5 167:9
**backing**
234:19
**backloaded**
124:7
**backward** 64:9
103:3 142:16
**backwards**
106:24 107:15
108:19,20
131:20
**bad** 192:16
220:22 223:13
**balloon** 78:23
**ballot** 167:18
**bank** 3:1 4:12
4:21 7:5,15 8:7
10:15,22 11:11
11:16,22 12:6
16:20,25 17:18
17:21 18:22
20:14 21:2
22:25 24:12
25:7 27:7 28:5
29:10,21 30:7
32:7,19 33:17
34:4,10,22
35:1 38:8,15
40:10,15 42:19
42:23 43:9,17
43:23 44:5,10
45:8,15,24
48:2 52:14,15
52:23 53:1,6

| | | | |
|---|---|---|---|
| 53:12,19,24 | 143:15,17,19 | 43:13,14 60:22 | 59:11 77:3 |
| 55:10 56:8 | 144:11,13,14 | 94:20,25 95:9 | 79:19,23 80:5 |
| 57:2,5 58:6 | 144:15,15 | 96:4 99:25 | 80:12,14,23 |
| 60:1,5,12,23 | 145:7,11,15 | 104:24 105:22 | 81:1 89:2 |
| 61:3 63:3,8 | 146:6,8 147:2 | 107:10 108:16 | 97:13 109:4 |
| 65:23 66:18 | 147:4 148:1 | 112:11 126:25 | 119:23 145:21 |
| 68:5 74:19,23 | 149:7 150:16 | 127:5 131:24 | 145:24 150:11 |
| 74:25 75:1 | 151:18 152:9 | 140:25 146:4,5 | 150:17,18 |
| 77:4,14 80:12 | 152:17 153:11 | 151:1 157:12 | 151:21 154:3 |
| 80:19,20,22,24 | 153:14 154:2 | 160:3,20 | 155:10 157:3 |
| 81:8,11,21,21 | 155:8,13,17,21 | 161:16,21 | 181:9,11 |
| 82:8,15,19,25 | 155:23 157:15 | 162:9 173:17 | 201:20 |
| 83:1 84:5 85:8 | 157:16,16,20 | 189:4,6,15 | **banks**  14:23 |
| 86:12 87:2,10 | 158:12,21 | **banker**  10:11 | 19:11 35:7 |
| 87:16,25 88:1 | 159:5,7,11 | 12:6 47:4,12 | 44:2,16,20 |
| 88:21 89:1 | 160:24 164:16 | 47:14 49:3 | 50:24 57:23 |
| 91:2 94:20,23 | 164:22,25 | 51:7 63:2,16 | 74:20,25,25 |
| 96:1 99:17 | 165:17 166:7 | 81:14 96:12 | 75:3,5 127:23 |
| 100:20 101:23 | 166:23 167:3,8 | 100:2,7 105:18 | 141:22 |
| 102:21 103:18 | 167:22,24,25 | 123:18 124:2 | **barely**  190:23 |
| 105:8 107:3 | 168:23,24 | 149:14 152:9 | **barry**  6:8 |
| 108:5 111:7,10 | 169:9,24 171:1 | 177:18 178:19 | 190:4,6,16,20 |
| 111:24,25 | 171:10,13,17 | 187:16 213:10 | 191:3 195:7 |
| 112:9,18 113:2 | 171:24 172:1 | **banker's**  49:19 | **base**  55:18 |
| 113:6,7 114:15 | 172:13,18,24 | 96:12 98:18 | 174:6 |
| 116:22 117:21 | 173:7,8,9,11 | 105:5 | **based**  15:23 |
| 117:23 118:13 | 179:18,19,25 | **bankers**  11:2 | 19:2 20:18 |
| 119:3 121:2 | 180:3,6,11,21 | 44:7 183:12 | 22:8 38:7,14 |
| 124:5 125:5,8 | 182:11,25 | **banking**  10:8,9 | 39:18 50:14 |
| 126:12 127:3 | 183:1,4,10,18 | 10:12 23:12 | 60:21 63:21,24 |
| 129:2 130:11 | 184:1,7,8,9,11 | 42:17 46:16 | 68:17,18 74:18 |
| 130:15,25 | 184:12,14,17 | 50:13 54:23 | 76:15 81:25 |
| 131:4,4 132:15 | 185:3,4,15 | 65:8,25 84:10 | 83:25 84:3 |
| 133:18 134:15 | 188:12 189:24 | 85:13 170:11 | 85:11,20,25 |
| 140:22 141:6 | 220:20 226:20 | **bankruptcy** | 86:2,21 87:13 |
| 141:10,15,19 | **bank's**  3:5,8 | 1:1 2:4,23 4:3 | 87:14 89:18 |
| 142:8,9 143:11 | 15:10 34:9 | 7:3 14:24 | 90:15,25 93:15 |

103:12,24
106:14,24
107:1,6 108:10
109:2 111:9
113:19 132:4
142:24 145:12
154:12,14
173:24 174:2
176:4 183:17
185:1 187:17
200:8 214:5
**baseline**   95:18
208:13
**basically**   43:18
44:2 113:23
234:25
**basis**   10:22
40:5 86:7
87:11,15 90:14
200:1 211:15
**bassford**   5:16
**bathrooms**
210:12,15
**bearings**   69:4
**bears**   165:3
**beating**   156:2
**bedroom**
207:16
**bedrooms**
207:17
**beginning**
49:16 85:11
86:9 87:7
103:2 114:24
117:12 124:12
134:24 175:5
183:19 184:15

188:3,5 212:20
221:12 233:17
233:19,20
**begins**   85:8
213:8
**behalf**   168:23
189:23 190:1
**belief**   175:25
176:3
**believe**   8:23
17:15 23:18
39:4 42:7
52:22 60:19
70:14 75:7
84:23,25 89:10
90:2 92:6
94:20 96:16
101:16,22,25
102:5,6 104:5
104:16 106:8
107:12,19
117:23 127:22
129:16,19
130:3,5 132:2
134:18,23
137:1,18,22
138:22,25
139:9 140:5,8
141:13,24
142:9 143:23
144:24 145:7
151:6,15,20,20
152:14,25
154:11,20
161:22 163:8,9
165:25 167:23
169:24 173:16

178:7 179:7
187:11 197:3
199:8,15 200:8
204:8,17,19,20
205:3 206:6,14
206:20 216:15
218:24,24,25
221:13,18,19
225:3 228:9
235:8 236:13
**benchmark**
51:7 107:25
108:1
**beneficial**
158:3
**benefit**   11:1
13:1 55:9 63:3
63:5 81:11
85:13 104:16
117:20 178:17
182:24 204:16
205:8
**best**   13:15
14:16 60:21
67:17 144:18
144:22 146:23
147:8 150:15
153:7 165:5,22
167:13 205:17
222:20
**better**   64:3
82:1 157:13,15
163:25 188:9
196:23
**betterment**
146:10

**beyond**   42:10
46:11 57:1
83:11 95:20
188:11 204:18
206:14,16
**biased**   54:15
54:19
**bid**   155:14,18
**bifurcates**
107:21
**big**   22:16
178:21 209:12
209:13
**bigger**   17:13
114:11,14
115:10 116:5
**biggins**   6:11
197:22 198:2,5
198:5,9,9,13
198:14,16
201:5,7,11
**billing**   106:19
**binding**   33:15
34:5
**bit**   18:25 33:3
33:11 46:21
54:14,15,15,19
54:25 61:15
73:1 79:8
84:16 85:22
89:16 102:23
110:2,2 133:5
138:18 144:25
152:3 155:8
160:19 161:19
187:12 190:13
193:12,21

198:19 207:14
207:15,17,18
207:19 213:2
**bits** 218:25
**black** 150:7
**blindside** 7:18
**blocks** 72:11
219:7
**blow** 157:17
**blowing** 157:7
**blue** 26:14
68:21
**blur** 131:23
**boots** 150:7
**bootstrapped**
196:18
**boring** 72:25
**born** 224:2
**borrower**
61:24 62:13,20
65:5 83:21
113:21
**borrowers**
62:1,3,4,7,8,15
63:4,12 65:1
65:20 140:12
140:17 141:7,9
169:22 171:15
172:8
**bottom** 24:8
25:5,23 27:5
29:8 31:8 71:3
72:3 74:1
210:16
**boulevard** 5:3
**box** 5:4 153:21
190:14

**boy** 209:20
**brain** 63:23
107:15 150:14
170:11
**breach** 195:25
**break** 59:16,16
97:8,12 118:9
118:10,25
119:1,19 164:1
197:19 201:13
201:16
**breakdown**
175:3
**breaking** 56:18
**bridge** 108:9
108:14 109:5
109:25
**brief** 118:5
119:7 228:10
**briefly** 202:13
227:18
**bring** 103:1
106:5 212:25
**brings** 41:5
**broad** 147:17
170:12
**broadly** 169:20
**broke** 59:12
66:19 201:21
**broken** 192:17
192:17
**brothers**
191:15
**brought** 48:7
224:12
**budget** 55:20
56:4 169:22

170:20
**budgets** 174:25
**build** 52:25
53:3,7 56:23
138:13 217:16
**building** 41:10
41:17 51:19
52:25 53:4,7,7
57:4,6 71:24
81:12 82:1,4
83:10 87:7
106:15 107:8
107:10 114:13
114:18 115:14
117:17 150:3
151:21 153:17
181:1 191:23
193:2 199:3
207:20,24
208:5 209:4,5
209:9,10,11
210:14 219:7,9
219:11 220:11
220:16
**building's**
151:23 152:1,7
**buildings**
115:17 183:13
208:6 219:14
225:19
**built** 63:19
87:8 114:14
129:19 207:8
**burden** 21:19
94:13 146:14
146:16 157:24
165:3

**burdick** 2:5
**bush** 156:2
**business** 10:7
43:10 60:5
64:25 87:1,2
87:18,23
135:15 158:15
178:2 203:19
203:25 204:3,4
204:5 218:1,3
218:12 225:4,7
**businesses**
11:8 217:21
**buy** 76:1
155:24
**buying** 219:15
**bw** 195:17
**byproduct**
157:5

c

**c** 4:1 7:1 17:25
18:1,4 23:17
23:23 24:22
25:2,19 26:25
27:3 28:25
31:1 69:18
181:16 233:14
238:1,1
**calculate** 36:17
38:4,18 96:19
**calculated** 48:7
**calculation**
206:24
**calculations**
206:16
**calculator** 48:1
85:14

calendar
  120:13 151:19
  229:3
calendars
  121:1
call   7:5 8:22
  9:3,6 38:15
  54:25 62:21
  115:13 174:1
  190:2 201:21
  210:7
callback   19:8
  19:18,20 20:8
  20:18
callbacks   19:8
called   101:13
  116:23 127:14
  142:19 143:23
  175:6 199:3
calling   126:14
calls   33:21,21
  34:7 38:6 67:6
  78:19,25 89:21
  97:21 101:17
  111:18 115:3
  166:19 184:21
  190:3 197:22
  201:24
calm   58:7,13
calmed   58:16
canceled   120:3
  121:15
cancer   56:3
capacity
  172:23 204:23
capital   57:4
  89:7,8 107:8

121:14 136:24
car   141:22
card   137:2,7
  138:1
card's   58:23
cards   137:4
care   231:17
career   10:20
  54:24
careful   156:20
carefully
  200:25
caren   4:17
carrying
  146:16
case   1:3,11,19
  3:1,5,9 7:3
  9:12 12:8,23
  21:19 53:10
  59:11 65:24
  66:1 79:14
  80:10 89:2,9
  94:2,9 98:17
  103:19 104:11
  106:6 110:21
  119:3,17,23
  120:1 138:7
  145:12,24
  146:7 152:22
  156:5,8 157:3
  157:24 158:3
  160:4 162:15
  166:24 167:16
  173:2 175:5
  179:15 180:15
  181:9,11 190:8
  194:21 198:11

201:20 202:1
  214:1 218:3,13
  225:9
cases   180:15
cash   42:3
  43:12 44:3,11
  44:15 46:3
  48:5,13 55:24
  56:7 57:3,15
  57:22,23 58:4
  58:4,12 81:15
  83:23 91:2
  95:1,17,18,19
  95:24 96:1,11
  96:13,16,17,20
  97:2,11,18
  98:19,24 99:6
  99:7,12,21
  100:2,10,12
  101:12,22,25
  102:4,10,14
  105:7 107:23
  108:14 109:9,9
  154:11,14
  180:4 188:13
  213:4,4 222:4
  222:6,14,19,19
  222:23
cashier's   31:5
  31:8 32:5 65:6
cast   167:18
cat   36:6 100:9
catch   109:16
cathcart   4:9
  211:19
cause   21:6,22
  21:22,23 84:6

116:16,22
  130:15 178:8
cbre   111:15
  113:6
cent   100:16
  103:20,20
cents   80:3,8
  123:25
certain   44:21
  51:7 91:13
  127:15 134:10
  136:2 138:3
  153:18 156:19
  175:2 223:3,4
certainly   91:15
  91:22,25 94:19
  95:11 128:1
  135:23 146:3
  160:7 228:21
  231:21
certificate
  203:22 214:3
certified   238:3
certifying   7:15
  8:6
cetera   127:24
  145:21 185:24
chance   78:6
  93:24
change   35:18
  37:6 49:2
  102:13 107:7,9
  115:2 123:2
  128:11 129:8
  183:2 209:24
  209:25 210:22
  211:3,6 220:18

changed
  116:22 151:24
  152:2,7 159:21
  210:4,23 212:8
  220:21,21
  222:22
changes  51:2,3
  104:15 120:2
changing
  82:18
chapter  3:2,5,9
  3:9 21:6 84:25
  104:25 105:6
  155:25 157:14
  157:16 158:13
  159:6 160:4,6
  165:9 167:18
  168:3,10,19,20
  178:18 179:4
  218:13,13
characterizat...
  46:14 49:25
  127:1
characterize
  46:21 76:3
charge  167:18
charged
  212:25
charles  7:15
  12:5,23 20:19
  49:5,8 51:21
  76:22 130:23
  152:21 179:21
  180:6,23
  220:25
charles's  12:10

chart  17:3,19
  69:13 133:7
  136:4,8 176:11
  176:16 178:18
charts  133:1
  135:24 176:13
  177:15 178:16
check  19:4,6
  31:5,8,9,10,11
  31:15,16,18
  32:5 65:6
  118:5,16
  128:17 131:8
  139:18
checking  24:11
  24:19 25:8,24
  27:6 29:9,10
  29:20 128:16
  128:19 130:13
  131:12
checks  135:18
chief  119:4,17
chime  93:24
chipping  156:9
christianna  4:9
chunk  41:15
circle  225:1
circling  157:6
circuit  94:3
circumstances
  21:4,10,20
  22:12 23:8
  94:1,4,9,14
  146:24 147:9
  156:19 228:6
cited  192:4

city  90:15
  198:24 209:8
  209:10 210:7,9
  210:10,17,18
  217:17 225:24
claim  11:22
  85:7,9,25 90:8
  103:9,15,19,20
  104:3,6,11,17
  104:17,22,24
  105:2,14,15,22
  106:6,13,14,21
  107:13 108:4
  109:1,18
  110:20 145:11
  145:16 146:5,5
  146:13,14,15
  147:4 148:1,4
  148:10,14,16
  148:24 149:7
  149:21 165:1,2
  165:2 166:11
  179:11 196:9
  196:10,14,22
claim's  108:16
claims  11:24
  103:21 106:10
clarification
  154:6 225:18
  227:1 234:19
clarify  44:6
  78:1 127:6
  171:8 174:18
  176:11 179:16
  180:7,13 187:6
  202:25 230:16

clarifying
  51:13 225:22
clarity  117:2
  123:12 160:24
  199:11 200:21
  216:9,22
  217:22 229:22
  232:5,21
clark  122:20
  124:15 145:1
class  85:4,7
  90:8 97:4
  101:23 102:2
  103:8
classes  102:3
  106:23
clay  8:6
clear  21:25
  22:2 26:3 39:2
  40:16 42:1,1
  42:21 91:9
  93:6 94:16
  100:12 110:10
  117:6,11 129:1
  133:1,25
  147:16 156:23
  167:16 168:13
  171:11,17
  179:25 187:5
  210:17 223:11
  227:1 228:6
clerk  9:8,9,11
  9:15 13:22
  133:4,10
  136:15 137:11
  140:2 161:3
  164:13 181:15

190:5,7,11
192:20 193:10
193:20 198:1,7
198:8,10
214:14,18
215:22 217:1
233:9,12,14,23
234:3,5,8,11
234:13 235:8
235:10,22,25
236:15,18,23
236:25
**clerk's** 192:23
**client** 147:3,5
148:4,25 156:3
157:1,7 174:7
**client's** 130:11
**close** 32:24
33:5 145:1
148:10 227:18
228:19,22
237:1
**closed** 22:10
226:16 230:9
**closely** 62:5
**closer** 190:13
190:18,22
**closets** 211:7
**closing** 91:10
176:12 223:13
227:19
**closings** 228:22
**coaching** 54:18
148:10,19
**coalition**
167:21

**coat** 150:8
**coddington**
158:19
**code** 173:24
182:1
**codes** 174:1
**codington**
80:15 89:15
91:3,4
**coincidentally**
147:6
**cold** 150:7
**collateral** 44:3
80:13 83:2,3
84:4 115:2,23
117:24 158:22
180:4
**collect** 158:20
**college** 10:6
**colleges** 200:2
**colloquy** 98:6,7
156:22 166:4
**column** 74:14
74:15 234:2
**come** 9:7 11:6
51:1 55:25
56:5 57:23
74:24 108:22
108:23 109:10
109:11,13
113:23 128:19
138:12
**comes** 20:2
53:8 57:17
82:19 202:24
206:10

**comfort** 105:8
**comfortable**
104:2 134:5
141:5 190:19
**comical** 158:25
**coming** 55:12
55:22 62:20
84:10 124:1
134:7 148:9
158:24 175:24
177:25 181:19
181:24 197:15
**commas** 32:3
**commencem...**
85:11 88:15
97:16,17
**comment** 47:2
110:10
**comments**
147:10 208:18
208:19
**commercial**
10:19 23:13
36:1 46:23
53:15,20,23
54:8 124:2
169:9,24 172:5
210:6,10,14
**commingle**
67:8,11
**commingled**
67:3,5 176:1
177:18
**commingling**
177:16
**commitment**
189:4

**communicate**
34:21
**community** 8:6
10:11 14:25
15:3 18:11
20:16 32:2,9
66:6 68:6,10
**comp** 208:3,12
**company** 3:4
5:10 74:16
143:1 173:9
191:15,17
194:19
**comparable**
55:5 170:23
**compare** 32:11
131:21 192:14
**compared**
50:16 103:14
**comparing**
50:15 114:7
208:5
**comparison**
203:9 208:20
**compelling**
94:3 146:19
**compensate**
44:23 134:9
**compensated**
134:6
**compensation**
137:19,23
**competent**
148:16
**compilations**
126:8

compile 91:19
compiled 127:7
complaint
  230:20 234:22
complete
  147:16
completed 84:7
  107:19 108:18
  109:23 148:11
  160:16,17
  193:18 213:24
completely
  35:3 60:15
  61:2 75:1
completion
  193:25 195:21
  196:4
complex 168:8
compliant
  164:6
complicated
  42:25 88:18,18
  230:4
complimentary
  23:14
comported
  171:15
composition
  146:5
comprising
  127:25
computer
  39:19 136:18
  214:6
concede 232:6
concept 102:23
  147:17

concern 19:11
  99:5,10 167:2
concerned
  62:10 110:15
  176:6 177:16
concerning
  175:22
concerns 100:4
  120:9,13 152:6
concise 107:20
concisely 230:4
concluded 21:7
  237:3
conclusion
  34:8 67:6
  78:20 101:18
concordia 10:6
concrete
  159:15,15
concur 232:11
condensed
  140:1
condition
  109:5 187:8,10
  188:6 192:14
conditions
  34:24 35:8,18
  40:12 104:10
  109:3 194:1
conduct
  199:14
conducted
  152:24 199:8
  200:9
confer 233:3
conference
  152:25 197:24

conferencing
  72:24
confidence
  84:8 103:12
  105:8
confident
  20:17 84:5
  103:9,23
  106:12,19
  119:16 178:7
  185:18
confirm 30:1,6
  30:17
confirmability
  165:20
confirmation
  88:16 165:11
  165:17
confirmed
  84:19
confirming
  94:11 121:13
confirms 64:19
  65:17
conflating
  161:24
conflict 121:3
  121:11
confuse 181:12
confused 90:11
  126:2
confusing
  175:4 176:25
  180:7
confusion
  116:17 127:18
  180:14

conjunction
  83:21
connected
  60:16
connection
  42:8 75:6
  116:10 125:8
  136:14 163:3
  163:12 185:3
connotation
  67:9
consequences
  204:20 205:3
consider 22:11
  22:12,15 159:2
  228:5
consistent
  137:18 160:11
  160:12 226:22
consistently
  157:23
construct 52:2
  145:4 162:1
  209:24
constructed
  71:25 144:8
  174:3
construction
  23:2 35:24
  36:2,3,4,18
  37:7,10,18,20
  37:21 38:17,24
  40:22 41:2
  48:3,13 53:15
  53:20 56:23
  67:2 71:21,24
  81:22,23 88:7

131:25 132:16
144:1,15 159:7
159:11 160:16
160:25 161:8
161:10,25
162:2,22
163:12,21,24
164:4,7,9
172:11,14
173:22,25
180:2 183:19
187:7,9,14
188:7 191:6,18
192:2,14,25
194:24 196:13
196:22 206:16
210:8
**consulting**
198:17
**consuming**
81:7,9
**contact** 19:23
20:5,5
**contained** 98:4
126:5 154:12
234:21
**contains** 186:7
**contemplate**
38:3
**contemplated**
35:21 38:8,10
86:9
**contention**
157:13,14
**contents**
200:22

**contested**
232:8
**context** 22:5
62:5,18,18,19
64:3 100:17
117:9,14
169:22
**continue** 81:5
89:4 100:24
116:16 224:8
**continued**
215:14,20
216:12
**continues** 89:6
**continuing**
89:5
**continuum**
116:9
**contours** 42:9
78:25 105:11
**contract**
177:20 195:14
**contractor**
134:11 137:19
137:23 217:18
235:15
**contractors**
23:4,7 73:17
73:20,21
129:14,14,17
**contracts**
99:19
**contravene**
116:9
**contribute**
56:24

**contribution**
57:4 107:8
**contributions**
169:23 170:21
**control** 56:6
62:22 64:1,2
167:22
**controlled**
23:11 58:8
143:12
**conversation**
158:16 205:24
**conversations**
147:19 155:20
156:4 167:24
220:24
**conversion**
147:7 165:8
166:15 168:2
168:19 218:12
228:5
**convert** 3:1,5,9
22:11,14
107:15
**converted**
160:4 166:25
211:10
**conveyed**
220:20
**copies** 113:19
**copy** 31:7
185:17 218:22
**core** 16:17
**corner** 186:6
**corporate**
148:13

**corporations**
217:21
**correct** 7:7
12:12,14 13:16
23:10,21 25:11
25:17 30:23
31:25 37:24
38:2 41:19
51:9,22,23
52:16,17 53:4
56:12 63:20
69:11 77:1
80:11 82:10
83:19 92:20,23
106:11 114:2,3
123:3,4 124:12
124:13,21
129:6 130:5,7
132:10,14,17
132:24 133:15
133:16,20
134:11,22
136:24,25
137:2,3 140:10
140:19,20
141:16 144:8
145:5,6,10
151:1 153:2,6
154:13,15,18
155:4,5,6,7,10
160:4,5,8,23
161:1 162:21
172:5 173:7,12
179:6 185:21
188:3 189:9,15
189:16 195:11
195:19 196:11

| | | | |
|---|---|---|---|
| 199:2 200:19 | counsel's | 83:13 88:20 | 176:18,23 |
| 204:9,15 | 110:11 | 89:22 91:15 | 180:16 181:21 |
| 208:11 210:19 | counter 230:25 | 92:9,11,17,22 | 182:1,4,6 |
| 218:1,23 | counterparties | 93:1,11,11,20 | 184:23 186:11 |
| 221:12,15,17 | 130:12 | 93:20 94:6,16 | 186:17 188:23 |
| 222:1 223:7,8 | country 238:21 | 95:6,9,21 | 189:18,20,23 |
| 229:7,18,23,25 | counts 209:20 | 98:23 99:3,5 | 190:1,12,17,21 |
| 234:8 | county 73:21 | 100:14,18,23 | 190:25 195:5 |
| **correctly** | 73:23 80:15 | 101:1,5 105:13 | 197:8,13,15,23 |
| 187:24 209:21 | 89:15 91:3,4 | 105:17,21 | 198:3,6 200:12 |
| 225:5 | 158:19 | 106:2 109:12 | 200:15 201:3,5 |
| **correlated** | **couple** 7:12 | 110:14 111:22 | 201:15,19,25 |
| 16:19 | 44:6 58:16 | 112:2,5 115:6 | 202:9,11,14,19 |
| **correlation** | 112:22 162:14 | 115:13,21,25 | 202:21 203:1,6 |
| 21:9 | **coupled** 127:19 | 116:15,21 | 203:10 205:5 |
| **cost** 40:22 | 154:8 | 117:1 118:6,8 | 205:20,25 |
| 48:13 49:9,15 | **course** 96:2 | 118:24 119:10 | 206:21,22 |
| 51:18,21 53:4 | 209:4 | 119:15,18,22 | 207:2,13 208:9 |
| 56:23 89:6,8 | **court** 1:1 2:4 | 120:3,16,21 | 208:20 212:5 |
| 95:5 131:24 | 7:2,10,13,16 | 121:1,4,6,8,21 | 212:13,15,17 |
| **costing** 54:9 | 7:19,22 8:1,1,3 | 121:23 122:1,5 | 212:18 213:19 |
| **costs** 46:2 | 8:8,14,18,18 | 127:8 128:3,8 | 213:20 214:2 |
| **council** 161:9 | 8:21,24 9:1,7 | 131:22 138:4 | 215:11,15,25 |
| **counsel** 65:24 | 9:16,20 13:5 | 143:20 146:19 | 215:25 216:3,3 |
| 65:25 67:21 | 15:2,5 19:15 | 147:14,23 | 216:6,17,21,25 |
| 91:9 99:6 | 19:17 20:10 | 148:12 149:3,9 | 217:10 218:19 |
| 118:17 145:18 | 21:11,13,17 | 149:25 150:23 | 220:4 221:3 |
| 146:3 148:1,5 | 22:7 23:19 | 154:16 156:25 | 222:15 223:9 |
| 148:9,14,18,23 | 33:25 34:12 | 157:9 158:6,9 | 223:15 224:18 |
| 149:17 155:13 | 38:11 39:8,13 | 160:13 162:4 | 225:10,16 |
| 155:17,22 | 39:18,24 42:13 | 163:2,14 | 226:4,6,9,16 |
| 156:4,16,17,18 | 43:2 47:7 | 164:19 165:4 | 227:4,7,10,14 |
| 156:19,22 | 49:23 50:3 | 166:2,8 167:1 | 228:14 229:1,8 |
| 157:5,5 158:4 | 51:14 56:11,13 | 168:21 169:5 | 229:11,16,19 |
| 159:10 161:24 | 56:19 59:4,10 | 169:12 170:3 | 229:24 230:3,8 |
| 168:6 226:20 | 59:18 67:8,22 | 173:3 174:8,11 | 230:12,17,23 |
| 233:5 | 72:20 79:4 | 174:13 176:9 | 231:19,23 |

| | | | |
|---|---|---|---|
| 232:3,15,19 | 69:7,8,15,24 | 218:20,22 | **credited** 27:6 |
| 233:3,11,13 | 70:4,15,25 | 221:11 223:17 | **creditor** 34:22 |
| 234:23 235:17 | 71:1,2,15,16 | 223:17,22,23 | 103:8 110:12 |
| 235:19 236:4,6 | 73:6,18 75:25 | 224:1,10 | 157:2,16,24 |
| 236:9,20,22,24 | 101:9 113:9 | 226:10,11 | 158:5 166:11 |
| 237:1 | 125:1,15 | 235:14 | 175:24 178:13 |
| **court's** 13:1 | 128:15 129:13 | **craig's** 60:19 | 179:4 194:21 |
| 23:20 174:5 | 132:5,5,8,8 | 70:14 134:10 | 194:23 196:6 |
| 201:12 | 133:14,15,17 | 139:1 141:15 | 218:3 225:9 |
| **courted** 184:9 | 134:16 135:11 | 141:20 | **creditors** 75:8 |
| **courthouse** 2:5 | 135:12,12 | **cranberries** | 146:7,24,25 |
| 72:11 | 136:10 137:14 | 233:1 | 147:8 157:13 |
| **courts** 119:13 | 138:6 139:4,8 | **create** 55:20 | 157:14 158:3 |
| **cover** 93:5 | 139:9 140:12 | 124:5 | 165:6,22,23 |
| **coverage** 44:17 | 140:13,13,13 | **created** 27:6 | 178:25 |
| 137:8 153:18 | 140:17,18,18 | 46:8 116:17 | **credits** 11:4 |
| **covered** 143:7 | 140:18 141:10 | 148:11 183:10 | **creditworthi...** |
| 204:2 211:20 | 141:23 142:5 | 183:15 | 83:16 84:4 |
| **cp** 203:19,25 | 143:13 144:8 | **creates** 24:9 | **crisis** 10:21 |
| 204:3,4,5 | 144:18,22 | 29:8 | **criticize** 206:24 |
| 218:1,3,12 | 154:16 171:9,9 | **creating** 25:6 | **cross** 116:17 |
| 225:4,7 | 172:4 178:2,3 | 127:18 141:1 | 118:20 119:4 |
| **crafts** 49:18,22 | 178:5 183:21 | **credibility** | 119:17 122:6 |
| 49:25 50:4,10 | 184:19 185:2,7 | 173:3 206:22 | 122:11 135:18 |
| 50:11 116:24 | 185:19 194:9 | 206:25 224:17 | 138:5 161:12 |
| 116:25 130:10 | 199:14,17 | **credit** 8:6 15:1 | 161:19 171:14 |
| **craig** 6:13 | 200:3 201:24 | 15:4 18:11 | 195:5,7 200:12 |
| 11:10 18:11 | 201:25 202:8 | 20:16 24:11,11 | 202:19 206:23 |
| 19:4 20:15,17 | 202:10,10,16 | 25:24 30:1,4 | 218:19,20 |
| 23:10,10 31:10 | 202:16 203:12 | 31:7 32:2,4,9 | **crystal** 133:25 |
| 32:10 57:3,8 | 203:14,18 | 66:6 68:6,10 | **current** 10:10 |
| 58:1 60:6,9,23 | 204:23 206:2 | 82:20 83:7,9 | 10:23 106:6 |
| 61:3 62:5,11 | 207:5,7 208:14 | 83:25 115:8 | 107:1 112:6 |
| 65:6 66:1,2,2,2 | 209:23 211:22 | 121:14 137:2,4 | 196:17,22 |
| 66:20,21 68:7 | 212:7 213:14 | 137:7 138:1 | 214:5 |
| 68:8,11,12,13 | 214:22 217:4 | 155:14,18 | **currently** |
| 68:13,17 69:6 | 217:24,25 | | 60:17 82:24 |

157:21 160:3
196:23 197:6
**cushion**  43:17
43:22 108:20
109:24
**customary**
34:10 41:21,21
41:22 43:5
45:3,11
**customer**
11:11,18 16:8
19:10,21,22,25
20:1,6 23:5
31:7 33:17
34:6,23 35:1,5
43:20,25 44:13
49:18 50:16,19
50:22,23 51:1
51:5 54:22
55:12,18,25
57:16,17,25
58:13,18,21
64:20 74:19
82:17,18 88:1
89:19 111:24
111:24 113:8
114:6,11,13,14
114:19 116:4
117:18 129:22
177:19,22
183:7
**customer's**
11:5 153:20
**customers**
23:13 35:7
54:2,3,24
55:15,22 56:5

56:7 57:23
58:22 96:11
**cut**  21:15 142:2
144:5
**cx**  6:4
**cycle**  36:12
142:1 187:17

**d**

**d**  5:22 6:1 7:1
29:17 31:21
32:7 70:7
**d&m**  5:2
233:21
**dad**  191:14
**daily**  10:22
214:6,6
**dakota**  1:2 4:3
11:13 42:3,7
42:15 45:24
46:1,1,20,20
47:24 48:10,23
49:1 52:5,8
53:14 71:25
73:7 80:25
142:24 143:25
155:11 187:5,8
187:13 191:10
191:11 198:21
199:20 200:2
203:15 235:25
**dandy**  85:14
**danielle**  6:5 9:6
9:10,19,23
10:4 14:8 18:4
24:2 25:4,22
26:18 27:2
29:4 31:4,23

32:16 33:6,9
34:4,17 47:19
59:21 61:16
69:4 70:9,11
71:12 73:11
79:10 84:19
117:16 122:11
174:16,19
180:6 188:24
**data**  172:12,15
174:3
**date**  12:8 18:12
18:14,16,18
24:13 26:3
28:14 30:10,17
31:15,16 33:11
78:25 79:11,11
79:14 80:10
85:11 88:15,16
88:16 89:9
97:17 110:13
117:13 120:8
131:25 149:20
179:9 182:13
203:22 236:12
238:25
**dated**  26:1
27:12
**dates**  15:23
23:1 28:10
78:23 123:16
181:12 229:17
229:21
**daughter**
70:14 71:2
139:1

**davenport**
4:20
**day**  37:6
201:10 225:3
**days**  110:12,14
110:15 120:5
192:8 227:21
**deadline**
228:25 230:21
**deadlines**
230:9
**deal**  86:10 87:7
163:5 232:15
**dealing**  20:6
23:12 46:10
54:22
**dealt**  216:10
**death**  11:4
56:1
**debit**  24:8 25:6
27:6 29:8
58:23
**debt**  44:2,2,7
44:11,17,23
45:4 83:22,23
84:4,11 86:7
94:25 96:3
97:1,3 99:18
100:1 103:15
107:1 141:11
213:5 222:8,14
**debtor**  1:9,17
1:25 3:8 21:18
38:9 47:19
52:2,6,10,25
79:18 84:6
86:13 87:23,25

88:6 89:1,25
91:1 94:1
95:13,25 96:1
96:2,13 97:7
97:11,14,18
99:4,6,7,17
100:3,13,15
101:23 102:6
103:10,19
104:15 112:15
115:20 130:21
140:23 149:2
157:18 165:2
174:20 175:4,8
175:20 188:9
190:3 197:22
201:24 226:13
228:21 229:14
230:10 232:6
**debtor's** 22:1
45:4 84:25
85:24 86:25
87:5,18,23
89:15 94:13
99:10 104:9
228:15
**debtors** 4:4
8:14 96:9,18
99:17 106:9
115:8 117:22
157:14,23
167:9 177:9
178:8 180:5
190:1 201:21
**debts** 44:13
**december**
57:14 120:6,6

199:9 200:17
231:11 238:25
**decent** 214:17
**decide** 138:2
169:1
**decided** 38:3
210:12
**decides** 118:20
**decimals** 32:3
77:19
**decision** 47:11
47:12,14 51:8
82:20 114:21
115:8,20 116:6
148:15 149:16
159:8,14,14
162:10 168:25
179:14
**decisioned**
64:5
**decisioning**
44:5 107:21
**decisions** 81:24
83:7,9,25 84:5
159:20 178:19
**declaration**
6:19,20 7:14
8:5 13:5,7,10
13:13,16,19,20
13:21 14:17,22
76:9 124:21
175:18 176:21
177:7,15,16
233:21 236:12
**declarations**
12:22

**decor** 211:12
**decreased** 83:2
83:4
**deep** 231:4
**default** 45:9
74:23 80:23
102:5,8,18
170:13
**defaulted**
232:20
**defeats** 148:7
**defer** 56:16
**deferential**
228:24
**deficiency**
103:19
**defined** 88:14
101:11
**definitely**
211:9 213:9
**definition**
102:24 103:2
110:8
**degree** 10:9
46:16 63:20
104:19
**delay** 200:21
**deliverables**
89:19
**delivered**
131:17
**delve** 42:24
**demonstrate**
21:23 146:15
179:3
**demonstrates**
156:5

**department**
204:19
**depend** 167:14
221:21
**depending**
19:24 54:22
90:17
**depends** 141:8
**depiction**
215:5
**deposit** 25:9
27:7,10 29:6,9
32:5,6 69:7
**deposited**
16:20,25 17:18
17:21 24:17
30:2,7 68:10
**depositing**
25:7
**deposition**
152:22,23
153:3
**depositions**
152:25
**depository**
32:7
**deposits**
173:11,17
**derived** 156:13
**describe** 10:5
10:18 81:7
**described** 37:8
103:11
**description**
6:18
**design** 148:11
183:13

**destroyed**
153:5
**detail**   131:13
**detailed**   175:7
**details**   35:16
159:15 170:14
184:3
**deteriorated**
82:4
**determination**
83:16 155:13
155:17
**determine**
21:21 41:4
83:9 109:22
**determining**
49:19 83:3
**detriment**
143:18
**devaluation**
115:4
**developed**
138:7
**developer**
111:6 135:2,2
135:8 138:8
203:18 217:20
**development**
3:4 5:10 23:10
31:10 32:10
36:12 45:17
65:7 66:2,21
68:12,13 69:8
132:5,8 133:14
133:17 134:16
135:12,13
140:13,18

163:25 196:4
217:13,15
223:17 224:10
**develops**   138:6
**deviate**   44:22
**deviation**
65:20
**diamond**   5:17
**diem**   12:12
**difference**
108:8,9,23,24
109:20,25
114:4,10
**differences**
207:10,13
**different**   10:23
16:6,16 19:24
34:21 35:22
36:6,11 40:25
50:2,23 54:14
55:7 61:5,22
62:1 63:25
65:17 66:16,18
69:14 76:21
78:22,23 87:1
88:21,23 104:8
106:23 113:11
113:12 114:7
116:19,20
123:18 137:21
138:10 151:14
152:17 160:10
167:20 186:6
188:19 192:19
204:6 207:15
207:15,17,19
207:19 208:6

217:14,14,14
217:18 219:8,9
219:11 221:5
227:15
**differently**
117:23
**difficult**   49:17
49:20 50:17
54:13 100:11
149:19 177:4
**dip**   55:23
**direct**   9:23
45:18 59:13
118:4,19
122:13 129:22
136:23 137:1
143:5,7 147:13
147:15 161:11
163:6 191:3
198:14 203:12
**directed**
156:12
**direction**   185:9
**directions**
104:8
**directly**   21:14
65:5,25 94:6
98:16,21
113:19 114:1
132:19 142:6
184:10 185:14
185:15 224:10
**dirt**   219:11,13
**disadvantage**
94:10
**disagreeing**
125:14

**disbursed**   16:8
32:19 129:7
**disbursement**
16:2,7,13,14
16:15,19 17:19
18:9,10,13
20:13,13 24:2
24:10 25:6,10
25:23 27:5
31:12,13 61:8
61:19,20,20
64:14,23 141:2
141:2 235:16
**disbursements**
13:10 16:1,4
17:2 18:19
28:1,3,4 30:13
32:19 76:17
**disbursing**
18:22 65:6
**disclose**   156:3
157:9
**disclosing**
157:8
**disclosure**
119:25 120:2,4
120:5 122:3
**discover**
136:24
**discovered**
116:10
**discovery**
136:21 154:1
**discuss**   13:7,10
**discussed**   7:11
7:21 147:25
155:12,16,22

156:15,17
157:4 174:19
230:22
**discussing**
12:23
**discussion**
44:14 133:21
163:4 183:6
**discussions**
155:23 159:4
159:10 165:14
165:15 184:11
230:23
**dismiss**  22:10
22:15 230:21
232:1,7,14
**dismissal**
228:5
**dispersed**  21:1
22:24 23:9
132:23
**dispose**  160:7
**dispositive**
232:13
**disputed**  85:7
**distribute**  13:7
**distributions**
13:8,9
**district**  1:2
**divided**  48:21
97:1 147:1
**divorce**  11:5
56:1
**doc**  3:2,6,10
233:11 235:23
**docket**  8:1
13:23 14:2,6

15:13 16:11
18:19 24:23
32:17 61:11
78:10 84:13,14
110:4,5 124:16
140:3 161:4
181:15 216:4
231:20
**doctrine**
147:11
**document**
14:21 15:8
18:3 26:18,24
27:18,20 29:4
29:19 30:1,12
30:17,20 31:4
31:23 32:11,25
33:9,12 34:5
34:17,19,20
35:25 36:19
37:9 40:17
42:14,17,20
61:21,23 64:13
64:19,22,24
65:2 68:24
70:11 78:18,20
79:11 84:21,24
87:1 88:13,19
90:12 91:5,8,9
91:9 93:21
98:3,4,15
103:3 105:10
106:22 110:4
110:16 136:18
140:5 186:21
188:18 192:21
192:23 193:14

214:15 219:21
**documentary**
215:19
**documentation**
32:1 35:13,15
39:10,21 50:15
63:17,18,22,24
65:8 66:14
82:21 87:24
113:21,22,24
129:5,21
130:11 132:22
136:1 141:1
150:14 153:16
153:25
**documented**
60:25 61:5,8
**documents**
13:19,25 14:20
14:22 24:2,21
25:4,22 27:2
29:12 49:16
50:17,21,22,23
50:24 65:25
66:6,10,24
76:15 77:9
114:1 116:4,12
116:20 127:6
129:25 130:4
133:2 141:4
168:8 184:3
185:14,15
205:19,21
224:7
**doing**  39:19
95:21 126:3
152:20 177:19

178:23,24
191:8 194:3
**dollar**  18:18
24:15 70:16
77:14 108:8
117:3 126:17
127:17 176:22
178:21 189:2
210:11,19,20
210:20,20,21
**dollars**  175:3
188:16
**domino**  177:23
**don't**  75:5
225:12
**doors**  219:14
**double**  58:15
103:5 202:17
**dozen**  172:13
**draft**  228:11
**drafted**  175:18
176:21 177:7
**drafting**  13:4
91:8
**drag**  153:20
**dragged**
153:24
**draw**  16:19,24
17:14,17,21
18:7 24:7,22
25:7,9,16,17
25:25 26:1
27:14 28:11,12
28:14,16,19,20
28:22 29:6,6,9
29:14 30:2,6,8
30:17,19,21

[draw - entities]                                                                                    Page 24

31:12,13,18
32:12 37:13
40:18 73:22
75:23 116:21
128:22 129:6
132:7 133:20
134:18,20
136:13 139:23
174:23
**drawings**
112:25 113:5,6
113:7,10,12
114:1,4,5,11
114:12,19,20
115:9 116:5
183:10,16,18
183:20 184:20
185:12,19,20
185:23 186:8
186:19
**drawn** 87:24
**draws** 16:1,3
16:13 18:10
28:7 30:12
32:17,21
128:21 132:25
134:3,20
135:17,18,19
139:14,23
**dressing**
197:13
**drew** 4:18 92:4
**drill** 9:16
**drive** 141:25
142:3 209:15
209:15,16

**driving** 167:19
197:13
**drought** 29:14
**dtw** 207:6
**dual** 10:6
**due** 12:7 77:4
88:9 90:23
148:2 231:10
**duration** 119:9
**dx** 6:4

**e**

**e** 2:21,21 4:1,1
6:1,17 7:1,1
70:20 238:1
**earlier** 33:20
120:17 129:25
130:3 140:5
151:24 152:1,6
154:2 160:19
162:2,11
189:14 217:4
217:25 227:11
**early** 121:8
**earmarked**
134:16 135:14
135:15 136:10
**earth** 172:6
**easier** 79:22
**easily** 120:14
**easy** 140:21
236:20
**ecf** 6:19,20,21
6:22,23 7:17
7:23 8:5,11,15
8:16,18,19
13:2 33:1,3,6
67:20 181:18

186:20 223:20
234:5,14,14,14
234:15,15,15
234:15,15,18
235:8
**economic**
45:16 132:9,13
163:24 165:25
**ecro** 2:25
**educated**
232:11
**educational**
10:5
**effective** 88:16
**effectively** 52:6
**efficiencies**
207:16
**efforts** 80:12
80:17
**eight** 120:5
234:13,20
**eighty** 233:12
**either** 69:7,7
74:15 92:12
97:20 98:14
100:18 106:17
110:11 119:1
120:19 131:16
132:19 135:23
145:8 150:9
152:5 153:22
168:12,23
180:18 183:17
184:13 190:17
190:21 216:10
224:20 231:25

**eiver** 48:18
**element** 159:17
228:4
**elements** 22:16
**eleven** 28:9
**else's** 158:1
**email** 20:2
153:4,7 183:23
184:2 185:5,8
185:10
**emailed** 152:13
184:1 185:7
**emailing** 20:4
**emails** 152:15
153:20,23
216:14
**employee**
139:3,8,9
**ended** 125:15
204:15
**ends** 120:5
231:7
**enjoy** 203:7
**enormously**
156:24
**ensure** 20:8
**ensuring** 20:23
**entail** 193:1
**entered** 8:2,20
93:22 216:7
**entering** 94:7
**entire** 187:16
189:12
**entirety** 218:24
**entities** 62:5,24
65:1,10,11
66:3 68:15

71:15,16,18
73:14,15 74:17
75:20 140:22
140:23 148:13
167:21 171:9
171:10 172:4
178:3 217:20
**entitled** 134:10
137:19,23
146:3 157:19
**entity** 72:8
141:24 142:19
142:22,23
147:6 167:17
167:21 171:13
172:5 219:16
**entry** 16:22
97:5 124:16
140:3 161:4
**environmental**
198:17
**ep** 131:8
**epic** 119:9
**equally** 231:5
**equals** 36:25
**equity** 23:11
43:10,17,22
44:24 53:8
55:24 56:7,24
57:25 58:20
83:10 103:25
104:1 105:8
106:15,25
107:23 108:9
108:13,19
109:2,7,10,15
109:21,23

135:14 136:10
138:12 169:23
170:21 172:18
173:7,8,9
188:18
**equivalent**
166:10 208:23
**equivalents**
109:9
**erected** 193:2
**es** 6:4
**especially**
93:25 229:22
232:22
**essence** 35:6
**essentially**
29:23 64:1
112:16 195:13
**establish**
143:11 165:6
172:21 204:2
208:13
**established**
20:1 36:5
51:18 98:18
177:5 208:13
**establishing**
55:21
**estate** 10:19
22:2 36:1
46:23 53:20,23
54:8 90:13,15
90:18,19 143:1
143:2 144:7,17
144:19 145:23
179:2,8 219:4
219:21

**estate's** 160:7
**estimate** 77:24
80:22 89:8
118:12
**estimated** 49:9
**estimation**
119:6
**et** 127:23
145:21 185:24
**evaluate** 96:11
**evans** 4:20
**everybody**
34:23 121:12
170:16
**everything's**
65:8
**evidence** 8:2
8:20 22:6
88:19 91:10
92:5,9,10,14
92:25 93:22
94:7,17 98:21
116:11,12
118:11 124:20
126:2,5 127:7
177:12 189:23
194:15,16
200:17 205:18
215:10,14
216:7,15
**evidentiary**
91:14
**exact** 102:11
187:11 189:2
198:23 212:9
215:8 220:13

**exactly** 34:13
175:19 176:22
**examination**
9:23 39:20
59:13 116:18
118:20 122:6
122:11,13
136:23 138:5
171:14 174:16
188:24 191:3
195:5,7 198:14
200:12,25
202:19 203:12
218:19,20
**examine**
161:19
**example** 36:7
37:16 61:13
71:19,22
116:24 132:15
**examples** 94:3
**exceed** 40:22
41:1 48:2
**except** 50:3
**excess** 97:2
103:9,16
169:16 170:7
171:3,21
173:22
**exclude** 171:6
**excluded** 208:4
**exclusion**
208:12
**exclusive**
168:24 229:7
**exclusivity**
110:13

excuse  177:13
177:14
excused  189:21
197:16 201:6
226:9
executed
124:21
executive
236:1
exercise  107:25
112:12 128:19
exhibit  8:2,16
15:16 17:24
18:1,4 23:17
23:23 24:21
25:2 26:14,23
26:24 27:18
28:25 29:17
31:1,21 32:7
33:1,4 61:12
61:22 64:11
67:20 68:1,20
68:21 69:18
70:7,19 71:9
73:9 74:5
75:14 76:9
78:10 92:11,15
93:22 122:21
145:2 161:4,22
164:14 181:16
186:24 194:16
194:17 200:18
214:16 215:9
215:13,21
216:5,7,18
217:2 223:20
224:13 226:21

233:9 235:12
235:13,15,17
235:18,23
236:18
exhibits  7:12
8:13,20 76:13
91:17 126:4
127:20 215:20
216:9,13,16
227:3,5,22,25
233:4
existence  21:10
21:19 46:19
87:4 94:13
exists  235:2,3
expect  230:5
expectations
88:21
expenditures
217:5,8,11
expenses  56:4
76:4 132:4,12
137:8 213:2
217:19 224:15
experience
10:18 23:12
33:14 46:10
47:4 55:14
57:10 67:1,16
81:14 84:3,10
85:13 135:1,7
138:9 167:15
177:25
experienced
46:15 47:3
102:19

expert  33:21
81:19,23 90:16
97:21 98:10,11
98:14 99:14,14
99:21 104:24
115:3,13
131:24 180:2
204:23 208:4
expertise  47:15
54:22 98:5,7
99:24 105:18
105:22 204:21
213:9
experts  81:16
81:20,23 83:5
explain  42:16
42:19 58:14
163:5 192:24
217:10
explained
46:15 161:7
explaining
46:8
explains  51:11
64:3
explanation
42:24 47:9
50:4
exposure
161:16,21
expressed
165:24
expressly  34:8
extend  115:8
extended  37:12
extending
167:5

extension
143:13 230:21
231:6,24
232:24
extent  38:7,9
54:12 55:16
92:8 98:1,6
143:14,16
147:3,17,18
148:15 165:24
extinguished
133:24 134:1
139:25
extra  72:24
211:12
extreme
126:19
eyes  17:5

**f**

f  2:21 15:16
71:10 238:1
facade  214:25
215:2,6
face  39:25
42:14 81:6
172:5
facetiously
175:15
facially  161:23
facilities
208:16
facility  208:17
209:18
facing  214:25
215:2,6
fact  21:22 22:8
94:15 95:2

156:17
**factor** 36:22
38:21 41:6
42:4 62:12
63:12 90:17
106:25 159:16
166:25
**factored**
115:19 187:9
187:14
**factors** 40:25
41:4
**facts** 92:25
**fail** 102:6
**fair** 35:9
111:11 196:8
**fairly** 120:24
**fairness** 216:22
**faith** 175:25
176:3
**fall** 35:4 150:9
**falls** 4:23 5:12
198:25 199:1
**familiar** 10:20
11:12,15,18
12:22 15:19
34:17 84:20,21
110:20,23
140:9 142:19
191:23 199:3
203:14,17
207:7 215:2
217:7
**familiarity**
10:19 185:2
**family** 144:3,7

**far** 147:12
155:19 159:1
207:22 214:9
219:7
**fargo** 2:7 4:6
4:14 5:5 72:10
73:7
**farm** 115:14,15
**fashion** 222:17
228:1 232:16
**faster** 23:6,7
228:13
**fault** 11:5
**favor** 165:8,8
165:13 166:15
168:1 218:12
**favorably**
208:15
**favoring** 147:7
**favors** 168:19
**fcc** 68:6 125:10
**fccu** 14:25 66:5
68:9 124:25
125:15 128:15
128:17 129:13
130:5,13
**feasibility**
131:19 157:25
**feasible** 36:15
101:16 157:18
**february** 31:16
64:18 125:2
141:14 158:18
159:18
**fee** 135:3
138:14

**feel** 9:3 165:24
168:21 175:14
175:22,23
177:6 227:16
227:20
**feels** 63:21
156:8
**fees** 134:10,17
134:21 154:4
**feis's** 147:3
**feist** 5:14
172:23 174:11
189:18,19
197:8,9 201:3
201:4 226:4,5
226:19 227:2,5
227:6,8
**feist's** 147:5
**felt** 212:11
**fewer** 124:11
**fiduciary**
166:12 167:18
**field** 46:15
105:5
**fifo** 177:13
**fifth** 5:18
**figure** 231:11
**file** 19:9,21
20:5 50:13,15
63:22 84:1
113:20 129:6
148:1,13,15,16
153:16,19,21
153:22 179:11
185:1,3 231:25
231:25 232:7

**filed** 3:2,6,9
11:22,23 13:5
77:3 79:18
93:21 94:2
119:25 145:11
145:15 148:4
148:23 149:21
155:8 181:11
196:9,10 232:8
235:1,4
**files** 15:6 63:10
66:15,16,20
67:15 74:23
153:17
**filing** 80:23
**filled** 19:3
181:10 221:21
223:4
**final** 87:20
123:25
**finally** 58:16
**finance** 98:8
99:22 103:16
**financed** 46:23
60:8 142:13
**financial** 50:24
57:13 58:2
59:24 74:16,17
100:2 104:10
130:11,25
143:8 173:1
174:3
**financials**
83:21
**financing** 37:8
38:16 40:11
52:4 86:14

88:2 97:15,16
97:18 102:24
103:10 104:3
104:10,13,16
105:18,19
106:12,20
107:4,12
108:18 110:24
122:14 144:11
144:16 155:3
160:21,25
184:8,10
187:25 189:4,6
**find**  88:7 92:11
92:18 203:6
213:20 217:16
219:21
**finding**  21:22
**findings**
217:17
**fine**  14:1 39:7
46:8 63:6,23
64:8 110:18
228:15,21,23
228:25 229:13
**finish**  53:7
57:4,5,9 58:5
72:22 81:12
88:7 159:7,11
193:17 195:15
196:21
**finished**  37:10
54:10 144:2,2
144:5,7 164:13
174:1 194:24
195:2

**finishes**  72:21
**finishing**
230:24
**firm**  4:3,11
153:1 219:6,9
**first**  4:5 8:6,23
12:16 14:25
15:3,23 16:8
18:7,8,9,9,11
20:13,13,16
21:17 22:8,13
24:5,8 25:10
27:14 28:9
30:4 32:2,9
35:22 44:3,8
44:11,11 48:20
57:18 61:19
62:24 66:6
68:6,9 77:11
77:16 82:25
90:3 97:4,5,5
111:7 113:11
113:14 114:7
116:16 120:11
123:13 124:18
145:4 163:15
177:8,8,8,10
177:10 182:15
183:19 185:23
186:7 187:22
197:22 198:2
204:19 210:1
215:21 216:13
216:15 223:6
224:21 227:12
**firsthand**
152:19

**fit**  221:22
**five**  17:9,10
54:23 56:14
59:3 72:11
78:22
**fix**  11:6 81:15
83:22
**fixable**  55:1
**fixed**  38:24
86:14,20,22
87:6,17 88:1
122:17,24
123:1,4,8,13
192:18
**flag**  67:15,17
177:21
**flat**  78:21
**flats**  142:20
143:22,23
144:23
**flawed**  157:11
**flexibility**
124:8
**flexible**  203:2
228:13
**flipped**  58:11
**floor**  51:2
183:15 214:17
**flow**  44:3,11,15
64:1 65:9
81:15 83:24
91:2 95:1,17
95:24 96:1,11
96:13,16,17,20
97:11,18 98:24
99:7,8,12,21
100:3,10,12

101:25 102:4
102:10 105:7
107:23 154:12
154:14 213:4,4
222:5,6,14,19
222:20,23
**flows**  97:2
98:19 102:14
**fluctuate**  90:18
**fluctuation**
123:15
**fluctuations**
43:21
**fly**  76:2 120:24
**focus**  32:15
46:18 105:17
**focused**  165:21
**focusing**  85:6
**folder**  210:2
**follow**  20:23
48:12 109:6
146:4 165:7
168:15 182:18
182:19,20,22
188:17 228:16
233:5
**following**
17:17 78:22
210:13
**follows**  146:2
163:16
**folly**  161:23
**font**  17:4
**footage**  51:5,6
114:7,8,9
**footprint**
210:14 220:11

220:15

**foreclose**
  159:18
**foreclosure**
  80:14 81:1
  155:9,14,18
  158:18 159:6
  235:1
**foregoing**  95:4
  238:3
**forensic**
  175:12,13,16
  177:6
**form**  13:18
  14:19 18:5
  19:2 20:12,16
  31:6 64:15
  65:16,17,20
  116:25 128:25
  148:10
**forma**  154:12
  154:14,25
**formal**  35:12
**format**  16:16
  153:21
**formulate**
  95:16
**forth**  194:1
**forward**
  104:23 119:11
  216:24
**forwards**
  131:20
**found**  188:12
**foundation**
  22:4,9 42:6,9
  42:11 46:6

95:4,12 99:12
99:14,15,21
100:4,5,8
104:23 127:24
165:6 168:4
205:4,16
**foundational**
  46:10 51:8
**four**  17:10,12
  72:10 78:21
  82:8 111:15,17
  112:1,10
  119:17 130:13
  140:22 141:25
  142:3 192:8
  216:14 219:7
**fourth**  82:23
  113:11,13,25
  136:20
**frame**  82:3
  94:22 117:3,10
  167:6 171:20
  223:25
**framed**  192:4
**frames**  55:6
**framing**  191:6
  191:9,13
  192:24 193:3
**frank**  155:20
**fraud**  19:10
**free**  9:3
**frequently**
  11:8 96:10,10
**fresh**  176:14
**friday**  192:7
**friend**  222:18

**front**  9:8 36:19
  91:1 124:7,11
**full**  10:2,13,17
  11:2 24:12
  103:21 105:16
  106:10,13,21
  107:13 139:5
  195:18,22,25
  196:1,3 210:25
  212:21 219:1
**fuller**  5:9
**fully**  133:23
  134:1 139:24
  193:11 213:16
  218:25
**fun**  236:14
**funded**  32:5
  145:4
**funding**  38:22
**funds**  18:23
  19:5 24:11
  65:12,19 68:10
  125:16 128:18
  129:9,10,11,12
  132:20 133:23
  133:25,25
  135:15 139:24
  145:8,13 172:9
  177:18
**further**  106:17
  118:7 172:9
  174:10 177:12
  182:22 188:22
  189:17 195:4
  197:7 200:11
  218:18 226:3
  230:8

**future**  102:13
  103:15 111:13
  112:14 134:2,8
  195:14

**g**

**g**  7:1 26:14
  27:18 73:9
**game**  43:11,20
**gap**  72:23
  108:14 109:6
  109:25
**garage**  209:8
  209:13,17
**gate**  97:6
**gears**  102:22
  110:1 160:19
  179:7
**gehrtz**  151:9
  181:1,8 182:11
  183:3
**general**  35:12
  56:1 68:11
  134:11 135:15
  137:19,23
  166:11 196:14
  211:12
**generalizations**
  170:12
**generalized**
  34:23 146:8
**generally**
  146:25
**generate**  91:2
  95:19 96:13
  97:8,11,19
  101:12 222:4
  222:13

| | | | |
|---|---|---|---|
| **generations** | 23:25 26:15,23 | **god**  9:13 190:9 | 156:22,23 |
| 1:7 53:14 60:7 | 28:25 29:2,16 | 198:12 | 157:6 158:24 |
| 141:11 154:9 | 29:17 31:20,21 | **goes**  21:25 | 160:11,12,19 |
| 170:18 171:2 | 32:15 33:1,3 | 90:19 104:7 | 161:22 162:9 |
| 211:9 214:7,8 | 35:2 36:13 | 133:2 139:13 | 162:13 163:10 |
| **generous**  209:5 | 40:1,17 51:8 | 146:4,7 173:3 | 164:4,5 166:16 |
| **geographic** | 54:17 56:7,14 | 206:22 224:17 | 168:13,15,16 |
| 198:20 | 61:12 64:8,9 | **going**  8:22 9:5 | 169:5,22 173:3 |
| **getting**  7:5 | 64:10 67:19,20 | 9:17 14:3,8 | 174:19 176:11 |
| 17:5 22:6 | 67:21 68:20,22 | 15:1,12 17:12 | 177:1,20,22 |
| 33:20 34:10 | 69:17 70:7,8 | 22:7,12,20 | 178:12 179:7 |
| 102:12 148:9 | 70:19,20 71:9 | 24:19 32:15,24 | 180:16 181:17 |
| 158:20,21 | 71:10 72:19 | 34:12 35:1 | 183:8,8 186:16 |
| 165:18 190:22 | 73:9,9 74:5 | 39:18 40:19 | 187:19 190:17 |
| 201:21 | 75:14,15 76:8 | 45:18 46:6 | 193:17 197:21 |
| **give**  9:12 19:23 | 78:9,10 84:17 | 47:15 50:6 | 199:16 202:2,5 |
| 21:8 78:7 | 85:3,4 90:20 | 57:10 61:7 | 202:6 204:22 |
| 81:23 96:4 | 92:3 94:12 | 64:9 65:12,22 | 205:15 206:12 |
| 99:22 105:8 | 99:11,13,16 | 67:9,20,24 | 206:25 207:2 |
| 117:14 118:12 | 106:16,19 | 76:20 81:14,15 | 208:1,3,11,23 |
| 133:9 156:20 | 107:11 119:13 | 84:9 90:2,24 | 211:19 212:25 |
| 177:4 190:8 | 124:16,17,23 | 90:24 92:3,19 | 214:15 219:18 |
| 198:11 212:17 | 128:20,20 | 95:3,3 97:22 | 222:24 224:25 |
| 213:1 214:10 | 132:3 133:22 | 97:24 99:10 | 226:17 228:5 |
| 228:3 | 135:17 136:15 | 101:2 102:2,3 | 228:10,23 |
| **given**  81:10 | 137:11 140:2 | 102:12,13,22 | 230:14,25 |
| 84:9 113:6 | 163:17 174:19 | 103:16,17,20 | 231:8 232:15 |
| 180:13,14 | 177:23 181:8 | 105:1 107:24 | 232:23 233:7,9 |
| 227:21 | 184:12 186:20 | 108:16,23,25 | **good**  7:20 9:25 |
| **giving**  81:14 | 187:3,3 192:21 | 110:6 115:25 | 10:1 14:16 |
| 84:6 | 206:19 208:3 | 119:4,8 122:2 | 34:15 72:17 |
| **glitched**  218:7 | 208:12 217:15 | 124:16 126:13 | 79:5 118:8 |
| **globally**  102:4 | 219:5 225:24 | 127:5 133:11 | 119:1 122:1 |
| **go**  11:25 14:14 | 226:2 233:3,4 | 134:18,24 | 175:25 176:3 |
| 15:16 17:24 | 233:7 | 138:13,14 | 183:5 195:9 |
| 18:1,6 19:5,12 | **goal**  179:1 | 144:4 146:23 | 197:21 210:22 |
| 19:16 20:7 | | 147:1 148:3,3 | 212:5 227:24 |

236:23,24

**goods** 131:17

**gotten** 155:19
185:21

**graduate** 10:8
46:16

**graduated**
10:6

**grant** 229:2
232:17

**granted** 49:17

**grateful**
227:15

**gratitude**
197:12,14
201:8 226:11

**great** 7:13,13
11:24 21:18
45:24 56:19
59:4 122:5
198:6 229:16
230:5

**greater** 117:20

**greatly** 209:7

**green** 190:14

**greenwood**
6:20 8:6

**gritty** 55:20

**grotesque** 47:1

**ground** 164:1

**grounds** 21:5

**group** 109:13
229:22

**groups** 217:15

**growing** 62:10

**guarantee**
141:10 214:11

**guarantees**
140:24 141:6

**guarantors**
102:10 109:14

**guess** 78:15
97:17 116:23
118:9 124:18
216:8 225:6
226:25

**guessing** 59:6
130:10 133:5
150:12

**guidance** 54:19

**gut** 57:12
63:15,20

**gut's** 63:24

**h**

**h** 6:17 74:5

**haircut** 103:17

**half** 63:14,15
172:13 192:12
209:9,9,12
226:1

**hand** 17:13
25:12 26:5,12
27:20 30:14
31:2 32:8 48:7
57:22 74:15
85:2,6 86:24
89:16 110:5
186:6 198:7
201:9 209:14
219:5,5

**handed** 184:19

**handful** 217:11

**handicapping**
187:18

**handle** 19:13
59:5 202:18

**handling** 193:6

**hands** 23:6

**handy** 14:4
85:14

**hang** 201:6

**hanging**
201:10

**happen** 24:13
39:1 43:21
53:10 103:21
103:23 177:21
177:22 206:9

**happened**
37:22 64:4
90:20 140:1
162:5,11
175:23 184:15

**happening**
161:13

**happens** 45:4
215:21

**happy** 33:23
38:12 79:2
94:12 101:19
212:3 230:11
230:12

**hard** 15:18
23:22 51:10
115:16 138:9
223:15

**harder** 45:6

**harless** 6:5 9:6
9:7,10,10,14
9:19,19,23,25
10:4 22:23

96:9 100:21
101:9 118:16
119:4 122:11
122:13,23
124:20 128:11
136:5,20
137:14 143:22
147:25 150:2
150:15 152:21
159:5 160:15
161:6,14
162:17 164:16
165:11 169:8
172:18 174:16
188:24 189:1
189:22

**hashing** 149:1

**hastings** 2:22

**hats** 10:23

**head** 128:13

**header** 30:3

**healthy** 156:11

**hear** 9:18
54:16,18 139:5
163:15 164:20
166:5 190:15
190:23 198:4
215:11 217:4
218:6 228:7
229:20

**heard** 82:5
110:17,25
142:2 145:19
147:2,14 180:8

**hearing** 3:1,4,8
21:6,20 22:10
22:13,17 58:10

91:14 92:7
93:4 120:3,4,6
120:8,10 122:2
130:19 131:18
146:21 157:12
165:23 202:3
215:14,20
216:10,12,12
227:11,19
228:19
**hearing's**
228:19
226:17
**hearings** 202:4
233:17
**hearsay** 166:14
166:17,18,20
168:6,18 221:1
221:4
**heart** 47:13
163:17
**held** 21:7 62:5
141:15 143:11
**help** 9:13 14:13
23:4,5 55:19
102:24 103:5
186:7 190:9
198:12
**helpful** 14:4,11
22:20 56:15
64:8,9 91:16
99:25 103:1
133:8 176:12
182:7 212:18
**helping** 11:6
**helps** 79:20
**hesitation**
212:12

**high** 10:13
19:11 44:2
82:12
**higher** 41:21
45:3,6,9
114:25 115:15
154:24 155:1
**highlight**
100:19 206:23
**highlighted**
186:11
**highlighting**
227:25
**highly** 57:10
58:17 63:16
**hindsight** 55:9
117:20
**hire** 112:9
181:8 182:11
200:3
**hired** 81:16,23
82:8 111:25
183:3 200:5,7
217:15
**history** 11:15
11:17 27:23
146:14 175:7
**hohn** 4:25
**hold** 120:17
176:23,23,23
176:24
**holder** 172:18
173:7,8,9
**holding** 143:1
173:9
**holdings** 66:2
140:13,18

**holds** 143:2,17
145:22
**holes** 157:17
**holiday** 230:25
231:6 232:22
**holidays**
228:12
**home** 60:11,14
60:17 73:18,25
141:15,20
171:5
**hon** 2:22
**honest** 131:22
155:20 208:19
231:3,5
**honestly**
125:12
**honor** 8:17 9:5
9:22 21:4,15
22:18,19 46:5
47:17 51:12
59:3 67:10
88:12 92:2
110:19 120:12
120:19 122:4
122:10 126:22
146:1,12,22
147:20 148:8
156:10 161:6
161:24 169:3
169:14 171:8
174:5,10,15
186:14 189:25
190:3 191:2
194:14 195:3,6
196:25 197:7,9
197:11 198:1

200:10,14
201:12,17,23
202:13 203:11
204:17,22
205:15 206:12
207:1 208:1,10
208:25 211:17
215:9,12 216:2
218:17 226:8
226:13,15,25
228:9,15
229:15 230:7
230:15 231:17
**hope** 95:14
117:16 119:5
178:22 179:3
**hopefully** 7:14
**hoping** 94:15
178:16,17
**horn** 138:23
**horner** 70:12
70:13 138:25
139:3,7,15
**horribly**
172:10
**horsager** 92:18
226:21
**hour** 118:22
119:24 192:12
**hours** 66:25,25
119:17 176:6
**house** 132:17
210:11,16,25
225:19,20,25
**housekeeping**
7:9 8:25 9:2
93:4 112:22

216:8
**hundred**   17:12
**hurwitz**   4:20
**husband**
203:18 217:12
217:23
**huschka**
208:10
**hushka**   4:18
6:10 23:24
92:2,5,15,20
121:20 171:8
195:6,8 196:25
197:1,7 200:13
200:16 201:2
202:13,24
203:3 204:17
205:2,15
206:12 207:1
208:1 211:24
212:3,4,15,16
212:20 213:17
213:19,22
215:16 216:2
221:20 226:15
226:25 227:12
228:9 230:15
231:9,13,16,21
231:25 232:4,9
232:18,20,23
233:2,19 235:2
235:9 236:3,5
236:12
**hyde**   3:25
238:3,8
**hyper**   170:13
174:4 178:20

**hyperlink**   33:4
84:15
**hypothetical**
78:19 105:10

**i**

**idea**   104:22
135:22 139:17
157:10 163:24
221:7
**ideally**   37:10
**identified**
222:23
**identify**   213:19
**identity**   19:10
19:24
**illustrate**
176:13
**illustration**
37:3,4
**imagine**   156:15
**impact**   114:15
114:18,21
115:8,12
**impacted**
116:11 133:18
**imperial**   152:3
**implication**
147:10
**importance**
228:3
**important**   23:3
44:24,25
**impression**
126:23
**improper**
41:19

**inaccurate**
116:21 181:13
**inaccurately**
146:9
**inadequacy**
21:25
**inadvertently**
147:21
**inappropriate**
157:4 161:11
**inappropriat...**
104:20
**inartful**   53:19
79:6
**inception**
117:7
**inclinations**
165:25
**inclined**   178:6
201:13
**include**   41:17
41:19 140:17
**included**   48:4
81:21 96:23
112:16 139:20
139:22,25
140:12 156:14
179:25
**including**
94:25 102:2
106:22 147:3
157:15 213:5
**income**   96:24
96:25 97:5
101:13 102:2
108:3 134:7
135:2 154:15

154:18
**incoming**   32:4
**inconsistencies**
113:20
**increase**   188:8
188:11
**increment**
110:24
**increments**
135:9
**independent**
60:15 75:1
**indicate**   28:7
40:10 231:6
**indicated**
118:21 137:1
153:4 168:2
195:9 196:6
219:20 220:10
220:18
**indicates**   20:22
40:21 47:21
70:9 86:23
87:5
**indicating**
131:16
**indiscernible**
23:15 47:4,6
72:20 175:10
181:22,23
186:12 190:2
225:12,13
226:13 236:7
**individual**
158:14
**individually**
69:10 140:12

**indulge** 40:17
214:3
**indulgence**
174:6
**industries** 5:2
233:21
**industry** 74:17
98:9
**industrywide**
44:20
**ineligible**
129:15
**inference**
116:21
**inflated** 114:13
115:9
**inflation** 54:21
55:6 138:12
**inflow** 146:9
**inflows** 132:9
132:13,19
**info** 18:23
**information**
13:15 14:17
19:21,22,23
20:5 24:21,22
25:12,13 26:7
26:8 27:10,12
29:12,13 30:12
30:20,21 31:17
31:17,18 32:11
32:12 45:20
51:9 83:25
91:19 95:7
113:15 149:4
159:20,24
172:16 178:19

220:20 221:8
224:13
**informed**
81:24
**inherently**
45:16 48:5
164:2,3
**initial** 92:7
228:10
**initially** 152:9
**initiated** 38:24
**injection** 42:3
48:5 103:25
104:1,4 105:8
108:9,13 109:7
109:15,21
188:13,18
**injections**
109:10
**innately**
157:11
**inquiry** 39:19
164:25 208:2
**insert** 162:14
**inside** 151:12
151:19,21
184:13 192:16
**insider** 138:16
178:14,15
**insiders** 66:1
**insist** 140:22
**insofar** 208:15
**inspection**
182:21 198:18
198:19 199:8
199:13,14,15
199:23 200:6,9

**install** 193:5
**installed** 193:4
**installment**
90:4
**instance** 35:1
51:1 153:17
**institution**
167:17
**institutions**
50:25 66:1
74:16
**instruct** 65:24
**instructed**
113:21
**instructions**
19:4 20:4,18
**insufficient**
99:18
**insurance**
153:18
**integrity** 20:9
50:14 63:19
**intend** 47:22
216:16
**intended** 34:5
34:11 35:24
42:23 65:15
76:18 117:22
141:1
**intending**
39:10
**intent** 34:8
46:1
**intention** 93:9
175:19 176:21
177:7

**interest** 12:12
12:15,15 35:21
36:9,17,20
37:13,22,23,24
38:4,16,18
39:16 40:4
75:3 77:12,12
77:17 78:17
79:13,19 80:2
80:4,9 86:4,4
88:2 89:4,5,6
89:11 91:23
104:23 122:15
123:1,2,15
165:6,22
167:13 178:13
178:15 219:3,8
219:16 222:7
231:5
**interesting**
232:10
**interests** 146:6
146:23 147:8
165:24 178:14
**interference**
98:20
**interior** 151:6
151:15
**intermediaries**
132:20
**intermediary**
126:12
**internal** 20:24
24:3,4,18 26:4
29:5 31:5 34:4
34:9 83:1
165:14,15

internally
24:19,20
international
10:7
interplay
199:23
interpret 91:8
95:23 98:2
168:14
interpretation
94:18 104:21
interpreting
94:23 95:22
interrupt 7:8
92:2 123:10
235:21
interrupting
101:3
interstate 5:3
interval 38:25
182:23
intricacies
46:11
introduce
200:21
introduced
234:21
introduction
22:13
invalidate
187:23
invalidates
107:22
investigate
178:6,9 179:4
invite 34:12
101:2 116:1

162:13 226:17
invited 116:15
202:4
invites 166:16
inviting 166:13
invoice 131:12
131:15
invoices 80:19
80:20
invoking
148:20
involve 147:18
230:23
involved 24:15
43:22 54:16,17
56:9 80:17
144:10,19
184:7,10,11
involves
110:24
ironic 143:16
irregular 57:11
58:21 62:11
67:12 84:2
126:16 127:16
irrelevant
112:12,16
ish 59:7
issue 146:17
156:13,24
157:6 165:10
165:19 206:19
208:8 230:19
232:4,8,12
issued 130:6
issues 94:6
146:21 230:22

it'd 29:23 39:3
48:12 56:15
80:1 108:14
176:12 214:12
231:9
it'll 119:5
item 17:11
30:4

**j**

j 4:18 5:14
janitorial
211:7,10
january 33:13
35:20,22 70:2
120:9,9,10,14
121:10 122:3
137:15
jason 6:11
197:22,24
198:5,9,14
jeffrey 5:22
jesse 11:10
19:4,9 20:17
57:8 58:1
60:19 62:5
69:6,15 70:14
71:2 73:6
75:25 113:8
133:15 137:14
138:6 172:4
183:21 184:19
194:8 199:14
203:18 217:24
220:24 235:14
jesse's 142:14
job 51:10
191:20 193:17

john 5:7
joinder 3:4
jointly 1:3,11
jokes 175:15
jordan 5:14
70:12,13
138:23
josh 82:6,23
110:25
journal 36:21
38:20 39:5
86:18,21
122:17,19
123:7
jr 5:7
judge 2:23
judgment
234:22
judicial 39:13
39:16 236:3,7
july 10:17
29:23 96:22
116:10 151:4
154:13 155:6
june 17:20
27:8,8,12
182:14 196:13
jury 203:1
juxtaposed
146:6

**k**

kd 5:1
keep 26:11
97:24 122:1
162:10 234:1
keeping 147:9

| | | | |
|---|---|---|---|
| **kept** 55:12 | 76:2 77:22 | 209:4,23 211:8 | **labeled** 18:4 |
| 56:25 82:17,18 | 80:1,3 87:3 | 211:22 212:15 | **labor** 196:21 |
| **kesha** 4:16 | 92:7 96:24 | 213:17 220:6 | **lack** 117:8 |
| **key** 108:3 | 99:8,22,25 | 220:19,24 | **laid** 100:7,8 |
| 153:18 | 100:6 102:3,25 | 221:2,4 227:2 | 104:23 127:24 |
| **kid** 191:14 | 104:15 106:5 | 228:2,4 229:24 | 135:2 178:11 |
| **kind** 10:21 | 107:20 108:1,7 | 230:24 233:21 | **lake** 60:11,14 |
| 35:11 42:4 | 108:10 111:16 | **knowing** 57:21 | 60:17 73:18,25 |
| 44:4 55:2 | 121:20 125:12 | 134:15 135:14 | 132:17 141:15 |
| 58:23 61:1 | 128:4,5 129:3 | 156:15 211:8 | 141:20 171:5 |
| 64:1,9 68:11 | 130:17 131:11 | 232:22 233:1 | **language** 16:5 |
| 74:13 98:20 | 131:13 132:24 | **knowledge** | 47:25 187:20 |
| 107:14,21,24 | 133:21 135:21 | 13:15 14:16 | **lapse** 151:11 |
| 133:22 143:6 | 136:1,13 137:4 | 42:9 46:7 | 151:14 |
| 156:1 166:13 | 137:6 138:3 | 59:25 60:13,22 | **large** 126:24 |
| 174:18 175:7 | 139:3,7,19 | 74:18 81:24 | 127:2 141:11 |
| 176:13 177:8 | 141:19,22,24 | 85:13 98:8 | 147:8 211:8,8 |
| 185:24 186:14 | 142:25 143:2 | 127:24 144:18 | **largely** 14:25 |
| **klobucar** 5:22 | 143:24 144:10 | 144:22 150:15 | 66:20,21 |
| **klobucar's** | 144:11 145:15 | 152:19 153:7 | 112:12 |
| 147:10 | 146:20 147:18 | 184:13 213:9 | **larger** 114:20 |
| **knew** 57:16,16 | 149:9,20,22,22 | 220:7,8 | 117:19 124:11 |
| 64:4 187:19 | 150:13,20,21 | **knowledgeable** | 207:20,22,24 |
| 194:11 | 151:8 152:12 | 46:22 128:1 | 208:16,17 |
| **know** 9:16 | 153:23 156:6 | **known** 191:23 | 209:18 |
| 10:24 11:10 | 164:19 167:11 | 203:15 | **largest** 197:4 |
| 12:3,15 13:17 | 167:20 170:21 | **knows** 22:4,5 | **late** 77:24 |
| 19:17 20:3 | 171:10 172:1 | 34:13 46:19 | **law** 4:11 5:1 |
| 35:10 37:19 | 172:13,17,22 | 123:12 126:17 | 46:9 94:2 |
| 39:1,6 44:3,4 | 183:12,12,17 | 127:15,17 | 153:1 204:24 |
| 48:12 54:16 | 183:22 184:14 | 170:16 | 219:6,9 |
| 55:21 56:2,3,3 | 184:18 185:14 | **kreg** 125:20 | **laws** 91:6 98:3 |
| 56:4 57:19 | 186:5 189:2 | **krings** 5:7 | **lawsuit** 80:14 |
| 58:7,22,23,23 | 190:15 202:21 | **l** | **lawyers** 147:19 |
| 63:7,22,24 | 203:6,9 204:10 | | 156:7,12 203:6 |
| 64:2,3,6 72:7 | 205:11 206:8,9 | **l** 209:14 210:9 | **lay** 22:4,9 |
| 73:18 75:22 | 207:5 208:4 | 210:14,16,16 | 88:17 91:7,12 |
| | | 226:1 | |

99:13,20 100:5
105:5 111:12
145:19
**layer** 77:7
**layout** 207:14
**layouts** 211:5
**layperson** 67:9
168:7 180:12
**laypersons**
148:12
**lead** 91:16,16
211:14
**leading** 22:5
83:12 90:11
176:8,16
**leads** 178:19
**league** 55:3
**learn** 191:13
**learned** 143:8
191:14,15
**lease** 210:11,22
211:13,14,22
212:11 213:15
213:16 214:4,8
**leased** 210:18
211:3
**leases** 219:14
**leave** 129:9
197:17 233:6
**leaving** 129:2
**led** 126:7
**ledanski** 3:25
238:3,8
**leeway** 21:8
**left** 7:4 17:13
18:19 24:22
25:13 26:8

27:13 28:23
29:14 30:14,21
32:13,16,25
33:5 73:14
74:11,12,14,15
84:17,20 86:5
86:16 110:5
193:9
**legal** 34:7 42:7
42:25 67:6,8
68:15 71:18
80:19 88:19
94:6 98:17
101:17 104:24
105:9,9 140:25
145:14,20
154:4 156:15
161:18,18
168:8 232:10
232:12 238:20
**legally** 93:25
94:11 100:16
**lend** 10:21
**lender** 102:19
**lending** 10:19
46:17 63:15
83:10 140:22
167:17
**length** 86:3
**lent** 115:1
**lesser** 40:25
104:19
**letter** 195:13
**level** 95:20
107:1 124:4,6
209:14,14

**lien** 141:15,20
141:22 142:8,9
143:17
**lienholders**
91:3
**liens** 143:12
196:14
**life** 35:4 36:12
66:25 135:8
184:15 187:17
**lifo** 177:12
**light** 58:10
104:20 159:3
230:22
**likelihood**
105:15
**likely** 104:10
**likewise** 35:4
**limit** 229:23,25
230:4
**limitations**
149:3
**limited** 34:8
37:12 67:24
200:1
**limiting** 96:4
**limits** 48:7
162:6,7
**limoges** 131:11
131:11,15
**line** 16:22
17:11 21:9
27:12,14 30:4
30:8,18 86:17
112:23 124:12
136:20 137:22
139:16 181:19

208:2 212:20
213:6 226:18
**lines** 15:7
17:17 28:9
73:19 211:25
213:22
**liquidate**
158:22
**list** 92:11
139:20 141:7
226:21 233:4
233:10
**listed** 62:13
66:3 73:21
76:12 163:23
164:9,11
**listen** 163:14
**literally** 175:16
184:22 210:4
**little** 15:18
18:25 23:21
33:3,11,19
43:23 46:20
54:14,15,15,19
54:25 61:15
72:23 73:1
84:16 85:12,22
102:22 110:2,2
133:5 135:6
138:18 144:25
152:3 155:8
189:10,13
190:13 192:24
193:12,21
198:19 210:15
213:2

**living** 191:5
198:16
**llc** 1:7,15,23
20:15 65:7
72:8 73:4
133:14,17
134:16 140:12
140:17 142:23
207:6 219:3,16
**llp** 4:20
**loaded** 124:7
221:21
**loan** 11:8,15,17
13:10 15:25
16:1,2,4,7,15
17:2,19 20:13
20:20 21:1
24:8,9,19 25:5
25:23 27:5,5
28:1,4 29:8
32:19 35:12,15
36:8 37:16
38:5 40:8,11
40:12,14,21
41:1,20 43:5
43:15 44:9,13
44:16 45:3,6
45:11,16,19
46:1 47:23,23
48:2,6,6,9,10
48:17,18,22,24
50:13 51:20
52:2,23 53:6
54:4,14 55:22
57:18 58:18
60:2,11,22,25
61:5,6,7,9,16

61:17,24,25
62:2,6,11,18
63:9 64:16,20
64:23,25 65:15
67:1,2 76:16
77:8 87:8,24
102:15 108:6
108:20 109:19
114:22 115:20
116:7,7,12
117:4,5,6,12
117:13,19,22
118:1 124:9,25
125:16 129:10
129:10 132:18
133:25 138:10
141:14 142:6
142:10 144:13
144:13,16,20
153:17 160:20
161:8,10 162:1
162:2,18 163:4
163:13,25
166:10,12,14
166:24 168:11
171:2,10,13
173:24 175:1,7
175:9,19 176:7
185:1 187:17
187:22 188:6,8
188:11,17
189:1
**loaned** 47:20
47:22 52:6,9
52:15,24 55:10
117:21,21
125:5,8 132:16

134:1 160:24
**loaning** 56:25
81:12
**loans** 11:19
53:12,20,20,25
54:8 56:22
57:1,5 59:22
60:5,9,23 61:3
61:4 63:10
76:18 78:3
80:4 132:22,23
143:15 164:17
164:23 166:7
168:17 169:9
169:10,16,25
170:1,7,20,21
171:1,18 172:3
172:11,14,25
173:21 175:25
188:10
**local** 46:9
**located** 73:25
**location** 69:7
207:18
**locations**
217:14
**lodge** 161:5
**lodged** 163:6
**loft** 207:23
**lofts** 71:22,24
72:18 203:15
204:5 206:2
207:6,11,18
208:8,16,17
209:7,21 211:9
218:23 219:3
219:16 220:3,6

221:7
**logical** 134:25
183:23
**logically** 75:24
128:18 179:13
**logo** 185:24
**loi** 193:17
194:4 195:10
195:24
**long** 10:12,15
22:16 40:5
61:1 86:7 88:2
134:19 158:25
191:7 201:10
203:21 211:22
214:3 225:3
231:7
**longer** 41:9
112:15 119:8
223:24
**look** 12:2,12,14
16:17 17:12
22:20 36:13
41:16 50:13
73:14,19 78:7
82:1 87:19
95:23 102:24
108:6 120:11
124:7 133:4,9
133:10 152:15
159:12 174:2
175:22 178:10
178:23 182:16
187:16 192:10
214:6 215:8
224:22 229:2

**[looked - management]**                                                          Page 39

| | | | |
|---|---|---|---|
| **looked**  98:23 | **lower**  40:23 | **made**  28:2,3,5 | 134:4 135:6 |
| 132:24 186:3 | 41:22 | 28:7 36:11 | 149:16 155:13 |
| 192:13 230:19 | **ltv**  41:20 | 57:1 60:5,9,23 | 155:17 156:18 |
| **looking**  15:13 | **lump**  135:3 | 61:3,24 63:13 | 159:20 168:25 |
| 23:1,19 39:12 | **lumped**  174:1 | 69:6,15,23 | 169:18 178:19 |
| 42:1 51:3 | **lunch**  118:9 | 70:12,25 73:20 | 179:14 181:9 |
| 63:18 64:4 | 119:19 | 76:24 77:1 | 187:21,22 |
| 78:1,1 83:24 | **luther**  82:6,23 | 82:21 83:8,25 | 196:21 198:3 |
| 103:15 104:23 | 110:25 111:14 | 87:8 89:1 | 226:22,23 |
| 120:13 128:20 | 111:23 112:24 | 97:14 105:9 | **makes**  42:14 |
| 131:20,20 | 116:18 150:23 | 108:22 124:2 | 51:10 55:8 |
| 136:13,17 | 219:20,25 | 133:24 141:14 | 64:4 82:18 |
| 142:16 174:3 | 220:10 | 148:15 169:24 | 119:5 123:9 |
| 186:5,21 | **luther's**  154:13 | 171:1 181:5 | 141:5 159:8 |
| 208:18 212:2 | 154:25 155:3 | 188:10 199:22 | 164:7,12 |
| 212:15 228:20 | 219:25 | 224:9 225:4 | 170:16 |
| 233:16 | **luxurious** | 228:6 229:24 | **making**  44:1 |
| **looks**  178:22 | 217:8 | **main**  209:14 | 47:11,12,14 |
| 181:24 192:16 | **luxury**  217:5 | **major**  10:7 | 51:8 57:5 |
| 215:3 227:23 | 224:15 | **majority** | 58:15 64:5 |
| **loop**  223:14 | **m** | 168:23 217:12 | 85:10 113:4 |
| **losing**  35:3 | | 217:19 | 114:16 124:3 |
| **loss**  80:13 | **m**  4:25 5:7 | **make**  20:6 32:2 | 153:19 156:23 |
| **lost**  39:23 | 103:5 | 32:3 34:23 | 166:4 169:9,23 |
| **lot**  10:23,24 | **mac**  93:10 | 36:14 44:4 | 169:25 |
| 13:24 19:11 | 178:10 203:3 | 45:4,8 53:12 | **manage**  203:21 |
| 59:23 63:8 | 209:1 215:16 | 53:19 57:3,22 | **manageable** |
| 66:14 67:14 | 218:7 230:19 | 61:2 79:15,17 | 56:6 |
| 106:4 138:11 | **madam**  13:22 | 81:24 83:7 | **managed** |
| 147:14 169:19 | 122:20 124:15 | 84:5 91:19,24 | 203:19 |
| 176:5 209:9,10 | 133:4,10 | 92:15,19 96:13 | **management** |
| 230:5,5 | 136:15 137:11 | 96:14,15,25 | 44:10 59:23 |
| **lots**  49:18 | 140:2 145:1 | 97:15,19 | 63:9 172:17 |
| 191:22 | 161:3 164:13 | 100:12 102:7 | 203:20 204:1,3 |
| **love**  9:16 | 192:20 193:10 | 104:2,10,15,16 | 204:4,5 218:1 |
| **low**  152:3 | 193:20 214:14 | 106:20 107:12 | 218:3,12 225:5 |
| | 214:18 217:1 | 109:3 133:8 | 225:8 |

**[manager - measure]**                                                Page 40

| | | | |
|---|---|---|---|
| **manager** | **master's** 10:9 | **matt** 181:1,8 | 143:10 145:18 |
| 134:11 137:20 | **match** 18:18 | **matter** 1:5,13 | 149:20 154:7,8 |
| 137:24 159:20 | 24:22,24 25:13 | 1:21 7:9 50:11 | 159:15 160:9 |
| 204:19 205:16 | 25:15 26:7 | 59:5,7 74:24 | 160:11 166:9 |
| **managers** | 27:12 28:22,23 | 81:10 107:7 | 168:15 172:1 |
| 43:18 | 29:13 30:13,15 | 119:19 154:4,7 | 177:10 179:15 |
| **managing** | 31:17,18 32:12 | 154:8 170:14 | 185:11 187:14 |
| 204:5 | 46:2 50:17,21 | 177:4 185:2 | 229:6,8 |
| **manner** 146:8 | 129:23 135:18 | 221:11 230:13 | **meaning** 13:9 |
| **march** 16:12 | 135:20,21 | **matters** 9:2 | 36:3 41:7 55:1 |
| 16:18 18:16 | 185:22 | 141:12 145:20 | 128:15 133:11 |
| 23:1,2 39:3 | **matched** | 154:9 156:4 | 167:21,24 |
| 125:1 137:15 | 130:21 | 157:4,8 173:1 | 168:8,9 180:14 |
| 171:18 203:23 | **matches** 27:14 | 188:20 | 210:17 |
| 204:9 | 30:5,18,21 | **matured** 78:16 | **meanings** |
| **margin** 43:18 | 187:11 222:2 | **maturity** 78:25 | 42:17 |
| 106:15 213:23 | **material** 49:2 | 79:11 | **means** 19:24 |
| **marginal** | 120:2 152:3 | **maurice** 4:8 | 47:25 102:25 |
| 120:23 | 195:24 | **max** 108:6,20 | 106:15,24 |
| **margins** | **materials** | 109:19 | 123:13,21 |
| 221:15,16 | 137:5 196:21 | **mean** 7:18 11:2 | 125:17 133:5 |
| **mark** 121:14 | **math** 48:12 | 16:3,5 35:23 | 167:2 180:6 |
| 229:25 230:2 | 90:6,7 91:13 | 40:17,20,24 | 197:16 201:6 |
| **marked** 215:13 | 98:15 99:23 | 41:9,10 44:10 | 213:10,10 |
| 215:20 216:9 | 206:8 | 45:21 48:9 | **meant** 33:15 |
| 216:12 | **mathematics** | 50:12,20,22 | 33:20 34:20 |
| **market** 43:21 | 91:6 98:3 | 54:20 55:5,6 | 36:20 37:8,11 |
| 212:24 214:5 | **matson** 6:8 | 66:16 68:8 | 37:11,12,23 |
| **marking** 26:14 | 190:4,6,6,10 | 71:16 75:24,25 | 41:23,25 42:20 |
| **marshaling** | 190:16,16,20 | 84:1 90:7 | 45:22 59:15 |
| 147:11 | 190:20,24 | 95:11 97:3 | 125:12 154:6 |
| **martin** 152:11 | 191:3,5,19 | 102:6 103:13 | 163:24 178:20 |
| 152:13 183:20 | 192:23 193:14 | 106:15 108:10 | 180:8,13,23 |
| 184:16,20 | 193:23 194:19 | 108:24 109:8 | 225:23 |
| **maryland** | 195:7,9 197:2 | 111:12 120:6 | **measure** |
| 120:14 | 197:13 | 123:1,10 124:7 | 172:15 |
| | | 135:5 142:2 | |

**measured**
200:24 220:11
220:13,14,15
**mechanic**  91:2
**mechanism**
157:19
**mediation**
200:1
**meet**  99:18
**meetings**
217:17,18,18
**member**
134:20 138:9
144:24
**members**
81:21 219:15
**membership**
73:7 219:2,8
219:16
**memory**  63:14
87:13 90:2
100:8 105:21
134:18,24
184:2 205:20
224:24 226:22
**mentally**
107:24
**mentioned**
56:21 217:25
**merit**  21:5
**messaged**
228:11
**met**  81:19
**meta**  222:17
**metrics**  44:16
96:2 108:1

**microphone**
190:13,18
198:4
**mid**  210:3
**middle**  20:21
29:25 30:4
31:6,6 39:19
64:24 65:3,4
**midwest**  55:17
**million**  17:12
46:3 47:20,21
48:13,14,15,18
52:3,15,22,24
52:24 53:2
57:9,15,18,20
58:4 60:11
103:9,15 106:8
106:14,24
107:1,13,17
108:4,8,15,21
108:21,22,25
109:1,22
125:15 126:6
128:11,14,24
129:1,12,16,17
132:18 160:20
160:25 161:16
161:21 162:18
169:17 170:8
170:22 171:4
171:21,22
173:11,18,19
173:22 188:16
189:2,4,10,11
**millisecond**
200:21

**mind**  58:6,25
104:7 147:10
158:25 162:11
**mindful**  56:11
190:21
**minds**  176:14
**mindy**  202:10
**mine**  121:19
193:12 197:15
**mineola**  238:23
**minneapolis**
5:20
**minnesota**
132:16 141:16
141:20
**minus**  48:13
**minute**  118:25
119:1 135:3
166:2
**minutes**  56:12
56:14 59:3
118:11 119:10
119:19 225:14
**miscellaneous**
75:20
**mischaracter...**
47:2
**mischaracter...**
179:23 219:24
225:7
**mischaracter...**
126:18,21
**misled**  117:24
**misrepresents**
162:3
**missed**  26:23
72:7 105:23

127:11 166:3
**missing**  159:24
**misspeak**
170:15 184:4
**misspoke**  17:9
26:2 122:18
**misstate**
228:17
**misstates**
222:16
**mistake**  229:24
**misunderstood**
170:24
**mitigate**  43:18
43:19
**mitigation**
43:25 62:8
65:11
**mn**  5:20
**moderately**
119:8
**modified**
183:15
**modify**  55:2
**mold**  198:19
198:19 199:8
199:13,14,25
200:1,3,5,7
**moment**  22:13
22:21 30:16
37:2 39:7
118:5 129:24
174:6,19 183:9
186:10,22
187:4 188:22
196:25 198:24
200:13 204:7

206:5 232:25
**money**   16:7
20:7 23:6,6
25:6 47:23
52:20 53:6
55:13,23,25
56:24 58:22
59:1,4 62:12
62:21 64:1
65:9 69:9
81:12,14 82:17
82:19 84:6,8
94:21 99:16
114:22 115:1
115:20 117:19
117:21,22
125:20 126:15
126:24 127:3
127:15,21
128:20 129:7
132:16 160:18
175:8 188:16
189:15,15
194:19 196:21
204:10 205:12
205:14 222:4
222:13
**money's**   61:7
127:25 134:8
143:14
**monies**   125:4,7
126:9 132:13
133:17 134:16
143:15 145:4
146:10 148:2
**monitor**
169:12

**month**   37:18
58:3 77:11,15
78:3 79:25
80:4 88:10
97:2,8 101:12
110:15 123:22
123:24 154:20
210:20 211:13
211:15 213:3,4
221:12
**month's**
123:13,14
**monthly**   77:4
77:10 78:16,21
85:10,15,17
88:8,9 97:19
123:21,23
**months**   37:13
37:14,15,17,19
37:23 38:23
39:4 78:22
88:6 89:12
123:24 149:21
149:21,22
195:18,22,25
196:1,3 213:1
213:11,12,15
214:9,12,13
221:24,25
223:2,2,3,5,6
**morning**   9:25
10:1 121:9
127:2 130:3
138:22 140:6
140:11,16
145:7 154:11
155:2 156:11

169:8 215:8
**morning's**
126:23
**morph**   35:17
**mortgage**
10:21 75:4
**motion**   3:1,5,9
22:10,14
230:21 231:23
232:1,7,14
234:22 235:3
**motorcycle**
142:5
**mouth**   169:21
**movant**   228:8
228:21
**move**   11:4
27:18 39:10
47:16 63:6
68:10 73:1
76:20 89:14
93:14 169:3
183:5 215:9,13
216:16
**moved**   24:11
120:15
**moving**   63:11
63:11 92:21
93:11,12
188:18 194:14
216:24
**mulinda**   6:13
69:24 201:24
203:12 218:20
**multi**   144:2,7
165:20

**multifamily**
53:15 144:6
**multiple**   62:20
63:12 77:7
107:16 127:16
141:9 150:5
181:12 184:4
**mute**   33:20
120:11 181:23
182:4
**muted**   181:22
200:20
**myriad**   157:14

**n**

**n**   2:5,6 4:1 6:1
7:1 238:1
**name**   9:9,17
10:2 60:20
61:21 141:24
190:5,15 198:4
198:8 202:6,9
**names**   75:1
**narrative**
148:8
**narrow**   96:5
161:19 224:14
**native**   153:21
153:22
**natural**   56:18
59:16
**naturally**
126:23
**nature**   65:18
146:5 161:17
**navigate**   44:19
**nd**   2:7 4:6,14
5:5

nearing  112:23
necessarily
  124:1 148:20
  153:16
necessary
  143:13 186:12
  200:8
need  26:24
  43:23 55:23
  56:11 57:19
  58:2 81:24
  82:19,21 84:15
  97:11,18
  103:21 104:4
  105:7 107:23
  108:19 109:25
  112:16 144:21
  146:20 150:13
  150:13,14
  157:8 187:3,20
  187:21,21
  188:21 197:19
  198:23 210:12
  211:9 230:17
needed  53:7
  55:12 110:7
  179:11 210:15
  230:24
needs  20:7
  82:19 95:19
  230:17
negatively
  178:1
neighbor's
  115:14,15
neither  181:21

net  96:24,25
  101:12,13
  102:1 108:2
  109:19,25
  114:8,10,20
  117:18 154:15
  154:18 213:4
never  22:9
  55:4 58:21,24
  179:13 184:10
  218:22
new  22:1 36:12
  93:12 102:15
  116:1 120:5
  149:25 163:24
  177:1 207:3
  221:5 223:9,11
  233:17
nicely  197:13
night  120:24
nine  17:14
  206:4
ninety  234:11
  234:13
nitty  55:20
noise  181:19
non  44:7 76:3
  132:13
nonbinding
  34:21 35:6,10
nonpayment
  59:25
noon  119:24
nope  26:12
norm  44:22
normal  20:23
  55:8 102:21

106:15 109:2,2
109:4 135:1
138:17 158:21
normally  16:4
167:17
normative
105:11
north  1:2 4:5
  45:24,25 46:20
  73:7 80:25
  142:24 143:25
northern  4:13
northwest
  72:11
notating
  139:18
notation
  139:18 188:13
note  12:16,18
  12:20 13:8
  15:21,23 16:8
  18:8,10 20:14
  24:6,8 25:10
  26:21 27:15,22
  27:25 28:2,5,8
  31:11 38:24
  40:5 57:8,8,18
  61:13,18 62:3
  62:4,13,16,24
  63:4,13,13
  64:17 66:3
  77:2,11,16,18
  77:21 78:6,6
  78:15 79:11,14
  79:24 83:11
  87:19 104:25
  140:8,9,17

141:3 183:20
208:14 234:20
noted  49:25
137:14
notes  12:24
  13:11 22:20
  24:5 26:20
  27:24 32:18
  39:12,23 53:21
  62:25 76:24
  77:5,6,9,10,15
  77:25 78:3
  79:19,20 80:9
  86:1 89:4,5
  92:16 124:24
  125:6 169:21
  174:22
nothing's
  35:17
notice  39:14,16
  236:3,4,8
noticed  119:24
notwithstand...
  177:6
november  2:9
  49:6 76:24
  78:13 89:13
  158:20
number  7:3
  13:23 14:6
  15:13 16:11,20
  16:24 18:20
  19:9 24:23
  25:16 26:1,24
  28:11,12,15,19
  28:25 29:7,14
  30:2,6,8,13,17

30:22 32:4,17
36:23 42:15,16
49:12 51:6
59:11 61:12
67:20 78:10
79:21 82:12
84:14 85:19
109:18 110:6
119:23 124:17
133:9 143:12
155:1 181:16
181:17 182:1
186:21 189:7
201:20 215:13
227:21 231:20
231:21

**numbering**
33:2

**numbers**   13:2
28:22 51:7
80:24 90:25
98:4 103:14,24
106:23 109:20
114:25 133:12
178:20 183:12
193:12 207:16
213:1

**ny**   238:23

**o**

**o**   2:21 7:1
238:1

**o'clock**   118:10
119:13,20
121:14

**oath**   122:8
202:2,7

**object**   49:24
95:10 126:13
148:3 206:13
208:1

**objected**
161:16 164:24

**objection**   3:8
21:3 33:19,21
34:7 38:6,8
42:6,21 43:2
46:5,6 47:1,9
49:22 51:15
67:5,6 78:18
83:12 88:12,14
89:21 91:5,10
92:12,24 93:18
93:24 94:18
95:4 96:5
99:15 100:4
101:2,17
104:18 105:24
110:9 111:18
115:3,11,25
116:8 117:2,8
117:9 126:1
127:9,10,11
128:3 137:25
143:4,20
145:17 156:1
156:22 160:9
161:5,14
162:11,15,24
163:7,14
164:18 166:19
169:6 172:20
176:8,17
179:23 184:21

204:17 205:5
205:15,25
206:22 208:11
208:24 211:18
211:24 215:25
219:24 222:15
223:10 224:11
224:18,25
225:6

**objectionable**
47:13 112:2

**objections**   22:3
95:12 120:7
143:4 148:19
158:7 202:14
202:18,20

**obligated**
148:6 167:8

**obligation**
89:20 157:25

**obligors**   63:13
141:7

**observation**
182:17

**obstinate**
159:22

**obtained**
130:11

**obtaining**
47:19

**obvious**   42:18
170:15 217:22

**obviously**
93:18 184:13
207:17 218:14

**occasion**
201:14

**occupancy**
203:22 212:22
214:4

**occupation**
10:10

**occur**   82:22
95:12 124:7

**occurred**
175:21

**occurs**   82:20

**offer**   38:15,18
88:1 94:19,20
99:7 107:4

**offered**   98:11
205:18

**offering**   94:17

**offhand**   39:6
77:23 102:3
130:17 132:24
172:17

**office**   58:1 62:7

**officer**   20:20
67:1

**official**   217:18

**offset**   29:9

**oh**   7:13 8:24
9:16 14:4 33:1
48:1 54:1
56:13 70:8
88:10 90:8
100:24 103:4
110:3 120:11
121:10 139:7
197:24 209:20
218:7 224:7
236:2

**[okay - organized]**                                                                            Page 45

| | | | |
|---|---|---|---|
| **okay**  7:10,16 | 112:18,21 | 207:7,24 211:2 | **operation** |
| 7:19 8:1,8,14 | 116:2 117:16 | 214:1 215:25 | 144:19 |
| 8:18,24 11:10 | 118:3,17 | 216:21 217:7 | **operations** |
| 11:21 12:5,18 | 119:10,18,22 | 217:25 218:9 | 60:22 |
| 12:22 13:4,18 | 120:16 121:4 | 218:10 221:3 | **opine**  104:25 |
| 14:13,16 15:5 | 121:10,11 | 221:24 222:9 | 105:5 |
| 15:12,24 16:7 | 122:1,5 123:1 | 223:9 224:6 | **opinion**  14:19 |
| 16:14 17:2,16 | 123:12 124:10 | 225:14,21 | 33:21 87:16 |
| 17:23 18:6 | 124:23 125:4,7 | 226:3,4,16,16 | 96:12 97:21 |
| 20:12 21:14,18 | 125:23 128:6 | 227:7,18 | 98:10 101:15 |
| 22:7,23 23:16 | 129:16 130:6 | 229:19 230:8 | 115:4,13 |
| 24:4 26:18 | 130:15,24 | 231:23 232:3 | 145:14 158:14 |
| 27:16,20 28:22 | 131:22 132:8 | 232:15,18,19 | **opinions**  13:18 |
| 28:25 29:22 | 132:12,19 | 233:3,7,12,13 | **opportune** |
| 31:20 32:15,24 | 134:15 135:11 | 234:3 235:21 | 201:13 |
| 33:25 34:2 | 139:3 141:10 | 236:11,22,25 | **opportunity** |
| 35:2 37:5,21 | 141:14 142:19 | **old**  17:5 186:5 | 91:19 92:1 |
| 39:24 41:20 | 143:4,24 | 210:2 238:21 | 192:10 203:7 |
| 45:11 47:7,7 | 144:18 145:11 | **once**  69:4 | **opposed**  59:16 |
| 49:5 51:16 | 147:12 151:18 | 124:16 135:12 | 95:13 140:24 |
| 53:12 59:4,7 | 154:24 155:8 | 160:16,17 | 180:25 185:8 |
| 59:18 61:22 | 163:19 167:1 | 181:22 193:18 | 185:19 |
| 66:23 67:19 | 170:2 172:8 | 212:21 | **opposite** |
| 68:19,24 72:2 | 175:12 176:23 | **ones**  43:12 | 183:14 |
| 72:18,19 73:14 | 177:5,14 | 54:17,17 | **option**  100:6 |
| 79:4 84:14,16 | 179:16 180:16 | 134:20 152:16 | **order**  44:5 |
| 85:2,21 88:6 | 180:25 182:5,9 | 171:2 233:17 | 82:15 83:6 |
| 89:14,18 90:24 | 183:5 185:23 | **ongoing**  90:14 | 95:19 168:16 |
| 92:22 93:1,20 | 187:24 188:21 | **open**  23:2 | 200:16 202:14 |
| 95:2 99:1,3 | 188:22 190:19 | 26:12 30:25 | 236:1 |
| 100:21 101:22 | 190:24 191:11 | 121:9,10 | **ordered**  111:24 |
| 102:15,22 | 194:14 197:25 | 186:22 | 183:24 |
| 103:8 106:2,4 | 199:25 201:15 | **operating** | **ordinary**  120:8 |
| 106:19 107:7 | 201:19 202:9 | 96:24 101:13 | 139:12 |
| 109:7 110:1,18 | 202:14 203:10 | 102:2 108:2 | **organized** |
| 110:20,23 | 204:10 205:5 | 154:15,18 | 153:19 |
| 111:14 112:8 | 205:11 206:5,8 | | |

origin 116:19
original 51:21
  53:3 55:11
  127:9 152:12
  183:6 185:18
  185:20 204:1
  216:11 223:10
originally 49:8
  49:21 52:1,23
  57:2 86:9
  216:9
originating
  20:20
osi 148:17
otter 73:20,23
ought 232:25
outflow 146:9
outline 202:15
outlined
  195:13
outlook 153:20
outside 56:1
  65:21 78:25
  82:3 102:20
  105:10 143:5
  147:12 150:20
  171:5 175:9
  192:13 198:22
  217:20
outstanding
  197:5
overall 23:5
  48:6 192:18
overdrawn
  133:24 139:24
overdrew
  134:7

overhearing
  220:24
overlaps 23:22
overly 88:18
overrule 22:7
  67:9 173:4
overruled
  105:24 127:11
  128:3 138:5
  143:20 158:7
  163:15
overruling
  208:24
oversight 93:9
overtly 163:23
owe 89:25
  232:11
owed 90:3
  94:21,23 95:1
  95:10,14 96:4
  138:6 194:19
owes 179:2
owing 12:7
own 15:10
  41:13 46:22
  55:3,24 56:7
  57:3 58:20
  60:13 62:12
  74:25 111:10
  111:13 112:9
  127:24 138:7,7
  138:14 143:22
  191:15 208:7
  218:1,5
owned 141:23
  142:5 143:12
  209:8,10

owner 23:11
  43:10 107:8
  135:14 136:10
  139:9 144:24
  204:4,6
owners 56:24
ownership
  60:19 109:13
  138:12 145:12
  159:5
owning 43:11
owns 60:17
  71:18 111:4
  138:8 145:8,23
  147:4 148:2
  165:1 166:23

**p**

p 4:1,1 7:1
  222:6
p.m. 119:14
  237:2
p.o. 5:4
pace 73:1
pacific 4:13
page 6:2,18
  11:24 12:2
  14:13,21 15:16
  17:25 20:21
  23:18 26:15,15
  29:1,1,25
  34:24 35:7
  68:1,20,21
  71:10 76:10
  85:3,6 95:15
  103:5 124:18
  133:6,9,10,11
  136:16 137:12

  181:18 192:21
  193:11 211:25
  224:7 229:22
  229:25 230:3
pages 15:7
  66:9,11,13,14
  130:5 214:19
pagination
  181:18
paid 65:5
  78:21 104:4,6
  104:13 105:16
  124:9 132:12
  134:3,3,4
  135:8 158:20
  158:22,23
  193:18 195:18
  195:22,24
  196:1,3 205:18
  210:22 213:3
pain 54:20,21
pandemic
  236:8
paper 42:1
  230:6
papered 193:3
papers 233:8
paragraph
  85:20 124:17
  124:23 182:15
parameters
  55:21 102:20
  187:22
paraphrasing
  169:20 182:17
pardon 41:25

**parens** 46:8
  47:25
**parentheses**
  36:23 45:20
**park** 210:9
  225:23
**parked** 14:13
**parking**
  207:19,24
  208:16,17,22
  209:5,6,7,7,8
  209:10,12,14
  209:16,18,20
  209:22
**parkside** 1:15
  53:14 60:7
  72:1 141:11
  154:8 170:18
  171:3 211:9
  214:7,8 225:22
**parsed** 22:17
**part** 22:11 32:1
  41:9 45:19
  64:24 71:20
  99:14 104:19
  104:21,22
  108:12 127:22
  137:7 142:17
  145:8,12,24
  147:4 152:18
  156:11 160:21
  163:13 164:2
  166:10,11
  177:20 184:14
  184:14 188:4
  193:3 201:1
  208:11,20

209:2 210:6,8
  211:7 214:7
  215:22 217:13
  219:8,10
  223:12 225:24
  226:1
**partial** 235:3
**partially**
  129:19 214:2
**participant**
  167:4
**participants**
  165:8,8 166:13
  166:14 167:10
  167:11,19,24
  168:16,24
**participated**
  45:21 162:18
  164:16,23
  165:23 166:7,8
  166:9 167:2
**participation**
  167:14,15
  168:11,22
  169:1
**particular**
  43:15 59:7
  98:24 100:5,6
  128:5 163:14
  228:4
**particularly**
  228:4
**parties** 7:22
  22:14 34:11,21
  35:23 36:17
  38:3,7 40:5
  43:22 74:10,12

74:14,15 86:6
  86:25 87:6
  93:15 120:7
  165:12 168:11
  227:23
**partnership**
  219:9,10
**parts** 156:11
**party** 165:2
  185:9,16
**passed** 103:4
**past** 173:23
  179:20 180:22
  214:17
**patience** 72:24
**patronizing**
  46:21
**pattern** 178:1
**pause** 126:1
**paused** 218:5
**pay** 23:6 89:20
  91:2 99:17
  100:13 101:22
  101:23 103:21
  104:17 106:9
  106:13,20
  107:12 138:2
  138:16 204:14
  204:25 205:12
  205:14
**payable** 31:9
  31:10 65:6,7
**paying** 204:16
**payment** 19:4
  23:4 27:22
  53:9 59:23
  76:23 77:1,22

78:2,7,16,24
  85:15,17,25
  88:15 97:17
  98:2 102:18
  123:13,14,18
  123:22,23,25
  124:3,5 188:16
  224:21
**payments**
  36:11 44:4,24
  77:4,10,25
  78:21 85:11
  86:3 88:8,9
  89:1 94:22
  95:5 96:14,17
  97:12,14,19
  99:9,9 102:7
  102:12 124:11
  124:12 137:2,8
  139:12,16,17
  224:9 225:4
**payout** 107:2
**payroll** 139:12
  139:16,17,19
**pc** 5:9
**pdf** 23:18,20
  133:10,12
  136:16 137:12
  153:22 181:17
**pending** 208:8
**penny** 178:21
**people** 54:5
  55:18 98:14
  158:15 159:23
  225:23 226:1
**perceive** 96:1

perceives
  94:23 95:14
  105:15
percent   12:17
  12:19,21 35:2
  36:22,25 37:22
  38:22 40:22
  41:1,21 42:4
  43:7,9 45:13
  45:13,14,21
  46:3 47:20,22
  48:3,8,10,17
  48:22 56:23
  86:14,24 87:6
  87:10,17 88:1
  94:2,5,8
  101:11 102:1
  107:2 108:19
  109:5,23 114:9
  114:20 115:10
  116:5 117:17
  162:18 165:1,1
  165:2 166:23
  189:11,14
  192:5 193:9
  212:22,23
  214:10,11,12
  214:13 223:3
percentages
  168:17
perfect   9:20
  16:14 35:18
  56:19 133:12
perfectly   228:6
  231:12
perform
  195:21 196:4

199:25 200:1
performance
  54:4
performed
  131:17
performing
  78:4
period   29:22
  37:12,13,14,18
  37:23,24 38:19
  53:13,16,21
  54:4,12 55:15
  57:19 62:6
  69:25 70:2
  77:12 78:12
  80:4 82:12
  85:24 86:20
  88:10 97:13,13
  123:3 125:1
  128:21,22,22
  129:9 132:24
  133:19,23
  134:1 139:14
  139:23,23
  140:1 150:12
  150:18 151:22
  169:10,25
  170:9 171:2,16
  172:14,25
  173:13 212:10
  212:11 214:8
  214:10 222:7
periods   36:5
  132:6,7 151:14
permanent
  35:24 36:2,7
  37:9 38:1,5,16

40:3,7 45:19
  52:4,9,10
  86:13,17
  122:14,23
  144:13,16
  160:21 161:25
  162:1,17 164:2
  164:5,6 187:6
  187:19 188:1,7
permissive
  46:11
permitted
  161:15
permitting
  199:19,23
person   19:1,2
  19:3,7 20:2,3,7
  46:14 99:11,13
  100:9 127:6
  140:23,25
  145:20 150:3
  160:10 162:8
  182:4 191:25
  197:12 199:5
  201:9 202:19
personal   57:13
  58:2 60:10
  65:17 173:1
  220:7,8
personally
  11:18 66:23
  80:17 136:11
  150:2 179:21
  180:23 220:11
  220:14,15,19
  221:1,3

perspective
  43:13,14 45:8
  49:2,20 63:2
  82:4 91:14
  94:20,25 95:9
  96:3,5,12
  98:19 99:25
  103:8 107:3,9
  107:10 112:11
  112:17 117:11
  118:25 124:2
  140:25 158:17
  175:11
peruse   14:8
peterson
  152:11,13,16
  153:10,14
  183:20 184:16
  184:20
peterson's
  152:15 153:4,7
  153:23
petition   12:8
  79:14,24 80:10
  89:9 105:1
  117:13 179:8
petitioning
  157:22
phase   35:24,24
  36:2,2,8,13,18
  37:7,9,21 38:1
  38:5,16,17
  40:3 45:19
  52:9,10 86:17
  87:25 122:23
  160:25 161:8
  161:10,25

162:1,2,17,22
163:12,21
164:3,9 187:6
187:7,9,14,18
187:19,23
188:1,2,7
**phillips**  5:11
**photographs**
6:23 151:11,12
214:16,19,22
215:23,23
216:1,3,4,14
216:18
**photos**  181:5,9
214:25 215:5
**phrase**  41:7
50:10 88:14
109:7 178:7
180:8
**phrased**
184:22
**physical**
179:17
**physically**
185:2,4
**pick**  51:20
233:7
**picked**  133:6
**picture**  189:12
**piece**  82:3
113:18
**pieces**  108:4
218:25
**pipelines**  55:7
**place**  1:15 52:4
72:1 77:19

**places**  217:16
**plain**  78:20
**plaintiff**  232:6
**plan**  6:22 22:1
51:2 85:1,24
86:23 87:5,22
88:8,9,10,15
88:20 90:25
91:4 92:13,21
93:18,21 94:2
94:5,8,11,15
94:18,24 95:5
95:13,22,23,25
96:9,15,17
97:12,15,19,20
98:19,24 99:8
99:9,9 100:11
100:16 101:16
101:24 102:5
102:15,23,25
103:11,20
104:1,5,15,21
104:25 105:6
105:16 106:7,9
106:22 110:12
120:8 145:21
156:14 157:17
158:1 165:11
165:13,17,21
167:10,11
168:10 178:8
178:11 188:4
194:16 195:18
196:18,20
215:17,21,23
216:13 225:20

**planned**  85:11
**planning**  21:15
118:16
**plans**  151:23
152:2,7,12
153:10,13
157:20 158:2
183:6,6,7,8,10
183:15 207:7
209:24 210:2
215:16 220:18
220:21,21,23
**play**  107:16
142:12 228:2,2
**pleading**  231:7
232:16
**please**  9:6,9,15
10:2 11:21,24
13:23 15:15
19:19 25:20
31:1,1 33:1
61:11 68:2,20
69:17 70:7,19
74:6 75:15
79:8 84:14
98:12 124:15
124:17,23
133:6,9 136:15
137:12 140:2
161:3 181:15
190:5,11
192:20 198:8
200:13 209:1
214:14,18
223:19
**pledged**  158:22

**pllc**  5:1
**plus**  36:21,25
87:11 213:1
**pockets**  55:24
**point**  39:2,23
47:5 56:15,18
83:22 87:11
91:22 92:10
133:8 138:4,4
148:22 158:23
159:4 184:2
196:7 200:16
202:14 220:19
225:18 226:25
**pointedly**
167:23
**policing**
186:15
**polling**  165:22
**portion**  21:6
60:13 90:11
105:2 109:2
111:7 163:21
164:10 215:14
215:21 216:11
224:15
**posed**  213:22
222:19
**position**
100:11 155:2
232:12
**positive**  84:9
**possibility**
94:10 180:14
**possible**  21:8
26:16 64:10
99:20 103:24

104:3 121:7
133:7 137:7
169:19 184:19
184:22 185:5
187:25 228:5
**possibly**
108:24 123:24
159:12 173:18
**post** 175:10
**postponing**
120:10
**potential** 34:22
147:10 195:14
**potentially**
160:7
**practice** 34:10
**practices** 34:4
67:17
**prebuilt** 193:2
**preceded** 71:25
**precise** 170:1
**precisely**
149:12 162:24
**precluding**
94:7,17
**prefer** 228:21
**preference**
118:12 120:21
120:23 121:2
168:2 194:23
195:1 227:22
227:23 229:12
229:12
**premise** 125:14
**premised**
91:11,11
104:21 155:3

156:12 171:14
**preparation**
142:17
**prepare** 13:20
99:12 183:4
202:16,18
**prepared** 59:6
91:17 132:4
133:2 136:4,8
**prepares**
202:15
**preparing**
127:20
**prepetition**
80:24
**present** 12:5
49:5 82:5
100:21 101:9
131:22 150:23
152:21 154:16
172:23 178:5
180:25 194:5
219:20 220:10
227:20
**presented**
129:7
**presently**
215:24
**press** 119:11
**presumably**
99:10 105:2
**pretrial** 121:14
**pretty** 42:24
146:19 211:5
224:12
**prevented**
162:25

**previous** 77:1
224:22
**previously**
12:6 52:14
53:8 56:21
66:5 220:6,8
234:2
**price** 204:11
206:6,17
208:13
**pride** 55:17
**primarily** 68:9
198:18,21
**primary** 46:18
64:25
**prime** 36:21,24
38:21 39:1
86:18 87:10
123:7
**principal** 36:8
63:13 86:4
228:10
**prior** 58:3
76:16 80:22
89:24 97:17
155:9 158:18
188:1 211:25
233:22
**priority** 90:8
196:23
**privilege** 148:5
148:7 157:8
167:23
**privileged**
149:4 156:18
156:20 157:11
165:16

**pro** 121:14
154:12,14,25
229:24 230:1
**probably**
45:12 80:1
168:15 186:19
193:9 201:1
214:13,17
**problem** 54:16
56:8 81:15
156:9 178:10
212:4 222:24
**problematic**
148:9
**problems** 54:9
54:11
**procedure**
18:22 20:18
21:2
**procedures**
19:12 20:24
**proceed** 9:21
19:18 59:14
64:21 118:13
122:6,9 191:1
202:12 203:10
**proceeded**
193:4
**proceeding**
49:6
**proceedings**
237:2 238:4
**proceeds** 13:8
31:14 60:2
67:2 76:18
124:25 174:22
175:19 176:1,7

process   35:3
  49:17 83:1
  116:7 199:20
processes   58:8
produce
  182:11
produced
  130:4 177:15
  178:16
product   55:22
  86:22 123:8
  163:25
products   55:7
profession
  46:22
professional
  11:2 33:14
  80:20 81:13
  204:18
profit   213:23
  221:15,16
program   41:5
  42:2,3,7,10,15
  42:25 45:14,15
  45:17,21,23,23
  45:24 46:7,8
  46:11,19 47:3
  47:9,10,24
  48:3,4,10,23
  49:1 52:5,8
  160:21 161:7,9
  161:15,17,18
  161:20 162:8
  162:12,19,23
  163:10,10,12
  163:17,22,23
  187:5,8,13,20

187:25 188:8
188:10,14,15
program's
42:7
project   11:12
  32:20 33:10
  36:4,4 41:24
  42:8 43:6,11
  43:15 46:2
  47:22 48:24
  49:9,14 51:21
  52:2,20 55:22
  56:25 57:10,25
  60:3,24 62:12
  65:7,16 67:2
  74:20 78:24
  81:16,17 82:13
  84:7 95:17,19
  101:10 114:22
  114:24 122:15
  125:9,14,18,21
  125:25 126:10
  126:11,20,20
  126:25 127:4
  127:23 128:12
  129:4,11,18
  131:1,5,13,14
  131:16 134:11
  134:12 135:8
  137:5,9,20,24
  144:1,2,12,16
  146:10,11
  175:3,8 176:6
  183:1 195:15
  213:24
project's   36:10

projected   53:3
projects   53:12
  54:11,11 63:11
  67:3 71:17
  173:22 174:1
  176:1,2,5,7
  217:12,13
promise
  115:14
promised   59:3
  96:14
promising
  97:14
promissory
  61:18 77:9
  78:6 87:19
  140:8 141:3
prong   165:20
prongs   165:21
proof   11:22
  145:11,15
  148:1,4,10,14
  148:16,23
  149:7,21
  157:24 196:9
  196:10
prop   106:14
proper   42:11
  108:2 178:24
  205:3
properly
  231:20
properties
  18:11 20:15
  23:10 60:7
  66:2,20 68:11
  68:13 69:8

70:15 71:20
132:5,8 139:4
139:8,10
140:13,18
184:5 223:23
224:1
property   31:13
  41:12,12,12
  44:1 45:12
  51:2,3 58:5
  60:19 72:10,13
  72:15 73:6
  75:4 82:24
  83:5,22,23
  84:11 89:19,24
  89:25 90:1,3
  90:16,17,19,21
  102:9 106:16
  106:25 107:17
  108:2,3,5,6,25
  112:13 129:19
  129:20,21
  138:7,13
  143:22 150:16
  150:20,22
  151:6,12,15,19
  154:17 155:24
  159:6 160:1,15
  160:17 179:17
  203:14,17,19
  203:21 213:15
  214:4,16
property's
  108:15
proponent
  93:18

**proposal**  22:8
  38:14 55:11
  85:1 102:15
**propose**  36:17
  40:5 52:1
  85:25 86:13
  193:17
**proposed**  22:1
  36:16 51:18,19
  57:2 86:12
  89:15 96:14
  97:4,12 100:3
  101:23 157:18
  178:8 196:17
  215:17
**proposing**
  100:13 175:1
**protect**  80:13
  80:16
**protection**
  19:10
**prove**  94:13
  157:25 175:19
  176:21 179:1
**provide**  11:7
  19:4 39:20
  43:23 46:1
  52:20 54:18
  86:13 91:24
  99:19,23
  113:12 117:10
  123:23 167:9
  177:7
**provided**  20:17
  20:19 47:23,24
  49:18 50:16,19
  50:22,23 51:5

  51:9 52:21
  66:6 83:21
  113:1,2,3,15
  113:21,22
  114:11,12,14
  114:19 116:4,5
  153:25 174:21
  183:20 220:20
  220:23
**provides**  43:17
  43:22 172:16
**providing**
  43:12 184:8
**proving**  21:19
**provisions**
  91:13 98:2
**public**  150:21
  210:12,14
  221:8 225:24
**publicly**  221:8
**pull**  11:21
  13:21,22 14:2
  61:11,12 78:5
  84:13 122:20
  161:3 181:15
  186:23 190:13
  192:21 214:14
  223:19
**pulled**  215:17
**pulling**  192:23
  212:17
**purchase**
  137:4 142:6
  158:12 204:11
  205:19,20,23
  206:5 218:23
  219:1,2,8,11

  219:17
**purchased**
  219:13
**purchaser**
  204:14,25
  205:8,11,14,17
  207:5 219:13
**purporting**
  94:1 100:16
**purports**
  103:19 106:9
**purpose**  20:8
  21:20 34:19,20
  43:13,14 44:9
  60:24 61:25
  62:23 63:2
  64:20,25 65:10
  76:16 142:25
  176:11,13,16
**purposes**  37:3
  37:4 41:18
  61:4,16 62:2
  64:25 112:23
**pursuant**
  131:15
**pursue**  178:12
**put**  32:3 37:3
  48:2 59:1
  62:12,23 63:7
  63:12 66:18
  95:18 98:21
  111:20 120:8
  136:12 149:18
  154:17 160:18
  161:22 169:20
  192:17 210:2
  227:3 230:14

  231:1
**putative**  78:24
**putatively**
  143:7 217:8
**putting**  15:8
  58:20 63:3
  130:9

---

**q**

---

**qualification**
  206:20
**qualified**  98:11
  99:20 115:18
  115:18 116:19
  145:20 161:12
  168:7,9 204:19
**quantifying**
  129:13
**quentin**  2:5
**query**  39:9
**question**  10:25
  23:7 26:3
  33:24 35:19,22
  38:7 40:19,21
  42:22 43:3
  46:7 47:15
  50:2,6 53:18
  53:19 54:6
  56:18 61:1,9
  64:7 72:7,21
  77:13 79:3,16
  79:16 82:11
  87:22 88:24
  90:12 93:7,13
  95:17 96:6
  99:19 100:5
  101:3 104:8,19
  104:21 105:21

105:23,24
107:14 112:2,3
112:6,9,21
115:22 116:1,8
117:1,3,5,16
118:9 127:8
128:5,5,14,23
129:16 135:13
136:6 137:21
138:9 140:21
144:21 146:4
147:21,22
148:7 149:5,6
149:18,25
153:12 154:7
155:15,23
156:6 158:10
162:2,4,13
163:1,6,9,15
163:16,18,19
164:20,20,22
165:7,19 166:3
166:3,5,6,19
166:20,22
168:1,5 170:3
172:22 173:5
176:15,18,20
176:22,25
177:1 179:24
179:24 180:9
180:17,18
183:2 184:22
186:16,20
188:9 202:7
203:5 204:25
205:1 207:3
208:24 212:10

213:17,21,22
217:22 219:15
221:4,5,9,19
221:20 222:10
222:17,18
223:9 224:14
225:7,11
228:16 232:10
**question's**
115:12
**questioning**
21:24 47:3
186:14
**questions**
19:18 21:9
51:13 59:22
65:22 67:24
94:5 95:24
112:22,24
118:4,15
142:16 156:23
157:20 162:12
165:5 168:15
174:11,20
197:7 201:2
202:18 204:23
211:18 222:19
225:4 226:4
**quick** 197:21
200:25 209:25
**quickly** 67:21
174:6
**quiet** 58:7
**quit** 223:25
**quite** 10:20
40:16 41:25
55:8 58:24

81:5 207:14,15
207:17,18,19
217:17
**quote** 142:12
150:12 170:1
171:19

**r**

**r** 2:21 4:1 7:1
238:1
**raise** 198:7
**raised** 58:9
232:10
**raises** 100:4
**rare** 55:16
**rarely** 198:21
**rate** 12:15,16
35:21 36:17,20
36:21 37:1,22
38:4,16,18
39:1,8,16 40:4
86:4,14,18,24
87:6,17 88:1
122:16,17,19
122:24,24
123:1,2,4,6,9
123:13 212:22
212:23
**rates** 12:12
39:5 107:25
109:3,4 123:15
**rather** 13:7
62:3 86:12
91:20
**ratio** 40:11,15
40:22 41:20
43:5,15 45:3
45:12 48:9,10

116:7 117:3,4
117:5,7 188:6
188:8,11
**rcx** 6:4
**rdx** 6:4
**reaching** 127:8
**read** 39:8
81:19 85:20
88:17 91:12
95:25 106:22
110:11,11
188:14 212:16
213:18 221:20
**reading** 36:19
**ready** 7:5
201:21
**real** 10:19 36:1
46:23 49:19
53:20,23 54:8
90:13,15,18,19
118:9 120:7
143:1,2 144:7
144:16,19
219:3,21
**realist** 142:23
**reality** 50:18
50:19 51:10
55:5 125:20
127:2 129:23
136:1
**realize** 123:22
**realized**
200:20 213:7
**really** 17:4
19:11 44:14
58:25 59:12
94:5,8,9

| | | | |
|---|---|---|---|
| 100:13 108:3 | 224:19,20,25 | 27:2,20 29:4 | 225:7 226:16 |
| 116:18 126:9 | **recalls** 111:25 | 29:19 31:4 | 227:1 230:9,17 |
| 128:23 133:25 | **recap** 32:17 | 33:9 64:13 | 230:18 231:1 |
| 138:19 150:7 | 45:1 | 68:4,24 69:20 | 231:17 232:21 |
| 154:7 166:15 | **receivable** | 70:11,22 71:12 | 233:6 237:1 |
| 167:25 168:21 | 197:4 | 71:22 72:8 | 238:4 |
| 173:1 203:6 | **receive** 8:15 | 73:11,15 74:8 | **record's** 72:23 |
| 208:18 217:22 | 63:20 66:9,10 | 75:17 100:2 | **records** 7:15 |
| **reason** 43:24 | 93:12,20 | 182:9 193:14 | 8:7 15:10 |
| 48:4 73:18 | 183:25 216:18 | 211:20 214:22 | 65:23 127:7 |
| 75:7 88:13 | **received** 7:23 | **recognized** | 130:12,18,19 |
| 184:12 194:15 | 19:3 67:22 | 73:4 | 130:20,25,25 |
| 199:15 203:2 | 77:15 112:18 | **recognizes** | 131:3,4 153:11 |
| 212:7 225:21 | 112:20 113:8 | 70:9 | 153:14 219:22 |
| 232:24 | 113:19 129:22 | **recollection** | 226:24 |
| **reasonable** | 137:14 162:6 | 14:9,14 42:19 | **recourse** |
| 57:15 63:20,23 | 175:1 185:5 | 49:14 60:21 | 158:21 |
| 105:6,7 138:18 | 204:15 205:8 | 76:25 78:5,11 | **recover** 157:20 |
| **reasons** 193:11 | 215:15 216:19 | 82:15 86:6 | **recovering** |
| 220:1 | 228:2 233:5 | 87:14 110:7,17 | 157:13,15 |
| **reassess** 82:20 | **receiver** 80:16 | 181:14 183:17 | **recovery** 157:3 |
| **rebut** 228:23 | **receives** 8:1,18 | **recommend** | 157:11,19 |
| **rebuttal** | 216:3 | 200:6 | **recreated** |
| 226:14 229:2,4 | **receiving** | **recommenda...** | 153:8 |
| 229:7,9 | 203:22 216:1 | 44:20 | **recross** 188:23 |
| **rebutting** | **recent** 150:6 | **reconstructed** | 188:24 |
| 229:6 | 154:25 155:4 | 153:8 | **red** 3:1,4,8 |
| **recall** 22:24 | 181:10 186:4 | **record** 7:3 9:9 | 4:12,21 7:4 |
| 45:22 49:8 | **recently** 13:4 | 9:18 10:3 50:1 | 10:15 11:11,15 |
| 57:6 60:1 62:2 | 54:21 181:1 | 59:9,10 101:1 | 11:17,22 12:6 |
| 63:6 82:13 | **recess** 56:12 | 110:10,12 | 16:20,25 17:18 |
| 112:8,24 142:9 | 59:5,8 62:9 | 119:21,22 | 17:21 21:1 |
| 150:9 162:5 | 119:20 230:13 | 153:13 190:5 | 22:25 24:12,17 |
| 181:4 184:11 | **recognize** 12:3 | 190:15 198:8 | 25:7 26:4 27:7 |
| 186:1,2 210:1 | 12:4 16:23 | 201:18,19 | 28:4 29:10,20 |
| 211:4,6 212:9 | 18:3 24:2 25:4 | 217:23 219:25 | 30:7 48:16,17 |
| 220:13,14 | 25:22 26:18 | 222:16 223:12 | 48:18 51:19 |

52:1,6,9,21
57:9 60:11
61:17 67:15,17
68:5 85:7,25
88:10 107:9
111:7 121:1
132:15 144:11
144:13,13,14
144:15 147:1
152:9 171:10
171:13 177:21
184:7 186:4
189:23 190:14
226:20 234:15
234:15,16,16
234:16,16,17
234:17,17,17
234:17 235:5
**redi** 41:5 42:2
42:3,7,15
45:14,15,21,23
46:3,7 47:3,10
47:24 48:3,4
48:10,16,19,23
49:1 52:5,8
160:21 161:7,9
161:15,20
162:19,23
163:17,22,23
187:5,8,13,20
187:25 188:8
188:10,14,15
**redirect** 163:5
174:14,16
197:10,12
226:7

**redlined** 120:1
**reduce** 45:15
**reduced** 45:16
161:21
**reduces** 48:5
**redundant**
150:3 186:14
**reference** 41:5
42:15 123:7
130:10 135:19
141:18 162:22
163:11,22
180:1 210:17
**referenced**
57:13 96:22
181:6
**referencing**
36:20 40:12
182:23
**referred** 60:18
130:9 140:8
183:7
**referring** 62:9
87:3 129:12
170:18 189:7
195:10
**reflected**
135:23 136:4,8
136:9
**refresh** 14:9,14
78:11 86:5
100:8 110:6,16
181:14
**refreshing**
182:24
**regard** 123:14
167:6

**regarding**
22:14 162:7,8
222:3,6,12
230:19
**regardless**
139:20
**regimented**
19:13
**region** 46:24
**register** 11:24
**regular** 77:4,9
85:10 91:3
**rehash** 146:17
**rehashing**
149:1
**reimbursed**
217:20
**reimbursement**
137:8
**reinforcing**
158:17
**related** 15:7
24:4,7 31:11
54:5,21 59:25
67:15 73:17,19
74:20 76:3
104:8 117:2
127:9,10
132:13 146:21
156:4,8 199:19
199:22 202:3
**relates** 108:4
117:8
**relation** 127:23
**relationship**
11:19 152:10
178:2 184:16

204:3 225:8
**relatively**
119:7
**relentlessly**
156:9
**relevance** 21:3
22:8 104:18
115:11 116:25
117:2 127:9,10
143:6 147:16
147:16 164:18
166:16 167:7
169:2 172:16
172:20 173:2
208:2,5,7
**relevant** 21:14
93:25 94:6,11
98:17,22
100:16,20
116:22 156:24
164:25 165:4
165:15 166:1
166:23 168:22
187:8
**reliable** 87:15
**relied** 149:23
194:11
**relief** 157:21
**rely** 47:19 83:5
208:19
**relying** 92:9
196:3
**remain** 122:8
202:2,7 230:13
**remaining**
165:9 168:3,20

**remains** 193:6
193:8
**remediation**
198:19 199:25
200:4,5,7,8
**remedy** 21:21
21:24 22:1
**remele** 5:16
**remember**
15:21 58:17
105:24 112:8
122:14 138:23
139:1 140:6
151:3,9,13,23
152:1,6 153:3
154:4,21,21
158:6 160:22
164:20 169:8
175:5 202:7
204:1 205:22
209:21 210:1
211:4,19
**remembering**
225:5
**remembers**
115:7
**remind** 91:18
103:6 122:7,7
166:2 169:18
202:2,5 224:22
231:19
**reminder**
170:3
**reminders**
227:16
**remove** 188:15

**removed** 210:6
210:16
**removes**
188:16
**removing**
143:14
**rent** 214:7
**rentable** 114:8
114:10,20
117:18 211:11
**rental** 214:5
**rented** 193:18
**renters** 88:7
**rents** 212:24
**reopen** 146:17
230:17
**reorganization**
85:1 156:14
157:17
**repay** 44:13,14
134:2
**repeat** 112:7
163:19 180:17
180:18 195:23
209:2 222:10
**repeated**
147:21 168:6
**repeatedly**
145:19 168:7
**repetitive**
98:20
**rephrase** 33:23
34:13 38:12
40:20 53:18
54:6 63:1
74:13 79:2,15
90:12 101:19

103:22 104:7
**replace** 26:13
31:1 32:25
38:17 44:25
110:4,5
**replaced** 35:14
37:8,11 38:1
**reply** 229:8,9
229:12
**report** 82:23
82:25 111:20
112:11 113:12
113:13 116:21
174:1 181:2,9
181:10 182:9
182:11,13
183:4 185:23
186:7 200:17
200:22,23
**reports** 81:19
82:9,12,16
111:16,17,23
112:1,10
113:11,14
132:4 174:2
181:13 217:16
**representative**
22:2 172:24
179:19 180:3,7
180:11,21
182:25
**represents**
35:10,11 157:5
**request** 18:5
20:2 57:22
61:20 62:19
64:14 66:19

129:6 136:14
175:6 185:14
**requested**
185:15 210:7
**requests** 73:22
75:23 133:21
134:18,20
174:23 175:1
**require** 43:7
46:3
**required** 109:2
168:22
**requirement**
188:14
**requirements**
99:18
**requires** 42:3
48:5 161:18
**requiring**
43:15
**research** 39:9
231:4
**residential**
172:3 211:2
**respectfully**
136:3
**respective**
115:17
**respond** 21:12
42:12 46:13
93:23 97:23
98:12 105:12
111:21 115:5
116:13 146:2
156:10 176:10
228:22

**response** 66:7
146:2 221:19
232:11
**responsibiliti...**
152:18
**responsibility**
152:19
**responsive**
231:7
**rest** 42:18
118:19 208:18
208:19
**restate** 79:16
105:25 149:6
180:18
**rests** 226:13
**result** 84:9
**resume** 59:6,6
201:16
**retention**
218:13,14
**retired** 85:10
**retract** 186:16
**return** 75:25
**returning**
186:8
**returns** 75:24
148:22
**reveal** 161:23
165:14 167:3
**revealing**
149:4 156:6
**revenue** 111:1
111:4,5 112:14
112:19,20
211:14

**revenues** 41:13
111:12,13
134:2,9
**review** 13:19
14:20 63:17
67:14 74:22,23
76:15 80:19
87:14 89:18,24
95:4 130:18,19
131:21 185:1
**reviewed** 13:24
15:7,10 49:16
66:20,23 75:24
83:8,15,18
96:9 120:1
130:14,20
194:9 218:25
**reviewing**
100:11 131:8
186:1
**reword** 115:24
184:24
**rework** 101:19
**right** 7:2,5,22
7:23 8:3 9:1,3
9:17,21 16:10
18:3 20:7
23:16 25:2,12
25:20 26:5,12
26:16,24 27:11
27:11,17,20
29:13,16 30:20
31:2,21,24
32:8,12,25
39:19 44:8
50:3 51:6,20
59:4,10,21

76:20 77:19
84:19,22,24
85:2,4,6,6
86:23 89:16
91:1 92:13
93:1,7,12
105:17 111:4
121:16,21,22
121:23 122:9
126:3 130:1
131:17 132:5
132:13,21
134:23 135:16
140:14 147:16
152:24 159:23
159:23 161:13
165:12 166:24
179:8 181:20
186:5,8 189:5
189:20,22
190:1,14,25
197:4,18 198:7
201:5 202:11
210:9 213:17
216:17 226:9
227:14 229:5,7
230:8,12 232:7
232:19 234:25
235:22 236:8
**rights** 168:11
**risk** 36:21
43:17,18,19,25
44:10,16 45:9
49:2 59:23
62:8,22 63:9
64:2 65:10
72:25 81:11

102:18,20
**river** 3:1,5,8
4:12,21 7:4
10:15 11:11,16
11:17,22 12:6
16:20,25 17:18
17:21 21:1
22:25 24:12,17
25:7 26:4 27:7
28:4 29:10,20
30:7 48:16,17
51:19 52:1,6,9
52:21 57:9
60:11 61:17
68:5 85:8
88:10 111:7
121:1 132:15
144:11,13,14
144:14,15
147:1 152:9
171:10,13
184:7 189:24
226:20 234:15
234:16,16,16
234:16,16,17
234:17,17,17
234:18 235:5
**river's** 85:25
107:9
**road** 150:21
238:21
**role** 10:23 63:8
104:23 161:7
**roles** 152:17,18
**romanettes**
85:12

| | | | |
|---|---|---|---|
| **room** 43:23 | 59:22 60:1,2,3 | 164:17,23 | **sat** 160:1 |
| 152:25 | 60:13,24 61:4 | 169:10 170:1,9 | **save** 93:7 |
| **rooms** 17:22 | 61:6,13 62:25 | 171:2 174:21 | 176:12 |
| 110:24 | 63:4 64:17 | 175:19,25 | **saw** 136:24 |
| **rotate** 203:5 | 65:7,16 66:3 | 176:7 180:22 | **saying** 41:17 |
| **rough** 168:16 | 68:6,14,17 | 181:8 183:11 | 50:22 55:12,23 |
| **roughly** 79:24 | 71:17 73:6,19 | 183:19 184:5,8 | 57:17 63:21,23 |
| 81:2 90:5,6,23 | 74:18,19,24,25 | 185:3,16 | 63:24 64:1 |
| 213:4,11 | 75:3,6,8,21,22 | 186:22 189:1 | 124:10 125:4,7 |
| 221:24 | 76:3,16,18,23 | 191:23,25 | 125:17 131:21 |
| **round** 80:24 | 77:3,5,6,10,11 | 192:2,6,25 | 135:7,9 147:4 |
| 213:1 | 77:15,16,18,21 | 194:19 195:15 | 148:25 159:23 |
| **rounded** 189:2 | 78:6 79:13,20 | 195:15,22 | 171:25 173:21 |
| **rounding** | 79:24 80:23 | 196:4,7,13 | 174:24 187:24 |
| 52:13,22 | 81:2,22 83:11 | 199:3,5,7,8 | 220:14 |
| **rrsb** 85:9 86:25 | 83:17 86:1 | 200:3 201:20 | **says** 30:1 36:3 |
| **ruins** 1:23 7:4 | 87:2 88:8 89:3 | 207:8,8,11,17 | 40:17 45:14,19 |
| 11:12,16 12:24 | 89:20 90:13 | 207:22 208:15 | 58:3 65:4,4 |
| 13:8,11 15:21 | 96:13,16 | 208:16 209:13 | 82:19 85:7 |
| 15:23 16:7,20 | 101:10 102:8 | 209:20,24 | 86:17,18 87:19 |
| 16:25 17:18 | 107:5 114:22 | 210:10 211:23 | 87:23 88:11 |
| 18:8,9,10 | 119:23 122:15 | 213:24 215:1,3 | 90:8 122:24 |
| 20:13 23:1,9 | 124:24 125:6,9 | 215:6 220:11 | 136:20 162:18 |
| 23:15 24:5,5,8 | 125:13,18,21 | 220:16,19 | 182:20 214:16 |
| 24:12 25:8,10 | 125:25 126:10 | 221:16 222:4 | **schedule** 88:4 |
| 25:24 26:20,21 | 126:11,15 | 222:13 225:20 | 120:4 122:2 |
| 27:7,14,22,24 | 128:12,16,19 | 225:21 | 123:18 |
| 27:25 28:2,5,8 | 129:2,3,11,18 | **rules** 148:12 | **schedules** |
| 28:11,12,19 | 131:25 132:9 | **running** | 85:14 179:15 |
| 29:10 30:7 | 132:13 133:18 | 232:21 233:6 | **school** 10:8,13 |
| 31:11,13 32:18 | 134:12 137:5,9 | | **scolded** 158:2 |
| 32:19 33:2,4 | 138:7 140:9,12 | **s** | **scolding** 158:6 |
| 33:10 47:22 | 140:17 142:14 | **s** 4:1 6:17 7:1 | **scooch** 190:12 |
| 49:9 52:2 | 143:9,10 145:4 | **sale** 155:14,18 | 190:17 |
| 53:13,21 54:4 | 150:3 152:10 | 159:7 160:8 | **scoot** 190:18 |
| 54:10 55:3 | 152:12 154:4,7 | 203:23 206:18 | **scope** 42:10,22 |
| 57:4,7,8,18 | 154:8 155:9 | 219:21 220:2 | 46:12 143:5 |
| | | 221:7 | |

147:12 162:11
204:18,21
206:15 217:15
224:11,19,23
232:14,24
**scoping** 217:13
**scratch** 177:1
**screen** 15:14
18:19 23:17
24:23 25:13,14
26:5 27:12,13
27:21 28:23
29:13,14 30:14
32:16 33:3,5
85:3 86:24
110:5 182:2
214:6
**scroll** 11:24
14:5 15:15
18:25 23:17
25:1,19 26:13
29:25 31:1
33:7,11 61:15
61:23 65:3,4
65:13 68:1,19
69:1 70:8 71:3
72:2 73:13
74:1 76:10
79:8 84:16
85:4,17,21
89:16 103:3
110:2,7 133:5
181:16 187:11
193:10,20
214:15,19
224:6,22

**scrolled** 215:22
**scrolling** 224:8
**sd** 4:23 5:12
45:21 162:18
162:23 163:22
**search** 220:2,3
**seated** 230:14
**second** 6:20,22
8:4,5 12:18
16:14 24:5
26:21 27:22,25
28:2,5,8 30:8
33:20 44:3
57:7 62:25
77:18 84:25
86:17 93:21
97:24 120:17
133:9 135:22
176:22 182:15
182:18,23
187:8,23
212:17 216:13
216:15 230:16
234:1
**second's**
216:14
**secondly** 22:9
**seconds** 162:14
**section** 37:9
61:16 93:4,25
103:2 164:25
166:25
**secure** 85:9
**secured** 85:7
103:14 109:18
146:7

**see** 15:18 17:11
17:25 19:1
21:8 22:20
23:22 26:15
30:25 33:4
54:2 64:6,9
65:3 74:16
78:11 79:10
81:6 86:16
100:3 103:24
122:23 124:8
125:3 135:1
136:20 137:16
159:3 162:17
162:20,22
163:22 177:18
177:20,21,24
177:24 178:11
186:7 188:6
196:23 228:11
229:3
**seeing** 16:17,18
184:2 186:1,2
197:23 205:23
210:2 211:6
**seeks** 38:9
**seem** 147:7
**seems** 42:10,17
57:15 105:10
116:8 148:18
148:24 158:3
159:1,2 161:8
161:10 166:13
**seen** 55:4
113:20 138:18
150:5 175:2,7
183:23 202:17

213:8 218:22
218:24 220:1
**selection** 123:6
**seller** 205:17
**send** 19:7
**sense** 55:8
57:22 58:15
64:4,6 82:18
119:5 123:9
134:4 141:5
164:8,12 166:4
170:16,22
225:25
**sensed** 202:22
**sent** 20:14,15
22:24 131:15
152:16 153:10
153:13
**sentence** 40:20
40:20,24 42:16
85:8 182:15
**separate** 22:17
60:25 61:5,25
62:1 68:15
71:18 142:15
212:2 225:25
**separately**
141:19
**september**
11:23 77:2
150:12 152:23
182:18 210:3,3
210:5
**sequence** 210:1
**serve** 178:15
**served** 62:23
202:1

**serves**  142:25
178:14
**service**  44:2,7
44:11,17,23
45:5 84:4 97:1
97:3 213:5
222:8,14
**services**  55:7
131:17
**servicing**
144:20
**set**  19:22 24:18
44:21 90:22
113:12 135:22
149:3 194:1
**seven**  136:16
234:20
**seventh**  121:2
**several**  21:7
44:16 81:21
216:23
**severe**  215:7
**shake**  201:9
**shape**  209:14
**shaped**  210:14
**share**  76:1
145:18
**shared**  48:20
199:16
**shares**  76:1
**sharon**  11:21
14:1,5 15:15
17:24 23:17
25:1,19 26:11
27:17 29:16
30:25 31:20
32:24 33:7

61:11 64:10
67:19 68:2,19
69:1,17 70:8
70:19 71:4,9
74:5 75:15
78:9 79:8
84:13 85:2,21
110:2 223:19
231:20 233:5
**she'd**  105:3
**sheds**  104:20
**sheer**  227:21
**sheet**  33:2,5,10
33:14,18 35:14
37:25 38:15
40:14,21 45:13
47:21 84:15,20
86:5,10,15,16
87:4,14 122:21
163:21 164:10
186:22 187:4,9
189:6
**shift**  150:2
155:8 160:19
**shifted**  146:15
157:23
**shifting**  144:25
**shon**  2:22
**short**  57:17
59:5 82:12
99:6 119:5
**shorter**  123:22
**shortfall**  96:19
**shortfalls**
56:22
**shot**  210:15

**show**  15:21
21:23 28:1
61:7 70:24
74:14 163:11
175:21 233:14
**showed**  57:14
**showing**  65:8,9
132:22
**shows**  32:4
69:5 73:16
75:19 99:8
133:14
**shrug**  211:19
**shultz**  5:9
**shut**  98:16
**side**  14:2,3
15:13 17:13
18:19 23:16
24:22 25:2,12
25:13,20 26:5
26:12 27:11,11
27:13,21 28:23
29:13,14 30:14
31:2 32:8,16
33:5 63:23
84:14,14 85:3
85:6 89:16
110:5 164:6,6
164:7
**sided**  193:3
**sides**  229:6
**sideshow**
236:14
**sideways**  11:4
63:10,11,11
**siding**  191:6,9
191:13 192:24

193:5
**sign**  13:13 65:2
65:14 141:3
**signature**
20:20,21
185:24 193:23
238:6
**signatures**
65:3
**signed**  20:20
194:11 195:10
**significance**
73:23 74:10,12
**significant**
103:17,25,25
**significantly**
222:25
**signing**  65:21
**silo**  61:8
**similar**  25:5
45:25 53:12
54:9 186:2,3
**similarly**
197:21
**simple**  109:8
**simply**  22:1
98:3 126:10
140:24 163:11
168:14 170:19
204:25 208:14
**simultaneous**
228:17,20
229:1,11
**single**  138:9
**sioux**  4:23 5:12
198:25 199:1

sir  199:24
    201:11
sister  44:25
sit  55:19
    173:14 209:11
    215:3
site  81:22,25
    150:11 179:17
    179:19,22
    180:22 181:5,5
    183:4
sites  191:20
    217:14,17
sits  210:9
sitting  57:11
situation  11:7
    23:5 54:13
    55:3 57:11,24
    58:24 62:6,19
    84:2 102:8,11
    138:10 141:8
    148:21 207:19
situations  81:13 138:15
six  23:24 37:18
    214:13 216:12
    223:5,6 234:11
sixth  121:2
sizable  133:20
size  114:13
    117:17 146:4
    170:23 208:21
    210:23 211:2
sizes  116:20
skid  142:11,12
    142:13,15

skill  47:4
skilled  46:15
    46:22 47:2
skin  36:6 43:11
    43:20
slight  209:25
slightly  16:6
    76:21
slips  25:9 26:4
    26:4,7 27:10
    27:11 29:6
slow  33:20
    73:2
slowly  14:5
    33:7 69:1
    214:19
small  17:4
    135:3,9,9
    165:22 232:4
smaller  10:22
    114:11 115:14
    210:15,16
smart  125:11
smith  4:20 5:9
smoothly  54:17
snappy  119:5
snapshot  35:15
    35:16 37:1
software  123:6
    123:8
sold  166:10
    196:13 204:6,7
    204:10 206:3
sole  194:15
solemnly  9:11
    190:7 198:10

solicit  87:17
    95:7
solicitation
    98:10 165:10
    165:17
solicited  86:25
    87:2,23
soliciting  87:25
solutions  11:7
    238:20
solve  56:8
solving  54:16
somebody
    43:10 135:25
    135:25 138:16
    158:7 185:10
something's
    108:22 109:5
somewhat
    88:18 156:9
sonya  3:25
    238:3,8
soon  162:12
sooner  231:14
sorry  7:17
    13:10 21:15
    26:3,12,22,23
    33:1,19 35:22
    46:25 48:1,18
    49:23 53:18
    64:7,23 65:4
    72:15 77:19
    81:4,5 87:22
    90:10 92:2
    100:23,25
    101:4 102:6
    106:18 107:14

109:12 110:3,4
113:17 114:17
114:18 117:4
121:5 122:7
123:10 133:8
133:10,12
135:4,5,6
139:5,7 142:2
152:5 164:19
164:21 172:10
177:14 186:21
190:24 195:23
197:25 200:20
203:3 209:1
212:23 215:11
218:7,8 220:21
224:7 229:8,19
233:16 235:21
sort  90:21
    109:21 136:12
    151:11 205:1
    214:18 216:11
    222:16
sorts  14:19
    15:25
sound  140:9
sounded  144:4
sounds  79:5
    152:24 214:1
source  43:8
    186:19
sources  133:17
south  5:11,19
    11:13 42:3,6
    42:15 46:1,19
    47:24 48:10,23
    49:1 52:5,8

53:14 71:25
80:25 155:11
187:4,8,13
191:10,11
198:21 199:20
200:2 203:15
214:25 215:2,6
235:25
**space** 116:9
150:14 210:6
210:10,13,14
210:17,23
211:10,12
225:25
**spaces** 209:20
209:22
**spanish** 10:7
**speak** 21:16,17
91:6 135:5
141:17,17
226:12
**speaking** 75:24
146:25 190:22
232:9
**speaks** 78:19
88:13,20 91:5
97:20 98:4,15
**special** 10:22
11:2 23:8
67:14 176:5
180:14
**specialists**
149:15
**specific** 61:25
88:13 100:4
144:21 149:15
163:1 170:13

172:2,4 174:4
180:1 220:2
224:24
**specifically**
10:16 14:21
53:22 60:10,23
63:9 74:24
80:2 96:6
100:20 163:6
180:4,5 196:9
205:23 211:4
222:23
**specify** 40:14
**speculate**
138:1 145:20
158:17 160:10
165:12 219:18
**speculation**
33:22 38:6,9
79:1 89:21
104:19 111:19
126:14 127:14
184:21
**speculative**
38:10 42:10
**speed** 197:22
**spend** 175:2
**spending**
174:24
**spent** 80:22,25
81:10 126:9,11
126:17,18,24
127:4,17,21
128:12 129:3
129:14,14,17
129:20,20
131:1,5 143:10

154:2 174:21
175:3,8,20
176:1,22
**sphere** 98:9
**split** 48:16
**splits** 209:9
**spoke** 142:3
**spores** 200:23
200:24
**spreadsheet**
15:19 16:9,10
16:15 17:9
**spreadsheets**
183:13
**spring** 150:9
**square** 51:4,5
114:7,8,9
209:12,13
**stabilization**
212:10 214:10
222:7
**stabilize** 88:7
221:25 222:25
**stabilized** 36:5
36:10 101:10
212:21 221:22
222:9 223:3,5
**stable** 212:11
221:22
**stage** 36:16
**stakeholders**
165:25 167:25
168:1
**stamp** 185:24
186:2,5
**stamping**
23:20

**stand** 9:6,7,15
119:6 190:11
196:20 201:25
**standard** 18:22
21:2 44:20
61:16 98:17
**standpoint**
20:25 62:8
65:11 107:15
153:19 172:17
175:24
**stands** 58:6
59:7 90:20
119:20 230:13
**stanley** 4:17
6:15 7:8,11,14
7:17 8:4,12,22
8:25 118:18
119:2 121:13
121:17,19
197:10 202:15
203:8 218:21
220:5 221:6
222:21 223:13
223:16,19,21
224:12,17
225:2,14,17
226:3 233:16
233:20 234:1,4
234:6,9,12,25
235:3,7,12,14
235:18,20
236:17,21
**start** 11:4 43:3
114:18 118:13
124:18 128:8
140:21 177:1

| | | | |
|---|---|---|---|
| **started**  10:20 | 158:18 177:22 | **stipulations** | **stripped** |
| 80:14 81:1 | **statement** | 180:5 | 196:14 |
| 89:2 104:14 | 29:20,22 57:13 | **stole**  210:25 | **stroh**  113:18 |
| 158:18 163:4 | 58:3 87:9,16 | **stood**  58:25 | 210:3,5 |
| 191:15 197:2 | 98:24 99:8 | **stop**  56:16 | **structure** |
| 231:3 | 119:25 120:2,4 | 160:12 165:18 | 77:22 187:17 |
| **starting**  181:12 | 120:5 122:3 | 204:5 | 209:11 226:1 |
| 191:14 | 124:3 139:13 | **stopped**  192:3 | **structures** |
| **starts**  15:16 | 141:2 211:6 | 192:15,25 | 115:17 209:6 |
| 23:18 | **statements** | **storage**  211:11 | **struggle** |
| **state**  3:1,5,8 | 89:24 130:14 | 211:12 | 170:12 |
| 4:12,21 7:4 9:9 | **states**  1:1 2:4 | **stores**  211:11 | **struggling** |
| 9:17 10:2,15 | 127:13 | **straight**  124:4 | 107:24 143:6 |
| 11:11,16,22 | **status**  206:18 | 124:6 138:19 | **stuff**  58:24 |
| 12:6 16:20,25 | **statute**  22:11 | 209:16 210:15 | 75:2 184:4 |
| 17:18,21 21:2 | 22:16 | **strange**  135:6 | 202:22 |
| 24:12 25:7 | **stay**  30:16 | **strategic**  156:4 | **stuffing**  232:25 |
| 27:7 28:4 | 226:18 | **strategy**  157:1 | **subcontractor** |
| 29:10,20 30:7 | **steer**  142:11,13 | 157:2,10 | 130:20,24 |
| 60:12 68:5 | 142:15 | **stream**  78:7 | 131:3 |
| 78:20 79:21 | **steers**  142:12 | **streams**  112:14 | **subcontractors** |
| 85:8 111:7 | **stem**  217:12 | 123:19 124:3,5 | 130:6,15 |
| 121:2 131:2 | **step**  43:24 | **street**  4:22 | **subject**  177:4 |
| 132:15 134:21 | **stepped**  139:5 | 5:18,19 36:21 | **submit**  149:7 |
| 143:24 144:11 | **stipulate**  8:10 | 38:20 39:5 | 174:23 |
| 144:13,14,14 | 230:20 231:9 | 86:18,21 | **submits**  135:25 |
| 144:15 147:1 | **stipulated** | 122:17,19 | **submitted** |
| 152:9 155:15 | 67:21 92:8 | 123:7 209:16 | 12:23 57:14 |
| 171:10,13 | 146:13,13,16 | **stress**  54:25 | 130:22 135:19 |
| 184:7 189:24 | 148:24 149:2 | 55:1,1,2 | 135:20 175:9 |
| 190:5,14 198:8 | 231:23 233:22 | **stretched**  86:3 | **subparts** |
| 198:21,22 | 233:25 234:2 | **stricken** | 216:23 |
| 202:6 226:20 | 234:23 | 206:13 | **subpoena** |
| 234:23 235:25 | **stipulation** | **strictly**  222:6 | 14:22 32:1 |
| **stated**  26:2 | 92:7 216:10 | **strike**  172:9 | 65:24,25 66:7 |
| 104:9 117:23 | 230:18 231:1 | 207:2 | 66:19,23 75:2 |
| 122:17 134:19 | 231:16 232:5 | | 130:12 131:15 |

185:13,17
186:4
**subpoenaed**
14:24,24,25
50:16,24 65:23
66:10 113:18
114:1 130:16
183:6,8
**subpoenas**
50:19 113:23
129:23 130:6
156:12
**substance**
224:3 232:10
**substantive**
227:15
**subtle** 186:4
**success** 44:21
**successful**
55:21
**successive**
228:17,22
**suddenly**
161:12
**sue** 58:19
178:6
**suffer** 203:8
**sufficient**
56:22 99:21
100:9 222:4,13
**suggest** 95:11
135:22
**suggested**
94:19 149:24
**suggesting**
128:24 158:2

**suite** 4:5 5:11
5:19 238:22
**sum** 25:8 78:21
94:21,22 99:9
99:16 127:25
171:3,21 232:9
**summary**
61:20 68:4,17
68:18 69:22,23
70:22 74:8
75:11,17,19
224:7 228:1
234:22 235:15
235:15
**sums** 78:22
126:5,5 135:3
135:12
**super** 203:2
**supervision**
10:24
**supplement**
102:13
**supplements**
141:3
**supplied** 18:24
114:5 183:7
**support** 83:10
205:4
**supposed**
49:15 52:23
63:17 65:19
100:24 122:15
123:21 128:20
192:18
**supreme**
115:13

**sure** 13:22 20:6
21:13 32:2,4
34:23 36:14
42:13 44:1
56:14 59:12
61:2 79:15,17
79:18 81:6
91:24 92:5,15
92:19 97:25
104:14 105:13
106:2 112:3
113:4 115:6
118:6,11
119:12,15
126:17 136:17
137:6 140:16
141:18 144:22
147:15 151:18
153:13,19
161:13 166:6
166:16 169:18
170:5,17
171:22 172:1
173:21 180:19
181:19 187:21
187:22 198:3
200:15,15
208:2,7 213:20
214:11,12
218:5 224:12
226:22,23
229:1
**surrounding**
62:19
**suspect** 120:14
**sustain** 33:25
79:5 115:25

169:5 208:20
224:25
**sustainable**
157:19
**sustained**
38:11 43:2
47:10 83:13
88:20 89:22
94:24 101:2
160:13 163:7
184:23 205:5
205:25 220:4
223:11 225:10
**sustaining**
92:12 94:17
96:5 117:9
**swath** 143:8
**swear** 9:11
190:7 198:7,10
202:5
**swipe** 198:2
**switch** 15:12
58:10 102:22
110:1 169:12
179:7
**swore** 118:22
**sworn** 9:8
221:11,14
**sydney** 70:25
70:25 71:1
**synonym** 67:7
**synonymous**
16:2 88:15
**system** 20:9
50:14 63:19
153:16,25
173:24

**systems** 5:17

**t**

**t** 6:17 238:1,1
**table** 11:25
  12:2,7 18:18
  25:13 26:8,20
  28:1,5,7,23
  30:5,13,18,21
  31:18 32:13
  69:5,23 71:12
  72:9 73:11,16
  74:14 179:14
  179:15
**tahoe** 141:25
**tail** 73:20,23
**take** 8:9 9:15
  12:2 39:13,16
  48:20 59:5
  73:13 80:13
  90:16 95:23
  97:1 103:10
  109:1 110:18
  118:10,25
  119:12,19
  121:19 126:23
  135:2 137:19
  137:23 181:8
  182:16 190:11
  201:13,15,25
  211:22 213:2
  213:15 214:4
  222:24 232:12
  232:25
**taken** 127:2
**takeout** 97:15
  97:16,18
  102:23 103:4

104:3,10,13,16
105:18 106:12
106:20 107:4
107:12 108:18
155:3
**takes** 72:24
229:2
**talk** 129:24
  132:3 151:23
  158:4 161:9
**talked** 40:4
  53:8 59:23
  159:16
**talking** 44:8
  78:13 81:6
  107:23 108:1
  113:17 117:11
  131:19 149:13
  152:20 159:2
  159:25 179:20
  183:9 184:5
**talks** 102:23
156:7
**tanabe** 4:16
  6:6 7:7 8:22
  9:3,5,21,22,24
  11:21 12:1
  13:1,3,22 14:1
  14:7 15:9,15
  15:17 17:24
  18:2 19:16
  20:11 21:12,14
  21:18 22:19,22
  23:16,21,25
  24:1 25:1,3,19
  25:21 26:11,17
  26:22 27:1,17

27:19 28:25
29:3,16,18
30:25 31:3,20
31:22 32:24
33:8,23 34:2,3
34:9,15,16
38:12,13 39:12
39:15,22,25
40:2 42:12,14
43:1,4 46:13
47:5,17,18
50:2,7,8,9
51:12,16,17
56:10,17,20
59:2,13,15,19
59:20 61:11,14
64:10,12 67:13
67:19,23 68:1
68:3,19,23
69:1,3,17,19
70:7,10,19,21
71:3,5,9,11
72:2,4,19,20
72:22,25 73:3
73:9,10 74:5,7
75:14,16 76:10
76:11 78:9,14
79:2,6,9 83:14
84:13,18 85:2
85:5,21,23
88:23,25 89:14
89:17,23 92:3
93:2,8,14,17
93:23 95:2,8
95:16 96:7,8
97:23,25 98:12
99:1,4 100:10

100:15,21,24
101:6,8,19,21
105:12,14
106:3 115:19
115:24 116:2,3
116:13,15
117:15 118:3,7
118:15 121:3,5
121:7,12,16,18
121:22,25
126:1,13
127:12,13
133:11 137:25
143:4 145:17
146:12 147:12
148:8 156:1
157:1,23 160:9
161:5,24
162:14,24
163:9 164:18
164:24 165:10
166:18 168:5
172:20 174:15
174:17 176:9
176:10,20
177:3 180:3,12
180:19,20
181:15,23
182:5,7,8
184:24,25
186:13,18
187:1,2 188:21
189:25 228:9
229:13,18
234:10 235:11
235:13,21,24
236:2,10

**tangent** 94:12
**tax** 75:24,25
  89:19,24 90:1
  90:8,13 110:24
  204:16,18,20
  204:24 205:2
**taxes** 90:3,10
  90:15,18,19
  91:3,4 204:16
  204:23
**team** 158:15
**teaming**
  202:17
**tell** 20:12 69:4
  69:25 84:21
  87:15 94:21,21
  118:24 181:21
  207:13
**teller** 10:13
**telling** 60:1
  147:25 155:12
  155:16,21
**temporary**
  37:7 38:17
  162:1
**ten** 40:9
**tenants** 211:11
**tend** 56:24
  74:22
**term** 33:2,5,10
  33:14,18 35:14
  37:15,24 38:15
  40:5,7,14,21
  44:9 45:13
  47:21 68:11
  84:15,20 86:5
  86:7,10,14,16

87:4,14 88:2
109:4 122:21
123:5,22 124:8
163:21,25
164:10 180:3
180:15 186:22
187:4,9 189:6
189:6 195:24
**terms** 34:23,24
  35:7,12 40:11
  44:6 46:2 54:9
  59:22,23,23,24
  59:25 78:20
  87:20 91:12
  102:17 109:3,8
  111:13 165:16
  195:13,17
  207:10 208:21
  221:7
**terry** 210:3,5
**test** 94:1
  115:16
**testified** 12:6
  45:11 46:18
  49:5,8 50:4
  51:21 52:14
  54:10 56:25
  61:24 62:9
  63:8 66:5
  67:14 74:22
  76:21,22 82:6
  82:8,24 96:10
  101:10 111:23
  112:25 113:10
  113:25 115:9
  116:4 117:17
  117:18 126:14

127:14,18,20
129:2 130:3
131:24 136:23
138:22,25
140:5,11,16
145:7,22
150:24 151:9
154:2,11,16
155:2 160:19
162:10 169:21
169:24 170:20
172:24 176:4
178:5 181:1,4
185:12 187:4
189:14 208:6
218:22 220:1
221:24 223:6
224:24 225:18
**testifies** 95:13
**testify** 47:10
  88:22 91:20
  94:25 98:18
  103:22 110:25
  116:19 126:17
  127:17 128:1
  129:25 145:24
  157:1,2 161:6
  161:11,12,15
  161:20 162:7,8
  168:8,9,10
  205:21 212:13
  220:2
**testifying** 47:5
  92:13 98:16
  111:14,19
  116:16,23
  122:14 151:3

151:24 152:1,6
161:17 162:25
169:8 205:2
222:24 224:20
**testimonies**
  126:9
**testimony** 9:11
  12:10 47:8,13
  76:16 91:22
  119:24 126:6
  126:10,19,21
  126:24 127:19
  127:22 142:15
  154:20 156:12
  161:23,25
  162:3,6 169:18
  171:14 179:24
  186:12 187:5
  190:7 197:14
  198:10 204:1
  208:7,22 212:1
  212:7 213:14
  217:4 219:25
  221:11,14
  222:3,12,22
  223:1,1 224:22
**testing** 198:5
**text** 17:13
  85:15
**thank** 9:5,22
  14:4,15 15:2
  15:12 17:23
  22:18,19 23:25
  24:25 25:2,18
  26:10,15,16,25
  27:16 29:12
  30:16,24 31:2

| | | | |
|---|---|---|---|
| 31:21 32:15,23 | 214:18,20 | 55:7 56:2,5,6 | 97:7 98:13 |
| 33:6,7 34:2 | 216:25 218:11 | 58:7,7 64:5 | 99:24 100:8,10 |
| 35:9,20 47:17 | 218:15 226:6 | 82:22 94:22 | 101:13 102:12 |
| 50:8 51:15,16 | 226:10 227:10 | 95:1 102:12 | 104:2,9,12,13 |
| 52:14 55:9 | 227:16 229:10 | 107:16 122:2 | 104:19 105:3,6 |
| 56:10,13 59:2 | 230:7 233:2 | 126:25 135:3 | 105:23,25 |
| 59:19 61:13 | **thanks** 20:10 | 138:1,3,13 | 107:18 109:1 |
| 65:22 67:10 | 182:6 227:9 | 142:17 145:17 | 109:17 110:14 |
| 69:16 70:6,18 | **thanksgiving** | 146:23 153:18 | 110:15 111:10 |
| 71:8 72:17,24 | 230:11,12,25 | 169:23 174:18 | 112:23 113:1 |
| 73:8 74:4,6 | **that'd** 39:4 | 175:2 177:21 | 113:10 116:9 |
| 75:13 76:8,20 | 103:1 112:7 | 177:23 203:2 | 116:16 117:21 |
| 84:12 88:6 | **theater** 141:25 | 219:12 230:14 | 117:21 118:3,8 |
| 93:17 101:6 | **theft** 19:10 | **think** 7:4 17:9 | 118:18,20 |
| 102:22 110:1 | **theoretically** | 22:23 23:19,21 | 119:10 120:16 |
| 110:19 112:18 | 37:18 38:23 | 23:24 26:14,22 | 120:18 122:5 |
| 116:2 118:3 | 90:18,22 108:9 | 26:24 27:17 | 123:12 126:14 |
| 120:12 122:4 | 129:10 159:19 | 29:1 33:2 | 126:18,22 |
| 122:10,21 | 174:23 | 46:20 49:24 | 127:9,18 128:4 |
| 124:14 128:9 | **therefrom** | 51:18 52:19 | 128:13 130:9 |
| 133:6 136:16 | 145:13 156:13 | 53:19 55:10 | 130:12 133:1 |
| 137:12 140:3 | **thereof** 21:10 | 56:11,15,17 | 136:3,7,17 |
| 144:25 164:14 | 46:11 91:12 | 59:2 61:20 | 139:15 140:21 |
| 169:14 170:4 | 215:21 | 63:10 66:5 | 142:12,15 |
| 174:9,9,13,15 | **thing** 16:3,5 | 67:8,15 68:20 | 143:5 144:9 |
| 181:16 182:5,7 | 42:23,25 47:8 | 73:15 74:22 | 145:17,21,22 |
| 186:17 187:1 | 55:17 72:22 | 75:19 76:17,23 | 145:23 146:1 |
| 188:21 189:17 | 99:6,7,15 | 77:1 79:18 | 146:16,22 |
| 189:20 191:2 | 108:24 127:4 | 80:5 82:5,11 | 148:3,8 149:13 |
| 193:12 195:3,6 | 149:14 166:20 | 82:23 84:15 | 149:20 155:2 |
| 197:9,16,17 | 167:12 177:24 | 85:17 87:15 | 156:10,21 |
| 198:6 200:10 | 202:23 221:5 | 88:10,16 89:16 | 157:10 165:18 |
| 201:4,7,9,11 | 223:11,15 | 89:20 90:5 | 166:3,18 |
| 201:17,23 | **things** 11:5 | 92:17,19,20 | 167:19 170:24 |
| 203:3,11 207:1 | 35:17 36:6 | 93:4,8,9,23 | 171:18 173:15 |
| 208:25 209:23 | 43:21 44:15,19 | 94:10 95:1,3 | 176:12,20 |
| 212:3,18 | 50:15 54:10 | 95:16 96:18,22 | 177:13 178:13 |

| | | | |
|---|---|---|---|
| 178:14 179:11 | **thousands** | 189:1,14 | 118:8 120:16 |
| 180:12,23 | 191:21 | 204:12,14,14 | 120:18 128:21 |
| 181:5,17 | **threaten** 58:19 | 204:15 205:1,9 | 129:9 131:2 |
| 182:23 183:1,7 | **three** 8:5 12:23 | 205:12 206:11 | 132:6,7,24 |
| 184:1 185:8 | 13:11 17:8,10 | 206:14,15,17 | 133:18,23 |
| 186:13,15,18 | 28:6,9 44:18 | 206:18 220:6,8 | 134:1,19 |
| 187:3 199:9 | 44:19 77:25 | **tiffany** 110:3,8 | 139:14,22,23 |
| 203:8,25 | 78:3 80:3,9 | 110:17 | 140:1,15 |
| 204:24 205:6 | 85:12 86:1 | **till** 110:3 | 141:14 145:2 |
| 205:17 210:4 | 110:12,14,15 | 118:10 | 150:6,11 |
| 213:8 216:22 | 111:15,16 | **time** 8:9 10:2 | 151:11,14,25 |
| 218:7 219:6 | 113:11,14 | 10:13,17 11:2 | 153:12 155:15 |
| 224:17 225:12 | 118:21,22 | 11:6 29:22 | 159:17,21 |
| 225:15,18 | 140:22,23 | 35:5,5,15,16 | 162:5 169:9,25 |
| 227:12 228:3 | 154:10 164:16 | 35:17,17 36:5 | 170:9,24 171:1 |
| 228:16 229:5 | 164:23 166:7 | 36:24 37:2,12 | 171:16,20 |
| 231:9 232:12 | 214:19 216:4 | 37:18,20 38:19 | 172:14,25 |
| 234:6 | 216:18 219:7 | 38:22 39:2,17 | 173:13 176:22 |
| **thinking** 39:22 | **threshold** | 52:7 53:13,16 | 176:24 177:2 |
| 39:25 58:17 | 159:2 | 53:21 54:1,3 | 182:23 184:2 |
| **thinks** 156:22 | **thrilled** 93:6 | 55:6,15 56:11 | 188:10 202:5 |
| **third** 12:20 | **ticket** 24:8,10 | 57:12,19,20 | 204:20 206:2 |
| 25:10 31:11 | 31:6 | 58:17 61:1 | 212:8 213:2 |
| 57:8,20 62:24 | **tickets** 24:3,4 | 62:6 63:21,22 | 215:12 222:25 |
| 63:4 64:17 | 29:5 | 64:5 69:25 | 223:6,25 224:3 |
| 66:3 77:2,21 | **tied** 18:7 | 70:2 73:13 | 224:21,21 |
| 78:5,6 79:13 | 122:18,19 | 74:21 78:12 | 227:12 228:7,8 |
| 79:24 83:11 | **tif** 40:23 41:3,3 | 80:4 81:7,9,10 | 230:5 231:24 |
| 140:9 185:9,16 | 41:7,9,11,11 | 82:3,3,13,20 | **timeline** 213:7 |
| **thirty** 206:4 | 41:18,19 48:14 | 82:21,22 83:24 | **timeliness** 23:3 |
| **thought** 93:2 | 110:23 111:1,3 | 83:25 84:6,8 | **timely** 23:3 |
| 126:1 149:18 | 111:4,5,10,15 | 86:3,25 87:7 | **timepiece** |
| 179:18 208:3 | 112:10,12,19 | 87:11 91:23 | 159:24 |
| 225:21 227:10 | 112:20 145:5,8 | 96:6 97:10 | **times** 58:16 |
| **thoughts** | 145:9,12 | 100:6 113:20 | 62:21 90:16 |
| 228:14 | 147:14 148:2 | 114:23,24 | 114:25 138:10 |
| | 149:9 179:7 | 116:9 117:3,10 | 150:5 154:22 |

**[tiny - trying]**

| | | | |
|---|---|---|---|
| **tiny** 79:8 | **total** 28:3 | **transfer** 18:5 | **triplicate** 31:6 |
| **tired** 236:21 | 32:18,21 47:21 | 18:23 19:1 | **trouble** 14:2 |
| **title** 74:16 | 49:9 69:12,14 | 20:1,4 | **true** 13:16 |
| **tl** 113:18 | 70:4,16 71:6 | **transferred** | 14:17 113:16 |
| **today** 92:21 | 72:5 74:1 | 68:16 69:9 | 155:22 215:5 |
| 93:7 117:7,12 | 75:10 76:6,12 | 70:4 124:25 | 219:2 221:23 |
| 118:12 129:25 | 78:2 88:9 | 126:15 127:15 | 225:25 238:4 |
| 131:18 142:18 | 107:19 124:24 | 127:21 128:15 | **trust** 177:19 |
| 153:11,15 | 129:13 173:17 | 128:15 129:12 | **trustee** 21:6 |
| 160:20 166:24 | 195:13 | **transfers** 19:12 | 155:25 158:13 |
| 173:14,15,17 | **totality** 104:24 | 68:5 69:6,12 | 159:6 160:6 |
| 184:5 197:14 | **totally** 56:2 | 69:23 70:1,12 | 178:18,22 |
| 212:8 215:3 | **touch** 146:23 | 70:16,25 71:6 | 179:4 |
| 217:4 222:2,22 | 174:6 | 71:15 72:5 | **truth** 9:12,13 |
| 223:1,2 227:20 | **towers** 5:18 | 74:2 75:10,20 | 9:13 190:8,9,9 |
| 229:3 | **track** 39:23 | 76:6,12 132:9 | 198:11,12,12 |
| **today's** 103:14 | 172:12 | 133:14 135:11 | **truthfulness** |
| **together** 15:8 | **traded** 142:14 | 136:24 138:23 | 234:21 |
| 45:2 66:19 | 142:14 | 139:11,15 | **try** 34:1 44:15 |
| **told** 98:14 | **training** 10:24 | 177:17 178:1,9 | 95:20 96:7 |
| 117:18 | 175:13 | **transition** | 106:4 141:19 |
| **took** 88:6 | **transaction** | 183:9 | 155:24 177:4 |
| 181:5 | 15:7 24:13 | **translate** 85:15 | 190:19 231:13 |
| **tools** 123:6 | 26:4 27:11 | **transparent** | **trying** 21:7 |
| **top** 23:20,22 | 35:12 | 65:9 | 22:3,4 51:1,20 |
| 24:10 25:24 | **transactions** | **treatment** | 73:1 78:23 |
| 26:14 29:2 | 24:18 30:1,4 | 89:15 | 88:17 94:12 |
| 31:5 61:23 | 143:8,9 | **trend** 208:15 | 98:13 99:4 |
| 68:21 79:10 | **transcribed** | **trespass** 105:1 | 112:13 115:7 |
| 103:5 209:8 | 3:25 | **trial** 121:9,10 | 122:1 125:11 |
| 214:16 | **transcript** | **trick** 154:6 | 126:8 128:13 |
| **topic** 76:21 | 15:25 131:12 | **tricky** 101:5 | 133:8 136:7 |
| 112:22 | 212:14,16 | **tried** 81:11 | 143:11 148:25 |
| **topical** 98:5 | 235:14 238:4 | 96:18 234:1 | 156:2 157:17 |
| **topics** 59:16 | **transcripts** | **trip** 148:4,25 | 158:4,19 |
| **torturing** | 131:9 | 157:7 170:17 | 159:17,22 |
| 231:5 | | | 161:19 163:11 |

165:6,18 168:3
169:20 170:17
170:19,22
172:21 176:10
180:7,13
208:12,14
230:22 232:1
**tuesday**  2:9
**tunnel**  159:3
**turkey**  232:25
**turn**  200:18
**turned**  48:1
**tweaks**  105:9
**twenty**  23:24
86:11,12 120:5
130:13
**twins**  224:2
**two**  8:4 17:10
22:17 24:2
26:11 34:21
35:3 36:11
40:25 41:1,4
42:16 44:18
58:3 60:7
63:14,15 68:9
69:14 78:19
79:23 90:2
104:7 108:3
109:20 115:17
120:22 131:21
132:6 140:22
142:12 143:4
143:16 145:17
147:1 151:14
156:11,20,23
158:24 171:23
180:4,5 197:22

203:5 207:16
210:5 211:17
225:14 228:11
228:13,16,24
229:3 230:5
231:10 232:23
233:22
**type**  41:24
42:17 43:5
45:12 46:17
74:17 107:4
109:5 141:25
150:13 173:24
177:9 205:1
**types**  44:21
56:5 200:23
**typical**  43:7
54:3 60:22
62:15,17,17
67:1 172:25
**typically**  36:1
43:8,10,12
44:15,22 50:13
50:14 53:8
55:23 56:8
58:18 61:18
102:10 109:10
109:13 122:18
122:19 123:17
177:23,24
**tyvek**  193:4

**u**

**u.s.**  2:5,23
**ultimately**  80:6
85:9 124:25
125:15 129:3

**unacceptable**
102:19
**uncertain**
129:21
**unclear**  72:23
101:7
**under**  28:7
46:9 77:8 91:4
93:25 96:14,15
97:15,19
101:23 106:7
116:22 122:8
122:23 125:3
162:17,22
163:21 164:9
164:25 165:15
165:19 166:25
168:11 202:2,7
203:19,25
205:12 210:22
**underground**
209:7
**underlying**
102:9
**underneath**
30:3 86:17
97:3,5 132:25
209:13
**understand**
42:2 58:2,14
91:16 95:8
111:9 126:8
137:2 143:6
160:3,6 167:1
167:2,6,13
187:24 193:11

**understanding**
8:12 13:17
16:9 35:10,11
75:6 107:2
111:4,9 131:18
139:2 144:9,14
151:20 160:15
161:18 168:18
170:19 184:9
196:17 228:19
**understood**
61:2 79:15,16
88:23 100:10
117:8
**underwrite**
83:20 102:21
**underwriting**
35:3 107:22
108:5
**unduly**  38:10
**unfolding**
10:21
**unfolds**  21:24
**unfortunately**
81:9 221:9
**unheard**
138:15
**union**  8:6 15:1
15:4 18:11
20:16 32:2,9
66:6 68:6,10
121:14
**unique**  54:14
54:15 91:21
99:24
**unit**  132:1
206:10,11,17

207:16 208:13
212:25
**united**  1:1 2:4
**units**  206:2
207:10,14,18
207:18,20,22
208:15,16
211:2,11
**universe**
105:10
**universes**
147:1
**universities**
200:2
**university**  10:8
**unknown**  2:25
56:4
**unpack**  44:12
**unpaid**  90:3
**unrealistic**
228:13
**unrelated**
72:13,14,16
73:6 75:20,22
**unrepresented**
148:13
**unsecured**
103:18 104:3,5
104:11,22
105:2 146:7
166:11 196:14
**unusual**  21:4
21:10,20 22:12
23:12,13 55:24
56:1 58:17
62:20 67:11
94:1,4,9,14

141:9 146:24
147:9 185:10
228:6
**unusually**
82:12
**updated**  82:21
220:23
**upfront**  146:25
**upper**  186:5
**upset**  58:9,22
**uptick**  54:24
**uptight**  202:21
**use**  16:4 19:20
20:5 44:6 51:7
57:3,25 60:2
60:10 61:13,22
65:12 90:22,22
110:6 113:22
123:7 132:15
134:2 141:6
149:15 152:5
153:16 159:20
170:12 180:6
210:2 213:1
**used**  16:16,18
48:11,23 50:10
52:5,8 63:10
65:15,19 67:7
83:20 96:2
109:7 110:16
125:8,13,17,21
125:25 126:20
126:20 129:11
137:4 138:2
143:17 145:4
160:21 173:25
176:7 180:4

183:4
**uses**  76:17,18
129:15
**using**  21:22,23
49:1 58:11
79:25 80:4,24
81:13 91:24
96:1 102:1
103:13,13
107:16 108:16
114:8 220:12
**usual**  135:7
**utilization**
143:18
**utilize**  114:25
187:20
**utilized**  42:8
**utilizing**  58:4
83:6

| **v** |
| :---: |

**vacancy**
101:11 212:23
**validated**
19:21 113:23
**validity**  146:14
234:24
**valuation**  83:5
115:16 206:19
**value**  40:11,13
40:14,21 41:1
41:11,16,17,20
43:5,15 44:9
44:17 45:3,7
45:12,16 48:2
48:6,6,9,10,22
51:2,3 83:1,3
84:4 90:16,17

90:19,21
103:13 106:5
106:20 107:6
107:11,17,19
108:1,7,18
109:22 111:3
112:13 115:2
115:12,15,23
116:7 117:4,4
117:5,6,12,13
117:24 146:15
163:4 175:23
178:23 188:6,8
188:11,17
204:12,13
206:11,14,15
**value's**  41:3
**valued**  111:15
**variable**  36:20
37:1,6,21
86:19,22
122:15,18,19
123:2,6,8
**variables**
82:17
**variance**  36:22
38:21 86:19
87:12
**variety**  198:17
**vary**  209:6
**varying**  50:18
**vast**  143:7,12
**vastly**  208:6
**venturing**
198:22
**verbiage**
187:11

**verify**   19:24
**veritext**   238:20
**version**   50:14
   120:1
**versions**   50:18
**verstandig**   4:8
   6:7,9,12,14
   7:11,18,20,24
   7:25 8:10,14
   8:17 21:3
   22:18 33:19
   34:7 38:6 42:6
   42:21 46:5,25
   49:22,24 67:5
   67:10 78:18
   83:12 88:12
   89:21 91:5
   92:6,20,24
   93:6,10,17
   97:20,24 98:1
   101:4,17
   104:18 105:20
   110:9,19
   111:18 115:3
   115:11 116:8
   116:14,17
   119:3,12,16
   120:11,12,19
   120:23 122:4,9
   122:10,12,20
   122:22 124:15
   124:19 126:4
   126:22 127:19
   128:7,9,10
   133:4,13
   136:15,19
   137:11,13

138:21 140:2,4
143:7,21 145:1
145:3 146:1,20
146:22 147:20
147:24 148:22
149:11 150:1
156:10 157:10
158:11 160:14
161:3,14
162:16 163:3,8
163:20 164:13
164:15,22
165:4,5,16
166:6,9,22
167:8,13
168:13 169:3,7
169:14,15
170:5,6 171:12
172:21 173:6
174:5,9,12
176:8,15
179:16,18,23
180:10,21
181:6,22,24
182:3 184:21
186:22,24
188:25 189:17
190:2,3,25
191:2,4 192:20
192:22 193:10
193:13,20,22
194:14,18
195:3,10
197:11,18,20
197:24 198:1
198:15 200:10
200:16,20

201:7,12,17,23
202:11 203:4
203:11,13
204:22 205:10
206:1 207:4
208:10,25
209:3 211:17
211:21 212:2,6
212:14 213:13
213:25 214:14
214:21 215:9
215:12,19
216:5,8,20,22
217:1,3 218:17
219:24 222:16
224:11,14
225:3,6,12
226:7,8,11,18
228:14,15
229:5,10,14,19
229:21 230:1,7
230:10,16
231:3,12,15
232:5,21
233:24 234:19
235:5 236:7,11
236:14,19
**verstandig's**
   118:19
**versus**   35:24
   114:5 183:6,8
**video**   72:23
   101:5 197:24
   218:7
**viewed**   150:16
   150:22

**views**   36:12
**visit**   81:16
   181:5 183:4
   185:3 192:6
   199:7 217:17
**visited**   150:20
   185:4 191:25
   199:5 227:18
**visiting**   225:23
**visits**   81:25
   179:17,17
**vogel**   4:11
   153:1 219:6,9
**voice**   58:9
   152:3
**voided**   19:3,6
**volatility**   54:23
   138:11
**volume**   129:25
   130:4
**volunteered**
   221:20
**vote**   165:13
   167:4,5,10,10
   167:11 168:23
   168:25

**w**

**w**   4:17
**wait**   72:20,22
   162:13 221:5
   222:15 230:15
**waiting**   23:4
**walked**   76:13
   150:21 192:12
**walkthrough**
   81:25

| | | | |
|---|---|---|---|
| **wall**  5:17 36:20 | **warm**  225:24 | 228:24 231:17 | 126:7,11 127:6 |
| 38:20 39:5 | **warming** | **ways**  36:6 | 127:23 131:13 |
| 86:18,21 | 210:11,16 | 43:19 79:23 | 134:16 142:18 |
| 122:17,19 | 225:19,20 | 158:4 214:17 | 143:9 181:4 |
| 123:7 | **waste**  35:5 | **wdc**  41:15,15 | 189:15 222:18 |
| **walls**  193:2 | **watching** | 52:20,24 53:1 | 223:4 224:16 |
| **want**  35:2,5 | 56:13 | 111:6,6,10 | **west**  4:22 72:8 |
| 39:8,13 43:18 | **waterfall**  42:5 | **wdc's**  110:20 | 72:10 73:4 |
| 59:24 61:2,12 | 44:5 | **we've**  54:24,24 | **whatever's** |
| 64:8 73:13 | **waterfalls** | 58:8 59:22 | 190:18 |
| 79:17 99:13 | 102:10 | 81:23 92:8 | **whatnot** |
| 100:5 101:1 | **watertown**  3:4 | 112:20 141:8 | 217:19 228:12 |
| 110:1,10 118:9 | 5:10 11:13 | 143:8 145:19 | **whatsoever** |
| 118:10,25 | 53:14 71:25 | 146:24 147:2 | 144:23 |
| 131:23 133:1 | 199:20 203:15 | 158:1 159:17 | **wheel**  141:25 |
| 141:18 144:5 | 210:18 215:7 | 215:13 230:22 | 142:3 220:12 |
| 156:20 164:1 | 225:19 | **weaknesses** | **whichever** |
| 167:16,25 | **wax**  186:5 | 100:1,19,19 | 40:23 |
| 170:14 174:18 | **way**  16:2 22:15 | **wear**  10:23 | **whoa**  47:7,7,7 |
| 179:16 181:13 | 34:21 35:6,6 | **wearing**  150:7 | **wife**  56:2 |
| 184:4 187:6 | 36:7 46:23 | **weather** | **wiggle**  43:23 |
| 190:13 198:3 | 47:8,12 62:22 | 197:16 | **willing**  107:4 |
| 202:17,19 | 63:25,25 64:2 | **week**  120:17 | 193:25 195:21 |
| 203:5 210:7 | 65:9 83:2 | 131:24 210:20 | 230:20 |
| 214:10 226:23 | 103:16 107:20 | 232:23 | **wind**  215:7 |
| 228:17 230:16 | 115:22 117:5 | **weeks**  21:7 | **windows** |
| 230:24 231:6 | 125:12 126:12 | 35:3 210:5 | 192:17 193:4 |
| 231:16 232:20 | 129:7 134:15 | 228:11,13,16 | **winter**  150:8 |
| 233:4 | 135:13,18,20 | 228:24 229:3 | 199:9,9 |
| **wanted**  19:5 | 135:23 136:1 | 230:5 231:10 | **wintertime** |
| 72:7 92:15 | 136:13 137:21 | **weigh**  147:7 | 225:24 |
| 170:21 202:25 | 139:19 141:4,4 | **weight**  228:2 | **wire**  18:5,23 |
| 210:10 224:19 | 143:5 148:7 | **weirdly**  222:17 | 18:25 19:2,7,8 |
| 227:3,19 | 150:4 155:22 | **welcome**  128:1 | 19:8,10,12,17 |
| **wants**  148:5 | 161:6 172:12 | 227:16 | 19:20 20:1,4,8 |
| 212:17 | 172:15,16 | **went**  10:7 52:4 | 20:24 23:14 |
| | 177:22 197:11 | 57:1 125:10 | |

| | | | y |
|---|---|---|---|
| **wired**  23:5 | **witness's**  42:9 | 232:1 | **y**  98:9 |
| **wires**  19:1 | 91:22 98:8 | **worked**  10:12 | **yeah**  7:19,19 |
| **wisconsin**  10:8 | 171:14 | 10:15 176:5 | 16:12 17:7,17 |
| **wish**  154:10 | **witnesses** | **working**  58:23 | 37:3 39:3,15 |
| **wishes**  230:10 | 59:17 118:19 | 63:9 223:25 | 54:1,7 56:14 |
| **witness**  6:4 7:5 | 118:21 119:6 | 231:1 | 57:7 66:12,13 |
| 8:23 9:4 13:24 | 126:6 127:19 | **works**  36:14 | 67:18 77:8 |
| 15:3,6 19:20 | 147:15 156:21 | 70:14 98:8 | 79:6 106:17 |
| 22:9 34:13 | 227:2,5 | 229:14 | 107:10 108:13 |
| 39:20 42:16,24 | **wonder**  228:12 | **worse**  82:1 | 111:13 112:6 |
| 46:14,21 47:10 | **wonderful** | **worst**  54:17 | 113:5 118:7 |
| 67:11 78:12 | 7:13 112:7 | 133:6 | 121:10 146:19 |
| 88:17 91:7,12 | **wonderfully** | **worth**  82:24 | 149:13 157:16 |
| 91:16,17,20,24 | 120:20 | 108:15 160:16 | 169:5 191:12 |
| 92:13 94:24 | **woods**  5:9 | 160:17 170:18 | 193:5,8 194:5 |
| 95:12,22 98:1 | **word**  38:7 | 186:25 203:5 | 194:25 195:25 |
| 98:5,5,6 99:11 | 61:19 63:10 | 233:24 235:6 | 197:15 218:16 |
| 99:15,16,19,24 | 67:5 110:3 | **wrap**  128:13 | 219:18 230:3 |
| 100:19 104:20 | 175:4 197:21 | **writ**  147:8 | 231:15 233:6,7 |
| 105:3,5,25 | **wording** | **write**  109:17 | 233:11,23 |
| 110:11 115:17 | 100:12 | **writing**  164:19 | 235:7,9,20 |
| 118:14 119:24 | **words**  16:2 | 227:20,22,23 | 236:2,5,14 |
| 127:5,24 128:4 | 63:7 106:4 | 231:17 | **year**  38:25 |
| 138:6 147:17 | 149:4 152:5 | **written**  38:14 | 82:1 86:2,6 |
| 148:10,16,19 | 169:21 180:6 | 38:20 65:13 | 88:4 89:25 |
| 149:6 150:3 | 220:13 | 188:19 232:16 | 90:3,14 97:9 |
| 157:7 158:8,10 | **work**  15:1 45:2 | **wrong**  17:8 | 122:24 123:3,4 |
| 163:19 169:13 | 46:18 106:24 | 51:4,5 110:4 | 150:8 151:19 |
| 173:5 174:10 | 108:19,20 | 147:22 186:21 | 154:18 158:24 |
| 195:4 197:18 | 120:20 121:12 | **wrote**  42:20 | 159:25 179:20 |
| 197:20 200:11 | 176:4 192:2,25 | 124:24 128:17 | 179:22 180:22 |
| 201:14,14,22 | 193:6,25 | | 197:3 199:9,11 |
| 202:1,3,17 | 195:21 196:4 | **x** | 210:11,20,21 |
| 205:8,23 | 198:17,19,20 | **x**  1:4,10,12,18 | 213:11,15 |
| 208:23 209:1 | 198:21 199:25 | 1:20 2:1 6:1,17 | 214:13 221:25 |
| 218:5,18 | 200:4 223:17 | 98:8 234:1 | 223:1,4 |
| 225:11 | 223:22 224:3 | | |

**[years - zoom]**                                                      Page 75

| |
|---|
| **years**  40:6,9 |
| 46:17 54:23 |
| 63:14,15 86:11 |
| 86:12,21 90:3 |
| 123:5,5,20,24 |
| 124:9 160:2 |
| 173:23 191:8 |
| 191:19 224:4 |
| **yep**  14:10,12 |
| 16:16,24 25:5 |
| 25:23 29:5 |
| 30:3,8 35:14 |
| 45:23 48:12 |
| 52:19 64:14,22 |
| 64:24 66:18 |
| 69:6,21,23 |
| 70:12 72:14,16 |
| 114:24 142:4 |
| 154:21 189:8 |
| 222:2 234:4 |
| **yesterday**  82:5 |
| 110:25 111:23 |
| 112:24 116:18 |
| 118:21 119:7 |
| 121:17 131:23 |
| 150:24 219:20 |
| **yup**  66:25 |
| **z** |
| **zero**  84:8 |
| **zoom**  26:16 |
| 81:5 135:6 |