## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| In Re: | Case No.:  25-30004 |
|---|---|
| | Chapter 11 |
| The Ruins, LLC, | |
| Debtor. | |

## RED RIVER STATE BANK'S POST-HEARING BRIEF IN SUPPORT OF MOTION TO CONVERT CASE TO CHAPTER 7

### INTRODUCTION

Creditor Red River State Bank ("RRSB") has moved, pursuant to Section 1112 of the Bankruptcy Code, to convert the Chapter 11 bankruptcy case of Debtor The Ruins, LLC ("The Ruins" or "Debtor") to a case under Chapter 7 (the "Motion").  *See generally* ECF No. 109. Creditor Watertown Development Company ("WDC") joined RRSB's Motion, *see generally* ECF No. 131, while The Ruins opposed it.  *See generally* ECF No. 143.

The Court held an evidentiary hearing on the Motion on November 3-4, 20, and 24-25, 2025 hearing from eight different witnesses, and receiving hundreds of pages of exhibits.  The evidence received proves two things: (1) RRSB established cause for relief under Section 1112, and (2) conversion is the appropriate remedy.  Accordingly, RRSB respectfully requests that this Court grant the Motion, and convert this case to Chapter 7.

### LAW AND ARGUMENT

**I.      Section 1112 "cause" exists in the form of continuing losses to the estate, Debtor's failure to provide accurate schedules, and Debtor's pre-petition bad faith conduct.**

Under Section 1112 of the Bankruptcy Code, upon the request of a party in interest, for "cause," a court "shall" convert a chapter 11 case to a case under chapter 7, or dismiss the case,

"unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). For purposes of Section 1112, "cause" includes "substantial or continuing loss to or diminution of the estate and the absence of reasonable likelihood of rehabilitation[.]" 11 U.S.C. § 1112(b)(4)(A). "Cause" also includes "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under" Chapter 11. 11 U.S.C. § 1112(b)(4)(F). Additionally, "[a]lthough there is no explicit requirement in § 1112 that a case be filed in good faith, the Eighth Circuit has recognized that 'a bad faith filing can be cause for dismissal.'" *Lariat Cos., Inc. v. Wigley (In re Wigley)*, 557 B.R. 671, 675 (BAP 8th Cir. 2016) (citations omitted). Movants bear the initial burden of establishing cause for relief under Section 1112. Here, continuing losses, the unexcused failure to satisfy reporting requirements, and bad faith warrant the Conversion of this Chapter 11 case.

    A.    <u>Debtor's continuing losses are cause under Section 1112.</u>

        1.    *Debtor's inability to pay post-petition expenses, as well as the continued deterioration of Debtor's sole significant asset, are continuing losses.*

            a.    Debtor's complete lack of income to pay mounting post-petition expenses is a continuing loss for purposes of Section 1112.

In *Loop Corp. v. United States Trustee*, 379 F.3d 511 (8th Cir. 2004), the Eighth Circuit considered the simple question of whether a debtor's negative cash flow in bankruptcy constituted a "continuing loss" to an estate for purposes of Section 1112. The Court held that negative cash flow "alone is sufficient to establish 'continuing loss to or diminution of the estate.'" *Id.* at 515-16 (citations omitted); *see also* 7 *Collier on Bankruptcy* ¶ 1112.04[5][a][i] (15th ed. 2004) ("If the debtor is operating with a sustained negative cash flow after entry of

the order for relief, this fact is sufficient to support a finding that the debtor is experiencing a 'continuing loss to . . . the estate.'").

Like the debtor in *Loop Corp.*, The Ruins has also experienced significant post-petition negative cash flow. The Ruins lacks cash flow because—as admitted by its principal—The Ruins lacks any employees or business operations. *See* Tr. from Nov. 4, 2025, Hr'g, at 32:2-6. And even though it has not been operating, The Ruins has still incurred more than $100,000.00 in post-petition expenses. *Id.* at 32:7-20. Indeed, Debtor's own monthly operating reports confirm that it has consistently operated at a loss. *See* ECF Nos. 32, 78-84. Debtor's persistent negative cash flow—alone—is a continuing loss warranting relief under Section 1112.

      b.     The depreciation of The Ruins Development is a continuing loss.

And even if this Court could ignore Debtor's negative cash flow, that is not Debtor's only continuing loss. The depreciation of the debtor's assets is a continuing loss for purposes of Section 1112. *See In re Schriock Construction, Inc.*, 167 B.R. 569, 575 n.8 (Bankr. D.N.D. 1994) ("The 'continuing loss' or 'diminution' standard can be satisfied even though the debtor may have had a positive postpetition cash flow if the value of estate assets are actually depreciating in an economic, rather than an accounting, sense." (citing 5 *Collier on Bankruptcy* ¶ 1112.03[i], at 1112-18 (15th ed. 1994))). Here, the continuing depreciation of The Ruins Development[1]—Debtor's sole significant asset—is cause in the form of a continuing loss to the estate.

---

[1]   As used herein, "<u>The Ruins Development</u>" shall mean the real estate development project owned by The Ruins, and located at 315 East Kemp Avenue in Watertown, South Dakota.

Based on an as-stabilized value, The Ruins valued The Ruins Development at $15,750,000.00 as of the Petition Date. *See* Tr. from Nov. 4, 2025, Hr'g, at 34:23-35:19 (explaining methodology for computation of the value of The Ruins Development, including consideration of rental income). Even if it ever was, the as-stabilized value of The Ruins Development is no longer $15,750,000.00.

RRSB offered testimony from Joshua Luther ("Mr. Luther"). *See generally* Tr. from November 24, 2025. Based on his experience and training, this Court qualified Mr. Luther as an expert in commercial real estate appraisal. *See id.* at 12:21-19-25. Mr. Luther appraised The Ruins Development on four (4) occasions: in May of 2021, in July of 2022, in October of 2023, and in July of 2025. *See generally* ECF No. 95-1; ECF No. 95-2; ECF No. 95-3; ECF No. 59, at 4-170. Mr. Luther never believed the as-stabilized value of The Ruins Development was $15,750,000.00, as nakedly claimed by The Ruins during the evidentiary hearing. Instead, Mr. Luther believed the pre-petition, as-stabilized value of The Ruins Development fluctuated between $11,140,000.00 and $12,410,000.00. *Compare* ECF No. 95-1, at 2 ($11,140,000.00 as-stabilized valuation), *with* ECF No. 95-2, at 2 ($12,410,000.00 as stabilized valuation), *and* ECF No. 95-3, at 2 ($11,460,000.00 as-stabilized valuation).

But, post-petition, Mr. Luther determined the as-stabilized value of The Ruins Development to be just $7,040,000.00. *See* ECF No. 59, at 5. Mr. Luther largely attributed this significant post-petition decrease in value industry trends, as well as evidence of a slumping Watertown commercial real estate market. *See id.* at 14-16 (outlining assumptions); *see also id.* at 51-117 (outlining methodology and calculations). Regardless of the cause, the diminishing value of The Ruins Development is a continuing loss for purposes of Section 1112. *Schriock Constr.*, 167 B.R. at 575, n.8.

In addition to market forces, water damage is also causing a continuing loss.  RRSB offered testimony from Matthew Gehrtz ("Mr. Gehrtz").  *See generally* Tr. from November 20, 2025, Hr'g.  Based on his training and experience, this Court qualified Mr. Gehrtz as an expert in commercial construction and supervision.  *Id.* at 8:12-25:7.  Mr. Gehrtz inspected The Ruins Development on three separate occasions.  Mr. Gehrtz first inspected The Ruis Development on April 17, 2024, provided a comprehensive review of the status of The Ruins Development's construction progress.  *See generally* ECF No. 60-1, at 1-401.  Mr. Gehrtz then returned to The Ruins Development on September 24, 2024, *see* Tr. from Nov. 20, 2025, Hr'g, at 97:4-12, and noted evidence of continued water penetration.  *See id.* at 98:1-6; *see also* ECF No. 60-1, at 403-04.  Mr. Gehrtz returned to The Ruins Development for another inspection in May of 2025, and noted continued evidence of ongoing water penetration.  *See* Tr. from Nov. 20, 2025, Hr'g, at 100:9-12.  Based on this water penetration, it was Mr. Gehrtz's expert opinion that remediation would be necessary.  *See* Tr. from Nov. 20, 2025, Hr'g, at 132:7-11; *id.* at 138:5-13.

The Ruins did not meaningfully impeach Mr. Gehrtz's expert testimony that The Ruins Development was experiencing ongoing water penetration issues.  Nor did The Ruins provide evidence that the issue had been adequately addressed or remediated since Mr. Gerhtz's most recent inspection in May of 2025.  At most, The Ruins offered lay opinion testimony that—in December of 2024, Jason Biggins did not believe that mold remediation was necessary.  *See generally* Tr. from Nov. 25, 2025, Hr'g, at 198-201.  In other words, the evidence before this Court is an ongoing and unaddressed water penetration issue—a textbook example of continuing loss to the estate.

2. *The Ruins lacks a reasonable likelihood of rehabilitation.*

Having established that The Ruins has been experiencing a continuing post-petition loss to the estate, RRSB must also establish "the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). "Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business." *Loop*, 379 F.3d at 516 (citations omitted). "This element requires a showing [from the movant] that the state of the debtor's financial affairs are such that it is unable to re-establish itself on a firm or sound base." *In re Schriock Construction, Inc.*, 167 B.R. at 576 (citations omitted). Because it is unrealistic that The Ruins would be able to complete The Ruins Development as currently contemplated, The Ruins does not have a reasonable likelihood of rehabilitation.

"Rehabilitation" of The Ruins would be a two-step process. First, rehabilitation would require completion of The Ruins Development. Rehabilitation would then require the stabilization of The Ruins Development, with The Ruins Development then producing sufficient cash flow to operate as a viable business. Neither step—completion or operation of The Ruins Development—are reasonably likely.

a. It is not reasonably likely that The Ruins will be able to complete The Ruins Development.

Debtor's proposal to complete The Ruins Development is contained in Debtor's Second Amended Chapter 11 Plan of Reorganization of The Ruins, LLC (the "Second Amended Plan"). *See generally* ECF No. 181. The Ruins, through the Second Amended Plan, contends that $1,317,352.00 is needed to complete The Ruins Development. *See id.* at § 4.2.1. The Ruins does not claim that it alone can provide such funding. Instead, The Ruins proposes $262,094.00 from Jesse Craig, $553,184.60 from B&W Construction, $196,297.50 from

Lakeside Construction, $58,500.00 from Limoges Construction, and $247,176.00 from Watertight for "exit financing" to complete the project. *Id.* In return, these "exit financiers" would receive full payment of all pre- and post-petition claims within two (2) years of the approval of the Second Amended Plan. *Id.* It is not reasonably likely that The Ruins will be able to complete The Ruins Development in such a manner.

First, the amounts proposed in the Second Amended Plan are insufficient to complete The Ruins Development. Mr. Gehrtz provided expert testimony regarding the requirements— from a cost and labor perspective—to complete The Ruins Development. In Mr. Gehrtz's expert opinion, completion of The Ruins Development will require contributions from thirty-three (33) different contractors, *see* Tr. from Nov. 20, 2025, Hr'g, at 129:6-21 (explaining that each line would be a separate subcontractor), and approximately $1,695,967.00. *See* ECF No. 60-1, at 406. The Ruins did not meaningfully impeach either the number of subcontractors needed to complete The Ruins Development, or the cost estimated by Mr. Gehrtz. Therefore, facially, the Second Amended Plan—even if it could be executed as proposed—would not suffice to complete The Ruins Development.

And even if this Court entirely disregarded Mr. Gehrtz testimony—which it should not, completion of The Ruins Development as proposed in the Second Amended Plan is still not reasonably likely. First, there is no evidence that The Ruins has been able to achieve commitments from all necessary parties. The Ruins only included with its Second Amended Plan letters of intent from B&W Construction and Lakeside Construction. In other words, there is no evidence in the record that Limoges Construction or Watertight have agreed to provide labor and materials in the manner proposed by The Ruins. It is not reasonably likely

that The Ruins will be able to complete The Ruins Development without $305,676.00 in commitments that it has identified as necessary to complete the construction.

Simply stated, whether the Second Amended Plan is believed or not, it is not reasonably likely that The Ruins Development can be completed as currently proposed.

> b.   It is not reasonably likely that The Ruins will be able to operate The Ruins Development to produce sufficient cash flow to pay necessary debts.

And even if, *arguendo*, it was possible to complete The Ruins Development as proposed in the Second Amended Plan, Debtor's rehabilitation still is not reasonably likely because The Ruins Development would be unable to cash flow.

As identified in Mr. Luther's expert report and opinion, it will take twenty-four (24) months for The Ruins Development to stabilize. *See, e.g.*, ECF No. 59, at 13. Once stabilized, Mr. Luther's opinion is that The Ruins Development will be able to produce $41,255.00 per month in net cash flow—excluding debt servicing. *See id.* at 14. Using these expert figures, even if the Court could assume that The Ruins Development could be completed immediately at plan confirmation—which it cannot,[2] and further assuming that The Ruins Development would be occupied at stabilized levels when completed—which it would not, The Ruins Development will only generate $990,120.00 in net cash flow over twenty-four (24) months. In other words, even in an entirely impossible scenario, Mr. Luther's expert opinion is that the net cash that The Ruins could receive in twenty-four (24) months ($99,120.00), would be insufficient to pay the $1,317,352.00 that would be due to "exit financiers" by the end of

---

[2]   Jesse Craig estimates that it would take four (4) months to complete The Ruins Development if the Second Amended Plan was confirmed. *See* Tr. from Nov. 4, 2025, Hr'g, at 96:3-6

twenty-four (24) months.  Moreover, this scenario entirely ignores the debt service that would be owed to RRSB as a secured creditor during that time.  Mr. Luther's expert testimony establishes that it would be impossible for The Ruins Development to generate sufficient cash flow to make the payments required under the Second Amended Plan.

RRSB anticipates that The Ruins may argue that this Court should not credit the expert testimony provided by Mr. Luther.  But even if this Court credited the testimony offered by The Ruins through Mulinda Craig ("Mulinda")—which it should not, her testimony also establishes that Debtor's proposal is not reasonably likely to succeed.  Mulinda testified that "it would be roughly 18 months[]" for The Ruins Development to stabilize.  Tr. from November 4, 2025, Hr'g, at 162:10-11.  Once stabilized, it was Mulinda's testimony that The Ruins Development would generate approximately $60,000.00 in net cash flow. *Id.* at 162:19-22.  Again, even assuming that The Ruins Development could be completed immediately at plan confirmation—which it could not, and that The Ruins Development would stabilize linearly, Mulinda's estimates are not sufficient to pay off "exit financiers," even if The Ruins provided no debt service to RRSB during this time. The following chart provides a hypothetical estimate of cashflow during a two-year stabilization period that clearly demonstrates there is no possible way The Ruins Development could pay off the estimated $1.3 million that would be owed to "exit financiers":

| Month | Percentage Stabilized | Net Revenue |
|-------|----------------------|-------------|
| 1 | 5.56% | $3,333.36 |
| 2 | 11.11% | $6,666.72 |
| 3 | 16.67% | $10,000.08 |
| 4 | 22.22% | $13,333.44 |
| 5 | 27.78% | $16,666.80 |
| 6 | 33.33% | $20,000.16 |
| 7 | 38.89% | $23,333.52 |
| 8 | 44.44% | $26,666.88 |

| | | |
|---|---|---|
| 9 | 50.00% | $30,000.24 |
| 10 | 55.56% | $33,333.60 |
| 11 | 61.11% | $36,666.96 |
| 12 | 66.67% | $40,000.32 |
| 13 | 72.22% | $43,333.68 |
| 14 | 77.78% | $46,667.04 |
| 15 | 83.33% | $50,000.40 |
| 16 | 88.89% | $53,333.76 |
| 17 | 94.44% | $56,667.12 |
| 18 | 100.00% | $60,000.00 |
| 19 | 100.00% | $60,000.00 |
| 20 | 100.00% | $60,000.00 |
| 21 | 100.00% | $60,000.00 |
| 22 | 100.00% | $60,000.00 |
| 23 | 100.00% | $60,000.00 |
| 24 | 100.00% | $60,000.00 |
| | Total | $930,004.08 |

Indeed, even crediting Mulinda's pie-in-the-sky testimony that The Ruins Development could somehow stabilize in only six (6) months, The Ruins Development still would not be able to generate sufficient money to cash flow when taking into account the time that it would take to complete The Ruins Development:

| Month | Percentage Stabilized | Net Revenue |
|---|---|---|
| 1 | 0.00% | $0.00 |
| 2 | 0.00% | $0.00 |
| 3 | 0.00% | $0.00 |
| 4 | 0.00% | $0.00 |
| 5 | 16.67% | $10,000.00 |
| 6 | 33.33% | $20,000.00 |
| 7 | 50.00% | $30,000.00 |
| 8 | 66.67% | $40,000.00 |
| 9 | 83.33% | $50,000.00 |
| 10 | 100.00% | $60,000.00 |
| 11 | 100.00% | $60,000.00 |
| 12 | 100.00% | $60,000.00 |
| 13 | 100.00% | $60,000.00 |
| 14 | 100.00% | $60,000.00 |
| 15 | 100.00% | $60,000.00 |
| 16 | 100.00% | $60,000.00 |
| 17 | 100.00% | $60,000.00 |
| 18 | 100.00% | $60,000.00 |
| 19 | 100.00% | $60,000.00 |

| 20 | 100.00% | $60,000.00 |
| 21 | 100.00% | $60,000.00 |
| 22 | 100.00% | $60,000.00 |
| 23 | 100.00% | $60,000.00 |
| 24 | 100.00% | $60,000.00 |
| | Total: | $1,050,000.00 |

Simply stated, whether by Mr. Luther's expert testimony, or through the thin and self-serving opinions proffered by Mulinda, the evidence before this Court is that The Ruins Development would not produce sufficient cash flow to fund the payments necessary under the Second Amended Plan.

RRSB further anticipates that The Ruins may argue The Ruins Development's inability to cash flow should be ignored because The Ruins would be able to obtain alternative "takeout" financing once The Ruins Development is completed and stabilized. Such argument would also fail. Again, under the expert opinions offered by Mr. Luther, this scenario would not be possible because The Ruins Development would not stabilize until twenty-four months after completion of The Ruins Development. *See, e.g.*, ECF No. 59, at 13. Because the Second Amended Plan only contemplates obtaining take-out financing once stabilized, *see* ECF No. 181, at § 4.4, it will be impossible to obtain takeout financing before payments to would be due to "exit financiers."

And even if this Court were to credit Mulinda's opinions over Mr. Luther's—which it should not—and believe that The Ruins Development could stabilize as little as six (6) months after completion, takeout financing still would not be available. This Court received testimony from Danielle Harless ("Ms. Harless"). *See generally* Tr. from Nov. 25, 2025, Hr'g, at 9-189. In her testimony, Ms. Harless explained the requirements of financial institutions when offering financing of commercial developments of the size and nature of The Ruins

11

Development.  Ms. Harless explained that, for a loan for a project like The Ruins Development, twenty-five percent (25%) down would be customary for the loan-to-value ratio.  *See id.* at 43:5-7.

The Ruins claims the Second Amended Plan will pay all claims in full, *see* ECF No. 181, at § 3.2, utilizing takeout financing following the stabilization of The Ruins Development. *Id.* at § 4.4.  As identified in the Second Amended Plan, the claims against The Ruins total at least $14,263,622.54.  *See id.* at § 3.2.  Accordingly, to achieve the required loan-to-value ratio, The Ruins Development would need to appraise at $19,018,163.39.  There is no evidence that The Ruins Development could possibly be worth $19,018,163.39.  Indeed, even Debtor's non-expert valuation of The Ruins Development at the as-stabilized value of $15,750,000.00 would be insufficient, let alone the more realistic value of $7,040,000.00 offered by Mr. Luther's expert training and experience.  *See* ECF No. 59, at 5.

Simply summarized, Debtor's rehabilitation still is not reasonably likely because The Ruins Development would be unable to cash flow as needed to make required payments. Absent cash flow sufficient to make required payments, there is no evidence before the Court of realistic alternative financing.  It is not reasonably likely that The Ruins can successfully rehabilitate itself.

B.    Debtor's admitted failure to provide accurate schedules is cause.

Continuing losses notwithstanding, Debtor's failure to provide accurate schedules—or timely update the schedules previously provided—warrants conversion under Section 1112. *Cf.* 11 U.S.C. § 1112(b)(4)(F) ("cause" includes "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter").  A debtor's—

12

failure to provide accurate schedules and statements falls under § 1112(b)(4)(F) as an unexcused failure to satisfy timely any filing or reporting requirement. Simply filing the correct form on time is not compliance with § 1112(b)(4)(F), at least where the timely filed documents contain grossly erroneous, material information. Filing a piece of paper is meaningless if the content is inaccurate, misleading, or wrong, thus the content of these documents is . . . relevant under § 1112(b)(4)(F).

*In re Korn*, 523 B.R. 453, 467 n.32 (Bankr. E.D. Pa. 2014) (citations, brackets, and internal quotations omitted); *see also In re Visicon S'holders Tr.*, 478 B.R. 292, 311, 315 (Bankr. S.D. Ohio 2012) (explaining that "full, complete and candid disclosure of all financial information concerning the Chapter 11 debtor in possession is compulsory" and dismissing the debtor's bankruptcy case for "cause" under 11 U.S.C. § 1112(b)(4)(F), where "the monthly operating reports were proven both inaccurate and incomplete" and the debtor had no good excuse for the deficiencies in the reports and there were no unusual circumstances in the case). Debtor's schedules fail to provide a full, complete, and candid disclosure of all financial information.

First, Debtor's schedules fail to schedule potential claims against insiders. *See* ECF No. 1, at 17 (scheduling alleged claims against RRSB, but no other tort claims). This is despite testimony from Jesse Craig ("Jesse") admitting that loan proceeds from RRSB provided to fund The Ruins Development were spent on other projects. *See also* Sec. I(C)(3), *infra* (outlining fraudulent conduct). Not only that, Jesse admitted that he—as Debtor's sole member—was not inclined to investigate or pursue any such claims. *See* Tr. from Nov. 4, 2025, Hr'g, at 36:6-8.

But potential insider claims were not the only asset that The Ruins failed to schedule. Jesse admitted that The Ruins received $181,000.00 to purchase appliances for The Ruins Development. *See* Tr. from Nov. 4, 2025, Hr'g, 38:15-22. Jesse further admitted that The Ruins only purchased approximately $81,000.00 worth of appliances, *id.* at 38:23-39:2,

claiming that the remaining $100,000.00 remained "earmarked" to finish The Ruins Development. *Id.* at 39:3-8. Despite claiming awareness of these "earmarked" funds as of the petition date, *see id.* at 39:9-20, the funds are not present on Debtor's schedules, *see* ECF No. 1, at 15-18 (failing to identify the alleged "earmarked" funds), and The Ruins has not amended its schedules since being specifically reminded of these funds more than two months ago. Debtor's failure to produce accurate schedules, or to timely amend and correct the same, is cause.

C.     Debtor's bad faith is cause.

Lastly, Debtor's bad faith also warrants conversion under Section 1112. "There is no single test for determining whether a Chapter 11 filing was made in bad faith." *Wigley*, 557 B.R. at 675 (citation omitted). Instead, when determining "whether a case has been filed in bad faith, 'courts consider the totality of the circumstances, including the court's evaluation of the debtor's financial condition, motives, and the local financial realities.'" *Id.* (citations omitted). Factors that this Court has previously identified as helpful to consider include:

1. The debtor has few or no unsecured creditors;

2. There has been a previous bankruptcy petition by the debtor or a related entity;

3. The pre-petition conduct of the debtor has been improper;

4. The petition effectively allows the debtor to evade court orders;

5. There are few debts to non-moving creditors;

6. The petition was filed on the eve of foreclosure;

7. The foreclosed property is the sole or major asset of the debtor;

8. The debtor has no ongoing business or employees;

9. There is no possibility of reorganization;

14

10. The debtor's income is not sufficient to operate;

11. There was no pressure from non-moving creditors;

12. Reorganization essentially involves the resolution of a two party dispute;

13. A corporate debtor was formed and received title to its major assets immediately before the petition;

14. The debtor filed solely to create the automatic stay.

*In re KRE, LLC*, No. 11-30227, 2011 WL 3296690, at *4 (Bankr. D.N.D. Aug. 1, 2011) (citation omitted).  Based on the totality of the circumstances, The Ruins commenced this case in bad faith.

       1.     *Debtor's unsecured creditors.*

The Ruins has identified six (6) unsecured creditors, with claims totaling $658,556.26. *See* ECF No. 35, at 13-14.

       2.     *Debtor's bankruptcy history.*

RRSB is unaware of The Ruins commencing a prior bankruptcy case.  However, bankruptcy proceedings were contemporaneously commenced by the related entities Generations on 1st, LLC, and Parkside Place, LLC.

       3.     *Debtor's improper pre-petition conduct.*

The Debtor's pre-petition conduct of altering many of the subcontractor invoices that were submitted in The Ruins Draw Requests demonstrates a deliberate pattern of fraudulent conduct. As detailed in the Summary of Draw Request Invoices vs. Original Invoices for The Ruins, *see* ECF No. 137, Ex. A, there are forty-one (41) separate instances of subcontractor invoices submitted on Draw Requests that were deliberately altered by Jesse Craig to inflate the amount of the invoice, to conceal the actual project the invoice was related to, and/or were submitted for Non-Ruins projects. Jesse Craig admitted that he "modified…probably 12 to 14"

15

but he attempted to explain that away by blaming RRSB for taking too long to fund certain Draw Requests so he would double-up certain amounts. *See* Tr. from Nov. 4, 2025, Hr'g, at 14:22-23. This self-serving explanation is simply not credible, especially considering that none of the subcontractors whose invoices were altered provided copies of the altered invoices in response to RRSB's subpoenas.

Some of the most egregious examples of the altered invoices submitted in support of The Ruins Draw Requests include:

- Draw #1 – Clausen Construction Invoice 589 for "Palace Apartments demo, excavation, and grading" for $716,200 submitted in Draw #1. The unaltered Invoice 589 is for "Palace Apartments demo" in the sum of $156,964.87. *See* ECF No. 137, Ex. 1-A.

- Draw #4 – Limoges Construction Invoice 102835 for Project "2101-Ruins" for $250,000 submitted in Draw #4. The unaltered invoice is for Project "2101-Generations" for $45,000. *See* ECF No. 137, Ex. 4-A.

- Draw #5 – D & M Industries Invoice 233453 for materials with a "Ship To: 6729 RUINS, Watertown SD 57201" notation and a Job Address of 26 1st Ave Southwest, Watertown, SD 57201 in the sum of $91,315.64. The unaltered invoice identifies the "Ship To: address as "Generations on 1st, 26 1st Ave Southwest, Watertown, SD 57201 in the sum of $91,315.64. *See* ECF No. 137, Ex. 5-C.

- Draw #8 – D & M Industries Invoice 238434 for materials with a "Ship To: 6729 RUINS, LLC Watertown SD 57201" notation and a Job Address of 26 1st Ave Southwest, Watertown, SD 57201 in the sum of $305,000. The unaltered invoice identifies the "Ship To: address as "Generations on 1st, 26 1st Ave Southwest, Watertown, SD 57201 in the sum of $58,192.64. *See* ECF No. 137, Ex. 8-A.

- Draw #8 – D & M Industries Invoice 237937 for materials with a "Ship To: 5657" notation without any mailing address and a Job Address of 22587 Knollwood Lane Pelican Rapids, MN 56572 in the sum of $17,910.93. The unaltered invoice identifies the "Ship To: address as "CRAIG LAKE HOME KNOLLWOOD LANE PELICAN RAPIDS MN 56572" in the sum of $17,910.93. *See* ECF No. 137, Ex. 8-C.

- Draw #8 – Watertown Cashway Lumber Payment Application #11 that identifies "To: Ruins, LLC" in the contract amount of $1,116,659.24 that requests a payment due of $428,122.32. The unaltered Payment Application #1 for the Ruins was for a Contract Amount of $1,103,231.18 and requested a payment due of $624.90. There were no further payment applications for Watertown Cashway Lumber with respect to The Ruins. Additionally, the unaltered Payment Applications ##'s 9 and 10 for Generations had a Contract Amount of $1,116,659.24. *See* ECF No. 137, Ex. 8-F.

- Draw #9 – Limoges Construction Invoice 9801 dated 4/30/2021 for Project "2054-Ruins Apartments" requesting the sum of $297,783.60 and also a Payment Application #2 for Project "The Ruins" requesting a payment amount of $147,783.60. An unaltered Invoice 102865 dated 2/25/2022 for the sum of $147,783.60 was obtained via subpoena to Limoges Construction. Given the Proposal executed by Limoges Construction for The Ruins Development was executed in November 2021, it is evident Invoice 9801 dated 4/30/2021 was unrelated to The Ruins Development. *See* ECF No. 137, Ex. 9-A.

- Draw #10 – Limoges Construction 102864 for Project "2101-Ruins" requesting payment in the sum of $205,346.30. The unaltered Invoice 102864 identifies the Project as "2101-Generations on 1st" and requests payment in the sum of $900.00. *See* ECF No. 137, Ex. 10-C.

- Draw #10 – Hebron Brick Supply Co. Invoice S-INV00046075 that does not include a Customer PO# requesting the sum of $39,197.08. The unaltered invoice includes a Customer PO # of "LAKE HOME" in the sum of $39,197.08. *See* ECF No. 137, Ex 10-D.

- Draw #11 – TL Stroh Architects Invoice dated 6/15/2022 for a fixed fee of $511,000 and requesting payment of $95,000. There was no corresponding invoice or documentation provided by TL Stroh Architects and the Account Statement for The Ruins Development was for $431,000. *See* ECF No. 137, Ex. 11-A; ECF No. 91, Ex A.

- Draw #11 – Watertight, Inc. Invoice 2956 requesting payment of $275,023.50. The same Invoice 2956 was also submitted in Draw #10 but requesting the sum of $67,521.15. *See* ECF No. 136, Ex 11-B.

- Draw #11 - D & M Industries Invoices 243729 (requesting payment of $17,155.84) and 242252 (requesting payment of $48,026.70) did not have any "Ship To:" address identified. The unaltered invoices identified a "Ship To: CRAIG LAKE HOME". *See* ECF No. 136, Exs 11-C and 11-D.

Both Mr. Aarestad and Ms. Harless testified that RRSB did not authorize the loan disbursements made on The Ruins Draw Requests to be used for any purpose other than for The Ruins Development. *See* Tr. from Nov. 4, 2025, Hr'g, at 74:16-25 & 75:1-4; Tr. from Nov. 25, 2025, Hr'g, at 59:25 & 60:1-4. Further, the Construction Loan Agreement dated 3/9/2022, that was executed by Jesse Craig on behalf of The Ruins specifically stated:

> **CONDITIONS PRECEDENT TO EACH ADVANCE.** Signed and Submitted Draw requests that match uses designated in the contractor sworn construction statement. No deviation or diversion of loan proceeds will be authorized.
> **DISBURSEMENT OF LOAN FUNDS.** The following provisions relate to the disbursement of funds from the Loan Fund.
> **Application for Advances.** Borrower shall apply for Advances from the Loan Fund according to the following disbursement schedule: Monthly Advances not later then the 15th of Each Month.
> Each application shall be stated on a standard AIA payment request form or other form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require. Borrower shall apply only for disbursement with respect to work actually done by the General Contractor and for materials and equipment actually incorporated into the Project. Each application for an Advance shall be deemed a certification of Borrower that as of the date of such application, all representations and warranties contained in the Agreement are true and correct, and that Borrower is in compliance with all of the provisions of this Agreement.

*See* Ex. RR4, at 3. Additionally, numerous Construction Loan Draw Request forms executed by Jesse Craig on behalf of The Ruins also included the following certification:

> **Certification: The undersigned hereby certifies (1) all labor and materials listed above have been used solely for this project; (2) all project bills have been or will be paid on a timely basis; (3) there are no mechanic's or construction liens against the project; and (4) Red River State Bank is authorized to disburse loan proceeds for the payment of the invoices described above.**

*See* ECF No. 102, at 31 (for Draw Request #s 4, 5, 6), 112 (for Draw Request #7), 123 (for Draw Request #8), & 166 (for Draw Request #9). Finally, the Contractor Summary Statement for The Ruins which was executed by Jesse Craig on behalf of Craig Development, LLC included a certification under oath that the names of subcontractors and the amounts identified therein were for "work done, materials supplied or services furnished in connection with construction, financing materials, equipping and/or developing the Project [*i.e.*, The Ruins]". A true and correct copy of this certification is included below:



*See* ECF No. 114, Ex 25.

Jesse Craig testified that certain invoices submitted in The Ruins Draw Requests clearly indicated they were for other projects such as Generations and that Mr. Aarestad was aware of it. *See* Tr. from Nov. 4, 2025, Hr'g, at 91:3-23. However, the uncontroverted evidence of the alterations that were made to the invoices such as redacting or "whiting out" the Ship To addresses on the D & M Industries and Hebron Brick invoices for example clearly show The Ruins and Jesse Craig were aware that The Ruins Draw Requests were to be used for The Ruins Development only. Frankly, there can be no other explanation for these blatant alterations.

The altered invoices submitted in the Draw Requests provided the mechanism by which The Ruins obtained loan proceeds from RRSB far in excess of what was initially contemplated. As explained by Mr. Aarestad, the total cost of construction of The Ruins Development was estimated to be $10,691,893 and that amount came from a "contractor disbursement sheet provided by Jesse Craig" to RRSB. *See* Tr. from Nov. 4, 2025, Hr'g, at 72:20-25. This total amount to construct The Ruins was specifically identified in the Construction Loan Agreement as follows:

19

**Project Costs.** The total cost for the Project shall not exceed $10,691,893.35. The Project costs are true and accurate estimates of the costs necessary to complete the Improvements in a good and workmanlike manner according to the Plans and Specifications presented by Borrower to Lender, and Borrower shall take all steps necessary to prevent the actual cost of the Improvements from exceeding the Project costs.

*See* Ex. RR4, at 3. A Contractor Disbursement Summary for The Ruins was accepted into evidence by the Court and it illustrates the problem caused by the altered invoices submitted by Jesse Craig on The Ruins Draws. For example, the Contractor Disbursement Summary shows the architect TL Stroh was paid the sum of $509,775.00 as follows:

| Total Bid Packages | | | 13,986,787.06 | $ | - | $ | 13,986,787.06 |
| Commercial Space | | $ | - | $ | - | $ | - |
| Architect/Engineer (4%) | Stroh Arc | $ | 509,775.00 | $ | 509,775.00 | $ | - |
| General Contractor | Craig Dev | $ | 1,398,678.71 | $ | 1,380,000.00 | $ | 18,678.71 |
| Site Supervision | Prevail | $ | 75,000.00 | $ | 65,000.00 | $ | 10,000.00 |
| TOTAL CONSTRUCTION COST | | $ | 15,970,240.77 | $ | 15,185,590.12 | $ | 784,650.65 |
| SWORN CONSTRUCTION STATEMENT - CONTRACTOR | | | | | | | |

*See* ECF No. 114, Ex. 25.

However, it is uncontroverted that the fixed-fee amount owing for TL Stroh's architectural services for The Ruins Development was $431,000. *See* ECF No. 91, Ex A. As explained by Mr. Aarestad, TL Stroh's documents provided pursuant to subpoena indicated it was paid $409,450 and $5,325 for a total amount paid of $414,775. *See* Tr. from Nov. 4, 2025, Hr'g, at 99:12-25 & 100:1-7; ECF No. 91, Ex A. Pursuant to the altered invoice in Draw #11 for TL Stroh, The Ruins and Jesse Craig requested (and received) an additional $95,000 ostensibly to be paid to TL Stroh (which was never actually paid over to TL Stroh according to the subpoenaed records). *See* ECF No. 137, Ex. 11-A; ECF No. 91, Ex A. The amount identified on the Contractor Disbursement Summary as paid to TL Stroh of $509,775 matches the $414,775 amount that was actually paid to TL Stroh *and* the $95,000 that was <u>not</u> paid to TL Stroh.

One other egregious example of how the information on the Contractor Disbursement Summary was inflated is demonstrated by the amount allegedly paid for appliances to Dugen's

Appliances which was discussed at length by Mr. Aarestad and also by Mr. Craig. The
Contractor Disbursement Summary indicates as follows for Dugen's:

| Toilets/Accessories | By Owner | $ | 17,038.64 | $ | 17,038.64 | $ | (0.00) |
| Appliances & AC Units | Dugens | $ | 411,505.00 | $ | 265,931.91 | $ | 145,573.09 |
| Kitchen Sinks/Faucets | By Owner | $ | 14,764.91 | $ | 14,764.91 | $ | (0.00) |

*See* ECF No. 114, Ex 25. However, Jesse Craig testified that although RRSB funded Draw
Requests for appliances in the sum of $180,000, The Ruins only purchased $81,000 worth of
appliances. *See* Tr. From Nov. 4, 2025 Hr'g, at 38:12-25 & 39:1-2. The remaining $100,000
was supposedly "earmarked" by Jesse Craig to finish the project. *See* Tr. From Nov. 4, 2025,
Hr'g, at 39:3-8. Yet, the Contractor Disbursement Summary clearly indicates that appliances
were estimated to cost $411,505 and $265,931.91 has been paid. This information (which was
certified as true and correct by Jesse Craig), is clearly false.

As explained by Mr. Aarestad, the Contractor Disbursement Summary (which includes
incorrect amounts for TL Stroh and Dugen's as just a couple of examples) was relied upon by
RRSB as to what costs were actually put into The Ruins Development and also by CBRE in
creating its appraisal for the cost approach to valuation. *See* Tr. from Nov. 4, 2025, Hr'g, at
107:20-25 & 108:1-5. By inflating the costs for construction through the altered invoices, etc.,
The Ruins and its representatives Jesse Craig and Craig Development, LLC were able to obtain
additional loan proceeds from RRSB to finish construction.

Ms. Harless testified that RRSB had only proposed to loan $7.2 million to The Ruins.
*See* Tr. from Nov. 25, 2025, Hr'g, at 59:25 & 60:1-4. However, RRSB actually loaned an
*additional* $2.75 million to The Ruins pursuant to the Second Ruins Note dated August 1,
2022. *See* ECF No. 85, Ex. 8. In making the second loan for $2.75 million, RRSB relied on
the personal financial statement of Jesse Craig that included falsified information on bank

statements from First Community Credit Union ("FCCU") and Town and Country Credit Union ("TCCU"). *See* Tr. from Nov. 4, 2025, Hr'g, at 140:6-25-142:6; *see also* ECF No. 137, Ex. B-1 (email from Jesse Craig to Charles Aarestad dated July 27, 2022 including falsified bank statements), Ex B-2 (original FCCU bank statement) and Ex B-3 (original TCCU bank statement). Jesse Craig's personal financial statement (including the falsified bank statements) was relied upon by RRSB in its decision to make the second loan to The Ruins of $2.75 million.

Jesse Craig provided at least one other financial statement to RRSB on August 15, 2023, which was relied upon by RRSB in its decision to not move forward with foreclosure at that point in time because a falsified bank statement was provided to allegedly demonstrate the $600,000 in proceeds from the Third Ruins Note was still available to be utilized to finish construction. *See* Tr. from Nov 3, 2025, Hr'g, at 65:17:25 & 66:1-9; *see also* ECF 137, Ex. C-1 (email from Jesse Craig to Charles Aarestad dated August 15, 2023 including falsified bank statements), Ex. C-2 (original FCCU bank statement), and Ex C-3 (original TCCU bank statement). Finally, after reviewing over 26,000 pages of bank documents provided by FCCU, Ms. Harless provided a summary chart of potentially fraudulent transfers to insiders from The Ruins loan disbursements totaling $4,365,805.33. *See* ECF No. 177, Ex A. Ms. Harless testified the summary chart was created with the intent "to show that this occurred and it's something to look into because I feel it's concerning and it shouldn't have happened and I feel that there's value there." Jesse Craig testified that he is in a "conundrum" as it relates to Chapter 5 claims because "I would in essence be suing myself or going after myself." See Tr. from Nov. 4, 2025, Hr'g at 36:1-8. Mr. Craig admitted that he was not inclined to sue himself. *Id.*

4.    *Evasion of court orders.*

The South Dakota state court entered orders appointing a receiver to manage the related entities of Generations on 1st, LLC, and Parkside Place, LLC.  *See* Ex. RR11.  Prepetition, RRSB sought entry of a similar order against The Ruins on an expedited basis.  *See* Ex. RR9. The Ruins did not respond to that motion, instead commencing this bankruptcy case, and allowing The Ruins to avoid the appointment of a receiver.

5.    *Debts owed to non-moving creditors.*

As outlined above, The Ruins has six (6) unsecured creditors, with claims totaling $658,556.26.  *See* ECF No. 35, at 13-14.  The Ruins also owes priority unsecured claims to three (3) unsecured creditors, totaling $32,563.94, *id.* at 12-13, for total unsecured claims in an amount of $691,120.20.  *Id.* at 14.  Lastly, The Ruins owes secured claims to ten (10) creditors, with the secured claims totaling $14,962,254.25.  *Compare id.* at 7-11 (outlining secured claims), *with* ECF No. 103 (stipulating to RRSB's secured claim in an amount of $11,658,331.25).    The secured claims by the moving parties—RRSB and WDC—total $13,933,331.25.  *Compare id.* at 10 (outlining WDC's $2,2750,000.00 secured claim), *with* ECF No. 103 (stipulating to RRSB's secured claim in an amount of $11,658,331.25).  In other words, the claims of the moving creditors are, by value, more than eighty-nine percent (89%) of the total claims against The Ruins.

6.    *Timing of the filing of Debtor's petition.*

The Ruins filed its bankruptcy petition on January 6, 2025.  At that time, The Ruins was subject to a pending motion for partial summary judgment in South Dakota state court— a motion that had been pending since June 25, 2024, *see* Ex. RR8, a ruling on which had only been avoided due to repeated requests for additional time to conduct discovery by The Ruins.

*See* Ex. RR10.  Additionally, Debtor's bankruptcy petition followed RRSB's attempt to seek the appointment of a receiver to manage The Ruins.  *See* Sec. I(C)(4), *supra*.

   7. *Debtor's assets.*

The Ruins values The Ruins Development at $15,750,000.00.  ECF No. 35, at 6.  The only other asset claimed by The Ruins in its schedules is a $12,860.00 utility deposit.  *Id.*  In other words, The Ruins Development—as valued by The Ruins—accounts for more than ninety-nine-point-nine percent (99.9%) of the assets of The Ruins.

   8. *Debtor's ongoing business—or lack thereof.*

The Ruins has no ongoing business operations or employees.  Tr. from Nov. 4, 2025, Hr'g, at 32:2-6.

   9. *The possibility of reorganization.*

The evidence before the Court is that it is not reasonably possible that The Ruins can reorganize because The Ruins is unable to complete The Ruins Development, and even if it could, The Ruins Development would not generate sufficient cash flow to operate as proposed in Debtor's Second Amended Plan.  *See* Sec. I(A)(2), *supra*.

   10. *Debtor's income to operate.*

The Ruins lacks sufficient—or any—income to operate.  Tr. from Nov. 4, 2025, Hr'g, at 67:14-16.  And even if Debtor's Second Amended Plan could be approved—which it cannot, The Ruins would still not generate sufficient income to make required plan payments.  *See* Sec. I(A)(2), *supra*.

11.   *Pressure from non-moving debtors.*

The Ruins was receiving pre-petition pressure from non-moving parties.  Specifically, in addition to the claims of RRSB, The Ruins faced state-court claims related to The Ruins Development from Finish Carpentry, LLC.  *See* Ex. RR10.

12.   *Resolution of a two-party dispute.*

This case primarily concerns the appropriate resolution for The Ruins Development. By virtue of its undisputed first-position secured status, the potential foreclosure of The Ruins Development is primarily a two-party dispute between RRSB and The Ruins.  Nevertheless, RRSB acknowledges that other parties have claimed an interest secured by The Ruins Development.

13.   *Formation of Debtor.*

This Court did not receive information at the evidentiary hearing regarding the date of formation of The Ruins or when it received title to The Ruins Development.

14.   *Creation of the automatic stay.*

Respectfully, Debtor's commencement of this case following RRSB's motion for summary judgment and motion to appoint a receiver evidence an intent to file simply to stall RRSB's enforcement of its mortgage.

The Ruins filed its bankruptcy petition on January 6, 2025.  At that time, The Ruins was subject to a pending motion for summary judgment in South Dakota state court—a motion that had been pending since June 25, 2024, *see* Ex. RR8, a ruling on which had only been avoided due to repeated requests for additional time to respond by The Ruins.  *See* Ex. RR10. Additionally, Debtor's bankruptcy petition followed RRSB's attempt to seek the appointment of a receiver to manage The Ruins.  *See* Sec. I(C)(4), *supra*

15.    *Conclusion.*

The Ruins Development—Debtor's sole asset, *see* Sec. I(C)(7), *supra*, is incomplete and faces ongoing depreciation due to water penetration issues and a softening commercial real estate market in Watertown South Dakota.  *See* Sec. I(A)(i)(b), *supra*.  The Ruins lacks current funds to complete The Ruins Development, or to pay any ongoing financial obligations.  *See* Sec. I(A)(i)(10), *supra*.  The Ruins lacks funds to complete The Ruins Development because The Ruins lacks any ongoing business operations or employees.  *See* Sec. I(A)(i)(8), *supra*.

Rather than complete The Ruins Development, or surrender the same to RRSB, The Ruins commenced the present bankruptcy case when facing imminent risk of foreclosure on The Ruins Development, *see* Sec. I(A)(i)(6), *supra*, as well as loss of control of The Ruins Development through a likely receivership order.  *See* Sec. I(A)(i)(4), *supra*.  The Ruins Development remains incomplete because Debtor's insiders siphoned funds loaned by RRSB for the completion of The Ruins Development.  *See* Sec. I(A)(i)(3), *supra*.  Despite this admitted siphoning of funds, Debtor's proposed plan of reorganization does not contemplate attempting to recover these siphoned funds.  Instead, The Ruins requests that this Court authorize the creation of an injunction that would prevent others from recovery—for The Ruins or otherwise—for the wrongdoing of Debtor's insiders.  *See* ECF No. 181, at § 4.8.

Upon the totality of the circumstances, the foregoing facts establish that The Ruins commenced this bankruptcy case in bad faith.

II.    **Conversion is the appropriate remedy under Section 1112 as it is in the best interest of all parties.**

Before the 2005 amendments to the Bankruptcy Code ("BAPCPA"), bankruptcy courts had broad discretion under Section 1112(b) to convert a case from Chapter 11 to Chapter 7. *In re Miell*, 419 B.R. 357, 366 (Bankr. N.D. Iowa 2009) (citation omitted). But, "[f]ollowing BAPCPA's 2005 amendments to the Bankruptcy Code, section 1112(b)(1) is 'no longer permissive, but instead mandates conversion or dismissal if the movant establishes exclusive cause, and no unusual circumstances establish that conversion or dismissal is not in the best interest of creditors.'" *Id.* at 366 (citations omitted). "Thus, absent a showing of 'unusual circumstances,' if the moving party establishes that cause exists, it is the Court's obligation to dismiss or convert a Chapter 11 case." *Id.* (citation omitted).

Having established "cause" under Section 1112, the question for this Court becomes the remedy to impose. As outlined below, the appropriate remedy is conversion to Chapter 7.

A.    The "unusual circumstances" exception does not apply to this case.

Under Section 1112(b)(2), even when a movant establishes "cause," a court is not required to convert or dismiss a case "if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate[.]" 11 U.S.C. § 1112(b)(2). As outlined below, this "unusual circumstances" exception does not apply to the case at bar.

1.    *Debtor's continuing losses preclude the application of the "unusual circumstances" exception.*

As outlined above, RRSB has established "cause" for Section 1112 relief in this case in the form of a continuing loss to the estate. *See* Sec. I(A). Under the plain language of Section 1112(b)(2), the "unusual circumstances" exception does not apply when cause is

established "under paragraph (4)(A)[.]"   Paragraph (4)(A) to Section 1112(b)(2) defines "cause" as "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation[.]"   11 U.S.C. § 1112(b)(4)(A).   Accordingly, to the extent that this Court were to find "cause" based on a continuing loss to the estate, then the "unusual circumstances" exception cannot apply to this case.  *See, i.e., In re Plymouth Oil Co., L.L.C.*, No. 12-01403, 2014 WL 3812078, at *5 (Bankr. N.D. Iowa Aug. 1, 2014) ("Moreover, the Court found cause exists to convert under § 1112(b)(4)(A).  Therefore, Debtor cannot as a matter of law satisfy § 1112(b)(2)(B) because that exception does not apply.").

> 2.   *The Ruins failed to carry its burden to establish "unusual circumstances."*

And even if, *arguendo*, Debtor's continuing losses were not "cause" for conversion, the avoidance of relief due to "unusual circumstances" would still be unwarranted in this case.  If cause has been established, the burden shifts to the debtor to prove the case falls within the "unusual circumstances" exception to Section 1112(b)(1) conversion.  *In re Miell*, 491 B.R. at 367 (citation omitted).  The Code does not define "unusual circumstances." *Id.*  "Nevertheless, 'the import of section 1112(b) is that, if cause exists, the case should be converted or dismissed unless unusual facts or circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding.'" *Id.* (citations omitted).  In this case, The Ruins has not identified any "unusual circumstances" which would warrant relief other than conversion.   Because The Ruins bears the burden to establish "unusual circumstances[,]" *id.*, its failure to carry that burden renders the exception inapplicable.

3.    *Debtor's inability to confirm a plan within a reasonable time renders the "unusual circumstances" exception inapplicable.*

And even if Debtor had—or will in the future—identify the "unusual circumstances" present in this case, Section 1112(b)(2) still does not permit a court to refuse to dismiss or convert unless the debtor—or other party in interest—establishes that "there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time.[.]"  11 U.S.C. § 1112(b)(2)(A).  As discussed above, *see* Sec. I(C)(9), and incorporated herein by reference, Debtor's Second Amended Plan cannot be confirmed.  Because The Ruins cannot confirm the Second Amended Plan within a reasonable time, The Ruins cannot avail itself of the "unusual circumstances" exception." *See, i.e.*, *In re Global Processing, Inc.*, 655 B.R. 486, 495 (Bankr. N.D. Iowa 2023) (likely inability of debtor to cram down proposed plan over creditor resistance precluded application of unusual circumstance exception)..

4.    *Debtor's lack of reasonable justification for engaging in conduct constituting "cause" precludes the application of the "unusual circumstances" exception.*

Another issue prevents the application of the "unusual circumstances" exception. Section 1112(b)(2) does not permit a court to refuse to dismiss or convert unless the debtor establishes "reasonable justification for the act or omission[]" constituting cause. 11 U.S.C. § 1112(b)(2)(B)(i).  Here, that would require The Ruins to establish a reasonable justification for its failure to timely produce accurate schedules, and for engaging in bad faith conduct.  The Ruins offered no evidence justifying ignoring Chapter 5 claims, omitted "earmarked" funds from its schedules, or for engaging in fraudulent conduct.  Debtor's inability to justify its actions preclude the application of the "unusual circumstances" exception.

     5.     *Debtor's inability to cure its bad faith conduct precludes the application of the "unusual circumstances" exception.*

Finally, Section 1112(b)(2) also does not permit a court to refuse to dismiss or convert unless the debtor cures the cause "within a reasonable period of time fixed by the court."  11 U.S.C. § 1112(b)(2)(B)(ii).  In application to this case, that would require The Ruins to cure its bad faith conduct.[3]  The Ruins offered no evidence for how it would cure its bad faith conduct.  To the contrary, Debtor's Second Amended Plain would insulate insiders from their malfeasance.  *See* ECF No. 181, at 4.8.  Debtor's inability to cure its bad faith conduct precludes the application of the "unusual circumstances" exception.

     B.     <u>Conversion, rather than dismissal, is in the best interest of creditors and the estate.</u>

Having established that the "unusual circumstances" exception is inapplicable to this case, the question becomes whether conversion or dismissal is in the best interest of creditors and the estate.  "Under the Bankruptcy Code, the only criteria when considering between dismissal or conversion of a chapter 11 case—upon a finding of cause—is whether conversion or dismissal in the 'best interest of creditors and the estate.'"  *In re McQuillen Place Co., LLC*, 609 B.R. 823, 831 (Bankr. N.D. Iowa 2019) (citations omitted).  As such, "'[t]he plain meaning of § 1112(b) allows the bankruptcy court to convert a debtor's voluntary Chapter 11 case when it is in the best interest of creditors and the estate, even if the debtor opposes conversion and favors dismissal.'"  *Id.* at 831-32 (citation omitted).

---

[3]    To the extent this Court were to base its "cause" finding solely on a finding that The Ruins failed to produce accurate schedules, RRSB does not deny that—theoretically—The Ruins could timely produce amended schedules.

While the Bankruptcy Code does not define "best interests" for purposes of Section 1112(b), courts often consider multiple factors, including:

> (1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal, (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted, (3) whether the debtor would simply file a further case upon dismissal, (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors, (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise, (6) whether any remaining issues would be better resolved outside the bankruptcy forum, (7) whether the estate consists of a "single asset," (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests, (9) whether a plan has been confirmed and whether any property remains in the estate to be administered, . . . (10) whether the appointment of a trustee is desirable to supervise the estate and address possible environment and safety concerns[,] . . . (11) [t]he prospect of payment of any unpaid secured claims, chapter 11 administrative claims, priority claims and nonpriority unsecured claims in a converted chapter 7 case or after dismissal[,] (12) [w]hether conversion to chapter 7 would result in bankruptcy powers and procedures being used to benefit secured creditors without providing a material benefit to other creditors[,] and (13) [a]ny other prejudice to parties in interest resulting from conversion or dismissal.

*Id.* at 832.  Based on the totality of these factors, conversion, rather than dismissal, is in the best interest of the parties.

1.     *Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal.*

The Ruins has failed to make post-petition payments to any creditors.

2.     *Whether there would be a loss of rights granted in the case if it were dismissed rather than converted.*

Dismissal, rather than conversion, would cause The Ruins to lose the right to pursue alleged fraudulent transfer claims against insiders, with such claims being preserved for the Chapter 7 trustee in a conversion.  *See generally* 11 U.S.C. ch. 5.

3.    *Whether the debtor would simply file a further case upon dismissal.*

There is no evidence in the record regarding Debtor's intent if this case were to be dismissed.

4.    *The ability of the trustee in a Chapter 7 case to reach assets for the benefit of creditors.*

A Chapter 7 trustee would benefit creditors by being empowered to pursue Chapter 5 claims against insiders.  *Compare* 11 U.S.C. ch. 5, *with* Sec. I(C)(3) (outlining the fraudulent conduct of debtor and debtor's insiders).  However, it is certainly possible The Ruins would file another bankruptcy case to prevent RRSB from completing its foreclosure action and enforcing its personal guaranty against Debtor's principal.

5.    *Whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise.*

Hypothetically, completion and stabilization of The Ruins Development would maximize its value.  *Compare* ECF No. 59, at 5 ($4,520,000.00 as-is value for The Ruins Development, *with id.* ($7,070,000.00 as-stabilized value for The Ruins Development), *and* ECF No. 60-1, at 406 ($1,695,967.00 to complete The Ruins Development).  However, there exists no realistically feasible plan to complete The Ruins Development.  *See* Sec. I(A)(2) (outlining that Debtor's inability to successfully rehabilitate).  Accordingly, liquidation in Chapter 7 would likely maximize the estate's value.

6.    *Whether any remaining issues would be better resolved outside the bankruptcy forum.*

RRSB is unaware of any issues that would be better resolved outside of bankruptcy.

7.    *Whether the estate consists of a "single asset."*

Debtor's estate is effectively a "single asset."  The Ruins values The Ruins Development at $15,750,000.00.  ECF No. 35, at 6.  The only other asset claimed by The Ruins

in its schedules is a $12,860.00 utility deposit.  *Id.*  In other words, The Ruins Development—

as valued by The Ruins—accounts for more than ninety-nine-point-nine percent (99.9%) of

the assets of The Ruins.

> 8.   *Whether the debtor had engaged in misconduct and whether creditors are in need of a Chapter 7 case to protect their interests.*

The Ruins, and its insiders, have engaged in serious misconduct, and a Chapter 7 case

is necessary to timely and effectively pursue Chapter 5 claims against insiders.  *Cf.* Sec.

I(C)(3), *supra* (outlining fraudulent conduct issues).

> 9.   *Whether a plan has been confirmed and whether any property remains in the estate to be administered.*

No plan has been confirmed.  The Ruins Development, as well as Chapter 5 claims,

remain to be administered in the event of conversion to Chapter 7.

> 10.   *Whether the appointment of a trustee is desirable to supervise the estate and address possible environment and safety concerns.*

There is evidence before the Court of Debtor's failure to adequately secure The Ruins

Development so that it has been subject to ongoing water penetration and vandalism issues.

*See* Sec. I(A)(2)(b), *supra*.

> 11.   *The prospect of payment of any unpaid secured claims, Chapter 11 administrative claims, priority claims and nonpriority unsecured claims in a converted Chapter 7 case or after dismissal.*

Appointment of a Chapter 7 trustee to investigate and pursue insider claims increases

the likelihood that The Ruins would be able to make meaningful payment to all creditors.  *Cf.*

Sec. I(C)(3), *supra* (outlining fraudulent conduct issues).

12. *Whether conversion to Chapter 7 would result in bankruptcy powers and procedures being used to benefit secured creditors without providing a material benefit to other creditors.*

RRSB is unaware of any bankruptcy powers that would be exercised only to benefit secured creditors in a Chapter 7 that would be unavailable in a Chapter 11.

13. *Any other prejudice to parties in interest resulting from conversion or dismissal.*

Conversion would be to other parties' benefits as it would maximize the chance of meaningful recovery via investigation and pursuit of claims against insiders. *Cf.* Sec. I(C)(3), *supra* (outlining fraudulent conduct issues).

14. *Conclusion.*

When determining whether to convert or dismiss a case for "cause" under Section 1112, "creditors are generally best served by the course of action that results in the largest number of them being paid the largest amount of money in the shortest amount of time." *In re Aurora Memory Care, LLC*, 589 B.R. 631, 643 (Bankr. N.D. Ill. 2018). As outlined by the foregoing factors, the best chance for the largest numbers of creditors to be paid the largest amount of money in the shortest amount of time is for this Court to convert this case to Chapter 7, so as to allow a Chapter 7 trustee to determine what to do with The Ruins Development to maximize recovery, as well as to authorize pursuit of Chapter 5 insider claims that The Ruins has entirely refused to consider and pursue. Accordingly, RRSB respectfully submits that conversion— rather than dismissal—is in the best interests of all parties.

C.    Conversion, rather than appointment of a trustee or examiner, is in the best interests of creditors and the estate.

A final remaining question is the alternative found in Section 1112(b)(1) that allows a court to avoid the conversion of a case if "the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."

34

11 U.S.C. § 1112(b)(1).  The appointment of a trustee or examiner is not in the best interest of creditors and the estate because the appointment of a trustee or examiner—with the ensuing need to pay the same—would exacerbate Debtor's administrative insolvency issues.

As discussed above, The Ruins is not currently operating, or generating any income. *See* Tr. from Nov. 4, 2025, Hr'g, at 67:14-16.  The Ruins offered no evidence during the hearing that it would be willing to obtain money to pay for a Section 1104 trustee or examiner. Instead, the evidence offered by The Ruins is that it intends to complete The Ruins Development, and that completion and operation of The Ruins Development will be a panacea to pay all interested parties.  However, as outlined above, it is not realistic that The Ruins Development can be completed as proposed.  *See* Sec. I(A)(2)(a).  Nor is it realistic that, even if completed, The Ruins Development could generate sufficient cash flow to pay secured creditors, let alone administrative expenses.  *See* Sec. I(A)(2)(b).  Because the appointment of a trustee or examiner would require the trustee or examiner to be paid, Debtor's inability to generate income sufficient to cover the expense that a trustee or examiner prevents the appointment being in the best interest of the creditors and the estate.

<u>CONCLUSION</u>

For the foregoing reasons, RRSB respectfully requests that this Court grant its Motion, and convert the above-captioned case to Chapter 7.

December 10, 2025                                  **VOGEL LAW FIRM**

BY: */s/ Drew J. Hushka*
      Caren W. Stanley (#06100)
      cstanley@vogellaw.com
      Kesha L. Tanabe
      ktanabe@vogellaw.com
      Drew J. Hushka (#08230)
      dhushka@vogellaw.com
      218 NP Avenue
      PO Box 1389
      Fargo, ND 58107-1389
      Telephone: (701) 237-6983
      Fax: (701) 476-7676
      *ATTORNEYS FOR RED RIVER STATE BANK*