IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30004 |
| | ) | (Chapter 11) |
| THE RUINS, LLC | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

**DEBTOR'S CLOSING ARGUMENT
ON MOTION TO CONVERT TO CHAPTER 7**

Come now The Ruins, LLC (the "Ruins" or the "Debtor"), by and through undersigned

counsel, following a five day trial on the motion to convert, DE #109 (the "Motion"), filed by Red

River State Bank ("RRSB"), and states as follows:

## I.    Introduction

The Debtor wishes to finish construction on an almost-complete apartment complex in

Watertown, South Dakota, so as to best position the project for either takeout financing or sale at

an optimum value. RRSB, by contrast, wishes to see this case jettisoned into the throes of chapter

7, presumably with designs of credit bidding the asset at a discount, and funding a thin carveout,

in a trustee's sale. The Ruins' suggested course of action will benefit all creditors (alongside the

community of Watertown); the bank's suggested course of action will solely benefit the bank.

Notwithstanding the avalanche of documentary evidence and testimony adduced over the

course of a five day hearing on the Motion, the issue *sub judice* ultimately boils down to one nearly

as simple as the foregoing overview. In drafting Title 11 of the United States Code (the

"Bankruptcy Code"), Congress recognized that the self-serving aspirations of certain creditors

would not always benefit the communal interests of all creditors. And so chapter 11 plainly

provides that even when cause may otherwise exist to convert a case to chapter 7 (something the

Debtor emphatically disputes instantly), conversion need not—and should not—ensue where

either (i) unusual circumstances militate in favor of continuing in chapter 11, or (ii) parties in interest will be best served by a chapter 11 trustee.

Here, there does not exist cause to grant the Motion in the first instance. But even if, *arguendo*, such cause could be distilled from a lengthy record replete with anecdotes of the fallibility of actors on both sides of the instant dispute, the evidence well supports that completion of construction is within grasp and will economically benefit all parties in interest. No one is asking RRSB to bankroll that completion. Nor is anyone asking RRSB to release its liens or cease zealously advocating for its own idiosyncratic interests. But the Debtor is urging that there be some recognition of those idiosyncrasies: the interests of RRSB are not the same as those of the creditor body writ large, with the bank being financially motivated both to procure an asset at a discounted price and to be rid of meddlesome litigation that shines an increasingly bright light upon the institution's seemingly-tortious conduct.

For these reasons, and as extrapolated upon *infra*, it is respectfully urged the Motion be denied or, in the alternative, a chapter 11 trustee be appointed.

## II.    Standard

The Bankruptcy Code provides that matters under chapter 11 may be converted or dismissed, after notice and a hearing, for "cause." 11 U.S.C. § 1112(b)(1). The same statutory provision then goes on to non-exhaustively delineate what may constitute such cause, including, *inter alia*, "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4).

"The list is illustrative, not exhaustive. Courts may find cause for other equitable reasons." *In re Whetten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012) (citing 11 U.S.C. § 1112(b)(4); *In re FRGR Managing Member LLC*, 419 B.R. 576, 582–83 (Bankr.S.D.N.Y.2009)).

One unenumerated ground for conversion is "bad faith." Under Eighth Circuit precedent, allegations of bad faith are to be assessed pursuant to a "totality of the circumstances test," *Lariat Cos. v. Wigley (In re Wigley)*, 557 B.R. 671, 675 (B.A.P. 8th Cir. 2016). This is because:

> Debtors often wish to shelter whatever assets they can from their creditors, and the Bankruptcy Code permits them to do so. We therefore must require a pattern of concealment, evasion, *and* direct violations of the Code or court order which clearly establishes an improper motive before allowing dismissals for bad faith.

*In re Kerr*, 908 F.2d 400, 404 (8th Cir. 1990) (citing *In re Johnson*, 880 F.2d 78 (8th Cir. 1989)) (emphasis added).

Once a creditor has filed a motion seeking conversion or dismissal, and has then proceeded to establish cause (whether an enumerated or unenumerated ground), the burden shifts to the debtor:

> The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that-- (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)-- (i) for which there exists a reasonable justification for the act or omission; and (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2).

### III.   Relevant Facts

Insofar as this is a closing argument, and not proposed findings of fact and conclusions of law, various key points of documentary evidence and testimony are noted throughout this brief. However, certain key facts—including certain items where contradictory testimony litters the record—merit particularized notation:

3

### a. Lending History

1.  On January 26, 2021, RRSB committed to furnish $7.2 million in loans to the Ruins, for purposes of constructing an apartment building in Watertown, South Dakota. *See* DE 141-14.[1]

2.  The bank ultimately loaned monies to the Debtor in three tranches: a promissory note for $7.74 million, a second note for $2.75 million, and a third note—on which several third parties are obligated—in the amount of $600,000.00. *See* Amended Claim #1 at p. 4.

3.  The Ruins also received construction financing, in the amount of $2,448,400.91, pursuant to a tax increment financing ("TIF") arrangement. *See* DE #182-1 at § 3.2.2.

### b. Construction Progress and Cost to Complete

4.  While construction on the eponymous construction project was commenced, such is not yet complete. *See* Transcript of November 4, 2025 at 59:20-22; DE #182-1 at § 4.2.

5.  The Debtor believes the cost of completion to be $1,317,352.00, *see* DE #182-1 at § 4.2.1, and has secured the commitments of various contractors and materialmen, as well as interest-free financing from an insider, to complete construction on the project, *id.*; Transcript of November 25, 2025 at 193:16-19.

6.  The Debtor proposes to complete construction through a plan of reorganization (the "Debtor Plan") that, as noted above, provides for the financing of such. *See* DE #182-1 at § 4.2.1.

7.  RRSB introduced expert testimony that the cost of completion would actually be $1,695,967.00, *see* Transcript of November 20, 2025 at 130:2-6.

---

[1] This docket entry is part of an exhibit list and was moved into evidence. All items cited herein— excepting the trial transcripts—are part of the evidentiary record.

8.     The bank's expert on construction costs was Matthew Gehrtz ("Mr. Gehrtz"), who, after fashioning his opinion as to cost of completion, acknowledged having not viewed two comparable apartment buildings (erected by the same developer, in the same town), *see* Transcript of November 20, 2025 at 144:5-10; having not investigated the cost of labor in the Watertown market even though he could have, *id.* at 147:6-14; having gathered pricing information from subcontractors other than the ones who already performed work on the project (and who would thusly be best situated to complete their own work), *id.* at 149:3-23; and not having any actual experience in the Watertown marketplace, *id.* at 149:24-150:3.

9.     Mr. Gehrtz also acknowledged that his view of the price of completion, while stated as a sum certain, is really an unspecified range of figures, and could be lower. *Id.* at 152:4-22.

10.    Worse, Mr. Gehrtz acknowledged that he often made assumptions as to what materials would be needed to complete construction, in lieu of simply inventorying the materials actually on site. *Id.* at 157:10-16; 158:13-18.

11.    Perhaps most unfortunately, Mr. Gehrtz testified that even when he did try to inventory items on site, his efforts were—on at least one occasion—contracted by the very photographs appended to his own expert report. *Id.* at 161:5-19.

12.    While the figures to complete construction are not enormously different, the Debtor's figure is pegged to the commitments of actual materialmen and contractors, who possess actual knowledge of the project from their firsthand experience, while the figure suggested by RRSB is that of an expert whose report appears to be rife with errant assumptions and objective misstatements.

### c. **Value of Project (As-Is and Upon Completion)**

13.      Mr. Gehrtz—RRSB's own expert—testified that he believes the cost of construction for the Ruins' real estate asset, in its current form (ie, without being completed), would be at least $14.1 million, with that figure being "the very low end." *Id.* at 172:14-173:6.

14.      If one assumes the whole of the financing documented above was actually received by the Ruins and used in connection with construction (something that appears to be in dispute for various reasons and both sides), the same equals $13,538,400.91. *See, supra,* ¶¶ 2-3.

15.      Notably, this sum is within $600,000.00 of that testified to by Mr. Gehrtz (the bank's own expert), and would well inform an appraisal of the property in its current condition, on a "cost of replacement" basis. (As discussed in greater detail *infra*, this figure also casts palpable doubt on RRSB's theory that some portion of loaned monies were not actually expended on the subject project.)

16.      The Debtor projects the as-completed value of the project to be $15.75 million. *See* Transcript of November 4, 2025 at 34:23-35:19.

17.      Mindy Craig, the manager of comparable apartment properties in Watertown, South Dakota (and the spouse of the Debtor's sole equity holder), testified that, upon completion and stabilization, the Debtor's building will have net monthly revenue (meaning after all expenses except for debt service) of $60,000.00. Transcript of November 4, 2025 at 162:13-22.

18.      RRSB relied on the expert testimony of Josh Luther, who furnished four separate appraisal reports for the property. *See* DE #59; DE #95.

19.      In 2021—before construction began—Mr. Luther appraised the as-completed-and-stabilized building to have a value of $11.14 million, with a then-current value of $520,000.00. *See* DE #95-1 at p. 2.

20.     In 2022—after construction was underway—Mr. Luther appraised the as-completed-and-stabilized building to have a value of $12.41 million, with a then-current value of $6.98 million. *See* DE #95-2 at p. 2.

21.     In 2023—when construction was further underway— Mr. Luther appraised the as-completed-and-stabilized building to have a value of $11.46 million, with a then-current value of $9.975 million. *See* DE #95-3 at p. 2.

22.     In 2025—when this case was pending, RRSB was under attack by the Debtor, and Mr. Luther was engaged to provide an appraisal in support of litigation—his valuation of the building plummeted, with an as-completed-and-stabilized value of $7.07 million and an as-is value of $4.52 million. *See* DE #59 at p. 5.

23.     In fashioning the latest appraisal, Mr. Luther ignored the most recent apartment building sale in Watertown, South Dakota, even though such would have been an apt "comp." *See* Transcript of November 24, 2025 at 65:12-25; Transcript of November 25, 2025 at 204:5-12.

24.     In creating an appraisal with a dramatically reduced value, Mr. Luther assumed a lower occupancy rate than previously considered, *see* Transcript of November 24, 2025 at 69:5-70:6, relying on third party market information, *id.* at 70:4-6, without considering the near-100% occupancy rate of two comparable apartment buildings in Watertown, South Dakota, *id.* at 70:8-71:24, which he ultimately acknowledged would be "an indicator" of likely occupancy rates, *id.* at 71:21.

25.     Mr. Luther's new appraisal also—in a marked departure from his three prior appraisals—suddenly omitted the "cost approach" to property valuation. *Id.* at 73:17-74:9.

26.     Other issues abound with Mr. Luther's most recent appraisal, including the fact that he dedicates palpable ink to discussing the "stigma" hampering the property's valuation, in light

of the bankruptcy proceeding, *see* DE #59 at p. 14, but insists such did not actually inform his valuation of the property, *see* Transcript of November 24, 2025 at 74:22-76:7.[2]

27.     Perhaps most jarringly, Mr. Luther's most recent report is based on projected net income of $495,060.00 per year, *id.* at 83:22-84:2, whereas Ms. Craig's testimony—pegged to actual experience in the market and empirical data—is that the project will fetch monthly net income of $60,000.00, leading to annualized income of $720,000.00, *id.* at 84:3-10, something Mr. Luther acknowledged would increase the value beyond that stated in his appraisal, *id.* at 84:11-15.

28.     Ultimately, Mr. Luther acknowledged a quicker lease-up period, and higher net income, would materially alter his appraisal of the as-completed-and-stabilized value of the asset. *Id.* at 8:24-85:7.

29.     In light of the dramatic post-litigation drop in Mr. Luther's appraisal, his reliance on figures at odds with the actual, uncontroverted data in the record, and his failure to account for the most appropriate comparable sale, it is difficult to credit his appraisal in juxtaposition to the testimony of Mr. Gehrtz (the bank's own expert witness) and the value assigned by the Debtor (who knows the project and the market better than most others).

---

[2] While briefly further discussed *infra*, this anomaly is perhaps meritorious of greater attention. Either Mr. Luther (i) included the "stigma" discussion in his appraisal because the same actually influenced his appraisal, in which case he was dishonest in testifying otherwise; or (ii) included the "stigma" discussion in his appraisal, but then wholly disregarded his own analysis in arriving at an appraised figure, in which case his appraisal is so arbitrary as to be at odds with its own prosaic provisions. This is not boilerplate language, being absent from the three prior appraisals. So, presumably, the discussion was added for a reason. It defies logic for Mr. Luther to have thought this meritorious of inclusion, but to have not thought it meritorious of impacting his actual appraisal figure. And in the realm of an appraisal that wildly departs from earlier figures, and that seems custom-tailored to suit a client's litigation needs, this only compounds the very serious questions that must be asked of Mr. Luther's credibility as a witness. *See FDIC v. Coleman Drive Assocs., LLC*, 2010 WL 162056, 2010 U.S. Dist. LEXIS 2817, at *6 (N.D. Ga. Jan. 14, 2010) ("Appraisers always differ on value . . . MAI, made as instructed.") (quoting a judge's comments at a status conference).

### d. Financial Records

30.    RRSB introduced exhibit purporting to show $4,365,805.33 in loaned monies being diverted away from the Ruins and to third party insiders. *See* DE #177-1.

31.    The general gist of this assertion is that monies intended for the Ruins, but disbursed or transferred to third party insiders, are monies that flowed away from the project. *Id.*

32.    Yet the bank's own officer acknowledged, via affidavit, that certain loan monies— for the Ruins project—were disbursed directly into a checking account for Craig Properties, LLC, not the Ruins. *See* #84 at ¶7, DE #86 at ¶ 7.

33.    Moreover, a different officer of the bank acknowledged, on cross-examination, that the bank's report of diverted monies includes funds that actually *were* expended on the Ruins project. *See* Transcript of November 25, 2025 at 124:23-125:24.

34.    When asked how much of the at-issue funds were not actually spent on the Ruins project, the bank's officer—who had personally compiled the subject reports—could not provide an answer. *Id.* at 128:11-25.

35.    The same witness later acknowledged that despite a report showing more than $7 million being allegedly diverted from the project, at least $6 million of that money was actually used to pay subcontractors on the project. *Id.* at 129:5-23.

36.    The same witness, when pressed on holes in her report (a report that covered historic distributions and bank transfers), remarkably testified "What you're talking about is looking backwards and I was looking forwards." *Id*. at 131:19-20.

37.    Later, the witness acknowledged that Jesse Craig ("Mr. Craig"), the equity holder of the Debtor and the general contractor and project manager, was entitled to take certain monies as fees for his services. *Id.* at 134:10-14; 136:7-14.

38.    The witness also acknowledged that some of the putatively unrelated expenses tracked by the bank may have, in fact, been expenditures on the Ruins project. *Id.* at 136:23-137:10.[3]

39.    Examination of the bank's chosen designee further led to an acknowledgement that some of the monies allegedly diverted from the Ruins to insiders were—by reason of RRSB's own bizarre practice of using multiple borrowers in lieu of guarantors—actually loaned to the very insiders who allegedly then used the money. *Id.* at 140:8-141:9.

40.    Additionally, as expounded upon *supra*, the bank's own construction expert testified that the cost of construction for the Ruins project, in its current condition, is—on the low end—is $14.1 million, a sum in excess of $500k *more* than the total financing, from all sources, of the Ruins project to date. *See, supra,* ¶¶ 13-14.

41.    Stated otherwise: the Debtor owns a partially-completed building that should have taken at least $14.1 million to build in its current condition, received only $13,538,400.91 in financing, and is being accused of having improperly diverted monies away from construction.

## IV.    Argument: RRSB Has Not Established Cause to Convert

### a.    There is No Substantial or Continuing Loss or Diminution

In the Motion, RRSB urges that there is a substantial and continuing loss afoot and, ergo, cause exists to convert this case under Section 1112(b)(4)(A). In so doing, the bank appears to rely on its own experts, who have opined that (i) the Ruins' building is not worth as much as it once was; and (ii) the same building displays certain outward signs—such as broken windows and wind-

---

[3] The answer on line 10 of page 137 is preceded by a "Q" in lieu of an "A." It is respectfully urged, based both on context in the transcript and recollection of the hearing, that such is a transcription error, with the line being the witness' answer and not counsel's question.

damaged wrappings—emblematic of a construction project halted midstream. The evidence adduced at trial, however, does not actually support either of these propositions.

As noted *infra*, the most recent appraisal of Mr. Luther—when juxtaposed to his *three* prior appraisals, from the recent past—is simply difficult to credit. Mr. Luther bases his sudden (and dramatic) drop in valuation on errant net cash flow projections, an errant projected occupancy rate, and comps that are not as appropriate as the most recent sale of an apartment building in the same community (built by the same developer). Mr. Luther also seems to base at least part of his dramatic appraisal on a bankruptcy "stigma" but then, on cross-examination, was unable to defend the same and suddenly insisted this portion of his appraisal report did not actually factor into his actual appraisal.

The cost of construction value given by the bank's own, other expert witness—$14.1 million, on the low end—would seem a more apt figure. This also tracks to the Debtor's own figures and unrefuted testimony concerning the cash flows to be realized upon stabilization.

Yet one thing seemingly all witnesses agreed on was that the project would be worth more once completed. That is precisely what the Debtor is proposing: to finish construction. And no one is asking RRSB to finance the completion of construction. So it is genuinely difficult, in the prism of these facts and this case, to see the Ruins' asset as one that is suffering an ongoing diminution in value; much to the contrary, the Ruins is very much trying—through the Debtor Plan—to add substantial value.

Moreover, while RRSB repeatedly pointed to alleged deficiencies in the current state of an uncompleted construction project (broken windows, water intrusion), those observations were universally outdated. Barry Matson—one of the more credible witnesses to testify at the trial—made clear that the property interior "looks about the same" as when construction was halted, and

11

that "[o]verall, it's not that much different," with his observations being based on a walk through of the property just four days prior to testifying. *See* Transcript of November 25, 2025 at 192:6-19. Additionally, photos of the property, in its current condition, show a clean, tightly-wrapped exterior. *See* DE #182-2. And a mold remediator testified that, upon inspecting the property, he "didn't believe remediation was necessary based on the inspection. . ." November 25, 2025 Transcript at 200:8-9.

In short, there simply is not credible evidence of a "substantial or continuing loss to or diminution of the estate. . ." 11 U.S.C. § 1112(b)(4)(A). To the contrary, there is evidence of a few broken windows and some minor weather damage that has been repaired—none of which ought to surprise, in the slightest, for a construction project halted midstream. And, on the more macroscopic appraisal level, there is no credible evidence of a notable post-petition decline in value, aside from the generality that asset values will fluctuate up—and, yes, down—in accord with the movement of interest rates (something that has changed as this very brief is being written).[4]

Equally, though, "cause" under Section 1112(b)(4)(A) requires not merely an ongoing loss or diminution but, too, ". . . the absence of a reasonable likelihood of rehabilitation." *Id.* The record does not support the proposition that the Debtor Plan is without a "reasonable likelihood" of confirmation. Nor does the record support the notion that a later-amended plan (if one were needed), or the plan of a friendly creditor (of which there appear to be several) would not, too, stand a strong likelihood of confirmation. To the contrary, and as discussed *passim*, there is every

---

[4] *See* Colby Smith, *The Fed Cut Rates Again but Deep Divisions Cloud Path Ahead*, N.Y. Times, Dec. 10, 2025, https://www.nytimes.com/2025/12/10/business/economy/fed-meeting-interest-rate-decision.html.

reason to believe the Debtor Plan—pegged to completing construction with the commitments of contractors—will satisfy the rigors of Section 1129 (even over RRSB's invariable objection).[5]

In short, this Debtor *does* have a reasonable likelihood of rehabilitation—whether through the Debtor Plan, through an amended plan, or through a friendly creditor's plan. Not unironically, the only party standing in the way of that rehabilitation is RRSB, which continues to pursue a scorched earth approach to this case and which appears irrationally obsessed with ensuring construction of the asset *not* be completed unless and until the bank may first bid-in the property at a foreclosure auction or through a trustee's sale.

### b.  This is Not a Bad Faith Case

RRSB also looks to establish "cause" through the unenumerated ground of bad faith, seemingly relying on the messy financial records encompassing the Ruins' history. In so doing, however, the bank does not point to a single post-petition action, *vel non*, of the Debtor. Rather, it appears to be RRSB's position that if a project is subsumed in dense and unusual paperwork—a reality occasioned by the bank's own actions and odd lending practices—then, *ipso facto*, some modicum of bad faith must be afoot. Such is simply not so.

As noted *supra,* Eighth Circuit precedent supports the proposition that a dismissal for "bad faith" requires an examination of the totality of a case's circumstances, and ordinarily requires some modicum of post-petition bad behavior. *See, supra*, § II; *In re Kerr*, 908 F.2d at 404.

Here, RRSB makes myriad broadside allegations against the Debtor's equity holder and other entities under his dominion and control, but all of the allegations concern *pre*-petition

---

[5] Relevantly, while Section 1112 creates a burden-shifting paradigm through which it is incumbent on a debtor to show unusual circumstances, *see, supra,* § II, the establishment of "cause" is the burden of the movant, *id.* "Cause" based on a diminution of asset value requires an absence of probability of reorganization, meaning it is the burden of RRSB—not the Debtor—to show there is no reasonably probability of reorganization.

activities. The bank is not alleging that Mr. Craig was careless with monies post-petition or that any of the financial reports or activities in this case have been errant in any way whatsoever. The bank is, rather, urging that Mr. Craig allegedly acted improperly several *years* pre-petition and, ergo, his company ought to be forever banished from chapter 11.

Myriad debtors enter bankruptcy on the heels of prior errors—whether they be ones of inadvertence, ones of misjudgment, or ones of permitting economic pressures to inspire retrospectively-regrettable actions. Yet case law scantly supports that such pre-petition ills may prove an ultimate barrier to reorganization. Numerous circuits hold that bad faith may only be found where objective futility is afoot. *See Bestwall LLC v. Off. Comm. of Asbestos Claimants (In re Bestwall LLC)*, 71 F.4th 168, 182 (4th Cir. 2023) (quoting *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 98 n.8 (3d Cir. 2023) (quoting *Carolin Corp. v. Miller*, 886 F.2d 693, 694 (4th Cir. 1989))). And even where, as in the Eighth Circuit, such a prong is not expressly extant, the criteria that govern a finding of bad faith— "the debtor's financial condition, motives, and the local financial realities," *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*, 235 F.3d 375, 379 (8th Cir. 2000) (quoting *In re Little Creek Devel. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986))—are chiefly focused on post-petition conduct and post-petition aspirations.

There does not exist any evidence that a bad faith motive underlies the filing of this case. The evidence, rather, is plain that the Debtor filed this case with ambitions of (i) halting a foreclosure; (ii) pursuing litigation claims against RRSB; and (iii) securing commitments to complete construction. Those are all perfectly valid exercises of Section 301 of the Bankruptcy Code. And while RRSB may not much like that this case has shined a light on the bank's myriad irregularities and suspect practices, such hardly equates to "cause" under Section 1112.

14

Moreover, the fallacy of a bad faith finding being pegged to purely pre-petition conduct is revealed by the Debtor Plan. The Ruins is proposing not merely to complete construction for the benefit of all creditors, and to pursue claims against RRSB for the benefit of all non-RRSB creditors, but, too, to do so under the watchful gaze of a third party fiduciary. The Debtor Plan appoints a well-respected accountant and political figure to take helm of the Debtor. And such is not uncommon in chapter 11 cases (at least four other cases, in this very court, have seen chief reorganization officers appointed in the preceding 18 months). Yet if pre-petition actions of executives were alone sufficient to merit dismissal or conversion, the Bankruptcy Code's open contemplation of such post-confirmation fiduciaries, *see* 11 U.S.C. § 1123(b)(3)(B), would make little sense.

Debtors are allowed to cure past maladies through chapter 11. History and practice support this generally-uncontroversial proposition, as does the plain language of the Bankruptcy Code. *Id*. Yet RRSB seems to be urging otherwise, essentially arguing that pre-petition conduct can be a per se bar to reorganization. This makes little sense in the context of a process aimed at affording a "fresh start" and rife with allowances for the curing or prior ills. This makes even less sense in the framework of a statutory text that allows for the vesting of power in third party fiduciaries through the plan confirmation process.

## V.    Argument: Even if There Did Exist Cause, Unusual Circumstances Support Denial of the Motion

Even assuming, *arguendo*, there did exist cause for conversion of this case, RRSB has overlooked the provision of Section 1112 dictating such a fate not befall debtors where "unusual circumstances" suggest conversion or dismissal to not be in the best interests of creditors and the estate. This is a case where construction on the Debtor's singular tangible asset can be completed— thereby enhancing the asset's value for the benefit of *all* creditors—in chapter 11, while the fire

15

sale of an uncompleted property would ensue in chapter 7. Such is assuredly the precise variety of "unusual circumstance" contemplated by Congress.

"Unusual circumstances" is an undefined term, *In re Miell*, 419 B.R. 357, 367 (Bankr. N.D. Iowa 2009), but "[c]ourts have significant discretion in determining whether unusual circumstances exist which weigh against conversion or dismissal," *id.* (citing *In re Prods. Int'l Co*., 395 B.R. 101, 10 (Bankr. D. Ariz. 2008)). Or, as noted by this Honorable Court, ". . . the import of section 1112(b) is that, if cause exists, the case should be converted or dismissed unless unusual facts or circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding." *In re Keeley & Grabanski Land P'ship*, 460 B.R. 520, 536-37 (Bankr. D.N.D. 2011) (quoting *In re Miel*, 419 B.R. at 367 (citing *In re Orbit Petroleum, Inc.*, 395 B.R. 145, 149 (Bankr. D.N.M. 2008), 7 Collier on Bankruptcy ¶ 1112.04[3], p. 1112-26 (Alan N. Resnick and Henry J.  Sommer, eds., 15th ed. rev. 2008))).

The uncontroverted testimony in this case—from both the Debtor's witnesses and the bank's own witnesses—is that the Ruins' project will be worth more once completed. Similarly, the uncontroverted evidence is that the project *can* be completed. Yes, RRSB's expert believes such will be moderately more expensive than does the Debtor but, as noted *supra*, such is seemingly because the bank's expert (i) is not actually that familiar with the project; (ii) is unfamiliar with prevailing market costs and rates in Watertown, South Dakota; (iii) crafted a report contradicted by his own photographs; and (iv) has chosen to state a completion cost as a sum certain, despite acknowledging such is actually a range that could skew lower.

The uncontroverted record also establishes that the Debtor can complete construction and has lined up the commitments of subcontractors to do so. The letters of intent are appended to the Debtor Plan and are a part of the record. One of the subcontractors testified about his willingness.

The Debtor's equity holder made clear his desire to commit monies to this cause. And he also made clear his willingness to fund the services of a third party fiduciary to oversee the project and all related finances.

Every creditor benefits from a more valuable asset—whether that asset is then used to create cash flows that, in turn, make plan payments, whether that asset is then used to procure takeout financing, or whether that asset is then sold. Yes, RRSB would like this Honorable Court to believe this is all academic, because the asset value will not exceed the bank's own claim. But the evidence in support of such a frightfully low valuation is replete with errors noted *passim* and well controverted by the more credible evidence of a markedly higher as-completed valuation (including the very same expert's own prior appraisals, from just a few years ago).

Moreover, as noted by a separate creditor during the opening phases of trial, even a complete building that does not pay RRSB's full claim may benefit other creditors courtesy of the doctrine of marshaling. *See generally C.T. Dev. Corp. v. Barnes (In re Oxford Dev.)*, 67 F.3d 683, 687 (8th Cir. 1995) (explaining the doctrine as applied to bankruptcy cases with multiple lienors).

The timeline proposed in the Debtor Plan is expedient. If the Debtor Plan proves unpalatable for any reason, an amendment thereto may be filed. Or, knowing that exclusivity will have lapsed by the time that plan comes on for confirmation, any creditor may, too, propose a plan that provides for completion of the construction project. There is no reason to believe any such plan will demand a large quotient of time; the record is plain in establishing construction may be completed relatively expediently. And yet RRSB, for reasons that wreak of self-interest, insists the case should be converted to chapter 7, and the assets presumably sold in as-is condition at a trustee's sale (or foreclosed through stay relief), rather than allow other creditors to realize the benefits of an enhanced asset valuation.

To be sure, these are "unusual circumstances." One creditor—facing ongoing litigation that poses a somewhat existential threat to that creditor's own existence—is pushing, mightily and illogically, to quickly convert this case to chapter 7 before a plan can be confirmed and construction can be completed. In so doing, that creditor has seen fit to run roughshod over the exclusivity provisions of the Bankruptcy Code, 11 U.S.C. § 1121, and has presented dense and voluminous exhibits ultimately acknowledged to be deceptive and/or uninformative by the creditor's own witnesses.

### VI.  Argument: In the Absence of Unusual Circumstances, Appointment of a Chapter 11 Trustee is in the Best Interests of Creditors

The "unusual circumstances" allowance of Section 1112 is not the only statutory text aimed at preventing conversion of a case in which creditors stand to materially gain from the allowances of reorganization. The Bankruptcy Code provision also allows for the appointment of a chapter 11 trustee, seemingly out of a similar recognition that one creditor's destructive motives ought not doom the upside potentially realized by all creditors. If cause is to be found herein (and the Ruins urges no cause to be afoot), and if unusual circumstances are not found to be extant (with the Debtor, similarly, urging them to be present), surely this is a case where a chapter 11 trustee would better serve creditors' interests than would a chapter 7 trustee.

The conversion language of Section 1112 is expressly hedged, dictating a finding of cause lead to conversion or dismissal (absent unusual circumstances), ". . . unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1).

Ensuring an optimal return to creditors is openly recognized as one of the circumstances under which it is appropriate to appoint a chapter 11 trustee in lieu of converting or dismissing a case. *See, e.g.*, *In re Glob. Processing, Inc.*, 655 B.R. 486, 495 (Bankr. N.D. Iowa 2023) ("After

careful review of the record, this Court finds that appointment of a Chapter 11 Trustee is appropriate in this case to maximize payments to creditors."); *In re Kwok*, 640 B.R. 514, 521 (Bankr. D. Conn. 2022) ("The appointment of a Chapter 11 trustee in this case is warranted because the record suggests a prospect for collection and payment of creditors' claims.").

Here, the Debtor's equity holder has testified that he will pay up to $20,000.00 for the services of a trustee, should such be required. *See* November 4, 2025 Transcript at 95:15-25. There is no active business to be overseen pre-confirmation, making such a perfectly reasonable sum (ie, it is not as though a chapter 11 trustee would need to oversee payroll disbursements, negotiate with suppliers, or even manage a portfolio of semi-liquid investment assets; all a trustee would need to do would be to oversee the Debtor's compliance with the rigors of chapter 11—such as the filing of operating reports and payment of quarterly fees—until such a time as a plan could be confirmed). And the appointment of a trustee would allow the Debtor Plan to face confirmation while also permitting competing plans to be tested through the chapter 11 process if the Debtor Plan is not first confirmed. *See* 11 U.S.C. § 1121(c)(1).

It is, quite genuinely, difficult to understand how the appointment of a chapter 11 trustee would not be more beneficial to creditors than conversion to chapter 7. The Debtor's equity holder has offered to pay for a trustee, mitigating any potential economic harms. And even if, somehow, completion of the project proved elusive through the plan confirmation process, a chapter 11 trustee could still market and sell the building through the ordinary Section 363 process.

## VII.    Conclusion

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) deny the Motion; (ii) in the alternative, appoint a chapter 11 trustee; and (iii) afford such other and further relief as may be just and proper.

Respectfully Submitted,

Dated: December 10, 2025      By:    /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtor*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of December, 2025, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig