IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-30004 |
| | ) | (Chapter 11) |
| THE RUINS, LLC | ) | |
| | ) | |
| Debtor | ) | |
| _____ | ) | |

**DEBTOR'S REPLY TO CLOSING ARGUMENT OF RED
RIVER STATE BANK ON MOTION TO CONVERT TO CHAPTER 7**

Comes now The Ruins, LLC (the "Ruins" or the "Debtor"), by and through undersigned counsel, in reply to closing argument, DE #224 (the "Bank Closing"), filed by Red River State Bank ("RRSB"), and states as follows:

**I.    Introduction**

RRSB really does not want to see construction completed on the Ruins' eponymous project. Through a five day trial—and, now, a 36 page closing brief—the bank has sought out seemingly every cognizable justification for a facially unjustifiable premise: creditors will somehow be better off seeing a partially-completed structure sold as-is than they would be seeing the building completed and either operated or sold as a going concern.

Throughout, RRSB fails to mention that the bank has been afforded relief from the automatic stay set forth in Section 362 of Title 11 of the United States Code (the "Bankruptcy Code"). The bank similarly fails to mention that the Debtor's principal has offered to fund the services of a third party, independent fiduciary if this case remains in chapter 11 (with RRSB actually going so far as to suggest expressly otherwise, *see* Bank Closing, DE #224, at § III(C)). And the movant thusly paints an incomplete—if not myopic—picture, portraying a generic decision whereby innumerable goods will flow from a conversion to chapter 7 whilst only maladies will ensue if this case is permitted to remain in chapter 11.

1

The Ruins stands firmly behind the arguments made in its own written closing, DE #225, and, for the reasons extrapolated upon *infra*, continues to urge the underlying motion to convert, DE #109 (the "Motion"), be denied. For ease of cross-reference, the Debtor herein addresses the bank's arguments in the same order in which they are made in the Bank Closing.

II.     **Section I – Alleged Cause**

   a.  **Subsection I(A)(1)(a) – Alleged Continuing Losses from Carrying Costs**

From the outset, there has been clarity that this case concerns an unfinished apartment building construction project and, as such, will not yield income until such a time as development is completed and tenants are able to occupy units. Such was every bit as true on January 6, 2025—when this case was filed—as during each of the five days of the trial on the Motion. Yet RRSB now alleges this reality—one wholly common in the universe of chapter 11 cases—amounts to *ipso facto* cause for conversion. The bank's theory is that the carrying costs of the project, coupled with administrative expenses, equate to an ongoing and continuing less. Such simply is not so.

At the outset, it bears notation that RRSB's assertion of an ongoing loss is exceedingly deceptive. The bank cites to the testimony of Jesse Craig ("Mr. Craig"), *see* Bank Closing, DE #224, at p. 3, who noted there to be ongoing expenses correlative to "insurance and oversight and utilities," *see* Transcript of November 4, 2025 at 32:11-12. What RRSB neglects to mention, however, is that Mr. Craig testified he has been personally paying these expenses. *Id.* at 43:20-44:8.

In fact, Mr. Craig went on to clarify that he is not even seeking to be recompensed from the Debtor for these payments, affirmatively indicating they do not constitute a "loss" for the Ruins since they are not being paid by the Ruins. *Id.* at 44:9-18.

This leaves only administrative expenses (chiefly legal fees) in the form of post-petition obligations to be paid. Yet the record is devoid of any administrative expense claim for legal fees (likely because undersigned counsel has not yet filed an interim—or final—fee application), and such fees would not be payable—in any event—unless and until approved by this Honorable Court. *See* 11 U.S.C. § 330(a)(1). Moreover, while the Debtor cannot in good faith argue legal fees are less than (or equal to) the pre-petition retainer being held by counsel, the record is notably devoid of any evidence as to what counsel's unbilled work-in-progress would be in this case. Moreover, as observed by a sister court, the accrual of legal fees is hardly the sort of "substantial or continuing loss," 11 U.S.C. § 1112(b)(4)(A), contemplated by the Bankruptcy Code:

> The question then becomes whether accrual of fees of professionals employed by the Debtors and the Committee, and the possibility of additional Delaware state taxes, amount to the type of "continuing loss" that Congress had in mind to trigger the nearly mandatory conversion, dismissal or chapter 11 trustee options § 1112(b)(1) contemplates. Perhaps from an accounting perspective (profit and loss), such accruals would constitute such losses. But the accrual of liabilities are not the same as the incurring of actual out-of-pocket losses, such as the dissipation of assets that diminishes the estate. Leaving the Debtors in possession of the chapter 11 estate is not risking some ever-diminishing pool of assets.

*In re Gabriel Techs. Corp.*, 2013 WL 2318581, 2013 Bankr. LEXIS 2162, at *7-8 (Bankr. N.D. Cal. May 27, 2013). *See also In re TMT Procurement Corp.*, 534 B.R. 912, 920 (Bankr. S.D. Tex. 2015) ("In a case where the debtor has few, if any, tangible assets remaining, the mere accrual of professional fees must be distinguished from actual out-of-pocket losses.") (citing *Gabriel Techs.*, 2013 WL 2318581, 2013 Bankr. LEXIS 2162); *In re Miller*, 496 B.R. 469, 479 (Bankr. E.D. Tenn. 2013) (accord).

Here, there has not been—and is not—an ongoing out-of-pocket loss. The Debtor's principal has paid third party obligations, *gratis*, as this case has progressed. And the "mere accrual" of as-yet-unapproved administrative legal fees does not give rise to cause for conversion.

3

b. **Subsection I(A)(1)(a) – Alleged Continuing Losses from Depreciation**

RRSB further urges that there exists an ongoing loss in this case because the Debtor's titular asset is depreciating and has suffered water damage. Yet three fundamental problems undermine this line of argument: (i) the appraisal supporting a post-petition depreciation does not actually show a post-petition depreciation and, in any event, is devoid of credibility; (ii) testimony concerning water damage was roundly refuted at trial; and (iii) case law does not generally support a theory of ongoing loss pegged solely to fluctuation in macroscopic market conditions (ie, the movement of interest rates).

On the first point, the bank relies—almost exclusivity—on the testimony of Josh Luther, who presented four separate appraisals of the asset, with the post-petition appraisal being dramatically—if not hyperbolically—lower than the others. Ruins has already addressed the myriad issues with Mr. Luther's appraisal (including the numerous inaccuracies to which it is moored) in the Debtor's closing, DE #225 at §§ III(c), IV(a). In the interests of brevity, the same will not be rehashed herein.

Yet a more technical point does merit notation: while Mr. Luther furnished appraisals for four separate dates, only one of those dates was post-petition and the next-most-recent was in 2023 (more than a year before this case was filed). One cannot distill, from those appraisals (even if the latest is to be credited) any post-petition loss or diminution. Mr. Luther has not testified to what the property was worth on the petition date (or any time shortly thereafter) and juxtaposed the same with what the property is worth now (or several months back, before a drop in interest rates, as it is).

As also covered in the Debtor's own closing, the testimony concerning water damage is at-best controverted, with the Debtor having the more credible witnesses. Barry Matson—someone

who presented as likely the most sincere and credible of witnesses—was also the witness who had most recently viewed the construction project, with his site visit coming just a few days prior to his testimony, and he made clear the building "looks about the same" as when construction was halted, and that "[o]verall, it's not that much different." *See* Transcript of November 25, 2025 at 192:6-19. Moreover, a professional mold remediator testified to the property not requiring any such work. *Id.* at 200:8-9.

This leaves only the question of whether post-petition macroscopic market conditions have invited an across-the-board decline in commercial housing values. As observed in the Debtor's closing, this is hardly a reliable benchmark insofar as interest rates have literally adjusted—in a favorable, downward direction—just since the trial concluded. *See* DE #225 at p. 12, n. 4. Yet, more pointedly, this is also assuredly not the sort of loss or diminution embraced by the Bankruptcy Code. Undersigned counsel cannot locate any case law urging a market-wide decline in economic conditions gives rise to a finding of "cause" and likely for good reason: if such were sufficient, almost every real estate debtor seeking to reorganize would face conversion every time the Federal Reserve raises interest rates.

### c. Subsection I(A)(2) – Alleged Lack of Reasonable Likelihood of Rehabilitation

A hearing on approval of the Debtor's disclosure statement pends just a matter of weeks away. Yet RRSB now urges that, notwithstanding the filing of a proposed plan of reorganization, and notwithstanding the efforts of Mr. Craig to line up commitments from subcontractors (while also pledging his own funds for completion efforts), there does not exist "a reasonable likelihood of rehabilitation," 11 U.S.C. § 1112(b)(4)(A). This is, at best, an exceedingly strained argument.

The bank insists there is a lack of evidence that subcontractors have agreed to provide labor and materials on the terms proposed in the Debtor's plan. *See* Bank Closing, DE #224, at § I(A)(2).

Yet two commitment letters are exhibits to the Debtor's plan, which is in evidence. *See* DE #182-1 at pp. 37-39. And Mr. Craig testified that he has gathered commitments from those whose work is essential to completion. *See* Transcript of November 4, 2025 at 54:14-56:5.

RRSB also insists that the project cannot be reasonably stabilized in an economically efficient manner. Yet, in so doing, the bank looks past the testimony of Mulinda Craig concerning the rapidity with which the residential units can be leased out. *See* Transcript of November 25, 2025 at 214:5-13. She specifically indicated a likely occupancy rate of 70% in "less than six months." *Id.* at 214:12-13.

Surprisingly, however, the bank—in endeavoring to visualize a faulty argument concerning rehabilitation—has included in its closing argument a duo of charts putatively showing future cash flows. *See* Bank Closing, DE #224, at pp. 9-10. Yet the charts appear to capriciously pick RRSB-friendly revenue numbers for the first several months of leasing activity, seemingly in an effort to make the numbers fit the bank's thesis. The latter chart somehow shows literally $0.00 in revenue for the first few months, *id.* at p. 10, suggesting Ms. Craig, as property manager, would not be able to lease a *single* unit for at least 120 days. This is not only unsupported by the record but, too, is facially wanting for credibility.

### d. Subsection I(B) – Alleged Failure to File Required Documents

RRSB subsequently urges "cause" for conversion exists under Section 1112(b)(4)(F) of the Bankruptcy Code, insofar as the Debtor has not filed accurate schedules. *See* Bank Closing, DE #224, at § I(B). This comes as a surprise, insofar as not only is the underlying premise faulty but, too, this is not one of the grounds upon which the Bank premised the motion to convert. *See* DE #109, *passim*.

To be sure, the failure of the bank to raise this issue in its underlying motion is not merely a matter of form over substance: the failure is, more potently, seemingly a matter of strategy. The brevity of the motion, juxtaposed to the length of trial (and even the length of the Bank Closing) evidences a litigant that opted to hold wide swaths of information as close to the vest as possible, for as long as possible, in a seeming effort to ambush the Debtor.

The manner in which evidence was adduced at trial certainly suggests the bank long planned to confront the Debtor with allegations of financial recordkeeping anomallies. Such was no small part of the examination of Mr. Craig. Yet the bank elected to not preview this in the underlying motion, to not offer any examples of alleged recordkeeping errors in the underlying motion, and to otherwise stay mum on the topic until Mr. Craig sat for deposition (with the bank remaining mum, as to a large swath of its allegations, until trial).

Plainly, the Debtor is entitled to notice of the grounds on which relief is being sought—before reading the movant's closing argument. *See, generally,* Fed R. Bankr. P. 2002 (requiring notice before a hearing on a motion to convert); *Rocky Mt. Farmers Union v. Goldstene*, 2010 WL 1949146, 2010 U.S. Dist. LEXIS 56493, at *8 (E.D. Cal. May 11, 2010) (". . . this Court will not consider UNICA's brief to the extent that UNICA raises legal arguments beyond those advanced by the defendants in their motions to dismiss."). In the analogous civil litigation context, the familiar "notice pleading" standard requires, *inter alia*, "fair notice of what the . . . claim is **and the grounds upon which it rests**," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (emphasis added).

It is thusly improper to consider this argument, in light of the wholesale absence of notice preceding what proved to be a five day trial (at which the Debtor would have planned to present appropriate topical evidence, if given notice). It at least seems the bank long planned to make this

7

argument, and worked (tirelessly, no doubt) to cobble together an evidentiary presentation in support of this argument; it equally seems, however, the bank did not much care to tip off the Debtor—much less this Honorable Court—to such in advance.

Yet even if the contention is to be considered on the merits, the theory still fails. RRSB points to the omission of $100k in "earmarked" funds from the Debtor's schedules. *See* Bank Closing, DE #224, at § I(B). Notably, the bank tepidly acknowledges that this is a curable oversight, if true. *Id.* at p. 30, n. 3. More pointedly, though, RRSB seems to miss that the at-issue monies assuredly do not belong on the Debtor's schedules (nor do the putative causes of action intimated by the bank).

The testimony surrounding the relevant $100k establishes that these were *not* monies held by the Debtor on the petition date. The testimony similarly establishes that these were *not* funds held in escrow for the Debtor. So these are not funds that could have been scheduled as liquid assets of the Debtor in any event. And to the extent the bank posits such should have been scheduled in the form of an "IOU" from Mr. Craig to the Debtor, RRSB seems to likewise ignore the extensive testimony about all the expenses of the Debtor paid by Mr. Craig—something that would setoff, *en toto*, any such obligation. *See* Transcript of November 4, 2025 at 43:24-44:3.[1]

Similarly, to the extent the bank posits there to exist causes of action against one or more insiders, the Debtor certainly vehemently disagrees with the same. The Debtor does not believe these claims to exist. RRSB appears to peg these broadside allegations to the financial records reviewed by the bank and summarized by the bank's own officers. Yet, as observed by the Ruins in its closing, RRSB's entire method of monetary tracing appears to be fundamentally errant, with

---

[1] The testimony concerns post-petition carrying costs paid by Mr. Craig but, from the testimony and the facts presented at trial, one may logically extrapolate similar pre-petition expenditures.

8

allegedly-diverted funds being acknowledged to have actually been expended on the Ruins project, with report figures being facially deceptive, and with the bank's own witness ultimately insisting the reporting was "looking forwards" and not "looking backwards." *See* DE #225 at § III(d).

   e. **Subsection I(C) – Alleged Bad Faith**

Allegations of bad faith are covered, in some detail, in the Ruins' own closing. *Id.* at § IV(b). The Debtor will, accordingly, forbear from rehashing most of those arguments herein. However, three aspects of the Bank Closing merit attention: (i) RRSB tepidly acknowledges the majority of "bad faith" factors do *not* support such a finding in this case; (ii) the bank's contention concerning evasion of a court order tests the limits of credulity; and (iii) arguments about the absence of an ongoing business miss the broader contextual reality that the Debtor is working to finalize construction so there will be an ongoing business.

The bank notes 14 factors, used to assess bad faith filings, in its briefing. *See* Bank Closing, DE #224, at § I(C) (quoting *In re KRE, LLC*, 2011 WL 3296690, at *4 (Bankr. D.N.D. Aug. 1, 2011)). Yet RRSB's own analysis goes on to show the overwhelming majority of these factors, applied to the facts *sub judice*, do *not* support a finding of bad faith. By way of anecdote only: the Ruins is not a repeat filer, this is not a case without unsecured creditors (nor is this a case with very few unsecured creditors, each holding *de minimis* claims), several debts are owed to non-moving creditors (some of whom appear to actively oppose conversion), and the Debtor was not formed on the eve of bankruptcy (this is not a "two step" case).

Moreover, some of the factors on which the bank relies are ones that patently do not support a finding of bad faith. In consideration of "evasion of court orders," the bank points to the filing of this case when a receivership motion was pending in state court. *See* Bank Closing, DE #224, at § I(C)(4). Assuredly, this is not a hallmark of bad faith; myriad debtors find their way to this

9

Honorable Court, and to sister courts, when foreclosure judgments near entry, when receivership motions are pending (or have recently been entered), and when other state court rulings hang in the balance. Seeking chapter 11 protection is not the evasion of such an order; seeking chapter 11 protection is the utilization of the Bankruptcy Code—including the automatic stay enshrined therein—to save a business.

RRSB similarly asserts the absence of an ongoing business. *Id.* at § 1(C)(8). Yet this seems to miss the point: the whole premise of this case is to finalize the creation of an ongoing business. The Debtor is in the process of constructing an apartment building that, once complete, will have employees and tenants. Urging such does not presently constitute an "ongoing business" is short-sighted; urging such to militate in favor of bad faith is simply wrong.

### III.    Section II – Remedy if Cause is to be Found

#### a.   Subsection II(A) – Unusual Circumstances

The Bank Closing urges the "unusual circumstances" exception to conversion to be inapplicable where there is an ongoing loss or diminution. *See* Bank Closing, DE #227, at § II(A)(1). On this front, the Debtor agrees: the unusual circumstances exception does not apply to cases where cause exists under Section 1112(b)(4)(A) (though the appointment of a chapter 11 trustee is still available in such instances). Yet, as noted above, this is not a case where there is an ongoing loss or diminution. *See, supra,* § II(a-b).

RRSB next contends unusual circumstances have not been established. *See* Bank Closing, DE #227, at § II(A)(2). The Debtor largely rests on its own closing as to this point, with there being extensive evidence, in the record, of unusual circumstances. *See* DE #225 at § V. Broadly, however, suffice it to posit that it is unusual to have a circumstance where (i) a debtor's sole asset value can be enhanced; (ii) everyone agrees the asset value can be enhanced; (iii) a plan is in place

10

to enhance the asset value; and (iv) a single creditor—which happens to have stay relief—is urging that asset value should not be enhanced for the benefit of all creditors.

Subsequently, the bank implores that a plan cannot be confirmed within a reasonable period of time. *See* Bank Closing, DE #224, at § II(A)(3). This is a three sentence argument. *Id.* Core to this argument is that the plan proposed by the Debtor is not confirmable. The Ruins obviously takes issue with this threadbare assertion and would note that (i) a disclosure statement hearing is set for January; (ii) even if issues do exist with the plan, they can be cured through amendment; and (iii) it is unfathomable that a plan proposed within the exclusivity period is not also one proposed within a "reasonable time."

Next, RRSB urges the grounds of "cause" lack reasonable justification, *id.* at § II(A)(4), and cannot be cured, *id.* at § II(A)(5). Both of these are exceedingly brief, sweepingly broad arguments. To the extent "cause" is ultimately found to exist, assuredly the points of argument set forth herein—and in the Debtor's prior written closing—establish reasonable justification for the same. This is not a case where "cause" is an open-and-shut matter and for which justification is the real focus (such as where operating reports are tardy because of an attorney's workload backlog, or where insurance briefly lapses because a notice of termination is not promptly opened). This is, rather, a cause where the Debtor truly believes it has acted properly—in the face of acrimony and chaotic circumstances, predominately of RRSB's own making—at every turn. Yet, to the extent any actions do demand a cure, it bears notation that the Debtor's proposed plan places an independent fiduciary at the helm of the reorganized estate, *see* DE #182-1 at § 4.1.2. Such surely would allow for the cure of any issues pegged to alleged bad faith.

11

b.  **Subsection II(B) – Conversion v. Dismissal**

*If* cause is found to exist, and *if* unusual circumstances are not found to be extant, the Debtor is advocating for appointment of a chapter 11 trustee, not conversion or dismissal. This portion of the bank's brief appears to address only the question of conversion versus dismissal. It does not appear anyone is advocating for dismissal. So, while there are very serious questions about what a chapter 7 trustee could do in a case where a secured creditor appears primed to pursue foreclosure litigation, having been granted stay relief, the Debtor will refrain from urging dismissal to be an appropriate remedy.

c.  **Subsection II(C) – Appointment of Chapter 11 Trustee**

"The Ruins offered no evidence during the hearing that it would be willing to obtain money to pay for a Section 1104 trustee or examiner," posits RRSB. *See* Bank Closing, DE #224, at § II(C). And, on that proposition, the bank rests its case for why appointment of a chapter 11 trustee would be improper (whilst also revisiting earlier, flawed arguments about the financial viability of the project). Critically, though, this assertion evinces a misreading of the record.

Mr. Craig plainly testified that he would contribute $20,000.00 to pay a chapter 11 trustee, if one were appointed in this case. *See* Transcript of November 4, 2025 at 95:21-25. As covered in the Debtor's closing, this sum would be more-than-sufficient. *See* DE #225 at § VI. And there is certainly no countervailing evidence to the contrary.

Of course the bank does not want to see a trustee appointed: such would allow the Debtor an opportunity to proceed with plan confirmation and frustrate RRSB's foreclosure efforts. But the question, if cause is established and if unusual circumstances are not found to be present, is not one of RRSB's own self-interests but, rather, those of the creditor body and estate writ large. *See* 11 U.S.C. § 1112(b)(1).

12

All of which returns to the underlying issue with the Bank Closing: RRSB is trying really quite hard to persuasively argue that creditors are not better off with a completed building than with an uncompleted building. This is not a sensible contention. And while the exemplary draftsmanship and lawyering behind the Bank Closing ought to be commended, the arguments therein simply do not hold up. That RRSB wants to take back this property is not a compelling ground of "cause," is not an exception to the "unusual circumstances" test, and is not reason to look past the appointment of a chapter 11 trustee.

### IV. Conclusion

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) deny the motion to convert; (ii) in the alternative, appoint a chapter 11 trustee; and (iii) afford such other and further relief as may be just and proper.

Respectfully Submitted,

Dated: December 16, 2025   By:   /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtor*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of December, 2025, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig

13