UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In Re:<br><br>The Ruins, LLC,<br><br>                Debtor. | Case No.: 25-30004<br><br>Chapter 11 |

**RED RIVER STATE BANK'S POST-HEARING REPLY BRIEF IN SUPPORT OF MOTION TO CONVERT CASE TO CHAPTER 7**

### INTRODUCTION

WDC[1] aptly summarized the likely position of all creditors—or at least RRSB's position—in this case: "[i]f [RRSB] could simply vote to confirm the pending plan and the result would be payment in full of [RRSB's] claim, [RRSB] would not be asking the Court to convert the case." ECF No. 218, at 2. The problem, however, is that "the pending plan faces too many hurdles to confirmation, is not feasible, and is far too speculative to rely upon." *Id.* Simply stated, "Debtor's pending plan does not provide a viable path for creditors to be paid, and therefore it is not in the best interests of the creditors to keep this case in a Chapter 11 where administrative expenses will continue to accrue." *Id.* at 3.[2] Therefore, because RRSB has established cause under Section 1112 to convert this case to Chapter 7, RRSB respectfully requests the conversion of this case to Chapter 7.

---

[1] Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in RRSB's Post-Hearing Brief in Support of Motion to Convert Case to Chapter 7. *See generally* ECF No. 224.

[2] Tellingly, WDC admits that if Debtor's plan were feasible, or if another feasible plan to complete The Ruins Development could be drafted, that it would benefit WDC for this case to remain in Chapter 11. *See* ECF No. 218, at 2.

LAW AND ARGUMENT

**I.     RRSB established "cause" under Section 1112 to convert this case.**

The Ruins argues that RRSB failed to establish "cause" to support the Motion. *See generally* ECF No. 225, at 10-15. Those arguments fail.

    A.     RRSB established "cause" due to continuing losses under Section 1112(b)(4)(A).

        1.  *RRSB established that The Ruins has been unable to pay its post-petition expenses and that The Ruins Development is depreciating—both continuing losses.*

           a.  The Ruins does not deny that it has been unable to pay its post-petition expenses.

As outlined in its principal brief, it is beyond dispute that The Ruins has consistently operated at a loss since initiating this case. *See* ECF No. 224, at 2-3. As the Eighth Circuit Court of Appeals has made clear, "negative cash flow . . . alone is sufficient to establish 'continuing loss to or diminution of the estate.'" *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 515-16 (8th Cir. 2004) (citations omitted). Debtor's inability to operate with a positive cashflow at any time in this bankruptcy case—alone—is "cause" in the form of a continuing loss to or diminution of the estate. *Id.*

           b.  The record establishes The Ruins Development's continued depreciation.

Inability to pay its bills aside, contrary to Debtor's protests, the evidence before this Court also establishes that The Ruins Development is depreciating in value while this case languishes.

The Ruins first asks this Court to ignore the expert opinions offered by Mr. Luther regarding the value of The Ruins Development. Debtor's attempts to attack the credibility of Mr. Luther—the only expert appraiser offered—fail. Mr. Luther's most recent valuations

2

reflect current market trends and conditions, including rising interest rates and changing dynamics in the Watertown market as established through data compiled by third parties, rather than through Mulinda's personal anecdotal information. *Compare* ECF No. 59, at 25-117 (outlining Mr. Luther's most recent methodology and calculation for the as-stabilized value of The Ruins Development), *with* Tr. from Nov. 4, 2025, Hr'g, at 161:4-6 (clarify that Mulinda's testimony about rental demands in Watertown, South Dakota based on her anecdotal experience managing Generations and Parkside was "an area of expertise of this lay witness"); *cf. also id.* at 164: 14-17 (Mulinda denying any experience in marketing or selling commercial properties). While prior appraisals were conducted under different economic circumstances, Mr. Luther confirmed that he used the same methodology to reach all his valuations. *See* Tr. from Nov. 24, 2025, Hr'g, at 36:6-13. In that The Ruins does not object to Mr. Luther's prior (and more favorable) valuations, *cf.* ECF No. 225, at 8 (decrying that Mr. Luther's most recent appraisal was "a marked departure from his three prior appraisals"), it cannot simply disregard Mr. Luther's most recent opinion when harmful to its case. Conclusory allegations about accuracy are not evidence of any inaccuracy.[3] And if The Ruins believed that Mr. Luther's most recent opinion was inaccurate, it was free to offer competing expert evidence. It did not, even though Jesse testified that he had paid money to retain experts. *See* Tr. from Nov. 4,

---

[3]   Debtor's only specific attack Mr. Luther's most recent appraisal is that it ignores "the most recent apartment building sale in Watertown, South Dakota, even though such would have been an apt 'comp.'" ECF No. 225, at 7. The fundamental flaw with this argument is that The Ruins never established that the sale of The Lofts was a comparable sale. It was not. *Compare*, Tr. from Nov. 24, 2025, Hr'g, at 65:12-22 (Mr. Luther denying knowledge of a comparable sale of The Lofts), *with* Tr. from No. 25, 2025, Hr'g, at 219:2-19 (Mulinda being able to "speculate" whether a membership sale is comparable to a simple real estate purchase sale). The sale of The Lofts was not the sale of real estate, but was instead a membership sale that The Ruins did not establish was relevant or material to Mr. Luther's appraisal process.

3

2025, Hr'g, at 47:15-24; *see also id.* at 178:24-25 ("Transparently, we have an appraiser who we engaged awhile ago who we have worked with transparently."). Debtor's conscious decision not to call its competing expert is, itself, telling regarding the accuracy of Mr. Luther's opinions. The record before this Court is that the value of The Ruins Development is diminishing during the pendency of this bankruptcy.

The Ruins also asks this Court to ignore the evidence of acute ongoing damage to the estate in the form of ongoing water penetration and damage. To argue that The Ruins Development is not experiencing ongoing water damage, The Ruins relies on recent exterior photographs, as well as testimony from Barry Matson ("Mr. Matson") and Jason Biggins ("Mr. Biggins"). None support Debtor's arguments.

First, the photos fail to establish that The Ruins has remedied the water penetration issue. Mr. Gehrtz identified at least thirty (30) points of ongoing water penetration at The Ruins Development: the 2nd floor fitness center, unit 201, unit 205, unit 207, unit 209, unit 213, unit 215, unit 217, unit 219, unit 221, unit 223, unit 301, unit 303, unit 305, unit 307, unit 309, unit 315, unit 317, unit 319, unit 321, unit 323, unit 325, unit 403, unit 405, unit 407, unit 409, unit 413, unit 421, unit 423, and unit 425. *See* ECF No. 60-1, at 38, 66, 86, 93, 103-04, 121, 134-35, 138-39, 142, 149-50, 154, 175, 177, 187, 195, 206, 215, 247, 250, 254-55, 258, 260, 264-65, 269-70, 273, 275, 308, 316-17, 324, 334, 353, 356, 376, 382-83, and 387-88. The limited photos offered by The Ruins, and the testimony regarding the same, do not establish that all—or even any—of these water penetration points were corrected by a single Tyvek repair.

As for Mr. Matson's testimony, The Ruins argues that he testified "that the property interiors 'looks about the same' as when construction was halted, and that '[o]verall, it's not

4

that much different,' with his observations being based on a walk through of the property just four days prior to testifying." ECF No. 225, at 11-12.  But photographic evidence received by the Court disproves the credibility of such testimony.  This Court received into evidence photos chronicling the water damage to The Ruins Development.  *See* ECF No. 60-1, at 403-04.  The only way for this Court to find that Mr. Matson was "one of the more credible witnesses to testify at the trial," as required by Debtor's argument, *see* ECF No. 225, at 11, is for this Court to disregard the photographs received into evidence—photographs that The Ruins did not even attempt to impeach.  *Cf.* Tr. from Nov. 20, 2025, Hr'g, at 142-174 (cross-examination of Mr. Gehrtz, without any questioning regarding the photos of water damage).  It may be true that The Ruins Development today is "about the same," or "not that much different," as testified to by Mr. Matson, but that is because The Ruins Development was experiencing water damage as January of 2025, and those water penetration issues have continued throughout the year while this case has stalled.

As for the testimony of Mr. Biggins, tellingly, The Ruins did not attempt to qualify Mr. Biggins as an expert witness.  *Cf.* Tr. from Nov. 25, 2025, Hr'g, at 198-200 (not offering Mr. Biggins as an expert, and not soliciting testimony regarding his training and experience that would permit him to qualify as an expert).  Accordingly, Mr. Biggins's opinion that The Ruins Development did not require mold remediation is of limited weight.  *Cf.* Fed. R. Evid. 701(c) (opinion from lay witness cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702").  And even if this Court wanted to give the opinion greater weight, the opinion does not support Debtor's argument.  Mr. Biggins's limited opinion was that he did not believe The Ruins Development required mold remediation in December of 2024.  *See* Tr. from Nov. 25, 2025, Hr'g, at 200:6-9.  Mr. Biggins did not provide an opinion

5

regarding whether The Ruins Development was experiencing ongoing water penetration issues. Mr. Biggins did not testify whether The Ruins Development was deteriorating. And Mr. Biggins did not testify whether mold remediation work would needed today. Indeed, while The Ruins had Mr. Matson visit The Ruins Development to prepare for his testimony, *see id.* at 192:6-9, The Ruins did not have Mr. Biggins revisit The Ruins Development since December of 2024. The implications raised by The Ruins keeping Mr. Biggins away from The Ruins Development are obvious—The Ruins Development is experiencing ongoing water penetration issues and damage, and even if unnecessary in December of 2024, mold remediation (and other restoration services) are currently needed because of the ongoing water penetration. Debtor's evidence does not disprove an ongoing water penetration issue.

Instead, the most credible evidence before the Court regarding the water penetration issue remains the testimony from Mr. Gehrtz. Mr. Gehrtz inspected The Ruins Development on three occasions over fourteen months, identifying ongoing water penetration and damage throughout those inspections. *See* ECF No. 60-1, at 1-401; Tr. from Nov. 20, 2025, Hr'g, at 98: 1-6; ECF No. 60-1, at 403-04; Tr. from Nov. 20, 2025, Hr'g, at 100:9-12. This Court received photographs chronicling ongoing water penetration, and the damage caused. ECF No. 60-1, at 403-04. The ongoing water damage to The Ruins Development—as proven at trial—is a continuing loss to, or diminution of, the estate.

    2.    *The Ruins lacks a reasonable likelihood of rehabilitation.*

The Ruins argues that RRSB bears the burden of establishing a lack of reasonable likelihood of rehabilitation. *See* ECF No. 225, at 13 n.5. RRSB already admitted the same. *See* ECF No. 224, at 6. And RRSB <u>did</u> establish a lack of reasonable likelihood of rehabilitation.

6

RRSB established the lack of reasonable likelihood of rehabilitation because The Ruins Development cannot be completed as proposed. *See* ECF No. 224, at § I(A)(2)(a). And even if The Ruins Development could be completed as proposed—which it cannot, The Ruins Development would not generate sufficient cash flow to make the necessary payments. *See* ECF No. 224, at § I(A)(2)(b). There is no reasonable likelihood that The Ruins can rehabilitate.

    B.    <u>RRSB established "cause" due to failure to provide accurate schedules under Section 1112(b)(4)(F).</u>

As outlined in its principal brief, The Ruins still fails to provide accurate schedules. *See* ECF No. 224, at § I(B). The Ruins does not claim to the contrary. *Cf.* ECF No. 225 (not addressing any issues with its schedules). The failure to provide accurate information is cause under Section 1112. *See* 11 U.S.C. § 1112(b)(4)(F); *In re Korn*, 523 B.R. 453, 467 n.32 (Bankr. E.D. Pa. 2014). Debtor's failure to produce accurate schedules is cause in the form of an unexcused failure to timely satisfy any filing or reporting requirement. *Id.*

    C.    <u>RRSB established "cause" due to Debtor's bad faith.</u>

Alternatively, The Ruins argues there is no evidence of bad faith because RRSB "does not point to a single post-petition action, *vel non*, of" The Ruins. *See* ECF No. 225, at 13; *see also id.* ([A]ll of the allegations concern *pre*-petition activities." (emphasis in original)). But the problem for The Ruins is that a debtor's prepetition conduct—alone—<u>can</u> establish bad faith for purposes of Section 1112. Indeed, within the last year, this Court has found "bad faith" warranting dismissal of a Chapter 11 case based entirely on prepetition conduct. *See In re Stark Energy, Inc.*, Bankr. No. 24-30168 (Bankr. D.N.D.), ECF No. 236 (dismissing debtor's chapter 11 case for bad faith based on prepetition conduct).

7

Tellingly, The Ruins does not even attempt to justify its pre-petition conduct. The Ruins, instead, half-heartedly characterizes the hundreds of pages of documents received by the Court as "messy financial records[,]" *see* ECF No. 225, at 13. But the only "messiness" is the depth and breadth of Debtor's wrongful conduct. As already summarized by RRSB, *see* ECF No. 224, at § I(C)(3), The Ruins submitted fraudulent invoices to RRSB on at least forty-one (41) occasions, causing loan proceeds that were specifically intended for The Ruins Development and the payment of The Ruins subcontractors to be transferred to statutory insiders. The insiders obtained more loan proceeds from RRSB than originally promised for completion of The Ruins Development, and likely engaged in bank fraud through the falsification of personal financial statements to keep additional loan proceeds forthcoming. It is beyond reasonable dispute that The Ruins engaged in substantial prepetition, bad faith conduct. But instead of recovering such funds as a fiduciary for the estate, The Ruins now seeks to confirm a Chapter 11 plan that would shield its insiders from liability for up to five years. . *Cf.* ECF No. 225, at 15 (outlining that a "third party fiduciary" would be empowered to pursue claims against RRSB, but not identifying any authorization to investigate or pursue Chapter 5 claims); *cf. also* ECF No. 181, at § 4.8 (providing an injunction against insiders). Under The Ruins' plan, there is no cost to The Ruins or the statutory insiders if construction is not completed or "take out financing" cannot be obtained. If the Chapter 11 case continues past the two-year anniversary of the petition date, the insiders will have outrun the statute of limitations for potentially valuable Chapter 5 claims. The Ruins not only engaged in prepetition bad faith conduct, the evidence before the Court supports an inference that The Ruins commenced this case and it is fighting to confirm an unfeasible plan for the bad faith purpose of shielding the insiders from liability for liability..

8

**II.     Conversion is the appropriate remedy.**

The Ruins argues that if this Court were to find cause, that conversion to Chapter 7 is unwarranted. *See generally* ECF No. 225, at 15-19. As addressed below, those arguments also fail.

    A.     <u>The "unusual circumstances" exception does not apply to this case.</u>

        1.     *That completion of The Ruins Development would increase its value is not an "unusual circumstance" under the meaning of Section 1112.*

The Ruins argues the "unusual circumstance" preventing this Court from converting this case is that The Ruins Development would be worth more if completed. *See* ECF No. 225, at 16-18. The increase in value to The Ruins Development if completed is not an "unusual circumstance." While the term is undefined by the Bankruptcy Code, the courts have interpreted the phrase to require "conditions that are not common in chapter 11 cases." *In re Pittsfield Weaving Co.*, 393 B.R. 271, 275 (Bankr. D.N.H. 2008) (citation omitted). The fact that completed real estate is more valuable than unfinished is just the sort of common condition present in all chapter 11 construction cases that would swallow the exception whole if permitted to qualify as an "unusual circumstance."

And even if the fact that The Ruins Development would be more valuable if completed could constitute unusual circumstances—which it cannot, The Ruins bears the burden of establishing unusual circumstances preventing the conversion of this case. *See In re Miell*, 419 B.R. 357, 367 (Bankr. N.D. Iowa 2009). That burden would include proving that its plan to complete The Ruins Development and generate a complete payoff for creditors would be feasible. While RRSB respectfully avers that it has established that the Second Amended Plan is not feasible, *see* Sec. I(A)(2), *supra.*, with the burden having swung to the other side, The Ruins utterly failed to establish that it would be feasible to confirm the Second Amended Plan.

9

The Ruins has not identified any viable source for Jesse's alleged contribution to The Ruins Development.  This is particularly problematic when Jesse has a history of fabricating and overstating his personal financial resources.  *See* Tr. from Nov. 3, 2025, Hr'g, at 53:17-60:11 (outlining Jesse' fabrication of personal financial statements submitted in support of obtaining loans from RRSB).  Issues with Jesse's contribution notwithstanding, The Ruins lacks necessary commitments from contractors to complete the project.  For the two letters of intent that The Ruins did produce, the LOIs include express disclaimer language confirming that they are not binding.  *See* ECF Nos. 181-2 & 181-3 ("The parties acknowledge and agree that this LOI is not contractual in nature.").  And The Ruins offered no evidence of even non-binding commitments from Watertight or Limoges.

In comparison, through Mr. Gehrtz, RRSB provided specific and detailed information about the time, costs, and materials necessary to complete The Ruins Development.  The Ruins failed to produce any detailed construction budgets or timelines for completion of The Ruins Development.  Without such information, it is entirely speculative whether the amounts and contractors proposed by The Ruins would suffice to complete The Ruins Development.  Indeed, based on the evidence submitted, at this juncture, Debtor's promises to pay all creditors appear more aspirational than reasonable.  Debtor's failure to establish through competent evidence that the Second Amended Plan would be feasible renders the unusual circumstances exception inapplicable to this case.

> 2. *Debtor's continuing losses preclude the application of the "unusual circumstances" exception.*

And even if greater value at completion could be an unusual circumstance, when conversion is based on a continuing loss to, or diminution of, the estate, the "unusual

10

circumstances" exception is unavailable. *See, i.e.*, *In re Plymouth Oil Co., L.L.C.*, No. 12-01403, 2014 WL 3812078, at *5 (Bankr. N.D. Iowa Aug. 1, 2014). The Ruins provides no argument to the contrary. Because conversion is warranted under Section 1112(b)(4)(A) for a continuing loss to the estate, the unusual circumstances exception is inapplicable to this case.

> 3. *Debtor's inability to confirm a plan within a reasonable time renders the "unusual circumstances" exception inapplicable.*

Further, as previously identified by RRSB, *see* ECF No. 224, at 29, the inability of a debtor to confirm a plan within a reasonable time renders the "unusual circumstances" exception inapplicable. *See* 11 U.S.C. § 1112(b)(2)(A). The burden of proving that plan can be confirmed within a reasonable time falls upon the debtor. *See In re Miell*, 419 B.R. at 367. The Ruins has failed to prove that the Second Amended Plan can be confirmed within a reasonable time. *See* Secs. II(A)(1), *supra*. This failure prevents application of the unusual circumstances exception.

> 4. *Debtor's lack of reasonable justification for engaging in conduct constituting "cause" precludes the application of the "unusual circumstances" exception.*

As also previously identified by RRSB, *see* ECF No. 224, at 29, the lack of reasonable justification for engaging in conduct constituting "cause" renders the "unusual circumstances" exception inapplicable. *See* 11 U.S.C. § 1112(b)(2)(B)(i). Because the burden of providing a reasonable justification falls upon the debtor, *see In re Miell*, 419 B.R. at 367, The Ruins must justify its conduct. The Ruins failed offer any justification—let alone a reasonable one—for: (1) submitting inaccurate schedules, (2) initiating this case in bad faith; or (3) shielding statutory insiders from liability for Chapter 5 claims at the expense of creditors. *Cf.* ECF No. 225, at 15-18 (failing to offer any justifications for its conduct). Indeed, even if it had tried to justify its conduct, as this Court previously explained, such explanations would necessarily fail

11

because "the 'weight of case law supports the conclusion that "bad faith" cannot be . . . justified such that the exception to dismissal under § 1112(b)(2) applies,' to the Court's analysis under section 1112." *In re Stark Energy, Inc.*, Bankr. No. 24-30168 (Bankr. D. N.D.), ECF No. 236, at 2 (quoting *In re LTL, Mgmt, LLC*, 652 B.R. 433, 454 (D.N.J. 2023)). This failure prevents application of the unusual circumstances exception.

        5.    *Debtor's inability to cure its bad faith conduct precludes the application of the "unusual circumstances" exception.*

Lastly, as previously identified by RRSB, *see* ECF No. 224, at 30, an inability to cure bad faith conduct renders the "unusual circumstances" exception inapplicable. *See* 11 U.S.C. § 1112(b)(2)(B)(ii). And with the burden being Debtor's, *see In re Miell*, 419 B.R. at 367, The Ruins must propose a cure for its conduct. It did not, instead maintaining that it had done nothing wrong and proposing a Chapter 11 plan that would affirmatively preclude any party from holding statutory insiders liable for loan proceeds they transferred out of The Ruins. *See* ECF No. 225, at 18 ("[T]he Ruins urges that no cause to be afoot[.]"). And Debtor's lack of a proposed cure is likely academic because "the 'weight of case law supports the conclusion that "bad faith" cannot be cured . . . such that the exception to dismissal under § 1112(b)(2) applies,' to the Court's analysis under section 1112." *In re Stark Energy, Inc.*, Bankr. No. 24-30168 (Bankr. D. N.D.), ECF No. 236, at 2 (quoting *In re LTL, Mgmt*, 652 B.R. at 454). The lack of cure—proposed or possible—prevents application of the unusual circumstances exception.

        B.    <u>Conversion, rather than appointment of a trustee or examiner, is in the best interests of creditors and the estate.</u>

The Ruins alternatively argues for the appointment of a trustee if this Court finds cause and does not apply the unusual circumstances exception. *See* ECF No. 225, at 18-19. The Court should not grant this request because Debtor's suggestion is not truly based in the

12

considerations set forth in Section 1104, and such an appointment would not be in the best interest of creditors and the estate.

The Ruins primarily argues that the appointment of a trustee would be in the best interest of the creditors and the estate because it would allow for the completion of The Ruins Development, which would benefit all parties. *See id.* at 18-19. This argument fails for two reasons. First, a trustee or examiner appointed pursuant to Section 1104 is an independent fiduciary. The Ruins seems to be suggesting that a Chapter 11 trustee can be appointed with instructions to implement the debtor-in-possession's prior plan of reorganization or to adopt its conclusions with respect to the investigation and prosecution of causes of action. But at this juncture, it is entirely unclear whether an independent fiduciary, as opposed to the "Estate Representative" proposed in the Second Amended Chapter 11 Plan filed by The Ruins, would pursue completion of The Ruins Development or confirmation of a plan that would grant a five-year injunction to all statutory insiders. ECF 181, at 10.

Second, Debtor's argument is circular because it assumes, without proving, that there exists a feasible proposal for the completion of The Ruins Development. If it was economically rational to complete The Ruins Development, and if the appointment of a Chapter 11 trustee or an examiner would resolve the concerns of the largest stakeholders in the case, such parties could have and would have moved for such relief. But the reality is that The Ruins has not been able to secure financing, as opposed to a patchwork of non-binding LOIs, to complete The Ruins Development. *See* Sec. II(A)(1), *supra*; *see also* ECF No. 224, at § I(A)(2)(a) (same). And even if the commitments that The Ruins had received were sufficient to complete The Ruins Development, the plan still would not be feasible because the Second Amended Plan does not generate sufficient income to make plan payments, *see* ECF

13

No. 224, at § I(A)(2)(b), notwithstanding the additional administrative burden that would come with a chapter 11 trustee. Still, The Ruins argues this Court should appoint a trustee merely because Jesse testified that he would provide $20,000 to pay a potential trustee. *See* ECF No. 225, at 19.[4] Again, a trustee or examiner is intended to be an independent fiduciary. But if the trustee or examiner will be compensated directly out of personal funds from a statutory insider, this could directly undermine such person's independence. Additionally, if a trustee or examiner is appointed in a case of this duration and complexity with such a modest fixed budget, it is entirely unclear how they would meaningfully manage construction and investigate or prosecute causes of action. The Ruins provided no testimony about the identity of the potential trustee would be, whether he or she would agree to perform the work, or the costs associated with the trustee's duties. Nevertheless, The Ruins argues that $20,000 for an unidentified and uncommitted trustee would necessarily be "a perfectly reasonable sum" because the chapter 11 trustee would not be overseeing an active business. *Id.* But Debtor's argument attempts to eat its cake and have it too. If the chapter 11 trustee will not be performing any meaningful work so that $20,000 would obviously suffice to cover the cost, then there is no meaningful benefit to creditors or the estate because the chapter 11 trustee is not performing meaningful work. If, however, the chapter 11 trustee would actually be empowered to manage The Ruins, including trying to formulate a feasible plan of reorganization—because the Second Amended Plan is not feasible, and investigating and

---

[4] The Ruins fails to explain how the payment of a chapter 11 trustee retainer from Jesse would not—itself—increase the administrative costs for The Ruins by $20,000.00. *See* 11 U.S.C. § 503(b)(3)(D) (identifying as allowable administrative expenses "the actual, necessary expenses . . . incurred by a creditor . . . in making a substantial contribution in a case under chapter . . . 11 of this title[]").

14

potentially pursuing Chapter 5 claims—because DIP has been unwilling to do so, then there is no evidence that $20,000 would suffice for a trustee to properly evaluate the complex construction issues with The Ruins development, oversee potential completion of The Ruins Development, navigate the currently pending claims against RRSB, and evaluate potential Chapter 5 claims.

Lastly, a specific person has been identified and proposed to serve as Estate Representative in the most recent plan filed by The Ruins. If the Court opts to appoint a Chapter 11 trustee, the U.S. Trustee would follow the selection procedure set forth in Section 1104(d). In sum, The Ruins claims to request the appointment of a Chapter 11 trustee, but on terms that are satisfactory to the statutory insiders. The primary difference between a Chapter 11 trustee and conversion to Chapter 7 is the insider's belief that they can still wield influence over this case for the primary purpose of shielding themselves from liability.

For all the foregoing reasons, Debtor's transparent request for a quasi-chapter 11 trustee should not be substituted for the knowable benefits of a Chapter 7 trustee. Appointment of a chapter 11 trustee would simply increase the administrative costs, and provide additional delay. Those costs and delays are not in the interest of any party except the statutory insiders.

C. <u>Conversion, rather than dismissal, is in the best interest of creditors and the estate.</u>

RRSB argued that conversion, rather than dismissal, was in the best interests of the creditors and the estate. The Ruins does not argue that dismissal would be a more appropriate remedy. *Cf.* ECF No. 225, at 15-19 (not advancing an argument for dismissal). Accordingly, to the extent that this Court finds cause, and does not apply the unusual circumstances

15

exception, or appoint a trustee or examiner, it is undisputed that conversion is the appropriate remedy.

## CONCLUSION

For the foregoing reasons, and the reasons originally set forth, RRSB respectfully requests that this Court grant its Motion, and convert the above-captioned case to Chapter 7.

December 16, 2025                              **VOGEL LAW FIRM**

BY: */s/ Drew J. Hushka*
Caren W. Stanley (#06100)
cstanley@vogellaw.com
Kesha L. Tanabe
ktanabe@vogellaw.com
Drew J. Hushka (#08230)
dhushka@vogellaw.com
218 NP Avenue
PO Box 1389
Fargo, ND 58107-1389
Telephone: (701) 237-6983
Fax: (701) 476-7676
*ATTORNEYS FOR RED RIVER STATE BANK*