**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

In Re:                                                      Bankruptcy No. 25-30004
                                                            Chapter 11
The Ruins, LLC,

                                    Debtor.

_____/

**ORDER ON MOTION TO CONVERT TO CHAPTER 7**

Red River State Bank filed an Expedited Motion to Convert Case to Chapter 7.

Doc. 109.  Watertown Development Company joined the motion.  Doc. 131.  Debtor The

Ruins, LLC, opposes the motion.  The Court received exhibits and testimony during

evidentiary hearings on the motion on November 3, 4, 20, 24 and 25.

This is a core proceeding under 28 U.S.C. § 157(b)(2), and this Court has

jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334. This opinion constitutes the

Court's findings and conclusions under Fed. R. Bankr. P. 7052, made applicable to this

contested matter by Fed. R. Bankr. P. 9014(c).  For the reasons that follow, the Court

grants Red River State Bank's motion and converts this Chapter 11 case to a case

under Chapter 7.

**BACKGROUND**

Debtor The Ruins is a limited liability company wholly owned by Jesse Craig,

who created The Ruins in 2019 for the purpose of constructing and operating a

residential apartment building in Watertown, South Dakota.  Creditor Red River State

Bank provided financing for the project.  After construction was underway,

disagreements arose between Debtor and Red River State Bank.  Red River State Bank

1

ultimately discontinued funding the project and pursued a loan default against Debtor. Lack of funding led to cessation of the construction project.

Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 6, 2025.  In its amended schedules, Debtor disclosed assets valued at just over $15.7 million and liabilities of just over $15 million.  With the exception of a $12,860 utility deposit and Debtor's adversary proceeding asserting claims for fraud, deceit and other causes of action, Debtor's only asset is the real estate and the nearly-complete apartment building on it.

Debtor valued the real property at $15,750,000. When asked how he arrived at that value, Jesse Craig explained: "Took the appraisal and then looked at kind of where our rents are scheduled to be now over the past two, three years that we've increased rents. Put a regular debt service on it and get an NOI and use a cap rate."  He clarified that the increased rents refer to lease rates charged by Generations on 1st, LLC, and Parkside Place, LLC.[1]  He also explained that the $15,750,000 value he assigned the real property is the finished value of The Ruins real estate project rather than its present value.

In Debtor's Second Amended Chapter 11 Plan of Reorganization of The Ruins, LLC, Debtor proposes to complete construction of the project through:

> the contribution of cash financing to be provided by an insider of the Debtor, in the sum of $262,094.00, in-kind financing to be provided by B&W Construction in the sum of $553,184.60 (inclusive of labor and materials), in-kind financing to be provided by Lakeside Construction in the sum of $196,297.50 (inclusive of labor and materials), in-kind financing to be provided by Limoges Construction in the sum of $58,500.00 inclusive of

---

[1] Generations on 1st, LLC, and Parkside Place, LLC, two other entities in which Jesse Craig owns an interest, also lease residential apartment units.

labor and materials), and in-kind financing to be provided by Watertight in the sum of $247,176.00, for a total completion cost of $1,317,352.00.

Doc. 181 at 11. Debtor secured letters of intent (which specifically provide that they are not contractual in nature) to provide this financing from B&W Construction and Lakeside Construction. Although Debtor offered no other written commitments, the Second Amended Chapter 11 Plan suggests, and Jesse Craig confirmed, that the other in-kind financers are committed to completing the project as well.

Matthew Gehrtz, an engineer and expert in commercial construction, estimated that the cost to complete construction of The Ruins would total $1,695,967. This estimate does not include remediation efforts necessary to repair water damage to The Ruins, which increased between his first and second inspections.[2]

On cross examination, Gehrtz conceded that he did not consider the cost of labor in the Watertown market; he gathered pricing information from subcontractors other than those who already performed work on the project; and he did not have any actual experience in the Watertown marketplace. He acknowledged the cost of completion could be lower, and his estimate was based in part on assumptions about the materials needed to complete construction without inventorying the materials on site.

The Second Amended Chapter 11 Plan provides that the Exit Financers will be paid the principal sum of the $1,317,352 completion costs in a single balloon installment not later than the second anniversary of the Effective Date of the plan. Further, the prepetition claims of each of the Exit Financers will be rolled into the postconfirmation debt owed to each of them, and Debtor will grant them a superpriority priming lien upon

---

[2] Debtor offered evidence disputing Gehrtz's testimony regarding water damage to The Ruins.

their postconfirmation contribution of cash or in-kind financing toward completion of the construction.

Debtor proposes to postpone payments to its secured creditors (Red River State Bank and Watertown Development Company), Codington County Treasurer and mechanics' lien holders until the Plan Payment Commencement Date (six months after permits requisite to commence renting apartments are issued following construction completion or January 1, 2027) or later.

Watertown Municipal Utilities, unsecured trade creditors, unsecured development cost creditors, Blacktail Investments, LLC, and the Internal Revenue Service will receive no payments under the plan until the Takeout Financing Date, which is defined as "(i) the date on which the Debtor closes on a loan in a sum sufficient to pay all allowed Claim Holders in full; or (ii) June 1, 2029." Doc. 181 at 5.

The Second Amended Chapter 11 Plan further provides that after Debtor achieves full (or near-full) occupancy, Debtor will procure "takeout financing" from one or more third party lenders in a sum sufficient to retire all claims in full. Id. at 12.

Danielle Harless, a community banker at Red River State Bank, testified about typical loan-to-value ratio requirements of financial institutions when offering commercial development financing for projects like The Ruins. She explained that 25% down is customary to provide sufficient equity to mitigate risk. According to Harless, a bank may hesitate to lend more than 75% of the value of collateral securing the loan due to risk of default, unless there is a specific program or benefit that guarantees or supplements the financing.

4

Red River State Bank retained CBRE to appraise The Ruins project four times over the years.  Expert witness Joshua Luther, a licensed real property appraiser with CBRE, has completed more than 1,500 appraisals in his career.  He testified about the four appraisals.

CBRE completed the first appraisal in May 2021.  At that time, the building previously on The Ruins site had been demolished, and the property was essentially unimproved land.  CBRE provided the following market values for The Ruins:

| Appraisal Premise | Date of Value | Value |
|---|---|---|
| As Is | May 4, 2021 | $520,000 |
| As Complete | June 4, 2022 | $10,730,000 |
| As Stabilized | March 4, 2023 | $11,140,000 |

Doc. 95-1 at 2.  Luther explained that the "as is" value essentially represented the land value because the property was undeveloped.  The "as complete" value reflected the property with the construction complete but prior to any tenant occupancy.  Lastly, the "as stabilized" value reflected the value of the property rented to the estimated stabilized occupancy rate, which the report concluded was 96% based on its assessment of occupancy in comparable properties within the competitive market.

CBRE performed its second appraisal in July 2022.  At that time, The Ruins project was approximately 50% completed, according to Luther.  CBRE again provided three value estimates of The Ruins:

| Appraisal Premise | Date of Value | Value |
|---|---|---|
| As Is | July 12, 2022 | $6,980,000 |
| As Complete | May 1, 2023 | $11,740,000 |
| As Stabilized | September 1, 2023 | $12,410,000 |

Doc. 95-2 at 2.  Luther explained that the increase in the "as is" value from $520,000 to nearly $7 million was attributable to the significant construction and improvements to the site.

CBRE performed its third appraisal in October 2023:

| Appraisal Premise | Date of Value | Value |
| --- | --- | --- |
| As Is | September 14, 2023 | $9,975,000 |
| As Complete | January 1, 2024 | $10,760,000 |
| As Stabilized | July 1, 2024 | $11,460,000 |

Doc. 95-3 at 2.  Luther explained that CBRE decreased the "as complete" and "as stabilized" values in part due to the increased capitalization rate because values are inversely affected by the capitalization rate.  CBRE extracted the capitalization rate from comparable sales in the market.

CBRE performed its last appraisal in July 2025, and valued the property significantly lower than in previous appraisals:

| Appraisal Premise | Date of Value | Value |
| --- | --- | --- |
| As Is | May 6, 2025 | $4,520,000 |
| Prospective As Complete | August 6, 2025 | $6,390,000 |
| Prospective As Stabilized | August 6, 2027 | $7,070,000 |

Doc. 59 at 5.  When asked to explain the significant decrease in the "as is" value from October 2023 to July 2025, Luther gave a generic and fairly non-responsive answer:

> [T]he as-is value is developed similar to the as-complete value where we're –we develop the–or excuse me, the as-stabilized value gets developed first. We deduct the lease-up costs and costs associated with stabilization from the as-stabilized value to get to the as-complete value.
>
> And then, from the as-complete value, we're deducting whatever costs there are to finish construction completion to arrive at the as-is value.

Factors that led Luther to lower the appraised value include a divergence between the actual building size and the initial plans.  After reviewing architectural drawings and

measuring the building, Luther concluded that the building was smaller than the initial plans used in earlier appraisals. The smaller size resulted in less rentable area and less income.  Luther also opined that the smaller apartment units would earn smaller rents. CBRE also decreased the occupancy rate from 96% to 93.5% in this appraisal.  Luther attributed this reduction to "some softening in occupancy" since the previous appraisal. He also increased the time it would take to lease the units to 24 months "[b]ased on current market conditions from multiple data sources."  He also noted that the capitalization rate was higher than previously.  Lower income leads to lower value, according to Luther.

Debtor focuses its criticism on CBRE's last appraisal.  Notably, Red River State Bank retained CBRE for this appraisal after Debtor filed this bankruptcy case.  In arriving at his values for this appraisal, Luther assumed a lower occupancy rate than previously considered, relying on third-party market information without considering the near-100% occupancy rates of Generations and Parkside.  Luther also neglected to consider the most recent apartment building sale in Watertown which Debtor argues is comparable to The Ruins property.  The July 2025 appraisal, contrasted from the previous three appraisals, omitted the "cost approach" to property valuation. Additionally, Luther projected net income of $495,060 per year.  Contrary to this estimate, Mulinda Craig, a professional property manager and Jesse Craig's wife, testified that the project will earn $720,000 per year.  Ultimately, Luther agreed that a shorter lease-up period and higher net income would materially alter his appraisal of the "as complete" and "as stabilized" values of the property.

Although not retained to appraise the value of The Ruins' residential apartment building, on cross examination, Gehrtz testified that, "generally speaking," the estimate of the construction cost of the initial build would be between $225,000 and $250,000 per residential unit, which equates to $14.1 million (at $225,000 per unit). Debtor argues that the $13,538,400.91 it received from Red River State Bank and the tax increment financing it used in connection with the building's construction is within $600,000 of Gehrtz's estimated $14.1 million cost of construction and should inform an appraisal of the property in its current condition on a "cost of replacement" basis.

Red River State Bank filed an amended proof of claim, asserting a secured debt totaling $11,658,331.25. According to Charles Aarestad, Vice President of Red River State Bank, the bank received no payments from Debtor since Debtor filed its bankruptcy petition. Red River State Bank's claim may be reduced or offset if Debtor is successful in its adversary proceeding against Red River State Bank. Doc. 181.

Secured creditor Watertown Development Company provided tax increment financing to Debtor for the project and filed a proof of claim for a secured debt totaling $2,485,641.14. In its Second Amended Chapter 11 Plan, Debtor does not acknowledge liability for the full sum of this claim. Instead, it provides that "the funds to be paid by the Debtor, in turn, equal $37,240.23." Doc. 181 at 8.

Debt to Watertown Development Company is reduced when Debtor pays real estate taxes because these payments are ultimately assigned to Watertown Development Company pursuant to a tax increment financing arrangement between Debtor and the City of Watertown and Debtor's agreement(s) with Watertown Development Company. The real estate taxes Debtor owes are past due. When

8

Debtor fails to pay property taxes, its principal debt to Watertown Development
Company remains unpaid and interest continues to accrue.  Because Debtor remains
liable to pay the full sum of its obligation to Watertown Development Company, and
because Debtor's progress toward satisfying this debt is uncertain, Watertown
Development Company objects to this plan treatment.

In its Second Amended Chapter 11 Plan, Debtor proposes to pay 100% of its
claims.  In its uncompleted state, The Ruins residential apartment building is not
generating any cash flow, and it will not begin generating cash flow until construction is
completed and it leases apartment units.  Its operations are at a standstill until Debtor
confirms a plan of reorganization.

Debtor's monthly operating reports from January through August 2025 show
consistent, if relatively small, losses, totaling $34,719:

| | |
|---|---|
| January | $2,391 |
| February | $4,699 |
| March | $6,902 |
| April | $5,550 |
| May | $4,548 |
| June | $4,121 |
| July | $4,880 |
| August | $1,628 |

Docs. 32, 78–83, 92.  These figures do not reflect administrative expenses Debtor
owes.  According to Debtor's Second Amended Chapter 11 Plan, the retainer paid to
Debtor's counsel will likely be insufficient to pay the professional fees Debtor owes.

Jesse Craig testified that Debtor continues to incur postpetition expenses such
as utilities, insurance, mold testing, repairs, property manager or oversight, and property
taxes.  These postpetition expenses total in excess of $100,000, according to Jesse

9

Craig.  Jesse Craig testified that he paid these expenses, except the property taxes, which he acknowledged are past due.

Luther estimated that it will take 24 months after construction is complete for The Ruins to stabilize.  Once stabilized, The Ruins will generate only $41,255 in net cash flow, according to Luther.

Jesse Craig estimated that it would take roughly four months to complete construction.  Mulinda Craig testified that it would take between 6 and 18 months to lease enough units to bring The Ruins to stabilized levels.  Once stabilized, Mulinda Craig opined that The Ruins would generate approximately $60,000 per month in net cash flow.

## DISCUSSION

Red River State Bank asks the Court to convert this case to Chapter 7 "for cause" under 11 U.S.C. § 1112(b).  A party seeking conversion or dismissal under section 1112(b)(1) bears the initial burden of establishing cause exists to convert or dismiss.  Loop Corp. v. U.S. Tr., 379 F.3d 511, 517 (8th Cir. 2004) (citation omitted).  If Red River State Bank satisfies its burden, Debtor must produce rebuttal evidence.  See id. at 517–18.

Section 1112(b) governs motions to dismiss a Chapter 11 case.  Section 1112(b)(1) provides that, subject to certain exceptions, the court shall dismiss a Chapter 11 case or convert it to Chapter 7—whichever is in the best interest of creditors and the estate—if the movant establishes "cause."  11 U.S.C. § 1112(b)(1).

Section 1112(b)(4) provides a non-exhaustive list of circumstances constituting cause for dismissal or conversion.  Red River State Bank asserts three grounds for

dismissal:  substantial or continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; Debtor's failure to provide accurate schedules; and Debtor's bad faith.

If the Court finds cause to convert this Chapter 11 case to a case under Chapter 7 for failure to file accurate schedules or for bad faith, the Court must then consider whether there are unusual circumstances establishing that converting or dismissing the case is not in the best interests of the creditors.  See 11 U.S.C. § 1112(b).  Debtor bears the burden of proving unusual circumstances.  In re Patel, 2012 WL 3764523, at *2 (Bankr. W.D. Ark. Aug. 23, 2012).  Additionally, Debtor or any other party in interest must establish that:

> (A)  there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B)  the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
>
>> (i)  for which there exists a reasonable justification for the act or omission; and
>>
>> (ii)  that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2).

If the Court finds that Red River State Bank established cause to convert this case to Chapter 7 case by showing a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" under section 1112(b)(4)(A), the "unusual circumstances" exception to mandatory conversion in section 1112(b)(2) does not apply.  See 11 U.S.C. § 1112(b)(2)(B); In re Glob.

11

Processing, Inc., 655 B.R. 486, 493 (Bankr. N.D. Iowa 2023), appeal dismissed sub

nom., Glob. Processing, Inc. v. Iowa Dep't of Agric. & Land Stewardship, 2024 WL

343180 (N.D. Iowa Jan. 30, 2024); In re Herb Philipson's Army and Navy Stores, Inc.,

2019 WL 11031654, at *7 (Bankr. N.D.N.Y. Dec. 19, 2019); In re Acme Holding Co.,

Inc., 2015 WL 13035103, at *11 (Bankr. W.D. Ark. July 23, 2015).  In this circumstance,

the Court "shall" convert the case to a case under Chapter 7 or dismiss the case,

whichever alternative is in the best interests of creditors and the estate "unless the court

determines that the appointment under section 1104(a) of a trustee or an examiner is in

the best interests of creditors and the estate."  11 U.S.C. § 1112(b)(1).

### A.    Substantial or Continuing Loss To or Diminution of the Estate

Red River State Bank asserts that Debtor's significant postpetition negative cash

flow and the depreciation of The Ruins project are continuing losses.

"To satisfy the first prong [under section 1112(b)(4)(A)], a movant may

demonstrate 'that the debtor continues to incur losses or maintains a negative cash-flow

position after the entry of the order for relief' or that the debtor's assets have declined in

value since the case was commenced."  In re Creekside Senior Apartments, L.P., 489

B.R. 51, 61 (B.A.P. 6th Cir. 2013) (quoting In re Westgate Props., Ltd., 432 B.R. 720,

723 (Bankr. N.D. Ohio 2010)); see also 3685 San Fernando Lender, LLC v. Cross

Equities, LLC (In re USA Comm. Mortg., Co.), 452 Fed.Appx. 715, 724 (9th Cir. 2011);

In re Wahlie, 417 B.R. 8, 11 (Bankr. N.D. Ohio 2009).

Negative cash flow may be sufficient to establish loss to or diminution of the

estate. See Loop Corp., 379 F.3d at 515–16 ("Under the interpretation of § 1112(b)(1)

consistently used in bankruptcy courts, this negative cash flow situation alone is

sufficient to establish 'continuing loss to or diminution of the estate.'" (citation omitted));

In re Schriock Constr., Inc., 167 B.R. 569, 575 (Bankr. D.N.D. 1994) (opining that

continuing loss or diminution of the estate "can be satisfied by demonstrating that the

debtor incurred continuing losses or maintained a negative cash flow position after the

entry of the order for relief").

Debtor's monthly operating reports show that it consistently operates at a loss.

Jesse Craig conceded that Debtor has no employees and no income. In its

uncompleted state, The Ruins residential apartment building is not generating any cash

flow, and it will not begin generating cash flow until construction is completed and it

leases apartment units. Its operations are at a standstill until Debtor confirms a plan of

reorganization.

Additionally, Jesse Craig testified that Debtor continues to incur postpetition

expenses such as utilities, insurance, mold testing, repairs, property manager or

oversight, and property taxes. These postpetition expenses total in excess of $100,000,

according to Jesse Craig.

Debtor suggests that the estate is not incurring substantial or continuing loss or

diminution because Jesse Craig is paying Debtor's ongoing expenses and is not

seeking reimbursement for these expenses. While Jesse Craig's willingness to absorb

Debtor's most urgent postpetition expenses demonstrates his genuine desire to prevent

conversion and save his business, Debtor's assertion overlooks a comprehensive view

of Debtor's financial position.

Debtor petitioned for bankruptcy relief on January 6, 2025, almost a year ago.

During this time, interest continues to accrue on its secured debt. Red River State Bank

received no debt service payments and no adequate protection payments since the petition date.  Additionally, the real estate taxes Debtor owes are past due.  Debtor's inability to pay this obligation jeopardizes collateral that serves as security for debt to Red River State Bank.

Failure to pay these taxes along with the delay in construction negatively impacts Watertown Development Company's claim as well.  This creditor filed a proof of claim for a secured debt totaling $2,485,641.14.  In its Second Amended Chapter 11 Plan, Debtor failed to acknowledge liability for the full sum of this claim.  Instead, it provides that "the funds to be paid by the Debtor, in turn, equal $37,240.23."  Doc. 181 at 8. While the mechanics of the tax increment financing arrangement allow for reduction of Debtor's obligations to Watertown Development Company when Debtor pays the real estate taxes it owes, failure to pay real estate taxes results in no debt reduction. Continued accrual of real estate tax debt or low property tax payments results in slow or no progress toward satisfying the debt to Watertown Development Company, calling into question the payment structure Debtor proposes in its Second Amended Chapter 11 Plan.

Finally, administrative expense claim(s) continue to accrue.  As noted in Debtor's Second Amended Chapter 11 Plan, the retainer paid to Debtor's counsel will likely be insufficient to pay the professional fees Debtor owes.  Doc. 181 at 5.

In Loop Corp, the Eighth Circuit opined that negative cash flow is especially problematic in the context of a debtor who has ceased business operations because "any negative cash flow—including that resulting only from administrative expenses— effectively comes straight from the pockets of the creditors."  See Loop Corp., 379 F.3d

14

at 515–16.  Although Jesse Craig is paying most of the postpetition expenses, there continues to be a loss to or diminution of the estate since the petition date arising from accruing debt, including unpaid real estate taxes, administrative expenses and interest to secured lenders.  See In re Westgate Props. Ltd., 432 B.R. at 723 ("This failure to pay real estate taxes as they become due also clearly shows a continuing loss to and diminution of estate assets."); In re Veterans Holdings, LLC, 2025 WL 1908132, at *8 (Bankr. E.D. La. July 9, 2025) (finding a continuing loss to or substantial diminution of the estate based on debtor's lack of unencumbered assets or income and accruing debt, including unpaid property taxes, administrative expenses, and payments to the senior secured lender).

Red River State Bank also offered the testimony from Gehrtz to support its claim that water damage to the residential apartment building is causing a continuing loss. While Debtor offered evidence disputing this water damage, the parties agree that delay in completing construction is not in the best interests of the bankruptcy estate.

In summary, the Court finds that Red River State Bank met its burden of showing a substantial or continuing loss to or diminution of the estate.

### B.   No Reasonable Likelihood of Rehabilitation

To meet its burden under section 1112(b)(4)(A), Red River State Bank must also establish "the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

> The term "rehabilitation" in § 1112(b)(4)(A) "refer[s] to the debtor's ability to restore the viability of its business." Loop Corp., 379 F.3d at 516. Thus, to determine a debtor's likelihood of rehabilitation, the court must weigh the debtor's business prospects to discern whether those prospects "justify continuance of the reorganization effort." 7 Collier on Bankruptcy ¶ 1112.04[6][a][ii] (Richard Levin & Henry J. Sommer eds., 16th ed. 2021). The

15

debtor's business prospects may justify continuance of the reorganization effort if "the causes of the debtor's continuing losses can be corrected," and "the debtor or some other party in interest is capable of performing the necessary remediation." Id. ¶ 1112.04[6][a][ii]. In determining the debtor's likelihood of rehabilitation, the court may consider the duration and quality of the debtor's prior efforts to rehabilitate its business and formulate a reasonable plan. See, e.g., Loop Corp., 379 F.3d at 518–19 (discussing the debtors' lack of efforts to rehabilitate and failed attempts to propose a viable plan).

In re Neosho Concrete Prods. Co., 2021 WL 1821444, at *6 (Bankr. W.D. Mo. May 6, 2021).

"To succeed [in showing the absence of the likelihood of rehabilitation], the movant must establish that 'the state of the [debtors'] financial affairs are such that [they are] unable to re-establish [themselves] on a firm or sound base.'"  In re Patel, 2012 WL 3764523, at *2 (quoting In re Schriock Constr., Inc., 167 B.R. at 576).

Some courts suggest that the "reasonable likelihood of rehabilitation" standard is more demanding than the reorganization standard.  For example, the Sixth Circuit BAP opined:

> To satisfy the second prong of § 1112(b)(4)(A), a movant must demonstrate that the debtor does not have a reasonable likelihood of rehabilitation. As used in § 1112(b)(4)(A), "rehabilitation does not necessarily denote reorganization, which could involve liquidation. Instead, rehabilitation signifies something more, with it being described as 'to put back in good condition; re-establish on a firm, sound basis.'" Westgate Props., 432 B.R. at 723 (quoting In re v. Cos., 274 B.R. 721, 725 (Bankr. N.D. Ohio 2002)). "'Rehabilitation' is a different and . . . much more demanding standard than 'reorganization.'" In re Brutsche, 476 B.R. 298, 301 (Bankr. D.N.M. 2012). If "'the debtor, or some other party, will be able to stem the debtor's losses and place the debtor's enterprise back on a solid financial footing within a reasonable amount of time,'" then the debtor may have a reasonable likelihood of rehabilitation. In re Costa Bonita Beach Resort, Inc., 479 B.R. 14, 42 (Bankr. D.P.R. 2012) (quoting 7 Collier on Bankruptcy ¶ 1112.04[6][a] (16th ed. 2012)). "The purpose of § 1112(b)(1) is to 'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope

of rehabilitation.'" <u>Loop Corp.</u>, 379 F.3d at 516 (quoting <u>In re Lizeric Realty</u>
<u>Corp.</u>, 188 B.R. 499, 503 (Bankr.S.D.N.Y.1995)).

<u>In re Creekside Senior Apartments</u>, 489 B.R. at 61; <u>see also</u> <u>Hassen Imps. P'ship v.</u>
<u>City of W. Covina</u> (<u>In re Hassen Imps. P'ship</u>), 2013 WL 4428508, at *14 (B.A.P. 9th Cir.
Aug. 19, 2013) ("Rehabilitation is a different and much more demanding standard than
reorganization.") (citation omitted); <u>In re Intown Cos., Inc.</u>, 2017 WL 3491831, at * 8
(Bankr. N.D. Fla. Apr. 14, 2017) (same).

Courts look to the debtor's plan or plans of reorganization to determine whether a
debtor can emerge as an economically viable enterprise capable of servicing its
obligations under the plan. <u>In re Schriock Const., Inc.</u>, 167 B.R. at 576. "This finding in
turn requires an assessment of the feasibility of the debtor's proposal for
rehabilitation[.]" <u>Id.</u>

In its Second Amended Chapter 11 Plan, Debtor proposes to complete
construction of the residential apartment building and then operate it. Debtor estimates
the cost of completion will total $1,317,352. It anticipates the following financing
sources:

> contribution of cash financing to be provided by an insider of the Debtor, in
> the sum of $262,094.00, in-kind financing to be provided by B&W
> Construction in the sum of $553,184.60 (inclusive of labor and materials),
> in-kind financing to be provided by Lakeside Construction in the sum of
> $196,297.50 (inclusive of labor and materials), in-kind financing to be
> provided by Limoges Construction in the sum of $58,500.00 inclusive of
> labor and materials), and in-kind financing to be provided by Watertight in
> the sum of $247,176.00, for a total completion cost of $1,317,352.00.

Doc. 181 at 11. The Second Amended Chapter 11 Plan suggests, and Jesse Craig
confirmed, that in-kind financers are committed to completing the project. Debtor

secured letters of intent from two of the contractors, but the letters specifically provide that they are not contractual in nature.  Debtor received no other written commitments.

In its Second Amended Chapter 11 Plan, Debtor proposes to pay the principal due to the Exit Financers not later than "the second anniversary of the Effective Date" (14 days after the confirmation date).  Likewise, the letters of intent provide that the "agreement would balloon in 24 months from the start of this plan."  As part of the consideration for the in-kind financing, Debtor also proposed to grant these "Exit Financers" a superpriority priming lien and "roll" the prepetition debt owed to the in-kind Exit Financers into this superpriority priming lien.

In the meantime, Debtor proposes to postpone payments to its secured creditors (Red River State Bank and Watertown Development Company), Codington County Treasurer and mechanics' lien holders to no earlier than the Plan Payment Commencement Date (six months after permits requisite to commence renting apartments are issued following construction completion or January 1, 2027).

Watertown Municipal Utilities, unsecured trade creditors, unsecured development cost creditors, Blacktail Investments, LLC, and the Internal Revenue Service will receive no payments under the plan until the Takeout Financing Date, which is defined as "(i) the date on which the Debtor closes on a loan in a sum sufficient to pay all allowed Claim Holders in full; or (ii) June 1, 2029."

Red River State Bank established that Debtor faces significant obstacles to confirmation of these proposals in its Second Amended Chapter 11 Plan as well as future rehabilitation of its business based on them.

18

First, Red River State Bank offered evidence showing that Debtor underestimated construction completion costs by roughly $378,000 through the testimony of Gehrtz, who estimated the cost to finish construction would total approximately $1,695,967.  Even if the Court finds Debtor's $1,317,352 estimate more credible, there is no evidence that Debtor could generate income sufficient to pay this debt to Exit Financers within two years and 14 days from the confirmation date.

Luther estimated that it will take 24 months after construction is complete for The Ruins to stabilize.  Once stabilized, The Ruins will generate only $41,255 in net cash flow, according to Luther.  Using these figures, The Ruins could not generate the $1.3 million necessary to pay Exit Financers in 24 months.

Even if the Court rejected Red River State Bank's evidence and relied exclusively on the testimony of Jesse and Mulinda Craig, there is insufficient cash flow to pay the Exit Financers in 24 months.  Jesse Craig testified that it would take roughly four months to complete construction.  Mulinda Craig testified that it would take between 6 and 18 months to lease enough units to bring The Ruins to stabilized levels.  Once stabilized, Mulinda Craig estimated that The Ruins would generate approximately $60,000 per month in net cash flow.

Assuming Debtor is not entitled to collect rent before a certificate of occupancy is issued,[3] Debtor would have only 20 months to generate $1,317,352.00 to pay the Exit

---

[3] Debtor quibbles with Red River State Bank's allocation of $0 in the first four months of the chart that uses Mulinda Craig's $60,000 monthly net cash flow estimate. It argues:  "The latter chart somehow shows literally $0.00 in revenue for the first few months, *id.* at p. 10, suggesting Ms. Craig, as property manager, would not be able to lease a *single* unit for at least 120 days.  This is not only unsupported by the record but, too, is facially wanting for credibility."  Doc. 239 at 6.  Debtor offered no cash flow chart and no evidence showing that The Ruins could and would generate income before

Financers—which equates to $65,867.60 per month in net cash flow.  This figure is significantly higher than the monthly net cash flow Mulinda Craig estimated and leaves no allowance for the time it will take to reach at or close to 100% occupancy.

While Debtor maintains that it might amend its plan to achieve confirmation, the record before the Court at this time (including the letters of intent) shows that the in-kind Exit Financer commitments are based on Debtor paying the principal due to the Exit Financers not later than 24 months after the effective date of the plan.  Debtor cannot meet this commitment.[4]

Second, Debtor's plan for operating its business and satisfying the debt to its creditors does not demonstrate a likelihood of rehabilitation or rebut Red River State Bank's evidence showing Debtor is unable to re-establish its business on a firm or sound basis.

For example, Mulinda Craig's estimate of $60,000 in net monthly revenue is not sufficient to make the plan payments scheduled to begin on the Plan Payment

---

construction was complete.  Jesse Craig offered the shortest time estimate for construction completion, and he estimated four months.  An estimate of $0 generated in the first four months is supported by reasonable inference.

[4] Without engaging in an extended analysis of the issue, the Court also questions whether the plan provision granting a superpriority priming lien to Exit Financers complies with various confirmation requirements under section 1129 including feasibility, fair and equitable treatment of creditors, and creditor retention of liens.  See In re Bordeaux Ventures, LLC., 2025 WL 2967288, at *7, 9 (Bankr. M.D. Tenn. Oct. 17, 2025) ("The Court cannot approve a priming loan to an exit financing lender when the loan's purpose is to fund post-confirmation operations instead of funding the administration of the estate.") (citing In re Scrubs Car Wash, Inc., 527 B.R. 453, 459 (Bankr. D. Colo. 2015) (finding that subordination of secured creditor's existing lien as a means of implementation was not fair and equitable); Ford Prods. Corp. v. Bank of New York (In re Ford Prods. Corp.), 159 B.R. 693, 695 (Bankr. S.D. N.Y. 1993) (noting that if a lien is subordinated the creditor does not retain its lien as required by 11 U.S.C. § 1129(b)(2)(A)(i)(I)).

20

Commencement Date.  Of even greater concern, Debtor's proposal to pay 100% of creditor claims in the Second Amended Chapter 11 Plan is premised on takeout financing, which is speculative.  Debtor offered no evidence that it has or can obtain takeout financing.

Conversely, Red River State Bank offered evidence suggesting that Debtor will not qualify for such financing.  Specifically, Harless testified about typical loan-to-value ratio requirements of financial institutions when offering commercial development financing for projects like The Ruins.  She explained that 25% down is customary to provide sufficient equity to mitigate risk.  In other words, either the borrower holds 25% equity in the collateral or a business owner agrees to make a down payment of 25% of the value of the collateral to secure the loan.  According to Harless, a bank may hesitate to lend more than 75% of the value of collateral securing the loan due to risk of default, unless there is a specific program or benefit that guarantees or supplements the financing.

Red River State Bank argues that "to achieve the required loan-to-value ratio, The Ruins Development would need to appraise at $19,018,163.39."  Doc. 224 at 12.  This figure is extrapolated from $14,263,622.54 in claims Debtor acknowledges in its plan.  Id.  The creditor claims total reflects the $11,090,000 Debtor anticipates owing Red River State Bank if it prevails in the adversary proceeding, rather than the full sum of the bank's claim which totals $11,658,331.25.  The outcome of the adversary proceeding is speculative.[5]  By using the $14,263,622.54 figure, Red River State Bank

---

[5] Courts typically decline to rely on the anticipated future outcome of a single lawsuit to establish a "reasonable likeliness of rehabilitation."  See In re Plymouth Oil

also assumes that the debt Debtor must pay Watertown Development Company is only $37,240.23 (which this creditor disputes) and that Debtor will have retired none of the debt listed in the plan at the time it seeks takeout financing.  Consequently, this calculation is unhelpful.  Debtor provides no cash flow analysis supporting its arguments, which is also unhelpful.

The question is whether a hypothetical financial institution applying the criteria outlined by Harless would lend to Debtor based on the evidence presented regarding the value of Debtor's real estate?  The answer appears to be "no."

The Court heard conflicting testimony regarding the value of the residential apartment building as stabilized.  Debtor's $15,750,000 value estimate is based on Jesse Craig's analysis.  When asked how he arrived at this figure, Jesse Craig explained: "Took the appraisal and then looked at kind of where our rents are scheduled to be now over the past two, three years that we've increased rents. Put a regular debt service on it and get an NOI and use a cap rate."  He clarified that the increased rents refer to Generations and Parkside lease rates.  Based on the record, including the testimony of Luther and the methodology included in his professional appraisal, Jesse Craig's estimate is not well supported.  His estimate appears to be designed to facilitate his plan of reorganization, rather than to provide an objective view of value necessary to support a request for takeout financing.

---

Co., L.L.C., 2014 WL 3812078, at *3–4 (Bankr. N.D. Iowa Aug. 1, 2014); In re Original IFPC S'holders., Inc., 317 B.R. 738, 742–43 (Bankr. N.D. Ill. 2004).

Likewise, the Court is not persuaded that the $7,070,000 appraised value estimate prepared by Luther in July 2025 accurately reflects the value of Debtor's real estate as stabilized.  In arriving at the values included in the July 2025 appraisal—which are significantly lower than his first two value estimates—Luther assumed a lower occupancy rate than previously considered, relying on third-party market information. He failed to consider the near-100% occupancy rates of Generations and Parkside, residential apartment buildings in Watertown, South Dakota.  Luther also neglected to consider the most recent apartment building sale in Watertown which Debtor argues is comparable to The Ruins property.  Additionally, Luther's July 2025 appraisal, contrasted from the previous three appraisals, omitted the "cost approach" to property valuation.  Luther's valuation is based on projected net income of $495,060 per year. Mulinda Craig testified, however, that the project will earn $720,000 per year. Ultimately, Luther agreed that a shorter lease-up period and higher net income would materially alter his appraisal of the "as complete" and "as stabilized" values of the property.  The Court finds that Luther's $7,070,000 appraisal lacks credibility.

Accordingly, the Court is left with the well-supported CBRE appraisals completed in July 2022 ($12,410,000 as stabilized value on 9/1/2023)  and October 2023 ($11,460,000 as stabilized value on 7/1/2024), or Debtor's $14.1 million cost of construction value estimate based on Gehrtz's testimony, which was not designed or intended to serve as an appraisal for the purposes of commercial financing.[6]  Using the

---

[6] Debtor argues that the $13,538,400.91 it received from Red River State Bank ($11,090,000) and tax increment financing ($2,448,400.91) which it used in connection with construction is within $600,000 of Gehrtz's estimated $14.1 million cost of construction and should inform an appraisal of the property in its current condition on a "cost of replacement" basis.

highest estimate, for the sake of argument, the typical financial institution offering
commercial development financing described by Harless would loan no more than
$10,575,000.  This sum is insufficient to retire all the debt described in the Second
Amended Plan, even after several years of plan payments made to certain creditors.

What remains apparent from this analysis is the speculative nature of Debtor's
proposal to obtain takeout financing.  In In re Intown Cos., Inc., 2017 WL 3491831, at *
8 (Bankr. N.D. Fla. Apr. 14, 2017), the court characterized the goal of selling or
refinancing as the "veritable pot at the end of the rainbow."  It explained:

> Plans which extensively rely on sale or refinance of real property that
> constitutes a debtor's primary or sole significant asset, and where that asset
> has been a marginal performer to date, are inherently speculative and invite
> close judicial scrutiny of the assumptions underlying the plan . . . .  While a
> proponent need not demonstrate the success of the plan with absolute
> certainty, more than simple optimism about future market conditions is
> needed to support the confirmation of a plan whose success depends on a
> future sale or refinance of the debtor's principal asset.

Id. at *9; see also In re Sugar Hill 473, LLC, 2025 WL 3481095, at *3 (Bankr. S.D.N.Y.
Dec. 3, 2025) (finding debtor's bare assurances of potential refinancing insufficient and
speculative where the plan purported to pay 100% to all creditors but the viability of the
plan hinged entirely on the debtor's ability to secure refinancing, the debtor presented
no credible evidence that refinancing was attainable, and the property was over-
leveraged; dismissing the case under section 1112(b)); In re Westgate Props., Ltd., 432
B.R. at 724 (finding cause to convert or dismiss where the debtor planned to rehabilitate
by obtaining refinancing but offered no evidence that it obtained any firm refinancing
offers or commitments, and the court concluded the ultimate availability of any financing
appeared to be "very speculative"); In re Veterans Holdings, LLC, 2025 WL 1908132, at
*8 (concluding the debtor did not have a reasonable likelihood of rehabilitation where

the debtor's plan of reorganization did not have a reasonable possibility of being confirmed because the evidence showed the debtor was not cash-flowing and its prospects of cash-flowing and refinancing were too speculative, rendering the plan not fair and equitable under section 1129(b)); see generally In re Bordeaux Ventures, LLC, 2025 WL 2967288, at *8 (Bankr. M.D. Tenn. Oct. 17, 2025) ("[W]ithout proper funding in place or a firm commitment of such funding, the Court cannot find the plan feasible.") (citing In re Stratford Assocs. Ltd. P'ship, 145 B.R. 689, 699 (Bankr. D. Kan. 1992)); see also In re Trans Max Techs., Inc., 349 B.R. 80, 92 (Bankr. D. Nev. 2006) (citation omitted) ("'The Debtor must offer more than speculation about the source of funding for the plan.'"); In re Made in Detroit, Inc., 299 B.R. 170, 176–77 (Bankr. E.D. Mich. 2003) (rejecting a plan contingent on exit financing that was not reasonably likely to close). Accordingly, Red River State Bank met its burden of showing that Debtor does not have a reasonable likelihood of rehabilitation, and Debtor failed to rebut this evidence.

From the moment Debtor petitioned for bankruptcy relief, Debtor maintained that it was in the best interest of the bankruptcy estate and its creditors to allow Debtor to complete construction on The Ruins property and begin operations sufficient to stabilize income.  This approach makes sense.  Unfortunately, in the year since filing its petition, Debtor failed in its significant attempts to convince its creditors to accommodate this approach or to design a plan that would not only survive confirmation but also demonstrate Debtor's ability to restore the viability of its business.  The Court recognizes that in reaching the conclusions in this Order, Debtor has not yet been granted the opportunity to test any of the three versions of its plans of reorganization through the confirmation process.  Nevertheless, on request of a party in interest and

after notice and a hearing, the Court must consider whether to convert this case to a case under Chapter 7.  11 U.S.C. § 1112(b).[7]

Debtor's Second Amended Chapter 11 Plan, its Disclosure Statement and Jesse Craig's testimony provide Debtor's plan and its prospects for rehabilitation.  Debtor's commitment to satisfy 100% of its creditors claims is admirable.  Unfortunately, the evidence showing Debtor's inability to generate revenue sufficient to meet this commitment in the plans it designed, and the speculative nature of its takeout financing proposal, demonstrate its inability to place The Ruins back on a solid financial footing within a reasonable amount of time.  Accordingly, the Court finds that Red River State Bank established substantial or continuing loss to or diminution of the estate and the

---

[7] Other courts faced with a motion to convert or dismiss before a confirmation hearing agreed that it is necessary to proceed with hearing the motion to dismiss or convert. See In re Keeley & Grabanski Land P'ship, 460 B.R. 520, 538 (Bankr. D.N.D. 2011) ("Certainly the ability to confirm a plan is a most significant consideration in the chapter 11 context, but it is a mistake to conclude that consideration of section 1112(b) should begin only after the confirmation process has ended. Care must be taken so that the court's discretion does not inevitably shelter inefficiency and injustice at the expense of the parties or the chapter 11 process as a whole." (quoting 7 Collier on Bankruptcy ¶ 1112.04[5][c] at 1112–26); In re JER/Jameson Mezz Borrower II, LLC, 461 B.R. 293, 302 (Bankr. D. Del. 2011) ("The Court disagrees with the Debtors' suggestion that it has to wait until the Debtors propose a plan to determine if the case should be dismissed. One of the grounds stated in section 1112 as a basis for dismissal of a case is that the debtor does not have a reasonable likelihood of rehabilitation, together with continuing loss. 11 U.S.C. § 1112(b)(4)(A). If the Court had to wait until a debtor files a plan to consider whether it has a prospect for rehabilitation, no case could be dismissed under that section for at least four months. Id. at § 1121(b)."); In re Midwest Commc'ns Inc., 269 B.R. 40, 43 (Bankr. N.D. Iowa 2001) ("The Court agrees that a debtor should be allowed a reasonable opportunity to show that a confirmable plan of reorganization can be presented [before dismissing under section 1112(b)]. However, when there is no reasonable possibility of an effective reorganization, the bankruptcy court is not required to wait for any specific time period. This is particularly so when a debtor is administratively insolvent, the debt load is continuing to increase and the rights of creditors are being impaired.").

absence of a reasonable likelihood of rehabilitation, demonstrating cause under section 1112(b)(4)(A).  The evidence Debtor offered is insufficient to rebut this finding.

Having concluded that Red River State Bank established cause under section 1112(b)(4)(A), it is unnecessary for the Court to consider the other grounds for cause asserted by the bank.

### C.  Convert, Dismiss or Appoint a Trustee Under 11 U.S.C. § 1104(a)

Because Red River State Bank met its burden of showing cause under section 1112(b)(4)(A), the "unusual circumstances" exception to mandatory conversion in section 1112(b)(2) does not apply.  See 11 U.S.C. § 1112(b)(2)(B); In re Glob. Processing, Inc., 655 B.R. at 493; In re Acme Holding, 2015 WL 13035103, at *11. Consequently, the Court "shall" convert this case to a case under Chapter 7 or dismiss the case, whichever alternative is in the best interests of creditors and the estate "unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."  See 11 U.S.C. § 1112(b)(1).

> While the Bankruptcy Code does not define "best interests" for purposes of the § 1112(b)(1) inquiry, courts have outlined a wealth of potential considerations. See In re McQuillen Place Co., LLC, 609 B.R. at 832–33 (compiling considerations and cases). "A court may consider other factors and equitable considerations in order to reach an appropriate result in the individual case." In re Miell, 419 B.R. at 366 (citing In re Kerr, 908 F.2d 400, 404 (8th Cir. 1990)). The court may also consider what outcome creditors favor when determining the best interests of creditors or the estate. Loop Corp. v. United States Tr., 290 B.R. 108, 115 (D. Minn. 2003), aff'd, 379 F.3d 511 (8th Cir. 2004).

In re Glob. Processing, 655 B.R. at 495.

Red River State Bank and Watertown Development Company argue that conversion is in the best interests of creditors and the estate.  Both highlight evidence

offered by Red River State Bank suggesting plausible claims for fraud, fraudulent transfer and perhaps other claims that could be pursued by a Chapter 7 trustee.

Debtor argues the appointment of a trustee under section 1104(a) is in the best interests of creditors and the estate because he or she could supervise construction completion. The problem with this option is that a Chapter 11 trustee would have no greater access to financing to complete construction or operate Debtor's business than Debtor. Based on the evidence, reorganization and rehabilitation appear unrealistic regardless of who is in control of Debtor.

No other parties filed pleadings asserting a preference. No party advocates for dismissal. Based on the record, the Court finds that conversion is in the best interests of creditors and the bankruptcy estate.

## CONCLUSION

For the reasons provided above, IT IS ORDERED that Red River State Bank's Expedited Motion to Convert Case to Chapter 7 is granted.

Dated: December 31, 2025.

Shon Hastings, Judge
United States Bankruptcy Court