UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>The Ruins, LLC,<br><br>            Debtor. | Bankruptcy Case No.: 25-30004<br><br>Chapter 7 |

**OBJECTION TO MOTION TO AMEND ORDER APPROVING SALE
FREE AND CLEAR OF LIENS AND ENCUMBRANCES**

Build, LLC, a North Dakota limited liability company (the "Successful Bidder" or "Build"), submits this Objection to Trustee's Motion to Amend Order Approving Sale Free and Clear of Liens and Encumbrances (the "Motion").

**INTRODUCTION**

This Motion does *not* present the narrow ministerial correction contemplated by Rule 60(a). Instead, it presents an extraordinary circumstance in which this Chapter 7 Trustee declared the successful purchaser under a Court-approved sale to be in default, inappropriately asserted the right to retain more than $1,100,000 in earnest money deposited by the Successful Bidder as liquidated damages, and only thereafter sought additional bankruptcy relief because the existing Sale Order was insufficient to convey marketable title under South Dakota law and to permit issuance of customary title insurance necessary to close the transaction.

The chronology in this case is significant. After the Court entered its Sale Order on June 4, 2026, two separate national title insurance underwriters independently concluded that the Sale Order did not provide sufficient authority to permit issuance of customary owner's and lender's title insurance. First Dakota Title, d.b.a. The Title Resource Network ("First Dakota Title"), advised Build, LLC and the Trustee that Chicago Title Insurance Company ("Chicago Title")

1

could issue title insurance only if numerous recorded liens, encumbrances, and bankruptcy matters remained exceptions to coverage—the very liens and matters the Trustee had contractually agreed to remove through the Sale Order. First Dakota Title, working through its underwriter Chicago Title, therefore advised that it was unable to issue customary title insurance under the existing Sale Order as part of a closing.

When Build attempted, at the Trustee's invitation, to locate another insurer, a separate title company, Old Republic National Title Insurance Company ("Old Republic"), independently reached the same conclusion and required an amended bankruptcy court order specifically identifying the liens and authorizing their release before it would be able to issue a standard title insurance policy to the Successful Bidder—*or any other party*.

Notwithstanding the independent conclusions reached by Chicago Title and Old Republic, the Trustee insisted that the Successful Bidder close the transaction under the existing Sale Order on July 6 and rejected Build's request for an extension to permit resolution of the title issues. On July 7, the very next day, the Trustee declared a default and, incredibly, asserted the right to retain all of Build's earnest money despite not being able to convey marketable title. Only hours later, the Trustee filed the present Motion requesting the very additional bankruptcy relief that Old Republic had identified as necessary before issuing customary title insurance so that the transaction could close in the ordinary course of a commercial real estate transaction.

The Trustee cannot simultaneously maintain: (1) that the Sale Order was legally sufficient and the Successful Bidder defaulted by failing to close; and (2) that the Sale Order must now be substantively amended because it was insufficient to permit issuance of title insurance. Those positions are irreconcilable.

2

Accordingly, the Motion should be denied. Alternatively, if the Court concludes that amendment of the Sale Order is appropriate under Rule 60, any such relief should be conditioned upon withdrawal of the Notice of Default, reinstatement of the Purchase Agreement, preservation of Build's earnest money, and establishment of a reasonable new closing date.

**FACTUAL BACKGROUND**

**A.      The Court Approved the Sale of The Ruins Property to Build, LLC Following a Competitive Sale Process.**

[¶ 1]     On or about April 24, 2026, Build, LLC and Erik Ahlgren, solely in his capacity as Chapter 7 Trustee for the bankruptcy estate of The Ruins, LLC (the "Trustee"), entered into a Real Estate Purchase and Sale Agreement (Doc. 327) (the "Purchase Agreement) concerning the sale of the commercial real property commonly known as "The Ruins," located at 315 E. Kemp Avenue, Watertown, South Dakota (the "Property").

[¶ 2]     The Purchase Agreement established a purchase price of $11,265,000.00, substantially exceeding the backup bid approved by the Court. Pursuant to the Purchase Agreement, Build deposited earnest money totaling $1,126,500.00 with the designated escrow agent First Dakota Title.

[¶ 3]     Following notice and hearing, this Court entered its Order Approving Sale of Real Estate Free and Clear of Liens and Encumbrances pursuant to 11 U.S.C. § 363(f) (the "Sale Order"), authorizing the Trustee to sell the Property to Build for $11,265,000.00 and approving Archer Land Co., LLC as the backup purchaser should the Successful Bidder fail to close by the contractual closing date. The Trustee sponsored the proposed sale transactions and the sale approval documents, including the proposed sale order. The Sale Order authorized the Trustee to convey the Property "free and clear of liens and encumbrances pursuant to 11 U.S.C. § 363(f)."

3

[¶ 4]    At all relevant times following entry of the Sale Order, Build acted in good faith and remained committed to completing the transaction approved by this Court. Build never advised the Trustee that it intended to abandon the transaction or terminate the Purchase Agreement. Rather, as described below, Build consistently sought to complete the purchase upon the Trustee's ability to convey the Property in the manner contemplated by the Purchase Agreement and the Sale Order.

**B.      Under the Purchase Agreement, the Trustee Agreed to Convey Fee Simple Title Free and Clear of Liens and Encumbrances.**

[¶ 5]    Section 6(A)(1) of the Purchase Agreement requires that, at closing, the Trustee deliver: "A duly executed and acknowledged trustee's deed in recordable form conveying title in fee simple to all of the real estate, free and clear of any and all liens, encumbrances, and subject only to the Permitted Title Exceptions."  Section 9 of the Purchase Agreement addresses what happens in the event the Trustee is unable to convey marketable, insurable title absent the agreement of the parties: "In the event Seller shall fail or be unable to deliver title to the Property as herein provided on account of title defects which Purchaser is unwilling to waive, this Agreement shall be terminated and the Earnest Money shall be returned forthwith to Purchaser."

[¶ 6]    The Purchase Agreement likewise contemplated that the Trustee would deliver the customary documents necessary to consummate the transaction and effectuate transfer of title in accordance with its terms.  Build understood, and the parties contemplated, that the transaction would be closed through First Dakota Title as agreed upon escrow agent pursuant to the Purchase Agreement.

4

**C.      Chicago Title Determines That the Existing Sale Order Was Insufficient to Permit Issuance of Customary Title Insurance.**

[¶ 7]    Following entry of the Sale Order, First Dakota Title submitted the transaction to one of its title insurance underwriters, Chicago Title, for review.

[¶ 8]    On June 23, 2026, First Dakota Title advised both the Trustee and Build that Chicago Title had completed its review of the transaction and concluded that it would not be able to issue title insurance consistent with the Purchase Agreement. Specifically, Chicago Title advised that it would issue title insurance only if numerous existing matters remained exceptions to coverage and further required a bankruptcy exception relating to matters arising from or connected with the bankruptcy proceeding. First Dakota Title and Chicago Title therefore advised: "Accordingly, First Dakota Title is unable to issue title insurance for this transaction unless those exceptions are included in the policy."

[¶ 9]    The practical effect of Chicago Title's determination was that title insurance could not be issued without excepting numerous recorded liens, encumbrances, and bankruptcy-related matters from coverage. Chicago Title's conclusions were not reached by Build or its lender. Rather, they represented the independent underwriting determination of a national title insurance company following review of the Court's Sale Order, the condition of title, and the requirements of South Dakota state law.

**D.      The Trustee Acknowledged the Title Issue and Invited the Successful Bidder to Locate Another Title Insurance Company.**

[¶ 10]   After learning of Chicago Title's position, counsel for the Trustee acknowledged the issue and invited Build—the Successful Bidder—to locate another title insurer. Significantly, neither the Trustee nor his counsel disputed Chicago Title's underwriting determination, suggested

5

that Chicago Title had misinterpreted the Sale Order, or sought clarification from the Bankruptcy Court. Instead, the Trustee directed Build to locate another title insurer.

[¶ 11]  On June 24, 2026, Michael Duffy, on behalf of the Trustee, wrote to Build's counsel: "Erik invites Build LLC to find and use another title company to close the deal."

[¶ 12]  Build accepted the Trustee's request. Initially, Build inquired whether The Title Company located in Fargo could close the transaction.  The Title Company advised it could not because the Property is located in South Dakota.  Immediately thereafter, Build began working with First Dakota Title, prospective lenders, and alternative title insurance underwriters in an effort to preserve the Court-approved sale.

**E.     Build Continued to Diligently Pursue Financing and the Transaction Could Not Be Financed Until the Trustee Was Able to Deliver Insurable Title.**

[¶ 13]  Following entry of the Sale Order, Build continued to devote substantial time and resources toward completing the acquisition approved by this Court. Build remained actively engaged with prospective lenders, financial participants, and potential investment sources in order to complete the $11,265,000 acquisition.

[¶ 14]  As is customary in sophisticated commercial real estate finance, each prospective institutional lender required issuance of a standard ALTA lender's title insurance policy insuring the priority and enforceability of its mortgage lien as a condition to funding. Likewise, Build reasonably expected to receive a customary owner's title insurance policy insuring its ownership interest.

[¶ 15]  These requirements were not unique to Build or imposed by any unusual financing arrangement. Rather, they reflect longstanding and universally accepted underwriting practices within the commercial real estate lending industry. Investors and institutional lenders do not advance millions of dollars secured by commercial real estate without receiving an insured first-

priority mortgage lien through a lender's title insurance policy issued by a nationally recognized title insurance underwriter.

[¶ 16] Because institutional lenders invest their own capital and assume the risks associated with commercial lending, they independently evaluate title and underwriting matters before committing funds. Build had no ability to compel any lender or title insurance underwriter to disregard its own underwriting standards or accept title that the underwriter concluded could not be insured under the existing Sale Order. Similarly, purchasers acquiring commercial real estate customarily receive an owner's title insurance policy insuring that the buyer has acquired marketable title under the laws of the state where the property is located. Build acknowledges that its potential lenders had additional standard requirements that needed to be completed, such as an interview with the Trustee, a tour of the Property, and a Phase I Environmental Site Assessment, before it could advance funds for the closing.  Build transparently advised the Trustee of this. However, the extension necessary for the additional bankruptcy court relief to provide marketable title and a standard title insurance policy could be completed contemporaneously with the potential lenders' requirements.

[¶ 17]  After Chicago Title concluded that it could not issue such policies under the existing Sale Order, Build did not abandon the transaction. Instead, at the Trustee's invitation, Build undertook substantial additional efforts to identify another title insurance underwriter willing to insure the transaction under the existing Sale Order. Those efforts ultimately resulted in First Dakota Title submitting the transaction to Old Republic for consideration.

[¶ 18]  Old Republic independently concluded that additional bankruptcy relief would be required before the Trustee could convey marketable title under South Dakota law and it could issue customary title insurance, thereby confirming that the issue arose from the sufficiency of the

7

existing Sale Order itself rather than from any lender-specific underwriting requirement unique to Build. First Dakota Title communicated Old Republic's conclusions and requirements to the parties on July 6 literally at the same time the Trustee was demanding that closing occur.

**F.      Build Requested an Extension to Complete the Court-Approved Sale.**

[¶ 19]  Build requested a limited extension of the contractual closing deadline to permit the Trustee sufficient time to obtain whatever additional bankruptcy relief Old Republic determined was necessary before customary title insurance could be issued and the same time Build was completing the requirements of its prospective lenders. The requested extension was sought solely to permit completion of the Court-approved transaction after the Trustee obtained the additional relief. Build advised the Trustee that, upon entry of the additional order requested by the substitute title insurer, it remained prepared to proceed promptly to closing in accordance with the Purchase Agreement.

[¶ 20]  Build advised that it remained ready, willing and able to complete the purchase promptly upon resolution of the title issue and expressly reaffirmed its commitment to closing under the Purchase Agreement. At no time did Build repudiate the Purchase Agreement or advise the Trustee that it no longer intended to purchase the Property.

**G.      Old Republic Independently Confirmed That Additional Bankruptcy Relief Was Required.**

[¶ 21]  Pursuant to the Trustee's invitation to seek another title insurer, First Dakota Title thereafter submitted the transaction to Old Republic National Title Insurance Company.

[¶ 22]  On July 6, 2026, Old Republic issued its title commitment.

[¶ 23]  Unlike Chicago Title, Old Republic did not require that matters related to the bankruptcy proceedings be excepted from coverage. It nevertheless independently concluded that

8

the existing Sale Order was insufficient to convey marketable title under South Dakota law and to permit issuance of a standard title insurance policy.

[¶ 24]   Specifically, Old Republic required as a condition of issuing title insurance: "An updated order of the Bankruptcy Court specifically identifying the judgments, liens, and lis pendens from which the Property is being sold free and clear, together with sufficient authority for the release of the lis pendens affecting the Property. Proper notice of the order must have been given, and the applicable appeal period must have expired."

[¶ 25]   Build immediately notified the Trustee of Old Republic's position and requested an extension to permit the Trustee to obtain the additional bankruptcy relief identified by Old Republic so the Court-approved transaction could proceed to closing.

## H.      Rather Than Resolve the Title Issue, the Trustee Declared Build in Default.

[¶ 26]   By the contractual closing date, two separate national title insurance underwriters—Chicago Title and Old Republic—had independently concluded that additional bankruptcy relief was required before customary title insurance could be issued under the existing Sale Order. First Dakota Title communicated those conclusions to the Trustee, and Build in turn requested an extension to permit the Trustee to obtain the necessary relief, and reaffirmed its willingness to close. Notwithstanding those circumstances, the Trustee insisted that Build close on the contractual closing date without obtaining the additional relief identified by Old Republic and rejected Build's request for an extension.

[¶ 27]   On July 7, 2026, the Trustee served Build with a Notice of Default asserting that Build had failed to close by the contractual closing date and that the Trustee was entitled to retain all earnest money as liquidated damages.  However, Build's obligation to close was conditioned on the Trustee being able to convey title in fee simple to all of the Property, free and clear of any

9

and all liens and encumbrances, The Notice of Default did not acknowledge—much less address—the independent underwriting determinations made by Chicago Title and Old Republic that additional bankruptcy relief was necessary before customary title insurance could be issued. Upon information and belief, the Trustee communicated directly with First Dakota Title to discuss the transaction and title matters.

**I.      Hours After Declaring Build in Default, the Trustee Filed the Present Motion.**

[¶ 28]  Later on July 7, 2026, the Trustee filed the pending Motion to Amend the Sale Order pursuant to Rule 60(a). In that Motion, the Trustee advised this Court that the title insurance company had requested an order "specifically identifying all liens and encumbrances" from which the Property was being sold free and clear and acknowledged that the amended order was being sought in response to that underwriting requirement. The Motion further acknowledges South Dakota's statutory recording requirements and explains that the proposed title insurer requested an order identifying the liens transferring the sale proceeds before issuing title insurance. Thus, within hours of declaring Build in default for failing to close under the existing Sale Order, the Trustee sought additional relief from this Court because the existing Sale Order did not satisfy the requirements identified by the title insurer, preventing the Trustee from closing with *any* buyer.

[¶ 29]  The Trustee's Motion, based on an assertion of clerical matters and Rule 60 is presently before the Court.

**<u>ARGUMENT</u>**

**A.      The Trustee's Motion Confirms That Additional Bankruptcy Relief Was Required Before the Court-Approved Sale Could Be Consummated.**

[¶ 30]  *The chronology is undisputed.* Chicago Title concluded the existing Sale Order would not support issuance of customary title insurance without excepting all liens, encumbrances, and bankruptcy proceedings. At the Trustee's request, Build sought another national title insurance

10

underwriter. Old Republic independently reached substantially the same conclusion. Build requested sufficient time for the Trustee to obtain the additional bankruptcy relief identified by Old Republic, which would have aligned with the remaining time needed to finalize financing, including the issuance of a lender's title insurance policy. Rather than pursue that relief before declaring a default and cooperating in good faith with the Successful Bidder, the Trustee declared Build in default and sought to retain more than $1.1 million of Build's earnest money. Only thereafter did the Trustee file the present Motion seeking the very relief that Old Republic had identified as necessary to close the transaction.

[¶ 31]  The Trustee's Motion fundamentally alters the posture of this dispute. Prior to filing the Motion, the Trustee consistently maintained that the existing Sale Order was sufficient to permit closing and that Build's inability to close was tantamount to a refusal and constituted a default under the Purchase Agreement. The Motion, however, concedes that additional relief from this Court is required before the Trustee can perform his obligations under the Purchase Agreement, customary title insurance may issue, and the transaction can proceed in the ordinary course.

[¶ 32]  The Motion is therefore inconsistent with the Trustee's prior position. If the existing Sale Order was sufficient, there would be no reason to seek amendment. Conversely, if amendment is necessary to permit consummation of the transaction, Build cannot reasonably be characterized as being in default. Nor should Build's good faith deposit and earnest money be subject to any claim of forfeiture.

**B.      Rule 60(a) Does Not Permit the Substantive Relief Requested by the Trustee.**

[¶ 33]  The Trustee seeks to characterize this matter as a narrow Rule 60(a) motion correcting an omission in the Sale Order. Federal Rule of Civil Procedure 60(a), made applicable

11

by Federal Rule of Bankruptcy Procedure 9024, authorizes correction of clerical mistakes, transcription errors, or omissions arising from oversight. It does not authorize substantive modification of a final order or permit the Court to alter the parties' substantive rights after entry of judgment.

[¶ 34]  The Trustee characterizes the requested amendment as correcting an "omission." The substance of the Motion demonstrates otherwise.

[¶ 35]  The original Sale Order authorized a sale free and clear under 11 U.S.C. § 363(f). The proposed amended order would identify specific judgments, liens, and lis pendens, specify the treatment of those interests, and provide the additional authority under South Dakota law requested by the title insurer before it will issue customary title insurance. Those provisions do not merely correct a clerical oversight. They provide substantive relief that did not previously exist and are sought because third parties have concluded the existing Sale Order is insufficient to convey marketable title.

[¶ 36]  Whether or not the Court ultimately concludes that such relief should be granted, the requested amendment is substantive in nature. It therefore cannot simultaneously be characterized as both unnecessary for closing and merely ministerial.

## C.   The Trustee Cannot Declare Build in Default for Requesting the Time Necessary for the Trustee to Perform His Own Obligations.

[¶ 37] The Purchase Agreement obligated the Trustee to convey fee simple title by trustee's deed, free and clear of liens and encumbrances except for the Permitted Title Exceptions. If the Trustee could not do so, the Trustee is in default.  When Chicago Title concluded that the existing Sale Order would not support issuance of customary title insurance, the Trustee did not dispute that conclusion, seek clarification from the Court, or insist that the underwriter had

12

misinterpreted the Sale Order. Instead, the Trustee directed Build to locate another title insurer. Build complied.

[¶ 38]   Old Republic independently reached substantially the same conclusion and advised that an amended bankruptcy order identifying the judgments, liens, and lis pendens was necessary before customary title insurance could be issued. Again, Build did not abandon the transaction. It communicated Old Republic's conclusions to the Trustee and in good faith requested an extension so the Trustee could obtain the additional relief that only the Trustee could seek from this Court.

[¶ 39]   Under these circumstances, the Trustee cannot reasonably characterize Build's conduct as a default. Build did precisely what the Trustee requested. It devoted substantial time and expense attempting to preserve the Court-approved transaction, continued pursuing financing, remained prepared to close, and sought only the time necessary for the Trustee to obtain the additional judicial relief that the Trustee now acknowledges is appropriate.

[¶ 40]   Fundamental principles of contract law and equity do not permit one contracting party to declare a default based upon the other party's insistence that the first party complete the performance that it is simultaneously asking the Court to authorize.

**D.      Equity Strongly Favors Preserving the Court-Approved Transaction Rather Than Rewarding the Trustee's Inconsistent Positions.**

[¶ 41]   Bankruptcy sales exist to maximize value for creditors while ensuring fairness and confidence in the judicial sale process.

[¶ 42]   Build was the successful bidder at $11,265,000—substantially exceeding the backup bid approved by the Court. Throughout the events described above, Build consistently expressed its willingness to complete the transaction on the terms approved by this Court. It never sought to escape the Purchase Agreement. Instead, it sought an extension to permit resolution of

13

an issue that two independent national title insurance underwriters determined required additional bankruptcy relief.

[¶ 43]  Permitting the Trustee to retain more than $1.1 million in earnest money after acknowledging the necessity of the very relief Build requested would produce an inequitable result. It would effectively reward the Trustee for maintaining inconsistent positions: first insisting that no amendment was necessary and declaring Build in default, then seeking the very amendment that Build requested be obtained before closing so that the Trustee can perform its obligation to convey marketable title. Equity does not support that result.

[¶ 44]  While couched merely as a clerical omission, the real issues here fundamentally revolve around contract and equitable issues that include the resolution of disputes with respect to: whether the Trustee defaulted under the Purchase Agreement; whether Build defaulted under the Purchase Agreement; whether the Trustee properly declared a default; whether the Purchase Agreement has been terminated or remains enforceable; whether the Trustee may retain Build's earnest money; and whether Build is entitled to specific performance or other equitable relief. None of those issues is or can be properly resolved through the Trustee's Rule 60 Motion.

[¶ 45]  The Trustee's Motion should not be construed as limiting or affecting any contractual remedies available to either party under the Purchase Agreement should subsequent proceedings become necessary. Accordingly, even if the Court concludes that amendment of the Sale Order is appropriate, the Court should expressly limit its ruling to the requested amendment and make clear that it is not adjudicating or prejudicing the parties' respective rights under the Purchase Agreement. Issues concerning the Trustee's inability to close, Build's alleged default, the Trustee's declaration of default, termination or continued enforceability of the Purchase Agreement, disposition of the earnest money deposit, specific performance, damages, attorneys'

14

fees and costs under the Purchase Agreement, and any related contractual or equitable claims are beyond the scope of the Trustee's Rule 60 Motion and should remain expressly reserved. *See generally* 11 U.S.C. § 105; Fed. R. Bankr. P. 7001.

**E.    If the Court Determines That Amendment Is Appropriate, Any Relief Should Be Conditioned Upon Restoration of the Parties to Their Pre-Default Positions.**

[¶ 46]   Build's primary position is that the Motion should be denied at this point and time and deferred pending resolution of all issues.

[¶ 47]   If, however, the Court concludes that amendment of the Sale Order is appropriate, the Court should also recognize that the Motion necessarily establishes that additional relief was required before the Trustee could close the sale. If the Court grants the requested amendment, Build respectfully requests that the Court expressly provide that the amended Sale Order shall not be construed as determining, impairing, or prejudicing any contractual or equitable rights of the parties arising under the Purchase Agreement, including without limitation issues relating to alleged default, termination, earnest money, specific performance, or other related claims.

[¶ 48]   Accordingly, any amended order should also expressly provide that (i) the amended Sale Order shall not determine or prejudice the parties' contractual or equitable rights under the Purchase Agreement; (ii) the Trustee shall not consummate any sale of the Property to any other purchaser absent further order of the Court; (iii) Build's earnest money deposit shall remain in escrow and shall not be released or disbursed absent further order of the Court; and (iv) all issues concerning default, termination, specific performance, and disposition of the earnest money shall remain expressly reserved pending further proceedings. *See* 11 U.S.C. § 105.

## CONCLUSION

[¶ 49]   For the foregoing reasons, Build respectfully requests that the Court deny the Trustee's Motion to Amend Order Approving Sale Free and Clear of Liens and Encumbrances. In

15

the alternative, if the Court grants the requested amendment, Build respectfully requests that the Court expressly provide that the amended Sale Order shall not be construed as adjudicating or prejudicing the parties' respective contractual or equitable rights under the Purchase Agreement and applicable law, including without limitation issues relating to alleged default, termination, disposition of the earnest money deposit, specific performance, or any related claims. Pending resolution of those issues, the Trustee should be prohibited from consummating a sale of the Property to any alternative purchaser or disbursing Build's earnest money deposit absent further order of this Court.

Dated this 13th day of July, 2026.

*/s/ Douglas W. Murch*
Douglas W. Murch, ND ID #05983
CONMY FESTE LTD.
3369 45th Street South
Fargo, ND  58104
(701) 293-9911
dmurch@conmylaw.com

ATTORNEY FOR BUILD, LLC

16

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>The Ruins, LLC,<br><br>       Debtor. | Bankruptcy Case No.:  25-30004<br><br>Chapter 7 |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that she is an employee at the law firm of Conmy Feste Ltd., and is a person of such age and discretion as to be competent to serve papers.

That on July 13, 2026, she served a copy of:

**OBJECTION TO MOTION TO AMEND ORDER APPROVING SALE
FREE AND CLEAR OF LIENS AND ENCUMBRANCES**

electronically by Notice of Electronic Filing upon all parties who have requested service in this case by filing the same via ECF with the Bankruptcy Court in the District of North Dakota.

/s/ *Leslyn A. Anderson*
Leslyn A. Anderson